## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| MARK A. WALDROP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. ___4:16-cv-235-HLM___ |
| | ) | |
| COMMUNITY HEALTH SYSTEMS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Mark A. Waldrop (hereinafter "Mr. Waldrop"), by and through counsel and pursuant to Federal Rules of Civil Procedure 7 through 11, states as follows for his cause of action against Defendant:

1.     Mr. Waldrop is an individual and resident of Hamilton County, Tennessee.

2.     Defendant is a Georgia nonprofit corporation having a principal office located at 213 Third Street, Macon, Georgia 31201 and may be served with process through Defendant's registered agent Angela Hammack at 213 Third Street, Macon, Georgia 31201.

3.     The Court has subject matter jurisdiction over Mr. Waldrop's claims

1

under 28 U.S.C. § 1332 because Mr. Waldrop and Defendant are citizens of different States and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      The Court has jurisdiction over Defendant under Federal Rule of Civil Procedure 4(k)(1) because Defendant is deemed to be a resident of the State of Georgia.

5.      Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Waldrop's claims occurred in Whitfield County, Georgia.

6.      As of June 20, 2006, Mr. Waldrop and Defendant entered into the Employment Agreement of Mark A. Waldrop (hereinafter "Employment Agreement").

7.      The Employment Agreement was amended and restated as of January 1, 2009.

8.      A true and exact copy of the amended and restated Employment Agreement as of January 1, 2009 is attached hereto as *Exhibit 1*.

9.      Under Paragraph 1 of the Employment Agreement, Mr. Waldrop agreed to "serve as the Executive Vice President, Integration Services" for Defendant.

10.     Section 2.1 of the Employment Agreement provides:

Unless earlier terminated pursuant to Sections 2.2-2.6 below, the initial term of [Mr. Waldrop]'s employment under this [Employment] Agreement began on January 1, 2006 and shall continue until December 31, 2006 (the "Initial Term"); provided that such Initial Term shall be automatically extended for additional periods of one (1) year commencing on January 1, 2007 and each anniversary thereof (such period or periods, the "Renewal Term"), unless either party shall have given notice to the other party at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term (as the case may be) that such party does not desire to extend the term of this [Employment] Agreement, in which event, the employment would terminate on December 31 of the Initial Term or applicable Renewal Term (as the case may be) (the Initial Term and the Renewal Term or Terms, if applicable, collectively, the "Term").

11.     Section 2.4 of the Employment Agreement provides:

[Defendant] may terminate [Mr. Waldrop]'s employment hereunder for Cause upon prior written notice of termination to [Mr. Waldrop] with such Cause being specific in such notice.   As used herein, "Cause" shall mean (i) [Mr. Waldrop]'s act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to [Defendant] or its reputation; (ii) [Mr. Waldrop]'s conviction of, pleading guilty to, or confessing to any felony; or (iii) [Mr. Waldrop]'s failure to observe or perform any material covenant, condition, or provision of this [Employment] Agreement or of [Defendant]'s written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to [Mr. Waldrop] by [Defendant].

12.     Section 2.5 of the Employment Agreement provides:

        (a)     [Defendant] may terminate [Mr. Waldrop]'s employment hereunder without Cause by giving [Mr. Waldrop] 30 days' prior written notice thereof.

3

(b)     In the event of [Defendant]'s termination of employment without Cause, as severance pay [Defendant] shall, subject to Section 2.8 below, continue to pay the Salary to [Mr. Waldrop] for (1) year. Such severance pay shall be payable in equal installments and in accordance with the regularly recurring pay periods established by [Defendant] but in no even less frequently than monthly.

13.     Section 2.7 of the Employment Agreement provides:

Upon termination of employment, all obligations of [Defendant] under this [Employment] Agreement shall terminate except with respect to (i) payment of compensation earned to the date of termination, (ii) any severance payments required to be paid under Section 2 of this [Employment] Agreement, (iii) reimbursement of expenses incurred prior to the date of termination of employment to which [Mr. Waldrop] would have been entitled under this [Employment] Agreement, and (iv) any unpaid vested amounts or benefits to which [Mr. Waldrop] would have been entitled as of the date of [Mr. Waldrop]'s  date of termination pursuant to any benefit plan.  In addition to the foregoing, (a) upon termination of employment pursuant to Section 2.5 and for the duration of the severance period set forth in Section 2.5(b), [Mr. Waldrop] shall be provided benefits, at no cost to [Mr. Waldrop], substantially similar to the employee benefits being provided to [Mr. Waldrop] at the time of such termination; and (b) upon termination of employment for any other reason, or immediately following the severance period set forth in Section 2.5(b), as applicable, [Mr. Waldrop] shall have the option to purchase continuation coverage as to any [Defendant]-provided medical, dental or vision plan in which he participates, such option being in addition to any legally-mandated rights [Mr. Waldrop] may have to COBRA continuance coverage as to any [Defendant]-provided medical, dental or vision plan in which [Mr. Waldrop] participates.

14.     Section 3 of the Employment Agreement provides:

For all services which [Mr. Waldrop] renders to [Defendant] during the Term, [Mr. Waldrop] shall receive from [Defendant] an annual salary as of January 1, 2009 (the "Salary") of $562,680, less normal

withholdings.  The Salary shall be paid to [Mr. Waldrop] on the regularly recurring pay periods established by [Defendant], but in no event less frequently than monthly.  The amount of the Salary shall be reviewed annually by the Board of Directors of [Defendant] for, at the discretion of the Board of Directors of [Defendant], possible increases in such amount.

15.   Section 6.1 of the Employment Agreement provides, in relevant part:

(a)   "Business" shall mean:  (a) the provision of rehabilitative therapy, medical and personal support services, home care, medical or pharmaceutical supplies or case management services; (b) the leasing, ownership, management or operation of nursing facilities or assisted living facilities ("assisted living facilities" being known under Section 31-712 of the Official Code of Georgia Annotated as "personal care homes"); (c) the operation and management of a health care cooperative; (d) the operation and management of one or more captive insurance companies; and (e) other activities or provision of products or services being conducted or provided, as applicable, or which [Defendant] has active plans to pursue, at the time of termination of [Mr. Waldrop]'s employment.

(b)   "Competing Business" shall mean any person or entity which engages in a business substantially the same as the Business or any portion thereof.

. . .

(f)   "Territory" shall mean the State of Georgia.

