IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,                          :

       PLAINTIFF,                        :

   VS.                                   :        CASE NO. 4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS,                 :
INC.,
                         :

       DEFENDANT.

MARCH 29, 2017            MACON, GEORGIA            8:55 A.M.

    Deposition of **JOE WALL**, called before Laura M. Jackson,

Certified Court Reporter, State of Georgia, Certificate No.

B-959, testimony taken in the offices of Smith, Hawkins,

Hollingsworth & Reeves, 688 Walnut Street, Macon, Georgia,

beginning at approximately 8:55 a.m., March 29, 2017.



Now Offering Video Conferencing

**HAWTHORNE & WEBB COURT REPORTING**

149 River Hills Lane
Macon, Georgia 31211
Phone:  478.746.2295
LAURA@HAWTHORNE-WEBB.COM

APPEARANCES:

FOR THE PLAINTIFF:          MR. GARY L. HENRY
                           Gearhiser, Peters, Elliott
                           & Cannon
                           320 McCallie Avenue
                           Chattanooga, Tennessee 37402
                           ghenry@gearhiserpeters.com


FOR THE DEFENDANT:          MR. HAROLD T. DANIEL
                           Holland & Knight
                           Regions Plaza
                           Suite 1800
                           1180 West Peachtree Street
                           Atlanta, Georgia  30309
                           harold.daniel@hklaw.com


ALSO PRESENT:               MR. MARK WALDROP, Plaintiff

                           MS. LORRAINE TAYLOR


REPORTER'S NOTE:            Witness RESERVES reading and
                           signing of the document.


**INDEX**

CROSS EXAMINATION                          6
BY MR. HENRY

DIRECT EXAMINATION                        174
BY MR. DANIEL

**EXHIBITS**

<u>EXHIBIT NO. & DESCRIPTION</u>                                    <u>ID'D AT PAGE</u>

PLAINTIFF'S EXHIBIT NO. 1                                              15
NOTICE AND SUBPOENA

PLAINTIFF'S EXHIBIT NO. 2                                              26
WALDROP'S EMPLOYMENT AGREEMENT

PLAINTIFF'S EXHIBIT NO. 3                                              32
ORGANIZATIONAL CHARTS

PLAINTIFF'S EXHIBIT NO. 4                                              54
LETTER DATED 05/20/2016

PLAINTIFF'S EXHIBIT NO. 5                                              54
LETTER DATED 05/15/2016

PLAINTIFF'S EXHIBIT NO. 6                                              60
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 7                                              69
EMAILS

PLAINTIFF'S EXHIBIT NO. 8                                              73
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 9                                              77
LETTER DATED 05/15/2016 WITH HIGHLIGHTS

PLAINTIFF'S EXHIBIT NO. 10                                             78
WALL'S PHONE MESSAGE

PLAINTIFF'S EXHIBIT NO. 11                                             81
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 12                                             81
CONSULTING AGREEMENT WITH SPIRITUS

PLAINTIFF'S EXHIBIT NO. 13                                             89
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 14                                             92
WALDROP'S EMPLOYMENT AGREEMENT WITH HIGHLIGHTS

PLAINTIFF'S EXHIBIT NO. 15                                             93
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 16                              95
BOARD MEETING MINUTES O6/21/2016

PLAINTIFF'S EXHIBIT NO. 17                             104
TALKING POINTS FOR MEETING

PLAINTIFF'S EXHIBIT NO. 18                             111
EMAIL AND MEMO 06/28/2016

PLAINTIFF'S EXHIBIT NO. 19                             114
LETTER DATED 07/01/2016

PLAINTIFF'S EXHIBIT NO. 20                             117
LETTER DATED 07/06/2016

PLAINTIFF'S EXHIBIT NO. 21                             119
WALL'S TALKING POINTS AND NOTES

PLAINTIFF'S EXHIBIT NO. 22                             150
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 23                             126
DISCUSSION QUESTIONS

PLAINTIFF'S EXHIBIT NO. 24                             142
WALL'S HANDWRITTEN NOTES, PREAMBLE

PLAINTIFF'S EXHIBIT NO. 25                             123
ISSUES TO DISCUSS WITH LAKE

PLAINTIFF'S EXHIBIT NO. 26                             123
EMAILS DATED 07/07/2016

PLAINTIFF'S EXHIBIT NO. 27                             127
SAME AS EXHIBIT 25 WITH NOTES

PLAINTIFF'S EXHIBIT NO. 28                             143
QUESTIONS FOR MOORE-ANDREWS

PLAINTIFF'S EXHIBIT NO. 29                             125
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 30                             156
LETTER DATED 08/16/2016

PLAINTIFF'S EXHIBIT NO. 31                             158
2013 EXPENSE REPORT

```
PLAINTIFF'S EXHIBIT NO. 32                    159
2014 EXPENSE REPORT
```

<u>**JOE WALL**</u>

Witness having been first

duly sworn, testified on

CROSS EXAMINATION

BY MR. HENRY:

Q     Mr. Wall, we've met previously, but just for the record, my name is Gary Henry.   I represent Mark Waldrop in the litigation that we're here about today.   Have you ever given a deposition before?

A     Yes.

Q     Okay.   I know you sat through a couple.

A     Matter of fact, she was in here about a month ago. Boone and I both got subpoenaed for some little frivolous thing we thought, but anyway.

Q     I know you're familiar with the process.

A     Yeah.

Q     But it never hurts to have a little bit of a refresher, just to go through a few things.   Obviously, I'm going to be asking you some questions today.   I'm going to try to be clear.   If I'm not clear, let me know.   I am not the clearest person in the world so I won't be offended if you say, look, I don't understand that.

A     Okay.

Q     Please, rephrase it.

A     That's good.

1    Q    If, for any reason though, you answer my question,

2   I'm going to assume you understood it.  Is that fair?

3    A    Yeah, that's fair.

4    Q    Please, answer audibly yes or no, not shaking head,

5   nodding head, uh-huh or uh-uh.  Doing that is hard to pick

6   up.

7    A    Yeah.

8    Q    You know all this, I'm sure, but once we get going,

9   if you need a break, let me know.  We'll accommodate.

10   A    I'm going to go as long as y'all can because I've

11  got other things I could be doing.

12   Q    I understand.  I understand.  It's that time of

13  year.  So let's just go ahead and jump right into it and

14  maybe we can plow some --

15   A    Okay.

16   Q    -- ground quickly.  If you would, just state your

17  full name for the record.

18   A    Joseph Allen Wall.

19   Q    Where do you live, Mr. Wall?

20   A    936 Fieldstone Drive, Macon, Georgia, 31210.

21   Q    You're an accountant; correct?

22   A    Yes.

23   Q    If you would, just walk me through your formal

24  education starting with high school.

25   A    Graduated from Lanier High School here in Macon;

1  went to University of Georgia; got through up there December

2  of 1970; and been here ever since.  Whenever they put in the

3  40 hour required continuing education requirements to renew

4  your CPA license, I've been doing that every year for 40

5  something years.

6      Q    Okay.  So you graduated from UGA in December of

7  1970?

8      A    Yes.

9      Q    With a Bachelor's in accounting?

10     A    BBA in business with a concentration in accounting.

11     Q    Okay.

12     A    And since then they've dressed it up pretty good to

13 make me look even better.

14     Q    That never hurts.

15     A    Yeah.

16     Q    Some of us need all the dressing we can get.

17     A    Uh-huh (affirmative).

18     Q    Other than your BBA in business from the University

19 of Georgia, do you have any other formal education, other

20 than the 40 hours a year?

21     A    No.  Uh-uh (negative).

22     Q    And you hold a CPA license?

23     A    Yes, I do.

24     Q    In Georgia?

25     A    In Georgia.

```
 1        Q     Any other states?

 2        A     No.

 3        Q     Have you ever had any complaints or disciplinary

 4   action based on your license?

 5        A     No.

 6        Q     Are you married?

 7        A     Yes.

 8        Q     And your wife's name?

 9        A     Patricia Hammock Wall.

10        Q     Patricia Hammock Wall?

11        A     Hammock, H-A-M-M-O-C-K.

12        Q     Is she related to Angela Hammack?

13        A     No.  No.

14        Q     Okay.  I just --

15        A     No.

16        Q     -- that's a name we've heard.  How long have y'all

17   been married?

18        A     Forty-seven years as of March the 20th.

19        Q     Wow.  You need to show her this transcript because

20   you rattled that off real fast.

21        A     Well, the reason I remember it is my older grandson

22   was born on that day and it helps me to remember that.

23        Q     That helps you.  Okay.  You might not want to show

24   her that part.  You might just want to make her think you

25   knew that just off the top of your head.
```

```
 1        A    I'm open about it.

 2        Q    Any children?

 3        A    My children?

 4        Q    Yes.

 5        A    I have two sons.

 6        Q    And what are their names and ages?

 7        A    Joseph Allen Wall, Jr.  Joe is 43.  And Robert

 8   Hammock Wall is 41.

 9        Q    Where do, I'll just say, Joe, Jr. and Robert live?

10        A    Joe lives in a town called Waxall, North Carolina,

11   which is a southern suburb of Charlotte.  His office is

12   located in Charlotte.  Rob lives in Winston-Salem, North

13   Carolina.

14        Q    So both in North Carolina?

15        A    Right.

16        Q    Again, I'm not trying to pry, but this is a case

17   where a jury has been demanded.  Do you have any relatives in

18   the northwestern part of Georgia, to your knowledge?

19        A    No.  No.  Not that -- no, I do not.

20        Q    Just trying to make sure we don't get anybody on

21   the jury pool that might be related to you.  Where are you

22   currently employed?

23        A    Meadors Wall and Company P.C., CPAs.

24        Q    The Wall in that name is you?

25        A    That's me.
```

     Q      How long have you been with that firm?

     A      Since January the 3rd, 1971, except for a little

break between April 14th, '71, and August 28th, '71, when I

was on active duty with the military.

     Q      Okay.  What branch of service were you in?

     A      Army National Guard.

(LORRAINE TAYLOR ENTERS THE ROOM)

(OFF THE RECORD)

     Q      MR. HENRY:  Mr. Wall, you were just telling me, I

think I had asked you what branch of the military you were

in.

     A      Army National Guard.

     Q      Where were you stationed?

     A      Well, the guard unit was out of Macon.  I went to

Fort Lewis Washington for basic training and Fort Sam Houston

in San Antonio, Texas, for what they called AIT back then.

That was medical training.

     Q      Did you ever -- you were only there briefly, it

looks like.  Of course, it probably seemed like a long time

to you, but you've never served overseas or anything like

that?

     A      No.

     Q      So your current employer has been your employer,

would it be fair to say, since you got your CPA license?

     A      Oh, yeah.  Yes.

```
 1        Q    So you basically started your own accounting firm?

 2        A    No.  We are a successor of one that was begun in

 3   1952.

 4        Q    Okay.  Well, this is usually one of the longest

 5   parts of a deposition, but you're easy.  You've got just one

 6   employer.

 7        A    Yeah.

 8        Q    So we're just moving right along.  That's good.

 9   You are the Chairman for the Board of Directors for Community

10   Health?

11        A    Yes.

12        Q    How long have you been in that position?

13        A    I believe it was either 2002 or 2003.

14        Q    Were you a board member prior to becoming the

15   chairman?

16        A    Yes, but our present board evolved from a couple of

17   mergers and before that we had a different entity than

18   Community Health Systems and I was on that board.

19        Q    So let me be sure I understand.  You said you'd

20   been on the board since 2002 to 2003.  Was that your --

21        A    Chairman.

22        Q    Chairman.  Okay.  Thank you.  So your period of

23   being chairman, from that period forward, has that been with

24   Community Health Systems or some predecessor entity?

25        A    I don't remember if it was named anything else, but
```

1    it's generally the same, basically the same entity.

2        Q    And you said you had served on boards of prior

3    entities, predecessor entities?

4        A    Right.  We formed an entity called Health

5    Scholarships, Inc.  It was formed in either 1986 or '88, and

6    I cannot remember the year.  But it was designed to give

7    nursing scholarships out of whatever available funds, and it

8    owned three facilities within it.  So there weren't but four

9    of us on that board.

10       Q    Do you know when you started serving on that board?

11       A    It was either '86 or '88.

12       Q    You had said that.  I apologize.  But in the 2002

13   to 2003 timeframe, that's when you began serving as chairman

14   of the Board of Community Health Systems?

15       A    Right.

16       Q    That's a part-time position?

17       A    Absolutely -- well, --

18       Q    Until recently?

19       A    Yeah.

20       Q    Okay.  That's not your only employment?

21       A    Right.

22       Q    Obviously.  What are your duties as chairman of the

23   board?

24       A    Basically to conduct the board meetings and nothing

25   unusual as far as the general perceived duties of a chairman

1    of the board.  We just -- I just have oversight over the

2    function of the board of directors.

3         Q    We'll get into this a little bit later, talking

4    about the organization, organizational charts.  I noticed in

5    some documents that there are various committees of the

6    board?

7         A    Exactly.  Yes.

8         Q    Do you serve on any committees of the board?

9         A    Right now I am chairman of the governance committee

10   and assistant chairman of all of the other committees:   the

11   audit committee, the investment committee, and the

12   compensation committee.

13        Q    Has your role with regard to these committees

14   changed since Mr. Waldrop's termination in June of 2016?

15        A    No.  No.

16        Q    So is it fair to say that you served on those

17   committees at the time of Mr. Waldrop's termination?

18        A    Oh, yes.  Absolutely.

19        Q    Are you compensated as a board member?

20        A    Yes.

21        Q    What is your compensation?

22        A    It's -- for a board member it's $2,000 a month.

23        Q    Do you receive anything beyond that as chairman?

24        A    No.

25        Q    So it's the same for all --

1      A    Right.  Well, I -- the first -- well, that's not

2   your question, so.  But all board members receive the same

3   thing.

4      Q    Has that been your compensation since Mr. Waldrop's

5   termination in June of 2016?

6      A    Well, there's been additional compensation for all

7   the time I have had to spend involved in this.

8      Q    Over and above the $2,000?

9      A    Yes.  Yes.

10      Q    How much has that been?

11      A    I don't remember the exact amount, but it's been

12   substantial.

13      Q    With the understanding that it's somewhat of a

14   guess, could you give me an estimate?

15      A    Let me think.  Probably 35 to $40,000.

16      Q    That additional compensation is tied directly to

17   your duties in this case?

18      A    Yes.

19      Q    Your time?

20      A    Yes.

21          MR. HENRY:  I'm going to go ahead and mark the

22      first Exhibit as Exhibit 1.

23   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 1)

24      Q    MR. HENRY:  Mr. Waldrop (sic), you're holding

25   what's been marked as Exhibit 1.  Have you seen Exhibit 1

```
 1   before?

 2       A     You asked Mr. Waldrop.

 3       Q     I'm sorry.  Mr. Wall.

 4       A     I have seen that, yes.

 5       Q     He's not testifying today thankfully; right?

 6       A     Right.

 7       Q     Mr. Wall, you've seen Exhibit 1 before?

 8       A     Yes.

 9       Q     You have been designated by Community Health

10   Systems to testify with respect to some topics --

11       A     Yes.

12       Q     -- today.  And I just want to go through those

13   topics to make sure that we are all on the same page as to

14   what you're here to testify about on behalf of the company.

15   Okay?

16       A     Okay.

17       Q     The first topic that you've been designated for is

18   topic number one, which is on page six.

19       A     Uh-huh (affirmative).

20       Q     If you read that and let me know when you're ready

21   for me to ask you just a few questions about it.

22       A     Do you want me to read it out loud?

23       Q     No.  You can read it to yourself.  Yes.

24       A     Okay.

25       Q     Are you prepared this morning to testify with
```

1  regard to topic number one?

2      A     Yes.

3      Q     On behalf of the company?

4      A     Yes.

5      Q     Did you speak to anybody within the company to

6  prepare yourself to testify about that topic?

7      A     Yes.

8      Q     Who did you speak with?

9      A     Our attorneys mainly.

10     Q     Anybody other than your attorneys?

11     A     No.

12     Q     Did you review any documents to prepare yourself to

13  testify with regard to topic number one?

14     A     This document and --

15     Q     And just for the record you're referring to Exhibit

16  1?

17     A     Absolutely.  But I don't recall any other documents

18  that I specifically reviewed for that item.

19     Q     Let's move on then to topic number 2.  I'm going to

20  ask you the same series of questions when you're ready.

21     A     Okay.  I'm ready.

22     Q     Are you prepared here this morning to testify with

23  regard to topic number two?

24     A     Yes.

25     Q     On behalf of the company?

1        A      Yes.

2        Q      And by the company, I'm referring to Community

3   Health Systems.

4        A      Yes.  I understand.

5        Q      Did you talk to anyone to prepare yourself to

6   testify with regard to topic number two?

7        A      None other than my previous answer.

8        Q      Did you review any documents to prepare yourself to

9   testify with regard to topic number two?

10       A      No.

11       Q      All right.  The next topic --

12       A      Let me back up.

13       Q      Okay.

14       A      I did not review any to prepare for this.  I have

15   reviewed that employment agreement years ago.

16       Q      Right.  That's a fair point.  My question is

17   limited to preparation for coming here today.

18       A      That's all.

19       Q      The next topic is topic number three.

20       A      Yes.

21       Q      Did you speak to anyone at the company to prepare

22   yourself to testify with regard to this topic?

23       A      None other than my answer in number one.

24       Q      Okay.  How about reviewing any documents?

25       A      Same answer.

1      Q      Same answer.   And you're prepared to testify today

2  on behalf of Community Health Systems with regard to topic

3  number three?

4      A      Yes.

5      Q      Is that correct?

6      A      Yes.

7      Q      Topic number four in Exhibit 1.

8      A      Yes.

9      Q      Are you prepared to testify today on behalf of the

10  company with regard to topic number four?

11      A      Yes.

12      Q      Did you speak to anyone other than your attorneys

13  to prepare to testify with regard to topic number four?

14      A      No.

15      Q      Review any documents to prepare yourself to testify

16  with regard to topic number four?

17      A      No.

18      Q      Topic number five from Exhibit 1.   Let me know when

19  you're ready.

20      A      I'm ready.

21      Q      Are you prepared to testify on behalf of the

22  company with regard to topic number five?

23      A      Yes.

24      Q      Did you have to speak to anyone or did you speak to

25  anyone other than your attorneys to prepare yourself to

1   testify with regard to topic five?

2       A    No.

3       Q    Did you review any documents?

4       A    No.

5       Q    Topic number six.

6       A    Okay.  Yes.

7       Q    Are you prepared to testify on behalf of Community

8   Health Systems with regard to topic number six?

9       A    Yes.

10      Q    Did you speak to anyone other than your attorneys

11  to prepare yourself to testify with regard to topic number

12  six?

13      A    No.

14      Q    Did you review any documents to prepare yourself to

15  testify with regard to topic number six?

16      A    No.

17      Q    All right.

18      A    I do have a question.  The last phrase of that

19  paragraph, "since fiscal year 2010-2011," I mean, should that

20  be up to the present time or --

21      Q    Well, I mean, I can't tell you --

22      A    I was just curious.

23      Q    I would say that the intent behind that was to say

24  since fiscal year 2010-2011, to the present time.

25      A    That's what I would have thought.

1          Q      Okay.  So you --

2          A      Yes.

3          Q      And you're prepared to testify with that

4    understanding?

5          A      Yes.

6          Q      Topic number seven.

7          A      Yes.

8          Q      Same questions.  Are you prepared to testify on

9    behalf of the company with regard to topic number seven?

10         A      Yes.

11         Q      Did you speak to anyone other than your attorneys

12   to prepare to testify with regard to topic number seven?

13         A      No.

14         Q      Did you review any documents to prepare yourself to

15   testify with regard to topic seven?

16         A      No.

17         Q      Skipping forward to topic 13 on page eight.

18         A      Uh-huh (affirmative).

19         Q      Are you ready?

20         A      Yes.

21         Q      Are you prepared to testify on behalf of Community

22   Health Systems with regard to topic number 13?

23         A      Yes.

24         Q      Did you speak to anyone other than your attorneys

25   to prepare to testify with regard to topic 13?

1     A     No.

2     Q     Did you review any documents?

3     A     No.

4     Q     Topic 22.

5     A     Yes.

6     Q     Are you prepared to testify on behalf of Community

7 Health Systems with regard to topic number 22?

8     A     Yes.

9     Q     Did you speak to anyone other than your attorneys

10 to prepare to testify with regard to topic 22?

11     A     No.

12     Q     Have you reviewed any documents?

13     A     No.

14     Q     Topic 23.

15     A     Yes.

16     Q     Are you prepared to testify on behalf of Community

17 Health Systems with regard to topic number 23?

18     A     Yes.

19     Q     Did you speak to anyone other than your attorneys

20 to prepare to testify with regard to topic 23?

21     A     Well, that's why I hesitated.  Since the phone call

22 at my home on May 16th, my wife has been intimately and --

23     Q     I understand.

24     A     -- alarmingly concerned about this whole matter.

25 So --

```
 1        Q      I'm not going to ask about anything you discussed
 2   specifically with your attorney or with your wife.
 3        A      Okay.
 4        Q      My question is did you speak to anyone within the
 5   company --
 6        A      Oh, no.
 7        Q      -- to prepare yourself --
 8        A      No.
 9        Q      -- to testify --
10        A      No.
11        Q      -- today?
12        A      No.
13        Q      And then finally topic 24.
14        A      No.
15        Q      Well, are you prepared to testify --
16        A      Yes.
17        Q      -- on behalf --
18        A      Yes.
19        Q      I know.  I know you're anticipating it, as you
20   should.  It's fairly tedious, but --
21        A      Right.
22        Q      -- are you prepared to testify on behalf of
23   Community Health Systems with regard to topic 24?
24        A      Yes.
25        Q      Did you speak to anyone other than your attorneys
```

1  to prepare yourself?

2      A    No.

3      Q    Review any documents?

4      A    No.

5      Q    I believe -- I will state this for the record, I

6  believe you may have been designated for topic 25, but we are

7  reserving that because it may not be an issue.

8          MR. DANIEL:  Topic number 25 is very general, as

9      we've discussed.

10         MR. HENRY:  Yes.

11         MR. DANIEL:  And I asked you to elaborate on it and

12     define it further before asking questions.

13         MR. HENRY:  Yes.  So I'm not going to be expecting

14     you to testify with respect to that topic.  I just had

15     some indication in my file that you had been designated

16     for this.

17         MR. DANIEL:  I'm not sure we can designate anyone

18     for that topic, subject to your clarification.

19     Q    MR. HENRY:  Okay?

20     A    Uh-huh (affirmative).

21     Q    I've asked you about the specific topics in the

22  notice, and now I want to ask you more generally what did you

23  do to prepare for your deposition here today?

24     A    Basically, I read through my notes and looked at my

25  calendar to get specific dates, and anything else I could to

1    jog my memory about all these proceedings obviously.

2        Q    Have you made the notes that you reviewed available

3    to your lawyers?

4        A    Yes.

5        Q    And how about your calendar that you reviewed?

6        A    I did not make it available because it had some,

7    what I consider, confidential information on it.

8        Q    Okay.

9        A    But I mean, it was just to jog my memory if nothing

10   else.

11       Q    Did you review any deposition transcripts?

12       A    I did.  I reviewed Lorraine's.

13       Q    How about Mr. Rollins's?

14       A    No.

15       Q    Ms. Dotson's?

16            COURT REPORTER:  I'm sorry.  What was that name?

17            MR. HENRY:  Dotson, D-O-T-S-O-N.

18            COURT REPORTER:  Thank you.

19       A    THE WITNESS:  I did look at hers.

20       Q    Of course, you were -- well, you weren't present

21   for her deposition?

22       A    No, and I've never met the lady before.  That was

23   the main reason I was reading it, just out of curiosity.

24       Q    Mr. Waldrop's deposition, did you review it?

25       A    I was there.

```
 1        Q    I know.  I just didn't know if you reviewed it.

 2        A    I did not need to look at it.

 3        Q    Okay.  Did you listen to any tape recordings --

 4        A    No.

 5        Q    -- of phone calls or anything?

 6        A    Listen to phone calls?

 7        Q    Yes.  Listen to tape recordings of phone calls?

 8        A    Oh, no.  No.

 9        Q    I know that was tedious.  The rest of it shouldn't

10   be that bad.  Let's go ahead and go with Exhibit 2, which has

11   already been marked as Exhibit 2 in another deposition.  So

12   I'm just going to cover that up.

13   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 2)

14        Q    MR. HENRY:  Mr. Wall, you're holding what's been

15   marked as Exhibit 2.  Have you had a chance to look at it

16   this morning?

17        A    This morning?

18        Q    Well, since I've handed it to you.

19        A    I've looked at page one.

20        Q    Okay.  Does that appear to be a copy of Mr.

21   Waldrop's employment agreement?

22        A    Yes.

23        Q    If you would describe for me how Exhibit 2 came

24   about.

25        A    It is my understanding that the board decided --
```

1  before this we had an employment agreement with Ronnie

2  Rollins, and it's my understanding that it was decided and I

3  was under the impression that Mark Waldrop asked for an

4  employment agreement and the board decided we would give both

5  Mark and Lorraine an employment agreement --

6        Q    Okay.

7        A    -- basically on the same pattern as Ronnie

8  Rollins's.

9        Q    Are you aware -- other than maybe the different

10  names and possibly different term of employment as far as

11  time are the employment agreements for Mr. Waldrop, Ms.

12  Taylor, and Mr. Rollins generally the same?

13        A    As far as I know.

14        Q    Okay.

15        A    That was my impression.

16        Q    Well, specifically, I'd like to look at paragraph

17  2.4, which is on page two.

18        A    Okay.

19        Q    Do you need some time to look at that or are you

20  familiar with it?

21        A    No.   I'm familiar enough with it.

22        Q    Is paragraph 2.4 generally the same in Ms. Taylor's

23  employment agreement to your knowledge?

24        A    To my knowledge, but I don't have the agreements

25  side-by-side so I cannot say for sure.

1      Q     How about Mr. Rollins's employment agreement?

2      A     Same answer.

3      Q     How long had Mr. Rollins had an employment

4   agreement with Community Health Systems before Exhibit 2 came

5   about?

6      A     2002, I think.  Since 2002.

7      Q     So if we're looking at Exhibit 2, it says that it's

8   made and entered into as of the 20th day of June, 2006, on

9   page one?

10      A     Right.

11      Q     You don't have any reason to believe that that date

12   is incorrect, do you?

13      A     No reason.

14          MR. DANIEL:  Object to form.  I think you should

15      note that this is an amended agreement.

16          MR. HENRY:  Well, I was about to get to that.

17      Q     MR. HENRY:  The handwritten date, it looks like it

18   was originally executed on June 20th of 2006.  Is that your

19   understanding?

20      A     That's my understanding.

21      Q     And it looks like it was subsequently amended and

22   restated as of January 1, 2009?

23      A     Yes.

24      Q     So based on what you said about Mr. Rollins's

25   deposition (sic), understanding it's not exact, but with it

1   being four years previous to this, you say it was executed in

2   the 2002 time frame?

3       A     That's what I recall.

4       Q     And how about Ms. Taylor's?

5       A     Hers and Mark Waldrop's were done --

6       Q     At the same time?

7       A     -- simultaneously.  Not simultaneously, but at the

8   same time.

9       Q     Generally at the same time?

10      A     Right.

11      Q     Is Exhibit 2 the form of Mr. Waldrop's agreement

12  that was in effect at the time of his termination?

13      A     Yes.

14      Q     So it hadn't been changed, to your knowledge, at

15  any time between January 1, 2009, and June 28th, 2016?

16      A     Not to my knowledge.

17      Q     How about the employment agreement of Mr. Rollins,

18  had it changed at any time between January 1, 2009 and June

19  28th, 2016?

20      A     Not that I recall.

21      Q     Same question for Ms. Taylor:  Had her employment

22  agreement changed in that time frame?

23      A     Not that I recall.

24      Q     Are you ready?

25      A     Oh, yeah.

1       Q       You had been looking at it.  I just wanted to --

2       A       The reason I was looking, I was looking to see if

3    there was a salary stated in here.

4       Q       Okay.

5       A       But that would have been subject to our

6    compensation studies and it would have changed.

7       Q       All right.  How much was Mr. Waldrop earning at the

8    time of his termination?

9       A       I don't recall specifically, but it was in excess

10   of a million dollars a year.

11      Q       Was there any other employee or associate of

12   Community Health Systems that was earning that much per year?

13      A       No.

14      Q       So Mr. Waldrop was the highest paid employee of the

15   company?

16      A       Yes.

17      Q       Mr. Rollins is the CEO of Community Health Systems;

18   correct?

19      A       Yes.

20      Q       Which means that he is actually or was Mr.

21   Waldrop's supervisor?

22      A       Yes.

23      Q       Why was Mr. Waldrop making more in salary that Mr.

24   Rollins?

25      A       For two reasons:  First of all we, as a board

1    during our compensation studies, were trying to justify Mr.

2    Waldrop's salary as high as possible, in the highest

3    percentile in order to make sure he was not led to another

4    health system and hired away from us.

5          Mr. Rollins voluntarily reduced his salary two or three

6    years ago.  He and I had a discussion about it and he reduced

7    his salary to, I think, in the range of $700,000.

8          Q     Did he receive any other remuneration,

9    compensation, payments to accommodate this reduction in

10   salary?

11         A     No.

12         Q     He, being Mr. Rollins.

13         A     Right.  No, he did not.

14         Q     So you said there were a couple of reasons that Mr.

15   Waldrop made more than Mr. Rollins.  One was the compensation

16   committee wanted to keep Mr. Waldrop from leaving --

17         A     Yes.

18         Q     -- basically?

19         A     Yes.

20         Q     Is the second reason what you just described --

21         A     Yes.

22         Q     -- with regard to Ronnie Rollins?

23         A     Yes.  That was the other factor.  That's the reason

24   that Mark Waldrop's salary was higher than Ronnie's.

25         Q     Mr. Wall, you're holding what's been marked as

1  Exhibit 3, and I will represent to you that Exhibit 3 is

2  somewhat of a collection of various organizational charts

3  that have been produced in discovery in this case.

4       A     Uh-huh (affirmative).

5       Q     If you would, just take a minute or two and go

6  through Exhibit 3 to yourself just to familiarize yourself

7  with what's in there and then I'll ask you some questions.

8  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 3)

9       Q     MR. HENRY:  And I will candidly tell you that it

10  appears the last few pages are misformatted.  I think it is

11  actually a larger document, but when we printed it on this

12  size paper, it kind of chopped it up.

13      A     Uh-huh (affirmative).

14      Q     I'm not really going to ask you very much about

15  those last few pages anyway.

16      A     Okay.

17      Q     Just wanted to tell you that.

18      A     Good.  I'm through.

19      Q     There's been reference in this case to a functional

20  organizational chart and a legal organizational chart.  Are

21  you familiar with that distinction?

22      A     Not formally.  Nobody has said here's a functional

23  organizational chart and here's a legal organizational chart.

24      Q     Let's look back at Exhibit 1.

25      A     Exhibit 1?

1      Q     Yeah.  That's the notice.  I'm sure I --

2      A     Number seven?

3      Q     Number seven, yes.  It speaks in terms of a

4  functional and legal organizational chart.  So I'm just

5  trying to understand what the difference between those two

6  is.

7      A     Well, I interpreted that to mean that was one

8  identification, functional and legal.

9      Q     Okay.  I understand.  Well, then sitting here

10  today, can you describe for me what your understanding is of

11  the difference between a functional and legal organizational

12  chart or is there a difference?

13      A     In my mind the terms collectively are the -- I

14  mean, that identifies one chart.

15      Q     Okay.

16      A     But I wouldn't define -- I would not define legal

17  in any way because I'm not an attorney.

18      Q     Did Community Health Systems have differing

19  organizational charts for one purpose as opposed to other

20  purposes?

21      A     Not to my knowledge.

22      Q     So Community Health Systems only had one

23  organizational chart?

24      A     Well, obviously that statement contradicts that, --

25      Q     Right.

1        A        -- this Exhibit 3.

2        Q        Let's just take an example.  Let's look at the

3    first page of Exhibit 3.

4        A        Okay.

5        Q        There's no other organizational chart with this

6    information on it that you would use for a different purpose

7    than just this chart here?

8        A        No, not to my knowledge.

9        Q        Let's look at the second page, which at the bottom

10   has a number 51498.

11       A        Yes.

12       Q        And there's a date at the top 3/22/16?

13       A        Yes.

14       Q        What is this a chart of?

15       A        It appears to me to be almost a summary chart of

16   the organization at the highest level.

17       Q        At the board level?

18       A        At the board and executive level.

19       Q        You have at the very top the Health System Board.

20       A        Correct.

21       Q        And then over toward the left there you have chief

22   executive officer; right?

23       A        Uh-huh (affirmative).

24       Q        Is the chief executive officer a member of the

25   board?

1    A    Yes.

2    Q    So Mr. Rollins is a member of the board?

3    A    Yes.

4    Q    And then you go down the chart and there are four

5    committees listed there.

6    A    Right.

7    Q    Do you see that?

8    A    Yes.

9    Q    Those are committees of the board?

10   A    Yes.

11   Q    Was this the structure of Community Health Systems

12   Board at the time Mr. Waldrop was terminated?

13   A    Yes.

14   Q    I believe you testified earlier you're the chairman

15   of the governance committee?

16   A    Yes.  Only because Olan Jones, who was a board

17   member, had a stroke and had to resign from the board.

18   Q    So you got the --

19   A    I got the promotion.

20   Q    You got the promotion --

21   A    Yeah.

22   Q    -- in a manner of speaking.  Okay.  Let's go to the

23   next page, 5150 there at the bottom.  What is this a chart

24   of?

25   A    It appears to me to be just an operational type

1   chart showing various functions of the operation.

2       Q     It was also apparently approved on March 22nd,

3   2016.  Do you see that?

4       A     Yes.

5       Q     Would this have been one of the organizational

6   charts that was in effect at the time of Mr. Waldrop's

7   termination?

8       A     Yes.

9       Q     Where did Mr. Waldrop fit in this particular

10  organizational chart?

11      A     I would think that he would be, being chief

12  operating officer, he'd be at the highest level.

13      Q     There where it says health systems support?

14      A     Yes.

15      Q     So that would mean that business operations -- you

16  see that?

17      A     Yes.

18      Q     We have a tier off to the left that says executive

19  assistant, --

20      A     Yes.

21      Q     -- but below that business operations, clinical

22  operations, real estate services, insurance services, health

23  strategy and policy.  If Mr. Waldrop was at the very top,

24  would all of those areas have fallen under him?

25      A     Yes.  Well, the financial services was more

1  Lorraine's responsibility.  She's the chief financial

2  officer.

3   Q Is there a financial services there on that second

4  tier?

5   A It's under business operations.

6   Q Under business operations?

7   A Yeah.

8   Q Fair enough.  What about information services,

9  which is the third box under business operations, would that

10  have fallen under Mr. Waldrop's prevue?

11   A I'm not sure.  I don't know.

12   Q Other than Mr. Waldrop who you said would have been

13  at the highest level on that chart, would there be other

14  people at that level?

15   A Lorraine Taylor, yes.

16   Q What about Mr. Rollins?

17   A He'd be above them.

18   Q There's a box there for executive assistant.  What

19  is an executive assistant at Community Health Systems?

20   A As in who that is or describe the position?

21   Q What is the position?  Yeah, describe the position

22  for me.

23   A I may be dating myself, but I consider that an

24  executive secretary.

25   Q Okay.

```
 1        A     Yeah.

 2        Q     Okay.  Well, what would the executive secretary do

 3   for an officer of the company?

 4        A     I have no specific idea whatsoever.

 5        Q     Make travel arrangements?  Would that be something

 6   you would expect an executive assistant to do?

 7        A     Like I said, I have no earthly idea.

 8        Q     So sitting here today you don't know what an

 9   executive assistant's duties were within the company?

10        A     I have not seen a job description as such.

11        Q     Okay.  So is that you don't know?

12        A     I don't know.

13        Q     Who would know within the company?

14        A     I don't know.

15        Q     Let's look within Exhibit 3 at the page that's been

16   marked 5153.

17        A     Got it.

18        Q     Okay.  What is this chart reflecting?

19        A     It appears to me to be the basic hierarchy of the

20   corporate government.

21        Q     At the very top you have the board of directors,

22   which is at the top of this structure; correct?

23        A     Correct.

24        Q     Then over to the right you have chief compliance

25   officer, Lucy Rogers.  Do you see that?
```

1    A    Yes.

2    Q    What is the role of the chief compliance officer?

3    A    She is responsible for monitoring our compliance

4  with everything we do is my impression, and she does a good

5  job of it.

6    Q    Does she serve in kind of an advisory capacity to

7  the board?

8    A    Only when she's got something to present to the

9  board.

10    Q    Okay.  Looking further at the chart on 5153, going

11  down to, I guess what I would call, the third tier starting

12  with Mr. Waldrop on the left and --

13    A    Uh-huh (affirmative).

14    Q    -- moving over, it appears that Mr. Waldrop has a

15  position under him for executive assistant.

16    A    Right.

17    Q    And that Ms. Taylor has a position under her for

18  executive assistant.

19    A    Right.

20    Q    But there does not appear to be any kind of

21  executive assistant for Mr. Rollins.  Is that how -- am I

22  reading the chart correctly in that regard?

23    A    That's what it shows.  I don't --

24    Q    Did Mr. Rollins -- I'm sorry.

25    A    Go ahead.

```
 1        Q     No.  You were -- I don't want to interrupt you.

 2        A     Well, I don't know if these executive assistants

 3   are the same people because there is an executive assistant

 4   on every page you've handed me.

 5        Q     There's not one on 5154, is there?

 6        A     5154.  I hadn't gotten that far.

 7        Q     Okay.  I mean, I'm just trying to be sure I

 8   understand your testimony.  You say there's one on every

 9   page.

10        A     Uh-huh (affirmative).

11        Q     There's not one on that one; right?

12        A     Right.

13        Q     Let's look at 5155.

14        A     Okay.

15        Q     July 1, 2016.

16        A     Right.

17        Q     Is that the effective date?

18        A     Yes.

19        Q     So this would have been the structure after Mr.

20   Waldrop's termination?

21        A     That's correct.

22        Q     At the very top we have Ronnie Rollins, but it

23   appears now he does have an executive assistant; is that

24   correct?

25        A     That's what this page reflects, yes.
```

1    Q    Does Mr. Rollins have an executive assistant?

2    A    I have no earthly idea.

3    Q    We talked previously that Ms. Taylor is in charge

4  of financial services, or was at least, when Mr. Waldrop was

5  employed; correct?

6    A    Yes.

7    Q    After Mr. Waldrop's termination, has Ms. Taylor

8  taken on additional responsibilities?

9    A    Evidently, yes, because one of these previous

10  charts that I said she was a part of the financial services,

11  the information services is under this.  And now on this

12  particular chart you're asking about it is also under that.

13    Q    Okay.  So you're comparing, just for the record's

14  purposes, you're comparing the chart on Bate's number 5150 --

15    A    Yes.

16    Q    -- to the one on 5155?

17    A    Correct.

18    Q    Moving over to the right, the very next column, on

19  5155, systems operations, Ronnie Rollins, President and CEO.

20  That's what this chart reflects?

21    A    Correct.  Yes.

22    Q    Based on this chart is it a true statement that Mr.

23  Rollins has taken over at least some of Mr. Waldrop's duties?

24    A    Yes.

25    Q    Because part of Mr. Waldrop's duties under the

1   chart on 5150 would have been system operations; right?

2       A    Yes.

3       Q    He's the COO of operations --

4       A    Right.

5       Q    -- so.  The other individuals going to the right:

6   Stelling Nelson and Dean Shuford, are those two individuals

7   also performing duties under this chart that were formerly

8   performed by Mr. Waldrop?

9       A    Not to my knowledge.

10      Q    Okay.  Was Stelling Nelson, who is listed here as

11  the senior vice president of real estate services, an

12  employee or representative of Community Health Systems prior

13  to Mr. Waldrop's termination?

14      A    Say that again.

15      Q    Was he an employee or associate of Community Health

16  Systems prior to June 28th --

17      A    Yes.

18      Q    -- 2016?

19      A    Yes.

20      Q    How about Dean Shuford?

21      A    Yes.

22      Q    So according to the chart of 5155, Community Health

23  Systems has not hired any new associates to replace Mr.

24  Waldrop?

25      A    Not to my knowledge.

1      Q      Turn to the very next page, 5156.  It's entitled

2    CHSGa, which I think, from other depositions, stands for

3    Community Health Systems of Georgia; is that correct?

4      A      That is correct.

5      Q      What is the relationship between Community Health

6    Systems, Inc. and Community Health Systems of Georgia?

7      A      Community Health Systems, Inc. is the formal name,

8    and we decided to rebrand, basically, because there's an

9    entity, and I think it was in Tennessee, that had a very bad

10   reputation under that name.

11     Q      Surely not.  Not in Tennessee.

12     A      Not in Tennessee.  It had to have been somewhere

13   else.  But that's the reason.  It's basically a d/b/a.

14     Q      Like an assumed name?

15     A      Right.

16     Q      And the date of the chart that we're looking at on

17   page 5156 of Exhibit 3 is dated July 1st, 2016; correct?

18     A      Correct.

19     Q      So this is an organizational chart that would have

20   went into effect after Mr. Waldrop's termination?

21     A      Yes.

22     Q      Lorraine Taylor is at the top of this chart, and

23   over to the left there's a Jaren Robertson listed --

24     A      Yes.

25     Q      -- as an executive assistant?  That's --

1       A      Yes.   That's what it says.

2       Q      I'm sorry.  Yeah.  Do you know what duties Ms.

3    Robertson performs?  It is Ms. Robertson, isn't it?  Is it a

4    man or a woman or do you know?

5       A      She's female.

6       Q      Jaren, I didn't know that from looking at it.  So

7    Ms. Robertson.  I didn't want to misspeak there.

8       A      Any more depth into her duties besides receptionist

9    at the front desk, I have no knowledge of.

10      Q      So she does perform some receptionist duties?

11      A      She sits at the front desk.

12      Q      Just so I'm clear.  I'm not going to ask you

13   specifically about any of these charts, but just thumbing

14   through Exhibit 3, it appears that there may have been

15   further changes to the organizational structure of the

16   company after July of 2016; is that true??

17      A      Yes.

18      Q      I see some drafts here from November 1.  I'll state

19   specifically where I'm looking.  Page 5159, draft November 1,

20   2016.

21      A      Uh-huh (affirmative).

22      Q      I think the next one actually says, the next page

23   5160, November 1 of 2016.  Would it be fair to say that the

24   organizational structure of Community Health Systems is

25   something that is revisited on a periodic basis?

1      A     That's fair to say, but these schedules do not

2   agree, I mean, the dates.

3      Q     Okay.

4      A     If you look at the one we were just looking at,

5   5155, and 11/01 -- well, this was afterwards.  I guess that's

6   basically almost the same schedule.  I don't know the

7   distinction or the difference in the dates.

8      Q     Is it something that gets, for lack of a better

9   word, tinkered with as things happen in the organization?

10      A     I'm not involved in that process so I don't know

11   what the motivation is to change these.

12      Q     Does the board have to approve these changes?

13      A     Not necessarily.  We are presented with the

14   changes.  I mean, that's a management function though.

15      Q     So that would be under the prevue of Mr. Rollins,

16   Ms. Taylor, and some of these other --

17      A     Right.

18      Q     -- executives we've been discussing?

19      A     Exactly.

20      Q     Let's move on to a topic that we're going to stay

21   on probably for the rest of the afternoon or the day.  Maybe

22   we won't go into the afternoon.  We'll see.  That is Mr.

23   Waldrop's termination.  If you will tell me in your own words

24   why Mr. Waldrop was terminated.

25      A     From beginning to end?

1      Q      In your own words.

2      A      In my own words.  He called my house Monday night,

3  May 16th, just as we were sitting down to dinner.  My wife

4  answered the phone and came back and said it was for me.  I

5  took the phone and walked out into our dining room, and he

6  said he would like to meet with me as soon as possible or as

7  soon as I could.  I told him that we were having a board

8  meeting, as he knew, the following morning so I couldn't do

9  it then.  So we scheduled it for after lunch that day, at

10  1:30 at my office.

11      Q      Okay.  So that would have been on May 17th?

12      A      Correct.

13      Q      And did you actually meet with Mr. Waldrop?

14      A      Yes, I did.

15      Q      Tell me about that meeting.

16      A      He was quite upset and said that Ronnie Rollins had

17  lied to him and was targeting him and had several complaints

18  in regard to that, and showed me an email and some

19  correspondence back and forth that had taken place the

20  previous Thursday and Friday, and he was real upset.

21      Q      Did you believe he was genuinely upset?

22      A      Oh, yeah, I did.  I had no reason to doubt it.

23      Q      Okay.  Well, what did you say in response to Mr.

24  Waldrop at that time?

25      A      My basic response was the two of us need to get

```
 1   together with Ronnie Rollins and air this out, lay it all on

 2   the table.

 3        Q    Had any other executive with Community Health

 4   Systems approached you like this in the past?

 5        A    Never.

 6        Q    Not just with regard to Mr. Rollins, but with any

 7   kind of issue similar to this with anybody?

 8        A    No.

 9        Q    So this was the first?

10        A    This was the first.

11        Q    Okay.  So what happened after this meeting?

12        A    I got in touch with Ronnie and informed him of the

13   whole thing up to that date:  the call at my house, the

14   meeting in my office, and told him what had transpired and

15   told him I thought we needed, the three of us, to get

16   together and meet -- and --

17        Q    And how did -- I'm sorry.  I didn't mean to

18   interrupt.  What was that last part you said?

19        A    I was going to say hope to have a kiss-and-make-up

20   meeting.

21        Q    Okay.  How did Mr. Rollins react when you told him

22   that Mr. Waldrop had come to see you?

23        A    I don't recall any particular reaction whatsoever.

24        Q    Was he angry?

25        A    No.
```

1    Q     What did he say during this conversation?

2    A     Between the two of us?

3    Q     Yes.

4    A     He just agreed to set up a meeting and we looked at

5    various dates that we could meet, and decided on a date, and

6    then I think I contacted Mark Waldrop to see if he could do

7    that.

8    Q     Did you end up meeting with both Mr. Waldrop and

9    Mr. Rollins?

10   A     Yes, we did.

11   Q     When was that?

12   A     That was Tuesday, May the 24th in my office.

13   Q     So that would have been a week -- no -- yes.  That

14   would have been a week after you initially met with Mr.

15   Waldrop?

16   A     Right.

17   Q     How long between your meeting with Mr. Waldrop on

18   May 17th -- how long was it before you called Mr. Rollins or

19   contacted him about this?

20   A     I don't recall.

21   Q     So you met with both Mr. Rollins and Mr. Waldrop on

22   May 24th, 2017?

23   A     Right.

24   Q     Tell me about that meeting.

25   A     In general or specifically?

```
1      Q      However you feel compelled to answer the question.

2      A      In general I thought it was a waste of time.

3      Q      Okay.  Why?

4      A      Specifically --

5      Q      Sorry.  Go ahead.

6      A      -- I thought there was no progress made only

7   because of the attitude of Mark Waldrop.  He was aggressive,

8   rude, insubordinate, and nothing was being resolved.

9      Q      In your prior experiences with Mr. Waldrop had he

10  been rude and insubordinate?

11     A      Before that?

12     Q      Yes.

13     A      No.  Never.

14     Q      In what way was he rude?

15     A      Ronnie would try to answer a statement that Mr.

16  Waldrop made and Ronnie would not be able to finish the

17  sentence for being interrupted.  On several occasions the

18  statement was made "that's a lie."

19     Q      Mr. Waldrop making that statement in response to --

20     A      Exactly.

21     Q      -- what Mr. Rollins would say?

22     A      Exactly.

23     Q      Are there any specific instances you can recall of

24  Mr. Waldrop being insubordinate during that meeting?

25     A      Oh, absolutely.  I thought the whole meeting he was
```

1    insubordinate.

2         Q    How so?

3         A    Well, I mean, insubordination, I go by the

4    definition in the military for the chain of command.

5         Q    Uh-huh (affirmative).

6         A    If you're insubordinate to your commanding officer,

7    it merited court marshal.

8         Q    So what did he do during the meeting that would be

9    insubordinate under that definition?

10        A    Contradicting and call -- I mean, when you call

11   somebody a liar, that's pretty insubordinate in any context

12   in my opinion.

13        Q    How long was this meeting?

14        A    Around an hour maybe.

15        Q    Do you place the blame on Mr. Waldrop for the

16   meting being unproductive to use your word?

17        A    I didn't really blame anybody.  It just was a waste

18   of time.

19        Q    Okay.  So what happened next with regard to these

20   series of events after that meeting on May 24th, 2017?

21        A    We --

22   (OFF THE RECORD)

23        A    THE WITNESS:  What was your question?

24        Q    That's fair enough.  I don't blame you for asking

25   me to rephrase it.  What happened next with regard to these

1   series of events after the meeting on May 24th, 2017?

2       A    Well, the two of them left my office and I talked

3   to Ronnie the next morning because I had never seen or

4   experienced anything like this.  I was kind of groping for

5   where do we go now.

6       Q    Okay.

7       A    We decided that we needed to have an independent

8   investigation of the charges against Ronnie and the conduct

9   of Mark Waldrop.

10      Q    So this would have been on the morning of May 25th?

11      A    It may have even been the 26th.  I cannot remember

12  exactly.

13      Q    Did you ever discuss the need to have an

14  independent investigation of this matter with Mr. Waldrop?

15      A    No.

16      Q    Why not?

17      A    I didn't feel like he deserved to be included in

18  that discussion because I felt like it was a board-level

19  function.

20      Q    Involving Mr. Rollins?

21      A    Right.

22      Q    So in your mind it was appropriate to involve Mr.

23  Rollins in those discussions, but not Mr. Waldrop because it

24  was a board-level decision?

25      A    Yes.

1    Q    Did you consult with any other board members about

2    this?

3    A    I did.  I talked to Paul Cable and Buddy Ponder.

4    Q    When did that conversation take place?

5    A    That I don't remember.  I may have talked to them

6    in between the two meetings.

7    Q    In between --

8    A    The initial meeting with Mark Waldrop and the

9    meeting of the 24th with the three of us.

10   Q    So when you spoke to Mr. Rollins on either May 25th

11   or 26, and you discussed an independent investigation, what

12   happened next?

13   A    Well, in the context of that discussion we weighed

14   how this investigation would go about and who would do it.

15   Q    Okay.

16   A    We first weighed whether we would hire an attorney

17   outside of the ones we already dealt with or whether we would

18   hire our auditors, McNair, McLemore & Middlebrooks, or

19   whether we would hire Mark Lange and his firm.  We decided

20   that hiring an outside attorney, the learning curve to just

21   get him familiar with the organization would take too long.

22   By definition the accounting professional ethics I did not

23   think that McNair, McLemore would be viewed, by accounting

24   independence definition, that they would be viewed as

25   independent.  So the logical answer was Mark Lange.

1        When we hired him, we discussed that very issue, whether

2  he would be considered independent and he basically assured

3  us by legal ethics if he got to the point where he considered

4  his ethics being compromised, he would withdraw.

5        Q     Okay.   There's a lot there I want to try to unpack,

6  but we've been going for about an hour.   Are you okay to keep

7  going?

8        A     I'm okay.

9              MR. HENRY:   Is everybody else okay to keep going?

10             MR. DANIEL:   Yes.

11       Q     MR. HENRY:   The auditing firm that you mentioned --

12       A     McNair, McLemore & Middlebrooks, 3M.

13       Q     3M.   You took the words right out of my mouth.   I'm

14  going to call them 3M --

15       A     Okay.

16       Q     -- so we all know what I'm talking about.   Was

17  there something in Mr. Waldrop's complaints about Mr. Rollins

18  that made you think that it would be necessary to do an audit

19  with 3M?

20       A     They already do our audit.   Yeah.

21       Q     I guess what I'm trying to understand is, was there

22  something about the complaints that Mr. Waldrop made that

23  would have required an analysis of financial issues by 3M?

24       A     Not that they were not already doing.

25       Q     Well, why -- a better way to ask it is this.   Why

1   were you considering 3M as a potential independent party to

2   conduct this investigation?

3       A    Just that they were familiar with our organization

4   and knew the processes and all that, and any other accounting

5   firm, our opinion would have been the same as hiring an

6   outside an attorney.  The learning curve would have been too

7   great.

8   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NOS. 4 AND 5)

9           MR. HENRY:  I've marked this document as Exhibit 4

10          and then I'm also going to give him Exhibit 5.  It's

11          marked Exhibit 6, but it's Exhibit 5 on your copy, Hal.

12      Q    MR. HENRY:  Mr. Wall, I've just handed you

13  documents that have been marked Exhibits 4 and 5.  Have you

14  seen those documents before?

15      A    Yes.

16      Q    If you would, starting with Exhibit 4, tell us what

17  Exhibit 4 is.

18      A    This is a communication from Mark Waldrop to Ronnie

19  Rollins that I guess just basically summarized their

20  disagreements, I guess.

21      Q    Is Exhibit 4 one of the documents that you were

22  presented with during your meetings with Mr. Waldrop and Mr.

23  Rollins?

24      A    Yes.

25      Q    Let's look at Exhibit 5.  Have you seen Exhibit 5

1   before?

2       A     Yes.

3       Q     What is Exhibit 5?

4       A     It's a letter to Mark from Ronnie.

5       Q     Is this one of the documents that was presented to

6   you during your meetings with Mr. Waldrop and Mr. Rollins?

7       A     Yes.

8       Q     Other than Exhibits 4 and 5 were you presented with

9   any other documents during those meetings?

10      A     I don't remember.

11      Q     Well, you've reviewed at some point in time

12  Exhibits 4 and 5; correct?

13      A     Yes.

14      Q     Did Exhibits 4 and 5 contain the bulk of Mr.

15  Waldrop's complaints against Mr. Rollins?

16      A     Let me read it in detail and see.  What was your

17  question again?

18      Q     Exhibits 4 and 5, do those documents contain the

19  basis for Mr. Waldrop's complaints against Mr. Rollins?

20      A     It does not mention targeting anywhere in this

21  document that I can see, briefly reading it, and I only say

22  that because I'd never heard that term before our meeting.

23      Q     Do you recall seeing a document that used that

24  phrase?

25      A     Not to my knowledge.

1    Q    I mean, in the course of your discussions with Mr.

2    Waldrop and Mr. Rollins, do you recall being presented with a

3    document that said targeting?

4    A    No.

5    Q    Well, we'll come back to that later.  But at some

6    point the decision was made to use Mark Lange and his firm to

7    conduct the independent investigation?

8    A    That is correct.

9    Q    Was that decision made -- strike that.  Your

10   meeting or your discussion with Mr. Rollins about that

11   subject was on either May 25th or May 26th?

12   A    Yes.

13   Q    How long after that discussion with Mr. Rollins was

14   the decision made to hire Mr. Lange and his firm to conduct

15   the independent investigation?

16   A    Best I can recall it was made the following week,

17   which would have been possibly the first week of June.

18   Q    So what did Mark Lange do once he was hired with

19   regard to this?

20   A    I'm not quite sure except what he told us he was

21   going to do.

22   Q    What did he tell you he was going to do?

23   A    He wanted to interview some employees, primarily

24   number one, Lorraine Taylor; and then he did not mention any

25   other employees at the time.

1      Q      Why did he want to interview Ms. Taylor?

2      A      He did not say.  Logically I would have thought

3  that she would be the first person that he would want to talk

4  to.

5      Q      Why?

6      A      Because they were at the same level in the

7  organization.  I don't know why he thought --

8      Q      I know.  I'm asking you why you thought logically

9  that would be --

10     A      Yeah.

11     Q      -- somebody.

12     A      I would think that because they're at the same

13  level.

14     Q      Okay.  So he wanted to interview some employees,

15  specifically Lorraine Taylor.  What else did he say he wanted

16  to do?

17     A      That was the extent of our conversation.  He did,

18  as I recall, furnish an engagement letter and it may have had

19  some other detail in it, but I didn't -- I did not really

20  read it extensively and memorize it certainly.

21     Q      Did Mr. Lange interview Ms. Taylor?

22     A      Yes, as far as I know.  I was not there.

23     Q      You didn't attend that interview?

24     A      No.

25     Q      At any point in time during this investigation did

1    you interview Ms. Taylor?

2        A    The only time, if you would consider the start of

3    the investigation, Mark Lange asked me -- we were meeting in

4    the conference room at Community Health Systems, and when we

5    engaged him he said he wanted to know when Lorraine would be

6    available to meet with him, and I went down to her office and

7    asked her.

8        Q    Did Mr. Lange report anything to you about the

9    interview with Ms. Taylor?

10       A    Not until the June 21st board meeting.  I don't

11   recall that he did.

12       Q    So after interviewing Ms. Taylor, what did Mark

13   Lange do with regard to this investigation?

14       A    The last thing I knew or the first thing after that

15   was report to us at the June 21st board meeting.

16       Q    So --

17       A    I don't know what he did in between there.

18       Q    Did you have any communications with Mr. Lange

19   between the time that he requested Ms. Taylor's interview and

20   his report at the June 21 board meeting?

21       A    Not that I recall.

22       Q    Well, what did you do with regard to the

23   investigation between the time that Mr. Lange requested Ms.

24   Taylor's interview and the June 21 board meeting?

25       A    I went to my office and worked on accounting-

1    related services.

2        Q    Fair enough.  With respect to this investigation

3    what did you do?

4        A    Nothing.

5        Q    So you basically just turned it over to Mr. Lange?

6        A    That's exactly what I wanted to do.

7        Q    I understand.  Other than interviewing Ms. Taylor,

8    do you know if Mr. Lange interviewed any other Community

9    Health Systems employees?

10       A    I do not have any personal knowledge of that.

11       Q    Well, do you have any knowledge whatsoever about

12   it?

13       A    No.

14       Q    Do you know what happened?

15       A    No.

16       Q    You don't know whether he interviewed Mr. Rollins?

17       A    Well, I'm sure he and Ronnie probably talked, but

18   that's mere speculation on my part.

19       Q    How about Mr. Waldrop, do you know if he spoke to

20   Mr. Waldrop?

21       A    I think he did in his office in Atlanta.

22       Q    Do you know when that was?

23       A    No.

24       Q    How did you find out about that interview?

25       A    I think I read it in an email after -- since all

1    this stuff's been going on.

2         Q    So you didn't find out about it before June 21?

3         A    No.  No.  Well, it may have been reported at that

4    June 21st --

5         Q    And that's what I'm trying to -- I'm trying to

6    figure out when you found out certain things about this

7    investigation.

8         A    Okay.

9         Q    If I'm understanding your testimony, you're saying

10   you turned it over to Mark Lange and didn't know anything

11   about it, didn't have any involvement in it until June 21?

12        A    Exactly.

13             MR. HENRY:  Let's take a break briefly.

14   (BREAK)

15             MR. HENRY:  This will be Exhibit 6.

16   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 6)

17        Q    MR. HENRY:  Mr. Wall, I've handed you what's been

18   marked as Exhibit 6.

19        A    Uh-huh (affirmative).

20        Q    What is Exhibit 6?

21        A    Those are my notes on basically the first week or

22   so of this whole proceeding.

23        Q    So you generated Exhibit 6?

24        A    Yeah.  That is my handwriting.

25        Q    Would you have generated Exhibit 6

1   contemporaneously with the meetings you had or at some other

2   time?

3       A    Mostly at the meetings I had because obviously the

4   first one wasn't contemporaneously --

5       Q    Okay.

6       A    -- but I was writing as fast as I could the day I

7   met on the 17th.

8       Q    Was this Exhibit 6 kind of an ongoing -- you might

9   make an entry on one day and then two days later make another

10  entry?

11      A    Well, only to the extent that down at the bottom I

12  kind of added to it.  I did go back and add the phrase

13  "called RR a liar and was targeting him."  Anyway, somewhere

14  on here -- yeah, the fact -- I was trying to remember what

15  really caught me as strange in this meeting.

16      If you'll look down at the bottom third, it said "ask

17  for three things when he does," and I assumed resign.  A

18  severance pay, write a recommendation, and then a position

19  for his assistant.  I just thought that was kind of not in

20  the context of what we were meeting about.

21      Q    Let's kind of go through this a little bit.

22  There's some writing that's in red?

23      A    Yeah.

24      Q    Would that have been notes you added after the

25  fact?

1        A      Yes.   Yes.   Yeah.

2        Q      You mentioned earlier that you discussed this with

3   Paul and -- well, I don't know that you used these names, but

4   Paul and Buddy?

5        A      Yes.   That's Paul Cable and Buddy Ponder.

6        Q      And do those notes below that characterize what

7   their concerns were or their issues were?

8        A      They were my concerns.

9        Q      Okay.

10       A      And we talked about them.

11       Q      They were concerned -- I'm just going to go through

12  them one by one.   They were concerned about a succession

13  plan.   Do you see that?

14       A      Yes.

15       Q      Why was that a concern?

16       A      Well, we had put in place and mistakenly had

17  announced that Mark would succeed Ronnie.

18       Q      Why do you say mistakenly?

19       A      Because in hindsight we'll never do that again.   I

20  mean, that was just not prudent to make that kind of

21  designation at that time.

22       Q      Why is that not prudent?

23       A      We just didn't think it was a good idea going

24  forward.   Obviously, when we were doing the compensation

25  studies, we were trying to get that in place to where it

1  would be a logical succession.

2       Q     Mark succeeding Mr. Rollins?

3       A     Correct.

4       Q     Mark Waldrop succeeding --

5       A     Waldrop, yes.

6       Q     I'm sorry.  There are --

7       A     Too many Marks.

8       Q     -- too many Marks.  Were there any proposals made

9  about a succession plan?

10      A     At this time?

11      Q     Yes.

12      A     No.  Uh-uh (negative).  We were still floundering.

13      Q     Let's back up for a second.  You just testified a

14  few minutes ago about he wants or he plans to resign and

15  there are three things:  severance pay, write a

16  recommendation, and position for his assistant.  Did Mr.

17  Waldrop say he planned to resign?

18      A     Not that I remember, but I -- I mean, having said

19  those three things, I kind of thought that's where he was

20  going and that's what I was trying to prevent.

21      Q     So when you wrote this note on Exhibit 6 about his

22  wants and his plans to resign, that's what you took from it.

23  He didn't say he was planning to resign?

24      A     No.  I don't recall that he ever said that.

25  Really, if you look at this page, above that line, above

1    these notes --

2         Q    Just for the record, I'm going to -- I think we're

3    talking about the same thing.

4         A    That line right there, (witness indicating).

5         Q    So you're talking about, when you say that line

6    right there, you're talking about the line above the phrase

7    he wants/plans to resign.

8         A    Right.  And everything above there except that

9    phrase written in red, "called RR a liar and was targeting

10   him," those were the notes that I was trying to write as he

11   was talking.

12        Q    Okay.  So everything below that line is things you

13   added later --

14        A    Right.

15        Q    -- after the meeting?

16        A    Right.

17        Q    Well, these three things that you list are -- where

18   did those come from?

19        A    That's what he said.

20        Q    But he didn't say --

21        A    Mark Waldrop.

22        Q    But he didn't say he was going to resign?

23        A    No.  Uh-uh (negative).

24        Q    What was the context where he listed these three

25   things?

1    A    Well, it was kind of out of the blue.  It didn't

2 have anything to do with these things about upset -- about

3 VEBA and cap. ex., and Ronnie didn't communicate with Mark.

4 It was kind of like he stopped in the middle of the

5 conversation and this was early -- kind of early into our

6 conversation.  He said he wanted his severance pay, write a

7 recommendation, and a position for his assistant.  At that

8 point I said, whoa.  Where is this thing going?

9    Q    Did you ask him that?

10   A    No.  No, I didn't ask him.  I just let him talk

11 because I didn't know about all this stuff.

12   Q    When you say all this stuff, you're talking about

13 the things above the line?

14   A    Yeah, and these things in this communication.

15   Q    Exhibits 4 and 5?

16   A    Right.  I just didn't know all these details.

17   Q    And these notes, everything above the line that

18 you've described, were taken during your meeting on May 17th,

19 2016?

20   A    Except for that phrase written in red.

21   Q    Right here?

22   A    Right.

23   Q    "Called RR a liar and was targeting him."

24   A    Yes.

25   Q    When did you add that to it?

1     A    Some time later that afternoon.

2     Q    Okay.  Let's go back down to the bottom of Exhibit

3 6.

4     A    Okay.

5     Q    Paul Cable and Buddy Ponder?

6     A    Yes.

7     Q    Who could/would replace Mark is the second --

8     A    Uh-huh (affirmative).

9     Q    -- note there.  What were your discussions about

10 that?

11     A    Well, I mean, that question was just kind of left

12 dangling.  I mean, we didn't have an answer to it.  That was

13 the first thing that popped into my mind.

14     Q    Next item has a red asterisk next to it.

15     A    Uh-huh (affirmative).

16     Q    Both agreed that I should talk to you.

17     A    Ronnie.

18     Q    So did you write this to Ronnie?

19     A    No.  Uh-uh (negative).  I just -- I mean, I made

20 some notes in preparation for our May 19th meeting with

21 Ronnie.  These things.  I had written these notes before I

22 called Buddy and Ronnie (sic), and then -- the first two, and

23 then I wrote that note at the bottom, that last sentence

24 after I had talked to them.

25     Q    Well, you testified earlier, and I'm just trying to

1    be sure I know what the timeline is here.  I believe you

2    testified earlier that you met with -- let me just be sure

3    I'm getting this.  The May 17th, 2016 meeting was with Mr.

4    Waldrop only.

5         A    Only.

6         Q    And then on May 19th did you meet with Ronnie only?

7         A    Yes.  And I think I may have said I called him.

8         Q    Okay.

9         A    But I actually evidently did meet with him.

10        Q    How long did y'all meet again?

11        A    Y'all being --

12        Q    You and Ronnie --

13        A    -- me and Mark?

14        Q    -- Rollins?

15        A    With Ronnie?

16        Q    Uh-huh (affirmative).

17        A    It wasn't a long one.  I mean, maybe an hour at the

18   most.

19        Q    These items that you're talking about here at the

20   bottom of Exhibit 6, the first page of Exhibit 6, took place

21   --

22        A    Right.

23        Q    -- you discussed these with Mr. Rollins before your

24   joint meeting with Mr. Rollins and Mr. Waldrop?

25        A    Yes.

1    Q    It says Paul did not want to be bothered.  What

2  does that mean?

3    A    He just kind of was real blunt or flip about it.

4  He said well, you need to call Ronnie, and I don't want to be

5  involved.  He didn't explicitly say that, but --

6    Q    That's what you took away from the conversation?

7    A    Yeah.  Yeah.

8    Q    Buddy was quite concerned?

9    A    Buddy is a little more serious type person.

10  Outside of me he was probably the most upset about this whole

11  proceeding.

12    Q    Continuing on with Exhibit 6, there's a note to the

13  left --

14    A    Uh-huh (affirmative).

15    Q    -- of the items we've just been discussing.  It

16  looks like a hole punch that might have --

17    A    Yeah.

18    Q    -- punched part of that word out.  Do you know what

19  that word is?

20    A    I don't.  No, I don't.

21    Q    Below it, either apologize and make up or severe

22  relationship.  Where did that come from?

23    A    That was just my thoughts after thinking through

24  this.

25    Q    It did not come from Ronnie?

1        A      Oh, no.   Uh-uh (negative).   No.

2        Q      Let's go ahead and look at the second page of

3   Exhibit 6.   I'm not sure if the second page is related to the

4   first page or not, but they were produced together, which is

5   why they're together.   So I'll ask you.   Is the second page

6   of Exhibit 6 related in any way to the first page of Exhibit

7   6?

8        A      I'm not sure it was done at the same time frame,

9   because I don't even recognize this writing up at the top.

10       Q      With his phone number?

11       A      Yeah.

12       Q      Mr. Waldrop's phone number?

13       A      Uh-huh (affirmative).

14       Q      That's not your writing?

15       A      No.

16       Q      There's some calculations it looks like down there

17  below.   I'm assuming that's what that is.

18       A      That is my writing.

19       Q      What is that?   What are you doing there?

20       A      I really do not remember.   That may have been when

21  we were discussing a severance package.

22       Q      Okay.

23  (OFF THE RECORD)

24  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 7.)

25       Q      MR. HENRY:   Exhibit 7.

1      A      Uh-huh (affirmative).

2      Q      You're holding that.  Have you had a chance to

3  review it, Exhibit 7?

4      A      I'm reading now.

5      Q      Okay.  I'm sorry.  Take your time.  Just let me

6  know when you're ready.

7      A      Yeah.  Okay.

8      Q      Do you recall this email exchange in Exhibit 7?

9      A      Yes.

10     Q      Looking at your email to Mr. Waldrop on May 20th at

11  11:45.  Mark:  Ronnie and I met yesterday afternoon for over

12  an hour.

13         That's the May 19th meeting --

14     A      Right.

15     Q      -- that we talked about here on Exhibit 6?

16     A      Uh-huh (affirmative).

17     Q      Of course at the top Mr. Waldrop responds to it and

18  talks about his availability.  What I'm curious about is the

19  handwritten note toward the bottom of the first page.

20     A      Uh-huh (affirmative).

21     Q      Is that your handwriting?

22     A      Yes.

23     Q      It says Workday, arrow, 293K option expired.

24     A      I don't remember the context of which I made that

25  note, and I'm not at all familiar with Workday and the

1    contract or whatever because that's an internal process.

2         Q    Would that be something more management related,

3    not board related?

4         A    Oh, absolutely.

5         Q    You don't want to get into Workday?

6         A    I don't want to get down in the weeds.

7         Q    I had all kinds of questions on Workday so I guess

8    we'll -- no, I'm kidding.  So strike that.

9         Was there a discussion of Workday in your meetings with

10   Mr. Waldrop and Mr. Rollins either collectively or

11   individually?

12        A    I think it was an issue in one of these emails.

13        Q    Okay.  Yep, it is.

14        A    But I was -- like I said earlier I was totally

15   unfamiliar with most of this stuff.

16        Q    Sitting here today you don't know what this 293K

17   option expired means?

18        A    The only thing I remember, and I'm not sure when or

19   in what context that came up, but there was evidently -- if

20   it was enacted at a certain point there would be, like, a

21   credit or a deal as part of that contract where we would not

22   have to spend that $293,000.

23        Q    I'm going to go back to Exhibit 6 briefly.  That's

24   your handwritten note.

25        A    Uh-huh (affirmative).

1      Q      Under the line that you identified earlier where

2  the three items are listed --

3      A      Uh-huh (affirmative).

4      Q      -- the first one says a severance pay.  (Do we have

5  a contract with Mark?)  You see that?

6      A      Yeah.

7      Q      So as of May 17th, 2016, you had already kind of

8  thought about the fact that there may be a contract in place?

9      A      Yeah.  Yeah.  I mean, I vaguely remembered that and

10  that was the reason I made that note was to possibly look for

11  it, but it was hopelessly in piles of documents that I have

12  in my office.

13      Q      Did you have any conversations with Mr. Lange about

14  the fact that Mr. Waldrop had an employment agreement?

15      A      At this time?

16      Q      Yes.

17      A      No.

18      Q      Or around this time?

19      A      Really not.  I think later I realized that he did

20  have an employment contract and that kind of took the issue

21  off the table or either put it on the table, whichever.

22      Q      Do you know if you came to that realization before

23  or during the June 21 board meeting?

24      A      Oh, we'd have known it by then.

25      Q      So you knew it going into the --

```
 1        A     Oh, yeah.

 2        Q     -- June 21 board meeting?

 3        A     Yes.

 4  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 8)

 5        Q     MR. HENRY:  Mr. Wall, you're holding what's been

 6  marked as Exhibit 8.

 7        A     Uh-huh (affirmative).

 8        Q     Do you recognize Exhibit 8?

 9        A     Oh, absolutely.

10        Q     Okay.  The first page of Exhibit 8 appears to be a

11  sticky note.

12        A     Uh-huh (affirmative).

13        Q     Is that your handwriting?

14        A     Yes.

15        Q     Do you recall the context of writing that sticky

16  note?

17        A     Really not.  It just was something that popped into

18  my head at some point in time.

19        Q     Was it during the independent investigation that

20  we've been talking about that that --

21        A     No.

22        Q     -- popped into your mind?

23        A     No.

24        Q     Would it have been after the June board meeting?

25        A     Possibly.
```

1        Q    Let's go to page two of Exhibit 8.  What is page 2

2    of Exhibit 8?

3        A    That is my notes of our May 24th meeting.

4        Q    Okay.  Did you take these contemporaneously with

5    that meeting?

6        A    Absolutely.

7        Q    So as the meeting was occurring, you were writing

8    it down?

9        A    Uh-huh (affirmative).

10        Q    That is the meeting of May 24th that you described

11    as unproductive and you said Mr. Waldrop was insubordinate

12    and rude; correct?

13        A    Correct.

14        Q    You say in this note on page two, R.R., which is

15    Ronnie Rollins; right --

16        A    Correct.

17        Q    -- was surprised, caught off guard, frustrated by

18    M.W., which is Mark Waldrop, his complaints, attitude and

19    demeanor, not "softening his position," totally

20    insubordinate.  Did Mr. Rollins use that phrase, "softening

21    his position?"

22        A    No, I did.

23        Q    You did?  Did you say that during the meeting?

24        A    No.

25        Q    And then below that it says I was, too.  Does that

1    mean you had the same reaction as Mr. Rollins?

2         A    Yes.

3         Q    What was Mark Waldrop's position that he was not

4    giving in on during that meeting?

5         A    Just that there was no halfway point or meeting in

6    the middle or compromise or even agreeing to disagree.

7         Q    Well --

8         A    I mean, that was my read of it.

9         Q    Were there competing options on the table for

10   resolving it?

11        A    Not necessarily, but there was just a lot of petty

12   stuff that sounded to me like Mark was being very thin-

13   skinned and emotional about.  I can point to you one item on

14   this email that I thought was just laughable.

15        Q    Please, do.

16        A    Number seven on the comments about Navicent, and I

17   don't even remember.  Mark made the statement, I remember --

18        Q    Let me just kind of interrupt you.  Just for the

19   record you're --

20        A    Exhibit 4.

21        Q    Exhibit 4.  Okay.

22        A    On Navicent, under number seven, not the response,

23   but under "C."  M.W. had no additional guidance on how to

24   proceed.  Mark says, wonder if somebody looked at that three

25   or six months down the road, what would they think?

1    I said, you know, I just thought that was kind of

2  bizarre.

3    Q    So you just didn't understand his concern about

4  that?

5    A    Uh-uh (negative).

6    Q    Do you know what Navicent is?

7    A    It's the Medical Center of Central Georgia here in

8  Macon.

9    Q    Would that have fallen under Mr. Waldrop's prevue

10  as COO?

11    A    No.  I mean, there was some discussions going on

12  and not at this time, but I remember that or found out later

13  that Mark was away while some of that was going on and Diana

14  Wilkes was involved in it.  Evidently Diana had not filled

15  Mark in on what had taken place.  But to me that was -- that

16  should have been the end of it or the resolution of it.

17    Q    Was that Diana Wilkes filled Mark Waldrop in on

18  what happened while he was away?

19    A    Did not.  That's what I gathered from that.

20    Q    So you just believe that Mark Waldrop's response to

21  that comment that he had no guidance was unreasonable?

22    A    Just rather petty.

23    Q    Petty?

24    A    Yeah.

25    Q    That's a specific example.  Are there other

1    specific examples you can point to sitting here today where

2    Mark Waldrop was, I think you said, thin-skinned?

3         A    Not really, but I just -- that one just stuck with

4    me.

5         Q    At any time during your meetings with Mr. Waldrop

6    and Mr. Rollins was there mention made of a break in at the

7    Dalton office?

8         A    I don't remember.  I mean, I found out about it at

9    some point in time, but I don't think there was a --

10        Q    You don't think that was discussed here?

11        A    I don't think that was discussed.

12   (OFF THE RECORD)

13   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 9)

14        Q    MR. HENRY:  Mr. Wall, you're holding what's been

15   marked as Exhibit 9, which, as was pointed out while we were

16   off, --

17        A    Uh-huh (affirmative).

18        Q    -- appears to be a copy of the same document that

19   was --

20        A    Uh-huh (affirmative).

21        Q    -- Exhibit 5.  But this Exhibit 9 has some color

22   highlights on it.  Do you see that --

23        A    Yes.

24        Q    -- on page two specifically and on page three.  Do

25   you know who added those highlights?

1       A     No, I do not.

2       Q     You didn't do it?

3       A     I don't think so.  I don't remember doing it.

4       Q     All right.

5   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 10)

6       Q     MR. HENRY:  Exhibit 10.  Have you had a chance to

7   take a look at Exhibit 10, Mr. Wall?

8       A     Uh-huh (affirmative).

9       Q     What is Exhibit 10?

10      A     This is a phone message from somebody in my office

11  that Ronnie had called me and I returned -- evidently

12  returned his call because I made a note on the message.

13      Q     So the black writing there on the first page of

14  Exhibit 10 -- well, strike that.  Let's lay the foundation

15  for this.  If you'll look at the first page of Exhibit 10 and

16  the last page of Exhibit 10 --

17      A     Uh-huh (affirmative).

18      Q     -- does the last page of Exhibit 10 appear to be

19  the reverse side of the first page of Exhibit 10?

20      A     I assume.  Yes.  If you look --

21      Q     I know.  I just want to be sure we're on the same

22  page.

23      A     Yeah.

24      Q     The black writing toward the bottom of the first

25  page of Exhibit 10 is your handwriting; correct?

1      A     Yes.

2      Q     And then the backside, which is the second page on

3  Exhibit 10, is that also your handwriting?

4      A     Yes.

5      Q     Was it Ronnie Rollins who reached out to Mark Lange

6  about doing this investigation?

7      A     I think he confirmed it some time after Ronnie and

8  I had talked about our alternatives, the three alternatives

9  of who would do it.  I think Ronnie may have talked to Mark

10  about the situation.

11      Q     Did you have any conversations with Mr. Rollins

12  about what he discussed with Mr. Lange?

13      A     Nothing other than my note here, do a full

14  investigation.

15      Q     Let's look at page two.

16      A     Okay.

17      Q     It's got check, board, question mark.  What is

18  that?

19      A     That was just what it says and I don't know why it

20  was written other than possibly to get the board together and

21  formally engage Mark or whatever, but I think later on it was

22  decided that I could engage Mark.

23      Q     Mark Lange?

24      A     Mark Lange.  Yes.

25      Q     Mark Lange will be -- going on down, I just want to

1  be sure I'm reading your writing correctly, although it's

2  very neat so it's legible.  Mark Lange will be contacting,

3  meet to discuss some corporate issues.

4      A    Right.

5      Q    Were those corporate -- well, strike that.  Did

6  Mark Lange end up contacting you at some point after this?

7      A    Yes.  I think he came to Macon.

8      Q    Did y'all discuss corporate issues?

9      A    Obviously, yes.

10     Q    I mean, I'm not going to ask specifically to the

11  extent it's not related to this case, but --

12     A    Yes.

13     Q    -- were those corporate issues related to this

14  investigation?

15     A    Yes.

16     Q    What did you discuss with Mr. Lange?

17     A    I don't remember specifically, but corporate

18  issues.

19     Q    Below that you have Mark W. and then a phone

20  number.  Is that Mark Waldrop?

21     A    I don't know, but I -- I mean, I don't know why I

22  would have written it because I certainly wasn't going to

23  call him.

24     Q    Did you at any point contact Mr. Waldrop to arrange

25  for a meeting between Mr. Waldrop and Mr. Lange during this

1   process?

2       A    Not until setting up our June 28th meeting.

3       Q    Okay.

4       A    Because like I said, Mark Lange -- I let him run

5   with it after that.

6       Q    You didn't have, if I remember your testimony

7   correctly earlier, you didn't have any communications with

8   Mark Waldrop between the meeting on May 17th and the meeting

9   on June 29th?

10      A    No.  No, because we met May the 24th.

11      Q    May 24th?

12      A    Yes.

13      Q    That was the joint meeting.  So after the joint

14  meeting, between that time and the time that you contacted

15  Mr. Waldrop to set up the meeting with Mr. Lange on June

16  28th, you didn't have any communications with Mr. Waldrop?

17      A    Not that I recall.

18      Q    You don't know why you would have put Mr. Waldrop's

19  number on this Exhibit 10 dated June 3rd?

20      A    I don't remember any reason.

21      Q    Okay.

22  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 11)

23      Q    MR. HENRY:  Mr. Wall, you're holding Exhibit 11.

24  Do you recognize Exhibit 11?

25      A    Yes.

1        Q        What is Exhibit 11?

2        A        It's some notes I made that I told you before about

3    the conversations that Ronnie and I had about where to go

4    from here and our alternatives as to who would conduct the

5    investigation.

6        Q        Right.   6/3, that very first note would have been

7    probably something that is related to Exhibit 10; right?

8        A        Right.

9        Q        The same day?

10       A        Yes.

11       Q        So would the notes under 6/3, under Exhibit 11, be

12   the notes of your conversation where you called Mr. Rollins

13   back?

14       A        Yes.

15       Q        It appears under that 6/3 note, above the line on

16   the left, that there is some -- there's a list.   Do you see

17   that?

18       A        Yes.

19       Q        It might have even been written in pencil.   I'm not

20   sure.   Is that your handwriting?

21       A        Yes.

22       Q        Those are the three options that y'all discussed

23   for the independent investigation; right?

24       A        Yes, that I'd mentioned before.

25       Q        Below the line, before that first line there's a

1  6/7/16 entry.  M.W. met with Mark Lange at Holland and Knight

2  offices.  When did you make that note?

3       A    Obviously after the notes above that.

4       Q    How did you find out that Mark Waldrop had met with

5  Mark Lange at Holland and Knight offices on June 7th, 2016?

6       A    I don't recall exactly how I knew that.

7       Q    You don't recall if Mr. Rollins told you about

8  that?

9       A    No, I don't.

10      Q    And then the next day, 6/8, R.R., Ronnie Rollins;

11  right?

12      A    Right.

13      Q    Is that M.L.?

14      A    Yes.

15      Q    I couldn't tell if that was an "L" or a "C."  Mark

16  Lange?

17      A    Mark Lange.

18      Q    And J.A.W., that's you?

19      A    Yes.

20      Q    Discussed Mark Lange meeting with Mark Waldrop.  Is

21  that what it says?

22      A    Yes.

23      Q    Did you have a meeting with Mr. Rollins and Mr.

24  Lange on June 8th or was that by phone?

25      A    That was in person.

1    Q    Okay.  What did y'all talk about with regard to

2  Mark Lange's meeting with Mark Waldrop?  What did Mark Lange

3  tell you about that meeting?

4    A    I don't think he went into a great deal of detail.

5  I don't remember any particular details that he told us.

6    Q    Is this the meeting that you described earlier

7  where you stepped down the hall and asked Ms. Taylor when she

8  could meet with Mr. Lange?

9    A    Yes.

10    Q    The very last note here on Exhibit 11 is she asked

11  if she and I could talk.  See tab number six.  That's your

12  handwriting.

13    A    Yes.

14    Q    Who is "she"?

15    A    Lorraine.

16    Q    Lorraine Taylor.  Did you talk to her?

17    A    Well, she did most of the talking.

18    Q    When was that?

19    A    That very afternoon, June the 8th.

20    Q    Tell me about that conversation.

21    A    Well, obviously I went down there to ask her if she

22  would be available June the 9th, in the morning, and she said

23  she was.  She said can I talk to you?  I said sure.

24    She began to tell me all kind of information about --

25  well, to start with she told me that Mark had called her at

1  home, wanting to get my phone number, and he was going to

2  call me.  He had asked her to go with him to meet with me and

3  she said she would not.  I don't remember anything beyond

4  that, but there was a bunch more information.  I just don't

5  recall whether that conversation included -- I can't remember

6  what else was said, I'll put it that way.

7      Q    On that specific day you don't remember what else

8  was said.

9      A    Right.  That's right.

10     Q    On that specific day did Ms. Taylor mention

11 anything to you about Mr. Wall's expense reimbursement

12 requests?

13     A    I don't remember.

14     Q    Did she at anytime between June 8 and the board

15 meeting on June 20th --

16     A    21st.

17     Q    -- did she at any time during that time frame

18 mention anything to you about Mr. Waldrop's expense

19 reimbursement requests?

20     A    I don't remember.  I know it was discussed in

21 detail June 21st.

22     Q    How long did you meet with Ms. Taylor on June 8th?

23     A    Maybe 30 minutes.  Not -- I mean --

24     Q    And all you can remember sitting here today about

25 that 30 minute conversation is that she told you that Mr.

1    Waldrop had asked for your phone number and had asked if she

2    wanted to attend a meeting with you?

3        A    Just what I said.

4        Q    When Mark Lange was engaged to conduct this

5    independent investigation, was the scope of his investigation

6    limited to the allegations that Mr. Waldrop had made against

7    Mr. Rollins?

8        A    That in my mind was the primary purpose of the

9    engagement.  Obviously, it expanded into a whole lot more.

10       Q    When did you find out that it had expanded into a

11   whole lot more?

12       A    The June 21st board meeting was the initial

13   conference, I guess, about what was going on.

14       Q    We're going to get to this in a minute, but you

15   sent a letter to Mr. Waldrop listing several reasons why he

16   was terminated in August of 2016.  Do you remember that?

17       A    Yes.

18       Q    Is it your testimony here today that the first you

19   heard about any of those issues was at the June 21st board

20   meeting?

21       A    In detail, yes.

22       Q    Well, when is the first time you heard anything

23   about it at all?

24       A    I don't remember.

25       Q    Well, let's try to narrow it down here.  You had a

1   conversation with Ms. Taylor on June 8th.  Was it during that

2   conversation?

3       A    I don't remember.

4       Q    All right.  Would it have been within a week of

5   that conversation?  We're talking about a limited time period

6   here, June 8th to June 21st.

7       A    Right.

8       Q    How long before the board meeting?

9       A    I don't remember.

10      Q    Did you make any notes when you found out?

11      A    No.  If I did, you've got a copy of them.

12      Q    Okay.  I'm going to try to go through these

13  handwritten notes here with you and maybe it will refresh

14  your memory of when you first found this out.

15      A    Okay.

16           MR. HENRY:  Exhibit 12; right?

17           COURT REPORTER:  Yes.

18           MR. HENRY:  All right.  We're on a roll.

19  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 12)

20      Q    MR. HENRY:  Exhibit 12, I think you're looking at

21  it.

22      A    Uh-huh (affirmative).

23      Q    Have you seen Exhibit 12 before?

24      A    I think so.

25      Q    What is Exhibit 12?

1        A     It's some kind of consulting agreement between

2   Spiritus and Community Health Services of Georgia, LLC.

3        Q     There's a handwritten note at the top of the first

4   page, violation of the by-laws.

5        A     Right.

6        Q     Is that your writing?

7        A     Yes.

8        Q     So do you know when you made that note?

9        A     No.

10        Q     Why would this consulting agreement be a violation

11   of the by-laws?

12        A     Well, several reasons.  We had initiated a charter

13   process for engaging into contracts and we were informed that

14   there were not -- there's not a charter initiated on this.

15   And I think, if I remember correctly, this contract was drawn

16   up in the name of our -- not in the name of Community Health

17   Systems, Incorporated, but in the name of Community Health

18   Services of Georgia, and I have no idea who that is.

19        Q     That's the name of the -- well, the LLC, I guess.

20   You don't know what the LLC is, but isn't that the assumed

21   name of Community Health Systems?

22        A     I've never heard of that.

23        Q     It's Community Health Systems of Georgia that we

24   talked about earlier?

25        A     Right.  Right.

1      Q      And you don't remember when you wrote this note at

2    the top of Exhibit 12?

3      A      No.

4      Q      Do you know if it was before or after the June

5    board meeting?

6      A      Same answer applies.

7    (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 13)

8      Q      MR. HENRY:   Exhibit 13.   Have you had a chance to

9    look at Exhibit 13?

10     A      Yes.

11     Q      Is that your handwriting?

12     A      Uh-huh (affirmative).

13     Q      What is Exhibit 13?

14     A      It's some notes I made.

15     Q      Do you know when you made them?

16     A      No.   It's not dated.

17     Q      Was this something that you might have made during

18   the board meeting?

19     A      It could be.

20     Q      You don't know when you made them, though?

21     A      That's what I said.

22     Q      Do you recall the context in which they were made?

23     A      Well, obviously somebody had been looking at the

24   expense reports of Stephanie and Mark.

25     Q      Uh-huh (affirmative).

1      A      And then this VP position, I think that related to

2   this contract --

3      Q      Exhibit --

4      A      -- with Spiritus or whatever.

5      Q      Exhibit 12?

6      A      Yeah.    And then the cap. ex., $400,000 not

7   budgeted; $28,000 each with master financing agreement.

8      Q      What was the issue with this VP position?

9      A      I don't really recall at all, but I think it had

10  something to do with this document, Exhibit 12.

11     Q      Well, Exhibit 12 talks about this agreement being a

12  violation of the by-laws, your note.

13     A      Right.

14     Q      Would the VP position have something to do with the

15  violation of the by-laws?

16     A      That's not written on this page.

17     Q      Okay.   I'm just trying to --

18     A      Keith Wilson, I think is an employee now and was

19  going to --

20     Q      Okay.

21     A      -- be in that spot rather than have this expensive

22  contract.

23     Q      Okay.   There's a note at the very, very bottom with

24  an asterisk next to it.  Can you just read that into the

25  record?  Well, first of all is that your handwriting?

1    A    That is.  The bad thing is -- well, that first word

2  I scribbled.

3    Q    That's why I was asking you to read it into the

4  record.  We've done pretty good so far.  I can read it all,

5  but I just can't --

6    A    Subverted approval process or policies.

7    Q    That's what it looks like to me.

8    A    Yes.

9    Q    What does that mean?

10   A    I don't remember.

11   Q    Do you know why you might have written that with an

12  asterisk next to it?

13   A    Just because I thought it was pertinent at the

14  time.

15   Q    Well, is there something going on here in this case

16  that would lead you to think that there was a subversion of

17  the approval process or policy?

18   A    I think this asterisk applies to the expense

19  reports.

20   Q    Okay.  So that note is in connection with

21  Stephanie, I'm assuming that's, Dotson?

22   A    Right.

23   Q    Her expense reports?

24   A    Right.

25  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 14)

1    Q    MR. HENRY:  Mr. Wall, you're holding Exhibit 14,

2  which I will represent to you is a copy -- color copy of

3  Exhibit 2.  Would you agree with that?

4    A    Yes.

5    Q    You see some highlights?

6    A    Uh-huh (affirmative).

7    Q    Did you add those highlights?

8    A    I could have possibly just in reviewing the

9  document.

10    Q    Well, let's look at page three of Exhibit 14.

11  There's a handwritten note there in the margin.  Is that your

12  handwriting?

13    A    Yes.

14    Q    Does seeing the fact that you have a handwritten

15  note on this document refresh your memory as to whether you

16  made these highlights?

17    A    Oh, I don't deny that I made them.

18    Q    Okay.  I just -- I thought you said you didn't

19  recall --

20    A    Yeah.

21    Q    -- whether you made them.  Do you know when you

22  made them?

23    A    No.

24    Q    Why would you highlight provisions in this

25  agreement?

1     A     Just more to familiarize me with what the potential

2  issues were or what issues were at hand, just out of my own

3  personal curiosity or need to know information.

4     Q     I know you said you don't remember when you made

5  the highlights, but do you recall whether it was before or

6  after the board meeting on June 21st?

7     A     I don't remember specifically at all.

8  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 15)

9     Q     MR. HENRY:  Mr. Wall you're holding what's been

10  marked as Exhibit 15.  Do you recognize Exhibit 15?

11     A     Vaguely.

12     Q     Is that your handwriting?

13     A     Yes, it is.

14     Q     Proof of:  expense reports, cap. ex. not budgeted,

15  create an officer position without board approval.  Did I

16  read the first part of that correctly?

17     A     Yes.

18     Q     Do you remember making that note?

19     A     I do not remember.  I obviously am bad about not

20  dating documents.

21     Q     Well, then it goes down and says section 6.3, take

22  away employees.  Is that what it says?

23     A     That's what it says, and I don't even understand

24  that note.

25     Q     Let's look back at Exhibit 14.  There's a section

1    6.3 on page six that's highlighted.  Do you think that might

2    be what you were referring to there in that handwritten note

3    in Exhibit 15?

4         A    Possibly so, yes.

5         Q    Was there a concern that Mr. Waldrop would take

6    away employees?

7         A    No.  No.  When you say was there, I had no concern.

8         Q    Did others?

9         A    I didn't hear anybody say that, but I wasn't --

10   certainly wasn't worried about it.

11        Q    But you did make a note about that section;

12   right --

13        A    Yeah.

14        Q    -- here in Exhibit 15?

15        A    Yeah.

16        Q    I guess none of these handwritten notes -- we're

17   probably going to talk about them again later.  I'm just

18   trying to figure out whether these handwritten notes refresh

19   your memory on when you first found out or learned that there

20   were issues with Mr. Waldrop and the cause for his

21   termination.  But none of the handwritten notes we've looked

22   at refresh your memory on that, do they?

23        A    Because they're not dated.

24        Q    I know.

25        A    I readily admit that.

1     Q     Okay.  Well, we've talked about the June 21 board

2   meeting already a little bit.  Let's go to Exhibit 16.

3   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 16)

4     Q     MR. HENRY:  Mr. Wall, you're holding Exhibit 16.

5   Have you seen Exhibit 16 before?

6     A     Yes.

7     Q     What is Exhibit 16?

8     A     It's the minutes of our June 21st, 2016 board

9   meeting.

10    Q     Let's go to the very last page of Exhibit 16, the

11  last paragraph.  There being no further questions or

12  discussion by the board, Mr. Wall and Mr. Rollins thanked all

13  the members of the board and the other meeting participants

14  for their attendance.  Upon motion then duly made by Mr.

15  Patton and seconded by Ms. Dennis, the board members went

16  into executive session.

17    A     Right.

18    Q     How many times between January 1st, 2010, and June

19  21st, 2016, had the board of directors for Community Health

20  Systems, Inc. gone into executive session?

21    A     At least one.

22    Q     This one?

23    A     This one.

24    Q     You can't recall any other instances?

25    A     I do not recall any other instances.

1      Q      What is executive session?

2      A      It is just a meeting to discuss specific issues

3  that the board needs to openly discuss.

4      Q      Needs to openly discuss?

5      A      I guess probably the term would be off the record.

6      Q      So there were no minutes taken of the executive

7  session?

8      A      Not to my knowledge.  I have not seen any.

9      Q      Who was present for the executive session of the

10  board?

11      A      Me, Paul Cable, Jimmy Patton, Buddy Ponder, Kathryn

12  Dennis, Randy Coody, and Ronnie Rollins, and Lorraine Taylor,

13  and Mark Lange.

14      Q      So Lorraine Taylor was present for the executive

15  session?

16      A      Yes.

17      Q      What was discussed in executive session?

18      A      The issue confronting us about the Mark Waldrop

19  investigation.

20      Q      What specifically?

21      A      Lorraine Taylor made a presentation in regard to

22  the expense reports and the evidence and documentation of

23  those, Mark Lange made a presentation in regard to his

24  complete investigation, and I made a presentation in regard

25  to the insubordination issue.

1    Q    Correct me if I'm wrong.   You said that Mark Lange

2  made a presentation in regard to his investigation?

3    A    Yes.

4    Q    What with regards to his investigation was he

5  making a presentation on?

6    A    What he had found so far in his investigation.

7    Q    And what had he found so far?

8    A    The expense report issues and documentation, the

9  violations -- some of the violations of issuing or engaging

10  our organization in contracts.

11    Q    Mark Waldrop-related issues?

12    A    Exactly.   That was the only investigation he was

13  doing.

14    Q    So he wasn't doing an investigation into Mark

15  Waldrop's allegations against Mr. Rollins?

16    A    Well, he led off with the fact that he found no

17  evidence to support that claim.

18    Q    Did Mr. Rollins actively participate in this

19  executive session?

20    A    Yes.

21    Q    He did?

22    A    I mean, he was in it.

23    Q    Did he comment?

24    A    Not that I recall.

25    Q    Did he say anything to the effect that he would

1   like to see Mr. Waldrop in jail?

2        A    I don't recall that.

3        Q    Did anything that Mark Lange presented in his

4   presentation at this board meeting come as a surprise to you

5   at that time?

6        A    At that time?  Not a surprise, but just further

7   information and the extent of the abuse is the main thing

8   that concerned me.

9        Q    Was the employment agreement discussed during the

10  executive session?

11       A    Yes, at least one term in it was.

12       Q    And which one was that?

13       A    For cause.

14       Q    That would be -- just for the record, we'll use the

15  one that we marked that's highlighted just because it's on

16  the top, Exhibit 14?

17       A    Uh-huh (affirmative).

18       Q    Would that be paragraph 2.4 that was discussed

19  during executive session?

20       A    Yes.

21       Q    Was it read out loud?

22       A    Not that I recall.

23       Q    Were you provided a copy of the agreement to look

24  at at the meeting?

25       A    I don't remember.

1  Q Do you know if any other board members had copies

2 of the agreement at the board meeting?

3  A I did not ask them or nobody mentioned it.  I don't

4 recall anybody having it.

5  Q So Lorraine Taylor made a presentation about

6 expense reimbursement reports, Mark Lange made a presentation

7 about his investigation, and you made a presentation about

8 Mr. Waldrop's insubordination?

9  A Correct.

10  Q What happened after those presentations?

11  A There were numerous comments and questions of Mark.

12 Then we were trying to -- the ultimate question of Mark that

13 I asked was do we have cause to terminate Mark Waldrop and he

14 said yes.

15  Q You said Mark.  I just want to -- when you said

16 Mark previously, you were talking about Mark Lange?

17  A Mark Lange, yes.

18  Q Mark Waldrop was not at this meeting?

19  A No.

20  Q How long had Mark Waldrop been an employee of

21 Community Health Systems at the time?

22  A And its predecessors, possibly 25, 26 years as I

23 understand it.

24  Q Did you ever ask Mr. Waldrop for an explanation of

25 the results of Mr. Lange's investigation?

1          A     Why would I ask?  I'm sorry.  No, I did not.

2          Q     That's what's confusing to me because he's a 20

3   plus year employee.  There are serious allegations here that

4   led to his termination and you've never asked him for an

5   explanation or to discuss this with him before he was

6   terminated?

7          A     No.  I relied on our investigation and our legal

8   advice, period.

9          Q     Do you know if Mark Lange ever discussed these

10  discoveries with Mr. Waldrop and asked him to provide an

11  explanation?

12         A     I never was included in a meeting if he would have.

13  No.

14         Q     Have you heard of any kind of meeting like that

15  taking place?

16         A     No.  Never, except for our June 28th meeting.

17         Q     We'll get to that in a minute.

18         A     Uh-huh (affirmative).

19         Q     I'm talking about prior to the board meeting, or

20  after the board meeting before he was terminated.  He was

21  terminated at the board meeting; right?

22         A     Well, it was voted to terminate.

23         Q     Okay.  No opportunity was given to Mr. Waldrop to

24  explain these findings or present any kind of countervailing

25  evidence?

 1       A     Not to my knowledge.

 2       Q     Would that have been something you would have

 3  relied on Mr. Lange to have done if it needed to be done?

 4       A     As part of the investigation I would rely on him,

 5  if he thought it was prudent to do.

 6       Q     Did anybody ever ask if Mr. Waldrop had been given

 7  an opportunity to explain the so-called cause for his

 8  termination?

 9       A     No.

10       Q     When Mark Waldrop first came to you with his

11  complaint about Mr. Rollins, your first reaction to that was

12  to speak to Mr. Rollins; right?

13       A     Correct.

14       Q     To get him to -- to get his side of the story

15  basically?

16       A     Well, just to report to him in my position and his

17  position, to inform him of what I had been told.

18       Q     Then later you had a joint meeting so both sides

19  could let their positions be known on these issues; right?

20       A     That was my purpose in having that.

21       Q     It didn't happen I know.  It was introductory, but

22  that was your --

23       A     Yeah.

24       Q     -- process?

25       A     Right.

1    Q    A process that was not followed with regard to Mr.

2  Waldrop?

3    A    Why do you say that?  Or I don't understand why

4  you're saying that.

5    Q    There was no joint meeting with you and Mr. Rollins

6  and Mr. Waldrop about these allegations for his cause, were

7  there?

8    A    At that point, no, because I was not involved in

9  the investigation and the investigation was still going on

10  and wasn't completed until August to determine the whole

11  extent of all of the willful violations of that contract?

12    Q    To your knowledge Mr. Lange never had a joint

13  meeting with Mr. Waldrop and asked for an explanation of

14  these causes, did he?

15    A    I don't know.  I don't have any idea.

16         MR. HENRY:  I'm at a pretty good stopping place.

17  Why don't we take a lunch break --

18         THE WITNESS:  Okay.

19         MR. HENRY:  -- and come back.

20  (LUNCH BREAK)

21    Q    MR. HENRY:  Mr. Wall, I just wanted to remind you

22  that you are still under oath.

23    A    Oh, yeah.

24    Q    Okay.  When we took our break for lunch, I had just

25  finished asking you about the board meeting on June 21st --

1     A    Right.

2     Q    -- and so let's talk about what happened after

3 that.  What was the next step that you took after the board

4 voted to terminate Mr. Waldrop?

5     A    That I took?

6     Q    Yes.

7     A    I did nothing waiting on the lawyers to decide what

8 they were going to compose and what I was going to have to

9 do.  It was decided that that Tuesday -- was it Tuesday, June

10 28th -- I was going to have to leave the beach and fly to

11 Atlanta, in the middle of my vacation, and terminate Mark.

12 That was the extent of my participation.

13     Q    So did you leave for the beach, I'm guessing

14 sometime after that board meeting on June 21st?

15     A    Well, we left that Saturday following it.

16     Q    Okay.

17     A    Drove to Charlotte and then drove from there to the

18 North Carolina coast.

19     Q    Who made the decision, ultimately, that you were

20 going to be the one involved in Mr. Waldrop's termination?

21     A    I guess I did.  I mean, I'd been involved from

22 beginning to end and I don't think it would have been proper

23 for anybody else to have.

24     Q    Okay.

25     A    Some things you just have to do.

1  Q Well, let me show you another document, Number 17.

2 (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 17)

3  Q MR. HENRY:  Just let me know once you've had a

4 chance to take a look at that Exhibit and I'll ask you some

5 questions.

6  A Could I ask what was redacted?

7  Q That was actually going to be one of my questions

8 to you.  Do you know?

9  A Well, they told me not to bring anything in here.

10  Q Okay.  So that's --

11  A I could go back to my office and look in my

12 notebook but --

13  Q Well, you didn't add those redactions?

14  A Absolutely.  Whatever the lawyers said to do from

15 this point, I was reading and walking with them.

16  Q Okay.  Well, we'll go through what we can and just

17 see where that takes us.

18  A Okay.

19  Q You had a chance to review Exhibit 17?

20  A Yes.

21  Q Okay.  What is Exhibit 17?

22  A It is the talking points that were composed by the

23 attorneys at Holland Knight for the meeting with Mark Waldrop

24 and me and Mark Lange --

25  Q Okay.  So --

1        A     -- on June 28th.

2        Q     So the attorneys for Holland and Knight prepared

3   this document?

4        A     Oh, yes.

5        Q     You didn't have a role in preparing it?

6        A     I wouldn't have touched it with a ten foot pole.

7        Q     So you were given this basically almost like a

8   script?

9        A     Exactly like a script.

10        Q     Okay.  The first six pages of Exhibit 17 appear to

11   be the talking points you've just described.

12        A     Uh-huh (affirmative).

13        Q     But when we look at the last two pages, actually

14   the one after that, the one that starts with CHSI18934 --

15        A     Okay.

16        Q     -- it's entitled "Talking Points With Ms. Stephanie

17   Dotson."  So she was going to be terminated as well?

18        A     Yeah.

19        Q     Okay.

20        A     Jimmy Patton did that.

21        Q     Right.  You had no involvement in that?

22        A     I wouldn't recognize Stephanie Dotson if she walked

23   up and introduced herself to me.

24        Q     Did Holland and Knight also prepare the talking

25   points for Stephanie Dotson?

```
 1        A     I'm pretty sure they did.

 2        Q     All right.  Well, we'll just focus then on the

 3   first document in Exhibit 17.

 4        A     Okay.

 5        Q     Did you literally read this to Mr. Waldrop?

 6        A     I started off reading it verbatim and then I got to

 7   thinking this is going drag out and then I just started

 8   hitting the highlights of each paragraph.

 9        Q     Okay.

10        A     But I'm not sure at what point I stopped reading

11   verbatim.

12        Q     Okay.  We'll look at page two, paragraph two under

13   board conclusions.  Do you recall whether you read that

14   verbatim to Mr. Waldrop?  I know there's a portion that's

15   redacted --

16        A     Yeah.

17        Q     -- but the unredacted portion.

18        A     I don't remember mainly because I don't know what

19   the rest of it said.

20        Q     Okay.  Do you have an unredacted portion of this

21   document where you provided it to your counsel?

22        A     Oh, yeah.  They generated it.

23              MR. HENRY:  Can we go off for just a second?

24   (OFF THE RECORD)

25              MR. HENRY:  Mr. Daniel and I just had an off-the-
```

1    record conversation that I want to memorialize at least

2    on the record.  It's my understanding that the redacted

3    portion of paragraph two under board conclusions under

4    Exhibit 17 has been redacted on the basis of privilege

5    and was not to be read to Mr. Waldrop.  Is that a fair

6    representation of our discussion?

7         MR. DANIEL:  That is correct.  And that applies to

8    all the redactions on Exhibit 17.

9         MR. HENRY:  Okay.

10        MR. DANIEL:  There are at least two others.

11        MR. HENRY:  Well, we'll reserve the right to

12   request a privilege log in accordance with Rule 26 that

13   would enable us to determine whether the privilege

14   actually attaches to the redacted portion.  But we'll

15   move on for the time being.

16   Q    MR. HENRY:  With that discussion, Mr. Wall, can you

17   now answer whether or not you read paragraph two on page two

18   under board conclusions to Mr. Waldrop?

19   A    I can't recall whether I read it verbatim, but I

20   know I summarized it at least.

21   Q    Okay.

22   A    Or paraphrased it at least.

23   Q    Let me ask you this question.  Did you add

24   anything?

25   A    No.  Absolutely not.

1     Q     So maybe you didn't read it verbatim --

2     A     Right.

3     Q     -- but there's nothing that you said that would not

4  be in this document.  Is that fair?

5     A     Well, not when I was presenting this document.

6     Q     Okay.

7     A     We had a little bit of exchange after this was read

8  that wasn't in this document.

9     Q     Okay.  What was the exchange that you had after

10 this was read?

11    A     I think Mark's comment was that he was shocked or

12 surprised or something to that extent.

13    Q     Again, I'm not trying to interrupt you but we've

14 got two Marks.

15    A     Mark Waldrop.

16    Q     I know.  It's easy to do, but I didn't want you to

17 go too far without making that clear.

18    A     And he made the comment that he was shocked or

19 surprised, and I made the statement that we're all very

20 shocked, and even Buddy Ponder made the comment that he felt

21 like he had been kicked in the stomach.  It was such a

22 surprise.

23    Q     Did Buddy Ponder have a closer working relationship

24 with Mr. Waldrop than other board members?

25    A     No.  No.  Buddy's the oldest member of our board

1  and he's got a lot of banking experience.  He's a banker and

2  therefore a lot of board experience, and he had made the

3  comment that he'd never seen anything like this before.  And

4  he was really quite upset about it.

5       Q     And the reason I ask that, I think there had been

6  testimony earlier about he was upset and I didn't know if

7  maybe there was some special --

8       A     No.

9       Q     So you read portions, at least, of Exhibit 17 to

10  Mr. Waldrop.

11      A     Uh-huh (affirmative).

12      Q     You have the exchange about Mr. Waldrop being

13  shocked and you saying well, we're shocked and Buddy Ponder

14  feels like he's been kicked in the stomach.  Anything else

15  you talked about in this meeting?

16      A     Not that I mentioned.  I mean, Mark had a couple of

17  other comments that he made that I remember.

18           MR. DANIEL:  Clarify which Mark.

19      A     THE WITNESS:  Mark Waldrop.  I'm sorry.  That was

20  all I recollect and then I can't even remember how we

21  adjourned the meeting but --

22      Q     Did Mark Lange say anything during the meeting?

23      A     I don't remember.  I'm sure he did.  I mean, but I

24  don't remember in what context he said it or what he said.

25      Q     All right.

```
 1        A     But he didn't say anything while I was presenting
 2   this --
 3        Q     Okay.
 4        A     -- until I was finished.
 5        Q     Okay.  You had the duty of --
 6        A     Delivering the message.
 7        Q     -- delivering the message, yeah.  Let's look at
 8   paragraph three.  That second sentence that starts
 9   "Notwithstanding," and carries over to the next page.
10        A     We may not be on the same page.
11        Q     Oh, I'm sorry.
12        A     I was at board conclusions and --
13        Q     There's more than one paragraph three, but just for
14   the record, I'm referring to paragraph three on page two
15   looking at board conclusions.
16        A     Okay.
17        Q     The second sentence starting, "Notwithstanding" --
18        A     Uh-huh (affirmative).
19        Q     -- if you'll just read that and let me know when
20   you're finished, please.
21        A     Okay.
22        Q     Do you recall whether you read that verbatim to Mr.
23   Waldrop?  That sentence?
24        A     I'm pretty sure I did.
25        Q     Why would Community Health Systems want to avoid a
```

1   written acknowledgement of a quote, "for cause termination"

2   for Mr. Waldrop?

3        A    That was more for his benefit than ours.  We didn't

4   -- I mean, that whole issue of for cause would be -- well,

5   first of all, the examination was not complete.  He didn't

6   know all the reasons and then the second point was the fact

7   that, you know, for 25, 26 years we were hoping that this

8   would just go away and not end up in an official record and

9   public knowledge.  And then the only other issue about cause

10  was most of this stuff was incurable and we couldn't go back

11  and cure it.

12       Q    Okay.  So the meeting on June 28th adjourned.  You

13  don't recall specifically how, but it did adjourn?

14       A    Yeah, we just -- yeah.

15            MR. HENRY:  Okay.  Exhibit 18?

16            COURT REPORTER:  Yeah.

17            MR. HENRY:  Great.

18  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 18)

19       Q    MR. HENRY:  Exhibit 18.  If you would, Mr. Wall,

20  just review Exhibit 18 and let me know when you're finished,

21  please.

22       A    Yeah.  I've read it.

23       Q    If you would, describe Exhibit 18.  What is it?

24       A    It's just a notice that was sent out from Ronnie to

25  all those people listed informing them of what was taking

1    place.

2         Q     And when you say, "all those people listed," you're

3    talking about --

4         A     Charles Briscoe, Diana Wilkes --

5         Q     In the "To" line?

6         A     Right.

7         Q     Under June 28th.  So this Exhibit 18 was actually

8    issued on the day that Mark Waldrop was terminated?

9         A     That's my understanding.

10        Q     Was the fact of Mr. Waldrop's termination

11   communicated to anybody else, officially, in the organization

12   other than the individuals listed?

13        A     At this point in time?

14        Q     Yes.

15        A     I have no knowledge.  If I had to say, this was it.

16   The notification.

17        Q     Okay.  Why these people?

18        A     Well, they were the, basically, the leadership

19   people, in the leadership positions.

20        Q     Who prepared the memorandum on the second page of

21   Exhibit 18?

22        A     I have no idea.

23        Q     You didn't prepare it?

24        A     I was on vacation.

25        Q     Okay.  So you came in, terminated Mr. Waldrop, and

1    you went back on vacation?

2         A     After 17 hours.   Yeah.

3         Q     And you don't know who prepared this?

4         A     Not definitely.   No.

5         Q     Well, did you review it before it went out?

6         A     I don't think so because I didn't take a laptop or

7    iPad or anything with me to the beach, and I don't know.   I

8    mean, I'm sure there was a copy of it on my desktop when I

9    got back the following week.

10        Q     But you didn't look at this before it actually went

11   to the individuals listed?

12        A     I do not recall seeing it before then.

13        Q     Mr. Rollins is the one who actually sent this memo

14   out.   Correct?

15        A     That's what it appears.   Yes.

16        Q     Do you know if Mr. Rollins prepared the memo?

17        A     I do not know.

18        Q     How long were you on vacation?

19        A     Well, after that Tuesday, and I got back to the

20   beach at quarter to 12:00 that night, my whole family was so

21   upset that my wife and I left the next day.   My son and his

22   family and my daughter-in-law and her parents stayed there.

23   We left.

24        Q     Unsettling.   This whole experience was unsettling.

25        A     Oh, absolutely.

1      Q     Exhibit 18.

2            COURT REPORTER:  I think we just did 18.

3            MR. HENRY:  Oh, did we?

4            COURT REPORTER:  The memo from Mr. Rollins.

5            MR. HENRY:  You're exactly right.  I'm taking 19

6      and put it right over the 18.

7            COURT REPORTER:  You've done very well.

8  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 19)

9            MR. HENRY:  So far it's gone through quite a bit

10     before I've made a mistake.

11           MR. HENRY:  Exhibit 19.  Did I already give you a

12     copy, Hal?

13           MR. DANIEL:  No.

14           MR. HENRY:  Oh, I gave him two.  I'm sorry.

15     Thought it felt thick.

16     Q     MR. HENRY:  You ready?

17     A     Yeah.

18     Q     I'm sorry.  I wanted to give you a chance to read

19  it.  Mr. Waldrop (sic),  you've got in front of you Exhibit

20  19.  What is Exhibit 19?

21     A     I'm Mr. Wall.  That's Mr. Waldrop.

22     Q     Marks, Waldrop, Wall.  Okay, Mr. Wall --

23     A     Yes.

24     Q     -- I'm sorry.  What is Exhibit 19, Mr. Wall?

25     A     It's a registered, certified mail letter that was

1    sent to me at the Community Health Systems office signed by

2    Mark Waldrop.

3         Q    Okay.  Do you recall when you received this letter?

4         A    Sometime, it was, I stayed in North Carolina.  That

5    week was, let me think, 28th.  Yeah.  That week after that

6    was July the 4th and we went over to the mountains and stayed

7    the 5th, 6th so I didn't get it until after then.

8         Q    Okay.  I thought that you just testified that you

9    left your vacation at the beach the night, or the day after

10   you got back.

11        A    On that Wednesday.

12        Q    Okay.

13        A    We drove back to Waxall, North Carolina, where my

14   son lives and then we decided from there we would go over to

15   Waynesville, --

16        Q    Okay.

17        A    -- North Carolina.  Or technically Clyde, North

18   Carolina.

19        Q    So you, the first -- well, strike that.  When do

20   you recall first seeing this letter?

21        A    Sometime later that week of July the 4th.

22        Q    Okay.  The third paragraph of that letter from Mr.

23   Waldrop states, "As of this date, I have not been provided

24   information regarding the reason for my termination."  Do you

25   agree with that statement?

1    A    Well, I thought, it wasn't in detail but I thought

2  that notice I read to him stated that we were terminating him

3  for cause.

4    Q    Okay.

5    A    And the only reason we didn't was we weren't

6  through with the examination.  But at the June 21st board

7  meeting, we had determined that we had enough evidence for

8  cause, or we were told we had enough.

9    Q    Did you tell Mr. Waldrop what the specific cause

10 for his termination was on June 28th of 2016?

11   A    No, because I didn't have the specifics.  Had not

12 seen a written report.

13   Q    I believe you testified earlier that one of the

14 reasons, perhaps the only reason, that a severance package

15 was going to be offered to Mr. Waldrop was to avoid the

16 embarrassment of him having a for-cause termination.  Is that

17 fair?

18   A    That was the general thinking.  Yeah.

19   Q    Looking at Exhibit 19, it appears that Mr. Waldrop

20 is asking for an explanation for the cause of his

21 termination.  Isn't he?

22   A    Yeah.

23   Q    Do you think by sending this letter, Mr. Waldrop

24 was concerned about being embarrassed by a for-cause

25 termination?

1        A        I don't know what he was thinking.

2        Q        Okay.  How did Community Health Systems, Inc.

3    respond to Exhibit 19?

4        A        I think Josh Bosin, the labor lawyer --

5        Q        Uh-huh (affirmative).

6        A        -- wrote a letter later in July to Mark in -- I

7    don't know that it was a response to this, but that was the

8    only other communication I knew of.

9    (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 20)

10       Q        MR. HENRY:  Well, let's look at Exhibit 20.  I

11   think that's what you're referring to.

12       A        Yeah.  Okay.

13       Q        Does that say, there in Exhibit 20 in the second

14   paragraph, we are in receipt of your July 1, 2016

15   correspondence?

16       A        Uh-huh (affirmative).

17       Q        So does that refresh your recollection as to

18   whether Exhibit 20 was sent in response to Exhibit 19?

19       A        Yeah.  And I had thought that this letter, it's

20   dated July the 6th, but I thought it was later on into July.

21   I did not remember.

22       Q        Are you familiar with the entity listed on page

23   nine of Exhibit 20?  I'll let you get there.  United Health

24   Services, Inc.?  It's at the very top.

25       A        Uh-huh (affirmative).

1        Q      Are you familiar with that entity?

2        A      No.  I don't know who that is.

3        Q      Where in Exhibit 20 does Mr. Bosin, on behalf of

4   Community Health Systems, provide the cause for Mr. Waldrop's

5   termination?

6        A      I'll have to read it.  I mean, he composed it.  I

7   don't know.  I'd have to let him -- I'm no lawyer.  I don't

8   know how this was composed.

9        Q      Okay.

10       A      This may not be the letter I was thinking about.  I

11  think there may be another one later on.

12       Q      So you think there might be a second letter from

13  Mr. Bosin to Mr. Waldrop?

14       A      Or from somebody from Holland and Knight.

15       Q      That would have been later than July 6th?

16       A      Right.

17       Q      You sent a letter to Mr. Waldrop, didn't you, in

18  August?

19       A      I may have signed one.

20       Q      Okay.

21       A      I didn't compose it.

22       Q      Do you think that might be the letter you're

23  referring to?

24       A      Maybe so.  Maybe August 15th or something around

25  there.

1    Q    Okay.  We'll be looking at that.  I just don't want

2    to get too far out of order here.

3    (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 21)

4    Q    MR. HENRY:  Exhibit 21.  Mr. Wall, if you would,

5    please, take a look at Exhibit 21 and let me know when you've

6    had a chance to review it.

7    A    Okay.

8    Q    What is Exhibit 21?

9    A    I'm not sure what that first page -- what the

10   context of it was.

11   Q    Okay.

12   A    But I met with several of the people we felt like

13   -- within the organization that we felt like we needed to

14   talk to because we were very concerned at how deeply this

15   attitude went.  And therefore, I had some general talking

16   points and then some specific ones for each individual that I

17   talked to.

18   Q    What do you mean when you say this attitude?

19   A    Of targeting and Ronnie lying and those type of

20   accusations.

21   Q    Was Mr. Lange involved in this aspect?

22   A    No.

23   Q    So this was just you and --

24   A    No, and Ronnie.  And maybe Lorraine was involved in

25   the conversation.

1      Q      Okay.  The sticky note there, at least it appears

2  to be a sticky note, on the second page --

3      A      Uh-huh (affirmative).

4      Q      -- did you write that?

5      A      Yes, I did.

6      Q      Okay.  What was the concern or what was the context

7  of you preparing this sticky note?

8      A      I wanted to ask each one of these people that I

9  talked to, this question particularly because of some

10  evidence we had, or some events that took place in regard to

11  contracts or agreements reached with like, the Workday people

12  and the VEBA management, BAS.  And it just smelled to high

13  heaven to me that the decision was made that quickly.

14      Q      Okay.  When did you have these interviews?

15      A      Sometime the middle of July, maybe.  I don't

16  remember the dates.  It was all the same morning, though.

17      Q      Looking at the last page, it starts off, Joe Wall

18  comments to each interviewee in group.  What group?

19      A      It wasn't a group.

20      Q      Okay.  So just interviewees?

21      A      Right.

22      Q      Who were the interviewees?

23      A      Michelle Moore-Andrews, Diana Wilkes, Ken McDonald,

24  and Blair Lake, and for the life of me, I thought there were

25  five, but I can't remember but those four.

1      Q      Okay.  Did you read what's reflected on page three

2  of Exhibit 21 to these individuals you just listed?

3      A      I went over them with them.  I didn't actually read

4  these things verbatim but I told them the story.

5      Q      All right.  Additional board action at the very

6  bottom.  Based on findings of its investigation, the board

7  determined it needs to provide additional guidance and

8  focused education to management.  What additional guidance

9  and focused education did the board determine it needed to

10 provide?

11     A      Well, we were concerned that the word mainly about

12 expense reimbursement was not clear even though we had

13 initiated -- we had started a new policy the first of the

14 year.  I mean, if the chief operating officer was not

15 complying with them, then we were concerned that there might

16 be a trickling down of this misunderstanding and we thought

17 we needed to tighten up.

18     Q      Okay.  So the expense reimbursement report --

19     A      Right.

20     Q      -- that's one area?

21     A      Right.

22     Q      Are there any others?

23     A      Not that I recollect.

24     Q      Okay.  Number 2, Board reconsiderations included

25 transparency, confidentiality, accountability, corporate

1    culture, and good governance.  What made those considerations

2    paramount to the board?

3        A    Well, I mean, that's just business principles that

4    we thought we ought to operate on no matter what, and I mean,

5    our board would not -- I don't think there's a member of our

6    board that would sit on that board without these tenets.

7        Q    So those considerations had nothing to do with Mr.

8    Waldrop's termination?

9        A    If so, I --

10        Q    (Inaudible) -- business?

11        A    No, I think technically every one of them do.

12        Q    There are a lot of notes here and I'm going to try

13    to just go ahead and mark all of them now because they relate

14    to each other.

15    (DOCUMENTS MARKED PLAINTIFF'S EXHIBIT NOS. 22, 23, 24, 25,

16    26, 27 28 AND 29.)

17        MR. HENRY:  This will be Exhibit 22.  At least, I

18        think they relate to each other.  Exhibit 23.  Exhibit

19        24.  Exhibit 25.  Exhibit 26.  Exhibit 27.  Exhibit 28.

20        I need more stickers.

21        COURT REPORTER:  Okay.

22        Q    MR. HENRY:  Last one, 29.  Okay.  Mr. Wall, I

23    handed you quite a few exhibits, but fortunately most of them

24    are just one page.  So hopefully we can get through them

25    pretty seamlessly.

1    I think you've been looking at them as I've been giving

2    them to you, but if you need a little time to sort of refresh

3    yourself on them, just feel free to take it.  Let me know

4    when you're ready.

5    A    I guess I'm ready.

6    Q    Okay.  Let's start with Exhibit 26, --

7    A    Twenty-six.

8    Q    -- which is --

9    A    Okay.

10   Q    -- an email, at least it appears to be an email

11   exchange between you and Ronnie Rollins.

12   A    Uh-huh (affirmative).

13   Q    Dated July 7th.  Y'all are -- well, you tell me.

14   What are y'all discussing here?

15   A    It appears to be compiling a list of issues that we

16   wanted to talk to various people I was going to talk to

17   about.  And Blair Lake, specifically.

18   Q    Okay.  Let's look at Exhibit 25.

19   A    Okay.

20   Q    Were the three issues listed there, with respect to

21   Blair Lake on Friday, issues to be discussed, were those

22   attached to the email that's Exhibit 26?

23   A    I don't think so.  I think these were just typed up

24   separately.

25   Q    Okay.  Well, this talks about issues to be

1    discussed with Blair Lake on Friday.

2         A    Right.

3         Q    The emails that you exchanged with Mr. Rollins were

4    on Thursday, July 7th --

5         A    Right.

6         Q    -- under Exhibit 26.  Do you believe that the

7    interviews you had with Blair Lake and these other

8    individuals occurred on July 8th?

9         A    Must have been.

10        Q    Okay.  So about a week after Mr. Waldrop sent the

11   letter requesting cause that was dated July 1st?

12        A    Okay.  Yes.

13        Q    Not long after that letter --

14        A    Right.

15        Q    -- was sent and received?  Okay.  There's also, if

16   we look at Exhibit 27 --

17        A    Okay.

18        Q    --  it appears to be the same list that's in

19   Exhibit 25 with one addition.  Do you see that?

20        A    Yes.

21        Q    Now, I believe, correct me if I'm wrong, if you

22   look at the email exchange with Mr. Rollins on Exhibit 26,

23   that fourth item is the one that Mr. Rollins suggested that

24   needed to be added.

25        A    No, I think I suggested that.

1      Q      Did you?

2      A      Yeah.

3      Q      Okay.  I'm sorry.  I stand corrected.  So you

4  suggested that point number four?

5      A      Right.

6      Q      So let's go through each one of these points and

7  why it was necessary or advisable to ask Mr. Lake about these

8  four points.  Number one, discusses a conference call between

9  the CEO and COO that Mr. Lake participated in.  Correct?

10     A      Yeah.  I think so.

11     Q      Why did Community Health Systems believe that that

12  was a subject that needed to be discussed with Mr. Lake?

13     A      There again, we wanted to find out how deeply these

14  sentiments were within the organization and management

15  structure.

16     Q      Okay.  Let's take a look at Exhibit 29.

17     A      Okay.

18     Q      Three handwritten notes.

19     A      All right.

20     Q      Specifically, the second page.  First of all, is

21  this your handwriting?

22     A      Yes.

23     Q      There are several items listed there under Blair,

24  which I'm assuming is Blair Lake.

25     A      Yes.

```
 1        Q    One through nine?  Well, three through nine on this
 2   list.  Correct me if I'm wrong.  Let's look at Exhibit 23.
 3   Sorry,  I know these are hard to follow but Exhibit 23 has
 4   nine questions that apparently, were going to be discussed
 5   with everybody on Friday; is that correct?
 6        A    Yes.
 7        Q    Do your handwritten notes on the second page of
 8   Exhibit 29 correspond to the answers given to the items
 9   listed on Exhibit 23?
10        A    Let me read them and see.
11        Q    Okay.
12        A    They are.
13        Q    Okay.  It doesn't look like item number one or item
14   number two are reflected in your handwritten notes.
15        A    Right.
16        Q    Do you recall, or those actually look like they're
17   about three statements.  We'll skip forward to number three,
18   which is the one you have noted.  Number three, "Have you
19   been or were you ever uncomfortable about anything that you
20   were asked to do by any person that you considered to be your
21   superior in the organization?"
22        Can you tell from your handwritten notes what Blair
23   Lake's response to that was?
24        A    He evidentially had pointed out an issue and then
25   he said in the end the right thing was done.  Ethics are not
```

1  to hide or deceive.

2      Q     Do you know what he was referring to by in the end,

3  the right thing was done?

4      A     Whatever the issue was that he felt uncomfortable

5  about.

6      Q     Okay.  Number four on Exhibit 23.  Are there any

7  policies or procedures that you consider unfair or harsh or

8  unnecessary?

9      A     Uh-huh (affirmative).

10     Q     Can you tell from your handwritten note on page two

11 of Exhibit 29 what Mr. Lake's response to that was?

12     A     He obviously said the only thing was can't have

13 everything in writing.

14     Q     Well, was there a policy that everything had to be

15 in writing?

16     A     Not to my knowledge.  I don't know.  But that's not

17 for the board to do.

18     Q     Do you remember even in what context he said that?

19     A     No, I don't.

20     Q     Okay.  Number five, "Do you have or have you

21 detected among any associates a fear of being fired or

22 terminated?  If so, is this being a part of our

23 organization's culture?"  Looks like Mr. Lake, according to

24 Exhibit 29, said yes.  Do you recall anything more beyond

25 what's written in these notes about his response?

1      A      No.

2      Q      You don't know what is meant by the phrase, "dash

3  in IRS?"

4      A      He was hung up and the whole reason for us wanting

5  to talk to him -- on the 28th of June and maybe 27th and 28th

6  of June, all of a sudden he showed up at the corporate

7  offices under the guise of working on the form, whatever the

8  Obamacare form was that had to be due out on June the 30th.

9  And he had made the statement that there were a bunch of

10  errors in it and he had to correct some of these forms that

11  had dashes in them, which to me was just bizarre.   I mean --

12      Q      Bizarre that there were dashes in them or bizarre

13  --

14      A      Bizarre that he was down here from his office

15  wherever it is, Alpharetta or wherever.   He had to come all

16  the down to Macon to get the dashes correct.

17      Q      Well, let's look at Exhibit 27.

18      A      Okay.

19      Q      Is that your handwriting at the bottom?

20      A      Uh-huh (affirmative).

21      Q      Number three, is that what you're describing?

22      A      Yes.   Absolutely.

23      Q      Okay.   Because number three on that list of

24  additional items to be discussed with Blair Lake, discusses

25  him coming into the office on June 28th.

1      A      Right.

2      Q      The very last part of that is, "Did we not trust

3  him?"  Isn't that what you wrote?

4      A      I've got a 25 --

5      Q      I'm sorry 27.

6      A      -- and a 27.

7      Q      At the end of three, on Exhibit 27.

8      A      I think he actually said that.

9      Q      How did you respond?

10     A      I didn't.  I don't think.  I just --

11     Q      Who else participated in these interviews?

12     A      Just -- it was one-on-one.

13     Q      Okay.  You didn't offer him any kind of assurance

14  that you did trust him?

15     A      Well, I mean, already there was an element of

16  distrust from what in the world was he doing in the office on

17  the day I was going to be in Atlanta and Dalton terminating

18  Mark and Stephanie?  And we just thought it was odd that for

19  the first time ever, he showed up down there to work.

20     Q      Well, had anybody told Mr. Waldrop prior to June

21  28th that he was going to be terminated?

22     A      No.

23     Q      Had anybody told Mr. Lake that Mr. Waldrop was

24  going to be terminated on June 28th?

25     A      No.

1  Q Did you think the two were connected in some way?

2  A We thought possibly, but had no evidence of it

3 because -- well, Mark Waldrop knew he was meeting with us on

4 the 28th in Holland and Knight's office.  We just kind of

5 thought it was odd that all of a sudden Blair showed up down

6 at the corporate office.  And it may have just been a

7 coincidence, but --

8  Q Do you believe it was a coincidence, sitting here

9 today?

10  A No.  I really don't have an opinion on it because

11 there was no proof, plus or minus, on whether it was or not.

12  Q Well, did you believe his explanation of what he

13 was doing?

14  A I did in a way, but there again, the question of

15 why he had to come to Macon to do that?

16  Q Let's go back now to Exhibit 23 and Exhibit 29

17 which is the --

18  A Hold it, 23.  Okay.

19  Q -- general list and then your handwritten notes

20 about Blair Lake's responses.  On page two, yeah.  Yeah.

21  A Okay.

22  Q Number five.  We were talking about dash and IRS

23 and that's where we got on this other exhibit, but below that

24 there's a quote, "If you cannot get along with your boss, you

25 need to leave."  Is that something Mr. Lake said?

1    A    Absolutely.  And he was our Human Resources guy.

2    Q    How did you respond to that comment?

3    A    I just took it and asked the next question, I

4    think.  I probably agreed with it, but I don't remember

5    specifically.

6    Q    That's kind of what happened with Mr. Waldrop and

7    Mr. Rollins.  Right?  They weren't getting along and Mr.

8    Waldrop ended up leaving.

9    A    True.

10    Q    Number six, "Are you familiar with the term

11    targeting?  Is it commonly used in our organization among our

12    associates?"  Appears that Mr. Lake said yes to that.  Is

13    that what --

14    A    That's what he did.

15    Q    Okay.  Other than what's written there on the

16    second page of Exhibit 29, do you remember anything else

17    about how he responded to it?

18    A    To that particular --

19    Q    To that particular question?

20    A    No.  That was about all.

21    Q    It says, "Education of supervisors on targeting."

22    Do you see that?

23    A    Yeah.

24    Q    What does that mean?

25    A    On which one?

```
 1        Q     I'm sorry.  Exhibit 29.   Page two.

 2        A     Well, you have to know Blair to appreciate this.   I

 3   mean, he --

 4        Q     I'm going to get to meet him.

 5        A     -- wore me out with his opinions of the world and

 6   that's why I've got more notes on this page than anywhere

 7   else.   And I detected that he was somewhat just telling me

 8   what the answer he thought I wanted to hear was.   And so

 9   anyway.

10        Q     Well, you had never heard the term targeting --

11        A     I never have until this incident except in the

12   field of fire in the military.

13        Q     A very different kind of targeting?

14        A     Absolutely.

15        Q     Yes.

16        A     But that's the way I took it.

17        Q     Number seven, "In your opinion, what is the

18   difference between targeting and being held accountable," in

19   Exhibit 23?  Your notes on Exhibit 29 say "Nit-picking."

20        A     And I think that's exactly what he said.

21        Q     And what did you take that to mean?

22        A     Nothing to heart.  I guarantee.  I just --

23        Q     What do you mean by that?

24        A     I mean, I was ready to get this thing over with by

25   that point.
```

```
 1        Q     Kind of like -- well, I won't ask you that.   I

 2   think you answered it.

 3        A     Yeah.

 4        Q     All right.  Number eight, Waterford crystal is what

 5   that deals with.

 6        A     Uh-huh (affirmative).

 7        Q     He said he was aware of Waterford crystal, right?

 8   It says yes.

 9        A     Uh-huh (affirmative).

10        Q     Were you aware of Waterford crystal being given as

11   gifts to Community Health System associates?

12        A     No.

13        Q     Prior to this?

14        A     No.

15        Q     Okay.  Number nine, "Do you feel any discomfort or

16   insecurity caused by the SOP reorganization?"  What does SOP

17   stand for?

18        A     Y'all have got to help me on this.   Standard

19   Operational Procedure is what pops into my mind, but I don't

20   think that's it.

21             MR. HENRY:  We can go off and we can refresh your

22        memory.   That's fine.

23   (OFF THE RECORD)

24        A     THE WITNESS:  All right.   Strategic Organizational

25   Procedure --
```

1      Q      Okay.

2      A      -- which was the change in the --

3      Q      What we looked at earlier?

4      A      -- organizational charts.

5      Q      All those charts we had?  Okay.  Why would someone

6  like Blair Lake feel insecurity or discomfort with SOP

7  reorganization?

8      A      Please, ask him because I have no idea.

9      Q      Well, he answered your question here.

10     A      Yeah.

11     Q      Can you just read that into the record, number nine

12  from Exhibit 29?

13     A      He said that it was probably a résumé issue or it

14  would be a résumé issue.  And then he said are we positioning

15  the organization to be sold or acquired?

16     Q      Okay.  How did you respond to that?

17     A      I said, no, we aren't.

18     Q      Did he explain why he might have thought that?

19     A      No, he didn't.

20     Q      Okay.  Exhibit 27 --

21     A      Okay.

22     Q      -- which are the Blair specific topics.  Number one

23  is that May 2016 conference call, I think we talked about

24  briefly, but his answer, I believe, is on page two of Exhibit

25  29 there at the bottom.

```
 1        A     Did you perceive any targeting?  Okay.  No.  Ronnie
 2   was talking over a Workday contract.  Angela, we had our
 3   time.  No issues now.  Yes, two years.  I don't know what
 4   that two years refers to.
 5        Q     Who is Angela?
 6        A     I presume Angela Hammack.
 7        Q     Okay.  Was it Blair Lake who said that Angela said
 8   quote, "We had our time?"
 9
10        A     I think so.  Yes.
11        Q     What does that mean?
12        A     I have no idea.
13        Q     So you were just listening to him and writing the
14   notes down?
15        A     Yeah.
16        Q     You weren't asking any follow-ups?
17        A     Uh-uh, (negative).
18        Q     Okay.  Number two on Exhibit 27.
19        A     Uh-huh (affirmative).
20        Q     Read that to yourself.
21        A     Okay.  I'm through.
22        Q     What was the issue with this trade show in Las
23   Vegas that necessitated asking Blair Lake about it?
24        A     Well, I think he went.
25        Q     Okay.
```

```
 1        A    And that was the reason.  There had been a series

 2   of trips, if I remember correctly, to Las Vegas and that

 3   stuck out like a sore thumb, especially the money that was

 4   spent.

 5        Q    In what way did they stick out?

 6        A    I mean, they were, like, you know, three and six

 7   weeks or I mean, there were too many at the same time.

 8        Q    Well, number two says that he was attending the

 9   trade show in Las Vegas.

10        A    Right.

11        Q    And then it was decided at some point that our COO,

12   which at that point would have been Mr. Waldrop; correct?

13        A    Uh-huh (affirmative).

14        Q    And two of our entity presidents would fly out.

15   Who were the two entity presidents?

16        A    Diana and Michelle.

17        Q    Okay.  Was Ms. Taylor at that --

18        A    No.

19        Q    -- trade show?

20        A    I wasn't there so I don't know, but I don't think

21   so.

22        Q    And all this had to do with the time and attendance

23   vendors; correct, according to Mr. Lake?

24        A    According to him.  Yeah.

25        Q    Did you believe that?
```

    1        A    May have been a general idea, or a general purpose.

    2        Q    Do you think there were maybe other things going

    3   on?

    4        A    Well, I've never been to Las Vegas, but I

    5   understand there are other things going on.

    6        Q    Did you ask Ms. Wilkes or Ms. Andrews about that

    7   trip?

    8        A    I'll have to look and see, but I -- no, I did not.

    9        Q    Why?

   10        A    I just -- I really, with Michelle, I thought there

   11   were more important things I needed to discuss with her.   And

   12   with Diana, I'm not even sure I made any notes talking to

   13   her.

   14        Q    I didn't see any.   Okay.   We've talked already

   15   about number three in Exhibit 27.

   16        A    Okay.

   17        Q    So let's go to number four.   That's the item that

   18   you added to the list.

   19        A    Uh-huh (affirmative).

   20        Q    What was Mr. Lake's response?

   21        A    A 100 dollar gift card.   Called Mark Waldrop.   And

   22   Mark told him to use it for lunch in the team office or

   23   something to that effect.

   24        Q    So Mr. Lake received a 100 dollar gift card from

   25   Workday?   Is that what he --

1    A    I presume so.  That's what he said.

2    Q    Okay.  These interviews occurred on July 8th, --

3    A    Right.

4    Q    -- 2016.

5    A    Uh-huh (affirmative).

6    Q    All right.  We can take a break if you want to, but

7  I'm about to get into Michelle.

8         MR. DANIEL:  Let's take a quick break and get some

9    water.

10  (BREAK)

11    Q    All right.  You ready to keep wading through this a

12  little bit?  We're getting pretty close.

13    A    Okay.

14         MR. DANIEL:  Always makes me nervous when a lawyer

15    says that.

16         MR. HENRY:  I said pretty close.  I didn't say

17    close.

18         MR. DANIEL:  That's like one quick question.

19         MR. HENRY:  Right.  All right.  Ready?

20         COURT REPORTER:  Yes.

21    Q    MR. HENRY:  Mr. Wall, I said we were going to talk

22  about --

23    A    Michelle.

24    Q    -- Michelle Moore-Andrews, but I think it would be

25  easier to just go ahead and talk about Ken McDonald --

1   A   Oh, okay.

2   Q   -- just because he doesn't have as much and we can

3   knock it out.  So let's look at Exhibit 29.  You got it?

4   A   Uh-huh (affirmative).

5   Q   First page, --

6   A   Uh-huh (affirmative).

7   Q   -- it looks like an answer from Ken McDonald to the

8   question on Exhibit 23.

9   A   Okay.

10   Q   Before we get into that though, let me ask you, who

11   is Ken McDonald?

12   A   He is an accounting person, employee, and he's

13   relatively new with the organization.  He came here from

14   Disney.

15   Q   Like Walt Disney? Like the Disney --

16   A   Yeah.  Like in Orlando.  I'd never -- before this

17   day I'd never laid eyes on him.

18   Q   Why was he one of the people that was to be

19   interviewed?

20   A   I didn't pick them out.  I think Ronnie and

21   Lorraine probably suggested.  Back up.  He worked with a lot

22   of the detail as far as accounting information so that -- I

23   don't know that for a fact.

24   Q   Did he work closely with Mr. Waldrop when he was

25   there?

1      A      Not that I know of.

2      Q      How about Mr. Lake, did he work closely with Mr.

3  Waldrop?

4      A      That was what I was told.

5      Q      Who told you that?

6      A      Just various people.

7      Q      You didn't choose these people to interview, did

8  you?

9      A      Well, I knew I wanted to talk to Diana and to

10  Michelle because they were and now are the two most important

11  individuals in the company other than Ronnie and Lorraine.

12      Q      Was it Mr. Rollins who chose to talk to Mr. Lake?

13  Chose him as somebody to be interviewed?

14      A      I don't remember.  I think it was kind of a

15  consensus because of that coincidence that he was in the

16  office that week.

17      Q      You said he's headquartered in Alpharetta?

18      A      That's what I think.  I've never been there.

19      Q      Does Community have an office in Alpharetta?

20      A      I think so.

21      Q      Okay.  Sorry.  I got kind of sidetracked.  Okay.

22  Ken McDonald.  Looks like you have -- first of all, the first

23  page of Exhibit 29, is that your handwriting?

24      A      Yes.

25      Q      Okay.  It looks like you have the number eight

1    there, which is in response to question number eight from

2    Exhibit 23; --

3         A    Uh-huh (affirmative).

4         Q    -- is that correct?

5         A    Yes.

6         Q    Question number eight is, "Are you aware of the

7    gift items such as Waterford crystal stored in the storage

8    unit in Dalton?  Is there more than one unit?"  His response,

9    "Yes."  He received one the first year.  What did he say yes

10   to?

11        A    I think he was aware of the Waterford crystal.  He

12   received or he was aware of the gift items.

13        Q    And he received one.

14        A    And he received them.

15        Q    Did he answered the question that you asked him

16   under number eight about the storing it in Dalton?  Or there

17   being more than one unit?

18        A    I don't think he was aware of that.  No, he didn't.

19        Q    And below that, it says, "Most competent org."

20        A    Org.

21        Q    What was that in response to?

22        A    That was kind of his closing statement that he was

23   very impressed with our organization and enjoyed working here

24   versus where he was before.

25        Q    Disney?

1      A     Yeah.   So I thought that was worth noting.

2      Q     Before we move on to Ms. Andrews, let's look at

3  Exhibit 24, which I haven't asked you --

4      A     Exhibit 24.   Okay.

5      Q     That's your handwriting as well; right?

6      A     Yeah.

7      Q     And what is Exhibit 24?

8      A     That was kind of my preamble to these meetings.

9      Q     Okay.

10     A     And, there again, we were -- two things.   We were

11 trying to get across the point that this was not the

12 beginning of a witch hunt and at the same time we were trying

13 to establish a level of trust among our people, and who we

14 could trust and impress upon them that they could trust us.

15 And that was the whole purpose of these meetings.   That in a

16 nutshell.   That was two parts of sentence, that statement.

17     Q     When you say, "Get the facts out as needed to upper

18 management," that's with regard to Mr. Waldrop's termination.

19 Right?

20     A     Yes.

21     Q     What facts needed to get out about the termination?

22     A     Well, that it wasn't a witch hunt and there were

23 specific issues and that everybody was not going to be

24 subject to this process.

25     Q     The fourth point on Exhibit 24 is, "Not required to

1    answer any question that I ask if you feel uncomfortable."

2    You told them that; right?

3         A    Uh-huh (affirmative).

4         Q    Did anybody refuse to answer any questions on that

5    basis?

6         A    No.

7         Q    Okay.  Let's talk about Michelle Moore-Andrews.

8         A    Okay.

9         Q    Exhibit 28.  Let's go ahead and get also Exhibit

10   23.  So we're going to look at three Exhibits, Exhibit 23,

11   28, and 29.

12        A    Got it.

13        Q    Okay.  Starting with Exhibit 29, it's handwritten,

14   the very last page?

15        A    Yeah.

16        Q    Again, that's your handwriting; correct?

17        A    Yes.

18        Q    And Michelle at the top, you're referring to

19   Michelle Moore-Andrews?

20        A    Right.

21        Q    What was that first part there?  If you'll just

22   read that into the record.

23        A    "Expense reimbursement - simplify.  Good to have

24   guidelines.  Voiced issue of administrative time to approve

25   expense reimbursement."  Those were her concerns.

1    Q    Okay.  Was that just a question you asked her,

2    generally?  I don't see it on Exhibit 23 is the reason I'm

3    asking.

4    A    I don't know what brought that up then.  She may

5    have had that on her mind when we --

6    Q    Yeah.  That's fine.  Okay.  I just didn't know if

7    that was an item that might have been added later.

8    A    No.

9    Q    Okay.  Number three, which is the question about

10   being uncomfortable about anything being asked to do.

11   A    No, she wasn't.

12   Q    There's nothing there.

13   A    She wasn't.  No.

14   Q    Number four, "Are there any policies or procedures

15   you consider unfair or harsh or unnecessary?"  I'm guessing

16   that first word under your notes on the third page of Exhibit

17   29, number 4 is unnecessary?

18   A    Yes.

19   Q    Clarity, written regulation, guidance, need to get

20   approval, fast approval, limit on money transaction.  What

21   was --

22   A    Number four kind of ties into that --

23   Q    That first --

24   A    -- first statement.  She was basically voicing the

25   opinion that we were creating more paperwork and additional

1    approval and such as that because she has an awful lot on her

2    plate.

3         Q    How long has she been with the organization?

4         A    Good grief.  Ten to 15 years, you know.  She's darn

5    good.  I'd trust her with my life.

6         Q    That's good.

7         A    Yep.

8         Q    You need people like that.

9         A    Uh-huh (affirmative).

10        Q    Okay.  Number five, "Fear of being fired or

11   terminated."  Her response according to your notes is, "Not

12   until now."

13        A    Right.

14        Q    Was it her answer that there is a fear of being

15   terminated?

16        A    Evidently so.  And I think that response,

17   basically, ties into this first issue here.

18        Q    Under Exhibit 28?

19        A    Right.

20        Q    Okay.  Let's just go ahead and talk about that

21   here.  Who was Claudette?

22        A    Claudette was a lady in the Hawkinsville office

23   that did some bookkeeping for either Home Health or something

24   and evidently, she was an older employee and kind of set in

25   her ways.  And it was decided -- she had a pattern, I think,

1   of making some errors and somebody finally became impatient

2   with that and she was terminated.

3        Q    Who terminated her?

4        A    Michelle.

5        Q    Michelle Moore-Andrews?

6        A    Right.

7        Q    Was Michelle Moore-Andrews her immediate

8   supervisor?

9        A    Yes, I think so.  Yes.

10       Q    And who was Michelle Moore-Andrews' immediate

11  supervisor when Mr. Waldrop was there?

12       A    Mark.

13       Q    Waldrop?

14       A    Waldrop.  Excuse me.

15       Q    Okay.  So what was the issue?  What was the problem

16  with Claudette that necessitated asking Michelle Moore-

17  Andrews about her on July 8th?

18       A    Two things.  Randy Coody, one of our board members

19  is from Hawkinsville and had operated -- before our merger

20  with his organization, had operated out of that office in

21  Hawkinsville.  And he was upset because she was an old

22  employee and an old acquaintance and he was upset about it.

23  And the second thing was that Michelle Moore-Andrews made a

24  special trip to Macon to tell Ronnie that she had terminated

25  her and Ronnie kind of thought that was unusual.

Q    Why did he think it was unusual?

A    For her to just come up and tell him that she was terminating not even a first-tier employee, but really, further on down in the organization.  I mean, it was --

Q    Did Mr. Rollins attribute that in some way to Mr. Waldrop?

A    I don't know.  He did not say.

Q    Did he tell you why he thought that was unusual?

A    Well, the fact that she had never done it before was most unusual to him, that and come up to Macon and tell him about terminating an employee.

Q    I mean, you'll have to forgive me.  I'm not trying to be flippant but I believe you called some of Mr. Waldrop's complaints about Mr. Rollins as trivial.  Petty might have been the word you used.

A    Uh-huh (affirmative).

Q    Do you not consider Mr. Rollins being upset about Ms. Andrews coming to Macon and telling him she had terminated this person as kind of petty?  A petty reason to be --

A    Oh, he wasn't upset about it.  He just thought it was odd.

Q    Okay.

A    I mean, he didn't express any discomfort or anger or anything.  He just thought it was an odd coincidence.

1      Q     Something that she needed to be asked about.

2      A     Right.  And there again, we were trying to drill

3 down into the organization and find out the culture --

4 whether our culture had changed and whether we could trust

5 them and they would trust us, period.  That was the whole

6 purpose for all of these meetings.

7      Q     All right.  Well, how did she respond?  It's not

8 reflected in your notes, I don't believe.  Correct me if I'm

9 wrong.  But how did she respond to that first question on

10 Exhibit 28?

11      A     First question.  Oh, I don't remember exactly but

12 she basically said she just felt like she needed to.  And

13 there again, Michelle is probably one of our most competent

14 employees, officers, and she takes full responsibility for

15 everything.  I mean, she's that competent to the point of

16 overly excessive about stuff like that.

17      Q     Would you trust her judgment on something like

18 this?

19      A     Oh, absolutely.

20      Q     If she felt like she needed to go and speak to Mr.

21 Rollins about that termination, you would trust her judgment

22 on that?

23      A     Sure.  Absolutely.

24      Q     Number two on Exhibit 28.  "Did anyone tell you to

25 meet with the CEO about that specific associate's

1    termination?"   Do you remember how she responded to that?

2        A    No.   She said no.

3        Q    She said no?

4        A    Yeah.

5        Q    Did Mr. Rollins suspect that someone had told her

6    to do that?

7        A    No.   Nobody.   We just kind of wanted to find out if

8    it was.

9        Q    Number three on Exhibit 28.   We actually do have an

10   answer for.   "I have been informed that you hate our CEO.   Is

11   that true?"   First, who informed you that Michelle Moore-

12   Andrews hates the CEO which would have been Ronnie Rollins?

13       A    I don't remember who informed us of that but

14   obviously, we thought that question needed to be answered and

15   she was overly expressive in that she did not.

16       Q    Now number three, I mean, it seems -- no, do not

17   see him regularly.   Not much interaction.   Liked -- in fact

18   though, she went so far as to say that she liked meetings

19   with him, and Lorraine, and I guess that's Diana Wilkes,

20   D.W.?

21       A    Yeah.

22       Q    Okay.

23            COURT REPORTER:   That's who?

24            MR. HENRY:   Diana Wilkes.

25            COURT REPORTER:   Thank you.

         MR. HENRY:   Yeah.   Sorry.

    Q     MR. HENRY:   Almost done with these, but I do think
there's one document I have not asked you about and that
would be Exhibit 22.   The very first one.

    A     Okay.

    Q     Come back to the first page and I'd like to talk
about the second page of Exhibit 22.

    A     Okay.

    Q     Do you recognize this page, handwritten notes?

    A     Yeah,

    Q     That's all your handwriting?

    A     That is.

    Q     How did this page of notes come about?

    A     I think I started trying to make notes of everybody
that I was talking to on one page and obviously, it didn't
work.

    Q     Well, that's one page.   It just looks like there's
a lot on the page.

    A     Yeah.

    Q     Were these notes taken during your discussions with
anybody else?

    A     I think it was taken with at least three people.

    Q     Okay.   Who were they?

    A     Well, Ken's name's at the very top --

    Q     I'm sorry.   I'm sorry.

1      A      Ken McDonald.

2      Q      Let me strike that question.  Let's do it this way.

3  Were these notes prepared before or after the July 8th, 2016

4  interviews?

5      A      They were during --

6      Q      Okay.  So that's why it's such a mess.  Okay.

7  These are contemporaneous.  Okay.  Let's look at the last

8  page of Exhibit 22.  Is that your handwriting?

9      A      Yes.

10     Q      Okay.  Where did this note come from?

11     A      I ain't got a clue.  No date.  No anything.

12     Q      All right.  Finally, the first page of Exhibit 22.

13  This one does have a date.

14     A      Right.

15     Q      July 18th, 2016.  So ten days, roughly, after these

16  interviews we've been talking about.

17     A      Uh-huh (affirmative).

18     Q      What is reflected on those?

19     A      We detected in going all the way back to prior to

20  all of May that conversations between Mark and Lorraine there

21  was some totally incorrect and uneducated knowledge of

22  Internal Revenue Code Section 4958 and these three issues --

23  I mean, Mark had given Lorraine -- Mark Waldrop had given

24  Lorraine the impression that if the entity was sold, there

25  would be big bonuses for everybody at the end of the sale and

1    all that.  And IRS Section 4958 extremely prohibits that.

2        Q    Okay.

3        A    There are penalties for excessive bonuses.  The

4    salaries and bonuses, that's why we had to have the

5    compensation study.  And the golden parachutes are even not

6    only for not-for-profit, but now from cooperate, I mean,

7    there's penalties for paying those.

8        Q    Tax penalties?

9        A    Tax penalties.  Yeah.  I mean, when you're not-for-

10   profit, that's your biggest motivator.

11       Q    And severance.

12       A    Severance, the same thing.

13       Q    Well, there's been some testimony in this case

14   about some golden parachute discussions and is it your

15   understanding that Section 4958 of the Internal Revenue Code

16   would prohibit golden parachutes, if a not-for-profit

17   organization were sold?

18            MR. DANIEL:  I'm going to object to the form of the

19       question.  You may answer.

20       A    THE WITNESS:  I would not approve it in a board

21   meeting, period.

22       Q    In any amount?

23       A    In any amount unless it's governed within the

24   reasonableness of the IRS regulations because if they are

25   done, there are penalties, ultimately, on the recipient and

1    on the board that approves them.  And I'm not going to stick

2    my neck out for somebody to get money.

3        Q    To get the golden parachute?

4        A    Right.  That's exactly right.

5        Q    The severance offer we looked at previously was

6    made to Mr. Waldrop; correct?

7        A    Right.

8        Q    From Mr. Bosin?

9        A    Right.

10       Q    Would that severance offer, under your

11   understanding, implicate Internal Revenue Code 4958?

12       A    No.  No, because it would not be considered an

13   excessive benefit and the amount wouldn't cause them to be

14   alarmed about it.

15       Q    Okay.  Salaries and bonuses.  You testified earlier

16   Mr. Waldrop was the highest paid employee --

17       A    Exactly.

18       Q    -- of the organization.  Was that ever a subject of

19   discussion in the context of Internal Revenue Code 4958?

20       A    Oh, absolutely, because that was the very reason we

21   had a compensation study every three years.

22       Q    Okay.

23       A    I mean, we had to hire, I guess, Buck Consultants

24   was out of Boston, and they would come in, examine our

25   organization, interview the executives, and then research

1    what a reasonable comp for that position was.   And like Randy

2    Coody used to say, "We want a report that's a coffee table

3    report, so if anybody sat down and saw it on a coffee table,

4    they could read it and understand where we were coming from."

5         Q     So in other words, no lawyers involved in drawing

6    it up?

7         A     Well, yeah.

8         Q     Just like that.

9         A     No, we just wanted to be protected.   Period.

10        Q     I understand.   Did Mr. Rollins, you testified took

11   a pay cut.

12        A     Uh-huh (affirmative).

13        Q     Was that in any way connected to this Code section?

14        A     Not really.   No.   You talking about in violation of

15   it?

16        Q     Was the Code section a consideration for the cut?

17        A     No.   He cut his salary, from what was spelled out

18   in the compensation report, down to a lower level.   IRS

19   doesn't reward you when you go in the opposite direction.

20        Q     Okay.   And forgive me if I'm asking this a second

21   time but the date of Exhibit 22 is July 18th, 2016.   Why on

22   that date were you focusing on this Code section?

23        A     I think this had to do with a meeting we had with

24   the organization's leadership out at the offices on Tom Hill

25   Boulevard.   Not downtown but we've got some office space out

1    there.  And we kind of wanted to get this across, this

2    information and the fact that we were wanting to move forward

3    and we wanted everybody onboard and be assured that we

4    weren't having a witch hunt, and we said -- and that may be

5    the reason -- where's that page at?

6         Q    Let's see.  It might be this one here.

7         A    That may be -- yes.

8         Q    Okay.  You're talking about page three in Exhibit

9    22?

10        A    Oh, okay.  Yeah.  We just kind of wanted to put

11   across the idea that we were transparent and if anybody had

12   any complaints or questions, the board was willing to discuss

13   them with them, period.  And I was there representing the

14   board.

15        Q    At the meeting outside of downtown?

16        A    Right.  It's just at another place.

17        Q    Okay.  Well, obviously, we're here today because of

18   a lawsuit that Mr. Waldrop filed.

19        A    Uh-huh (affirmative).

20        Q    When did you find out about that lawsuit?

21        A    Whatever day it arrived here in Macon.  I don't

22   think it was addressed to me anyway.

23        Q    I don't think it was either, but let's go ahead and

24   do this as the next one.

25             COURT REPORTER:  Thirty.

1    (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 30)

2            MR. HENRY:   Thirty.   Right on target.   Here you go,

3    Laura, I think we're pretty much done with them.   Okay.

4       Q    MR. HENRY:   Exhibit 30.   Please, take a look at

5    Exhibit and let me know when you're ready for me to ask you

6    some questions.

7       A    Okay.   I've read this before.

8       Q    That's your signature on the last page?

9       A    Yes.

10      Q    Who prepared Exhibit 30?

11      A    Somebody in the offices of Holland and Knight.

12      Q    Did you review it before it was sent?

13      A    I read it before I signed it, but I didn't have any

14   input into it at all, to its content.

15      Q    Didn't suggest any changes?

16      A    Oh, no.   Good night.

17      Q    Okay.   Well, let's look at this specific list of

18   causes that are listed in your letter beginning on page two.

19      A    Uh-huh (affirmative).

20      Q    Now before we go through these five specific ones,

21   I do want to ask you a question about the introductory

22   sentence to that list.   Starting with, "By way of example

23   only and without limitation."

24      A    Uh-huh (affirmative).

25      Q    Are there other causes for Mr. Waldrop's

1    termination that are not included in Exhibit 30?

2         A    To be completely honest, I'm not sure because I did

3    not read Chris Edwards' report until just over the weekend,

4    maybe.  Somehow or another, I did not get to see that and so

5    I just brushed through it.

6         Q    Chris Edwards is with 3M.

7         A    Right, and he's the forensic guy.

8         Q    So that's one of the documents you reviewed

9    recently in this case?

10        A    Yeah.  But, I mean, it was out there and supposedly

11   I was supposed to have gotten it, but I didn't get it.

12        Q    Well, is Community Health Systems contending that

13   there are additional causes for Mr. Waldrop's termination

14   beyond the five listed in Exhibit 30?

15        A    I don't know.  I think this is enough.

16        Q    All right.  Let's just go with the five of them.

17   First, is Exhibit 30 the first written notice of cause that

18   was provided to Mr. Waldrop for his termination?

19        A    As far as I know.  Yes.

20        Q    Okay.  Let's look at number one.  "You submitted

21   hundreds of thousands of dollars in business expenses for

22   reimbursement under your assistant's name rather than under

23   your name so as to conceal from your direct supervisor the

24   nature and magnitude of the unauthorized gifts, awards,

25   consumables, travel, office supplies, cleaning supplies, and

1  other questionable items for which you obtained reimbursement

2  from CHSI."  That's cause number one.

3      A    Right.

4      Q    What was wrong with Mr. Waldrop's expense

5  reimbursement requests?

6      A    His expenses were approved by himself, rather than

7  his supervisor because they would go in on his assistant's

8  expense report.

9      Q    Well, who was supposed to approve Mr. Waldrop's

10 expense reports?

11     A    His superior, and I presume that would be Ronnie

12 Rollins.

13     Q    Who was supposed to approve Ronnie Rollins' expense

14 reports?

15     A    Lorraine does that.

16     Q    Well, who approves Lorraine's, Lorraine Taylor's?

17     A    Ronnie Rollins.

18     Q    Okay.  You testified earlier that Ms. Taylor is in

19 charge of financial services.  Correct?

20     A    Correct.

21 (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 31)

22     Q    MR. HENRY:  Let's look at Exhibit 31.  Mr. Wall,

23 you've got what's been marked as Exhibit 31.  Does that

24 appear to be an expense report?

25     A    Yes.

Q    Do you recognize the signature appearing at the bottom of Exhibit 31?

A    I cannot read it.  I don't know who that is.

Q    I'll represent to you that that is Stephanie Dotson's signature.

A    Okay.

Q    Do you have any reason to dispute that?  You just don't know?

A    Don't know.

Q    Okay.  Well, assuming for the purposes of my question that that is Stephanie Dotson's signature, if we look at the very first expense dated November 23rd, 2013, it appears that it's a financial services meeting --

A    Uh-huh (affirmative).

Q    -- that's expense?  That would be something that would be for Lorraine Taylor.  Correct?

A    Well, looking at the date of it, 11/23/13, I'm not sure if that was the organizational chart at that time.

Q    Okay.

A    This is very dateable.

Q    Let's try one that maybe won't have that problem.

A    Okay.

(DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 32)

Q    MR. HENRY:  Exhibit 32.  Does that also appear to be an expense report?

```
 1        A     Yes, it does.

 2        Q     Okay.  The signature there at the bottom, do you

 3   recognize it?

 4        A     It's the same one that's on the previous, on 31.

 5        Q     And I'll represent to you that's Stephanie Dotson.

 6        A     Okay.

 7        Q     Stephanie Dotson was Mr. Waldrop's administrative

 8   assistant --

 9        A     Right.

10        Q     -- or executive assistant?

11        A     Okay.

12        Q     And she was in that role in January of 2014;

13   correct?

14        A     I guess, correct.  Yeah.

15        Q     The third entry on Exhibit 32 is for "a managed

16   care meeting at The Waverly.  Please code to Ronnie."

17        A     Okay.

18        Q     Would that be one of, based on the contents of

19   Exhibit 32, would that be an expense for Ronnie Rollins?

20        A     I don't have any knowledge of why that would be

21   entered that way.  I mean, this is way down below my

22   responsibility.

23        Q     I understand.  I'm just trying to make sure I

24   understand what the problem is with the expense reimbursement

25   process that Mr. Waldrop employed.  Because what we have here
```

1   on Exhibit 32 is expenses that were submitted by Mr.

2   Waldrop's assistant.

3        A    Okay.

4        Q    I'm representing to you that's what it is.

5        A    Okay.

6        Q    So if we assume that that's true, who would have

7   approved this expense?

8        A    Obviously, nobody did.

9        Q    There's no signature there.

10       A    Right.

11       Q    But if the procedure was used, the normal

12  procedure, who would have approved an expense reimbursement

13  request submitted by Mr. Waldrop's executive assistant?

14       A    I would think her superior would.

15       Q    Which would be who?

16       A    Mark Waldrop.

17       Q    So under this scenario, an expense reimbursement

18  request for Ronnie Rollins would have been submitted through

19  Mr. Waldrop's assistant for approval by Mr. Waldrop; is that

20  correct?

21       A     I wouldn't venture a judgment on that.  I mean,

22  that's just an entry on this line.  Whether Ronnie told her

23  to do that or whether she just did that or whether Mark

24  Waldrop told her to do it, I have no knowledge, because

25  that's way below my responsibility.

| | | |
|---|---|---|
| 1 | Q | Do you know what managed care meetings are? |
| 2 | A | Never been to one.  No. |

3      Q     If Community Health Systems expense reimbursement

4   procedure approval process for Ronnie Rollins would require

5   Lorraine Taylor to approve his expenses, but Mr. Waldrop was

6   approving those expenses, would that be a violation of

7   Community Health Systems policies?

8            MR. DANIEL:  Object to the form of the question.

9      Q     MR. HENRY:  You can answer.

10     A     I would think it would be.  The arrangement of

11  Lorraine approving Ronnie's expenses is because she is the

12  CFO right there in the office and they could discuss them.

13     Q     We've already established that the employment

14  agreements for Mr. Waldrop and Mr. Rollins are basically the

15  same when it comes to for-cause termination; correct?

16     A     Right.

17     Q     Speaking of the agreement, let's take a look at it.

18  And let's use the version that's been highlighted which would

19  be --

20           COURT REPORTER:  Fourteen.

21           MR. HENRY:  -- 14.  Thank you.

22     Q     MR. HENRY:  Exhibit 14.  Specifically, paragraph

23  2.4 on page three.  Now, I believe you testified earlier that

24  the first notice given to Mr. Waldrop of this cause for his

25  termination was Exhibit 30, August 16th?

1        MR. DANIEL:  Object to the form of the question.

2    Q    MR. HENRY:  The first written notice of the cause

3 that Mr. Waldrop received, Exhibit 30, was your letter?

4    A    Okay.

5    Q    Is that true?

6    A    That's true.

7    Q    Okay.

8    A    He was told that differently though on June 28th.

9    Q    Okay.  Well, let's look at the -- I want you to

10 read into the record the first sentence of paragraph 2.4.

11    A    "Company may immediately terminate employee's

12 employment hereunder for cause upon written notice of

13 termination to employee with such cause being specified in

14 such notice."

15    Q    Written notice, which is what this says; right --

16    A    Right.

17    Q    -- was not provided on June 28th; correct?

18    A    No, it was not.

19    Q    Written notice was not provided until August 16th,

20 2016 --

21    A    Right.

22    Q    -- after the filing of this lawsuit?

23    A    Right.

24    Q    Why could Mr. Waldrop not have cured the first item

25 in Exhibit 30 within 30 days of receiving notice?

1    A    I'm not sure based on what I've heard of his

2    testimony that he could have come up with the money.

3    Q    Okay.  The opportunity wasn't given to him though,

4    was it, to do that?

5    A    No.

6    Q    So if he had come up with the money to reimburse

7    that, that would have cured it?

8    A    Possibly that issue.

9    Q    Okay.  Let's look at number two a minute.

10   A    Okay.

11   Q    "You operated the DeBrock Poodles business owned by

12   you and your wife out of CHSI's Dalton, Georgia office.

13   Indeed, at least one online website for DeBrock Poodles lists

14   the contact telephone number for that business as the mobile

15   telephone number for which you submitted requests for 100

16   percent expense reimbursement to CHSI for many years and

17   received 100 percent expense reimbursement for many years,

18   and also provided to internal and external persons as your

19   CHSI cell phone number."  That's the second cause correct?

20   A    Number two.

21   Q    Why could Mr. Waldrop not have cured that cause

22   within 30 days of receiving notice?

23   A    You mean, unlist the number that was on the

24   website?

25   Q    I mean, would that have cured it?

1      A     I don't think it would remove the issue of getting

2   reimbursed 100 percent for it.

3      Q     Okay.

4      A     And I think in that employment agreement there was

5   an issue about other employment.

6      Q     Why don't you show me where that is?

7            COURT REPORTER:  Can you tell me how to spell that

8      DeBrock?

9            MR. HENRY:  Sure.  It's capital "D", little "E",

10     capital "B", R-O-C-K.

11           COURT REPORTER:  Thank you.

12           MR. DANIEL:  You want to take a break and let him

13     read it?

14           MR. HENRY:  Sure.  No problem.

15   (BREAK)

16     Q     MR. HENRY:  Have you had an opportunity to review

17   the agreement, Mr. Wall?

18     A     I have.

19     Q     Okay.  And you were going to point out a provision,

20   I think.

21     A     It's under number one on the first page.  It says,

22   "An employee shall not engage in any outside employment

23   without the express written consent from the board of

24   directors of the company."

25     Q     Okay.  So is it your testimony that he could not

1  have cured that cause for his termination by ceasing to

2  engage in that business?

3       A    Well --

4       Q    To the extent it was a business?

5       A    Well, to the extent of the lack of trust from that

6  point between him and the board of directors, I do not think

7  that could be cured.

8       Q    Were you aware at any point that Mr. Waldrop had

9  poodles that I guess were shown at Westminster?

10      A    Not until his deposition in your office.

11      Q    Okay.  All right.  Number three.  Again we're

12  reading from Exhibit 30.

13      A    Yeah.

14      Q    I just want to be sure the record's clear.  "You

15  served on the faculty of Southern Adventist University

16  teaching multiple courses and participating in campus-related

17  activities, for which you received compensation, that never

18  were disclosed to the CHI Board in violation of the terms of

19  your employment agreement."  That's the third cause; correct?

20      A    Correct.

21      Q    How could that not be cured?

22      A    Once you're distrusted, I don't think that's ever

23  cured.

24      Q    Okay.  So the DeBrock Poodles issue and the

25  Southern Adventist issue caused distrust?

1    A    Absolutely.  Along with the excessive expense

2  reimbursements and the method they were done.

3    Q    But you still trust Ronnie Rollins, don't you?

4    A    Oh, absolutely.

5    Q    Number four.  Well, before we go to number four,

6  have any other Community Health Systems associates,

7  employees, representatives taught at Southern Adventist

8  University?

9    A    I have no idea.

10    Q    Would it surprise you if others had?

11    A    Being 68 years old, not much surprises me anymore.

12    Q    Would those employees or representatives, if they

13  did teach at Southern Adventist University, need to be

14  terminated for cause?

15    A    Well, I'm not aware of anybody else having an

16  employment agreement with that term in it.

17    Q    So you can just terminate them for any reason if

18  they don't have an employment agreement; right?

19    A    As I understand, in the state of Georgia, you can.

20    Q    Okay.  Number four.  "After the flooding of CHSI's

21  Dalton, Georgia office in 2014, you authorized renovations

22  and refurbishments of the office space that cost in excess of

23  100,000 dollars more than the insurance proceeds received in

24  connection with the CHSI's property claim.  In connection

25  with that project, you also authorized the engagement of your

1   then-assistant's father pursuant to an independent

2   construction superintendent agreement when a general

3   contractor already had been retained to oversee and complete

4   the renovations and refurbishments.  You did not provide to

5   the board any information regarding that transaction, one

6   effect of which was to deprive the board of an opportunity to

7   address issues of independence, private inurement, or the

8   possibility of an excess benefit transaction."  That's the

9   fourth cause.  Correct?

10      A     Correct.

11      Q     Was Community Health Systems building new

12   facilities in 2014?

13      A     I don't remember, but probably so.

14      Q     And who would have been primarily in charge of

15   supervising the building of those facilities?

16      A     Day-to-day or ultimately?

17      Q     From a management perspective.

18      A     Stelling Nelson usually supervised those.

19      Q     Did Ronnie Rollins have a role in that at all?

20      A     As Chief Executive Officer, I'm sure he did.

21      Q     Okay.  Why could the fourth cause listed in Exhibit

22   30 not be cured, according to the company?

23      A     There again, it would be a matter of trust and also

24   business judgment.

25      Q     So is it the company's contention that there was a

1    problem with the business judgment exercised by Mr. Waldrop

2    with regard to discrimination?

3        A    Absolutely.

4        Q    How so?

5        A    Hiring a supervisor to supervise a construction

6    supervisor is redundant at best.

7        Q    How did you find out about this fourth cause?  You,

8    personally?

9        A    Me?  It was reported probably at the June 21st

10   board meeting.

11       Q    By Mark Lange?

12       A    I think so.  Yeah.

13       Q    Okay.  Number five.  "On numerous occasions, you've

14   failed to engage in and/or complete CHSI's project charter

15   authorization process, resulting in the commencement of

16   numerous projects and engagement of third parties to perform

17   work on behalf of CHSI without the standard approval of the

18   Chief Executive Officer and/or the Chief Financial Officer

19   and the board.  CHSI is aware of several instances in which

20   you provided false information to CHSI employees and third

21   parties regarding project charter authorization as CHSI's

22   Chief Executive Officer and the board as required when, in

23   fact, such authorization was never provided on behalf of the

24   organization in any way."  That's the fifth cause; correct?

25       A    Correct.

1    Q    And the last cause listed in Exhibit 30; correct?

2    A    Correct.

3    Q    When is a project charter authorization required?

4    A    Whenever they meet the parameters of the policy

5    that was set forth by the board.

6    Q    And that policy is what?

7    A    I do not remember.  It's written.  It's a written

8    document.

9    Q    When was it approved?

10    A    Y'all have got the minutes.

11    Q    Okay.

12    A    I don't -- I've been to so many board meetings, I

13    don't recall.

14    Q    Do projects that are not system-wide have to go

15    through the project charter authorization process?

16    A    Rephrase that.  I mean, ask me again.

17    Q    If a project is not system-wide, in other words,

18    doesn't affect the entire system.

19    A    That's a misconception.  I heard that in his

20    deposition.

21    Q    Okay.

22    A    That's not an excuse.  That's outside that policy.

23    Q    So would any Community Health Systems associate,

24    employee, representative who failed to file the project

25    charter authorization process for any project be subject to a

1    for cause termination?

2        A    I'm sure.  Yeah.  And that's excluding an

3    employment agreement, the immediate termination.  If they

4    aren't authorized to execute a document anyway.

5            MR. HENRY:  Let's take a quick break.  I may be

6        wrapping up.

7    (BREAK)

8        Q    MR. HENRY:  Okay.  Let's go back on and, Mr. Wall,

9    I appreciate your patience.  We're very close.  I just have a

10   few more --

11       A    Okay.

12       Q    -- questions.  Do you have any business dealings

13   with Ronnie Rollins outside of Community Health Systems?

14       A    No.

15       Q    No?  How about any of the other board members?

16       A    Well, Paul Cable, years ago, in the late '70s

17   wrote a Northwestern Life Policy for me.

18       Q    I'm sorry.  That was a bad question.  I'm talking

19   about Ronnie Rollins.  Does Ronnie Rollins have any business

20   or personal dealings with other board members?

21       A    Now, that would be disclosed on his conflicts of

22   interest statement that I require the board members to submit

23   every November.

24       Q    Would that have been submitted this year?  Has it

25   remained every year?

```
 1        A     It's every year.  That goes back --

 2        Q     Okay.  Is that part of the minutes or --

 3        A     No.  They're an affidavit-type thing, but that's

 4   required by Code section 4958.  You remember Senator Charles

 5   Grassley (phonetically) --

 6        Q     Yes.

 7        A     -- had hearings, and he almost pulled M.D.

 8   Anderson's tax exemption because they required somebody to

 9   pay an $80,000 deposit to get treated for cancer?

10        Q     Okay.  I'm not sure we asked for those in

11   discovery, just to be blunt.  So I'll make a request, but I'd

12   like to -- your testimony is those affidavits would disclose

13   those personal dealings?

14        A     Yes.

15        Q     Okay.

16        A     We're required to disclose them.

17        Q     Required to.  Okay.  Are you familiar with the

18   project at Zebulon Park in excess of one million dollars?

19        A     Very familiar with it because my mother spent three

20   months, two different, occasions out there.

21        Q     Okay.  Who performed the construction work on that

22   project?

23        A     I don't remember.  I'm sure I knew.

24        Q     Appling Brothers?

25        A     Who?
```

Q    Appling Brothers?   Does that sound familiar?

A    Appling Brothers is just --

Q    Well, they just did grading work.

A    Yeah.   And they were probably hired by the contractor.

Q    Well, did -- strike that.   Does Ronnie Rollins have any family relationship to Appling Brothers?

A    His father-in-law did own it.   I mean, his father-in-law is bedridden now so I'm sure he don't operate it.

Q    Would that be the type of personal dealing that would need to be disclosed on this affidavit that you've described?

A    I don't think so.   That's a stretch there.

Q    Okay.   I'm not familiar with the affidavit.   I'm genuinely asking because I don't know.

A    Yeah.

Q    What was the cost of the work that Appling Brothers did at Zebulon Park?

A    I have no earthly idea.

Q    Do you believe it was in excess of a million dollars?

A    I have no basis to believe anything.

Q    Did the board approve the use of Appling Brothers?

A    No.

Q    Is the board currently considering whether to

1    terminate Mr. Rollins' employment for cause?

2         A    No.

3         Q    How about Ms. Taylor?

4         A    No.

5              MR. HENRY:   Nothing further.

6                        DIRECT EXAMINATION

7    BY MR. DANIEL:

8         Q    I have a few questions for clarification.   It won't

9    take long.   I'd like to ask you about the June 21, 2016 board

10   meeting that was the subject of a number of questions that

11   Mr. Henry asked you about.

12        A    All right.

13        Q    And I understand that there was a board meeting at

14   some point and then there was an executive session

15   afterwards.

16        A    Correct.

17        Q    And I want to make sure I know how that transition

18   was made from the board meeting to the executive session.

19   First of all, at the board meeting, were there people in the

20   room for the board meeting who were not directors?

21        A    Yes.   We always -- well, Mark used to attend.

22        Q    Okay.

23        A    Mark Waldrop used to attend.

24        Q    Right.

25        A    And Theresa Moody.   I'm trying to think of the last

```
 1    one we had.  Theresa Moody, Angela Hammack.  Of course,

 2    Hazel, whatever she's doing, and she's there.  And then

 3    sometimes Randy Nichols and his assistant, Wendy, whatever

 4    her name is.  Our auditors are there.

 5         Q    Randy Nichols with 3M?

 6         A    Right.

 7         Q    He's the principal accountant in the firm?

 8         A    Yeah.  He's the lead partner and all that.  And

 9    Boone Smith attends sometimes.

10         Q    And he's an attorney for the company?

11         A    Right.

12         Q    And Hazel.  What's her job?

13         A    She takes the minutes like --

14         Q    Okay.

15              THE WITNESS:  What is your position called?

16              COURT REPORTER:  I'm a court reporter.

17              MR. WALL:  Court reporter.

18              COURT REPORTER:  Is it Hazel Farmer?

19              MR. WALL:  Yeah.  Hazel Farmer.  Yeah.

20              COURT REPORTER:  She's a court reporter, too.

21              MR. WALL:  Couldn't think of her last name.

22         Q    MR. DANIEL:  Now, back to the June 21, 2016

23    meeting.  Was Hazel present at that meeting?

24         A    Oh, yes.  Yeah.

25         Q    Did she stay for the executive session?
```

1    A    No.  It was just board members, and Lorraine stayed

2    until after she presented her presentation and she left, and

3    then Mark Lange and I spoke after that.

4    Q    At the time that the board made its decision with

5    respect to Mark Waldrop, who was in the room in this

6    executive session other than the directors themselves?

7    A    Mark Lange.

8    Q    Mr. Henry asked you a number of questions about

9    Exhibit 30 in your deposition.  Let's see if we can find

10   that.  I think this is it right here.

11   A    Yep.

12   Q    Okay.  I want to turn to page two and look at the

13   paragraph numbered one.

14   A    Uh-huh (affirmative).

15   Q    And I think it was read in the record before, but

16   I'll just read it briefly again.  And this is the letter you

17   signed to Mr. Waldrop dated August 16, 2016.

18   A    Uh-huh (affirmative).

19   Q    And you say, "You submitted hundreds of thousands

20   of dollars in business expenses for reimbursement under your

21   assistant's name rather than under your name so as to conceal

22   from your direct supervisor the nature and magnitude of the

23   unauthorized gifts, awards, consumables, travel, office

24   supplies, cleaning supplies, and other questionable items for

25   which you obtained reimbursement from CHSI."  So you see that

1  paragraph?

2      A    Yes.

3      Q    When the board met on June 21, 2016, in executive

4  session, and considered what action to take with respect to

5  Mark Waldrop's employment, did you consider the information

6  you had about Mr. Waldrop receiving unauthorized gifts,

7  awards, consumables, and these other items to be something

8  that was curable?

9           MR. HENRY:  Object to the form.  Leading.

10     Q    MR. DANIEL:  Did you consider that to be curable or

11  not?

12          MR. HENRY:  Same objection.

13     A    THE WITNESS:  I did not consider it to be curable.

14     Q    Why not?

15     A    Well, both from a financial standpoint, number one,

16  and then number two, the lack of trust from the board from

17  going forward.  Once trust is lost, I consider it very hard

18  to cure.

19          MR. DANIEL:  Okay.  That's it.

20  **(DEPOSITION CONCLUDED 3:27 P.M.)**

21

22

23

24

25

D I S C L O S U R E

STATE OF GEORGIA,

COUNTY OF BIBB:


Deposition of:   JOE WALL


Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

 I am a Georgia Certified Court Reporter.  I am here as a representative of Hawthorne & Webb Court Reporting.

 Hawthorne & Webb Court Reporting was contacted by the offices of Mr. Gary Henry to provide court reporting services for this deposition.  Hawthorne & Webb Court Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

 Hawthorne & Webb Court Reporting has no contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Hawthorne & Webb Court Reporting will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

 Dated:  MARCH 29, 2017


_____, CCR B-959
Certified Court Reporter

CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY;

I, Laura M. Jackson, CCR, B-959, CERTIFY that acting in such capacity on March 29, 2017, I reported the testimony of **JOE WALL,** and on the foregoing pages, numbered 6 through 177, both inclusive, have transcribed a true, accurate and complete transcript of the same.

I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or the outcome thereof.

WITNESS my hand and official seal this the 21st day of April, 2017.

Certificate Number B-959

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,                    :

        PLAINTIFF,                 :

    VS.                             :        CASE NO. 4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS,            :
INC.,
                          :

        DEFENDANT.

MARCH 29, 2017                MACON, GEORGIA              8:55 A.M.

EXHIBITS

TO THE DEPOSITION

OF

JOE WALL



Now Offering Video Conferencing

**HAWTHORNE & WEBB COURT REPORTING**

149 River Hills Lane
Macon, Georgia 31211
Phone:  478.746.2295
LAURA@HAWTHORNE-WEBB.COM

```
                              EXHIBITS

EXHIBIT NO. & DESCRIPTION                        ID'D AT PAGE

PLAINTIFF'S EXHIBIT NO. 1                             15
NOTICE AND SUBPOENA

PLAINTIFF'S EXHIBIT NO. 2                             26
WALDROP'S EMPLOYMENT AGREEMENT

PLAINTIFF'S EXHIBIT NO. 3                             32
ORGANIZATIONAL CHARTS

PLAINTIFF'S EXHIBIT NO. 4                             54
LETTER DATED 05/20/2016

PLAINTIFF'S EXHIBIT NO. 5                             54
LETTER DATED 05/15/2016

PLAINTIFF'S EXHIBIT NO. 6                             60
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 7                             69
EMAILS

PLAINTIFF'S EXHIBIT NO. 8                             73
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 9                             77
LETTER DATED 05/15/2016 WITH HIGHLIGHTS

PLAINTIFF'S EXHIBIT NO. 10                            78
WALL'S PHONE MESSAGE

PLAINTIFF'S EXHIBIT NO. 11                            81
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 12                            81
CONSULTING AGREEMENT WITH SPIRITUS

PLAINTIFF'S EXHIBIT NO. 13                            89
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 14                            92
WALDROP'S EMPLOYMENT AGREEMENT WITH HIGHLIGHTS

PLAINTIFF'S EXHIBIT NO. 15                            93
WALL'S HANDWRITTEN NOTES
```

PLAINTIFF'S EXHIBIT NO. 16                          95
BOARD MEETING MINUTES O6/21/2016

PLAINTIFF'S EXHIBIT NO. 17                         104
TALKING POINTS FOR MEETING

PLAINTIFF'S EXHIBIT NO. 18                         111
EMAIL AND MEMO 06/28/2016

PLAINTIFF'S EXHIBIT NO. 19                         114
LETTER DATED 07/01/2016

PLAINTIFF'S EXHIBIT NO. 20                         117
LETTER DATED 07/06/2016

PLAINTIFF'S EXHIBIT NO. 21                         119
WALL'S TALKING POINTS AND NOTES

PLAINTIFF'S EXHIBIT NO. 22                         150
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 23                         126
DISCUSSION QUESTIONS

PLAINTIFF'S EXHIBIT NO. 24                         142
WALL'S HANDWRITTEN NOTES, PREAMBLE

PLAINTIFF'S EXHIBIT NO. 25                         123
ISSUES TO DISCUSS WITH LAKE

PLAINTIFF'S EXHIBIT NO. 26                         123
EMAILS DATED 07/07/2016

PLAINTIFF'S EXHIBIT NO. 27                         127
SAME AS EXHIBIT 25 WITH NOTES

PLAINTIFF'S EXHIBIT NO. 28                         143
QUESTIONS FOR MOORE-ANDREWS

PLAINTIFF'S EXHIBIT NO. 29                         125
WALL'S HANDWRITTEN NOTES

PLAINTIFF'S EXHIBIT NO. 30                         156
LETTER DATED 08/16/2016

PLAINTIFF'S EXHIBIT NO. 31                         158
2013 EXPENSE REPORT

```
PLAINTIFF'S EXHIBIT NO. 32                    159
2014 EXPENSE REPORT
```

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

MARK A. WALDROP,       )
                               )

     Plaintiff,          )
                               )    Case No. 4:16-cv-235-HLM

vs.                         )
                               )    JURY TRIAL DEMANDED

COMMUNITY HEALTH SYSTEMS,   )
INC.,                       )
                               )

     Defendant.        )

---

## NOTICE OF DEPOSITION OF DEFENDANT
## COMMUNITY HEALTH SYSTEMS, INC.

---

TO:   Community Health Systems, Inc.
       c/o Harold T. Daniel, Jr., Esq.
       Holland & Knight LLP
       Regions Plaza, Suite 1800
       1180 West Peachtree Street
       Atlanta, Georgia 30309

Plaintiff Mark A. Waldrop (hereinafter "Mr. Waldrop"), by and through

counsel and pursuant to Federal Rule of Civil Procedure 30, hereby gives notice

that Mr. Waldrop will take the corporate deposition by oral examination of De-

fendant Community Health Systems, Inc., whose address is 213 Third Street, Ma-

con, Georgia 31201.  The deposition will commence on Monday, February 28,

2017 at 10:00 a.m. ET at the offices of Hall, Bloch, Garland & Meyer, 577 Mul-



1

berry Street, Suite 1500, Macon, Georgia 31201. The deposition may be continued to another date, time, or location to accommodate Defendant's designation of multiple officers, directors, managing agents, or other persons who consent to testify on Defendant's behalf. The deposition will be recorded stenographically. Pursuant to Federal Rule of Civil Procedure 30(b)(6), a list of matters for examination is attached hereto as *Exhibit 1*. You are invited to attend and participate.

DATED this  21st  day of February, 2017.

Respectfully submitted,

GEARHISER, PETERS, ELLIOTT
& CANNON, PLLC

By: _____
R. Wayne Peters (Ga. Bar #573700)
   (wpeters@gearhiserpeters.com)
Gary L. Henry (Ga. Bar #107821)
   (ghenry@gearhiserpeters.com)
320 McCallie Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 756-5171
Facsimile: (423) 266-1605
*Attorneys for Plaintiff Mark A. Waldrop*

## CERTIFICATE OF COMPLIANCE

Counsel, in compliance with LR 7.1D, NDGa, hereby certifies that this document has been prepared with one of the font and point selections approved by the Court in LR 5.1B, NDGa.  Specifically, this document has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

GEARHISER, PETERS, ELLIOTT &
CANNON, PLLC

By: _____

## MATTERS FOR EXAMINATION

Plaintiff Mark D. Waldrop (hereinafter "Mr. Waldrop"), by and through counsel and pursuant to Federal Rule of Civil Procedure 30(b)(6), submits the following matters for examination with respect to the deposition of Defendant:

### Instructions

1.      On the date specified in the Notice of Deposition of Defendant Community Health Systems, Inc., you must be prepared to testify with regard to the matters listed below.  Pursuant to Federal Rule of Civil Procedure 30(b)(6), you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf, about information known or reasonably available to you.  You may set out the matters on which each person designated will testify.

2.      You are required to supplement any testimony on the matters listed below to the extent required by Federal Rule of Civil Procedure 26(e).

### Definitions

For the purposes of these matters for examination, the following definitions shall apply:

1.      As used herein, the term "communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever



1

made, including, but not limited to, correspondence, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between or among two or more persons.

2.     As used herein, the term "document" means any medium upon which intelligence or information can be recorded or retrieved and any writing or other tangible thing from which data or information can be obtained or translated through detection devices to reasonably usable form, whether printed, recorded, reproduced by any process, or written or produced by hand, whether or not claimed to be privileged or exempt from production for any reason.  Set forth below is a list of examples of writings and tangible things which are included in this definition. This list is not an exclusive listing of the writings and tangible things included within this definition, but is intended to aid you in preparing for your deposition. Such examples include the following, including the original and each copy, regardless of origin and location:  letters, newspaper clippings, tape recordings, reports, agreements, communications (including intra-company communications), correspondence, telegrams, memoranda, summaries, forecasts, photographs, models, statistical statements, graphs, laboratory and engineering reports and notebooks, charts, plans, drawings, minutes or records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, customer lists,

2

reports, summaries, interviews, reports or summaries of investigations, opinions, or reports of consultants, appraisals, records, or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade papers, periodicals, order forms, diaries, calendars, telexes, cables, contracts, insurance policies, handwritten notes, drafts of any documents, working papers, sketches, indexes, lists, tapes, microfilms, data sheets, data processing cards, revisions of drafts of any documents, invoices, promissory notes, surveys, computer printouts, computer disk storage, e-mails, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced.  The term "document" also includes any electronically stored information.  In addition to the items on the forgoing list, any comment or notation appearing on any of the documents described above, and not part of the original text, is considered a separate document, and any draft or preliminary form of any document is also considered a separate document.

3.     As used herein, the term "identity" means such information as would enable a reasonably intelligent person to locate, describe, distinguish, understand, evaluate, or analyze the subject matter, including, but not limited to, descriptions, identifying marks, dates, amounts, terms, names, parties, values, numbers, labels, provisions, witnesses, signatories, writers, drafts, representatives, agents, officers, employees, opinions, conclusions, and custodians of the subject matter.  When

used in reference to a natural person, the term "identity" includes the full name, present or last known address, and present or last known business affiliation and job title of the person.  When used in reference to a governmental entity, corporation, or unincorporated business association, the term "identity" includes the full name, principal place of business address, and state or country of incorporation or organization of the person.

4.    As used herein, the term "Mr. Waldrop" refers to Plaintiff Mark A. Waldrop, each of his agents, representatives, attorneys, and each person acting or purporting to act on his behalf.

5.    As used herein, the term "Ms. Dotson" refers to Stephanie Dotson, each of her agents, representatives, attorneys, and each person acting or purporting to act on her behalf.

6.    As used herein, the term "or" appearing in any matter upon which examination is requested shall not be read so as to eliminate any part of the matter, but, whenever applicable, it should have the same meaning as "and."  For example, a matter upon which examination is requested stating "refer or relate in any way to" should be read as "refer and relate in any way to" if a matter that does both exists.

7.    As used herein, the term "person" means:  (1) any natural individual

in any capacity whatsoever; (2) any public or private entity or organization, including divisions, departments, and other units therein; or (3) any governmental entity, whether local, state, or federal, including divisions, departments, and other units therein.

8.     As used herein, the term "Pleadings" refers to:   (1) the Complaint filed on July 26, 2016; (2) the Answer, Defenses, and Counterclaim of Defendant Community Health Systems, Inc. filed on September 21, 2016; (3) the Answer to Counterclaim filed on October 4, 2016; (4) the Amended Complaint filed on December 12, 2016; (5) the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc. filed on December 15, 2016; (6) the Answer to Amended Counterclaim of Defendant Community Health Systems, Inc. filed on December 29, 2016; and (7) any amendments or supplements to the documents listed in this definition.

9.     As used herein, the phrase "refer or relate in any way to" shall mean to be in any way logically or factually connected with the matter that is the subject of the matter upon which examination is requested.

10.     As used herein, the term "representative" means any and all agents, employees, servants, officers, directors, attorneys, or any other persons acting or purporting to act on your behalf in this case.

11.    As used herein, the term "Rollins" refers to Ronnie D. Rollins, each of his agents, representatives, attorneys, and each person acting or purporting to act on his behalf.

12.    As used herein, the term "Taylor" refers to Lorraine Taylor, each of her agents, representatives, attorneys, and each person acting or purporting to act on her behalf.

13.    As used herein, the terms "you," "your," "yourself," or "yourselves" refer to Defendant Community Health Systems, Inc., each of its agents, representatives, attorneys, and each person acting or purporting to act on its behalf.

## MATTERS FOR EXAMINATION

1.    All facts or circumstances that refer or relate in any way to the execution of the Employment Agreement of Mark A. Waldrop, a copy of which is attached to the Amended Complaint as *Exhibit 1* (Doc. 27-1).

2.    All facts or circumstances that refer or relate in any way to the execution of an employment agreement by Rollins.

3.    All facts or circumstances that refer or relate in any way to the execution of an employment agreement by Taylor.

4.    All facts or circumstances that refer or relate in any way to the proceedings at the meetings of your board of directors since January 1, 2010, includ-

6

ing, but not limited to, the subjects discussed and actions taken at each such meeting and any proceedings conducted in executive session.

5.    All facts and circumstances that refer or relate in any way to the proceedings at the meetings of any audit committee of your board of directors since January 1, 2010, including, but not limited to, the subjects discussed and actions taken at each such meeting and any proceedings conducted in executive session.

6.    All facts or circumstances that refer or relate in any way to the budgets approved by your board of directors since fiscal year 2010-2011.

7.    Your functional and legal organizational charts and the relationships between each entity listed on those charts.

8.    All facts or circumstances that refer or relate in any way to any policies concerning the use of the Workday program by your representatives, including, but not limited to, the use of the Workday program by: (1) Rollins; (2) Taylor; (3) Mr. Waldrop; (4) Ms. Dotson; and (5) any person who has performed the duties formerly assigned to Mr. Waldrop.

9.    All facts or circumstances that refer or relate in any way to any policies concerning the use of the Selectica program by your representatives, including, but not limited to, the use of the Selectica program by: (1) Rollins; (2) Taylor; (3) Mr. Waldrop; (4) Ms. Dotson; and (5) any person who has performed the duties

formerly assigned to Mr. Waldrop.

10. All facts and circumstances that refer or relate in any way to your procedures for approving expense reimbursement requests from January 1, 2010 to the present.

11. All facts and circumstances that refer or relate in any way to expense reimbursement requests submitted by: (1) Rollins; (2) Taylor; (3) Mr. Waldrop; (4) Ms. Dotson; and (5) any person who has performed the duties formerly assigned to Mr. Waldrop.

12. All facts and circumstances that refer or relate in any way to your voluntary employees beneficiary association plan (VEBA), including the VEBA's structure, the investment of the VEBA's excess reserves or funds, and the overall performance of the VEBA.

✓ 13. All facts and circumstances that refer or relate in any way to the "internal investigation consisting of employee interviews and the review and collection of various documentation and relevant information" described in Paragraph 35 of the counterclaim portion of the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc. (Doc. 29).

14. All facts and circumstances that refer or relate in any way to the "offi-

cial audit" described in Paragraph 46 of the counterclaim portion of the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc. (Doc. 29), including, but not limited to, the "improprieties perpetrated by Mr. Waldrop that were previously unknown to . . . Rollins or [your] Board" as alleged in Paragraph 47 of the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc.

15.   All facts and circumstances that refer or relate in any way to any expense reimbursement requests or expense reports submitted by Mr. Waldrop or Ms. Dotson that you allege were improperly submitted by Mr. Waldrop or Ms. Dotson.

16.   All facts and circumstances that refer or relate in any way to expense reimbursement requests submitted in connection with your leadership development program.

17.   Mr. Waldrop's paid time off since January 1, 2010.

18.   All projects and third-party engagements for which you contend Mr. Waldrop should have obtained a Project Charter Authorization.

19.   All facts and circumstances that refer or relate in any way to your claim that Mr. Waldrop's activities with regard to DeBrock Poodles constitute a cause for Mr. Waldrop's termination.

20.   All facts and circumstances that refer or relate in any way to your claim that Mr. Waldrop activities at Southern Adventist University constitutes a cause for Mr. Waldrop's termination.

21.   All facts and circumstances that refer or relate in any way to your claim that the renovation of your Dalton, Georgia office constitutes a cause for Mr. Waldrop's termination.

22.   All facts and circumstances that refer or relate in any way to your termination of Mr. Waldrop's employment, including all facts and circumstances that refer or relate in any way to any notice you provided to Mr. Waldrop of the cause for Mr. Waldrop's termination.

23.   All communications you or your representatives have had with any person that refer or relate in any way to Mr. Waldrop's termination.

24.   All communications you or your representatives have had with any person that refer or relate in any way to Ms. Dotson's termination.

25.   All communications, facts, or circumstances that refer or relate in any way to the allegations in the Pleadings.

*Execution Version*

## EMPLOYMENT AGREEMENT
## OF MARK A. WALDROP

THIS EMPLOYMENT AGREEMENT (as amended and restated herein, this "Agreement") is made and entered into as of the 26 day of _June_, 2006, and is now amended and restated as of January 1, 2009, by and between Community Health Systems, Inc., a Georgia nonprofit corporation (the "Company"), and the undersigned employee, Mark A. Waldrop, a resident of the State of Tennessee ("Employee").

### WITNESSETH:

WHEREAS, the Company desires to continue to employ Employee; and Employee desires to accept such continued employment on the terms and conditions hereinafter stated; and

WHEREAS, Company and Employee now wish to update the Agreement in order to establish its compliance with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), with the understanding that this Agreement supersedes all prior versions and hereinafter shall solely establish the terms of Employee's employment with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1. **Employment.** Employee shall serve as the Executive Vice President, Integration Services and shall perform the duties set forth on Exhibit 1 attached hereto, in addition to those duties reasonably assigned to Employee from time to time by the President of the Company or the Board of Directors of the Company. Employee shall be employed on a full-time basis and shall report directly to the President of the Company. Employee shall be subject to the Company's policies and procedures in effect from time to time. Employee shall perform the duties assigned to him faithfully, diligently and to the best of his ability, and Employee shall not engage in any outside employment without the express written consent of the Board of Directors of the Company.

2. **Term of Employment.**

2.1 **Term.** Unless earlier terminated pursuant to Sections 2.2-2.6 below, the initial term of Employee's employment under this Agreement began on January 1, 2006 and shall continue until December 31, 2006 (the "Initial Term"); provided that such Initial Term shall be automatically extended for additional periods of one (1) year commencing on January 1, 2007 and each anniversary thereof (such period or periods, the "Renewal Term"), unless either party shall have given notice to the other party at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term (as the case may be) that such party does not desire to extend the term of this Agreement, in which event, the employment would terminate on December 31 of the Initial Term or the applicable Renewal Term (as the case may be) (the Initial Term and the Renewal Term or Terms, if applicable, collectively, the "Term").

2.2 **Termination upon Death.** Employee's employment hereunder shall automatically terminate upon the death of Employee. In the event of termination of employment upon death,



PLAINTIFF'S
EXHIBIT
2
Wall

ATLANTA:5093463.1

*Execution Version*

the Company shall pay to Employee's estate an amount equal to six (6) months' Salary (as defined below) payable in a lump sum within 60 days of the Employee's death.

2.3   Termination upon Disability.   The Company may terminate Employee's employment hereunder immediately upon Employee's Disability, which has lasted (or can reasonably be expected to last) for a period of six (6) consecutive months (except as prohibited by law). For purposes of this Agreement, "Disability" shall mean the inability of Employee, as determined by the Company's Board of Directors, to perform the essential functions of his regular duties and responsibilities, with or without reasonable accommodation, due to a medically determinable physical or mental illness.

2.4   Termination by the Company for Cause.   The Company may immediately terminate Employee's employment hereunder for Cause upon prior written notice of termination to Employee with such Cause being specified in such notice. As used herein, "Cause" shall mean (i) Employee's act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to the Company or its reputation; (ii) Employee's conviction of, pleading guilty to, or confessing to any felony; or (iii) Employee's failure to observe or perform any material covenant, condition, or provision of this Agreement or of the Company's written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to Employee by the Company.

2.5   Termination by the Company without Cause.

(a)   The Company may terminate Employee's employment hereunder without Cause by giving Employee 30 days' prior written notice thereof.

(b)   In the event of the Company's termination of employment without Cause, as severance pay the Company shall, subject to Section 2.8 below, continue to pay the Salary to Employee for (1) year. Such severance pay shall be payable in equal installments and in accordance with the regularly recurring pay periods established by the Company but in no event less frequently than monthly.

2.6   Termination by Employee.   Employee may terminate Employee's employment hereunder by giving the Company not less than 30 days' prior written notice thereof.

2.7   Effect of Termination of Employment.   Upon termination of employment, all obligations of the Company under this Agreement shall terminate except with respect to (i) payment of compensation earned to the date of termination, (ii) any severance payments required to be paid under Section 2 of this Agreement, (iii) reimbursement of expenses incurred prior to the date of termination of employment to which Employee would have been entitled under this Agreement, and (iv) any unpaid vested amounts or benefits to which Employee would have been entitled as of the date of Employee's date of termination pursuant to any benefit plan. In addition to the foregoing, (a) upon termination of employment pursuant to Section 2.5 and for the duration of the severance period set forth in Section 2.5(b), Employee shall be provided benefits, at no cost to Employee, substantially similar to the employee benefits being provided to Employee at the time of such termination; and (b) upon termination of employment for any other reason, or immediately following the severance period set forth in Section 2.5(b), as applicable,

ATLANTA:5093463.1

*Execution Version*

Employee shall have the option to purchase continuation coverage as to any Company-provided medical, dental or vision plan in which he participates, such option being in addition to any legally-mandated rights Employee may have to COBRA continuation coverage as to any Company-provided medical, dental or vision plan in which he participates.

    2.8    Code Section 409A Compliance. Notwithstanding anything in this Agreement to the contrary, if any benefit or amount payable to the Employee under Section 2 on account of Employee's termination of employment constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended or successor provision ("409A"), payment of such benefit or amount shall commence only when Employee incurs a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h). Such payments or benefits shall be provided in accordance with the timing provisions of Section 2 by substituting the references to "termination of employment" or "termination" with "separation from service". If at the time Employee incurs a separation from service Employee is a "specified employee" within the meaning of 409A, any benefit or amount payable to the Employee under Section 2 that constitutes nonqualified deferred compensation subject to 409A shall be delayed until the first day of the seventh month following the Employee's separation from service (the "409A Suspension Period"). Within 14 calendar days after the end of the 409A Suspension Period, the Company shall pay to the Employee (or his estate or beneficiary, as applicable) a lump sum payment in cash equal to any payments (without interest) that the Company would otherwise have been required to provide under this Agreement but for the imposition of the 409A Suspension Period. Thereafter, Employee shall receive any remaining payments due under Section 2 in accordance with the terms of Section 2 (as if there had not been any suspension period beforehand). For purposes of this Agreement, each payment that is part of a series of installment payments shall be treated as a separate payment for purposes of 409A.

    3.    Compensation. For all services which Employee renders to the Company during the Term, Employee shall receive from the Company an annual Salary as of January 1, 2009 (the "Salary") of $562,680, less normal withholdings. The Salary shall be paid to Employee on the regularly recurring pay periods established by the Company, but in no event less frequently than monthly. The amount of the Salary shall be reviewed annually by the Board of Directors of the Company for, at the discretion of the Board of Directors of the Company, possible increases in such amount.

    4.    Reimbursement of Business Expenses. The Company shall pay all reasonable and necessary travel and business expenses incurred by Employee directly related to Employee's performance of Employee's responsibilities and duties for the Company under this Agreement. Employee shall submit to the Company statements that justify in reasonable detail all expenses so incurred. Employee shall submit all reimbursements hereunder for a particular calendar year no later than forty-five (45) days after it ends, and payment shall occur not later than March 15 immediately following the end of the calendar year to which the reimbursement relates.

    5.    Benefits.

    5.1    Executive Benefits Program. The Company shall pay insurance premiums on behalf of Employee for health insurance for Employee and his dependents and for disability and life insurance, in such amounts as the Company from time to time may determine.

ATLANTA:5093463.1

*Execution Version*

5.2    Standard Benefits.  Employee shall be eligible to participate in any 401(k) plan in which the employees of the Company participate.  Employee shall also be entitled to participate in any other employee benefit plans and programs, to the same extent generally available to other similarly situated Company executives, in accordance with the terms of those plans and programs.

5.3    Short Term Disability Payments.

(a)    Irrespective of whether the Company purchases or maintains any disability insurance for Employee, should Employee become Disabled, then the Company shall provide to Employee short-term disability payments, as set forth in this Section 5.3.  During the first 180 days of a Disability, the Company will continue to pay to Employee his Salary commencing on the 6th day of such Disability.  During the first 5 days of such Disability, Employee must take sick days, vacation days or paid leave time to which he is entitled.  If Employee is not entitled to any more sick days, vacation days or paid leave time, then during the first 5 days of such Disability, Employee must take unpaid leave.  During the time period where Employee receives short-term disability benefit payments pursuant to this Section 5.3, Employee shall continue to be covered by all of the benefits and other provisions of the executive benefits program, if applicable, generally described above.

(b)    All such short-term disability benefit payments shall be made monthly on the appropriate regularly recurring pay periods established by the Company.  The short-term disability benefit payable from the Company shall be reduced by short-term disability benefit payments to Employee by insurance companies for which the premium is payable by the Company.

5.4    Executive Leave Policy.  During the Term, Employee shall be entitled to certain paid time off, as more fully described in the Company's Executive Leave Policy, a copy of which is attached hereto as Exhibit 5.4.

6.    Restrictive Covenants.

6.1    Definitions.

(a)    "Business" shall mean:  (a) the provision of rehabilitative therapy, medical and personal support services, home care, medical or pharmaceutical supplies or case management services; (b) the leasing, ownership, management or operation of nursing facilities or assisted living facilities ("assisted living facilities" being known under Section 31-712 of the Official Code of Georgia Annotated as "personal care homes"); (c) the operation and management of a health care cooperative; (d) the operation and management of one or more captive insurance companies; and (e) other activities or provision of products or services being conducted or provided, as applicable, or which the Company has active plans to pursue, at the time of termination of Employee's employment.

(b)    "Competing Business" shall mean any person or entity which engages in a business substantially the same as the Business or any portion thereof.

ATLANTA:5093463.1

*Execution Version*

(c)     "Confidential Information" shall mean any data or information, other than Trade Secrets, that is valuable to the Company, any other member of the System or their respective affiliates and is not generally known by the public. To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, lists (whether or not in writing) of the Company's, any other member of the System's or their respective affiliates' current or potential customers, lists of and other information about the Company's, any other member of the System's or their respective affiliates' officers and employees, financial information (whether or not in writing) that has not been released to the public by the Company, any other member of the System or their respective affiliates, marketing techniques, price lists, pricing policies, and the Company's, any other member of the System's or their respective affiliates' business methods, contracts and contractual relations with the Company's, any other member of the System's or their respective affiliates' customers and suppliers and future business plans. Confidential Information also includes any information or data described above which the Company, any other member of the System or their respective affiliates obtain from another party and which the Company, any other member of the System or their respective affiliates treat as proprietary or designate as confidential information whether or not owned or developed by the Company, any other member of the System or their respective affiliates. "Confidential Information" shall not include any materials or information of the types specified above to the extent that such materials or information (i) are or become publicly known or generally utilized by others engaged in the same business or activities in which the Company, any other member of the System or their respective affiliates utilized, developed, or otherwise acquired such information; or (ii) are known to Employee prior to employment, having been lawfully received from parties other than the Company, any other member of the System or their respective affiliates; or (iii) are furnished to others by the Company, any other member of the System or their respective affiliates with no restriction on disclosure. Failure to mark any Confidential Information as confidential shall not affect its status as "Confidential Information" under this Agreement.

(d)     "Restricted Customer" shall mean any customer or client of the Company or its affiliates with whom Employee has had business contact during his employment with the Company.

(e)     "Trade Secrets" shall mean any information of the Company, any other member of the System or their respective affiliates, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product or service plans, or a list of actual or potential patients or suppliers, which is not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secrets also include any information described in this Section 6.1(e) which the Company or other members of the System or their affiliates obtain from another party which the Company or other members of the System or their affiliates treat as proprietary or designate as trade secrets, whether or not owned or developed by the Company, any other member of the System or their respective affiliates. Failure to mark any Trade Secrets as confidential shall not affect its status as a Trade Secret under this Agreement.

ATLANTA:5093463.1

*Execution Version*

(f)     "Territory" shall mean the State of Georgia.

6.2     <u>Nondisclosure of Trade Secrets and Confidential Information.</u>  In the course of Employee's employment by the Company, Employee will have access to the Company's, other members of the System's or their respective affiliates' most sensitive and most valuable Trade Secrets and Confidential Information, the use, application or disclosure of any of which would cause substantial and possibly irreparable damage to the business and asset value of the Company, other members of the System or their respective affiliates.  Accordingly, Employee accepts and agrees to be bound by the following provisions:

(a)     During the Term and following the termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose, or permit any unauthorized person or entity access to, any Trade Secrets or any portion thereof so long as they remain Trade Secrets.

(b)     During the Term and for a period of two (2) years following termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by the Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose or permit any unauthorized person or entity access to, any Confidential Information or any portion thereof.

(c)     Without limiting the foregoing, Employee shall abide by the Company's policies and regulations, as established from time to time, for the protection of its Trade Secrets and Confidential Information.  Notwithstanding anything herein to the contrary, Employee shall be permitted to disclose Trade Secrets or Confidential Information if required by applicable law, provided that, in such case, Employee shall (i) furnish only that portion of the Confidential Information or Trade Secrets that he is advised by counsel is legally required to be disclosed, and (ii) provide the Company with prompt written notice of such request or requirement so that the Company may seek a protective order or other appropriate remedy.

(d)     Upon the request of the Company and in any event upon the termination of employment with the Company, Employee shall deliver to the Company all memoranda, notes, records, tapes, documentation, disks, manuals, files or other documents, and all copies thereof in any form, concerning or containing Confidential Information, Trade Secrets or Works (as defined below) that are in Employee's possession, whether made or compiled by Employee, furnished to Employee or otherwise obtained by Employee.

6.3     <u>Nonsolicitation of Customers and Employees.</u>  Employee covenants and agrees that during the Term and for a period of eighteen (18) months thereafter, Employee shall not, directly or indirectly (whether on his own behalf or on behalf of any other person, as owner, partner, stockholder, investor, employee, officer, director, agent, independent contractor, associate, executive, consultant or licensor):

6

*Execution Version*

(a)      (A) solicit, recruit, divert or take away or attempt to solicit, recruit, divert or take away any person that is an employee of the Company, any other member of the System or their respective affiliates and with whom Employee had personal contact during his employment under this Agreement, (B) encourage any person or entity (other than the Company, any other member of the System or their respective affiliates) to solicit, recruit, divert or take away any such employee or (C) otherwise encourage any such employee to discontinue his or her employment with the Company, any other member of the System or their respective affiliates; or

(b)      solicit, recruit, divert or take away a Restricted Customer for the purpose of directly or indirectly providing, distributing or selling products or services similar to those provided, distributed or sold in the operation of the Business.

Nothing herein shall prohibit Employee (following the termination of this Agreement) from conducting solicitations of the general public for employment or for business not targeted specifically at Restricted Customers or employees of the Company or its affiliates.

6.4      <u>Noncompetition Covenant</u>.  Except as set forth on <u>Exhibit 6.4</u> attached hereto, Employee further covenants and agrees that, during the Term and for a period of twenty four (24) months thereafter, he shall not, without the Company's prior written consent, serve as an operations manager, an executive vice president of integration services or in any other position requiring Employee to perform some or all of the duties that Employee was performing for the Company at the time this Agreement is terminated in the Territory for any Competing Business.

6.5      <u>Ownership of Common Stock</u>.  Notwithstanding anything in this Section 6 to the contrary, nothing contained herein shall prohibit Employee from owning not more than three percent (3%) of the common stock of any company whose common stock is publicly traded on a national securities exchange or in the over-the-counter market.

7.      <u>Company Ownership of Works</u>.

7.1      <u>Definition of Works</u>.  "Works" shall mean any and all works of authorship, code, inventions, improvements, discoveries, trademarks, technologies, and work product, whether or not patentable or eligible for copyright, trade secret or trademark protection, and in whatever form or medium and all derivative works thereof, and any and all rights, applications or registrations with respect thereto which are, have been or will be created, made, or developed by Employee: (a) in the course of employment with the Company, (b) during Employee's regular business hours with the Company, (c) on the Company's premises, or (d) using the Company's resources or equipment.  Employee agrees to fully and promptly disclose in writing to the Company any such Works as such Works from time to time may arise.

7.2      <u>Company Ownership of Works</u>.  All Works are the property of the Company. Employee shall execute and deliver such confirmatory assignments, instruments, or documents as the Company deems necessary or desirable without requiring the Company to provide any further consideration therefor.  Employee agrees to and hereby does assign to the Company all right, title, and interest in and to any and all Works, including all worldwide copyrights, patent rights, trademark rights, and all trade secrets embodied therein.  Employee waives any and all rights Employee may have in any Works, including but not limited to the right to

7

acknowledgement as author. Employee agrees not to use or include in Works any copyrighted, restricted or protected code, specifications, concepts, trademarks, or trade secrets of any third party or any other information that Employee would be prohibited from using by any law or any confidentiality, non-disclosure or other agreement with any third party.

7.3 <u>Further Assurances</u>. Employee shall, without charge to the Company other than reimbursement of Employee's reasonable out-of-pocket expenses, execute and deliver all such further documents, including applications for patents, trademarks and copyrights, and perform such acts, at any time during or after the Term as may be necessary, to obtain patents, trademarks, or copyrights, or any other legal protection in respect of the Works and to vest title such Works in the Company, its successors, assigns, or designees. Without limiting the generality of the foregoing, Employee further agrees to give all lawful testimony, during or after the Term, which may be required in connection with any proceedings involving any Works so assigned by Employee.

8.    <u>No Conflicting Obligations to Third Parties.</u>

Employee represents and warrants to the Company that Employee is not subject to any employment, non-disclosure, confidentiality, non-compete, or other agreement with any third party which would prevent or prohibit Employee from fulfilling Employee's duties for the Company. If Employee is the subject of any such agreement, and has any doubt as to its applicability to Employee's position with the Company, Employee will provide a copy of such agreement to the Company so that the Company can make a determination as to its effect on Employee's ability to work for the Company.

9.    <u>Remedies.</u>

The restrictions contained in this Agreement are considered by the parties hereto to be fair and reasonable and necessary for the protection of the legitimate business interests of the Company. It is recognized that damages in the event of breach of the provisions of this Agreement by Employee would be difficult, if not impossible, to ascertain, and it is therefore agreed that the Company, in addition to and without limiting any other remedy or right it may have, shall have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach. The existence of this right shall not preclude any other rights and remedies at law or in equity which the Company may have.

10.    <u>Notices.</u>

Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally (including by facsimile, overnight courier or express mail service) or sent by registered or certified mail, postage or fees prepaid,

Company:

   Community Health Systems, Inc.
   213 Third Street
   Macon, Georgia 31201

ATLANTA:5093463.1

*Execution Version*

Attention: Joseph A. Wall
Fax: (478) 743-4501

With a copy (which shall not constitute notice) to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia  30308
Attention:  Mark S. Lange
Fax:  (404) 815-2433

Employee:     Mark A. Waldrop
9686 Bowen Trail
Ooltewah, TN 37363
Fax: _____

or at such other address for a party as shall be specified by like notice.  Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or the office of such party. Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth business day after the day it is so placed in the mail or, if earlier, the time of actual receipt.

11.     Binding Agreement.

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company.  This Agreement is a personal service agreement and may not be assigned in whole or in part by Employee without the prior written consent of the Company.  The covenants of Employee contained in Section 7 shall be binding upon the heirs, beneficiaries, administrators, and executors of Employee.

12.     Modifications and Amendments.  This Agreement shall not be modified or amended except by an instrument signed by both parties, which makes specific reference to this Agreement.

13.     Waiver.  The failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or of any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver.

14.     Severability.  If any provision or covenant, or any part thereof, of this Agreement should be held by any court to be invalid, illegal or unenforceable, either in whole or in part, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remaining provisions or covenants, or any part thereof, of this Agreement, all of which shall remain in full force and effect.

ATLANTA:5093463.1

*Execution Version*

15.    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all which together shall constitute one and the same instrument.

16.    <u>Governing Law: Jurisdiction</u>.

This Agreement and the rights and obligations of the parties to the Agreement will be determined in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.  The Company and Employee irrevocably consent to the exclusive jurisdiction and venue of the courts of any county in the State of Georgia and the district courts of Georgia, in any judicial proceeding brought to enforce this Agreement.  The parties agree that any forum other than the State of Georgia is an inconvenient forum and that a lawsuit (or non-compulsory counterclaim) brought by one party against another party in a court of any jurisdiction other than the State of Georgia should be forthwith dismissed or transferred to a court located in the State of Georgia.

17.    <u>Attorney's Fees</u>.

If either party to this Agreement breaches any terms hereof, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

18.    <u>Interpretation</u>.

This Agreement (including the Exhibits attached hereto) constitutes the complete understanding between the parties concerning the subject matter hereof, and all prior negotiations, representations and agreements having been merged into this Agreement.

***(Signatures on following page)***

ATLANTA:5093463.1

*Execution Version*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth hereinabove.

"Company"

COMMUNITY HEALTH SYSTEMS, INC.

By: _____

Name: Ronnie D. Rollins
Title:   President

"Employee":

_____
Mark A. Waldrop

ATLANTA:5093463.1

## EXHIBIT 1

Duties of Employee

**Overall Responsibility/Primary Objective/Summary**:  Manage the overall operations of each individual operating company to ensure the consistent application of Company policies (financial, business practices and people), operating philosophies, values and principles.  Work with the Business Unit Presidents to develop and implement plans for the successful integration of services to customers, systems, processes and people to accomplish the goals of the Company.

**Summary of Major Responsibilities**

**Board of Directors**
- Serve as Ex-Officio member of the Board of Directors' Systems Integration and Support Committee
- Coordinate documentation and presentations necessary for the Board of Directors

**Executive Committee and Steering Committee**
- Serve on Executive Committee and Steering Committee
- Assist all Steering Committee members in the coordination of all operating matters

**Financial Management**
- Work with the Executive Committee to review budgets and business goals and manage the business units to meet these goals
- Approve all contracts between business units and its clients

**Integration**
- Collaborate with Business Unit Presidents to launch cross Business Unit Initiatives that improve service to customers, revenue, compliance with regulation, efficiency/effectiveness, etc.
- Develop initiatives that encourage collaboration across business unit senior management and staff lines
- Bridge cultural and communications gaps across Business Units and work with Executive staff to mobilize joint teams as necessary

**Patient Centered Care**
- Establish partnerships among practitioners, aging/disabled customers and their families to ensure that decisions respect a customer's wants, needs and preferences
- Ensure that customers have the education and support needed to make decisions and participate in their own healthcare
- Enable transition to preventative healthcare, chronic care and care management in home and community based settings

**Human Resources Management**

- Directly and indirectly manage direct reports including the President, Ethica Health & Retirement Community; President, Health Distribution; President, Pharmacy Services; President, Integra Rehabilitation; President, Home & Community Services; Vice President, Human Resources; Director, Information Services; and Director of Project Management
- Establish goals for direct reports and ensure direct reports have goals established for their employees that correspond.  Manage performance toward achieving these goals
- Constantly evaluate the skill sets versus requirements of direct reports and make adjustments accordingly
- Provide leadership direction to the organization to ensure direct reports are optimally utilized
- Work with the VP, Human Resources, to review Human Resources initiatives and financial models to meet the needs of the organization

**Essential Job Functions:**

- Provide day-to-day leadership to the System that mirrors the mission, vision, and values of the organization
- Orchestrate transfer of best practice between Business Units
- Help identify and implement critical business and clinical synergies across the day-to-day operations of the System
- Monitor progress against the goals of the System and individual Business Units
- Analyze industry trends and look for business and revenue enhancement opportunities
- Monitor the operating and capital budget for each business unit in ways that direct effective forecasting and control of costs
- Work with Business Unit Presidents and Corporate leadership to redesign key processes and standardize policies and procedures
- Work with Business Unit Presidents to assure timely provision of skilled nursing, home and community based services in the most appropriate setting
- Participate in multiple state and national professional associations
- Perform other tasks as assigned by the President

## EXHIBIT 5.4

Executive Leave Policy

*See attached.*

*Execution Version*

# EXECUTIVE
# LEAVE
# POLICY

**May 2006**

## Executive Leave

The organization provides its eligible executives with an Executive Leave Policy that is designed to allow executives greater flexibility in planning their lives.  Under the Executive Leave Policy, executives may use their leave days for vacation, sick leave, medical appointments, family illness or any leave of absence.

Executives are eligible immediately upon employment and leave may be taken any time during employment, with supervisory approval.  Executives will receive their leave days at the beginning of each anniversary year and will be based on the number of continuous years of service on the executive's previous anniversary year.  Leave days do not carry over to future years, and cannot be borrowed from future unearned leave.

The organization recognizes the importance of an executive taking time off from work to rest and relax and accordingly provides leave days as follows:

## Leave Days Available:

- Year One (1) thru Year Five (5)          20 days
- Year Six (6) thru Year Ten (10)          25 days
- After Tenth (10) Year and Beyond         30 days

All requests for Executive Leave must be in writing and approved by the President.  In order to balance and meet organization needs, executives should provide appropriate notice when anticipating taking time off.  Requested leave will be approved taking into account organization needs and other associates' leave requests.

## EXHIBIT 6.4

1.     Section 6.4 of this Agreement shall not prohibit Employee from the continued ownership, operation or use of any real or personal property owned by Employee at the time of termination of Employee's employment hereunder.

2.     In the event that Employee's employment is terminated by the Company without Cause under Section 2.5 of this Agreement, then Section 6.4 of this Agreement shall automatically terminate.

# Community Health Systems, Inc.
# d/b/a Community Health Services of Georgia



**Ronnie D. Rollins,**
CEO & President

**Mark A. Waldrop,**
COO

**Lorraine T. Taylor,**
CFO & Secretary

**Ben H. Griffin, Jr.,**
VP, Govt Relations

**T. Randolph Coody,**
VP

**Teresa W. Moody,**
VP, Financial Services

12/22/2016

CONFIDENTIAL



PLAINTIFF'S
EXHIBIT
3
Wall

CHSI_0005148

Approved 3.22.16



Organizational chart:

- **Health System Board**
  - **Chief Executive Officer**
  - **Audit Committee**
    - Annual Audit
    - IRS Form 990 Review
  - **Compensation Committee**
    - Compensation Study
    - Annual Compensation
  - **Governance Committee**
    - Legal
    - Corporate Compliance
  - **Investment Committee**
    - 401(k) & VEBA
    - Investment Management

CHSI_0005149

CONFIDENTIAL

Approved 3.22.16



Approved 3.22.16



CHSI_0005151

Approved 3.22.16



CHSI_0005152

# Community Health Systems, Inc.
# d/b/a Community Health Services of Georgia



CONFIDENTIAL

CHSI_0005153

# CHSGa Functional Organizational Chart   07.01.2016



CHSI_0005154

07.01.2016



CONFIDENTIAL

# CHSGa Business Operations Organizational Chart    07.01.2016



CONFIDENTIAL

CHSI_0005156

# CHSGa System Operations Organizational Chart   07.01.2016



CONFIDENTIAL

CHSI_0005157

# Community Health Systems, Inc.
# d/b/a Community Health Services of Georgia



CONFIDENTIAL

CHSI_0005158



Draft 11.01.2016

CHSGa Functional Organizational Chart

Board of Directors

Chief Executive Officer

Audit Committee
- Annual Audit
- IRS Form 990 Review

Compensation Committee
- Compensation Study
- Annual Compensation

Governance Committee
- Legal
- Corporate Compliance

Investment Committee
- 401(k) & VEBA
- Investment Management

CONFIDENTIAL

CHSI_0005159

11.01.2016



CHSI_0005160

CONFIDENTIAL

# Business Operations

11.01.2016



CONFIDENTIAL

# System Operations

11.01.2016



**Ronnie Rollins**
President & CEO

**Diana Wilks**
Senior VP,
Inpatient Services

**Michelle Andrews**
Senior VP,
Clinical Support Services

**Freddie Walter**
Senior VP,
Application & Integration
Services

**Lynne King**
VP,
Community Relations

**Jill Snow**
VP,
Compliance & Quality (CHS)

**Els Martens**
Senior VP, Rehabilitation
Services (Integra)

**Scott Thrasher**
Director,
Application Services

**Kim Hodges**
VP, Operations (Ethica)

**Vicki Hill-Hoffman**
Senior VP, Staffing &
Recruitment (Integra)

**Ylice Crews**
Administrative
Assistant

**Yolanda Pence**
VP,
Compliance & Quality (Integra)

**Keith Wilson**
VP,
Operations (CPC)

**Tracie Clark**
VP,
Community Based Services

**Open Position**
VP,
Provider Services (CPC)

**Rusty Lee**
VP,
Pharmacy Services

**Joe Robinson**
Senior VP,
Emergency Services (CA)

**Cal Franklin**
VP,
Medical Supply Distribution

**Larry Ebert**
CEO,
Northridge Medical Center

**Robin Leake**
Senior VP,
Home Care Services

**Blair Lake**
VP,
Human Resources

CHSI_0005162





# ORGANIZATIONAL CHART

COMMUNITY HEALTH SYSTEMS, INC., ITS SUBSIDIARIES AND CERTAIN AFFILIATES

INTERNAL DOC

# GANIZATIONAL CHART

**TY HEALTH SYSTEMS, INC., ITS SUBSIDIARIES AND CERTAIN AFFILIATES**

INTERNAL DO



01.01.2014

IAL

CH

Community Health Foundation, Inc.
501(c)3
(BOARD)

System Administrative Services, LLC
(MEM)

Clinical Services, Inc.
501(c)3
(BOARD)

Health Systems Facilities, Inc.
501(c)3
(BOARD)

Piedmont Regional Health, Inc.
501(c)3
(BOARD)

Health Scholarships, Inc.
501(c)3
(BOARD)

Community Rehabilitation Services, Inc.
501(c)3
(BOARD)

Steward Health Services, Inc.
501(c)5
(BOARD)

Community Affiliated Services, Inc.
501(c)3
(BOARD)

Health Scholarships of Georgia, LLC
(MEM)

Ethica Health & Retirement Communities
(operating division)

Coastal Regional Health, Inc.
(BOARD)

Bulloch County LTC, LLC
(MGR)

Oconee County Health & Rehabilitation, LLC
(MGR)

Community Staffing Solutions, LLC

Affinis Hospice, LLC
(MEM)

HD, Distribution, LLC
(MEM)

Oconee County Holdings, LLC
(MEM)

CRHS, LLC
TO BE DISSOLVED

Candler County LTC, LLC
(MGR)

Franklin County Health & Rehabilitation, LLC
(MGR)

InHSon Rehabilitation Agency, LLC

Amicita Home Health, LLC
(MEM)

Health Distribution Services, LLC
(BOARD)

Oconee County Holdings II, LLC
(MEM)

Golden Age Properties Management Co., LLC
(MEM)

Candler County II LTC, LLC
(MGR)

Hart County Health & Rehabilitation, LLC
(MGR)

Integra Staffing Solutions, Inc.
(BOARD)

Arista Health Services, Inc.
(MEM)

SourceCare Management, LLC
(MEM)

Evans County LTC, LLC
(MGR)

Madisen County Health & Rehabilitation, LLC
(MGR)

Avell Medical Equipment & Supply, LLC (MEM)

HelpLink, LLC
(MEM)

Johnson County LTC, LLC
(MGR)

Chelsey Park Health & Rehabilitation, LLC
(MGR)

Independence In Home Care, LLC
(MEM)

Brentwood Terrace Health Center, LLC
(MGR)

Greene Point Health Care, LLC
(MEM)

Sparta Health Care, LLC
(MGR)

Harrington Park Health & Rehabilitation, LLC
(MGR)

PCS, LLC
(MEM)

Bryant Nursing Center, LLC
(MEM)

Hancock County Health Care, LLC
(MGR)

Sparta Health Care II, LLC
(MGR)

Meadows Park Health & Rehabilitation, LLC
(MGR)

Georgia Home Care, LLC
(MEM)

Bulloch County Health Care, LLC
(MGR)

Heritage Inn of Barnesville, LLC
(MGR)

Taylor County Health Care, LLC
(MGR)

Ansley Park Health and Rehabilitation, LLC
(MGR)

Avalon Health Care, LLC
(MGR)

Oakview Nursing and Rehabilitation Center, LLC (MGR)

Riverside Nursing Center of Thomaston, LLC (MGR)

Georgia Pharmacy Services, LLC
(BOARD)

Cherry Blossom Health Care Center, LLC
(MGR)

Heritage Inn of Sandersville, LLC
(MGR)

Thomaston Health Care, LLC
(MEM)

Baldwin County Nursing Home, LLC
(MGR)

Bibb County Health Care, LLC
(MGR)

Stevens Park Health and Rehabilitation Center, LLC (MGR)

The Seasons Health & Rehabilitation Center, LLC (MEM)

Community Care Pharmacy Hawkinsville, LLC
(MGR)

Dawson Manor Nursing Home, LLC
(MGR)

Lee County Health Care, LLC
(MGR)

Toombs Nursing Home, LLC
(MGR)

Chaplinwood Nursing Home, LLC
(MGR)

Coffee County Nursing Home, LLC
(MGR)

Townsend Park Health and Rehabilitation, LLC
(MGR)

Traditions Health & Rehabilitation Center, LLC (MGR)

Community Care Pharmacy Royston, LLC
(MGR)

Four County Health Care, LLC
(MGR)

Lillian G. Carter Nursing Center, LLC
(MGR)

Ware County Health Care, LLC
(MGR)

Cornerstone Health & Rehabilitation Center, LLC (MEM)

Dublin Health Care and Rehabilitation Center, LLC (MEM)

Treutlen County Nursing Home, LLC
(MGR)

Central Georgia Long-Term Care, LLC
(MGR)

Glascock County Health Care, LLC
(MGR)

McDuffie County Nursing Home, LLC
(MGR)

Warren County Health Care, LLC
(MGR)

Fayette County Nursing Home, LLC
(MGR)

Gordon Health Care Center, LLC
(MGR)

Winthrop Manor Nursing Home, LLC
(MGR)

Jones County Nursing Home, LLC
(MGR)

*Holds a 20% interest in Georgia Pharmacy Ventures, LLC

Golden Age Oak View Home, LLC
(MGR)

Oconee Health Care, LLC
(MGR)

Greene County Nursing Center, LLC
(MGR)

Monroe County Nursing Home, LLC
(MGR)

Wynfield Park Health and Rehabilitation, LLC
(MGR)

Lynn Haven Nursing Home, LLC
(MGR)

Greene County Health Care, LLC
(MGR)

Putnam County Health Care, LLC
(MGR)

Montezuma Health Care Center, LLC
(MGR)

Newnan Nursing and Rehabilitation, LLC
(MGR)

Zebulon Park Health and Rehabilitation, LLC
(MEM)

Stone Brooke Suites, LLC
(MGR)



**Clinical Services, Inc. d/b/a Ethica (NFP)**
- Coastal Regional Health, Inc. (FP)
- Community Primary Care of Georgia, LLC (NFP)
- Optimus Diagnostics, LLC (NFP)
- Optimus Ultrasound, LLC (NFP)

**Health Systems Facilities, Inc. (NFP)**
- Brentwood Terrace Health Center, LLC (NFP)
- Bulloch County Health Care, LLC (NFP)
- Cherry Blossom Health Care Center, LLC (NFP)
- Dawson Manor Nursing Home, LLC (NFP)
- Four County Health Care, LLC (NFP)
- Glascock County Health Care, LLC (NFP)
- Golden Age Oak View Home, LLC (NFP)
- Greene County Health Care, LLC (NFP)
- Hancock County Health Care, LLC (NFP)
- Heritage Inn of Barnesville, LLC (NFP)
- Heritage Inn of Sandersville, LLC (NFP)
- Lee County Health Care, LLC (NFP)
- Lillian G. Carter Nursing Center, LLC (NFP)
- Oconee Health Care, LLC (NFP)
- Putnam County Health Care, LLC (NFP)
- Sparta Health Care, LLC (NFP)
- Taylor County Health Care, LLC (NFP)
- Toombs Nursing Home, LLC (NFP)
- Ware County Health Care, LLC (NFP)
- Warren County Health Care, LLC (NFP)

**Piedmont Regional Health, Inc. (NFP)**
- Bulloch County LTC, LLC (NFP)
- Candler County LTC, LLC (NFP)
- Candler County II LTC, LLC (NFP)
- Evans County LTC, LLC (NFP)
- Johnson County LTC, LLC (NFP)

**Health Scholarships, Inc. (NFP)**
- Avalon Health Care, LLC (NFP)
- Baldwin County Nursing Home, LLC (NFP)
- Chaplinwood Nursing Home, LLC (NFP)
- Coffee County Nursing Home, LLC (NFP)
- Fayette County Nursing Home, LLC (NFP)
- Franklin County Health & Rehabilitation, LLC (NFP)
- Gordon Health Care Center, LLC (NFP)
- Greene County Nursing Center, LLC (NFP)
- Hart County Health & Rehabilitation, LLC (NFP)
- Madison County Health & Rehabilitation, LLC (NFP)
- Monroe County Nursing Home, LLC (NFP)
- Montezuma Health Care Center, LLC (NFP)
- Newnan Nursing and Rehabilitation, LLC (NFP)
- Central Georgia Long-Term Care, LLC (NFP)
- Jones County Nursing Home, LLC (NFP)
- Lynn Haven

- Oakview Nursing and Rehabilitation Center, LLC (NFP)
- Oconee County Health & Rehabilitation, LLC (NFP)
- Riverside Nursing Center of Thomaston, LLC (NFP)
- Traditions Health & Rehabilitation Center, LLC (NFP)
- Treutlen County Nursing Home, LLC (NFP)
- Winthrop Manor Nursing Home, LLC (NFP)
- Ansley Park Health and Rehabilitation, LLC (NFP)
- Chelsey Park Health & Rehabilitation, LLC (NFP)
- Harrington Park Health & Rehabilitation, LLC (NFP)
- Meadows Park Health & Rehabilitation, LLC (NFP)
- Stevens Park Health and Rehabilitation, LLC (NFP)
- Townsend Park Health and Rehabilitation, LLC (NFP)
- Wynfield Park Health and Rehabilitation, LLC

**Steward Health Services, Inc. (NFP)**
- Arista Health Services, Inc. (FP)
- Amicita Home Health, LLC (NFP)
- Affinis Hospice, LLC (NFP)
- Avel Medical Equipment & Supply, LLC (NFP)

**Home & Community Services, Inc (NFP)**
- H&CS Services, LLC d/b/a Community Ambulance (NFP)
- MGAS Holdings, LLC (NFP)
- Upson Ambulance Company, LLC (NFP)
- Jackson County Healthcare Holdings, LLC (NFP)
- Restoration Healthcare of Commerce, LLC (NFP)
- RHC Real Estate, LLC (NFP)
- Commerce Physicians Group, LLC (NFP)

**Community Rehabilitation Services** (d/b/a Inte...)
- Integra Solu...
- Community Stone Soluti...
- Integra Rehab Agen...

**Community Health Ventures, Inc. (FP)**
- Tropical Assurance, Ltd. (Cayman Islands Captive)

**Community Health Foundation, Inc. (NFP)**
- Health Scholarships of Georgia, LLC (NFP)

**System Administrative Services, (NFP)**

**Mark Waldrop**

| | |
|---|---|
| **From:** | Mark Waldrop |
| **Sent:** | Friday, May 20, 2016 11:46 PM |
| **To:** | Ronnie Rollins (RRollins@chs-ga.org) |
| **Subject:** | Fw: Follow-up from today's call |

Since our goal is to stay on the same page, I hope these notes (please see below in blue font) regarding the follow-up/action items help to provide additional insight. Thanks!

-Mark

**From:** Ronnie Rollins
**Sent:** Thursday, May 12, 2016 5:59 PM
**To:** Mark Waldrop
**Subject:** Follow-up from today's call

Mark,

I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.

After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".

1. EHR
    a. You have not really been involved in LG pilot
    b. Diligence on LG CNS (who are they)
    c. Monday was the first time you had seen the product demonstrated
    d. You have a number of questions and will be following up with Diana
    e. LG is not your recommendation for a system-wide EHR solution at this time
    f. No system solution identified
    g. RR does not need to respond to Diana or her team

**Response:**
1. EHR
    a. I was aware, as were you and Lorraine, that Diana was conducting the LG pilot in two of our nursing centers. During one of our strategic planning meetings with Diana and Michelle, you asked Diana when we were going to be able to see the software. Diana asked that we wait to see the software until the pilot was complete. Why? Diana

PLAINTIFF'S
EXHIBIT
Wall
03-29-17

1

wanted to make certain that the software met her needs before recommending it to us. Diana gave me regular updates that the pilot was progressing well. A couple of weeks ago, you asked to see the software so I worked with Diana to schedule the meeting. Diana felt it was a good idea to see the software in a live Ethica environment and I agreed.

b.c.d.g. You asked if I was recommending LG and I indicated that I had follow-up questions for Diana after seeing the software in a live environment. I do want to review the LG CNS corporate structure. I have asked Diana to send me the diligence work that has been completed thus far for the pilot.

e.f. I am encouraged by LG CNS. I think that, strategically, an electronic health record (EHR) is something that will propel us into the future. You and I have discussed EHR in the past, but we were not aware of a good system platform. In addition, we have discussed on numerous occasions that we did not want to be too early of an adopter. Furthermore, we did not want to pay too much or purchase the wrong system that would not "talk" to hospitals, physicians, etc. LG CNS appears to have the platform we have been searching for. We also discussed finding the money for the additional expense of the software. I shared that LG CNS may also solve our need of an integrated software because they indicated that they now have hospice, home health and transitions of care as well. Further, we discussed that I would visit Scott and see the software in a smaller traditional SNF. You stated that you believe the expectation for an approval of a couple of million dollars based on a demonstration needs to first have a set of parameters. I expressed that I did not think Ethica leadership expected us to make a decision on Monday. Jill was opening it up for any questions after the live demonstration. I also expressed that I wanted to follow-up on the Therapute integration. As LG has progressed, it appears at this point that they may provide a system-wide solution.

2. VEBA Contracts
   a. Lack of understanding of my concern regarding the negotiation of multiple contracts with different expiration dates
   b. Varying opinions on payment of early termination fees ($55,000/yr.)
   c. Agreement on not executing contracts at present and watch a few more months and reconsider


Response:
2. VEBA Contracts
a.b. BAS (TPA) is an annually renewable agreement with a three year price escalation limit of 3% per year. Termination with a 30-day notice prior to renewal. No penalty.

**Anthem (Network)** is an annually renewable agreement with a four year price escalation limit of 3% per year on network access fees. Termination with a 30-day notice. No penalty.

**Magellan (PBM)** is a three year agreement with a negotiated 90-day termination/out clause. Penalties of approximately $55,000 (based on approximately 5,500+ members) per year after year one should we terminate early.

**Rx Results (Formulary Management)** is a three year agreement with a 90-day termination/out clause. No penalty.

**Sun Life (Stop Loss)** is a one year term.

**Inetico (Pre-certification/Case Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty.

**Data Smart (Reporting/Care Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty. Paid for by Sun Life.

**Truveris (RFP Procurement Tool)** is a three year agreement with a 90-day termination/out clause. No penalty. Paid for by Magellan.

With all due respect, we did not discuss "varying opinions" on payment of early termination fees ($55,000/yr.). We may terminate any combination of the contracts listed above and still have access to our data through Data Smart, according to John Hearn, The Benefit Company. Vendor data (medical and pharmacy claims) is housed in Data Smart. As we have discussed over the last couple of years, our strategy is to move from a bundled single carrier solution to an unbundled approach. This allows us to improve transparency of claims and financial details. It also gives NextStep Care access to acute claims information more quickly, in an effort to intervene in care coordination for our associates. It further provides us additional flexibility to changing market conditions.

c. I concurred with your idea of not signing the agreements until we see more performance data and after you seek legal counsel to determine if we can legally delay.

3. Workday Contract
   a. Identified work projects over the next 6 – 18 months are all included in the current contract fees
   b. Should there be a reduction in cost? Paid in advance?
   c. RR noted Business Process (PBJ) meeting identified several weaknesses in current time and attendance system

3

d. RR, MW and LT previously identified need for new time and attendance system within next 2 years (Imp 2016-2017)
e. T&A not included in HCM/PAY strategy or FIN strategy with Workday
f. RR to speak with LT regarding FIN and T&A
g. RR to speak with Workday regarding T&A during contract discussions

Response:
## 3. Workday Contract

b. With all due respect, we did not discuss if there should be a reduction in cost or if it should be paid in advance.

c.d.e. You indicated you had the HCM stuff and the finance stuff. At the business process meeting, one of the things you noticed was that we needed a new time and attendance system. You said that neither Lorraine nor I raised the need for a time and attendance system, so it's not on the Workday list. You said that you thought it was a strategic issue for us. I indicated that I appreciated you raising the issue and that Lorraine and I had already shared with you, in a previous meeting, that we would need a time and attendance system in the future.

4. HHA and Hospice market information
   a. MW has information and did not provide because prior meeting was telephonic and not in person
   b. MW to send market information to RR by email

Response:
## 4. HHA and Hospice Market Information

a. You cancelled our regular two week in-person communication meeting on Friday, where I was planning to bring the information for our review together.

b. I emailed the information earlier this week, as requested.

 With all due respect, the statement, "MW has information and did not provide because prior meeting was telephonic and not in person" is not what I discussed during our call.

5. Academic Relations Grants
   a. RR informed Board looking to make change in investment managers
   b. Now is opportune time to discuss ARG strategy
   c. MW to speak with team and prioritize recommendations and provide to RR

Response:
## 5. Academic Relations Grant

b.c. During the presentation several weeks ago, we reviewed the strategy to assist the LPN schools in the geographic areas where we have the greatest need for additional

nurses. An email was sent this week with academic donation ranking, as requested, from academic relations.

6. Brogdon homes
   a. RR met with owners of centers to discuss lease extensions
   b. Learned centers owned by Global REIT and introduction of discussion of Goodwill in Macon
   c. MW is unaware of what Diana is doing
   d. DW informed Mark she is working with RR
   e. RR informed that decision expected by Global by end of week – 50/50 chance deal will go

**Response:**
**6. Brogdon Homes**

c.d. Our conversation last Thursday was the first time you had mentioned anything to me regarding Global. Diana had shared with me that she was working on Global REIT with you at your request. She also informed me that Ken was running some numbers and that she had been on several conference calls with you. You said, I guess Diana is talking to you. She and Ken seem to be working, which is fine, are you supportive of what they are doing? I discussed with you that even while I was in Macon attending the Business Process Meeting which you attended as well, that you, Lorraine, Ken and Diana had already planned to tour the Macon center. However, you did not ask me to attend nor have you included me in any of the Global conversations. Further, you indicated that you assumed she had pulled me back in, but maybe she didn't need me and that was okay.

7. Navicent
   a. RR informed of recent meetings between CHS and Navicent
   b. RR and HH having meetings some of which included Diana and discussion of beds
   c. MW had no additional guidance on how to proceed

**Response:**
**7. Navicent**

c. You asked me to let you know if any issues had bubbled up regarding Navicent. I discussed Elbert's tour of our centers and that our staff felt the visits went well. We further discussed that some of the physical plants were older, but clean. You indicated that Elbert was not a decision maker, but rather a practical day-to-day guy. I said, "Okay, I'm just updating you on his visit, since you asked for updates on Navicent." You indicated that you had spoken with Elbert and he told you the visits went great and it was all positive. Elbert was impressed with what we do.

With all due respect, you did not ask for my guidance or input on how to proceed. You did ask that I make you aware if I heard anything and I assured you I would.

8. FSLA
   a. RR requested impact analysis for system (assumed HR had prepared) proposed rule on exempt status
   b. Blair Lake attending seminar on FSLA today
   c. MW to forward report on impact of proposed rule

**Response:**
8. FSLA
   c. FSLA email sent this week with estimated impacts to our organization.

Please let me know if you have any additions to the follow-up/action items from today's call.

Thanks.

Thank you for allowing me the opportunity to provide clarification from our call on Thursday, May 12th. I believe the recent opportunity for increased communication on these important matters is a step in the right direction.

***Ronnie Rollins***
*President*

***Community Health Services of Georgia***
P.O. Box 1037
Macon, GA 31202



COMMUNITY
HEALTH SERVICES *of Georgia*

May 15, 2016

Mr. Mark Waldrop
1013 Riverburch Parkway
Suite 1
Dalton, GA  30721

Dear Mark,

This letter is to follow-up your phone call to me on Friday, March 13, 2016 regarding my email dated 5/12/15, subject matter "Follow-up from today's call". In our conversation on Friday you indicated there were "lies" in my email message to you – that is a very strong statement. I will speak more on that later in this letter.

During our call, I asked you to follow-up in writing regarding the instances you were referring to as lies and I have not received it to date. However, please do not consider that statement to be criticism, rather merely the rationale for my sending this letter to you in advance of receipt of your comments. The purpose of this letter is to address the "lie" that you discussed in our call on Friday.

First, I ask that you read the first three sentences of the May 12th email for context of the email (see excerpt below).

**[I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.**

**After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".]**

Context – I had provided what I thought were clear directions and support to the VEBA Trustees in a memo dated March 16, 2016 and in a subsequent follow-up conference call on March 21, 2016 with the VEBA Trustees. At no point was it discussed that Tracie would be running the VEBA Trustee meetings.  As a practical matter, I do not recall any discussions or questions regarding the VEBA Trustees or the VEBA Trustee meetings in the previous two months since the March memo and conference call.

In reaching out to me, Tracie was very concerned that she did not know what she needed to do and that she was unprepared to run the VEBA meeting; however, she was very willing to try.  I assured her that I believed that she and her team were very capable of managing and reporting on the claims and pharmacy operations of the VEBA and looked forward to her report.  In addition, I assured her that I had not intended for her to chair the VEBA meeting.  It was after 5 pm on Thursday and it was clear to me that I needed to speak with you and Blair.

PLAINTIFF'S
EXHIBIT
5
Walt     03-29-17

Mark Waldrop
May 15, 2016
Page 2

My rationale was simple; I had sent an email and had conversations with you, Blair and Lorraine, as VEBA Trustees. It seemed clear that I needed to speak with you as Michelle's supervisor (and Michelle as Tracie's supervisor) and Blair as VEBA chair and as a subordinate to you to clarify that I had not made any changes to the VEBA Trustees or their meetings. The sole purpose of the March email was to assign additional focus (personnel) to the VEBA given its poor performance over the preceding two years in anticipation that VEBA performance might improve and we could avoid another year with multi-million dollar expenditures in excess of planned results.

At that time I made the decision to request a call on Friday morning to clear-up the confusion regarding Tracie's call to me. Also, as you and I had just completed a lengthy call a few hours earlier regarding several matters, I decided to send a quick email with bullet notes to summarize the results of our call which I completed and sent just before 6 PM.

On Friday morning I sent an email to you and Blair requesting a call (see excerpt below)

**[Tracie Clark called me with questions on the VEBA meeting next week. There appears to be some confusion based on her conversations with with you.**

**I believe it would be helpful for us to talk today. Are you available at 10 or 10:30 this morning?]**

On the call I shared with you and Blair my conversation with Tracie and learned that she had been instructed she would be leading the VEBA Trustee Meeting on Thursday. When I questioned why she was given those instructions, I was stunned when you and Blair indicated "I thought that's what you wanted me to do" or words to that effect. I was not taking notes and was too stunned by the response to write down the exact words, as I could not think of any rational reason either he or you would think those directions had been provided to the VEBA Trustees. The example that quickly came to my mind and that I shared with you and Blair would be a request from me to have Blair, Diana, or Charles serve as chair of the CHS Board meeting. It just seems too irrational to understand from my perspective. Nonetheless, Blair quickly "got it" as I believe he stated and set about to handle VEBA Committee meeting information as VEBA Chairman as he has for the past couple of years.

Shortly after the call with Blair, you called me indicating a number of issues with our relationship and specifically that my email on May 12th contained "lies". My impression was that you were very upset and you made several strong statements in addition to the "lies" comment including your belief that I was "targeting" you and the May 12th email was part of creating a file and that months down the road someone could look at the email and infer/conclude that you were not doing your job. In identifying the "lies" in the email, you specifically pointed out Item 7 of the memo as misrepresenting our conversation. You told your perspective of the conversation. You did not ask for my perspective.

Mark Waldrop
May 15, 2016
Page 3

Mark, let me first state that I am disappointed that you would begin a conversation regarding another associate's email by indicating the other associate has written lies. I believe that approach is unprofessional and name-calling is counter-productive to resolving issues. I expect an apology and I would expect you to apologize to any other associate for a similar action. Below is Item 7 from the May 12th email.

> Navicent
> a. RR informed of recent meetings between CHS and Navicent
> b. RR and HH having meetings some of which included Diana and discussion of beds
> c. MW had no additional guidance on how to proceed

The topic of this item is "Navicent". I have been handling conversations with Navicent for many, many months and you have not been engaged in the negotiations involving BMS, MIH, the call center, skilled nursing beds, case management or any other aspect of the Navicent relationship. All the comments that you indicated on Friday that I had said to you in our Thursday conversation had probably been said by me, as I lead the conversation and recall the comments. From my perspective, I updated and informed you of the actions taken and conversations had by me and the group I am leading to make you aware of our actions – not to ask your opinion or your advice. 7a and 7b provided you information regarding our conversations with Navicent and 7c confirmed that you did not offer comments, suggestions or any other information which is the desired response from your role within our organization. The only change I might make, given your subsequent comments, would be to add the words "as expected" to item 7c. I believe any CEO in this context would expect no comments being made unless there was a problem. Given the CEO, CFO and two SVP's are working on the Navicent matter, I believe it is expected that there will be few, if any, issues arising that affect the COO or daily operations.

In this context, your comments about someone looking at this email months down the road and concluding that you did not do your job because you did not offer guidance appears somewhat implausible. I suggest you reconsider your statement regarding the truthfulness and accuracy of item 7. I also suggest in the future if you have questions regarding communications that you ask questions and discuss matters before reaching conclusions. I believe this process to be a much more professional and productive way to handle communication.

Again, I welcome your comments on my email and look forward to discussing and resolving whatever issues you may have.

Sincerely,

Ronnie D. Rollins
President and CEO

5/16/16 Monday evening, Mark called me @ home, wanted to meet w/ me, anytime, anywhere.

5/17/16 Met Tuesday 1:30 P.M.

Was real upset + emotional
Called RR a liar + "Was targeting him."
read notes from 4 or 5 pages

His ~~complaints~~ issues:
Ronnie has changed since the UPL event.
RR Upset about VEBA
RR ✓     ✓     Cap X
RR Does not communicate w/ Mark
RR Goes to associates below Mark

- called R a liar! (Copies of letter + e-mail)

- Fussed @ Mark + Lorraine in front of others
- Other incidents that I could not remember or write down
- He says that Lorraine is real upset too!

He wants/plans to resign
- Ask for 3 things when he does -
  1) A severance pay (Do we have a contract w/ Mark?)
  2.) Write a recommendation
  3.) A position for his assistant

✳ 5/19/16 Met w/ Ronnie

(I have discussed w/ Paul + Buddy
They were concerned about succession plan!
Who could/would replace Mark?
✳ Both agreed that I should talk to you - Paul did not want to be bothered; Buddy was quite concerned.

- either apologize + make up
- or severe relationship

PLAINTIFF'S EXHIBIT 6  Watt  05-29-17  PENGAD 800-631-6989

CONFIDENTIAL

CHSI_0018940

(cell)   706-270-4265   Mark Waldrop
mwaldrop@chs-ga.org

7/31        34,855.50                    34,855.50
8/31                                            5
9/30                                   17,427.750
10/31
11/30

CONFIDENTIAL

CHSI 0018044

**Joseph Wall**

| | |
|---|---|
| From: | Mark Waldrop [MWaldrop@chs-ga.org] |
| | Friday, May 20, 2016 2:36 PM |
| To: | Joseph Wall |
| Subject: | Re: |

Joe,

I am encouraged by your email and want to extend my appreciation for your leadership in this matter. Please know that your taking time out of your schedule on Tuesday to talk with me will be forever appreciated. I am available to meet on Tuesday any time after 2 p.m. Thank you!
-Mark

Sent from my iPhone

On May 20, 2016, at 11:45 AM, Joseph Wall <jaw@meadorswall.com> wrote:

> Mark,
>
> *5/19/16*
>
> Ronnie & I met yesterday afternoon for over an hour & discussed the meeting that you & I had on Tuesday. As we talked on, it became pretty apparent that the 3 of us need to sit down and discuss everything that needs to be put on the table, especially to get back to where we were before all this began. I personally think that every bit of this is correctible, and I can assure you that Ronnie has not changed in any way about his feelings toward you or his confidence in you.
>
> I can meet any time next Tuesday, Wednesday or Thursday, so we just need to match up yours & Ronnie's schedules. Let me know what works best for you.
>
> Thanks,
> -Joe

Notice: The content of this e-mail including any attachments may contain CONFIDENTIAL and legally protected information. If you are not the addressee or intended recipient, please do not read, copy, use or disclose this communication to others. Please notify the sender immediately by return e-mail, delete this e-mail including attachments and destroy any copies. Thank you!

*Workday ⟶ 293 K option expired*



PLAINTIFF'S EXHIBIT 7
Wall
05-29-2017

CONFIDENTIAL

CHSI_0018942

**Joseph Wall**

T~·                            Mark Waldrop

Mark,

  Ronnie & I met yesterday afternoon for over an hour & discussed the meeting that you & I had on Tuesday. As we talked on, it became pretty apparent that the 3 of us need to sit down and discuss everything that needs to be put on the table, especially to get back to where we were before all this began. I personally think that every bit of this is correctible, and I can assure you that Ronnie has not changed in any way about his feelings toward you or his confidence in you.

  I can meet any time next Tuesday, Wednesday or Thursday, so we just need to match up yours & Ronnie's schedules. Let me know what works best for you.

Thanks,
-Joe

1

CONFIDENTIAL

CHSI_0018943

**Mark Waldrop**

| | |
|---|---|
| **From:** | Mark Waldrop |
| **Sent:** | Friday, May 20, 2016 11:46 PM |
| **To:** | Ronnie Rollins (RRollins@chs-ga.org) |
| **Subject:** | Fw: Follow-up from today's call |

Since our goal is to stay on the same page, I hope these notes (please see below in blue font) regarding the follow-up/action items help to provide additional insight. Thanks!

–Mark

**From:** Ronnie Rollins
**Sent:** Thursday, May 12, 2016 5:59 PM
**To:** Mark Waldrop
**Subject:** Follow-up from today's call

Mark,

I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.

After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".

1. EHR
    a. You have not really been involved in LG pilot
    b. Diligence on LG CNS (who are they)
    c. Monday was the first time you had seen the product demonstrated
    d. You have a number of questions and will be following up with Diana
    e. LG is not your recommendation for a system-wide EHR solution at this time
    f. No system solution identified
    g. RR does not need to respond to Diana or her team

Response:
1. EHR
    a. I was aware, as were you and Lorraine, that Diana was conducting the LG pilot in two of our nursing centers. During one of our strategic planning meetings with Diana and Michelle, you asked Diana when we were going to be able to see the software. Diana asked that we wait to see the software until the pilot was complete. Why? Diana

1

CHSI_0018944

wanted to make certain that the software met her needs before recommending it to us. Diana gave me regular updates that the pilot was progressing well. A couple of weeks ago, you asked to see the software so I worked with Diana to schedule the meeting. Diana felt it was a good idea to see the software in a live Ethica environment and I agreed.

b.c.d.g. You asked if I was recommending LG and I indicated that I had follow-up questions for Diana after seeing the software in a live environment. I do want to review the LG CNS corporate structure. I have asked Diana to send me the diligence work that has been completed thus far for the pilot.

e.f. I am encouraged by LG CNS. I think that, strategically, an electronic health record (EHR) is something that will propel us into the future. You and I have discussed EHR in the past, but we were not aware of a good system platform. In addition, we have discussed on numerous occasions that we did not want to be too early of an adopter. Furthermore, we did not want to pay too much or purchase the wrong system that would not "talk" to hospitals, physicians, etc. LG CNS appears to have the platform we have been searching for. We also discussed finding the money for the additional expense of the software. I shared that LG CNS may also solve our need of an integrated software because they indicated that they now have hospice, home health and transitions of care as well. Further, we discussed that I would visit Scott and see the software in a smaller traditional SNF. You stated that you believe the expectation for an approval of a couple of million dollars based on a demonstration needs to first have a set of parameters. I expressed that I did not think Ethica leadership expected us to make a decision on Monday. Jill was opening it up for any questions after the live demonstration. I also expressed that I wanted to follow-up on the Therapute integration. As LG has progressed, it appears at this point that they may provide a system-wide solution.



2. VEBA Contracts
    a. Lack of understanding of my concern regarding the negotiation of multiple contracts with different expiration dates
    b. Varying opinions on payment of early termination fees ($55,000/yr.)
    c. Agreement on not executing contracts at present and watch a few more months and reconsider

**Response:**
**2. VEBA Contracts**
a.b. **BAS (TPA)** is an annually renewable agreement with a three year price escalation limit of 3% per year. Termination with a 30-day notice prior to renewal. No penalty.

CONFIDENTIAL

CHSI_0018945

**Anthem (Network)** is an annually renewable agreement with a four year price escalation limit of 3% per year on network access fees. Termination with a 30-day notice. No penalty.

**Magellan (PBM)** is a three year agreement with a negotiated 90-day termination/out clause. Penalties of approximately $55,000 (based on approximately 5,500+ members) per year after year one should we terminate early.

**Rx Results (Formulary Management)** is a three year agreement with a 90-day termination/out clause. No penalty.

**Sun Life (Stop Loss)** is a one year term.

**Inetico (Pre-certification/Case Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty.

**Data Smart (Reporting/Care Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty. Paid for by Sun Life.

**Truveris (RFP Procurement Tool)** is a three year agreement with a 90-day termination/out clause. No penalty. Paid for by Magellan.

With all due respect, we did not discuss "varying opinions" on payment of early termination fees ($55,000/yr.). We may terminate any combination of the contracts listed above and still have access to our data through Data Smart, according to John Hearn, The Benefit Company. Vendor data (medical and pharmacy claims) is housed in Data Smart. As we have discussed over the last couple of years, our strategy is to move from a bundled single carrier solution to an unbundled approach. This allows us to improve transparency of claims and financial details. It also gives NextStep Care access to acute claims information more quickly, in an effort to intervene in care coordination for our associates. It further provides us additional flexibility to changing market conditions.

c. I concurred with your idea of not signing the agreements until we see more performance data and after you seek legal counsel to determine if we can legally delay.

3. Workday Contract
    a. Identified work projects over the next 6 – 18 months are all included in the current contract fees
    b. Should there be a reduction in cost? Paid in advance?
    c. RR noted Business Process (PBJ) meeting identified several weaknesses in current time and attendance system

3

CHSI_0018946

d. RR, MW and LT previously identified need for new time and attendance system within next 2 years (Imp 2016-2017)
e. T&A not included in HCM/PAY strategy or FIN strategy with Workday
f. RR to speak with LT regarding FIN and T&A
g. RR to speak with Workday regarding T&A during contract discussions

**Response:**
**3. Workday Contract**
   b. With all due respect, we did not discuss if there should be a reduction in cost or if it should be paid in advance.

   c.d.e. You indicated you had the HCM stuff and the finance stuff. At the business process meeting, one of the things you noticed was that we needed a new time and attendance system. You said that neither Lorraine nor I raised the need for a time and attendance system, so it's not on the Workday list. You said that you thought it was a strategic issue for us. I indicated that I appreciated you raising the issue and that Lorraine and I had already shared with you, in a previous meeting, that we would need a time and attendance system in the future.

4. HHA and Hospice market information
   a. MW has information and did not provide because prior meeting was telephonic and not in person
   b. MW to send market information to RR by email

**Response:**
**4. HHA and Hospice Market Information**
   a. You cancelled our regular two week in-person communication meeting on Friday, where I was planning to bring the information for our review together.

   b. I emailed the information earlier this week, as requested.

   With all due respect, the statement, "MW has information and did not provide because prior meeting was telephonic and not in person" is not what I discussed during our call.

5. Academic Relations Grants
   a. RR informed Board looking to make change in investment managers
   b. Now is opportune time to discuss ARG strategy
   c. MW to speak with team and prioritize recommendations and provide to RR

**Response:**
**5. Academic Relations Grant**
   b.c. During the presentation several weeks ago, we reviewed the strategy to assist the LPN schools in the geographic areas where we have the greatest need for additional

4

CHSI_0018947

nurses. An email was sent this week with academic donation ranking, as requested, from academic relations.

6. Brogdon homes
   a. RR met with owners of centers to discuss lease extensions
   b. Learned centers owned by Global REIT and introduction of discussion of Goodwill in Macon
   c. MW is unaware of what Diana is doing
   d. DW informed Mark she is working with RR
   e. RR informed that decision expected by Global by end of week -- 50/50 chance deal will go

**Response:**
**6. Brogdon Homes**

c.d. Our conversation last Thursday was the first time you had mentioned anything to me regarding Global. Diana had shared with me that she was working on Global REIT with you at your request. She also informed me that Ken was running some numbers and that she had been on several conference calls with you. You said, I guess Diana is talking to you. She and Ken seem to be working, which is fine, are you supportive of what they are doing? I discussed with you that even while I was in Macon attending the Business Process Meeting which you attended as well, that you, Lorraine, Ken and Diana had already planned to tour the Macon center. However, you did not ask me to attend nor have you included me in any of the Global conversations. Further, you indicated that you assumed she had pulled me back in, but maybe she didn't need me and that was okay.

7. Navicent
   a. RR informed of recent meetings between CHS and Navicent
   b. RR and HH having meetings some of which included Diana and discussion of beds
   c. MW had no additional guidance on how to proceed

**Response:**
**7. Navicent**

c. You asked me to let you know if any issues had bubbled up regarding Navicent. I discussed Elbert's tour of our centers and that our staff felt the visits went well. We further discussed that some of the physical plants were older, but clean. You indicated that Elbert was not a decision maker, but rather a practical day-to-day guy. I said, "Okay, I'm just updating you on his visit, since you asked for updates on Navicent." You indicated that you had spoken with Elbert and he told you the visits went great and it was all positive. Elbert was impressed with what we do.

With all due respect, you did not ask for my guidance or input on how to proceed. You did ask that I make you aware if I heard anything and I assured you I would.

CHSI_0018948

8. FSLA
   a. RR requested impact analysis for system (assumed HR had prepared) proposed rule on exempt status
   b. Blair Lake attending seminar on FSLA today
   c. MW to forward report on impact of proposed rule

Response:
8. FSLA
   c. FSLA email sent this week with estimated impacts to our organization.

Please let me know if you have any additions to the follow-up/action items from today's call.

Thanks.

Thank you for allowing me the opportunity to provide clarification from our call on Thursday, May 12th. I believe the recent opportunity for increased communication on these important matters is a step in the right direction.

**Ronnie Rollins**
*President*

**Community Health Services of Georgia**
P.O. Box 1037
Macon, GA 31202

CONFIDENTIAL

CHSI_0018949

**Joseph Wall**

| | |
|---|---|
| From: | Ronnie Rollins [RRollins@chs-ga.org] |
| | Monday, May 23, 2016 6:28 PM |
| To: | Joseph Wall |
| Subject: | FW: Fw: Follow-up from today's call |

Joe,

Here is email #3, Mark's email on Friday the 20th responding to my initial email on the 12th.

Thanks.

*Ronnie Rollins*
President

*Community Health Services of Georgia*
P.O. Box 1037
Macon, GA 31202

**From:** Mark Waldrop
**Sent:** Friday, May 20, 2016 11:46 PM
**To:** Ronnie Rollins
**Subject:** Fw: Follow-up from today's call

Since our goal is to stay on the same page, I hope these notes (please see below in blue font) regarding the follow-up/action items help to provide additional insight. Thanks!

~Mark

**From:** Ronnie Rollins
**Sent:** Thursday, May 12, 2016 5:59 PM
**To:** Mark Waldrop
**Subject:** Follow-up from today's call

Mark,

I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.

After speaking with her, I felt it best to provide you follow-up notes from our call today to help "stay on the same page".

1. EHR

1

CONFIDENTIAL

CHSI_0018950

a. You have not really been involved in LG pilot
b. Diligence on LG CNS (who are they)
c. Monday was the first time you had seen the product demonstrated
d. You have a number of questions and will be following up with Diana
e. LG is not your recommendation for a system-wide EHR solution at this time
f. No system solution identified
g. RR does not need to respond to Diana or her team

**Response:**
**1. EHR**

a. I was aware, as were you and Lorraine, that Diana was conducting the LG pilot in two of our nursing centers. During one of our strategic planning meetings with Diana and Michelle, you asked Diana when we were going to be able to see the software. Diana asked that we wait to see the software until the pilot was complete. Why? Diana wanted to make certain that the software met her needs before recommending it to us. Diana gave me regular updates that the pilot was progressing well. A couple of weeks ago, you asked to see the software so I worked with Diana to schedule the meeting. Diana felt it was a good idea to see the software in a live Ethica environment and I agreed.

b.c.d.g. You asked if I was recommending LG and I indicated that I had follow-up questions for Diana after seeing the software in a live environment. I do want to review the LG CNS corporate structure. I have asked Diana to send me the diligence work that has been completed thus far for the pilot.

e.f. I am encouraged by LG CNS. I think that, strategically, an electronic health record (EHR) is something that will propel us into the future. You and I have discussed EHR in the past, but we were not aware of a good system platform. In addition, we have discussed on numerous occasions that we did not want to be too early of an adopter. Furthermore, we did not want to pay too much or purchase the wrong system that would not "talk" to hospitals, physicians, etc. LG CNS appears to have the platform we have been searching for. We also discussed finding the money for the additional expense of the software. I shared that LG CNS may also solve our need of an integrated software because they indicated that they now have hospice, home health and transitions of care as well. Further, we discussed that I would visit Scott and see the software in a smaller traditional SNF. You stated that you believe the expectation for an approval of a couple of million dollars based on a demonstration needs to first have a set of parameters. I expressed that I did not think Ethica leadership expected us to make a decision on Monday. Jill was opening it up for any questions after the live demonstration. I also expressed that I wanted to follow-up on the Theraptue integration. As LG has progressed, it appears at this point that they may provide a system-wide solution.

2. VEBA Contracts
   a. Lack of understanding of my concern regarding the negotiation of multiple contracts with different expiration dates

2

                                                                 CHSI_0018951

b. Varying opinions on payment of early termination fees ($55,000/yr.)
c. Agreement on not executing contracts at present and watch a few more months and reconsider

**Response:**
**2. VEBA Contracts**
a.b. **BAS (TPA)** is an annually renewable agreement with a three year price escalation limit of 3% per year. Termination with a 30-day notice prior to renewal. No penalty.

**Anthem (Network)** is an annually renewable agreement with a four year price escalation limit of 3% per year on network access fees. Termination with a 30-day notice. No penalty.

**Magellan (PBM)** is a three year agreement with a negotiated 90-day termination/out clause. Penalties of approximately $55,000 (based on approximately 5,500+ members) per year after year one should we terminate early.

**Rx Results (Formulary Management)** is a three year agreement with a 90-day termination/out clause. No penalty.

**Sun Life (Stop Loss)** is a one year term.

**Inetico (Pre-certification/Case Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty.

**Data Smart (Reporting/Care Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty. Paid for by Sun Life.

**Truveris (RFP Procurement Tool)** is a three year agreement with a 90-day termination/out clause. No penalty. Paid for by Magellan.

With all due respect, we did not discuss "varying opinions" on payment of early termination fees ($55,000/yr.). We may terminate any combination of the contracts listed above and still have access to our data through Data Smart, according to John Hearn, The Benefit Company. Vendor data (medical and pharmacy claims) is housed in Data Smart. As we have discussed over the last couple of years, our strategy is to move from a bundled single carrier solution to an unbundled approach. This allows us to improve transparency of claims and financial details. It also gives NextStep Care access to acute claims information more quickly, in an effort to intervene in care coordination for our associates. It further provides us additional flexibility to changing market conditions.

c. I concurred with your idea of not signing the agreements until we see more performance data and after you seek legal counsel to determine if we can legally delay.

3

CHSI_0018952

3. Workday Contract
   a. Identified work projects over the next 6 – 18 months are all included in the current contract fees
   b. Should there be a reduction in cost? Paid in advance?
   c. RR noted Business Process (PBJ) meeting identified several weaknesses in current time and attendance system
   d. RR, MW and LT previously identified need for new time and attendance system within next 2 years (Imp 2016-2017)
   e. T&A not included in HCM/PAY strategy or FIN strategy with Workday
   f. RR to speak with LT regarding FIN and T&A
   g. RR to speak with Workday regarding T&A during contract discussions

**Response:**
**3. Workday Contract**
   b. With all due respect, we did not discuss if there should be a reduction in cost or if it should be paid in advance.

   c.d.e. You indicated you had the HCM stuff and the finance stuff. At the business process meeting, one of the things you noticed was that we needed a new time and attendance system. You said that neither Lorraine nor I raised the need for a time and attendance system, so it's not on the Workday list. You said that you thought it was a strategic issue for us. I indicated that I appreciated you raising the issue and that Lorraine and I had already shared with you, in a previous meeting, that we would need a time and attendance system in the future.

4. HHA and Hospice market information
   a. MW has information and did not provide because prior meeting was telephonic and not in person
   b. MW to send market information to RR by email

**Response:**
**4. HHA and Hospice Market Information**
   a. You cancelled our regular two week in-person communication meeting on Friday, where I was planning to bring the information for our review together.

   b. I emailed the information earlier this week, as requested.

   With all due respect, the statement, "MW has information and did not provide because prior meeting was telephonic and not in person" is not what I discussed during our call.

5. Academic Relations Grants
   a. RR informed Board looking to make change in investment managers
   b. Now is opportune time to discuss ARG strategy
   c. MW to speak with team and prioritize recommendations and provide to RR

4

CHSI_0018953

**Response:**

**5. Academic Relations Grant**

b.c. During the presentation several weeks ago, we reviewed the strategy to assist the LPN schools in the geographic areas where we have the greatest need for additional nurses. An email was sent this week with academic donation ranking, as requested, from academic relations.

6. Brogdon homes
    a. RR met with owners of centers to discuss lease extensions
    b. Learned centers owned by Global REIT and introduction of discussion of Goodwill in Macon
    c. MW is unaware of what Diana is doing
    d. DW informed Mark she is working with RR
    e. RR informed that decision expected by Global by end of week — 50/50 chance deal will go

**Response:**

**6. Brogdon Homes**

c.d. Our conversation last Thursday was the first time you had mentioned anything to me regarding Global. Diana had shared with me that she was working on Global REIT with you at your request. She also informed me that Ken was running some numbers and that she had been on several conference calls with you. You said, I guess Diana is talking to you. She and Ken seem to be working, which is fine, are you supportive of what they are doing? I discussed with you that even while I was in Macon attending the Business Process Meeting which you attended as well, that you, Lorraine, Ken and Diana had already planned to tour the Macon center. However, you did not ask me to attend nor have you included me in any of the Global conversations. Further, you indicated that you assumed she had pulled me back in, but maybe she didn't need me and that was okay.

7. Navicent
    a. RR informed of recent meetings between CHS and Navicent
    b. RR and HH having meetings some of which included Diana and discussion of beds
    c. MW had no additional guidance on how to proceed

**Response:**

**7. Navicent**

c. You asked me to let you know if any issues had bubbled up regarding Navicent. I discussed Elbert's tour of our centers and that our staff felt the visits went well. We further discussed that some of the physical plants were older, but clean. You indicated that Elbert was not a decision maker, but rather a practical day-to-day guy. I said, "Okay, I'm just updating you on his visit, since you asked for updates on Navicent." You indicated that you had spoken with Elbert and he told you the visits went great and it was all positive. Elbert was impressed with what we do.

5

CHSI 0018954

With all due respect, you did not ask for my guidance or input on how to proceed. You did ask that I make you aware if I heard anything and I assured you I would.

8. FSLA
   a. RR requested impact analysis for system (assumed HR had prepared) proposed rule on exempt status
   b. Blair Lake attending seminar on FSLA today
   c. MW to forward report on impact of proposed rule

Response:
8. **FSLA**
   c. FSLA email sent this week with estimated impacts to our organization.


Please let me know if you have any additions to the follow-up/action items from today's call.

Thanks.


Thank you for allowing me the opportunity to provide clarification from our call on Thursday, May 1̣0̣th. I believe the recent opportunity for increased communication on these important matters is a step in the right direction.

*Ronnie Rollins*
*President*

*Community Health Services of Georgia*
P.O. Box 1037
Macon, GA 31202

---

Notice: The content of this e-mail including any attachments may contain CONFIDENTIAL and legally protected information. If you are not the addressee or intended recipient, please do not read, copy, use or disclose this communication to others. Please notify the sender immediately by return e-mail, delete this e-mail including attachments and destroy any copies. Thank you!

CONFIDENTIAL                                                     CHSI_0018955

When is exec.'s pay
date ? (next)
7/1/16 ?



CONFIDENTIAL

5/24/16   @   2:00   @   MEADORS, WALL offices

JAW, RR, MW met

- MW was not giving in on his position. Openly argued w/ RR

- * RR was surprised, caught off guard, frustrated by MW, his complaints, attitude + demeanor, not "softening his position", totally insubordinate.

* I was too!

CONFIDENTIAL



COMMUNITY
HEALTH SERVICES *of Georgia*

May 15, 2016

Mr. Mark Waldrop
1013 Riverburch Parkway
Suite 1
Dalton, GA 30721

Dear Mark,

This letter is to follow-up your phone call to me on Friday, March 13, 2016 regarding my email dated 5/12/15, subject matter "Follow-up from today's call". In our conversation on Friday you indicated there were "lies" in my email message to you — that is a very strong statement. I will speak more on that later in this letter.

During our call, I asked you to follow-up in writing regarding the instances you were referring to as lies and I have not received it to date. However, please do not consider that statement to be criticism, rather merely the rationale for my sending this letter to you in advance of receipt of your comments. The purpose of this letter is to address the "lie" that you discussed in our call on Friday.

First, I ask that you read the first three sentences of the May 12th email for context of the email (see excerpt below).

**[I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.**

**After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".]**

Context – I had provided what I thought were clear directions and support to the VEBA Trustees in a memo dated March 16, 2016 and in a subsequent follow-up conference call on March 21, 2016 with the VEBA Trustees. At no point was it discussed that Tracie would be running the VEBA Trustee meetings. As a practical matter, I do not recall any discussions or questions regarding the VEBA Trustees or the VEBA Trustee meetings in the previous two months since the March memo and conference call.

In reaching out to me, Tracie was very concerned that she did not know what she needed to do and that she was unprepared to run the VEBA meeting; however, she was very willing to try. I assured her that I believed that she and her team were very capable of managing and reporting on the claims and pharmacy operations of the VEBA and looked forward to her report. In addition, I assured her that I had not intended for her to chair the VEBA meeting. It was after 5 pm on Thursday and it was clear to me that I needed to speak with you and Blair.

PLAINTIFF'S
EXHIBIT
9
Wall
03-29-17
PENGAD 800-631-6989

478.621.2206  |  FAX 478.743.4501  |  213 THIRD STREET  |  P.O. BOX 1037  |  MACON, GEORGIA 31202

CONFIDENTIAL

Mark Waldrop
May 15, 2016
Page 2

My rationale was simple; I had sent an email and had conversations with you, Blair and Lorraine, as VEBA Trustees. It seemed clear that I needed to speak with you as Michelle's supervisor (and Michelle as Tracie's supervisor) and Blair as VEBA chair and as a subordinate to you to clarify that I had not made any changes to the VEBA Trustees or their meetings. The sole purpose of the March email was to assign additional focus (personnel) to the VEBA given its poor performance over the preceding two years in anticipation that VEBA performance might improve and we could avoid another year with multi-million dollar expenditures in excess of planned results.

At that time I made the decision to request a call on Friday morning to clear-up the confusion regarding Tracie's call to me. Also, as you and I had just completed a lengthy call a few hours earlier regarding several matters, I decided to send a quick email with bullet notes to summarize the results of our call which I completed and sent just before 6 PM.

On Friday morning I sent an email to you and Blair requesting a call (see excerpt below)

**[Tracie Clark called me with questions on the VEBA meeting next week. There appears to be some confusion based on her conversations with with you.**

**I believe it would be helpful for us to talk today. Are you available at 10 or 10:30 this morning?]**

On the call I shared with you and Blair my conversation with Tracie and learned that she had been instructed she would be leading the VEBA Trustee Meeting on Thursday. When I questioned why she was given those instructions, I was stunned when you and Blair indicated "I thought that's what you wanted me to do" or words to that effect. I was not taking notes and was too stunned by the response to write down the exact words, as I could not think of any rational reason either he or you would think those directions had been provided to the VEBA Trustees. The example that quickly came to my mind and that I shared with you and Blair would be a request from me to have Blair, Diana, or Charles serve as chair of the CHS Board meeting. It just seems too irrational to understand from my perspective. Nonetheless, Blair quickly "got it" as I believe he stated and set about to handle VEBA Committee meeting information as VEBA Chairman as he has for the past couple of years.

Shortly after the call with Blair, you called me indicating a number of issues with our relationship and specifically that my email on May 12th contained "lies". My impression was that you were very upset and you made several strong statements in addition to the "lies" comment including your belief that I was "targeting" you and the May 12th email was part of creating a file and that months down the road someone could look at the email and infer/conclude that you were not doing your job. In identifying the "lies" in the email, you specifically pointed out Item 7 of the memo as misrepresenting our conversation. You told your perspective of the conversation. You did not ask for my perspective.

CONFIDENTIAL

Mark Waldrop
May 15, 2016
Page 3

Mark, let me first state that I am disappointed that you would begin a conversation regarding another associate's email by indicating the other associate has written lies. I believe that approach is unprofessional and name-calling is counter-productive to resolving issues. I expect an apology and I would expect you to apologize to any other associate for a similar action. Below is Item 7 from the May 12th email.

> Navicent
> a. RR informed of recent meetings between CHS and Navicent
> b. RR and HH having meetings some of which included Diana and discussion of beds
> c. MW had no additional guidance on how to proceed

The topic of this item is "Navicent". I have been handling conversations with Navicent for many, many months and you have not been engaged in the negotiations involving EMS, MIH, the call center, skilled nursing beds, case management or any other aspect of the Navicent relationship. All the comments that you indicated on Friday that I had said to you in our Thursday conversation had probably been said by me, as I lead the conversation and recall the comments. From my perspective, I updated and informed you of the actions taken and conversations had by me and the group I am leading to make you aware of our actions – not to ask your opinion or your advice. 7a and 7b provided you information regarding our conversations with Navicent and 7c confirmed that you did not offer comments, suggestions or any other information which is the desired response from your role within our organization. The only change I might make, given your subsequent comments, would be to add the words "as expected" to item 7c. I believe any CEO in this context would expect no comments being made unless there was a problem. Given the CEO, CFO and two SVP's are working on the Navicent matter, I believe it is expected that there will be few, if any, issues arising that affect the COO or daily operations.

In this context, your comments about someone looking at this email months down the road and concluding that you did not do your job because you did not offer guidance appears somewhat implausible. I suggest you reconsider your statement regarding the truthfulness and accuracy of item 7. I also suggest in the future if you have questions regarding communications that you ask questions and discuss matters before reaching conclusions. I believe this process to be a much more professional and productive way to handle communication.

Again, I welcome your comments on my email and look forward to discussing and resolving whatever issues you may have.

Sincerely,


Ronnie D. Rollins
President and CEO

CHSI  0018967

**Urgent** ☐

FOR _Joe_

DATE _6-3_   TIME _4:25_

## While You Were Out

M _Ronnie Rollins_

OF _____

PHONE _731-9392_

CELL _____

FAX _____

☑ TELEPHONED
☐ CAME TO SEE YOU
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ WANTS TO SEE YOU

**Message**

_Mark Lange_

_to full investigation_

RAP
A9711
T-3002                    SIGNED



PLAINTIFF'S
EXHIBIT
10
Wall         05-25-17

PENGAD 800-631-6989

CONFIDENTIAL

✓ Board. ?

Mark Lange will be
contacting, meet to discuss
some corporate issues.

Mark W. ⟨706⟩ 270 - 4265

CONFIDENTIAL

6/3 ~~or 6/6~~

RR & I talked, to decide where to go from here —

① 3m, CPA/
② another CPA/
      law firm
③ H+K (as our
      corp attorney)

RR said we had to have an independent investigation; hired Mark Lange's firm

6/7/16 — MW met w/ Mark Lange @ Holland + Knight offices

6/8   RR, ML, JAW discussed ML meeting w/ MW; ML asked to talk to LT & would I ask her if she were available 6/9 A.M. —

She asked if she & I could talk; see tab #6

PLAINTIFF'S
EXHIBIT
11
Walt
03-29-17
PENGAD 800-631-6989

CHSI_0018975

*violation of the by-laws*

# CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement") is effective as of November 30, 2015 (the "Effective Date") by and between Spiritus, LLC, located at 827 Virgil Street, Atlanta, Georgia 30307 (the "Consultant") and Community Health Services of Georgia, LLC, located at 213 Third Street, Macon, Georgia 31201 (the "Company"). Consultant and Company are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties."

Whereas, The Company desires to arrange for Consultant to provide certain Consulting services to the Company on the terms and conditions stated in this Agreement and the Consultant desires to provide such consulting services on those terms and conditions.

Therefore, accordingly, in consideration of the mutual promises contained herein, the parties hereby agree as follows:

1. **Consultant Responsibilities.** The duties of the Consultant shall be those commensurate with Consultant's position as Consultant, which under this agreement shall be those specifically defined herein; and any other duties (outside of those identified herein) requested by the Company of the Consultant and accepted by Consultant, shall be at such additional consideration as Consultant and the Company shall agree upon additional fees and an amendment to the existing agreement will be made at that time to reflect those duties and additional fees.

    1.1. **Services.** Consultant agrees to perform to the best of Consultant's abilities, consulting duties in the capacity of a *Business Consultant* for a period of six (6) months with a minimum of 160 hours of service work to be performed each month by Consultant which includes, but is not limited to, the following:

    A. Evaluate facility enhancement services model.

    B. Develop and implement new employment manual/guidelines.

    C. Conduct skilled nursing facility profile assessment.

    D. Develop denials management tracking tool.

    E. Develop and implement medical director score card.

    F. Review and recommend enhancements to compensation models and agreements.

    G. Review compliance plan for attestation documents.

    H. Use gEHRIMed tools to improve scheduling.

    I. Evaluate current staffing patterns and make necessary changes.

    J. Analyze coding, reimbursement and revenue cycle systems.

    K. Develop and manage individual provider efficiency.

    L. Evaluate comprehensive billing process.

    M. review comprehensive billing manual and make enhancements.

    N. Provide appropriate coding education.

    O. Evaluate credentialing process and make enhancements to the process.

    P. Oversee successful implementation of gEHRIMed.

    Q. Other duties and assignments as requested.

2. **Compensation.** The Company will pay Consultant for the performance of the agreement and services specified herein:

    2.1. **Rates.** Company agrees to pay a fee of $ 15,625.00 per month for services rendered hereunder.

    2.2. **Invoices.** Consultant shall invoice the Company no later than the 1st of each month in arrears.

    2.3. **Additional Fees.**

    A. **Additional Services.** An additional service fee will be negotiated for any services agreed to by Consultant and the Company and that are not specified herein.

    B. **Mileage.** Periodic reimbursement of mileage incurred by Consultant in performance of Consultant's duties hereunder shall be charged at the current mileage rate as established by the IRS.

    2.4. **Unauthorized Services or Expenses.** Payment by Company for Services or expenses not previously approved or agreed to by Company in writing shall be at Company's sole discretion.

    2.5. **Payment Terms.** Payment for invoiced amount shall be paid directly to the Consultant no later than the 10th of each month.

3. **Screening of Consultant.** Consultant understands that this contract is contingent upon receipt by the Company of a satisfactory drug screening report and satisfactory National and Georgia criminal background report (with GCIC Stamp on the results). The Company accepts responsibility for the cost of conducting and obtaining all criminal background reports

Page 1 of 11

Document Integrity Verified ———— Adobe Document Cloud Transa———————————— yHIIYG-nlVI4OX9lPindIn ————

PLAINTIFF'S
EXHIBIT
12
watt

and drug screening reports regarding the Consultant. Consultant understand that throughout the duration of this agreement additional drug testing and criminal background reports may be required by the Company and hereby agrees to comply. This Agreement may be terminated immediately upon the occurrence of any of the following: Noncompliance of the Consultant to submit to requested criminal background reports and/or drug screening or receipt by the Company of an unsatisfactory criminal background report and/or unsatisfactory drug screening report.

4.    Standard of Care.  In the performance of its services hereunder, Consultant shall exercise the same (but no higher) standards and degree of care used by reasonable and prudent entities engaged as a Consultant. Notwithstanding anything herein to the contrary, Consultant shall not be deemed in violation of this Agreement if Consultant is prevented, delayed or impeded from performing any of its obligations hereunder: (i) by the acts or omissions of Company, or (ii) for reasons beyond its reasonable control including, without limitation, strikes, walkouts or other employee disturbances, natural disasters, acts of God, terrorist acts, acts of war or the action or promulgation of any statute, rule, regulation or order by any federal, state, or local governmental or judicial agency or official, irrespective of whether such action or promulgation of any statute, rule, regulation or order results in reformation of this Agreement.

5.    Company Property.  Consultant understands that in the course of providing consulting services to Company, they may be called upon to create and/or participate in the creation of various documents, materials and presentations. These services will be covered under this agreement and will be considered "work for hire" and are the work product and property of the Company. As such, Consultant agrees that the Company has the right to reproduce, distribute and share said materials in any media form as deemed appropriate by the Company.

6.    Compliance with Laws.  Consultant, and any Consultant personnel performing services hereunder, and Company agree at all times during the existence of this Agreement to comply with all federal, state and local laws, rules, ordinances and regulations as they relate to this Agreement; and to comply with all professional and applicable policies, rules and regulations of Company.

      The parties intend and in good faith believe this Agreement complies with the provisions of all Medicare and Medicaid statutes and all other federal and state laws (collectively "Laws").  Should either party express a reasonable belief this Agreement is contrary to any provision of said Laws, or the regulations promulgated thereunder, or any case law or other authority, then the parties agree to attempt in good faith to renegotiate the provision or provisions in question to the mutual satisfaction of all parties.  If an agreement cannot be reached within thirty (30) days, this Agreement may be immediately terminated by either party.

7.    Warranty of Non-Exclusion.  Consultant represents and warrants to Company that as of the Effective Date, neither Consultant nor any of its officers, directors or employees (i) have been heretofore excluded, debarred, suspended or have been otherwise determined to be, or identified as, ineligible to participate in any governmental program (collectively, the "Governmental Programs") or are about to be excluded, debarred, suspended or otherwise determined to be, or identified as, ineligible to participate in any Governmental Program, (ii) have received any information or notice, or become aware, by any means or methods, that it is the subject of any investigation or review regarding its participation in any Governmental Program, or (iii) have been convicted of any crime relating to any  Governmental Program. Consultant agrees to notify Company within five (5) business days of Consultant becoming aware of any of the foregoing information, notice, actions or events during the term of this Agreement. The listing of Consultant or any of its officers, directors or employees on the Office of Inspector General's ("OIG") exclusion list or OIG's website for excluded individuals/entities shall constitute a breach of this representation and warranty and shall require immediate notice to Company. In the event that Consultant or any of its officers, directors or employees is excluded from any Governmental Program, this Agreement shall, at the sole option of Company, immediately terminate.

8.    Corporate Compliance.  In accordance with the Federal Deficit Reduction Act (DRA) of 2005 and other applicable law, the Consultant acknowledges by its execution of this Agreement that it has reviewed a copy of the Company's DRA Compliance Policy ("Compliance Policy") for the detection and prevention of health care fraud, waste and abuse and for the promotion of integrity and for the assurance of compliance with regulations for state and federally funded healthcare programs. Elements of the Compliance Policy include but are not limited to: a Compliance Officer; compliance training and written certification of review of Company's Code of Conduct for all officers, directors, employees and medical staff, in addition to contractors, subcontractors, agents and others who perform certain functions on behalf of Company; compliance policies and procedures; a Disclosure Program which emphasizes a non-retribution, non-retaliation policy and a toll-free 24 hour hotline; an audit program; and an effective screening and termination process for ineligible persons.  Consultant is encouraged to notify Company's Compliance Office of any possible conflicts of interest or potential violations of fraud and abuse laws regarding the prohibition of offering, paying, soliciting or receiving any money, gifts, or service in return for the referral of patients, or to induce the purchase of items or services.

      The Parties intend that the relationship established by this Agreement will comply with all applicable state and federal laws, including those relating to the referrals and the generation of business. The parties expressly agree and do hereby state that the compensation and remuneration paid under this Agreement does not take into account, directly or indirectly, the

Document Integrity Verified ———————————————————— Adobe Document Cloud Transaction Number: CBJCHBCAABAAKQrUQvAX4yV41tYO-NVI4OX9!PmAhI

CONFIDENTIAL

CHSI_0018980

value or volume of referrals or business generated between the parties, and that such compensation and remuneration is equivalent to fair market value for reasonable and necessary services.

9. Insurance. At all times during the term of this Agreement, Consultant shall maintain in full force and effect, insurance coverage in an amount deemed adequate for the industry in which each operates. Consultant shall be solely responsible for paying any deductible or self-insured retention applicable to any claims implicated under the insurance specified in this Section. Consultant further agrees to furnish to Company copies of all certificates of insurance or other evidence satisfactory to Company that all required insurance has been procured and is in force prior to the Effective Date.

10. Indemnification. Consultant will indemnify and hold harmless Company, its officers, directors, employees, and agents from and against any and all claims, actions, or liabilities which may be brought against them by third parties as a result of negligent performance of Consultant, its officers, directors, employees and agents under this Agreement. Company will indemnify and hold harmless Consultant, its officers, directors, employees, and agents from and against any and all claims, actions, or liabilities which may be brought against them by third parties as a result of negligent performance of the Company, its officers, directors, employees, and agents under this Agreement.

11. Access to Books and Records. For so long as required by law, each Party shall make available, upon written request of HHS, the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and the books, documents, and records of such Party that are necessary to verify the nature and extent the costs of providing services under this Agreement. If either Party carries out any of the duties of this Agreement through a subcontract the value of which is $10,000 or more over a twelve-month period, such subcontract shall contain a clause to the effect that, for so long as required by law, after the furnishing of such services pursuant to such subcontract, the subcontracting party shall make available, upon written request of HHS, or upon request of the Comptroller, or any of their duly authorized representatives, the subcontract, and books, documents, and records of such organization that are necessary to verify the nature and extent of such costs. If either Party receives a request or demand from a government authority to disclose any books, documents, or records relevant to this Agreement for the purpose of an audit or investigation, such Party, if not prohibited by law, shall immediately (and no later than five business days after receipt of such request or demand) notify the other Party in writing of the nature and scope of such request or demand and shall make available to the other Party, upon written request of the other Party, all such books, documents, or records produced to the government authority. This Section is included pursuant to and is governed by the requirements of 42 U.S.C. § 1395x(v)(1) and the regulations promulgated there under.

12. Confidentiality. The Parties agree to comply with the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. Section 1320d ("HIPAA") and any current and future regulations promulgated thereunder including without limitation the federal privacy regulations contained in 45 C.F.R. Parts 160 and 164 (the "Federal Privacy Regulations"), the federal security standards contained in 45 C.F.R. Part 142 (the "Federal Security Regulations"), the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162, all collectively referred to herein as "HIPAA Requirements". The Parties agree not to use or further disclose any Protected Health Information (as defined in 42 U.S.C. Section 1320d), other than as permitted by HIPAA Requirements and the terms of this Agreement. The Parties agree to comply with any state law and regulations that govern or pertain to the confidentiality, privacy, security of, and electronic transactions and code sets pertaining to, information related to patients. The Parties will make their internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary of Health and Human Services ("HHS") to the extent required for determining compliance with the Federal HIPAA requirements and state law.

13. Non-Disclosure. Consultant agree to maintain the confidentiality of information regarding the Company, except for the required dissemination of such records to authorities, not to disclose such information without the written consent of the individual authorized to release such records, or as required by law.

  13.1. Definition of Confidential Information. For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which Company is engaged. If Confidential Information is in written form, the Company shall label or stamp the materials with the word "Confidential" or some similar warning. If Confidential Information is transmitted orally, the Company shall promptly provide a writing indicating that such oral communication constituted Confidential Information.

  13.2. Exclusions from Confidential Information. Consultant's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Consultant; (b) discovered or created by the Consultant before disclosure by Company; (c) learned by the Consultant through legitimate means other than from the Company or Company's representatives; or (d) is disclosed by Consultant with Company's prior written approval.

  13.3. Obligations of Consultant. Consultant shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Company. Consultant shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Consultant shall not, without

Page 3 of 11

CONFIDENTIAL

CHSI_0018981

prior written approval of Company, use for Consultant's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Company, any Confidential Information. Consultant shall return to Company any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Consultant requests it in writing.

13.4.  Time Periods. The nondisclosure provisions of this Agreement shall survive the termination of this Agreement and Consultant's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Company sends Consultant written notice releasing Consultant from this Agreement, whichever occurs first.

14.  Business Associate Agreement. Both parties agree to be bound by the obligations as set forth in Exhibit A, "Business Associate Agreement," attached hereto and incorporated herein by reference.

15.  Term and Termination.

15.1.  Term. This Agreement shall be for a period of six (6) months ("Term") commencing on the Effective Date and shall expire on May 30, 2016. The term of this Agreement may be extended for additional 30 day periods upon mutual consent, unless sooner terminated as provided herein.

15.2.  Termination. This Agreement may also be terminated as follows:

A.  Mutual Agreement. By mutual written agreement of the parties at any time.

B.  Without Cause. Following the initial ninety (90) days after the commencement of this Agreement, either party may terminate this Agreement with or without cause by providing the other party with thirty (30) day written notice.

C.  Supervening Law. Immediately upon written notice by either party in the event that any governmental authority makes a determination that either is acting in violation of any law or regulation which materially affects the rights or obligations of the parties under this Agreement; or in the event that any change in law or regulation or government enforcement policy creates an unreasonable risk of sanction to either party from performance of this Agreement.

16.  Notices. Except as otherwise specified herein, all notices, demands, requests, or other communication which may be or are required to be given, served, or sent by any party to any other party pursuant to this Agreement shall be in writing and shall be delivered personally, mailed by first-class, registered or certified mail, return receipt requested, postage prepaid and addressed as set forth above or as otherwise directed by a party in accordance with this provision.

Each party may designate by notice, in writing, a new address to which any notice, demand, or request or communication thereafter be so given, served or sent. Each notice, demand, request or communication which shall be mailed, delivered, or transmitted in the manner described above shall be deemed sufficiently given, served, sent and received for all purposes at such time as it is (a) delivered personally to the addressee, (b) received in the mail by the addressee (with the return receipt, the delivery receipt, or the affidavit of messenger being conclusive evidence of its receipt), (c) with respect to a facsimile transmission, the machine confirmation being deemed conclusive evidence of such delivery or (d) at such time as delivery is refused by the addressee upon presentation.

17.  General Provisions.

17.1.  Headings.  The headings of the Sections of this Agreement are inserted only as a matter of convenience and for reference, and they in no way define, limit or describe the scope or intent of any provision of this Agreement, nor will they be construed to affect, in any manner, the terms and provisions hereof or the interpretation or construction thereof.

17.2.  Waiver of Breach. One party's waiver, expressed or implied, of any default by the other party of any provision of this Agreement is not a waiver of any other default. A party's waiver of any default shall not affect the right of that party to require performance of the defaulted provision at any future time.

17.3.  Severability. If any of the provisions of this Agreement shall be declared invalid or unenforceable under applicable law, said provisions shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining provisions of the Agreement.

17.4.  Independent Contractor. Company and Consultant are independent contractors, and neither party hereto is the agent of the other, and neither party has any right to make any representation on behalf of the other. All persons designated by Consultant to perform services pursuant to this agreement shall be employees of Consultant and will not be employees of Company. Consultant shall be responsible for withholding federal and state income taxes and unemployment insurance.

17.5.  Arbitration. Any claim, controversy and/or dispute arising out of or in connection with this agreement which cannot be mutually resolved by the parties hereto shall be settled by arbitration. Each party hereto shall designate an arbitrator and these two arbitrators shall thereupon confer and select a third arbitrator who shall chairman the

Document Integrity Verified    Adobe Document Cloud Transaction Number: CBJCHBCAABAAkGzUQvAx4yV4tiYG-nIVf4OX0GPindin

CONFIDENTIAL

CHSI_0018982

panel. The arbitrators shall then meet at a location as a majority of them shall determine and by majority decision shall render their decision as to the matter in dispute. The decision of the arbitrators shall be conclusive. Each party shall bear the expense of its own arbitrator and an equal share of the expense of the third arbitrator. To the extent not otherwise herein provided, the arbitration shall be conducted in accordance with the rules then in effect of the American Arbitration Association and judgment may be entered in any court of competent jurisdiction.

17.6.   Successors and Assigns. Neither party shall assign this Agreement in whole or in part without the written consent of the other which shall not be unreasonably withheld. Neither party shall assign any monies, obligations, or entitlements due or to become due to it under this Agreement without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the successors, permitted assigns, heirs, and representatives of the Company and the Consultant. Any attempted assignment of this Agreement in violation of the provisions of this section is void.

17.7.   No Personal Liability. No elected official, director, officer, agent or employee of either Party shall be charged personally or held contractually liable by or to the other party under any term or provision of this Agreement or because of any breach thereof or because of its or their execution, approval or attempted execution of this Agreement.

17.8.   Use of Name or Logo. No party to this Agreement shall use the name or the logo of the other party to this Agreement in any promotional or advertising material, unless review and approval in writing of the intended use is first obtained from the party whose name is to be used.

17.9.   No Intended Third Party Beneficiaries. It is the explicit intention of the parties that no other person or entity is or shall be entitled to bring any action to enforce any provision of this Agreement against either of the parties, and that the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by the parties or their respective successors and assigns as permitted under this Agreement.

17.10.   Governing Law. This agreement shall be governed by the laws of the State of Georgia.

17.11.   Amendments. No modification, alteration or amendment of this Agreement shall be effective unless contained in a writing signed by both Parties and that specifically refers to this Agreement.

17.12.   Counterparts. This Agreement may be executed and delivered, including by facsimile transmission or by electronic transmission in Adobe portable document format ("PDF file") in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

17.13.   Entire Agreement. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions, agreements or understandings, whether written or oral. No amendment to this Agreement or its attachments are effective or binding on either party unless agreed to in writing signed by both parties.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement, or have caused this Agreement to be duly executed on their behalf, as of the day and year first hereinabove set forth.

**Spiritus, LLC**                                    **Community Health Services of Georgia, LLC**

By: _Mark Hunt_                                      By: _Mark A. Waldrop_

Name:   Mark Hunt                                    Name:   Mark A. Waldrop

Title:   Principal                                   Title:   Chief Operating Offi·

Date:   Nov 24, 2015                                 Date:   Nov 30, 2015

🌀 Document Integrity Verified ···················· Adobe Document Cloud Transaction Number: CBJCHBCAABAAKOrUQvAxtyV41PYQ-nIVI4CIX99Pmhhi

CONFIDENTIAL                                                    CHSI_0018983

## EXHIBIT A
## Business Associate Agreement

This Business Associate Agreement (the "Agreement") is effective as of the Effective date of the Underlying Consulting Agreement ("Effective Date") by and between Company (the "Covered Entity") and Consultant (the "Business Associate").

The parties have entered into, and may in the future from time to time enter into one or more contracts, written or oral, which require Business Associate to be provided with, to have access to, and/or create, maintain, and/or transmit Personally Identifiable Information and Protected Health Information that is subject to the federal privacy and security regulations issued pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH") (the "Underlying Contract(s)"). Pursuant to the Underlying Contract(s), Business Associate has agreed to provide the following categories of services or functions to Covered Entity:

* **Business Consultant**

Covered Entity and Business Associate acknowledge that the supporting services provided by Business Associate also include access, usage and storage of Personal Identifiable Information supplied by Covered Entity and that the privacy and financial security of individuals is increasingly at risk due to the ever more widespread collection of personal information by the corporate sector. They also acknowledge that the victims of identity theft must act quickly to minimize the damage and agree that the expeditious notification of unauthorized acquisition and possible misuse of an individual's Personal Identifiable Information is imperative.

1. Terms used, but not otherwise defined, in this BA Agreement shall have the same meaning as those terms in the federal privacy and security regulations issued pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). The following terms are defined as set forth below:

   1.1. _Individual_. "Individual" shall have the same meaning as the term "individual" in HIPAA and HITECH and the regulations promulgated thereunder and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

   1.2. _Privacy Rule_. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E.

   1.3. _Protected Health Information_. "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in HIPAA and HITECH and the regulations promulgated thereunder, limited to the information Business Associate receives from or creates, maintains, transmits, or receives on behalf of Covered Entity.

   1.4. _Personal Identifiable Information_. "Personal Identifiable Information" or "PII" means an individual's first name or first initial and last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted:

   A.   Social security number;

   B.   Driver's license number or state identification card number;

   C.   Account number, credit card number, or debit card number, if circumstances exist wherein such a number could be used without additional identifying information, access codes, or passwords;

   D.   Account passwords or personal identification numbers or other access codes;

   E.   Date of birth, date of death, age, phone numbers, fax numbers, health plan beneficiary's numbers, license numbers, account numbers or any "personal information" as defined in O.C.G.A. § 10-15-1;

   F.   Any of the items contained in subparagraphs (A) through (E) of this paragraph when not in connection with the individual's first name or first initial and last name, if the information compromised would be sufficient to perform or attempt to perform identity theft against the person whose information was compromised.

   1.5. _Breach_. "Breach of the security of the system" means unauthorized access or use of an individual's Personal Identifiable Information or Protected Health Information maintained by Business Associate, its employees or agents. Good faith acquisition of Personal Identifiable Information or Protected Health Information by an employee or agent of Business Associate for the purposes of such Business Associate is not a breach of the security of the system, provided that the Personal Identifiable Information or Protected Health Information is not used or subject to further unauthorized disclosure.

Document Integrity Verified    Adobe Document Cloud Transaction Number: CBJCHBCAABAAkQrUQvAx4yV41YG-ntVHOX9iPindhi

CONFIDENTIAL

CHSI_0018984

1.6.   Breach Notification Rule. "Breach Notification Rule" shall mean the rules for notification of breaches of unsecured protected health information as set forth under 45 C.F.R. Parts 160 and 164.

1.7.   Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in HIPAA and HITECH and the regulations promulgated thereunder.

1.8.   Secretary. "Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services or his designee.

1.9.   Security Rule. "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. part 160 and part 164, subparts A and C.

1.10.  Security Incident. "Security Incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

1.11.  Unsecured PHI. "Unsecured PHI" shall mean Protected Health Information not rendered unusable, unreadable, or indecipherable to unauthorized persons through use of a technology or methodology specified by the Secretary in guidance issued under section 13402(h)(2) of Public Law 111-5.

1.12.  Secured PHI. "Secured PHI" shall mean Protected Health Information that is rendered unusable, unreadable, or indecipherable to unauthorized persons through use of a technology or methodology specified by the Secretary in guidance issued under section 13402(h)(2) of Public Law 111-5.

2.    Obligations and Activities of Business Associate

2.1.   Business Associate agrees to not use or disclose Protected Health Information or Personal Identifiable Information other than as permitted or required by this BA Agreement or as required by law.

2.2.   Business Associate agrees to not use or disclose Protected Health Information in a manner that would violate the Privacy Rule if done by Covered Entity, except for the specific uses and disclosures set forth hereunder.

2.3.   Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information and Personal Identifiable Information. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information or Personal Identifiable Information by Business Associate in violation of the requirements of this BA Agreement.

2.4.   To the extent Business Associate is to carry out one or more of Covered Entity's obligations under the Privacy Rule, Business Associate agrees to comply with the requirements thereunder that apply to Covered Entity in the performance of such obligation(s).

2.5.   In accordance with 45 C.F.R. 164.502(e)(1)(ii) and 45 C.F.R. 308(b)(2), as applicable, Business Associate will ensure that any subcontractors that create, receive, maintain, or transmit Personal Identifiable Information and/or Protected Health Information on behalf of Business Associate agree to the same restrictions, conditions, and requirements that apply to Business Associate with respect to such information.

2.6.   Business Associate warrants that it has implemented and will maintain administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Protected Health Information and Personal Identifiable Information created, maintained or transmitted for, or received from, Covered Entity including, but not limited to safeguards necessary to ensure that:  (i) the Protected Health Information and Personal Identifiable Information disclosed by Covered Entity to Business Associate are not used or disclosed by Business Associate except as is permitted or required in this BA Agreement or under the law; (ii) access to the Protected Health Information and Personal Identifiable Information disclosed by Covered Entity to Business Associate is limited to authorized personnel of Business Associate; and (iii) Business Associate's security systems and procedures will be consistent with professional industry standards to protect the Protected Health Information and Personal Identifiable Information. Business Associate acknowledges that Covered Entity is relying on Business Associate's security warranty in selecting Business Associate to perform hereunder.  Business Associate shall promptly notify Covered Entity of any material change to any aspect of its privacy and security safeguards.

2.7.   Business Associate agrees that all Personal Identifiable Information and Protected Health Information used or maintained by Business Associate on behalf of Covered Entity shall be maintained to the extent commercially practicable as Secured PHI under HIPAA and HITECH as specified under 45 C.F.R. Parts 160 and 164, as amended. Without limiting the generality of the foregoing, and any contrary provision herein notwithstanding, Business Associate will not transmit Protected Health Information or Personal Identifiable Information over the Internet or any other insecure or open communication channel unless such information is encrypted using standards for Secure Protected Health Information defined in the Breach Notification regulations. If Business Associate stores or maintains Personal Identifiable Information and Protected Health Information in encrypted form, Business

Page 7 of 11

✔ Document Integrity Verified ═══ Adobe Document Cloud Transaction Number: CBJCHBCAABAAKQtUQvAxAyV4IIYG-hiVi4OX90PItdIht ═══

CHSI_0018985

Associate shall, promptly at Covered Entity's request, provide Covered Entity with the key or keys to decrypt such information.

2.8.   Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner as designated by the Covered Entity, to Personal Identifiable Information or Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to satisfy Covered Entity's obligations under 45 C.F.R. 164.524.

2.9.   Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 C.F.R. 164.526 and take other measures as necessary to satisfy Covered Entity's obligations under 45 C.F.R. 164.526.

2.10.   Business Associate agrees to make internal practices, books, and records, including policies and procedures and Personal Identifiable Information and Protected Health Information, relating to the use and disclosure of Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, within 30 days of written request by Covered Entity or in a time and manner as designated by the Secretary, whichever is the lesser of the two, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

2.11.   Business Associate agrees to document any disclosures of Protected Health Information and information related to such use or disclosures required for an accounting of disclosures of Protected Health Information with respect to the individual in accordance with 45 C.F.R. 164.528. Business Associate will provide such information necessary to provide an accounting in accordance with 45 C.F.R. 164.528 within thirty (30) days of Covered Entity's request.

2.12.   Business Associate agrees not to use, disclose or transmit Protected Health Information in any manner that would violate the requirements of HIPAA or HITECH.

2.13.   Business Associate agrees that upon receipt of a subpoena requesting Protected Health Information, to inform Covered Entity of such subpoena, to the extent permitted by law, and afford Covered Entity the opportunity to move to quash such subpoena before Business Associate discloses such Protected Health Information.

2.14.   Business Associate agrees that at all times during the term of this BA Agreement, use or disclosure of Protected Health Information is subject to the minimum necessary standards set forth in the Privacy Rule. Business Associate shall only use or disclose the scope or amount of Protected Health Information that is minimally necessary to perform its obligations under this BA Agreement, the Underlying Contract(s), or as required by law. In addition, Business Associate acknowledges that Covered Entity is the owner of any and all Protected Health Information obtained by Business Associate its agents or its subcontractors, on behalf of Covered Entity. Business Associate shall require that any person, business or agent that maintains Protected Health Information or Personal Identifiable Information on behalf of Business Associate shall notify Business Associate of any breach of the security of the data immediately following discovery.

2.15.   Business Associate agrees to promptly report to Covered Entity any use or disclosure of Personal Identifiable Information or Protected Health Information not provided for by this BA Agreement and any Security Incident of which Business Associate becomes aware. In addition, and any contrary provision herein notwithstanding, Business Associate agrees to report to and notify Covered Entity in writing of any breach of Unsecured Protected Health Information (the "Breach"), in accordance with 45 C.F.R. 164.410, in an expeditious manner, but in no event later than ten (10) days after discovery of such Breach, as defined in 45 C.F.R. 164.410(a)(2), by Business Associate, or as required under applicable state law, whichever requires the earlier response.

A.   Business Associate shall promptly and thoroughly investigate any Breach as follows:

     a.   For any Breach that is exempt from the breach notification requirements under 45 C.F.R. 164.402, Business Associate shall maintain records in sufficient detail to ensure that the requirements for exemption are met and report those findings in writing to Covered Entity upon request.

     b.   For any Breach that is not exempt from the breach notification requirements under 45 C.F.R. 164.402, Business Associate shall provide Covered Entity a written report of its investigation, document all relevant facts pertaining to the breach, and compile all relevant data in a form that allows Covered Entity to readily perform a thorough risk assessment.

     c.   Business Associate will provide such written reports as set forth herein, as applicable, of this Section within ten (10) days after discovery of the Breach, as defined in 45 C.F.R. 164.410(a)(2), or as may be earlier required to enable Covered Entity to meet applicable reporting and other requirements under applicable state law.

B.   Business Associate shall use best efforts to mitigate, at its own reasonable cost and expense and in a manner approved by Covered Entity, any harmful effect of use of disclosure of unsecured Personal

Page 8 of 11

CONFIDENTIAL

CHSI_0018986

Identifiable Health Information by Business Associate including, but not limited to, assuming the reasonable costs of notifying affected individuals, the media and others as directed by the Covered Entity and providing credit monitoring services for individuals whose information has been breached.

3.  **Permitted Uses and Disclosures by Business Associate**

3.1.  Except as otherwise limited in this BA Agreement, Business Associate may use Personal Identifiable Information and Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

3.2.  Except as otherwise limited in this BA Agreement, Business Associate may disclose Personal Identifiable Information and Protected Health Information for the proper management and administration of the Business Associate, provided that such disclosures are Required By Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

3.3.  Except as otherwise limited in this BA Agreement, Business Associate may use Personal Identifiable Information or Protected Health Information to provide Data Aggregation services to Covered Entity as permitted by HIPAA or HITECH.

3.4.  Business Associate may disclose Personal Identifiable Information and Protected Health Information to agents, including a subcontractor (collectively, "Recipients") and may allow Recipients to create or receive such information on its behalf only if the Recipients agree in writing to the same restrictions and conditions that apply to Business Associate under this BA Agreement, including, but not limited to, the requirement that the Recipients will (i) comply with all requirements of the Privacy Rule and Security Rule that apply to Business Associate, (ii) appropriately safeguard Personal Identifiable Information and Protected Health Information that is either created or received, and comply with the Breach notification and mitigation requirements set forth under this BA Agreement. To the extent permitted by law, Business Associate shall be fully liable to Covered Entity for any acts, failures, or omissions of Recipients in furnishing the services as if they were Business Associate's own acts, failures, or omissions.

4.  **Obligations of Covered Entity**

4.1.  Covered Entity shall notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 C.F.R. 164.520, to the extent that such limitation may affect, as determined by Covered Entity, Business Associate's use or disclosure of Protected Health Information.

4.2.  Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by an individual to use or disclose Protected Health Information, to the extent that such changes may affect, as determined by Covered Entity, Business Associate's use or disclosure of Protected Health Information.

4.3.  Covered Entity shall notify Business Associate of any restriction to the use or disclosure of Protected Health Information that Covered Entity has agreed to or is required to abide by under 45 C.F.R. 164.522, to the extent that such restriction may affect, as determined by Covered Entity, Business Associate's use or disclosure of Protected Health Information.

5.  **Term and Termination**

5.1.  **Term.** The Term of this BA Agreement shall commence as of the Effective Date and shall terminate upon the termination or expiration of the Underlying Contract(s) or on the effective date of termination of this BA Agreement by Covered Entity for cause, whichever occurs sooner.

5.2.  **Termination for Cause.** Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall:

A.  Provide written notice to Business Associate of such breach and, if susceptible of cure, provide Business Associate with the opportunity to cure the breach within thirty (30) days and thereafter immediately terminate this BA Agreement by providing written notice thereof to Business Associate if Business Associate fails to effect such cure within such thirty-(30)-day period; or

B.  Immediately terminate this BA Agreement by providing written notice thereof to Business Associate if Business Associate has materially breached this BA Agreement and Covered Entity determines, in its sole discretion, that such cure is not feasible.

5.3.  **Effect of Termination.**

Page 9 of 11

CONFIDENTIAL

CHSI  0018987

A.  Upon termination of this BA Agreement, for any reason, Business Associate, with respect to Personal Identifiable Information and Protected Health Information received from Covered Entity or created, maintained, or received by Business Associate on behalf of Covered Entity, will:

1)  retain only that Personal Identifiable Information and Protected Health Information that is necessary for Business Associate to continue its proper management and administration or to carry out its legal commitments;

2)  return to Covered Entity or destroy the remaining Personal Identifiable Information and Protected Health Information that Business Associate maintains in any form;

3)  continue the appropriate safeguards and comply with the Security Rule, as applicable, with respect to electronic Personal Identifiable Information and electronic Protected Health Information to prevent use and disclosure thereof, other than as provided for in this Section, for so long as Business Associate retains such information;

4)  not use or disclose the Personal Identifiable Information or Protected Health Information retained by Business Associate other than for the purpose for which such Personal Identifiable Information and Protected Health Information was retained and subject to the same conditions set out above which applied prior to termination; and

5)  return to Covered Entity or destroy the Personal Identifiable Information and Protected Health Information retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.

B.  The obligations of Business Associate under this Section shall survive the termination or expiration of this BA Agreement and/or the Underlying Contract(s).

6.  **Indemnification.** In addition to and without limiting any indemnification provisions set forth in the Underlying Contract(s), Business Associate will indemnify, defend, and hold harmless Covered Entity from and against any and all claims, demands, lawsuits, actual losses, proceedings, damages, liabilities, penalties, fines, and expenses, including reasonable attorneys' fees, asserted by persons or entities against Covered Entity, or incurred by Covered Entity as a result thereof, relating to Personal Identifiable Information and/or Protected Health Information maintained, used, or disclosed by Business Associate, or by its agents or subcontractors, or arising in any way from Business Associate's, or its agents' or subcontractors', obligations or performance under this BA Agreement or violations of applicable federal or state laws, rules, or regulations. The obligations of Business Associate under this Section shall survive the termination or expiration of this BA Agreement and/or any and all Underlying Contract(s).

7.  **Miscellaneous**

7.1.  **Regulatory References.** A reference in this BA Agreement to a section in HIPAA and/or HITECH means the section as in effect and as amended from time to time.

7.2.  **Amendment.** The parties agree to take such action as is necessary to amend this BA Agreement from time to time as is necessary for Covered Entity and Business Associate to comply with the requirements of HIPAA, HITECH and other federal or state laws. If any applicable law and/or the regulations promulgated under HIPAA or HITECH are amended, or interpreted by governmental authorities, in a manner that renders this BA Agreement inconsistent therewith, the parties shall amend this BA Agreement to the extent necessary to comply with such amendments or interpretations. Notwithstanding the foregoing, if Covered Entity and Business Associate have not amended this BA Agreement to address a law or final regulation that becomes effective after the Effective Date and that is applicable to this BA Agreement, then, upon the effective date of such law or regulation (or any portion thereof), this BA Agreement shall be amended automatically and deemed to incorporate such new or revised provisions as are necessary for this BA Agreement to be consistent with such law or regulation and for Covered Entity and Business Associate to be and remain in compliance with all applicable laws and regulations. Except as provided in this Section no amendment to this BA Agreement shall be effective unless it is in writing and signed on behalf of Covered Entity and Business Associate.

7.3.  **Waiver.** No provision of this BA Agreement or any breach thereof shall be deemed waived unless such waiver is in writing and signed by the party claimed to have waived such provision or breach. No waiver of a breach shall constitute a waiver or excuse of any different or subsequent breach.

7.4.  **Assignment.** This BA Agreement and the rights and obligations of each party hereunder may not be assigned by such party without the prior written consent of the other party. Notwithstanding the foregoing, Covered Entity will have the right to assign its rights and obligations hereunder to any entity that is an affiliate or successor of Covered Entity, without the prior approval of Business Associate.

7.5.  **Relationship of Parties.** Nothing in this BA Agreement shall be construed to create (i) a partnership, joint venture, or other joint business relationship between the parties or any of their affiliates, or (ii) a relationship of employer

Document Integrity Verified        Adobe Document Cloud Transaction Number: CBJCHBCAABAAAOHJQVAx4yV4HYG-nJV4QX06Pzxdhu

CONFIDENTIAL

CHSI_0018988

and employee between the parties.  Business Associate is acting as an independent contractor, not an agent, to Covered Entity, and nothing contained herein is intended to, or shall be construed to, expand the scope or nature of the relationship.

7.6.  **Equitable Relief.**  Business Associate understands and acknowledges that any disclosure or misappropriation of any Personal Identifiable Information or Protected Health Information in violation of this BA Agreement may cause Covered Entity irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Covered Entity will have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as Covered Entity shall deem appropriate.  Such right of Covered Entity is to be in addition to the remedies otherwise available to Covered Entity at law or in equity.  Business Associate expressly waives the defense that a remedy in damages will be adequate and further waives any requirement in an action for specific performance or injunction for the posting of a bond by Covered Entity.

7.7.  **Interpretation.**  Any ambiguity in this BA Agreement shall be resolved to permit Covered Entity to comply with HIPAA and HITECH. .

7.8.  **No Third-Party Beneficiaries.**  This Agreement does not and is not intended to confer any rights or remedies upon any person other than Covered Entity and Business Associate.

7.9.  **Notices.**  All notices, requests, demands, and other communications required or permitted to be given or made under this BA Agreement shall be in writing, shall be effective upon receipt or attempted delivery, and shall be sent by (i) personal delivery; (ii) certified or registered United States mail, return receipt requested; or (iii) overnight delivery service with proof of delivery.  Notices to either party shall be sent to such party's address as set forth on the signature page below.  Neither party shall refuse delivery of any notice hereunder.

7.10.  **Compliance Certification.**  Business Associate hereby certifies and warrants that Business Associate is presently in compliance with the terms of this BA Agreement and that Business Associate shall maintain its compliance with all applicable rules and regulations as amended under HIPAA and HITECH, including, without limitation, the Privacy Rule, the Security Rule, and the Breach Notification Rule, and any amendments thereto.

7.11.  **Governing Law.**  This BA Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia, excluding its conflicts-of-law provisions.

Document Integrity Verified    Adobe Document Cloud Transaction Number: CBJCHBCAABAAKQrUQvAk4yV4IrYG-mVI4OX99Pmdhl

CONFIDENTIAL

CHSI_0018989

# Network Access Acknowledgement

**Member Organization Requesting: Community Health Services of Georgia**
**Company/Vendor/Provider Name: Mark Hunt**
**Individual Access for: Mark Hunt**

| CONDITIONS OF USE & PROHIBITED ACTIVITIES |
|---|
| The device will only be used for task directly associated with a requirement of one of the member organizations. |
| If the device is a computer, a reputable anti-virus program must be installed and exhibit up-to-date protection. |
| There will be no expectation of privacy for any device connected to the organization's network. Activities taking place on, and network traffic to the device may be monitored at any time. |
| Users shall not store any business information, PHI or PII belonging to the organization on the local drives of any computer. |
| All access to the network from non-organization computers should utilize connection methods approved by the SAS IS department. |
| Devices should not be left unattended while connected to the organization's network. |
| User should never save passwords on non-organization owned devices. |
| Non-organization owned computers used to access the network should have security updates periodically installed for operating systems and application software. |
| No attempt will be made by the user to monitor network traffic. |
| No attempt will be made by the user to communicate with any other device connected to the organization's network other than web sites and terminal servers. |
| No attempt will be made by user to identify any devices on the organization's network. |
| No data will be downloaded by the user to the device other than what is required for tasks directly associated with a requirement of the member organization. |

*I have read the above Conditions of Use and Prohibited Activities and agree to abide at all times. I understand that if it is determined that my failure to adhere to these conditions directly causes damage or harm to the organization's network, I may be held responsible for damages.*

Mark Hunt

By: _____

Date: _____5/13/16_____

CONFIDENTIAL

– Expense reports:

    Stephanie   40 K * – most of it MW (he approves his own exp.)

    Mark    10 K

– V.P. position

    paying consultant   200 k

    * V.P. Keith Wilson to approved 6/21

– Cap Ex

    $ 300 400 K   not budgeted

        $28 K each  w/ master financing agreement

* submitted approval process or policy

PLAINTIFF'S
EXHIBIT
13

PENGAD 800-631-6989

CONFIDENTIAL

*Execution Version*

## EMPLOYMENT AGREEMENT
## OF MARK A. WALDROP

THIS EMPLOYMENT AGREEMENT (as amended and restated herein, this "Agreement") is made and entered into as of the 20 day of June, 2006, and is now amended and restated as of January 1, 2009, by and between Community Health Systems, Inc., a Georgia nonprofit corporation (the "Company"), and the undersigned employee, Mark A. Waldrop, a resident of the State of Tennessee ("Employee").

### WITNESSETH:

WHEREAS, the Company desires to continue to employ Employee and Employee desires to accept such continued employment on the terms and conditions hereinafter stated; and

WHEREAS, Company and Employee now wish to update the Agreement in order to establish its compliance with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), with the understanding that this Agreement supersedes all prior versions and hereinafter shall solely establish the terms of Employee's employment with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1.      Employment. Employee shall serve as the Executive Vice President, Integration Services and shall perform the duties set forth on Exhibit 1 attached hereto, in addition to those duties reasonably assigned to Employee from time to time by the President of the Company or the Board of Directors of the Company. Employee shall be employed on a full-time basis and shall report directly to the President of the Company. Employee shall be subject to the Company's policies and procedures in effect from time to time. Employee shall perform the duties assigned to him faithfully, diligently and to the best of his ability, and Employee shall not engage in any outside employment without the express written consent of the Board of Directors of the Company.

2.      Term of Employment.

2.1     Term. Unless earlier terminated pursuant to Sections 2.2-2.6 below, the initial term of Employee's employment under this Agreement began on January 1, 2006 and shall continue until December 31, 2006 (the "Initial Term"); provided that such Initial Term shall be automatically extended for additional periods of one (1) year commencing on January 1, 2007 and each anniversary thereof (such period or periods, the "Renewal Term"), unless either party shall have given notice to the other party at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term (as the case may be) that such party does not desire to extend the term of this Agreement, in which event, the employment would terminate on December 31 of the Initial Term or the applicable Renewal Term (as the case may be) (the Initial Term and the Renewal Term or Terms, if applicable, collectively, the "Term").

2.2     Termination upon Death. Employee's employment hereunder shall automatically terminate upon the death of Employee. In the event of termination of employment upon death,



PLAINTIFF'S EXHIBIT
14
Wall
PENGAD 800-631-6989
TLANTA:5093463.1

*Execution Version*

the Company shall pay to Employee's estate an amount equal to six (6) months' Salary (as defined below) payable in a lump sum within 60 days of the Employee's death.

2.3     Termination upon Disability.     The Company may terminate Employee's employment hereunder immediately upon Employee's Disability, which has lasted (or can reasonably be expected to last) for a period of six (6) consecutive months (except as prohibited by law). For purposes of this Agreement, "Disability" shall mean the inability of Employee, as determined by the Company's Board of Directors, to perform the essential functions of his regular duties and responsibilities, with or without reasonable accommodation, due to a medically determinable physical or mental illness.

2.4     Termination by the Company for Cause.     The Company may immediately terminate Employee's employment hereunder for Cause upon prior written notice of termination to Employee with such Cause being specified in such notice. As used herein, "Cause" shall mean (i) Employee's act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to the Company or its reputation; (ii) Employee's conviction of, pleading guilty to, or confessing to any felony; or (iii) Employee's failure to observe or perform any material covenant, condition, or provision of this Agreement or of the Company's written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to Employee by the Company.

2.5     Termination by the Company without Cause.

(a)     The Company may terminate Employee's employment hereunder without Cause by giving Employee 30 days' prior written notice thereof.

(b)     In the event of the Company's termination of employment without Cause, as severance pay the Company shall, subject to Section 2.8 below, continue to pay the Salary to Employee for (1) year. Such severance pay shall be payable in equal installments and in accordance with the regularly recurring pay periods established by the Company but in no event less frequently than monthly.

2.6     Termination by Employee.     Employee may terminate Employee's employment hereunder by giving the Company not less than 30 days' prior written notice thereof.

2.7     Effect of Termination of Employment.     Upon termination of employment, all obligations of the Company under this Agreement shall terminate except with respect to (i) payment of compensation earned to the date of termination, (ii) any severance payments required to be paid under Section 2 of this Agreement, (iii) reimbursement of expenses incurred prior to the date of termination of employment to which Employee would have been entitled under this Agreement, and (iv) any unpaid vested amounts or benefits to which Employee would have been entitled as of the date of Employee's date of termination pursuant to any benefit plan. In addition to the foregoing, (a) upon termination of employment pursuant to Section 2.5 and for the duration of the severance period set forth in Section 2.5(b), Employee shall be provided benefits, at no cost to Employee, substantially similar to the employee benefits being provided to Employee at the time of such termination; and (b) upon termination of employment for any other reason, or immediately following the severance period set forth in Section 2.5(b), as applicable,

2

ATLANTA:5093463.1

CONFIDENTIAL

*Execution Version*

Employee shall have the option to purchase continuation coverage as to any Company-provided medical, dental or vision plan in which he participates, such option being in addition to any legally-mandated rights Employee may have to COBRA continuation coverage as to any Company-provided medical, dental or vision plan in which he participates.

    2.8    Code Section 409A Compliance. Notwithstanding anything in this Agreement to the contrary, if any benefit or amount payable to the Employee under Section 2 on account of Employee's termination of employment constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended or successor provision ("409A"), payment of such benefit or amount shall commence only when Employee incurs a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h). Such payments or benefits shall be provided in accordance with the timing provisions of Section 2 by substituting the references to "termination of employment" or "termination" with "separation from service". If at the time Employee incurs a separation from service Employee is a "specified employee" within the meaning of 409A, any benefit or amount payable to the Employee under Section 2 that constitutes nonqualified deferred compensation subject to 409A shall be delayed until the first day of the seventh month following the Employee's separation from service (the "409A Suspension Period"). Within 14 calendar days after the end of the 409A Suspension Period, the Company shall pay to the Employee (or his estate or beneficiary, as applicable) a lump sum payment in cash equal to any payments (without interest) that the Company would otherwise have been required to provide under this Agreement but for the imposition of the 409A Suspension Period. Thereafter, Employee shall receive any remaining payments due under Section 2 in accordance with the terms of Section 2 (as if there had not been any suspension period beforehand). For purposes of this Agreement, each payment that is part of a series of installment payments shall be treated as a separate payment for purposes of 409A.

    3.    Compensation. For all services which Employee renders to the Company during the Term, Employee shall receive from the Company an annual Salary as of January 1, 2009 (the "Salary") of $562,680, less normal withholdings. The Salary shall be paid to Employee on the regularly recurring pay periods established by the Company, but in no event less frequently than monthly. The amount of the Salary shall be reviewed annually by the Board of Directors of the Company for, at the discretion of the Board of Directors of the Company, possible increases in such amount.

    4.    Reimbursement of Business Expenses. The Company shall pay all reasonable and necessary travel and business expenses incurred by Employee directly related to Employee's performance of Employee's responsibilities and duties for the Company under this Agreement. Employee shall submit to the Company statements that justify in reasonable detail all expenses so incurred. Employee shall submit all reimbursements hereunder for a particular calendar year no later than forty-five (45) days after it ends, and payment shall occur not later than March 15 immediately following the end of the calendar year to which the reimbursement relates.

    5.    Benefits.

    5.1    Executive Benefits Program. The Company shall pay insurance premiums on behalf of Employee for health insurance for Employee and his dependents and for disability and life insurance, in such amounts as the Company from time to time may determine.

3

CONFIDENTIAL

CHSI_0018994

*Execution Version*

5.2    Standard Benefits. Employee shall be eligible to participate in any 401(k) plan in which the employees of the Company participate. Employee shall also be entitled to participate in any other employee benefit plans and programs, to the same extent generally available to other similarly situated Company executives, in accordance with the terms of those plans and programs.

5.3    Short Term Disability Payments.

(a)    Irrespective of whether the Company purchases or maintains any disability insurance for Employee, should Employee become Disabled, then the Company shall provide to Employee short-term disability payments, as set forth in this Section 5.3. During the first 180 days of a Disability, the Company will continue to pay to Employee his Salary commencing on the 6th day of such Disability. During the first 5 days of such Disability, Employee must take sick days, vacation days or paid leave time to which he is entitled. If Employee is not entitled to any more sick days, vacation days or paid leave time, then during the first 5 days of such Disability, Employee must take unpaid leave. During the time period where Employee receives short-term disability benefit payments pursuant to this Section 5.3, Employee shall continue to be covered by all of the benefits and other provisions of the executive benefits program, if applicable, generally described above.

(b)    All such short-term disability benefit payments shall be made monthly on the appropriate regularly recurring pay periods established by the Company. The short-term disability benefit payable from the Company shall be reduced by short-term disability benefit payments to Employee by insurance companies for which the premium is payable by the Company.

5.4    Executive Leave Policy. During the Term, Employee shall be entitled to certain paid time off, as more fully described in the Company's Executive Leave Policy, a copy of which is attached hereto as Exhibit 5.4.

6.    Restrictive Covenants.

6.1    Definitions.

(a)    "Business" shall mean: (a) the provision of rehabilitative therapy, medical and personal support services, home care, medical or pharmaceutical supplies or case management services; (b) the leasing, ownership, management or operation of nursing facilities or assisted living facilities ("assisted living facilities" being known under Section 31-712 of the Official Code of Georgia Annotated as "personal care homes"); (c) the operation and management of a health care cooperative; (d) the operation and management of one or more captive insurance companies; and (e) other activities or provision of products or services being conducted or provided, as applicable, or which the Company has active plans to pursue, at the time of termination of Employee's employment.

(b)    "Competing Business" shall mean any person or entity which engages in a business substantially the same as the Business or any portion thereof.

4

ATLANTA:5093463.1

CHSI_0018995

(c)     "Confidential Information" shall mean any data or information, other than Trade Secrets, that is valuable to the Company, any other member of the System or their respective affiliates and is not generally known by the public.  To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, lists (whether or not in writing) of the Company's, any other member of the System's or their respective affiliates' current or potential customers, lists of and other information about the Company's, any other member of the System's or their respective affiliates' officers and employees, financial information (whether or not in writing) that has not been released to the public by the Company, any other member of the System or their respective affiliates, marketing techniques, price lists, pricing policies, and the Company's, any other member of the System's or their respective affiliates' business methods, contracts and contractual relations with the Company's, any other member of the System's or their respective affiliates' customers and suppliers and future business plans.  Confidential Information also includes any information or data described above which the Company, any other member of the System or their respective affiliates obtain from another party and which the Company, any other member of the System or their respective affiliates treat as proprietary or designate as confidential information whether or not owned or developed by the Company, any other member of the System or their respective affiliates.  "Confidential Information" shall not include any materials or information of the types specified above to the extent that such materials or information (i) are or become publicly known or generally utilized by others engaged in the same business or activities in which the Company, any other member of the System or their respective affiliates utilized, developed, or otherwise acquired such information; or (ii) are known to Employee prior to employment, having been lawfully received from parties other than the Company, any other member of the System or their respective affiliates; or (iii) are furnished to others by the Company, any other member of the System or their respective affiliates with no restriction on disclosure.  Failure to mark any Confidential Information as confidential shall not affect its status as "Confidential Information" under this Agreement.

(d)     "Restricted Customer" shall mean any customer or client of the Company or its affiliates with whom Employee has had business contact during his employment with the Company.

(e)     "Trade Secrets" shall mean any information of the Company, any other member of the System or their respective affiliates, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product or service plans, or a list of actual or potential patients or suppliers, which is not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Trade Secrets also include any information described in this Section 6.1(e) which the Company or other members of the System or their affiliates obtain from another party which the Company or other members of the System or their affiliates treat as proprietary or designate as trade secrets, whether or not owned or developed by the Company, any other member of the System or their respective affiliates.  Failure to mark any Trade Secrets as confidential shall not affect its status as a Trade Secret under this Agreement.

5

CONFIDENTIAL

CHSI_0018996

*Execution Version*

(f)     "Territory" shall mean the State of Georgia.

6.2     <u>Nondisclosure of Trade Secrets and Confidential Information</u>.  In the course of Employee's employment by the Company, Employee will have access to the Company's, other members of the System's or their respective affiliates' most sensitive and most valuable Trade Secrets and Confidential Information, the use, application or disclosure of any of which would cause substantial and possibly irreparable damage to the business and asset value of the Company, other members of the System or their respective affiliates.  Accordingly, Employee accepts and agrees to be bound by the following provisions:

(a)     During the Term and following the termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose, or permit any unauthorized person or entity access to, any Trade Secrets or any portion thereof so long as they remain Trade Secrets.

(b)     During the Term and for a period of two (2) years following termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by the Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose or permit any unauthorized person or entity access to, any Confidential Information or any portion thereof.

(c)     Without limiting the foregoing, Employee shall abide by the Company's policies and regulations, as established from time to time, for the protection of its Trade Secrets and Confidential Information.  Notwithstanding anything herein to the contrary, Employee shall be permitted to disclose Trade Secrets or Confidential Information if required by applicable law, provided that, in such case, Employee shall (i) furnish only that portion of the Confidential Information or Trade Secrets that he is advised by counsel is legally required to be disclosed, and (ii) provide the Company with prompt written notice of such request or requirement so that the Company may seek a protective order or other appropriate remedy.

(d)     Upon the request of the Company and in any event upon the termination of employment with the Company, Employee shall deliver to the Company all memoranda, notes, records, tapes, documentation, disks, manuals, files or other documents, and all copies thereof in any form, concerning or containing Confidential Information, Trade Secrets or Works (as defined below) that are in Employee's possession, whether made or compiled by Employee, furnished to Employee or otherwise obtained by Employee.

6.3     <u>Nonsolicitation of Customers and Employees</u>. Employee covenants and agrees that during the Term and for a period of eighteen (18) months thereafter, Employee shall not, directly or indirectly (whether on his own behalf or on behalf of any other person, as owner, partner, stockholder, investor, employee, officer, director, agent, independent contractor, associate, executive, consultant or licensor):

6

ATLANTA:5093463.1

CONFIDENTIAL

CHSI_0018997

*Execution Version*

(a)      (A) solicit, recruit, divert or take away or attempt to solicit, recruit, divert or take away any person that is an employee of the Company, any other member of the System or their respective affiliates and with whom Employee had personal contact during his employment under this Agreement, (B) encourage any person or entity (other than the Company, any other member of the System or their respective affiliates) to solicit, recruit, divert or take away any such employee or (C) otherwise encourage any such employee to discontinue his or her employment with the Company, any other member of the System or their respective affiliates; or

(b)      solicit, recruit, divert or take away a Restricted Customer for the purpose of directly or indirectly providing, distributing or selling products or services similar to those provided, distributed or sold in the operation of the Business.

Nothing herein shall prohibit Employee (following the termination of this Agreement) from conducting solicitations of the general public for employment or for business not targeted specifically at Restricted Customers or employees of the Company or its affiliates.

6.4      Noncompetition Covenant. Except as set forth on Exhibit 6.4 attached hereto, Employee further covenants and agrees that, during the Term and for a period of twenty four (24) months thereafter, he shall not, without the Company's prior written consent, serve as an operations manager, an executive vice president of integration services or in any other position requiring Employee to perform some or all of the duties that Employee was performing for the Company at the time this Agreement is terminated in the Territory for any Competing Business.

6.5      Ownership of Common Stock. Notwithstanding anything in this Section 6 to the contrary, nothing contained herein shall prohibit Employee from owning not more than three percent (3%) of the common stock of any company whose common stock is publicly traded on a national securities exchange or in the over-the-counter market.

7.      Company Ownership of Works.

7.1      Definition of Works. "Works" shall mean any and all works of authorship, code, inventions, improvements, discoveries, trademarks, technologies, and work product, whether or not patentable or eligible for copyright, trade secret or trademark protection, and in whatever form or medium and all derivative works thereof, and any and all rights, applications or registrations with respect thereto which are, have been or will be created, made, or developed by Employee: (a) in the course of employment with the Company, (b) during Employee's regular business hours with the Company, (c) on the Company's premises, or (d) using the Company's resources or equipment. Employee agrees to fully and promptly disclose in writing to the Company any such Works as such Works from time to time may arise.

7.2      Company Ownership of Works. All Works are the property of the Company. Employee shall execute and deliver such confirmatory assignments, instruments, or documents as the Company deems necessary or desirable without requiring the Company to provide any further consideration therefor. Employee agrees to and hereby does assign to the Company all right, title, and interest in and to any and all Works, including all worldwide copyrights, patent rights, trademark rights, and all trade secrets embodied therein. Employee waives any and all rights Employee may have in any Works, including but not limited to the right to

ATLANTA:5093463.1

CONFIDENTIAL

CHSI_0018998

*Execution Version*

acknowledgement as author. Employee agrees not to use or include in Works any copyrighted, restricted or protected code, specifications, concepts, trademarks, or trade secrets of any third party or any other information that Employee would be prohibited from using by any law or any confidentiality, non-disclosure or other agreement with any third party.

7.3     Further Assurances. Employee shall, without charge to the Company other than reimbursement of Employee's reasonable out-of-pocket expenses, execute and deliver all such further documents, including applications for patents, trademarks and copyrights, and perform such acts, at any time during or after the Term as may be necessary, to obtain patents, trademarks, or copyrights, or any other legal protection in respect of the Works and to vest title such Works in the Company, its successors, assigns, or designees.   Without limiting the generality of the foregoing, Employee further agrees to give all lawful testimony, during or after the Term, which may be required in connection with any proceedings involving any Works so assigned by Employee.

8.     No Conflicting Obligations to Third Parties.

Employee represents and warrants to the Company that Employee is not subject to any employment, non-disclosure, confidentiality, non-compete, or other agreement with any third party which would prevent or prohibit Employee from fulfilling Employee's duties for the Company.   If Employee is the subject of any such agreement, and has any doubt as to its applicability to Employee's position with the Company, Employee will provide a copy of such agreement to the Company so that the Company can make a determination as to its effect on Employee's ability to work for the Company.

9.     Remedies.

The restrictions contained in this Agreement are considered by the parties hereto to be fair and reasonable and necessary for the protection of the legitimate business interests of the Company.   It is recognized that damages in the event of breach of the provisions of this Agreement by Employee would be difficult, if not impossible, to ascertain, and it is therefore agreed that the Company, in addition to and without limiting any other remedy or right it may have, shall have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach. The existence of this right shall not preclude any other rights and remedies at law or in equity which the Company may have.

10.     Notices.

Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally (including by facsimile, overnight courier or express mail service) or sent by registered or certified mail, postage or fees prepaid,

Company:

       Community Health Systems, Inc.
       213 Third Street
       Macon, Georgia 31201

ATLANTA:5093463.1

CONFIDENTIAL

CHSI_0018999

*Execution Version*

Attention: Joseph A. Wall
Fax: (478) 743-4501

With a copy (which shall not constitute notice) to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia  30308
Attention:  Mark S. Lange
Fax:  (404) 815-2433

Employee:     Mark A. Waldrop
9686 Bowen Trail
Ooltewah, TN 37363
Fax: _____

or at such other address for a party as shall be specified by like notice. Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or the office of such party. Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth business day after the day it is so placed in the mail or, if earlier, the time of actual receipt.

11.    Binding Agreement.

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. This Agreement is a personal service agreement and may not be assigned in whole or in part by Employee without the prior written consent of the Company. The covenants of Employee contained in Section 7 shall be binding upon the heirs, beneficiaries, administrators, and executors of Employee.

12.    Modifications and Amendments. This Agreement shall not be modified or amended except by an instrument signed by both parties, which makes specific reference to this Agreement.

13.    Waiver. The failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or of any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver.

14.    Severability. If any provision or covenant, or any part thereof, of this Agreement should be held by any court to be invalid, illegal or unenforceable, either in whole or in part, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remaining provisions or covenants, or any part thereof, of this Agreement, all of which shall remain in full force and effect.

9

ATLANTA:5093463.1

CONFIDENTIAL

CHSI  0019000

*Execution Version*

15.    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all which together shall constitute one and the same instrument.

16.    Governing Law; Jurisdiction.

This Agreement and the rights and obligations of the parties to the Agreement will be determined in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.  The Company and Employee irrevocably consent to the exclusive jurisdiction and venue of the courts of any county in the State of Georgia and the district courts of Georgia, in any judicial proceeding brought to enforce this Agreement.  The parties agree that any forum other than the State of Georgia is an inconvenient forum and that a lawsuit (or non-compulsory counterclaim) brought by one party against another party in a court of any jurisdiction other than the State of Georgia should be forthwith dismissed or transferred to a court located in the State of Georgia.

17.    Attorney's Fees.

If either party to this Agreement breaches any terms hereof, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

18.    Interpretation.

This Agreement (including the Exhibits attached hereto) constitutes the complete understanding between the parties concerning the subject matter hereof, and all prior negotiations, representations and agreements having been merged into this Agreement.

*(Signatures on following page)*

10

ATLANTA:5093463.1

CONFIDENTIAL

CHSI 0019001

*Execution Version*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth hereinabove.

"Company"

COMMUNITY HEALTH SYSTEMS, INC.

By: _____
Name: Ronnie D. Rollins
Title:   President

"Employee":

_____
Mark A. Waldrop

11

ATLANTA:5093463.1

CONFIDENTIAL

CHSI  0019002

*Execution Version*

## EXHIBIT 1

Duties of Employee

**Overall Responsibility/Primary Objective/Summary:**  Manage the overall operations of each individual operating company to ensure the consistent application of Company policies (financial, business practices and people), operating philosophies, values and principles.  Work with the Business Unit Presidents to develop and implement plans for the successful integration of services to customers, systems, processes and people to accomplish the goals of the Company.

### Summary of Major Responsibilities

**Board of Directors**
- Serve as Ex-Officio member of the Board of Directors' Systems Integration and Support Committee
- Coordinate documentation and presentations necessary for the Board of Directors

**Executive Committee and Steering Committee**
- Serve on Executive Committee and Steering Committee
- Assist all Steering Committee members in the coordination of all operating matters

**Financial Management**
- Work with the Executive Committee to review budgets and business goals and manage the business units to meet these goals
- Approve all contracts between business units and its clients

**Integration**
- Collaborate with Business Unit Presidents to launch cross Business Unit Initiatives that improve service to customers, revenue, compliance with regulation, efficiency/effectiveness, etc.
- Develop initiatives that encourage collaboration across business unit senior management and staff lines
- Bridge cultural and communications gaps across Business Units and work with Executive staff to mobilize joint teams as necessary

**Patient Centered Care**
- Establish partnerships among practitioners, aging/disabled customers and their families to ensure that decisions respect a customer's wants, needs and preferences
- Ensure that customers have the education and support needed to make decisions and participate in their own healthcare
- Enable transition to preventative healthcare, chronic care and care management in home and community based settings

**Human Resources Management**

ATLANTA:5093463.1

CONFIDENTIAL

CHSI_0019003

*Execution Version*

- Directly and indirectly manage direct reports including the President, Ethica Health & Retirement Community; President, Health Distribution; President, Pharmacy Services; President, Integra Rehabilitation; President, Home & Community Services; Vice President, Human Resources; Director, Information Services; and Director of Project Management
- Establish goals for direct reports and ensure direct reports have goals established for their employees that correspond. Manage performance toward achieving these goals
- Constantly evaluate the skill sets versus requirements of direct reports and make adjustments accordingly
- Provide leadership direction to the organization to ensure direct reports are optimally utilized
- Work with the VP, Human Resources, to review Human Resources initiatives and financial models to meet the needs of the organization

**Essential Job Functions:**

- Provide day-to-day leadership to the System that mirrors the mission, vision, and values of the organization
- Orchestrate transfer of best practice between Business Units
- Help identify and implement critical business and clinical synergies across the day-to-day operations of the System
- Monitor progress against the goals of the System and individual Business Units
- Analyze industry trends and look for business and revenue enhancement opportunities
- Monitor the operating and capital budget for each business unit in ways that direct effective forecasting and control of costs
- Work with Business Unit Presidents and Corporate leadership to redesign key processes and standardize policies and procedures
- Work with Business Unit Presidents to assure timely provision of skilled nursing, home and community based services in the most appropriate setting
- Participate in multiple state and national professional associations
- Perform other tasks as assigned by the President

ATLANTA:5093463.1

CONFIDENTIAL

*Execution Version*

## EXHIBIT 5.4

Executive Leave Policy

*See attached.*

ATLANTA:5093463.1

CONFIDENTIAL

CHSI_0019005

*Execution Version*

# EXECUTIVE
# LEAVE
# POLICY

## May 2006

### Executive Leave

The organization provides its eligible executives with an Executive Leave Policy that is designed to allow executives greater flexibility in planning their lives. Under the Executive Leave Policy, executives may use their leave days for vacation, sick leave, medical appointments, family illness or any leave of absence.

Executives are eligible immediately upon employment and leave may be taken any time during employment, with supervisory approval. Executives will receive their leave days at the beginning of each anniversary year and will be based on the number of continuous years of service on the executive's previous anniversary year. Leave days do not carry over to future years, and cannot be borrowed from future unearned leave.

The organization recognizes the importance of an executive taking time off from work to rest and relax and accordingly provides leave days as follows:

### Leave Days Available:

- Year One (1) thru Year Five (5)            20 days
- Year Six (6) thru Year Ten (10)            25 days
- After Tenth (10) Year and Beyond           30 days

All requests for Executive Leave must be in writing and approved by the President. In order to balance and meet organization needs, executives should provide appropriate notice when anticipating taking time off. Requested leave will be approved taking into account organization needs and other associates' leave requests.

ATLANTA:5093463.1

CONFIDENTIAL

*Execution Version*

ATLANTA:5093463.1

CONFIDENTIAL

CHSI_0019007

## EXHIBIT 6.4

1.      Section 6.4 of this Agreement shall not prohibit Employee from the continued ownership, operation or use of any real or personal property owned by Employee at the time of termination of Employee's employment hereunder.

2.      In the event that Employee's employment is terminated by the Company without Cause under Section 2.5 of this Agreement, then Section 6.4 of this Agreement shall automatically terminate.

ATLANTA:5093463.1

## Amended and Restated Employment Agreement
### of Mark A. Waldrop

2.4     Termination by the Company for Cause.   The Company may immediately terminate Employee's employment hereunder for Cause upon prior written notice of termination to Employee with such Cause being specified in such notice. As used herein, "Cause" shall mean (i) Employee's act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to the Company or its reputation; (ii) Employee's conviction of, pleading guilty to, or confessing to any felony; or (iii) Employee's failure to observe or perform any material covenant, condition, or provision of this Agreement or of the Company's written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to Employee by the Company.

#46901047_v1

CONFIDENTIAL

Proof of:
Expense reports
Cap ex not budgeted
create an officer position w/o board approval


Section 6.3    take away employees



CONFIDENTIAL

CHSI_0019013

<div align="center">

**MINUTES**
*of*
**A REGULAR MEETING**
*of*
**THE BOARD OF DIRECTORS**
*of*
**COMMUNITY HEALTH SYSTEMS, INC.**

*held on Tuesday, June 21, 2016*

</div>

A regular meeting of the board of directors (the "Board") of Community Health Systems, Inc., a Georgia nonprofit corporation (the "Corporation"), was held on Tuesday, June 21, 2016, at the offices of the Corporation located at 213 Third Street, Macon, Georgia 31201.

The following individuals participated in the meeting in accordance with those certain Amended and Restated Bylaws of the Corporation, dated as of July 1, 2008 (the "Bylaws"):

> Joseph A. Wall
> Paul A. Cable
> James B. Patton
> Herbert M. Ponder, Jr.
> Kathryn H. Dennis
> T. Randolph Coody
> Ronnie D. Rollins

Also participating in the meeting at the invitation of the Board were (i) Lorraine T. Taylor, Chief Financial Officer and Secretary of the Corporation and (ii) Teresa W. Moody, Vice President of the Corporation. All participants could hear and be heard by one another throughout the meeting.

Mr. Wall called the meeting to order at approximately 8:00 A.M., after noting that a quorum was present. As the first order of business, Mr. Wall asked the other Board members if they had reviewed the minutes for the regular meeting held on March 22, 2016, and if they had any questions or comments. There being no questions or comments, upon motion then duly made by Mr. Patton and seconded by Ms. Dennis, the minutes of March 22, 2016 were unanimously approved.

Next, Mr. Wall asked Ms. Taylor to present the financial reports for the nine-month period ended March 31, 2016. Ms. Taylor began the financial report with a review of cash on hand, trade receivables and investment activity. She noted that the performance of the Corporation's investment accounts was unfavorable as compared to the Operating Plan.

Next, Mr. Wall asked Ms. Taylor to present the "draft" FY 2017 Operating Plans (the "Plans"). Ms. Taylor asked the Board members if they had reviewed the Plans that were provided to them prior to the meeting. After confirming that everyone had reviewed the Plans, Ms. Taylor led the Board members in a lengthy discussion regarding the assumptions that were used to prepare the "Plans". Following the discussion, Ms. Taylor informed the Board members that Consent Resolutions would be circulated to obtain approval of the Plans.

<div align="center">1</div>



CONFIDENTIAL

Next Mr. Wall asked Mr. Ponder to present the Audit Committee report. Mr. Ponder reported that the Audit Committee met on April 19, 2016, at which time J. Randolph Nichols, Partner, McNair, McLemore, Middlebrooks & Co., LLP, outside auditors of the Corporation, presented draft June 30, 2015 IRS Forms 990. Mr. Ponder also reported that Mr. Nichols reviewed the most recent organizational chart for the Corporation along with audit engagement letters and agreed upon procedures letters for the year ending June 30, 2016.

Next, Mr. Wall asked Mr. Cable to present the Compensation Committee report. Mr. Cable reported that the Compensation Committee met on April 19, 2016, at which time a 2016 Executive Compensation Study (the Study") was discussed.  Mr. Cable informed the Board that Buck Consultants would be engaged to conduct the Study later in 2016.

Next, Mr. Wall asked Mr. Patton to present the Investment Committee report. Mr. Patton reported that the Investment Committee met on April 19, 2016, at which time the Consent Resolution authorizing the Corporation to obtain a $3,750,000 line of credit from Morris Bank was reviewed and approved.  Mr. Patton also reported that a representative from The Benefit Company met with the Committee to provide an update on the Corporation's health benefit plan.  He also informed the Board that representatives from Alliance Bernstein met with the Committee to review and discuss the Corporation's investment portfolio.

Next, Mr. Wall informed the Board members that the Governance Committee report would be presented during an Executive Session to be held immediately following Mr. Rollins' management report.

Mr. Wall then asked Mr. Rollins to present the management report.  Mr. Rollins' management report included a lengthy discussion regarding the proposed acquisition of Greene Point Health and Rehabilitation and the potential lease of the former Goodwill Nursing Center.

There being no further questions or discussion by the Board, Mr. Wall and Mr. Rollins thanked all of the members of the Board and the other meeting participants for their attendance. Upon motion then duly made by Mr. Patton and seconded by Ms. Dennis, the Board members went into Executive Session.

Respectfully submitted,

*Lorraine T. Taylor*

Lorraine T. Taylor, Corporate Secretary
Community Health Systems, Inc.

2

CHSI_0004401

Proposed Talking Points for Meeting with Mark A. Waldrop
and Joe Wall, Chairman of the Board
of Directors of Community Health Systems, Inc.
at the law offices of Holland & Knight LLP
on Tuesday, June 28, 2016
at 3:30 p.m.

\* Joe Wall would be the primary speaker

**Opening Statements to make to Mark Waldrop**

1.      As you know, you and I met in my office on Tuesday, May 17, 2016 to discuss your concerns about your working relationship with Ronnie Rollins, the President and CEO of Community Health Systems, Inc., doing business as Community Health Services of Georgia ("CHS").

2.      At our meeting on May 17, 2016, you made certain specific allegations against Mr. Rollins, including that he sent you an email on May 12, 2016 at 5:59 p.m. that was "full of lies" and that you thought that Mr. Rollins was "targeting" you (meaning that you thought that he was somehow taking actions to build a factual basis for ultimately seeking to terminate you from your position as Chief Operating Officer of CHS).

3.      From and after our meeting on May 17, 2016, as Chairman of the Board of Directors of CHS, I have discussed these matters with Mr. Rollins, and on behalf of the CHS Board of Directors, I engaged Mark Lange at the law firm of Holland & Knight LLP to conduct a limited internal investigation into the accusations that you have made against Mr. Rollins.

4.      To that end, Mr. Lange has interviewed certain persons, and also interviewed you on the afternoon of June 8, 2016 at his Atlanta law office.



CONFIDENTIAL

CHSI 0018928

5.      He has also reviewed certain documents and collected certain other information on behalf of the CHS Board of Directors as part of his internal investigation.

6.      This information has been presented to the full Board of Directors of CHS at which the full Board fully and fairly considered these matters.

7.      In connection with this matter, the Board of Directors has also reviewed your Employment Agreement with Community Health Systems, Inc. entered into on June 20, 2006 and amended and restated as of January 1, 2009 (the "Employment Agreement").

8.      In connection with its review of these matters, the full Board of Directors has reached the following conclusions.

### Board Conclusions

1.      You should also be aware that the Board has concluded that there is absolutely no factual basis whatsoever for any of your accusations against Mr. Rollins.

2.      The Board believes, based on the Board's review of various types of information and on the advice of counsel, that there is sufficient basis for CHS to immediately terminate your employment "for Cause" pursuant to your Employment Agreement. ( [ Redacted ] [ Redacted ] )

3.      Consistent with the Board's belief, the Board has directed that you should be relieved of your duties as an officer of CHS effective immediately today.  Notwithstanding the Board's direction that your employment be effectively ended today, in recognition of your over 25 years of service to this organization, the Board is willing to offer to you a separation arrangement

2

#46922801_v2

CONFIDENTIAL

CHSI 0018929

designed to avoid written acknowledgement of a "for Cause" termination under your Employment Agreement.

4.     We plan to send to you a draft separation agreement in the next few days for your review. We encourage you to seek counsel to assist you in your review. Nevertheless, if you do not seek counsel, we will try to answer your questions about the proposal. If you hire counsel, we will be happy to have our counsel work directly with your counsel on the separation agreement if that is your preference.

5.     You will not be permitted to re-enter your office in Dalton, although we will be happy to arrange for someone from CHS to accompany you to that office for the purpose of collecting your personal items from that office.

6.     Whatever CHS owes you as of today including PTO, etc., you will be paid, but you will not be receiving a salary amount as of July 1, 2016 because your employment is being terminated today.

**Proposed Severance Arrangement**

1.     **Resignation**. You will voluntarily resign as Chief Operating Officer as set forth in the separation agreement.

2.     **PTO Pay-Out**. Taking into account your time off last week, and subject to further confirmation, as of yesterday, June 27, 2016, we believe that you were owed 18 days of Paid Time Off (PTO) and that the value of this PTO is $72,392.20. This amount would be paid to you upon the effective date of your Separation Agreement.

#46922801_v2

CONFIDENTIAL

CHSI  0018930

3.      **Severance Amount**.  Your gross monthly salary is $87,138.76 per month.  CHS would be willing to pay you two (2) months' severance equal to $174,277.52.  This would be paid to you in five (5) equal monthly payments (after applicable employment and income tax withholding) of $34,855.50 for the five (5) months of July, 2016 through November, 2016 to be paid on the last day of each month starting with July 31, 2016.  These severance amounts would be paid through the CHS payroll system.

4.      **Retention of June Salary**.  You would be permitted to retain your June salary amount, but would not receive your normal July 1, 2016 salary amount.

5.      **Two (2) Year Non-Compete Restriction**.  For the 2-year period following termination of your employment, you would have a non-compete restriction for the territory of the entire State of Georgia.

6.      **Two (2) Year Non-Solicit Restriction**.  For the 2-year period following termination of your employment, you would be restricted from soliciting existing employees at CHS or any of its affiliated entities.

7.      **Confidentiality Agreement**.  You would be subject to a permanent agreement not to disclose to any third person (except as required to as part of a legal proceeding or upon a subpoena to testify) the existence or terms of your Separation Agreement or any other confidential information, data, trade secrets or other protected information concerning CHS and any of its affiliates.

8.      **Non-Disparagement**.  Both CHS and you would both agree not to make any disparaging comments about the other party.

#46922801_v2

CONFIDENTIAL

CHSI  0018931

9.     **Full Release by Mr. Waldrop**.  You would release any potential claims of any kind that you may believe you have against CHS and any of its affiliates. ✗ ( **Redacted**

**Redacted**

10.     **Other Standard Provisions**.  The Separation Agreement would also contain other typical provisions.  This would include offering you COBRA coverage on your health insurance benefits.

### While You Consider this Proposal

1.     The Board believes that it is the best interests of CHS to conclude these matters as soon as reasonably possible.

2.     Please note that during this period of completion of the separation agreement, it is critical that you not discuss these matters with anyone inside or outside the CHS organization (other than your legal counsel, if any), in order for this process to be accomplished and for you to receive any severance benefits.

3.     In particular, this applies to your direct reports and your assistant.  Please be aware that separate discussions will be had with your personal assistant, Stephanie Dotson concerning her employment relationship with CHS.

4.     The Board would also appreciate your cooperation with any specific requests from Mr. Rollins or Ms. Lorraine Taylor or others at CHS.

5

#46922801_v2

CHSi_0018932

## Redacted

# Redacted

We are happy to discuss more at your convenience.

6

#46922801_v2

CONFIDENTIAL

CHSI_0018933

**Proposed Talking Points for Meeting with Ms. Stephanie Dotson**
**at the offices of Community Health Services of Georgia,**
**1013 Riverburch Parkway, Suite One, Dalton, Georgia 30721**
**on Tuesday, June 28, 2016**
**at 3:30 p.m.**

\* Jimmy Patton would be the primary speaker

**Proposed Statements to make to Ms. Stephanie Dotson**

1.    Jimmy Patton says:   While I am here as a member of the board of directors of Community Health Systems, Inc., doing business as Community Health Services of Georgia ("CHS"), I am here to convey to you certain decisions that have been made by senior management of CHS.

2.    You should be aware that management of CHS has determined that this office of CHS be closed today.

3.    It is not apparent that there is any other position within the CHS organization that is currently available that management believes that you will be able to apply for or fill.

4.    Management is investigating various matters, some of which may relate to you.

5.    It is critical that you cooperate with any CHS personnel that requests information from you.

6.    More importantly, it is critical that you not discuss these matters with anyone inside or outside the CHS organization or destroy any CHS records or information that you have in your possession.

#46960878_v3

CONFIDENTIAL

CHSI 0018934

7.    Do you have any or are you aware of any **property** or **records** of CHS located anywhere other than 1013 Riverburch Parkway; Dalton Georgia?

    a.  Computers? Cell phones? Ipads? Paper records? Electronic records?

    b.  At your personal residence? At a storage building? In Tennessee?

8.  Do you know the password or have access to the password for any other associate of CHS?

9.  Have you been asked to perform, participate in or observe any act that you considered might be improper?

10. Have you received any personal financial benefit or other personal benefit outside your compensation from CHS?

11. Did you sign a contract on behalf of Integra Rehabilitation with Dwight Scott Masonry in the amount of $13,658.41 on April 14, 2014? Who authorized you?

12.    Is there anything you want to tell me on behalf of the Board of Directors today before the Board completes its investigation?

---

2

#46960878_v3

CONFIDENTIAL

CHSI 0018935

**Ronnie Rollins**

| | |
|---|---|
| From: | Ronnie Rollins |
| Sent: | Tuesday, June 28, 2016 4:12 PM |
| To: | Charles Briscoe; Diana Wilks; Michelle Andrews; Robin Leake; Blair Lake; Chris Johnson; Lynne King; Steve King; Lucy Rogers |
| Cc: | Ronnie Rollins; Lorraine Taylor; Joseph A. Wall (jaw@meadorswall.com) |
| Subject: | Memo from the Chairman |
| Attachments: | Joe Wall Memo_6.28.16.docx |

Good afternoon,

Attached is an important memo from Joe Wall, the Chairman of the Board of Directors of Community Health Services of Georgia.  Please read and feel free to call if you have any questions.

Thank you for your service."

*Ronnie Rollins*
*President*

***Community Health Services of Georgia***
P.O. Box 1037
Macon, GA 31202



1

CONFIDENTIAL

CHSI_0006170

**Memorandum**

June 28, 2016

To:   Charles Briscoe
      Diana Wilks
      Michelle Andrews
      Robin Leake
      Blair Lake
      Chris Johnson
      Lynne King
      Steve King
      Lucy Rogers

From:  Joe Wall; Chairman, Board of Directors

Good afternoon to each of you.  First, I want to thank each of you for your efforts on behalf of Community Health Services of Georgia to enhance the quality of life for those we serve. The purpose of this memorandum is to share certain information regarding actions taken by the Board of Directors today. These are serious matters and I ask that each of you respect the serious nature of them and maintain this information in confidence until I can speak with you.

Effective today, June 28, 2016, Mark Waldrop is no longer serving as COO of CHSGA and the Dalton office has been closed.

Ronnie Rollins will assume system support for Diana Wilks, Michelle Andrews, Robin Leake, Charles Briscoe, Lynne King and Steve King.

Lorraine Taylor will assume system support for Blair Lake, Chris Johnson and Lucy Rogers.

Ronnie and Lorraine will contact you directly to discuss any specific questions you may have regarding your day-to-day responsibilities. I will be scheduling meetings with each of you in the near future to further address this Board action.

Please be reminded of the seriousness of this action taken by the Board and maintain confidentiality as requested above.  Also understand that the Board of Directors is committed to supporting each of you in the performance of your work in service to our associates and customers. In addition, in the spirit of good governance and transparency, we will share with you the results of our work and provide guidance for future activities of the organization at a meeting after the July 4th holiday.

Thank you again for your service to our health system and commitment to those we serve.

cc:   Ronnie Rollins
      Lorraine Taylor

CONFIDENTIAL

CHSI_0018936

**CERTIFIED MAIL®**

Mark Waldrop
9686 Bowen Trail
Ooltewah, TN 37363





U.S. POSTAGE
PAID
CHATTANOOGA, TN
37421
JUL 01, 15
AMOUNT
**$6.47**
R2303S101936-06

9414 7266 9904 2023 8097 40
1000
31201
RETURN RECEIPT REQUESTED

Mr. Joseph A. Wall
Community Health Systems, Inc.
213 Third Street
Macon, Georgia 31201

3120183308 C062



PENGAD 800-631-6989

EXHIBIT

CONFIDENTIAL

Mark Waldrop
9686 Bowen Trail
Ooltewah, TN  37363


July 1, 2016

Community Health Systems, Inc.
213 Third Street
Macon, Georgia 31201
Attention: Joseph A. Wall

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia 30308
Attention: Mark S. Lange


<u>VIA CERTIFIED MAIL</u>

In Re:   **Employment Agreement of Mark A Waldrop**
         **Amended and restated as of January 1, 2009**

Gentlemen:

I'm writing to follow up on our meeting in the offices of attorney Mark S. Lange on Tuesday, June 28, 2016.

During that meeting you advised me that my employment was immediately terminated, and requested that I not return to my office in Dalton, Georgia.  You also informed me that the Dalton, Georgia office was being closed.

As of this date I have not been provided information regarding the reason for my termination.

This letter is to advise you that I stand ready, willing and able to perform my services under and in accordance with my Employment Agreement.  Additionally, I am not aware of any reason which gives the right to the Company to terminate my employment for cause.  If you believe that there is such cause, then I request that you advise me of the same, and that I be given the opportunity to remedy the same in accordance with Paragraph 2.4 of my Employment Agreement.  I stand willing, able and ready to continue to provide services in accordance with my Employment Agreement, and to make all reasonable efforts to address and remedy any issues relating to my employment, including but not limited to the remedy as provided under Paragraph 2.4.

CONFIDENTIAL



Mark Waldrop
July 1, 2016
Page 2

Since there is no cause for the termination of my employment, or if you believe there is cause and do not give me the opportunity to remedy the same in accordance with the terms of my Employment Agreement, then I will expect to be paid severance pay by the continuance of my annual salary of $1,045,665.17 for a period of one year in accordance with paragraph 2.5 (b) of my Employment Agreement.

In the event the Company does not meet its obligations to me under the Employment Agreement, I will also expect the Company to pay any attorney's fees, costs and expenses incurred by me in enforcing my rights under the Agreement and in responding to the Company's defaults under the Agreement.

Sincerely Yours,

Mark A. Waldrop

cc:    Mark S. Lange
       Holland and Knight
       1180 West Peachtree Street
       Suite 1800 Northwest
       Atlanta, GA  30309
       (via e-mail)

CONFIDENTIAL

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Joshua I. Bosin
404.817.8558
joshua.bosin@hklaw.com

July 6, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mark A. Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

> *Re:   Community Health Systems, Inc. and Mark A. Waldrop*

Dear Mr. Waldrop:

The law firm of Holland & Knight LLP and the undersigned in particular represent Community Health Systems, Inc. ("CHSI") in connection with the above-referenced matter.

We are in receipt of your July 1, 2016 correspondence addressed to Joseph A. Wall, the Chair of CHSI's Board of Directors, and my law partner, Mark S. Lange, Esq.

Although CHSI terminated your employment effective immediately on June 28, 2016, the company would like to provide you with certain separation benefits in recognition of your many years of service to CHSI.  Accordingly, please find enclosed a Separation Agreement, General Release, Waiver & Confidentiality Agreement memorializing the terms of CHSI's separation offer to you as discussed during your recent meeting with Messrs. Wall and Lange.  I look forward to hearing from you upon your receipt and review of the same.

Should you have any additional questions in the interim, please contact me at your convenience.

Very truly yours,

HOLLAND & KNIGHT LLP

Joshua I. Bosin

> EXHIBIT
> 20

Enclosure

cc:    Joseph A. Wall
       Mark S. Lange, Esq.

## SEPARATION AGREEMENT, GENERAL RELEASE,
## WAIVER & CONFIDENTIALITY AGREEMENT

This **SEPARATION AGREEMENT, GENERAL RELEASE, WAIVER & CONFIDENTIALITY AGREEMENT** (this "**Agreement**") is entered into by and between **COMMUNITY HEALTH SYSTEMS, INC.**, a non-profit corporation duly organized under the laws of the State of Georgia ("**CHSI**"), on the one hand, and **MARK A. WALDROP**, a resident of the State of Tennessee ("**Employee**"), on the other.  CHSI and Employee may each be referred to herein individually as a "**Party**" or collectively as the "**Parties**."

In conjunction with this Agreement, the applicable policies and procedures of CHSI, and in exchange for the good and valuable consideration consisting of the mutual promises and covenants as set forth herein, the receipt, adequacy, and sufficiency of which is hereby acknowledged by both Parties, it is agreed as follows:

1.　　**Termination of Relationship and Employment Agreement**.

　　　　(a)　　The Parties' relationship shall end effective as of the close of business on Tuesday, June 28, 2016 (the "**Separation Date**").

　　　　(b)　　This Agreement shall become effective on the Effective Date (as defined below).

　　　　(c)　　CHSI and Employee entered into that certain Employment Agreement of Mark A. Waldrop dated as of June 20, 2006 and as amended and restated as of January 1, 2009 (the "**Employment Agreement**").  Employee and CHSI agree that as of the Separation Date, the Employment Agreement automatically terminated and is of no further force and effect, and all rights of Employee under the Employment Agreement were terminated as of such Separation Date.

2.　　**Payments and Benefits**.　　In connection with Employee's separation from Employee's employment with CHSI:

　　　　(a)　　Employee acknowledges and agrees that, except as set forth in Section 2(b) below with respect to the payment of any amounts due and owing to Employee for accrued but unused paid time off, as of the Separation Date, Employee already will have received from CHSI the payment of all wages, compensation, and/or other benefits otherwise due and owing to Employee and earned through and including the Separation Date.  For the avoidance of doubt, CHSI and Employee agree that Employee may retain his full salary payment for the month of June 2016, which such payment was made to Employee on June 8, 2016.

　　　　(b)　　Employee and CHSI agree that as of the Separation Date, Employee only will have used twelve (12) of his thirty (30) day paid time off allotment for 2016.  Accordingly, CHSI agrees that not later than the Effective Date (as

defined below), CHSI will pay to employee through its regular payroll system the amount of Seventy-Two Thousand Three Hundred Ninety-Two and 20/100 Dollars ($72,392.20), less all applicable payroll-related tax and income tax withholdings, such sum representing the eighteen (18) days of accrued but unused paid time off due and owing to Employee.

(c)     If, and only if, Employee complies with this Agreement and the terms and conditions set forth herein, and if, and only if, Employee does not revoke this Agreement in the manner set forth in Section 5 hereof, CHSI agrees to pay Employee the amount of One Hundred Seventy-Four Thousand Two Hundred Seventy-Seven and 52/100 Dollars ($174,277.52), such sum representing two (2) months of Employee's current base salary equal (the "**Separation Payment**"). The Separation Payment shall be paid to Employee through CHSI's regular payroll system in five (5) equal and consecutive monthly installments of Thirty-Four Thousand Eight Hundred Fifty-Five and 50/100 Dollars ($34,855.50) each, less all applicable payroll-related tax and income tax withholdings, commencing in July 2016 and ending in November 2016 on the last day of each such month (starting with July 31, 2016) (the "**Separation Pay Period**"). Employee understands and agrees that during the Separation Pay Period, he will not be deemed an employee of CHSI for any reason whatsoever.

(d)     Employee's and Employee's dependents' health insurance coverage under CHSI's health insurance plan(s) ended on the Separation Date. From and after the Separation Date, Employee and Employee's dependents' will be eligible for continuing health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) as required by applicable law at Employee's own expense. CHSI shall provide to Employee information regarding the COBRA election under separate cover.

(e)     Employee shall not be entitled to receive any reimbursements for business expenses incurred in connection with Employee's employment with CHSI following the Separation Date, regardless of whether such reimbursement requests were submitted prior to the Separation Date.

3.     **No Admission**. The Parties acknowledge and agree that this Agreement is not intended by either Party to be construed and will not be construed as an admission by them of any liability or violation of any federal, state, and/or local law, statute, ordinance, regulation, or legal or moral duty of any nature whatsoever. The Parties have entered into this Agreement for the purpose of maintaining an amicable and cooperative relationship and also to settle any and all existing claims now or heretofore in existence between them. The Parties agree that this Agreement shall not constitute or be asserted by any Party to this Agreement to constitute evidence of the existence or non-existence of or validity or invalidity of any right, claim, or obligation or any liability or wrongdoing, except as expressly provided for herein and then only

for purposes of the enforcement of (or defense against) claims made under or pursuant to the terms of this Agreement.

4.    **General Release and Covenant Not to Sue.**   In exchange for the mutual promises and covenants described herein, Employee, on behalf of himself, his representatives, agents, estate, heirs, executors, administrators, successors, and assigns, hereby unconditionally releases, acquits, discharges, and agrees to release CHSI, its Affiliates (as defined below), and its and their past, present, and/or future directors, administrators, officers, trustees, employees, agents, attorneys, insurers, representatives, and assigns (hereinafter collectively referred to as the "**Released Parties**"), or any one or more of them, from any and all charges, complaints, claims, liens, contracts, covenants, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, attorneys' fees, costs, losses, and/or debts of any kind or nature that arose or accrued on or prior to Employee's execution of this Agreement, including, but not limited to, any or all claims that may have arisen or begun to arise or accrue out of any federal, state, and/or local law, constitution, regulation, or common law theory, whether statutory in nature, in tort, contract, equity, or otherwise (each such action, claim, suit, right, liability, or demand being hereinafter individually referred to as a "**Claim**" and hereinafter collectively referred to as the "**Claims**") that Employee may now or hereafter have against the Released Parties, or any one or more of them, including, but not limited to, any and all Claim(s) in connection with:  (a) Employee's employment relationship with CHSI; (b) the terms and conditions of Employee's employment relationship with CHSI, including, without limitation, those set forth in the Employment Agreement (and including, but not limited to, compensation and benefits); (c) Employee's service as an employee of CHSI; (d) the end of Employee's employment relationship with CHSI and the circumstances surrounding the end of such employment relationship; and/or (e) any one or more of the following Claim(s) sounding in or with specific regard to, without limitation:  pay, commissions, sick pay, vacation pay, wages, incentives, or bonuses of any type or character; all claims based on any oral, written, or implied contract or breach of contract (including, without limitation, the Employment Agreement); breach of the duty of loyalty; breach of covenants; breach of the covenant of good faith and fair dealing; infliction of emotional distress; tortious interference with contractual relations; tortious interference with business relations; wrongful discharge; violation of public policy; libel; slander; defamation; invasion of privacy; misappropriation of trade secrets; misappropriation of property; conversion of property; unjust enrichment; negligence; assault; battery; negligent retention; negligent hiring; negligent supervision; promissory estoppel; retaliation; bad faith refusal to pay; or any other tort.

Without limiting the generality of the foregoing, Employee specifically releases, acquits, discharges, waives, and agrees to indemnify and hold the Released Parties, or any one or more of them, harmless from and against any and all Claim(s) arising under:  (a) the Civil Rights Acts of 1866, 1871, 1964, and 1991; the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the ADA Amendments Act of 2008; the Lilly Ledbetter Fair Pay Act of 2009; the Genetic Information Nondiscrimination Act of 2008; the Older Workers Benefit Protection Act of 1990; the Family and Medical Leave Act of 1993; the Fair Labor Standards Act of 1938; the Age Discrimination in Employment Act of 1967; the Equal Pay Act of 1963; Executive Order Nos. 11246 and 11478; the Occupational Safety and Health Act of 1970; the Immigration Reform and Control Act of 1984; the Sarbanes-Oxley Act of 2002; the False Claims Act; the

National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; each such law as amended; and/or any other federal employment practices-related law; (b) the laws of the State of Georgia with regard to CHSI concerning fair employment practices (which acts and laws prohibit discrimination based upon race, religion, sex, national origin, color, age, disability, and, in some local jurisdictions, sexual orientation), including, but not limited to, the Georgia Sex Discrimination in Employment Act; the Georgia Equal Employment for Persons with Disabilities Code; the Georgia Age Discrimination Act; and/or the Georgia Security and Immigration Compliance Act; (c) the Employee Retirement Income Security Act of 1974 (other than such rights as are mandated or vested by law or by operation of any applicable ERISA-qualifying or other retirement-related plan under which Employee may have such rights); any right to health care continuation pursuant to any applicable plan documents, COBRA, or any similar state law; and/or all health care policy or plan conversion rights; and/or (d) any other federal, state, and/or local constitutions, laws, and/or regulations, and/or any common law theories of recovery.

Except as otherwise provided for in this Agreement or to the extent prohibited by applicable law, Employee agrees that Employee has not and will not file, promote, instigate, or participate in any complaint, charge, claim, action, proceeding, suit, or litigation in any court or before any federal, state, or local government agency or department with respect to any Claim(s) released by Employee herein. If Employee does file, promote, instigate, or participate in any complaint, charge, claim, action, proceeding, suit, or litigation in any court or before any federal, state, or local government agency or department with respect to any Claim(s) released by Employee herein, Employee covenants and agrees to hold the Released Parties, or any one or more of them, harmless from and to indemnify the Released Parties, or any one or more of them, from and against any damages, losses, costs, expenses, and/or attorneys' fees paid, suffered, sustained, incurred by, and/or asserted against any of the Released Parties, or any one or more of them, in addition to any judgments arising therefrom.

Except as otherwise prohibited by applicable law, Employee waives any right to become and promises not to become a member of any class in any proceeding in any court or before any federal, state, or local government agency or department in which claims are asserted against CHSI or its Affiliates that are related in any way to Employee's employment with CHSI or that relate to or are otherwise connected to matters or events that arose or accrued on or prior to Employee's execution of this Agreement. If, without Employee's prior knowledge and consent, Employee is made a member of a class in any such proceeding in any court or before any federal, state, or local government agency or department, Employee immediately shall opt-out of the class at the first opportunity afforded to Employee after Employee learns about Employee's inclusion in the class.

Employee understands, acknowledges, and agrees that nothing contained in this Section 4 or any other portion of this Agreement is intended to or shall interfere with Employee's rights under any federal, state, or local laws to file, institute, or otherwise initiate a complaint, charge, claim, action, proceeding, suit, or litigation with the Equal Employment Opportunity Commission (EEOC) or any other federal, state, or local government agency or department; to participate in any federal, state, or local government agency or department proceeding; or to provide truthful testimony if under compulsion of subpoena or otherwise cooperate in any

federal, state, or local government agency or department investigation. In addition, nothing contained in this Section 4 or any other portion of this Agreement is intended to or shall interfere with Employee's rights to report possible violations of any federal law or regulation to any governmental agency or entity, including, but not limited to, the Department of Justice, the Securities and Exchange Commission, the United States Congress, and any agency Inspector General, or to make other disclosures that are protected under the whistleblower provisions of any such federal law or regulation. Provided, however, that Employee hereby waives all of Employee's individual rights to any benefits and relief, including, but not limited to, monetary recovery and reinstatement, derived from any complaint, charge, claim, action, proceeding, suit, or litigation brought on Employee's behalf related in any way to Employee's employment with CHSI, including, but not limited to, any complaint, charge, claim, action, proceeding, suit, or litigation brought by the EEOC, any other federal, state, or local governmental agency or department, or any other person or third party.

Notwithstanding the foregoing, Employee hereby represents that, although Employee is not legally barred from doing so, Employee does not presently have on file and has not made or filed in any forum any complaint(s), charge(s), claim(s), action(s), proceeding(s), suit(s), or litigation (whether civil, administrative, criminal, or otherwise) against CHSI or the Released Parties, or any one or more of them, and Employee acknowledges that CHSI has relied on Employee's representation as to such in agreeing to perform its obligations and provide the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement.

Employee understands and agrees that the foregoing is not a complete list of Claim(s) released. Employee further understands and warrants that this Agreement shall operate as a fully binding and complete resolution of all Claim(s) by and between the Parties to this Agreement and all Parties represented by or claiming through such Parties and that Employee shall not be able to seek any monies for any Claim(s), whether known or unknown, against any of the persons or entities released hereunder, unless otherwise expressly provided for herein. Nothing contained in this Section 4 shall preclude either Party from asserting a claim for breach of this Agreement and/or a claim that may arise from events occurring after this Agreement is executed.

5.     **Revocation of Release**. Employee agrees that Employee has been advised to consult with an attorney and/or other advisor of Employee's choosing concerning Employee's rights and obligations under this Agreement and that Employee has been advised to consider this Agreement fully before executing it. Employee further agrees that Employee has been offered twenty-one (21) days within which to review this Agreement. After Employee signs and delivers this Agreement, Employee has the right to revoke this Agreement within seven (7) days from the date on which Employee signs and delivers this Agreement. This Agreement shall not become effective until the expiration of that seven-day revocation period, and, therefore, the Parties agree that the effective date of this Agreement shall be the eighth (8th) day following such seven-day revocation period (the "**Effective Date**"). If Employee wants to revoke this Agreement, Employee must deliver a written revocation to: CHSI c/o Mark S. Lange, Esq., Holland & Knight LLP, Regions Plaza, Suite 1800, 1180 West Peachtree Street, Atlanta, Georgia 30309, within that seven-day period. If Employee does not revoke this Agreement, Employee will

receive the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement.

6.   **Confidentiality and Non-Disclosure of This Agreement**.

(a)   Except as otherwise authorized by this Agreement, Employee hereby warrants and agrees that Employee has not and will not and that none of Employee's attorneys, agents, or representatives or anyone acting on Employee's behalf has or will, under any circumstances, whether directly or indirectly, disclose or cause to be disclosed to any person any of the terms and conditions of this Agreement, including, without limitation, the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement or any facts or other information relating to the negotiation and execution of this Agreement, all such information being deemed strictly confidential.

(b)   Nothing contained in this Section 6 shall prohibit the disclosure of any term of this Agreement:

(i)   To the extent necessary to comply with any law, rule, regulation, court or administrative order, and/or directive or to enforce or defend against claims arising in connection with this Agreement; provided, however, that if Employee receives a subpoena or other formal legal process seeking the disclosure of any information about this Agreement, Employee must give the Released Parties, or any one or more of them, sufficient advance notice in writing (as set forth in Section 15) prior to any such disclosure to allow the Released Parties, or any one or more of them, to take steps to object to and/or seek other protection from any such disclosure;

(ii)   To a government agency or department in connection with any charge or investigation it is conducting or may conduct; or

(iii)   To the extent necessary, to members of Employee's immediate family and Employee's attorneys, accountants, and tax advisors; provided, however, that Employee shall inform each such person about the confidentiality provisions of this Agreement and that such disclosure is made on the condition that such information be treated as strictly confidential.

7.   **Employee's Continuing Obligations to CHSI**.

(a)   **Confidentiality of CHSI's Information**.   Employee recognizes that by virtue of Employee's employment with CHSI, Employee has been granted otherwise prohibited access to trade secrets and other confidential and proprietary information that is not known to

CHSI's competitors or within the industry generally, that has been developed by CHSI and its Affiliates over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to CHSI and its Affiliates. This information (in whatever form or medium) relating to CHSI and its Affiliates includes, but is not limited to, CHSI's and its Affiliates' trade secrets, including the information defined by the Georgia Trade Secrets Act, O.C.G.A. §§ 10-1-761 *et seq.*, or any other applicable trade secrets statute or act; information relating to CHSI's and its Affiliates' tax-exempt charitable healthcare activities and services, earnings, assets, liabilities, revenues, or any other financial data for any time periods; marketing and service strategies, programs, and procedures with respect to the provision of healthcare services and products; contract expiration dates; any and all types of patient or resident or customer data, including, without limitation, any information protected by HIPPA; information concerning the third party payor programs, including Medicaid, Medicare, managed care plans, and other private insurance company programs; business plans; marketing plans; computer programs and databases; research projects; new healthcare products and service developments; and any other information of CHSI and its Affiliates or any of their patients, residents, or customers that CHSI informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential (the "**Confidential and Proprietary Information**"). Confidential and Proprietary Information does not include information that is: (i) in the public domain (except as a result of a breach of this Agreement or Employee's obligations under statutory or common law); or (ii) obtained by Employee from a third party subsequent to the termination of Employee's employment with CHSI (except where the third party obtains the information in violation of a contractual obligation or a statutory or common law obligation). Employee agrees that: (a) Employee will never disclose, access, or use or permit others to access or use or attempt to disclose, access, or use or permit others to access or use, whether directly or indirectly, any of CHSI's Confidential or Proprietary Information or make use of any of CHSI's Confidential or Proprietary Information for Employee's own purposes or the purposes of another, except as required for the benefit of CHSI or as required by law; and (b) Employee will take all reasonable measures, in accordance with CHSI's policies, procedures, and instructions, to protect CHSI's Confidential and Proprietary Information from any accidental or unauthorized disclosure or use. To the extent that any of CHSI's information loses its status as a "trade secret" (as so designated and protected by state statutory or common law), such information will immediately fall within the foregoing definition of Confidential and Proprietary Information.

(b)  **Non-Solicitation of Customers**. For a period of twenty-four (24) months following the Separation Date (the "**Restricted Period**"), Employee shall not, directly or indirectly: (i) for any Competing Business (as defined below) solicit or accept or attempt to solicit or accept business from any of CHSI's or its Affiliates' residents, patients, or customers or any of CHSI's and its Affiliates' specifically identified and/or prospective residents, patients, or customers with whom or which Employee had Material Contact (as defined below) on behalf of CHSI and its Affiliates in the twelve (12) months preceding the Separation Date; and/or (ii) cause any of CHSI's and its Affiliates' residents, patients, customers or any of CHSI and its Affiliates specifically identified and/or prospective residents, patients, or customers with whom or which Employee had Material Contact on behalf of CHSI and its Affiliates in the twelve (12) months preceding the Separation Date to terminate or otherwise diminish its or their business relationship with CHSI and its Affiliates.

(c)  **Non-Solicitation of CHSI's Personnel**.  During the Restricted Period, Employee shall not, directly or indirectly, solicit, induce, recruit, or otherwise encourage any of CHSI's or its Affiliates' employees, officers, directors, contractors, consultants, agents, or anyone else providing services to CHSI and its Affiliates that Employee had Material Contact with or that Employee obtained Confidential Information about in the twelve (12) months preceding the Separation Date to end or leave their employment, engagement, or business relationship with CHSI and its Affiliates for any reason, to cease doing business with CHSI and its Affiliates, or to engage in any Competing Business.

(d)  **Non-Competition with CHSI**.  During the Restricted Period, Employee shall not, directly or indirectly, whether in an individual or representative capacity (and whether or not for compensation) as an employee, agent, consultant, independent contractor, officer, or otherwise, render services in a like or similar capacity to that in which he was functioning prior to the Separation Date for or to any Person engaged in a Competing Business in the Restricted Territory (as such terms are defined in this Section 7). Provided, however, that the provisions of this Section 7(d) shall not be construed to prohibit Employee from owning up to two percent (2%) of the issued shares of any company whose common stock is listed for trading on any national securities exchange or the NASDAQ National Market System.

It is acknowledged and agreed by the parties hereto that the non-competition provisions contained in this Section 7(d) have been narrowly tailored to prohibit Employee from working in competition with CHSI within the limited geographic area described herein and that they are reasonable and necessary to protect CHSI's legitimate business interests and goodwill and are not burdensome to Employee or merely punitive or arbitrary in nature and that Employee shall be able to earn a living while complying with such restrictive covenants.  Employee acknowledges that the foregoing definitions provide fair notice of the maximum reasonable scope of this Section 7(d).

(e)  **Certain Definitions**.  For purposes of this Agreement, the term "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition of "Affiliate" the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by control or otherwise.  For purposes of this Agreement, the term "**Business**" shall mean: (i) providing nursing home care, assisted living, senior housing, home health care, adult day care, hospice care, medical transportation services of any type, rehabilitative therapy services, medical and pharmaceutical supplies, equipment and related supplies to such providers of healthcare services, disease management or case management services, in-patient or out-patient diagnostic medical services; (ii) providing acute care medical and/or emergency room services in an in-patient hospital facility (or portion of such facility) or in an out-patient surgery setting; (iii) the acquisition, establishment, financing, construction, leasing, management, or operation of licensed nursing facilities or assisted living facilities; (iv) the acquisition, development, operation and management of one or more captive insurance companies; and (v) the provision of other healthcare services being offered to the public by CHSI and its Affiliates as of the Separation Date.  For purposes of this Agreement, the term "**Competing Business**" shall mean any Person that engages in a business substantially the same

as the Business or any portion thereof, including, without limitation, United Health Services, Inc., a Georgia corporation and its Affiliates. For purposes of this Agreement, the term **"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-5, 42 U.S.C. §§ 1320d-1329d-8, and the Regulations promulgated thereunder. For purposes of this Agreement, **"Material Contact"** is defined as any contact between Employee and a person or entity that: (a) Employee solicited directly for CHSI or its Affiliates; (b) Employee dealt with directly for CHSI's or its Affiliates' business purposes and maintained a business relationship; and/or (c) Employee obtained Confidential and Proprietary Information about as a result of Employee's employment with CHSI. For purposes of this Agreement, the term **"Person"** means any individual, corporation, partnership, joint venture, limited liability company, trust, association, or other entity or organization. For purposes of this Agreement the term **"Restricted Territory"** shall mean the State of Georgia.

(f)     **Reasonable Restrictions**. Employee acknowledges and agrees that the time and geographic restrictions and other obligations placed on Employee by this Section 7 (the **"Restrictions"**) are reasonable and necessary to protect and preserve the legitimate interests, properties, goodwill, and business of CHSI and its Affiliates.

(g)     **Court or Agency Order**. If Employee receives a subpoena, court order, agency order, or any other form of compulsory process requesting any information related to CHSI and its Affiliates, including, but not limited to CHSI's Confidential and Proprietary Information, Employee will, to the extent permitted by law: (i) provide to CHSI and its Affiliates reasonable and timely notice of the subpoena or order so that CHSI or its Affiliates, as applicable, may object, obtain a protective order, or seek other appropriate relief on behalf of CHSI or its Affiliates, as applicable, in a timely manner; (ii) provide reasonable cooperation and assistance, in conjunction with CHSI and at CHSI's expense, in any efforts to obtain relief from the subpoena or order; and/or (iii) take all appropriate steps, in conjunction with CHSI and at CHSI's expense, to limit the amount and scope of the information to be disclosed. If Employee is called to testify in response to a subpoena, court order, agency order, or any other form of compulsory process concerning any of the matters referenced in this Subsection, nothing contained in this Agreement shall serve to limit the substance of Employee's testimony in any way.

(h)     **Scope of Restrictions**. Employee carefully has read and considered the provisions of this Section 7, and, having done so, agrees that the Restrictions set forth in this Section 7 (including the time period and geographic scope of the Restrictions) are fair and reasonable and are reasonably required for the protection of the interests of CHSI and its Affiliates. Without limiting other possible remedies available to CHSI, Employee agrees that immediate injunctive or any other equitable relief from a court of competent jurisdiction shall be available to enforce the covenants set forth in this Section 7, such relief to be available to CHSI without the necessity of posting a bond. In the event that any part of the covenants set forth in this Section 7 shall be held to be invalid, overbroad, or unenforceable by a court of competent jurisdiction, the Parties hereto agree that such invalid, overbroad, or unenforceable provision(s) may be modified or severed from this Agreement without in any manner affecting the remaining

portions hereof (all of which shall remain in full force and effect). In the event that any Restriction set forth in this Section 7 related to time period, geographic scope, or restricted activities shall be declared by a court of competent jurisdiction to exceed the maximum time period or activities such court deems reasonable and enforceable, said time period or restricted activities shall be deemed modified to the minimum extent necessary to make the temporal restrictions, geographic scope, or activities reasonable and enforceable.

(i)     **Common Law and Statutory Obligations Remain.**  This Agreement shall not supersede, replace, or diminish Employee's common law and statutory obligations to CHSI, as those obligations are in addition to the Restrictions (and other obligations) set forth in this Agreement.

(j)     **Tolling.**  The Restricted Period shall be tolled and extended for any period during which the enforcement of the Restrictions is being litigated or arbitrated, including any appeal or confirmation proceedings, provided that the outcome of such litigation or arbitration is initiated to enforce, in whole or in part, the Restrictions set forth in this Section 7.

8.     **Return of Materials.**  Employee agrees that not later than seven (7) days following the Separation Date, Employee will return all of CHSI's Confidential and Proprietary Information and any other documents, materials, and other things in Employee's possession, custody, or control relating to CHSI, or that have been or were in Employee's possession, custody, or control as of the Separation Date, regardless of the form thereof (including, but not limited to, all of CHSI's technology devices of any kind, programs, manuals, and equipment), without retaining any copies or replicas thereof. To the extent that Employee has use and/or possession of any of CHSI's Confidential and Proprietary Information that is not capable of being physically returned to CHSI, Employee agrees to destroy and/or delete and such information as contained in its non-physical form and, upon request, execute an affidavit affirming the same, which such affidavit shall become a part of this Agreement and incorporated herein.

9.     **Employee Cooperation.**  Employee agrees that Employee will cooperate with and assist CHSI by providing information relevant to matters about which Employee gained knowledge while employed by CHSI and that, upon reasonable notice from CHSI, Employee will meet with CHSI's attorneys and other representatives, appear at hearings, depositions, trials, and other proceedings relating to any such matters. CHSI will reimburse Employee for all reasonable and necessary out-of-pocket expenses necessitated by Employee's cooperation as described in this Section 9.

10.     **Non-Disparagement.**  Employee agrees not to disclose any information, or make or publish any statement, or make to or solicit for the media or others, or say or do anything to or in relation to any of the Released Parties that is adverse or prejudicial to any of the Released Parties or that may be considered to be negative, harmful, false, disparaging, derogatory, defamatory, slanderous, or libelous as to any of the Released Parties. Employee further agrees not to disclose any information, or make or publish any statement, or make to or solicit for the media or others, or say or do anything to or in relation to any of the Released Parties that may tend to harm or prejudice the reputation or good name or goodwill of any of the Released Parties.

11.   **Employee Reference Request.**   Confirmation of Employee's dates of employment, position(s) held by Employee, Employee's rate(s) of pay, and/or other administrative matters shall be provided by request through CHSI's Human Resources Department.

12.   **No Reemployment.**   In further consideration of the undertakings described herein, Employee agrees that following the Separation Date, Employee is not eligible for and will not apply for or otherwise seek employment, reemployment, or reinstatement with or otherwise provide services for CHSI or any of its Affiliates, including, but not limited to, engagement or retention on a freelance, independent contractor, consultant, or other contract basis. In the event that Employee applies for any position or engagement with CHSI or any of its Affiliates, Employee acknowledges that CHSI nor any of its Affiliates has no obligation to rehire, reemploy, or reinstate Employee, and Employee agrees that any denial of Employee's application is not and will not be deemed retaliatory or form the basis for any retaliation claim against CHSI or any of its Affiliates. Employee agrees that Employee may be denied employment or any other remunerative relationship with CHSI or any of its Affiliates without CHSI or any of its Affiliates incurring any liability whatsoever. Employee acknowledges that the provisions of this Section are fair and just under the relevant facts and circumstances, and Employee acknowledges and agrees that Employee's forbearance from seeking future employment is purely contractual and is in no way involuntary, discriminatory, or retaliatory.

13.   **No Assignment of Claims and Warranty.**   Employee, on behalf of himself and his representatives, agents, estate, heirs, executors, administrators, successors, and assigns, hereby expressly warrants and represents that Employee is the owner of all Claim(s) released by Employee herein, that Employee has not assigned or transferred or purported to have assigned or transferred (whether expressly, impliedly, voluntarily, or by operation of law or otherwise) any of the Claim(s) released by Employee herein or any portion thereof. Employee further agrees that Employee will hold harmless and indemnify CHSI and the Released Parties, or any one of more of them, from and against any and all Claim(s) so assigned or transferred.

14.   **Attorneys' Fees and Costs.**   In any dispute involving the interpretation or enforcement of this Agreement, whether by way of a legal proceeding or otherwise, the prevailing party shall be entitled to recover its/his reasonable attorneys' fees and costs (including such fees and costs of any enforcement or appeal proceedings), which fees may be set by a court in the trial or appeal of any such action or awarded in a separate action brought for that purpose and which fees shall be in addition to any other relief (whether at law or in equity). For purposes of this Section 14, the prevailing party means the party obtaining substantially the relief sought, whether by compromise, settlement, or judgment.

15.   **Notice.**   Any notices required to be provided under this Agreement by Employee to CHSI and/or the Released Parties, or any one or more of them, shall be made to CHSI c/o Mark S. Lange, Esq., Holland & Knight LLP, Regions Plaza, Suite 1800, 1180 West Peachtree Street, Atlanta, Georgia 30309.

16.   **Governing Law.**   This Agreement will be construed, interpreted, and enforced, both as to substance and remedies, in accordance the laws of the State of Georgia. Employee

irrevocably consents to the personal jurisdiction of the courts of the State of Georgia and to the personal jurisdiction of the United States District Court for the Middle District of Georgia for all purposes related to this Agreement. Further, Employee irrevocably consents to venue in the state and/or federal courts having jurisdiction over Macon-Bibb County, State of Georgia. Employee hereby waives any objections to jurisdiction and venue as set forth herein, including, but not limited to, any forum non conveniens objections.

17.  **Waiver of Jury Trial**.   The Parties hereby knowingly, voluntarily, and intentionally waive any right to a jury trial with respect to any claims arising in connection with the Parties' employment relationship and/or this Agreement.

18.  **General Provisions**.  This Agreement may be executed in any number of counterparts each of which, taken together, shall constitute one Agreement. If any provision of this Agreement should be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions will not be affected, and the illegal or invalid parts, terms, or provisions will be deemed not to be a part of this Agreement. The provisions of this Agreement may be amended, modified, or waived in a writing made to effectuate the same and only with the prior written consent of each Party hereto. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their successors, legal representatives, and assigns.

19.  **Entire Agreement**.  This Agreement constitutes the sole and entire agreement between Employee and CHSI and supersedes all other agreements, representations, promises, understandings, undertakings, and inducements, whether written or oral, made prior to or contemporaneously with the execution and delivery of this Agreement.

20.  **Consultation with Legal Counsel**.  Employee expressly acknowledges that before signing this Agreement, Employee was advised of Employee's right to consult with legal counsel and/or other advisors selected by Employee regarding the terms and conditions of this Agreement as well as the federal and state income tax consequences of this Agreement, that Employee knows and understands the contents of this Agreement, and that Employee enters into this Agreement of Employee's own free will without any inducement not described in this Agreement and not under duress or coercion of any nature.

21.  **Tax Matters**.  All amounts paid to Employee under this Agreement shall be net of amounts withheld for federal and state income taxes and applicable payroll-related taxes. Employee and CHSI agree that CHSI shall not under any circumstances be responsible to Employee for any of the tax consequences of the Employee's receipt of payments under this Agreement, including, without limitation, as a result of the application of Section 409A of the Internal Revenue Code of 1986, as amended.

**IN WITNESS WHEREOF**, and intending to be legally bound, the parties hereto have executed the foregoing Separation Agreement, General Release, Waiver & Confidentiality Agreement as of the dates accompanying the Parties' respective signatures below.

**ACCEPTED AND AGREED**:

MARK A. WALDROP

**COMMUNITY HEALTH SYSTEMS, INC.**, a Georgia nonprofit corporation

_____

Date:_____

By:_____

Its:_____

Date:_____

#46986611_v3

**Governance** – Board is aware of the need to address conflicts of interests, understanding of delegated versus non-delegated authority

- Pursuant to its Bylaws, the corporation's Board delegates authority to the President or his designee to execute contracts on behalf of the organization
- Conflicts of interests are to be avoided while conducting business for the system
- 

**Organization Culture** – Culture should reflect the beliefs of the Board, its associates and leadership.  Compliance with rules, policies, procedures, guidelines is anticipated using best practices

- Environment of fair play among all associates
- There is no room for self-interest above the interest of the organization
- 

**Personal Benefit/Private Inurement** – associates are not to receive personal benefit outside or in addition to the compensation approved by the Board

- Expense paid trips, gifts, stock options or incentives not allowed
- Partnering with for-profit entities only with agreements approved by the Board
- 

**Accountable Reimbursements** – Board is aware of the draft policies and procedures to be put in place for all reimbursements after 7/1/16

- Non-profit status – IRS scrutiny
- Government funding – most system funding is paid by Medicare and Medicaid and is subject to audit
- Investigation disclosed room for improvement regarding personal versus business expenditures by organization personnel; use of corporate credit cards; authorization and approval of expenditures by approved personnel
- 



EXHIBIT

21

CONFIDENTIAL

Did you, prior to, or since, the signing of the Workday contract, receive any gifts or remuneration, reimbursements or benefits from that Vendor

OR

from any other Vendor?

CHSI_0018915

Joe Wall comments to each interviewee and group

1. A "thank you" for the work you do and confirmation of the seriousness of this conversation

2. The interview or meeting is intended to be both informative and educational for all parties

### *Background*

3. Upon request of the COO, the Board Chair met privately with the COO and listened to accusations against CEO (listening session only)

4. Board Chair met privately with CEO to discuss accusations of the COO

5. Board Chair conducted a joint meeting with CEO & COO to discuss working relationship and the accusations against the CEO and to determine next steps

6. Board Chair engaged legal counsel to conduct an independent investigation of accusations against the CEO

7. Board Chair and legal counsel met with all members of the C-Suite and others as they determined necessary

8. The Board Chair and legal counsel reported their findings to the full membership of the Board of Directors

9. The Board of Directors unanimously concluded the accusations against the CEO were unfounded and took other actions it deemed appropriate under the circumstances

### *Additional Board Action*

1. Based on findings of its investigation, the Board determined it needs to provide additional guidance and focused education to management

2. Board considerations included transparency, confidentiality, accountability, corporate culture and good governance

CHSI 0018916

7/18/16

NFP → $ 4958

Salaries + bonuses
Golden parachutes
Severence



EXHIBIT

22

CONFIDENTIAL

CHSI_0018923

Ken McDonald —

② E ✻ Any policies/procedures that unfair, etc.

Blair — any lies from telephone conversation, targetting

Had targeting/+ lies been discussed prior to that phone call

④ E ✻ Was there a fear of being fired/terminated; culture created by Mark?

⑦ E Waterford stored in storage facility

Michele — Why she came to tell Ronnie about Claudette?
✓ she is considered to hate RR
...-y did you ~~felt the need to come to RR?~~ Did anyone suggest her being?

⑤ E — Targeting term — used commonly in our culture

⑥ E — What is difference between targeting and being held accountable?

(Las Vegas) trip in November

✻ E ① Not discuss that we were meeting

③ E Were you ever uncomfortable about anything you were asked to do by any person that is your superior?

✻ E ⑧ Is SOP a factor?
3 you think

CONFIDENTIAL

CHSI_0018924

CONFIDENTIAL

CHSI_0018925

Lots of problems arise from lack of information or education or failure to communicate.

Issues to be discussed with all management associates on Friday:

1- Everything discussed here is to be completely confidential and is not to be talked about to anyone outside this meeting. I am obligated to share anything said here to other members of the Board of Directors, but only if I determine that it should be made known to them as part of this ongoing matter.

2- Our purpose here is to clear the air within the organization and move forward & put this issue behind us as fast as possible.

3- Have you been or were you ever uncomfortable about anything that you were asked to do by any person that you consider your superior in the organization?

4- Are there any policies or procedures that you consider unfair or harsh or unnecessary?

5- Do you have or have you detected among any associates a fear of being fired or terminated? If so, is this feeling a part of our organization's culture?

6- Are you familiar with the term "targeting"? Is it commonly used in our organization among our associates?

7- In your opinion, what is the difference between "targeting" & being held accountable ?

8- Are you aware of the gift items, such as Waterford crystal, stored in the storage unit in Dalton? ? Is there more than one unit?

9- Do you feel any discomfort or insecurity caused by the SOP re-organization?



EXHIBIT

23

Purpose:

→ I am here representing the Board of Directors

1) Dispel any rumors regarding COO termination + get the facts out as needed, to upper mgmt. Hope you have not had any contact w/ ~~COO~~, former COO. Board wants to be completely transparent, especially in this situation but confidential

2) ~~Get the facts~~ We learned from this process that we need to educate people (+ ourselves) in the org. about not for profit corp.

3) Get feed back as to how the org. is viewed within mgmt. team.

4) Not required to answer any question that I ask if you feel uncomfortable



EXHIBIT
24

Issues to be discussed with Blair Lake on Friday:

1- Back in May, 2016, you were on a conference call with our organization's CEO & COO concerning, among other matters, the Workday contract. During or after or since that conversation, have you felt that any lies, misrepresentations or untruths were said to anybody in the conversation by anyone included in the call? Did you perceive any "targeting" of anyone by anyone else on the call? Did you discuss lies or targeting with any parties involved in the call, either immediately after the call or since that call?

2- Last November, you were attending a meeting or trade show in Las Vegas. It was decided at some point that our COO & 2 of our entity presidents would fly out, attend the show, and spend a total of $6,000 to $8,000 on that trip? Prior to your attendance, did you discuss the others attending & if so, why was their attendance needed? Who's idea was it?

3- The week of June 28, you spent approximately 3 days working in the Macon office of CHS, which you had never done before. Why did you decide that you needed to do so? Did anyone ask you to do so?



CHSI_0018927

**Joseph Wall**

To:                              Ronnie Rollins
ject:                           RE: Interview comments

I left out one point on Blair's as follows: Did you, prior to or since, the signing of the Workday contract, receive any gifts, remuneration, reimbursements or benefits from that vendor? OR from any other vendor at any other time?

**From:** Ronnie Rollins [mailto:RRollins@chs-ga.org]
**Sent:** Thursday, July 07, 2016 10:04 AM
**To:** Joseph Wall
**Subject:** RE: Interview comments

We will be available.

*Ronnie Rollins*
*President*

*Community Health Services of Georgia*
P.O. Box 1037
Macon, GA 31202

**From:** Joseph Wall [mailto:jaw@meadorswall.com]
**Sent:** Thursday, July 07, 2016 9:35 AM
**To:** Ronnie Rollins
ject: RE: Interview comments

Thanks. I just finished talking to Randy Nichols about what he feels needs to be done for a forensic examination. He wanted to meet with Angela tomorrow, probably while I'm meeting with those that we have scheduled. Then he & I were getting together to compare notes, possibly with you & Lorraine if available.

**From:** Ronnie Rollins [mailto:RRollins@chs-ga.org]
**Sent:** Thursday, July 07, 2016 8:49 AM
**To:** Joseph Wall
**Subject:** interview comments

Joe,

Here are some points I feel like need to be made to the folks you will be speaking with tomorrow.

I realize you have some specific questions, but thought these are some general matters that need to be dealt with.

I had Lorraine look at these this morning also, just to get her input.

Thanks for handling.



EXHIBIT
26

1

CHSI_0018926

Issues to be discussed with Blair Lake on Friday:

1- Back in May, 2016, you were on a conference call with our organization's CEO & COO concerning, among other matters, the Workday contract. During or after or since that conversation, have you felt that any lies, misrepresentations or untruths were said to anybody in the conversation by anyone included in the call? Did you perceive any "targeting" of anyone by anyone else on the call? Did you discuss lies or targeting with any parties involved in the call, either immediately after the call or since that call?

2- Last November, you were attending a meeting or trade show in Las Vegas. It was decided at some point that our COO & 2 of our entity presidents would fly out, attend the show, and spend a total of $6,000 to $8,000 on that trip? Prior to your attendance, did you discuss the others attending & if so, why was their attendance needed? Who's idea was it?

3- The week of June 28, you spent approximately 3 days working in the Macon office of CHS, which you had never done before. Why did you decide that you needed to do so? Did anyone ask you to do so?

4- Did you, prior to or since the signing of the Workday contract, receive any gifts, remuneration, reimbursements or benefits from that vendor? Or from any other vendor at any other time?

*$100 gift card, called MW, use for lunch in Team office*

#2 BL 'scouted' show / for time + attendance vendor /
tripped over EMR vendor / spent day looking @
T+A vendors / Trip was pre-planned—

#3 Correcting 1094 + 1095's / late into night
to be filed by 6/30; 6/24 Hema (IT) + LT on
phone w/ IRS (Did we not trust him).



EXHIBIT
27

CHSI_0018922

Issues to be discussed with Michele Moore-Andrews on Friday:

1- Why did you feel the need to come meet with the CEO to inform him of the termination of Claudette, in the Hawkinsville office?

2- Did anyone tell you to meet with the CEO about that specific associate's termination?

3- I have been informed that you hate our CEO. Is that true?



CONFIDENTIAL

Ken

#8   Yes, he received one 1st year

Most competent org.

EXHIBIT

29

CONFIDENTIAL

# Blair

#3  In the end, the right thing was done; ethics are
not hide, deceive

4 - Can't have everything in writing

5 - Yes, Fear of making mistakes, dash in IRS

"If you cannot get along with your boss,
you need to leave"

6 - Yes, people come complaining about being @
centers. Education of supervisors on
targeting —

7 - Nit - picking

8 - Yes, Stephanie approve / Mark's age idea;
BH received as a Christmas —

9 - Resumé issue / are we positioning to be sold,
acquired —

#1 - No. Ronnie was taking over WorkDay contract;
Angela - "we had one time", no issues now,
yes - 2 yrs.

CONFIDENTIAL

Michele
- expense reimbursement - simplify / good to have
guideline / Voiced issue of administrative time to
approve exp. reimb

# 3

#4  Unnecessary - clarity, written regulation, guidance,
need to get approval, fast approval (limit on
$ transaction)

#5  Not until now,

#8  No, Mark gives Christmas gifts
                    leadership council @ Amelia

        Michele - 30 (3 pieces per year)

_____

#3 No, do not see him regularly; not much interaction
                    strategic planning
    Liked meetings w/ RR, LT, DW, MMA
        (helpful for her to see)

CONFIDENTIAL                                    CHSI_0018921

# COMMUNITY
## HEALTH SERVICES *of Georgia*

August 16, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mr. Mark Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

> *Re:*   *Community Health Systems, Inc. and Mark A. Waldrop*
> *Termination of Employment with "Cause"*

Dear Mr. Waldrop:

As you are aware, Community Health Systems, Inc. ("CHSI") terminated your employment effective June 28, 2016.

At the time of your employment termination, the CHSI Board of Directors (the "Board") was in the preliminary phases of an investigation into certain acts undertaken and omissions made by you in violation of that certain January 1, 2009 amended and restated Employment Agreement of Mark A. Waldrop by and between you and CHSI (the "Employment Agreement") and CHSI's practices, policies, and procedures.  Based on the initial investigative results, under no circumstances could CHSI continue your employment; your conduct prior to June 28, 2016 was of such an egregious nature that the emergency removal of you from the organization was mandatory.

In an effort to minimize any embarrassment or further harm to you or the organization, the CHSI Board decided to offer to you a separation package in recognition of your years of service to CHSI as discussed during a meeting between you, Mark Lange, and me in the offices of Holland & Knight LLP on June 28, 2016.  Subsequently, that offer was extended to you in writing in a draft Separation Agreement, General Release, Waiver & Confidentiality Agreement sent to you by attorney Joshua I. Bosin, Esq. on July 6, 2016.

On July 26, 2016, rather than accept CHSI's separation package (or even inquire as to whether the terms thereof were negotiable), you filed a lawsuit against CHSI in federal court seeking in excess of one million dollars from the organization and alleging that CHSI breached its obligations to you pursuant to the Employment Agreement.  That was an unfortunate decision.



EXHIBIT

30

Mark A. Waldrop
August 16, 2016
Page 2

I write now to confirm and provide the formal notice to you as required by Section 2.4 of the Employment Agreement that your employment with CHSI was, in fact, terminated immediately on June 28, 2016 with "Cause." Not only did you engage in acts and omissions amounting to gross negligence and willful misconduct that were and are detrimental to CHSI and its reputation, but you also failed to observe or perform material covenants, conditions, and provisions of the Employment Agreement and abide by CHSI's written policies and procedures, all of which such failures are incapable of remedy. By way of example only and without limitation:

1)      You submitted hundreds of thousands of dollars in business expenses for reimbursement under your assistant's name rather than under your name so as to conceal from your direct supervisor the nature and magnitude of the unauthorized gifts, awards, consumables, travel, office supplies, cleaning supplies, and other questionable items for which you obtained reimbursement from CHSI.

2)      You operated the DeBrock Poodles business owned by you and your wife out of CHSI's Dalton, Georgia office. Indeed, at least one online website for DeBrock Poodles lists the contact telephone number for that business as the telephone number for the mobile telephone for which you submitted requests for 100% expense reimbursement to CHSI for many years -- and received 100% expense reimbursement for many years – and also provided to internal and external persons as your CHSI cell phone number.

3)      You served on the faculty of Southern Adventist University teaching multiple courses and participating in campus-related activities, for which you received compensation, that never were disclosed to the CHSI Board in violation of the terms of your Employment Agreement.

4)      After the flooding of CHSI's Dalton, Georgia office in 2014, you authorized renovations and refurbishments of the office space that cost in excess of one hundred thousand dollars more than the insurance proceeds received in connection with CHSI's property claim. In connection with that project, you also authorized the engagement of your then-assistant's father pursuant to an Independent Construction Superintendent Agreement when a general contractor already had been retained to oversee and complete the renovations and refurbishments. You did not provide to the Board any information regarding that transaction, one effect of which was to deprive the Board of an opportunity to address issues of independence, private inurement, or the possibility of an excess benefit transaction.

5)      On numerous occasions, you failed to engage in and/or complete CHSI's project charter authorization process, resulting in the commencement of numerous projects and the engagement of third-parties to perform work on behalf of CHSI without the standard approval of the Chief Executive Officer and/or the Chief Financial Officer and the Board. CHSI is aware of several instances in which you provided false information to CHSI employees and third-parties regarding project charter authorization by CHSI's Chief Executive Officer and the Board as

Mark A. Waldrop
August 16, 2016
Page 3

required when, in fact, such authorization was never provided on behalf of the organization in any way.

Lastly, it is my understanding that our attorneys have communicated with your attorneys regarding the return of your personal effects from the Dalton office and CHSI's property still in your possession. Please arrange for the exchange of those items as soon as possible as directed by counsel.

Should you have any additional questions in connection with these matters, please direct them to our attorneys.

Very truly yours,

Joseph A. Wall
Chairman of the Board

cc:   Joshua I. Bosin, Esq.
      Mark S. Lange, Esq.

**Community Health Services of Georgia**

Expense Report - (920)

Name: Stephanie S. Dotson      Mileage @  0.565      Date: 12.20.13

| Date | Location/Purpose | Meals | Lodging | Air Fare | Seminar/ Meetings | Auto Miles | Taxi | Amount | Supplies | Totals |
|------|------------------|-------|---------|----------|-------------------|------------|------|--------|----------|--------|
| 11/23/2013 | Financial Services Meeting- additional charges that did not show up until after the last ER was subitted | | | | 173.67 | | | 0.00 | | 173.67 |
| 12/9/2013 | Hobby Lobby- gift wrap for misc. gifts | | | | | | | 0.00 | 37.03 | 37.03 |
| 12/10/2013 | UPS Store- packages shipped to Brian O'Rourke and Christal Borck | | | | | | | 0.00 | 42.92 | 42.92 |
| 12/12/2013 | Walmart/Bath & Body Works/Hallmark- office supplies | | | | | | | 0.00 | 264.83 | 264.83 |
| 12/16/2013 | Mark and Stephanie working lunch | 15.59 | | | | | | 0.00 | | 15.59 |
| 12/18/2013 | UPS Store- packages shipped to Sarah, Sheketra and Kathy | | | | | | | 0.00 | 97.60 | 97.60 |
| 12/19/2013 | Walmart- drinks for office | 8.53 | | | | | | | | 8.53 |
| 12/20/2013 | Misc. mileage for office errands from 11/1- 12/20/13 | | | | | 144 | | 81.36 | | 81.36 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| **Subtotals (A)** | | 24.12 | 0.00 | 0.00 | 173.67 | 144.00 | 0.00 | 81.36 | 442.38 | 721.53 |

| Miscellaneous: | | | |
|----------------|--|--|--|
| Dues/Licenses: | 9092 | | 0.00 |
| Taxes & Licenses: | 9550 | | 0.00 |
| Other Benefits: | 5086 | | 0.00 |
| Telephone: Monthly cell phone bill | 9094 | | 296.06 |
| | | | |
| | | | |
| | | | |
| | | Subtotal | 296.06 |
| | | Subtotal (A) | 721.53 |
| | | Grand Total | 1,017.59 |

Signature

Approval Signature



CONFIDENTIAL

CHSI_0006672



### Bath&BodyWorks

WALNUT SQUARE MALL
816 WALNUT STREET STE 24
DALTON, GA 30721

QUESTIONS? Call 1-800-308-1001

```
12/12/13                       6:43 PM
Trans.: 4963             Store: 00590
Reg.: 002              Till: 1002
Cashier: 1570042
           SALE
```

*barcode*

```
BXM1_14.52_FC_HNF       11.00 T
066793352T040    1 @   20.00
   Deal Discount Amt.
   2/$22 3-Wick Candles      (9.00)

BXM1_14.52_FC_HNF       11.00 T
066793352T040    1 @   20.00
   Deal Discount Amt.
   2/$22 3-Wick Candles      (9.00)

BXM1_14.52_FC_HNF       11.00 T
066793352T040    1 @   20.00
   Deal Discount Amt.
   2/$22 3-Wick Candles      (9.00)

BXM1_14.52_FC_HNF       11.00 T
066793352T040    1 @   20.00
   Deal Discount Amt.
   2/$22 3-Wick Candles      (9.00)

BXM1_14.52_FC_HNF       11.00 T
066793352T040    1 @   20.00
   Deal Discount Amt.
   2/$22 3-Wick Candles      (9.00)

BXM1_14.52_FC_HNF       11.00 T
066793352T040    1 @   20.00
   Deal Discount Amt.
   2/$22 3-Wick Candles      (9.00)

Total Discount              (54.00)

Subtotal                     66.00
  GA Tax 6.0000% on 66.00     3.96

Total                        69.96

Credit                       69.96
  Card: AmEX
  Account:      8099
  Auth: 662281 (A)
  Entry: Swipe

Total Tender                 69.96

Change Due                    0.00

TOTAL ITEMS PURCHASED = 6
```

---

### Walmart �belle
*Save money. Live better.*

```
( 706 ) 279 - 1906
MANAGER RICKY BARTLETT
2545 E WALNUT AVE
DALTON GA 30721
ST# 0669 OP# 00003101 TE# 21 TR# 09384
BATH TISSUE   003600010579   12.97 X
PAPER TOWELS  003700001438   13.97 X
TANDEM TOPKNI 001198778033   12.97 X
GP 320Z TRIO  001920003331    1.98 X
GP 320Z TRIO  001920003331    1.98 R
BATH TISSUE   007874202173    2.76 X
BATH TISSUE   007874202173    2.76 R
SWIFFER 16CT  003700000357   11.47 R
CLN GLOVE LG  006130638003    1.38 X
CLN GLOVE LG  006130638003    1.38 X
CLN GLOVE LG  006130638003    1.38 R
WONDER POP    007173602001    5.48 X
WONDER WIP    007173602041    5.48 X
DISHWAND      002120006626    2.98 X
AIRFRESHNER   068539131502   28.88 Y
F3 12PK       004000042137 F  1.78 R
CHOC 12PK     003400000661 F  1.78 R
CHOC 12PK     004000042138 F  1.78 R
CHOC 6PK      004000046707 F  1.00 R
CHOC 6PK      004000046707 F  1.00 R
CHOC 12PK     004000007018 F  1.78 R
CHOC         003400023930 F  1.78 R
M & M        004000042137 F  8.98 R
CHOC 6PK      004000046428 F  1.00 R
GV LUN AHRI  007074209261    1.12 X
GV LUN AHRI  007074209261    1.12 Y
CLXTBCLCHGL  004460004627    3.76 R
CLXTBCLCHGL  004460036627    3.76 R
KAM FRSTC    015703130270    3.88 X
KAM FRSTC    015703136270    3.88 Y
PSQLCLN10002 005119440229    4.86 Y
PLDG 6OZ 003 003600046080    4.86 Y
PLDG 6X H DL 026680072374    3.57 Y
PLDG 6X H DL 026680072374    3.97 Y
SB TOILT DEL 025207407400    6.97 Y
SB TOILT DEL 025207607600    6.97 Y
               SUBTOTAL     178.66
TAX 1  6.000 X               9.46
TAX 2  2.000 X               0.42
               TOTAL       188.44
AMEX TEND                  188.44
```

```
ACCOUNT #        XXXX XXXX XXXX 009 S
APPROVAL # 500266
REF # 334600616138
TERMINAL # 29016843

12/12/13     14:03:13

CHANGE DUE       0.00

# ITEMS SOLD 35
```

*barcode*  TC# 3765 2322 9905 0976 7312 6

```
Don't forget
Pick up your Layaway by Dec. 13th
  12/12/13     14:03:13
  ***CUSTOMER COPY***
```

---



Gift wrap : Christel B.
Brian B.
Angel S.

### HOBBY LOBBY

2103 E. Walnut Ave.
Dalton, GA 30721

Hobby Lobby Store #248 (706) 270-4030

```
S-248  R-3  I-0290 XYZ S       SALE

107500000     CardsParty      4.59
100000000     Sewing          4.89
100000000     Sewing          4.89
104000000     Christmas       4.99
  50 % Off (9.99-5.00)
104000000     Christmas       4.99
  50 % Off (9.99-5.00)
104000000     Christmas       4.99
104000000     Christmas       4.99
  50 % Off (9.99-5.00)

              SUBTOTAL        34.93
              TAX TOTAL        2.10
              TOTAL           37.03

AMEX                         37.00
ACCOUNT #: xxxxxxxxxx8099
AUTH#: 505469
REF#: 334313140099
CHANGE DUE                    0.00

Number of Items Purchased 7

Total savings: 20.00

   Thank you. Please come again.
   Become a fan on Facebook.
  RETURN POLICY ON BACK OF RECEIPT
Visit our website at www.hobbylobby.com
```

*barcode* 024800003290120931

```
12/9/13    02:14 PM

--Continued on Side 2--
```

---

may
*signature*
REPRINT
CLAY'S RESTAURANT
302 NORTHGATE DRIVE
DALTON, GA 30721
706-278-1155

```
12/15/2013              16:16:40
Merchant ID:     518009529014309
Device ID:                  6500
Terminal ID:                0001

         CREDIT CARD
         VISA SALE

CARD #       XXXXXXXXXXXX5555
TRANS #               1007
Batch #:                 0
Approval Code:       117012
ACI Code:                E
TRANS ID:    16339922129923
Entry Method:        Swiped
Mode:                 Online

SALE AMOUNT          $15.59

TIP AMOUNT

TOTAL AMOUNT         15.59
```

X *signature*
STEPHANIE L DOTSON

---

LYNNE HALLMARK
816 WALNUT SQ BLVD #25
DALTON, GA 30721

```
12/17/2013              18:27:12
Merchant ID:    0000000291475D
Terminal ID:          DE1343957

         CREDIT CARD
         VISA SALE

CARD #       XXXXXXXXXXXX5555
INVOICE               4092
Batch #:            000401
Approval Code:      704490
Entry Method:       Swiped
Mode:                Online

SALE AMOUNT          $6.43
```

CUSTOMER COPY

---

#1 of 1
Not Records

Sarah, Stefrie, Kelly

#1 of 1
Your Records

#1 of 1
Your Records

The UPS Store - #6179
1323 N Walnut Ave
Suite 2
Dalton, GA 30720
(706) 270-1153

12/10/13  01:44 PM

We are the one stop for all your
shipping, postal and business needs.

facebook.com/theupsstore6179
Twitter: @theupsstore6179

| 001 010002 (002) | T1 $ 2.50 |
| 08 X 08 x 06 box | NR |
| 002 020010 (009) ****5**** | T1 $ 1.26 |
| 08x08x08 Mat Std | |
| 003 030010 (016) ****0**** | T0 $ 1.00 |
| 08x08x08 Serv Std | |
| 004 101237 (002) | T1 $ 3.05 |
| 12x8x8 box | NR |
| 005 020010 (009) ****0**** | T1 $ 2.00 |
| 12x8x8 box Pac H S | |
| 006 030007 (016) ****0**** | T0 $ 1.00 |
| 12x8x8 box Pac S S | |
| 007 001040 (001) | T0 $ 15.41 |
| Ground Commercial | |
| Tracking 1ZA4292003243008223 | |
| 008 001045 (001) | T0 $ 16.33 |
| Ground Residential | |
| Tracking 1ZA4292003330066662 | |

Subtotal $ 42.34
6% Tax (1) $ 0.58
Total $ 42.92

American Express $ 42.92
ACCOUNT NUMBER * ****4**4*8000
Appr Code: (5) Sale

Items Designated NR are NOT eligible
for Returns, Refunds or Exchanges.

Receipt ID 0213450990964660600069 008 Items
CSM: David        Tran: 4079 Reg: 002

SEND YOUR PRINT JOB TO US AT:
store6179@theupsstore.com

Whatever your business and personal
needs, we are here to serve you.

ENTER FOR A CHANCE TO
WIN $1000

We value your feedback
To enter please complete the customer
satisfaction survey located at:

www.theupsstore.com/survey

For official rules and Teras and
Conditions go to www.theupsstore.com
and click on the Customer Experience
Survey link

---

The UPS Store - #6179
1323 N Walnut Ave
Suite 2
Dalton, GA 30720
(706) 270-1153

12/10/13  09:48 AM

We are the one stop for all your
shipping, postal and business needs.

facebook.com/theupsstore6179
Twitter: @theupsstore6179

| 001 010007 (002) | T1 $ 6.00 |
| 16 x 16 x 16 box | NR |
| 002 020025 (009) ****5**** | T1 $ 2.75 |
| 16x16x16 Mat Std | |
| 003 030025 (016) ****0**** | T0 $ 1.50 |
| 16x16x16 Serv Std | |
| 004 010005 (002) | T1 $ 3.95 |
| 12 x 12 x 12 box | NR |
| 005 020020 (009) ****4**** | T1 $ 4.10 |
| 12x12x12 Mat Froz | |
| 006 030020 (016) ****4**** | T0 $ 2.00 |
| 12x12x12 Serv Froz | |
| 007 010005 (002) | T1 $ 3.95 |
| 12 x 12 x 12 box | NR |
| 008 020070 (009) ****4**** | T1 $ 3.10 |
| 12x12x12 Mat Froz | |
| 009 030020 (016) ****4**** | T0 $ 2.00 |
| 12x12x12 Serv Froz | |
| 010 001045 (001) | T0 $ 24.94 |
| Ground Residential | |
| Tracking 1ZA4292003249433900 | |
| 011 001045 (001) | T0 $ 24.90 |
| Ground Residential | |
| Tracking 1ZA4292003396107304 | |
| 002 001045 (001) | T0 $ 0.00 |
| Ground Residential | |
| Reg Unit Price $ 13.22 | |
| Loyalty C (100.00%) $ 13.22- | |
| Tracking 1ZA4292003290491010 | |
| 013 001045 (001) | T0 $ 17.22 |
| Ground Residential | |
| Tracking 1ZA4292003294896921 | |

Subtotal $ 96.11
6% Tax (1) $ 1.49
Total $ 97.60

American Express $ 97.60
ACCOUNT NUMBER * ****4**4*8000
Appr Code: (3) Sale

Items Designated NR are NOT eligible
for Returns, Refunds or Exchanges.

Receipt ID 0213459972700360626H 013 Items
CSM: David        Tran: 5441 Reg: 002

SEND YOUR PRINT JOB TO US AT:
store6179@theupsstore.com

Whatever your business and personal
needs, we are here to serve you.

ENTER FOR A CHANCE TO
WIN $1000

We value your feedback
To enter please complete the customer
satisfaction survey located at:

www.theupsstore.com/survey

For official rules and Teras and
Conditions go to www.theupsstore.com
and click on the Customer Experience
Survey link



**Walmart**
Save money. Live better.

( 706 ) 279 - 1905
MANAGER RICKY BARTLETT
2646 E WALNUT AVE
DALTON GA 30721
ST# 0669 OP# 00000270 TE# 21 TR# 00810
DIET COKE      004900003637 F    4.18 R
DIET COKE      004900003637 F    4.18 R
                    SUBTOTAL      8.36
TAX 2    2.000 %                  0.17
                       TOTAL      8.53
            DEBIT TEND            8.53
         DEBIT CASH BACK         20.00
    TOTAL DEBIT PURCHASE         28.53
            CHANGE DUE           20.00


EFT DEBIT        PAY FROM PRIMARY
     8.53  PURCHASE
    20.00  CASH BACK
    28.53  TOTAL PURCHASE
ACCOUNT #   **** **** **** 5565  S
REF # 335400686143
NETWORK ID. 0056 APPR CODE 341305
TERMINAL # 29016843

        12/20/13    12:57:49

# ITEMS SOLD 2

    TC# 6203 0963 2143 3790 267

Our Guaranteed Low Prices
Are Unbeatable with Ad Match!
    12/20/13    12:57:51

PO BOX 4001
ACWORTH, GA 30101

| Manage Your Account & View Your Usage Details | Account Number | Date Due |
|---|---|---|
| My Verizon at www.verizonwireless.com | 820138869-00001 | 12/20/13 |
| Address Changed? -- go to vzw.com/changeaddress | Invoice Number | 6970017897 |

KEYLINE
/3070554466/

STEPHANIE DOTSON
4854 SMYRNA CHURCH RD
CHATSWORTH, GA 30705-5446

## Quick Bill Summary
Oct 26 - Nov 25

| | |
|---|---|
| Previous Balance (see back for details) | $153.14 |
| Payment — Thank You | −$153.10 |
| Adjustments | −$.04 |
| Balance Forward | $.00 |
| Monthly Charges | $127.98 |
| Usage and Purchase Charges | $156.63 |
| Verizon Wireless' Surcharges and Other Charges & Credits | $7.23 |
| Taxes, Governmental Surcharges & Fees | $4.22 |
| Total Current Charges | $296.06 |

**Total Charges Due by December 20, 2013**          **$296.06**

---

**Go Green With Paperless Billing
And Auto Bill Pay**
Ditch the monthly clutter. Save time and
postage by enrolling in paperless billing
and Auto Pay. See the Need-to-Know
section in the back of this bill for further
details.

---

| Pay from Wireless | Pay on the Web | Questions: |
|---|---|---|
| #PMT (#768) | My Verizon at www.verizonwireless.com | 1.800.922.0204 or *611 from your wireless |

VE

Bill Date          November 25, 2013
Account Number     820138869-00001
Invoice Number     6970017897

STEPHANIE DOTSON
4854 SMYRNA CHURCH RD
CHATSWORTH, GA 30705-5446

## Total Amount Due

will be submitted to credit card on 12/18/13
DO NOT MAIL PAYMENT                                        $296.06

PO BOX 660108
DALLAS, TX 75266-0108

/7526601085/

☐ Check here and fill out the back of this slip if your billing address
has changed or you are adding or changing your email address.

6970017897010820138869000010000296060000296067

CONFIDENTIAL

CHSI_0006676

Page 1 of 1

POSTED CHARGES

| | |
|---|---|
| Transaction Date: | 11/23/2013 Sat |
| Transaction Description: | HOTEL IBEROSTAR GRANHGUEY |
| | LODGING |
| | 133,300.00 DOMINICAN REPUBLIC PESO CONVERT |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 3,158.77 ✓ |
| Foreign Spend Amount: | 133,300.00 DOMINICAN REPUBLIC PESO |
| Doing Business As: | HOTEL IBEROSTAR GRAND |
| Merchant Address: | BAVARO |
| | BAVARO |
| | DOMINICAN REPUBLIC |
| Reference Number: | 820133300273488118 |
| Category: | Travel - Lodging |
| Transaction Date: | 11/23/2013 Sat |
| Transaction Description: | FOREIGN TRANSACTION FEE |
| | SUPERMERCADO IBEROSTHGUEY |
| | 529.02 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 0.79 |
| Reference Number: | 820133300273488116 |
| Category: | Fees & Adjustments - Fees & Adjustments |
| Transaction Date: | 11/23/2013 Sat |
| Transaction Description: | FOREIGN TRANSACTION FEE |
| | HOTEL IBEROSTAR GRANHGUEY |
| | 3,158.77 ✓ |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 85.26 |
| Reference Number: | 820133300273488116 |
| Category: | Fees & Adjustments - Fees & Adjustments |

Hotel Ibeostar Charges: $3,383.67
✓Tourist Card fees

Total expensed on 11/26: $3210.00
*Charges had not yet appeared on
Amex, despite date.

Difference owed: $173.67

CONFIDENTIAL

CHSI_0006677



**IBEROSTAR**
Bávaro
★★★★
*Grand Hotel*

**IBEROSTAR GRAND HOTEL BAVARO**
INVERSIONES CORALILLO
ARENA GORDA - HIGUEY
REPUBLICA DOMINICANA
TEL. +1 809 221 6500   FAX. +1 809 688 6186
iberostar.com

NCF : A010090010100065452

| | |
|---|---|
| DOTSON , | |
| chatstworth 6a | |
| 30705 | |
| USA | |
| ESTADOS UNIDOS DE AMÉRICA | |
| ESTADOS UNIDOS DE AMÉRICA | |

| Huésp. DOTSON ,STEPHANIE J. | Nş Fiscal |
|---|---|

| Factura/Invoice 65748/G13 | | |
|---|---|---|
| Fecha/Date 23/11/2013 | Pag. 1/2 | ORIGINAL |

| Llegada/Arrival 20/11/2013 | Habit./Room 7349 |
|---|---|
| Salida/Departure 23/11/2013 | Nş Reserva 15493/2013 |
| | Cuenta |

| Fecha/Date | Descripción/Description | Ser. | Tipo | Total | Descuento | Saldo/Balance |
|---|---|---|---|---|---|---|
| 20-11-2013 | Tratamiento SPA - STONE 80" | Al | STVM | 5.805,00 | | 5 805,00 |
| 20-11-2013 | Tratamiento SPA - MANICU+PEDIC -7219 | Al | STVM | 2.150,00 | | 7 955,00 |
| 20-11-2013 | Tratamiento SPA - MANICU+PEDICU | Al | STVM | 2.150,00 | | 10 105,00 |
| 20-11-2013 | Tratamiento SPA - AROMA  50" - 7112 | Al | STVM | 3.440,00 | | 13 545,00 |
| 20-11-2013 | Tratamiento SPA - AROMA 25"-7117 | Al | STVM | 1.935,00 | | 15 480,00 |
| 20-11-2013 | Tratamiento SPA - FACIAL CLASSIC -7212 | Al | STVM | 3.010,00 | | 18 490,00 |
| 21-11-2013 | Tratamiento SPA - DIA HIDROATANTE 7112 | Al | STVM | 9.030,00 | | 27 520,00 |
| 21-11-2013 | Tratamiento SPA - SWED 50"-  7209 | Al | STVM | 3.010,00 | | 30 530,00 |
| 21-11-2013 | Tratamiento SPA - SWED 80"-7219 | Al | STVM | 4.085,00 | | 34 615,00 |
| 21-11-2013 | Tratamiento SPA - SWED 80" --7212 | Al | STVM | 4.085,00 | | 38 700,00 |
| 21-11-2013 | Tratamiento SPA - SWED 80" --7114 | Al | STVM | 4.085,00 | | 42 785,00 |
| 21-11-2013 | Tratamiento SPA - TERAPIA 50- -7117 | Al | STVM | 3.870,00 | | 46 655,00 |
| 21-11-2013 | Tratamiento SPA - STONE 50 X2 PAX --7354 | Al | STVM | 10.535,00 | | 57 190,00 |
| 21-11-2013 | Tratamiento SPA - STONE 80"+ PEDICURE | Al | STVM | 7.740,00 | | 64 930,00 |
| 21-11-2013 | Tratamiento SPA - REFLEXOLOG-GRUPO DOTSON H | Al | STVM | 3.870,00 | | 68 800,00 |
| 21-11-2013 | Tratamiento SPA - REFLEXOLOG-GRUPO DOTSON H | Al | STVM | 2.150,00 | | 70 950,00 |
| 21-11-2013 | Tratamiento SPA - AROMA-GRUPO DOTSON HAB.711 | Al | STVM | 1.935,00 | | 72 885,00 |
| 22-11-2013 | Tratamiento SPA - FACIAL+TERAP+SPA MA | Al | STVM | 5.375,00 | | 78 260,00 |
| 22-11-2013 | Tratamiento SPA - CHOCO SOLO 10USD | Al | STVM | 430,00 | | 78 690,00 |
| 22-11-2013 | Tratamiento SPA - CELULI -7112 | Al | STVM | 1.935,00 | | 80 625,00 |
| 22-11-2013 | Tratamiento SPA - DIA BELLEZA --7209 | Al | STVM | 9.030,00 | | 89 655,00 |
| 22-11-2013 | Tratamiento SPA - STONE 80 | Al | STVM | 5.805,00 | | 95 460,00 |
| 22-11-2013 | Tratamiento SPA - STONE 80 | Al | STVM | 5.805,00 | | 101 265,00 |
| 22-11-2013 | Tratamiento SPA - AROMA 80 | Al | STVM | 4.515,00 | | 105 780,00 |
| 22-11-2013 | Tratamiento SPA - AROMA 80-- 7219 | Al | STVM | 4.515,00 | | 110 295,00 |
| 22-11-2013 | Tratamiento SPA - PROF +FACIAL+SPA MA | Al | STVM | 12.040,00 | | 122 335,00 |
| 22-11-2013 | Tratamiento SPA - TERAPIA 25 | Al | STVM | 2.150,00 | | 124 485,00 |
| 22-11-2013 | Tratamiento SPA - FACIAL EXPRESS--7117 | Al | STVM | 1.720,00 | | 126 205,00 |
| | Total Facturado (RD$) | | | 126 205,00 | 0,00 | 126 205,00 |

CONFIDENTIAL

CHSI_0006678



**IBEROSTAR**
Bávaro
★★★★★
*Grand Hotel*

IBEROSTAR GRAND HOTEL BAVARO
INVERSIONES CORALILLO
ARENA GORDA - HIGUEY
REPUBLICA DOMINICANA
TEL. +1 809 221 6500  FAX. +1 809 688 6186
iberostar.com

NCF : A010090010100065452

DOTSON ,
chatstworth 6a
30705
USA
ESTADOS UNIDOS DE AMÉRICA

ESTADOS UNIDOS DE AMÉRICA

| Huésp. DOTSON ,STEPHANIE J. | Nş Fiscal |
|---|---|

| Factura/Invoice 65748/G13 | |
| Fecha/Date 23/11/2013 | Pag. 2/2    ORIGINAL |

| Llegada/Arrival 20/11/2013 | Habit./Room 7349 |
| Salida/Departure 23/11/2013 | Nş Reserva 15493/2013 |
| | Cuenta |

| Fecha/Date | Descripción/Description | Ser. | Tipo | Total | Descuento | Saldo/Balance |
|---|---|---|---|---|---|---|
| | Transporte | | | 126 205,00 | | 126 205,00 |
| 22-11-2013 | Tratamiento SPA - PARCIAL 25 --7219 | AI | STVM | 1.720,00 | | 127 925,00 |
| 22-11-2013 | Tratamiento SPA - REFLEX | AI | STVM | 2.150,00 | | 130 075,00 |
| 23-11-2013 | Tratamiento SPA - REFLEXO --7304 | AI | STVM | 3.225,00 | | 133 300,00 |
| 23-11-2013 | TARJETA DE CREDITO - AMEX | AI | STVM | -133 300,00 | | 0.00 |

| | | Total Facturado (RD$) | 133 300,00 | 0.00 | 0.00 |
|---|---|---|---|---|---|

| Impuesto | Incidencia | Valor |
|---|---|---|
| 0.00% | 112 966,10 | 0.00 |
| 18.00% | 112 966,10 | 20 333,90 |
| | 225 932,20 | 20 333,90 |

Firma/Signature

FUNCIONARIO EMA

Procesado por computadora

**IBEROSTAR.COM**

IBEROSTAR
HOTELS & RESORTS

CONFIDENTIAL

DIRECCION GENERAL
DE IMPUESTOS
INTERNOS



Stephanie Dolson
TARJETA: ****-****-****-9400

Recibo de pago No. 0000000019862

11/7/2013 3:50:42 PM

República Dominicana-Dominican Republic

| DESCRIPCION | VALOR |
|---|---|
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131107155800069627 | |
| TOTAL | US$10.00 |

CONFIDENTIAL

CHSI_0006680




DIRECCION GENERAL
DE IMPUESTOS
INTERNOS
DGII-0040454

Stephanie Dolson
TARJETA: ***-****-****-9408

Recibo de pago No. 0000000019751

11/8/2013 4:48:51 PM

República Dominicana-Dominican Republic

| DESCRIPCION | VALOR |
|---|---|
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106164800069389 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106164800069390 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106164800069391 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106164800069392 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106164800069393 | |
| TOTAL | US$50.00 |

CHSI_0006681

DIRECCION GENERAL
DE IMPUESTOS
INTERNOS

Stephanie Dotson
TARJETA: ****-****-****-9408

### Recibo de pago No. 0000 /00019762

11/8/2013 4:54:57 PM

República Dominicana-Dominican Republic

| DESCRIPCION | VALOR |
|---|---|
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106165400069394 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106165400069395 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106165400069396 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106165400069397 | |
| TARJETA DE TURISTA | US$10.00 |
| NO. 9407131106165400069398 | |
| TOTAL | US$50.00 |

CHSI_0006682

CHSI_0006663

**RECEIPT** DATE 02.04.14          No. 030718

RECEIVED FROM Beth Caldwell          $ 50.00

Fifty + n _____ DOLLARS

FOR RENT
FOR birthday cake for Benson Ranson - UPP today

| ACCOUNT | | CASH | # 1148 |
|---------|---|------|--------|
| PAYMENT | 50.00 | CHECK | FROM _____ TO _____ |
| BAL. DUE | 0 | MONEY ORDER / CREDIT CARD | BY Beth Caldwell |

**Community Health Services of Georgia**

**Expense Report - (920)**

| Name: | Stephanie S. Dotson | | | | Mileage @: | 0.560 | | Date: | 2.6.14 | |
|---|---|---|---|---|---|---|---|---|---|---|

| Date | Location/Purpose | Meals | Lodging | Air Fare | Seminar/ Meetings | Auto | | Amount | Supplies | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Miles | Taxi | | | |
| 1/21-1/24 | PC Meeting at The Waverly/ Meeting at Twelve Atlantic Station Hotel to tour meeting space | 70.02 | | | 1150.79 | 207 | 6.00 | 120.92 | | 1341.73 |
| 1/22/2014 | Ethics Leadership Team Meeting at The Waverly [PLEASE CODE TO CHS] | | | | 875.44 | | | 0.00 | | 875.44 |
| 1/24/2014 | Managed Care Meeting at The Waverly (PLEASE CODE TO RONNIE) | | | | 787.33 | | | 0.00 | | 787.33 |
| 1/27/2014 | Buesch Travel- LDP change fee for Shelley Marshall's flight/ deposit for LDP meeting | | 261.00 | | 500.00 | | | 0.00 | | 761.00 |
| 1/31/2014 | LDP offsite meeting in February- hotel accommodations | | 12845.15 | | | | | 0.00 | | 12845.15 |
| 2/3/2014 | Walmart-computer wipes/USB flash drive/Apple Tech Support call/extra mouse (3) for the office and LDP/ Deposit for Cumine's dinner (LDP offsite meeting) | 320.00 | | | | | | 0.00 | 92.28 | 412.28 |
| 2/4/2014 | Leadership Development Program in Atlanta/ Cake for Genten Ransaw/Rocky Face Post Office | 1157.38 | 368.88 | | | 236 | 76.00 | 208.16 | 150.00 | 1864.42 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| Subtotals (A) | | 1547.40 | 13475.03 | 0.00 | 3313.56 | 443.00 | 81.00 | 331.30 | 242.28 | 18909.57 |

| Miscellaneous: | | | |
|---|---|---|---|
| Dues/Licenses: | 9092 | | 0.00 |
| Taxes & Licenses: | 9680 | | 0.00 |
| Other Benefits: | 6086 | | |
| Telephone: | 9094 | | 144.78 |
| | | | |
| | | | |
| | | | |
| | Subtotal | | 144.78 |
| | Subtotal (A) | | 18,909.57 |
| | Grand Total | | 19,054.35 |

Signature

Approval Signature

EXHIBIT
32

CONFIDENTIAL

CHSI 0006684

Bursch Travel -
Let us help plan
your dream
vacation

Bursch Travel/American Express
15 locations to serve you
Contact Information
www.burschtravel.com



Travel
Services
Representative

COMMUNITY HEALTH SERVICES OF GA
MARK WALDROP
1013 RIVERBURCH PARKWAY SUITE ONE
DALTON GA 30721

## PASSENGER INFORMATION

| | |
|---|---|
| Company Name: ETHICA HEALTH AND RETIREMENT | Account No.: 7064280158 |
| Date Issued: January 27, 2014 | Agency Confirmation: 4AWB3D |
| Agent: MARY JO | Invoice #: 064462 |
| First Name: SHELLEY,MOORE | Last Name: MARSHALL |

## CONFIRMATION INFORMATION

TICKET CONFIRMATION FOR DELTA IS GDAMCA

## FLIGHT                                              ▲ DELTA

**Tuesday February 18, 2014**

| | |
|---|---|
| Air Vendor: DELTA | Flight Number: 2386 |
| From: ATLANTA | Departs: 04:45 PM |
| To: LGA | Arrives: 07:02 PM |
| Seat: 29-A **RESERVED** | Ticket Confirmation: GDAMCA |
| Aircraft: M80 | Class of Service: [ X ] ECONOMY CLASS |
| Operated By: DELTA | Flight Type: NON-STOP |

BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY | DEPART TERMINAL S | ARRIVE TERMINAL D | MILES 756 | FLIGHT DURATION 2.17 HRS

## FLIGHT                                              ▲ DELTA

**Thursday February 20, 2014**

| | |
|---|---|
| Air Vendor: DELTA | Flight Number: 1147 |
| From: LGA | Departs: 08:00 PM |
| To: ATLANTA | Arrives: 10:44 PM |
| Seat: 28-D **RESERVED** | Ticket Confirmation: GDAMCA |
| Aircraft: M80 | Class of Service: [ T ] ECONOMY CLASS |
| Operated By: DELTA | Flight Type: NON-STOP |

BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY | DEPART TERMINAL D | ARRIVE TERMINAL S | MILES 756 | FLIGHT DURATION 2.44 HRS

## INVOICE INFORMATION

| | |
|---|---|
| Invoice #: | 064462 |
| Air Fare: | $ 261.39 |
| Taxes And Carrier Imposed Fees: | $ 41.61 |
| Admin/Penalty Fee: | $ 200.00 |
| Exchanged Fare: | $ -292.00 |
| Total Air Fare: | $ 211.00 |
| Service Fee: | $ 25.00 |
| Total: | $ 236.00 |
| Total Payment: | $ 236.00 |

## PAYMENT HISTORY

| Date | Form of Payment | Credit Card Number/Type | Amount |
|---|---|---|---|
| 01/27/14 | Credit Card | XXXX XXXXXX X8009/AX | $ 236.00 |
| 01/27/14 | Exchanged Ticket | T-0067330881362 | -$ 292.00 |

CONFIDENTIAL

CHSI_0006685

## GENERAL INFORMATION

TICKET NUMBER(S):    E0067331824603
SERVICE FEE MCO:     8900627588344

EXCHANGE DOCUMENT(S): T-0067330881362

## REMARKS

GOVT ISSUED PHOTO ID REQUIRED TO BOARD AIRCRAFT.
TRIP PROTECTION INSURANCE IS RECOMMENDED.
CHECK ALL DOCUMENTS FOR ACCURACY.
PRICES ARE SUBJECT TO INCREASE PRIOR TO YOUR FULL
PAYMENT ON ANY TRIP INCLUDING AIR.
AFTER FULL PAYMENT PRICES ARE NOT SUBJECT TO
INCREASE EXCEPT FOR INCREASES IN GOVERNMENT
IMPOSED TAXES AND FEES.
FOR BAGGAGE ALLOWANCE/FEE INFORMATION
VISIT WWW.BURSCHTRAVEL.COM
TICKETS ARE NONREFUNDABLE. PENALTY APPLIES TO
ANY CHANGES MADE
PLEASE RECONFIRM ALL FLIGHTS PRIOR TO DEPARTURE
CHECK IN NO LATER THAN 90 MINUTES PRIOR TO
DEPARTURE FOR DOMESTIC FLIGHTS AND 2 HOURS FOR
INTERNATIONAL FLIGHTS OR BOARDING MAY BE DENIED
SEAT ASSIGNMENTS ARE NOT GUARNTEED
CHANGES AND CANCELLATIONS MUST BE MADE PRIOR TO
YOUR DEPARTURE FLIGHT OR YOU COULD LOSE YOUR
TICKET.

OnQueue™ - © 2013 MagnaTech - all rights reserved  -  Travel Agency Systems by Magnatech

CONFIDENTIAL                                                                 CHSI_0006686

**Stephanie Dotson**

| | |
|---|---|
| **From:** | Mary Jo Follmuth <MaryJoF@burschtravel.com> |
| **Sent:** | Thursday, January 30, 2014 12:53 AM |
| **To:** | Stephanie Dotson |
| **Subject:** | Travel Itinerary/Invoice for SHELLEY.MOORE MARSHALL - Travel Date February 18, 2014 |

Stephanie,

I have attached the invoice to change Shelley's ticket. Click on the link below.

Thanks,
Mary Jo

Bursch Travel
220 Division Street
Waite Park, MN 56387
320-251-3180 - Phone
320-251-3391 - Fax

Please click here to view your itinerary online.

If receiving on a PDA, please scroll down to view itinerary.

**Note:** The attached .ics file(s) contain(s) travel information that can be inserted into your iCal compliant calendar. Please disregard if not applicable.

If you can't click on the link(s) above or if your itinerary does not display correctly, simply copy the link (excluding the brackets) from below and paste it into your browser window's address field.

Online itinerary: [http://magna.magnatech.com/OnQueue/3RD/Feb-18-2014022020143RD3334353A3437343835393336.htm]
If the itinerary is still not appearing, please advise your travel agent.

Bursch Travel
220 Division Street
Waite Park MN 56387
320-251-3180 - Phone
320-251-3391 - Fax

--
COMMUNITY HEALTH SERVICES OF GA
MARK WALDROP
1013 RIVERBURCH PARKWAY SUITE ONE

1

CONFIDENTIAL

CHSI_0006687

DALTON GA 30721

Passenger Information

Company Name: ETHICA HEALTH AND RETIREMENT
Account No.: 7064280158
Date Issued: January 27, 2014
Agency Confirmation: 4AWB3D
Agent: MARY JO
Invoice #: 064462
First Name: SHELLEY.MOORE
Last Name: MARSHALL
CONFIRMATION INFORMATION
TICKET CONFIRMATION FOR DELTA IS GDAMCA


FLIGHT

Tuesday February 18, 2014
http://www.flightstats.com/go/FlightStatus/flightStatusByFlight.do?airline=DL&flightNumber=2386&departureDate=2014-02-18
http://magna.magnatech.com/GetMap.html?LGA%20airport
http://www.delta.com/traveling_checkin/index.jsp
Air Vendor: DELTA
Flight Number: 2386
From: ATLANTA
Departs: 04:45 PM
To: LGA
Arrives: 07:02 PM
Seat: 29-A **RESERVED**
Ticket Confirmation: GDAMCA
Aircraft: M80
Class of Service: [ X ] ECONOMY CLASS
Operated By: DELTA
Flight Type: NON-STOP
BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY
DEPART TERMINAL S
ARRIVE TERMINAL D
MILES 756
FLIGHT DURATION 2.17 HRS


FLIGHT

Thursday February 20, 2014
http://www.flightstats.com/go/FlightStatus/flightStatusByFlight.do?airline=DL&flightNumber=1147&departureDate=2014-02-20
http://magna.magnatech.com/GetMap.html?ATL%20airport
http://www.delta.com/traveling_checkin/index.jsp
Air Vendor: DELTA
Flight Number: 1147
From: LGA
Departs: 08:00 PM
To: ATLANTA
Arrives: 10:44 PM
Seat: 28-D **RESERVED**
Ticket Confirmation: GDAMCA
Aircraft: M80
Class of Service: [ T ] ECONOMY CLASS
Operated By: DELTA
Flight Type: NON-STOP

2

CONFIDENTIAL

CHSI 0006688

BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY
DEPART TERMINAL D
ARRIVE TERMINAL S
MILES 756
FLIGHT DURATION 2.44 HRS


INVOICE INFORMATION

Invoice #:064462
Air Fare:$ 261.39
Taxes And Carrier Imposed Fees:$ 41.61
Admin/Penalty Fee$ 200.00
Exchanged Fare:$ -292.00
Total Air Fare:$ 211.00
Service Fee:$ 25.00
Total:$ 236.00
Total Payment:$ 236.00


PAYMENT HISTORY

01/27/14
Credit Card
XXXX XXXXXX X8009/AX
$ 236.00
01/27/14
Exchanged Ticket
T-0067330881362
-$ 292.00


GENERAL INFORMATION

TICKET NUMBER(S):      E0067331824603
SERVICE FEE MCO:       8900627588344
EXCHANGE DOCUMENT(S): T-0067330881362


REMARKS

GOVT ISSUED PHOTO ID REQUIRED TO BOARD AIRCRAFT.
TRIP PROTECTION INSURANCE IS RECOMMENDED.
CHECK ALL DOCUMENTS FOR ACCURACY.
PRICES ARE SUBJECT TO INCREASE PRIOR TO YOUR FULL
PAYMENT ON ANY TRIP INCLUDING AIR.
AFTER FULL PAYMENT PRICES ARE NOT SUBJECT TO
INCREASE EXCEPT FOR INCREASES IN GOVERNMENT
IMPOSED TAXES AND FEES.
FOR BAGGAGE ALLOWANCE/FEE INFORMATION
VISIT WWW.BURSCHTRAVEL.COM
TICKETS ARE NONREFUNDABLE. PENALTY APPLIES TO
ANY CHANGES MADE
PLEASE RECONFIRM ALL FLIGHTS PRIOR TO DEPARTURE
CHECK IN NO LATER THAN 90 MINUTES PRIOR TO
DEPARTURE FOR DOMESTIC FLIGHTS AND 2 HOURS FOR
INTERNATIONAL FLIGHTS OR BOARDING MAY BE DENIED
SEAT ASSIGNMENTS ARE NOT GUARNTEED
CHANGES AND CANCELLATIONS MUST BE MADE PRIOR TO
YOUR DEPARTURE FLIGHT OR YOU COULD LOSE YOUR
TICKET.

*add $25⁰⁰ Prof fee from Bursch as listed on Amex 1/27/14* (handwritten)

3

CONFIDENTIAL

CHSI_0006689

*Managed Care +*
*Medicaid RFP*
*Task Force Mtgs - Ronnie*
*Hunter*

the Renaissance Atlanta Waverly Hotel & Convention Center
**BANQUET CHECK DETAIL**

Check #:    574373
Check Date: 01/24/14
Manager:    //
Room:    MULTIPLE

Community Health System
Community Health System Meetin
1013 RIVERBURCH PARK
DALTON, GA 30721-8888

Page #: 1
Bill Method: NA
Tax Exempt: N
BEO #: 600400

Friday, January 24, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|---|---|---|---|---|---|
| **Food** | | | | | |
| Coffee Break, Cobb | | | | | |
| | 1 | Freshly Brewed Starbucks Regular Coffee | 68.00 | 68.00 | |
| | 1 | Freshly Brewed Starbucks Decaffeinated Coffee | 68.00 | 68.00 | |
| | 1 | Assorted Tazo Teas | 68.00 | 68.00 | |
| | | Food SUBTOTAL | | 204.00 | |
| **Audio Visual** | | | | | |
| Meeting, Cobb | | | | | |
| | 1 | LCD Meeting Room Package including 3500 Lumens Projector, Projector Cart, Tripod Screen and Power | 395.00 | 395.00 | |
| | | Audio Visual SUBTOTAL | | 395.00 | |

Bqt Service Charge 24%          48.96
AV Service Charge 24%           94.80
State Sales Tax 6%              15.18
AV State Sales Tax 6%           29.39

GRAND TOTAL                    787.33

30

CONFIDENTIAL

CHSI_0006690


PC Meeting on 1/20

the Renaissance Atlanta Waverly Hotel & Convention Center
BANQUET CHECK DETAIL

Check #:      628657
Check Date: 01/20/14
Manager:     /EC/
Room:        MULTIPLE

Community Health System
Ethica Health and Retirement C
1013 RIVERBURCH PARK
DALTON, GA 30721-8888

Page #: 1
Bill Method: NA
Tax Exempt: N
BEO #: 725554

Monday, January 20, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|---|---|---|---|---|---|
| **Food** | | | | | |
| Continuous Break, Stately | | | | | |
| | 2 | Still Bottled Waters | 3.25 | 6.50 | |
| | 1 | Freshly Brewed Starbucks Regular Coffee | 68.00 | 68.00 | |
| | 1 | Assorted Soft Drinks | 4.00 | 4.00 | |
| | 1 | Assorted Tazo Teas | 68.00 | 68.00 | |
| | | Food SUBTOTAL | | 146.50 | |
| **Audio Visual** | | | | | |
| Meeting, Stately | | | | | |
| | 1 | LCD Meeting Room Package including 3500 Lumens Projector, Projector Cart, Tripod Screen and Power | 395.00 | 395.00 | |
| | | Audio Visual SUBTOTAL | | 395.00 | |
| **Room Rental** | | | | | |
| Meeting, Stately | | | | | |
| | 1 | Stately | 350.00 | 350.00 | |
| | | Room Rental SUBTOTAL | | 350.00 | |

|  |  |
|---|---|
| Bqt Service Charge 24% | 119.16 |
| AV Service Charge 24% | 94.80 |
| State Sales Tax 6% | 15.94 |

MARRIOTT CONFIDENTIAL AND PROPRIETARY INFORMATION

30

CONFIDENTIAL

CHSL 0006601

the Renaissance Atlanta Waverly Hotel & Convention Center
BANQUET CHECK DETAIL

Check #:     628657
Check Date: 01/20/14
Manager:    /EC/
Room:       MULTIPLE

Community Health System
Ethica Health and Retirement C
1013 RIVERBURCH PARK
DALTON, GA 30721-8888

Page #: 2
Bill Method: NA
Tax Exempt: N
BEO #: 725554

Monday, January 20, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|----------|----------|------|------------|----------|-------|
| | | | | AV State Sales Tax 6% | 29.39 |
| | | | | GRAND TOTAL | 1,150.79 |

MARRIOTT CONFIDENTIAL AND PROPRIETARY INFORMATION
Page    6

CONFIDENTIAL

CHSI_0006692

*Ethical Leadership Team Meeting Dinner $875.44 total*

## the Renaissance Atlanta Waverly Hotel & Convention Center
### BANQUET CHECK DETAIL

| | | |
|---|---|---|
| Check #:    518354 | Community Health System | Page #: 1 |
| Check Date: 01/21/14 | Community Health System Meetin | Bill Method: NA |
| Manager:    / / | 1013 RIVERBURCH PARK | Tax Exempt: N |
| Room:    MULTIPLE | DALTON, GA 30721-8888 | BEO #: 600345 |

Tuesday, January 21, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|---|---|---|---|---|---|
| **Food** | | | | | |
| Coffee Break, Stately | | | | | |
| | 6 | Still Bottled Waters | 3.25 | 19.50 | |
| | 4 | Assorted Soft Drinks | 4.00 | 16.00 | |
| | 1 | Assorted Tazo Teas | 68.00 | 68.00 | |
| | 1 | Freshly Brewed Starbucks Regular Coffee | 68.00 | 68.00 | |
| | | Food SUBTOTAL | | 171.50 | |
| **Room Rental** | | | | | |
| Meeting, Stately | | | | | |
| | 1 | Stately | 350.00 | 350.00 | |
| | | Room Rental SUBTOTAL | | 350.00 | |

| | |
|---|---|
| Bqt Service Charge 24% | 125.16 |
| State Sales Tax 6% | 17.80 |
| **GRAND TOTAL** | 664.46 |

MARRIOTT CONFIDENTIAL AND PROPRIETARY INFORMATION

30

CONFIDENTIAL

CHSI_0006693

*the Renaissance Atlanta Waverly Hotel & Convention Center*
**RETAIL OUTLET CHECK DETAIL**

*COMMUNITY HEALTH SYSTEM*
*COMMUNITY HEALTH SYSTEM M*
*Event Dates 01/21/14 to 01/21/14*
*Invoice Number ****DRAFT****.*

```
        & & & 402 & & &
********* ROOM SERVICE *********
241 CHARLES                   3
---------------------------------
TBL 1/1      6312    GST 8
            STATELY/ROOM
            21JAN'14 11:25AM
---------------------------------
   MIXED/GREEN
 1 OPEN FOOD COLD      7.00
 1 SALMON SPINACH     16.00
 2 TURKEY CLUB        28.00
 1 SALMON CEASAR      16.00
 1 CHIX SPINACH       14.00
 1 CHIX CEASAR        14.00
 1 CHOP SALAD         14.00
 1 CRAB CAKE SAND     14.00
 1 DESSERT             5.00
 1 TUSCAN BURGER      12.00
 1 SOFT DRINK          3.50
 3 SOFT DRINK          9.00
 1 ICED TEA            3.00
   Sub-Total:        155.50
   DELIVERY CHARGE    13.00
   20% RS SVC CHG     31.10
      Tax             11.38
      Total:     210.98
      CHARGE TIP $    10.00
   1A000864
   ROOM/ACCT CHG     210.98
------241 CLOSED 21JAN  1:48PM------
```

CONFIDENTIAL                                    CHSI_0006694



# TWELVE™

Community Health Services of Georgia
United States

| | |
|---|---|
| Date | 01-27-14 |
| Time | 04:50 PM |
| Room | |
| Conf. No. | 3725156 |
| Recpt. No. | 129703 |

### Credit Card Receipt

| Date | Description | Exp Date | Amount |
|---|---|---|---|
| 01-27-14 | American Express  XXXXXXXXXXX8009 | XX/XX | 500.00USD |

| Arrival | Departure | Group ID / Room Type |
|---|---|---|
| 02-04-14 | 02-05-14 | 4214260 |

Guest Signature

Cashier No.   1

Room deposit for LDP 2/5

TWELVE Hotels & Residences ATLANTIC STATION
361 17th Street | NW Atlanta, GA 30308
M: 404-961-1212 | F: 404-961-2121
TWELVE ATLANTIC STATION is located at the corner of 17th & Market Street

CONFIDENTIAL                                                                CHSI-0006605

PO BOX 4001
ACWORTH, GA 30101

| Manage Your Account & View Your Usage Details | Account Number | Date Due |
|---|---|---|
| My Verizon at www.verizonwireless.com | 820138869-00001 | 02/20/14 |
| Address Changed? -- go to vzw.com/changeaddress | Invoice Number | 6995332899 |

KEYLINE
/3070554466/

STEPHANIE DOTSON
4854 SMYRNA CHURCH RD
CHATSWORTH, GA  30705-5446

## Quick Bill Summary

Dec 26 - Jan 25

| | |
|---|---|
| Previous Balance (see back for details) | $150.88 |
| Payment -- Thank You | −$150.88 |
| Balance Forward | $.00 |
| Monthly Charges | $127.98 |
| Usage and Purchase Charges | $9.95 |
| Verizon Wireless' Surcharges and Other Charges & Credits | $2.63 |
| Taxes, Governmental Surcharges & Fees | $4.22 |
| Total Current Charges | $144.78 |

**Total Charges Due by February 20, 2014**          **$144.78**

**2014 Resolution -- Go Paperless**
Sign up for paperless billing and save postage, reduce clutter and help the environment. Visit go.vzw.com/gogreen to learn more.

| Pay from Wireless | Pay on the Web | | Questions: |
|---|---|---|---|
| #PMT (#768) | My Verizon at www.verizonwireless.com | | 1.800.922.0204 or *611 from your wireless |

VE

Bill Date               January 25, 2014
Account Number          820138869-00001
Invoice Number          6995332899

STEPHANIE DOTSON
4854 SMYRNA CHURCH RD
CHATSWORTH, GA  30705-5446

## Total Amount Due

will be submitted to credit card on 02/18/14
DO NOT MAIL PAYMENT                                    $144.78

PO BOX 660108
DALLAS, TX  75266-0108

/7526601085/

☐  Check here and fill out the back of this slip if your billing address has changed or you are adding or changing your email address

6995332899010820138869000010000144780000144787

CONFIDENTIAL

DA VINCI'S PIZZA OF MIDTOWN
1270 N PEACHTREE ST NW
ATLANTA GA 30309
404-249-7800

Merchant ID: 619299134
Term ID: 3004

Sale

AMEX
XXXXXXXXXXX8005
Entry Method: Manual
Apprvd: Online    Batch#: 000004
02/05/14                    07:45:46
AVS Code: Y

Inv#: 00000023  Appr Code: 122198

Amount:      $      26.68
Tip:                     3.00
Total:                  29.68

Customer Copy
THANK YOU

---

LongHorn 5302
1301 Lovers Lane Rd
Calhoun, GA 30701
****Take Out****

                        Check # :17597
MJ
02:51 PM 02/04/2014
Transaction #:1715393229

Card Number              Auth Code
XXXXXXXXXXX 5555           763997
dotson/ stephanie            Visa

Check Amount            9.08

Tip....               2.00

Total...             10.08

X_____
Cardmember agrees to pay total in
accordance with agreement governing
use of such card.

Restaurant Copy

---





Walmart ✦
Save money. Live better.

( 706 ) 279 - 1905
MANAGER RICKY BARTLETT
2545 E WALNUT AVE
DALTON GA 30721
ST# 0669 OP# 00000207 TE# 53 TR# 08890
** RETRIEVED TRANSACTION 48604498466 **
ZSS CS WP 20 066283460110       1.88 X
ZSS CS WP 20 066283460110       1.88 X
4G USB DRIVE 061965909200       7.97 X
WIPES        007487766660       2.88 X
WIPES        007487766660       2.88 X
PC MOUSE     088537022063      19.88 X
**   RETRIEVED ITEMS COMPLETE       X
              SUBTOTAL         37.37
WWW HDWR     088537016394      15.88 X
WWW HDWR     088537016394      15.88 X
              SUBTOTAL         69.13
   TAX 1  6.000 %               4.15
              TOTAL            73.28
         AMEX TEND            73.28

ACCOUNT #       **** **** ***8 009 S
APPROVAL # 6H5061
REF # 403600456412
TERMINAL # 03007223

      02/04/14    09:18:56

            CHARGE DUE      0.00

# ITEMS SOLD 8

TC# 1660 7298 9170 9342 823
Our Guaranteed Low Prices
Are Unbeatable with Ad Match!
02/04/14    09:18:57

***CUSTOMER COPY***

CONFIDENTIAL



PC Meeting

RED LOBSTER 0392
2570 Cobb Parkway
Smyrna, GA 30080-3009
Check # :22370

Table 3
Terrence :
11:41 01/26/2014                    Gst 1
Transaction #:1534654029

............................................

ID # 0271 26376 9818

*********************************
*  We value your opinion. Please  *
*  tell us about your dining      *
*  experience by completing an    *
*  online survey within 7 days of *
*  your visit. You could win a    *
*  $1,000 Grand Prize or 1 of 100 *
*  $50 prizes. Winners are drawn  *
*  monthly!!                      *
*                                 *
*  To complete the survey and enter *
*  the contest, go to             *
*  www.RedLobsterSurvey.com and   *
*  enter the ID on this receipt.  *
*  NO PURCHASE NECESSARY. Void where *
*  prohibited. See Official Rules at *
*  www.RedLobsterSurvey.com.      *
*                                 *
*  Valoramos su opinión. Complete la *
*  encuesta sobre su experiencia  *
*  gastronómica en                *
*  www.RedLobsterSurvey.com.      *
*********************************
(OFFER EXPIRES Jan 27, 2014)

............................................

Card Number              Auth Code
xxxxxxxxxxxx 5555           035910
dotson/ stephanie            Visa

Check Amount            22.78

Tip Not Included

Suggested tip amounts    15% = $3.22
are provided for your    18% = $3.07
convenience.             20% = $4.30

Tip..... 300

Total... 26—

X _____
Cardholder agrees to pay total in
accordance with agreement governing
use of such card.

Guest Copy

---

1301 Lovers Lane Rd
Calhoun, GA 30701
Check # :19991

Table 912
MJ
07:09 PM 01/20/2014
Transaction #:1587344029

------------------------------------
LongHorn 5302
1301 Lovers Lane Rd
Calhoun, GA 30701

Check # :19???

Table 912
19:09:37 01/20/2014

............ Guest No.1 ............

1 Water
1 Firecracker Wrap             8.49
1 Wild West Shrimp             9.29
------------------------------------
                 Subtotal     17.78
               Sales Tax       1.24

19:09:37 01/20/2014
           Please pay this amount
            T o t a l     19.02

Tip Not Included
------------------------------------
Suggested tip amounts    15% = $2.67
are provided for your    18% = $3.20
convenience.             20% = $3.56

(5555)Visa                   19.02

       Amount Due      0.00
          Change       0.00

Bar

Name: OK

*******************************
Join our LongHorn Hospitality Club
for great deals and a FREE appetizer
with purchase of 1 adult dinner entree
www.longhornsteakhouse.com/join
*******************************
* * * * * * * * * * * *
Keith Rauch
Managing Partner

(706) 624-4250

---



Manager Cue
LOS REYES MEXICAN RE
1235 GLENWOOD AVE
DALTON, GA 30721

TERMINAL I.D.:            LXU73411
MERCHANT # :         038580479118?

VISA                       SALE: 1
XXXXXXXXXXXX5555
SALE
BATCH: 000147    INV: 000031
DATE: JAN 17, 14    TIME: 11:4
REF#: 401703628414 AUTH:682159
AVS RESPONSE: B

BASE              $20.23

TIP                4.77

TOTAL            25—

STEPHANIE DOTSON

        1235 Glenwood Ave
        Dalton, GA 30721
        706-226-0032

CUSTOMER COPY

POSTED CHARGES

| | |
|---|---|
| Transaction Date: | 01/27/2014 Mon |
| Transaction Description: | BURSCH TRAVEL AGENCYWAITE PARK MN |
| | 012709 TRAVEL AGENCY |
| | TRAVEL AGENCY SERVICE |

| From: | To: | Carrier: | Class: |
|---|---|---|---|
| N/A | N/A | YY | |
| N/A | | | |
| N/A | | | |
| N/A | | | |

Ticket Number: 8907331824B032

Passenger Name: MARSHAL/SHELLEY.MOO

Document Type: TRAVEL AGENCY FEE

*Charge for Shelley Marshall's flight (LDP)*

| | |
|---|---|
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 25.00 |
| Doing Business As: | AIRLINES RPRTING CORPTAF |
| Merchant Address: | 3000 WILSON BLVD |
| | STE 300 |
| | ARLINGTON |
| | VA |
| | 22201-3862 UNITED STATES |
| Reference Number: | 32014028023930B9743 |
| Category: | Travel - Travel Agencies |

| | |
|---|---|
| Transaction Date: | 01/28/2014 Tue |
| Transaction Description: | TWELVE ATLANTIC STATATLANTA GA |
| | 3990699 4046618983 |

| Arrival Date | Departure Date |
|---|---|
| 02/04/14 | 02/05/14 |

LODGING

CARDEPOSIT

4049618983

| | |
|---|---|
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 500.00 |
| Doing Business As: | TWELVE ATLANTIC STATION |
| Merchant Address: | 361 17TH ST NW |
| | ATLANTA |
| | GA |
| | 30363-1076 UNITED STATES |
| Reference Number: | 32014028024764B527 |
| Category: | Travel - Lodging |

| | |
|---|---|
| Transaction Date: | 01/31/2014 Fri |
| Transaction Description: | DOUBLETREE GSTSTE NYNEW YORK NY |
| | 0002092415 (212)719-1600 |

| Arrival Date | Departure Date |
|---|---|
| 01/29/14 | 01/30/14 |

LODGING

(212)719-1600

| | |
|---|---|
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 12,845.15 |
| Doing Business As: | DOUBLETREE GST STE NY FD |
| Merchant Address: | 1568 BROADWAY |
| | NEW YORK |
| | NY |
| | 10036-8201 UNITED STATES |
| Reference Number: | 32014031027B595659 |
| Category: | Travel - Lodging |

https://online.americanexpress.com/myca/shared/summary/estatement/print_doc.html          2/6/2014

CONFIDENTIAL

CHSI_0006699

| Transaction Date: | 01/31/2014 Fri |
| Transaction Description: | RENAISSANCE WAVERLY ATLANTA GA |
| | 695 LODGING |
| | Arrival Date   Departure Date |
| | 01/20/14     01/30/14 |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 1,150.79 |
| Doing Business As: | RENAISSANCE WAVERLY |
| Merchant Address: | 2450 GALLERIA PKWY SE |
| | ATLANTA |
| | GA |
| | 30339-3130 UNITED STATES |
| Reference Number: | 320140310283601040 |
| Category: | Travel - Lodging |

| Transaction Date: | 01/31/2014 Fri |
| Transaction Description: | RENAISSANCE WAVERLY ATLANTA GA |
| | 694 LODGING |
| | Arrival Date   Departure Date |
| | 01/21/14     01/30/14 |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 875.44 |
| Doing Business As: | RENAISSANCE WAVERLY |
| Merchant Address: | 2450 GALLERIA PKWY SE |
| | ATLANTA |
| | GA |
| | 30339-3130 UNITED STATES |
| Reference Number: | 320140310283901334 |
| Category: | Travel - Lodging |

| Transaction Date: | 02/01/2014 Sat |
| Transaction Description: | RENAISSANCE WAVERLY ATLANTA GA |
| | 695 LODGING |
| | Arrival Date   Departure Date |
| | 01/24/14     01/31/14 |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 787.33 |
| Doing Business As: | RENAISSANCE WAVERLY |
| Merchant Address: | 2450 GALLERIA PKWY SE |
| | ATLANTA |
| | GA |
| | 30339-3130 UNITED STATES |
| Reference Number: | 320140320297850538 |
| Category: | Travel - Lodging |

| Transaction Date: | 02/03/2014 Mon |
| Transaction Description: | APPLE ONLINEUSA APPLCUPERTINO CA |
| | 20129255073 APPLE ONLINE STORES |
| | APPLE ONLINE STORES |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 19.00 |
| Doing Business As: | APPLE WEB STORE |
| Merchant Address: | 12545 RIATA VISTA CIR |
| | AUSTIN |
| | TX |
| | 78727-6524 UNITED STATES |
| Reference Number: | 320140340321936223 |

CONFIDENTIAL                                                                         CHSL 0006700

| Category: | Merchandise & Supplies - Internet Purchase |
|---|---|
| Transaction Date: | 02/04/2014 Tue |
| Transaction Description: | WAL-MART SUPERCENTERDALTON GA |
| | 39882124 DISCOUNT STORE |
| | DISCOUNT STORE |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 73.28 |
| Doing Business As: | WALMART SUPERCENTER |
| Merchant Address: | 702 SW 8TH ST |
| | BENTONVILLE |
| | AR |
| | 72716-0299 UNITED STATES |
| Reference Number: | 320140350305243468 |
| Category: | Merchandise & Supplies - Wholesale Stores |

| Transaction Date: | 02/03/2014 Mon |
|---|---|
| Transaction Description: | CARMINES 44TH CARMINEW YORK NY |
| | 176012 NEW YORK NEW YORK,NY |
| | NEW YORK NEW YORK,NY |
| | FOOD/BEVERAGE    $320.00 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 320.00 |
| Doing Business As: | CARMINE'S |
| Merchant Address: | 200 W 44TH ST |
| | NEW YORK |
| | NY |
| | 10036-3900 UNITED STATES |
| Reference Number: | 320140350338362382 |
| Category: | Restaurant - Restaurant |

| Transaction Date: | 02/04/2014 Tue |
|---|---|
| Transaction Description: | DA VINCIS PIZZA OF 404-249-7890 |
| | 85363534008 USFC30309 |
| | USFC30309 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 29.88 |
| Doing Business As: | DA VINCIS PIZZA OF MIDTOW |
| Merchant Address: | 1270 W PEACHTREE ST NW |
| | ATLANTA |
| | GA |
| | 30309 UNITED STATES |
| Reference Number: | 320140360348040584 |
| Category: | Restaurant - Restaurant |

CONFIDENTIAL                                                                                      CHSI_0006701

REVISED #3

**ESTIMATED INVOICE**



**DOUBLETREE SUITES**
BY HILTON·
NEW YORK CITY – TIMES SQUARE
1568 Broadway
New York, NY 10036

Date:   1/31/2014

From:   Zaida Lopez

| | |
|---|---|
| To: | MARY JO FOLLMUTH |
| Company: | BURSCH TRAVEL |
| Address: | 1411 1ST AVENUE SW |
| | AUSTIN, MN  55912 |
| Phone #: | 507-437-8773 |
| Email: | MARYJOF@BURSCHTRAVEL.COM |

Group Name: COMMUNITY HEALTH SERVICES OF GEORGIA

| | |
|---|---|
| Arrival: | Tuesday, February 18, 2014 |
| Departure: | Friday, February 21, 2014 |

| | King | Dbl/Dbl | Conference |
|---|---|---|---|
| Single | $  259.00 | $   - | $   - |
| Double | $  259.00 | $   - | $   - |
| Triple | $  289.00 | $   - | $   - |
| Quad | $  319.00 | $   - | $   - |

| # of Suites | Suite Type | | Rate | | Nights | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | x | | x | | = | | $   - |
| 15 | Single | x | $  259.00 | x | 3 | = | | $  11,655.00 |
| 1 | Single | x | $  259.00 | x | 2 | = | | $  518.00 |
| | | x | | x | | = | | $   - |
| | | | | | Sub-Total Suites: | | | $  12,173.00 |

| | | |
|---|---|---|
| State Sales Tax | 8.875% | $  1,080.35 |
| City Sales Tax | 5.875% | $  715.16 |
| NYC Occupancy Tax | $4.00 | $  188.00 |
| Javits Center Fee | $1.50 | $  70.50 |
| Total Cost Suite & Tax: | | $  14,227.02 |

Please be advised:
In the event of a group arrival a mandatory porterage fee will be assessed. This fee has been estimated at (1) bag per person and will be charged at $7.75* roundtrip plus applicable taxes. The baggage count will be conducted upon group arrival. The prepaid amount is only an estimate.

Porterage will be charged based on actual bag count as conducted and agreed upon by the Bell Captain and the group contact. The difference will be required to be paid in full by the group at check-in.

*Porterage fee subject to change according to labor requirements.

| INDIVIDUAL ARRIVAL | | |
|---|---|---|
| BAGGAGE HANDLING | | |
| # of Bags | Cost Per Bag | Total Cost |
| 14 | $7.75 | $  108.50 |
| Add 8.875% Sales Tax | | $  9.63 |
| Total Porterage Costs: | | $  118.13 |

| FULL AMERICAN BREAKFAST | | |
|---|---|---|
| # of People | Price | Total Cost |
| | $28.00 | $   - |

| Contracted Room Nights | | Contracted Performance | 90% of Contracted Room Nights | Current Pick-up | Variance |
|---|---|---|---|---|---|
| 48 | x | 90% | 43 | 47 | |
| | | | Total Revenue Owed for Performance Damages | $ | |

| BANQUET CHARGES | | |
|---|---|---|
| BEO # | | $   - |
| BEO # | | $   - |
| Total Banquet Charges | | $   - |

| GRAND TOTAL | | $  14,345.15 |
|---|---|---|

| DEPOSITS | | |
|---|---|---|
| Date Check Received or CC Charged | Check # | Amount |
| 01/21/14 | CC-8009 | $  (1,500.00) |
| 30-Jan | CC-8009 | $  (12,845.15) |
| | | $   - |

Payment Instructions:

| | | | | |
|---|---|---|---|---|
| 1ST DEPOSIT | AMOUNT: | $  1,500.00 | DUE ON OR BEFORE: | 1/13/2014 |
| 2ND DEPOSIT | AMOUNT: | | DUE ON OR BEFORE: | |
| REMAINING BALANCE | AMOUNT: | | DUE ON OR BEFORE: | 1/28/2014 |

Incidental charges are to be paid on an individual basis upon check-out.

| BALANCE DUE: | $  (0.00) |
|---|---|

**Please remit payment to the attention of the Doubletree Suites by Hilton - Times Square.**
**c/o Zaida Lopez, Event Manager, 1568 Broadway, New York, NY 10036.**

Please call the Event Manager directly at (212) 403-6329 for any questions or concerns regarding this statement.
Thank you for choosing the DoubleTree Guest Suites!

CONFIDENTIAL

CHSI_0006702

| Invoice # |
|---|
| CHG - 020414 - AS |
| Date |
| February 6, 2014 |

# TWELVE

| Group | Community Health of Georgia |
|---|---|
| Address | |
| Attn: | Stephanie Dotson |

| DATE | DESCRIPTION | ARRIVAL DATE | - | DEPARTURE DATE | PRICE | QUANTITY | TOTAL |
|---|---|---|---|---|---|---|---|
| **Event Details** | | | | | | | |
| *February 4, 2014* | Miscellaneous | | | | | | |
| MEETING | Screen & projector | | | | $75.00 | 1 | $75.00 |
| *February 5, 2014* | Room Fee | | | | | | |
| MEETING | Space Rental - Cellar | | | | $500.00 | 1 | $500.00 |
| | Beverage | | | | | | |
| | Assorted Sodas | | | | $3.50 | 42 | $147.00 |
| | Regular Coffee & Tea (gallon) | | | | $55.00 | 3 | $165.00 |
| | Catering | | | | | | |
| | Chef's selection of assorted mini desserts | | | | $48.00 | 1 | $48.00 |
| | Sliced fresh fruit platter | | | | $65.00 | 1 | $65.00 |
| | Assorted breakfast pastries | | | | $42.00 | 1 | $42.00 |
| | Platter of Hummus Platter | | | | $60.00 | 1 | $60.00 |
| | Turkey club | | | | $10.00 | 1 | $10.00 |
| | Full Green Salad with Chicken | | | | $15.00 | 3 | $45.00 |
| | Tomato Bisque Soup | | | | $6.00 | 3 | $18.00 |
| | Full Green Salad | | | | $11.00 | 1 | $11.00 |
| | Full Cesar Salad | | | | $11.00 | 1 | $11.00 |
| | Chicken Sandwich | | | | $12.00 | 4 | $48.00 |
| | Magghertia Pizza | | | | $14.00 | 1 | $14.00 |
| | Full Green Salad with Salmon | | | | $16.00 | 1 | $16.00 |
| | Quesadilla | | | | $9.00 | 2 | $18.00 |
| | Grilled cheese | | | | $9.00 | 1 | $9.00 |
| | Shrimp Salad | | | | $13.00 | 1 | $13.00 |
| | Trail Mix | | | | $1.75 | 2 | $3.50 |
| | Yogurt | | | | $2.75 | 3 | $8.25 |
| | Miscellaneous | | | | | | |
| | Screen & projector | | | | $75.00 | 1 | $75.00 |
| **Accommodations** | | | | | | | |
| | 318 Stephanie Dotson | 2/4/2014 | - | 2/5/2014 | $159.00 | 1 | $159.00 |
| | 508 Mark Waldrop | 2/4/2014 | - | 2/5/2014 | $159.00 | 1 | $159.00 |
| **Guest Incidentals** | | | | | | | |
| | 318 Stephanie Dotson | Overnight Valet Parking | | | $28.00 | 1 | $28.00 |
| | 508 Mark Waldrop | Overnight Valet Parking | | | $28.00 | 1 | $28.00 |

lodg.

parking



CONFIDENTIAL

| Invoice # |
|---|
| CHG - 020414 - AS |
| **Date** |
| February 6, 2014 |

# TWELVE

| Group | Community Health of Georgia |
|---|---|
| Address - | |
| Atln: - | Stephanie Dotson |

| DATE | DESCRIPTION | ARRIVAL DATE | DEPARTURE DATE | PRICE | QUANTITY | TOTAL |
|---|---|---|---|---|---|---|
| **Summary of Charges** | | | | | | |
| | | | | | Room Rental | $500.00 — *exp. sep* |
| | | | | | Beverages | $112.00 ⎫ |
| | | | | | Catering | $439.75 ⎬ *food* |
| | | | | | Service Charge | $172.90 ⎭ |
| | | | | | Tax @ 8% | $113.97 |
| | | | | | Miscellaneous | $150.00 — *supplies* |
| | | | | | Accomodations | $318.00 ⎫ *lodging* |
| | | | | | Accomodations Tax @ 16% | $50.88 ⎭ |
| | | | | | Guest Incidentals | $66.00 — *parking* |
| | | | | | **Total Charges** | $2,113.50 |
| **Payment Details** | | | | | | |
| | | | | | Advance Deposit | $500.00 |
| | | | | | Payment 2 | $1,613.50 |
| | Terms: Balance Due Upon Final Receipt of Invoice | | | | **Balance Due:** | $0.00 |

TWELVE Hotel Atlantic Station - 361 17th Street, NW - Atlanta, GA 30363

Page 2 of 2

CONFIDENTIAL



# TWELVE

Stephanie Dotson
United States

Room No.    318
Folio No.    130066
Invoice No.
Arrival       02-04-14
Departure   02-05-14

Page No.    1 of 1

**Guest Folio**

Cashier    173

Group Block :   COMM_016
Company :       Community Health

*Thank you for staying with us !*

02-06-14

| Date | Description | | Charges | Credits |
|------|-------------|--|---------|---------|
| 02-05-14 | In Room Dining | *Line# 318 : CHECK# 4225* | 29.00 | |
| 02-05-14 | American Express | | | 29.00 |
| | | Total | 29.00 | 29.00 |
| | | Balance | 0.00 | |

**Signature:** _____

*I agree that my liability for this bill is not waived and I agree to be held personally liable in the event that the indicated person,
company or third party fails to pay for any part of these charges.*

CONFIDENTIAL