IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,

      Plaintiff,

                                Case No.

     vs.                       4:16-cv-235-HLM

COMMUNITY HEALTH SYSTEMS,

INC.,

      Defendant.

_____

ORIGINAL

DEPOSITION OF
MARK S. LANGE

April 25, 2017
9:59 a.m.

1180 West Peachtree Street
Suite 1800
Atlanta, Georgia

Janice S. Baker & Associates
235 Peachtree Street
North Tower, Suite 400
Atlanta, GA 30303
Alison M. Wyman, CCR-2529, RPR

Page 2

```
 1     APPEARANCES OF COUNSEL:
 2     For the Plaintiff:    GARY L. HENRY
                             Attorney at Law
 3                           Gearhiser, Peters, Elliott &
                             Cannon, PLLC
 4                           320 McCallie Avenue
                             Chattanooga, Tennessee  37402
 5                           (423) 756-5171
                             (423) 266-1605 (Fax)
 6                           ghenry@gearhiserpeters.com
 7
 8     For the Defendant:    HAROLD T. DANIEL
                             LATOYA BRISBANE
 9                           Attorneys at Law
                             Holland & Knight LLP
10                           1180 West Peachtree Street
                             Suite 1800
11                           Atlanta, Georgia  30309
                             (404) 817-8500
12                           (404) 881-0470 (Fax)
                             harold.daniel@hklaw.com
13                           latoya.brisbane@hklaw.com
14
15     ALSO PRESENT:         MARK A. WALDROP
16
17                           JOE WALL
                             Defendant Representative
18
19                             -   -   -   -   -
20
21
22
23
24
25
```

1                          INDEX
     MARK S. LANGE                                  PAGE
2
     CROSS-EXAMINATION
3         By Mr. Henry                                 4
4    DIRECT EXAMINATION
          By Mr. Daniel                              110
5
     FURTHER CROSS-EXAMINATION
6         By Mr. Henry                               112
7    FURTHER DIRECT EXAMINATION
          By Mr. Daniel                              112
8
     FURTHER CROSS-EXAMINATION
9         By Mr. Henry                               113
10
                    -   -   -   -   -
11
                  INDEX TO EXHIBITS
12
     PLAINTIFF'S        DESCRIPTION              PAGE
13
     Exhibit 1     Talking points for meeting
14                 dated 6/28/2016                    76
15   Exhibit 2     Two-page letter dated 7/1/2016
                   to Joseph A. Wall and Mark S.
16                 Lange from Mark A. Waldrop          80
17   Exhibit 3     One-page letter dated 7/6/2016
                   to Mark A. Waldrop from Joshua
18                 I. Bosin, with an attached
                   document entitled "Separation
19                 Agreement, General Release,
                   Waiver & Confidentiality
20                 Agreement"                         84
21   Exhibit 4     Employment agreement of Mark A.
                   Waldrop                            86
22
     Exhibit 5     Three-page letter dated
23                 8/16/2016 to Mark Waldrop from
                   Joseph A. Wall                     90
24
     (Original Exhibits 1 through 5 have been attached to
25   the original transcript.)
                    -   -   -   -   -
25                  -   -   -   -   -

Page 4

1           (Mr. Waldrop is not present in the room.)

2                     MARK S. LANGE,

3    being first duly sworn, was deposed and testified as

4    follows:

5                     CROSS-EXAMINATION

6    BY MR. HENRY:

7        Q.    Mr. Lange, we met briefly before the

8    deposition started.  But just for the record, my name

9    is Gary Henry.  I'm an attorney in Chattanooga and I

10   represent Mark Waldrop in this litigation pending

11   against Community Health Systems.

12           You're a lawyer, I know.  So you're probably

13   pretty familiar with how depositions work, aren't you?

14       A.    I've actually never been in a deposition.

15       Q.    Oh, okay.  Well --

16           MR. DANIEL:  Before you start, let me just

17       make one statement for the record.  As you know,

18       Mr. Lange is an attorney for the company.

19           MR. HENRY:  Yes.

20           MR. DANIEL:  He's corporate counsel.  And we

21       do not waive attorney-client privilege.  There are

22       many questions you can ask Mr. Lange and he will

23       be free to answer them.  But if there are

24       questions that -- to which the privilege attaches,

25       I will make an objection at the appropriate time.

1              MR. HENRY:  And, hopefully, we won't get

2        into that, but we'll just deal with it when it

3        comes up.  I don't anticipate that being an issue,

4        but I acknowledge your position and we'll just

5        deal with that if it comes up.  But I don't think

6        we'll really be getting into that too much.

7        Q.    (By Mr. Henry)  Well, just since you're not

8    real familiar and you haven't been in a deposition

9    before, I'll go over just a few things and we can get

10   started.

11             I'll be asking you some questions.  It's not

12   my intent to be unclear or trick you or anything like

13   that.  Just trying to get some information.  So if my

14   question is unclear, please let me know.  I'll do my

15   best to be clear.

16             If you would, answer verbally so that we can

17   get that on the transcript.  Shaking heads, nodding of

18   the heads, uh-huh or huh-uh really doesn't come

19   across.  So if at some point I say, "Is that a yes?"

20   or "Is that a no?" I'm not trying to be rude.  I'm not

21   trying to make you say something you don't mean to

22   say.  I just want to be sure that what you say is

23   actually represented on the transcript.

24   A.    Agreed.

25   Q.    All right.  If you need a break, let me

1    know.  We'll accommodate.  I don't think we'll be here

2    very long, but we will probably need to take a few

3    breaks.  So if you need one, just let me know and

4    we'll do that.  Okay?

5         A.   Okay.

6         Q.   All right.  If you would state your full

7    name for the record.

8         A.   Mark, M-A-R-K, middle initial S, last name

9    Lange, L-A-N-G-E.

10        Q.   Okay.  Where do you live, Mr. Lange?

11        A.   59 Woodcrest, one word, Avenue, Atlanta,

12   Georgia 30309.

13        Q.   Okay.  And I know you are an attorney.

14   Where did you go to law school?

15        A.   Indiana University School of Law.

16        Q.   And when did you graduate from Indiana?

17        A.   1980.

18        Q.   Do you have any post-law school education?

19   A J -- an LLM or anything of that nature?

20        A.   I have a master's in taxation from DePaul

21   University in Chicago.  Master's of tax.

22        Q.   And when did you receive that?

23        A.   In 1981.

24        Q.   Do you practice primarily in the tax field?

25        A.   Tax and transactional corporate and tax

 1    exempt.

 2         Q.   All right.  I'm going to talk to you a

 3    little bit about your work history.  Where was your

 4    first legal job after you graduated from Indiana

 5    School of Law?

 6         A.   It was a Jacksonville, Florida, law firm.

 7    Mahoney, Hadlow & Adams.

 8         Q.   And how long were you with the Mahoney firm?

 9         A.   I was with them a little over three years.

10         Q.   So would that have been from

11    approximately --

12         A.   1983 to June 6th of 1986.

13         Q.   Okay.  So what did you do between 1980 and

14    1983?

15         A.   Well, the first year was the master's in

16    tax --

17         Q.   Right.

18         A.   -- in Chicago at De Paul.  Then I was with

19    Arthur Andersen & Company CPAs in Tampa, Florida.

20         Q.   Are you a licensed CPA?

21         A.   No.

22         Q.   All right.  So after leaving the Mahoney

23    firm in 1986, where did you go?

24         A.   I came up to Atlanta and joined Trotter,

25    Smith & Jacobs, which was a small mergers and

Page 8

1    acquisitions law firm.

2        Q.   Okay.  And at the Mahoney firm, going back

3    to that, did you practice primarily tax and

4    transactional work?

5        A.   Yes.

6        Q.   And is the same true with regard to the

7    Trotter firm in Atlanta?

8        A.   Yes.

9        Q.   How long were you with the Trotter firm?

10       A.   Until October 15th, 1990, when I joined

11   Long, Aldridge & Norman here in Atlanta.  As a tax

12   partner.

13       Q.   How big was the Long firm at the time?

14       A.   It was starting to get a little bit bigger.

15   I'm not sure what you define as "big."  But it was

16   between 50 and 100 at that point.

17       Q.   Okay.  Larger than the Trotter firm?

18       A.   Yes.

19       Q.   And I believe you said it was October of

20   1990 --

21       A.   Right.

22       Q.   -- when you went to the Long firm.  How long

23   were you with the Long firm?

24       A.   I was with the Long firm until February of

25   2004, at which time I went over to Paul Hastings,

1      which is here in Atlanta as well.  Again, as a tax

2      partner.

3              Q.   How long were you with Paul Hastings?

4              A.   From February of 2004 to April of 2009.

5              Q.   Is that the firm that you were at when

6      Mr. Waldrop's employment agreement was executed?

7              A.   Yes, sir.

8              Q.   Okay.  And in 2009 where did you go?

9              A.   I returned to what was then McKenna Long

10     Aldridge.

11             Q.   Okay.

12             A.   Which was a later generation of Long,

13     Aldridge & Norman.

14             Q.   So same firm --

15             A.   Yes, sir.

16             Q.   -- just different name.  And how long were

17     you with the McKenna firm?

18             A.   Until June 15th of 2015, when I came to

19     Holland & Knight.

20             Q.   All right.  And you're no longer with

21     Holland & Knight?

22             A.   Correct.  I'm now with BakerHostetler here

23     in Atlanta.

24             Q.   And when did you go to BakerHostetler?

25             A.   March 9th of this year.

1        Q.    And you had no other employment between

2    Holland & Knight and BakerHostetler?

3        A.    No, sir.

4        Q.    Okay.  What states are you licensed to

5    practice law in?

6        A.    Georgia and Florida.

7        Q.    How long have you been licensed in Georgia?

8        A.    Since 1987.

9        Q.    Is your license in Florida still active?

10       A.    Yes.

11       Q.    I'm licensed in Georgia so I'm generally

12   familiar with the CLE requirements in Georgia.  But do

13   you have to fulfill any other or different CLE

14   requirements to maintain your Florida license?

15       A.    It's a similar CLE process.

16       Q.    Okay.  Do you hold any certifications?

17       A.    No.

18       Q.    All right.  Mr. Daniel represented a few

19   minutes ago that you are corporate counsel for

20   Community Health Systems.  Is that correct?

21       A.    Yes.

22       Q.    How long have you been corporate counsel for

23   Community Health Systems?

24       A.    I would say over 20 years.

25       Q.    And as corporate counsel, are you on

1      retainer?

2          A.    No.

3          Q.    Have you ever been on a retainer --

4          A.    No.

5          Q.    -- with Community Health?

6          A.    No.

7          Q.    Okay.  You have other clients --

8          A.    Yes.

9          Q.    -- than just Community Health Systems?

10             How much of your practice is devoted to work

11     for Community Health Systems?

12         A.    It depends on the year.  It could be maybe

13     25 percent.  It could be -- in particular years, it

14     might get up to be a higher percentage.  But it varies

15     year to year depending on the transactions and matters

16     that CHSI has asked me to assist on.

17         Q.    So how about in 2016?  What was the

18     percentage?

19         A.    It was probably lower in 2016.

20         Q.    Okay.  So somewhere south of 25 percent?

21         A.    Right.

22         Q.    How about in 2015?

23         A.    It was higher in 2015 based on some

24     transactional work.

25         Q.    You've met Mark Waldrop before, haven't you?

1        A.    Yes.

2        Q.    In your 20 years representing Community

3   Health Systems, did your work with Community Health

4   ever involve Mark Waldrop?

5        A.    Indirectly.   There -- I can't remember a

6   specific transaction or matter where we were working

7   day to day.

8        Q.    You didn't work with him regularly?

9        A.    No.

10        Q.    Who is your primary contact at Community

11   Health Systems?

12        A.    That would be Mr. Rollins, Ronnie D.

13   Rollins, who's the president and CEO.

14        Q.    Has Mr. Rollins been your primary contact

15   throughout your representation at Community Health

16   Systems?

17        A.    Yes.

18        Q.    Are you familiar with 501(r)?

19        A.    501(r) is an Internal Revenue Code provision

20   that relates to several things; but, among others, a

21   requirement that periodic community need assessments

22   be obtained by certain tax-exempt organizations.

23   Primarily hospitals.   501(r) is primarily a hospital

24   provision.

25        Q.    Okay.   Does 501(r) have an impact on

1      Community Health Systems's business?

2          A.    The only way it would is to the extent that

3      Community Health Systems owned and operated a licensed

4      hospital.

5          Q.    And does Community Health Systems own

6      licensed hospitals?

7          A.    There -- it only owns one and that's a

8      hospital in Commerce referred to as the Northridge

9      Medical Center.

10         Q.    How long has Community Health Systems owned

11     that hospital?

12         A.    For several years.

13         Q.    Did they own it during the time that

14     Mr. Waldrop was COO?

15         A.    Yes.

16         Q.    Did you ever work with Mr. Waldrop with

17     regard to 501(r) compliance?

18         A.    No.

19         Q.    How would you describe your working

20     relationship with Ronnie Rollins?

21         A.    I think it would be positive.  Good.

22         Q.    And in the times that you've worked with

23     Mr. Waldrop, how would you describe your working

24     relationship with him?

25         A.    The same.  Although my point was I have not

1      ever worked directly with Mr. Waldrop.

2           Q.   Okay.  Well, how would you work indirectly

3      with Mr. Waldrop when he was COO?

4           A.   You'll have to rephrase that.

5           Q.   Okay.  You said you never worked directly

6      with him?

7           A.   Yes.  I didn't -- I don't know how to

8      work -- he would -- I would work with him indirectly.

9      My point was we had very little contact.

10          Q.   Okay.  We talked a little bit about 501(r).

11     Are you familiar with 4959 written financial policies?

12          A.   I'm not sure what that section involves.

13          Q.   Okay.

14          A.   I have not heard that section number.

15          Q.   Doesn't ring a bell with you?

16          A.   No.

17          Q.   Okay.  Did 501(r)'s impact on Community

18     Health Systems undergo a change in, say, the last

19     three years?

20          A.   I haven't been engaged to work on 501(r)

21     with respect to Community Health Systems.

22          Q.   Do you recall a period of time when Congress

23     was revising 501(r) and there was a need to analyze

24     the impact of those revisions on Community Health

25     Systems?

1        A.    No.

2        Q.    Did Mr. Waldrop ever make a request of you

3   for information relating to 501(r) regulations and

4   compliance?

5        A.    Not to my knowledge.

6        Q.    Did you ever tell Mr. Waldrop that if you

7   sent documents to Mr. Waldrop relating to 501(r) that

8   Mr. Rollins would fire you?

9        A.    No.

10       Q.    Or comments to that effect?

11       A.    No.

12       Q.    In your service as corporate counsel for

13   Community Health Systems, have you been involved in

14   the compensation of Community Health Systems officers?

15       A.    You'll need to tell me what you mean by

16   "involved in."

17       Q.    Well, let me ask it this way.  Does Medicare

18   or Medicaid laws and regulations have an impact on the

19   compensation of Community Health Systems officers?

20       A.    I'm not sure Medicare or Medicaid has an

21   impact.  There are Internal Revenue Code provisions

22   that impact compensation.

23       Q.    And have you ever been involved with regard

24   to those issues in connection with Community Health

25   Systems?

1      A.    Yes.

2      Q.    During the time that Mr. Waldrop was the COO

3 of Community Health Systems, who was the highest paid

4 officer in Community Health Systems?

5      A.    Well, I think you have to ask me when.

6 There's -- there's been a -- certainly an increase in

7 compensation for both Mr. Rollins and Mr. Waldrop over

8 time.

9      Q.    Fair enough.  2015.

10      A.    I don't specifically remember whose

11 compensation was highest in 2015.  I don't know that I

12 have that information.

13      Q.    2016?

14      A.    I'm not sure I have -- I don't have that

15 information for 2016.

16      Q.    Are you aware of the fact that Mr. Waldrop

17 was making over a million dollars as COO of Community

18 Health Systems?

19      A.    Yes.

20      Q.    Is that more or less than Mr. Rollins was

21 making as CEO at the time of Mr. Waldrop's

22 termination?

23      A.    I don't know.

24      Q.    Do you recall Mr. Rollins taking a pay cut?

25      A.    I'm not aware of a pay cut.

1        Q.    You just didn't have any involvement in

2    that?

3        A.    No.

4        Q.    Does Community Health Systems have a

5    foundation?

6        A.    Community Health Systems has a foundation

7    called Community Health Foundation.

8        Q.    How is that foundation structured?

9        A.    It's a 501(c)(3) tax-exempt entity.

10       Q.    And how is it funded?

11       A.    It's funded from public donations and

12   contributions periodically from the operating

13   subsidiaries.

14       Q.    We have discussed these operating

15   subsidiaries in other depositions.  And I have used

16   the phrase "affiliates."  So if I slip into using an

17   "affiliate" of Community Health Systems, that's what

18   I'm referring to.  Okay?  Is that fair enough?

19       A.    Okay.

20       Q.    Okay.  Does each affiliate of Community

21   Health Systems have its own officer that's in charge

22   of that affiliate?

23       A.    It depends on the affiliate.

24       Q.    Okay.

25       A.    Some affiliates are corporations.  Some

1      affiliates are LLCs.

2           Q.    And how would you describe the relationship

3      of Community Health Systems to its affiliates?

4                 (Mr. Waldrop entered the room.)

5           A.    Indirectly.  Each of the affiliates would

6      ultimately flow up to a second tier set of

7      corporations.  And those corporations would generally

8      be supervised by Community Health Systems.

9           Q.    How many of these second-tier affiliates are

10     there?

11          A.    In the corporate realm, I believe there's

12     currently 11.

13          Q.    Has that number changed since Mr. Waldrop

14     was terminated as COO?

15          A.    Not to my knowledge.

16          Q.    Going back to compensation, are there

17     periodic audits of Community Health Systems's

18     compensation of its officers?

19          A.    I'm not sure what you mean by "audit."

20          Q.    Okay.  Does a governmental entity examine

21     the compensation that's paid to Community Health

22     Systems officers from time to time?

23          A.    Well, the Internal Revenue Service has the

24     ability to audit and examine the Form 990, the annual

25     information return filed by any tax-exempt

1      corporation.  I'm not aware that that has occurred

2      with respect to Community Health.

3           Q.   So in your 20 years as Community Health

4      Systems counsel, you're not aware of any instance

5      where the IRS has examined those issues?

6           A.   I'm not aware of that.

7           Q.   Are you aware of any instance in which

8      Mr. Rollins has taken a compensation reduction to

9      avoid an examination by the IRS?

10          A.   I'm not aware of that.

11          Q.   Are you familiar with an entity called

12     "Therapy Enterprises"?

13          A.   Yes.

14          Q.   What is Therapy Enterprises?

15          A.   Therapy Enterprises is a Georgia limited

16     liability company.

17          Q.   Okay.  Who owns Therapy Enterprises, LLC?

18          A.   As far as I know, it's owned one third by

19     Mr. Rollins, one third by an individual by the name of

20     Freddie Walter, and one third by Mark Waldrop.

21          Q.   Have there been any recent transactions with

22     regard to Therapy Enterprises?

23          A.   There was a transaction in October of 2016

24     in which Therapy Enterprises received a termination

25     royalty payment with respect to the sale of another

1    entity.

2         Q.    And what was that other entity?

3         A.    That other entity was named Therapute, LLC.

4         Q.    And who purchased Therapute, LLC?

5         A.    An affiliate of CHSI, Community Health

6    Systems.

7         Q.    And which affiliate?

8         A.    I actually don't remember which affiliate

9    did the purchase.

10        Q.    What was the royalty payment that Therapy

11   Enterprises received as a result of that purchase?

12        A.    It was a termination payment that was called

13   for.  I believe that termination payment was $330,000.

14   It was a fixed percentage of the purchase price paid

15   by Community Health Systems for the outstanding

16   membership interest in Therapute.

17        Q.    Has Mr. Rollins received a distribution of

18   any of this termination payment?

19        A.    Not that I am aware of.

20        Q.    What about Mr. Walters [sic]?

21        A.    Not that I'm aware of.

22        Q.    And Mr. Waldrop?

23        A.    Not that I'm aware of.

24        Q.    Did you handle that transaction?

25        A.    I handled the CHSI purchase of Therapute.

```
 1        Q.   So you haven't had any involvement directly
 2   with how the royalty payment has been distributed or
 3   not?
 4        A.   Not yet.
 5             MR. HENRY:  Can we take a brief break?
 6             MR. DANIEL:  Sure.
 7             (A recess was taken in the deposition at
 8             10:27 a.m., and the deposition was resumed at
 9             10:36 a.m.)
10        Q.   (By Mr. Henry)  Mr. Lange, I think you
11   testified earlier that in 2016 the amount of work you
12   did for Community Health Systems was a little bit on
13   the lower than average side.
14        A.   Yes.
15        Q.   But in 2015 it was above average?
16        A.   (Witness nods head affirmatively.)
17        Q.   Is that correct?
18        A.   Yes.
19        Q.   And is that because -- well, why was that?
20        A.   There were various transactions that
21   Community Health considered.  Some it consummated;
22   some it didn't.  But we looked at various
23   transactions.
24        Q.   How many transactions were actually
25   consummated?
```

1      A.    I don't recall.

2      Q.    Was it more or less than the ones that were

3   not consummated?

4      A.    That's probably -- it's less than the ones

5   that were contemplated.

6      Q.    When Community Health Systems engages in

7   these transactions that are consummated, is there a

8   particular affiliate that is involved in that process?

9      A.    It depends on the transaction.  If it's a

10  single nursing home that might be acquired, there

11  could be a new single member LLC formed to acquire the

12  real property.  And there could be a separate single

13  member LLC formed to conduct the operations of that

14  nursing home.

15     Q.    Is there a particular affiliate of CHSI that

16  handles construction-related projects?

17     A.    Yes.

18     Q.    And what is the name of that affiliate or

19  entity?

20     A.    I believe it's named Health Systems Real

21  Estate, Inc.

22     Q.    These transactions that were consummated in

23  2015, how many of those transactions was Health

24  Systems Real Estate, Inc., involved in?

25     A.    Well, if it was the acquisition of real

1    property, then a subsidiary of that entity would have

2    been involved in acquiring the real property.  I can't

3    remember how many.

4        Q.   Do you recall a period of time in 2015 when

5    CHSI had as many as three construction projects going

6    on at one time?

7        A.   I'm not familiar with the number of

8    construction projects going on.

9        Q.   Let's talk about Mr. Waldrop's termination

10   and your involvement in that process.  Please tell me

11   about your involvement in any investigation into

12   allegations by or against Mr. Waldrop in 2016.

13       A.   I was contacted by the chairman of CHSI, Joe

14   Wall, to conduct a limited investigation into the

15   accusations made by Mr. Waldrop against Mr. Rollins.

16   Specifically, an accusation that Mr. Rollins was

17   "targeting," close quote, Mr. Waldrop.

18       Q.   I believe you testified earlier your primary

19   contact with Community Health Systems has been Ronnie

20   Rollins.

21       A.   That's correct.  In this particular case,

22   the chairman, Joe Wall, called about this engagement,

23   not Mr. Rollins.

24       Q.   Okay.  Was that unusual for Mr. Wall to

25   contact you?

1       A.    I'm not prepared to say that it was unusual.

2    I've had contact with Joe Wall as chairman in the past

3    on various other matters.

4       Q.    Okay.  So when Mr. Wall contacted you about

5    these targeting allegations, what did you do?

6       A.    I told him that I would want to interview

7    certain people and talk to them and would carry that

8    out.

9       Q.    And who did you want to interview?

10      A.    I wanted to interview Mr. Waldrop.  That was

11   the first interview.

12      Q.    All right.  And when did you interview

13   Mr. -- well, let me back up.  When did Mr. Wall

14   contact you?

15      A.    I believe it was on or about June 6th.

16      Q.    Of 2016?

17      A.    Yes.

18      Q.    And how long after that contact on or about

19   June 6th of 2016 -- how long after that did you

20   interview Mr. Waldrop?

