# In The Matter Of:

*Mark A. Waldrop v.*
*Community Health Systems, Inc.*

---

*Melanie Lorraine Thomas Taylor, CFO*
*February 28, 2017*

---

*American Court Reporting Company, Inc.*
*52 Executive Park South*
*Suite 5201*
*Atlanta, Georgia 30329-2217*
*(404) 892-1331 - (800) 445-2842*

Original File 75422.TXT
Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA, ROME DIVISION


MARK A. WALDROP,

                    Plaintiff,
                                        Case No.
          vs.                          4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS, INC.,

                    Defendant.


                    * * *


     The deposition of MELANIE LORRAINE THOMAS TAYLOR,

CFO; 30 (b) (6) Community Health Systems, Inc.,

Deponent, taken for the purposes of examination and

under the provisions of the Federal Rules of Civil

Procedure; the reading and signing of the deposition

being reserved; taken before Gaye D. Traynor,

Certified Court Reporter B-2209, commencing at 9:43

a.m. on this day, Tuesday, February 28, 2017, at The

Law Offices of Hall, Bloch, Garland & Meyer, LLP; 577

Mulberry Street, Suite 1500; Macon, Georgia 31208.

2

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    GARY L. HENRY, Esquire
      GEARHISER, PETERS, ELLIOTT & CANNON, PLLC
 4    320 McCallie Avenue
      Chattanooga, Tennessee 37402
 5    PH:   423.756.5171
      FAX:  423.266.1605
 6    E-MAIL:  ghenry@gearhiserpeters.com

 7    For the Defendant:

 8    HAROLD T. DANIEL, Esquire
      HOLLAND & KNIGHT, LLP
 9    1180 West Peachtree Street
      Suite 1800
10    Atlanta, Georgia 30309
      PH:   404.817.8509
11    FAX:  404.881.0470
      E-MAIL:  harold.daniel@hklaw.com

12
      Also Present:
13
      Mark A. Waldrop, Plaintiff
14
      Ronnie Rollins, CEO
15    Community Health Systems, Inc.

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2    EXAMINATIONS:

3    By Mr. Henry                                    4

4

5                       PLAINTIFF'S EXHIBITS

6    EXHIBITS                                     MARKED

7     1 Notice of Deposition of Defendant           11

8     2 Bursch Travel Invoice No. 8010              68

9     3 Stephanie Dotson Expense 2014 Report        70

10    4 Stephanie Dotson Expense 2013 Report        71

11    5 Stephanie Dotson Expense 2014 Report        74

12    6 Expense Report Audit                         84

13    7 Expense Reports Over Threshold               86

14    8 Mark Waldrop Paystubs                       101

15    9 12-30-13 to 01-05-14 Calendar              103

16   10 08-22 and 08-23-16 E-mails                 109

17   11 11-09-15 E-mail                            121

18   12 02-09-16 E-mails                           127

19   13 03-17-16 Various E-mails with attachments  128

20   14 Expense Reports                            153

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                              * * *

3            MELANIE LORRAINE THOMAS TAYLOR, CFO; 30 (b) (6)

4        Community Health Systems, Inc., was called as a

5        witness and having first been duly sworn, was

6        examined and testified as follows:

7                            EXAMINATION

8    BY MR. HENRY:

9        Q    Ms. Taylor, good morning.  We've met before.  But

10   just for the record, my name is Gary Henry.  I'm an attorney

11   from Chattanooga, Tennessee, and I represent Mark Waldrop in

12   some litigation pending with the U.S. District Court for the

13   Northern District of Georgia against Community Health

14   Systems, Inc.

15            If you would state your name for the record?

16       A    Melanie Lorraine Thomas Taylor.

17       Q    Okay.  Have you ever given a deposition before,

18   Ms. Taylor?

19       A    I've not.

20       Q    I know you've sat in on Mr. Waldrop's deposition

21   previously so you're probably a little bit familiar with how

22   this works.  Today will work pretty similar to that.

23            I'm going to ask you a series of questions.  It's

24   not my intent be unclear or trip you up or make you say

25   something that's untrue.  I'm just trying to get some

5

1   information.  So in that vein, if you don't understand my

2   question, will you let me know that?

3       A    Yes.

4       Q    And I'll try to rephrase.  Okay.

5            As a corollary to that, if I ask you a question

6   and you answer it, I'm going to assume that you understood

7   it.  Is that fair?

8       A    Yes.

9       Q    All right.  You're doing a good job of this so

10  far.  But when you answer, please make a verbal answer.

11  Oftentimes in conversation it's easy to slip into a head nod

12  or a head shake or say uh-huh or huh-uh.  But those

13  responsibilities don't really show up on the record.

14           So if you answer a question and I say, "Is that a

15  yes"? or "Is that a no"? I'm not trying to be rude or

16  intimidate you to the extent I can even do that.  I'm just

17  trying to make sure the record is clear.

18      A    Okay.

19      Q    We can take a break whenever you want to.  This is

20  certainly not a marathon.  If you need to take a break, let

21  us know.  I will try to call for breaks periodically.

22  Sometimes I can get longwinded so just let me know if you

23  need one.

24      A    Okay.

25      Q    The only exception to that is if a question's

6

1    pending, I have to go ahead and get an answer to that before

2    we break.  Okay?

3        A    Yes, sir.

4        Q    All right.  See, we're doing good.

5             Okay.  Ms. Taylor, where do you live?

6        A    I live at 226 Amy Clay Drive; Gray, Georgia.

7        Q    How long have you lived there?

8        A    Fourteen years.

9        Q    Okay.  All right.  Where did you live before Amy

10   Clay Drive?

11       A    648 Bowen Hill Road; Haddock, Georgia.

12       Q    How long were you at Bowen Hill Road?

13       A    Approximately nine years.

14       Q    Okay.  How close is Haddock, Georgia, to Macon?

15       A    Less than 20 miles.

16       Q    Okay.  So it's in the Macon area?

17       A    It is.

18       Q    Okay.  Do you have any formal education past high

19   school?

20       A    Yes, I do.

21       Q    Where did you receive that formal education?

22       A    Georgia College.

23       Q    And what did you study at Georgia College?

24       A    I studied business information systems and

25   accounting.

1    Q    Did you receive a degree?

2    A    Yes, I did.

3    Q    What kind of degree?

4    A    Bachelor of Business Administration.

5    Q    In what year?

6    A    1986.

7    Q    Other than the Bachelor's in Business

8  Administration, do you have any other formal education?

9    A    Yes.  I received my Certified Public Accountant's

10  license in 1991.

11    Q    Is that in the State of Georgia?

12    A    Yes.

13    Q    Do you have a CPA license anywhere?  Any other

14  states besides...

15    A    No.

16    Q    Okay.  Do you have to attend any continuing

17  education or seminars to maintain your CPA?

18    A    Yes.

19    Q    All right.  How much do you have to attend?

20    A    I have to obtain 80 hours in a two-year time

21  period.

22    Q    Okay.  And are you current in your continuing

23  education requirements?

24    A    Yes, I am.

25    Q    Have you ever been disciplined or censored by the

8

1   board that regulates CPAs?

2       A    I have not.

3       Q    Okay.  Are you married?

4       A    Yes.

5       Q    All right.  And what's your husband's name?

6       A    James Steven Taylor.

7       Q    And what does Mr. Taylor do for a living?

8       A    He is a purchasing agent.

9       Q    For?

10      A    USA Aggregates.

11      Q    USA Aggregates?

12      A    Aggregates.

13      Q    Okay.  Have any children?

14      A    Yes.

15      Q    How many?

16      A    One.

17      Q    All right.  And what is your child's name?

18      A    Dalton David Taylor.

19      Q    How old is Dalton?

20      A    Dalton is...

21      Q    I don't want to be too informal but...

22      A    Dalton is 21.

23      Q    Okay.  Does he still live at home?

24      A    He is in college.

25      Q    Where is he in college?

9

```
1      A      At Abraham Baldwin Agricultural College.

2      Q      Abraham Baldwin?

3      A      Uh-huh, yes.

4      Q      And where is Abraham Baldwin Agricultural College?

5      A      Tifton, Georgia.

6             COURT REPORTER:  It's ABAC.

7             THE WITNESS:  ABAC, yes.

8  BY MR. HENRY:

9      Q      Okay.  ABAC.  That would be easier.

10            What is he studying at ABAC?

11     A      He is a turf grass and golf course management

12 major.

13     Q      All right.  You are currently the CFO of Community

14 Health Systems?

15     A      Yes.

16     Q      And how long have you been in that position?

17     A      Since 2008, I believe.

18     Q      Before becoming CFO, what position did you hold

19 for employment?

20     A      Senior Vice-President of Financial Services.

21     Q      And is that also with Community Health Systems?

22     A      Yes, it was.

23     Q      And how long did you have that position?

24     A      From 2005, I believe, until 2008.

25     Q      And then prior to 2005?
```

10

1      A     My title was Vice-President.

2      Q     Okay.  Of Financial Services?

3      A     No, just Vice-President.

4      Q     Okay.  For Community Health?

5      A     Yes.

6      Q     All right.  What -- what year did you start in

7   that position?

8      A     I started in that position in 2001.

9      Q     Okay.  So from 2001 to 2005?

10     A     Yes.

11     Q     All right.  Now, prior to 2001?

12     A     I was Director of Financial Services.

13     Q     Was that also with Community Health?

14     A     That was with Care More Management Company.

15     Q     And there has been testimony that there are

16   several affiliates of Community Health Systems.  Is Care

17   More one of those facility affiliates?

18     A     Care More merged into Health Scholarships, which

19   is an affiliate.

20     Q     Okay.  So Care More was connected in some way to

21   Community Health?

22     A     Yes, yes.

23     Q     And how long were you Director of Financial

24   Services at Care More?

25     A     1997 until 2001.

1      Q    All right.  Probably know where I'm going next.

2  How about prior to 1997?

3      A    Prior to 1997, I worked for Frank J. Davis, CPA.

4      Q    Until 1997?

5      A    Yes.

6      Q    And then you went to work for community health or

7  one of its affiliates?

8      A    Yeah, for Care More Management in '97.

9      Q    These various positions you've held with Community

10 Health Systems and Care More, have they all been related in

11 some way to a company's finances?

12     A    Yes.

13     Q    Never had any responsibilities with regard to

14 operations?

15     A    No.

16     Q    Okay.  Ms. Taylor, you're giving a deposition here

17 today as a representative of Community Health Systems.  And

18 to that end, I want to go through -- this is going to be a

19 little bit tedious, but I want to be sure we're all on the

20 same page.

21          MR. HENRY:  Go ahead and mark that as Exhibit

22     1.

23          (Plaintiff's Exhibit 1 marked for

24     identification.)

25     A    (No response.)

1    BY MR. HENRY:

2        Q    Ms. Taylor, you've got in front of you there what

3    the court reporter has marked as Exhibit 1.  Have you seen

4    Exhibit 1 before?  Very long and brilliantly written

5    document.

6        A    Yes.

7        Q    You've been designated by Community Health

8    Systems' counsel to testify with regard to, I believe, five

9    topics under Exhibit 1.  I just want to go through each one

10   of those with you real briefly and ask you a few questions.

11            If you would, look at topic 8, which is on page 7

12   of Exhibit 1.  Do you see that?

13       A    Yes.

14       Q    If you would review that and let me know when

15   you're finished?

16       A    Yes, sir.

17       Q    Okay.  Are you prepared to testify on behalf of

18   Community Health Systems, Inc., with regard to the subject

19   outlined in topic 8 of Exhibit 1?

20       A    Yes.

21       Q    Did you talk to anyone in at Community Health

22   Systems to prepare yourself to testify with regard to topic

23   8?

24       A    I did not.

25       Q    Okay.  Did you review any documents to prepare

1   yourself to testify with regard to topic 8?

2        A    I did not.

3        Q    All right.  Let's skip down to topic 9 immediately

4   below that.  If you would read that as well and let me know

5   when you're finished?

6        A    Okay.

7        Q    Okay.  Are you prepared to testify on behalf of

8   Community Health Systems, Incorporated, with regard to the

9   subject matter of topic 9 in Exhibit 1?

10       A    Yes.

11       Q    Did you talk to anyone at Community Health Systems

12  to prepare yourself to testify with regard to topic 9?

13       A    I did not.

14       Q    Did you review any documents to --

15       A    I did not.

16       Q    -- assist in preparation for your testimony on

17  topic 9?

18       A    I did not.

19       Q    Okay.  There's a -- there's a lady that has been

20  mentioned in prior document -- in prior depositions named

21  Connie Stovall.  I believe she was described by one of the

22  witnesses as the gatekeeper for the Selectica Program?

23  Would you agree with that designation?

24       A    Yes.

25       Q    You didn't talk to Ms. Stovall and prepare to

1    testify with regard to topic 9?

2        A    I did not.

3        Q    All right.  The next topic is topic 10.  Have you

4    had a chance to review topic 10?

5        A    Yes.

6        Q    Are you prepared to testify on behalf of Community

7    Health Systems with regard to the subject matter in topic 10

8    in Exhibit 1?

9        A    Yes.

10        Q    Did you speak to anyone to prepare yourself to

11   testify with regard to topic 10?

12        A    I did not.

13        Q    Did you review any documents?

14        A    I did not.

15        Q    All right.  Topic 16, which is on page 9, are you

16   prepared to testify with regard to the subject matter of

17   topic 16 on behalf of Community Health Systems, Inc.?

18        A    Yes.

19        Q    Did you speak with anyone to prepare yourself to

20   testify with regard to topic 16?

21        A    I did not.

22        Q    Did you review any documents to prepare yourself

23   to testify with regard to topic 16?

24        A    I did not.

25        Q    Okay.  All right.  I think this is the last one.

1   It's the very next one, topic 17.

2            Are you prepared to testify with regard to the

3   subject matter of topic 17 in Exhibit 1 on behalf of

4   Community Health Systems, Inc.?

5       A    Yes.

6       Q    Did you review any documents to prepare yourself

7   to testify?

8       A    I did not.

9       Q    Did you speak to anyone to prepare yourself to

10  testify?

11      A    I did not.

12      Q    All right.  If you would, tell me what you did to

13  prepare for your deposition here today.

14      A    I met with CHS's legal counsel.

15      Q    Okay.  Is that Mr. Daniel?

16      A    Yes, yes.

17      Q    All right.  Okay.  Other than that?

18      A    I reviewed the five topics that I am prepared to

19  speak to --

20      Q    Okay.

21      A    -- in this document that you've shared with me.

22      Q    Exhibit 1?

23      A    Exhibit 1.

24      Q    Just for the record.  Okay.

25      A    Yes.

16

1    Q    All right.  Anything else?

2    A    No.

3    Q    Did you listen to any tape recordings?

4    A    I did not.

5    Q    Did you review any deposition transcripts?

6    A    Yes.

7    Q    Whose deposition transcripts did you review?

8    A    Mr. Rollins.

9    Q    When did you review Mr. Rollins's deposition

10   transcript?

11   A    Shortly after it was received.  I don't -- I can't

12   recall the exact time.

13   Q    I understand.

14        (Discussion off the record.)

15   A    (No response.)

16   BY MR. HENRY:

17   Q    Okay.  So, you reviewed Mr. Rollins's deposition

18   transcript shortly after it was received?

19   A    Yes.

20   Q    Is that what you said?

21   A    Yes.

22   Q    Okay.  Any other documents?  Is that a no?

23   A    No.

24   Q    All right.  I want to talk a little bit about

25   your -- your duties as CFO.  If you would, just describe in

1  general terms what your duties are.

2      A    In general terms, I provide leadership and support

3  for the business operations of Community Health Systems,

4  Inc.

5      Q    I want to be sure I heard that correctly.  You

6  provide leadership in the business operations of Community

7  Health Systems, Inc.?

8      A    Yes.

9      Q    So your duties as CFO do involve operations?

10     A    Business operations.

11     Q    Okay.  Is it more financial related?

12     A    Yes.

13     Q    What is Financial Services?

14     A    Financial Services includes financial reporting,

15  compliance, cost reporting, treasury management.

16     Q    Is Financial Services something that falls under

17  your purview as the CFO?

18     A    Yes, yes.

19     Q    Okay.  How many employees or representatives are

20  under your supervision?

21     A    I have, I believe, eight direct reports.

22     Q    Okay.  Who are they?

23     A    Theresa Moody, M-O-O-D-Y.

24     Q    Okay.

25     A    Ken McDonald.

1    Q    Okay.

2    A    Chris Johnson.  Angela Hammack.  Kim Sheffield.

3    Q    Kim?

4    A    Kim -- K-I-M -- Sheffield.  Renee Maddox.  Lucy

5    Rogers.  And Jaren Robertson.

6    Q    Jaren?

7    A    J-A-R-E-N.

8    Q    At the time that Mr. Waldrop was terminated on

9    June 28th, 2016, did you have the same number of direct

10   reports?

11   A    I did not.

12   Q    Okay.  So that number has changed since

13   Mr. Waldrop left the company?

14   A    Yes.

15   Q    How has it changed?

16   A    I did not provide support to Chris Johnson or Lucy

17   Rogers prior to June 28, 2016.

18   Q    Why were Chris Johnson and Lucy Rogers brought

19   under your supervision after Mr. Waldrop left?

20   A    We -- Chris Johnson was -- was actually scheduled

21   to come under my supervision.  We were going through a

22   strategic organizational positioning, and Information

23   Services was coming under my leadership.

24   Q    Okay.  Did you say Information Services?

25   A    Information Services.

19

```
 1      Q    So that's the -- the area that Mr. Johnson works
 2  in?
 3      A    Yes, it is.
 4      Q    And Lucy Rogers?
 5      A    Yes.
 6      Q    Why was she transferred to your supervision?
 7      A    Lucy is our corporate compliance officer.  She's
 8  part time, and she is a -- she's a consultant for our
 9  organization.
10      Q    Okay.  Have you taken over any duties that were
11  formerly assigned to Mr. Waldrop?
12      A    Information Services.
13      Q    Okay.  Anything else?
14      A    I don't recall that I have, no.
15      Q    Does Community Health Systems go through a
16  budgeting process every year?
17      A    Yes, we do.
18      Q    What is your involvement as CFO in that process?
19      A    I provide support in that process.
20      Q    To whom?
21      A    To our Clinical Operations.
22      Q    And what does that mean:  Clinical Operations?
23      A    That means my team provides support to the area
24  that is under -- that was under Mr. Waldrop as COO:  The
25  operations of the organization.
```

1      Q      And what kind of support do you provide?

2      A      We provide support with the use of the budgeting

3   tools and input of information provided to us by Operations.

4      Q      And what budgeting tools are you referring to?

5      A      We use a tool called Adaptive.

6      Q      Adaptive?

7      A      Uh-huh.

8      Q      Is that a software?

9      A      It's a software, yes.

10      Q      And how does that software work?  Not technically

11   but...

12      A      Okay.

13      Q      That was a -- that was a loaded question.

14      A      Yes.

15      Q      How does it work from your perspective as CFO?

16   What does it do for the company?

17      A      It essentially is a tool to accumulate the data to

18   prepare -- to prepare a budget and accumulates statistical

19   information and staffing information and financial

20   information, again, provided to us by the Operations.

21      Q      Okay.  How long have you been using the Adaptive

22   program?

23      A      We're in our fourth year.

24      Q      Okay.  So once this information is accumulated and

25   you've provided support --

21

1       A     Uh-huh.

2       Q     -- to the various divisions, Operations, what

3    happens after that with the budgeting process?

4       A     Mr. Waldrop and I met with the various managers of

5    Operations under his supervision to -- to review -- review

6    plans at a consolidated level.

7       Q     Okay.  And what were you reviewing them for?

8       A     Primarily for benchmarks, looking at historical

9    trends.

10      Q     Benchmarks such as?

11      A     Typically national benchmarks for our industries.

12      Q     Okay.  All right.  So other than reviewing the

13   plans for benchmarks, are there any other things you're

14   reviewing those plans for?

15      A     No, I don't recall.

16      Q     Were you reviewing them to determine what impact

17   they might have financially in the company?

18      A     Yes, they were used in our planning and

19   forecasting for the company, yes.

20      Q     Okay.  So would both you and Mr. Waldrop have to

21   approve those plans after the review?

22      A     We -- the plans were approved by the business

23   managers of the Operations.

24      Q     Okay.

25      A     Mr. Waldrop and I were responsible for sharing the

22

1   plan with our CEO.

2       Q    Which is Mr. Rollins?

3       A    Which is Mr. Rollins, yes.

4       Q    Okay.  And would Mr. Rollins have to approve the

5   plans?

6       A    The plans were ultimately approved by our Board of

7   Directors.

8       Q    Who presented those plans to the board?

9       A    I did.

10      Q    So if a plan were approved by the board, how did

11  that affect the ongoing operations?

12      A    I'm not understanding your question.

13      Q    Okay.  It's a budget, right?

14      A    It's a budget, yes.

15      Q    So if the board approves a budget --

16      A    Yes.

17      Q    -- in a certain amount --

18      A    Yes.

19      Q    -- let's just say a million dollars just

20  hypothetically --

21      A    Yes.

22      Q    -- would that mean that the division of Community

23  Health Systems that got approved for a million dollars could

24  spend a million dollars at their discretion?  Or were there

25  guidelines?

23

1      A      There were guidelines.

2      Q      Okay.  What were those guidelines?

3      A      First and foremost, our guidelines are dictated by

4  Medicare and Medicaid.

5      Q      Okay.  All right.  So other than Medicare and

6  Medicaid guidelines, what else -- what other guidelines were

7  there?

8      A      IRS guidelines.

9      Q      Okay.  What other guidelines?

10     A      I don't recall any others at the moment.

11     Q      Okay.  So if -- if a proposed use of budgeting

12 funds complied with the Medicare and Medicaid guidelines and

13 the IRS guidelines, would it then be up to the leaders of

14 the division that got that budgeted amount to spend it the

15 way they saw fit?

16     A      If they were reasonable and necessary expenditures

17 for the operation of the business, yes.

18     Q      Okay.  Who made the determination whether they

19 were reasonable and necessary?

20     A      The manager of -- of that division.

21     Q      Is there a written policy that says that the

22 manager of a division is to make a determination on whether

23 budgeted funds and the use of budgeted funds is reasonable

24 and necessary?

25     A      Yes.

24

1    Q    What is that written guideline?

2    A    For our nursing facilities, there is an annual

3  administrator letter.

4    Q    Okay.  What about for non-nursing guidelines?

5    A    It would be covered in their job description.

6    Q    Okay.  So if the manager determined that the

7  expenditure was reasonable and necessary and it complied

8  with Medicare, Medicaid and IRS guidelines, could the funds

9  be spent?

10   A    Yes.

11   Q    Up to the budgeted amount?

12   A    Yes.

13   Q    Did the board -- well, strike that.

14        Were these budgets produced annually?

15   A    Yes.

16   Q    In writing?

17   A    Yes.

18   Q    Distributed?

19   A    To the Board of Directors, yes.

20   Q    How about to Mr. Waldrop?

21   A    Yes.

22   Q    And the various managers?

23   A    Yes.

24   Q    Would they receive a copy as well?

25   A    Yes.

25

1      Q      Who is your supervisor at Community Health
2  Systems?
3      A      Ronnie Rollins.
4      Q      When did he become your supervisor?
5      A      1997.
6      Q      And by supervisor, I mean direct -- you directly
7  report to him?
8      A      To him.
9      Q      So Mr. Rollins became your direct supervisor when
10 you became the Director of Financial -- Financial Services
11 at Care More?
12     A      Yes.
13     Q      When Mr. Waldrop was the COO, to what extent did
14 you and Mr. Waldrop work together?
15     A      We worked together very regularly.
16     Q      Did any of your areas of responsibility overlap?
17     A      We -- I don't know I would say they overlapped.
18 We supported one another.  Our functions supported one
19 another.
20     Q      Kind of like when you're reviewing the plans for
21 the budgets?
22     A      Yes.
23     Q      Or that kind of thing?
24     A      Yes, yes.
25     Q      Okay.  If you would, just describe your working

26

1    relationship with Mr. Waldrop while he was COO.

2         A    I -- generally I would describe it as a good

3    working relationship.

4         Q    Okay.  All got along pretty well?

5         A    Yes.

6         Q    Did you confide in each other?

7         A    Yes.

8         Q    How often would you talk to Mr. Waldrop about

9    business-related matters?

10        A    It depended.  Most often weekly.  But in some

11   cases depending on what we were working on, it could be

12   daily.

13        Q    Okay.  Mr. Waldrop was terminated on June 28th,

14   2016.  Are you familiar with that?

15        A    I am familiar with that.

16        Q    At any point prior to June 28th, 2016, did your

17   working relationship change?

18        A    Did my working relationship change with

19   Mr. Waldrop?

20        Q    With Mr. Waldrop, yes, ma'am.

21        A    There were times that we had had differences of

22   opinion on things, but I wouldn't say that it changed.

23        Q    Did you view Mr. Waldrop as being mark centric?

24             MR. DANIEL:  I'm going to object to the form of

25        the question.  You can answer.

```
 1        A    (No response.)
 2   BY MR. HENRY:
 3        Q    If you understand.
 4        A    What do you -- what do you mean?
 5        Q    Just a phrase I've heard:  Mark centric.  Have you
 6   ever heard that phrase before?
 7        A    I don't recall that I've heard that phrase before.
 8        Q    The way I understand it is that it's
 9   self-centered.  Are you familiar with that phrase?
10        A    Yes, I'm familiar with that phrase.
11        Q    Would you describe Mr. Waldrop as self-centered?
12        A    How does this relate to the questions that I'm
13   supposed to -- am I required to answer that?
14             MR. DANIEL:  Just tell us where you're going
15        with this.  I'm not sure either.  But does this
16        relate to the topics she's to discuss?
17             MR. HENRY:  Well, I think that under the law, I
18        can ask about things that are not necessarily
19        related to the topics so long as she's got personal
20        knowledge of them because that testimony just
21        wouldn't bind the company.
22             But I do think this questioning could relate to
23        the topics because it's background information on
24        the very reason we're here, which is Mr. Waldrop's
25        termination.
```

1              MR. DANIEL:  Okay.  Repeat the question.  I

2       want to make sure I understand it.

3  BY MR. HENRY:

4       Q    I don't remember exactly what I said, but this was

5  the gist of it.

6              Would you describe Mr. Waldrop as self-centered?

7       A    No.  I mean, my dealings with Mr. Waldrop were

8  business related.  I don't -- so...

9       Q    Okay.  Did you ever discuss your working

10  relationship with Mr. Waldrop with anyone else at Community

11  Health Systems while he was employed as COO?

12      A    I don't recall specifics, but there were times I

13  probably did.

14      Q    Okay.  Do you recall ever discussing your working

15  relationship with Mr. Waldrop with Mr. Rollins?

16      A    While Mr. Waldrop was employed?

17      Q    Employed as COO.

18      A    No.

19      Q    So you have no memory of discussing that working

20  relationship with Mr. Rollins -- let me start over.  Strike

21  that.

22              You have no specific memory of discussing your

23  relationship -- working relationship with Mr. Waldrop with

24  Mr. Rollins while Mr. Waldrop was COO?

25      A    I do not recall that I did.

1     Q    Okay.  How about with Angela Hammack?

2     A    Did I -- please rephrase the question.

3     Q    Okay.  Did you ever discuss your working

4  relationship with Mr. Waldrop, while Mr. Waldrop was COO,

5  with Angela Hammack?

6     A    Not while Mr. Waldrop was COO.

7     Q    Okay.  But afterwards?

8     A    Yes.

9     Q    Who is Angela Hammack?

10    A    Angela Hammack is -- at the time of Mr. Waldrop's

11 employment, was Vice-President of Special Projects.

12    Q    And she is one of the individuals I believe you

13 identified as being one of your direct reports?

14    A    That is correct.

15    Q    Was she a direct report to you while

16 Mr. Waldrop...

17    A    She was.

18    Q    Okay.  What were Ms. Hammack's duties while

19 Mr. Waldrop was COO?

20    A    Ms. Hammack's duties -- Hammack was hired to

21 direct our -- to be the Director of our Community Benefit

22 Program.  She is -- her background is an accountant, and she

23 was the project manager when we implemented our Workday

24 financial applications.

25    Q    Okay.  So she was originally hired to be over

1    special benefits?  Is that what you said?

2         A    No, Community Benefits.

3         Q    Community Benefits.

4         A    As a nonprofit, yes.

5         Q    Okay.

6         A    And she continues to do that today.

7         Q    And then I believe you said that she oversaw or

8    had some role with regard to the Workday?

9         A    She was the project manager of the implementation

10   of the financial applications that CHS uses in Workday.

11        Q    Did you ever discuss Angela Hammack and her value

12   to the company with Mr. Waldrop?

13        A    Yes, I did.

14        Q    Tell me about that.  Tell me about what you

15   discussed.

16        A    Mr. Waldrop did not like Ms. Hammack.

17        Q    What do you base that on?

18        A    He based that on complaints that he received from

19   various associates.

20        Q    What kind of complaints?

21        A    Mr. Waldrop was never specific with me.  It was

22   always vague.  He would call me to let me know that he had

23   received a phone call or had conversations with someone.

24   And that basically he believed that Ms. Hammack was staying

25   up at night looking for ways to find things within the

1    Workday system to get people in trouble.

2         Q     Is there something about her duties that would

3    have required her to review information in the Workday

4    system?

5         A     Not to review information.  She serves on the

6    Security Committee and provides support to the applications.

7    She would have no reason to review information in the

8    system.

9         Q     Are you aware of any instances where Ms. Hammack

10   did review information in the Workday system?

11        A     I do not recall, no.

12        Q     These discussions that you had with Mr. Waldrop

13   where he made these claims about Ms. Hammack --

14        A     Uh-huh.

15        Q     -- did you initiate those or did he?

16        A     He did.

17        Q     Did it happen multiple times?

18        A     Yes.

19        Q     During what time frame were these discussions

20   taking place?

21        A     The latter part of 2014, I believe, is probably

22   where they began.

23        Q     Okay.

24        A     And they escalated through the early part of 2015.

25        Q     How did you respond to Mr. Waldrop's claims about

1  Ms. Hammack?

2      A    I requested information regarding the accusations

3  so that I could address the issues.

4      Q    Did Mr. Waldrop provide information?

5      A    No.

6      Q    Did you ever discuss Mr. Waldrop's claims with

7  Ms. Hammack?

8      A    I don't recall during that time that I did.

9      Q    And when you say during that time, you're talking

10  about the latter part of 2014 --

11      A    Uh-huh.

12      Q    -- and when those discussions escalated during

13  2015?

14      A    Yes.

15      Q    Did you discuss them with her after 2015?

16      A    After Mr. Waldrop's termination.

17      Q    Tell me about those discussions.

18      A    Those discussions?

19      Q    After Mr. Waldrop's termination that you had with

20  Ms. Hammack.

21      A    I can't recall the specifics of the discussions.

22      Q    Just tell me what you recall.

23      A    I was not aware that Ms. Hammack knew that

24  Mr. Waldrop did not like her.  I believed that the

25  conversations regarding Ms. Hammack were kept between me and

33

1    Mr. Waldrop, and I did not -- I was not aware that -- it was

2    important to me that she not know.

3         Q    Okay.  So I just want to be sure I understand.

4         A    Uh-huh.

5         Q    You were not aware that Ms. Hammack knew that

6    Mr. Waldrop did not like her?

7         A    That is correct.

8         Q    And it was important to you that she not know

9    that?

10        A    It was important to me when Mr. Waldrop would call

11   me with accusations but never gave me facts to allow me to

12   investigate, that I did not share that information with

13   Ms. Hammack.  There was no need to.

14        Q    Okay.

15        A    So it was important before Mr. Waldrop was

16   terminated that I try to keep relationships and people

17   working together.

18        Q    Okay.  And I understand that.

19        A    Okay.

20        Q    But I think my question was after the termination.

21   You said you did discuss it with her?

22        A    Yes.

23        Q    Correct?  And those are the discussions that I was

24   asking about.

25        A    Yes.

1     Q     If you could tell me what you recall?

2     A     Ms. Hammack -- Ms. Hammack shared with me that she

3  was aware that Mr. Waldrop did not like her.

4     Q     Did she tell you how she became aware?

5     A     There were those in the organization, and I cannot

6  speak to who they were, that had shared with Mr. Waldrop

7  that -- that had shared with Angela that Mr. Waldrop told

8  them he did not like Angela.

9     Q     Okay.

10          MR. DANIEL:  Let me ask you, Mr. Henry, about

11       this line of questioning.  I know that Ms. Hammack

12       had some involvement with the Workday program, but

13       I'm not sure, you know, what this has to do with the

14       topics on which Mrs. Taylor is to be examined.  So

15       can you explain your position?

16          MR. HENRY:  Well, my position is that

17       Ms. Hammack in her role in the company is relevant

18       to Workday.  But even if there's a dispute about

19       that, a dispute about the scope of my question under

20       the Notice, I'm still entitled here today to ask

21       Ms. Taylor about anything she knows individually.

22          It just may be that if that knowledge, the

23       questioning is not directly covered by the topic,

24       her testimony wouldn't come in about the company.

25       Does that make sense?

1           MR. DANIEL:  No.  Do you have extensive

2       questions along these lines --

3           MR. HENRY:  I have...

4           MR. DANIEL:  -- on Ms. Hammack?  I mean, it

5       seems to me we're getting off topic here a bit.

6           MR. HENRY:  Well, I do have quite a few

7       questions about Ms. Taylor's personal knowledge that

8       some would say are marginally related to the topics.

9           But, again, I'm entitled to ask her about

10      things she has personal knowledge of even if they're

11      not covered by the topics.

12          So we can -- I think it would be a question for

13      another day whether her testimony on things that

14      aren't covered by the topic would bind the company.

15      To the extent the questions are about the topics,

16      she's binding the company.  That's the distinction.

17          MR. DANIEL:  Well, that's my concern because

18      you -- she's been designated as a 30 (b) (6)

19      witness, and -- and there are some specific topics

20      that she's prepared to testify about on behalf of

21      the company.

22          MR. HENRY:  Sure.

23          MR. DANIEL:  When she discusses conversations

24      with an employee, does not seem to relate to these

25      topics, I'm not sure that that should be construed

1    as -- as testimony on behalf of the company.  This

2    is just information she has personally.  So that's

3    my concern about it.

4         So perhaps it would be more useful if you could

5    clarify when you ask a question, whether you're

6    asking it as -- offer her as a 30 (b) (6)

7    representative or not.

8         And maybe the best thing to do would be to go

9    through the questions that -- I mean, the topics

10   that she's assigned to answer on behalf of the

11   company.  And then if there are any other questions

12   you need to -- to explain those or to clarify them,

13   whatever you can say, this may not be really

14   directly related to the topic.  I think it will help

15   me understand your answer to questions that were on

16   the assigned list.