16.   Section 6.4 of the Employment Agreement provides:

Except as set forth in <u>Exhibit 6.4</u> attached hereto, [Mr. Waldrop] further covenants and agrees that, during the Term and for a period of twenty four (24) months thereafter, [Mr. Waldrop] shall not, without [Defendant]'s prior written consent, serve as an operations manager, an executive vice president of integration services or in any other position requiring [Mr. Waldrop] to perform some or all of the duties that [Mr. Waldrop] was performing for [Defendant] at the time this [Employment] Agreement is terminated in the Territory for any Com-

5

peting Business.

17.   Exhibit 6.4 of the Employment Agreement provides:

1.   Section 6.4 of this [Employment] Agreement shall not prohibit [Mr. Waldrop] from the continued ownership, operation or use of any real or personal property owned by [Mr. Waldrop] at the time of termination of [Mr. Waldrop's] employment hereunder.

2.   In the event that [Mr. Waldrop]'s employment is terminated by [Defendant] without Cause under Section 2.5 of this [Employment] Agreement, then Section 6.4 of this [Employment] Agreement shall automatically terminate.

18.   Section 17 of the Employment Agreement provides, "If either party to this [Employment] Agreement breaches any terms hereof, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorney's fees, incurred by that party in enforcing the terms of this [Employment] Agreement."

19.   During Mr. Waldrop's employment with Defendant under the Employment Agreement, Mr. Waldrop worked out of Defendant's office in Dalton, Whitfield County, Georgia.

20.   From and after January 1, 2009, Defendant's Board of Directors raised the amount of Mr. Waldrop's salary on several occasions.

21.   Defendant eventually promoted Mr. Waldrop to the position of chief operating officer.

22.     As of June 28, 2016, Mr. Waldrop's salary was $1,045,665.17 per year.

23.     As of June 28, 2016, Mr. Waldrop had accumulated eighteen days in unpaid leave benefits in the amount of $72,392.20.

24.     Joseph A. Wall (hereinafter "Mr. Wall") is one of Defendant's representatives.

25.     On June 28, 2016, Mr. Wall invited Mr. Waldrop to a meeting in Atlanta, Georgia.

26.     At the June 28, 2016 meeting, Mr. Wall advised Mr. Waldrop that Mr. Waldrop's employment with Defendant was terminated immediately.

27.     Mr. Wall did not give Mr. Waldrop any explanation or reason for Mr. Waldrop's termination on June 28, 2016.

28.     On July 1, 2016, Mr. Waldrop sent a letter (hereinafter "Waldrop Letter") to Wall and Defendant's counsel.

29.     A true and exact copy of the Waldrop Letter is attached hereto as *Exhibit 2*.

30.     In the Waldrop Letter, Mr. Waldrop requests an explanation for Defendant's termination of Mr. Waldrop's employment.

31.     In response, Defendant's counsel sent a letter ("Defendant Letter") to

Mr. Waldrop on July 6, 2016.

32.    A true and exact copy of the Defendant Letter is attached hereto as *Exhibit 3*.

33.    The Defendant Letter confirms that Defendant terminated Mr. Waldrop's employment "effectively immediately on June 28, 2016" and offers to provide Mr. Waldrop with separation benefits.

34.    The separation benefits offered in the Defendant Letter are less than the severance benefits for a termination without cause under the amended and restated Employment Agreement.

35.    The Defendant Letter does not state any "Cause" or disclose the reason for Mr. Waldrop's termination.

36.    As of the date of this Complaint, Defendant has not provided any written notice to Mr. Waldrop regarding the termination of Mr. Waldrop's employment, nor any notice of any cause for Mr. Waldrop's immediate termination on June 28, 2016.

## COUNT ONE:  BREACH OF CONTRACT

37.    Mr. Waldrop repeats the allegations in Paragraphs 1 through 36 as if fully realleged in this Paragraph.

38.    The Employment Agreement constitutes an enforceable contract be-

8

tween Mr. Waldrop and Defendant.

39.    By failing to provide prior written notice of Mr. Waldrop's termination, Defendant has breached Sections 2.4 and 2.5(a) of the Employment Agreement.

40.    By failing to provide prior written notice of any cause for the termination of Mr. Waldrop's employment, Defendant has breached Section 2.4 of the Employment Agreement.

41.    By failing to provide prior written notice and an opportunity for Mr. Waldrop to remedy any cause for the termination of Mr. Waldrop's employment, Defendant has breached Section 2.4 of the Employment Agreement.

42.    As a direct and proximate cause of Defendant's breaches of the Employment Agreement, Mr. Waldrop has been and continues to be damaged.

43.    Because the termination of Mr. Waldrop's employment was without prior written notice, and without prior written notice with Cause being specified in such notice, Mr. Waldrop is entitled to the following damages under Section 2.7 of the Employment Agreement: (i) any unpaid salary through June 28, 2016; (ii) $1,045,665.17 in salary payments for one year to be paid no less frequently than monthly; (iii) any unreimbursed expenses incurred by Mr. Waldrop prior to June 28, 2016; (iii) eighteen days in unpaid leave benefits totaling $72,392.20; and (iv)

benefits, at no cost to Mr. Waldrop, substantially similar to the employee benefits being provided to Mr. Waldrop as of June 28, 2016, including, but not limited to, medical benefits, dental benefits, vision benefits, disability and life insurance, and long-term health care insurance.

44.    As the non-defaulting party under the Employment Agreement, Mr. Waldrop is also entitled to costs, expenses, and attorney's fees under Section 17 of the Employment Agreement.

## COUNT TWO:  DECLARATORY JUDGMENT

45.    Mr. Waldrop repeats the allegations in Paragraphs 1 through 44 as if fully realleged in this Paragraph.

46.    As evidenced by the Waldrop Letter and Defendant Letter, there is an actual controversy regarding Mr. Waldrop's rights under the Employment Agreement pursuant to 28 U.S.C. § 2201(a).

47.    In light of the terms of the Employment Agreement and contents of the Waldrop Letter and Defendant Letter, Mr. Waldrop requests that the Court enter a declaratory judgment confirming that Defendant's termination of Mr. Waldrop was without prior written notice of termination and without prior written notice of Cause under Section 2.5 of the Employment Agreement.

48.    Since Defendant's termination of Mr. Waldrop was without cause, the

Court should declare that: (i) the noncompetition covenant under Section 6.4 is automatically terminated as of June 28, 2016 in accordance with Paragraph 2 of Exhibit 6.4 to the Employment Agreement; and (ii) Mr. Waldrop is entitled to any other rights arising out of Mr. Waldrop's termination without prior written notice and prior written notice of cause under the Employment Agreement.