21      A.    I interviewed Mr. Waldrop on June 8th, 2016,

22   here in these offices.

23      Q.    Okay.  And tell me about that interview.

24      A.    Mr. Waldrop expressed his concern about his

25   deterioration with his working relationship with

1     Mr. Rollins.  That that deterioration had occurred

2     over a several-year period but had become more severe

3     in 2016.

4          Q.   Did Mr. Waldrop attribute that deterioration

5     or more severe deterioration to anything in

6     particular?

7          A.   I don't remember that he had one item that

8     he indicated was the most significant.

9          Q.   But did he provide you a list of things that

10    had occurred?

11         A.   I don't recall a list.

12         Q.   Let me ask it this way.  What did he

13    attribute the severe deterioration in his relationship

14    with Mr. Rollins to?

15         A.   He indicated that Mr. Rollins was

16    increasingly difficult to work with.

17         Q.   In what way?

18         A.   In terms of his interaction and his

19    instructions, his responses to actions taken in

20    management decisions made by the parties.

21         Q.   Have you ever found Mr. Rollins to be

22    difficult to work with?

23         A.   Not personally.

24         Q.   Okay.  Did Mr. Waldrop share with you any

25    documents or other materials during that interview?

1      A.    I did not receive any documents or materials

2   in that interview.

3      Q.    Did you receive any beforehand?

4      A.    No.

5      Q.    Okay.   Other than Mr. Waldrop expressing

6   concern about the increased deterioration in his

7   relationship with Mr. Rollins, what else was

8   discussed?

9      A.    Mr. Waldrop discussed a specific email.   He

10  did not mention to me that day the date of that email.

11  But he mentioned a particular email exchange that they

12  had.   And Mr. Waldrop indicated that he used the term

13  "lie" once in characterizing the contents of that

14  email from Mr. Rollins to Mr. Waldrop.

15     Q.    But he didn't share that email with you at

16  that interview?

17     A.    No, he did not.

18     Q.    Have you seen that email?

19     A.    Subsequently I have seen that email.

20     Q.    And did you find Mr. Waldrop's

21  characterization of that email to be truthful?

22     A.    Honestly, I had a hard time characterizing

23  the portion of that email as anything but a normal

24  interchange between senior officers of a corporation.

25     Q.    So nothing about that email chain in your

1    view was out of the ordinary?

2        A.   I think it's consistent with there were a

3    number of topics raised in the email.  There was one

4    particular topic commented on.  But I couldn't discern

5    from that email that there was anything out of the

6    ordinary other than the comment -- the comment made by

7    Mr. Rollins.

8        Q.   And what comment was made by Mr. Rollins in

9    those emails?

10       A.   Well, it covered a number of topics based on

11   a phone call that had occurred.  I believe the

12   particular topic in that particular email was with

13   respect to another hospital chain called "Navicent" in

14   Macon, Georgia.

15       Q.   Okay.

16       A.   And there was a specific comment about the

17   status of discussions between CHS and Navicent.  And I

18   believe the specific comment was that Mr. Waldrop had

19   no further comments on strategy or words to that

20   effect.

21       Q.   And was it that comment that was tied to

22   this claim by Mr. Waldrop that Mr. Rollins was lying?

23       A.   Yes.

24       Q.   All right.  So we've talked about this

25   email.  We've talked about concern about the

1       deterioration of Mr. Waldrop's relationship with

2       Mr. Rollins.  What else was discussed during this

3       interview?

4            A.   Mr. Waldrop indicated that he believed that

5       from and after the time that he had met with Chairman

6       Joe Wall on May 17th, 2016, that it would be

7       difficult, if not impossible, for him to remain with

8       the company.

9            Q.   Well --

10           A.   That by the action of going to Chairman Joe

11      Wall that he would have a difficulty staying with the

12      company.

13           Q.   Do you agree with that?

14           A.   I couldn't assess that at that time.

15           Q.   So deteriorating relationship with

16      Mr. Rollins, the email, and Mr. Waldrop's belief that

17      he could no longer stay with the company after having

18      gone to Chairman Wall.  What else was discussed during

19      that interview?

20           A.   Mr. Waldrop indicated that he would like to

21      receive a severance payment, that he would like a

22      recommendation for himself, and that his assistant,

23      Stephanie Dotson -- D-O-T-S-O-N, I believe -- receive

24      another position or continue her position with the

25      company.

1      Q.   And what was your reaction to Mr. Waldrop's

2   claim that he would like a severance package and that

3   Ms. Dotson would have a position with the company?

4      A.   I took him at his word.

5      Q.   Did you feel that Mr. Waldrop had a

6   legitimate concern?

7      A.   Well, there was only one email, the May

8   12th, 2016, email.  I could not find and did not find

9   a pattern of conduct, a series of events, or any other

10   information other than that one email that could be

11   characterized as targeting.  So it was very difficult

12   to conclude based on that one email that Mr. Rollins

13   was targeting Mr. Waldrop.

14      Q.   Are you familiar with any gifts that

15   Mr. Rollins has given to Mr. Waldrop?

16      A.   I'm familiar with one that Mark Waldrop

17   mentioned in his conversation with me on June 8th.

18      Q.   Okay.  What was that gift?

19      A.   I understand that Mr. Rollins gave

20   Mr. Waldrop $250,000 at some point previously.

21      Q.   And that $250,000 -- I call it -- it's been

22   called a "gift" -- was discussed during your interview

23   with Mr. Waldrop?

24      A.   Mr. Waldrop simply pointed out that that had

25   occurred in the past.  He indicated he had worked very

1    hard for the company.  He didn't indicate why

2    Mr. Rollins chose to make that gift.

3         Q.    So Mr. Waldrop didn't mention anything to

4    you about Mr. Rollins providing the $250,000 in

5    exchange for Mr. Waldrop continuing to be a member in

6    Therapy Enterprises, LLC?

7         A.    I did not -- no such conversation...

8         Q.    That connection was never made?

9         A.    No.

10        Q.    Deteriorating relationship, the email,

11   Mr. Waldrop's belief that he could not continue

12   working for the company since he went to Mr. Wall,

13   Mr. Waldrop's request for a severance pay and a

14   position for Ms. Dotson, and the $250,000 gift were

15   discussed during this interview.  Anything else?

16        A.    I think those were the main points.

17        Q.    Did you ever suggest to Mr. Waldrop during

18   this interview the possibility of having Mr. Waldrop

19   report to the board of directors on operational issues

20   and that Mr. Rollins report to the board on

21   transactional issues?

22        A.    No.

23        Q.    Did you ever discuss that at any point in

24   time with Mr. Waldrop?

25        A.    No.

1      Q.    Do you believe that dividing the reporting

2  duty on those issues would have been a viable solution

3  to Mr. Waldrop's concerns?

4      A.    I don't have any idea.

5      Q.    Did you ever indicate to Mr. Waldrop during

6  that interview that Mr. Rollins was jealous of

7  Mr. Waldrop's relationship with Community Health

8  Systems associates?

9      A.    No.

10     Q.    Have you ever said anything like that to

11  Mr. Waldrop or anyone else?

12     A.    No.

13     Q.    Did you ask Mr. Waldrop during that

14  interview if Mr. Waldrop was sure he -- well, strike

15  that.  Let me try that again.

16          Did you ever ask Mr. Waldrop if he was sure

17  about proceeding with his allegations against

18  Mr. Rollins?

19     A.    No.

20     Q.    So how did the interview end?

21     A.    We simply ended the interview and I

22  indicated that I had other people that I needed to

23  talk to.

24     Q.    Okay.  Let's see.  You interviewed

25  Mr. Waldrop first.  Who did you interview after that?

1       A.    I interviewed Lorraine Taylor the next day

2    on June 9th, 2016.

3       Q.    And Lorraine Taylor is who?

4       A.    She is the CFO of CHSI.

5       Q.    And why did you feel it was important to

6    interview Ms. Taylor?

7       A.    Well, based on the organizational structure,

8    Ronnie Rollins was the president and CEO, Mark Waldrop

9    was the COO, and Lorraine Taylor was the CFO.  And

10   they were the three senior management persons at the

11   company.

12      Q.    Okay.  So just based on the organizational

13   structure you felt it was necessary to interview

14   Ms. Taylor?

15      A.    I thought she could provide information

16   about recent management issues and she could

17   potentially provide information about the

18   deterioration of the relationship between Mr. Rollins

19   and Mr. Waldrop.

20      Q.    Had you spoken to Mr. Rollins about

21   Mr. Waldrop's allegations prior to interviewing

22   Mr. Waldrop?

23      A.    No.

24      Q.    So at the time you interviewed Mr. Waldrop,

25   you had spoken to no one other than Mr. Wall?

1          A.    I believe Mr. Rollins was on the phone call

2     in which I was asked to be in the investigation, but I

3     had not spoken to Mr. Rollins about the allegations.

4     Mr. Wall simply explained to me that they had been

5     made, that he had met with Mr. Waldrop on May 17th,

6     that there had been some subsequent meetings, and he

7     asked me to get involved.

8          Q.    Did Mr. Rollins say anything during that

9     telephone conversation?

10         A.    Not about the allegations.  He just was on

11     the call.

12         Q.    Okay.  Well, did Ms. Taylor provide

13     information about management issues in your interview

14     with her?

15         A.    Yes.  She did provide information that

16     corroborated the notion that the relationship between

17     Mr. Rollins and Mr. Waldrop had deteriorated over

18     time.

19         Q.    Did she attribute that to anything?

20         A.    No one particular event.

21         Q.    Okay.  How about more than one particular

22     event?

23         A.    I think she indicated that that was sort of

24     a general problem.  She indicated that her

25     relationship with Mr. Waldrop also had become more

1    difficult.

2         Q.    In what way?

3         A.    In their working relationship on various

4    projects.  Simply because she was in the financial

5    area and Mr. Waldrop was in the operational area and

6    there were instances in which their respective views

7    on how to accomplish a particular objective did not

8    agree.

9         Q.    Did she mention time and attendance?

10        A.    She mentioned time and attendance.

11        Q.    Was that one of the areas where she and

12   Mr. Waldrop did not agree?

13        A.    I believe that's right.

14        Q.    Okay.  Other than time and attendance, did

15   she mention anything else where they had disagreed?

16        A.    She mentioned other projects.  That time and

17   attendance issue was part of a greater set of issues

18   related to the HR software vendor that they were

19   dealing with called Workday.  But that was the primary

20   one.

21        Q.    Okay.  Did Ms. Taylor mention anything to

22   you about an internal audit that had been conducted

23   earlier in 2016 during that interview?

24        A.    Yes.

25        Q.    What did she tell you about that internal

1    audit?

2        A.    She told me that an internal audit had been

3    conducted with respect to business expense reporting

4    for a six-month period beginning July 1, 2015, to

5    12/31/2015.

6        Q.    And what was significant about that audit to

7    Ms. Taylor?

8        A.    What she thought was significant was that

9    they took a look at officer reported business expenses

10   during that period and that it indicated that the

11   highest number of business expenses reported during

12   that period was attributable to Mark Waldrop's

13   assistant, Stephanie Dotson, at a number slightly

14   greater than $40,000.

15       Q.    Did that make you suspicious?

16       A.    It seemed unusual simply because I didn't

17   think Stephanie Dotson would have incurred that level

18   of business expenses.

19       Q.    Okay.  Time and attendance and internal

20   audit were discussed during your interview with

21   Ms. Taylor.  What else?

22       A.    Various conversations that Ms. Taylor had

23   with Mr. Waldrop which evidenced the tension that

24   existed between Mr. Waldrop and Mr. Rollins.

25       Q.    Let me back up.  Was anybody else present

1    for your interview with Ms. Taylor?

2         A.   No.

3         Q.   So it was just --

4         A.   I was --

5         Q.   -- just the two of you?

6         A.   Just the two of us in Macon, Georgia, at

7    their offices.

8         Q.   Okay.  And, specifically, what conversations

9    did Ms. Taylor tell you about?

10        A.   Conversations that she had with Mark Waldrop

11   in which he expressed concern about his relationship

12   with Ronnie Rollins.

13        Q.   And did she give you any specific details of

14   any of those conversations?

15        A.   Not specific details.  Just the frequency of

16   those conversations and the difficult situation that

17   presented.  And she did indicate that Mr. Waldrop had

18   indicated to her that he planned to go to see Joe Wall

19   and to have a conversation about it.

20        Q.   Did Ms. Taylor express an opinion on whether

21   she felt that Mr. Waldrop's concerns were legitimate?

22        A.   I don't know that she was specifically aware

23   of the email that was the topic of discussion.  I

24   didn't ask her about that specific email.

25        Q.   Did you ask her about targeting?

1        A.    She indicated that Mr. Waldrop had indicated

2    to her that he believed that Mr. Rollins was targeting

3    him.   That was the comment she made to me.

4        Q.    Prior to your involvement in Mr. Waldrop's

5    allegations against Mr. Rollins, had you been involved

6    in any similar employment-related investigation for

7    CHSI in the past?

8        A.    No.

9        Q.    Okay.   Was anything else discussed during

10   your interview with Ms. Taylor?

11       A.    She indicated that Mr. Waldrop had asked her

12   to attend the meeting with Mr. Joe Wall and that she

13   declined that invitation to attend the meeting.

14       Q.    Did Ms. Taylor describe her working

15   relationship with Mr. Rollins during that interview?

16       A.    We didn't discuss her working relationship

17   with Mr. Rollins.

18       Q.    Did she explain why she did not take

19   Mr. Waldrop up on his offer to join him in discussing

20   this matter with Mr. Wall?

21       A.    No.   She just indicated that she declined.

22       Q.    Did you discuss anything else during that

23   interview?

24       A.    She mentioned her own level of difficulty in

25   dealing with Mr. Waldrop on various projects like the

1    time and attendance project.

2         Q.    Sitting here today, do you recall any other

3    specific instances she mentioned other than the time

4    and attendance project where she experienced

5    difficulty with Mr. Waldrop?

6         A.    That was the -- that was the one that

7    occupied the most time in that conversation.

8         Q.    What specifically did she tell you those

9    difficulties were with regard to time and attendance?

10        A.    It related to the -- her analysis versus the

11   analysis done by Mark Waldrop and others about which

12   time and attendance program would be best suited for

13   Community Health Systems.  And that there were

14   differences of opinion about the ability of Workday's

15   program to work versus the other vendors that were

16   being considered.

17        Q.    Did she tell you how that disagreement was

18   ultimately resolved?

19        A.    I don't recall how it was ultimately

20   resolved.  I am aware that the Workday contract went

21   forward.  I'm not sure -- I was not involved in those

22   contract negotiations.

23        Q.    Well, which did Ms. Taylor favor?

24        A.    I think Ms. Taylor was concerned about

25   Workday's ability to provide the services.

1      Q.    So she was in favor of another vendor?

2      A.    Yes.

3      Q.    Is that what she told you during this

4   interview?

5      A.    Yes.

6      Q.    All right.  Anything else discussed during

7   the interview?

8      A.    Not that I can recall.

9      Q.    So after interviewing Ms. Taylor, what did

10   you do as a part of your investigation?

11      A.    I also interviewed Chairman Joe Wall.

12      Q.    Okay.  Tell me about that interview.  Well,

13   let's back up.  When did that happen?

14      A.    That was also June 9th.

15      Q.    Okay.  Tell me about that interview, please.

16      A.    I asked Joe about his meeting on May 17th,

17   2016.  And he related that meeting to me.

18      Q.    What did he tell you?

19      A.    He told me that Mark had these concerns

20   about that particular email and that he was concerned

21   about his relationship with Mr. Rollins.  That it had

22   deteriorated as I had explained earlier.

23      Q.    Did he share the email with you?

24      A.    He did not share the email with me at that

25   moment.

1        Q.   So at this point in time had you even seen

2   the email?

3        A.   I had not yet seen it.

4        Q.   Anything else discussed during that

5   interview with Mr. Wall?

6        A.   I think it was fair to say that Mr. Wall was

7   very concerned about the serious nature of these

8   allegations.  He indicated that he had spoken to

9   Mr. Rollins about them.

10       Q.   And what did he tell you he had discussed

11  with Mr. Rollins specifically?

12       A.   Well, they discussed the -- specifically,

13  the email in question, the May 12th email.  They also

14  discussed that there was a follow-up meeting on May

15  24th in which Mr. Rollins, Mr. Wall, Mr. Waldrop all

16  met to discuss these issues.

17       Q.   And what did he tell you happened at that

18  meeting?

19       A.   He told me that that was not a productive

20  meeting.  That essentially they didn't make any

21  progress at that meeting.  He viewed Mr. Waldrop as

22  not constructive in that conversation and there was

23  very little accomplished.  He, in fact, indicated

24  Mr. Waldrop was insubordinate.

25       Q.   Did he tell you how Mr. Waldrop was

1    insubordinate?

2         A.   He indicated that Mr. Waldrop was attempting

3    to answer questions posed by Mr. Rollins before he

4    could finish his sentence.

5         Q.   All right.  Was anything else discussed

6    during that interview with Mr. Wall?

7         A.   Mr. Wall indicated to me also that

8    Mr. Waldrop had requested severance, a recommendation

9    for himself, and that his assistant, Stephanie Dotson,

10   continue to have a position with the company.

11        Q.   So, basically, the same thing Mr. Waldrop

12   had told you the day before?

13        A.   That is correct.

14        Q.   Was anybody else present for your interview

15   with Mr. Wall?

16        A.   No.

17        Q.   Anything else discussed during that

18   interview?

19        A.   Not that I can recall.

20        Q.   So what did you do after you interviewed

21   Ms. Taylor and Mr. Wall?

22        A.   I interviewed Mr. Rollins.

23        Q.   All right.  When did that take place?

24        A.   That was also June 9th.

25        Q.   Anybody else present for that interview?

1        A.    No.

2        Q.    And what did you discuss in your interview

3   with Mr. Rollins?

4        A.    I asked Mr. Rollins about the May 12th

5   email.  He provided me a copy of the May 12th email.

6   He provided me a copy of a May 15th letter that he

7   wrote to Mr. Waldrop.  And also a response email that

8   contained comments about the May 12th email that I

9   believe Mr. Waldrop sent him on May 20th.

10       Q.    Was this the first time you had seen the

11  email?

12       A.    Yes.

13       Q.    And what did Mr. Rollins tell you about the

14  email, the letter, and Mr. Waldrop's response email?

15       A.    He indicated to me that he thought that he

16  had fairly accurately described the topics discussed

17  in the call that generated the May 12th email.  He did

18  not see that there was any targeting impact of any

19  portion of the email.

20             Specifically, the comment that Mr. Waldrop

21  didn't have any further indications about the Navicent

22  meeting.  Mr. Rollins indicated, and he did indicate

23  in his letter dated May 15th, that that was simply

24  because Mr. Waldrop hadn't been involved in those

25  discussions so that it seemed reasonable for him to

1    simply indicate that Mr. Waldrop had no further

2    comments on that matter.

3         Q.   Did Mr. Rollins make any comments about his

4    relationship with Mr. Waldrop?

5         A.   None other than he was working hard to

6    maintain a good relationship with him.  He was, I

7    think, visibly upset about the allegations.  He had

8    attempted to provide feedback and that was the reason

9    he sent his May 15th letter.  That he sought to

10   resolve this issue.  But he was obviously surprised in

11   the action of Mr. Waldrop to go to Chairman Joe Wall

12   and have the meeting with obviously a very serious

13   matter.

14        Q.   Did Mr. Rollins make any comments about

15   whether his relationship with Mr. Waldrop had

16   deteriorated over the last few weeks?

17        A.   He indicated that -- that there had been

18   increasing tension in 2016.

19        Q.   Did he attribute that to anything?

20        A.   He didn't indicate a particular topic.  He

21   did indicate that there had been certain difficult

22   meetings and conversations about an issue with respect

23   to their VEBA, which was an employee benefit program,

24   and it had had some poor financial results.  And they

25   had conversations about that that were difficult.

1      Q.    Did he say when those conversations had

2    occurred?

3      A.    Those would have been in the spring of 2016.

4      Q.    All right.  Anything else discussed during

5    this interview with Mr. Rollins?

6      A.    I don't recall anything further.

7      Q.    Did Mr. Rollins mention anything during that

8    interview about the $250,000 gift?

9      A.    No.

10     Q.    Did you ask him about it?

11     A.    No.

12     Q.    Okay.  So on June 9th you interviewed

13   Ms. Taylor, Mr. Wall, and Mr. Rollins.  Did you

14   interview anybody else?

15     A.    No.

16     Q.    Nobody else on that day?

17     A.    Nobody else on that day or subsequently to

18   that day.

19     Q.    So those are the only three interviews you

20   conducted?

21     A.    That's correct.

22     Q.    And the one of Mr. Waldrop?

23     A.    That's correct.

24     Q.    The day before.  Okay.  So after conducting

25   these four interviews -- Mr. Waldrop, Ms. Taylor,

1    Mr. Wall, and Mr. Rollins -- what did you do with

2    respect to this issue?

3         A.   At that particular moment I didn't do

4    anything.  I reviewed, the next day and subsequent

5    days, the May 12th email and the subsequent

6    correspondence that I had received from Mr. Rollins;

7    specifically, the May 15th letter, the May 20th email

8    from Mr. Waldrop.

9         Q.   Did you make any notes of your interviews?

10        A.   I don't believe I made any notes of those

11   interviews.

12        Q.   So after reviewing these items, what did you

13   do in the course of your investigation?

14        A.   I didn't -- there was -- based on the May

15   12th email, based on my conversations, based on a

16   review of the correspondence back and forth, I came to

17   the conclusion, having not received any other

18   information, that there was a pattern of conduct, that

19   there was a series of events, that there was any

20   factual basis to the allegations based on my

21   investigation.

22        Q.   In other words, Mr. Waldrop's claims were

23   unfounded in your opinion?

24        A.   That was my opinion based on a review of the

25   information that I had gained.

1      Q.   When did you -- well, strike that.  Did you

2    communicate your findings to anybody with Community

3    Health Systems?

4      A.   Not at that time.

5      Q.   Okay.  So after coming to this conclusion,

6    what did you do?

7      A.   I didn't do anything at that time until

8    there was a subsequent board meeting on June 21st,

9    2016.

10     Q.   Okay.  At any time, did the focus of your

11   investigation shift from Mr. Waldrop's allegations to

12   allegations of wrongdoing against Mr. Waldrop?

13     A.   On June 9th, Lorraine Taylor provided me her

14   description of the internal audit with respect to

15   business expenses.  And based on that information and

16   the seriousness of the information revealed in that

17   audit that she indicated to me, I concluded it was

18   important to follow up on that information.

19     Q.   And did you follow up on that information?

20     A.   I did.

21     Q.   How so?

22     A.   I asked Lorraine Taylor to send me copies of

23   the information that had been pulled -- part of the

24   information that had been pulled as part of that

25   internal audit.

1       Q.   And did she send it to you?

2       A.   Yes.

3       Q.   Did Ms. Taylor, in sending that information

4  to you, provide you with any emails that she had

5  exchanged with Mr. Waldrop or Ms. Dotson regarding the

6  audit?

7       A.   No.

8       Q.   It was just purely the results of the audit?

9       A.   It was literally copies of signed business

10  expense reports.

11          MR. DANIEL:  When you have a chance to take

12      a break, could we take a short one?

13          MR. HENRY:  Sure.  Yeah.  This is

14      actually --

15          MR. DANIEL:  This is a good time?

16          MR. HENRY:  Yeah.

17          (A recess was taken in the deposition at

18      11:24 a.m., and the deposition was resumed at

19      11:45 a.m.)

20      Q.   (By Mr. Henry)  Mr. Lange, before we took a

21  break you were testifying that you had requested some

22  information from Ms. Taylor.  Remember that?

23      A.   Yes.

24      Q.   What specifically did she send you?

25      A.   She specifically sent me copies of specific

1    business expense reports that had been submitted

2    during the period 7/1/2015 to December 31, 2015.

3         Q.   Were they all expense reports that were

4    submitted during that time frame or just expense

5    reports submitted by certain people?