17        MR. HENRY:  Well, I appreciate the suggestion.

18        MR. DANIEL:  Okay.

19        MR. HENRY:  I will conduct the deposition the

20   way that I see fit.  And if down the road there's a

21   dispute over whether a particular answer Ms. Taylor

22   gives binds the company under the Notice, you know,

23   we'll take that up.  But right now I'm going to stay

24   on this topic.

25        MR. DANIEL:  Okay.  Well, let me just lodge an

1    objection then to questions which are being asked of

2    this witness which are not directly related to the

3    topics in which she has been noticed to depose -- to

4    be deposed as a company representative.  And I'd

5    like to have a continuing objection.  Otherwise, I

6    can make a specific objection to each question as

7    you're asking it.

8         MR. HENRY:  I don't think there's a need for

9    you to make an objection every time a question is

10   asked.  I acknowledge the objection.  To the extent

11   that a question is not covered by a topic, I think

12   it's a valid objection insofar as its binding effect

13   on the company.  So I acknowledge the objection.

14   We'll call it a continuing objection.

15        I will say that in the course of my

16   examination, I will try to be a little bit more

17   clear on when I'm talking about a topic.  But as far

18   as limiting the scope of my questions to the topics,

19   I'm not willing to do that.  Okay.

20        MR. DANIEL:  All right.  Let's proceed.

21        MR. HENRY:  All right.  And I -- you know...

22        MR. DANIEL:  And I'll make objections as

23   appropriate.

24        MR. HENRY:  Okay.

25   A    (No response.)

1   BY MR. HENRY:

2       Q    Okay.  After that, what I'm sure was a tantalizing

3   legal discussion, I don't recall exactly what my last

4   question was.  So let me...

5              COURT REPORTER:  Would you like it?

6              MR. HENRY:  No, I think -- I think to the

7          extent there was one pending, I'll strike it and

8          then we'll make it.

9       A    (No response.)

10  BY MR. HENRY:

11      Q    I believe you testified that Ms. Hammack became

12  aware from other representatives of Community Health that

13  Mr. Waldrop did not like her?

14      A    Yes.

15      Q    Is that correct?  But you never told her that?

16      A    I never told her that.

17      Q    Did Mr. Waldrop ever give you an opinion on

18  whether Ms. Hammack should be terminated?

19      A    Yes.

20      Q    Tell me about that.

21      A    Mr. Waldrop -- I recall in the spring of 2015, I

22  had a conversation with Mr. Waldrop, and he recommended that

23  I fire Angela.  I asked him on what grounds.  I didn't have

24  any grounds to fire her.

25              In that conversation Mr. Waldrop told me that

1    Ms. Hammack was evil.  And at the end of the conversation he

2    let -- he -- he stated that when we got to heaven, God was

3    going to show me that he was right about Ms. Hammack.

4        Q    Did you ask Mr. Waldrop to tell you whether he

5    felt she should be terminated?

6        A    I don't recall that I asked that.  I do recall

7    that I made a statement that I -- you know, I could fire

8    her, but she was not the problem.  I -- you know, bringing

9    someone else into that role, their responsibilities would be

10   the same.

11       Q    So from your perspective, the problem wasn't

12   individualized to Ms. Hammack?  It was more a function of

13   her position with the company?

14       A    Yes.

15       Q    Do you agree with Mr. Waldrop's characterization

16   of Ms. Hammack?

17       A    I do not.

18       Q    Well, how did you react during that conversation

19   to Mr. Waldrop's description of Ms. Hammack as evil?

20       A    I disagreed.

21       Q    Okay.  Did you tell him that?

22       A    Yes.

23       Q    What specifically did you tell him?

24       A    I can't recall what I specifically said.

25       Q    Okay.  Has Ms. Hammack's job duties changed since

1    Mr. Waldrop's termination?

2         A    Ms. Hammack's job duties were expanded as part of

3    the strategic organizational positioning that was approved

4    prior to Mr. Waldrop's termination.

5         Q    Okay.  So the strategic reorganization was

6    something that had already been approved prior to

7    Mr. Waldrop's termination?

8         A    Yes.

9         Q    Were any changes made to the strategic

10   repositioning plan as a result of Mr. Waldrop's termination?

11        A    Duties were reassigned.  But, no, the plan itself

12   is in place.

13        Q    Does Community Health Systems have currently a

14   COO?

15        A    We do not.

16        Q    Okay.  You have been designated with regard to

17   topic 8 concerning Workday?

18        A    Yes.

19        Q    So this will be a line of questioning that will be

20   specifically covered by the Notice.

21             What is Workday?

22        A    Workday is a cloud-based software that provides

23   business applications.

24        Q    What do you mean by business applications?

25        A    The modules that CHS utilizes are general ledger,

1  accounts payable, benefits management, payroll, and expense

2  report processing.

3      Q    Okay.  There's been a phrase that's been used:

4  Time-and-attendance --

5      A    Yes.

6      Q    -- policies.  Is Workday related to time and

7  attendance?

8      A    Workday was a vendor that was considered for time

9  and attendance, yes.

10     Q    Okay.  So -- well, strike that.

11         What is your understanding of what time and

12  attendance is?

13     A    It's a labor management.  It's the capturing of

14  time data for reporting as well as for payroll.

15     Q    Okay.  So one of the things you described with

16  regard to Workday is payroll?

17     A    Yes.

18     Q    That's one of the business applications?

19     A    Yes.

20     Q    Okay.  So is payroll something different from time

21  and attendance?  Or are they related?

22     A    Payroll is a different component.

23     Q    Okay.  Is CHSI, Community Health, using Workday's

24  time and attendance?

25     A    No.

42

1      Q     No.  Has Community Health ever used the
2  time-and-attendance application for Workday?

3      A     No.

4      Q     Why not?

5      A     I'm not sure that I can answer that.

6      Q     Okay.  Were there discussions about using
7  Workday's time and attendance?

8      A     Yes, yes.

9      Q     And sitting here today, you don't know why that
10  wasn't acted upon?

11     A     The time-and-attendance project was initiated
12  based on a requirement from CMS, the Center for Medicare and
13  Medicaid Services for PBJ reporting.

14     Q     I've got four kids.  When I hear PBJ, I think
15  peanut butter and jelly.  Okay.

16     A     It is Payroll-Based Journal Reporting.

17     Q     Okay.

18     A     It's a requirement by CMS that time-and-attendance
19  information be reported by persons worked, by day.

20     Q     And Workday had an application that would assist
21  in complying with the time-and-attendance requirements?

22     A     We did not know at the time.

23     Q     Okay.

24     A     We were utilizing Stromberg.  We currently use
25  Stromberg.

1           The purpose of the time-and-attendance project was

2    our internal information services in payroll associates

3    indicated to us that their review of Stromberg resulted in

4    -- they did not believe of that Stromberg was capable of

5    capturing what we needed for the PBJ Reporting, which was to

6    become effective July 1st of 2016.

7           Otherwise, we would not have been looking for a

8    time-and-attendance system.  It was driven by a CMS

9    regulation.

10      Q    Okay.  But you're using Stromberg now?

11      A    Yes.

12      Q    Did Stromberg improve in some way that would...

13      A    No.  After several months of investigating our,

14   again, internal information services and payroll, associates

15   ultimately determined that Stromberg could meet our needs.

16      Q    Okay.

17      A    And so we're using Stromberg today.

18      Q    All right.  What -- does Workday have any

19   relationship to capital expense?

20      A    What type of relationship?

21      Q    Fair enough.  Is Workday used in any way with

22   regard to capital expenses?

23      A    The general ledger system.

24      Q    Okay.

25      A    I mean, yes.

44

1      Q     What is a capital expense?

2      A     We actually utilize Medicare and Medicaid

3   guidelines for capital expenditures.  As I recall, it's

4   expenditures over $5,000.

5      Q     Okay.  So let's see if I understand this.  So if

6   something costs over $5,000, it's considered a capital

7   expense?

8      A     Yes, and it is capitalized on the balance sheet

9   and not expensed in the P&L.

10     Q     Okay.  Does Community Health Systems have written

11  policies regarding the use of Workday?

12     A     Yes, we do.

13     Q     Who maintains those written policies?

14     A     They are maintained in the office at 213 Third

15  Street.

16     Q     Is that part of your responsibility to maintain

17  those?

18     A     Yes, it is.  Policies for the Workday financial

19  applications.

20     Q     Okay.

21     A     Human resource applications being benefits

22  management and hiring processes, are maintained by our Human

23  Resource.

24     Q     Blair?

25     A     Blair, yes.

45

1    Q    Blair Lake?  Okay.

2    A    Yes.  Blair Lake.

3    Q    And what is his title for the record?

4    A    Vice-President of Human Resources.

5    Q    So with regard to Community Health Systems'

6  written policies for Workday --

7    A    Uh-huh.

8    Q    -- you're responsible for maintaining the

9  financial-related applications?

10    A    Uh-huh.

11    Q    And Mr. Lake is responsible for maintaining the

12  Human Resources applications?

13    A    Yes.

14    Q    Okay.  Who is responsible for enforcing those

15  policies?

16    A    A person's direct supervisor would be responsible

17  for making certain that their associates comply with those

18  policies.

19    Q    Okay.  Harry Truman described the presidency as

20  the buck stops here.

21    A    Uh-huh.

22    Q    Where does the buck stop with regard to the

23  enforcement of Workday policies?

24    A    The enforcement of the buck would stop with our

25  CEO.

46

1    Q    All right.  What are your responsibilities as CFO

2  for enforcing the Workday policies?

3    A    Education.  It's my responsibility to hire and

4  provide education to associates regarding the policies.  And

5  we have -- most of the policies are built into the Workday

6  system.

7         MR. HENRY:  Okay.  We've been going for about

8       an hour, and I had that bottle of water.  It's a

9       good time for a break.

10         THE WITNESS:  That's fine.

11         (Brief recess.)

12  BY MR. HENRY:

13    Q    Ready, Ms. Taylor?

14    A    Yes.

15    Q    All right.  Before the break, we were talking

16  about capital expenses --

17    A    Uh-huh.

18    Q    -- I believe.

19         When Mr. Waldrop was the COO, did any of the

20  people he supervised reach out to you about whether

21  something should be expensed or capitalized?  Seek guidance

22  from you?

23    A    I recall one particular instance right before

24  Mr. Waldrop was terminated that there was some sort of

25  renovation project going at Northridge Medical Center.

1          Mr. Waldrop called me because he had recommended

2     that the project be expensed, not capitalized.

3          Q    Okay.

4          A    Mr. Charles Briscoe, who reported to Mark,

5     questioned Mr. Waldrop about the policy.  He didn't -- he

6     believed it should have been capitalized.

7          Mr. Waldrop called me, let me know that

8     Mr. Briscoe was questioning the expenditures and the proper

9     treatment of those expenditures.  Mr. Waldrop described it

10    to me as repairs and some painting and things.

11          So I asked him to send me the document that

12    Mr. Briscoe had sent to him so that I could see exactly what

13    it was.  But I just, you know, wanted to make sure I

14    understood.

15          Q    Yeah.

16          A    One of the items was a nursing -- a nurses'

17    station renovation, if I recall correctly, for $14,000.  I

18    recommended to Mr. Waldrop that that be capitalized.

19          Mr. Waldrop made the statement that he couldn't go

20    back and tell Mr. Briscoe to capitalize it rather than

21    expense it because Mr. Briscoe would think that if he didn't

22    get an answer he liked from Mark, he could come to me.  And

23    that's -- I don't recall any other.  I mean, I'm sure over

24    the years there probably were.

25          Q    Okay.  Do you -- do you recall any instance where

48

1    you recommended that a purchase or cost greater than $5,000
2    be expensed rather than capitalized?
3         A    I don't recall.
4         Q    I believe you testified earlier that Community
5    Health follows CMS guidelines on -- or maybe it was
6    Medicare/Medicaid guidelines --
7         A    Yes.
8         Q    -- on capital expenditures?
9         A    Yes, we do.
10        Q    Do you follow any other guidelines such as
11   hospitalization nursing guidelines?
12        A    We use the American Hospital Association for
13   determining depreciable lines.
14        Q    Going back a little bit to the discussion we had
15   with regard to Angela Hammack --
16        A    Uh-huh.
17        Q    -- do you recall Mr. Waldrop informing you of a
18   complaint he received from Scott Thrasher?
19        A    Yes.  That's the only incident that Mr. Waldrop
20   did give me some specifics, and I addressed it.
21        Q    Tell me about that incident.
22        A    As best I can recall, there was a meeting.  In
23   that meeting a vote was taken of committee members or team
24   members.  A nonteam member was attending the meeting and
25   proceeded to cast a vote.

49

1              And Ms. Angela -- Angela Hammack made the

2    statement that she was not a voting team member.

3        Q    And this nonvoting team member, was this the

4    employee of Scott Thrasher?

5        A    Yes, it was.

6        Q    What's her name?

7        A    Lee Ann Churcher.

8        Q    Lee Ann Churcher?

9        A    Churcher, yes.

10       Q    Is she still with --

11       A    She is.

12       Q    -- Community Health?

13            What is her position?

14       A    She is a Director of System Support, and she

15   currently reports to Angela Hammack.

16       Q    And you said you addressed that issue; is that

17   correct?

18       A    Yes, I did.

19       Q    How did you address it?

20       A    Mr. Waldrop had Chris Johnson, who was

21   Mr. Thrasher's supervisor, come over it to my office.  And

22   we called Mr. Waldrop.  They described what happened.

23            I reached out to a team member -- not

24   Ms. Hammack -- so that I could also have another person's

25   perspective on what happened in the meeting.

1            And then I had a conversation with Ms. Hammack to

2    let her know that Ms. Churcher was sensitive to the comment

3    that she made and asked that she be sensitive in the future.

4         Q    Who was the other team member?

5         A    Kim Sheffield.

6         Q    And, again, going back briefly to the budgeting

7    process --

8         A    Uh-huh.

9         Q    -- I believe you testified that you and

10   Mr. Waldrop had would review the plans to ensure that they

11   met benchmarks?

12        A    Uh-huh.

13        Q    Did you or your team ever do any analysis of those

14   plans beyond just benchmark?

15        A    Through the years I'm sure that we did.

16        Q    Okay.  Were there ever any changes made to the

17   plans as a result of your analysis?

18        A    We made recommendations.  I can't recall whether

19   changes were made or not.  But, yes, we made

20   recommendations.

21        Q    Can you recall any instance where a recommendation

22   you made was not implemented?

23        A    I don't recall.

24        Q    All right.  Workday.

25        A    Uh-huh.

1      Q     Have there been any changes in the Workday policy

2   since July 28th, 2016?

3      A     No.

4      Q     Are you aware of any instances where Mr. Waldrop

5   violated Workday policies?

6      A     At what particular time?

7      Q     At any time.

8      A     I'm aware since his termination that he violated a

9   policy.

10      Q     Okay.  What do you know about that?

11      A     It's not a Workday policy.  It is a CHS policy --

12      Q     Okay.

13      A     -- that an individual is to submit their personal

14   expenses incurred for reasonable and necessary business

15   travel on their own expense report and submit it to their

16   supervisor.

17      Q     And you're aware of instances where Mr. Waldrop

18   has violated that policy?

19      A     Yes.

20      Q     What instances are you aware of?

21      A     I can't speak specifically.  In general, I'm aware

22   that expenditures for Mr. Waldrop were put on Ms. Dotson's

23   expense report.

24      Q     And just for the record, Ms. Dotson is...

25      A     Stephanie Dotson.

1    Q    And what is or was her position with Community
2  Health?
3    A    She was Executive Assistant to Mr. Waldrop.
4    Q    Are you aware of any instances where Stephanie
5  Dotson violated those policies -- Workday policies?
6    A    Expense e-mail reimbursement policies, yes.
7    Q    Okay.  So that's different?  I mean...
8    A    Yes, yes.
9    Q    Maybe -- maybe -- maybe I'm confusing them.  I'm
10  not trying to.  I'm not trying to ask a trick question.
11    A    Uh-huh.
12    Q    Is expense reimbursement tied to Workday in some
13  way?
14    A    Yes, it's process -- they are processed through
15  the Workday system.
16    Q    Okay.  Okay.  All right.  So back to my question.
17    A    Uh-huh.
18    Q    Are you aware of any instances where Ms. Dotson
19  violated the expense reimbursement policy?
20    A    Yes, I am.
21    Q    And what are those instances?
22    A    By putting Mr. Waldrop's business and
23  travel-related expenditures on her expense report which then
24  went to Mr. Waldrop for approval.  They were not approved by
25  Mr. Waldrop's supervisor.

53

1    Q    Okay.  Anything else?

2    A    I don't recall.

3    Q    Okay.  Selectica.

4    A    Uh-huh.

5    Q    Which is another topic that you've been designated

6  for.

7    A    Yes.

8    Q    What is Selectica.

9    A    Selectica is a cloud-based contract management

10  system.

11    Q    So it's used for contract management?

12    A    Yes.

13    Q    What do you mean by that?

14    A    It is a tool that is used to prepare contracts.

15    Q    Okay.  Anything beyond preparation?

16    A    The software itself?  No.

17    Q    There has been some testimony that it also helped

18  keep track of deadlines and renewals and things of that

19  nature.  Is that...

20    A    It can.  We -- at the time of Mr. Waldrop's

21  termination, we had not fully implemented Selectica.

22    Q    Okay.

23    A    So CHS was not using it for those purposes.

24    Q    Is CHS using it for those purposes now?

25    A    Yes.

1      Q      Is there a reason that Community Health wants to

2  have contracts entered into the Selectica program?

3      A      Yes.

4      Q      And what is that reason?

5      A      We're central -- we were centralizing and have

6  since centralized the contract management process.

7      Q      Okay.

8      A      A number of our service lines were managing

9  contracts manually.  And for efficiency purposes, we made

10  the determination to centralize the function.

11      Q      You've testified already a little bit about Connie

12  Stovall?

13      A      Uh-huh.

14      Q      What specifically is her role with regard to

15  Selectica?

16      A      Connie is Director of Contract Management.

17      Q      Okay.

18      A      And her role is to maintain our Selectica software

19  and to assist with contract preparation.

20      Q      Okay.  Does she have any responsibilities right

21  now with regard to monitoring expirations or renewals?

22      A      Those are done in the system.  She sets those up

23  based on the terms of the contract, but it's automatic.

24  Renewals are -- notices are automatically generated.

25      Q      So does Ms. Stovall -- strike that.

1           If you would describe for me the process of using

2      the Selectica program for a contract.

3      A      For example, an administrator in a nursing

4      facility can reach out to Ms. Stovall, and they can actually

5      enter into Selectica a request for a specific type of

6      contract.  The contract language for routine contracts that

7      are -- that are entered into for the operations of our

8      different service lines is -- has been entered into the

9      system and approved by legal counsel.

10     Q      So it cut lawyers out of a job?

11     A      No, we're not.

12          And so Ms. Stovall really is an assistant to

13     administer the process, but she's -- she's not responsible

14     for executing contracts.  Or it's all built into the

15     Selectica program.

16     Q      Okay.  Does she have any kind of review authority?

17     A      Yes, she does.

18     Q      What is that review authority?

19     A      She can review and make recommendations.  And if

20     she believes that if there is language that is outside of

21     language that has already ban proved by legal counsel for

22     use in contracts, then we send that to legal counsel for

23     review.

24     Q      Okay.  Does Ms. Stovall's review authority extend

25     to deciding whether the contract should be entered into or

56

1   complies with?

2       A    She has no authority.  She can make

3   recommendations.

4       Q    Okay.  As to whether it should be entered into?

5       A    Yes.

6       Q    Okay.  Has she ever made a recommendation to you

7   positive or negative on whether a contract should be entered

8   into?

9       A    She has not.

10      Q    Are you aware of her having done that to anyone at

11  Community Health?

12      A    I'm not.  I've only been directly working with her

13  since 2012.

14      Q    Okay.  All right.  So going back to the process, a

15  request from an associate would be made for a particular

16  kind of contract?

17      A    Uh-huh.

18      Q    And Ms. Stovall or someone working with her would

19  help get that contract ready for them --

20      A    Uh-huh.

21      Q    -- for execution?

22      A    Uh-huh.

23      Q    Does the Selectica program have any involvement in

24  authorizing contracts or approving contracts at the

25  corporate level?

1       A    It does have the ability to do that.  We were not

2  utilizing that when Mr. Waldrop was working with us.

3       Q    Are you utilizing that now?

4       A    To some extent.  We're still implementing the

5  software.

6       Q    Okay.  So now that I know you're still

7  implementing it.  But to the extent you have implemented it,

8  how does that process work as far as approving a contract?

9       A    You can define the steps that a contract should go

10  through and have it directly sent to approvers all the way

11  down to the person who is authorized to sign.  Those

12  parameters are built into the system.

13       Q    Okay.  Does the Selectica program have any --

14  well, strike that.

15            Is the Selectica program involved or used with

16  regard to project charter authorizations?

17       A    I don't recall, no.

18       Q    Is it possible for a contract to get approved

19  through the Selectica program without going through a

20  project charter authorization process?

21       A    Not all contracts are required to go through a

22  project charter authorization process.

23       Q    Okay.  Why did you not speak to Ms. Stovall to

24  prepare yourself to testify with regard to topic 9 of

25  Exhibit 1?

58

1      A      Because topic 9 specifically addressed access to

2   Selectica.  And at the time of Mr. Waldrop's termination,

3   Mr. Rollins, myself, Mr. Waldrop, nor Ms. Dotson had access

4   to the Selectica system.

5      Q      Okay.

6      A      To me it was a very limited conversation.

7      Q      Do you want to look at it:  Topic 9 in Exhibit 1?

8      A      Uh-huh.

9      Q      Okay.  So having looked back at topic 9, you do --

10  you do not believe that you needed to speak to Mrs. Stovall

11  to prepare yourself to testify with regard to that topic?

12     A      I did not.

13     Q      Does Community Health Systems have any written

14  policies regarding the use of Selectica?

15     A      I do not know the answer to that.

16     Q      Who would?

17     A      Connie Stovall and Ken McDonald.

18     Q      Who is Ken McDonald?

19     A      Ken McDonald is Senior VP of Financial Services,

20  and he's Ms. Stovall's current supervisor.

21     Q      Okay.  You didn't speak to him either, did you?

22     A      I did not.

23     Q      Forgive me for -- for going back over something

24  you've touched on before.  But did you say that Selectica

25  was not -- well, strike that.

1           How was Selectica being used at the time that

2    Mr. Waldrop was COO?

3        A     If I recall, we were beginning to migrate

4    contracts -- existing contracts and new contracts into the

5    Selectica system.  We had some issues, some technical issues

6    and -- regarding Selectica's integration with our active

7    directory, essentially our password land desk, and were not

8    going to utilize Selectica, you know, until -- we weren't

9    going to move forward with the implementation until we had

10   that resolved.

11       Q     Okay.

12       A     So, I mean, we were using it some, but I can't

13   speak to what extent.

14       Q     Are you aware of any instances where Mr. Waldrop

15   or Ms. Dotson did not use the Selectica program when it

16   should have been used?

17       A     No, I don't know of any.

18       Q     Topic 10, expense reimbursement procedures, I

19   believe, is generally what topic 10 in Exhibit 1 deals with.

20   Go ahead and take a look at it.

21       A     Okay.

22       Q     If you would, describe Community Health Systems

23   expense reimbursement process.

24       A     Okay.  An employee that incurs reasonable and

25   necessary expenditures relevant to their job responsibility,

1    prepares an expense report documenting the purpose and

2    additional information that's required in the -- in the

3    report.

4           They also attach supporting documentation,

5    receipts and any other documentation to substantiate the

6    expenditure.  And it is submitted to the person's supervisor

7    for approval.

8        Q    Okay.  And if the supervisor approves it, what

9    happens next?

10       A    It flows through the Workday -- currently the

11   Workday system and is processed for payment.

12       Q    Is that general description the same as -- is that

13   process the same as it was when --

14       A    Yes.

15       Q    -- Mr. Waldrop was COO?

16       A    Yes.

17       Q    When you say it flows through the Workday system

18   and is processed for payment --

19       A    Uh-huh.

20       Q    -- what do you mean by that?

21       A    The business process is defined in Workday, and

22   the steps are an employee submits -- they enter their

23   expenses, attach their documentation.  When they're

24   complete, they hit complete.

25           It goes directly to their supervisor.  Their

1    supervisor reviews it.  They have the opportunity to send it

2    back, deny it, or approve it.

3         Q    Okay.

4         A    Assuming that it is approved, it flows through to

5    be scheduled for payment.  It's automatic.  There's no

6    manual intervention for that.

7         Q    Okay.  So -- so once the supervisor approves the

8    expense report --

9         A    Uh-huh.

10        Q    -- it automatically --

11        A    It does.

12        Q    -- generates a check?

13        A    Or direct deposit.

14        Q    Or direct deposit?

15        A    Yes, yes, uh-huh.

16        Q    So there's no further review?

17        A    There is not.

18        Q    Are there any types of expenses that are not

19   reimbursable?

20        A    Yes.

21        Q    What are those?

22        A    Again, they're outlined in the Medicare/Medicaid

23   guidelines.  One particular expenditure that comes to mind

24   is alcohol.

25        Q    Okay.

1     A     I'd have to refer to the guidelines.

2     Q     I understand.

3           So has Community Health Systems adopted those

4  guidelines as their own?

5     A     Yes.

6     Q     Has Community Health Systems added anything to

7  those guidelines, additional things that are not

8  reimbursable?

9     A     We've added some clarification and put some

10 parameters around expenditures.  But, no, we generally

11 follow Medicare/Medicaid.

12    Q     So just -- just to be sure I understand, let's say

13 that there was a guideline under Medicare and Medicaid that

14 would allow a certain type of expense to be reimbursed.

15    A     Uh-huh.

16    Q     You're not aware of any example where Community

17 Health Systems says even though this can be reimbursed under

18 Medicare and Medicaid, we're not going to allow that to be

19 reimbursed?

20    A     I'm not.

21    Q     Okay.  And is it fair to say that there are no

22 expenses that you allow to be reimbursed that the guidelines

23 do not allow to be reimbursed?

24    A     We should not.

25    Q     You should not.  Okay.  Okay.

63

1          That's Community Health Systems' policy?

2     A    Yes.

3     Q    Is there some kind of audit that is conducted by

4  Medicare or Medicaid --

5     A    Yes.

6     Q    -- to ensure compliance with --

7     A    Yes.

8     Q    -- those guidelines?

9     A    Yes.

10    Q    How often are those done?

11    A    It -- it depends.  The last Medicaid audit that

12  we -- we had was, I believe, in 2012.

13    Q    Are there any Medicare or Medicaid guidelines on

14  -- that are implemented at Community Health Systems on the

15  amount of salary that can be paid to Chief Executive

16  Officers?

17    A    Yes.

18    Q    What are those?

19    A    I can't recall them off the top of my head.

20    Q    Do you know what Mr. Rollins's salary is as CEO?

21    A    I have a general idea.

22    Q    What is that?

23    A    Today I think it may be in the $700,000 range.

24    Q    Is it your understanding that that salary is

25  within the guidelines?

64

1      A    Again, I'd have to refer to the guidelines.  It

2  depends on the size of the organization.  There are a number

3  of...

4      Q    Number of different factors that go into that?

5      A    Right, right.  Yes, yes.

6      Q    Okay.  Are there guidelines of --

7  Medicare/Medicaid guidelines that Community Health Systems

8  has adopted with regard to salaries for other officers of

9  Community Health Systems?

10     A    Of course, we look at those guidelines, but our

11 board also engages a third-party executive compensation

12 review --

13     Q    Okay.

14     A    -- to come in and substantiate to help establish

15 the salaries.

16     Q    Do you know how much -- what Mr. Rollins's salary

17 was at the time Mr. Waldrop was COO?

18     A    I recall that it's roughly what -- what it is

19 today.

20     Q    Around $700,000 roughly?

21     A    Yes, yes.

22          We received an adjustment in January, a

23 three-percent adjustment.

24     Q    Okay.  Supervisor approval of expenses.

25     A    Uh-huh.

1    Q    Was that just the direct supervisor that had to

2  approve those?

3    A    Yes.

4    Q    So in your case that would be Mr. Rollins?

5    A    Yes.

6    Q    And in Mr. Waldrop's case when he was COO, that

7  would also be Mr. Rollins?

8    A    Yes.

9    Q    Who approved Mr. Rollins's expense reimbursement

10 requests?

11   A    I did as a concurring officer.

12   Q    What does that mean?

13   A    That means that they could be approved by the

14 Chairman of the Board or they could be -- that -- that

15 authority could be delegated to another officer of the

16 organization.

17   Q    Okay.  And that was delegated to you?

18   A    That was delegated to me, yes.

19   Q    Did you ever reject any of Mr. Rollins's expense

20 reimbursement requests?

21   A    I don't recall that I did.

22   Q    Did you ever send any back?

23   A    Don't recall that I did.

24   Q    These eight people that you've identified earlier

25 as being your direct reports --

66

1      A    Yes.

2      Q    -- are those -- are their expense reimbursement

3  requests subject to your approval?

4      A    Yes.

5      Q    Does Financial Services play a role at all in the

6  expense reimbursement?

7      A    Not in the process for payment of expenses, no.

8      Q    Okay.  In any other aspect?

9      A    Not generally, no.

10     Q    Okay.  Have there been any changes in Community

11  Health Systems' expense reimbursement policy since June

12  28th, 2016?

13     A    Yes, there have been.

14     Q    And what are those changes?

15     A    We implemented a policy that executive level

16  associates' expense reports go to an internal auditor for

17  review before income to -- it's my direct reports and

18  Mr. Rollins's direct reports.  So all those are reviewed by

19  an internal auditor before they come to us for review.

20     Q    Who is the internal auditor?

21     A    Brook Davis.

22     Q    And that policy is one that was adopted after

23  Mr. Waldrop's --

24     A    Yes.

25     Q    -- termination?

67

1       A    Yes.

2       Q    Again, I'm not trying to be rude, but just so the

3  record's clear, would you be sure and let me finish my

4  question before you answer?

5       A    Yes.

6       Q    Okay.  Again, I'm not -- you're doing fine.  I'm

7  just -- I want to be sure we're clear on the machine there.

8  Okay.

9            (Discussion off the record.)

10      A    (No response.)

11 BY MR. HENRY:

12      Q    You -- you spoke earlier about problems that

13 you're aware of with Mr. Waldrop and Ms. Dotson's expense

14 reimbursement requests?

15      A    Yes.

16      Q    Specifically, I think you said that Mr. Waldrop

17 would have Ms. Dotson submit his expenses so that

18 Mr. Waldrop would be the only one to approve them?

19      A    Yes.

20      Q    Sitting here today, do you know how often that

21 happened?

22      A    I don't recall.  I'd have to go back and look at

23 records.

24      Q    Okay.

25      A    Generally speak, I'd say frequently.

68

1      Q      Frequently.

2             Do you believe that Mr. Waldrop's expense

3   reimbursement practices justified his termination?

4      A      I can't speak to that.

5      Q      Do you have an opinion?

6      A      No, I don't have an opinion about that.

7      Q      One of the -- one of the issues that's come up in

8   this case is a claim that a cruise was inappropriately

9   expensed to the company.  Are you familiar with that at all?

10     A      Yes, I am.

11     Q      Has the company ever paid for Royal Caribbean

12  cruises?

13     A      Yes.

14     Q      Specifically on September 23rd, 2013?

15     A      Yes.  Excuse me, I can't speak specifically.  I

16  know in general terms...

17     Q      I'm -- I'm about -- I'm about to show you.

18     A      Okay.

19            MR. HENRY:  Yeah, this will be Exhibit -- go

20       ahead and mark that as the next exhibit.

21            (Plaintiff's Exhibit 2 marked for

22       identification.)

23  BY MR. HENRY:

24     Q      This is Exhibit 2, Ms. Taylor.  If you'll take a

25  moment and look at that?

69

1      A      Uh-huh.

2      Q      Is that a cruise that the company paid for --

3      A      It appears to be.

4      Q      -- on September 23rd, 2013?

5      A      It appears to be.

6      Q      And if you look down to -- it says:  Cruise

7  reservations.  It lists some individuals there.  You're

8  actually listed there, aren't you?

9      A      Yes, I am.

10     Q      So you went on this cruise?

11     A      No, sir, I did not.

12     Q      You did not?

13     A      No, sir, I did not.

14     Q      Okay.  Well, why are you listed as a passenger?

15     A      I participated in leadership council, which is a

16  group led by Mr. Waldrop.  I was asked to go on this cruise,

17  and I can't recall specifically why I did not go.

18     Q      Okay.  Would the company paying for the expenses

19  in Exhibit 2 be a violation of expense reimbursement

20  policies?

21     A      Not if they had been approved by Mr. Rollins.

22     Q      Okay.  This one was approved by Mr. Rollins?

23     A      I don't know.

24     Q      You don't know?

25            Did Mr. -- or excuse me.  Strike that.

1          Did Ms. Dotson ever submit any expense

2    reimbursement requests on behalf of Community Health

3    employees other than Mr. Waldrop?

4        A    I don't recall specifics, no.

5             (Plaintiff's Exhibit 3 marked for

6        identification.)

7    BY MR. HENRY:

8        Q    Ms. Taylor, you're holding what the court reporter

9    has marked as Exhibit 3?

10       A    Uh-huh.

11       Q    Do you recognize the signature at the bottom of

12   that?

13       A    It appears to be Stephanie Dotson's signature.

14       Q    Okay.  If you'll look on the very first page about

15   -- about halfway down that table, there's an expense on

16   April 13th, 2014:  Due diligence in Brunswick, Georgia,

17   lodging for Lorraine Taylor?

18       A    Uh-huh.

19       Q    Is this not an example of Ms. Dotson submitting

20   one of your expense reimbursement requests?

21       A    Yes, it is.

22       Q    Do you know if Mr. Rollins approved this expense

23   reimbursement request?

24       A    I do not know.

25       Q    Would there be a record of that approval?

1     A     There would be a record in Workday, yes.

2           (Plaintiff's Exhibit 4 marked for

3     identification.)

4  BY MR. HENRY:

5     Q     Ms. Taylor, you're looking at what's been marked

6  as Exhibit 4, correct?

7     A     Yes.

8     Q     Is that Ms. Dotson's signature there at the bottom

9  of Exhibit 4?

10    A     It appears to be.

11    Q     The very first entry for 11-23-2013:  Financial

12 Services meeting.  Additional charges that did not show up

13 until after the last ER was submitted.  Do you see that?

14    A     I do.

15    Q     Financial Services falls under your purview, I

16 think you testified earlier; is that correct?

17    A     Yes.

18    Q     So would this also be an example of an expense

19 that Ms. Dotson submitted for someone other than Mr. Waldrop

20 for reimbursement?

21    A     It appears that it could be, yes.

22    Q     Do you know if Mr. Rollins approved this expense

23 reimbursement?