WHEREFORE, in light of the foregoing, Mr. Waldrop respectfully requests that the Court:

1.      Issue process and cause process to be served on Defendant;

2.      Enter a judgment in favor of Mr. Waldrop and against Defendant for any unpaid salary payments through June 28, 2016 under Section 2.5 of the Employment Agreement;

3.      Enter a judgment in favor of Mr. Waldrop and against Defendant for $1,045,665.17 in salary payments for one year to be paid no less frequently than monthly under Section 2.5 of the Employment Agreement;

4.      Enter a judgment in favor of Mr. Waldrop and against Defendant for any unreimbursed expenses incurred by Mr. Waldrop prior to June 28, 2016 under Section 2.5 of the Employment Agreement;

5.      Enter a judgment in favor of Mr. Waldrop and against Defendant for eighteen days of unpaid leave benefits in the amount of $72,392.20 under Section

2.5 of the Employment Agreement;

6.    Enter a judgment in favor of Mr. Waldrop and against Defendant for benefits substantially equivalent to the employee benefits being provided to Mr. Waldrop as of June 28, 2016 under Section 2.5 of the Employment Agreement, at no cost to Mr. Waldrop, substantially similar to the employee benefits being provided to Mr. Waldrop as of June 28, 2016, including, but not limited to, medical benefits, dental benefits, vision benefits, disability and life insurance, and long-term health care insurance;

7.    Declare that Defendant's termination of Mr. Waldrop was without cause under Section 2.5 of the Employment Agreement;

8.    Declare that the noncompetition covenant in Section 6.4 of the Employment Agreement was automatically terminated on June 28, 2016 pursuant to the provisions of Exhibit 6.4 of the Employment Agreement;

9.    Declare that Mr. Waldrop is entitled to all rights arising out of Mr. Waldrop's termination without cause under the Employment Agreement;

10.    Award Mr. Waldrop costs, expenses, and attorney's fees under Section 17 of the Employment Agreement;

11.    Tax all costs to Defendant; and

12.    Grant Mr. Waldrop such further relief that the Court deems equitable

and just.

Respectfully submitted,

GEARHISER, PETERS, ELLIOTT &
   CANNON, PLLC

By: s/Gary L. Henry           
   R. Wayne Peters (Ga. Bar #573700)
      (wpeters@gearhiserpeters.com)
   Gary L. Henry (Ga. Bar #107821)
      (ghenry@gearhiserpeters.com)
320 McCallie Avenue
Chattanooga, Tennessee 37402
Telephone:  (423) 756-5171
Facsimile:  (423) 266-1605
*Attorneys for Plaintiff Mark A. Waldrop*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this document has been prepared with one of the font and point selections approved by the Court in Civil Local Rule of Practice 5.1B.

GEARHISER, PETERS, ELLIOTT &
   CANNON, PLLC

By: s/Gary L. Henry           

*Execution Version*

# EMPLOYMENT AGREEMENT
## OF MARK A. WALDROP

THIS EMPLOYMENT AGREEMENT (as amended and restated herein, this "Agreement") is made and entered into as of the 26 day of *June* , 2006, and is now amended and restated as of January 1, 2009, by and between Community Health Systems, Inc., a Georgia nonprofit corporation (the "Company"), and the undersigned employee, Mark A. Waldrop, a resident of the State of Tennessee ("Employee").

WITNESSETH:

WHEREAS, the Company desires to continue to employ Employee and Employee desires to accept such continued employment on the terms and conditions hereinafter stated; and

WHEREAS, Company and Employee now wish to update the Agreement in order to establish its compliance with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), with the understanding that this Agreement supersedes all prior versions and hereinafter shall solely establish the terms of Employee's employment with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1.    Employment.  Employee shall serve as the Executive Vice President, Integration Services and shall perform the duties set forth on Exhibit 1 attached hereto, in addition to those duties reasonably assigned to Employee from time to time by the President of the Company or the Board of Directors of the Company.  Employee shall be employed on a full-time basis and shall report directly to the President of the Company.  Employee shall be subject to the Company's policies and procedures in effect from time to time.  Employee shall perform the duties assigned to him faithfully, diligently and to the best of his ability, and Employee shall not engage in any outside employment without the express written consent of the Board of Directors of the Company.

2.    Term of Employment.

2.1    Term.  Unless earlier terminated pursuant to Sections 2.2-2.6 below, the initial term of Employee's employment under this Agreement began on January 1, 2006 and shall continue until December 31, 2006 (the "Initial Term"); provided that such Initial Term shall be automatically extended for additional periods of one (1) year commencing on January 1, 2007 and each anniversary thereof (such period or periods, the "Renewal Term"), unless either party shall have given notice to the other party at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term (as the case may be) that such party does not desire to extend the term of this Agreement, in which event, the employment would terminate on December 31 of the Initial Term or the applicable Renewal Term (as the case may be) (the Initial Term and the Renewal Term or Terms, if applicable, collectively, the "Term").

2.2    Termination upon Death.  Employee's employment hereunder shall automatically terminate upon the death of Employee.  In the event of termination of employment upon death,

**EXHIBIT 1**

ATLANTA:5093463.1

the Company shall pay to Employee's estate an amount equal to six (6) months' Salary (as defined below) payable in a lump sum within 60 days of the Employee's death.

2.3     Termination upon Disability.   The Company may terminate Employee's employment hereunder immediately upon Employee's Disability, which has lasted (or can reasonably be expected to last) for a period of six (6) consecutive months (except as prohibited by law). For purposes of this Agreement, "Disability" shall mean the inability of Employee, as determined by the Company's Board of Directors, to perform the essential functions of his regular duties and responsibilities, with or without reasonable accommodation, due to a medically determinable physical or mental illness.

2.4     Termination by the Company for Cause.   The Company may immediately terminate Employee's employment hereunder for Cause upon prior written notice of termination to Employee with such Cause being specified in such notice.  As used herein, "Cause" shall mean (i) Employee's act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to the Company or its reputation; (ii) Employee's conviction of, pleading guilty to, or confessing to any felony; or (iii) Employee's failure to observe or perform any material covenant, condition, or provision of this Agreement or of the Company's written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to Employee by the Company.

2.5     Termination by the Company without Cause.

(a)     The Company may terminate Employee's employment hereunder without Cause by giving Employee 30 days' prior written notice thereof.