6         A.   They were largely expense reports submitted

7    by Stephanie Dotson.

8         Q.   Were they all of the expense reports

9    submitted by Stephanie Dotson during that time frame?

10        A.   I don't recall that it was all.  I recall

11   that there were a number of them.

12        Q.   Okay.  Did Ms. Taylor decide what to send

13   you or did you specifically ask for expense reports?

14        A.   I was following up on Ms. Taylor's comment

15   that the internal audit had produced a number which

16   indicated that of the officers that had reported over

17   5,000 in business expenses that Stephanie Dotson's was

18   the highest at approximately 40,000.

19        Q.   Did Ms. Taylor send you any expense reports

20   submitted by Stephanie Dotson where she had requested

21   reimbursement for expenses incurred on behalf of

22   Mr. Rollins?

23        A.   Not that I'm aware of.  Not Mr. Rollins.

24        Q.   Did she -- did Ms. Taylor provide you any

25   expense reports in which Ms. Dotson had sought

1      reimbursement for expenses incurred on behalf of

2      financial services?

3           A.   No, not that I'm aware of.

4           Q.   Did Ms. Taylor send you any expense

5      reimbursement requests whereby Ms. Dotson was seeking

6      reimbursement for expenses incurred on behalf of

7      Ms. Taylor?

8           A.   No.

9           Q.   Have you ever seen any expense reports where

10     Ms. Dotson was seeking reimbursement for costs

11     incurred on behalf of Mr. Rollins, Ms. Taylor, or

12     financial services?

13          A.   No.

14          Q.   Are you aware of whether any such expense

15     reimbursement requests exist?

16          A.   No, I'm not aware.

17          Q.   Other than expense reimbursement requests,

18     did Ms. Taylor send you any other documents?

19          A.   No.  They were -- the documents I reviewed

20     and received were actual copies of expense reports and

21     an Excel spreadsheet that reflected aggregate business

22     expense reporting totals for that six-month period.

23          Q.   Did the Excel spreadsheet that she sent you

24     show expense reimbursement requests from persons other

25     than Stephanie Dotson?

Page 50

1      A.    Not that I recall.

2      Q.    Okay.  So you received these expense

3  reimbursement requests from Ms. Taylor.  And what did

4  you do?

5      A.    I reviewed them.

6      Q.    And what did you discover as a result of

7  your review?

8      A.    I discovered that it -- in reviewing them it

9  would appear that Stephanie Dotson was reporting

10  Mr. Waldrop's business expenses on her business

11  expense reports.  And those had been submitted under

12  their Workday program and approved by Mr. Waldrop.

13     Q.    Anything else that was revealed as a result

14  of your review of the expense reimbursement requests

15  that Ms. Taylor sent you?

16     A.    Well, that fact was significant.  It's not

17  apparent to me why Mr. Waldrop's expense

18  reimbursements would appear on Stephanie Dotson's

19  business expense reports.  That seemed irregular.

20     Q.    Do you have a secretary or legal assistant?

21     A.    In my practice?

22     Q.    Yes.

23     A.    Yes, I do.

24     Q.    Does that secretary or legal assistant make

25  travel arrangements for you?

1        A.    That has occurred in the past.  I tend to

2    make my own travel arrangements.

3        Q.    Would making travel arrangements, in your

4    view, be out of the ordinary for a secretary or legal

5    assistant to do for a lawyer that they work for?

6        A.    No.

7        Q.    But you did find it significant that

8    Ms. Dotson, as Mr. Waldrop's assistant, was submitting

9    expenses for reimbursement that she had incurred on

10   his behalf?

11       A.    Yes.  During that period, that same Excel

12   spreadsheet reflected approximately $10,000 of

13   Mr. Waldrop's own expenses on his own expense reports.

14   And that Excel spreadsheet indicated over $40,000 of

15   expense reimbursements submitted by Ms. Dotson.  That

16   was an -- approximately -- indication that 80 percent

17   of Mr. Waldrop's expenses during that period were

18   reflected on Ms. Dotson's reports.

19             It's significant that the Workday program,

20   the written policies and procedures, would have been

21   that Mr. Waldrop would approve Stephanie Dotson's

22   reports.  Ronnie Rollins would have report -- would

23   have approved Mr. Waldrop's reports.  So it appeared

24   that Mr. Rollins would not have been able to see or

25   approve approximately 80 percent of those expenses.

1        Q.   Who approved Mr. Rollins's expense

2   reimbursement requests?

3        A.   I believe that Lorraine Taylor looked at

4   them.  Mr. Rollins didn't have a superior in the

5   organization.

6        Q.   Who approved Ms. Taylor's expense

7   reimbursement requests?

8        A.   I don't know.

9        Q.   If Ms. Dotson had submitted expense

10  reimbursement requests for expenses incurred by

11  Mr. Rollins, who would have approved those?

12       A.   I don't know.

13       Q.   All right.  So you found and attached

14  significance to the fact that over 80 percent of the

15  expenses reflected on the Excel spreadsheet that

16  Ms. Taylor showed you were submitted by Ms. Dotson,

17  correct?

18       A.   That's not a correct statement.

19       Q.   Okay.

20       A.   You said 80 percent.  I said that of

21  Mr. Waldrop's expenses...

22       Q.   80 percent of them were submitted by

23  Ms. Dotson?

24       A.   Correct.

25       Q.   Okay.  And that was significant in your

1    view?

2         A.    It was significant.  And I believe it was a

3    violation of Mr. Waldrop's employment agreement and

4    the Workday written policies and procedures indicating

5    that you were supposed to submit your own expense

6    reports with your expenses to be approved by your

7    supervisor.  In this case, Mr. Rollins, as

8    Mr. Waldrop's only supervisor, was not permitted to

9    review or approve those business expenses reflected on

10   Ms. Dotson's report.

11        Q.    When did you come to the conclusion that

12   that process was a violation of Mr. Waldrop's

13   employment agreement?

14        A.    In the process of reviewing those business

15   expense emails.

16        Q.    When?  What time frame are we talking about?

17        A.    I received those emails during the week of

18   June 17th.

19        Q.    Okay.  So how long after you received the

20   emails did you come to the conclusion that the process

21   whereby Ms. Dotson submitting Mr. Waldrop's expense

22   reimbursement requests violated Mr. Waldrop's

23   employment agreement?

24        A.    Well, I reviewed his employment agreement.

25   I had conversations with Lorraine Taylor.  Lorraine

1    Taylor indicated to me that the Workday process

2    involved the submission of your business expense

3    reports to your superior for approval.  That

4    Mr. Waldrop's business expense reports would have been

5    submitted to Mr. Rollins for approval.  And his

6    employment agreement was very clear that he had to

7    comply with policies and procedures and properly

8    report his business expenses.

9         Q.   I'm trying to -- trying to pin down the time

10   frame here.  So you just testified, I believe --

11   correct me if I'm wrong -- that you started receiving

12   emails or you received emails from Lorraine Taylor

13   with the expense reimbursement requests and Excel

14   spreadsheets during the week of June 17th, 2016.

15        A.   That's correct.

16        Q.   Then you just testified that you reviewed

17   the employment agreement and had conversations with

18   Lorraine Taylor about Workday processes.  Correct?

19        A.   That's correct.

20        Q.   When did you review the employment

21   agreement?

22        A.   The same day I got the emails.

23        Q.   Okay.  So during the week of June 17th?

24        A.   Yes.

25        Q.   And when did you have conversations with

1    Lorraine Taylor about the Workday process?

2        A.    Those same days that I got the emails.

3        Q.    So all of this was occurring during the week

4    of June 17th, 2016?

5        A.    Yes.

6        Q.    When you spoke to Ms. Taylor about the

7    Workday processes, what else did you discuss with her?

8        A.    Simply the process whereby business expense

9    reports were submitted, how the Workday process

10   worked.

11       Q.    Did she provide to you a written policy

12   regarding Workday processes?

13       A.    She did not provide me a written policy.

14   She simply described how the system worked.  I think

15   that at some point the Workday process became

16   automated and the reports were submitted by email.  I

17   don't remember if that period was a period during

18   which they were submitted by email.  But it's a --

19   it's now an automated process, I understand.

20       Q.    So your knowledge of how the Workday process

21   worked that you obtained during the week of June 17th,

22   2016, came exclusively from Ms. Taylor?

23       A.    That's correct.

24       Q.    All right.  So when you made this

25   determination that Mr. Waldrop and Ms. Dotson's

1    submission of expense reimbursement requests violated

2    Mr. Waldrop's employment agreement, what did you do?

3         A.    During the week of June 17th, I didn't do

4    anything but contact Ms. Lorraine Taylor and we had

5    discussions about it.

6         Q.    Okay.

7         A.    I subsequently had --

8         Q.    And that's -- I'm sorry to interrupt, but I

9    just want to be sure I know -- the discussions you had

10   had to do with Workday processes, correct?

11        A.    Yes.

12        Q.    Okay.  Please continue.

13        A.    I subsequently had conversations with Joe

14   Wall about that.

15        Q.    All right.  When did those conversations

16   occur?

17        A.    Also during the week of June 17th.

18        Q.    Was it toward the end of the week?

19        A.    After I had reviewed the emails and the

20   actual business expense reports.

21        Q.    And what did you discuss with Mr. Wall?

22        A.    Simply the magnitude of the number in that

23   six-month audit period and specific invoices --

24   specific business expense reports that I reviewed, my

25   conversations with Lorraine Taylor about the process,

1    and the pattern of reflecting on Ms. Dotson's expense

2    reports Mr. Waldrop's business expenses.

3        Q.   Do you still haves copies of the expense

4    reports that you reviewed during the week of June

5    17th, 2016?

6        A.   I don't have them in my possession right

7    now.

8        Q.   Right.  I mean, just generally.  Do you have

9    access to them?

10       A.   I believe they may have been produced in the

11   written requests for production.

12           MR. HENRY:  Okay.  Can we go off for a

13       second?

14           (Discussion held off the record.)

15       Q.   (By Mr. Henry)  To the best of your

16   knowledge, those expense reports have been given to

17   counsel for Community Health Systems in this case,

18   correct?

19       A.   Yes.

20       Q.   And have been produced?

21       A.   It's my understanding they've been produced.

22   I haven't been personally involved in the production.

23       Q.   Okay.  All right.  So you have this

24   conversation with Joe Wall about these expense

25   reimbursement requests and reports.  How did he

1    respond?

2         A.   I think he was very concerned.  I think he

3    expressed significant concern.  I think he was very

4    surprised.

5         Q.   Okay.  And you said this conversation

6    occurred during the week of June 17th?

7         A.   Correct.

8         Q.   And you've already referenced a board

9    meeting that occurred.  What was the date of that

10   board meeting?

11        A.   June -- Tuesday, June 21st.

12        Q.   So the next week?

13        A.   Correct.

14        Q.   Did you make any recommendations to Mr. Wall

15   about responding to the results of your investigation?

16        A.   I was asked to come and participate at the

17   June 21 board meeting and to indicate at that time

18   what I had found with respect to these matters.

19        Q.   Who made that request?

20        A.   Mr. Wall made that request that I attend the

21   board meeting.

22        Q.   Was that during this conversation you had

23   with him?

24        A.   One of the conversations.  We had more than

25   one conversation during the week of June 17th.

1        Q.    How many did you have with Mr. Wall during

2   that week?

3        A.    Several.  I can't remember how many.

4        Q.    During your several conversations with

5   Mr. Wall during the week of June 17th, 2016, did the

6   two of you discuss terminating Mr. Waldrop's

7   employment?

8        A.    No.

9        Q.    Do you know if Mr. Wall spoke to any other

10   board members during the week of June 17th?

11        A.    I'm not aware of whether he talked to

12   specific board members.

13        Q.    He didn't tell you he had?

14        A.    He did not tell me he had talked to board

15   members.

16        Q.    How many conversations did you have with

17   Lorraine Taylor during that week?

18        A.    I think I had a conversation probably three

19   times with Lorraine with respect to the receipt of the

20   emails.

21        Q.    Okay.  How about not with respect to receipt

22   of the emails?

23        A.    Our conversations were exclusively with

24   respect to my questions that I had about the emails.

25        Q.    Did you have any discussions with

1    Mr. Rollins during the week of June 17th, 2016,

2    regarding Mr. Waldrop?

3        A.   Yes.

4        Q.   And how many discussions did you have with

5    Mr. Rollins?

6        A.   I had a couple conversations with

7    Mr. Rollins during the week.  He was aware that there

8    was going to be a June 21st board meeting.  He also

9    sent me some additional information with respect to

10   that board meeting.

11       Q.   What additional information did he send you?

12       A.   He sent me a copy of a contract that had

13   been executed with Mr. Mark Hunt who was hired as a

14   consultant to provide consulting services to an

15   affiliate of CHSI called "Community Primary Care

16   Physicians."

17       Q.   And why did he send that to you?

18       A.   I believe he wanted me to see that to see

19   that it had been executed by Mr. Waldrop.  And that

20   Mr. Hunt was effectively asked to perform an

21   officer-level consultancy with respect to that

22   subsidiary.

23       Q.   And that was during the week of June 17,

24   2016, that he sent you that contract?

25       A.   Yes.

1          Q.    Was Mr. Rollins aware during that week that

2     you were investigating Mr. Waldrop's expense

3     reimbursement requests?

4          A.    I don't know whether he had had direct

5     conversations with Lorraine Taylor about that or not.

6     But he was aware that I had received emails.

7          Q.    He was aware that you had received emails

8     from Lorraine Taylor?

9          A.    Yes.

10         Q.    Forwarding the expense reimbursement

11    requests?

12         A.    Yes.

13         Q.    Was he copied on those emails?

14         A.    I don't recall whether he was copied.  I do

15    not believe he was copied on those.

16         Q.    Okay.  So you were asked to attend the board

17    meeting on June 21, 2016, by Mr. Wall?

18         A.    That's correct.

19         Q.    What occurred at the June 21, 2016, board

20    meeting?

21         A.    There were conversations about the

22    accusations that Mark Waldrop made against

23    Mr. Rollins.  There were discussions about the

24    business expense reporting violations by Mr. Waldrop.

25    There were discussions about the termination of

1    Mr. Waldrop.  There were discussions about offering

2    him a severance package.

3         Q.    Did Mr. Rollins participate in those

4    discussions?

5         A.    He only participated when asked questions by

6    board members and when asked to comment on his

7    attempts to describe in detail what he intended to

8    mean in the May 12th email.

9         Q.    In the 20 years that you've been acting as

10   corporate counsel for Community Health Systems, how

11   many times have you attended a board meeting?

12        A.    Numerous times.  Less frequently in recent

13   years, but certainly a number of board meetings over

14   that period of time.

15        Q.    When you attended board meetings in the

16   past, did the board go into executive session?

17        A.    I had not been -- well, strike that.  I had

18   been in meetings in which the board was in executive

19   session before.

20        Q.    And that -- the board actually went into

21   executive session on June 21st, 2016, correct?

22        A.    That's correct.  At a certain point.

23        Q.    Who else was present at the board meeting --

24   besides board members -- where Mr. Waldrop's

25   allegations against Ronnie Rollins and Mr. Waldrop's

Page 63

1    termination were discussed?

2         A.   Well, for a portion of that meeting Lorraine

3    Taylor was present.

4         Q.   Okay.  Did Lorraine Taylor participate in

5    conversations about Mark Waldrop's allegations against

6    Ronnie Rollins?

7         A.   No.

8         Q.   Did Lorraine Taylor participate in

9    discussions about expense reimbursement requests?

10        A.   Yes.

11        Q.   And what was her participation with regard

12   to that topic?

13        A.   She simply relayed the information to the

14   board about the six-month audit that had been

15   conducted and indicated to them some of the numbers

16   that were reflected on emailed spreadsheets that were

17   the result of that audit.

18        Q.   The emailed spreadsheets that were a result

19   of the audit that you just described -- did Lorraine

20   Taylor share those spreadsheets with you during the

21   week of June 17th, 2016?

22        A.   Well, there's one specific spreadsheet that

23   contained the totals reported by officers.  I did

24   receive a copy of that spreadsheet.

25        Q.   Okay.  And is that the same spreadsheet that

Page 64

1    Ms. Taylor showed to the board during executive

2    session?

3        A.   I don't believe Ms. Taylor actually showed

4    or distributed any written document or spreadsheet

5    during the meeting.  She spoke about them.

6        Q.   Okay.  All right.  Other than relaying the

7    information to the board about the six-month audit,

8    what else did Ms. Taylor contribute to the meeting

9    with regard to expense reimbursement requests?

10       A.   She indicated some additional information

11   about a three-year period ending June 30, 2016, where

12   those totals had been calculated a second time for the

13   three-year period ending 6/30 -- June 30, 2016, and

14   indicated that during that period the total business

15   expense reimbursements submitted by Ms. Dotson were

16   over $259,000.

17       Q.   Had she shared that information with you

18   previously?

19       A.   Yes.

20       Q.   Was that one of the things she sent you

21   during the week of June 17, 2016?

22       A.   Yes.  I received an email with that

23   information.

24       Q.   So is it your understanding that there were

25   two audits performed?  One covering a six-month period

1      and one covering a three-year period?

2          A.   No.  She simply went onto Workday and sought

3      a multiyear recapitulation of those numbers.  She

4      didn't indicate that there was a separate audit

5      conducted for that period.  She simply ran numbers for

6      a three-year period.

7          Q.   The expense reimbursement requests that you

8      reviewed during the week of June 17, 2016, that

9      Ms. Taylor sent you -- did any of those fall outside

10     the six-month audit period?

11         A.   No.

12         Q.   Did Ms. Taylor indicate to the board on June

13     21, 2016, that Ms. Dotson had submitted expense

14     reimbursement requests for expenses incurred by

15     Mr. Rollins?

16         A.   No.

17         Q.   Did Ms. Taylor indicate to the board on June

18     21, 2016, that Ms. Dotson had submitted expense

19     reimbursement requests on behalf of financial

20     services?

21         A.   No.

22         Q.   Did Ms. Taylor indicate to the board on June

23     21, 2016, that Ms. Dotson had submitted expense

24     reimbursement requests on behalf of Ms. Taylor?

25         A.   No.

1        Q.    Other than providing or relaying information

2    about the six-month audit and providing a total for

3    the expenses submitted by Stephanie Dotson over a

4    three-year period, did Ms. Taylor provide any other

5    information to the board on June 21, 2016, as it

6    relates to expense reimbursement requests?

7        A.    No.

8        Q.    Did Ms. Taylor provide any information to

9    the board with regard to terminating Mr. Waldrop?

10       A.    No.

11       Q.    Did Ms. Taylor provide any information to

12   the board with regard to offering a severance package

13   to Mr. Waldrop?

14       A.    No.

15       Q.    You described that Mr. Rollins provided

16   information to the board regarding Mr. Waldrop's

17   allegations against Mr. Rollins, correct?

18       A.    That's correct.  He was asked at the board

19   meeting about that.

20       Q.    Did Mr. Rollins provide any information to

21   the board with regard to expense reimbursement

22   requests?

23       A.    No.

24       Q.    Did Mr. Rollins provide any information or

25   have any discussions during the board meeting

1    regarding the termination of Mr. Waldrop?

2         A.    No.

3         Q.    Did Mr. Rollins provide any information or

4    participate in any discussions at the June 21, 2016,

5    board meeting regarding offering a severance package

6    to Mr. Waldrop?

7         A.    I believe Mr. Rollins was asked the question

8    what an appropriate severance package might look like.

9    He did not offer any information about that.  He was

10   asked about that.

11        Q.    Did he say that he would like to see

12   Mr. Waldrop in jail?

13        A.    I did not and have not ever heard that

14   statement from Mr. Rollins.

15             And let's go back for a minute.  You --

16   Lorraine Taylor was present while she made her

17   financial presentation, but then she left the meeting

18   and that started the executive session of the board.

19        Q.    Okay.  So Ms. Taylor was not present for any

20   conversations regarding Mr. Waldrop's allegations

21   against Ronnie Rollins?

22        A.    That's correct.

23        Q.    And she was not present for any discussions

24   regarding the termination of Mr. Waldrop?

25        A.    That's correct.

1      Q.    Or the offering of a severance package to

2    Mr. Waldrop?

3      A.    That's correct.

4      Q.    But Mr. Rollins was present for all of

5    those?

6      A.    Yes.

7      Q.    Were there any other nonboard members that

8    presented information regarding Mr. Waldrop's

9    allegations against Mr. Rollins?

10      A.    No.

11      Q.    Were there any other nonboard members who

12    provided information regarding expense reimbursement

13    requests?

14      A.    No.

15      Q.    Were there any other nonboard members who

16    provided any information regarding the termination of

17    Mr. Waldrop?

18      A.    No.

19      Q.    Were there any other nonboard members who

20    provided any information regarding the offering of a

21    severance package to Mr. Waldrop?

22      A.    No.

23           MR. DANIEL:    Now -- let me just clarify the

24           question.    You're speaking during this executive

25           session --

1            MR. HENRY:  Correct.

2            MR. DANIEL:  -- for those questions you just

3       asked?

4            MR. HENRY:  Correct.

5            THE WITNESS:  Yes.  That was my

6       understanding.

7       Q.   (By Mr. Henry)  So with Mr. Daniel's

8  clarification, is your answer the same?

9       A.   Yes.

10      Q.   Okay.  Was Mr. Waldrop's employment

11 agreement discussed during the June 21, 2016, board

12 meeting?

13      A.   Yes.

14      Q.   And what was discussed about his employment

15 agreement?

16      A.   His employment agreement was discussed in

17 the context of what actions constituted a for cause

18 termination under the agreement.

19      Q.   Did you provide an opinion on whether

20 Mr. Waldrop could be terminated for cause?

21           MR. DANIEL:  Wait a minute.  What's the

22      question?  Can you read that back?

23           (The following testimony was read back:

24           "Did you provide an opinion on whether

25      Mr. Waldrop could be terminated for cause?")

1          MR. DANIEL:  Okay.  I'll object to this

2      question.  I think it calls for information

3      subject to attorney-client privilege.

4          MR. HENRY:  I agree.  I'll withdraw that

5      question.

6      Q.   (By Mr. Henry)  Did the board make a

7  determination with regard to whether Mr. Waldrop could

8  be terminated for cause under the employment agreement

9  on June 21, 2016?

10     A.   Yes, the board did.

11     Q.   And what was that determination?

12     A.    That the improper business expense reporting

13  pattern of conduct by Mr. Waldrop constituted willful

14  misconduct under the employment agreement that

15  constituted sufficient cause for a for cause

16  termination.

17     Q.   Did anybody at the June 21, 2016, board

18  meeting suggest that Mr. Waldrop should be given the

19  opportunity to explain the expense reimbursement

20  requests that Ms. Dotson submitted?

21     A.   Not that I'm aware of.

22     Q.   You didn't suggest that?

23     A.   No.

24     Q.   Why not?

25     A.   Well, it's important to realize that the

1    business expense reporting violation that is the

2    reporting of Mr. Waldrop's expenses on Ms. Dotson's

3    expense report was viewed by me and the board as an

4    extraordinary breach of trust.  That breach of trust

5    wasn't curable.

6           There were two aspects to that conduct.

7    First, there was no opportunity for Mr. Waldrop's

8    supervisor -- in this case, Mr. Rollins -- to review

9    and approve those business expenses.  Secondly, many

10   of those business expenses appeared to be improper.

11   Were there to be some explanation for this pattern of

12   conduct which was persistent and significant over that

13   six-month audit period -- the return of the money

14   reimbursed was only part of the equation.  The second

15   part of the equation was that that breach of trust was

16   not curable, it couldn't be repaired, and it was

17   viewed by the board as extraordinarily flagrant.

18          This was the COO of a charitable institution

19   who had repeatedly during that six-month period caused

20   his executive assistant to report his business

21   expenses on her report, not his, and then approved

22   that report.

23          So I don't think the board concluded that it

24   would have made any difference had an opportunity for

25   explanation been provided.  And I couldn't conclude

1    either that that would have been a meaningful

2    exercise.