24    A     If you'll give me just a minute?

25    Q     Sure.

1       A     I'm looking at the documentation.

2       Q     Yeah, take your time.

3       A     Yes, this is a trip that -- the purpose of the

4    trip was for a Financial Services group and Mr. Waldrop,

5    myself and Ms. Dotson.  And Mr. Rollins while I don't -- I

6    can't speak to whether he approved this expense report.  He

7    did approve the trip.

8       Q     Okay.  So is that a distinction that matters under

9    the expenses reimbursement policy?  He approved the trip,

10   but he might not necessarily have approved the expense?

11      A     Yes, that would -- we have policies for --

12   typically with an expenditure like this, we would run most

13   of it through our accounts payable system, and it would go

14   through a different approval process.

15            Mr. -- Mr. Rollins was aware of this trip.  He

16   approved this trip, and he approved the total amount of the

17   trip.

18      Q     Okay.  You said something there so I just want to

19   make sure I understand.

20      A     Uh-huh.

21      Q     Taking Exhibit 4 --

22      A     Uh-huh.

23      Q     -- is it your testimony that Exhibit 4 would have

24   undergone a different type of approval process than the

25   normal approval process where Mr. Waldrop would approve this

73

1    as Ms. Dotson's supervisor?

2         A    Yes.  For the travel expenditures, specifically

3    for a travel agent, which is what this appears to have maybe

4    gone through or the hotel, we planned it well enough in

5    advance that the company could have paid for that.  It did

6    not necessarily need to be put on someone's expense report.

7         Q    So is this not a Stephanie Dotson expense report?

8         A    It is a Stephanie Dotson expense report.

9         Q    Okay.  So maybe I'm just confused.  If I

10   understood what you just said --

11        A    Uh-huh.

12        Q    -- this was planned far enough in advance to where

13   it would have been approved by the company; is that right?

14        A    It could have gone through our accounts payable

15   system and not on an individual's expense report.

16        Q    Okay.

17        A    Ms. Dotson responsibility with this trip was to

18   assist with coordinating the trip.

19        Q    Okay.  Are you aware of any instances where

20   Ms. Dotson coordinated travel for Mr. Waldrop and submitted

21   expenses in this manner?

22        A    I can't speak specifically to that.

23        Q    If she had done that, would that be a violation of

24   the policy?

25        A    On a routine basis, yes.  If it was arranging

1    lodging for Mr. Waldrop specifically, yes.

2         Q    Is there any reason for Exhibit 4 not to have gone

3    through the Workday program for approval by Mr. Waldrop?

4         A    I don't understand your question.

5         Q    Well, you testified earlier that -- correct me if

6    I'm wrong.  I'm not trying to put words in your mouth.

7         A    Uh-huh.

8         Q    But it's my understanding from what you said

9    earlier, that expense reports were uploaded to Workday?

10        A    Yes.

11        Q    And then there was a notification given to a

12   supervisor to either approve, deny or send back?

13        A    That's correct.

14        Q    Would Exhibit 4 have gone through the same

15   process?

16        A    Yes.

17        Q    Okay.  So...

18        A    If it was submitted as an expense report, yes.

19        Q    So the approval of Exhibit 4 would have been under

20   the Workday procedure solely by Mr. Waldrop?

21        A    That is correct.

22        Q    Okay.

23             (Plaintiff's Exhibit 5 marked for

24        identification.)

25        A    (No response.)

1    BY MR. HENRY:

2        Q    Show you what the court reporter has marked as

3    Exhibit 5.  And once you've had a chance to review it, just

4    let me know and I'll ask you some questions.  I certainly

5    want to give you sufficient time.

6        A    Okay.

7        Q    Okay.  You've had a chance to review Exhibit 5?

8        A    Yes.

9        Q    That's Stephanie Dotson's signature there below on

10   the first page of Exhibit 5, isn't it?

11       A    It appears to be.

12       Q    If you'll look at the third entry on the first

13   page of Exhibit 5:  Managed care meeting at the Waverly.

14   Please code to Ronnie.  Do you see that?

15       A    I see that.

16       Q    Do you know what that is:  The managed care

17   meeting at the Waverly?

18       A    I do not.

19       Q    All right.  Can you tell from looking at Exhibit 5

20   whether this was an expense reimbursement for an expense

21   that Ronnie Rollins incurred?

22       A    The only thing that I see is a handwritten note on

23   the invoice.

24       Q    Okay.

25       A    But I can't tell you whether that was the purpose

1   of the meeting or not.

2       Q    Would this be an expense reimbursement request for

3   expenses incurred by Ronnie Rollins?

4       A    It could be.  I don't know.

5       Q    You just don't know that from...

6       A    Oh, no, I don't know.

7       Q    You can't tell from...

8       A    I cannot tell from this.

9       Q    Are you aware of whether Exhibit 5 received

10  concurring officer approval from you?

11      A    I do not recall, no.

12      Q    Do you have any reason sitting here today to

13  believe that someone other than Mr. Waldrop approved this

14  expense in the Workday system?

15      A    I do not.  And to be quite honest with you, other

16  than the note that is written on the receipt, there's no

17  indication of what the meeting was about.

18      Q    Okay.  If you would let me know just for the

19  records -- the record what page you're looking at?  There's

20  some Bates numbers in the lower...

21      A    You're referring to the third entry?

22      Q    Yes, ma'am.

23      A    I'm looking at CHS 6690.  Other than a handwritten

24  note on this invoice, there's no indication of what this

25  meeting was for.

1     Q   The handwritten note says, the very last thing:

2  Task force.  I don't know what that next word is.

3     A   I don't either.

4     Q   Ronnie and Hunter?

5     A   That's what it appears to say, yes.

6     Q   Do you know who Hunter is?  Were you familiar with

7  a Hunter?

8     A   Hunter Hurst is also an associate in our system.

9         (Discussion off the record.)

10  BY MR. HENRY:

11     Q   We're okay to proceed?

12     A   Sure.  We can.

13     Q   Ms. Taylor, you identified Lucy Rogers earlier as

14  a corporate compliance --

15     A   Yes.

16     Q   -- officer?

17     A   Yes.

18     Q   Is that -- is that fair?

19     A   Yes, it is.

20     Q   Okay.  When did Ms. Rogers take on that role?

21     A   I don't recall the specific dates.  Somewhere

22  maybe 2012, 2013.

23     Q   Okay.  So while Mr. Waldrop was the COO?

24     A   Yes, yes.

25     Q   And does -- does Community Health have a corporate

78

1    compliance program?

2         A     Yes.

3         Q     What is that?  Can you describe that?

4               (Discussion off the record.)

5         A     (No response.)

6    BY MR. HENRY:

7         Q     I'm sorry.  I think I had asked you something

8    about a corporate compliance program.  What is a corporate

9    compliance program?

10        A     In general, it is a nonprofit entity as well as a

11   participant in Medicare/Medicaid programs.  We have

12   corporate guidelines that direct the activities of the

13   organization.

14        Q     Okay.  And does Ms. Rogers have any kind of

15   responsibility for enforcing that program?

16        A     Ms. Rogers, as a corporate compliance officer,

17   reports to the Board of Directors.  And it is her

18   responsibility to inform the board if there are compliance

19   issues.  And the enforcement would take place at the board

20   level.

21        Q     Okay.  Are you aware of any reports that

22   Ms. Rogers or anybody else made to the board with regard to

23   Mr. Waldrop?

24        A     I don't know.  I would not know about that, no.

25        Q     How about Ms. Dotson?

1    A    I would not know about that.

2    Q    Okay.  You've also been designated with regard to

3    topic 16 in Exhibit 1, of which you're free to look at it.

4    But the way I've got it summarized is expense reimbursements

5    for leadership training?

6    A    Uh-huh.

7    Q    What is leadership development training?

8    A    Leadership development.  The leadership

9    development program was a program specific to a strategic

10   initiative of CHS to provide growth opportunities for our

11   internal associates as they -- they move through their

12   career ladder.

13   Q    Okay.  And is there a training that is conducted

14   in connection with that program?

15   A    There's education.

16   Q    Okay.

17   A    Yes, yes.

18   Q    Who typically attends those education sessions or

19   the training or whatever you want to call it?

20   A    We have actually only -- only -- only completed

21   one program.  And there was applications submitted by some

22   number of individuals.  I want to say 60 or so.  And maybe

23   15 to 18 of those applicants were chose to participate in --

24   in the program and...

25   Q    So you described it as education?

1    A    Yes.

2    Q    Who's doing the teaching?

3    A    Mr. Waldrop was responsible for the program.

4    Q    Okay.

5    A    And he chose the topics and then selected various

6    consultants or others to provide the education on those

7    topics.

8    Q    Did he choose presenters or consultants within the

9    company to do that?

10   A    Yes.

11   Q    Okay.  Was Mr. Rollins chosen?

12   A    Yes.

13   Q    Were you chosen?

14   A    Yes.

15   Q    Anybody else you can think of?

16   A    Within the company, I don't -- I don't recall.  I

17   do recall that Ron Fuegway, who was the Senior

18   Vice-President of Human Resources helped Mr. Waldrop with

19   the coordination of the program.

20   Q    Is there any difference in how the expense

21   reimbursements were handled in regard to that program as

22   opposed to the normal expenses that we've been talking

23   about?

24   A    There should not have been.

25   Q    Okay.  Do you know who handled the reporting of

1    those expenses -- requests for reimbursement?

2         A     Mark and Stephanie would have handled those.

3         Q     Are you aware of any violations of company policy

4    by Mr. Waldrop or Ms. Dotson with regard to that program and

5    expense reimbursements?

6         A     No.

7         Q     Where was the program held?

8         A     Goodness.  Let me think about that.  We were

9    primarily at a 12 hotel either in midtown or at Atlantic

10   Station in Atlanta.

11        Q     Okay.  Okay.  So not here in Macon?

12        A     No, no.

13        Q     So it would require travel?

14        A     Yes.

15        Q     For which presumably expenses in connection with

16   the travel would have been turned in for reimbursement?

17        A     Yes.

18        Q     Are any of your family members employed by

19   Community Health Systems?

20        A     Yes.

21        Q     Who?

22        A     Loray Childs.  Loray, L-O-R-A-Y.  Childs,

23   C-H-I-L-D-S.

24        Q     And she...

25        A     She is my sister.

1      Q    Okay.  So -- okay, so your name is Lorraine and
2  her name is Loray?
3      A    That's correct.
4      Q    Okay.  And I thought I saw something.  Are
5  y'all -- are y'all twins?
6      A    We are.
7      Q    Okay.  I have a hard enough time keeping up with
8  four kids that are three years apart each.  Be that --
9  strike that.
10          And what does she -- what does she do for
11 Community Health Systems?
12     A    She leads our retail pharmacy operations.
13     Q    Is that connected in any way with Financial
14 Services?
15     A    No, it's not.
16     Q    Okay.  Did Financial Services take a trip to the
17 Dominican Republic?
18     A    Yes, we did.
19     Q    Did your sister attend that?
20     A    Yes, she did.
21     Q    Did her husband attend with her?
22     A    I don't recall whether he did or not.
23     Q    Were your sister's paid -- sister's expenses paid
24 by Community Health?
25     A    Yes.

1    Q    And it was a Financial Services trip?

2    A    Yes.

3         MR. HENRY:  Can we go off for a second?

4         (Discussion off the record.)

5   BY MR. HENRY:

6    Q    Ms. Taylor, before the break, I believe you

7   testified that once expense reimbursement requests were

8   uploaded to Workday --

9    A    Uh-huh.

10    Q    -- and approved --

11    A    Uh-huh.

12    Q    -- it was an automated process?

13    A    Yes.

14    Q    Did you or anyone working under you ever perform

15   an audit of the expenses that had been submitted?

16    A    Yes.

17    Q    Is that something that happens regularly or

18   sporadically?

19    A    We have put in place an internal audit program.

20    Q    Okay.

21    A    And historically we had not done that.  But, yes,

22   we do have.

23    Q    Had that program been implemented prior to

24   Mr. Waldrop's termination?

25    A    Yes.

1      Q      How many audits had been performed before his

2 termination under that program?

3      A      None.

4      Q      Okay.

5             (Plaintiff's Exhibit 6 marked for

6       identification.)

7      A      (No response.)

8 BY MR. HENRY:

9      Q      Ms. Taylor, you've got in front of you Exhibit 6.

10 If you would, please, just take a look at that and let me

11 know when you've had a chance to familiarize yourself with

12 it.

13             I will state for the record, the spreadsheet was

14 produced by Community natively.  I think when we printed it,

15 it chopped up the spreadsheet so it's a little --

16      A      Okay.

17      Q      -- difficult to navigate through but...

18             MR. DANIEL:  What do you mean?  The control

19       numbers are not on every page as a reference?

20             MR. HENRY:  Well, not just that.  That's --

21       that's one thing which is understandable.  But what

22       I'm saying is there are multiple columns.  And when

23       we printed it --

24             MR. DANIEL:  Right.

25             MR. HENRY: -- someone forgot to hit "fit all

1      columns on one page" so it's not quite as easy to

2      read as it probably should be.  But I think we can

3      work through it.

4           THE WITNESS:  Of course depending on your

5      questions, I've not had time -- don't have time to

6      study this.

7   BY MR. HENRY:

8      Q    And I'll navigate.  I'll direct you to anything

9   specific.

10     A    Okay.

11     Q    But do you recognize Exhibit 6?

12     A    It appears to be documentation from our audit that

13  was done in December of 2015, yes.

14     Q    Okay.  Is that the one audit that you said was

15  performed?

16     A    Yes, it is.

17     Q    If you'll look at the very first page, the e-mail

18  at the top, it appears that you sent this e-mail to yourself

19  on July 2nd, 2016?

20     A    Uh-huh.

21     Q    Why did you send this to yourself on July 2nd,

22  2016?

23     A    If I recall, it was at the request of an internal

24  -- an internal investigation that was going on.

25     Q    Okay.  Would that be an internal -- okay, strike

86

1    that.

2            Who was conducting the internal investigation?

3        A    Our legal counsel we engaged.  McNair, McElmore,

4    Middlebrooks and Company.

5        Q    That's what would have been in other case

6    depositions was referred to as 3M?

7        A    3M, that's correct.

8        Q    That might make it a little easier as we go down

9    the road.  Okay.

10           I want to show you another document to put

11   alongside that one.  This will be Exhibit 7.

12           (Plaintiff's Exhibit 7 marked for

13           identification.)

14       A    (No response.)

15   BY MR. HENRY:

16       Q    Again, this Exhibit 7 was produced by Community

17   Health Systems natively, which is not a problem.  It's just

18   it didn't print -- it printed like the other one when we --

19   when we put it into our system.

20           But I want you to put Exhibit 6 and Exhibit 7 side

21   by side 'cause I have some -- some questions about both of

22   them.

23           Specifically, if you turn past the gray columns on

24   the reporting title, the expense reports above threshold on

25   both Exhibit 6 and 7.  Do you see?  I may have to help you.

1  Yeah, if you'll go ahead and keep turning past this.  It's

2  not really what I want to ask you about.

3          There's actually two gray columns.  I want you to

4  get into the page that says:  Expense report audit.

5      A    In both documents?

6      Q    Yes, I think both documents have a page entitled:

7  Expense report document.

8          First of all, and I know it's going to be

9  difficult.  But if we can look at Exhibit 7, which is the

10 second one I handed you?

11     A    Right.

12     Q    Well, strike that.  Let's go ahead and -- let's go

13 ahead and compare them, and then maybe that'll make it

14 possible for you to answer the question I'm going to ask

15 you.

16     A    Uh-huh.

17     Q    Taking Exhibit 6, which is the one with the e-mail

18 on the front, page entitled:  Expense Report Audit.  Taking

19 Exhibit 7, which is the one that doesn't have an e-mail in

20 front of it.  Expense report audit.

21     A    Uh-huh.

22     Q    You see you have Maxic Burger listed there at the

23 top under both of them?

24     A    Yes.

25     Q    And there's three entries for Maxic Burger on

1    both, correct?

2         A    Yes.

3         Q    Then there appears to be a switch between the two.

4    There's a difference in the two.  You have five entries

5    related to Stephanie Dotson on Exhibit 7.  Do you see that?

6         A    I do.

7         Q    Then on Exhibit 6 it switches down to Sheila

8    Mitchum?

9         A    Uh-huh.

10        Q    On Exhibit 7 Sheila Mitchum shows up lower than

11   that?

12        A    Right.

13        Q    Do you see that?

14        A    Yes.

15        Q    Okay.  So does it appear that Exhibit 7 is an

16   audit at least similar to the audit that you shared with

17   Mr. Waldrop that's Exhibit 6?

18        A    It does.

19        Q    Okay.  Can you tell from looking at those two

20   documents and the difference that I've identified --

21        A    Uh-huh.

22        Q    -- namely Ms. Dotson being included on Exhibit 7

23   rather than Exhibit 6?

24        A    Uh-huh.

25        Q    Can you tell me when Exhibit 7 was generated?

1    That's the one that includes Stephanie Dotson.

2        A    I can't necessarily speak to the generation of the

3    documents and not knowing the source.

4        Q    I understand.

5        A    So...

6        Q    And this is -- and I'm not trying to ask you a

7    trick question, but this is how it was produced to us.

8        A    Okay.

9        Q    So I just wanted to -- I just wanted to see if you

10   could add any clarification to that.  But you don't know?

11       A    I don't know.

12       Q    Okay.  What do you believe Exhibit 7 is?

13       A    It appears to be a report that was produced at

14   some time during the audit process.

15       Q    Okay.

16       A    I can't say that it's a complete report.  I don't

17   -- I can't speak to that.

18       Q    I understand.

19            Were there any -- well, strike that.

20            Looking at Exhibit 6 --

21       A    Yes.

22       Q    -- it does not appear that anything with regard to

23   Stephanie Dotson was reported on Exhibit 6, correct?

24       A    That is correct.

25       Q    Which is the report that you shared with

90

1  Mr. Waldrop?

2      A    That is correct.

3      Q    But there was a report with regard to Ms. Dotson

4  on Exhibit 7?

5      A    Yes.

6      Q    Do you know why that would be?

7      A    Yes, I do.

8      Q    Okay.  Please explain that to me.

9      A    When the audit was -- was completed, Brook Davis

10  met with me and expressed a concern that Mr. Waldrop was

11  running his expenses through Ms. Dotson's expense report.

12      Q    I'm going to just stop you there for a second.  I

13  want to be sure I heard that name.  Rick Davis?

14      A    Brook Davis.

15      Q    Brook Davis.  I'm sorry.

16      A    The auditor.

17      Q    Okay.  Okay.  That makes sense.

18      A    Uh-huh.

19      Q    Is Brook Davis the Community Health representative

20  who --

21      A    Yes.

22      Q    -- I guess was responsible for doing these --

23      A    She was, yes.

24      Q    -- audits?

25      A    Yes, yes.

へ

1      Q    Okay.  All right.

2           Please continue.  You said Brook Davis expressed

3  some concern to you about Ms. Waldrop or Ms. -- let me start

4  all over again.

5           You said that Ms. Davis expressed some concern to

6  you about Ms. Dotson running Mr. Waldrop's expenses for

7  reimbursement?

8      A    Yes, yes.

9      Q    And what was concerning to her about that?

10     A    That Mr. Waldrop was not following our policy;

11 that his expenditures incurred on his behalf were -- should

12 have gone to Mr. Rollins for approval.

13     Q    Okay.  When did this conversation take place?

14     A    In early January of 2016.

15     Q    So before Mr. Waldrop was terminated?

16     A    Yes, yes.

17     Q    And that's the reason that Stephanie Dotson is

18 included in Exhibit 7?

19     A    That -- she was part of the audit, yes.

20     Q    Okay.  If that concern was expressed to you in

21 early -- well, strike that.

22          Did Ms. Davis express this concern to you before

23 or after you sent the audit, Exhibit 6, to Mr. Waldrop on

24 January 5th, 2016?

25     A    Before.

1      Q    Okay.  So why wasn't Ms. Dotson's expenses and the

2   concerns related thereto raised in Exhibit 6?

3      A    This was my first knowledge of -- of this

4   particular issue.  Mr. Waldrop and I had been having

5   disagreements regarding Angela Hammack.  I felt that our

6   relationship was a little rocky.

7           I did not want Mr. Waldrop to feel that I was

8   accusing him of anything; therefore, I chose to take

9   Stephanie's expenses off of the report that I sent to him

10  and used opportunities of what other -- some other findings

11  that related to the things that Mr. Waldrop was doing and

12  Ms. Dotson were doing to bring to his attention it was not

13  appropriate.

14          So where there might have been -- someone else had

15  put an expenditure, their personal expenditure on another

16  expense report, I brought that to Mr. Waldrop's attention to

17  -- without accusing him.

18     Q    Okay.

19     A    Uh-huh.

20     Q    How did Mr. Waldrop respond to these other

21  opportunities you called them?

22     A    I have learned since his termination how he

23  responded.

24     Q    And what have you learned?

25     A    Before his termination, he and I discussed the

93

1   findings.  And he asked that I present just basic

2   reimbursement guidelines to our leadership council at a

3   meeting sometime late in January.  I don't recall the date.

4        Q    Okay.

5        A    And I have learned since he was terminated that he

6   had Ms. Dotson send the report to his direct reports and had

7   them either provide documentation or try to correct the

8   issues.

9             I also understand in some cases where there were

10  inappropriate expenses, he required that his direct reports

11  seek reimbursement from employees.

12       Q    Okay.  Explain that last part to me.  Well, can

13  you read her answer back?

14            (Previous answers read back as follows:  Before

15        his termination, he and I discussed the findings.

16        And he asked that I present just basic reimbursement

17        guidelines to our leadership council at a meeting

18        sometime late in January.  I don't recall the date.

19            And I have learned since he was terminated that

20        he had Ms. Dotson send the report to his direct

21        reports and had them either provide documentation or

22        try to correct the issues.

23            I also understand in some cases where there

24        were inappropriate expenses, he required that his

25        direct reports seek reimbursement from employees.)

1        A    (No response.)

2   BY MR. HENRY:

3        Q    Okay.  Thank you.

4             Did you have any -- strike that.

5             Did you think that there was anything

6   inappropriate with Ms. Dotson sending the report to

7   Mr. Waldrop's direct reports?

8        A    Again, I did not learn about that until after he

9   was terminated.

10       Q    Okay.  But sitting here today, do you think there

11  was anything inappropriate about that?

12       A    Yes, because Mr. Waldrop and I had discussed the

13  fact that following the education at leadership council,

14  that I would send to each person the -- the findings and --

15  for -- and we did it for -- from July of 2015 to December of

16  2015.  We were in the middle of a cost reporting year.  And

17  we were going to attempt to get documentation.  We did not

18  go back past July.

19       Q    Okay.  So -- so what you felt was -- or is

20  inappropriate about what Mr. Waldrop did about sending those

21  reports to his direct reports was that that was something

22  the two of you had agreed you would do?

23       A    Yes.

24       Q    Okay.  All right.  And then seeking reimbursement

25  where you said there were inappropriate expenses that

1    Mr. Waldrop had asked employees to seek reimbursement from

2    other employees?

3        A    Yes.

4        Q    Okay.  Explain that to me.

5        A    There was an associate that had turned in a

6    receipt for alcohol.  Actually, I recall two associates that

7    had turned in receipts and been paid for alcohol.  And their

8    supervisor was asked to have them reimburse the company for

9    that.

10       Q    Okay.  Is there anything inappropriate about that?

11       A    Yes, we do not want pay for alcohol.  We do not

12   reimburse for alcohol.

13       Q    I thought that I heard you say that Mr. Waldrop --

14   maybe I misheard you.  I'm not trying to put words in your

15   mouth.  But what I thought I just heard you say was that

16   Mr. Waldrop had told the employees to reimburse the company

17   for any alcohol expenses.  Did I hear you incorrectly?

18       A    I believe it's -- the expenses were inappropriate.

19   I did not mean that it was inappropriate for Mr. Waldrop to

20   seek reimbursement.

21       Q    Okay.  Okay.  So the way Mr. Waldrop handled that

22   particular issue, you didn't see a problem with that?

23       A    I did not.

24       Q    Okay.  It was just the first thing you mentioned

25   where he had submitted the report to his reports when you

1     had agreed previously you would do that?

2         A     That is correct.

3         Q     Okay.  Between January 5th, 2016, and

4     Mr. Waldrop's termination in June of 2016, did you ever tell

5     Mr. Waldrop that there were concerns about Ms. Dotson

6     submitting his expense reimbursement requests?

7         A     I did not.

8         Q     Why not?

9         A     Mr. Waldrop was COO of the organization.  In his

10    position, he -- I trusted that Mr. Waldrop understood the

11    guidelines and the expectations of the organization.

12        Q     And those expectations being that Ms. Dotson was

13    not supposed to submit reimbursement requests for expenses

14    that Mr. Waldrop incurred?

15        A     He was supposed to follow the expense

16    reimbursement guidelines.

17        Q     And that's one of them, correct?

18        A     That is one of them, yes.

19        Q     When was that guideline adopted?

20        A     Well, Mark and I both have employment

21    agreements --

22        Q     Okay.

23        A     -- that were executed in 2006, and they speak to

24    how reimbursement expenses will be handled.

25              In addition to our employment agreements, the

1    corporation adopted corporate guidelines that also provide

2    for how expenses will be handled.

3        Q    And it's your understanding that either the

4    employment agreements you and Mr. Waldrop had or the

5    corporate guidelines required that Mr. Waldrop directly

6    submit for reimbursement any expenses that he incurred?

7        A    Yes, on his behalf, yes.

8        Q    And then Ms. Dotson was not supposed to do that?

9        A    That is correct.

10       Q    Other than your employment agreements and the

11   corporate guidelines, were there any other written policies

12   that you contend put that requirement out there?

13       A    I mean, those speak for themselves.

14       Q    Okay.

15       A    In addition, Mr. Waldrop also is a licensed

16   nursing administrator so should understand reimbursement of

17   expenses.

18       Q    Okay.  Exhibit 6 notes several, I guess I would

19   call them problems, with reimbursement requests by a number

20   of Community representatives, correct?

21       A    Well --

22       Q    I know.

23       A    -- again, I haven't had time to --

24       Q    I know.

25       A    -- to study.  It's been quite some time since I've

98

1    looked at this.

2         Q    What I was going to ask you was, is it your

3    understanding that these issues have been addressed --

4         A    Yes.

5         Q    -- that have been disclosed in Exhibit 6?

6         A    Yes, yes.

7         Q    Okay.  What did you -- to the extent you recall,

8    what did you specifically tell Brook Davis to do with regard

9    to the differences between Exhibit 6 and Exhibit 7?  Did you

10   tell her to remove Ms. Dotson's?

11        A    I removed Ms. Dotson's.

12        Q    You did?

13        A    Yes.

14        Q    So when you say in Exhibit 6, "Attached is the

15   worksheet that Brook prepared to summarize her findings in

16   the expense report audit," it's actually the worksheet you

17   prepared, correct?

18        A    Yes.  It's the worksheet that Brook prepared minus

19   Stephanie's.

20        Q    Brook prepared it; you altered it?

21        A    Yes.

22        Q    Do you know if anybody ever told Ms. Dotson that

23   the way these expense requests were being submitted was

24   inappropriate?

25        A    I don't know.

99

1      Q     You never did that?

2      A     I did not.

3      Q     I know we've had several documents here, but let's

4  go back to Exhibit 1, which is the Notice.  There's one

5  topic that I don't think we have covered yet, and that topic

6  17 relating to Mr. Waldrop's paid time off since January 1,

7  2010?

8      A     Yes.

9      Q     And you're prepared to testify with regard to that

10 topic?

11     A     Yes.

12     Q     If you would, describe for me the paid time off

13 policy of Community Health Systems as it applied to

14 Mr. Waldrop.

15     A     Pursuant to Mr. Waldrop's employment agreement, he

16 was covered under an executive leave policy which provided

17 for 30 days of leave each year.

18     Q     All right.

19     A     In order to take leave, a leave request should be

20 submitted to Mr. Rollins, his supervisor, and approved by

21 Mr. Rollins.

22     Q     Is there anything else Mr. Waldrop must do in

23 order to obtain or take PTO than get Mr. Rollins's approval?

24     A     The agreement doesn't call for anything else that

25 I can recall.

1    Q    Okay.  Do you know generally what process

2  Mr. Waldrop employed when obtaining PTO?  Did he do anything

3  other than ask Mr. Rollins for approval?

4    A    I don't recall.  I mean, I assume he followed the

5  process.

6    Q    Okay.  How would or how did Community Health

7  Systems keep track of paid time off for Mr. Waldrop?

8    A    For what time period?

9    Q    Did it change while he was COO?

10    A    Yes, when Workday was implemented.

11    Q    Okay.  And when was Workday implemented?

12    A    Payroll and leave was implemented in the spring of

13  2011.

14    Q    Okay.  Okay.  Well, let's just focus on after

15  Workday.

16    A    Okay.

17    Q    Where is that -- strike that.

18         How does Community Health Systems keep track of

19  Mr. Waldrop's paid time off after the implementation of

20  Workday?

21    A    Okay.  When Workday was implemented, the

22  parameters of the PTO plan, the executive leave plan, was

23  set up into Workday.

24    Q    Okay.

25    A    So on Mark's anniversary date he gets 30 days.

1    Requests for PTO is self-service.  Mark would have -- he

2    would go into Workday and enter his own request for PTO.

3         Q    Okay.

4         A    And only he would have the ability to do that

5    under his sign-on, under his password.

6         Q    Okay.

7         A    When he submitted it, Workday automatically sent

8    it to Mr. Rollins.  Mr. Rollins could approve, send back and

9    request more information or deny it.

10        Q    Are you aware of any instances where Mr. Rollins

11   did not approve a PTO request submitted by Mr. Waldrop

12   through the Workday program?

13        A    I'm not aware, no.

14        Q    Would Mr. Waldrop's PTO be reflected on his

15   paystub?

16        A    Yes.

17             (Plaintiff's Exhibit 8 marked for

18             identification.)

19   BY MR. HENRY:

20        Q    Ms. Taylor, I've handed you -- or the court

21   reporter has handed you what's been marked as Exhibit 8.

22        A    Uh-huh.

23        Q    I'll ask some specific questions about specific

24   paycheck stubs, but let's just start with the very first

25   one.  It appears that it covers the pay period January 1,

1    2014, through January 31, 2014?

2         A     Yes.

3         Q     There's a box there on the right-hand side toward

4    the bottom that says:  Absence plans?

5         A     Yes.

6         Q     Is that where the paycheck stub would reflect PTO?

7         A     What's available, yes.

8         Q     Okay.  And that 80 there would be hours?

9         A     Yes.

10        Q     Okay.  So when on a paycheck stub would PTO that

11   had been taken be reflected?

12        A     We get paid monthly.

13        Q     Okay.

14        A     So it typically should show up on the pay --

15   the -- it depends on when you enter it.  But those days

16   should show up on the paystub that covers that time period

17   that you're taking off.

18        Q     Okay.  So you say it depends on when you enter it?

19        A     If you enter the days as you take them

20   appropriately, they will show up on the appropriate paystub.

21        Q     Okay.  So taking -- taking page 1 of Exhibit 8 --

22        A     Uh-huh.

23        Q     -- as an example --

24        A     Uh-huh.

25        Q     -- it appears that the check date for January of

1    2014 was January 8th, 2014?

2        A    Yes.

3        Q    So I'm not sure since we're using January, this

4    will actually work.  But if let's say Mr. Waldrop put in for

5    and obtained 40 hours of PTO in December.  Would it be

6    reflected in the January paystub?

7        A    If Mr. Waldrop entered those days after the 8th of

8    the month, they would be reflected on the next.

9        Q    Okay.  Okay.  I see.

10       A    But Workday would actually show the exact dates

11   that he put in -- put it in by day.

12       Q    Are you aware of any instances where Mr. Waldrop

13   or anybody else at Community might have taken PTO or had

14   talked to their supervisor about PTO but then forgot to put

15   it in Workday and entered it in later?

16       A    I don't recall.

17       Q    Okay.  You're not aware of any instances where

18   that may have happened?

19       A    No.  I mean, I don't recall any, no.

20       Q    Okay.  Well, you were present for Mr. Waldrop's

21   deposition.  You may recall that there was a question during

22   his deposition about some PTO that was reflected on a

23   calendar in April of 2014.  Do you remember that?

24       A    I remember that.

25            (Plaintiff's Exhibit 9 marked for

104

1       identification.)

2   BY MR. HENRY:

3       Q    So, Ms. Taylor, I'm showing you what's been marked

4   as Exhibit 9.  I will represent to you that it's my

5   understanding this is a copy of Mr. Waldrop's calendar for

6   the entire year of 2014.  Does that appear to be what it is

7   to you?

8       A    It appears to be.

9       Q    Let's take a look at the page bearing Bates No.

10  17651.

11           Okay.  Do you see there on April 18th it says:

12  Mark PTO?

13      A    Yes.

14      Q    And if you flip the page to the following week,

15  April 21 through April 27, 2014, it looks like Monday,

16  Tuesday, Wednesday, Thursday, and Friday all say:  Mark PTO?

17      A    Uh-huh.

18      Q    So if Mr. Waldrop had requested and obtained PTO

19  for that time period, is it your testimony that that would

20  have shown up on his May paystub?

21      A    It depends on the time period that he entered it.

22      Q    Okay.  Okay.  Well, looking back at Exhibit 8 at

23  Bates No. 17960 -- I'm sorry, you're in -- maybe I gave you

24  the wrong exhibit number.  You're in Exhibit 9.  I'm talking

25  about the paystubs, Exhibit 8.  Sorry.

1       A    Okay, I'm sorry.

2       Q    I'm referring to them by exhibit number to keep

3  the record clear but...

4       A    What page was that, please?

5       Q    1796O.

6            Okay.  Looking at absence plans?

7       A    Yes.

8       Q    It appears that he has 200 hours of PTO?

9       A    Yes, his anniversary date was in -- was in March.

10      Q    Okay.  All right.  And then going over to the next

11  page, which is his paystub for May of 2014?

12      A    Uh-huh.

13      Q    He's still got 200 hours, correct?

14      A    Yes.

15      Q    And then on to June of 2014, he's still got 200

16  hours, right?

17      A    That is correct.

18      Q    Then in July, which is the next one, it appears

19  that his PTO has been reduced by 40 hours?

20      A    Yes.

21      Q    So under what you've testified earlier, that would

22  mean that he would have had to have requested and taken 40

23  hours of PTO in June for this to be accurate?

24      A    No, if he had entered -- the dates that -- the 40

25  hours, if he had entered those, it could have been June.  It

106

1   could have been May.  It could have been July 1st.

2        Q    Could it have been April?

3        A    There's a Workday report that shows the specific

4   dates that -- that were entered for PTO.  I'd have to see

5   that to actually answer your question.

6        Q    Okay.  Is it fair to say that if I look at Exhibit

7   9 and I don't see any PTO between April 18 --

8        A    Uh-huh.

9        Q    -- and July 31st, that perhaps the 40 hours

10  reflected on Mr. Waldrop's July paystub could have been for

11  that April PTO?