(b)     In the event of the Company's termination of employment without Cause, as severance pay the Company shall, subject to Section 2.8 below, continue to pay the Salary to Employee for (1) year.   Such severance pay shall be payable in equal installments and in accordance with the regularly recurring pay periods established by the Company but in no event less frequently than monthly.

2.6     Termination by Employee.   Employee may terminate Employee's employment hereunder by giving the Company not less than 30 days' prior written notice thereof.

2.7     Effect of Termination of Employment.   Upon termination of employment, all obligations of the Company under this Agreement shall terminate except with respect to (i) payment of compensation earned to the date of termination, (ii) any severance payments required to be paid under Section 2 of this Agreement, (iii) reimbursement of expenses incurred prior to the date of termination of employment to which Employee would have been entitled under this Agreement, and (iv) any unpaid vested amounts or benefits to which Employee would have been entitled as of the date of Employee's date of termination pursuant to any benefit plan.   In addition to the foregoing, (a) upon termination of employment pursuant to Section 2.5 and for the duration of the severance period set forth in Section 2.5(b), Employee shall be provided benefits, at no cost to Employee, substantially similar to the employee benefits being provided to Employee at the time of such termination; and (b) upon termination of employment for any other reason, or immediately following the severance period set forth in Section 2.5(b), as applicable,

Employee shall have the option to purchase continuation coverage as to any Company-provided medical, dental or vision plan in which he participates, such option being in addition to any legally-mandated rights Employee may have to COBRA continuation coverage as to any Company-provided medical, dental or vision plan in which he participates.

2.8   <u>Code Section 409A Compliance</u>.  Notwithstanding anything in this Agreement to the contrary, if any benefit or amount payable to the Employee under Section 2 on account of Employee's termination of employment constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended or successor provision ("<u>409A</u>"), payment of such benefit or amount shall commence only when Employee incurs a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h).  Such payments or benefits shall be provided in accordance with the timing provisions of Section 2 by substituting the references to "termination of employment" or "termination" with "separation from service".  If at the time Employee incurs a separation from service Employee is a "specified employee" within the meaning of 409A, any benefit or amount payable to the Employee under Section 2 that constitutes nonqualified deferred compensation subject to 409A shall be delayed until the first day of the seventh month following the Employee's separation from service (the "<u>409A Suspension Period</u>").  Within 14 calendar days after the end of the 409A Suspension Period, the Company shall pay to the Employee (or his estate or beneficiary, as applicable) a lump sum payment in cash equal to any payments (without interest) that the Company would otherwise have been required to provide under this Agreement but for the imposition of the 409A Suspension Period.  Thereafter, Employee shall receive any remaining payments due under Section 2 in accordance with the terms of Section 2 (as if there had not been any suspension period beforehand).  For purposes of this Agreement, each payment that is part of a series of installment payments shall be treated as a separate payment for purposes of 409A.

3.   <u>Compensation</u>.  For all services which Employee renders to the Company during the Term, Employee shall receive from the Company an annual Salary as of January 1, 2009 (the "<u>Salary</u>") of $562,680, less normal withholdings.  The Salary shall be paid to Employee on the regularly recurring pay periods established by the Company, but in no event less frequently than monthly.  The amount of the Salary shall be reviewed annually by the Board of Directors of the Company for, at the discretion of the Board of Directors of the Company, possible increases in such amount.

4.   <u>Reimbursement of Business Expenses</u>.  The Company shall pay all reasonable and necessary travel and business expenses incurred by Employee directly related to Employee's performance of Employee's responsibilities and duties for the Company under this Agreement. Employee shall submit to the Company statements that justify in reasonable detail all expenses so incurred.  Employee shall submit all reimbursements hereunder for a particular calendar year no later than forty-five (45) days after it ends, and payment shall occur not later than March 15 immediately following the end of the calendar year to which the reimbursement relates.

5.   <u>Benefits</u>.

5.1   <u>Executive Benefits Program</u>.  The Company shall pay insurance premiums on behalf of Employee for health insurance for Employee and his dependents and for disability and life insurance, in such amounts as the Company from time to time may determine.

ATLANTA:5093463.1

5.2     <u>Standard Benefits</u>.  Employee shall be eligible to participate in any 401(k) plan in which the employees of the Company participate.  Employee shall also be entitled to participate in any other employee benefit plans and programs, to the same extent generally available to other similarly situated Company executives, in accordance with the terms of those plans and programs.

5.3     <u>Short Term Disability Payments</u>.

(a)     Irrespective of whether the Company purchases or maintains any disability insurance for Employee, should Employee become Disabled, then the Company shall provide to Employee short-term disability payments, as set forth in this Section 5.3.  During the first 180 days of a Disability, the Company will continue to pay to Employee his Salary commencing on the 6th day of such Disability.  During the first 5 days of such Disability, Employee must take sick days, vacation days or paid leave time to which he is entitled.  If Employee is not entitled to any more sick days, vacation days or paid leave time, then during the first 5 days of such Disability, Employee must take unpaid leave.  During the time period where Employee receives short-term disability benefit payments pursuant to this Section 5.3, Employee shall continue to be covered by all of the benefits and other provisions of the executive benefits program, if applicable, generally described above.

(b)     All such short-term disability benefit payments shall be made monthly on the appropriate regularly recurring pay periods established by the Company.  The short-term disability benefit payable from the Company shall be reduced by short-term disability benefit payments to Employee by insurance companies for which the premium is payable by the Company.

5.4     <u>Executive Leave Policy</u>.  During the Term, Employee shall be entitled to certain paid time off, as more fully described in the Company's Executive Leave Policy, a copy of which is attached hereto as <u>Exhibit 5.4</u>.

6.     <u>Restrictive Covenants</u>.

6.1     <u>Definitions</u>.

(a)     "Business" shall mean:  (a) the provision of rehabilitative therapy, medical and personal support services, home care, medical or pharmaceutical supplies or case management services; (b) the leasing, ownership, management or operation of nursing facilities or assisted living facilities ("assisted living facilities" being known under Section 31-712 of the Official Code of Georgia Annotated as "personal care homes"); (c) the operation and management of a health care cooperative; (d) the operation and management of one or more captive insurance companies; and (e) other activities or provision of products or services being conducted or provided, as applicable, or which the Company has active plans to pursue, at the time of termination of Employee's employment.

(b)     "Competing Business" shall mean any person or entity which engages in a business substantially the same as the Business or any portion thereof.