3              Further, the board had received information

4    that over the three-year period ending 6/30 -- June

5    30, 2016, that over $259,000 had been reported on

6    Stephanie Dotson's expense reports.  It's fair to say

7    that the board was shocked.  It's fair to say that the

8    board was angry.  It's fair to say that this was

9    viewed as an incredibly serious circumstance.

10        Q.   The information presented to the board with

11   regard to the expense reimbursement requests was

12   provided by whom?

13        A.   I made a report at the board meeting

14   describing the information I had received from

15   Lorraine Taylor.  Lorraine Taylor presented the same

16   information in the first part of that meeting prior to

17   the executive session.

18        Q.   So you and Ms. Taylor presented the

19   information?

20        A.   That's correct.

21        Q.   And the information you presented was based

22   solely on what Ms. Taylor had provided to you?

23        A.   That's correct.

24        Q.   So the source for all of that information

25   was Ms. Taylor; is that correct?

1        A.    That's correct.  And the reports themselves.

2        Q.    If Ms. Taylor had submitted -- well, strike

3    that.  If Ms. Dotson had submitted an expense

4    reimbursement request for expenses incurred by

5    Ms. Taylor, Mr. Waldrop would have approved those

6    requests under the Workday system, correct?

7        A.    I'm not sure that's correct.

8        Q.    But Mr. Waldrop is not Ms. Taylor's

9    supervisor, is he?

10       A.    Not to my knowledge.

11       Q.    And he wasn't when he was COO, right?

12       A.    Not to my knowledge.

13       Q.    So under that scenario, if it occurred,

14   Ms. Taylor and her expenses would not be approved by

15   her supervisor either, would they?

16            MR. DANIEL:  I'll object to the form of the

17        question.  But you may answer.

18       Q.    (By Mr. Henry)  Would you like me to restate

19   it?

20       A.    Please.

21       Q.    Okay.  If Ms. Dotson submitted expense

22   reimbursement requests on behalf of Ms. Taylor and

23   Mr. Waldrop approved those expenses, then Ms. Taylor's

24   expenses would not have been approved by her

25   supervisor, would they?

1          MR. DANIEL:  Object to form.

2     Q.   (By Mr. Henry)  You may answer.

3     A.   I think that's correct.

4          MR. HENRY:  I don't know -- let's go off for

5     a second.

6          (A luncheon recess was taken in the

7          deposition at 12:30 p.m., and the deposition was

8          resumed at 1:23 p.m.)

9     Q.   (By Mr. Henry)  Mr. Lange, before we took

10    our lunch break we were talking about the board

11    meeting on June 21st, 2016.

12         The audit spreadsheet and audit results that

13    Ms. Taylor relayed to the board and had shared with

14    you previously -- did it reflect any audits of

15    expenses submitted by other employees?

16    A.   I'm not -- I'm not aware that it did.

17    Q.   You're not aware of whether the audit

18    reflected that Ms. Taylor, for example, had submitted

19    alcohol expenses for reimbursement?

20    A.   I'm -- I'm just not aware of that.

21    Q.   Would the submission of alcohol expenses for

22    reimbursement be improper?

23    A.   I'm not sure that -- it would depend on the

24    context.

25    Q.   As a nonprofit organization, are there IRS

1    regulations that govern the types of expenses that

2    Community Health Systems can reimburse to employees?

3        A.    Well, it's a tax-exempt entity so it's not

4    deducting those expenses for federal income tax

5    purposes.  Some of the IRS and Code provisions that

6    talk about the deductibility of expenses really relate

7    to for-profit enterprises.  So I'm not sure about your

8    question.  I'm not sure that there's a particular code

9    section that limits specific items of deductibility.

10       Q.    What about Medicare or Medicaid regulations?

11   Would Medicare or Medicaid regulations govern the

12   types of expenses that can be reimbursed by Community

13   Health Systems?

14       A.    Yes, I believe there would be guidelines

15   from a Medicare or Medicaid standpoint.

16       Q.    Do you know if there are any Medicare or

17   Medicaid guidelines that prohibit or limit the ability

18   to seek reimbursement for alcohol expenses?

19       A.    I'm not aware of that.

20       Q.    Was Ms. Stephanie Dotson's employment

21   discussed at the June 28th, 2016, board meeting?

22       A.    Yes.

23       Q.    How so?

24       A.    Simply that the board concluded that the

25   Dalton office would be closed at some point and that

1    Stephanie Dotson's employment would be terminated at

2    some point consistent with its determination to

3    terminate Mr. Waldrop.

4         Q.   So after the board meets on June 21, 2016,

5    and decides to terminate Mr. Waldrop's employment,

6    what do you do next with regard to this issue?

7         A.   Well, there was a determination at the June

8    21 board meeting that Mark Waldrop would be asked to

9    come to our offices on June 28th at 3:30 p.m.  And

10   that Joe Wall and I would meet with him and inform him

11   that the board had concluded to terminate his

12   employment effective immediately.

13        Q.   And that meeting actually took place in

14   these offices, correct?

15        A.   That's correct.

16        Q.   Holland & Knight's offices here in Atlanta?

17        A.   Yes.

18             MR. HENRY:  It's actually, I think, the very

19        first exhibit to your deposition.  It's a little

20        surprising we've gone this long without having one

21        yet.

22             (Plaintiff's Exhibit 1 was marked for

23        identification.)

24        Q.   (By Mr. Henry)  Mr. Lange, the court

25   reporter has handed you what's been marked as

1      Plaintiff's Exhibit 1.  Have you seen Plaintiff's

2      Exhibit 1 before?

3           A.   Yes.

4           Q.   And what is Plaintiff's Exhibit 1?

5           A.   It's described as talking points for the

6      meeting with Mr. Waldrop.  Joe Wall, chairman of the

7      board, would be the primary speaker.  It's dated

8      Tuesday, June 28th, 2016, at 3:30 p.m.

9           Q.   Did you prepare Exhibit 1?

10          A.   I assisted in the preparation of it, yes.

11          Q.   Your law firm prepared it?

12          A.   Yes.

13          Q.   Have you reviewed Exhibit 1 prior to today?

14          A.   Yes, I've -- I've reviewed it before.

15          Q.   Is Exhibit 1 consistent with the subjects

16     that were discussed with Mr. Waldrop on June 28, 2016?

17          A.   Yes.

18          Q.   Was this document actually read to

19     Mr. Waldrop?

20          A.   Well, if you look at the top where you see

21     "Opening statements to make," Mr. Wall initially was

22     reading it verbatim.  There was probably a point at

23     which he ceased to say it verbatim, but it was very --

24     he tried very hard to stick to this.

25          Q.   Do you know if he said anything to

1    Mr. Waldrop during the June 28th, 2016, meeting that

2    is not reflected in Plaintiff's Exhibit 1?

3         A.   I believe there was a very short exchange

4    that was not contained in Plaintiff's Exhibit 1.

5         Q.   And what was that short exchange?

6         A.   I believe that Mr. Waldrop at one point

7    indicated that he was very shocked about the meeting

8    and about the statements made in the exhibit.  And

9    Mr. Wall indicated that board members of CHSI were

10   equally shocked.  And I believe that he said the words

11   "Some of the board members believed they had been

12   kicked in the stomach."

13        Q.   Looking at page 2 of Plaintiff's Exhibit 1

14   under the heading "Board Conclusions," specifically

15   paragraph 2 -- do you see that?

16        A.   Yes.

17        Q.   I'll read that into the record.  "The board

18   believes, based on the board's review of various types

19   of information and on the advice of counsel that there

20   is sufficient basis for CHS to immediately terminate

21   your employment for cause pursuant to your employment

22   agreement."  Did Mr. Wall say those words to

23   Mr. Waldrop?

24        A.   I believe that he said exactly those words.

25        Q.   Okay.  You see there's a portion of

1    paragraph 2 on page 2 under "Board Conclusions" that

2    is redacted.  Did you add those redactions?

3         A.   Holland & Knight and I added those -- we --

4    I didn't redact this document.

5         Q.   Okay.

6         A.   There were some words there.  I didn't

7    redact this document.

8         Q.   The words that have been redacted were on

9    the document at the time Mr. Wall read it; is that

10   correct?

11        A.   Yes.  I believe so.

12        Q.   Do you know what's behind those reactions?

13        A.   Right this minute I don't remember.

14        Q.   Other than paragraph 2 on page 2 of

15   Plaintiff's Exhibit 1, is there anything else in

16   Plaintiff's Exhibit 1 that discusses the cause for

17   Mr. Waldrop's termination?

18        A.   Can you rephrase that or repeat that?

19        Q.   Sure.  Other than paragraph 2 under "Board

20   Conclusions" on page 2 of Plaintiff's Exhibit 1, is

21   there anything else in Plaintiff's Exhibit 1 that

22   discusses the cause for Mr. Waldrop's termination?

23             MR. DANIEL:  Why don't you take time to read

24        it.

25        Q.   (By Mr. Henry)  Yes.  Yeah.  Take your time.

1      A.    No, I don't see anything in Plaintiff's

2  Exhibit 1 that describes the cause.

3      Q.    I just want to be sure I heard what you

4  said.  Did you say that you don't see anything else in

5  Exhibit 1 that describes the cause?

6      A.    Correct.

7      Q.    Okay.  Did you or Mr. Wall deliver any

8  written documentation to Mr. Waldrop at the June 28th,

9  2016, meeting?

10     A.    No.

11     Q.    No written explanation of the cause for his

12  termination?

13     A.    That's correct.

14           (Plaintiff's Exhibit 2 was marked for

15           identification.)

16     Q.    (By Mr. Henry)  Mr. Lange, you've got in

17  front of you what the court reporter has marked as

18  Plaintiff's Exhibit 2.

19     A.    Yes.

20     Q.    Have you seen Plaintiff's Exhibit 2 before?

21     A.    Yes.

22     Q.    In fact, it appears that Plaintiff's Exhibit

23  2 is addressed to you.  Do you see that?

24     A.    Yes.

25     Q.    I think it might have been to one of your

 1     old law firms.  Right?  Paul Hastings?

 2          A.   Yes.  That's correct.

 3          Q.   Did you actually receive Plaintiff's Exhibit

 4     2?

 5          A.   I believe it was -- a copy of it was sent to

 6     me.

 7          Q.   The third paragraph of Plaintiff's Exhibit

 8     2 -- and this is Mark Waldrop talking -- says "As of

 9     this date I have not been provided information

10     regarding the reason for my termination."  Do you

11     agree with that statement?

12          A.   Yes.  As of July 1, 2016, I believe that's

13     correct.

14          Q.   Okay.  Why didn't you or Mr. Wall provide

15     information to Mr. Waldrop regarding the reason for

16     his termination on June 28th, 2016?

17          A.   Well, there were a couple of factors that

18     bore on that question.  The first one was that the

19     board on June 21st at the board meeting was extremely

20     concerned about the business expense reporting

21     violations.  They had heard about the six-month audit

22     period.  They had received a little information about

23     a three-year total.  And they were concerned that

24     additional investigation needed to be made with

25     respect to business expense reporting.  And,

1    generally, a further investigation of Mr. Waldrop's

2    activities needed to take place.

3           And as of June 21 that investigation had not

4    yet been completed.  And they instructed Joe Wall, as

5    chairman, to consider who to hire to conduct that

6    investigation.

7           So part of the reason that no notice or

8    discussion of the aspects of the for cause termination

9    were provided on June 28th is that, in addition to the

10   business expense reporting violations, that

11   investigation was not yet complete.  And the board did

12   not want to produce an incomplete notice of the causes

13   for the for cause termination.

14          Now, the second aspect of that notice

15   related to what the consequences of providing a

16   written notice outlining the causes of a for cause

17   termination would do.  The board considered that

18   because of Mr. Waldrop's years of service to the

19   company -- over 25 years, I think -- that it would be

20   in both parties' best interests not to have a formal

21   written notice outlining the causes for the for cause

22   termination become public.

23          And, instead, the board thought it would be

24   better to make an offer of severance so that we could

25   avoid the adverse publicity.  Mr. Waldrop could avoid

1    having a for cause formal termination notice out

2    there.  And that was thought to be beneficial to both

3    parties.

4              And those reasons together resulted in the

5    decision to not provide a description of the causes of

6    the for cause termination on June 28th.

7        Q.   So the first reason is that the

8    investigation was not yet complete, correct?

9        A.   That's correct.

10       Q.   So Mr. Waldrop was terminated before the

11   completion of an investigation into the cause for his

12   termination?

13       A.   I don't believe that's a correct statement.

14   There was sufficient cause presented to the board

15   sufficient for them to conclude that termination was

16   appropriate under the employment agreement for willful

17   misconduct.  That was based on the improper business

18   expense reporting.

19             You said because the investigation wasn't

20   complete.  I said there were further things that the

21   board wanted to have investigated, including the

22   duration of this period of improper business expense

23   reporting and anything else that was discovered.

24       Q.   Well, couldn't you have told Mr. Waldrop

25   that on June 28th, 2016?  And you said, "Hey, this is

1    what we found.  You can be terminated for this, but we

2    haven't finished our investigation.  We're going to

3    finish it."  Couldn't you have told him that?

4         A.    The decision was made by the board not to

5    provide information.  Now, there was an exchange at

6    the June 28th meeting.  Mr. Waldrop asked repeatedly,

7    "Well, just give me an idea of what this is about."

8    And I mentioned, "Well, one of the issues is business

9    expense reporting."  That was a one-line sentence.  I

10   didn't mention any other reasons for termination.

11   Neither did Mr. Wall.

12        Q.    So he had asked for the reason at the

13   meeting and you...

14        A.    Correct.

15        Q.    That's all you said in response?

16        A.    That's correct.

17        Q.    And, in fact, he's asking for it again in

18   writing in Plaintiff's Exhibit 2, isn't he?

19        A.    That's correct.

20              (Plaintiff's Exhibit 3 was marked for

21              identification.)

22        Q.    (By Mr. Henry)  Mr. Lange, you've got in

23   front of you what's been marked as Plaintiff's Exhibit

24   3.  Have you seen Plaintiff's Exhibit 3 before?

25        A.    Yes.

1        Q.    Was Plaintiff's Exhibit 3 sent in response

2   to Plaintiff's Exhibit 2?

3        A.    I don't think it's fair to say it was sent

4   in response to Plaintiff's Exhibit 2.  It was sent

5   consistent with the message conveyed to Mr. Waldrop on

6   June 28th that a subsequent offer of separation would

7   follow the June 28th meeting.

8        Q.    But Exhibit 3 was sent after you received

9   Plaintiff's Exhibit 2, wasn't it?

10       A.    That's correct.

11       Q.    In fact, Plaintiff's Exhibit 3 acknowledges

12  that Holland & Knight had received Plaintiff's Exhibit

13  2, doesn't it?

14       A.    That's correct.

15       Q.    Okay.  Take your time if you need to, but

16  where in Plaintiff's Exhibit 3 is the cause for

17  Mr. Waldrop's termination explained?

18       A.    The cause for Mr. Waldrop's termination was

19  not discussed in Plaintiff's Exhibit 3.

20       Q.    So in response to Mr. Waldrop's request at

21  the June 28th meeting for an explanation of cause, you

22  indicated it had to do with expense reimbursement

23  reporting.  Correct?

24       A.    That's correct.

25       Q.    And then after receiving Plaintiff's Exhibit

1    2, your law firm sent Plaintiff's Exhibit 3, which

2    didn't explain the cause for Mr. Waldrop's

3    termination.   Correct?

4         A.    That's correct.

5         Q.    Okay.  I'm going to ask you a question about

6    page 9 of the "Separation Agreement, General Release,

7    Waiver & Confidentiality Agreement" included in

8    Plaintiff's Exhibit 3.

9         A.    Yes.

10        Q.    Do you see that?  Page 9?  There at the top

11   there's an entity referenced.  United Health Services,

12   Inc., a Georgia corporation.  Do you see that?

13        A.    Yes.

14        Q.    Are you familiar with that entity?

15        A.    Actually, I'm -- I'm not.

16        Q.    Okay.  Did you prepare the separation

17   agreement included in Exhibit 3?

18        A.    No.  That was prepared by my law partner,

19   Joshua Bosin.

20        Q.    Okay.  Sitting here today you don't know why

21   that entity was included in the separation agreement?

22        A.    No, I don't.

23             (Plaintiff's Exhibit 4 was marked for

24        identification.)

25        Q.    (By Mr. Henry)  Mr. Lange, you've got in

1      front of you what's been marked as Plaintiff's Exhibit

2      4.   Is that the employment agreement for Mr. Waldrop?

3           A.   Yes, it is.

4           Q.   Is it the same employment agreement that you

5      reviewed during the week of June 17th, 2016?

6           A.   Yes.

7           Q.   Look at paragraph 2.4 on page 2.

8           A.   Yes.

9           Q.   Is that the provision whereby Community

10     Health Systems terminated Mr. Waldrop's employment for

11     cause?

12          A.   Yes.

13          Q.   If you would read the first sentence of

14     paragraph 2.4 into the record.

15          A.   "The company may immediately terminate

16     employee's employment hereunder for cause upon prior

17     written notice of termination to employee with such

18     cause being specified in such notice."

19          Q.   Community Health Systems didn't comply with

20     that sentence of paragraph 2.4, did it?

21          A.   Not at the time of the June 28th

22     termination.

23          Q.   Okay.  After you received Plaintiff's

24     Exhibit 2, did you feel that Mr. Waldrop was concerned

25     about being embarrassed by written explanation of the

1    cause for his termination?

2         A.   I'm not sure I understand the question.

3         Q.   Well, one of the things that you said was

4    the reason Community Health Systems didn't comply with

5    the first sentence of paragraph 2.4 is that you wanted

6    to avoid embarrassment to the parties.

7              MR. DANIEL:   I object to the form of the

8         question.

9         Q.   (By Mr. Henry)  Isn't that one of the

10   reasons you didn't provide the required prior written

11   notice under paragraph 2.4?

12        A.   The board believed that avoiding the

13   publication of a written notice setting forth the

14   causes of the for cause termination would be

15   advantageous to both parties.

16        Q.   Would you agree with me that the company was

17   required to provide a prior written notice explaining

18   the cause under paragraph 2.4?

19             MR. DANIEL:   Objection to form.

20        A.   I agree that's what the contract provided.

21        Q.   (By Mr. Henry)  Is "embarrassment" listed in

22   the contract anywhere as an excuse for not providing

23   that notice?

24        A.   No.

25        Q.   Looking at Plaintiff's Exhibit 2, does it

1     appear that Mr. Waldrop is concerned about being

2     embarrassed by written explanation of the for cause

3     for his termination?

4          A.   I can't make -- I can't determine that from

5     the letter.

6          Q.   Well, wouldn't you deduce from the letter

7     that it's the exact opposite?  He's asking for an

8     explanation, isn't he?

9          A.   Okay.

10         Q.   So he's not concerned with being

11    embarrassed, is he?

12         A.   It doesn't appear that to be -- it doesn't

13    appear so.

14         Q.   Okay.  Did Community Health Systems

15    eventually complete the investigation into the cause

16    for Mr. Waldrop's termination?

17         A.   Community Health Systems continued to pursue

18    that investigation.

19         Q.   Has that investigation been completed?

20         A.   I can't determine -- I can't tell you

21    whether that investigation's been finally completed.

22         Q.   Are you familiar with an entity known as

23    "3M"?

24         A.   Yes, I am.

25         Q.   And what is 3M?  What does that stand for?

1      A.   It's an acronym for the names of individuals

2   in a CPA firm.

3      Q.   Okay.  Did 3M have any involvement in

4   Community Health Systems's post-termination

5   investigation into the cause for Mr. Waldrop's

6   termination?

7      A.   Yes, I believe it did.

8      Q.   Did you work with 3M at all in the course of

9   doing that post-termination investigation?

10     A.   I didn't work with 3M in their work.  I am

11  aware that 3M was doing work and was pursuing that

12  investigation.

13     Q.   Did you have any further involvement with

14  issues relating to Mr. Waldrop's termination after the

15  June 28th, 2016, meeting with Mr. Waldrop?

16     A.   I was involved in reviewing some of the

17  documents you've described, including the offer of

18  separation and a subsequent communication between CHSI

19  and Mark Waldrop.

20          (Plaintiff's Exhibit 5 was marked for

21          identification.)

22     Q.   (By Mr. Henry)  Mr. Lange, you've got in

23  front of you what's been marked as Plaintiff's Exhibit

24  5.  Is Plaintiff's Exhibit 5 the subsequent

25  communication you just referred to?

1        A.    Yes, it is.

2        Q.    What specifically was your involvement with

3    regard to Plaintiff's Exhibit 5?

4        A.    I reviewed drafts of this letter prior to it

5    being signed.

6        Q.    Okay.  Did you contribute any of the

7    contents of this letter?

8        A.    I'm not sure what the word "contribute"

9    means.

10        Q.    Did you provide any of the contents of this

11    letter for inclusion?

12        A.    I don't think it's fair to say I provided

13    the contents.  I provided a review of the text of the

14    letter.

15        Q.    Did you draft this document?

16        A.    No.

17        Q.    Okay.  Have you had any involvement on

18    behalf of Community Health Systems with regard to

19    Mr. Waldrop's termination after the sending of

20    Plaintiff's Exhibit 5?

21        A.    I've had conversations with other lawyers at

22    Holland & Knight with respect to the subsequent

23    litigation.

24        Q.    Okay.

25        A.    With respect to items mentioned in the

1    letter dated August 16th.  Some of these items relate

2    to information that was discovered as part of the

3    investigation.  And so I'm generally aware of that

4    information.

5         Q.   How about between the sending of Exhibit 3

6    and the sending of Exhibit 5?  Did you have any

7    involvement in the investigation into the cause for

8    Mr. Waldrop's termination?

9              MR. DANIEL:  I want to object to this

10             question because this period would include the day

11             in which the litigation was filed.  So I think

12             that any questions that relate to what happened

13             after the litigation was filed -- which was July

14             the 26th, 2016?  Is that right?

15             MR. HENRY:  That sounds close.  It's

16             probably on one of these -- yes.  July 26.

17             MR. DANIEL:  I think those questions would

18             be subject to privilege, so...

19             MR. HENRY:  Fair enough.

20        Q.   (By Mr. Henry)  How about between July 6th,

21   2016, and July 26th, 2016?  What was your involvement

22   in the investigation into the cause for Mr. Waldrop's

23   termination?

24        A.   I was not actively involved in the

25   investigation.

1      Q.   Would it be fair to say that your active

2   involvement into the cause for Mr. Waldrop's

3   termination concluded, for all practical purposes, on

4   June 28th, 2016?

5      A.   No.   That would not be an accurate

6   statement.   There were -- there was information

7   discovered in the Dalton office on June 28th, 2016,

8   that related to causes set forth in the August 16th,

9   2016, letter that I was made aware of and discussed

10   with lawyers at Holland & Knight.

11      Q.   What specific information was discovered in

12   the Dalton office as it relates to Plaintiff's Exhibit

13   5?

14      A.   I believe that the information with respect

15   to cause No. 3, relating to Mr. Waldrop's teaching

16   activities at Southern Adventist University, was

17   discovered based on written materials that were

18   contained in Mr. Waldrop's Dalton office.

19      Q.   So those materials were actually discovered

20   after Mr. Waldrop was terminated?

21      A.   That's correct.

22      Q.   Okay.   So it's your -- is it your

23   understanding that Southern Adventist University was

24   not a part of the cause for the board's decision to

25   terminate Mr. Waldrop on June 28th, 2016?

1    A.   That's correct.  Because this information

2    hadn't been discovered.

3    Q.   Okay.  Anything else that was discovered as

4    a result of going into the Dalton office?

5    A.   I think there were some -- there was

6    additional information discovered about the DeBrock

7    Poodles business, paragraph No. 2 --

8    Q.   Okay.

9    A.   -- discovered by virtue of information in

10   the Dalton office that was recovered on June 28th,

11   2016.