12       A    It doesn't mean that.  We're not required to put

13  our PTO on our calendar.

14       Q    But Mr. Waldrop did, didn't he, at least in April?

15       A    He did in April.

16       Q    And it appears that he did it at other places?

17       A    Again, I can't speak to Mr. Waldrop's personal

18  practices with his calendar.

19       Q    All right.  I'm going to ask you some questions

20  now that are not specifically covered by 30 (b) (6) topics

21  so not necessarily binding on the company although the two

22  may overlap.

23            There's been some discussion in this case about

24  UPL.  What is UPL?

25       A    UPL stands for Upper Payment Limit.

1      Q    Okay.  What is that:  Upper Payment Limit?

2      A    It is a supplemental payment program.

3      Q    Explain that to me?

4      A    It is a program administered by the federal

5    government.  States can apply for those funds.  There is an

6    application process, and they can apply for access to those

7    funds.

8      Q    Has Community Health Systems benefitted from UPL

9    payments?

10      A    We have received UPL payments, yes.

11      Q    You said you reviewed Mr. Rollins's deposition?

12      A    I did.

13      Q    Do you recall Mr. Rollins describing UPL as,

14    quote, the single greatest thing that ever happened to

15    Community Health Systems?

16      A    I don't recall seeing that.  I didn't read his

17    deposition in entirety.

18      Q    Okay.  Do you agree with that statement?

19      A    The single largest?  I don't know if I'd say that.

20    I mean, I don't know.

21      Q    That's fine.  That's what he said.  I was just

22    asking if you agreed with him.

23           Okay.  How much in -- well, strike that.

24           I believe you described UPL as a supplemental

25    payment program administered by the federal government, and

1  the states can apply for it?

2      A     That is correct.

3      Q     How did or do those funds get paid to Community

4  Health Systems?

5      A     The -- the facilities -- nursing facilities and

6  hospitals working through local authorities can access those

7  funds.

8      Q     At some point in time Community Health Systems

9  stopped receiving certain UPL payments?

10     A     Yes, we did.

11     Q     Is that correct?

12           When was that?

13     A     I think maybe 2014.  I do not recall.

14     Q     And in terms of dollars, what kind of -- how much

15  in payments were no longer being received?

16     A     In later years, roughly 40, 45 million.  In our

17  earlier years of participation, the state got most of the

18  money.

19     Q     So when Community stopped receiving some of these

20  UPL payments --

21     A     Uh-huh.

22     Q     -- is it your testimony that they -- the Community

23  Health Systems stopped receiving between 40 and 45 million a

24  year?

25     A     Roughly, yes.

1      Q    How does that compare to the overall revenue of

2  the company?

3      A    Overall revenue?  It's not significant.  I mean,

4  our revenues are roughly 3/4 of a billion dollars.

5      Q    Okay.  Community Health Systems have any

6  outstanding loans last year with United Community Bank?

7      A    Yes.

8      Q    And what were those loans?

9      A    We actually had a $20 million loan on real estate.

10     Q    Was that secured by the real estate?

11     A    It was, yes.

12     Q    Anything else?

13     A    No.

14          (Plaintiff's Exhibit 10 marked for

15      identification.)

16  BY MR. HENRY:

17     Q    Ms. Taylor, you're holding what the court reporter

18  has marked as Exhibit 10?

19     A    Yes.

20     Q    Have you had a chance to review Exhibit 10?

21     A    Yes.

22     Q    Do you recall receiving the e-mail from John

23  Thompson on August 22nd, 2016?

24     A    I recall receiving an e-mail.

25     Q    Okay.  In that e-mail Mr. Thompson says the 47.5

1    million UPL write-down for FYE 2015 is garnering attention?

2         A     Uh-huh.

3         Q     Do you know what he meant by that?

4         A     When we obtained the $20 million loan with United

5    Community Bank, we went through an underwriting process.

6    And we answered these questions in that underwriting

7    process.  That would have been in the spring of 2015.  The

8    loan was made in July of 2015.

9              We had already provided documentation in answering

10   these questions so...

11        Q     So he's following up on that?

12        A     He's following up to refresh his memory.

13        Q     What would you -- would you read that e-mail as a

14   concern on his part about the 47.5 million UPL write-down?

15        A     I don't read it as concern on his part.  He was

16   looking for assistance.  They had a -- had some new senior

17   lending officers in the organization that had come into the

18   organization since we obtained our loan.

19             And it was my understanding that they were

20   basically reviewing information on not just our loan but

21   other loans in anticipation of audits and I guess maybe

22   FDIC.  I don't really know.

23             But Mr. Thompson was trying to -- he couldn't

24   recall trying to get clarification on some of these

25   questions.  So, no, I don't -- I did not find it concerning.

1          What I found concerning was that we'd already done

2   this, and he's asking for it again.

3          Q    Okay.  So your e-mail:  FYI really with three

4   question marks --

5          A    Uh-huh, uh-huh.

6          Q    -- what did you mean by that?

7          A    It meant to Ronnie:  I see that I sent the e-mail,

8   and I do recall sending it.  We've already been through this

9   one time.  We've got to take the time to go through it

10  again.

11         Q    Well, it appears that Mr. Rollins responded and

12  said:  See comments below?

13         A    Uh-huh.

14         Q    And are the comments below the responses to the

15  four questions that are in Mr. Thompson's e-mails?

16         A    I don't see.

17         Q    They're at the bottom of the page.  I'm sorry.

18  Response below.  You see that there's -- in Mr. Thompson's

19  original e-mail to you on the first page.  Maybe it's the

20  third page.  Yeah, I think, yeah, okay.

21         Actually, his -- his e-mail to you in its original

22  form is on the very last page of Exhibit 10, right?

23         A    Uh-huh, yes.

24         Q    And if you go to the first page of Exhibit 10, it

25  appears that those four questions have answers after them.

1  Do you see that?

2      A    At the bottom?

3      Q    Yes, ma'am.

4      A    Yes.

5      Q    Are those the answers that Mr. Rollins provided?

6      A    It appears to be.

7      Q    If you had already provided this information, then

8  why couldn't you just provide the information without going

9  to Mr. Rollins?

10     A    I always make Mr. Rollins aware of any

11  correspondence that I have with outside banks or any outside

12  parties.

13     Q    Did you make Mr. Rollins aware of the concerns

14  that were voiced regarding Ms. Dotson's expense

15  reimbursement practices?  I'm sorry.  I can't find her name.

16  The lady who prepared the audits.

17     A    Repeat that question?  I'm sorry.

18     Q    Is it Brook Taylor?

19     A    Brook Davis.

20     Q    Davis.  You're Lorraine Taylor.  Brook Davis.

21          Did you share Brook Davis's concerns regarding

22  Ms. Dotson's expense reimbursement procedures with

23  Mr. Rollins?

24     A    I did not.

25     Q    Okay.  I believe you testified earlier that

1  Mr. Rollins's salary while Mr. Waldrop was COO, was $700,000
2  approximately?
3      A    You asked his current salary.  And, yes, it's
4  around $700,000.
5      Q    Is that what it was when Mr. Waldrop was COO at
6  the time he was terminated?
7      A    At the time he was terminated, I believe so.  I'd
8  have to look at my notes.
9      Q    I understand.  I know it's not exact.
10          What about your salary at the time he was
11  terminated?  What was your salary at the time he was
12  terminated?
13      A    Roughly $675,000.
14      Q    And Mr. Waldrop's salary was what at the time he
15  was terminated?
16      A    Roughly a million dollars.
17      Q    So he was making more than both you and
18  Mr. Rollins?
19      A    Yes.
20      Q    What's the current status of Community Health
21  Systems receiving UPL payments?
22      A    We're currently participating in several
23  facilities.
24      Q    How many is several?
25      A    Two.

1     Q    How many facilities were participating before some

2  of these funds were cut off?

3     A    Roughly 30, I'm guessing.  I don't recall the

4  exact number.

5     Q    If you would, describe for me your working

6  relationship with Ronnie Rollins.

7     A    Generally we had a good working relationship.

8     Q    How would you compare it to your working

9  relationship with Mr. Waldrop?

10     A    I worked real closely with Mr. Waldrop on a

11  regular basis.

12     Q    You're aware of the fact that Mr. Rollins or his

13  company gave Mr. Waldrop $250,000 --

14     A    Yes.

15     Q    -- in November of 2015?

16     A    Yes.

17     Q    How did you become aware of that?

18     A    Mr. Waldrop told me.

19     Q    When?

20     A    In middle of May of 2016.  I'm sorry, my voice is

21  going.

22     Q    We can take a break.  You okay?

23     A    I'm fine.

24     Q    What was the context of him telling you that?

25     A    He shared with me that Mr. Rollins had written him

1    a check for $250,000, and he didn't understand why.

2         Q    Okay.  And what did you say?

3         A    I don't recall what I said.

4         Q    Did you offer your thoughts on why he might have

5    done that?

6         A    I don't recall that I did.

7         Q    Have you ever received any money from Mr. Rollins?

8         A    I've not received any money from Mr. Rollins.

9         Q    How about with an entity Altamaha -- I'm not

10   sure -- A-L-T-A-M-A-H-A?  Altamaha Investment Holdings, Inc.

11   Have you ever received any money from that?

12        A    I have not.  No, I have not.

13        Q    Did you think it was appropriate for Mr. Rollins

14   to give Mr. Waldrop $250,000?

15        A    I was aware of other gifts that Mr. Rollins had

16   given to Mr. Waldrop.  They had a very long-term

17   relationship.  It was not my place to question it.

18        Q    Again, I understand it wasn't your place to

19   question.  I'm asking you if you felt it was appropriate.

20        A    I don't recall that I thought about it being

21   appropriate or not appropriate.

22        Q    Sitting here today, do you think it was

23   appropriate?

24        A    If he chose to give it to him, yes.

25        Q    Are you aware of Mr. Rollins giving money like he

1   gave to Mr. Waldrop to anybody else at Community Health

2   Systems?

3        A    Yes, I am.

4        Q    What -- what do you specifically?

5        A    Specifically, I recall somewhere around 2002

6   Mr. Rollins gave one million dollars each to Mr. Waldrop,

7   Dean Shuford and Freddie Walter.  And he put it into an LLC

8   that they were all members of.  If I believe correctly, it

9   was for investment purposes.

10       Q    Do you know what the name of that LLC was?

11       A    I think it was Southern Legacy Group.  I can't

12   recall exactly.

13       Q    Okay.  Other than the $250,000 and the one million

14   each that you just described, are you aware of any other

15   gifts or money that Mr. Rollins has given to other Community

16   representatives?

17       A    I am aware that in 2005 -- I believe that was the

18   time period -- that Mr. Rollins -- I'm not sure exactly how

19   the transaction occurred, but a million-dollar investment

20   that he gave to each of those -- those three persons, they

21   actually were exchanged for tax exempt bonds.  And I think

22   it was in the neighborhood of about $800,000.

23       Q    Okay.

24       A    And then I recall sometime -- and I don't know the

25   date -- maybe 2008, 2009, Mr. Waldrop approached Mr. Rollins

1    and asked for him to purchase his bond because he wanted to

2    get out of debt and pay off his house.

3        Q    How did you find out about that?

4        A    It required communications with the trustee.

5             Mr. Waldrop actually told me about it to begin

6    with, and then I assisted with the trustee.

7        Q    Okay.  Anything else?

8        A    I am aware that Mr. Rollins purchased some

9    property in Montana for Mr. Waldrop.  I don't know any

10   details of that other than that I am aware that

11   Mr. Rollins...

12       Q    How did you become aware of that?

13       A    Mr. Waldrop told me.

14       Q    Is that the case with regard to all these things

15   you just mentioned?  Mr. Waldrop told you?

16       A    Yes.

17       Q    All right.  Anything else?

18       A    I don't recall.

19       Q    Have you done any work for Mr. Rollins's other

20   businesses?

21       A    Any work?  What do you mean?

22       Q    Work of any nature for any businesses that

23   Mr. Rollins is involved in other than Community Health

24   Systems?

25       A    I have provided some accounting services for a

1    couple of entities that are related to the organization.

2          Q     Okay.  What entities were those?

3          A     Connector Medical Offices, LLC.

4          Q     Okay.

5          A     Connector Medical Offices, LLC.

6          Q     Okay.

7          A     Connector Medical Properties, LLC.  And Care More

8    Management Liquidating Trust.

9          Q     How is Connector Medical Offices related to

10   Community Health Systems?

11         A     Connector Medical Offices is an office --

12   physician office -- initially it was a physician office.

13   But the system has utilized it for administrative space.

14         Q     Okay.

15         A     So we've leased it from Connector Medical Offices.

16         Q     So is Connector Medical Offices an affiliate?  Is

17   it a subsidiary?

18         A     It is not.

19         Q     Completely separate entity?

20         A     Completely separate entity, yes.

21         Q     How about Connector Medical Properties?

22         A     That is the entity that owns an assisted living

23   facility that we operate.

24         Q     Okay.

25         A     And it's not an affiliate.

1     Q     So a separate entity?

2     A     Uh-huh.

3     Q     And Care More Management Investment Trust?

4     A     It's a liquidating trust.

5     Q     Were you paid for the work you did for these

6  entities?

7     A     I was not.

8     Q     Did Mr. Rollins offer to pay you?

9     A     I don't recall.  It's -- it was a minimal amount

10 of work.  There was very few transactions.

11    Q     Okay.  Did you ever complain to Mr. Waldrop about

12 Mr. Rollins?

13    A     I'm certain through the years I may have.

14    Q     Do you recall an incident where you were on the

15 phone with Mr. Waldrop while in a closet drinking wine upset

16 about Mr. Rollins?

17    A     I do not.  I have heard that from others, and I

18 find that quite comical.

19    Q     Why do you find it comical?

20    A     Because I've never drank wine in my closet.  If I

21 drink wine, I drink it in the livingroom.

22    Q     Okay.

23          (Discussion off the record.)

24          THE WITNESS:  Well, I started to since I had

25     heard that, I started to share with you that that's

1          how I prepared for any deposition.  But that

2          wouldn't be truthful.

3                  MR. HENRY:  Maybe we ought to take a break.

4                  (Brief recess.)

5     BY MR. HENRY:

6          Q    Ms. Taylor, you ready?

7          A    Yeah.

8          Q    I wanted to follow up briefly on these three

9     entities that you had done some accounting services for?

10         A    Yes, uh-huh.

11         Q    Who owned those entities?

12         A    Connector Medical Offices was owned by

13    Mr. Rollins, Mr. Britt Nelson and Mr. Al Bridges.

14              Excuse me, that was Connector Medical Properties.

15         Q    Okay.

16         A    I apologize.  Connector Medical Properties, the

17    three of them.

18         Q    Okay.  Connector Medical Offices?

19         A    Yes.

20         Q    Who owned that?

21         A    Ronnie Rollins and Britt Nelson.

22         Q    And Care More Management Investment Trust?

23         A    Liquidating Trust --

24         Q    Liquidating Trust?

25         A    -- does not have an owner.  The beneficiaries of

1    the trust are former owners of businesses that merged into

2    our organization and they took back bonds and they were put

3    into a trust.

4         Q    Who were those owners?

5         A    Britt Nelson, Glenn Nelson, Ronnie Rollins and

6    four of the Nelson children.

7         Q    Okay.  One topic that has come up before is VEBA.

8    Are you familiar -- you're familiar with VEBA, right?

9         A    I am.

10        Q    V-E-B-A.  It's an acronym.  I'm not going to make

11   you say what the acronym stands for, but VEBA is how we

12   refer to it.

13            When Mr. Waldrop was COO, who were the trustees of

14   the VEBA?

15        A    Mr. Waldrop, myself and Blair Lake.

16        Q    Who is John Hearn?

17        A    John Hearn is a principal of the benefit company.

18        Q    And what does the benefit company do?

19        A    They provide consulting services for the VEBA.

20            (Plaintiff's Exhibit 11 marked for

21            identification.)

22   BY MR. HENRY:

23        Q    Okay.  Ms. Taylor, you're holding what the court

24   reporter has marked as Exhibit 11?

25        A    Uh-huh.

122

1      Q     Let me know when you've had a chance to take a
2  look at it.
3      A     Okay.
4      Q     Exhibit 11 appears to be an e-mail from Ronnie
5  Rollins to John Hearn dated November 9, 2015?
6      A     Yes.
7      Q     Was there anything going on around that time
8  period with regard to the VEBA that would have made
9  Mr. Rollins take a more active role in the VEBA?
10     A     Yes, the financial performance of the VEBA had --
11  the VEBA had not performed as planned.
12     Q     Okay.  What do you mean by the VEBA had not
13  performed as planned?
14     A     A budget was established for the VEBA --
15     Q     Uh-huh.
16     A     -- with the assistance of the benefit company and
17  actuaries.  And actual performance of the VEBA had not
18  performed as the plan called for.
19     Q     And what was Mr. Rollins's role with regard to the
20  VEBA going to be in light of that?
21     A     To back up a minute, the trust agreement between
22  Community Health Systems, Inc., and the VEBA trustees was
23  signed by Mr. Rollins.  He had the authorization to enter
24  into that trust agreement on behalf of our Board of
25  Directors.

1      Q    Okay.  All right.

2      A    Uh-huh.

3      Q    So how does that answer my question about

4   Mr. Rollins's role with regard to the VEBA, his increased

5   role?

6      A    The shortfall in the VEBA was covered with funds

7   over and above premiums that were contributed by Community

8   Health Systems, Inc.

9      Q    Okay.  So is this another way to say what you just

10   said:  The losses of the VEBA were being made up by the

11   company?

12      A    That is correct.

13      Q    Do you recall a board meeting in November of 2015

14   where the VEBA was discussed?

15      A    Yes, I do.

16      Q    Tell me about that board meeting.

17      A    I don't recall the specifics of it.  I think maybe

18   a question was asked about the VEBA, and there were excess

19   reserves.  And previously the trustees had the -- well, to

20   back up a minute, the trustees have the obligation to manage

21   the plan assets.

22           And we went through an RFP and a selection

23   process, the trustees did, and selected a firm to provide

24   those services in the event we ever needed them.  And

25   Mr. Patton, who's a board member, was a principal of that

1  firm.

2      Q    Why was Mr. Patton chosen in response to the RFP?

3      A    Because they -- the trustees determined that they

4  were best qualified to manage the assets.

5      Q    Okay.

6      A    And the benefit company assisted us with the RFP

7  as well as legal counsel.

8      Q    Okay.  So the question of reserve funds was raised

9  at the November 2015 meeting?

10     A    Yes.

11     Q    By whom?

12     A    I don't recall.

13     Q    Was it Jimmy Patton?

14     A    It may have been Mr. Patton.

15     Q    Okay.  And what was the response to that issue

16  being raised at the meeting?

17     A    I remember Mr. Rollins responding, and I don't

18  recall it being a lengthy response.  I think it was -- it

19  spoke to the Affordable Care Act and changes in the

20  healthcare that were occurring about that time.

21     Q    All right.

22     A    I don't recall the specifics of it.

23     Q    Did Mr. Rollins approach either you or Mr. Waldrop

24  after the meeting to discuss the VEBA?

25     A    Following the meeting, the three of us were having

1  a conversation that led to conversations about the VEBA.  I

2  don't recall that it was -- that we began the conversation

3  discussing the VEBA.

4      Q   You did have at least a conversation with

5  Mr. Rollins and Mr. Waldrop immediately after the board

6  meeting, correct?

7      A   We did.

8      Q   And what was the content of that conversation?

9      A   Mr. Rollins expressed concern.

10      Q   Was he angry?

11      A   I would not say that he was angry.  I think it was

12  -- it was a very serious conversation.

13      Q   Did either you or Mr. Waldrop say anything during

14  this conversation?

15      A   I don't recall.  I don't recall.

16      Q   Did you feel threatened or upset after Mr. Rollins

17  had this conversation with you?

18      A   What do you mean -- what do you mean by

19  threatened?

20      Q   Do you recall sitting in your car with Mr. Waldrop

21  and shaking?

22      A   I recall sitting in my car with Mr. Waldrop.  It

23  was a challenging conversation.  I took responsibility as a

24  trustee for the performance of the VEBA.

25      Q   Do you recall shaking?

1    A    I may have.

2    Q    Out of fear or apprehension?

3    A    Not out of fear.

4    Q    Apprehension?

5    A    Not out of apprehension.

6    Q    Well, why would you be shaking?

7    A    I said I may have been shaking.

8    Q    Okay.

9    A    I don't -- I don't recall if I was shaking.

10    Q    Fair enough.  Would it be surprising to you to

11   learn that Mr. Waldrop felt intimidated by Mr. Rollins's

12   tone?

13    A    It was not surprising.  He expressed that to me.

14    Q    Did you -- strike that.

15         But you didn't share those feelings?

16    A    I was concerned, yes.  I was very concerned.

17   Again, I was a trustee of a VEBA that was not performing

18   well.

19    Q    Okay.  Have you ever undergone any treatment for

20   stress or nervousness?

21    A    Treatment for stress or nervousness?

22    Q    Yes, ma'am.

23    A    I have been hospitalized with chest pains at one

24   point.

25    Q    Were there any changes suggested or implemented

1   with regard to the VEBA after the November 2015 board

2   meeting.

3       A    What exactly do you mean?

4       Q    Well, to -- to cause it to perform better?

5       A    Well, we certainly were having discussions with

6   our -- with the benefit company, with our consultants.  And

7   we had recently, if I recall correctly the dates, had

8   recently changed third-party administrators.

9       Q    Who primarily was having the conversations with

10  the benefit company?

11      A    To my knowledge, Mark and Blair Lake.

12           (Plaintiff's Exhibit 12 marked for

13           identification.)

14  BY MR. HENRY:

15      Q    Ms. Taylor, you're holding what's been marked as

16  Exhibit 12?

17      A    Yes.

18      Q    Do you recall the series of e-mails that are in

19  Exhibit 12?

20      A    Yes.

21      Q    Jimmy Patton was the board member that was going

22  to be investing the reserve funds for the VEBA?

23      A    Yes.

24      Q    So in these e-mails he's following up with you on

25  the availability of those; is that correct?

128

1      A      Yes, yes.

2      Q      Why wouldn't you forward that e-mail along to

3   Mr. Waldrop or Mr. Lake as cotrustees of the VEBA?

4      A      Mr. Rollins is my supervisor.  He had asked that

5   we forward or that we include him in any communication.  And

6   especially with it being a board member, I chose to send it

7   to Mr. Rollins.

8      Q      Okay.  Did you not feel that you should have

9   copied Mr. Waldrop or Mr. Lake on that communication?

10     A      I can't say that I did or didn't.  I mean, it's

11  not here, but I can't say that they didn't receive this

12  information.

13     Q      Okay.  So you're saying that you may have

14  forwarded it to them separately?

15     A      Yes.

16     Q      Okay.  You just don't know that sitting here?

17     A      I just don't know that sitting here.

18     Q      Okay.

19            (Plaintiff's Exhibit 13 marked for

20         identification.)

21     A      (No response.)

22  BY MR. HENRY:

23     Q      Ms. Taylor, you're holding what's been marked as

24  Exhibit 13, and it's a fairly lengthy exhibit.  You're free

25  to take time to take a look at all of it if you would like

1   to, but I'm only going to ask you about the first couple of

2   pages.  Just let me know when you're ready.

3        A    Okay.

4        Q    At the bottom of the first page of Exhibit 13,

5   there's some initials there:  CHSGA VEBA.  Is that CHSGA,

6   Community Health Systems of Georgia?

7        A    It's the abbreviation for the d/b/a name, yes.

8        Q    Okay.  It appears there's going to be a call on

9   Monday, March 21st, 2016, at 4:00 p.m.; is that right?

10       A    If appears so, yes.

11       Q    Do you remember that call?

12       A    I do not specifically remember the call.

13       Q    The call was going to relate to the VEBA, correct?

14       A    It appears from this e-mail, yes.

15       Q    Were Mr. Lake or Mr. Waldrop copied any of the

16  communications relating to this call?

17       A    Not in the e-mail that you've handed me.  Again,

18  they could have received information outside of this e-mail.

19       Q    Well, would you have any reason to dispute

20  Mr. Waldrop saying that he did not know anything about this

21  call or participate in this call?

22       A    I have no reason to dispute that, no.  It was not

23  unusual for Mr. Waldrop and Mr. Lake to have conversations

24  with the benefit company without other trustees or benefit

25  committee members being present.

1      Q    As a trustee, did that -- did that appear to be

2  appropriate to you?

3      A    It was not appropriate.

4      Q    How do you know that these conversations had taken

5  place?

6      A    In 2015 when we made the decision to change

7  vendors for our third-party administration, Theresa Moody --

8  we were both benefit committee members, were asked to travel

9  to Chicago to meet with a company called BAS.  It was a due

10 diligence visit to -- it was one of the companies that was

11 being considered for vendors.

12          And I had asked -- I guess we were invited about a

13 month before the actual meeting.  I asked repeatedly of

14 Blair Lake for information regarding background on the

15 company.  I knew nothing about them.  I knew the benefit

16 company was handling the RFP, and I wanted some background

17 information before we go due diligence.

18          A couple of days prior to our -- our visit, I did

19 get some information.  And when we arrived that evening, we

20 had several members or representatives from the benefit

21 company, Mr. Waldrop, Mr. Lake, and Shelly Marshal who was

22 the other benefit committee member.

23          We were to have dinner with the -- with the

24 proposed vendor.  And when we walked into the restaurant

25 that night, it was obvious to Theresa and myself that

1  everyone in the room had met these people prior.  I mean,

2  and Theresa had no idea that they had already been having

3  meetings with them.

4         I questioned the benefit company the following

5  morning on the way over to their office and learned that

6  essentially work had been done, and the decision pretty much

7  had been decided that it would be the BAS.  They were

8  wrapping -- wrapping it up.

9         So, yes, it was inappropriate that Theresa and I

10  were not included in those conversations.

11     Q    Well, if Mr. Rollins and Mr. Lake were not

12  included in this conversation, would you view that as

13  inappropriate?

14     A    I would not 'cause it's not a decision-making

15  meeting.

16     Q    Okay.  Why would you be providing financial

17  information for a conference call, which is apparently what

18  Exhibit 13 is doing, if it wasn't for decision-making

19  purposes?

20     A    Mr. Rollins received a package from Mr. Lake

21  monthly.  When the VEBA reports came out, the financial

22  reports and the dashboards, he received those routinely.

23     Q    Okay.  Is the VEBA a separate entity from

24  Community Health Systems?

25     A    Yes, that is.

1      Q     Does Community Health Systems have any oversight

2  over on the VEBA?

3      A     Yes, they're the planned sponsor.

4      Q     Who are the current trustees of the VEBA?

5      A     Current trustees are myself, Ronnie Rollins and

6  Katherine Dennis, who is also a CHS board member.

7      Q     When did she become a board member?

8      A     She's been a board member since November of 2014,

9  I believe.

10     Q     Okay.  And so the current VEBA board is comprised

11  of two board -- or, excuse me.  Strike that.

12            The trustees of the VEBA right now consist of two

13  board members and you?

14     A     Yes.

15     Q     When was that change made?

16     A     The change was made effective -- I'd have to look

17  at the date to be quite honest with you.  I don't have that

18  in front of me.

19     Q     I've seen a document that has that date, but I

20  don't...

21     A     I don't recall the exact date.

22     Q     Okay.

23     A     That was a board decision.

24     Q     Do you attend every board meeting?

25     A     Yes.

1      Q    Do you take notes?

2      A    Yes.

3      Q    Are you responsible for preparing the minutes?

4      A    Yes, I am.

5      Q    Has there ever been an instance where a court

6   reporter or a stenographer has been present for board

7   meetings?

8      A    There have been.

9      Q    Okay.  If you're already taking minutes, why would

10   there be a stenographer there?

11      A    I take notes.  I don't take minutes.

12      Q    Okay.

13      A    I participate in the board meetings.  I have to

14   present.  It's very difficult for me to keep up.

15      Q    I've been there; done that.  I know.

16           Okay.  Who's the court reporter that sometimes

17   attends the meetings?

18      A    The company is Claude Joiner Reporting.  Claude

19   Joiner Reporting.

20      Q    Okay.  So when a court reporter attends the

21   meetings and types up a transcript, who do they send that

22   to?

23      A    To Community Health Systems.  They deliver it to

24   our office.

25      Q    Okay.  Do you have any responsibility for

1    reviewing that?

2        A    I have it available, yes, to prepare the minutes.

3        Q    Do you make any changes or alterations to the

4    transcript?

5        A    I don't alter the transcript.  I utilize the

6    transcript to prepare minutes.

7        Q    Do you keep the transcript?

8        A    I do not.

9        Q    So how to you dispose of them?  Do you shred them?

10       A    They're shredded, yes, along with all of our other

11   shredded documents.

12       Q    Do you have any transcripts that you've kept?

13       A    I would have to check to see.  I don't -- I don't

14   recall that I have any on hand at the moment.

15       Q    Okay.  Did you check to see if you had any

16   transcripts in conjunction with getting documents ready to

17   produce in this case?

18       A    At the point in time I was asked to produce the

19   minutes, yes, we produced all that we had on hand.

20       Q    Including transcripts?

21       A    Including transcripts, yes.

22       Q    So is it your testimony that if no transcripts

23   were produced, then you didn't have any?

24       A    As best I can recall, yes.

25       Q    I would just ask just to be double -- double sure,

1    and I would put the request on the record that any search be
2    made for the transcripts you may still have and that those
3    be produced.
4         A    Okay.
5              MR. HENRY:  Direct that to Mr. Daniel.  Just
6         want to make that on the record.
7    BY MR. HENRY:
8         Q    After you prepare board meeting minutes, do you
9    give those to Mr. Rollins or anybody else to review?
10        A    I send those to all board members in draft form.
11        Q    And most boards I've been involved in, there's a
12   meeting and then they approve the minutes from the prior
13   meeting?
14        A    That's what we do.
15        Q    Is that the same procedure?
16        A    Yes, yes.
17        Q    Are there revisions suggested throughout the days
18   leading up to the meeting where you approve the minutes?
19        A    There can be.  I don't recall, but they have the
20   opportunity to -- the board members have the opportunity to
21   comment.
22        Q    On the minutes?
23        A    On the minutes, yes, and ask questions.
24        Q    Have you ever participated in any executive
25   session --

136

1       A    I have not.

2       Q    -- meetings of the board?  So you've never taken

3  minutes of any executive session?

4       A    I have not.

5       Q    Do you know if Claude Joiner Reporters or any

6  other reporter has ever done a transcript?

7       A    They have not.

8       Q    Make sure I finish my question just to be sure the

9  record is clear.

10           Are you aware of whether Claude Joiner Reporters

11  or any other court reporting firm has done a transcript or

12  prepared a transcript of any executive sessions of the Board

13  of Directors?

14       A    I am not aware.

15       Q    To your knowledge, are any records kept of the

16  proceedings in executive sessions of the Board of Directors?

17       A    I would not have knowledge of that.

18       Q    Who would?

19       A    Joe Wall is Chairman of the Board.

20       Q    Are you aware of complaints that Mr. Waldrop made

21  against Mr. Rollins in May of 2016?

22       A    Yes.

23       Q    What's your understanding of those complaints?

24       A    Mr. Waldrop called me, informed me that he had had

25  a telephone conversation regarding an e-mail that

1    Mr. Waldrop had sent to him.

2              He informed me that he told Mr. Waldrop -- excuse

3    me -- Mr. Rollins that the e-mail was full of lies, and he

4    believed that Mr. Rollins was targeting him.

5         Q    Let's back up for just a second.

6         A    Uh-huh.

7         Q    When Mr. Waldrop called you, did he call you on a

8    cellphone?

9         A    He called me -- I was at home.  I can't recall if

10   it was on his cellphone or his wife's cellphone.

11        Q    Okay.  Do you have more than one cellphone?

12        A    Yes, I do.

13        Q    Do you have a business cellphone and a personal

14   cellphone?

15        A    Yes, I do.

16        Q    Why do you have a business and a personal

17   cellphone as opposed to just one phone?

18        A    I have had both for years.  There was a time that

19   the IRS required taxation, if you will, of -- it was taxable

20   wages if you used a personal phone -- a business phone for

21   personal uses.  Had it since way back when, and I've just

22   maintained it.  It's the primary phone on my family's

23   account so I've kept it.

24        Q    Did you ever tell Mr. Waldrop that he should call

25   you on your personal cellphone as opposed to your business

1  cellphone?

2      A    I may have.

3      Q    Did you ever tell Mr. Waldrop that the reason you

4  preferred to use your personal cellphone for certain

5  conversations is because Mr. Rollins was monitoring the

6  cellphone usage of Mr. Waldrop, you and others?

7      A    I did not tell him that.  Mr. Waldrop suggested

8  that he believed that Mr. -- that Mr. Rollins was monitoring

9  cellphones.

10      Q    So it was Mr. Waldrop that brought that up?

11      A    Yes.

12      Q    Did you ever tell Mr. Waldrop that someone from

13  Community Health Systems' IT Department or Computer

14  Department, if you will, had set up a program on

15  Mr. Rollins's computer where he could track incoming and

16  outgoing calls to Mr. Waldrop and others?

17      A    On his computer, no.

18      Q    On anything else?

19      A    Mr. Rollins has an IP phone.  It's a system phone

20  on his desk.  And he does have the ability to see extensions

21  for various individuals.  I have the same thing on my phone.

22      Q    Is that for his cellphone or a land line?

23      A    It's for -- it's for the office, the business

24  line.  It's an Internet based.  It has been that way for

25  years.

1    Q    Can he monitor cellphone usage?

2    A    No.

3    Q    And you don't recall ever telling Mr. Waldrop that

4    he had a program installed on his computer to monitor

5    cellphone usage?

6    A    I do not.

7    Q    All right.  Going back to this conversation you

8    had with Mr. Waldrop where he called you and told you that

9    Mr. Rollins had sent an e-mail full of lies and was

10   targeting him.  How did you respond to that?

11   A    To begin the conversation, Mr. Waldrop was so

12   emotional that I could not understand.  He was not coherent.

13   He was sobbing, and it took a few minutes for him to explain

14   to me what happened.

15        If I recall correctly, I advised him to sleep on

16   it.  And I told him that I would be praying for him.  And he

17   asked if I minded saying a prayer for him right there, and I

18   did.

19   Q    And did you -- did you get the sense from talking

20   to him that Mr. Waldrop was fabricating this?

21   A    I did not believe he was fabricating.  I felt that

22   there might be something going on in Mr. Waldrop's life that

23   he may be under some pressures I was not aware of.

24   Q    Did you ask him that?

25   A    I did not.

1    Q    Did you have any basis to believe that at that

2  time?