4

(c)  "Confidential Information" shall mean any data or information, other than Trade Secrets, that is valuable to the Company, any other member of the System or their respective affiliates and is not generally known by the public. To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, lists (whether or not in writing) of the Company's, any other member of the System's or their respective affiliates' current or potential customers, lists of and other information about the Company's, any other member of the System's or their respective affiliates' officers and employees, financial information (whether or not in writing) that has not been released to the public by the Company, any other member of the System or their respective affiliates, marketing techniques, price lists, pricing policies, and the Company's, any other member of the System's or their respective affiliates' business methods, contracts and contractual relations with the Company's, any other member of the System's or their respective affiliates' customers and suppliers and future business plans. Confidential Information also includes any information or data described above which the Company, any other member of the System or their respective affiliates obtain from another party and which the Company, any other member of the System or their respective affiliates treat as proprietary or designate as confidential information whether or not owned or developed by the Company, any other member of the System or their respective affiliates. "Confidential Information" shall not include any materials or information of the types specified above to the extent that such materials or information (i) are or become publicly known or generally utilized by others engaged in the same business or activities in which the Company, any other member of the System or their respective affiliates utilized, developed, or otherwise acquired such information; or (ii) are known to Employee prior to employment, having been lawfully received from parties other than the Company, any other member of the System or their respective affiliates; or (iii) are furnished to others by the Company, any other member of the System or their respective affiliates with no restriction on disclosure. Failure to mark any Confidential Information as confidential shall not affect its status as "Confidential Information" under this Agreement.

(d)  "Restricted Customer" shall mean any customer or client of the Company or its affiliates with whom Employee has had business contact during his employment with the Company.

(e)  "Trade Secrets" shall mean any information of the Company, any other member of the System or their respective affiliates, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product or service plans, or a list of actual or potential patients or suppliers, which is not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secrets also include any information described in this Section 6.1(e) which the Company or other members of the System or their affiliates obtain from another party which the Company or other members of the System or their affiliates treat as proprietary or designate as trade secrets, whether or not owned or developed by the Company, any other member of the System or their respective affiliates. Failure to mark any Trade Secrets as confidential shall not affect its status as a Trade Secret under this Agreement.

5

(f)     "Territory" shall mean the State of Georgia.

6.2     <u>Nondisclosure of Trade Secrets and Confidential Information</u>.  In the course of Employee's employment by the Company, Employee will have access to the Company's, other members of the System's or their respective affiliates' most sensitive and most valuable Trade Secrets and Confidential Information, the use, application or disclosure of any of which would cause substantial and possibly irreparable damage to the business and asset value of the Company, other members of the System or their respective affiliates.  Accordingly, Employee accepts and agrees to be bound by the following provisions:

(a)     During the Term and following the termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose, or permit any unauthorized person or entity access to, any Trade Secrets or any portion thereof so long as they remain Trade Secrets.

(b)     During the Term and for a period of two (2) years following termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by the Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose or permit any unauthorized person or entity access to, any Confidential Information or any portion thereof.

(c)     Without limiting the foregoing, Employee shall abide by the Company's policies and regulations, as established from time to time, for the protection of its Trade Secrets and Confidential Information.  Notwithstanding anything herein to the contrary, Employee shall be permitted to disclose Trade Secrets or Confidential Information if required by applicable law, provided that, in such case, Employee shall (i) furnish only that portion of the Confidential Information or Trade Secrets that he is advised by counsel is legally required to be disclosed, and (ii) provide the Company with prompt written notice of such request or requirement so that the Company may seek a protective order or other appropriate remedy.

(d)     Upon the request of the Company and in any event upon the termination of employment with the Company, Employee shall deliver to the Company all memoranda, notes, records, tapes, documentation, disks, manuals, files or other documents, and all copies thereof in any form, concerning or containing Confidential Information, Trade Secrets or Works (as defined below) that are in Employee's possession, whether made or compiled by Employee, furnished to Employee or otherwise obtained by Employee.

6.3     <u>Nonsolicitation of Customers and Employees</u>. Employee covenants and agrees that during the Term and for a period of eighteen (18) months thereafter, Employee shall not, directly or indirectly (whether on his own behalf or on behalf of any other person, as owner, partner, stockholder, investor, employee, officer, director, agent, independent contractor, associate, executive, consultant or licensor):

ATLANTA:5093463.1

(a)    (A) solicit, recruit, divert or take away or attempt to solicit, recruit, divert or take away any person that is an employee of the Company, any other member of the System or their respective affiliates and with whom Employee had personal contact during his employment under this Agreement, (B) encourage any person or entity (other than the Company, any other member of the System or their respective affiliates) to  solicit, recruit, divert or take away any such employee or (C) otherwise encourage any such employee to discontinue his or her employment with the Company, any other member of the System or their respective affiliates; or

(b)    solicit, recruit, divert or take away a Restricted Customer for the purpose of directly or indirectly providing, distributing or selling products or services similar to those provided, distributed or sold in the operation of the Business.

Nothing herein shall prohibit Employee (following the termination of this Agreement) from conducting solicitations of the general public for employment or for business not targeted specifically at Restricted Customers or employees of the Company or its affiliates.

6.4    Noncompetition Covenant.  Except as set forth on Exhibit 6.4 attached hereto, Employee further covenants and agrees that, during the Term and for a period of twenty four (24) months thereafter, he shall not, without the Company's prior written consent, serve as an operations manager, an executive vice president of integration services or in any other position requiring Employee to perform some or all of the duties that Employee was performing for the Company at the time this Agreement is terminated in the Territory for any Competing Business.

6.5    Ownership of Common Stock.  Notwithstanding anything in this Section 6 to the contrary, nothing contained herein shall prohibit Employee from owning not more than three percent (3%) of the common stock of any company whose common stock is publicly traded on a national securities exchange or in the over-the-counter market.

7.    Company Ownership of Works.

7.1    Definition of Works.  "Works" shall mean any and all works of authorship, code, inventions, improvements, discoveries, trademarks, technologies, and work product, whether or not patentable or eligible for copyright, trade secret or trademark protection, and in whatever form or medium and all derivative works thereof, and any and all rights, applications or registrations with respect thereto which are, have been or will be created, made, or developed by Employee:  (a) in the course of employment with the Company, (b) during Employee's regular business hours with the Company, (c) on the Company's premises, or (d) using the Company's resources or equipment.  Employee agrees to fully and promptly disclose in writing to the Company any such Works as such Works from time to time may arise.