12   Q.   So prior to June 28th, 2016, was DeBrock

13   Poodles a cause for Mr. Waldrop's termination?

14   A.   Well, there was knowledge that his cell

15   phone was being used as the address -- the contact

16   telephone number for the business.  But there was

17   not -- there was not additional information with

18   respect to the DeBrock Poodles business known at that

19   time.

20   Q.   Okay.  So we've talked about Southern

21   Adventist University and DeBrock Poodles.  Is there

22   anything else in Plaintiff's Exhibit 5 that became a

23   cause for Mr. Waldrop's termination upon the entry of

24   the Dalton office by CHSI?

25   A.   Well, when you say "became a cause" -- there

1    are additional causes listed here, some of which were

2    discovered subsequent to June 28th.

3         Q.   And that's what I'm asking.  Which ones were

4    discovered subsequent to June 28th?

5         A.   Well, there were details relating to the

6    flooding that is mentioned in paragraph 4.  Some of

7    the information was discovered subsequent to June

8    28th.

9         Q.   So when you met with Mr. Waldrop on June

10   28th, 2016, was the flooding at the Dalton office a

11   cause for Mr. Waldrop's termination?

12        A.   No.

13        Q.   Okay.  Is the same true with regard to the

14   DeBrock Poodles issue?

15        A.   That's correct.

16        Q.   All right.  Anything else in Plaintiff's

17   Exhibit 5 that was a cause discovered after the entry

18   of the Dalton office?

19        A.   Well, not as a result of the entry of the

20   Dalton office.  But there were other documents that

21   were found and examined subsequent to June 28th, some

22   of which are described in item No. 5.  But those

23   documents weren't necessarily discovered in the Dalton

24   office.

25        Q.   Item No. 5 has to do with project charter

1    authorizations.

2        A.    Correct.

3        Q.    So at the time you met with Mr. Waldrop on

4    June 28th, 2016, was the project charter authorization

5    process a cause for Mr. Waldrop's termination?

6        A.    Well, in the case of the contract for

7    Mr. Mark Hunt, that was a matter that should have come

8    before a project charter authorization.  So that

9    specific matter would have been one.  That was not

10   specifically referred to as the -- by the board as the

11   cause of the termination.

12       Q.    Well, the Hunt contract was provided to you

13   by Mr. Rollins during the week of June 17th, 2016,

14   correct?

15       A.    That's right.  So it was -- it was known.

16       Q.    Okay.  Had you asked Mr. Rollins for that

17   contract during the week of June 17th, 2016?

18       A.    No.

19       Q.    So he just voluntarily gave it to you?

20       A.    I think it came up as the result of looking

21   at various contracts and documents during that period.

22       Q.    Did you have any conversations prior to June

23   28th, 2016, with anybody at Community Health Systems

24   regarding the project charter authorization process as

25   it relates to Mr. Waldrop?

1    A.   The only conversation was at the board

2  meeting in which this specific contract was discussed.

3    Q.   Who brought up the Hunt contract at the

4  board meeting?

5    A.   I brought it up.

6    Q.   Are you familiar with a set of transactions

7  known as the "Global" transactions?

8    A.   You may have to be more precise about that.

9    Q.   I may just have to come back to it 'cause

10  I'm not sure I can be any more precise about it

11  sitting here right now.   I'll make a note.

12       Did you have any involvement in a series of

13  interviews of Community Health Systems employees that

14  occurred on July 8th, 2016?

15    A.   No, sir.

16    Q.   Did you have any involvement in a meeting

17  that occurred on Tom Hill Road in Macon at which

18  Mr. Wall and Mr. Rollins were present along with other

19  leadership of Community Health Systems?

20    A.   No.

21    Q.   Are you aware that such a meeting took

22  place?

23    A.   I believe that I remember seeing a reference

24  to such a meeting in Mr. Wall's transcript of his

25  deposition.   But I'm not aware of the meeting or

Page 98

1    anything about the meeting.

2         Q.   What did you do to prepare for your

3    deposition here today?

4         A.   I had some conversations with lawyers at

5    Holland & Knight.

6         Q.   Okay.  Did you review any documents?

7         A.   I reviewed certain of the documents that

8    you've marked as exhibits today.

9         Q.   Did you review any deposition transcripts?

10        A.   The only deposition transcript I reviewed

11   was a rough draft of Joe Wall's deposition.

12        Q.   Did you listen to any recordings of

13   telephone conversations?

14        A.   I did not listen to any recordings of

15   telephone conversations.

16        Q.   Did you read any transcripts of recordings

17   of telephone conversations?

18        A.   I believe that for maybe an hour or two that

19   I read a couple of transcripts of phone conversations

20   in the spring of 2016.

21        Q.   Have you reviewed -- other than Mr. -- the

22   rough draft of Mr. Wall's deposition transcript, have

23   you reviewed any other deposition transcripts at any

24   time --

25        A.   No.

Q. -- with regard to this case? Okay.

Are you familiar with Community Health Systems's organizational charts?

A. It depends on which charts you're talking about.

Q. Well, does Community Health Systems have a functional organizational chart and a legal organizational chart?

A. I believe they do.

Q. Are they two different organizational charts?

A. I'm not sure of the answer to that question. I've seen a chart that says "Functional Organizational Chart."

MR. HENRY: Why don't we take a quick break. We may be getting close. I just want to go over my notes and talk to Mr. Waldrop.

THE WITNESS: Okay.

MR. DANIEL: Okay.

MR. HENRY: Thank you.

(A recess was taken in the deposition at 2:09 p.m., and the deposition was resumed at 2:23 p.m.)

Q. (By Mr. Henry) We're close, but I do have a few more things to ask you about, Mr. Lange.

1          Going back to the meeting that you had with

2     Mr. Waldrop, the interview that I think you said

3     occurred on -- June 6th?  Is that right?

4          A.    June 8th.

5          Q.    June 8th.  Okay.  Did Mr. Waldrop mention

6     anything to you about the VEBA during that meeting?

7          A.    I can't remember.  The VEBA was a topic that

8     Lorraine Taylor mentioned on June 9th.  I can't

9     exactly remember if there was a conversation on June

10    8th about the VEBA.  I know it was an issue that had,

11    you know, come up before between various officers.

12         Q.    So you don't recall whether Mr. Waldrop

13    mentioned to you an incident that occurred with

14    Mr. Rollins after the November 2015 board meeting

15    regarding investment of excess funds of the VEBA?

16         A.    I don't recall that.

17         Q.    With Jimmy Patton?

18         A.    No.  I'm not aware of that.

19         Q.    Did Mr. Waldrop mention during the June 8th,

20    2016, interview that he felt physically threatened by

21    Mr. Rollins?

22         A.    I don't remember that at all.

23         Q.    Did Mr. Waldrop mention anything to you

24    during the June 8th, 2016, interview regarding a

25    break-in at the Dalton office?

1      A.   I do believe that he mentioned that there

2   had been a break-in.

3      Q.   Okay.  What was your conversation with

4   regard to the break-in?

5      A.   Well, I remember that he mentioned that it

6   had occurred and I remember that he did say that he

7   called Mr. Rollins about it, but I don't remember -- I

8   don't remember whether anything was stolen or there

9   was -- I don't remember that there was an issue about

10  it.

11     Q.   Did you conduct any kind of investigation

12  into the break-in at the Dalton office?

13     A.   No.

14     Q.   Did Mr. Waldrop mention anything to you

15  during the June 8th, 2016, interview about UPL?

16     A.   UPL stands for "upper payment limitation."

17  It's a description of certain federally authorized but

18  state allocated payments to certain nursing homes.

19          And it was true that CHSI had received UPL

20  payments for a number of years.  And there was a

21  review of that program by the federal government.  And

22  pursuant to that review those payments were largely

23  stopped.

24          And I remember Mr. Waldrop saying that from

25  and after the time that those UPL payments ceased did

1    coincide with there being more tension between he and

2    Mr. Rollins concerning operations.  Obviously, those

3    UPL payments were helpful from a financial standpoint.

4         Q.   Well, Mr. Rollins described UPL in his

5    deposition as the single greatest thing that had ever

6    happened to Community Health Systems.

7              MR. DANIEL:  Object to the form of the

8         question.

9         Q.   (By Mr. Henry)  Do you agree with that

10   statement?

11        A.   I'm not sure that I understand exactly what

12   Mr. Rollins means by that.

13        Q.   Well, I had asked you previously about this

14   interview on June 8, 2016.  And I thought that I had

15   asked you whether the subjects we had discussed back

16   then was everything.  But now I'm learning that you

17   did, in fact, talk about UPL.

18             Is there anything else that you talked about

19   in your interview with Mr. Waldrop that we have not

20   discussed?

21        A.   It's true he mentioned the UPL -- the loss

22   of UPL as being a factor in his relationship with

23   Mr. Rollins.  I can't think of anything else.

24        Q.   Did it seem reasonable to you at the time

25   that the loss of UPL would impact Mr. Rollins's

1    relationship with Mr. Waldrop?

2        A.   Can you ask -- can you rephrase that or can

3    you ask that again?

4        Q.   I'll try.  At the time of your June 8th,

5    2016, interview with Mr. Waldrop, did it seem

6    reasonable to you that the loss of UPL would have

7    negatively impacted Mr. Rollins's relationship with

8    Mr. Waldrop?

9        A.   I can't say that I would have said that that

10   was reasonable.  I think it was forecasted and I think

11   other states had -- prior to Georgia.  And the federal

12   government started ceasing making UPL payments.  So I

13   think that part of this UP -- the loss of UPL was

14   anticipated.  But I can't conclude whether it was

15   reasonable to think that that was a cause for their --

16   the difficulty they had in their managerial

17   relationship.

18       Q.   Was there ever a risk or threat that

19   Community Health Systems would have to actually refund

20   UPL payments that it had previously received?

21       A.   I'm not sure that that was ever a realistic

22   possibility.  I don't know the answer to that

23   question.

24       Q.   We talked in the context of the -- one of

25   these exhibits about project charter authorizations

1    and the Hunt contract.  When did you first become

2    aware that the Hunt contract could potentially be a

3    violation of project charter authorization processes?

4         A.   When I received a copy of it so that I could

5    read it.

6         Q.   Did you, as Community Health Systems's

7    counsel, have a role in implementing the project

8    charter authorization process for CHSI?

9         A.   No, I did not.

10        Q.   Did Mr. Rollins tell you during the week of

11   June 17th, 2016, that he believed the Hunt contract

12   was a violation of the project charter authorization

13   process?

14        A.   No.  He did not.

15        Q.   How often prior to the week of June 17th,

16   2016, had you dealt with the project charter

17   authorization process?

18        A.   I'd say very infrequently.  I was aware of

19   it, but I was not personally involved in that process.

20   That process was an internal management process.  And,

21   as I understand it, that internal management process

22   involved seeking descriptions of the project, reasons

23   for the project, justifications for the project, and

24   seeking signatures of Mr. Rollins, Ms. Taylor, and

25   Mr. Waldrop on the authorization form.  But I was not

1    involved in the development of that process.

2        Q.   So how did you become aware of the

3    requirements of the project charter authorization

4    process?

5        A.   I was made aware of those requirements as it

6    relates to the Hunt contract by Lorraine Taylor.

7        Q.   During the week of June 17th, 2016?

8        A.   Well, she mentioned that contract in our

9    conversation on June 9th.

10       Q.   Okay.

11       A.   I didn't have a copy of it, but she

12   mentioned the circumstances under which it was

13   executed.

14       Q.   But it was Mr. Rollins who actually provided

15   to you a copy of that contract?

16       A.   That's correct.

17       Q.   Okay.  We had -- or I had asked you a

18   question about "Global" transactions.  And you had

19   asked for greater clarification.  And now, after

20   speaking to Mr. Waldrop, I think I can provide that

21   for you.

22            Are you familiar with facilities in Greene

23   Point, Warrenton, and Macon?

24       A.   I am aware of facilities there.

25       Q.   Are you aware of any transactions whereby

1    Community Health Systems became the owner of those

2    facilities?

3         A.   I can't remember which one, but I remember

4    there were -- there were transactions involving those

5    facilities.

6         Q.   Does that refresh your memory as to these

7    "Global" transactions?

8         A.   It doesn't refresh my memory about the

9    details.

10        Q.   Okay.  Did you handle those transactions?

11        A.   I knew about them.  I was working on them.

12   I don't remember them right now.

13        Q.   From whom did Community Health Systems

14   acquire those facilities?

15        A.   I think the answer was that they were

16   acquired from an entity that was a for-profit entity.

17        Q.   Named Global?

18        A.   I think "Global" may have been in the -- in

19   the -- in their name.  I just don't know the full

20   name.

21        Q.   Okay.  Did 3M have any involvement in

22   connection with those transactions?

23        A.   I do not know anything about 3M and those

24   transactions.

25        Q.   Do you recall any discussions with

1      Mr. Rollins regarding 3M potentially having a conflict

2      of interest because it performed auditing work for the

3      Global entity and was providing financial work for

4      Community Health Systems with regard to these

5      transactions?

6          A.   No, I had no such conversations with

7      Ronnie -- Mr. Rollins about that.

8          Q.   Are you aware of whether this potential

9      conflict had been raised to the board of directors?

10         A.   I'm not aware.

11         Q.   Have you ever heard Mr. Rollins or anybody

12     on the board of directors express concern with regard

13     to conflicts of interest involving 3M?

14         A.   I haven't personally heard that.

15         Q.   Do you -- well, have you ever, as CHSI's

16     corporate counsel, dealt with conflict of interest

17     issues?

18         A.   Yes.

19         Q.   So it's --

20         A.   Not with -- I've never heard about that

21     issue in the context of 3M.

22         Q.   Are you aware of any conflict of interest

23     issues that Community Health Systems, Incorporated,

24     has encountered that have not been brought to your

25     attention for advice and counsel?

1      A.   I have no way of answering that question.

2      Q.   Are you familiar with a Community Foundation

3   For Central Georgia?

4      A.   Yes.  I believe I've heard that name before.

5      Q.   Do you know who the chairman of that

6   foundation is?

7      A.   I don't know who the chairman of that

8   foundation is.

9      Q.   Do you know if any board members for CHSI

10  are affiliated in any way with the Community

11  Foundation For Central Georgia?

12     A.   I'm not for sure.  The question is

13  whether -- there is a relatively new board member by

14  the name of Kathryn Dennis.  And she may have an

15  affiliation with that foundation.  But I don't

16  personally know that.

17     Q.   Is Ronnie Rollins the chairman of the

18  Community Foundation For Central Georgia?

19     A.   I don't know.

20     Q.   Who is Emily Crosby?

21     A.   Emily Crosby is a lawyer that I worked with

22  when I was at McKenna, Long & Aldridge.

23     Q.   Do you still work with her?

24     A.   I work with her some.  She's a partner at

25  BakerHostetler.

1      Q.    Did Ms. Crosby ever go to work for Community

2   Health Systems?

3      A.    Yes, she did.  She worked for Community

4   Health Systems for some amount of time.  I'm not sure

5   how long, but she did work for them.

6      Q.    Did she work with Mr. Rollins when she

7   worked for Community Health Systems?

8      A.    I'm -- I'm sure she did.

9      Q.    Do you know if she liked working for

10  Mr. Rollins?

11     A.    I don't know the answer to that.

12     Q.    She never told you one way or the other?

13     A.    I think she had significant respect for

14  Mr. Rollins and his -- what he had done.

15     Q.    Were you working with the McKenna firm at

16  the time Ms. Crosby went to work for Community Health

17  Systems?

18     A.    That's correct.

19     Q.    Did Mr. Rollins ever approach any of the

20  partners at the McKenna firm and claim that you were

21  mentally unstable?

22     A.    I'm not sure about that.

23     Q.    Have you ever heard that before?

24     A.    I haven't heard that before.

25           MR. HENRY:  I think we're done.  Mr. Daniel

1          may have some questions.

2               MR. DANIEL:   I have a few questions for

3          clarification.

4                         DIRECT EXAMINATION

5     BY MR. DANIEL:

6          Q.   What evidence, if any, did you find in your

7     investigation of what was called "targeting" of Mark

8     Waldrop by Ronnie Rollins?

9          A.   I did not find any evidence of what was

10    called "targeting" of Mark Waldrop by Ronnie Rollins.

11         Q.   You mentioned that on June 9, 2016, you went

12    to Macon and interviewed several people.  I think you

13    said Joe Wall, Ronnie Rollins, and Lorraine Taylor on

14    the same day.  Is that -- did I get that right?

15         A.   That's right.

16         Q.   In which order did you interview the three

17    people?

18         A.   I interviewed Lorraine Taylor first, then I

19    interviewed Joe Wall, then I interviewed Ronnie

20    Rollins.

21         Q.   Okay.  And when did Lorraine Taylor inform

22    you for the first time about the internal audit that

23    had been done for that six-month period of the expense

24    reimbursement records?

25         A.   During that interview that I had with her on

1    June 9th.

2        Q.   Now, do you recall how the person or persons

3    doing the internal audit decided which employees to

4    include in the audit?

5        A.   Well, actually, Lorraine Taylor didn't

6    conduct the audit.  It's my understanding that another

7    person conducted the audit.  I believe her name was

8    Brooke Davis.  But I believe the query Brooke Davis

9    constructed was a printout -- a printout of all the

10   business expense reimbursements that totaled over

11   $5,000 for that six-month period beginning July 1,

12   2015, to 12/31/15.

13       Q.   So the audit covered employees who had

14   expense reimbursements of $5,000 or more, regardless

15   of who they were?

16       A.   Correct.

17       Q.   And so the summary that you saw -- would it

18   have included other names other than Stephanie Dotson

19   and Mark Waldrop?

20       A.   Yes.  It included anyone who had reported

21   over $5,000 of business expenses.

22       MR. DANIEL:  Okay.  Thank you.  That's all I

23       have.

24       MR. HENRY:  Real quick clarification.

25              FURTHER CROSS-EXAMINATION

Page 112

1    BY MR. HENRY:

2         Q.   You said that Brooke Davis conducted the

3    audit?

4         A.   I believe that's her name.  She was an

5    internal CHSI employee as I understand it.

6         Q.   Do you know who she reported to?

7         A.   I don't know the answer to that.  But I

8    believe it's fair to say she was on the staff that

9    Lorraine Taylor manages as the CFO.

10             MR. HENRY:  I believe that's all I have.

11                  FURTHER DIRECT EXAMINATION

12   BY MR. DANIEL:

13        Q.   Do you recall whether or not Mr. Wall

14   suggested to you that you should follow up on the

15   expense reimbursement requests and reimbursements?

16        A.   Yes.  I believe that he did suggest that I

17   ought to follow up on that once I discussed that with

18   him.

19             MR. DANIEL:  Okay.  Thank you.

20             THE WITNESS:  On June 9th.

21             MR. DANIEL:  Okay.

22             THE WITNESS:  During his interview.

23             MR. HENRY:  Every question leads to another

24        one in these things.

25                  FURTHER CROSS-EXAMINATION

1    BY MR. HENRY:

2         Q.   Just for -- just to confirm, though, you did

3    talk to Mr. Wall after you spoke to Lorraine Taylor

4    that day?

5         A.   Yes.  I did speak to Lorraine first, then

6    Mr. Wall, and then finally Mr. Rollins.

7              MR. HENRY:  Okay.

8              MR. DANIEL:  Okay.  I have no further

9         questions.  The witness will reserve the right to

10        read and sign the deposition.

11             (The deposition was concluded at 2:43 p.m.

12        Signature of the witness has been reserved.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1    STATE OF GEORGIA

2    COUNTY OF GWINNETT:

3

4            I hereby certify that the foregoing

5    transcript was reported, as stated in the caption, and

6    the questions and the answers thereto were reduced to

7    typewriting under my direction; that the foregoing

8    pages represent a true, complete, and correct

9    transcript of the evidence given upon said hearing,

10   and I further certify that I am not of kin or counsel

11   to the parties in the case; am not in the employ of

12   counsel for any of said parties; nor am I in any way

13   interested in the result of said case.

14           This the 9th of May, 2017.

15

16

17

18

19

20

21

22                   Alison M. Wyman, CCR-2529, RPR

23

24

25

1                    DISCLOSURE OF NO CONTRACT

2              I, Alison M. Wyman, Certified Court
Reporter, do hereby disclose pursuant to Article 10.B.

3  of the Rules and Regulations of the Board of Court
Reporting of the Judicial Council of Georgia that I am

4  a Georgia Certified Court Reporter; I was contacted by
the party taking the deposition to provide court

5  reporting services for this deposition; I will not be
taking this deposition under any contract that is

6  prohibited by O.C.G.A. 15-14-37(a) and (b) or Article
7.C. of the Rules and Regulations of the Board; and I

7  am not disqualified for a relationship of interest
under O.C.G.A. 9-11-28(c).

8              There is no contract to provide reporting
services between myself or any person with whom I have

9  a principal and agency relationship nor any attorney
at law in this action, party to this action, or party

10 having a financial interest in this action.  Any and
all financial arrangements beyond my usual and

11 customary rates have been disclosed and offered to all
parties.

12

13

14

15

16

17

18              _____

19              Alison M. Wyman

20              Certified Court Reporter

21              Certificate No. 2529

22

23

24

25

1                          CERTIFICATE

2     STATE OF_____

      COUNTY/CITY OF_____

3

4     Before me this day personally appeared _____

      who, being duly sworn, states that the foregoing

5     transcript of his deposition, taken in the matter, on

      the date and at the time and place set out on the

6     title page hereof, constitutes a true and accurate

      transcript of said deposition.

7

8

9                      _____

                              MARK S. LANGE

10

11    SUBSCRIBED and SWORN to before me this _____ day of

12    _____ 20___ in the jurisdiction aforesaid.

13

14

15

      _____    _____

16    My Commission Expires           Notary Public

17

18

19            [ ]  No changes made to the Errata Sheet;

20        therefore, I am returning only this signed,

21        notarized certificate.

22

23            [ ]  I am returning this signed, notarized

24        certificate and Errata Sheet with changes noted.

25

1            DEPOSITION ERRATA SHEET

2    Witness Name:_____

3    Deposition Date:_____

4    To Reporter:

5    I have read the entire transcript of my deposition

6    taken in the captioned matter or the same has been

7    read to me.  I request that the following changes be

8    entered upon the record for the reasons indicated.  I

9    have signed my name to the Errata Sheet and

10   appropriate certificate and authorize you to attach

11   both to the original transcript.

12

13

14   Page No._____  Line No._____

15   Change to:_____

16   Reason for Change:_____

17

18   Page No._____  Line No._____

19   Change to:_____

20   Reason for Change:_____

21

22   Page No._____  Line No._____

23   Change to:_____

24   Reason for Change:_____

25

```
 1                    DEPOSITION ERRATA SHEET

 2

 3     Page No._____  Line No._____

 4     Change to:_____

 5     Reason for Change:_____

 6

 7     Page No._____  Line No._____

 8     Change to:_____

 9     Reason for Change:_____

10

11     Page No._____  Line No._____

12     Change to:_____

13     Reason for Change:_____

14

15     Page No._____  Line No._____

16     Change to:_____

17     Reason for Change:_____

18

19     Page No._____  Line No._____

20     Change to:_____

21     Reason for Change:_____

22

23

24     Signature:_____  Date:_____

25            MARK S. LANGE
```

**Proposed Talking Points for Meeting with Mark A. Waldrop
and Joe Wall, Chairman of the Board
of Directors of Community Health Systems, Inc.
at the law offices of Holland & Knight LLP
on Tuesday, June 28, 2016
at 3:30 p.m.**

\* Joe Wall would be the primary speaker

Opening Statements to make to Mark Waldrop

1.      As you know, you and I met in my office on Tuesday, May 17, 2016 to discuss your concerns about your working relationship with Ronnie Rollins, the President and CEO of Community Health Systems, Inc., doing business as Community Health Services of Georgia ("CHS").

2.      At our meeting on May 17, 2016, you made certain specific allegations against Mr. Rollins, including that he sent you an email on May 12, 2016 at 5:59 p.m. that was "full of lies" and that you thought that Mr. Rollins was "targeting" you (meaning that you thought that he was somehow taking actions to build a factual basis for ultimately seeking to terminate you from your position as Chief Operating Officer of CHS).