3    A    I did not other than he was very, very emotional.

4  And while we have very -- we both had very stressful jobs,

5  and we deal with very tough situations.  I felt that I was

6  dealing with a lot of the things that he was at the same

7  time.  And while I was concerned, I was not in -- I was not

8  in a desperate situation.  I felt -- and I felt like he for

9  whatever reason had reached maybe a breaking point.  I don't

10  know.

11    Q    Okay.  So is that where the conversation ended?

12  You said a prayer with him?

13    A    Uh-huh, that night, yes, I did.

14    Q    When's the next time you spoke to Mr. Waldrop

15  after that?

16    A    He called me the following morning.  I was on my

17  way to work.  And he was traveling, he said, to the office.

18  And his wife was driving.  And he was still fairly

19  emotional.  He indicated he had his wife drive him because

20  he was unable to drive to work.

21    Q    When you say going to the office, did you -- do

22  you mean to Macon?

23    A    I assumed...

24    Q    Or Dalton?

25    A    I assumed the Dalton office.

1     Q   Okay.  All right.  Is that -- is that all he told

2  you was that he was having his wife drive him to the Dalton

3  office?

4     A   He -- if I recall correctly, and I don't know that

5  I have the chronology exactly right.  But at some point he

6  was to have a conversation with Mr. Rollins.  And at some

7  point on that day -- it was a Friday -- he had a

8  conversation.  I don't know the times or anything.

9         But I did learn sometime later that day from

10  Mr. Waldrop that he had confronted Ronnie on a telephone

11  conversation about the lies in the e-mail.

12     Q   And what was your reaction to that?

13     A   I don't -- I don't recall exactly what I said.

14     Q   Did you think that was a dangerous thing or

15  foolish thing for him to do?

16     A   Dangerous, absolutely.

17     Q   Why do you say absolutely dangerous?

18     A   To call your supervisor a liar is pretty -- is

19  pretty serious.  Or, excuse me, it's very serious.

20     Q   Okay.  Did you tell him that?

21     A   I did not.

22     Q   All right.  So he told you that he had confronted

23  Mr. Rollins on the phone that day.  How did you respond to

24  that?

25     A   I don't recall.  I mean, we had conversations

1    regarding he felt he was being targeted.  And I tried to

2    reassure him.  I did not think he was being targeted.

3        Q    Okay.  I mean, I believe you said earlier that in

4    the January time frame when we were discussing these

5    audits --

6        A    Uh-huh.

7        Q    -- that you and Mr. Waldrop had had a rocky

8    relationship at that point?

9        A    We had gone through a difficult situation.  When

10   you work with someone for 20 years --

11       Q    Uh-huh.

12       A    -- there can be challenging times.

13       Q    Had that resolved itself in your mind by May when

14   you were having these calls with him?

15       A    I felt that we were in a better place, yes.

16       Q    And the reason I ask is because, was that

17   something that Mr. Waldrop did frequently:  Call you and

18   tell you about issues he's having with Mr. Rollins?

19       A    We discussed periodically.

20       Q    Okay.

21       A    But in normal course of business.

22       Q    Okay.  So after Mr. Waldrop informed you that he's

23   confronted Mr. Rollins, when is the next time you spoke to

24   Mr. Waldrop?

25       A    If I recall, Mr. Waldrop called me early on that

1    Saturday morning following the Friday conversation and

2    informed me that his office had been broken into -- his

3    Dalton office.

4        Q    Okay.  Was that surprising to you?

5        A    Yes, it was.

6        Q    And what did you say in response?

7        A    Mr. Waldrop informed me that he believed that

8    Mr. Rollins had broken into his office.

9        Q    Mr. Waldrop used those words with you?

10       A    Yes.

11       Q    Do you remember the specific words?

12       A    I can't recall the specific words, but he believed

13   that Mr. Rollins was responsible for the break-in.

14       Q    How did you respond to that?

15       A    I don't recall.

16       Q    Do you think it was a possibility that Mr. Rollins

17   could have been responsible for the break-in?

18       A    I did not.

19       Q    And you didn't tell Mr. Waldrop that you disagreed

20   with him or thought that that was --

21       A    I did not.

22       Q    -- not true?

23       A    I did not.

24       Q    What did you tell him?

25       A    I believe I tried to console him.  He was still

1    very emotional.

2         Q    At some point in time did he ask you for

3    Mr. Wall's number?

4         A    He did.

5         Q    Tell me about that.

6         A    I believe it was on Sunday of that same weekend.

7    He called and asked me -- well, if I recall correctly, I was

8    having lunch with my family, and my cellphone rang.  And it

9    was a call from his wife's cellphone.

10              He asked me to call him back on that -- that

11    number from a land line.  So I disconnected, went and found

12    a land line -- a phone, which was a little difficult because

13    we don't use them that often.  Tried to find one that was

14    charged, and I called him back.

15              At that point he discussed with me going to see

16    Mr. Wall.

17         Q    What did you say in response?

18         A    I don't recall exactly what I said in response.

19         Q    Did you think that was a smart idea?

20         A    I felt that if he believed that he could not

21    resolve his issues with Mr. Rollins, that it was appropriate

22    to go to the Chairman of the Board.

23         Q    Did you tell him that?

24         A    I don't recall exactly what I told him.

25         Q    Did it surprise you that he said he was going to

1   go to the Chairman of the Board?

2       A     Not in the state of mind that he was in, no.

3       Q     Had you ever experienced a conversation with

4   Mr. Waldrop when he was in a similar state of mind?

5       A     No.  That -- that time period -- I had never

6   experienced that before that time period.

7       Q     Okay.  Did you provide him with Mr. Wall's number?

8       A     Yes, I did.

9       Q     How did the conversation end?

10      A     Mr. Waldrop asked me if I would go with him to see

11  Mr. Wall.  And I told him, no.

12      Q     Why did you tell him, no?

13      A     Because I did not believe that I could go see

14  Mr. Wall.  I did not -- I did not have an issue at that

15  point that I felt that I needed to take to Mr. Wall.

16      Q     All right.  So after giving Mr. Waldrop Mr. Wall's

17  number, when is the next time you spoke to Mr. Waldrop?

18      A     I don't recall exactly when we spoke.  I do recall

19  that we never discussed the situation with -- this entire

20  situation at all.  I never knew that he had gone to Joe or

21  to Mr. Wall.  I never knew any of that so we had

22  conversations, but they were strictly business.

23      Q     When did you first learn that Mr. Waldrop had been

24  terminated?

25      A     If I recall correctly, I learned -- it was either

1  late on the 27th or maybe the morning of the 28th.

2      Q    And how did you find out?

3      A    Joe Wall.

4      Q    Did he call you?  Send you an e-mail?  Come see

5  you?

6      A    I recall he came to the office.

7      Q    And what did he tell you?

8      A    He may have called.  I really -- I can't remember.

9  But working out logistics to close the Dalton office.

10     Q    He told you that he was working out logistics to

11  close the Dalton office?

12     A    Yes.

13     Q    What else did he tell you?

14     A    I don't recall that he shared any other

15  information with me.

16     Q    Did he say:  Hey, Mark's been terminated?

17     A    I don't -- I don't recall that he did at that

18  time.  I received an e-mail later on the 28th along with a

19  group of other executives informing us of Mr. Waldrop's

20  termination.

21     Q    Okay.  Were you surprised?

22     A    Yes, I was surprised.

23     Q    Why?

24     A    I was hopeful that the issues could be resolved.

25     Q    In the days leading up to June 28th, 2015 -- '16,

1    had you been asked to do any kind of investigations or

2    audits of Mr. Waldrop's expense reimbursement requests?

3        A    I don't recall the exact dates of being asked to

4    provide information.  I do recall that early -- in early

5    June, I was interviewed by Joe Wall and Mr. Lange, so I was

6    aware that there was an investigation going on.

7        Q    Okay.  In early June?

8        A    Yes.

9        Q    Mr. Wall and Mr. Lange interviewed you?

10       A    Yes.

11       Q    Jointly or separately?

12       A    Separately.

13       Q    Okay.  Who interviewed you first?

14       A    Mr. Wall.

15       Q    All right.  And that was in early June of 2016?

16       A    Yes.

17       Q    And what was discussed during that interview --

18   that investigation interview?

19       A    I was made aware that there was an investigation

20   of accusations that Mr. Waldrop had made against Mr. Rollins

21   and that I may be asked to provide information or I was made

22   aware of the investigation.

23       Q    Did Mr. Wall tell you what the allegations were?

24       A    I can't remember if he told me on that day or not.

25       Q    Okay.  Did you have more than one interview with

1  Mr. Wall?

2      A    I did not.

3      Q    Okay.  And then I think you testified that

4  Mr. Lange interviewed you?

5      A    Yes.

6      Q    How long after Mr. Wall interviewed you did

7  Mr. Lange interview you?

8      A    The following day.

9      Q    Okay.  So both interviews took place around the

10  same time?

11      A    Yes.

12      Q    Okay.  And what did Mr. Lange interview you about?

13      A    Basically the same information.  Told me the same

14  thing that Mr. Wall had shared with me the previous day;

15  that there was an internal investigation; there were

16  allegations and investigation was ongoing; and I may be

17  asked to provide information.

18      Q    Were you ever asked to provide information?

19      A    At some point, and I can't recall exactly when,

20  but, yes.

21      Q    Can you tell me approximately how long after your

22  interviews with Mr. Wall and Mr. Lange that you were asked

23  to provide information?

24      A    I would say probably immediately after.  You know,

25  sometime the next day or so, yes, early.

1      Q      Okay.  And what were you asked to provide?

2      A      I would have to go back and check my notes.  I

3  mean, there's been a lot of information provided so I'm not

4  sure.  I can't tell you exactly today what I provided.

5      Q      Do you have notes from those interviews?

6      A      I do not.

7      Q      What records would you go back to check to see

8  what you provided?

9      A      I could check e-mail, or I would have most likely

10  shared those by e-mail.

11      Q      Okay.  And just to Mr. Daniel to the extent they

12  haven't already been produced, I would ask for any e-mails.

13  They probably have, but I'd just for the record...

14      A      Yes.

15      Q      Do you remember the type of information that you

16  were asked to provide?  Was it financial?

17      A      It was a number of things.

18      Q      Okay.

19      A      Some financial, some contracts, project-related

20  information.

21      Q      Was the information you were asked to provide

22  related to the issues that Mr. Waldrop had told you

23  Mr. Rollins had lied about in an e-mail?

24      A      I don't recall because I don't recall what was in

25  the e-mail.

1     Q     Okay.

2     A     I'm not sure that I ever saw the e-mail.

3     Q     Do you recall being asked for expense reports?

4     A     Yes.

5     Q     In early June of 2016?

6     A     Early June?  Probably.  Probably.

7     Q     Mr. Waldrop's expense reports?

8     A     Possibly.  I mean, I was asked for a lot of

9  information.

10    Q     What I'm getting at is, was the information you

11  were asked for related to Mr. Waldrop's allegations against

12  Mr. Rollins?  Or was it related to the events and

13  circumstances that Community Health Systems alleges led to

14  Mr. Waldrop's termination?

15    A     I can't speak to that.  I was asked to provide

16  information.  I did not ask questions about what I was

17  providing and what it would be used for.

18    Q     Okay.  Fair enough.

19          Other than the -- well, strike that.

20          How many times were you asked to provide

21  information?

22    A     I can't recall.

23    Q     I mean, was it multiple times?  It wasn't just

24  isolated?

25    A     At what time period are we talking about?

151

1    Q    June of 2016.

2    A    It would have been multiple times, yes.

3    Q    Did you ever have any conversations with

4 Mr. Rollins about the interviews?

5    A    I did not.

6    Q    Or the requests for information?

7    A    I did not.  I understood that the allegations that

8 were being investigated involved Mr. Rollins, and I did not

9 speak with him.

10    Q    Speak to Angela Hammack about it?

11    A    Yes, I spoke to Angela Hammack about the

12 information, did not provide information about why we needed

13 it.

14    Q    Did you tell her that you had been interviewed?

15    A    I may have.  I don't recall.

16    Q    As CFO of Community Health Systems, do you believe

17 Ms. Dotson's submission of Mr. Waldrop's expense

18 reimbursement requests justified Mr. Waldrop's termination?

19    A    I can't speak to that.  I don't know.

20    Q    Let me put it this way.  If one of your direct

21 reports did the same thing, would you terminate them?

22    A    I would have to look at the details of the

23 situation to make that determination.

24    Q    I'm getting close to being done, but I would like

25 to take a break.

1      A    Okay.

2           (Brief recess.)

3  BY MR. HENRY:

4      Q    All right.  Are you ready?

5      A    I'm ready.

6      Q    I think, Ms. Taylor, that will probably be our

7  last break 'cause I only have just a few more questions,

8  some follow-up questions and some additional questions.

9      A    Okay.

10     Q    Earlier when we were discussing the VEBA, and you

11  indicated that the VEBA trustees had put out an RFP for the

12  investment of the reserve funds --

13     A    Uh-huh.

14     Q    -- did Mr. Rollins inform you before the RFP went

15  out that Jimmy Patton's firm would be investing those funds?

16     A    Not that they would be; that they could be

17  considered.

18     Q    Okay.  Did you have a meeting with Mr. Patton and

19  Mr. Waldrop at an Italian restaurant whereby Mr. Waldrop

20  indicated to Mr. Patton that they would have to put out an

21  RFP for due diligence purposes?

22     A    We did have a meeting, yes.

23     Q    Is what I just said, was that discussed?

24     A    I don't recall that it was discussed at that

25  meeting, but it was discussed at some point.

153

1      Q    Okay.  Prior to the issuance of the RFP?

2      A    Yes.

3      Q    All right.

4           (Plaintiff's Exhibit 14 marked for

5      identification.)

6      A    (No response.)

7  BY MR. HENRY:

8      Q    Ms. Taylor, you're holding what's been marked as

9  Exhibit 14 and you are, of course, free to review the entire

10 document if you would like.

11     A    Uh-huh.

12     Q    But I am not going to ask you any questions about

13 what's behind the e-mail --

14     A    Yes.

15     Q    -- in front of you.

16          It appears from Exhibit 14 that you e-mailed to

17 yourself an e-mail that Stephanie Dotson had sent to B.

18 Lake?

19     A    Uh-huh.

20     Q    Which I'm assuming is Blair Lake; is that correct?

21     A    Uh-huh.

22     Q    Now, you had e-mailed to yourself an e-mail that

23 Ms. Dotson sent to Blair Lake on January 6th, 2016?

24     A    Uh-huh.

25     Q    And the date that you forwarded that e-mail to

154

1  yourself is June 28th, 2016, at 11:14 p.m.?

2      A    Uh-huh.

3      Q    Is that correct?

4      A    Yes, it is.

5      Q    Why would you be forwarding yourself that e-mail

6  on June 28th of 2016?

7      A    I most likely was doing it in response to a

8  request for information from Mr. Wall or someone in the

9  investigation.  And I can't tell you exactly why but...

10     Q    Well, is it your understanding that Mr. Waldrop

11  was terminated on June 28th, 2016?

12     A    It is my understanding.

13     Q    Okay.  So Mr. Waldrop had already been

14  terminated --

15     A    Uh-huh.

16     Q    -- at this point, correct?

17     A    Yes.

18     Q    So then the information you're gathering by this

19  e-mail is being gathered after his termination, correct?

20     A    On the date of his termination, yes.

21     Q    Was the information that you forwarded to yourself

22  on June 28th, 2016, at 11:14 requested from you after your

23  interviews with Mr. Wall and Mr. Lange in June of 2016?

24     A    Yes, as best I can recall, it was in conjunction

25  with an audit that legal counsel had engaged 3M to do.

1    Q    Okay.

2    A    If I recall correctly.

3    Q    And you testified earlier there were other things?

4    A    Yes, yes.

5    Q    This is more of that?

6    A    I think it's more of that, yes.

7    Q    Okay.  When did you first learn that Mr. Waldrop

8  had filed the lawsuit we're here about today?

9    A    If I recall correctly, we learned about it from

10  Mr. Lange -- from Mark Lange, if I recall correctly.

11    Q    Okay.

12    A    And then subsequent to being informed that a

13  lawsuit had been filed, Angela Hammack, who is corporate

14  secretary for Community Health Systems, Inc., was served in

15  our office.

16    Q    All right.  Did you at any time sign up with Pacer

17  Monitor to track events in this litigation?

18    A    Yes, I did.

19    Q    Why did you do that?

20    A    To obtain what had been filed.

21    Q    Are you still a subscriber to that?

22    A    Yes, I am.

23    Q    Have you shared anything that you have received as

24  a result of your Pacer Monitor subscription with individuals

25  outside Community Health Systems?

156

1    A    No, I have not.

2    Q    Have you discussed the allegations of this case

3  with anybody outside of Community Health Systems?

4    A    Not that I recall.

5    Q    Have you ever accused Mr. Waldrop to anybody

6  outside of Community Health Systems of having committed a

7  fraud?

8    A    I have not.

9    Q    Have you ever accused Mr. Waldrop to anybody

10  outside of Community Health Systems of having stolen money

11  from Community Health Systems?

12    A    I have not that I recall, no.

13         MR. HENRY:  I think that's it unless Mr. Daniel

14      has any follow-up questions.

15         MR. DANIEL:  No questions.

16         The witness will reserve the right to read and

17      sign the deposition.

18            (Deposition Concluded at 3:50 p.m.)

19

20

21

22

23

24

25

157

1                              DISCLOSURE

2     STATE OF GEORGIA

3     COUNTY OF BIBB

4     DEPOSITION OF:

5     MELANIE LORRAINE THOMAS TAYLOR, CFO; 30 (b) (6) Community

6     Health Systems, Inc.

7     DATE:  Tuesday, February 28, 2017

8
                    Pursuant to Article 10.B of the Rules and
9          Regulations of the Board of Court Reporting of the
           Judicial Council of Georgia, I make the following
10         disclosure:
                    I am a Georgia Certified Court Reporter.  I am
11         here as a representative of AMERICAN COURT REPORTING
           COMPANY, INCORPORATED.
12                  I am not disqualified for a relationship of
           interest under provisions of OCGA 9-11-28(c)
13                  AMERICAN COURT REPORTING COMPANY, INCORPORATED,
           was contacted by the offices of Gearhiser, Peters,
14         Elliott & Cannon, PLLC, to provide court reporting
           services for this deposition.
15                  AMERICAN COURT REPORTING COMPANY, INCORPORATED,
           will not be taking this deposition under any
16         contract that is prohibited under OCGA 15-14-37(a)
           and (b).
17                  AMERICAN COURT REPORTING COMPANY, INCORPORATED,
           has no exclusive contract to provide reporting
18         services with any party to the case, any counsel in
           the case, or any reporter or reporting agency from
19         whom a referral might have been made to cover this
           deposition.
20                  AMERICAN COURT REPORTING COMPANY, INCORPORATED,
           will charge its usual and customary rates to all
21         parties in the case, and a financial discount will
           not be given to any party to this litigation.
22                  This the 22nd day of March, 2017.

23

24
                        GAYE D. TRAYNOR, CCR #B-2209
25

158

1                     C E R T I F I C A T E
     STATE OF GEORGIA:
2
     COUNTY OF BIBB:
3
              I hereby certify that the foregoing transcript
4       was taken down as stated in the caption, and the
        proceedings were reduced to typewriting under my
5       direction and control.
              I further certify that the transcript is a true
6       and correct record of the evidence given at the said
        proceedings.
7             I further certify that I am neither a relative
        or employee or attorney or counsel to any of the
8       parties, nor financially or otherwise interested in
        this matter.
9             This the 22nd day of March, 2017.

10

11

12

13

14

15

16

17              GAYE D. TRAYNOR, CCR #B-2209

18

19

20

21

22

23

24

25

1            E R R A T A   S H E E T

2   IN RE:

3   MARK A. WALDROP
              versus
4   COMMUNITY HEALTH SYSTEMS, INC.
    FILE NO.:  4:16-CV-235-HLM
5   COURT:  United States District Court; Northern District
    of Georgia; Rome Division
6   DEPOSITION OF:  MELANIE LORRAINE THOMAS TAYLOR, CFO; 30 (b)
    (6) Community Health Systems, Inc.
7   DATE OF DEPOSITION:  February 28, 2017

8            I have read the transcript of my
    deposition and find that no changes are necessary.

9

10  _____
    MELANIE LORRAINE THOMAS TAYLOR
11
            Having read the transcript of my
12  deposition, I wish to make the following changes:

13  PAGE   LINE
    _____   _____   CHANGE: _____
14
            REASON: _____
15  _____   _____   CHANGE: _____
16
            REASON: _____
17  _____   _____   CHANGE: _____
18
            REASON: _____
19

20  _____ Date: _____
    MELANIE LORRAINE THOMAS TAYLOR
21
            Sworn to and subscribed before me, this
22  the _____ day of _____, 2017; _____
    County, Georgia.
23

24  _____
    Notary Public
25  My commission expires: _____

Mark A. Waldrop v.
Community Health Systems, Inc.

Melanie Lorraine Thomas Taylor, CFO
February 28, 2017

## $

**$14,000 (1)**
47:17
**$20 (2)**
109:9;110:4
**$250,000 (4)**
114:13;115:1,14;
116:13
**$5,000 (3)**
44:4,6;48:1
**$675,000 (1)**
113:13
**$700,000 (4)**
63:23;64:20;113:1,
4
**$800,000 (1)**
116:22

## A

**ABAC (4)**
9:6,7,9,10
**abbreviation (1)**
129:7
**ability (3)**
57:1;101:4;138:20
**above (2)**
86:24;123:7
**Abraham (3)**
9:1,2,4
**Absence (2)**
102:4;105:6
**absolutely (2)**
141:16,17
**access (4)**
58:1,3;107:6;108:6
**account (1)**
137:23
**accountant (1)**
29:22
**Accountant's (1)**
7:9
**accounting (3)**
6:25;117:25;120:9
**accounts (3)**
41:1;72:13;73:14
**accumulate (1)**
20:17
**accumulated (1)**
20:24
**accumulates (1)**
20:18
**accurate (1)**
105:23
**accusations (3)**
32:2;33:11;147:20
**accused (2)**
156:5,9
**accusing (2)**
92:8,17
**acknowledge (2)**

**37:10,13**
**acronym (2)**
121:10,11
**Act (1)**
124:19
**acted (1)**
42:10
**active (2)**
59:6;122:9
**activities (1)**
78:12
**actual (2)**
122:17;130:13
**actually (15)**
18:20;44:2;55:4;
69:8;79:20;87:3;
95:6;98:16;103:4,10;
106:5;109:9;111:21;
116:21;117:5
**actuaries (1)**
122:17
**Adaptive (3)**
20:5,6,21
**add (1)**
89:10
**added (2)**
62:6,9
**addition (2)**
96:25;97:15
**additional (4)**
60:2;62:7;71:12;
152:8
**address (2)**
32:3;49:19
**addressed (4)**
48:20;49:16;58:1;
98:3
**adjustment (2)**
64:22,23
**administer (1)**
55:13
**administered (2)**
107:4,25
**Administration (3)**
7:4,8;130:7
**administrative (1)**
118:13
**administrator (3)**
24:3;55:3;97:16
**administrators (1)**
127:8
**adopted (5)**
62:3;64:8;66:22;
96:19;97:1
**advance (2)**
73:5,12
**advised (1)**
139:15
**affect (1)**
22:11
**affiliate (3)**
10:19;118:16,25
**affiliates (3)**

**10:16,17;11:7**
**Affordable (1)**
124:19
**afterwards (1)**
29:7
**again (18)**
20:20;35:9;43:14;
50:6;61:22;64:1;
67:2,6;86:16;91:4;
94:8;97:23;106:17;
111:2,10;115:18;
126:17;129:17
**against (4)**
4:13;136:21;
147:20;150:11
**agent (2)**
8:8;73:3
**Aggregates (3)**
8:10,11,12
**agree (3)**
13:23;39:15;
107:18
**agreed (3)**
94:22;96:1;107:22
**agreement (4)**
99:15,24;122:21,
24
**agreements (4)**
96:21,25;97:4,10
**Agricultural (2)**
9:1,4
**ahead (7)**
6:1;11:21;59:20;
68:20;87:1,12,13
**AI (1)**
120:13
**alcohol (6)**
61:24;95:6,7,11,12,
17
**allegations (5)**
147:23;148:16;
150:11;151:7;156:2
**alleges (1)**
150:13
**allow (5)**
33:11;62:14,18,22,
23
**along (5)**
26:4;35:2;128:2;
134:10;146:18
**alongside (1)**
86:11
**Altamaha (2)**
115:9,10
**A-L-T-A-M-A-H-A (1)**
115:10
**alter (1)**
134:5
**alterations (1)**
134:3
**altered (1)**
98:20
**although (1)**

**106:21**
**always (2)**
30:22;112:10
**American (1)**
48:12
**amount (6)**
22:17;23:14;24:11;
63:15;72:16;119:9
**Amy (2)**
6:6,9
**analysis (2)**
50:13,17
**Angela (17)**
18:2;29:1,5,9,10;
30:11;34:7,8;38:23;
48:15;49:1,1,15;
92:5;151:10,11;
155:13
**angry (2)**
125:10,11
**Ann (2)**
49:7,8
**anniversary (2)**
100:25;105:9
**annual (1)**
24:2
**annually (1)**
24:14
**answered (1)**
110:6
**anticipation (1)**
110:21
**apart (1)**
82:8
**apologize (1)**
120:16
**apparently (1)**
131:17
**appear (4)**
88:15;89:22;104:6;
130:1
**appears (26)**
69:3,5;70:13;
71:10,21;73:3;75:11;
77:5;85:12,18;88:3;
89:13;101:25;
102:25;104:8;105:8,
18;106:16;111:11,
25;112:6;122:4;
129:8,10,14;153:16
**applicants (1)**
79:23
**application (3)**
42:2,20;107:6
**applications (11)**
29:24;30:10;31:6;
40:23,24;41:18;
44:19,21;45:9,12;
79:21
**applied (1)**
99:13
**apply (3)**
107:5,6;108:1

**appreciate (1)**
36:17
**apprehension (3)**
126:2,4,5
**approach (1)**
124:23
**approached (1)**
116:25
**appropriate (11)**
37:23;92:13;
102:20;115:13,19,21,
21,23;130:2,3;144:21
**appropriately (1)**
102:20
**approval (14)**
52:24;60:7;64:24;
66:3;70:25;72:14,24,
25;74:3,19;76:10;
91:12;99:23;100:3
**approve (12)**
21:21;22:4;61:2;
65:2;67:18;72:7,25;
74:12;101:8,11;
135:12,18
**approved (25)**
21:22;22:6,10,23;
40:3,6;52:24;55:9;
57:18;61:4;65:9,13;
69:21,22;70:22;
71:22;72:6,9,10,16,
16;73:13;76:13;
83:10;99:20
**approvers (1)**
57:10
**approves (3)**
22:15;60:8;61:7
**approving (2)**
56:24;57:8
**Approximately (3)**
6:13;113:2;148:21
**April (10)**
70:16;103:23;
104:11,15,15;106:2,
7,11,14,15
**area (3)**
6:16;19:1,23
**areas (1)**
25:16
**around (6)**
62:10;64:20;113:4;
116:5;122:7;148:9
**arranging (1)**
73:25
**arrived (1)**
130:19
**aspect (1)**
66:8
**assets (2)**
123:21;124:4
**assigned (3)**
19:11;36:10,16
**assist (4)**
13:16;42:20;54:19;

73:18

**assistance (2)**
110:16;122:16

**Assistant (2)**
52:3;55:12

**assisted (3)**
117:6;118:22;
124:6

**associate (3)**
56:15;77:8;95:5

**associates (7)**
30:19;43:2,14;
45:17;46:4;79:11;
95:6

**associates' (1)**
66:16

**Association (1)**
48:12

**assume (2)**
5:6;100:4

**assumed (2)**
140:23,25

**Assuming (2)**
61:4;153:20

**Atlanta (1)**
81:10

**Atlantic (1)**
81:9

**attach (2)**
60:4,23

**Attached (1)**
98:14

**attempt (1)**
94:17

**attend (5)**
7:16,19;82:19,21;
132:24

**attendance (6)**
41:7,9,12,21,24;
42:7

**attending (1)**
48:24

**attends (3)**
79:18;133:17,20

**attention (3)**
92:12,16;110:1

**attorney (1)**
4:10

**audit (17)**
63:3,11;83:15,19;
85:12,14;87:4,18,20;
88:16,16;89:14;90:9;
91:19,23;98:16;
154:25

**auditor (4)**
66:16,19,20;90:16

**audits (6)**
84:1;90:24;110:21;
112:16;142:5;147:2

**August (1)**
109:23

**authorities (1)**
108:6

**authority (5)**
55:16,18,24;56:2;
65:15

**authorization (3)**
57:20,22;122:23

**authorizations (1)**
57:16

**authorized (1)**
57:11

**authorizing (1)**
56:24

**automated (1)**
83:12

**automatic (2)**
54:23;61:5

**automatically (3)**
54:24;61:10;101:7

**availability (1)**
127:25

**available (2)**
102:7;134:2

**aware (45)**
31:9;32:23;33:1,5;
34:3,4;38:12;51:4,8,
17,20,21;52:4,18;
56:10;59:14;62:16;
67:13;72:15;73:19;
76:9;78:21;81:3;
101:10,13;103:12,17;
112:10,13;114:12,17;
115:15,25;116:14,17;
117:8,10,12;136:10,
14,20;139:23;147:6,
19,22

## B

**Bachelor (1)**
7:4

**Bachelor's (1)**
7:7

**back (27)**
47:20;48:14;50:6;
52:16;56:14;58:9,23;
61:2;65:22;67:22;
74:12;93:13,14;
94:18;99:4;101:8;
104:22;121:2;
122:21;123:20;
137:5,21;139:7;
144:10,14;149:2,7

**background (4)**
27:23;29:22;
130:14,16

**balance (1)**
44:8

**Baldwin (3)**
9:1,2,4

**ban (1)**
55:21

**Bank (2)**
109:6;110:5

**banks (1)**

112:11

**BAS (2)**
130:9;131:7

**base (1)**
30:17

**based (4)**
30:18;42:12;54:23;
138:24

**basic (2)**
93:1,16

**basically (3)**
30:24;110:20;
148:13

**basis (3)**
73:25;114:11;
140:1

**Bates (3)**
76:20;104:9,23

**bearing (1)**
104:9

**became (4)**
25:9,10;34:4;38:11

**become (5)**
25:4;43:6;114:17;
117:12;132:7

**becoming (1)**
9:18

**began (2)**
31:22;125:2

**begin (2)**
117:5;139:11

**beginning (1)**
59:3

**behalf (12)**
12:17;13:7;14:6,
17;15:3;35:20;36:1,
10;70:2;91:11;97:7;
122:24

**behind (1)**
153:13

**believes (1)**
55:20

**below (5)**
13:4;75:9;111:12,
14,18

**benchmark (1)**
50:14

**benchmarks (5)**
21:8,10,11,13;
50:11

**beneficiaries (1)**
120:25

**Benefit (14)**
29:21;121:17,18;
122:16;124:6;127:6,
10;129:24,24;130:8,
15,20,22;131:4

**benefits (5)**
30:1,2,3;41:1;
44:21

**benefitted (1)**
107:8

**besides (1)**

7:14

**best (5)**
36:8;48:22;124:4;
134:24;154:24

**better (2)**
127:4;142:15

**beyond (2)**
50:14;53:15

**billion (1)**
109:4

**bind (2)**
27:21;35:14

**binding (3)**
35:16;37:12;
106:21

**binds (1)**
36:22

**bit (7)**
4:21;11:19;16:24;
35:5;37:16;48:14;
54:11

**Blair (9)**
44:24,25;45:1,2;
121:15;127:11;
130:14;153:20,23

**board (40)**
8:1;22:6,8,10,15;
24:13,19;64:11;
65:14;78:17,18,19,
22;122:24;123:13,16,
25;125:5;127:1,21;
128:6;132:6,7,8,10,
11,13,23,24;133:6,
13;135:8,10,20;
136:2,12,16,19;
144:22;145:1

**boards (1)**
135:11

**bond (1)**
117:1

**bonds (2)**
116:21;121:2

**both (13)**
21:20;86:21,25;
87:5,6,23;88:1;
96:20;113:17;130:8;
137:18;140:4;148:9

**bottle (1)**
46:8

**bottom (6)**
70:11;71:8;102:4;
111:17;112:2;129:4

**Bowen (2)**
6:11,12

**box (1)**
102:3

**break (10)**
5:19,20;6:2;46:9,
15;83:6;114:22;
120:3;151:25;152:7

**break-in (2)**
143:13,17

**breaking (1)**

140:9

**breaks (1)**
5:21

**Bridges (1)**
120:13

**Brief (3)**
46:11;120:4;152:2

**briefly (2)**
12:10;50:6;120:8

**brilliantly (1)**
12:4

**bring (1)**
92:12

**bringing (1)**
39:8

**Briscoe (5)**
47:4,8,12,20,21

**Britt (3)**
120:13,21;121:5

**broken (2)**
143:2,8

**Brook (14)**
66:21;90:9,14,15,
19;91:2;98:8,15,18,
20;112:18,19,20,21

**brought (3)**
18:18;92:16;
138:10

**Brunswick (1)**
70:16

**buck (3)**
45:20,22,24

**budget (5)**
20:18;22:13,14,15;
122:14

**budgeted (4)**
23:14,23,23;24:11

**budgeting (6)**
19:16;20:2,4;21:3;
23:11;50:6

**budgets (2)**
24:14;25:21

**built (3)**
46:5;55:14;57:12

**Burger (2)**
87:22,25

**business (22)**
6:24;7:4,7;17:3,6,
10;21:22;23:17;28:8;
40:23,24;41:18;
51:14;52:22;60:21;
137:13,16,20,25;
138:23;142:21;
145:22

**businesses (3)**
117:20,22;121:1

**business-related (1)**
26:9

**butter (1)**
42:15

## C

Mark A. Waldrop v.
Community Health Systems, Inc.