7.2    Company Ownership of Works.  All Works are the property of the Company. Employee shall execute and deliver such confirmatory assignments, instruments, or documents as the Company deems necessary or desirable without requiring the Company to provide any further consideration therefor.  Employee agrees to and hereby does assign to the Company all right, title, and interest in and to any and all Works, including all worldwide copyrights, patent rights, trademark rights, and all trade secrets embodied therein.  Employee waives any and all rights  Employee  may  have  in  any  Works,  including  but  not  limited  to  the  right  to

7

*Execution Version*

acknowledgement as author. Employee agrees not to use or include in Works any copyrighted, restricted or protected code, specifications, concepts, trademarks, or trade secrets of any third party or any other information that Employee would be prohibited from using by any law or any confidentiality, non-disclosure or other agreement with any third party.

    7.3   <u>Further Assurances</u>.  Employee shall, without charge to the Company other than reimbursement of Employee's reasonable out-of-pocket expenses, execute and deliver all such further documents, including applications for patents, trademarks and copyrights, and perform such acts, at any time during or after the Term as may be necessary, to obtain patents, trademarks, or copyrights, or any other legal protection in respect of the Works and to vest title such Works in the Company, its successors, assigns, or designees.  Without limiting the generality of the foregoing, Employee further agrees to give all lawful testimony, during or after the Term, which may be required in connection with any proceedings involving any Works so assigned by Employee.

    8.    <u>No Conflicting Obligations to Third Parties</u>.

    Employee represents and warrants to the Company that Employee is not subject to any employment, non-disclosure, confidentiality, non-compete, or other agreement with any third party which would prevent or prohibit Employee from fulfilling Employee's duties for the Company.  If Employee is the subject of any such agreement, and has any doubt as to its applicability to Employee's position with the Company, Employee will provide a copy of such agreement to the Company so that the Company can make a determination as to its effect on Employee's ability to work for the Company.

    9.    <u>Remedies</u>.

    The restrictions contained in this Agreement are considered by the parties hereto to be fair and reasonable and necessary for the protection of the legitimate business interests of the Company.  It is recognized that damages in the event of breach of the provisions of this Agreement by Employee would be difficult, if not impossible, to ascertain, and it is therefore agreed that the Company, in addition to and without limiting any other remedy or right it may have, shall have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach.  The existence of this right shall not preclude any other rights and remedies at law or in equity which the Company may have.

    10.   <u>Notices</u>.

    Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally (including by facsimile, overnight courier or express mail service) or sent by registered or certified mail, postage or fees prepaid,

Company:

           Community Health Systems, Inc.
           213 Third Street
           Macon, Georgia 31201

Attention: Joseph A. Wall
Fax: (478) 743-4501

With a copy (which shall not constitute notice) to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia 30308
Attention: Mark S. Lange
Fax: (404) 815-2433

Employee:        Mark A. Waldrop
9686 Bowen Trail
Ooltewah, TN 37363
Fax: _____

or at such other address for a party as shall be specified by like notice. Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or the office of such party. Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth business day after the day it is so placed in the mail or, if earlier, the time of actual receipt.

11.      <u>Binding Agreement</u>.

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. This Agreement is a personal service agreement and may not be assigned in whole or in part by Employee without the prior written consent of the Company. The covenants of Employee contained in Section 7 shall be binding upon the heirs, beneficiaries, administrators, and executors of Employee.

12.      <u>Modifications and Amendments</u>. This Agreement shall not be modified or amended except by an instrument signed by both parties, which makes specific reference to this Agreement.

13.      <u>Waiver</u>. The failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or of any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver.

14.      <u>Severability</u>. If any provision or covenant, or any part thereof, of this Agreement should be held by any court to be invalid, illegal or unenforceable, either in whole or in part, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remaining provisions or covenants, or any part thereof, of this Agreement, all of which shall remain in full force and effect.

                                                           ATLANTA:5093463.1

15.    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all which together shall constitute one and the same instrument.

16.    Governing Law: Jurisdiction.

This Agreement and the rights and obligations of the parties to the Agreement will be determined in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.  The Company and Employee irrevocably consent to the exclusive jurisdiction and venue of the courts of any county in the State of Georgia and the district courts of Georgia, in any judicial proceeding brought to enforce this Agreement.  The parties agree that any forum other than the State of Georgia is an inconvenient forum and that a lawsuit (or non-compulsory counterclaim) brought by one party against another party in a court of any jurisdiction other than the State of Georgia should be forthwith dismissed or transferred to a court located in the State of Georgia.

17.    Attorney's Fees.

If either party to this Agreement breaches any terms hereof, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

18.    Interpretation.

This Agreement (including the Exhibits attached hereto) constitutes the complete understanding between the parties concerning the subject matter hereof, and all prior negotiations, representations and agreements having been merged into this Agreement.

***(Signatures on following page)***

*Execution Version*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth hereinabove.

"Company"

COMMUNITY HEALTH SYSTEMS, INC.

By: _____

Name: Ronnie D. Rollins
Title:   President

"Employee":

_____
Mark A. Waldrop

## EXHIBIT 1

Duties of Employee

**Overall Responsibility/Primary Objective/Summary**:  Manage the overall operations of each individual operating company to ensure the consistent application of Company policies (financial, business practices and people), operating philosophies, values and principles.  Work with the Business Unit Presidents to develop and implement plans for the successful integration of services to customers, systems, processes and people to accomplish the goals of the Company.

**Summary of Major Responsibilities**

**Board of Directors**
- Serve as Ex-Officio member of the Board of Directors' Systems Integration and Support Committee
- Coordinate documentation and presentations necessary for the Board of Directors

**Executive Committee and Steering Committee**
- Serve on Executive Committee and Steering Committee
- Assist all Steering Committee members in the coordination of all operating matters

**Financial Management**
- Work with the Executive Committee to review budgets and business goals and manage the business units to meet these goals
- Approve all contracts between business units and its clients

**Integration**
- Collaborate with Business Unit Presidents to launch cross Business Unit Initiatives that improve service to customers, revenue, compliance with regulation, efficiency/effectiveness, etc.
- Develop initiatives that encourage collaboration across business unit senior management and staff lines
- Bridge cultural and communications gaps across Business Units and work with Executive staff to mobilize joint teams as necessary

**Patient Centered Care**
- Establish partnerships among practitioners, aging/disabled customers and their families to ensure that decisions respect a customer's wants, needs and preferences
- Ensure that customers have the education and support needed to make decisions and participate in their own healthcare
- Enable transition to preventative healthcare, chronic care and care management in home and community based settings