3.      From and after our meeting on May 17, 2016, as Chairman of the Board of Directors of CHS, I have discussed these matters with Mr. Rollins, and on behalf of the CHS Board of Directors, I engaged Mark Lange at the law firm of Holland & Knight LLP to conduct a limited internal investigation into the accusations that you have made against Mr. Rollins.

4.      To that end, Mr. Lange has interviewed certain persons, and also interviewed you on the afternoon of June 8, 2016 at his Atlanta law office.



PLAINTIFF'S EXHIBIT
1
4-25-17

CONFIDENTIAL

5.     He has also reviewed certain documents and collected certain other information on behalf of the CHS Board of Directors as part of his internal investigation.

6.     This information has been presented to the full Board of Directors of CHS at which the full Board fully and fairly considered these matters.

7.     In connection with this matter, the Board of Directors has also reviewed your Employment Agreement with Community Health Systems, Inc. entered into on June 20, 2006 and amended and restated as of January 1, 2009 (the "Employment Agreement").

8.     In connection with its review of these matters, the full Board of Directors has reached the following conclusions.

**Board Conclusions**

1.     You should also be aware that the Board has concluded that there is absolutely no factual basis whatsoever for any of your accusations against Mr. Rollins.

2.     The Board believes, based on the Board's review of various types of information and on the advice of counsel, that there is sufficient basis for CHS to immediately terminate your employment "for Cause" pursuant to your Employment Agreement. ( **Redacted** **Redacted** .)

3.     Consistent with the Board's belief, the Board has directed that you should be relieved of your duties as an officer of CHS effective immediately today.  Notwithstanding the Board's direction that your employment be effectively ended today, in recognition of your over 25 years of service to this organization, the Board is willing to offer to you a separation arrangement

#46922801_v2

CONFIDENTIAL

CHSI 0018929

designed to avoid written acknowledgement of a "for Cause" termination under your Employment Agreement.

4.      We plan to send to you a draft separation agreement in the next few days for your review.  We encourage you to seek counsel to assist you in your review.  Nevertheless, if you do not seek counsel, we will try to answer your questions about the proposal.  If you hire counsel, we will be happy to have our counsel work directly with your counsel on the separation agreement if that is your preference.

5.      You will not be permitted to re-enter your office in Dalton, although we will be happy to arrange for someone from CHS to accompany you to that office for the purpose of collecting your personal items from that office.

6.      Whatever CHS owes you as of today including PTO, etc., you will be paid, but you will not be receiving a salary amount as of July 1, 2016 because your employment is being terminated today.

**Proposed Severance Arrangement**

1.      **Resignation**.  You will voluntarily resign as Chief Operating Officer as set forth in the separation agreement.

2.      **PTO Pay-Out**.  Taking into account your time off last week, and subject to further confirmation, as of yesterday, June 27, 2016, we believe that you were owed 18 days of Paid Time Off (PTO) and that the value of this PTO is $72,392.20.  This amount would be paid to you upon the effective date of your Separation Agreement.

CONFIDENTIAL

CHSI 0018930

3.     **Severance Amount**.  Your gross monthly salary is $87,138.76 per month.  CHS would be willing to pay you two (2) months' severance equal to $174,277.52.  This would be paid to you in five (5) equal monthly payments (after applicable employment and income tax withholding) of $34,855.50 for the five (5) months of July, 2016 through November, 2016 to be paid on the last day of each month starting with July 31, 2016.  These severance amounts would be paid through the CHS payroll system.

4.     **Retention of June Salary**.  You would be permitted to retain your June salary amount, but would not receive your normal July 1, 2016 salary amount.

5.     **Two (2) Year Non-Compete Restriction**.  For the 2-year period following termination of your employment, you would have a non-compete restriction for the territory of the entire State of Georgia.

6.     **Two (2) Year Non-Solicit Restriction**.  For the 2-year period following termination of your employment, you would be restricted from soliciting existing employees at CHS or any of its affiliated entities.

7.     **Confidentiality Agreement**.  You would be subject to a permanent agreement not to disclose to any third person (except as required to as part of a legal proceeding or upon a subpoena to testify) the existence or terms of your Separation Agreement or any other confidential information, data, trade secrets or other protected information concerning CHS and any of its affiliates.

8.     **Non-Disparagement**.  Both CHS and you would both agree not to make any disparaging comments about the other party.

CONFIDENTIAL

CHSI 0018931

9.    **Full Release by Mr. Waldrop**.  You would release any potential claims of any kind that you may believe you have against CHS and any of its affiliates. Redacted

Redacted

10.    **Other Standard Provisions**.  The Separation Agreement would also contain other typical provisions.  This would include offering you COBRA coverage on your health insurance benefits.

**While You Consider this Proposal**

1.    The Board believes that it is the best interests of CHS to conclude these matters as soon as reasonably possible.

2.    Please note that during this period of completion of the separation agreement, it is critical that you not discuss these matters with anyone inside or outside the CHS organization (other than your legal counsel, if any), in order for this process to be accomplished and for you to receive any severance benefits.

3.    In particular, this applies to your direct reports and your assistant.  Please be aware that separate discussions will be had with your personal assistant, Stephanie Dotson concerning her employment relationship with CHS.

4.    The Board would also appreciate your cooperation with any specific requests from Mr. Rollins or Ms. Lorraine Taylor or others at CHS.

#46922801_v2

5

CONFIDENTIAL at bottom left, CHSI_0018932 bottom right

CONFIDENTIAL

## Redacted

# Redacted

We are happy to discuss more at your convenience.

6

#46922801_v2

CONFIDENTIAL

CHSI_0018933

Mark Waldrop
9686 Bowen Trail
Ooltewah, TN 37363

July 1, 2016

Community Health Systems, Inc.
213 Third Street
Macon, Georgia 31201
Attention: Joseph A. Wall

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia 30308
Attention: Mark S. Lange

<u>VIA CERTIFIED MAIL</u>

In Re:   **Employment Agreement of Mark A Waldrop**
         **Amended and restated as of January 1, 2009**

Gentlemen:

I'm writing to follow up on our meeting in the offices of attorney Mark S. Lange on Tuesday, June 28, 2016.

During that meeting you advised me that my employment was immediately terminated, and requested that I not return to my office in Dalton, Georgia. You also informed me that the Dalton, Georgia office was being closed.

As of this date I have not been provided information regarding the reason for my termination.

This letter is to advise you that I stand ready, willing and able to perform my services under and in accordance with my Employment Agreement. Additionally, I am not aware of any reason which gives the right to the Company to terminate my employment for cause. If you believe that there is such cause, then I request that you advise me of the same, and that I be given the opportunity to remedy the same in accordance with Paragraph 2.4 of my Employment Agreement. I stand willing, able and ready to continue to provide services in accordance with my Employment Agreement, and to make all reasonable efforts to address and remedy any issues relating to my employment, including but not limited to the remedy as provided under Paragraph 2.4.


PLAINTIFF'S EXHIBIT
2
4-25-17 Aw

Mark Waldrop
July 1, 2016
Page 2

Since there is no cause for the termination of my employment, or if you believe there is cause and do not give me the opportunity to remedy the same in accordance with the terms of my Employment Agreement, then I will expect to be paid severance pay by the continuance of my annual salary of $1,045,665.17 for a period of one year in accordance with paragraph 2.5 (b) of my Employment Agreement.

In the event the Company does not meet its obligations to me under the Employment Agreement, I will also expect the Company to pay any attorney's fees, costs and expenses incurred by me in enforcing my rights under the Agreement and in responding to the Company's defaults under the Agreement.

Sincerely Yours,

Mark A. Waldrop

cc:     Mark S. Lange
        Holland and Knight
        1180 West Peachtree Street
        Suite 1800 Northwest
        Atlanta, GA  30309
        (via e-mail)

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Joshua I. Bosin
404.817.8558
joshua.bosin@hklaw.com

July 6, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mark A. Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

   Re: *Community Health Systems, Inc. and Mark A. Waldrop*

Dear Mr. Waldrop:

   The law firm of Holland & Knight LLP and the undersigned in particular represent Community Health Systems, Inc. ("CHSI") in connection with the above-referenced matter.

   We are in receipt of your July 1, 2016 correspondence addressed to Joseph A. Wall, the Chair of CHSI's Board of Directors, and my law partner, Mark S. Lange, Esq.

   Although CHSI terminated your employment effective immediately on June 28, 2016, the company would like to provide you with certain separation benefits in recognition of your many years of service to CHSI.  Accordingly, please find enclosed a Separation Agreement, General Release, Waiver & Confidentiality Agreement memorializing the terms of CHSI's separation offer to you as discussed during your recent meeting with Messrs. Wall and Lange.  I look forward to hearing from you upon your receipt and review of the same.

   Should you have any additional questions in the interim, please contact me at your convenience.

         Very truly yours,

         HOLLAND & KNIGHT LLP

         Joshua I. Bosin

PLAINTIFF'S
EXHIBIT
3
4-25-17

Enclosure

cc: Joseph A. Wall
   Mark S. Lange, Esq.

Anchorage | Atlanta | Austin | Bogotá | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville
Lakeland | London | Los Angeles | Mexico City | Miami | New York | Northern Virginia | Orlando | Portland | San Francisco | Stamford
Tallahassee | Tampa | Washington, D.C. | West Palm Beach

#47175963_v1

**SEPARATION AGREEMENT, GENERAL RELEASE,**
**WAIVER & CONFIDENTIALITY AGREEMENT**

This **SEPARATION AGREEMENT, GENERAL RELEASE, WAIVER & CONFIDENTIALITY AGREEMENT** (this "**Agreement**") is entered into by and between **COMMUNITY HEALTH SYSTEMS, INC.**, a non-profit corporation duly organized under the laws of the State of Georgia ("**CHSI**"), on the one hand, and **MARK A. WALDROP**, a resident of the State of Tennessee ("**Employee**"), on the other.  CHSI and Employee may each be referred to herein individually as a "**Party**" or collectively as the "**Parties.**"

In conjunction with this Agreement, the applicable policies and procedures of CHSI, and in exchange for the good and valuable consideration consisting of the mutual promises and covenants as set forth herein, the receipt, adequacy, and sufficiency of which is hereby acknowledged by both Parties, it is agreed as follows:

1.     **Termination of Relationship and Employment Agreement**.

    (a)    The Parties' relationship shall end effective as of the close of business on Tuesday, June 28, 2016 (the "**Separation Date**").

    (b)    This Agreement shall become effective on the Effective Date (as defined below).

    (c)    CHSI and Employee entered into that certain Employment Agreement of Mark A. Waldrop dated as of June 20, 2006 and as amended and restated as of January 1, 2009 (the "**Employment Agreement**").  Employee and CHSI agree that as of the Separation Date, the Employment Agreement automatically terminated and is of no further force and effect, and all rights of Employee under the Employment Agreement were terminated as of such Separation Date.

2.     **Payments and Benefits**.    In connection with Employee's separation from Employee's employment with CHSI:

    (a)    Employee acknowledges and agrees that, except as set forth in Section 2(b) below with respect to the payment of any amounts due and owing to Employee for accrued but unused paid time off, as of the Separation Date, Employee already will have received from CHSI the payment of all wages, compensation, and/or other benefits otherwise due and owing to Employee and earned through and including the Separation Date.  For the avoidance of doubt, CHSI and Employee agree that Employee may retain his full salary payment for the month of June 2016, which such payment was made to Employee on June 8, 2016.

    (b)    Employee and CHSI agree that as of the Separation Date, Employee only will have used twelve (12) of his thirty (30) day paid time off allotment for 2016.  Accordingly, CHSI agrees that not later than the Effective Date (as

defined below), CHSI will pay to employee through its regular payroll system the amount of Seventy-Two Thousand Three Hundred Ninety-Two and 20/100 Dollars ($72,392.20), less all applicable payroll-related tax and income tax withholdings, such sum representing the eighteen (18) days of accrued but unused paid time off due and owing to Employee.

(c)     If, and only if, Employee complies with this Agreement and the terms and conditions set forth herein, and if, and only if, Employee does not revoke this Agreement in the manner set forth in Section 5 hereof, CHSI agrees to pay Employee the amount of One Hundred Seventy-Four Thousand Two Hundred Seventy-Seven and 52/100 Dollars ($174,277.52), such sum representing two (2) months of Employee's current base salary equal (the "**Separation Payment**").   The Separation Payment shall be paid to Employee through CHSI's regular payroll system in five (5) equal and consecutive monthly installments of Thirty-Four Thousand Eight Hundred Fifty-Five and 50/100 Dollars ($34,855.50) each, less all applicable payroll-related tax and income tax withholdings, commencing in July 2016 and ending in November 2016 on the last day of each such month (starting with July 31, 2016) (the "**Separation Pay Period**").  Employee understands and agrees that during the Separation Pay Period, he will not be deemed an employee of CHSI for any reason whatsoever.

(d)     Employee's and Employee's dependents' health insurance coverage under CHSI's health insurance plan(s) ended on the Separation Date.  From and after the Separation Date, Employee and Employee's dependents' will be eligible for continuing health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) as required by applicable law at Employee's own expense.   CHSI shall provide to Employee information regarding the COBRA election under separate cover.

(e)     Employee shall not be entitled to receive any reimbursements for business expenses incurred in connection with Employee's employment with CHSI following the Separation Date, regardless of whether such reimbursement requests were submitted prior to the Separation Date.

3.     **No Admission**.  The Parties acknowledge and agree that this Agreement is not intended by either Party to be construed and will not be construed as an admission by them of any liability or violation of any federal, state, and/or local law, statute, ordinance, regulation, or legal or moral duty of any nature whatsoever.  The Parties have entered into this Agreement for the purpose of maintaining an amicable and cooperative relationship and also to settle any and all existing claims now or heretofore in existence between them.   The Parties agree that this Agreement shall not constitute or be asserted by any Party to this Agreement to constitute evidence of the existence or non-existence of or validity or invalidity of any right, claim, or obligation or any liability or wrongdoing, except as expressly provided for herein and then only

for purposes of the enforcement of (or defense against) claims made under or pursuant to the terms of this Agreement.

4. <u>**General Release and Covenant Not to Sue**</u>.  In exchange for the mutual promises and covenants described herein, Employee, on behalf of himself, his representatives, agents, estate, heirs, executors, administrators, successors, and assigns, hereby unconditionally releases, acquits, discharges, and agrees to release CHSI, its Affiliates (as defined below), and its and their past, present, and/or future directors, administrators, officers, trustees, employees, agents, attorneys, insurers, representatives, and assigns (hereinafter collectively referred to as the "**Released Parties**"), or any one or more of them, from any and all charges, complaints, claims, liens, contracts, covenants, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, attorneys' fees, costs, losses, and/or debts of any kind or nature that arose or accrued on or prior to Employee's execution of this Agreement, including, but not limited to, any or all claims that may have arisen or begun to arise or accrue out of any federal, state, and/or local law, constitution, regulation, or common law theory, whether statutory in nature, in tort, contract, equity, or otherwise (each such action, claim, suit, right, liability, or demand being hereinafter individually referred to as a "**Claim**" and hereinafter collectively referred to as the "**Claims**") that Employee may now or hereafter have against the Released Parties, or any one or more of them, including, but not limited to, any and all Claim(s) in connection with:  (a) Employee's employment relationship with CHSI; (b) the terms and conditions of Employee's employment relationship with CHSI, including, without limitation, those set forth in the Employment Agreement (and including, but not limited to, compensation and benefits); (c) Employee's service as an employee of CHSI; (d) the end of Employee's employment relationship with CHSI and the circumstances surrounding the end of such employment relationship; and/or (e) any one or more of the following Claim(s) sounding in or with specific regard to, without limitation:  pay, commissions, sick pay, vacation pay, wages, incentives, or bonuses of any type or character; all claims based on any oral, written, or implied contract or breach of contract (including, without limitation, the Employment Agreement); breach of the duty of loyalty; breach of covenants; breach of the covenant of good faith and fair dealing; infliction of emotional distress; tortious interference with contractual relations; tortious interference with business relations; wrongful discharge; violation of public policy; libel; slander; defamation; invasion of privacy; misappropriation of trade secrets; misappropriation of property; conversion of property; unjust enrichment; negligence; assault; battery; negligent retention; negligent hiring; negligent supervision; promissory estoppel; retaliation; bad faith refusal to pay; or any other tort.

Without limiting the generality of the foregoing, Employee specifically releases, acquits, discharges, waives, and agrees to indemnify and hold the Released Parties, or any one or more of them, harmless from and against any and all Claim(s) arising under: (a) the Civil Rights Acts of 1866, 1871, 1964, and 1991; the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the ADA Amendments Act of 2008; the Lilly Ledbetter Fair Pay Act of 2009; the Genetic Information Nondiscrimination Act of 2008; the Older Workers Benefit Protection Act of 1990; the Family and Medical Leave Act of 1993; the Fair Labor Standards Act of 1938; the Age Discrimination in Employment Act of 1967; the Equal Pay Act of 1963; Executive Order Nos. 11246 and 11478; the Occupational Safety and Health Act of 1970; the Immigration Reform and Control Act of 1984; the Sarbanes-Oxley Act of 2002; the False Claims Act; the

National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; each such law as amended; and/or any other federal employment practices-related law; (b) the laws of the State of Georgia with regard to CHSI concerning fair employment practices (which acts and laws prohibit discrimination based upon race, religion, sex, national origin, color, age, disability, and, in some local jurisdictions, sexual orientation), including, but not limited to, the Georgia Sex Discrimination in Employment Act; the Georgia Equal Employment for Persons with Disabilities Code; the Georgia Age Discrimination Act; and/or the Georgia Security and Immigration Compliance Act; (c) the Employee Retirement Income Security Act of 1974 (other than such rights as are mandated or vested by law or by operation of any applicable ERISA-qualifying or other retirement-related plan under which Employee may have such rights); any right to health care continuation pursuant to any applicable plan documents, COBRA, or any similar state law; and/or all health care policy or plan conversion rights; and/or (d) any other federal, state, and/or local constitutions, laws, and/or regulations, and/or any common law theories of recovery.

Except as otherwise provided for in this Agreement or to the extent prohibited by applicable law, Employee agrees that Employee has not and will not file, promote, instigate, or participate in any complaint, charge, claim, action, proceeding, suit, or litigation in any court or before any federal, state, or local government agency or department with respect to any Claim(s) released by Employee herein. If Employee does file, promote, instigate, or participate in any complaint, charge, claim, action, proceeding, suit, or litigation in any court or before any federal, state, or local government agency or department with respect to any Claim(s) released by Employee herein, Employee covenants and agrees to hold the Released Parties, or any one or more of them, harmless from and to indemnify the Released Parties, or any one or more of them, from and against any damages, losses, costs, expenses, and/or attorneys' fees paid, suffered, sustained, incurred by, and/or asserted against any of the Released Parties, or any one or more of them, in addition to any judgments arising therefrom.

Except as otherwise prohibited by applicable law, Employee waives any right to become and promises not to become a member of any class in any proceeding in any court or before any federal, state, or local government agency or department in which claims are asserted against CHSI or its Affiliates that are related in any way to Employee's employment with CHSI or that relate to or are otherwise connected to matters or events that arose or accrued on or prior to Employee's execution of this Agreement. If, without Employee's prior knowledge and consent, Employee is made a member of a class in any such proceeding in any court or before any federal, state, or local government agency or department, Employee immediately shall opt-out of the class at the first opportunity afforded to Employee after Employee learns about Employee's inclusion in the class.

Employee understands, acknowledges, and agrees that nothing contained in this Section 4 or any other portion of this Agreement is intended to or shall interfere with Employee's rights under any federal, state, or local laws to file, institute, or otherwise initiate a complaint, charge, claim, action, proceeding, suit, or litigation with the Equal Employment Opportunity Commission (EEOC) or any other federal, state, or local government agency or department; to participate in any federal, state, or local government agency or department proceeding; or to provide truthful testimony if under compulsion of subpoena or otherwise cooperate in any

federal, state, or local government agency or department investigation.  In addition, nothing contained in this Section 4 or any other portion of this Agreement is intended to or shall interfere with Employee's rights to report possible violations of any federal law or regulation to any governmental agency or entity, including, but not limited to, the Department of Justice, the Securities and Exchange Commission, the United States Congress, and any agency Inspector General, or to make other disclosures that are protected under the whistleblower provisions of any such federal law or regulation.  Provided, however, that Employee hereby waives all of Employee's individual rights to any benefits and relief, including, but not limited to, monetary recovery and reinstatement, derived from any complaint, charge, claim, action, proceeding, suit, or litigation brought on Employee's behalf related in any way to Employee's employment with CHSI, including, but not limited to, any complaint, charge, claim, action, proceeding, suit, or litigation brought by the EEOC, any other federal, state, or local governmental agency or department, or any other person or third party.

Notwithstanding the foregoing, Employee hereby represents that, although Employee is not legally barred from doing so, Employee does not presently have on file and has not made or filed in any forum any complaint(s), charge(s), claim(s), action(s), proceeding(s), suit(s), or litigation (whether civil, administrative, criminal, or otherwise) against CHSI or the Released Parties, or any one or more of them, and Employee acknowledges that CHSI has relied on Employee's representation as to such in agreeing to perform its obligations and provide the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement.

Employee understands and agrees that the foregoing is not a complete list of Claim(s) released. Employee further understands and warrants that this Agreement shall operate as a fully binding and complete resolution of all Claim(s) by and between the Parties to this Agreement and all Parties represented by or claiming through such Parties and that Employee shall not be able to seek any monies for any Claim(s), whether known or unknown, against any of the persons or entities released hereunder, unless otherwise expressly provided for herein. Nothing contained in this Section 4 shall preclude either Party from asserting a claim for breach of this Agreement and/or a claim that may arise from events occurring after this Agreement is executed.

5.     **Revocation of Release**.  Employee agrees that Employee has been advised to consult with an attorney and/or other advisor of Employee's choosing concerning Employee's rights and obligations under this Agreement and that Employee has been advised to consider this Agreement fully before executing it.  Employee further agrees that Employee has been offered twenty-one (21) days within which to review this Agreement.  After Employee signs and delivers this Agreement, Employee has the right to revoke this Agreement within seven (7) days from the date on which Employee signs and delivers this Agreement.  This Agreement shall not become effective until the expiration of that seven-day revocation period, and, therefore, the Parties agree that the effective date of this Agreement shall be the eighth (8th) day following such seven-day revocation period (the "**Effective Date**").  If Employee wants to revoke this Agreement, Employee must deliver a written revocation to:  CHSI c/o Mark S. Lange, Esq., Holland & Knight LLP, Regions Plaza, Suite 1800, 1180 West Peachtree Street, Atlanta, Georgia 30309, within that seven-day period.  If Employee does not revoke this Agreement, Employee will

receive the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement.

6.  **Confidentiality and Non-Disclosure of This Agreement**.

(a)  Except as otherwise authorized by this Agreement, Employee hereby warrants and agrees that Employee has not and will not and that none of Employee's attorneys, agents, or representatives or anyone acting on Employee's behalf has or will, under any circumstances, whether directly or indirectly, disclose or cause to be disclosed to any person any of the terms and conditions of this Agreement, including, without limitation, the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement or any facts or other information relating to the negotiation and execution of this Agreement, all such information being deemed strictly confidential.

(b)  Nothing contained in this Section 6 shall prohibit the disclosure of any term of this Agreement:

(i)  To the extent necessary to comply with any law, rule, regulation, court or administrative order, and/or directive or to enforce or defend against claims arising in connection with this Agreement; provided, however, that if Employee receives a subpoena or other formal legal process seeking the disclosure of any information about this Agreement, Employee must give the Released Parties, or any one or more of them, sufficient advance notice in writing (as set forth in Section 15) prior to any such disclosure to allow the Released Parties, or any one or more of them, to take steps to object to and/or seek other protection from any such disclosure;

(ii)  To a government agency or department in connection with any charge or investigation it is conducting or may conduct; or

(iii)  To the extent necessary, to members of Employee's immediate family and Employee's attorneys, accountants, and tax advisors; provided, however, that Employee shall inform each such person about the confidentiality provisions of this Agreement and that such disclosure is made on the condition that such information be treated as strictly confidential.