Melanie Lorraine Thomas Taylor, CFO
February 28, 2017

**calendar (4)**
103:23;104:5;
106:13,18
**call (23)**
5:21;30:22,23;
33:10;37:14;79:19;
97:19;99:24;129:8,
11,12,13,16,21,21;
131:17;137:7,24;
141:18;142:17;
144:9,10;146:4
**called (17)**
4:4;20:5;47:1,7;
49:22;92:21;122:18;
130:9;136:24;137:7,
9;139:8;140:16;
142:25;144:7,14;
146:8
**calls (2)**
138:16;142:14
**came (2)**
131:21;146:6
**can (42)**
5:16,19,22;26:25;
27:18;34:15;35:12;
36:13;37:6;42:5;
48:22;50:21;53:20;
55:4,4,19;56:2;57:9;
62:17;63:15;75:19;
77:12;78:3;80:15;
83:3;85:2;87:9;
88:19,25;93:12;
99:25;107:5,6;108:1,
6;114:22;134:24;
135:19;139:1;
142:12;148:21;
154:24
**capable (1)**
43:4
**capital (7)**
43:19,22;44:1,3,6;
46:16;48:8
**capitalize (1)**
47:20
**capitalized (6)**
44:8;46:21;47:2,6,
18;48:2
**capturing (2)**
41:13;43:5
**car (2)**
125:20,22
**Care (14)**
10:14,16,18,20,24;
11:8,10;25:11;75:13,
16;118:7;119:3;
120:22;124:19
**career (1)**
79:12
**Caribbean (1)**
68:11
**case (8)**
65:4,6;68:8;86:5;
106:23;117:14;

134:17;156:2
**cases (3)**
26:11;93:9,23
**cast (1)**
48:25
**cause (4)**
86:21;127:4;
131:14;152:7
**cellphone (16)**
137:8,10,10,11,13,
14,17,25;138:1,4,6,
22;139:1,5;144:8,9
**cellphones (1)**
138:9
**censored (1)**
7:25
**Center (2)**
42:12;46:25
**central (1)**
54:5
**centralize (1)**
54:10
**centralized (1)**
54:6
**centralizing (1)**
54:5
**centric (2)**
26:23;27:5
**CEO (3)**
22:1;45:25;63:20
**certain (6)**
22:17;45:17;62:14;
108:9;119:13;138:4
**certainly (3)**
5:20;75:4;127:5
**Certified (1)**
7:9
**CFO (10)**
4:3;9:13,18;16:25;
17:9,17;19:18;20:15;
24:6;151:16
**Chairman (4)**
65:14;136:19;
144:22;145:1
**challenging (2)**
125:23;142:12
**chance (6)**
14:4;75:3,7;84:11;
109:20;122:1
**change (6)**
26:17,18;100:9;
130:6;132:15,16
**changed (5)**
18:12,15;26:22;
39:25;127:8
**changes (9)**
40:9;50:16,19;
51:1;66:10,14;
124:19;126:25;134:3
**characterization (1)**
39:15
**charged (1)**
144:14

**charges (1)**
71:12
**Charles (1)**
47:4
**charter (3)**
57:16,20,22
**Chattanooga (1)**
4:11
**check (8)**
61:12;102:25;
115:1;134:13,15;
149:2,7,9
**chest (1)**
126:23
**Chicago (1)**
130:9
**Chief (1)**
63:15
**children (2)**
8:13;121:6
**Childs (2)**
81:22,22
**child's (1)**
8:17
**C-H-I-L-D-S (1)**
81:23
**choose (1)**
80:8
**chopped (1)**
84:15
**chose (5)**
79:23;80:5;92:8;
115:24;128:6
**chosen (3)**
80:11,13;124:2
**Chris (5)**
18:2,16,18,20;
49:20
**chronology (1)**
141:5
**CHS (8)**
30:10;40:25;51:11;
53:23,24;76:23;
79:10;132:6
**CHSGA (1)**
129:5,5
**CHSI (1)**
41:23
**CHS's (1)**
15:14
**Churcher (4)**
49:7,8,9;50:2
**circumstances (1)**
150:13
**claim (1)**
68:8
**claims (3)**
31:13,25;32:6
**clarification (1)**
62:9;89:10;110:24
**clarify (2)**
36:5,12
**Claude (4)**

133:18,18;136:5,
10
**Clay (1)**
6:6,10
**clear (6)**
5:17;37:17;67:3,7;
105:3;136:9
**Clinical (2)**
19:21,22
**close (4)**
6:14;146:9,11;
151:24
**closely (1)**
114:10
**closet (2)**
119:15,20
**cloud-based (2)**
40:22;53:9
**CMS (4)**
42:12,18;43:8;48:5
**code (1)**
75:14
**coherent (1)**
139:12
**College (6)**
6:22,23;8:24,25;
9:1,4
**columns (4)**
84:22;85:1;86:23;
87:3
**comical (2)**
119:18,19
**coming (1)**
18:23
**comment (2)**
50:2;135:21
**comments (2)**
111:12,14
**committed (1)**
156:6
**Committee (5)**
31:6;48:23;129:2;
130:8,22
**communication (2)**
128:5,9
**communications (2)**
117:4;129:16
**Community (91)**
4:4,13;9:13,21;
10:4,13,16,21;11:6,9,
17;12:7,18,21;13:8,
11;14:6,17;15:4;
17:3,6;19:15;22:22;
25:1;28:10;29:21;
30:2,3;38:12;40:13;
41:23;42:1;44:10;
45:5;48:4;49:12;
52:1;54:1;56:11;
58:13;59:22;62:3,6,
16;63:1,14;64:7,9;
66:10;70:2;77:25;
81:19;82:11,24;
84:14;86:16;90:19;

97:20;99:13;100:6,
18;103:13;107:8,15;
108:3,8,19,22;109:5,
6;110:5;113:20;
116:1,15;117:23;
118:10;122:22;
123:7;129:6;131:24;
132:1;133:23;
138:13;150:13;
151:16;155:14,25;
156:3,6,10,11
**companies (1)**
130:10
**Company (47)**
10:14;18:13;20:16;
21:17,19;27:21;
30:12;34:17,24;
35:14,16,21;36:1,11,
22;37:4,13;39:13;
68:9,11;69:2,18;73:5,
13;80:9,16;81:3;
86:4;95:8,16;106:21;
109:2;114:13;
121:17,18;122:16;
123:11;124:6;127:6,
10;129:24;130:9,15,
16,21;131:4;133:18
**company's (1)**
11:11
**compare (3)**
87:13;109:1;114:8
**compensation (1)**
64:11
**complain (1)**
119:11
**complaint (1)**
48:18
**complaints (4)**
30:18,20;136:20,
23
**complete (3)**
60:24,24;89:16
**completed (2)**
79:20;90:9
**Completely (2)**
118:19,20
**compliance (9)**
17:15;19:7;63:6;
77:14;78:1,8,9,16,18
**complied (2)**
23:12;24:7
**complies (1)**
56:1
**comply (1)**
45:17
**complying (1)**
42:21
**component (1)**
41:22
**comprised (1)**
132:10
**Computer (4)**
138:13,15,17;

139:4

**concern (10)**
35:17;36:3;90:10;
91:3,5,20,22;110:14,
15;125:9

**concerned (3)**
126:16,16;140:7

**concerning (4)**
40:17;91:9;110:25;
111:1

**concerns (4)**
92:2;96:5;112:13,
21

**Concluded (1)**
156:18

**concurring (2)**
65:11;76:10

**conduct (1)**
36:19

**conducted (2)**
63:3;79:13

**conducting (1)**
86:2

**conference (1)**
131:17

**confide (1)**
26:6

**confronted (3)**
141:10,22;142:23

**confused (1)**
73:9

**confusing (1)**
52:9

**conjunction (2)**
134:16;154:24

**connected (2)**
10:20;82:13

**connection (2)**
79:14;81:15

**Connector (12)**
118:3,5,7,9,11,15,
16,21;120:12,14,16,
18

**Connie (4)**
13:21;54:11,16;
58:17

**considered (4)**
41:8;44:6;130:11;
152:17

**consist (1)**
132:12

**console (1)**
143:25

**consolidated (1)**
21:6

**construed (1)**
35:25

**consultant (1)**
19:8

**consultants (3)**
80:6,8;127:6

**consulting (1)**
121:19

**contend (1)**
97:12

**content (1)**
125:8

**context (1)**
114:24

**continue (1)**
91:2

**continues (1)**
30:6

**continuing (4)**
7:16,22;37:5,14

**contract (16)**
53:9,11;54:6,16,19,
23;55:2,6,6,25;56:7,
16,19;57:8,9,18

**contracts (13)**
53:14;54:2,9;55:6,
14,22;56:24,24;
57:21;59:4,4,4;
149:19

**contributed (1)**
123:7

**control (1)**
84:18

**conversation (27)**
5:11;38:22,25;
39:1,18;50:1;58:6;
91:13;125:1,2,4,8,12,
14,17,23;131:12;
136:25;139:7,11;
140:11;141:6,8,11;
143:1;145:3,9

**conversations (12)**
30:23;32:25;35:23;
125:1;127:9;129:23;
130:4;131:10;138:5;
141:25;145:22;151:3

**COO (21)**
19:24;25:13;26:1;
28:11,17,24;29:4,6,
19;40:14;46:19;59:2;
60:15;64:17;65:6;
77:23;96:9;100:9;
113:1,5;121:13

**coordinated (1)**
73:20

**coordinating (1)**
73:18

**coordination (1)**
80:19

**copied (2)**
128:9;129:15

**copy (2)**
24:24;104:5

**corollary (1)**
5:5

**corporate (12)**
19:7;56:25;77:14,
25;78:8,8,12,16;97:1,
5,11;155:13

**corporation (1)**
97:1

**correctly (11)**
17:5;47:17;116:8;
127:7;139:15;141:4;
144:7;145:25;155:2,
9,10

**correspondence (1)**
112:11

**cost (3)**
17:15;48:1;94:16

**costs (1)**
44:6

**cotrustees (1)**
128:3

**council (4)**
69:15;93:2,17;
94:13

**counsel (8)**
12:8;15:14;55:9,
21,22;86:3;124:7;
154:25

**couple (3)**
118:1;129:1;
130:18

**course (6)**
9:11;37:15;64:10;
85:4;142:21;153:9

**Court (13)**
4:12;9:6;12:3;
38:5;70:8;75:2;
101:20;109:17;
121:23;133:5,16,20;
136:11

**covered (10)**
24:5;34:23;35:11,
14;37:11;40:20;99:5,
16;106:20;123:6

**covers (2)**
101:25;102:16

**CPA (3)**
7:13,17;11:3

**CPAs (1)**
8:1

**cruise (5)**
68:8;69:2,6,10,16

**cruises (1)**
68:12

**current (7)**
7:22;58:20;113:3,
20;132:4,5,10

**currently (6)**
9:13;40:13;42:24;
49:15;60:10;113:22

**cut (2)**
55:10;114:2

# D

**d/b/a (1)**
129:7

**daily (1)**
26:12

**Dalton (10)**
8:18,19,20,22;

140:24,25;141:2;
143:3;146:9,11

**dangerous (3)**
141:14,16,17

**Daniel (19)**
15:15;26:24;27:14;
28:1;34:10;35:1,4,17,
23;36:18,25;37:20,
22;84:18,24;135:5;
149:11;156:13,15

**dashboards (1)**
131:22

**data (2)**
20:17;41:14

**date (11)**
93:3,18;100:25;
102:25;105:9;
116:25;132:17,19,21;
153:25;154:20

**dated (1)**
122:5

**dates (6)**
77:21;103:10;
105:24;106:4;127:7;
147:3

**David (1)**
8:18

**Davis (19)**
11:3;66:21;90:9,
13,14,15,19;91:2,5,
22;98:8;112:19,20,20

**Davis's (1)**
112:21

**day (10)**
35:13;42:19;
103:11;141:7,9,23;
147:24;148:8,14,25

**days (8)**
99:17;100:25;
102:15,19;103:7;
130:18;135:17;
146:25

**deadlines (1)**
53:18

**deal (1)**
140:5

**dealing (1)**
140:6

**dealings (1)**
28:7

**deals (1)**
59:19

**Dean (1)**
116:7

**debt (1)**
117:2

**December (3)**
85:13;94:15;103:5

**decided (1)**
131:7

**deciding (1)**
55:25

**decision (3)**

130:6;131:6;
132:23

**decision-making (2)**
131:14,18

**define (1)**
57:9

**defined (1)**
60:21

**degree (2)**
7:1,3

**delegated (3)**
65:15,17,18

**deliver (1)**
133:23

**Dennis (1)**
132:6

**deny (3)**
61:2;74:12;101:9

**Department (2)**
138:13,14

**depended (1)**
26:10

**depending (2)**
26:11;85:4

**depends (5)**
63:11;64:2;102:15,
18;104:21

**depose (1)**
37:3

**deposed (1)**
37:4

**deposit (2)**
61:13,14

**deposition (16)**
4:17,20;11:16;
15:13;16:5,7,9,17;
36:19;103:21,22;
107:11,17;120:1;
156:17,18

**depositions (2)**
13:20;86:6

**depreciable (1)**
48:13

**describe (10)**
16:25;25:25;26:2;
27:11;28:6;55:1;
59:22;78:3;99:12;
114:5

**described (8)**
13:21;41:15;45:19;
47:9;49:22;79:25;
107:24;116:14

**describing (1)**
107:13

**description (3)**
24:5;39:19;60:12

**designated (5)**
12:7;35:18;40:16;
53:5;79:2

**designation (1)**
13:23

**desk (2)**
59:7;138:20

**desperate (1)**
140:8
**details (2)**
117:10;151:22
**determination (4)**
23:18,22;54:10;
151:23
**determine (1)**
21:16
**determined (3)**
24:6;43:15;124:3
**determining (1)**
48:13
**development (3)**
79:7,8,9
**dictated (1)**
23:3
**difference (3)**
80:20;88:4,20
**differences (2)**
26:21;98:9
**different (7)**
41:20,22;52:7;
55:8;64:4;72:14,24
**difficult (5)**
84:17;87:9;133:14;
142:9;144:12
**diligence (4)**
70:16;130:10,17;
152:21
**dinner (1)**
130:23
**direct (24)**
17:21;18:9;25:6,9;
29:13,15,21;45:16;
61:13,14;65:1,25;
66:17,18;78:12;85:8;
93:6,10,20,25;94:7,
21;135:5;151:20
**directly (8)**
25:6;34:23;36:14;
37:2;56:12;57:10;
60:25;97:5
**Director (6)**
10:12,23;25:10;
29:21;49:14;54:16
**Directors (6)**
22:7;24:19;78:17;
122:25;136:13,16
**directory (1)**
59:7
**disagreed (2)**
39:20;143:19
**disagreements (1)**
92:5
**disciplined (1)**
7:25
**disclosed (1)**
98:5
**disconnected (1)**
144:11
**discretion (1)**
22:24

**discuss (8)**
27:16;28:9;29:3;
30:11;32:6,15;33:21;
124:24
**discussed (13)**
30:15;92:25;93:15;
94:12;123:14;
142:19;144:15;
145:19;147:17;
152:23,24,25;156:2
**discusses (1)**
35:23
**discussing (6)**
28:14,19,22;125:3;
142:4;152:10
**Discussion (9)**
16:14;38:3;48:14;
67:9;77:9;78:4;83:4;
106:23;119:23
**discussions (9)**
31:12,19;32:12,17,
18,21;33:23;42:6;
127:5
**dispose (1)**
134:9
**dispute (5)**
34:18,19;36:21;
129:19,22
**distinction (1)**
35:16;72:8
**Distributed (1)**
24:18
**District (2)**
4:12,13
**division (4)**
22:22;23:14,20,22
**divisions (1)**
21:2
**document (8)**
12:5;13:20;15:21;
47:11;86:10;87:7;
132:19;153:10
**documentation (9)**
60:4,5,23;72:1;
85:12;93:7,21;94:17;
110:9
**documenting (1)**
60:1
**documents (13)**
12:25;13:14;14:13,
22;15:6;16:22;87:5,
6;88:20;89:3;99:3;
134:11,16
**dollars (7)**
22:19,23,24;
108:14;109:4;
113:16;116:6
**Dominican (1)**
82:17
**done (15)**
54:22;56:10;63:10;
73:23;83:21;85:13;
111:1;115:5;117:19;

120:9;131:6;133:15;
136:6,11;151:24
**Dotson (34)**
51:24,25;52:5,18;
58:3;59:15;67:17;
70:1,19;71:19;72:5;
73:7,8,17,20;78:25;
81:4;88:5,22;89:1,
23;90:3;91:6,17;
92:12;93:6,20;94:6;
96:5,12;97:8;98:22;
153:17,23
**Dotson's (13)**
51:22;67:13;70:13;
71:8;73:1;75:9;
90:11;92:1;98:10,11;
112:14,22;151:17
**double (2)**
134:25,25
**down (7)**
13:3;36:20;57:11;
69:6;70:15;86:8;88:7
**draft (1)**
135:10
**drank (1)**
119:20
**drink (2)**
119:21,21
**drinking (1)**
119:15
**Drive (5)**
6:6,10;140:19,20;
141:2
**driven (1)**
43:8
**driving (1)**
140:18
**Due (4)**
70:16;130:9,17;
152:21
**duly (1)**
4:5
**During (9)**
31:19;32:8,9,12;
39:18;89:14;103:21;
125:13;147:17
**duties (10)**
16:25;17:1,9;
19:10;29:18,20;31:2;
39:25;40:2,11

**E**

**earlier (13)**
48:4;65:24;67:12;
71:16;74:5,9;77:13;
105:21;108:17;
112:25;142:3;
152:10;155:3
**early (11)**
31:24;91:14,21;
142:25;147:4,4,7,15;
148:25;150:5,6

**easier (2)**
9:9;86:8
**easy (2)**
5:11;85:1
**education (12)**
6:18,21;7:8,17,23;
46:3,4;79:15,18,25;
80:6;94:13
**effect (1)**
37:12
**effective (2)**
43:6;132:16
**efficiency (1)**
54:9
**eight (2)**
17:21;65:24
**either (11)**
27:15;58:21;74:12;
77:3;81:9;93:7,21;
97:3;124:23;125:13;
145:25
**else (19)**
16:1;19:13;23:6;
28:10;39:9;53:1;
78:22;80:15;92:14;
99:22,24;103:13;
109:12;116:1;117:7,
17;135:9;138:18;
146:13
**e-mail (35)**
52:6;85:17,18;
87:17,19;109:22,24,
25;110:13;111:3,7,
19,21;122:4;128:2;
129:14,17,18;136:25;
137:3;139:9;141:11;
146:4,18;149:9,10,
23,25;150:2;153:13,
17,22,25;154:5,19
**e-mailed (2)**
153:16,22
**e-mails (4)**
111:15;127:18,24;
149:12
**emotional (4)**
139:12;140:3,19;
144:1
**employed (5)**
28:11,16,17;81:18;
100:2
**employee (4)**
35:24;49:4;59:24;
60:22
**employees (7)**
17:19;70:3;93:11,
25;95:1,2,16
**employment (7)**
9:19;29:11;96:20,
25;97:4,10;99:15
**end (3)**
11:18;39:1;145:9
**ended (1)**
140:11

**enforcement (3)**
45:23,24;78:19
**enforcing (3)**
45:14;46:2;78:15
**engaged (2)**
86:3;154:25
**engages (1)**
64:11
**enough (6)**
43:21;73:4,12;
82:7;126:10;150:18
**ensure (2)**
50:10;63:6
**enter (7)**
55:5;60:22;101:2;
102:15,18,19;122:23
**entered (12)**
54:2;55:7,8,25;
56:4,7;103:7,15;
104:21;105:24,25;
106:4
**entire (3)**
104:6;145:19;
153:9
**entirety (1)**
107:17
**entities (5)**
118:1,2;119:6;
120:9,11
**entitled (4)**
34:20;35:9;87:6,18
**entity (7)**
78:10;115:9;
118:19,20,22;119:1;
131:23
**entries (2)**
87:25;88:4
**entry (3)**
71:11;75:12;76:21
**ER (1)**
71:13
**escalated (2)**
31:24;32:12
**especially (1)**
128:6
**essentially (3)**
20:17;59:7;131:6
**establish (1)**
64:14
**established (1)**
122:14
**estate (2)**
109:9,10
**even (4)**
5:16;34:18;35:10;
62:17
**evening (1)**
130:19
**event (1)**
123:24
**events (2)**
150:12;155:17
**everyone (1)**

131:1

**evil (2)**
39:1,19

**exact (6)**
16:12;103:10;
113:9;114:4;132:21;
147:3

**exactly (14)**
28:4;38:3;47:12;
116:12,18;127:3;
141:5,13;144:18,24;
145:18;148:19;
149:4;154:9

**EXAMINATION (2)**
4:7;37:16

**examined (2)**
4:6;34:14

**example (5)**
55:3;62:16;70:19;
71:18;102:23

**exception (1)**
5:25

**excess (1)**
123:18

**exchanged (1)**
116:21

**Excuse (6)**
68:15;69:25;
120:14;132:11;
137:2;141:19

**executed (1)**
96:23

**executing (1)**
55:14

**execution (1)**
56:21

**Executive (10)**
52:3;63:15;64:11;
66:15;99:16;100:22;
135:24;136:3,12,16

**executives (1)**
146:19

**exempt (1)**
116:21

**Exhibit (101)**
11:21,23;12:3,4,9,
12,19;13:9;14:8;
15:3,22,23;57:25;
58:7;59:19;68:19,20,
21,24;69:19;70:5,9;
71:2,6,9;72:21,23;
74:2,14,19,23;75:3,7,
10,13,19;76:9;79:3;
84:5,9;85:11;86:11,
12,16,20,20,25;87:9,
17,19;88:5,7,10,15,
17,22,23,25;89:12,
20,23;90:4;91:18,23;
92:2;97:18;98:5,9,9,
14;99:4;101:17,21;
102:21;103:25;
104:4,22,24,24,25;
105:2;106:6;109:14,

18,20;111:22,24;
121:20,24;122:4;
127:12,16,19;128:19,
24,24;129:4;131:18;
153:4,9,16

**existing (1)**
59:4

**expanded (1)**
40:2

**expectations (2)**
96:11,12

**expenditure (6)**
24:7;60:6;61:23;
72:12;92:15,15

**expenditures (12)**
23:16;44:3,4;47:8,
9;48:8;51:22;52:23;
59:25;62:10;73:2;
91:11

**expense (64)**
41:1;43:19;44:1,7;
47:21;51:15,23;52:6,
12,19,23;59:18,23;
60:1;61:8;62:14;
65:9,19;66:2,6,11,16;
67:13;68:2;69:19;
70:1,15,20,22;71:18,
22;72:6,10;73:6,7,8,
15;74:9,18;75:20,20;
76:2,14;79:4;80:20;
81:5;83:7;86:24;
87:4,7,18,20;90:11;
92:16;96:6,15;98:16,
23;112:14,22;147:2;
150:3,7;151:17

**expensed (5)**
44:9;46:21;47:2;
48:2;68:9

**expenses (32)**
43:22;46:16;51:14;
60:23;61:18;62:22;
64:24;66:7;67:17;
69:18;72:9;73:21;
76:3;80:22;81:1,15;
82:23;83:15;90:11;
91:6;92:1;93:10,
24;94:25;95:17,18;
96:13,24;97:2,6,17

**experienced (2)**
145:3,6

**expirations (1)**
54:21

**explain (7)**
34:15;36:12;90:8;
93:12;95:4;107:3;
139:13

**express (1)**
91:22

**expressed (6)**
90:10;91:2,5,20;
125:9;126:13

**extend (1)**
55:24

**extensions (1)**
138:20

**extensive (1)**
35:1

**extent (10)**
5:16;25:13;35:15;
37:10;38:7;57:4,7;
59:13;98:7;149:11

## F

**fabricating (2)**
139:20,21

**facilities (5)**
24:2;108:5,5;
113:23;114:1

**facility (3)**
10:17;55:4;118:23

**fact (2)**
94:13;114:12

**factors (1)**
64:4

**facts (1)**
33:11

**fair (7)**
5:7;43:21;62:21;
77:18;106:6;126:10;
150:18

**fairly (2)**
128:24;140:18

**falls (2)**
17:16;71:15

**familiar (9)**
4:21;26:14,15;
27:9,10;68:9;77:6;
121:8,8

**familiarize (1)**
84:11

**family (2)**
81:18;144:8

**family's (1)**
137:22

**far (4)**
5:10;37:17;57:8;
73:12

**FDIC (1)**
110:22

**fear (2)**
126:2,3

**federal (2)**
107:4,25

**feel (3)**
92:7;125:16;128:8

**feelings (1)**
126:15

**felt (13)**
39:5;92:5;94:19;
115:19;126:11;
139:21;140:5,8,8;
142:1,15;144:20;
145:15

**few (5)**
12:10;35:6;119:10;

139:13;152:7

**filed (3)**
155:8,13,20

**finances (1)**
11:11

**Financial (28)**
9:20;10:2,12,23;
17:11,13,14,14,16;
20:19;25:10,10;
29:24;30:10;44:18;
58:19;66:5;71:11,15;
72:4;82:13,16;83:1;
122:10;131:16,21;
149:16,19

**financially (1)**
21:17

**financial-related (1)**
45:9

**find (8)**
30:25;110:25;
112:15;117:3;
119:18,19;144:13;
146:2

**findings (5)**
92:10;93:1,15;
94:14;98:15

**fine (4)**
46:10;67:6;107:21;
114:23

**finish (2)**
67:3;136:8

**finished (2)**
12:15;13:5

**fire (3)**
38:23,24;39:7

**firm (4)**
123:23;124:1;
136:11;152:15

**first (18)**
4:5;23:3;70:14;
71:11;75:10,12;
85:17;87:8;92:3;
95:24;101:24;
111:19,24;129:1,4;
145:23;147:13;155:7

**fit (3)**
23:15;36:20;84:25

**five (3)**
12:8;15:18;88:4

**flip (1)**
104:14

**flows (3)**
60:10,17;61:4

**focus (1)**
100:14

**follow (4)**
48:10;62:11;96:15;
120:8

**followed (1)**
100:4

**following (11)**
91:10;94:13;
104:14;110:11,12;

124:25;127:24;
131:4;140:16;143:1;
148:8

**follows (3)**
4:6;48:5;93:14

**follow-up (2)**
152:8;156:14

**foolish (1)**
141:15

**force (1)**
77:2

**forecasting (1)**
21:19

**foremost (1)**
23:3

**Forgive (1)**
58:23

**forgot (2)**
84:25;103:14

**form (3)**
26:24;111:22;
135:10

**formal (2)**
6:18,21;7:8

**former (1)**
121:1

**formerly (1)**
19:11

**forward (3)**
59:9;128:2,5

**forwarded (3)**
128:14;153:25;
154:21

**forwarding (1)**
154:5

**found (2)**
111:1;144:11

**four (5)**
42:14;82:8;111:15,
25;121:6

**Fourteen (1)**
6:8

**fourth (1)**
20:23

**frame (2)**
31:19;142:4

**Frank (1)**
11:3

**fraud (1)**
156:7

**Freddie (1)**
116:7

**free (3)**
79:3;128:24;153:9

**frequently (3)**
67:25;68:1;142:17

**Friday (3)**
104:16;141:7;
143:1

**front (6)**
12:2;84:9;87:18,
20;132:18;153:15

**Fugeway (1)**

Mark A. Waldrop v.
Community Health Systems, Inc.

Melanie Lorraine Thomas Taylor, CFO
February 28, 2017

80:17
**full (2)**
137:3;139:9
**fully (1)**
53:21
**function (2)**
39:12;54:10
**functions (1)**
25:18
**funds (14)**
23:12,23,23;24:8;
107:5,7;108:3,7;
114:2;123:6;124:8;
127:22;152:12,15
**further (1)**
61:16
**future (1)**
50:3
**FYE (1)**
110:1
**FYI (1)**
111:3

**G**

**garnering (1)**
110:1
**Gary (1)**
4:10
**gatekeeper (1)**
13:22
**gathered (1)**
154:19
**gathering (1)**
154:18
**gave (6)**
33:11;104:23;
114:13;116:1,6,20
**general (9)**
17:1,2;40:25;
43:23;51:21;60:12;
63:21;68:16;78:10
**generally (7)**
26:2;59:19;62:10;
66:9;67:25;100:1;
114:7
**generated (2)**
54:24;88:25
**generates (1)**
61:12
**generation (1)**
89:2
**Georgia (10)**
4:13;6:6,11,14,22,
23;7:11;9:5;70:16;
129:6
**gets (1)**
100:25
**gifts (2)**
115:15;116:15
**gist (1)**
28:5
**given (4)**

4:17;74:11;115:16;
116:15
**gives (1)**
36:22
**giving (3)**
11:16;115:25;
145:16
**Glenn (1)**
121:5
**God (1)**
39:2
**goes (1)**
60:25
**golf (1)**
9:11
**good (6)**
4:9;5:9;6:4;26:2;
46:9;114:7
**Goodness (1)**
81:8
**government (2)**
107:5,25
**grass (1)**
9:11
**Gray (3)**
6:6;86:23;87:3
**greater (1)**
48:1
**greatest (1)**
107:14
**grounds (2)**
38:23,24
**group (4)**
69:16;72:4;116:11;
146:19
**growth (1)**
79:10
**guess (4)**
90:22;97:18;
110:21;130:12
**guessing (1)**
114:3
**guidance (1)**
46:21
**guideline (3)**
24:1;62:13;96:19
**guidelines (37)**
22:25;23:1,2,3,6,6,
8,9,12,13;24:4,8;
44:3;48:5,6,10,11;
61:23;62:1,4,7,22;
63:8,13,25;64:1,6,7,
10;78:12;93:2,17;
96:11,16;97:1,5,11

**H**

**Haddock (2)**
6:11,14
**halfway (1)**
70:15
**Hammack (39)**
18:2;29:1,5,9,10,

20;30:11,16,24;31:9,
13;32:1,7,20,23,25;
33:5,13;34:2,2,11,17;
35:4;38:11,18;39:1,3,
12,16,19;48:15;49:1,
15,24;50:1;92:5;
151:10,11;155:13
**Hammack's (4)**
29:18,20;39:25;
40:2
**hand (2)**
134:14,19
**handed (4)**
87:10;101:20,21;
129:17
**handled (6)**
80:21,25;81:2;
95:21;96:24;97:2
**handling (1)**
130:16
**handwritten (3)**
75:22;76:23;77:1
**happen (1)**
31:17
**happened (6)**
49:22,25;67:21;
103:18;107:14;
139:14
**happens (3)**
21:3;60:9;83:17
**hard (1)**
82:7
**Harry (1)**
45:19
**head (3)**
5:11,12;63:19
**Health (82)**
4:4,13;9:14,21;
10:4,13,16,18,21;
11:6,10,17;12:7,18,
21;13:8,11;14:7,17;
15:4;17:3,7;19:15;
22:23;25:1;28:11;
38:12;40:13;41:23;
42:1;44:10;45:5;
48:5;49:12;52:2;
54:1;56:11;58:13;
59:22;62:3,6,17;63:1,
14;64:7,9;66:11;
70:2;77:25;81:19;
82:11,24;86:17;
90:19;99:13;100:6,
18;107:8,15;108:4,8,
23;109:5;113:20;
116:1;117:23;
118:10;122:22;
123:8;129:6;131:24;
132:1;133:23;
138:13;150:13;
151:16;155:14,25;
156:3,6,10,11
**healthcare (1)**
124:20

hear (2)
42:14;95:17
**heard (9)**
17:5;27:5,6,7;
90:13;95:13,15;
119:17,25
**Hearn (3)**
121:16,17;122:5
**heaven (1)**
39:2
**held (2)**
11:9;81:7
**help (4)**
36:14;56:19;64:14;
86:25
**helped (2)**
53:17;80:18
**HENRY (53)**
4:8,10;9:8;11:21;
12:1;16:16;27:2,17;
28:3;34:10,16;35:3,6,
22;36:17,19;37:8,21,
24;38:1,6,10;46:7,12;
67:11;68:19,23;70:7;
71:4;75:1;77:10;
78:6;83:3,5;84:8,20,
25;85:7;86:15;94:2;
101:19;104:2;
109:16;120:3,5;
121:22;127:14;
128:22;135:5,7;
152:3;153:7;156:13
**Hey (1)**
146:16
**high (1)**
6:18
**Hill (2)**
6:11,12
**hire (1)**
46:3
**hired (2)**
29:20,25
**hiring (1)**
44:22
**historical (1)**
21:8
**historically (1)**
83:21
**hit (2)**
60:24;84:25
**hold (1)**
9:18
**holding (6)**
70:8;109:17;
121:23;127:15;
128:23;153:8
**Holdings (1)**
115:10
**home (2)**
8:23;137:9
**honest (2)**
76:15;132:17
**hopeful (1)**

146:24
**Hospital (1)**
48:12
**hospitalization (1)**
48:11
**hospitalized (1)**
126:23
**hospitals (1)**
108:6
**hotel (2)**
73:4;81:9
**hour (1)**
46:8
**hours (10)**
7:20;102:8;103:5;
105:8,13,16,19,23,
25;106:9
**house (1)**
117:2
**huh-uh (1)**
5:12
**Human (5)**
44:21,22;45:4,12;
80:18
**Hunter (4)**
77:4,6,7,8
**Hurst (1)**
77:8
**husband (1)**
82:21
**husband's (1)**
8:5
**hypothetically (1)**
22:20

**I**

**idea (3)**
63:21;131:2;
144:19
**identification (14)**
11:24;68:22;70:6;
71:3;74:24;84:6;
86:13;101:18;104:1;
109:15;121:21;
127:13;128:20;153:5
**identified (4)**
29:13;65:24;77:13;
88:20
**immediately (3)**
13:3;125:5;148:24
**impact (1)**
21:16
**implementation (3)**
30:9;59:9;100:19
**implemented (12)**
29:23;50:22;53:21;
57:7;63:14;66:15;
83:23;100:10,11,12,
21;126:25
**implementing (2)**
57:4,7
**important (4)**

33:2,8,10,15
**improve (1)**
43:12
**inappropriate (12)**
93:10,24;94:6,11,
20,25;95:10,18,19;
98:24;131:9,13
**inappropriately (1)**
68:8
**Inc (11)**
4:4,14;12:18;
14:17;15:4;17:4,7;
115:10;122:22;
123:8;155:14
**incident (3)**
48:19,21;119:14
**include (1)**
128:5
**included (4)**
88:22;91:18;
131:10,12
**includes (2)**
17:14;89:1
**Including (2)**
134:20,21
**income (1)**
66:17
**incoming (1)**
138:15
**Incorporated (1)**
13:8
**incorrectly (1)**
95:17
**increased (1)**
123:4
**incurred (6)**
51:14;75:21;76:3;
91:11;96:14;97:6
**incurs (1)**
59:24
**indicated (4)**
43:3;140:19;
152:11,20
**indication (2)**
76:17,24
**individual (1)**
51:13
**individualized (1)**
39:12
**individually (1)**
34:21
**individuals (5)**
29:12;69:7;79:22;
138:21;155:24
**individual's (1)**
73:15
**industries (1)**
21:11
**inform (2)**
78:18;152:14
**informal (1)**
8:21
**information (55)**