**Human Resources Management**

- Directly and indirectly manage direct reports including the President, Ethica Health & Retirement Community; President, Health Distribution; President, Pharmacy Services; President, Integra Rehabilitation; President, Home & Community Services; Vice President, Human Resources; Director, Information Services; and Director of Project Management
- Establish goals for direct reports and ensure direct reports have goals established for their employees that correspond.  Manage performance toward achieving these goals
- Constantly evaluate the skill sets versus requirements of direct reports and make adjustments accordingly
- Provide leadership direction to the organization to ensure direct reports are optimally utilized
- Work with the VP, Human Resources, to review Human Resources initiatives and financial models to meet the needs of the organization

**Essential Job Functions:**

- Provide day-to-day leadership to the System that mirrors the mission, vision, and values of the organization
- Orchestrate transfer of best practice between Business Units
- Help identify and implement critical business and clinical synergies across the day-to-day operations of the System
- Monitor progress against the goals of the System and individual Business Units
- Analyze industry trends and look for business and revenue enhancement opportunities
- Monitor the operating and capital budget for each business unit in ways that direct effective forecasting and control of costs
- Work with Business Unit Presidents and Corporate leadership to redesign key processes and standardize policies and procedures
- Work with Business Unit Presidents to assure timely provision of skilled nursing, home and community based services in the most appropriate setting
- Participate in multiple state and national professional associations
- Perform other tasks as assigned by the President

## **EXHIBIT 5.4**

Executive Leave Policy

*See attached.*

*Execution Version*

# EXECUTIVE
# LEAVE
# POLICY

**May 2006**

## Executive Leave

The organization provides its eligible executives with an Executive Leave Policy that is designed to allow executives greater flexibility in planning their lives. Under the Executive Leave Policy, executives may use their leave days for vacation, sick leave, medical appointments, family illness or any leave of absence.

Executives are eligible immediately upon employment and leave may be taken any time during employment, with supervisory approval. Executives will receive their leave days at the beginning of each anniversary year and will be based on the number of continuous years of service on the executive's previous anniversary year. Leave days do not carry over to future years, and cannot be borrowed from future unearned leave.

The organization recognizes the importance of an executive taking time off from work to rest and relax and accordingly provides leave days as follows:

## Leave Days Available:

- Year One (1) thru Year Five (5)          20 days
- Year Six (6) thru Year Ten (10)          25 days
- After Tenth (10) Year and Beyond          30 days

All requests for Executive Leave must be in writing and approved by the President. In order to balance and meet organization needs, executives should provide appropriate notice when anticipating taking time off. Requested leave will be approved taking into account organization needs and other associates' leave requests.

**EXHIBIT 6.4**

1.      Section 6.4 of this Agreement shall not prohibit Employee from the continued ownership, operation or use of any real or personal property owned by Employee at the time of termination of Employee's employment hereunder.

2.      In the event that Employee's employment is terminated by the Company without Cause under Section 2.5 of this Agreement, then Section 6.4 of this Agreement shall automatically terminate.

Mark Waldrop
9686 Bowen Trail
Ooltewah, TN  37363


July 1, 2016

Community Health Systems, Inc.
213 Third Street
Macon, Georgia 31201
Attention: Joseph A. Wall

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia 30308
Attention: Mark S. Lange


**VIA CERTIFIED MAIL**

In Re:  **Employment Agreement of Mark A Waldrop**
       **Amended and restated as of January 1, 2009**

Gentlemen:

I'm writing to follow up on our meeting in the offices of attorney Mark S. Lange on Tuesday, June 28, 2016.

During that meeting you advised me that my employment was immediately terminated, and requested that I not return to my office in Dalton, Georgia.  You also informed me that the Dalton, Georgia office was being closed.

As of this date I have not been provided information regarding the reason for my termination.

This letter is to advise you that I stand ready, willing and able to perform my services under and in accordance with my Employment Agreement.  Additionally, I am not aware of any reason which gives the right to the Company to terminate my employment for cause.  If you believe that there is such cause, then I request that you advise me of the same, and that I be given the opportunity to remedy the same in accordance with Paragraph 2.4 of my Employment Agreement.  I stand willing, able and ready to continue to provide services in accordance with my Employment Agreement, and to make all reasonable efforts to address and remedy any issues relating to my employment, including but not limited to the remedy as provided under Paragraph 2.4.

**EXHIBIT**

**2**

Mark Waldrop
July 1, 2016
Page 2

Since there is no cause for the termination of my employment, or if you believe there is cause and do not give me the opportunity to remedy the same in accordance with the terms of my Employment Agreement, then I will expect to be paid severance pay by the continuance of my annual salary of $1,045,665.17 for a period of one year in accordance with paragraph 2.5 (b) of my Employment Agreement.

In the event the Company does not meet its obligations to me under the Employment Agreement, I will also expect the Company to pay any attorney's fees, costs and expenses incurred by me in enforcing my rights under the Agreement and in responding to the Company's defaults under the Agreement.

Sincerely Yours,

Mark A. Waldrop

cc:    Mark S. Lange
       Holland and Knight
       1180 West Peachtree Street
       Suite 1800 Northwest
       Atlanta, GA  30309
       (via e-mail)

# Holland & Knight

1180 West Peachtree Street, Suite 1800  |  Atlanta, GA 30309  |  T 404.817.8500  |  F 404.881.0470
Holland & Knight LLP  |  www.hklaw.com

Joshua I. Bosin
404.817.8558
joshua.bosin@hklaw.com

July 6, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mark A. Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

> *Re:    Community Health Systems, Inc. and Mark A. Waldrop*

Dear Mr. Waldrop:

The law firm of Holland & Knight LLP and the undersigned in particular represent Community Health Systems, Inc. ("CHSI") in connection with the above-referenced matter.

We are in receipt of your July 1, 2016 correspondence addressed to Joseph A. Wall, the Chair of CHSI's Board of Directors, and my law partner, Mark S. Lange, Esq.

Although CHSI terminated your employment effective immediately on June 28, 2016, the company would like to provide you with certain separation benefits in recognition of your many years of service to CHSI.  Accordingly, please find enclosed a Separation Agreement, General Release, Waiver & Confidentiality Agreement memorializing the terms of CHSI's separation offer to you as discussed during your recent meeting with Messrs. Wall and Lange.  I look forward to hearing from you upon your receipt and review of the same.

Should you have any additional questions in the interim, please contact me at your convenience.