7.  **Employee's Continuing Obligations to CHSI**.

(a)  **Confidentiality of CHSI's Information**.  Employee recognizes that by virtue of Employee's employment with CHSI, Employee has been granted otherwise prohibited access to trade secrets and other confidential and proprietary information that is not known to

CHSI's competitors or within the industry generally, that has been developed by CHSI and its Affiliates over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to CHSI and its Affiliates. This information (in whatever form or medium) relating to CHSI and its Affiliates includes, but is not limited to, CHSI's and its Affiliates' trade secrets, including the information defined by the Georgia Trade Secrets Act, O.C.G.A. §§ 10-1-761 *et seq.*, or any other applicable trade secrets statute or act; information relating to CHSI's and its Affiliates' tax-exempt charitable healthcare activities and services, earnings, assets, liabilities, revenues, or any other financial data for any time periods; marketing and service strategies, programs, and procedures with respect to the provision of healthcare services and products; contract expiration dates; any and all types of patient or resident or customer data, including, without limitation, any information protected by HIPPA; information concerning the third party payor programs, including Medicaid, Medicare, managed care plans, and other private insurance company programs; business plans; marketing plans; computer programs and databases; research projects; new healthcare products and service developments; and any other information of CHSI and its Affiliates or any of their patients, residents, or customers that CHSI informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential (the "**Confidential and Proprietary Information**"). Confidential and Proprietary Information does not include information that is: (i) in the public domain (except as a result of a breach of this Agreement or Employee's obligations under statutory or common law); or (ii) obtained by Employee from a third party subsequent to the termination of Employee's employment with CHSI (except where the third party obtains the information in violation of a contractual obligation or a statutory or common law obligation). Employee agrees that: (a) Employee will never disclose, access, or use or permit others to access or use or attempt to disclose, access, or use or permit others to access or use, whether directly or indirectly, any of CHSI's Confidential or Proprietary Information or make use of any of CHSI's Confidential or Proprietary Information for Employee's own purposes or the purposes of another, except as required for the benefit of CHSI or as required by law; and (b) Employee will take all reasonable measures, in accordance with CHSI's policies, procedures, and instructions, to protect CHSI's Confidential and Proprietary Information from any accidental or unauthorized disclosure or use. To the extent that any of CHSI's information loses its status as a "trade secret" (as so designated and protected by state statutory or common law), such information will immediately fall within the foregoing definition of Confidential and Proprietary Information.

      (b)    **Non-Solicitation of Customers**. For a period of twenty-four (24) months following the Separation Date (the "**Restricted Period**"), Employee shall not, directly or indirectly: (i) for any Competing Business (as defined below) solicit or accept or attempt to solicit or accept business from any of CHSI's or its Affiliates' residents, patients, or customers or any of CHSI's and its Affiliates' specifically identified and/or prospective residents, patients, or customers with whom or which Employee had Material Contact (as defined below) on behalf of CHSI and its Affiliates in the twelve (12) months preceding the Separation Date; and/or (ii) cause any of CHSI's and its Affiliates' residents, patients, customers or any of CHSI and its Affiliates specifically identified and/or prospective residents, patients, or customers with whom or which Employee had Material Contact on behalf of CHSI and its Affiliates in the twelve (12) months preceding the Separation Date to terminate or otherwise diminish its or their business relationship with CHSI and its Affiliates.

(c)     **Non-Solicitation of CHSI's Personnel**.  During the Restricted Period, Employee shall not, directly or indirectly, solicit, induce, recruit, or otherwise encourage any of CHSI's or its Affiliates' employees, officers, directors, contractors, consultants, agents, or anyone else providing services to CHSI and its Affiliates that Employee had Material Contact with or that Employee obtained Confidential Information about in the twelve (12) months preceding the Separation Date to end or leave their employment, engagement, or business relationship with CHSI and its Affiliates for any reason, to cease doing business with CHSI and its Affiliates, or to engage in any Competing Business.

(d)     **Non-Competition with CHSI**.  During the Restricted Period, Employee shall not, directly or indirectly, whether in an individual or representative capacity (and whether or not for compensation) as an employee, agent, consultant, independent contractor, officer, or otherwise, render services in a like or similar capacity to that in which he was functioning prior to the Separation Date for or to any Person engaged in a Competing Business in the Restricted Territory (as such terms are defined in this Section 7).  Provided, however, that the provisions of this Section 7(d) shall not be construed to prohibit Employee from owning up to two percent (2%) of the issued shares of any company whose common stock is listed for trading on any national securities exchange or the NASDAQ National Market System.

It is acknowledged and agreed by the parties hereto that the non-competition provisions contained in this Section 7(d) have been narrowly tailored to prohibit Employee from working in competition with CHSI within the limited geographic area described herein and that they are reasonable and necessary to protect CHSI's legitimate business interests and goodwill and are not burdensome to Employee or merely punitive or arbitrary in nature and that Employee shall be able to earn a living while complying with such restrictive covenants.    Employee acknowledges that the foregoing definitions provide fair notice of the maximum reasonable scope of this Section 7(d).

(e)     **Certain Definitions**.    For purposes of this Agreement, the term "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition of "Affiliate" the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by control or otherwise.  For purposes of this Agreement, the term "**Business**" shall mean:  (i) providing nursing home care, assisted living care, senior housing, home health care, adult day care, hospice care, medical transportation services of any type, rehabilitative therapy services, medical and pharmaceutical supplies, equipment and related supplies to such providers of healthcare services, disease management or case management services, in-patient or out-patient diagnostic medical services; (ii) providing acute care medical and/or emergency room services in an in-patient hospital facility (or portion of such facility) or in an out-patient surgery setting; (iii) the acquisition, establishment, financing, construction, leasing, management, or operation of licensed nursing facilities or assisted living facilities; (iv) the acquisition, development, operation and management of one or more captive insurance companies; and (v) the provision of other healthcare services being offered to the public by CHSI and its Affiliates as of the Separation Date.  For purposes of this Agreement, the term "**Competing Business**" shall mean any Person that engages in a business substantially the same

as the Business or any portion thereof, including, without limitation, United Health Services, Inc., a Georgia corporation and its Affiliates.  For purposes of this Agreement, the term **"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-5, 42 U.S.C. §§ 1320d-1329d-8, and the Regulations promulgated thereunder.  For purposes of this Agreement, **"Material Contact"** is defined as any contact between Employee and a person or entity that:  (a) Employee solicited directly for CHSI or its Affiliates; (b) Employee dealt with directly for CHSI's or its Affiliates' business purposes and maintained a business relationship; and/or (c) Employee obtained Confidential and Proprietary Information about as a result of Employee's employment with CHSI.  For purposes of this Agreement, the term **"Person"** means any individual, corporation, partnership, joint venture, limited liability company, trust, association, or other entity or organization.  For purposes of this Agreement the term **"Restricted Territory"** shall mean the State of Georgia.

      (f)    **Reasonable Restrictions**.  Employee acknowledges and agrees that the time and geographic restrictions and other obligations placed on Employee by this Section 7 (the "Restrictions") are reasonable and necessary to protect and preserve the legitimate interests, properties, goodwill, and business of CHSI and its Affiliates.

      (g)    **Court or Agency Order**.  If Employee receives a subpoena, court order, agency order, or any other form of compulsory process requesting any information related to CHSI and its Affiliates, including, but not limited to CHSI's Confidential and Proprietary Information, Employee will, to the extent permitted by law:  (i) provide to CHSI and its Affiliates reasonable and timely notice of the subpoena or order so that CHSI or its Affiliates, as applicable, may object, obtain a protective order, or seek other appropriate relief on behalf of CHSI or its Affiliates, as applicable, in a timely manner; (ii) provide reasonable cooperation and assistance, in conjunction with CHSI and at CHSI's expense, in any efforts to obtain relief from the subpoena or order; and/or (iii) take all appropriate steps, in conjunction with CHSI and at CHSI's expense, to limit the amount and scope of the information to be disclosed.  If Employee is called to testify in response to a subpoena, court order, agency order, or any other form of compulsory process concerning any of the matters referenced in this Subsection, nothing contained in this Agreement shall serve to limit the substance of Employee's testimony in any way.

      (h)    **Scope of Restrictions**.  Employee carefully has read and considered the provisions of this Section 7, and, having done so, agrees that the Restrictions set forth in this Section 7 (including the time period and geographic scope of the Restrictions) are fair and reasonable and are reasonably required for the protection of the interests of CHSI and its Affiliates.  Without limiting other possible remedies available to CHSI, Employee agrees that immediate injunctive or any other equitable relief from a court of competent jurisdiction shall be available to enforce the covenants set forth in this Section 7, such relief to be available to CHSI without the necessity of posting a bond.  In the event that any part of the covenants set forth in this Section 7 shall be held to be invalid, overbroad, or unenforceable by a court of competent jurisdiction, the Parties hereto agree that such invalid, overbroad, or unenforceable provision(s) may be modified or severed from this Agreement without in any manner affecting the remaining

portions hereof (all of which shall remain in full force and effect).   In the event that any Restriction set forth in this Section 7 related to time period, geographic scope, or restricted activities shall be declared by a court of competent jurisdiction to exceed the maximum time period or activities such court deems reasonable and enforceable, said time period or restricted activities shall be deemed modified to the minimum extent necessary to make the temporal restrictions, geographic scope, or activities reasonable and enforceable.

   (i) **Common Law and Statutory Obligations Remain**.  This Agreement shall not supersede, replace, or diminish Employee's common law and statutory obligations to CHSI, as those obligations are in addition to the Restrictions (and other obligations) set forth in this Agreement.

   (j) **Tolling**.  The Restricted Period shall be tolled and extended for any period during which the enforcement of the Restrictions is being litigated or arbitrated, including any appeal or confirmation proceedings, provided that the outcome of such litigation or arbitration is initiated to enforce, in whole or in part, the Restrictions set forth in this Section 7.

   8. **Return of Materials**.  Employee agrees that not later than seven (7) days following the Separation Date, Employee will return all of CHSI's Confidential and Proprietary Information and any other documents, materials, and other things in Employee's possession, custody, or control relating to CHSI, or that have been or were in Employee's possession, custody, or control as of the Separation Date, regardless of the form thereof (including, but not limited to, all of CHSI's technology devices of any kind, programs, manuals, and equipment), without retaining any copies or replicas thereof.  To the extent that Employee has use and/or possession of any of CHSI's Confidential and Proprietary Information that is not capable of being physically returned to CHSI, Employee agrees to destroy and/or delete and such information as contained in its non-physical form and, upon request, execute an affidavit affirming the same, which such affidavit shall become a part of this Agreement and incorporated herein.

   9. **Employee Cooperation**.  Employee agrees that Employee will cooperate with and assist CHSI by providing information relevant to matters about which Employee gained knowledge while employed by CHSI and that, upon reasonable notice from CHSI, Employee will meet with CHSI's attorneys and other representatives, appear at hearings, depositions, trials, and other proceedings relating to any such matters. CHSI will reimburse Employee for all reasonable and necessary out-of-pocket expenses necessitated by Employee's cooperation as described in this Section 9.

   10. **Non-Disparagement**.  Employee agrees not to disclose any information, or make or publish any statement, or make to or solicit for the media or others, or say or do anything to or in relation to any of the Released Parties that is adverse or prejudicial to any of the Released Parties or that may be considered to be negative, harmful, false, disparaging, derogatory, defamatory, slanderous, or libelous as to any of the Released Parties.  Employee further agrees not to disclose any information, or make or publish any statement, or make to or solicit for the media or others, or say or do anything to or in relation to any of the Released Parties that may tend to harm or prejudice the reputation or good name or goodwill of any of the Released Parties.

11.   **Employee Reference Request**.   Confirmation of Employee's dates of employment, position(s) held by Employee, Employee's rate(s) of pay, and/or other administrative matters shall be provided by request through CHSI's Human Resources Department.

12.   **No Reemployment**.   In further consideration of the undertakings described herein, Employee agrees that following the Separation Date, Employee is not eligible for and will not apply for or otherwise seek employment, reemployment, or reinstatement with or otherwise provide services for CHSI or any of its Affiliates, including, but not limited to, engagement or retention on a freelance, independent contractor, consultant, or other contract basis. In the event that Employee applies for any position or engagement with CHSI or any of its Affiliates, Employee acknowledges that CHSI nor any of its Affiliates has no obligation to rehire, reemploy, or reinstate Employee, and Employee agrees that any denial of Employee's application is not and will not be deemed retaliatory or form the basis for any retaliation claim against CHSI or any of its Affiliates. Employee agrees that Employee may be denied employment or any other remunerative relationship with CHSI or any of its Affiliates without CHSI or any of its Affiliates incurring any liability whatsoever. Employee acknowledges that the provisions of this Section are fair and just under the relevant facts and circumstances, and Employee acknowledges and agrees that Employee's forbearance from seeking future employment is purely contractual and is in no way involuntary, discriminatory, or retaliatory.

13.   **No Assignment of Claims and Warranty**. Employee, on behalf of himself and his representatives, agents, estate, heirs, executors, administrators, successors, and assigns, hereby expressly warrants and represents that Employee is the owner of all Claim(s) released by Employee herein, that Employee has not assigned or transferred or purported to have assigned or transferred (whether expressly, impliedly, voluntarily, or by operation of law or otherwise) any of the Claim(s) released by Employee herein or any portion thereof. Employee further agrees that Employee will hold harmless and indemnify CHSI and the Released Parties, or any one of more of them, from and against any and all Claim(s) so assigned or transferred.

14.   **Attorneys' Fees and Costs**.   In any dispute involving the interpretation or enforcement of this Agreement, whether by way of a legal proceeding or otherwise, the prevailing party shall be entitled to recover its/his reasonable attorneys' fees and costs (including such fees and costs of any enforcement or appeal proceedings), which fees may be set by a court in the trial or appeal of any such action or awarded in a separate action brought for that purpose and which fees shall be in addition to any other relief (whether at law or in equity). For purposes of this Section 14, the prevailing party means the party obtaining substantially the relief sought, whether by compromise, settlement, or judgment.

15.   **Notice.** Any notices required to be provided under this Agreement by Employee to CHSI and/or the Released Parties, or any one or more of them, shall be made to CHSI c/o Mark S. Lange, Esq., Holland & Knight LLP, Regions Plaza, Suite 1800, 1180 West Peachtree Street, Atlanta, Georgia 30309.

16.   **Governing Law**.   This Agreement will be construed, interpreted, and enforced, both as to substance and remedies, in accordance the laws of the State of Georgia. Employee

irrevocably consents to the personal jurisdiction of the courts of the State of Georgia and to the personal jurisdiction of the United States District Court for the Middle District of Georgia for all purposes related to this Agreement. Further, Employee irrevocably consents to venue in the state and/or federal courts having jurisdiction over Macon-Bibb County, State of Georgia. Employee hereby waives any objections to jurisdiction and venue as set forth herein, including, but not limited to, any forum non conveniens objections.

17. **Waiver of Jury Trial**. The Parties hereby knowingly, voluntarily, and intentionally waive any right to a jury trial with respect to any claims arising in connection with the Parties' employment relationship and/or this Agreement.

18. **General Provisions**. This Agreement may be executed in any number of counterparts each of which, taken together, shall constitute one Agreement. If any provision of this Agreement should be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions will not be affected, and the illegal or invalid parts, terms, or provisions will be deemed not to be a part of this Agreement. The provisions of this Agreement may be amended, modified, or waived in a writing made to effectuate the same and only with the prior written consent of each Party hereto. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their successors, legal representatives, and assigns.

19. **Entire Agreement**. This Agreement constitutes the sole and entire agreement between Employee and CHSI and supersedes all other agreements, representations, promises, understandings, undertakings, and inducements, whether written or oral, made prior to or contemporaneously with the execution and delivery of this Agreement.

20. **Consultation with Legal Counsel**. Employee expressly acknowledges that before signing this Agreement, Employee was advised of Employee's right to consult with legal counsel and/or other advisors selected by Employee regarding the terms and conditions of this Agreement as well as the federal and state income tax consequences of this Agreement, that Employee knows and understands the contents of this Agreement, and that Employee enters into this Agreement of Employee's own free will without any inducement not described in this Agreement and not under duress or coercion of any nature.

21. **Tax Matters**. All amounts paid to Employee under this Agreement shall be net of amounts withheld for federal and state income taxes and applicable payroll-related taxes. Employee and CHSI agree that CHSI shall <u>not</u> under any circumstances be responsible to Employee for any of the tax consequences of the Employee's receipt of payments under this Agreement, including, without limitation, as a result of the application of Section 409A of the Internal Revenue Code of 1986, as amended.

**IN WITNESS WHEREOF**, and intending to be legally bound, the parties hereto have executed the foregoing Separation Agreement, General Release, Waiver & Confidentiality Agreement as of the dates accompanying the Parties' respective signatures below.

**ACCEPTED AND AGREED:**

MARK A. WALDROP

COMMUNITY HEALTH SYSTEMS, INC., a Georgia nonprofit corporation

_____

Date:_____

By:_____

Its:_____

Date:_____

Page 13 of 13

*Execution Version*

# EMPLOYMENT AGREEMENT
## OF MARK A. WALDROP

THIS EMPLOYMENT AGREEMENT (as amended and restated herein, this "Agreement") is made and entered into as of the 26 day of June , 2006, and is now amended and restated as of January 1, 2009, by and between Community Health Systems, Inc., a Georgia nonprofit corporation (the "Company"), and the undersigned employee, Mark A. Waldrop, a resident of the State of Tennessee ("Employee").

### WITNESSETH:

WHEREAS, the Company desires to continue to employ Employee and Employee desires to accept such continued employment on the terms and conditions hereinafter stated; and

WHEREAS, Company and Employee now wish to update the Agreement in order to establish its compliance with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), with the understanding that this Agreement supersedes all prior versions and hereinafter shall solely establish the terms of Employee's employment with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1.     Employment. Employee shall serve as the Executive Vice President, Integration Services and shall perform the duties set forth on Exhibit 1 attached hereto, in addition to those duties reasonably assigned to Employee from time to time by the President of the Company or the Board of Directors of the Company. Employee shall be employed on a full-time basis and shall report directly to the President of the Company. Employee shall be subject to the Company's policies and procedures in effect from time to time. Employee shall perform the duties assigned to him faithfully, diligently and to the best of his ability, and Employee shall not engage in any outside employment without the express written consent of the Board of Directors of the Company.

2.     Term of Employment.

2.1     Term. Unless earlier terminated pursuant to Sections 2.2-2.6 below, the initial term of Employee's employment under this Agreement began on January 1, 2006 and shall continue until December 31, 2006 (the "Initial Term"); provided that such Initial Term shall be automatically extended for additional periods of one (1) year commencing on January 1, 2007 and each anniversary thereof (such period or periods, the "Renewal Term"), unless either party shall have given notice to the other party at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term (as the case may be) that such party does not desire to extend the term of this Agreement, in which event, the employment would terminate on December 31 of the Initial Term or the applicable Renewal Term (as the case may be) (the Initial Term and the Renewal Term or Terms, if applicable, collectively, the "Term").

2.2     Termination upon Death. Employee's employment hereunder shall automatically terminate upon the death of Employee. In the event of termination of employment upon death,



PLAINTIFF'S
EXHIBIT
4
4-25-17  AW
PENGAD 800-631-6989

ATLANTA:5093463.1

*Execution Version*

the Company shall pay to Employee's estate an amount equal to six (6) months' Salary (as defined below) payable in a lump sum within 60 days of the Employee's death.

2.3     Termination upon Disability.   The Company may terminate Employee's employment hereunder immediately upon Employee's Disability, which has lasted (or can reasonably be expected to last) for a period of six (6) consecutive months (except as prohibited by law).  For purposes of this Agreement, "Disability" shall mean the inability of Employee, as determined by the Company's Board of Directors, to perform the essential functions of his regular duties and responsibilities, with or without reasonable accommodation, due to a medically determinable physical or mental illness.

2.4     Termination by the Company for Cause.   The Company may immediately terminate Employee's employment hereunder for Cause upon prior written notice of termination to Employee with such Cause being specified in such notice.  As used herein, "Cause" shall mean (i) Employee's act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to the Company or its reputation; (ii) Employee's conviction of, pleading guilty to, or confessing to any felony; or (iii) Employee's failure to observe or perform any material covenant, condition, or provision of this Agreement or of the Company's written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to Employee by the Company.

2.5     Termination by the Company without Cause.

(a)     The Company may terminate Employee's employment hereunder without Cause by giving Employee 30 days' prior written notice thereof.

(b)     In the event of the Company's termination of employment without Cause, as severance pay the Company shall, subject to Section 2.8 below, continue to pay the Salary to Employee for (1) year.  Such severance pay shall be payable in equal installments and in accordance with the regularly recurring pay periods established by the Company but in no event less frequently than monthly.

2.6     Termination by Employee.  Employee may terminate Employee's employment hereunder by giving the Company not less than 30 days' prior written notice thereof.

2.7     Effect of Termination of Employment.   Upon termination of employment, all obligations of the Company under this Agreement shall terminate except with respect to (i) payment of compensation earned to the date of termination, (ii) any severance payments required to be paid under Section 2 of this Agreement, (iii) reimbursement of expenses incurred prior to the date of termination of employment to which Employee would have been entitled under this Agreement, and (iv) any unpaid vested amounts or benefits to which Employee would have been entitled as of the date of Employee's date of termination pursuant to any benefit plan.  In addition to the foregoing, (a) upon termination of employment pursuant to Section 2.5 and for the duration of the severance period set forth in Section 2.5(b), Employee shall be provided benefits, at no cost to Employee, substantially similar to the employee benefits being provided to Employee at the time of such termination; and (b) upon termination of employment for any other reason, or immediately following the severance period set forth in Section 2.5(b), as applicable,

ATLANTA:5093463.1

*Execution Version*

Employee shall have the option to purchase continuation coverage as to any Company-provided medical, dental or vision plan in which he participates, such option being in addition to any legally-mandated rights Employee may have to COBRA continuation coverage as to any Company-provided medical, dental or vision plan in which he participates.

2.8     Code Section 409A Compliance.   Notwithstanding anything in this Agreement to the contrary, if any benefit or amount payable to the Employee under Section 2 on account of Employee's termination of employment constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended or successor provision ("409A"), payment of such benefit or amount shall commence only when Employee incurs a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h).   Such payments or benefits shall be provided in accordance with the timing provisions of Section 2 by substituting the references to "termination of employment" or "termination" with "separation from service".   If at the time Employee incurs a separation from service Employee is a "specified employee" within the meaning of 409A, any benefit or amount payable to the Employee under Section 2 that constitutes nonqualified deferred compensation subject to 409A shall be delayed until the first day of the seventh month following the Employee's separation from service (the "409A Suspension Period").   Within 14 calendar days after the end of the 409A Suspension Period, the Company shall pay to the Employee (or his estate or beneficiary, as applicable) a lump sum payment in cash equal to any payments (without interest) that the Company would otherwise have been required to provide under this Agreement but for the imposition of the 409A Suspension Period.   Thereafter, Employee shall receive any remaining payments due under Section 2 in accordance with the terms of Section 2 (as if there had not been any suspension period beforehand).   For purposes of this Agreement, each payment that is part of a series of installment payments shall be treated as a separate payment for purposes of 409A.

3.     Compensation.   For all services which Employee renders to the Company during the Term, Employee shall receive from the Company an annual Salary as of January 1, 2009 (the "Salary") of $562,680, less normal withholdings.   The Salary shall be paid to Employee on the regularly recurring pay periods established by the Company, but in no event less frequently than monthly.   The amount of the Salary shall be reviewed annually by the Board of Directors of the Company for, at the discretion of the Board of Directors of the Company, possible increases in such amount.

4.     Reimbursement of Business Expenses.   The Company shall pay all reasonable and necessary travel and business expenses incurred by Employee directly related to Employee's performance of Employee's responsibilities and duties for the Company under this Agreement. Employee shall submit to the Company statements that justify in reasonable detail all expenses so incurred.   Employee shall submit all reimbursements hereunder for a particular calendar year no later than forty-five (45) days after it ends, and payment shall occur not later than March 15 immediately following the end of the calendar year to which the reimbursement relates.

5.     Benefits.

5.1     Executive Benefits Program.   The Company shall pay insurance premiums on behalf of Employee for health insurance for Employee and his dependents and for disability and life insurance, in such amounts as the Company from time to time may determine.

ATLANTA:5093463.1

*Execution Version*

5.2     Standard Benefits.  Employee shall be eligible to participate in any 401(k) plan in which the employees of the Company participate.  Employee shall also be entitled to participate in any other employee benefit plans and programs, to the same extent generally available to other similarly situated Company executives, in accordance with the terms of those plans and programs.

5.3     Short Term Disability Payments.

(a)     Irrespective of whether the Company purchases or maintains any disability insurance for Employee, should Employee become Disabled, then the Company shall provide to Employee short-term disability payments, as set forth in this Section 5.3.  During the first 180 days of a Disability, the Company will continue to pay to Employee his Salary commencing on the 6th day of such Disability.  During the first 5 days of such Disability, Employee must take sick days, vacation days or paid leave time to which he is entitled.  If Employee is not entitled to any more sick days, vacation days or paid leave time, then during the first 5 days of such Disability, Employee must take unpaid leave.  During the time period where Employee receives short-term disability benefit payments pursuant to this Section 5.3, Employee shall continue to be covered by all of the benefits and other provisions of the executive benefits program, if applicable, generally described above.

(b)     All such short-term disability benefit payments shall be made monthly on the appropriate regularly recurring pay periods established by the Company.  The short-term disability benefit payable from the Company shall be reduced by short-term disability benefit payments to Employee by insurance companies for which the premium is payable by the Company.

5.4     Executive Leave Policy.  During the Term, Employee shall be entitled to certain paid time off, as more fully described in the Company's Executive Leave Policy, a copy of which is attached hereto as Exhibit 5.4.

6.     Restrictive Covenants.

6.1     Definitions.

(a)     "Business" shall mean:  (a) the provision of rehabilitative therapy, medical and personal support services, home care, medical or pharmaceutical supplies or case management services; (b) the leasing, ownership, management or operation of nursing facilities or assisted living facilities ("assisted living facilities" being known under Section 31-712 of the Official Code of Georgia Annotated as "personal care homes"); (c) the operation and management of a health care cooperative; (d) the operation and management of one or more captive insurance companies; and (e) other activities or provision of products or services being conducted or provided, as applicable, or which the Company has active plans to pursue, at the time of termination of Employee's employment.

(b)     "Competing Business" shall mean any person or entity which engages in a business substantially the same as the Business or any portion thereof.

ATLANTA:5093463.1

*Execution Version*

(c)    "Confidential Information" shall mean any data or information, other than Trade Secrets, that is valuable to the Company, any other member of the System or their respective affiliates and is not generally known by the public.  To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, lists (whether or not in writing) of the Company's, any other member of the System's or their respective affiliates' current or potential customers, lists of and other information about the Company's, any other member of the System's or their respective affiliates' officers and employees, financial information (whether or not in writing) that has not been released to the public by the Company, any other member of the System or their respective affiliates, marketing techniques, price lists, pricing policies, and the Company's, any other member of the System's or their respective affiliates' business methods, contracts and contractual relations with the Company's, any other member of the System's or their respective affiliates' customers and suppliers and future business plans.  Confidential Information also includes any information or data described above which the Company, any other member of the System or their respective affiliates obtain from another party and which the Company, any other member of the System or their respective affiliates treat as proprietary or designate as confidential information whether or not owned or developed by the Company, any other member of the System or their respective affiliates.  "Confidential Information" shall not include any materials or information of the types specified above to the extent that such materials or information (i) are or become publicly known or generally utilized by others engaged in the same business or activities in which the Company, any other member of the System or their respective affiliates utilized, developed, or otherwise acquired such information; or (ii) are known to Employee prior to employment, having been lawfully received from parties other than the Company, any other member of the System or their respective affiliates; or (iii) are furnished to others by the Company, any other member of the System or their respective affiliates with no restriction on disclosure.  Failure to mark any Confidential Information as confidential shall not affect its status as "Confidential Information" under this Agreement.

(d)    "Restricted Customer" shall mean any customer or client of the Company or its affiliates with whom Employee has had business contact during his employment with the Company.

(e)    "Trade Secrets" shall mean any information of the Company, any other member of the System or their respective affiliates, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product or service plans, or a list of actual or potential patients or suppliers, which is not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Trade Secrets also include any information described in this Section 6.1(e) which the Company or other members of the System or their affiliates obtain from another party which the Company or other members of the System or their affiliates treat as proprietary or designate as trade secrets, whether or not owned or developed by the Company, any other member of the System or their respective affiliates.  Failure to mark any Trade Secrets as confidential shall not affect its status as a Trade Secret under this Agreement.

ATLANTA:5093463.1

*Execution Version*

(f)     "Territory" shall mean the State of Georgia.

6.2     <u>Nondisclosure of Trade Secrets and Confidential Information</u>.  In the course of Employee's employment by the Company, Employee will have access to the Company's, other members of the System's or their respective affiliates' most sensitive and most valuable Trade Secrets and Confidential Information, the use, application or disclosure of any of which would cause substantial and possibly irreparable damage to the business and asset value of the Company, other members of the System or their respective affiliates.  Accordingly, Employee accepts and agrees to be bound by the following provisions:

(a)     During the Term and following the termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose, or permit any unauthorized person or entity access to, any Trade Secrets or any portion thereof so long as they remain Trade Secrets.

(b)     During the Term and for a period of two (2) years following termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by the Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose or permit any unauthorized person or entity access to, any Confidential Information or any portion thereof.

(c)     Without limiting the foregoing, Employee shall abide by the Company's policies and regulations, as established from time to time, for the protection of its Trade Secrets and Confidential Information.  Notwithstanding anything herein to the contrary, Employee shall be permitted to disclose Trade Secrets or Confidential Information if required by applicable law, provided that, in such case, Employee shall (i) furnish only that portion of the Confidential Information or Trade Secrets that he is advised by counsel is legally required to be disclosed, and (ii) provide the Company with prompt written notice of such request or requirement so that the Company may seek a protective order or other appropriate remedy.

(d)     Upon the request of the Company and in any event upon the termination of employment with the Company, Employee shall deliver to the Company all memoranda, notes, records, tapes, documentation, disks, manuals, files or other documents, and all copies thereof in any form, concerning or containing Confidential Information, Trade Secrets or Works (as defined below) that are in Employee's possession, whether made or compiled by Employee, furnished to Employee or otherwise obtained by Employee.

6.3     <u>Nonsolicitation of Customers and Employees</u>. Employee covenants and agrees that during the Term and for a period of eighteen (18) months thereafter, Employee shall not, directly or indirectly (whether on his own behalf or on behalf of any other person, as owner, partner, stockholder, investor, employee, officer, director, agent, independent contractor, associate, executive, consultant or licensor):

ATLANTA:5093463.1

*Execution Version*

(a)    (A) solicit, recruit, divert or take away or attempt to solicit, recruit, divert or take away any person that is an employee of the Company, any other member of the System or their respective affiliates and with whom Employee had personal contact during his employment under this Agreement, (B) encourage any person or entity (other than the Company, any other member of the System or their respective affiliates) to  solicit, recruit, divert or take away any such employee or (C) otherwise encourage any such employee to discontinue his or her employment with the Company, any other member of the System or their respective affiliates; or

(b)    solicit, recruit, divert or take away a Restricted Customer for the purpose of directly or indirectly providing, distributing or selling products or services similar to those provided, distributed or sold in the operation of the Business.

Nothing herein shall prohibit Employee (following the termination of this Agreement) from conducting solicitations of the general public for employment or for business not targeted specifically at Restricted Customers or employees of the Company or its affiliates.

6.4    <u>Noncompetition Covenant</u>.  Except as set forth on <u>Exhibit 6.4</u> attached hereto, Employee further covenants and agrees that, during the Term and for a period of twenty four (24) months thereafter, he shall not, without the Company's prior written consent, serve as an operations manager, an executive vice president of integration services or in any other position requiring Employee to perform some or all of the duties that Employee was performing for the Company at the time this Agreement is terminated in the Territory for any Competing Business.

6.5    <u>Ownership of Common Stock</u>.  Notwithstanding anything in this Section 6 to the contrary, nothing contained herein shall prohibit Employee from owning not more than three percent (3%) of the common stock of any company whose common stock is publicly traded on a national securities exchange or in the over-the-counter market.

7.    <u>Company Ownership of Works</u>.

7.1    <u>Definition of Works</u>.  "Works" shall mean any and all works of authorship, code, inventions, improvements, discoveries, trademarks, technologies, and work product, whether or not patentable or eligible for copyright, trade secret or trademark protection, and in whatever form or medium and all derivative works thereof, and any and all rights, applications or registrations with respect thereto which are, have been or will be created, made, or developed by Employee: (a) in the course of employment with the Company, (b) during Employee's regular business hours with the Company, (c) on the Company's premises, or (d) using the Company's resources or equipment.  Employee agrees to fully and promptly disclose in writing to the Company any such Works as such Works from time to time may arise.

7.2    <u>Company Ownership of Works</u>.  All Works are the property of the Company. Employee shall execute and deliver such confirmatory assignments, instruments, or documents as the Company deems necessary or desirable without requiring the Company to provide any further consideration therefor.  Employee agrees to and hereby does assign to the Company all right, title, and interest in and to any and all Works, including all worldwide copyrights, patent rights, trademark rights, and all trade secrets embodied therein.  Employee waives any and all rights Employee may have in any Works, including but not limited to the right to

ATLANTA:5093463.1

*Execution Version*

acknowledgement as author. Employee agrees not to use or include in Works any copyrighted, restricted or protected code, specifications, concepts, trademarks, or trade secrets of any third party or any other information that Employee would be prohibited from using by any law or any confidentiality, non-disclosure or other agreement with any third party.

7.3    <u>Further Assurances</u>.  Employee shall, without charge to the Company other than reimbursement of Employee's reasonable out-of-pocket expenses, execute and deliver all such further documents, including applications for patents, trademarks and copyrights, and perform such acts, at any time during or after the Term as may be necessary, to obtain patents, trademarks, or copyrights, or any other legal protection in respect of the Works and to vest title such Works in the Company, its successors, assigns, or designees.    Without limiting the generality of the foregoing, Employee further agrees to give all lawful testimony, during or after the Term, which may be required in connection with any proceedings involving any Works so assigned by Employee.

8.    <u>No Conflicting Obligations to Third Parties</u>.

Employee represents and warrants to the Company that Employee is not subject to any employment, non-disclosure, confidentiality, non-compete, or other agreement with any third party which would prevent or prohibit Employee from fulfilling Employee's duties for the Company.  If Employee is the subject of any such agreement, and has any doubt as to its applicability to Employee's position with the Company, Employee will provide a copy of such agreement to the Company so that the Company can make a determination as to its effect on Employee's ability to work for the Company.

9.    <u>Remedies</u>.

The restrictions contained in this Agreement are considered by the parties hereto to be fair and reasonable and necessary for the protection of the legitimate business interests of the Company.  It is recognized that damages in the event of breach of the provisions of this Agreement by Employee would be difficult, if not impossible, to ascertain, and it is therefore agreed that the Company, in addition to and without limiting any other remedy or right it may have, shall have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach.  The existence of this right shall not preclude any other rights and remedies at law or in equity which the Company may have.

10.    <u>Notices</u>.

Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally (including by facsimile, overnight courier or express mail service) or sent by registered or certified mail, postage or fees prepaid,

Company:

        Community Health Systems, Inc.
        213 Third Street
        Macon, Georgia 31201

*Execution Version*

> Attention: Joseph A. Wall
> Fax: (478) 743-4501

With a copy (which shall not constitute notice) to:

> Paul, Hastings, Janofsky & Walker LLP
> 600 Peachtree Street, Suite 2400
> Atlanta, Georgia  30308
> Attention:  Mark S. Lange
> Fax:  (404) 815-2433

Employee:       Mark A. Waldrop
>               9686 Bowen Trail
>               Ooltewah, TN 37363
>               Fax: _____

or at such other address for a party as shall be specified by like notice.  Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or the office of such party.  Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth business day after the day it is so placed in the mail or, if earlier, the time of actual receipt.

11.     Binding Agreement.

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company.  This Agreement is a personal service agreement and may not be assigned in whole or in part by Employee without the prior written consent of the Company.  The covenants of Employee contained in Section 7 shall be binding upon the heirs, beneficiaries, administrators, and executors of Employee.

12.     Modifications and Amendments.  This Agreement shall not be modified or amended except by an instrument signed by both parties, which makes specific reference to this Agreement.

13.     Waiver.  The failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or of any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver.

14.     Severability.  If any provision or covenant, or any part thereof, of this Agreement should be held by any court to be invalid, illegal or unenforceable, either in whole or in part, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remaining provisions or covenants, or any part thereof, of this Agreement, all of which shall remain in full force and effect.

ATLANTA:5093463.1

*Execution Version*

15.   <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all which together shall constitute one and the same instrument.

16.   <u>Governing Law: Jurisdiction</u>.

This Agreement and the rights and obligations of the parties to the Agreement will be determined in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.  The Company and Employee irrevocably consent to the exclusive jurisdiction and venue of the courts of any county in the State of Georgia and the district courts of Georgia, in any judicial proceeding brought to enforce this Agreement.  The parties agree that any forum other than the State of Georgia is an inconvenient forum and that a lawsuit (or non-compulsory counterclaim) brought by one party against another party in a court of any jurisdiction other than the State of Georgia should be forthwith dismissed or transferred to a court located in the State of Georgia.

17.   <u>Attorney's Fees</u>.

If either party to this Agreement breaches any terms hereof, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

18.   <u>Interpretation</u>.

This Agreement (including the Exhibits attached hereto) constitutes the complete understanding between the parties concerning the subject matter hereof, and all prior negotiations, representations and agreements having been merged into this Agreement.

***(Signatures on following page)***

ATLANTA:5093463.1

*Execution Version*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth hereinabove.

"Company"

COMMUNITY HEALTH SYSTEMS, INC.

By: _____
Name: Ronnie D. Rollins
Title:   President

"Employee":

_____
Mark A. Waldrop

11

ATLANTA:5093463.1

## EXHIBIT 1

### Duties of Employee

**Overall Responsibility/Primary Objective/Summary:**  Manage the overall operations of each individual operating company to ensure the consistent application of Company policies (financial, business practices and people), operating philosophies, values and principles.  Work with the Business Unit Presidents to develop and implement plans for the successful integration of services to customers, systems, processes and people to accomplish the goals of the Company.

**Summary of Major Responsibilities**

**Board of Directors**
- Serve as Ex-Officio member of the Board of Directors' Systems Integration and Support Committee
- Coordinate documentation and presentations necessary for the Board of Directors

**Executive Committee and Steering Committee**
- Serve on Executive Committee and Steering Committee
- Assist all Steering Committee members in the coordination of all operating matters

**Financial Management**
- Work with the Executive Committee to review budgets and business goals and manage the business units to meet these goals
- Approve all contracts between business units and its clients

**Integration**
- Collaborate with Business Unit Presidents to launch cross Business Unit Initiatives that improve service to customers, revenue, compliance with regulation, efficiency/effectiveness, etc.
- Develop initiatives that encourage collaboration across business unit senior management and staff lines
- Bridge cultural and communications gaps across Business Units and work with Executive staff to mobilize joint teams as necessary

**Patient Centered Care**
- Establish partnerships among practitioners, aging/disabled customers and their families to ensure that decisions respect a customer's wants, needs and preferences
- Ensure that customers have the education and support needed to make decisions and participate in their own healthcare
- Enable transition to preventative healthcare, chronic care and care management in home and community based settings .

**Human Resources Management**

Case 4:16-cv-00235-HLM   Document 66   Filed 07/14/17   Page 153 of 159
Case 4:16-cv-00235-HLM   Document 1   Filed 07/26/16   Page 26 of 32
*Execution Version*

- Directly and indirectly manage direct reports including the President, Ethica Health & Retirement Community; President, Health Distribution; President, Pharmacy Services; President, Integra Rehabilitation; President, Home & Community Services; Vice President, Human Resources; Director, Information Services; and Director of Project Management
- Establish goals for direct reports and ensure direct reports have goals established for their employees that correspond.  Manage performance toward achieving these goals
- Constantly evaluate the skill sets versus requirements of direct reports and make adjustments accordingly
- Provide leadership direction to the organization to ensure direct reports are optimally utilized
- Work with the VP, Human Resources, to review Human Resources initiatives and financial models to meet the needs of the organization

**Essential Job Functions:**

- Provide day-to-day leadership to the System that mirrors the mission, vision, and values of the organization
- Orchestrate transfer of best practice between Business Units
- Help identify and implement critical business and clinical synergies across the day-to-day operations of the System
- Monitor progress against the goals of the System and individual Business Units
- Analyze industry trends and look for business and revenue enhancement opportunities
- Monitor the operating and capital budget for each business unit in ways that direct effective forecasting and control of costs
- Work with Business Unit Presidents and Corporate leadership to redesign key processes and standardize policies and procedures
- Work with Business Unit Presidents to assure timely provision of skilled nursing, home and community based services in the most appropriate setting
- Participate in multiple state and national professional associations
- Perform other tasks as assigned by the President

Case 4:16-cv-00235-HLM   Document 66   Filed 07/14/17   Page 154 of 159
Case 4:16-cv-00235-HLM   Document 1   Filed 07/26/16   Page 27 of 36
*Execution Version*

**EXHIBIT 5.4**

Executive Leave Policy

*See attached.*

*Execution Version*

# EXECUTIVE
# LEAVE
# POLICY

## May 2006

## Executive Leave

The organization provides its eligible executives with an Executive Leave Policy that is designed to allow executives greater flexibility in planning their lives.  Under the Executive Leave Policy, executives may use their leave days for vacation, sick leave, medical appointments, family illness or any leave of absence.

Executives are eligible immediately upon employment and leave may be taken any time during employment, with supervisory approval.  Executives will receive their leave days at the beginning of each anniversary year and will be based on the number of continuous years of service on the executive's previous anniversary year.  Leave days do not carry over to future years, and cannot be borrowed from future unearned leave.

The organization recognizes the importance of an executive taking time off from work to rest and relax and accordingly provides leave days as follows:

## Leave Days Available:

- Year One (1) thru Year Five (5)          20 days
- Year Six (6) thru Year Ten (10)          25 days
- After Tenth (10) Year and Beyond         30 days

All requests for Executive Leave must be in writing and approved by the President.  In order to balance and meet organization needs, executives should provide appropriate notice when anticipating taking time off.  Requested leave will be approved taking into account organization needs and other associates' leave requests.

## **EXHIBIT 6.4**

1.      Section 6.4 of this Agreement shall not prohibit Employee from the continued ownership, operation or use of any real or personal property owned by Employee at the time of termination of Employee's employment hereunder.

2.      In the event that Employee's employment is terminated by the Company without Cause under Section 2.5 of this Agreement, then Section 6.4 of this Agreement shall automatically terminate.

ATLANTA:5093463.1

# COMMUNITY
## HEALTH SERVICES *of Georgia*

August 16, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mr. Mark Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

> ***Re:***   *Community Health Systems, Inc. and Mark A. Waldrop*
> *Termination of Employment with "Cause"*

Dear Mr. Waldrop:

As you are aware, Community Health Systems, Inc. ("CHSI") terminated your employment effective June 28, 2016.

At the time of your employment termination, the CHSI Board of Directors (the "Board") was in the preliminary phases of an investigation into certain acts undertaken and omissions made by you in violation of that certain January 1, 2009 amended and restated Employment Agreement of Mark A. Waldrop by and between you and CHSI (the "Employment Agreement") and CHSI's practices, policies, and procedures.  Based on the initial investigative results, under no circumstances could CHSI continue your employment; your conduct prior to June 28, 2016 was of such an egregious nature that the emergency removal of you from the organization was mandatory.

In an effort to minimize any embarrassment or further harm to you or the organization, the CHSI Board decided to offer to you a separation package in recognition of your years of service to CHSI as discussed during a meeting between you, Mark Lange, and me in the offices of Holland & Knight LLP on June 28, 2016.  Subsequently, that offer was extended to you in writing in a draft Separation Agreement, General Release, Waiver & Confidentiality Agreement sent to you by attorney Joshua I. Bosin, Esq. on July 6, 2016.

On July 26, 2016, rather than accept CHSI's separation package (or even inquire as to whether the terms thereof were negotiable), you filed a lawsuit against CHSI in federal court seeking in excess of one million dollars from the organization and alleging that CHSI breached its obligations to you pursuant to the Employment Agreement.  That was an unfortunate decision.



PLAINTIFF'S
EXHIBIT
**5**
4-25-17  AW

Mark A. Waldrop
August 16, 2016
Page 2

I write now to confirm and provide the formal notice to you as required by Section 2.4 of the Employment Agreement that your employment with CHSI was, in fact, terminated immediately on June 28, 2016 with "Cause." Not only did you engage in acts and omissions amounting to gross negligence and willful misconduct that were and are detrimental to CHSI and its reputation, but you also failed to observe or perform material covenants, conditions, and provisions of the Employment Agreement and abide by CHSI's written policies and procedures, all of which such failures are incapable of remedy. By way of example only and without limitation:

1)      You submitted hundreds of thousands of dollars in business expenses for reimbursement under your assistant's name rather than under your name so as to conceal from your direct supervisor the nature and magnitude of the unauthorized gifts, awards, consumables, travel, office supplies, cleaning supplies, and other questionable items for which you obtained reimbursement from CHSI.

2)      You operated the DeBrock Poodles business owned by you and your wife out of CHSI's Dalton, Georgia office. Indeed, at least one online website for DeBrock Poodles lists the contact telephone number for that business as the telephone number for the mobile telephone for which you submitted requests for 100% expense reimbursement to CHSI for many years – and received 100% expense reimbursement for many years – and also provided to internal and external persons as your CHSI cell phone number.

3)      You served on the faculty of Southern Adventist University teaching multiple courses and participating in campus-related activities, for which you received compensation, that never were disclosed to the CHSI Board in violation of the terms of your Employment Agreement.

4)      After the flooding of CHSI's Dalton, Georgia office in 2014, you authorized renovations and refurbishments of the office space that cost in excess of one hundred thousand dollars more than the insurance proceeds received in connection with CHSI's property claim. In connection with that project, you also authorized the engagement of your then-assistant's father pursuant to an Independent Construction Superintendent Agreement when a general contractor already had been retained to oversee and complete the renovations and refurbishments. You did not provide to the Board any information regarding that transaction, one effect of which was to deprive the Board of an opportunity to address issues of independence, private inurement, or the possibility of an excess benefit transaction.

5)      On numerous occasions, you failed to engage in and/or complete CHSI's project charter authorization process, resulting in the commencement of numerous projects and the engagement of third-parties to perform work on behalf of CHSI without the standard approval of the Chief Executive Officer and/or the Chief Financial Officer and the Board. CHSI is aware of several instances in which you provided false information to CHSI employees and third-parties regarding project charter authorization by CHSI's Chief Executive Officer and the Board as

Mark A. Waldrop
August 16, 2016
Page 3

required when, in fact, such authorization was never provided on behalf of the organization in any way.

Lastly, it is my understanding that our attorneys have communicated with your attorneys regarding the return of your personal effects from the Dalton office and CHSI's property still in your possession. Please arrange for the exchange of those items as soon as possible as directed by counsel.

Should you have any additional questions in connection with these matters, please direct them to our attorneys.

Very truly yours,

Joseph A. Wall
Chairman of the Board

cc:     Joshua I. Bosin, Esq.
        Mark S. Lange, Esq.