5:1;6:24;18:22,24,
25;19:12;20:3,19,19,
20,24;27:23;31:3,5,7,
10;32:2,4;33:12;
36:2;42:19;43:2,14;
60:2;101:9;110:20;
112:7,8;128:12;
129:18;130:14,17,19;
131:17;146:15;
147:4,21;148:13,17,
18,23;149:3,15,20,
21;150:9,10,16,21;
151:6,12,12;154:8,
18,21
**informed (6)**
136:24;137:2;
142:22;143:2,7;
155:12
**informing (2)**
48:17;146:19
**initially (1)**
118:12
**initials (1)**
129:5
**initiate (1)**
31:15
**initiated (1)**
42:11
**initiative (1)**
79:10
**input (1)**
20:3
**insofar (1)**
37:12
**installed (1)**
139:4
**instance (4)**
46:23;47:25;50:21;
133:5
**instances (12)**
31:9;51:4,17,20;
52:4,18,21;59:14;
73:19;101:10;
103:12,17
**integration (1)**
59:6
**intent (1)**
4:24
**internal (12)**
43:2,14;66:16,19,
20;79:11;83:19;
85:23,24,25;86:2;
148:15
**Internet (1)**
138:24
**intervention (1)**
61:6
**interview (5)**
147:17,18,25;
148:7,12
**interviewed (6)**
147:5,9,13;148:4,
6;151:14

**interviews (5)**
148:9,22;149:5;
151:4;154:23
**intimidate (1)**
5:16
**intimidated (1)**
126:11
**into (27)**
5:11;10:18;39:9;
46:5;54:2;55:5,7,8,
14,25;56:4,8;57:12;
59:4;64:4;86:19;
87:4;100:23;101:2;
110:17;116:7;121:1,
3;122:24;130:24;
143:2,8
**investigate (1)**
33:12
**investigated (1)**
151:8
**investigating (1)**
43:13
**investigation (9)**
85:24;86:2;147:6,
18,19,22;148:15,16;
154:9
**investigations (1)**
147:1
**investing (2)**
127:22;152:15
**Investment (6)**
115:10;116:9,19;
119:3;120:22;152:12
**invited (1)**
130:12
**invoice (2)**
75:23;76:24
**involve (1)**
17:9
**involved (4)**
57:15;117:23;
135:11;151:8
**involvement (3)**
19:18;34:12;56:23
**IP (1)**
138:19
**IRS (4)**
23:8,13;24:8;
137:19
**isolated (1)**
150:24
**issuance (1)**
153:1
**issue (5)**
49:16;92:4;95:22;
124:15;145:14
**issues (12)**
32:3;59:5,5;68:7;
78:19;93:8,22;98:3;
142:18;144:21;
146:24;149:22
**Italian (1)**
152:19

**items (1)**
47:16

**J**

**James (1)**
8:6
**January (15)**
64:22;91:14,24;
93:3,18;96:3;99:6;
101:25;102:1,25;
103:1,3,6;142:4;
153:23
**Jaren (2)**
18:5,6
**J-A-R-E-N (1)**
18:7
**jelly (1)**
42:15
**Jimmy (3)**
124:13;127:21;
152:15
**job (4)**
5:9;24:5;39:25;
40:2;55:10;59:25
**jobs (1)**
140:4
**Joe (4)**
136:19;145:20;
146:3;147:5
**John (4)**
109:22;121:16,17;
122:5
**Johnson (6)**
18:2,16,18,20;
19:1;49:20
**Joiner (4)**
133:18,19;136:5,
10
**Jointly (1)**
147:11
**Journal (1)**
42:16
**July (11)**
43:6;51:2;85:19,
21;94:15,18;105:18;
106:1,9,10;110:8
**June (21)**
18:9,17;26:13,16;
66:11;96:4;105:15,
23,25;146:25;147:5,
7,15;150:5,6;151:1;
154:1,6,11,22,23
**justified (2)**
68:3;151:18

**K**

**Katherine (1)**
132:6
**keep (8)**
33:16;53:18;87:1;
100:7,18;105:2;

133:14;134:7
**keeping (1)**
82:7
**Ken (4)**
17:25;58:17,18,19
**kept (4)**
32:25;134:12;
136:15;137:23
**kids (2)**
42:14;82:8
**Kim (4)**
18:2,3,4;50:5
**K-I-M (1)**
18:4
**kind (11)**
7:3;20:1;25:20,23;
30:20;55:16;56:16;
63:3;78:14;108:14;
147:1
**knew (6)**
32:23;33:5;130:15,
15;145:20,21
**knowing (1)**
89:3
**knowledge (8)**
27:20;34:22;35:7,
10;92:3;127:11;
136:15,17
**knows (1)**
34:21

**L**

**labor (1)**
41:13
**ladder (1)**
79:12
**lady (2)**
13:19;112:16
**Lake (16)**
45:1,2,11;121:15;
127:11;128:3,9;
129:15,23;130:14,21;
131:11,20;153:18,20,
23
**land (4)**
59:7;138:22;
144:11,12
**Lange (9)**
147:5,9;148:4,7,12,
22;154:23;155:10,10
**language (3)**
55:6,20,21
**largest (1)**
107:19
**last (9)**
14:25;38:3;63:11;
71:13;77:1;93:12;
109:6;111:22;152:7
**late (3)**
93:3,18;146:1
**later (4)**
103:15;108:16;

141:9;146:18
**latter (2)**
31:21;32:10
**law (1)**
27:17
**lawsuit (2)**
155:8,13
**lawyers (1)**
55:10
**leaders (1)**
23:13
**leadership (11)**
17:2,6;18:23;
69:15;79:5,7,8,8;
93:2,17;94:13
**leading (2)**
135:18;146:25
**leads (1)**
82:12
**learn (5)**
94:8;126:11;141:9;
145:23;155:7
**learned (7)**
92:22,24;93:5,19;
131:5;145:25;155:9
**leased (1)**
118:15
**least (3)**
88:16;106:14;
125:4
**leave (6)**
99:16,17,19,19;
100:12,22
**led (3)**
69:16;125:1;
150:13
**ledger (2)**
40:25;43:23
**Lee (2)**
49:7,8
**left (2)**
18:13,19
**Legacy (1)**
116:11
**legal (8)**
15:14;38:3;55:9,
21,22;86:3;124:7;
154:25
**lending (1)**
110:17
**lengthy (2)**
124:18;128:24
**Less (1)**
6:15
**letter (1)**
24:3
**level (4)**
21:6;56:25;66:15;
78:20
**liar (1)**
141:18
**license (2)**
7:10,13

**licensed (1)**
97:15
**lied (1)**
149:23
**lies (3)**
137:3;139:9;
141:11
**life (1)**
139:22
**light (1)**
122:20
**liked (1)**
47:22
**likely (2)**
149:9;154:7
**Limit (2)**
106:25;107:1
**limited (1)**
58:6
**limiting (1)**
37:18
**line (6)**
34:11;40:19;
138:22,24;144:11,12
**lines (4)**
35:2;48:13;54:8;
55:8
**Liquidating (4)**
118:8;119:4;
120:23,24
**list (1)**
36:16
**listed (3)**
69:8,14;87:22
**listen (1)**
16:3
**lists (1)**
69:7
**litigation (2)**
4:12;155:17
**little (10)**
4:21;11:19;16:24;
37:16;48:14;54:11;
84:15;86:8;92:6;
144:12
**live (4)**
6:5,6,9;8:23
**lived (1)**
6:7
**living (2)**
8:7;118:22
**livingroom (1)**
119:21
**LLC (5)**
116:7,10;118:3,5,7
**loaded (1)**
20:13
**loan (5)**
109:9;110:4,8,18,
20
**loans (3)**
109:6,8;110:21
**local (1)**

108:6
**lodge (1)**
36:25
**lodging (2)**
70:17;74:1
**logistics (2)**
146:9,10
**long (10)**
6:7,12;9:16,23;
10:23;12:4;20:21;
27:19;148:6,21
**longer (1)**
108:15
**long-term (1)**
115:16
**longwinded (1)**
5:22
**look (20)**
12:11;58:7;59:20;
64:10;67:22;68:25;
69:6;70:14;75:12;
79:3;84:10;85:17;
87:9;104:9;106:6;
113:8;122:2;128:25;
132:16;151:22
**looked (2)**
58:9;98:1
**looking (13)**
21:8;30:25;43:7;
71:5;72:1;75:19;
76:19,23;88:19;
89:20;104:22;105:6;
110:16
**looks (1)**
104:15
**Loray (3)**
81:22,22;82:2
**L-O-R-A-Y (1)**
81:22
**LORRAINE (5)**
4:3,16;70:17;82:1;
112:20
**losses (1)**
123:10
**lot (3)**
140:6;149:3;150:8
**lower (2)**
76:20;88:10
**Lucy (6)**
18:4,16,18;19:4,7;
77:13
**lunch (1)**
144:8

## M

**ma'am (4)**
26:20;76:22;112:3;
126:22
**machine (1)**
67:7
**Macon (4)**
6:14,16;81:11;

140:22
**Maddox (1)**
18:4
**maintain (3)**
7:17;44:16;54:18
**maintained (3)**
44:14,22;137:22
**maintaining (2)**
45:8,11
**maintains (1)**
44:13
**major (1)**
9:12
**makes (1)**
90:17
**making (2)**
45:17;113:17
**manage (2)**
123:20;124:4
**Managed (2)**
75:13,16
**management (14)**
9:11;10:14;11:8;
17:15;41:1,13;44:22;
53:9,11;54:6,16;
118:8;119:3;120:22
**manager (5)**
23:20,22;24:6;
29:23;30:9
**managers (3)**
21:4,23;24:22
**managing (1)**
54:8
**manner (1)**
73:21
**manual (1)**
61:6
**manually (1)**
54:9
**many (6)**
8:15;17:19;84:1;
113:24;114:1;150:20
**marathon (1)**
5:20
**March (2)**
105:9;129:9
**marginally (1)**
35:8
**Mark (14)**
4:11;11:21;26:23;
27:5;47:4,22;68:20;
81:2;96:20;101:1;
104:12,16;127:11;
155:10
**marked (25)**
11:23;12:3;68:21;
70:5,9;71:2,5;74:23;
75:2;84:5;86:12;
101:17,21;103:25;
104:3;109:14,18;
121:20,24;127:12,15;
128:19,23;153:4,8,
23
**marks (1)**

111:4
**Mark's (2)**
100:25;146:16
**married (1)**
8:3
**Marshal (1)**
130:21
**matter (4)**
13:9;14:7,16;15:3
**matters (2)**
26:9;72:8
**Maxic (2)**
87:22,25
**may (25)**
34:22;36:13;63:23;
86:25;103:18,21;
104:20;105:11;
106:1,22;114:20;
119:13;124:14;
126:1,7;128:13;
135:2;136:21;138:2;
139:23;142:13;
146:8;147:21;
148:16;151:15
**maybe (20)**
36:8;48:5;52:9,9,9;
73:3,9;77:22;79:22;
87:13;95:14;104:23;
108:13;110:21;
111:19;116:25;
120:3;123:17;140:9;
146:1
**McDonald (4)**
17:25;58:17,18,19
**McElmore (1)**
86:3
**McNair (1)**
86:3
**mean (38)**
19:22;22:22;25:6;
27:4;28:7;35:4;36:9;
40:24;43:25;47:23;
52:7;53:13;59:12;
60:20;65:12;84:18;
95:19;97:13;100:4;
103:19;105:22;
106:12;107:20;
109:3;111:6;117:21;
122:12;125:18,18;
127:3;128:10;131:1;
140:22;141:25;
142:3;149:3;150:8,
23
**means (2)**
19:23;65:13
**meant (2)**
110:3;111:7
**Medicaid (11)**
23:4,6,12;24:8;
42:13;44:2;62:13,18;
63:4,11,13
**Medical (13)**
46:25;118:3,5,7,9,

11,15,16,21;120:12,
14,16,18
**Medicare (10)**
23:4,5,12;24:8;
42:12;44:2;62:13,18;
63:4,13
**Medicare/Medicaid (5)**
48:6;61:22;62:11;
64:7;78:11
**meet (2)**
43:15;130:9
**meeting (30)**
48:22,23,24;49:25;
71:12;75:13,17;76:1,
17,25;93:3,17;
123:13,16;124:9,16,
24,25;125:6;127:2;
130:13;131:15;
132:24;135:8,12,13,
18;152:18,22,25
**meetings (6)**
131:3;133:7,13,17,
21;136:2
**MELANIE (2)**
4:3,16
**member (12)**
48:24;49:2,3,23;
50:4;123:25;127:21;
128:6;130:22;132:6,
7,8
**members (10)**
48:23,24;81:18;
116:8;129:25;130:8,
20;132:13;135:10,20
**memory (3)**
28:19,22;110:12
**mentioned (3)**
13:20;95:24;
117:15
**merged (2)**
10:18;121:1
**met (6)**
4:9;15:14;21:4;
50:11;90:10;131:1
**middle (2)**
94:16;114:20
**Middlebrooks (1)**
86:4
**midtown (1)**
81:9
**might (7)**
21:17;72:10;86:8;
92:14;103:13;115:4;
139:22
**migrate (1)**
59:3
**miles (1)**
6:15
**million (12)**
22:19,23,24;
108:16,23;109:9;
110:1,4,14;113:16;
116:6,13

**million-dollar (1)**
116:19
**mind (4)**
61:23;142:13;
145:2,4
**minded (1)**
139:17
**minimal (1)**
119:9
**minus (1)**
98:18
**minute (3)**
71:24;122:21;
123:20
**minutes (13)**
133:3,9,11;134:2,6,
19;135:8,12,18,22,
23;136:3;139:13
**misheard (1)**
95:14
**Mitchum (2)**
88:8,10
**modules (1)**
40:25
**moment (3)**
23:10;68:25;
134:14
**Monday (2)**
104:15;129:9
**money (7)**
108:18;115:7,8,11,
25;116:15;156:10
**monitor (4)**
139:1,4;155:17,24
**monitoring (3)**
54:21;138:5,8
**Montana (1)**
117:9
**month (2)**
103:8;130:13
**monthly (2)**
102:12;131:21
**months (1)**
43:13
**Moody (2)**
17:23;130:7
**M-O-O-D-Y (1)**
17:23
**More (23)**
10:14,17,18,20,24;
11:8,10;17:11;25:11;
36:4;37:16;39:12;
101:9;113:17;118:7;
119:3;120:22;122:9;
137:11;147:25;
152:7;155:5,6
**morning (5)**
4:9;131:5;140:16;
143:1;146:1
**Most (7)**
26:10;46:5;72:12;
108:17;135:11;
149:9;154:7

**mouth (2)**
74:6;95:15
**move (2)**
59:9;79:11
**Mrs (2)**
34:14;58:10
**much (5)**
7:19;64:16;107:23;
108:14;131:6
**multiple (4)**
31:17;84:22;
150:23;151:2
**must (1)**
99:22
**myself (5)**
58:3;72:5;121:15;
130:25;132:5

## N

**name (11)**
4:10,15;8:5,17;
49:6;82:1,2;90:13;
112:15;116:10;129:7
**named (1)**
13:20
**namely (1)**
88:22
**national (1)**
21:11
**natively (2)**
84:14;86:17
**nature (2)**
53:19;117:22
**navigate (2)**
84:17;85:8
**necessarily (5)**
27:18;72:10;73:6;
89:2;106:21
**necessary (6)**
23:16,19,24;24:7;
51:14;59:25
**need (6)**
5:20,23;33:13;
36:12;37:8;73:6
**needed (6)**
43:5;58:10;123:24;
145:15;151:12
**needs (1)**
43:15
**negative (1)**
56:7
**neighborhood (1)**
116:22
**Nelson (5)**
120:13,21;121:5,5,
6
**nervousness (2)**
126:20,21
**new (2)**
59:4;110:16
**next (13)**
11:1;14:3;15:1;

60:9;68:20;77:2;
103:8;105:10,18;
140:14;142:23;
145:17;148:25
**night (3)**
30:25;130:25;
140:13
**nine (1)**
6:13
**nod (1)**
5:11
**None (1)**
84:3
**non-nursing (1)**
24:4
**nonprofit (2)**
30:4;78:10
**nonteam (1)**
48:24
**nonvoting (1)**
49:3
**nor (1)**
58:3
**normal (3)**
72:25;80:22;
142:21
**Northern (1)**
4:13
**Northridge (1)**
46:25
**note (4)**
75:22;76:16,24;
77:1
**notes (6)**
97:18;113:8;133:1,
11;149:2,5
**Notice (4)**
34:20;36:22;40:20;
99:4
**noticed (1)**
37:3
**notices (1)**
54:24
**notification (1)**
74:11
**November (6)**
114:15;122:5;
123:13;124:9;127:1;
132:8
**number (15)**
18:9,12;54:8;64:2,
4;79:22;97:19;
104:24;105:2;114:4;
144:3,11;145:7,17;
149:17
**numbers (2)**
76:20;84:19
**nurses' (1)**
47:16
**nursing (6)**
24:2;47:16;48:11;
55:3;97:16;108:5

## O

**object (1)**
26:24
**objection (8)**
37:1,5,6,9,10,12,
13,14
**objections (1)**
37:22
**obligation (1)**
123:20
**obtain (3)**
7:20;99:23;155:20
**obtained (4)**
103:5;104:18;
110:4,18
**obtaining (1)**
100:2
**obvious (1)**
130:25
**occurred (1)**
116:19
**occurring (1)**
124:20
**off (17)**
16:14;35:5;63:19;
67:9;77:9;78:4;83:3,
4;92:9;99:6,12;
100:7,19;102:17;
114:2;117:2;119:23
**offer (3)**
36:6;115:4;119:8
**office (19)**
44:14;49:21;
118:11,12,12;131:5;
133:24;138:23;
140:17,21,25;141:3;
143:2,3,8;146:6,9,11;
155:15
**officer (6)**
19:7;65:11,15;
76:10;77:16;78:16
**Officers (3)**
63:16;64:8;110:17
**Offices (3)**
118:3,5,9,11,15,16;
120:12,18
**often (5)**
26:8,10;63:10;
67:20;144:13
**Oftentimes (1)**
5:11
**old (1)**
8:19
**once (4)**
20:24;61:7;75:3;
83:7
**one (50)**
5:23;8:16;10:17;
11:7;12:9;13:21;
14:25;15:1;25:18,18;
29:12,13;38:7;41:15,

18;46:23;47:16;
61:23;66:22;67:18;
68:7,7;69:22;70:20;
79:21;84:21;85:1,14;
86:11,18;87:10,17,
19;89:1;96:17,18;
99:4;101:25;105:18;
111:9;116:6,13;
121:7;126:23;
130:10;137:11,17;
144:13;147:25;
151:20
**ongoing (2)**
22:11;148:16
**only (11)**
5:25;48:19;56:12;
67:18;75:22;79:20,
20,20;101:4;129:1;
152:7
**operate (1)**
118:23
**operation (1)**
23:17
**operations (16)**
11:14;17:3,6,9,10;
19:21,22,25;20:3,20;
21:2,5,23;22:11;
55:7;82:12
**opinion (4)**
26:22;38:17;68:5,6
**opportunities (3)**
79:10;92:10,21
**opportunity (3)**
61:1;135:20,20
**opposed (3)**
80:22;137:17,25
**order (2)**
99:19,23
**organization (12)**
19:9,25;34:5;64:2;
65:16;78:13;96:9,11;
110:17,18;118:1;
121:2
**organizational (2)**
18:22;40:3
**original (2)**
111:19,21
**originally (1)**
29:25
**others (5)**
23:10;80:6;119:17;
138:6,16
**Otherwise (2)**
37:5;43:7
**ought (1)**
120:3
**out (17)**
46:20;49:23;55:4,
10;97:12;117:2,3;
126:2,3,5;131:21;
146:2,9,10;152:11,
15,20
**outgoing (1)**
138:16
**outlined (2)**
12:19;61:22
**outside (8)**
55:20;112:11,11;
129:18;155:25;
156:3,6,10
**outstanding (1)**
109:6
**over (14)**
19:10;28:20;29:25;
36:21;44:4,6;47:23;
49:21;58:23;91:4;
105:10;123:7;131:5;
132:2
**overall (2)**
109:1,3
**overlap (2)**
25:16;106:22
**overlapped (1)**
25:17
**oversaw (1)**
30:7
**oversight (1)**
132:1
**own (3)**
51:15;62:4;101:2
**owned (3)**
120:11,12,20
**owner (1)**
120:25
**owners (2)**
121:1,4
**owns (1)**
118:22

**P**

**P&L (1)**
44:9
**Pacer (2)**
155:16,24
**package (1)**
131:20
**page (24)**
11:20;12:11;14:15;
70:14;75:10,13;
76:19;84:19;85:1,17;
87:4,6,18;102:21;
104:9,14;105:4,11;
111:17,19,20,22,24;
129:4
**pages (1)**
129:2
**paid (14)**
63:15;68:11;69:2;
73:5;82:23,23;95:7;
99:6,12;100:7,19;
102:12;108:3;119:5
**pains (1)**
126:23
**painting (1)**
47:10
**parameters (3)**
57:12;62:10;
100:22
**part (10)**
19:8;31:21,24;
32:10;40:2;44:16;
91:19;93:12;110:14,
15
**participant (1)**
78:11
**participate (3)**
79:23;129:21;
133:13
**participated (2)**
69:15;135:24
**participating (2)**
113:22;114:1
**participation (1)**
108:17
**particular (7)**
36:21;46:23;51:6;
56:15;61:23;92:4;
95:22
**parties (1)**
112:12
**passenger (1)**
69:14
**password (2)**
59:7;101:5
**past (4)**
6:18;86:23;87:1;
94:18
**Patton (7)**
123:25;124:2,13,
14;127:21;152:18,20
**Patton's (1)**
152:15
**pay (5)**
95:11;101:25;
102:14;117:2;119:8
**payable (3)**
41:1;72:13;73:14
**paycheck (3)**
101:24;102:6,10
**paying (1)**
69:18
**payment (8)**
60:11,18;61:5;
66:7;106:25;107:1,2,
25
**payments (6)**
107:9,10;108:9,15,
20;113:21
**payroll (8)**
41:1,14,16,20,22;
43:2,14;100:12
**Payroll-Based (1)**
42:16
**paystub (7)**
101:15;102:16,20;
103:6;104:20;
105:11;106:10
**paystubs (1)**
104:25
**PBJ (3)**
42:13,14;43:5
**peanut (1)**
42:15
**pending (3)**
4:12;6:1;38:7
**people (5)**
31:1;33:16;46:20;
65:24;131:1
**perform (2)**
83:14;127:4
**performance (3)**
122:10,17;125:24
**performed (5)**
84:1;85:15;122:11,
13,18
**performing (1)**
126:17
**perhaps (2)**
36:4;106:9
**period (11)**
7:21;100:8;101:25;
102:16;104:19,21;
116:18;122:8;145:5,
6;150:25
**periodically (2)**
5:21;142:19
**person (2)**
57:11;94:14
**personal (5)**
27:19;35:7,10;
51:13;92:15;106:17;
137:13,16,20,21,25;
138:4
**personally (1)**
36:2
**persons (2)**
42:19;116:20
**person's (3)**
45:16;49:24;60:6
**perspective (3)**
20:15;39:11;49:25
**pharmacy (1)**
82:12
**phone (5)**
30:23;119:15;
137:17,20,20,22;
138:19,19,21;141:23;
144:12
**phrase (6)**
27:5,6,7,9,10;41:3
**physician (2)**
118:12,12
**place (10)**
31:20;40:12;78:19;
83:19;91:13;115:17,
18;130:5;142:15;
148:9
**places (1)**
106:16
**Plaintiff's (14)**
11:23;68:21;70:5;
71:2;74:23;84:5;
86:12;101:17;
103:25;109:14;
121:20;127:12;
128:19;153:4
**plan (8)**
22:1,10;40:10,11;
100:22,22;122:18;
123:21
**planned (5)**
73:4,12;122:11,13;
132:3
**planning (1)**
21:18
**plans (14)**
21:6,13,14,21,22;
22:5,6,8;25:20;50:10,
14,17;102:4;105:6
**play (1)**
66:5
**please (7)**
5:10;29:2;75:14;
84:10;90:8;91:2;
105:4
**pm (3)**
129:9;154:1;
156:18
**point (14)**
26:16;108:8;
126:24;134:18;
140:9;141:5,7;142:8;
144:2,15;145:15;
148:19;152:25;
154:16
**policies (19)**
41:6;44:11,13,18;
45:6,15,18,23;46:2,4,
5;51:5;52:5,5,6;
58:14;69:20;72:11;
97:11
**policy (18)**
23:21;47:5;51:1,9,
11,11,18;52:19;63:1;
66:11,15,22;72:9;
73:24;81:3;91:10;
99:13,16
**position (11)**
9:16,18,23;10:7,8;
34:15,16;39:13;
49:13;52:1;96:10
**positioning (2)**
18:22;40:3
**positions (1)**
11:9
**positive (1)**
56:7
**possibility (1)**
143:16
**possible (2)**
57:18;87:14
**Possibly (1)**
150:8
**practices (3)**

68:3;106:18;
112:15
**prayer (2)**
139:17;140:12
**praying (1)**
139:16
**preferred (1)**
138:4
**premiums (1)**
123:7
**preparation (3)**
13:16;53:15;54:19
**prepare (18)**
12:22,25;13:12,25;
14:10,19,22;15:6,9,
13;20:18,18;53:14;
57:24;58:11;134:2,6;
135:8
**prepared (15)**
12:17;13:7;14:6,
16;15:2,18;35:20;
98:15,17,18,20;99:9;
112:16;120:1;136:12
**prepares (1)**
60:1
**preparing (1)**
133:3
**present (6)**
93:1,16;103:20;
129:25;133:6,14
**presented (1)**
22:8
**presenters (1)**
80:8
**presidency (1)**
45:19
**pressures (1)**
139:23
**presumably (1)**
81:15
**pretty (5)**
4:22;26:4;131:6;
141:18,19
**Previous (2)**
93:14;148:14
**previously (3)**
4:21;96:1;123:19
**Primarily (3)**
21:8;81:9;127:9
**primary (1)**
137:22
**principal (2)**
121:17;123:25
**print (1)**
86:18
**printed (2)**
84:14,23;86:18
**prior (15)**
9:25;10:11;11:2,3;
13:20,20;18:17;
26:16;40:4,6;83:23;
130:18;131:1;
135:12;153:1

**probably (11)**
4:21;11:1;28:13;
31:21;47:24;85:2;
148:24;149:13;
150:6,6;152:6
**problem (4)**
39:8,11;86:17;
95:22
**problems (2)**
67:12;97:19
**procedure (2)**
74:20;135:15
**procedures (2)**
59:18;112:22
**proceed (2)**
37:20;77:11
**proceeded (1)**
48:25
**proceedings (1)**
136:16
**process (29)**
19:16,18,19;21:3;
50:7;52:14;54:6;
55:1,13;56:14;57:8,
20,22;59:23;60:13,
21;66:7;72:14,24,25;
74:15;83:12;89:14;
100:1,5;107:6;110:5,
7;123:23
**processed (3)**
52:14;60:11,18
**processes (1)**
44:22
**processing (1)**
41:2
**produce (2)**
134:17,18
**produced (9)**
24:14;84:14;86:16;
89:7,13;134:19,23;
135:3;149:12
**Program (36)**
13:22;20:22;29:22;
34:12;54:2;55:2,15;
56:23;57:13,15,19;
59:15;74:3;78:1,8,9,
15;79:9,9,14,21,24;
80:3,19,21;81:4,7;
83:19,23;84:2;
101:12;107:2,4,25;
138:14;139:4
**programs (1)**
78:11
**project (9)**
29:23;30:9;42:11;
43:1;46:25;47:2;
57:16,20,22
**project-related (1)**
149:19
**Projects (1)**
29:11
**proper (1)**
47:8

**Properties (4)**
118:7,21;120:14,
16
**property (1)**
117:9
**proposed (2)**
23:11;130:24
**proved (1)**
55:21
**provide (28)**
17:2,6;18:16;
19:19;20:1,2;32:4;
46:4;79:10;80:6;
93:7,21;97:1;112:8;
121:19;123:23;
145:7;147:4,21;
148:17,18,23;149:1,
16,21;150:15,20;
151:12
**provided (11)**
20:3,20,25;99:16;
110:9;112:5,7;
117:25;149:3,4,8
**provides (3)**
19:23;31:6;40:22
**providing (2)**
131:16;150:17
**PTO (23)**
99:23;100:2,22;
101:1,2,11,14;102:6,
10;103:5,13,14,22;
104:12,16,18;105:8,
19,23;106:4,7,11,13
**Public (1)**
7:9
**purchase (2)**
48:1;117:1
**purchased (1)**
117:8
**purchasing (1)**
8:8
**purpose (4)**
43:1;60:1;72:3;
75:25
**purposes (6)**
53:23,24;54:9;
116:9;131:19;152:21
**Pursuant (1)**
99:15
**purview (2)**
17:17;71:15
**put (22)**
51:22;62:9;73:6;
74:6;83:19;86:10,19,
20;92:15;95:14;
97:12;103:4,11,11,
14;106:12;116:7;
121:2;135:1;151:20;
152:11,20
**putting (1)**
52:22

## Q

**qualified (1)**
124:4
**question's (1)**
5:25
**quite (6)**
35:6;76:15;85:1;
97:25;119:18;132:17
**quote (1)**
107:14

## R

**raised (3)**
92:2;124:8,16
**rang (1)**
144:8
**range (1)**
63:23
**rather (3)**
47:20;48:2;88:23
**reach (2)**
46:20;55:4
**reached (2)**
49:23;140:9
**react (1)**
39:18
**reaction (1)**
141:12
**read (8)**
13:4;85:2;93:13,
14;107:16;110:13,
15;156:16
**Ready (7)**
46:13;56:19;120:6;
129:2;134:16;152:4,
5
**real (4)**
12:10;109:9,10;
114:10
**really (7)**
5:13;36:13;55:12;
87:2;110:22;111:3;
146:8
**reason (12)**
27:24;31:7;54:1,4;
74:2;76:12;91:17;
129:19,22;138:3;
140:9;142:16
**reasonable (6)**
23:16,19,23;24:7;
51:14;59:24
**reassigned (1)**
40:11
**reassure (1)**
142:2
**recall (122)**
16:12;19:14;21:15;
23:10;27:7;28:12,14,
25;31:11;32:8,21,22;
34:1;38:3,21;39:6,6,

24;44:3;46:23;47:17,
23,25;48:3,17,22;
50:18,21,23;53:2;
57:17;59:3;63:19;
64:18;65:21,23;
67:22;69:17;70:4;
76:11;77:21;80:16,
17;82:22;85:23;93:3,
18;95:6;98:7;99:25;
100:4;103:16,19,21;
107:13,16;108:13;
109:22,24;110:24;
111:8;114:3;115:3,6,
20;116:5,12,24;
117:18;119:9,14;
123:13,17;124:12,18,
22;125:2,15,15,20,
22,25;126:9;127:7,
18;132:21;134:14,
24;135:19;137:9;
139:3,15;141:4,13,
25;142:25;143:12,
15;144:7,18,24;
145:18,18,25;146:6,
14,17;147:3,4;
148:19;149:24,24;
150:3,22;151:15;
152:24;154:24;
155:2,9,10;156:4,12
**receipt (2)**
76:16;95:6
**receipts (2)**
60:5;95:7
**receive (4)**
6:21;7:1;24:24;
128:11
**received (18)**
7:9;16:11,18;
30:18,23;48:18;
64:22;76:9;107:10;
108:15;115:7,8,11;
129:18;131:20,22;
146:18;155:23
**receiving (6)**
108:9,19,23;
109:22,24;113:21
**recently (2)**
127:7,8
**recess (3)**
46:11;120:4;152:2
**recognize (2)**
70:11;85:11
**recommendation (2)**
50:21;56:6
**recommendations (4)**
50:18,20;55:19;
56:3
**recommended (4)**
38:22;47:1,18;48:1
**record (22)**
4:10,15;5:13,17;
15:24;16:14;45:3;
51:24;67:9;70:25;

71:1;76:19;77:9;
78:4;83:4;84:13;
105:3;119:23;135:1,
6;136:9;149:13
**recordings (1)**
16:3
**records (4)**
67:23;76:19;
136:15;149:7
**record's (1)**
67:3
**reduced (1)**
105:19
**refer (3)**
62:1;64:1;121:12
**reference (1)**
84:19
**referred (1)**
86:6
**referring (3)**
20:4;76:21;105:2
**reflect (1)**
102:6
**reflected (6)**
101:14;102:11;
103:6,8,22;106:10
**refresh (1)**
110:12
**regard (40)**
11:13;12:8,18,22;
13:1,8,12;14:1,7,11,
16,20,23;15:2;30:8;
40:16;41:16;43:22;
45:5,22;48:15;54:14,
21;57:16,24;58:11;
64:8;78:22;79:2;
80:21;81:4;89:22;
90:3;98:8;99:9;
117:14;122:8,19;
123:4;127:1
**regarding (12)**
32:2,25;44:11;
46:4;58:14;59:6;
92:5;112:14,21;
130:14;136:25;142:1
**regular (1)**
114:11
**regularly (2)**
25:15;83:17
**regulates (1)**
8:1
**regulation (1)**
43:9
**reimbursable (2)**
61:19;62:8
**reimburse (3)**
95:8,12,16
**reimbursed (5)**
62:14,17,19,22,23
**reimbursement (43)**
52:6,12,19;59:18,
23;65:9,20;66:2,6,11;
67:14;68:3;69:19;

70:2,20,23;71:20,23;
72:9;75:20;76:2;
81:1,16;83:7;91:7;
93:2,11,16,25;94:24;
95:1,20;96:6,13,16,
24;97:6,16,19;
112:15,22;147:2;
151:18
**reimbursements (3)**
79:4;80:21;81:5
**reject (1)**
65:19
**relate (5)**
27:12,16,22;35:24;
129:13
**related (17)**
11:10;17:11;27:19;
28:8;35:8;36:14;
37:2;41:6,21;88:5;
92:2,11;118:1,9;
149:22;150:11,12
**relating (2)**
99:6;129:16
**relationship (18)**
26:1,3,17,18;28:10,
15,20,23,23;29:4;
43:19,20;92:6;114:6,
7,9;115:17;142:8
**relationships (1)**
33:16
**relevant (2)**
34:17;59:25
**remember (10)**
28:4;103:23,24;
124:17;129:11,12;
143:11;146:8;
147:24;149:15
**remove (1)**
98:10
**removed (1)**
98:11
**Renee (1)**
18:4
**renewals (3)**
53:18;54:21,24
**renovation (2)**
46:25;47:17
**reorganization (1)**
40:5
**repairs (1)**
47:10
**Repeat (2)**
28:1;112:17
**repeatedly (1)**
130:13
**rephrase (2)**
5:4;29:2
**report (32)**
25:7;29:15;41:2;
51:15,23;52:23;60:1,
3;61:8;72:6;73:6,7,8,
15;74:18;87:4,7,18,
20;89:13,16,25;90:3,

11;92:9,16;93:6,20;
94:6;95:25;98:16;
106:3
**reported (3)**
42:19;47:4;89:23
**REPORTER (12)**
9:6;12:3;38:5;
70:8;75:2;101:21;
109:17;121:24;
133:6,16,20;136:6
**Reporters (2)**
136:5,10
**reporting (12)**
17:14,15;41:14;
42:13,16;43:5;80:25;
86:24;94:16;133:18,
19;136:11
**reports (25)**
17:21;18:10;29:13;
49:15;65:25;66:16,
17,18;74:9;78:17,21;
86:24;93:6,10,21,25;
94:7,21,21;95:25;
131:21,22;150:3,7;
151:21
**repositioning (1)**
40:10
**represent (2)**
4:11;104:4
**representative (4)**
11:17;36:7;37:4;
90:19
**representatives (5)**
17:19;38:12;97:20;
116:16;130:20
**Republic (1)**
82:17
**request (11)**
55:5;56:15;70:23;
76:2;85:23;99:19;
101:2,9,11;135:1;
154:8
**requested (4)**
32:2;104:18;
105:22;154:22
**requests (16)**
65:10,20;66:3;
67:14;70:2,20;81:1;
83:7;96:6,13;97:19;
98:23;101:1;147:2;
151:6,18
**require (1)**
81:13
**required (10)**
27:13;31:3;57:21;
60:2;93:10,24;97:5;
106:12;117:4;137:19
**requirement (3)**
42:12,18;97:12
**requirements (2)**
7:23;42:21
**reservations (1)**
69:7

**reserve (4)**
124:8;127:22;
152:12;156:16
**reserves (1)**
123:19
**resolve (1)**
144:21
**resolved (3)**
59:10;142:13;
146:24
**resource (2)**
44:21,23
**Resources (3)**
45:4,12;80:18
**respond (5)**
31:25;92:20;
139:10;141:23;
143:14
**responded (2)**
92:23;111:11
**responding (1)**
124:17
**response (21)**
11:25;16:15;27:1;
37:25;38:9;67:10;
74:25;78:5;84:7;
86:14;94:1;111:18;
124:2,15,18;128:21;
143:6;144:17,18;
153:6;154:7
**responses (1)**
111:14
**responsibilities (5)**
5:13;11:13;39:9;
46:1;54:20
**responsibility (9)**
25:16;44:16;46:3;
59:25;73:17;78:15,
18;125:23;133:25
**responsible (11)**
21:25;45:8,11,14,
16;55:13;80:3;90:22;
133:3;143:13,17
**restaurant (2)**
130:24;152:19
**result (3)**
40:10;50:17;
155:24
**resulted (1)**
43:3
**retail (1)**
82:12
**revenue (2)**
109:1,3
**revenues (1)**
109:4
**review (33)**
12:14,25;13:14;
14:4,13,22;15:6;16:5,
7,9;21:5,5,21;31:3,5,
7,10;43:3;50:10;
55:16,18,19,23,24;
61:16;64:12;66:17,

19;75:3,7;109:20;
135:9;153:9
**reviewed (4)**
15:18;16:17;66:18;
107:11
**reviewing (7)**
21:7,12,14,16;
25:20;110:20;134:1
**reviews (1)**
61:1
**revisions (1)**
135:17
**RFP (8)**
123:22;124:2,6;
130:16;152:11,14,21;
153:1
**Rick (1)**
90:13
**right (64)**
5:9;6:4,9;7:19;8:5,
17;9:13;10:6,11;
11:1;13:3;14:3,15,
25;15:12,17;16:1,24;
21:12;22:13;23:5;
36:23;37:20,21;39:3;
43:18;46:1,15,23;
50:24;52:16;54:20;
56:14;64:5,5;73:13;
75:19;84:24;87:11;
88:12;91:1;94:24;
99:18;105:10,16;
106:19;111:22;
117:17;121:8;123:1;
124:21;129:9;
132:12;139:7,17;
141:1,5,22;145:16;
147:15;152:4;153:3;
155:16;156:16
**right-hand (1)**
102:3
**Road (4)**
6:11,12;36:20;86:9
**Robertson (1)**
18:5
**rocky (2)**
92:6;142:7
**Rogers (9)**
18:5,17,18;19:4;
77:13,20;78:14,16,22
**role (11)**
30:8;34:17;39:9;
54:14,18;66:5;77:20;
122:9,19;123:4,5
**Rollins (92)**
16:8;22:2,3,4;25:3,
9;28:15,20,24;58:3;
65:4,7;69:21,22;
70:22;71:22;72:5,15;
75:21;76:3;80:11;
91:12;99:20,21;
100:3;101:8,8,10;
107:13;111:11;
112:5,9,10,13,23;

113:18;114:6,12,25;
115:7,8,13,15,25;
116:6,15,18,25;
117:8,11,23;119:8,
12,16;120:13,21;
121:5;122:5,9,23;
124:17,23;125:5,9,
16;128:4,7;131:11,
20;132:5;135:9;
136:21;137:3,4;
138:5,8,19;139:9;
141:6,23;142:18,23;
143:8,13,16;144:21;
147:20;149:23;
150:12;151:4,8;
152:14
**Rollins's (15)**
16:9,17;63:20;
64:16;65:9,19;66:18;
99:23;107:11;113:1;
117:19;122:19;
123:4;126:11;138:15
**Ron (1)**
80:17
**Ronnie (12)**
25:3;75:14,21;
76:3;77:4;111:7;
114:6;120:21;121:5;
122:4;132:5;141:10
**room (1)**
131:1
**roughly (8)**
64:18,20;108:16,
25;109:4;113:13,16;
114:3
**routine (2)**
55:6;73:25
**routinely (1)**
131:22
**Royal (1)**
68:11
**rude (2)**
5:15;67:2
**run (1)**
72:12
**running (2)**
90:11;91:6

## S

**salaries (2)**
64:8,15
**salary (9)**
63:15,20,24;64:16;
113:1,3,10,11,14
**same (14)**
11:20;18:9;39:10;
60:12,13;74:14;
135:15;138:21;
140:6;144:6;148:10,
13,13;151:21
**sat (1)**
4:20

**Saturday (1)**
143:1
**saw (3)**
23:15;82:4;150:2
**saying (4)**
84:22;128:13;
129:20;139:17
**scheduled (2)**
18:20;61:5
**Scholarships (1)**
10:18
**school (1)**
6:19
**scope (2)**
34:19;37:18
**Scott (2)**
48:18;49:4
**search (1)**
135:1
**second (4)**
83:3;87:10;90:12;
137:5
**secretary (1)**
155:14
**secured (1)**
109:10
**Security (1)**
31:6
**seeing (1)**
107:16
**Seek (5)**
46:21;93:11,25;
95:1,20
**seeking (1)**
94:24
**seem (1)**
35:24
**seems (1)**
35:5
**selected (2)**
80:5;123:23
**Selectica (23)**
13:22;53:3,8,9,21;
54:2,15,18;55:2,5,15;
56:23;57:13,15,19;
58:2,4,14,24;59:1,5,
8,15
**Selectica's (1)**
59:6
**selection (1)**
123:22
**self-centered (3)**
27:9,11;28:6
**self-service (1)**
101:1
**seminars (1)**
7:17
**send (14)**
47:11;55:22;61:1;
65:22;74:12;85:21;
93:6,20;94:14;101:8;
128:6;133:21;
135:10;146:4

**sending (3)**
94:6,20;111:8
**Senior (4)**
9:20;58:19;80:17;
110:16
**sense (3)**
34:25;90:17;
139:19
**sensitive (2)**
50:2,3
**sent (11)**
47:12;57:10;85:18;
91:23;92:9;101:7;
111:7;137:1;139:9;
153:17,23
**separate (4)**
118:19,20;119:1;
131:23
**separately (3)**
128:14;147:11,12
**September (2)**
68:14;69:4
**series (2)**
4:23;127:18
**serious (3)**
125:12;141:19,19
**served (1)**
155:14
**serves (1)**
31:5
**service (2)**
54:8;55:8
**Services (27)**
9:20;10:2,12,24;
17:13,14,16;18:23,
24,25;19:12;25:10;
42:13;43:2,14;58:19;
66:5;71:12,15;72:4;
82:14,16;83:1;
117:25;120:9;
121:19;123:24
**session (2)**
135:25;136:3
**sessions (3)**
79:18;136:12,16
**set (2)**
100:23;138:14
**sets (1)**
54:22
**several (7)**
10:16;43:13;97:18;
99:3;113:22,24;
130:20
**shake (1)**
5:12
**shaking (5)**
125:21,25;126:6,7,
9
**share (4)**
33:12;112:21;
119:25;126:15
**shared (11)**
15:21;34:2,6,7;

88:16;89:25;114:25;
146:14;148:14;
149:10;155:23
**sharing (1)**
21:25
**sheet (1)**
44:8
**Sheffield (3)**
18:2,4;50:5
**Sheila (2)**
88:7,10
**Shelly (1)**
130:21
**shortfall (1)**
123:6
**Shortly (2)**
16:11,18
**show (10)**
5:13;39:3;68:17;
71:12;75:2;86:10;
102:14,16,20;103:10
**showing (1)**
104:3
**shown (1)**
104:20
**shows (2)**
88:10;106:3
**shred (1)**
134:9
**shredded (2)**
134:10,11
**Shuford (1)**
116:7
**side (3)**
86:20,21;102:3
**sign (3)**
57:11;155:16;
156:17
**signature (4)**
70:11,13;71:8;75:9
**signed (1)**
122:23
**significant (1)**
109:3
**sign-on (1)**
101:5
**similar (3)**
4:22;88:16;145:4
**single (2)**
107:14,19
**sister (2)**
81:25;82:19
**sister's (2)**
82:23,23
**sitting (9)**
42:9;67:20;76:12;
94:10;115:22;
125:20,22;128:16,17
**situation (5)**
140:8;142:9;
145:19,20;151:23
**situations (1)**
140:5

**size (1)**
64:2
**skip (1)**
13:3
**sleep (1)**
139:15
**slip (1)**
5:11
**smart (1)**
144:19
**sobbing (1)**
139:13
**software (7)**
20:8,9,10;40:22;
53:16;54:18;57:5
**solely (1)**
74:20
**someone (9)**
30:23;39:9;56:18;
71:19;76:13;84:25;
92:14;138:12;
142:10;154:8
**someone's (1)**
73:6
**sometime (5)**
93:3,18;116:24;
141:9;148:25
**Sometimes (2)**
5:22;133:16
**Somewhere (2)**
77:21;116:5
**sorry (9)**
78:7;90:15;104:23,
25;105:1;111:17;
112:15,17;114:20
**sort (1)**
46:24
**source (1)**
89:3
**Southern (1)**
116:11
**space (1)**
118:13
**speak (24)**
14:10,19;15:9,19;
34:6;51:21;57:23;
58:10,21;59:13;
67:25;68:4,15;72:6;
73:22;89:2,17;96:23;
97:13;106:17;
150:15;151:9,10,19
**Special (2)**
29:11;30:1
**specific (13)**
28:22;30:21;35:19;
37:6;55:5;77:21;
79:9;85:9;101:23,23;
106:3;143:11,12
**specifically (19)**
39:23,24;40:20;
51:21;54:14;58:1;
67:16;68:14,15;
69:17;73:2,22;74:1;

86:23;98:8;106:20;
116:4,5;129:12
**specifics (6)**
28:12;32:21;48:20;
70:4;123:17;124:22
**spend (2)**
22:24;23:14
**spent (1)**
24:9
**spoke (7)**
67:12;124:19;
140:14;142:23;
145:17,18;151:11
**sponsor (1)**
132:3
**sporadically (1)**
83:18
**spreadsheet (2)**
84:13,15
**spring (3)**
38:21;100:12;
110:7
**staffing (1)**
20:19
**stands (2)**
106:25;121:11
**start (4)**
10:6;28:20;91:3;
101:24
**started (3)**
10:8;119:24,25
**state (6)**
4:15;7:11;84:13;
108:17;145:2,4
**stated (1)**
39:2
**statement (4)**
39:7;47:19;49:2;
107:18
**states (3)**
7:14;107:5;108:1
**station (2)**
47:17;81:10
**statistical (1)**
20:18
**status (1)**
113:20
**stay (1)**
36:23
**staying (1)**
30:24
**stenographer (2)**
133:6,10
**Stephanie (12)**
51:25;52:4;70:13;
73:7,8;75:9;81:2;
88:5;89:1,23;91:17;
153:17
**Stephanie's (2)**
92:9;98:19
**steps (2)**
57:9;60:22
**Steven (1)**

8:6
**still (11)**
8:23;34:20;49:10;
57:4,6;105:13,15;
135:2;140:18;
143:25;155:21
**stolen (1)**
156:10
**stop (3)**
45:22,24;90:12
**stopped (3)**
108:9,19,23
**stops (1)**
45:20
**Stovall (10)**
13:21,25;54:12,25;
55:4,12;56:18;57:23;
58:10,17
**Stovall's (2)**
55:24;58:20
**strategic (5)**
18:22;40:3,5,9;
79:9
**Street (1)**
44:15
**stress (2)**
126:20,21
**stressful (1)**
140:4
**strictly (1)**
145:22
**strike (19)**
24:13;28:20;38:7;
41:10;54:25;57:14;
58:25;69:25;82:9;
85:25;87:12;89:19;
91:21;94:4;100:17;
107:23;126:14;
132:11;150:19
**Stromberg (8)**
42:24,25;43:3,4,10,
12,15,17
**stub (2)**
102:6,10
**stubs (1)**
101:24
**studied (1)**
6:24
**study (3)**
6:23;85:6;97:25
**studying (1)**
9:10
**subject (6)**
12:18;13:9;14:7,
16;15:3;66:3
**submission (1)**
151:17
**submit (6)**
51:13,15;67:17;
70:1;96:13;97:6
**submits (1)**
60:22
**submitted (12)**

60:6;71:13,19;
73:20;74:18;79:21;
83:15;95:25;98:23;
99:20;101:7,11
**submitting (2)**
70:19;96:6
**subscriber (1)**
155:21
**subscription (1)**
155:24
**subsequent (1)**
155:12
**subsidiary (1)**
118:17
**substantiate (2)**
60:5;64:14
**sufficient (1)**
75:5
**suggested (3)**
126:25;135:17;
138:7
**suggestion (1)**
36:17
**summarize (1)**
98:15
**summarized (1)**
79:4
**Sunday (1)**
144:6
**supervised (1)**
46:20
**supervision (5)**
17:20;18:19,21;
19:6;21:5
**supervisor (23)**
25:1,4,6,9;45:16;
49:21;51:16;52:25;
58:20;60:6,8,25;61:1,
7;64:24;65:1;73:1;
74:12;95:8;99:20;
103:14;128:4;141:18
**supplemental (2)**
107:2,24
**support (9)**
17:2;18:16;19:19,
23;20:1,2,25;31:6;
49:14
**supported (2)**
25:18,18
**supporting (1)**
60:4
**supposed (4)**
27:13;96:13,15;
97:8
**sure (29)**
5:17;11:19;17:5;
27:15;28:2;33:3;
34:13;35:22,25;38:2;
42:5;47:13,23;50:15;
62:12;67:3,7;71:25;
72:19;77:12;90:13;
103:3;115:10;
116:18;134:25;

136:8,8;149:4;150:2
**surprise (1)**
144:25
**surprised (2)**
146:21,22
**surprising (3)**
126:10,13;143:4
**switch (1)**
88:3
**switches (1)**
88:7
**sworn (1)**
4:5
**system (24)**
31:1,4,8,10;43:8,
23;46:6;49:14;52:15;
53:10;54:22;55:9;
57:12;58:4;59:5;
60:11,17;72:13;
73:15;76:14;77:8;
86:19;118:13;138:19
**Systems (61)**
4:4,14;6:24;9:14,
21;10:16;11:10,17;
12:18,22;13:8,11;
14:7,17;15:4;17:3,7;
19:15;22:23;25:2;
28:11;40:13;44:10;
58:13;59:22;62:3,6,
17;63:14;64:7,9;
81:19;82:11;86:17;
99:13;100:7,18;
107:8,15;108:4,8,23;
109:5;113:21;116:2;
117:24;118:10;
122:22;123:8;129:6;
131:24;132:1;
133:23;150:13;
151:16;155:14,25;
156:3,6,10,11
**Systems' (5)**
12:8;45:5;63:1;
66:11;138:13

---

## T

**table (1)**
70:15
**talk (5)**
12:21;13:11,25;
16:24;26:8
**talked (1)**
103:14
**talking (7)**
32:9;37:17;46:15;
80:22;104:24;
139:19;150:25
**tantalizing (1)**
38:2
**tape (1)**
16:3
**targeted (2)**
142:1,2

**targeting (1)**
137:4;139:10
**Task (1)**
77:2
**tax (1)**
116:21
**taxable (1)**
137:19
**taxation (1)**
137:19
**TAYLOR (32)**
4:3,9,16,18;6:5;
8:6,7,18;11:16;12:2;
34:14,21;36:21;
46:13;68:24;70:8,17;
71:5;77:13;83:6;
84:9;101:20;104:3;
109:17;112:18,20;
120:6;121:23;
127:15;128:23;
152:6;153:8
**Taylor's (1)**
35:7
**teaching (1)**
80:2
**team (7)**
19:23;48:23;49:2,
3,23;50:4,13
**technical (1)**
59:5
**technically (1)**
20:10
**tedious (1)**
11:19
**telephone (2)**
136:25;141:10
**telling (2)**
114:24;139:3
**Tennessee (1)**
4:11
**terminate (1)**
151:21
**terminated (19)**
18:8;26:13;33:16;
38:18;39:5;46:24;
91:15;93:5,19;94:9;
113:6,7,11,12,15;
145:24;146:16;
154:11,14
**termination (24)**
27:25;32:16,19;
33:20;40:1,4,7,10;
51:8;53:21;58:2;
66:25;68:3;83:24;
84:2;92:22,25;93:15;
96:4;146:20;150:14;
151:18;154:19,20
**terms (5)**
17:1,2;54:23;
68:16;108:14
**testified (12)**
4:6;38:11;48:4;
50:9;54:11;71:16;

74:5;83:7;105:21;
112:25;148:3;155:3
**testify (19)**
12:8,17,22;13:1,7,
12;14:1,6,11,16,20,
23;15:2,7,10;35:20;
57:24;58:11;99:9
**testimony (11)**
10:15;13:16;27:20;
34:24;35:13;36:1;
53:17;72:23;104:19;
108:22;134:22
**that'll (1)**
87:13
**therefore (1)**
92:8
**Theresa (5)**
17:23;130:7,25;
131:2,9
**thereto (1)**
92:2
**Third (4)**
44:14;75:12;76:21;
111:20
**third-party (3)**
64:11;127:8;130:7
**THOMAS (2)**
4:3,16
**Thompson (3)**
109:23,25;110:23
**Thompson's (2)**
111:15,18
**though (1)**
62:17
**thought (5)**
82:4;95:13,15;
115:20;143:20
**thoughts (1)**
115:4
**Thrasher (2)**
48:18;49:4
**Thrasher's (1)**
49:21
**threatened (2)**
125:16,19
**three (7)**
82:8;87:25;111:3;
116:20;120:8,17;
124:25
**three-percent (1)**
64:23
**threshold (1)**
86:24
**throughout (1)**
135:17
**Thursday (1)**
104:16
**tied (1)**
52:12
**Tifton (1)**
9:5
**Time-and-attendance (7)**
41:4;42:2,11,18,

21;43:1,8
**times (8)**
26:21;28:12;31:17;
141:8;142:12;
150:20,23;151:2
**title (3)**
10:1;45:3;86:24
**Today (5)**
4:22;11:17;15:13;
30:6;34:20;42:9;
43:17;63:23;64:19;
67:20;76:12;94:10;
115:22;149:4;155:8
**together (3)**
25:14,15;33:17
**told (21)**
34:7;38:15,16,25;
95:16;98:22;114:18;
117:5,13,15;137:2;
139:8,16;141:1,22;
144:24;145:11;
146:10;147:24;
148:13;149:22
**tone (1)**
126:12
**took (4)**
121:2;125:23;
139:13;148:9
**tool (3)**
20:5,17;53:14
**tools (2)**
20:3,4
**top (3)**
63:19;85:18;87:23
**topic (41)**
12:11,19,22;13:1,3,
9,12,17;14:1,3,3,4,7,
11,15,17,20,23;15:1,
3;34:23;35:5,14;
36:14,24;37:11,17;
40:17;53:5;57:24;
58:1,7,9,11;59:18,19;
79:3;99:5,5,10;121:7
**topics (17)**
12:9;15:18;27:16,
19,23;34:14;35:8,11,
15,19,25;36:9;37:3,
18;80:5,7;106:20
**total (1)**
72:16
**touched (1)**
58:24
**tough (1)**
140:5
**toward (1)**
102:3
**track (5)**
53:18;100:7,18;
138:15;155:17
**training (4)**
79:5,7,13,19
**transaction (1)**
116:19

**transactions (1)**
119:10
**transcript (10)**
16:10,18;133:21;
134:4,5,6,7;136:6,11,
12
**transcripts (8)**
16:5,7;134:12,16,
20,21,22;135:2
**transferred (1)**
19:6
**travel (7)**
51:15;73:2,3,20;
81:13,16;130:8
**traveling (1)**
140:17
**travel-related (1)**
52:23
**treasury (1)**
17:15
**treatment (3)**
47:9;126:19,21
**trends (1)**
21:9
**trick (2)**
52:10;89:7
**tried (3)**
142:1;143:25;
144:13
**trip (12)**
4:24;72:3,4,7,9,15,
16,17;73:17,18;
82:16;83:1
**trouble (1)**
31:1
**true (1)**
143:22
**Truman (1)**
45:19
**Trust (10)**
118:8;119:3,4;
120:22,23,24;121:1,
3;122:21,24
**trusted (1)**
96:10
**trustee (5)**
117:4,6;125:24;
126:17;130:1
**trustees (11)**
121:13;122:22;
123:19,20,23;124:3;
129:24;132:4,5,12;
152:11
**truthful (1)**
120:2
**try (6)**
5:4,21;33:16;
37:16;93:7,22
**trying (11)**
4:25;5:15,17;
52:10,10;67:2;74:6;
89:6;95:14;110:23,
24

**Tuesday (1)**
104:16
**turf (1)**
9:11
**turn (1)**
86:23
**turned (3)**
81:16;95:5,7
**turning (1)**
87:1
**twins (1)**
82:5
**two (10)**
87:3;88:3,4,19;
94:22;95:6;106:21;
113:25;132:11,12
**two-year (1)**
7:20
**type (5)**
43:20;55:5;62:14;
72:24;149:15
**types (2)**
61:18;133:21
**Typically (4)**
21:11;72:12;79:18;
102:14

### U

**ultimately (2)**
22:6;43:15
**unable (1)**
140:20
**unclear (1)**
4:24
**under (25)**
12:9;17:16,20;
18:19,21,23;19:24,
24;21:5;27:17;34:19;
36:22;62:13,17;
71:15;72:8;74:19;
83:14;84:2;87:23;
99:16;101:5,5;
105:21;139:23
**undergone (2)**
72:24;126:19
**understandable (1)**
84:21
**understood (5)**
5:6;47:14;73:10;
96:10;151:7
**underwriting (2)**
110:5,6
**United (2)**
109:6;110:4
**unless (1)**
156:13
**untrue (1)**
4:25
**unusual (1)**
129:23
**up (34)**
4:24;5:13;23:13;

24:11;30:25;36:23;
54:22;68:7;71:12;
82:7;84:15;88:10;
100:23;102:14,16,20;
104:20;110:11,12;
120:8;121:7;122:21;
123:10,20;127:24;
131:8;133:14,21;
135:18;137:5;
138:10,14;146:25;
155:16
**UPL (12)**
106:24,24,25;
107:8,10,13,24;
108:9,20;110:1,14;
113:21
**uploaded (2)**
74:9;83:8
**upon (1)**
42:10
**Upper (2)**
106:25;107:1
**upset (2)**
119:15;125:16
**USA (2)**
8:10,11
**usage (3)**
138:6;139:1,5
**use (13)**
20:2,5;23:11,23;
42:24;44:11;48:12;
55:22;58:14;59:15;
138:4;144:13
**used (13)**
21:18;41:3;42:1;
43:21;53:11,14;
57:15;59:1,16;92:10;
137:20;143:9;150:17
**useful (1)**
36:4
**uses (2)**
30:10;137:21
**using (10)**
20:21;41:23;42:6;
43:10,17;53:23,24;
55:1;59:12;103:3
**utilize (3)**
44:2;59:8;134:5
**utilized (1)**
118:13
**utilizes (1)**
40:25
**utilizing (3)**
42:24;57:2,3

### V

**vague (1)**
30:22
**valid (1)**
37:12
**value (1)**
30:11

**various (7)**
11:9;21:2,4;24:22;
30:19;80:5;138:21
**VEBA (37)**
121:7,8,11,14,19;
122:8,9,10,11,12,14,
17,20,22;123:4,6,10,
14,18;124:24;125:1,
3,24;126:17;127:1,
22;128:3;129:5,13;
131:21,23;132:2,4,
10,12;152:10,11
**V-E-B-A (1)**
121:10
**vein (1)**
5:1
**vendor (2)**
41:8;130:24
**vendors (2)**
130:7,11
**verbal (1)**
5:10
**Vice-President (6)**
9:20;10:1,3;29:11;
45:4;80:18
**view (2)**
26:23;131:12
**violated (5)**
51:5,8,18;52:5,19
**violation (2)**
69:19;73:23
**violations (1)**
81:3
**visit (2)**
130:10,18
**voice (1)**
114:20
**voiced (1)**
112:14
**vote (2)**
48:23,25
**voting (1)**
49:2
**VP (1)**
58:19

**W**

**wages (1)**
137:20
**Waldrop (198)**
4:11;18:8,13,19;
19:11,24;21:4,20,25;
24:20;25:13,14;26:1,
8,13,19,20,23;27:11;
28:6,7,10,15,16,23,
24;29:4,4,6,16,19;
30:12,16,21;31:12;
32:4,24;33:1,6,10,15;
34:3,6,7;38:13,17,21,
22,25;39:4;46:19,24;
47:1,5,7,9,18,19;
48:17,19;49:20,22;

50:10;51:4,17,22;
52:3,24;57:2;58:3;
59:2,14;60:15;64:17;
67:13,16,18;69:16;
70:3;71:19;72:4,25;
73:20;74:1,3,20;
76:13;77:23;78:23;
80:3,18;81:4;88:17;
90:1,10;91:3,10,15,
23;92:4,7,11,20;
94:12,20;95:1,13,16,
19,21;96:5,9,10,14;
97:4,5,15;99:14,22;
100:2,7;101:11;
103:4,7,12;104:18;
106:14;113:1,5;
114:9,10,13,18;
115:14,16;116:1,6,
25;117:5,9,13,15;
119:11,15;121:13,15;
124:23;125:5,13,20,
22;126:11;128:3,9;
129:15,20,23;130:21;
136:20,24;137:1,2,7,
24;138:3,6,7,10,12,
16;139:3,8,11,20;
140:14;141:10;
142:7,17,22,24,25;
143:7,9,19;145:4,10,
16,17,23;147:20;
149:22;152:19,19;
154:10,13;155:7;
156:5,9
**Waldrop's (42)**
4:20;27:24;29:10;
31:25;32:6,16,19;
39:15,19;40:1,4,7,10;
52:22,25;53:20;58:2;
65:6;66:23;68:2;
83:24;91:6;92:16;
94:7;96:4;99:6,15;
100:19;101:14;
103:20;104:5;
106:10,17;113:14;
139:22;146:19;
147:2;150:7,11,14;
151:17,18
**walked (1)**
130:24
**Wall (17)**
136:19;144:16;
145:11,14,15,21;
146:3;147:5,9,14,23;
148:1,6,14,22;154:8,
23
**Wall's (3)**
144:3;145:7,16
**Walter (1)**
116:7
**wants (1)**
54:1
**water (1)**
46:8

**Waverly (2)**
75:13,17
**way (19)**
10:20;11:11;23:15;
27:8;36:20;43:12,21;
52:13;57:10;79:4;
82:13;95:21;98:23;
123:9;131:5;137:21;
138:24;140:17;
151:20
**ways (1)**
30:25
**Wednesday (1)**
104:16
**week (1)**
104:14
**weekend (1)**
144:6
**weekly (1)**
26:10
**weren't (1)**
59:8
**what's (2)**
8:5;49:6;71:5;
101:21;102:7;104:3;
113:20;127:15;
128:23;136:23;
153:8,13
**whenever (1)**
5:19
**When's (1)**
140:14
**whereby (1)**
152:19
**Who's (3)**
80:2;123:25;
133:16
**Whose (1)**
16:7
**wife (3)**
140:18,19;141:2
**wife's (2)**
137:10;144:9
**willing (1)**
37:19
**wine (3)**
119:15,20,21
**within (4)**
30:25;63:25;80:8,
16
**without (4)**
57:19;92:17;112:8;
129:24
**witness (8)**
4:5;9:7;35:19;
37:2;46:10;85:4;
119:24;156:16
**witnesses (1)**
13:22
**word (1)**
77:2
**words (5)**
74:6;95:14;143:9,

11,12
**work (17)**
4:22;11:6;20:10,
15;25:14;57:8;85:3;
103:4;117:19,21,22;
119:5,10;131:6;
140:17,20;142:10
**Workday (53)**
29:23;30:8,10;
31:1,3,10;34:12,18;
40:17,21,22;41:6,8,
16;42:2,20;43:18,21;
44:11,18;45:6,23;
46:2,5;50:24;51:1,5,
11;52:5,12,15;60:10,
11,17,21;71:1;74:3,9,
20;76:14;83:8;
100:10,11,15,20,21,
23;101:2,7,12;
103:10,15;106:3
**Workday's (2)**
41:23;42:7
**worked (4)**
11:3;25:15;42:19;
114:10
**working (21)**
25:25;26:3,11,17,
18;28:9,14,19,23;
29:3;33:17;56:12,18;
57:2;83:14;108:6;
114:5,7,8;146:9,10
**works (2)**
4:22;19:1
**worksheet (3)**
98:15,16,18
**wrapping (2)**
131:8,8
**write-down (2)**
110:1,14
**writing (1)**
24:16
**written (10)**
12:4;23:21;24:1;
44:10,13;45:6;58:13;
76:16;97:11;114:25
**wrong (2)**
74:6;104:24

**Y**

**y'all (2)**
82:5,5
**year (9)**
7:5;10:6;19:16;
20:23;94:16;99:17;
104:6;108:24;109:6
**years (11)**
6:8,13;47:24;
50:15;82:8;108:16,
17;119:13;137:18;
138:25;142:10

**1**

**1 (20)**
11:22,23;12:3,4,9,
12,19;13:9;14:8;
15:3,22,23;57:25;
58:7;59:19;79:3;
99:4,6;101:25;
102:21
**10 (11)**
14:3,4,7,11;59:18,
19;109:14,18,20;
111:22,24
**11 (3)**
121:20,24;122:4
**11:14 (2)**
154:1,22
**11-23-2013 (1)**
71:11
**12 (4)**
81:9;127:12,16,19
**13 (4)**
128:19,24;129:4;
131:18
**13th (1)**
70:16
**14 (3)**
153:4,9,16
**15 (1)**
79:23
**16 (6)**
14:15,17,20,23;
79:3;146:25
**17 (3)**
15:1,3;99:6
**17651 (1)**
104:10
**1796O (2)**
104:23;105:5
**18 (2)**
79:23;106:7
**18th (1)**
104:11
**1986 (1)**
7:6
**1991 (1)**
7:10
**1997 (5)**
10:25;11:2,3,4;
25:5
**1st (2)**
43:6;106:1

**2**

**2 (3)**
68:21,24;69:2,19
**20 (2)**
6:15;142:10
**200 (3)**
105:8,13,15
**2001 (4)**

Case 4:16-cv-00235-HLM   Document 68   Filed 07/17/17   Page 178 of 178
Mark A. Waldrop v.
Community Health Systems, Inc.

Melanie Lorraine Thomas Taylor, CFO
February 28, 2017

10:8,9,11,25
**2002 (1)**
  116:5
**2005 (4)**
  9:24,25;10:9;
  116:17
**2006 (1)**
  96:23
**2008 (3)**
  9:17,24;116:25
**2009 (1)**
  116:25
**2010 (1)**
  99:7
**2011 (1)**
  100:13
**2012 (3)**
  56:13;63:12;77:22
**2013 (3)**
  68:14;69:4;77:22
**2014 (14)**
  31:21;32:10;70:16;
  102:1,1;103:1,1,23;
  104:6,15;105:11,15;
  108:13;132:8
**2015 (17)**
  31:24;32:13,15;
  38:21;85:13;94:15,
  16;110:1,7,8;114:15;
  122:5;123:13;124:9;
  127:1;130:6;146:25
**2016 (26)**
  18:9,17;26:14,16;
  43:6;51:2;66:12;
  85:19,22;91:14,24;
  96:3,4;109:23;
  114:20;129:9;
  136:21;147:15;
  150:5;151:1;153:23;
  154:1,6,11,22,23
**21 (2)**
  8:22;104:15
**213 (1)**
  44:14
**21st (1)**
  129:9
**226 (1)**
  6:6
**22nd (1)**
  109:23
**23rd (2)**
  68:14;69:4
**27 (1)**
  104:15
**27th (1)**
  146:1
**28 (1)**
  18:17
**28th (12)**
  18:9;26:13,16;
  51:2;66:12;146:1,18,
  25;154:1,6,11,22
**2nd (2)**

85:19,21

**3**

**3 (2)**
  70:5,9
**3/4 (1)**
  109:4
**3:50 (1)**
  156:18
**30 (7)**
  4:3;35:18;36:6;
  99:17;100:25;
  106:20;114:3
**31 (1)**
  102:1
**31st (1)**
  106:9
**3M (3)**
  86:6,7;154:25

**4**

**4 (8)**
  71:2,6,9;72:21,23;
  74:2,14,19
**4:00 (1)**
  129:9
**40 (7)**
  103:5;105:19,22,
  24;106:9;108:16,23
**45 (2)**
  108:16,23
**47.5 (2)**
  109:25;110:14

**5**

**5 (7)**
  74:23;75:3,7,10,13,
  19;76:9
**5th (2)**
  91:24;96:3

**6**

**6 (21)**
  4:3;35:18;36:6;
  84:5,9;85:11;86:20,
  25;87:17;88:7,17,23;
  89:20,23;91:23;92:2;
  97:18;98:5,9,14;
  106:20
**60 (1)**
  79:22
**648 (1)**
  6:11
**6690 (1)**
  76:23
**6th (1)**
  153:23

**7**

**7 (17)**
  12:11;86:11,12,16,
  20,25;87:9,19;88:5,
  10,15,22,25;89:12;
  90:4;91:18;98:9

**8**

**8 (10)**
  12:11,19,23;13:1;
  40:17;101:17,21;
  102:21;104:22,25
**80 (2)**
  7:20;102:8
**8th (2)**
  103:1,7

**9**

**9 (15)**
  13:3,9,12,17;14:1,
  15;57:24;58:1,7,9;
  103:25;104:4,24;
  106:7;122:5
**97 (1)**
  11:8