Very truly yours,

**HOLLAND & KNIGHT LLP**

Joshua I. Bosin

Enclosure

cc:    Joseph A. Wall
        Mark S. Lange, Esq.

**EXHIBIT 3**

Anchorage | Atlanta | Austin | Bogotá | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville
Lakeland | London | Los Angeles | Mexico City | Miami | New York | Northern Virginia | Orlando | Portland | San Francisco | Stamford
Tallahassee | Tampa | Washington, D.C. | West Palm Beach

#47175963_v1

# CIVIL COVER SHEET

JS44 (Rev. 6/16 NDGA)

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

| I. (a) PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Mark A. Waldrop | Community Health Systems, Inc. |

| (b) **COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**   Hamilton, Tennessee<br>(EXCEPT IN U.S. PLAINTIFF CASES) | **COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**   Bibb, Georgia<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) **ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS) | **ATTORNEYS** (IF KNOWN) |
|---|---|
| R. Wayne Peters (wpeters@gearhiserpeters.com)<br>Gary L. Henry (ghenry@gearhiserpeters.com)<br>Gearhiser, Peters, Elliott & Cannon, PLLC<br>320 McCallie Avenue<br>Chattanooga, Tennessee 37402; (423) 756-5171 | Mark S. Lange (mark.lange@hklaw.com)<br>Joshua I. Bosin (joshua.bosin@hklaw.com)<br>Holland & Knight, LLP<br>1180 West Peachtree Street, Suite 1800<br>Atlanta, Georgia 30309; (404) 817-8500 |

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. GOVERNMENT PLAINTIFF

☐ 2 U.S. GOVERNMENT DEFENDANT

☐ 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)

☑ 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|---|
| | ☐ 1 | ☐ 1 | CITIZEN OF THIS STATE | ☐ 4 | ☑ 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| | ☑ 2 | ☐ 2 | CITIZEN OF ANOTHER STATE | ☐ 5 | ☐ 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| | ☐ 3 | ☐ 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☐ 6 | ☐ 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X "IN ONE BOX ONLY)

☑ 1 ORIGINAL PROCEEDING

☐ 2 REMOVED FROM STATE COURT

☐ 3 REMANDED FROM APPELLATE COURT

☐ 4 REINSTATED OR REOPENED

☐ 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)

☐ 6 MULTIDISTRICT LITIGATION - TRANSFER

☐ 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

☐ 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Plaintiff is seeking severance damages for breach of employment contract due to failure of Defendant to give written notice of cause for termination. Plaintiff is also seeking a declaratory judgment automatically terminating noncompetition covenant due to termination without cause. Plaintiff is a citizen of Tennessee, Defendant is a Georgia corporation having a principal office in Georgia, and the amount in controversy exceeds $75,000.00.

(IF COMPLEX, CHECK REASON BELOW)

☐ 1. Unusually large number of parties.

☐ 2. Unusually large number of claims or defenses.

☐ 3. Factual issues are exceptionally complex

☐ 4. Greater than normal volume of evidence.

☐ 5. Extended discovery period is needed.

☐ 6. Problems locating or preserving evidence

☐ 7. Pending parallel investigations or actions by government.

☐ 8. Multiple use of experts.

☐ 9. Need for discovery outside United States boundaries.

☐ 0. Existence of highly technical issues and proof.

**CONTINUED ON REVERSE**

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT $_____   APPLYING IFP_____   MAG JUDGE (IFP)_____

JUDGE_____   MAG JUDGE_____   NATURE OF SUIT_____   CAUSE OF ACTION_____
         (Referral)

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 151 MEDICARE ACT
- [ ] 160 STOCKHOLDERS' SUITS
- [x] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY
- [ ] 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- [ ] 365 PERSONAL INJURY - PRODUCT LIABILITY
- [ ] 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 440 OTHER CIVIL RIGHTS
- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING/ ACCOMMODATIONS
- [ ] 444 WELFARE
- [ ] 445 AMERICANS with DISABILITIES - Employment
- [ ] 446 AMERICANS with DISABILITIES - Other
- [ ] 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- [ ] 462 NATURALIZATION APPLICATION
- [ ] 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- [ ] 463 HABEAS CORPUS- Alien Detainee
- [ ] 510 MOTIONS TO VACATE SENTENCE
- [ ] 530 HABEAS CORPUS
- [ ] 535 HABEAS CORPUS DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS - Filed Pro se
- [ ] 555 PRISON CONDITION(S) - Filed Pro se
- [ ] 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- [ ] 550 CIVIL RIGHTS - Filed by Counsel
- [ ] 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT. RELATIONS
- [ ] 740 RAILWAY LABOR ACT
- [ ] 751 FAMILY and MEDICAL LEAVE ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 820 COPYRIGHTS
- [ ] 840 TRADEMARK

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- [ ] 830 PATENT

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- [ ] 861 HIA (1395ff)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- [ ] 870 TAXES (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- [ ] 375 FALSE CLAIMS ACT
- [ ] 376 Qui Tam 31 USC 3729(a)
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 430 BANKS AND BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC.
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- [ ] 480 CONSUMER CREDIT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 890 OTHER STATUTORY ACTIONS
- [ ] 891 AGRICULTURAL ACTS
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 895 FREEDOM OF INFORMATION ACT
- [ ] 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- [ ] 410 ANTITRUST
- [ ] 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- [ ] 896 ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

---

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23   DEMAND $ At least $1,118,057.37

JURY DEMAND [ ] YES [x] NO (CHECK YES ONLY IF DEMANDED IN COMPLAINT)

## VIII. RELATED/REFILED CASE(S) IF ANY
JUDGE_____   DOCKET NO._____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- [ ] 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- [ ] 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- [ ] 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- [ ] 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____, WHICH WAS DISMISSED. This case [ ] IS  [ ] IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

_____   7/26/16
SIGNATURE OF ATTORNEY OF RECORD                DATE

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Georgia

| | | |
|---|---|---|
| Mark D. Waldrop | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | Civil Action No. |
| v. | ) | |
| Community Health Systems, Inc. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Community Health Systems, Inc.
c/o Angela Hammack, Registered Agent
213 Third Street
Macon, Georgia 31201

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   R. Wayne Peters, Esq.
Gary L. Henry, Esq.
Gearhiser, Peters, Elliott & Cannon, PLLC
320 McCallie Avenue
Chattanooga, Tennessee 37402

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                        _____

                                                        *Server's signature*

                                               _____

                                                        *Printed name and title*


                                               _____

                                                        *Server's address*

Additional information regarding attempted service, etc: