# In The Matter Of:

*Mark A. Waldrop v.*
*Community Health Systems, Inc.*

---

*Richard Andrew Powell*
*June 22, 2017*

---

*American Court Reporting Company, Inc.*
*52 Executive Park South*
*Suite 5201*
*Atlanta, Georgia 30329-2217*
*(404) 892-1331 - (800) 445-2842*

Original File 76066.TXT

**Min-U-Script® with Word Index**

        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF GEORGIA
                ROME DIVISION


MARK A. WALDROP,

        Plaintiff,

     vs.                              Civil Action File

                                      No:4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS, INC.,

        Defendant.



        The deposition of RICHARD ANDREW POWELL,

    taken on behalf of the Defendant, taken pursuant

    to agreement of counsel, taken for all purposes

    authorized by the Federal Rules of Civil

    Procedure; the reading and signing of the

    deposition being reserved; taken before Bonnie L.

    Smith, RPR, Certified Court Reporter, commencing

    at 9:05 a.m., on this the 22nd day of June, 2017,

    at 320 McCallie Avenue, Chattanooga, Tennessee.

2

1     APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3         GARY L. HENRY, ESQ.
          Gearhiser, Peters, Elliott & Cannon, PLLC
4         320 McCallie Avenue
          Chattanooga, Tennessee 37402
5         423-756-5171
          ghenry@gearhiserpeters.com

6

7    For the Defendant:

8         HAROLD T. DANIEL, JR., ESQ.
          Holland & Knight, LLP
9         1180 West Peachtree Street, Suite 1800
          Atlanta, Georgia 30309
10        404-817-8500
          harold.daniel@hklaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    C O N T E N T S

2                 E X A M I N A T I O N

3                                               Page

4    Cross-Examination by Mr. Daniel.....................4

5

6                     E X H I B I T S

7                                               Page
        Defendant's           Description        Marked
8
        Exhibit 1     Expert Report by Richard Powell      5
9
        Exhibit 2     Expert Report of Quentin Mimms       14
10
        Exhibit 3     Interview Questions for Mark A.      26
11                    Waldrop

12      Exhibit 4     Interview Questions and Answers      26
                      for Mark A. Waldrop
13
        Exhibit 5     Interview Questions for Stephanie    28
14                    Dotson

15      Exhibit 6     Interview Questions and Answers      28
                      for Stephanie Dotson
16
        Exhibit 7     6/9/17 E-Mail Correspondence         30
17
        Exhibit 8     6/12/17 E-Mail Correspondence        32
18
        Exhibit 9     6/15/17 E-Mail Correspondence        34
19
        Exhibit 10    6/8/17 E-Mail Correspondence         61
20
        Exhibit 11    Expense Report for Stephanie Dotson  95
21
        Exhibit 12    2012 Budget and Plan Worksheets      104
22
        Exhibit 13    2013 Budget and Plan Worksheets      111
23

24

25

4

P R O C E E D I N G S

1
2          (Whereupon,
3                    RICHARD ANDREW POWELL
4      Was called as a witness and, having first been
5      duly sworn, was examined and testified as
6      follows:)
7                    CROSS-EXAMINATION
8  BY MR. DANIEL:
9      Q    Would you state your full name for the
10  record?
11      A    Richard Andrew Powell.
12      Q    Where do you live?
13      A    6708 Moss Lake Drive, Hixson, Tennessee.
14      Q    That's a suburb of Chattanooga?
15      A    Yes, sir.
16      Q    What is your business or profession?
17      A    My profession is a sole proprietor CPA firm
18  working primarily in the area of litigation support,
19  forensic and management services for small to medium
20  businesses.
21      Q    What is the name of your firm?
22      A    Powell CPA, LLC.
23      Q    Do you have other employees in your firm?
24      A    No, sir.
25      Q    How long have you been working as an

1    accountant with your current firm?

2        A    Since September of last year.

3        Q    When were you first licensed as a certified

4    public accountant?

5        A    1980 in the state of Florida.

6        Q    Are you licensed in any other state?

7        A    I was licensed in the state of Tennessee in

8    1995.

9        Q    Have you been continually licensed as a

10   certified public accountant in Florida since 1980?

11       A    Yes, sir.

12       Q    Have you been continually licensed as a

13   certified public accountant in the state of Tennessee

14   since you were initially licensed?

15       A    Yes, sir.

16       Q    Have you been the subject of any

17   disciplinary proceedings as a certified public

18   accountant?

19       A    No, sir.

20            MR. DANIEL:  I want to mark a document

21       please.

22            (Defendant's Exhibit 1 was marked for

23       identification.)

24   BY MR. DANIEL:

25       Q    I want to hand you a document that's marked

6

1    as exhibit one to your deposition.  And I'll ask if

2    you can tell me what this is.

3         A    This is an expert report written by me at

4    the request of Gearhiser on the case that's mentioned,

5    Mark Waldrop versus Community Health Systems, Inc.

6         Q    Are you the sole author of this report

7    marked as exhibit one?

8         A    Yes, sir.

9         Q    Did you have any assistance from anyone in

10   writing this report?  And I don't mean the name of

11   persons you interviewed.  I just want to know did

12   anyone help you write it.

13        A    No, sir.

14        Q    Please look at appendix A to the report.

15   This appears to be your CV.  Do you see that?

16        A    Yes, sir.

17        Q    Is this CV current?

18        A    Yes, sir.

19        Q    And then the last page of appendix A

20   contains a list of testimony for the last 10 years.

21   Do you see that?

22        A    Yes, sir.

23        Q    Can you tell me about each of the five cases

24   you've listed here, the dates that you either were

25   engaged or testified, beginning with United States of

1    America versus Timothy H. Parkes?

2         A    And what information do you want from each

3    case?

4         Q    I want to know when you were engaged or when

5    you testified, either one.

6         A    For Mr. Parkes' case, it was early May or

7    June 2009 to December 2009.

8         Q    All right.  The second case is Robert Joe

9    Lee versus Nancy Katherine Stanfield and some others.

10   When were you engaged in that case or when did you

11   testify?

12        A    The specific month timeframe that I was

13   involved in that case, I don't specifically recall at

14   this time, but it was in the last 10 years.

15        Q    Do you remember when you testified?

16        A    My best recollection right now would be 2007

17   or 2008.

18        Q    Okay.  The third case is Hometown Folks,

19   LLC, versus S&B Wilson, Inc., and some others.  When

20   did you offer deposition testimony in that case?

21        A    The best timeframe I can give you is 2007 to

22   2008.

23        Q    The next case is Julie Sabry -- I cannot

24   pronounce the name -- a marital divorce case.  When

25   did you -- when were you engaged in that case?

8

1      A     The best recollection I have is 2007 to

2   2008.

3      Q     And the last case is James H. Mick, Junior,

4   versus Dr. Cindy Meler-Mick -- excuse me; they're the

5   plaintiffs -- versus Alside, Inc., and some others.

6   When did you testify in that case?

7      A     My best recollection was 2007 to 2008.

8      Q     Now, it appears then you've not offered any

9   trial testimony or deposition testimony since you

10  formed Powell CPA, LLC; is that right?

11     A     That's correct.

12     Q     Okay.  And so these engagements would appear

13  to go back to a time in 2006 to 2007 when you were

14  working for an entity known as Richard A. Powell, CPA.

15     A     Yes, sir.

16     Q     And in between the time that you worked as

17  Richard A. Powell, CPA, and the time that you formed

18  and began working at Powell CPA, LLC, you were

19  employed as the chief financial officer of an entity

20  known as Remington Industries, Inc.; is that correct?

21     A     Yes, sir.  That's one of the firms I was

22  chief financial officer for.

23     Q     So were you chief financial officer for more

24  than one firm at the same time?

25     A     Yes, sir.

9

1      Q      What were the other firms that you were CFO
2   for?
3      A      Remington Global, Inc., and RemSource USA,
4   Inc.
5      Q      And you were chief financial officer for
6   those three entities from 2007 to 2016; is that
7   correct?
8      A      Yes, sir.
9      Q      Did you engage in the private practice of
10  accounting while you were CFO of those entities?
11     A      No, I did not.
12     Q      Why did you cease being CFO of those
13  entities and then return to the private practice of
14  accounting?
15     A      The owner of the three entities tried an
16  unsuccessful sale of the three entities from 2015 to
17  the summer of 2016.  When it became unsuccessful at
18  that time, I decided to leave the corporation and form
19  Powell CPA, LLC.
20     Q      Did you voluntarily terminate your
21  employment?
22     A      Yes, sir.
23     Q      What is the nature of your practice today at
24  Powell CPA, LLC?
25     A      The nature of the practice is to provide

1    forensic and litigation support and management

2    services to small and medium businesses.

3       Q    I believe you said you were first licensed

4    as a certified public accountant in Florida in 1980.

5    Were you working for Coopers and Lybrand at that time?

6       A    Yes, sir.

7       Q    As I look at your CV, it appears that in the

8    time that you have been working as a CPA or with CPA

9    credentials that approximately half of the time you've

10   worked for corporations as opposed to engaging in the

11   private practice of accounting; is that correct?

12      A    That's a fair statement.

13      Q    Now, when you were the chief financial

14   officer of Remington Industries, Inc., Remington

15   Global, Inc. and RemSource USA, Inc., can you describe

16   generally what your duties were?

17      A    The duties included being the liaison

18   between the companies and external auditors, external

19   tax return preparers, financial lending institutions,

20   being responsible for the financial reporting for

21   licensors such as Michelin, Rubbermaid, Stanley.

22         I was over the internal operations of

23   accounting and human resources which included

24   cash-flow management of all three companies and the

25   human resource responsibilities of all three

1  companies.

2        Q    Did you have any responsibility for

3  preparation of budgets?

4        A    Yes, sir.

5        Q    Generally describe what that responsibility

6  was.

7        A    Each company had their own budget that had

8  to stand alone that we worked through each year.  And

9  in addition to that, there were certain central cost

10  centers that were allocated out to two of the three

11  companies such as accounting, IT and EDI.

12        Q    And while you were chief financial officer

13  of those three companies, did you have responsibility

14  for handling or supervision of reimbursement of

15  business expenses?

16        A    Yes, sir.

17        Q    Okay.  Tell me what your responsibility was.

18        A    Our expense report reimbursement policy

19  followed policy and had an expense report form.  The

20  form was to be completed by the employee, given to his

21  or her direct report to review.  Once approved and

22  reviewed by the direct report, it came into accounts

23  payable.  Accounts payable reported to a controller

24  that reported to me.

25            Then accounts payable -- my accounts payable

12

1    clerk made sure of the comprehensiveness and accuracy

2    of all information on the expense reports.  If for any

3    reason she felt it was deficient of policy, whether

4    accuracy or comprehensiveness, she did not put it into

5    the system.  She, in those situations, usually brought

6    it to me to go over the deficiency.

7         Q    When you use the term direct report, do you

8    mean that employee's supervisor?

9         A    Yes, sir.

10        Q    When you were the chief financial officer of

11   these three entities, did your system allow an

12   employee to approve his or her own expenses and then

13   submit them for payment?

14        A    No, sir.  The only person to approve their

15   own expenses was the owner.

16        Q    Okay.  That's the top of the food chain,

17   isn't it?

18        A    Yes.

19        Q    And so if you had someone red flag an

20   expense reimbursement report because it had not been

21   approved by the direct report, that is, the supervisor

22   of the employee submitting the report, would you have

23   approved it for payment?

24        A    No, sir.

25        Q    Now, on page two of exhibit one, your report

1   in this case, you indicate that you are a certified

2   fraud examiner as credentialed by the Association of

3   Certified Fraud Examiners.  What does that

4   certification -- what's the significance of that

5   certification?

6        A    The certified fraud examiner credential is

7   known worldwide by people who deal in the area of

8   fraud.  This is a group I believe formed in the '70s

9   that pull in all enforcement elements of fraud, not

10   just accountants.  It includes law enforcement,

11   attorneys and -- and other people who, in their roles,

12   deal with fraud and forensic work.

13        Q    Have you dealt with fraud in the forensic

14   work you've done as a certified public accountant?

15        A    Yes, sir.

16        Q    Tell me what you've done in general terms.

17        A    In general terms, help identify and quantify

18   misappropriations, embezzlement, initiate

19   investigations for alleged fraud.  I've been involved

20   in financial fraud.  And I think those categories

21   pretty much summarize the various cases I've been

22   involved in with fraud.

23        Q    In appendix B to your report which is marked

24   exhibit one, you indicate among the documents and

25   information considered that you considered the answer

14

1  and defenses to Plaintiff's amended complaint and

2  amended counterclaim of Defendant Community Health

3  Systems, Inc., dated December 15th, 2016; is that

4  right?

5      A    Yes, sir.

6      Q    Did you read the defenses of Community

7  Health and the counterclaim of Community Health in

8  this case?

9      A    Yes, sir.

10     Q    Did you determine that there was a

11  counterclaim for fraud alleged against Mr. Waldrop in

12  one of the counterclaims?

13     A    Can you repeat that question?

14         MR. DANIEL:  Read it back please.

15         (Whereupon, the record was read by the

16      reporter as requested.)

17         THE WITNESS:  Yes, I understood there was a

18      counterclaim for fraud.

19         (Defendant's Exhibit 2 was marked for

20      identification.)

21  BY MR. DANIEL:

22     Q    All right.  I hand you a document marked

23  exhibit two to your deposition and ask if you

24  recognize this as a copy of the expert report of

25  Quentin L. Mimms.

1      A      Yes, sir.  It appears to be a copy of

2  Quentin Mimms' expert report.

3      Q      Now, again, going to appendix B to your

4  report marked exhibit one, there's an indication there

5  under reports that you did consider the expert report

6  of Quentin L. Mimms dated April 21st, 2017; is that

7  right?

8      A      That's correct.

9      Q      Did you read this report?

10     A      Yes, sir.

11     Q      And on page seven of this report, if you'll

12  look at the top paragraph -- it's a part of paragraph

13  13 which begins on the previous page -- there is a

14  reference to -- well, I'll just read what it says.

15             I understand this termination followed an

16  internal investigation that was initially prompted by

17  complaints Mr. Waldrop made regarding Mr. Rollins'

18  actions towards him.  CHSI's internal investigation

19  revealed, quote, numerous instances of fraud committed

20  by Mr. Waldrop and acts undertaken by Mr. Waldrop in

21  violation of the employment agreement, the guidelines

22  and the corporate governance policies, closed quote,

23  which resulted in the termination of Mr. Waldrop.

24             Did you read that -- those two sentences

25  when you read Mr. Mimms' report?

16

1      A      Yes, sir.

2      Q      So when you prepared your report marked

3 exhibit one, you knew that there were allegations of

4 fraud by Community Health against Mr. Waldrop, did you

5 not?

6      A      Yes, sir.

7      Q      Did you undertake any investigation to

8 determine whether or not Mr. Waldrop had committed a

9 fraud?

10      A      Yes, sir.  I believe I did the steps

11 necessary to determine the actions of Mr. Waldrop

12 relative his expense reports and get his responses to

13 interview questions and other discussions to determine

14 whether his view had an eligible answer for his duties

15 as COO of CHSI.

16      Q      Did you offer an opinion in your report

17 marked exhibit one as to whether or not Mr. Waldrop

18 committed a fraud against Community Health?

19      A      Specifically for fraud, I don't believe so.

20      Q      I mean, I haven't found one.  If there's one

21 in there, I'd like you to point me to it.

22      A      Well, one of the elements of fraud is

23 intent.  And it's very difficult for investigators to

24 get in the mind of the individual who allegedly

25 committed the fraud.  I found no indications of any

1   intent in my discussions with Mr. Waldrop that he

2   intentionally had any deception on the management of

3   CHSI.

4        Q    Well, I'm trying to learn whether or not you

5   offered any opinion in your written report as to

6   whether or not Mr. Waldrop committed a fraud.  Did

7   you?

8        A    No, sir.

9        Q    Have you ever been subjected to what is

10  known as a Daubert or Daubert challenge?

11       A    Not that I'm aware of.

12       Q    Has your -- withdrawn.  Have your

13  credentials as an expert ever been challenged in any

14  court proceeding, state or federal?

15       A    Not that I'm aware of.

16       Q    Tell me what the scope of your engagement in

17  this case was.

18       A    As stated in the first paragraph on page one

19  of my report, I was asked to examine Quentin Mimms'

20  report for the specific report findings of the four

21  invalid expense items listed under invalid category

22  one and to analyze other information to determine if a

23  different conclusion could be reached; and, two, to

24  identify any potential discriminatory acts committed

25  by Community Health Systems, Inc.'s management.

1    Q    Was your scope -- withdrawn.  Was the scope

2  of your engagement enlarged beyond those two tasks?

3  In other words, did you do anything more than those

4  two things?

5    A    No, sir.

6    Q    The second inquiry that you made to identify

7  potential discriminatory acts committed by Community

8  Health Management, what was the purpose of this

9  inquiry, if you know?

10    A    I felt, based on my previous experience and

11  based on the expert report of Quentin Mimms, that

12  there could possibly be a double standard going on,

13  that rules were made after his departure that were not

14  rules by management during his employment term and it

15  was very concerning to me, as my experience of CFO,

16  about discriminatory acts.

17    Q    Was there any allegation of discrimination

18  in the amended complaint which you read?

19    A    No, sir.

20    Q    Did undertake this task of identifying

21  potential discriminatory acts committed by Community

22  Health Management on your own or were you asked to do

23  it?

24    A    It was something I was asked to do.

25    Q    When were you engaged in this matter?

1    A    In the early days of May of 2017.  I'd like

2  to say May 1st, but I can't be that specific at this

3  time.

4    Q    So you've been engaged as an expert in this

5  matter for a little bit less than two months; is that

6  right?

7    A    Yes, sir.

8    Q    How many hours have you devoted to this --

9  this assignment, you know, before we got here today?

10    A    I would say in the range of 80 to 100 hours.

11    Q    Have you billed Mr. Waldrop any amount for

12  your work?

13    A    I have billed through the month of May.

14    Q    How much did you bill for the month of May?

15    A    A little over $11,000.

16    Q    And, again, your hourly rate is what?  $210

17  an hour?

18    A    Yes, sir.

19    Q    And you don't have any other timekeepers who

20  are billing on this matter?

21    A    No, sir.  I have no employees.

22    Q    Have you been paid?

23    A    I've been paid a retainer and another

24  installment payment that exceeds the 11,000.

25    Q    How much were you paid as a retainer?

1      A      $5,000.

2      Q      And how much have you been paid in

3   installment payments?

4      A      $7,500.

5      Q      Do you know approximately how much you will

6   bill for your services up to the point of the

7   deposition today?

8      A      I imagine, for the month of June, it will be

9   consistent with the month of May.  Probably around 10

10  to $12,000.

11     Q      When you began your work in preparation of

12  the report that's marked exhibit one, did you make any

13  assumptions?

14     A      No, sir.

15     Q      I didn't see any assumptions stated in your

16  report.  I just wanted to know if you had made any in

17  connection with the formation of your opinions.

18     A      No, sir.

19     Q      Tell me what you did to -- once you were

20  engaged and you had the task of doing these two things

21  that you described earlier, how did you go about it?

22     A      I primarily looked at the sources that are

23  shown in appendix B starting with the amended

24  complaint and the following two court filings that

25  followed the amended complaint, read to get background

1  on the complaint, then primarily looked at the

2  depositions and went through the depositions, and then

3  any supporting documents that were referenced in those

4  depositions were incorporated.

5       Q    In appendix B to your report marked exhibit

6  one, you list some depositions that you considered,

7  specifically the deposition of Ronnie Rollins,

8  Stephanie Dotson, Mark A. Waldrop, Lorraine Taylor,

9  Joe Wall, Christopher Edwards and Quentin L. Mimms.

10 Do you see that?

11      A    Yes, sir.

12      Q    Did you read those depositions?

13      A    Yes, sir.

14      Q    Did you read any other depositions other

15 than the ones that are listed here?

16      A    No, sir.

17      Q    How did you select those depositions?  There

18 are seven of them.  How did you select those to be the

19 ones that you would read as opposed to others?

20      A    Relevant to the scope of my assignment in

21 talking with Gearhiser, we identified which

22 depositions were most relevant to my scope and those

23 were identified.

24      Q    Okay.  And this is something you did with

25 the lawyers for Mr. Waldrop?

1  A  Yes, sir.

2  Q  Did you ask to read depositions that are not

3 on this list?

4  A  No, sir.

5  Q  Did you know anything about a deposition of

6 Christine Waldrop, for example, who's the wife of Mark

7 Waldrop?

8  A  I might have been aware of it, but I did not

9 ask to read it.

10  Q  What about an employee named Diana Wilks?

11 She was a direct report to Mr. Waldrop.  Did you ask

12 to read her deposition?

13  A  No, I did not.

14  Q  Did you ask to read any depositions not on

15 this list and you were told, no, you shouldn't read

16 that?

17  A  No, sir.

18  Q  Did you ask for anything that you were not

19 given?

20  A  No, sir.

21  Q  Looking at page two of exhibit B, the last

22 item here is Bates labeled documents by beginning

23 Bates and the second one says Community Health

24 Systems, Inc., production documents.  And there are

25 nine documents identified there.  Do you see those?

23

1    A    Yes, sir.

2    Q    How did you select those nine documents

3  beginning with the one that says CHSI 0006442 and

4  ending with the last one, CHSI 0018034?  How did you

5  select those nine documents to be documents which you

6  would consider?

7    A    They either were documents referenced in the

8  expert report of Quentin Mimms or in one of the

9  depositions that I read or I had asked Gearhiser to go

10  through and find expense reports of Ms. Dotson that

11  contained other employees' expenses on her expense

12  report.

13    Q    Okay.  You mentioned that you read the

14  depositions listed on appendix B to your report marked

15  exhibit one.  What else did you do to gather

16  information before forming opinions which you've

17  expressed in exhibit one?

18    A    After looking at the depositions and other

19  source documents, in order to formulate my report, I

20  went back to Quentin Mimms' report for the four subset

21  invalid expense categories of category one to

22  determine the basis that he invalidated each of the

23  four items and helped the framework of my report be

24  delineated based on his conclusions of those four.

25    Q    What did you do next?

1     A     For the next section of my report, I looked

2   at Stephanie Dotson's expense reports that had names

3   of other employees on her reports to determine if, in

4   fact, she had transacted expenses for the benefit of

5   other employees.  I also got produced the internal

6   audit report of expense reports that was performed by

7   CHSI in the early part of 2016 and looked at the

8   different worksheets tabs on that Excel file and

9   focused on the findings tab, especially in the area of

10  concerns and issues that were raised.

11    Q     This was the internal audit for the

12  six-month period from July 1st through the end of

13  December 2015?

14    A     Yes, sir.

15    Q     And when you said you looked at Community

16  Health expense reports to find where Stephanie Dotson

17  had submitted expenses of others, are you talking

18  about those eight or nine documents that are

19  referenced on page two of appendix B, the ones that I

20  asked you about a moment ago?

21    A     Yes, sir.  And they should be in my exhibit

22  two.

23    Q     All right.  What did you do next?

24    A     On the Excel file with the internal audit, I

25  created my own columns to the right and placed the

1  elements of the substantiation of expenses as defined

2  by the 2014 CHSI guide for expenses, noting they have

3  five areas in their expense report, to make sure those

4  were covered by the expenses and started lining up,

5  counting the number of employees on the audit, the

6  number of expense reports reviewed and the number of

7  concerns/issues that were identified on the Excel

8  file.

9      And I tried to categorize those concerns and

10  issues relative to the substantiation of expenses

11  associated with their guide.  If for any reason the

12  concern or issue was not covered by that paragraph in

13  their guide, I created four buckets to categorize

14  those concerns or issues that are explained on exhibit

15  three.

16      Q    Okay.  What else did you do in preparation

17  for preparing this report marked exhibit one?

18      A    I also had various interview questions and

19  discussions with Mark and Stephanie.

20      Q    Okay.  Did you meet in person with either

21  Mark Waldrop or Stephanie Dotson?

22      A    I did meet with Mark Waldrop May 31st in

23  person in the presence of counsel.

24      Q    Did you meet with Mark Waldrop more than one

25  time?

26

1      A      No, sir.

2      Q      Did you meet in person with Stephanie Dotson

3  at any time?

4      A      No, sir.

5             (Defendant's Exhibit 3 was marked for

6      identification.)

7  BY MR. DANIEL:

8      Q      Let me show you a document that's marked as

9  exhibit three to your deposition.  Tell me if you know

10 what this is.

11     A      These are the -- it appears to be the

12 interview questions that I had provided counsel to

13 share with Mark Waldrop.

14     Q      Did you prepare these questions?

15     A      Yes, sir.

16     Q      And in what stage of your work did you

17 prepare them?  In other words, when did you do it?

18     A      This was in the latter half of May and prior

19 to reading Mr. Waldrop or Ms. Dotson's deposition.

20     Q      So you prepared the questions before you

21 read the depositions?

22     A      Yes, sir.

23     Q      And was there a reason for that?

24     A      Yes, sir.  Due to personal timing on myself.

25             (Defendant's Exhibit 4 was marked for

1       identification.)

2    BY MR. DANIEL:

3       Q    I show you a document that's marked as

4    exhibit four to your deposition.  Can you tell me what

5    that is?

6       A    These are responses of specific interview

7    questions that were returned to me from Mark Waldrop

8    through counsel.

9       Q    Now, in your report marked exhibit one, you

10   refer in footnotes to interview responses by Mark

11   Waldrop on three different dates, May 30th, June 8th,

12   and June 9th; is that right?

13      A    Yes, sir.

14      Q    Now, are all of those interview responses

15   you're referring to in the footnotes of your report

16   contained in Powell exhibit four?

17      A    No, sir.

18      Q    Okay.  Can you tell me the date that you --

19   withdrawn.  Do you have other interview responses

20   other than are contained in Powell exhibit four?

21      A    Yes, sir.  I believe June 9th and June 15th

22   were communicated to me via e-mail through counsel.

23      Q    Okay.  If I understand your answer then, you

24   don't have another document similar to exhibit four

25   which appears to be a set of your questions with typed

1    answers; is that right?

2        A    Correct.

3        Q    When you received the information contained

4    on exhibit four, what was your understanding as to the

5    authorship of these responses?

6        A    My understanding would be that Mark would

7    have responded to these questions and sent them back

8    to Mr. Henry and due to client-attorney privilege, it

9    would be passed on to me after Mr. Henry reviewed

10   Mr. Waldrop's responses.

11            (Defendant's Exhibit 5 was marked for

12       identification.)

13   BY MR. DANIEL:

14       Q    I show you a document marked as exhibit five

15   to your deposition and ask you to tell me what this

16   is.

17       A    This is a list of interview questions

18   prepared by me to be sent to Stephanie Dotson.

19       Q    Okay.  And had you read Ms. Dotson's

20   deposition at the time you prepared these questions?

21       A    No, sir.

22            (Defendant's Exhibit 6 was marked for

23       identification.)

24   BY MR. DANIEL:

25       Q    Let me show you a document marked as Powell

29

1    exhibit six.  Tell me what this is.

2        A    This is -- all but the last page are

3    responses by Stephanie Dotson regarding the interview

4    questions that were sent to her.

5        Q    And what is the last page, if you know?

6        A    The last page I believe was a separate

7    document I received that expanded -- from Mark

8    Waldrop -- that expanded Stephanie Dotson's summer

9    convention duties for the GHCA conference or

10   convention.

11       Q    Did you rely upon any of the information

12   contained in Powell exhibit six when you formed your

13   opinions and prepared your report that's marked

14   exhibit one?

15       A    Yes, sir.

16       Q    The only time I saw a citation to interview

17   responses by Stephanie Dotson was on page 35 -- excuse

18   me -- page 15 of your report marked exhibit one.  Was

19   there any other time that you cited by footnote to

20   interview responses of Stephanie Dotson?

21       A    I don't specifically recall.  If you want me

22   to flip through each page of the report, I shall.

23       Q    You may.

24       A    No, sir.  I don't find where the interview

25   questions from Stephanie was referenced anywhere else

30

1    in my report.

2              (Defendant's Exhibit 7 was marked for

3         identification.)

4    BY MR. DANIEL:

5         Q    Please look at the document marked exhibit

6    seven to your deposition and tell me if you can

7    identify this.

8         A    Yes.  This is the e-mail I received from

9    counsel on June 9th for the content that's included in

10   the e-mail.

11        Q    And did you understand this to be

12   information being transmitted by counsel for

13   Mr. Waldrop from Mr. Waldrop?  Did you understand this

14   information was coming through counsel from

15   Mr. Waldrop?

16        A    Yes, sir.

17        Q    Now, if you'll look down on exhibit seven to

18   the e-mail from Mr. Henry to you, he has a list of

19   names of persons who allegedly attended some meetings,

20   an Ethica trip in April/May of 2013 and Financial

21   Services trip in November of 2013.  Did do you see

22   those lists?

23        A    Yes, sir.

24        Q    Did you do anything independently to verify

25   that those people actually attended the meetings as

1    indicated in this e-mail?

2        A    No, sir.

3        Q    When you were dealing with Mr. Waldrop and

4    Ms. Dotson, did you do anything to assure yourself

5    that the information they were giving you was true and

6    correct?

7        A    No, sir.  I didn't do any extended

8    substantive procedures to validate the information.

9        Q    You did not ask Mr. Waldrop or Ms. Dotson to

10   sign an affidavit, for example, with respect to the

11   information they gave you, did you?

12       A    I did not.

13       Q    So did you make an assumption in the course

14   of forming your opinions in this case which you've

15   stated in exhibit one to your deposition that the

16   information that Mark Waldrop gave you was true and

17   correct?

18       A    Yes, sir.  That assumption was made.

19       Q    And did you make an assumption in preparing

20   your report and forming your opinions as stated in the

21   report marked exhibit one that the information

22   supplied to you by Stephanie Dotson was true and

23   correct?

24       A    I'm sorry.  Could you restate that?

25            MR. DANIEL:  Read it back please.

```
 1              (Whereupon, the record was read by the
 2         reporter as requested.)
 3              THE WITNESS:  Yes, I made that assumption.
 4              (Defendant's Exhibit 8 was marked for
 5         identification.)
 6    BY MR. DANIEL:
 7         Q    I show you a document marked as exhibit
 8    eight to your deposition.  Can you tell me what this
 9    is?
10         A    Yes.  This is an e-mail I received from
11    counsel in his followup with Mark to find out certain
12    information about certain individuals that worked with
13    CHSI's companies.
14         Q    And were those certain individuals Ronnie
15    Rollins and Lorraine Taylor?
16         A    No, sir.
17         Q    Okay.  I see.  You're talking about the very
18    top memo.  But look down below on page two of exhibit
19    eight to your deposition.  There's an e-mail from
20    Mr. Henry to you where he references a collection of
21    expense reports.  Do you see that?
22         A    Yes, sir.
23         Q    Now, are these the expense reports that are
24    identified in your report, appendix B, page two, under
25    Bates labeled documents by beginning Bates?
```

1      A      Not all of the documents in appendix B, page

2  two, I believe relate to this e-mail.

3      Q      Okay.  Do all but the last one relate to the

4  e-mail?

5      A      If you'd like me to compare my exhibit two

6  to this e-mail, I will.

7      Q      I'd like you to.  Because I believe that you

8  used the documents that are identified on appendix B

9  to prepare your exhibit two; is that right?

10      A      Yes.  But from what I recall, I had one or

11  two expense reports already in hand for exhibit two of

12  my report prior to the expense reports referred to in

13  this June 7th e-mail.

14      Q      Okay.  Look -- if you would, take the time

15  to look at your exhibit two -- that's exhibit two to

16  your report -- and appendix B to your report.  And

17  just tell me if these expense reports, these documents

18  that are referenced at about the middle of page two of

19  two of appendix B are, in fact, the documents that you

20  used in preparation of exhibit two to your report.

21      A      Yes, sir.  All except the last Bates number

22  showing up in appendix B, page two.

23      Q      And these are the expense reports that

24  Mr. Henry sent you by this e-mail that was dated

25  June 7th, 2017, which is a part of Powell exhibit

34

1    number eight?

2         A    Yes, sir.  The majority of those Bates

3    numbers were supplied.  I believe I had one or two of

4    those documents that appear in exhibit two prior to

5    this e-mail.

6              (Defendant's Exhibit 9 was marked for

7         identification.)

8    BY MR. DANIEL:

9         Q    Okay.  Please look at the document that's

10   marked exhibit number nine to your deposition and tell

11   me if you know what this is.

12        A    This is an e-mail I received from counsel

13   based on his discussion with Mark Waldrop after Mark

14   had a chance to read the draft of my initial expert

15   report.

16        Q    And it appears here that counsel is offering

17   edits to your draft report; is that right?

18        A    I cannot say whether he's editing or

19   becoming a messenger.  In order to edit something,

20   you'd have had to know what it said beforehand and I

21   wouldn't be in a position to know if Mark stated

22   something that didn't appear on what I received.

23        Q    Well, I'm just looking at the e-mail itself

24   at the top of exhibit nine.  There are three numbered

25   paragraphs and it appears to me that Mr. Henry is

1  suggesting some corrections to your draft report; is

2  that right?

3      A    I do not see it the way you're responding.

4  Right below my name on the e-mail, it says Mark had

5  the following factual corrections relating to your

6  draft report.  So I would tend to disagree that you

7  feel Gary is the editor of these corrections.

8      Q    All right.  Well, Mr. Henry sent you the

9  e-mail; right?

10     A    Yes, sir.

11     Q    And he says Richard, Mark had the following

12 factual corrections relating to your draft report,

13 colon, and there are three.  Do you see that?

14     A    Yes, sir.

15     Q    Did you understand that Mark Waldrop had

16 read your draft report and was suggesting these three

17 changes be made?

18     A    Yes, sir.

19     Q    Now, when I read your report marked exhibit

20 one, you referred to interview responses by Mark

21 Waldrop on May 30th, June 8th and June 9th.  And I

22 asked you earlier to identify the document that is

23 marked as exhibit four to your deposition.  And I

24 understood you to say this is the only time that you

25 received answers in this form, that is, answers to the

1    questions attributed to Mark Waldrop; is that right?

2         A     Yes, sir.  And to best delineate it,

3    interview questions for Mark related to that exhibit.

4         Q     So when you cite in your report to interview

5    responses by Mark Waldrop on June 8th and June 9th,

6    are you referring to these e-mails from Gary Henry to

7    you, one of which is dated June 9th and it's marked

8    exhibit seven to your deposition, and -- I don't see

9    one for June 8th, but is that what you're referring

10   to?

11        A     Yes, sir.

12        Q     When you met with Mark Waldrop in person,

13   how long did the meeting last?

14        A     As I recall, about two and a half or three

15   hours.

16        Q     Did you take any notes at that meeting?

17        A     Yes, sir.  I did.

18        Q     Do you have those notes?

19        A     No, sir.

20        Q     What happened to them?

21        A     They're in my office.

22        Q     But you do have notes of that meeting?

23        A     Yes, sir.  The subpoena did not request

24   documents.

25                MR. DANIEL:  All right.  Mr. Henry, we

1    request that you give us a copy of those notes.

2            MR. HENRY:  Well, I acknowledge your request

3    and we'll determine if they're discoverable and

4    respond accordingly.

5            MR. DANIEL:  I believe that we asked already

6    for all notes and work papers that he had earlier

7    this week and those were not supplied.

8            MR. HENRY:  You asked for, as I recall, any

9    documents that he relied on that we had that

10    supported his opinions.  We produced what were in

11    our possession.

12           There was a request for production directed

13    to Mr. Waldrop relating to that, which we

14    responded to through a supplemental response

15    earlier this week.  I do not believe there was a

16    request made specifically to Mr. Powell for his

17    notes.

18           MR. DANIEL:  Well, I disagree, because it

19    was our intention to ask for any notes and work

20    papers that Mr. Powell had in connection with

21    this matter.  I'll confirm at the break from my

22    associate what she discussed with you, but I

23    think you -- I think you knew we wanted those

24    notes.

25  BY MR. DANIEL:

38

1       Q    All right.  Mr. Powell --

2            MR. HENRY:  Well, and let me just say this.

3       I'll state, for the record, I wasn't aware there

4       were any notes that Mr. Powell had.  But I

5       disagree with your characterization of the scope

6       of the request in any event.

7  BY MR. DANIEL:

8       Q    So, Mr. Powell, did you have telephone

9  conversations with Mr. Waldrop in connection with your

10 work in this case?

11      A    No, sir.

12      Q    So when you cite the discussions with Mark

13 Waldrop on May 31st and June 15th, 2017, you only had

14 discussions with him in person on May 31st; is that

15 right?

16      A    Yes, sir.

17      Q    And so the June 15th, would that refer to

18 one of these e-mails?  There is one dated June 15th.

19 It's marked exhibit nine to your deposition.

20      A    Yes, sir.

21      Q    Is that what you're referring to?

22      A    Yes, sir.

23      Q    And, again, when you refer to interview

24 responses by Mr. Waldrop, you're referring to exhibit

25 four and to these e-mails which have been identified

1    as exhibits seven, eight -- seven and eight to your

2    deposition; is that right?

3        A    No, sir.  The interview responses only

4    correspond to exhibit four.  Anything received by an

5    e-mail subsequent to that was cited individually in

6    the footnotes, such as the June 8th and the June 9th

7    citings.

8        Q    Okay.  But the citations in the footnotes

9    say interview responses by Mark Waldrop on June 9th,

10   2017.

11       A    Okay.

12       Q    And if it says that --

13       A    Based on that date, that would be an e-mail.

14       Q    Okay.  And so that really is referring to

15   this e-mail that has been identified as exhibit seven

16   to your deposition?

17       A    Yes, sir.  If that's the appropriate date on

18   the citing.

19       Q    Right.  And then where it says interview

20   responses by Mark Waldrop on June 8th, 2017, what's

21   that referring to?

22       A    Could you let me know what page you're --

23       Q    Page 24 of your report marked exhibit one,

24   the last footnote.  It's footnote 78.  It says

25   interview responses by Mark Waldrop on June 8th, 2017.

40

1       A     That was a document received by e-mail that
2    appears as the last page of exhibit six.
3       Q     All right.  That's the page that has the
4    control number MAW 003703 down at the very bottom?
5       A     Yes, sir.
6       Q     Okay.  There's no date on this, but it's
7    your testimony that's when it was received?
8       A     Yes, sir.
9       Q     Was it received with a cover e-mail?
10      A     It was received via e-mail.  So I imagine
11   there was a cover e-mail associated with it, but I
12   don't specifically recall.
13      Q     I'm just trying to learn how you know that
14   that document came to you on June 8th, 2017.
15      A     Via e-mail.
16      Q     I mean, how do you know it came on that
17   date?
18      A     Because it was cited in my report.  In my
19   records, I have a copy of that e-mail that I cited
20   through the footnote.
21      Q     Okay.  This is something else that's back at
22   your office?
23      A     Yes, sir.
24            MR. HENRY:  I'll state for the record if
25        it's an e-mail I sent, I'll try to find it and I

1      will produce that.

2             MR. DANIEL:  Okay.  Well, find it at the

3      break if you would.

4             MR. HENRY:  Sure.

5             MR. DANIEL:  We'd like to see it.

6  BY MR. DANIEL:

7      Q    And, again, you did not meet with Stephanie

8  Dotson in person?

9      A    That's correct.

10     Q    You did not speak with her by telephone?

11     A    That's correct.

12     Q    Now, exhibit B to your report marked --

13  withdrawn.  On appendix B to your report marked

14  exhibit one, you list documents and information

15  considered in the preparation of your report and the

16  formation of your opinions.  Did you consider anything

17  else, any other documents that are not contained on

18  this appendix?

19     A    No, sir.  Not that were used to form my

20  opinion.

21     Q    Now, on page three of your report marked

22  exhibit one, you have a section E, basis for opinions

23  and methodology.  What was the methodology you used in

24  the preparation of this report?

25     A    I looked at the documents shown on my

1    appendix B to get the background of the case;

2    formulated questions intentionally posed to

3    Mr. Waldrop or Ms. Dotson to answer questions I had

4    that I could not find in the depositions or other

5    filings; applied my basic experience and knowledge

6    based on being a CFO for 16 of the last 18 years; and

7    applied procedures to determine if a different

8    conclusion could be reached on the four subsets of

9    expenses that were called invalid; as well as

10   requested other information to determine standard

11   operating procedure of Ms. Dotson paying for expenses

12   of others; as well as any information I could gain

13   from the analysis of the Excel report on the internal

14   audited expense reports.

15            The depositions were also used to get a

16   basic understanding of the budgetary process and the

17   expense reimbursement process of CHSI.

18        Q    On page three of your report marked exhibit

19   one, in the paragraph beginning at line eight, you say

20   I am relying on -- and you have the word statement --

21   statement given by others associated with the matters

22   to which my report will address.  What did you mean by

23   that word statement?

24        A    That was a grammatical error.  It should be

25   plural and say statements.

1      Q     And which statements were you relying on?

2      A     The statements shown on appendix B,

3   primarily the depositions and the interview questions

4   and responses with Mark and Stephanie.

5      Q     You go on in that same paragraph on line 11

6   to say that methodology used to prepare my report

7   included understanding the roles and responsibilities

8   of Mr. Waldrop and Ms. Dotson, gaining an

9   understanding of CHSI's processes for corporate

10  budgeting and expense report reimbursements.  How did

11  you reach that understanding?

12     A     For the roles and responsibilities of

13  Mr. Waldrop and Ms. Dotson, a lot of my questions were

14  those interview questions that I sent them.  In

15  addition to Mr. Waldrop, I gained it based on looking

16  at his employment agreement that was in one of the --

17  I believe it was exhibit one of the amended complaint.

18          As for the corporate budgeting expense

19  reports, I read depositions and various people had

20  various perceptions of the expense reimbursement

21  process.  But I relied heavily on Lorraine Taylor's

22  deposition for the budget and expense report

23  reimbursements since she is the CFO of CHSI and should

24  be the most informed party as to understanding those

25  processes.

44

1      Q     On line 13, page three of exhibit one to

2   your deposition, you say reviewing the results of an

3   internal audit of internal expense reports.  Were you

4   referring there to the internal audit for that

5   six-month period beginning July 1st, 2015, ending

6   December 2015?

7      A     Yes, sir.

8      Q     And what was the extent of your review of

9   that internal audit?

10      A     I reviewed the entire Excel file to see what

11   worksheet information was provided.  I specifically

12   focused on the findings worksheet tab where it had

13   concerns and issues that were the result of the

14   internal audit to determine what level of problems or

15   degree of problems were they experiencing in that

16   six-month period for their sample.

17      Q     Turn again if you would to exhibit two to

18   your deposition.  This is the report of Quentin Mimms.

19   And I'd like you to look at appendix C to this report.

20   Tell me when you've found that.

21      A     Yes, I see it.

22      Q     Now, in appendix C to Mr. Mimms' report,

23   he -- he states documents and information considered.

24   Do you see that?

25      A     Yes, sir.

45

1       Q    And if you look down to the bottom of page
2   one of five, you see Bates labeled documents by
3   beginning Bates and that continues for several pages.
4   It goes over through page three of five.  Do you see
5   that?
6       A    Yes, sir.
7       Q    Did you review all of the documents that
8   Mr. Mimms had reviewed?
9       A    No, sir.  I did not.
10      Q    Why not?
11      A    The scope of the work I was asked to do was
12  to focus on the four subsets of category one, invalid
13  expenses, to determine if there's other information
14  to -- that could be analyzed to reach a different
15  conclusion.  Those four subsets basically represent
16  70 percent of the invalid expenses.
17      Q    And the other 30 percent you did not review
18  at all, did you?
19      A    That's correct, other than the generalized
20  wording he used in his report of category two and
21  category three.
22      Q    Did you verify the amounts of expenses
23  reimbursed to Mark Waldrop and Stephanie Dotson?
24      A    No, sir.  I relied on the report of the
25  expert ahead of me.

1     Q    Okay.  Do you have any reason to doubt or
2   challenge the numbers in Mr. Mimms' report?
3     A    I have no reason to doubt the amounts in his
4   report.
5     Q    Did you read the report of Chris Edwards?
6     A    Yes, sir.
7     Q    Did you do anything to verify the numbers in
8   Mr. Edwards' report?
9     A    No, sir.
10     Q    Do you have any reason to doubt or to
11   challenge the numbers in Mr. Edwards' report?
12     A    No, sir.
13     Q    Did you review any responses to
14   interrogatories in this case?
15     A    No, sir.
16     Q    With the exception of the expense reports
17   that are listed on appendix B to your report marked
18   exhibit one to this deposition, did you review any of
19   the underlying records relating to expense
20   reimbursements of Stephanie Dotson or Mark Waldrop?
21     A    No, sir, unless they were specifically cited
22   in my report.
23     Q    Now, on page five of your report marked
24   exhibit one, you refer to the budget process.  And you
25   specifically make reference at lines 13 and 14 to

47

1    Medicare, Medicaid and IRS guidelines.  Do you see

2    that?

3        A    Yes, sir, as it relates to nursing

4    facilities.

5        Q    Okay.  What did you do to evaluate these

6    Medicare, Medicaid and IRS guidelines which may apply

7    to the Community Health budgeting process?

8        A    From my understanding, the entity CHSI is a

9    non-profit management company that has management

10   overhead that's allocated downstream to the nursing

11   facilities.  And it, by itself, is a non-nursing

12   entity containing the board, management, Mr. Waldrop,

13   Ms. Dotson, and the Financial Services group along

14   with some -- I believe the IT department.

15       Q    That was your understanding.  Did you do

16   anything to confirm that understanding?

17       A    I reviewed the 990s filed publicly for CHSI

18   and felt, based on the information provided on the

19   employees in CHSI, that that was an adequate

20   conclusion and a proper conclusion.

21       Q    On page six of your report marked exhibit

22   one, line 15, you say the percentage of Mr. Waldrop's

23   plan worksheet totals to overall revenues

24   is .029 percent and .033 percent for the years 2012

25   and  2013 respectively.  Do you see that?

1      A      Yes, sir.

2      Q      Now, I think you were taking those

3  percentages off a total revenue number of $750,000; is

4  that right?

5      A      No, sir.  It was off 750 million.

6      Q      Excuse me.  That's right.  You know what

7  Senator Dirksen said.  So you had taken off a figure

8  of $750 million.  Where did you get that $750 million

9  number?

10     A      That amount was stated by Lorraine Taylor in

11  her deposition.

12     Q      Which year did that number apply to?

13     A      It was not stated.

14     Q      So you don't really know what the revenues

15  were at Community Health for either 2012 or 2013, do

16  you?

17     A      That's correct.  This analysis was for

18  roughly right, trying to get a flavor of how much

19  Mr. Waldrop's cost center expenses measured up to the

20  total universe of revenues that the CHSI board of

21  directors are responsible for.  It was a roughly right

22  figure.  That was the only intent of that comment.

23     Q      Did you have any other reason for repeatedly

24  citing these percentages in your report?  Because it's

25  not the only time you cite them.

49

1      A      I felt based on my opinion in my expert

2   report that certain elements of this report needed to

3   be repeated consistently under each of the four

4   invalid subset expenses to constantly remind the

5   reader of the background of which all this information

6   is being derived.

7      Q      If some of the expenses submitted by

8   Mr. Waldrop or Ms. Dotson were improper, are you

9   saying when you refer to these percentages that a

10  small percentage of improper spending by corporate

11  executives is acceptable?

12     A      No, sir.

13     Q      Do you believe that it is important for top

14  executives to set an example for other employees?

15     A      Yes, sir.

16     Q      On page 11 of your report marked exhibit

17  one, you have a chart that shows the amount expensed

18  for Waterford crystal.  Do you see that?

19     A      Yes, sir.

20     Q      Now, I believe this chart actually came from

21  Mr. Mimms' report, did it not?

22     A      No, sir.  It did not.

23     Q      Okay.  This is something you created?

24     A      Yes, sir.

25     Q      Okay.  On this chart, it shows no amounts

50

1    expended for Waterford crystal in either 2011 or 2016.

2    Do you see that?

3         A    Yes, sir.

4         Q    Did you ask Mr. Waldrop or Ms. Dotson the

5    reason that no amounts were expensed for Waterford

6    crystal for 2011 and 2016?

7         A    I did not.

8         Q    Do you know the reason that no amounts were

9    expensed in those years for Waterford crystal?

10        A    Do I know?  No, sir.

11        Q    The chart shows that all of the Waterford

12   crystal was expensed by Stephanie Dotson.  Do you see

13   that?

14        A    Yes, sir.

15        Q    So you determined that Mr. Waldrop did not

16   expense any amount for Waterford crystal from 2010 to

17   2016; is that correct?

18        A    Based on the expert report of Quentin Mimms,

19   yes, sir.

20        Q    And you have no reason to doubt that report?

21        A    Not those amounts as to how they were

22   reported.

23        Q    Okay.  So you have no evidence that

24   Mr. Waldrop expensed any amount for Waterford crystal

25   from 2010 to 2016 under his own name; is that right?

1      A     That's right.

2      Q     Now, you understand that the way the expense

3   reimbursement practice worked at Community Health was

4   that when Mrs. Dotson submitted an expense report

5   claiming expenses for Waterford crystal, that it was

6   approved by Mark Waldrop?

7      A     Yes, sir.

8      Q     And from your understanding of the way

9   expense reimbursements were handled at Community

10  Health, did anyone else approve those expenses after

11  Mr. Waldrop approved them?

12     A     Based on my understanding, no.

13     Q     Now, you have several pages in your report

14  marked exhibit one which refer to the budget process

15  at Community Health at the time that Mr. Waldrop was

16  employed there.  Could you tell me your understanding

17  of how the budget process worked?

18     A     My understanding was gained based on

19  Lorraine Taylor's deposition.  She and her

20  departmental team, Financial Services, provided

21  support to all entities and all cost centers.  In

22  particular to Mr. Waldrop's area, she would provided

23  them with an Excel spreadsheet to complete for his

24  cost center.

25          The budgeting tool was a software called

1    Adaptive.  And Stephanie and Mark, for their cost

2    center, would accumulate costs, outside of salary and

3    related salary-related benefits, and send them forward

4    to Financial Services.  At the end of that process,

5    Mark and Lorraine would get together and look at his

6    cost center expenses.

7              Once approved between the two of them, they

8    would sit down there with Mr. Rollins on the budget

9    and then the budgets of all entities would be provided

10   to the board and presented to the board by Lorraine

11   Taylor for their approval.

12       Q    Did you ever see a budget prepared by Mark

13   Waldrop or Stephanie Dotson or the two of them

14   together that showed purchases of Waterford crystal?

15       A    No, sir.  I did not.

16       Q    You noted on page eight of your report which

17   is marked exhibit one to your deposition that

18   Stephanie Dotson reported 2.7 times the amount of

19   expenses as Mr. Waldrop.  Do you see that?

20       A    Yes, sir.

21       Q    Was it of concern to you that most of

22   Mr. Waldrop's expense reimbursement requests were

23   submitted under Stephanie Dotson's name?

24       A    Not at all.

25       Q    And why not?

1      A    My understanding is they are in a two-person

2    office.  He's a chief operating officer over multiple

3    facilities throughout all the state of Georgia and

4    responsible for direct-line reporting to the

5    presidents of the underlying entities.  And he had, at

6    his assistance, Stephanie Dotson to be able to help

7    him out with his expenses.

8            Management 101 would say I would want my

9    executive out doing what he was asked to do in his

10   employment contract under his defined roles and

11   responsibilities and allow the administrative side of

12   expenses and such be kept and maintained by an

13   executive assistant.

14           Had he done the inverse, he books his own

15   expenses, he books the travel, he books the motel, the

16   inversion would be so unusual in business, to have an

17   executive in a two-person office be booking his own

18   travel just to have it on his own expense report --

19   and then what would she be doing?  He'd probably be

20   fired for not properly using his time for what he was

21   hired for.

22           If proper budgeting is followed and proper

23   expensing of those items is followed, a legitimate

24   business expense is a legitimate business expense

25   regardless who reports it in the corporate pie.

1            So it didn't surprise me after I came out to

2    find more information about the relationship of that

3    two-person office.

4        Q    You knew that the policy at Community Health

5    at all times that Mr. Waldrop was employed there

6    required him to submit his expense report requests to

7    his direct report, Ronnie Rollins, the CEO, did you

8    not?

9        A    That's correct.

10       Q    And when Mr. Waldrop had his executive

11   assistant submit Waldrop's expense reimbursement

12   requests under her name, these did not go to

13   Mr. Rollins for approval, did they?

14       A    That's correct.

15       Q    In effect then, Mr. Waldrop, by approving

16   Stephanie Dotson's expense reports which included his

17   own -- some of his own expenses, was approving his own

18   expenses; is that right?

19       A    Correct.  On expenses that were pre-approved

20   by the budget process.

21       Q    Well, we'll get to that a little bit later.

22   But the point is Mr. Waldrop was approving his own

23   expenses when he approved expense reimbursement

24   requests submitted by Stephanie Dotson, his assistant,

25   which included his expense items; is that right?

55

1      A      That's correct.

2      Q      And as you understand the system at

3  Community Health at the time Mr. Waldrop was employed

4  there, no one above Mr. Waldrop checked those expense

5  reports.  They were simply paid; is that right?

6      A      That's correct.

7      Q      The only way that Community Health could

8  have determined that Mr. Waldrop was submitting large

9  expense reports under Ms. Dotson's name was by an

10 audit; is that right?

11          MR. HENRY:  Object to the form, but you may

12      answer.

13          THE WITNESS:  Not necessarily.  From my

14      understanding, Workday is out there and available

15      for anybody to pull up at the higher levels any

16      report on any individual.  I do not believe that

17      an internal audit report was the only way to

18      identify expense report volume.

19 BY MR. DANIEL:

20      Q      You do know, though, that that internal

21 audit that you reviewed, one that was done for

22 December -- withdrawn.  You do know that the internal

23 audit report that you reviewed, the one for the period

24 July 1st through December 2015, did disclose that

25 Ms. Dotson was submitting expenses of Mr. Waldrop

56

1    under her own name?

2         A    Yes, sir.

3         Q    And you do know that that internal audit led

4    to further investigations, do you not?

5         A    Yes, sir, which surprised me.

6         Q    Did you ask either Ms. Dotson or Mr. Waldrop

7    why Stephanie Dotson on occasion would seek

8    reimbursement for an expense that Mr. Waldrop had paid

9    for with his own credit or debit card?

10        A    No, sir.  I'm not aware that happened.

11        Q    You didn't review the underlying expense

12   records to see whether or not Mr. Waldrop on occasion

13   would charge something on his credit card or use his

14   debit card to pay for something and then have

15   Stephanie Dotson seek reimbursement of that amount,

16   did you?

17        A    If that's what happened, I'm not aware.

18        Q    Did you ask Stephanie Dotson why she applied

19   for reimbursement of Waldrop's expenses?

20        A    No, sir.

21        Q    Did you ask Mr. Waldrop why did you have

22   Stephanie Dotson seek reimbursement for your expenses?

23        A    No, sir.

24        Q    Did you note the number of credit and debit

25   cards from which receipts were offered to substantiate

1    expense reimbursement requests of Mark Waldrop and

2    Stephanie Dotson?

3         A    I saw it in Quentin Mimms' report.  It was

4    not part of my scope.  It didn't surprise me.  It may

5    be high, but in a span of six and a half years with

6    two people that are married and have other cards in

7    the family, I -- as a father of three, I don't jump to

8    conclusions on that without substantive data.

9              The amount of credit cards showing up in my

10   own post office because of breach of security of the

11   credit card companies or an underlying party that used

12   those credit cards, you just can't jump to conclusions

13   based on that volume.  If it's a legitimate business

14   expense, it shouldn't matter the method or payment on

15   how that expense was paid.

16        Q    Looking at Mr. Mimms' report -- this is

17   exhibit two to your deposition -- and exhibit five to

18   that report has a list of the last four digits of the

19   credit or debit cards used by Waldrop and Dotson for

20   expense reimbursement requests from January 2010 to

21   June 2016.  Do you see that?

22        A    Yes, sir.

23        Q    And the total number of credit and debit

24   cards was 41.  Did you investigate to determine

25   whether or not the expenses sought for reimbursement

1    using these 41 unique credit or debit cards were

2    expenses actually paid by Waldrop or Dotson?

3        A    The 41 credit cards and the specific

4    relationship of these credit card numbers to the

5    expenses was not part of the scope of my report.

6        Q    So the answer's no?

7        A    So the answer's no.

8        Q    You told me you read the deposition of

9    Stephanie Dotson; is that right?

10       A    Yes, sir.

11       Q    And you had an opportunity to ask her

12   questions and you submitted to her a list of questions

13   that I think were -- we've previously marked as

14   exhibit four I believe; is that right?

15           MR. HENRY:  I think it might be exhibit

16       five.

17   BY MR. DANIEL:

18       Q    It's not exhibit four.  Excuse me.  It's

19   exhibit five; is that right?

20       A    Yes, sir.

21       Q    That's right.  Okay.  Let me start over with

22   the question then.  You've had an opportunity to read

23   Ms. Dotson's deposition and you submitted questions to

24   her marked exhibit five to your deposition.  You got

25   responses which are marked exhibit six to your

1    deposition.  But you did not inquire of Stephanie

2    Dotson why she used so many credit or debit cards for

3    expense reimbursement requests or to support them?

4         A    That's correct.

5         Q    And when you read Ms. Dotson's deposition,

6    did you learn how many credit cards she said that she

7    had during the time period that was involved here?

8         A    I don't specifically recall.

9         Q    Do you -- withdrawn.  I believe you said you

10   did not read the deposition of Christine Waldrop; is

11   that right?

12        A    That's correct.

13        Q    If you'll look again at Mr. Mimms' report --

14   this is exhibit two to your deposition -- look at page

15   33 of the Mimms report and tell me when you find that.

16        A    I've found it.

17        Q    Okay.  Now, Mr. Mimms here refers to the

18   fact that, in total, 41 unique credit or debit cards

19   based on the last four digits of the card number were

20   used to generate receipts for which expense

21   reimbursement was requested.  And he goes on to say at

22   the bottom of page 33 and going over to page 34 that

23   Mr. Waldrop's and Ms. Dotson's deposition testimony,

24   as well as that of Christine Waldrop, Mr. Waldrop's

25   wife, suggests that at most they had eight different

1    debit -- credit or debit cards among them.  Do you see

2    that?

3        A    Yes, sir.

4        Q    If you had inquired of Stephanie Dotson,

5    Mark Waldrop and Christine Waldrop about the number of

6    credit cards they had during the time period at issue

7    and learned that at most they had eight credit cards

8    and yet you discovered that 41 different credit and

9    debit cards were used for expense reimbursement

10   requests, would this have been of concern to you?

11       A    Well, for one, it was outside the scope of

12   my report.  But, hypothetically, it would appear

13   unusual, but I just wouldn't jump to conclusions on

14   the fact that this report does span six and a half

15   years, changing banks, changing debit cards.  I don't

16   know their personal life well enough to make a

17   conclusion that it's improper from the start.

18       Q    Did you do anything to confirm that Mark

19   Waldrop and Stephanie Dotson actually paid the

20   expenses for which they sought reimbursement?

21       A    No, sir.

22       Q    I believe you told me earlier that as a CFO,

23   you would not have approved the payment of an expense

24   reimbursement request which had not been approved by a

25   person senior to the person seeking reimbursement; is

61

1    that right?

2         A     That's correct.

3              MR. DANIEL:  Do you want to take a break?

4         It's been about two hours.  Do you want to take a

5         10-minute break?

6              MR. HENRY:  I was about to ask.

7              (Whereupon, a recess was taken from 10:47

8         a.m. until 10:57 a.m.)

9              (Defendant's Exhibit 10 was marked for

10        identification.)

11   BY MR. DANIEL:

12        Q     Okay.  Mr. Powell, please look at the

13   document marked exhibit 10 to your deposition.  Tell

14   me if you recognize this as a copy of the e-mail by

15   which you received the last page of the document

16   marked Powell exhibit six.

17        A     Yes.  That's correct.

18              MR. HENRY:  And I'll state for the record

19        the redactions have been made based on work

20        product, mental impression.

21   BY MR. DANIEL:

22        Q     On page 16 of your report which is marked

23   exhibit one, you state the opinion that the Waterford

24   crystal expenses are valid business expenses based on

25   the business purposes presented above.  Do you see

62

1   that?

2        A    Yes, sir.

3        Q    Tell me the basis of that opinion.

4        A    When you look at Mr. Waldrop's roles and

5   responsibilities as the COO and all the different

6   direct reports that come to him, part of his job

7   responsibilities involved integration of the people

8   below him.  And it's one of many of his job

9   responsibilities that refer to synergies between

10  people, leadership between people.

11            The Waterford crystal were always handed out

12  as employee recognition.  It's part of their culture

13  for years in the years that are shown in this

14  January 2010 to June 2016.  It is budgeted in his

15  budget under core value awards, Christmas awards and

16  other employee recognition.

17            Although it is not explicitly spelled out,

18  it has been consistently budgeted, consistently

19  expensed, approved in the budget, part of his

20  responsibilities as COO and, therefore, I declare it

21  valid in my opinion.

22       Q    Did you ever see a budget at Community

23  Health that listed Waterford crystal?

24       A    No, sir.

25       Q    Did you make any inquiry about the gift

63

1   policy in effect at Community Health from 2010 to

2   2016?

3      A    Besides reading the gift policy in the

4   policy itself, no, sir.

5      Q    Do you know what that gift policy was at

6   Community Health?

7      A    Not right offhand.

8      Q    Did you make any inquiry of Mr. Waldrop or

9   Ms. Dotson about what the gift policy was at Community

10  Health?

11     A    No, sir.

12     Q    On page 15 of your report marked exhibit

13  one, you describe what you call the corporate culture

14  of giving Waterford crystal.  What do you mean by

15  that?

16     A    Typically a culture is something that's part

17  of a group, a corporation, that has been part of their

18  ongoing corporate life as defined as the definition of

19  culture.  And in appearance, the crystal has been

20  given out as gifts on numerous occasions by

21  Mr. Waldrop, even Mr. Rollins giving him a piece of

22  Waterford crystal when he first joined the company in

23  '90.  So it seemed to me it's a part of the ongoing

24  culture of the company to be giving out these gifts.

25     Q    Did you discuss the corporate culture of

64

1  giving Waterford crystal with either Mr. Waldrop or

2  Ms. Dotson?

3      A    Actually using the words corporate culture?

4      Q    Uh-huh.

5      A    No.  The culture is a word I used in my

6  report.

7      Q    Do you know when Community Health converted

8  from a profit corporation to a non-profit corporation?

9      A    No, sir.  I do not know that.

10     Q    Do you know whether or not the company

11  policy about gifts changed after it became a

12  non-profit corporation?

13     A    I'm not aware of any change.

14     Q    Do you know what instructions, if any,

15  Mr. Rollins, as the chief executive officer, gave

16  Mr. Waldrop and others at Community Health about gifts

17  after Community Health became a non-profit

18  corporation?

19     A    I believe there was a comment in a

20  deposition that Mr. Rollins stated to Mr. Waldrop not

21  to give out Tiffany gift boxes.  But that's the only

22  item I recall right now about gifts.

23     Q    Do you know what the issue was about Tiffany

24  gift boxes?

25     A    No, sir.

1       Q       Did you ask Mr. Waldrop?

2       A       No, sir.

3       Q       Did you ask Ms. Dotson about the Tiffany

4   gift boxes?

5       A       No, sir.

6       Q       Were the gifts of Waterford crystal

7   deductible under federal tax laws?

8       A       They are deductible as a reasonable and

9   necessary business expense and any excess of the

10  employee gift limit under the IRS should be added to

11  the W-2 of the employees that received it.

12      Q       What is the extent of deduction for a gift

13  under Internal Revenue Service guidelines?

14      A       I don't specifically recall, but I believe

15  there's literature to $25, 75 and a recent ruling of

16  $100 limits that I've read.  But it's $100 or less.

17      Q       Are you aware of a $25 limitation under

18  federal tax guidelines for deduction of gifts?

19      A       I am aware of that.

20      Q       In your opinion, did that $25 limitation on

21  gifts apply in this Community Health situation?

22      A       It should have applied.  If they still have

23  a necessary expense like this, then the differential

24  between the appropriate IRS amount and this gift

25  should be added to the W-2 of the employee receiving

66

1    the gift.

2         Q    What was the cost of a piece of Waterford

3    crystal?

4         A    I don't specifically recall.  But,

5    generally, it's a couple hundred dollars, several

6    hundred dollars.

7         Q    In reaching the opinion which you stated on

8    page 16 of your report marked exhibit one, did you

9    consider the IRS limitation on the amount of a gift

10   when you opined that the Waterford crystal expenses

11   are valid expenses based on the business purposes

12   presented?

13        A    Yes.  Because if it's still budgeted and

14   allowed as part of the corporate culture, then as they

15   give out gifts like this, that excess should be

16   appropriately reported in a W-2 and the entire expense

17   should be valid.

18        Q    Do you know whether or not the excesses were

19   reported on the W-2s after gifts were given to

20   employees at Community Health by Mr. Waldrop?

21        A    I am not aware of anything with the W-2s.

22        Q    When an employee sought reimbursement for an

23   expense for a gift, was the employee entitled to a

24   reimbursement for an amount that was not deductible

25   under federal tax laws?

67

1        A     Is this a hypothetical question?

2        Q     No.  I'm talking about Community Health.

3        A     Can you restate the question?

4        Q     She'll read it to you.

5              (Whereupon, the record was read by the

6        reporter as requested.)

7              THE WITNESS:  Yes.

8   BY MR. DANIEL:

9        Q     What's the basis of that statement?

10       A     If the item has been budgeted as an

11  appropriate expense and I pay the excess amount to be

12  reimbursed, I get the reimbursement.  It's up to the

13  company to either disallow the excess on their tax

14  return or add that difference into the W-2 of the

15  employee receiving the gift.

16       Q     Please look at page 35 of your report.  It's

17  your report marked exhibit one.  Have you found it?

18       A     Yes, sir.

19       Q     Here you refer at line three to Stephanie

20  Dotson's accounting for costs within her expense

21  reports.  And you cite to the reimbursement expenses

22  for the guide adopted at Community Health in 2009 and

23  the one adopted in 2014 and you quote from that guide.

24  Do you see that?

25       A     Yes, sir.

68

1      Q    And you have underscored, emphasis added,
2   some words:  Paid or incurred by the employee in
3   connection with his or her services as an employee.
4   Do you see that?
5      A    Yes, sir.
6      Q    So you have quoted from the guides saying
7   advances allowances or reimbursements will be paid to
8   an employee for any business expenses that are paid or
9   incurred by the employee in connection with his or her
10  services as an employee.  Do you see that?
11     A    Yes, sir.
12     Q    But you did not underscore the words right
13  after that, did you?
14     A    No, sir.
15     Q    And those words are that would otherwise be
16  deductible and are substantiated in accordance with
17  paragraph two below.  Do you see that?
18     A    Yes, sir.
19     Q    Now, under this guide, isn't it true,
20  Mr. Powell, that for an employee to obtain an expense
21  reimbursement, the expense must have been paid or
22  incurred by the employee in connection with his or her
23  service as an employee and otherwise be deductible and
24  substantiated?
25     A    That's the wording of the guide, yes.  Yes.

1      Q    Now, if Mr. Waldrop and Ms. Dotson purchased

2  Waterford crystal that had a value of $200 and the

3  piece of crystal was given to an employee, the maximum

4  amount for which he or she should have been reimbursed

5  was $25; is that right?

6           MR. HENRY:  Object to the form, but you may

7      answer.

8           THE WITNESS:  They could also be reimbursed

9      for the $200 and have the difference added to the

10     W-2 as income for the employee that received the

11     gift.

12  BY MR. DANIEL:

13     Q    Well, I'm going to ask you to assume that

14  that did not happen.  Nothing was added to the W-2.

15  The gift that was given was a $200 gift and Ms. Dotson

16  seeks reimbursement on behalf of Mr. Waldrop for $200.

17  How much is she entitled to receive as reimbursement

18  under the guidelines?

19     A    So she's out-of-pocket for the corporation

20  $200.  The oversight was in not reporting it correctly

21  on the W-2 of the recipient employee.  But her job as

22  an employee, she paid out of her own pocket $200.

23     Q    She's paid $200.  She's sought

24  reimbursement.  How much reimbursement is she entitled

25  to get assuming that the excess was not reported on a

70

1   W-2?

2       A     $200.  I don't hold it her responsibility as

3   an administrative assistant to understand the W-2 side

4   of a company that has over 8,000 employees.

5       Q     So you're offering an opinion that

6   Ms. Dotson would be entitled to receive a full $200

7   reimbursement for the purchase of Waterford crystal

8   regardless of whether that amount was deductible or

9   not; is that right?

10      A     Yes, sir.

11      Q     On page 14 of your report, you note that

12  Waterford crystal purchases were reported under five

13  spend categories.  Do you see that?

14      A     Yes, sir.

15      Q     And on page 12 of your report, you say,

16  beginning at line two, that in your opinion the

17  business purpose can be determined by the account name

18  used in the corporate records for budgeting and

19  recording actual transactions for the item.  And you

20  refer to discussion below.  So you really were saying

21  there that if you want to find the business purpose

22  for an expense, you look at the spend item; is that

23  right?

24      A     The spend category.

25      Q     You look at the spend category.  And then on

1  page 14, you've identified five that were used for

2  Waterford crystal?

3      A    Yes, sir.

4      Q    And to see what these five are, you need to

5  go over to exhibit one of your report; is that right?

6      A    Yes, sir.

7      Q    And exhibit one of your report is actually a

8  document that came from Mr. Mimms' report, is it not?

9      A    The actual exhibit did not come from his

10  report but were excerpts of the lines that only

11  related to Waterford that I compiled.

12      Q    Okay.  You compiled this from Mr. Mimms'

13  report?

14      A    Yes, sir.

15      Q    Okay.  And if you look at the column here

16  which is the seventh column from the left, it says

17  spend category.  Do you see that?

18      A    Yes, sir.

19      Q    And so this crystal that was purchased from

20  2010 to 2015 was charged to five different spend

21  categories; is that right?

22      A    That's correct, according to the exhibit.

23      Q    Okay.  And these five different spend

24  categories, the first one is benefits/incentives.  The

25  second is other benefits, associate recognition.  The

72

1    third one is other benefits, special occasions and

2    supplies.  The fourth one is simply other benefits.

3    And then the fifth one, supplies; is that right?

4         A    Yes, sir.

5         Q    So if someone was trying to determine how

6    much Waterford crystal was purchased by Mr. Waldrop or

7    Ms. Dotson in this time period, 2010 to 2016, they

8    would have to go and look at all five of these spend

9    categories; is that right?

10        A    Worst case, if all five were used in one

11   particular year, yes.  I can't tell you what their

12   general ledger was, the account nature breakout per

13   year on the different accounts.

14        Q    Well, the point is the Waterford crystal was

15   not recorded just under one spend category, was it?

16        A    Not according to the exhibit.

17        Q    Do you have any reason to believe this

18   exhibit is inaccurate?

19        A    No, sir.  But I believe this is the overall

20   spend category that the initial budget was set up in

21   for this incentive item.

22        Q    Which one?

23        A    Benefits and incentive was the major

24   category on the 2012 and '13 budget for Mr. Waldrop's

25   cost center that was for core values, Christmas gifts,

1  and other awards like this.

2           MR. DANIEL:  Can you read that back?

3           (Whereupon, the record was read by the

4       reporter as requested.)

5  BY MR. DANIEL:

6       Q    Did you make any inquiry to determine the

7  difference between other benefits, special occasions,

8  and other benefits, associate recognition?

9       A    No, sir.  I did not.

10      Q    Did you make any inquiry of Mr. Waldrop or

11  Ms. Dotson about what any of these categories meant?

12      A    No, sir.  I did not.

13      Q    Did you make any inquiry as to why some of

14  the purchases of Waterford crystal were listed under

15  supplies?

16      A    I did not.

17      Q    Do you know the amount of inventory of

18  Waterford crystal that was on hand in the Dalton

19  office of Community Health on the day that Mr. Waldrop

20  and Ms. Dotson were terminated?

21      A    I don't specifically recall, but generally

22  it was several thousand dollars of crystal.

23      Q    There was a lot of crystal there, wasn't

24  there?

25           MR. HENRY:  Object to the form.

74

1                THE WITNESS:  That depends on your
2           definition of a lot.
3    BY MR. DANIEL:
4           Q     You don't know how many pieces were there?
5           A     No, sir.  I don't.
6           Q     Now, Ms. Dotson had sought reimbursement for
7    the expenses connected with the purchase of the
8    Waterford crystal that was in storage at the Dalton
9    office.  Was she entitled to that reimbursement?
10          A     Yes, sir.  She was.
11          Q     These -- these pieces of Waterford crystal
12   had not been given to anyone, had not been given to
13   anyone at a retirement party, associate recognition,
14   celebration, anything else.  They're sitting in
15   inventory on a shelf.  And it's your testimony that
16   Ms. Dotson was entitled to get reimbursement for the
17   cost of that Waterford crystal that was sitting there
18   on the shelves in inventory?
19          A     Yes, sir.
20          Q     What's the basis of that position?
21          A     If those expenses were properly budgeted and
22   they were giving gifts out on a continuous biannual
23   basis by the company according to the culture they
24   set, then buying them in advance at a discount was
25   actually a better cost for the company.

1           Another analogy is punishing somebody who

2    bought paper in advance to be used in a copier machine

3    at a discount at a cheaper price, and yet when you let

4    them go, you have excess paper sitting there because

5    they bought in advance.

6           So I don't see where there was anything

7    wrong in the volume of Waterford crystal at the date

8    of their termination.  They, in fact, were coming up

9    on the June convention for GHCA where the crystal was

10   typically given out as well.  So it wouldn't be

11   surprising to me at the time period she was terminated

12   that they would have a higher volume on hand.

13        Q    If your investigation in this matter had

14   determined that Mr. Waldrop had been told by the chief

15   executive officer, Ronnie Rollins, not to make gifts,

16   would your opinion change?

17        A    Possibly.  It would really depend on factors

18   as to when that statement was made and how many

19   occurrences since the statement was made that what

20   appears to me to be the corporate culture still

21   continued in his presence and him condoning it.  I

22   doubt if I would really change my opinion of it being

23   a valid expense under their corporate culture.

24        Q    Do you know whether or not Mr. Rollins was

25   aware of the fact that Mark Waldrop was making gifts

76

1    of Waterford crystal after the company became a

2    non-profit corporation?

3        A    I generally recall that he was present many

4    times when Mr. Waldrop was giving out the Waterford

5    crystal to the recipients.

6        Q    What's the basis of that general recall?

7        A    The interview responses from Mark, I

8    believe, and Stephanie.

9        Q    Well, tell me where I can find those

10   responses.

11       A    In my report, exhibit one, page 15,

12   beginning with the tail end of line four, that

13   Mr. Rollins was fully aware of these gifts and was

14   present numerous times when Mr. Waldrop presented them

15   to employees in his role as COO and that besides

16   Mr. Rollins attending events where Waterford crystal

17   was presented to employees by Mr. Waldrop, other

18   employees in attendance included Ms. Taylor, CFO;

19   board of director members; Ms. Dotson; and members of

20   the presidential council (which later transitioned to

21   the leadership council).

22       Q    Now, you attribute this information to

23   interview responses by Mark Waldrop on May 30th, 2017;

24   is that right?

25       A    Yes, sir.

1      Q    Now, is this the time -- are you referring

2   here to the written responses he gave you, the written

3   responses to your questions?

4      A    Yes, I am.

5      Q    Well, let's look to those written responses

6   and help me find where he gave you that information.

7   That would be exhibit four to your deposition.

8      A    On page two of exhibit four, the very first

9   question, the response to the very first question, the

10  last sentence.  Ronnie Rollins was fully -- RR was

11  fully aware of these gifts and was present numerous

12  times when I presented them to employees when I was

13  COO.

14           Question number six on that page was

15  responding varying -- the question was what other

16  executives and/or board members were physically

17  present when the crystal was handed out to the

18  employees, question mark.  The response received

19  stated varying, from year to year, CEO/CFO/COO/board

20  of directors/Stephanie Dotson/presidential council

21  (which later transitioned to leadership council).

22     Q    You told me earlier that you did nothing to

23  verify the information given to you by Mark Waldrop in

24  exhibit four; is that correct?

25     A    That's correct.

1      Q     And do you know the year that Community

2   Health became a non-profit corporation?

3      A     No, sir.  I do not.

4      Q     When Mr. Waldrop refers up at the top of the

5   page in response to question number one on page -- the

6   control number at the bottom is 3713, the second page

7   of exhibit four -- when he refers to the idea of

8   Waterford crystal as a gift came from RR at the very

9   beginning of my career, do you know what year he's

10  referring to?

11     A     I don't specifically recall.  I know it was

12  somewhere in the '90s.

13     Q     It was about 1990, wasn't it?

14     A     Yes, sir.

15     Q     And you refer to the second sentence there

16  to receiving a piece of Waterford crystal at a holiday

17  party in 1990.  Do you see that?

18     A     Yes, sir.

19     Q     Now, did you inquire of Mr. Waldrop or

20  Ms. Dotson for that matter about whether or not these

21  occasions that are being referred to here in his

22  interview response all predated the time that

23  Community Health became a non-profit corporation?

24     A     No, sir.  I did not.

25     Q     So you, as you sit here today, don't know

79

1    whether or not these times that Mr. Waldrop referred

2    to regarding the presentation of crystal in the

3    presence of Ronnie Rollins and board members and

4    presidential council members, CFO, predated the change

5    of status of Community Health to a non-profit

6    corporation, do you?

7        A    Did you say I said something the other day?

8        Q    Let me ask it again.  It may not have been

9    my best question of the day.

10            You simply do not know whether or not the

11   times that Mr. Waldrop is referring to in responses to

12   questions one and six on the second page of exhibit

13   four took place before the company became a non-profit

14   corporation?

15       A    That's correct.

16       Q    On another page in exhibit four, if you have

17   that before you, page 10 of 14 -- it has control

18   number 3721 at the bottom -- about the middle of the

19   page, in response to a question, the author says all

20   of my expenses were approved by my supervisor, CEO RR.

21   Do you see that?

22       A    Yes, sir.

23       Q    Do you understand that to refer to approval

24   by Ronnie Rollins, the chief executive officer?

25       A    Yes, sir.

1       Q    That is an untrue statement, is it not?

2       A    I am not aware of it being true or untrue.

3  I did not use it in my report.  My understanding were,

4  under the system, all the expenses go directly to the

5  direct supervisor.

6       Q    And some of Mark Waldrop's expenses did go

7  to Ronnie Rollins, his direct supervisor, for

8  approval; is that right?

9       A    Yes, sir.

10      Q    But we previously have talked about the fact

11 that Stephanie Dotson would submit a lot of the

12 expense reimbursement requests for Mr. Waldrop under

13 her name; is that right?

14      A    Yes, expenses that were approved for his

15 cost center that she paid for were under her name and

16 approved by Mark Waldrop.

17      Q    And those expenses, whether they were

18 approved or authorized or not, but those expenses,

19 whatever they were, they were not approved by Ronnie

20 Rollins, were they?

21      A    Those expenses being Ms. Dotson's?

22      Q    The expenses of Mark Waldrop which Stephanie

23 Dotson submitted under her name were not submitted to

24 Ronnie Rollins for approval, were they?

25      A    That's correct.

1    Q    So this is an untrue statement, isn't it, by

2  Mr. Waldrop, who apparently said all of my expenses

3  were approved by my supervisor, CEO RR?

4    A    I don't know what his intent of all my

5  expenses were.  If he said all my expenses that were

6  on my expense reports were approved, it would be more

7  clear.

8    Q    He didn't say that?

9    A    No.

10   Q    He said all of my expenses.  Is that a true

11  statement?

12   A    Not in the context you're reading it.

13   Q    Well, you're an expert witness.

14   A    Correct.

15   Q    And you'll have other cases in the future.

16   A    Correct.

17   Q    This is not the only case you'll ever have.

18   A    Correct.

19   Q    I just want to know the answer, yes or no.

20  Is that a true statement?

21   A    If you're including the whole population of

22  the expenses that he paid out of his pocket, I would

23  say it's a true statement.

24   Q    I asked you earlier if you knew of

25  situations where Mark Waldrop had charged an expense

1    to either his credit or debit card and then handed

2    that receipt to Stephanie Dotson and she applied for

3    the reimbursement on his behalf and you told me you

4    didn't know of any such situations.

5         A    That's correct.

6         Q    If you assume that that did happen on at

7    least one occasion -- let's just say one occasion --

8    then that would have been an expense of Mark Waldrop

9    that was not approved by Ronnie Rollins because it

10   went through Stephanie Dotson and was approved by Mark

11   Waldrop himself; is that right?

12        A    Under that situation you laid out, yes, you

13   are correct.

14        Q    If that happened even on one occasion, the

15   sentence I just referred you to is not true, is it?

16        A    That's correct.  Based on the presentation

17   of the case you just gave, yes.

18        Q    And even if Stephanie Dotson charged an

19   expense for Mark Waldrop on her credit card and

20   submitted it under her name for approval for

21   reimbursement, that was still an expense of Mark

22   Waldrop, whether he paid for it or not; is that right?

23        A    That's correct.  But I believe the corporate

24   guides here are contradictory because I don't read the

25   guide where if it's your expense you have to pay it

83

1   out of 100 percent of your pocket.  If that's the
2   baseline --
3        Q    But the point is if Mark Waldrop is -- say
4   he's going to attend a convention and he tells
5   Stephanie Dotson sign me up for that convention, pay
6   the registration.  She takes out a credit card and she
7   uses her credit card to pay for the registration and
8   then fills out an expense report to seek reimbursement
9   for that.  Are you with me?
10       A    Yes, sir.
11       Q    Now, if that happens, although he did not
12  pay it himself, it's still an expense item for
13  something that -- that he is getting the benefit of;
14  is that right?  It's his expense?
15       A    Yes, sir.
16       Q    It's just she paid for it?
17       A    Correct.  And that's very common in the
18  United States corporate environment.  I don't expect
19  executives to transact on their own business card
20  every transaction they have.  Otherwise they would be
21  turning into an administrative assistant.
22       Q    Well, in that situation where Stephanie
23  Dotson has paid for an expense of Mark Waldrop and has
24  sought reimbursement for it, it is still an expense of
25  Mark Waldrop as far as the company's concerned.  It's

84

1    not Ms. Dotson.  She's not going to the convention.

2    It's Mark Waldrop; right?

3        A    Correct.  But it's a legitimate expense that

4    comes out of the corporate pie.

5        Q    And that expense, if it is processed that

6    way with Ms. Dotson charging it, Ms. Dotson seeking

7    reimbursement and submitting it under her name, it is

8    not submitted for approval by the CEO, Ronnie Rollins,

9    is it?

10       A    That's correct.

11       Q    And so, again, in that situation, the

12   statement on this page 10 of 14 of exhibit four is not

13   true.  That's another expense of Mark Waldrop that was

14   not approved by Ronnie Rollins; is that right?

15       A    Indirectly he approved it via the budget

16   approval on the front end of the year if that's a

17   legitimate corporate expense for the company.

18       Q    I'm talking about the expense reimbursement

19   form.  I'm not talking about indirect.  I'm talking

20   about direct.  He did not approve the expense, did he?

21       A    Which he are you --

22       Q    Ronnie Rollins did not approve the expense

23   in that situation?

24       A    In that situation, no, he did not.

25       Q    You noted that Stephanie Dotson's expense

85

1   reimbursement requests were 2.7 times higher than

2   Mr. Waldrop's.  Do you remember that?

3       A    Yes, sir.

4       Q    And many of these expense reimbursement

5   requests submitted by Ms. Dotson actually covered

6   expenses of Mark Waldrop.  Do you agree?

7       A    Yes, sir.  And others.

8       Q    Okay.  Do you find anything deceptive about

9   this practice of Mark Waldrop having his assistant

10  submit his expense reimbursements under her name so

11  that he approved them and they did not have to be

12  submitted to his direct report, Mr. Rollins?

13      A    No, sir.

14      Q    You don't find that deceptive?

15      A    No, sir.

16      Q    Again, this is -- this is only one case

17  you've got.  You're going to have other cases.

18      A    I understand.  But in a two-person office

19  where he's COO over other facilities, I would expect

20  an assistant to be booking all those activities.  And

21  whether she used a corporate credit card, which I

22  understand were not available, or her own, in today's

23  ID theft world, she couldn't even have been using his

24  credit card and book it for him because the ID theft

25  issue, if there's a problem, it would be a she on the

86

1    phone with a he card.

2              The whole layout of a two-person office did

3    not surprise me at all when she had that volume of

4    expense reports when she's executing transactions on

5    expenses that were legitimately budgeted on the front

6    end of the year for a corporation.  It's a legitimate

7    business expense coming out of the same corporate pie.

8    It shouldn't matter who or what method the expenses

9    were paid by.

10             So it didn't surprise me.  Not at all.  As I

11   stated before in my inverse mind saying if Mark has to

12   book everything he does as a COO for an 8,000 person

13   entity, he'd be staying in the office doing

14   administrative work to set all that stuff up and not

15   going out and doing what he was originally hired to do

16   and would put himself more in a position to be fired

17   than not.  He had an administrative assistant.

18        Q    Some employees at Community Health had

19   corporate credit cards.  Are you aware of that?

20        A    I'm aware that maybe one had a corporate

21   credit card.  I think Diana Wilks I believe was the

22   one that had a corporate credit card.

23        Q    And she reported directly to Mark Waldrop;

24   right?

25        A    Yes, sir.

1      Q     Now, did you ask Mr. Waldrop why he did not

2   have a corporate credit card?

3      A     The discussions we had that I remember were

4   that the CFO did not like corporate credit cards.

5      Q     But Diana Wilks had one?

6      A     Correct.

7      Q     And possibly others?

8      A     Possibly.  There's always exceptions to

9   rules in the corporate environment.

10     Q     Do you remember in Mr. Waldrop's deposition

11  when he said he had -- what?  Was it one credit card?

12     A     I don't recall specifically in his

13  deposition.

14     Q     Do you remember Mr. Waldrop saying he had

15  one credit card with a $500 limit?

16     A     Generally I recall, yes.

17     Q     You do recall that?

18     A     Yeah.

19     Q     If that was the case, would not that have

20  been a good time to -- for Mr. Waldrop to go to the

21  CFO and say I need a corporate credit card?

22     A     Hypothetically, yes.  But my understanding

23  was the CFO did not like corporate credit cards.

24     Q     If you have a corporate credit card, the

25  bill goes to the corporation, doesn't it?

1      A     Correct.

2      Q     And somebody's going to open that bill and

3  see what was charged on it; is that right?

4      A     That's correct.

5      Q     Now, let me ask you this question.  You've

6  got Mr. Waldrop and Ms. Dotson sitting in this office

7  in Dalton.  They're the only two in that office;

8  right?

9      A     Yes, sir.  That's my understanding.

10      Q     And Mr. Waldrop has some expenses and he

11  needs reimbursement for them.  And it's logical for

12  Ms. Dotson to prepare the expense reimbursement

13  requests; is that right?

14      A     To prepare the request for his expenses on

15  his expense report?

16      Q     Well, yes.

17      A     Yeah.  A lot of administrative executives in

18  this country prepare expense reports for their boss.

19      Q     Well, and some of Mr. Waldrop's expenses

20  were submitted for reimbursement under his name and

21  they went to Ronnie Rollins; right?

22      A     Yes.  That's my understanding.

23      Q     And in all likelihood, Stephanie Dotson

24  prepared those expense reimbursement requests; is that

25  right?

1      A     I don't know the likelihood of that.  But

2  it's very likely.

3      Q     But 2.7 times more, she prepared expense

4  reimbursement requests, some of which were her

5  expenses and you say maybe others, but many of the

6  expenses were Mark Waldrop's, would you agree, on the

7  Stephanie Dotson expense reimbursement requests?

8      A     They related to Mark's roles and

9  responsibilities.  He was over leadership groups.  And

10  I imagine a large volume of those dollars related to

11  getting everybody set up, conventions, getting meeting

12  halls set up, getting hotel rooms set up.

13          I can't imagine his company working

14  efficiently if every single time an event like that

15  occurs that who then becomes responsible for a meeting

16  room and if I have 12 people attending, do I tell each

17  12 what dates and which hotel.  They'd have to

18  individually record in order to have it on their

19  personal expense credit card to show up in their

20  personal expense report.

21          It's -- it's very -- it's a very

22  dysfunctional view of running a corporation as to how

23  this is being perceived based on the guides.

24  According to the guides, she was doing exactly what

25  she was asked to do under her services to the company

1    in a pre-approved budget in which it's very legitimate

2    for me to see her have more expenses than Mark.

3        Q    Do you consider it to be dysfunctional for

4    the corporation to require Mark Waldrop to submit his

5    expense reimbursement requests to his direct report,

6    Ronnie Rollins?

7        A    Not when he's the one paying for them.

8        Q    No qualification.  Can you answer that

9    question, yes or no?

10       A    Can you restate the question?

11           MR. DANIEL:  Read it back please.

12           (Whereupon, the record was read by the

13       reporter as requested.)

14           THE WITNESS:  No.

15   BY MR. DANIEL:

16       Q    Is there any reason that Stephanie Dotson,

17   rather than submitting Mark Waldrop's expense

18   reimbursement requests for things like air travel,

19   Mark Waldrop's hotel bills, Mark Waldrop's meals, Mark

20   Waldrop's registrations for conventions and meetings,

21   could not have prepared that expense reimbursement

22   request under Mark Waldrop's name and submitted it

23   regardless of whether he had paid the items or not?

24       A    Theoretically, yes, you could do that.  That

25   creates another dysfunctionality.  Now you get into

1   interpersonal payables and receivables between who

2   actually had the expense coming out of their pocket

3   versus who actually benefited.  How would you handle a

4   meeting room for 15 people for a day when all 15 are

5   for the benefit of that expense?

6        Q    I'm not talking about that.  Let's just --

7   let's just limit it to an expense that is solely

8   attributed to Mark Waldrop.  Let's talk about airfare.

9   Mark Waldrop is going to fly from Atlanta to Las Vegas

10  for a meeting, a convention, and he tells Ms. Dotson

11  to make airline reservations and get him a ticket and

12  she uses her credit card, but it's his ticket.  The

13  receipt clearly shows Mark Waldrop's ticket, no one

14  else's.

15           Was there any reason she could not have

16  prepared an expense reimbursement request under Mark

17  Waldrop's name, submitting that receipt and allowing

18  him to submit that to Ronnie Rollins for approval?

19       A    There's no reason why that couldn't have

20  been done.

21       Q    Okay.

22       A    But that is not common --

23       Q    And I understand --

24       A    -- in corporate America.

25       Q    Well, I understand that at some point there

1    has to be some reconciliation if Stephanie Dotson paid

2    out of her own pocket the cost of that airline ticket

3    and Mark Waldrop gets reimbursed.  He'd need to

4    reimburse her.  But that could have been done, could

5    it not?

6         A    Yes, it could have been done.  But I imagine

7    if they're working a hectic pace of corporate life,

8    you're adding many hours on every week or every month

9    trying to figure out who got paid what for who had an

10   expense on who's credit card.  It's just something you

11   don't commonly see in corporate America.

12        Q    You read in Ms. Dotson's deposition that she

13   said that she got an American Express card with an

14   unlimited limit so that she could handle charges for

15   Mr. Waldrop.  Do you remember that?

16        A    Yes.  I think that was out of the advice of

17   her predecessor.

18        Q    Okay.  Mr. Waldrop testified he did not have

19   an American Express card with no limit.  Do you

20   remember that?

21        A    Yes, sir.

22        Q    He said something about having had an

23   American Express card sometime in the past and some

24   issue.

25        A    Right.

1      Q      But I don't know exactly what that was.  Do
2  you remember that?
3      A      Yes, sir.
4      Q      Now, do you know what compensation
5  Mr. Waldrop had at Community Health at the time of his
6  termination?
7      A      I understand it was over $1 million, a
8  little bit over $1 million at his termination date.
9      Q      Do you know the reason he did not have an
10  American Express credit card?
11      A      No.  I did not ask him.
12      Q      Do you know the reason that he says he only
13  had one credit card with a $500 limit?
14      A      No, sir.
15      Q      Do you know whether or not Community Health
16  had a procedure under which you can get an advance for
17  a business expense?  For example, if you were going to
18  go to the convention or trade show in Las Vegas, you
19  could get an advance from the company to pay the
20  registration so it didn't have to come out of your
21  pocket?
22      A      Yes.  I'm aware there was an advance portion
23  in their policy.
24      Q      Is there any reason Ms. Dotson could not
25  have sought advances to cover some of the expenses of

94

1   Mr. Rollins -- excuse me.  Strike that.  Is there any

2   reason that Mr. Waldrop could not have gone to Ronnie

3   Rollins and said you're my direct report, I need an

4   advance for this meeting, I've got the registration

5   and airfare and hotel?  Is there any reason he

6   couldn't have done that?

7        A    Not that I'm aware of.

8        Q    Have you read the reasons that Mr. Waldrop

9   was terminated at Community Health?

10       A    I did not read the letter, no.

11       Q    What letter are you referring to that you

12  did not read?

13       A    I'm aware that -- I'm aware of the

14  background of the case.  He was let go for cause.

15  Cause wasn't stated.  He asked for a letter of cause

16  and a letter later showed up listing the reasons of

17  cause and one of those items were expense report

18  reimbursements.  That's all I know.

19       Q    And do you know that one of the reasons that

20  was cited as cause for Mr. Waldrop's termination was

21  the fact that many of his expense reimbursement

22  requests had been submitted under Stephanie Dotson's

23  name and approved by him, approved by Mr. Waldrop, and

24  not submitted to his direct report, Ronnie Rollins?

25       A    Yes, I'm aware of that.

1      Q    Please look at exhibit two to your report

2   which is marked exhibit one to this deposition.

3      A    Yes, sir.

4      Q    Okay.  Let me be sure how you compiled this

5   exhibit two.  It's my understanding you took some of

6   the expense reimbursement requests and pulled certain

7   items from them which are referenced by the Bates

8   control numbers here and then compiled in this

9   exhibit; is that right?

10     A    That's correct.  They're just examples that

11  were found and provided to me of her expense reports

12  where Stephanie had processed expenses for the benefit

13  of other employees on her expense reports, excluding

14  Mark Waldrop.

15     Q    Okay.  Well, let's -- let's look at some of

16  these.  I don't know that we need to look at all of

17  them, but look on the second page of exhibit two.  And

18  there's a reference there to CHSI 0007033, 9/18/14.

19  Do you see that?

20     A    Yes, sir.

21          (Defendant's Exhibit 11 was marked for

22          identification.)

23  BY MR. DANIEL:

24     Q    I want to show you a document that's been

25  marked exhibit 11 to your deposition.  So I'll ask if

96

1   this is the source document that you used when you

2   pulled certain information from it for exhibit two.

3        A    Yes, sir.  It does appear to be --

4        Q    Okay.

5        A    -- the document referred to on the expense

6   report.

7        Q    And then it appears to me that you pulled

8   one item from a page that has control number 7038 on

9   exhibit 11.  Do you see that?

10       A    Yes, sir.

11       Q    And this -- the item is September 7th, 2014,

12   strategic meeting with Ronnie, Mark and Lorraine.

13       A    Yes, sir.

14       Q    You've got $113.78 and it refers to one

15   third of food and meeting space and it's attributed

16   here to Mr. Rollins, president and COO [sic].  Do you

17   see that?

18       A    Yes, sir.  One third of it.  It's my

19   understanding there were three people in the meeting.

20       Q    Okay.  So just tell me why you attributed

21   one third of this expense to Mr. Rollins.

22       A    There were three people in the meeting

23   according to the description.  So the expense paid by

24   Stephanie was actually for the benefit of three

25   individuals.  So not knowing their eating habits.  I

97

1    just divided it by three between Ronnie, Mark and

2    Lorraine.

3        Q    Okay.  Then two items below there, again on

4    exhibit two of your -- of your report, you've got the

5    same amount which was attributed to Lorraine Taylor,

6    $113.78.  Do you see that?

7        A    Yes, sir.

8        Q    Now, this expense report that's marked as

9    exhibit 11 to your deposition was signed by Stephanie

10   Dotson; right?

11       A    Yes, sir.

12       Q    Do you have any evidence that Mr. Rollins

13   asked Stephanie Dotson to submit this expense report

14   on his behalf?

15       A    No.

16       Q    Do you have any evidence that Lorraine

17   Taylor asked Stephanie Dotson to submit this

18   reimbursement on her behalf?

19       A    Not for this item.

20       Q    Okay.  With respect to any of the -- of the

21   expense items on exhibit two to your report where they

22   are attributed to some other employee of the company,

23   do you have any evidence that these employees asked

24   Stephanie Dotson to submit the expenses on their

25   behalf?

98

1      A      No, I do not.

2      Q      Do you have any evidence to indicate that

3  any of these employees knew that Stephanie Dotson was

4  submitting an expense reimbursement on their behalf?

5      A      I can't exactly say what they knew or what

6  they did not know.  If they called to ask her to set

7  up a meeting room and she did it for them and used her

8  own credit card, then they knew they asked her.  So I

9  cannot say what -- what was known between the parties

10  when these transactions actually occurred.

11      Q      Okay.

12      A      I imagine for Ms. Taylor, on the Bursch

13  Travel, she knew -- she had to have known -- she

14  should have known that Stephanie was setting up an

15  entire trip for the Financial Services group on her

16  credit card.  But I can't speak explicitly whether

17  Ms. Taylor, quote, knew or not.

18      Q      Okay.  But with respect to Mark Waldrop,

19  when Stephanie Dotson submitted an expense

20  reimbursement request for him, that is, for an expense

21  that he had incurred or which she had paid for for

22  him, he knew about it, didn't he?

23      A      Yes.

24      Q      Mark Waldrop knew about every single expense

25  item that Stephanie Dotson submitted for him, did she

99

1    not -- did he not?

2         A    I can't say he knew every single one, but he

3    should have known when he reviewed the expense report.

4         Q    Well, the point is that when Stephanie

5    Dotson prepared an expense reimbursement request, it

6    was submitted to Mark Waldrop for approval; right?

7         A    Correct.

8         Q    And so if it's on the expense reimbursement

9    request, he knew about it because he got it and he had

10   to approve it before it was paid; is that right?

11        A    Correct.

12        Q    In the situation we're looking at here,

13   exhibit two to your report, there's no way to know

14   that any employee who's listed here, whether it's

15   Ronnie Rollins, Lorraine Taylor, Lucy Rogers, Robin

16   Leake -- there's no way to know whether or not they

17   knew about the expense reports being submitted by

18   Stephanie Dotson, is there?

19        A    In my experience, when you have an

20   administrative assistant setting up events such as

21   these, there's common knowledge that somebody has set

22   up the events; somebody has paid for the room; don't

23   worry about it.  When you show up to register, it's

24   not on your card; it's on somebody else's card.  So I

25   think there was more knowledge out there in the

1   overall group of these events than saying nobody knew

2   at all.

3        Q    Look at exhibit 11 again.  So this is the

4   expense reimbursement request and it's completed and

5   it's signed by Stephanie Dotson.  Do you see that?

6        A    Yes, sir.

7        Q    And it encompasses four items, two of which

8   are -- maybe more than that, but -- all four of which

9   on exhibit two to your report are attributed to either

10  Mr. Rollins or Ms. Taylor.  But you have no evidence

11  that either Mr. Rollins or Ms. Taylor ever saw this

12  expense report, do you?

13       A    That's correct.

14       Q    At the end of your report on page 36, you

15  have some references to testimony by Lorraine Taylor

16  regarding Mr. Waldrop's termination.  Do you see that?

17       A    Yes, sir.

18       Q    What's the relevance of this to your report?

19       A    I just -- in the scope of my report, looking

20  at overall the corporate environment, the work being

21  done relative to the expense reports, the fact that

22  Ms. Taylor was another C-level employee, I was -- I

23  found it unusual but actually shocked that she didn't

24  have an opinion as to whether the expense

25  reimbursement practices justified his termination.

1    Because if somebody should have, it would have been

2    the corporate officer most knowledgeable about

3    financial compliance.

4              It should have been more of a definitive

5    answer in my mind.  Why she has no opinion I cannot

6    surmise and will not surmise.  And when she was asked

7    about Ms. Dotson's submission of Mr. Waldrop's expense

8    reimbursement requests, she didn't know and she

9    couldn't speak to whether it was enough to justify his

10   termination.

11             She is defined by CHSI as the chief

12   financial officer who should be the one in position

13   without a doubt should be more definitive in a

14   response.  And in my professional experience, why a

15   CFO of a company involved in this situation couldn't

16   come up with an opinion was extremely unusual.

17        Q    Do you know whether or not Ms. Taylor had

18   the authority to terminate Mr. Waldrop's employment?

19        A    I do not know.

20        Q    Do you know who terminated Mr. Waldrop's

21   employment?

22        A    Exactly who, I'm not aware.

23        Q    Do you know the process under which his

24   employment was terminated?

25        A    I knew there was a meeting in Atlanta with

1    the attorney firm, and I'm guessing the chairman of

2    the board was there when they terminated Mr. Waldrop.

3         Q    Do you know what role, if any, the board

4    played in the termination of Mr. Waldrop?

5         A    I'm not aware.

6              MR. DANIEL:  We're about to go to a new

7         area.  Do you want to break for lunch now?

8              MR. HENRY:  Yeah.  Lunch is here.

9              (Whereupon, a recess was taken from 12:07

10        p.m. until 1:00 p.m.)

11   BY MR. DANIEL:

12        Q    Mr. Powell, did you learn in your

13   investigation that some of the Waterford crystal had

14   been paid for by a combination of charge -- credit

15   card charge and by cash?

16        A    Yes, I was aware of that.

17        Q    And did you inquire as to the reason for

18   paying by credit card and cash for the same

19   transaction?

20        A    No, I did not.

21        Q    Did you review the handling of the petty

22   cash account by Waldrop and Dotson?

23        A    No, sir.  That was outside the scope.

24        Q    Okay.  You saw the reference to that in

25   Mr. Mimms' report?

1      A      Yes, sir.

2      Q      But you did not look into that?

3      A      That's correct.

4      Q      On page 13 of your report marked exhibit

5  one, you note that some of the Waterford crystal was

6  purchased in bulk by Ms. Stephanie Dotson.  Do you see

7  that?

8      A      Yes, sir.

9      Q      At the time of termination of Mr. Waldrop

10 and Ms. Dotson, I'll represent to you that there were

11 96 pieces of Waterford crystal in their inventory in

12 their storage area.  Does that surprise you?

13     A      Not one way or the other, no.

14     Q      You noted that no Waterford crystal was

15 purchased in 2016.  So all that must have been

16 purchased between '15 and earlier; is that right?

17     A      That's what I would have to presume.

18     Q      In your opinion, was it appropriate for

19 this -- these expenses for the purchases of the

20 Waterford crystal that was still in inventory, was it

21 appropriate to expense those items in full?

22     A      If it was properly budgeted and included in

23 the budget, then yes.

24     Q      And, again, you have not been able to show

25 me anyplace in the budget where Waterford crystal was

1  specifically mentioned, have you?

2      A    That's correct.

3      Q    Gifting Waterford crystal from inventory

4  would not evade the limitation imposed by the Internal

5  Revenue Service for gifts, would it, the monetary

6  limitation?

7      A    That's correct.

8      Q    Do you know whether or not Ronnie Rollins

9  and Lorraine Taylor believed that any gifts being

10  given by Mark Waldrop to employees were being paid for

11  by him personally?

12      A    I could not state what they believed.

13          (Defendant's Exhibit 12 was marked for

14      identification.)

15  BY MR. DANIEL:

16      Q    Let me show you another document.  This

17  document has been marked as exhibit 12 to your

18  deposition.  Do you recognize it?

19      A    Yes, I do.

20      Q    And I believe -- although there's no Bates

21  number on the copy I gave you, I believe that it is

22  the document that is referred to in your appendix B,

23  page two of two of exhibit one to your deposition that

24  has the Bates number CHSI 0018034.  Can you look and

25  confirm that or tell me if it's not correct?

1          MR. HENRY:  I'm sorry.  What was the Bates

2      number you said that you believed this was?

3          MR. DANIEL:  18034.

4          THE WITNESS:  I believe it is the document.

5  BY MR. DANIEL:

6      Q    On page six of your report, line 12, you

7  refer to Mr. Waldrop's plan worksheet budget for 2012.

8  Do you see that?

9      A    Yes, sir.

10     Q    Is this the document you were talking about?

11     A    Yes, sir.

12     Q    Okay.  What evidence do you have that either

13 Ronnie Rollins or Lorraine Taylor ever approved the

14 budget for Mr. Waldrop's cost center for 2012?

15     A    Just the basis of Mark, that the budgets

16 that were approved and provided to Financial Services,

17 that those budgets were approved at the board level.

18     Q    Okay.  This is just what Mark told you, what

19 Mark Waldrop told you?

20     A    Yes, sir.

21     Q    But I'm asking specifically about these two

22 individuals.  You've got a chief executive officer,

23 Ronnie Rollins, and you've got the chief financial

24 officer, Lorraine Taylor.  I just want to know what

25 evidence you have, you know, that either of those

1    persons specifically approved the budget that Mark

2    Waldrop sent to Financial Services for his cost center

3    for 2012.

4         A    I don't have anything with their individual

5    approval on it.

6         Q    What about 2013 or any other year?

7         A    No, I don't.

8         Q    Now, look at exhibit 12 if you would and

9    just tell me what you understand this is.

10        A    The first two pages represent detail of

11   items under an expense account nature such as the

12   first one, benefits and incentives.  It provides the

13   detail associated with the budgeted amount for

14   benefits and incentives that flows by month to the

15   third page under the specific category such as

16   benefits and incentives.

17        Q    Does the -- do the first two pages of

18   exhibit 12 tie to the third page?  Is that what you're

19   saying?

20        A    They tie, but not in absolute dollars.

21        Q    Well, that's what I'm trying to figure out.

22   Because I'm looking at benefits and incentives and I

23   think that's where you said the Waterford crystal was

24   covered; is that right?

25        A    Yes, sir.

1    Q    Although when I see this breakdown here,

2    benefits and incentives, I don't see Waterford

3    crystal.  It's not there, is it?

4    A    That's correct.

5    Q    And the total amount is $17,500 on page one

6    of exhibit 12 for benefits and incentives; is that

7    right?

8    A    That's correct.

9    Q    And then I look at the third page of exhibit

10   12.  This is the plan worksheet.  This would be 2012,

11   cost center COO, and benefits and incentives.  The

12   total amount for the year is 17,000 -- let's see.

13   Excuse me.  Let's see what it is.  17,400.  Is that

14   it?

15   A    Yes, sir.

16   Q    And then if you look down below to meetings

17   and seminars, there are a lot of different meetings

18   and seminars listed and the total amount for the year

19   on the first page of exhibit 12 is $28,200.  Do you

20   see that?

21   A    Yes, sir.

22   Q    But if you look at the third page of exhibit

23   12, meetings and seminars, the total for the year

24   is -- what is that?  58,600?

25   A    That's what it appears.

108

1      Q      Now, how do you explain that discrepancy?

2      A      I can't explain it.

3      Q      Now, when you look at benefits and

4   incentives on page one of exhibit 12, there are seven

5   categories of expense items.  Do you see that?

6      A      Yes, sir.

7      Q      And as a matter of fact, for 2012,

8   Ms. Dotson purchased $16,839.27 of Waterford crystal;

9   is that right?  It's on page 11 of your report marked

10  exhibit one.

11     A      I want to make sure we're not comparing

12  apples and oranges.  The table on my report page 11

13  appears to be summarized based on a calendar year

14  basis, while the budgetary basis of CHSI is from

15  July 1st to June 30th for each year.  So unless you

16  have the semiannual breakout, I don't know if a direct

17  comparison should be made.

18     Q      Well, if you use that first page of exhibit

19  12 there and you were going to put Waterford crystal

20  under any of those seven categories, how would you

21  break it down?

22     A      It would be broken down based on the nature

23  which the Waterford crystal was given out, if it was

24  for a PC birthday, Christmas gift, core value or PC

25  award.  I don't think it falls well under wellness

1  program or cards or miscellaneous gifts, so --

2       Q    You don't know how to do that, do you, as

3  you sit here today?

4       A    Correct.  I haven't done it.  But I know

5  this was the category Mark and Stephanie stated was

6  budgeted for the Waterford crystal.

7       Q    Do you know whether or not Mr. Waldrop or

8  Ms. Dotson submitted any of the pages of exhibit 12 to

9  Financial Services in connection with their budget

10  submittal for the fiscal year 2012?

11      A    I believe these were the documents presented

12  for 2012 and 2013 for their budget.

13      Q    Okay.  You think that all of exhibit 12 was

14  presented, all five pages?

15      A    I apologize.  The five pages represent 2012

16  only.  It does not include 2013.

17      Q    Okay.  But were all five pages submitted to

18  Financial Services?

19      A    Yes.  That's what I assume.

20      Q    That's what you assume?

21      A    Yes, sir.

22      Q    Do you know that?

23      A    Do I know it as an exact fact?  No, sir.

24      Q    Okay.  Look at the third page of exhibit 12.

25  This is the one that says plan worksheet, cost center.

1    And then the fourth page says plan worksheet,

2    associate, Mark Waldrop.  The last page, the fifth

3    page, says plan worksheet, associate, Stephanie

4    Dotson.  Do you see those three pages?

5         A    Yes, sir.

6         Q    Now, is the third page, the one that says

7    plan worksheet, cost center, a combination of the

8    fourth and fifth pages, the ones for Mr. Dotson and

9    Ms. Waldrop -- excuse me -- Mr. Waldrop and

10   Ms. Dotson?

11        A    That's what I would assume except for the

12   bottom two lines --

13        Q    Okay.

14        A    -- of the third page.

15        Q    And those refer to rent and utilities?

16        A    Yes, sir.

17        Q    Now, tell me how someone reviewing the third

18   page of exhibit 12, the plan worksheet for the cost

19   center for fiscal year 2012, could have determined

20   that there was an intention to purchase Waterford

21   crystal that year.

22        A    There would be no way to infer it.  There

23   would be no way to see it.

24        Q    Now, you have opined about trips, various

25   trips and so forth that are discussed in your report,

1    to New York and some other places.  Would those be

2    covered under meetings and seminars, that category on

3    the third page of exhibit 12?

4         A    Yes.  That's what I would assume.

5         Q    Now, is there any way to tell -- when you

6    look at this plan worksheet and you look at the

7    meetings and seminars item and it's in excess of

8    $50,000, any way you can tell where those meetings

9    were scheduled to be held?

10        A    No, sir.

11        Q    Any way you can tell what the purpose of the

12   meetings was?

13        A    No, sir, other than it was a business

14   meeting or seminar.

15        Q    Well, how do you know it was a business

16   meeting or seminar from looking at --

17        A    That's the category it was budgeted under.

18        Q    Okay.  So the requirement for reimbursement

19   is that it be a business meeting or seminar; is that

20   right?

21        A    A legitimate business purpose that's

22   reasonable and necessary for the business.

23             (Defendant's Exhibit 13 was marked for

24        identification.)

25   BY MR. DANIEL:

1      Q    Okay.  I hand you a document that's marked

2   as exhibit 13 to your deposition.  And I will ask you

3   to look at it and tell me if you can identify it.

4      A    It looks like the same budget worksheets for

5   fiscal year 2013 for Mark Waldrop's cost center.

6      Q    And, again, as you sit here today, you do

7   not have evidence as to what documentation was

8   actually submitted by Mark Waldrop or Stephanie Dotson

9   in connection with the 2013 fiscal year budget, do

10  you?

11     A    That's correct.

12     Q    In your report, there's some discussion

13  about a New York trip in 2011.  Can we discuss that a

14  minute?  And you, I believe, begin your discussion

15  about this trip on page 17 of your report marked

16  exhibit one.  Do you see that?

17     A    Yes, sir.

18     Q    Now, this was a trip to New York City.  And

19  you state the names of the people whom you understood

20  attended that trip.  Do you see those names?

21     A    Yes, sir.

22     Q    And I believe you told me earlier you got

23  those names from Mr. Henry; is that right?

24     A    They had been received by Mr. Henry from

25  responses from Mr. Waldrop.

1      Q     Okay.  And do you have the --

2      A     Would you like me to find the exhibit?

3      Q     Yes.  Find the e-mail that you received from

4   Mr. Henry.

5      A     I don't find the list of names in any of the

6   present exhibits.

7      Q     In any event, that's how you got the names?

8   You got them from Mr. Henry?

9      A     Yes, sir.  They were typed out in an e-mail

10  by Mr. Waldrop and forwarded to Mr. Henry who

11  forwarded them to me, yes.

12     Q     Now, you noted in your report that a number

13  of spouses attended this New York trip; is that right?

14     A     Yes.

15     Q     Do you know whether or not there were any

16  formal meetings or programs on this New York trip?

17     A     Formal meetings or programs?

18     Q     Right.

19     A     I guess if you're looking for a typed-out

20  agenda with a date and time and meeting place, not

21  that I'm aware of.

22     Q     There was no agenda for this meeting, was

23  there?

24     A     There was no formal agenda for the meeting.

25     Q     Now, Ms. Dotson told you there was no agenda

1  for this meeting in her responses to your question,

2  did she not?

3       A    I don't specifically recall.

4       Q    If you'll look at -- look at her responses.

5  This would be exhibit six to your deposition.  And

6  over in the -- do you see where she discusses it?  She

7  mentioned several times in exhibit six that there were

8  no agendas for these meetings, did she not?

9       A    Yeah.  On page two of the exhibit relative

10  to the PC cruises and New York trip, she stated:  As

11  stated above -- this is item five -- as stated above,

12  there was no agenda handed out or documents taken

13  (other than to catch up on work/reading while

14  traveling).

15       Q    And there were no program materials prepared

16  for this meeting, were there?

17       A    If the program materials were the same as

18  agendas, no, sir.

19       Q    Now, with respect to this meeting,

20  Mr. Waldrop told you that this leadership development

21  program was on the Community Health strategic plan; is

22  that correct?

23       A    Yes, sir.

24       Q    And you cite -- I think you cite him on page

25  17 as saying that.

1      A      Yes, sir.

2      Q      The fact is that this leadership development

3  program was not instituted until 2013; is that right?

4      A      I'm not aware of the exact date it was

5  instituted.

6      Q      Look at exhibit nine to your deposition.

7  This is an e-mail from Gary Henry to you dated

8  June 15th, 2017.  Do you have that in front of you?

9      A      Exhibit nine?  Yes, sir.

10      Q      And here he's passing on comments from Mark

11  Waldrop, is he not?

12      A      Yes, sir.  He is.

13      Q      And number two says page 17, line seven,

14  should be revised because the 2011 New York trip is

15  not directly related to the leadership development

16  program.  Do you see that?

17      A      Yes, sir.

18      Q      But you did not revise your opinion, did

19  you?

20      A      No, sir.  I did not.

21      Q      Now, in the course of forming your opinions

22  in this case and preparing the report that's marked

23  exhibit one, did you look into Internal Revenue

24  Service guidelines the things that are necessary to

25  substantiate a business trip for tax deductibility?

1       A       Not specifically.

2       Q       Well, generally, do you know what those

3  guidelines are?  You know, what's necessary -- if

4  you're going to have a business trip, what's necessary

5  to satisfy the Internal Revenue Service in order to

6  take a deduction for that trip, the expenses for that

7  trip?

8       A       The substantiation requirements?

9       Q       Yeah.

10      A       The time, place, the date, the business

11  purpose of the event, and business relationships of

12  those involved.

13      Q       What about attendance of spouses?  What are

14  the requirements to deduct the expenses of spouses on

15  a business trip like this New York trip?

16      A       Spousal deductions, they can go one of two

17  ways.  Either you don't on your tax return deduct that

18  expense and move it into a non-deductible category or

19  if it's being reported on the tax return, the spousal

20  expense should be added to the W-2 of the employee it

21  relates to.

22      Q       Do you know whether or not the spousal

23  expenses for this New York trip were added to any

24  employee's W-2s?

25      A       I do not.

1      Q    I mean, basically, for -- for a spouse's

2    expenses to be covered on a trip like this, a spouse

3    has got to do more than just show up and go to

4    cocktail parties; isn't that right?

5      A    Unless it's handled one of the other two

6    ways.  In order for it to be cover by a business

7    expense, yes.

8      Q    I'm saying in order to be deductible.

9      A    Right.

10     Q    I mean, we all like to have our spouses

11   attend things with us.  But to deduct it under the

12   federal income tax laws and guidelines, there's got to

13   be a business connection to that spouse's attendance,

14   doesn't there?

15     A    Correct.

16     Q    Do you know whether or not there was any

17   business reason for the spouses attending this New

18   York trip?

19     A    I have no idea.

20     Q    Do you know of any business transacted on

21   this New York trip, any business at all?

22     A    Other than the response Mr. Waldrop gave me

23   specific to this trip.  The business activity

24   Mr. Waldrop reported to me was employee recognition,

25   employee appreciation, employee conflict resolution,

1    strengthening personal relationships, strategic

2    planning, business discussions and healthcare article

3    reviews.

4         Q    In your opinion, are those reasons

5    sufficient to deduct these expenses for the New York

6    trip for federal income tax purposes?

7         A    For the employees, yes.

8         Q    What about the spouses?

9         A    They should be treated properly by either

10   not deducting them on the tax return or adding the

11   value to the W-2s of the employees.

12        Q    So basically they're not deductible, the

13   spouses' expenses?

14        A    They are deductible if you add them to the

15   W-2 of the employees.

16        Q    If they were not added?

17        A    Then they should not be deducted.

18        Q    Are you aware of any requirements under

19   Internal Revenue Service guidelines that business

20   trips have a certain amount of time that must be

21   devoted to business matters, something you can verify

22   as opposed to just casual conversations?

23        A    I don't specifically recall.  I believe

24   there's a reference to the majority of time, but not

25   any specific.

1        Q      On page 18, you discuss a PC cruise in 2013

2     and you list some people who allegedly, you know,

3     participated in this cruise.  Do you see that?

4        A      Yes, sir.

5        Q      And, again, you got the names from Mr. Henry

6     who got them from Mr. Waldrop; is that right?

7        A      Yes, sir.

8        Q      And you didn't verify that these people

9     actually attended?

10       A      That's correct.

11       Q      There was no agenda for this cruise, was

12    there?

13       A      There was no formal agenda from what I

14    understand.

15       Q      And there were no formal programs or

16    meetings, were there?

17       A      Not that I'm aware of.

18       Q      And there were no program materials

19    generated for this meeting, were there?

20       A      Not that I'm aware of.

21       Q      Do you have any evidence that any business

22    was conducted on this cruise?

23       A      The response I received from Mr. Waldrop on

24    the business activities that occurred during the trip.

25       Q      And that's the same thing you referred to

1    earlier, which are on page 17 of your report under

2    business purpose?

3        A    Yes, sir.

4        Q    All right.  Then at the bottom of page 18,

5    going to page 19 of your report, there is reference to

6    a PC cruise of 2014.  Do you see that?

7        A    Yes, sir.

8        Q    Here again, you've got a list of names of

9    people who allegedly attended.  And you got those from

10   Mr. Henry who got them from Mr. Waldrop?

11       A    Yes, sir.

12       Q    Did you do anything to verify or confirm

13   those people actually attended?

14       A    No, sir.

15       Q    Now, there are brackets behind all these

16   names and I assume that those are the names of the

17   direct reports of the individuals who were attending

18   the cruises; right?

19       A    Yes, sir.

20       Q    So when it says there at the bottom of 18,

21   Mark Waldrop, COO of CHSI [Ronnie Rollins], that just

22   means that Ronnie Rollins was his direct supervisor?

23       A    Yes, sir.

24       Q    It does not mean that Ronnie Rollins

25   attended the cruise, does it?

1      A     No, it does not.  If you look at the line

2   that leads in, the bracketed direct report defines

3   what the intent of those names are.

4      Q     Okay.  Good.  Now, there was no agenda for

5   this cruise, was there?

6      A     No formal agenda.

7      Q     And there were no formal programs or

8   meetings on this cruise, were there?

9      A     That's correct.

10     Q     And there were no program materials prepared

11  for this cruise, were there?

12     A     I don't know.  Some of the healthcare

13  article reviews were prepared in advance, but not that

14  I'm aware of on anything else.

15     Q     Okay.  So you're talking about copying

16  some -- making photocopies of articles?  Is that what

17  you meant?

18     A     Yeah.  One of the business activities

19  Mr. Waldrop brought up that was used on these trips

20  was healthcare article reviews.  So I'm gathering

21  there could have been a chance there was production of

22  documents to provide to all the attendees to take a

23  look at.

24     Q     Are you aware of some occasion he said,

25  well, here's some articles, read them on the plane on

1   the way down?

2        A     I'm not aware of when it would occur.

3        Q     Now, I notice that Ms. Dotson's spouse

4   attended this particular meeting.  His name's Tom

5   Dotson.  Do you see that?  It's the top of page 19.

6        A     Yeah.  I have Tim, but --

7        Q     You're right.  I'm too far away from it.

8   Was there any business purpose for Tim Dotson

9   attending this cruise?

10       A     Not that I'm aware of.

11       Q     Now, all these cruises -- withdrawn.  All

12  these events, the New York -- the New York trip and

13  the two PC cruises, were expensed by Stephanie Dotson;

14  is that right?

15       A     Yes, sir.

16       Q     And you show that on page 17 of your report;

17  right?

18       A     Yes, sir.

19       Q     And Mark Waldrop did not seek reimbursement

20  for any of the amounts expended for these trips, the

21  New York trip, the 2013 cruise or the 2014 cruise, did

22  he?

23       A     That's correct.

24       Q     But he, in turn, approved Stephanie Dotson's

25  expense reimbursement request for these trips; is that

123

1   right?

2       A    That's correct.

3       Q    These trips were not submitted to Ronnie

4   Rollins for approval, were they?

5       A    Not specifically.

6       Q    And in your investigation, did you learn

7   that Mr. Rollins -- withdrawn.  In your investigation,

8   did you learn that Mr. Waldrop intended to conceal one

9   or more of these trips from Mr. Rollins?

10      A    I am not aware of that.

11      Q    You just don't know?

12      A    Don't know.

13      Q    When Mr. Waldrop and Ms. Dotson submitted

14  budgets for 2013 and 2014 -- well, for any of these

15  years, what information did they give about these

16  trips?

17      A    I don't know.

18      Q    Did you learn whether or not Mr. Rollins had

19  knowledge in advance about these PC trips and the New

20  York trip which are discussed in your report?

21      A    I'm sorry.  Could you --

22           MR. DANIEL:  Read that back please.

23           (Whereupon, the record was read by the

24      reporter as requested.)

25           THE WITNESS:  No, I didn't.

1   BY MR. DANIEL:

2        Q    Is it possible for a valid business expense

3   to be non-deductible under federal tax law?

4        A    Under tax law, if a valid business expense

5   is deductible, it would then not be not deductible.

6        Q    Well, what I'm asking is, can there be an

7   occasion on which you have a valid business reason to

8   incur an expense, but it's not something you can

9   deduct for tax purposes?

10       A    Nothing comes to mind really.

11       Q    Well, let's take a situation where you have

12  a client who gets married.  This is a client that you

13  value.  You want to give the client a nice wedding

14  gift and you go out and you spend $400 for the wedding

15  gift and you give it to the client.  Is that $400

16  deductible?

17       A    I wouldn't consider it deductible.  It

18  should be on your books.

19       Q    But you could argue there's a valid business

20  reason to give your client a wedding gift, couldn't

21  you?

22       A    Yes, sir.  But typically under gift laws of

23  firms and corporations, you would want to bring it on

24  the books of the corporation.

25       Q    Now, you have opined on page 20 of your

1    report that the three PC events, the New York trip and

2    the two cruises, are valid business expenses based

3    upon the business purposes presented above.  Do you

4    see that?

5         A    Yes, sir.

6         Q    And, again, those business purposes are

7    stated by you on page 17; is that right?

8         A    Yes, sir.

9         Q    Now, is it your opinion that the expenses

10   for these three PC trips were deductible under federal

11   tax law?

12        A    Yes, sir, assuming the spousal amounts that

13   were incremental go to the W-2s of the employees.

14        Q    And you don't know whether or not that

15   happened?

16        A    That's correct.

17        Q    If that did not happen, would they be

18   deductible?

19        A    Then the portion related to spouses should

20   not be deducted.

21        Q    And then as far as the other people are

22   concerned, it's your opinion that, based upon these

23   reasons, the business purpose that you state on page

24   17, that these three PC trips -- expenses of these

25   three PC trips would be deductible for federal tax

126

1    purposes with the exception again of the spousal

2    expenses?

3        A    Yes.

4        Q    In other words, you really are saying that

5    the business purpose as stated by Mr. Waldrop and

6    repeated by you on page 17 of your report, lines three

7    through six, is sufficient for these expenses to be

8    deducted for federal tax purposes; is that right?

9        A    Yes, sir.  I've had many corporate getaways

10   lasting a week that we had no formal agenda,

11   et cetera, where we had offsite bonding and the

12   intangibles that Mr. Waldrop described that were

13   deducted on tax returns I've been associated with.

14   It's not uncommon in my opinion.

15       Q    Were you ever audited for any of those

16   expenses?

17       A    Our financial statements were audited.

18       Q    I'm not talking about that.  How about by

19   the Internal Revenue Service?  Did they ever do an

20   audit?

21       A    No, sir.

22       Q    So you took the deduction, but it was never

23   audited by the Internal Revenue Service; is that

24   right?

25       A    That's correct.

1     Q    Now, again, on page 20, you repeat this

2  statement that you made before, that -- on line three,

3  you say it's previously determined within this report

4  that the percentage of Mr. Waldrop's plan worksheet

5  totals to overall organization revenue is -- and you

6  have some small percentages.  Do you see that?

7     A    Yes, sir.

8     Q    Are you saying there that the amount of

9  Mr. Waldrop's cost center budget is so small that it

10  just doesn't matter in the overall picture?

11     A    From a pure percentage standpoint, yes.  If

12  I'm the board of multiple entities running

13  $750 million of revenue, then from a big to small

14  responsibility of managing, the cost center budgets he

15  prepares is just not that significant in full.

16          They always had the right, if they wanted to

17  delineate further, to ask additional information if

18  they wanted to.  But in light of the overall picture

19  as a board and what they're running, it doesn't

20  surprise me that these things don't explicitly show up

21  on a line-item budget for their particular nature.

22     Q    In your opinion, is it all right for an

23  employee to steal a little bit as long as he doesn't

24  steal too much?

25     A    No, sir.

128

1        Q     You also discuss a trip for the Dominican

2    Republic -- or, to the Dominican Republic on page 20.

3    Can you look at your report, page 20, please?

4        A     Yes, sir.

5        Q     Now, this trip was not covered by the

6    budget, was it?

7        A     Mr. Waldrop stated the events were included

8    in his budget during the respective year.

9        Q     Okay.  Well, let's look at and see what

10   Ms. Dotson said about it.  Do you have her material

11   before you?  This is exhibit six to your deposition.

12   And look over the page that has MAW 3699 as the

13   control number at the bottom.  Do you see that page?

14       A     Yes, sir.

15       Q     When she says, in response to number one, I

16   did not prepare the budget for Ethica, so I do not

17   know if the trip to the Dominican Republic was

18   included or not, do you see that?

19       A     Yes, sir.

20       Q     Now, did you do anything to verify

21   Mr. Waldrop's assertion that this trip was in the

22   budget?

23       A     No, sir.

24       Q     To your knowledge, did Mr. Waldrop

25   independently ever prepare any budgets at Community

1   Health, that is, without the assistance of Stephanie

2   Dotson?

3        A     Not that I'm aware of.

4        Q     Was there an agenda for the Dominican

5   Republic trip?

6        A     The agenda for the business purpose were

7   only those items that Mr. Waldrop disclosed to me.

8        Q     And, again, these are the same items which

9   you have stated before and in this instance you state

10  on pages 20 and 21 of your report?

11       A     Yes, sir.

12       Q     And you have a list of people whom you

13  understood attended this trip to the Dominican

14  Republic.  I understand you got this list from

15  Mr. Henry who got it from Mr. Waldrop; is that

16  correct?

17       A     That's correct.

18       Q     Did you do anything to verify that these

19  people listed on page 21 actually attended the trip to

20  the Dominican Republic?

21       A     I did not.

22       Q     There were no formal meetings or programs on

23  this Dominican Republic trip, were there?

24       A     That's correct.

25       Q     And no written materials were prepared for

1    the persons attending this trip, were there?

2        A    Not that I'm aware of other than healthcare

3    articles that could be prepared at the time for the

4    trip.

5        Q    The Dominican Republic trip was submitted

6    for expense reimbursement by Ms. Dotson and approved

7    by Mr. Waldrop; is that right?

8        A    That's correct.

9        Q    Do you have any evidence that Ronnie

10   Rollins, the CEO of Community Health, had advance

11   knowledge about this trip?

12       A    No, I don't.

13       Q    Do you have any evidence that Mr. Rollins

14   was ever asked to approve this trip?

15       A    Not other than being a board member

16   approving a budget that evidently contains these

17   expense items in it.

18       Q    Well, do you know what information about

19   this Dominican Republic trip was contained in any

20   budgetary submission by Mark Waldrop or Stephanie

21   Dotson?

22       A    No, I don't.

23       Q    Without an audit, how could Financial

24   Services have learned about this trip and the expenses

25   incurred for this trip?

1      A      When you say financial audit, are you

2   talking about an external audit or are you talking

3   about --

4      Q      I'm talking about internal.

5      A      Internal?  These expenses would be showing

6   up on their corporate accounting records and budget

7   versus actual reports should be available to the CFO

8   and the CEO to see these expenses pop up on a report.

9      Q      Do you have any evidence that Mr. Rollins or

10  Lorraine Taylor, the CFO at Community Health, ever

11  reviewed any budget which provided for a trip to the

12  Dominican Republic in 2013?

13     A      No, I don't.

14     Q      There's discussion in your report about the

15  GHCA convention attendance by Stephanie Dotson.  Do

16  you see that?  It's on page 24.

17     A      Yes, sir.

18     Q      And, actually, there's a number of

19  conventions and you've got a chart showing the

20  conventions from 2010 to 2016 on page 24.  Do you see

21  that chart?

22     A      Yes, sir.

23     Q      And here on pages 24 and 25, in fact, going

24  over to page 26, there's a long list of purported

25  reasons -- purported tasks that Ms. Dotson performed

1    at these meetings.  Do you see that?

2         A    Yes, sir.

3         Q    Now, you got this list from Mr. Waldrop,

4    perhaps indirectly through Mr. Henry, but from

5    Mr. Waldrop; is that right?

6         A    That's correct.

7         Q    Do you know the percentage of time that

8    Stephanie Dotson spent performing these tasks which

9    are listed on pages 24 through 26 in your report?

10        A    I do not.

11        Q    Do you know the percentage of time that

12   would be required in order to deduct her expenses on

13   this trip?

14        A    Not specifically.

15        Q    Did you note that Ms. Dotson stayed for one

16   week on these convention trips?

17        A    Yes, I was aware of that.

18        Q    And did you note that the meetings did not

19   last that long?

20        A    Yes.

21        Q    Did you note that Ms. Dotson took her family

22   with her on these trips?

23        A    I was aware of that.

24        Q    When you look at the list of tasks that

25   Ms. Dotson was supposedly performing on these trips,

1  did you note that some of these tasks could have been

2  performed by telephone from her office in Dalton,

3  Georgia?

4        A    Yes.  I see.

5        Q    Now, Mr. Waldrop approved these expenses,

6  did he not?

7        A    Yes.

8        Q    And she was reimbursed in full for them; is

9  that right?

10       A    From what I understand, yes.

11       Q    And is it your opinion that full

12  reimbursement was justified?

13       A    The incremental costs relating to spouses

14  and other family members should have been treated

15  either as nondeductible or added to the W-2.

16       Q    Was anything added to her W-2?

17       A    I'm not aware of anything.

18       Q    Are you aware of any occasion on which

19  Mr. Waldrop or Ms. Dotson repaid Community Health for

20  some expense that had not been justified or they

21  determined should not -- they should not have received

22  reimbursement?

23       A    Not that I'm aware of.

24       Q    Now, on page 34, you have conclusions, and

25  the conclusions go over to page 35.  So let's take a

1    look at those.

2            Here you take the four expense categories

3    that Mr. Mimms had identified and you state, in line

4    nine, in conclusion I found that these costs have a

5    reasonable and necessary business purpose, and your

6    total was $206,655.25.  Do you see that?

7        A    Yes, sir.

8        Q    And that total represented a little less

9    than 70 percent of the total of invalid expense

10   amounts presented in Mr. Mimms' report; is that right?

11       A    That's correct.

12       Q    And basically you didn't do anything with

13   respect to that other 30 percent, did you?

14       A    No, sir.  I did not.

15       Q    You have a sentence here that says beginning

16   on page -- excuse me -- line 11, page 34 of exhibit

17   one, in my opinion, if time was spent to gather

18   additional facts and information about the remaining

19   30-plus percent of invalid expense amounts, it is very

20   likely that the majority of these amounts would be

21   considered valid business expenses as well.  Is that

22   what you said?

23       A    Yes, sir.

24       Q    But you really don't have anything to base

25   that on.  That's just conjecture; is that right?

1     A     Correct.  My professional conjecture.

2     Q     Now, you go on toward the end of page 34 to

3  say that I also find it unconventional that events are

4  somehow found to be invalid expense activities

5  subsequent to Mr. Waldrop's termination even though

6  they -- and then go to the next page on number two --

7  are budgeted and expensed openly between Mr. Waldrop's

8  cost center and Financial Services.  Do you see that?

9     A     Yes, sir.

10    Q     Now, I understand it to be your testimony

11  that with respect to the Waterford crystal that

12  Mr. Waldrop and Ms. Dotson budgeted for that by

13  putting it into that category of employee benefits; is

14  that right?

15    A     Well, the benefits and incentives category.

16  Yes, sir.

17    Q     Although there's no reference anywhere to

18  Waterford crystal?  It's just you say that the

19  Waterford crystal purchases were made under that

20  category?

21    A     Yes, sir.

22    Q     And so it's your position that that meant

23  that the Waterford crystal was budgeted openly; is

24  that right?

25    A     Yes, sir.  Under that category.

1    Q    And then it's also your testimony that the
2  Waterford crystal was expensed openly; is that right?
3    A    Yes, sir.  It was charged to the account to
4  where it was budgeted and approved in the budget.
5    Q    And that is your opinion notwithstanding the
6  fact that Mr. Waldrop did not expense a single piece
7  of Waterford crystal under his name; is that right?
8    A    Correct.  A legitimate business expense is a
9  legitimate business expense regardless who pays for
10  it.
11    Q    Okay.  But just to be sure the record is
12  clear, Mr. Waldrop personally did not expense a single
13  piece of Waterford crystal under his name and seek
14  approval from Ronnie Rollins for that, did he?
15    A    That's correct.
16    Q    In fact, all the Waterford crystal was
17  expensed by Stephanie Dotson and the only person who
18  approved it was Mark Waldrop; is that right?
19    A    That's correct.
20    Q    And in spite of the fact that the Waterford
21  crystal was purchased and expensed by Stephanie Dotson
22  and not submitted by Mark Waldrop for approval by
23  Ronnie Rollins, is it your opinion that the Waterford
24  crystal was expensed openly?
25    A    Yes, sir.  Under the budget category where

1   it was approved in the budget.  You may be in a

2   position where you're going to give awards out.  You

3   just don't know what you're going to buy as well.  So

4   I don't see where a budget, unless requested by the

5   board, would want to go to that level of detail in any

6   budget for the size of corporation they're running.

7        Q    Now, the PC trips and the trip to the

8   Dominican Republic -- there are three PC trips and

9   there's one trip to the Dominican Republic --

10  Ms. Dotson submitted reimbursement requests for the

11  expenses for these four trips; is that right?

12       A    Yes, sir.

13       Q    And they were all approved in full by

14  Mr. Waldrop; is that right?

15       A    That's correct.

16       Q    Ms. Dotson got reimbursed in full, didn't

17  she?

18       A    That's correct.

19       Q    You don't know of your own personal

20  knowledge what information, if any, Ms. Dotson or

21  Mr. Waldrop submitted in the budgetary process about

22  these trips, do you?

23       A    That's correct.

24       Q    And, yet, you contend that these trips were

25  budgeted openly?

1      A     Yes, sir.

2      Q     And what's the basis for that opinion?

3      A     If I budget a PC trip for $24,000 for the

4  year and put PC trips down in the budget, wherever

5  that trip went, whether the Dominican Republic or

6  what, it's still a proper expense under the category

7  that it was approved in that was intended by Mark and

8  his cost center.

9      Q     The category, as I recall, is meetings and

10  seminars.

11      A     Yes, sir.

12      Q     And I think we discussed earlier that when

13  you have something in the budget for meetings and

14  seminars, there's really an assumption that there's a

15  business purpose for this if you expect to be

16  reimbursed; is that right?

17      A     That's correct.

18      Q     And it is your opinion that these three PC

19  trips and the Dominican Republic trip are appropriate

20  for reimbursement notwithstanding the fact that there

21  were no written agendas, there were no formal meetings

22  or programs, and there were no program materials

23  submitted; is that right?

24      A     That's correct.

25      Q     And you're not quite sure how much time

1    under Internal Revenue Service guidelines should be

2    spent to substantiate a business deduction?

3         A    Not specifically.

4         Q    But you know there's some requirement?

5         A    Yes, sir.

6         Q    And do you have any information as to how

7    much time the participants in those meetings, the

8    three PC meetings and the Dominican meeting, gathered

9    and met for a business purpose?

10        A    No, sir.  I don't.

11        Q    And you go on to opine further that these

12   trips were openly expensed between Mr. Waldrop's cost

13   center and Financial Services; is that right?

14        A    Yes, sir.

15        Q    And you offer that opinion in spite of the

16   fact that all of these expenses were submitted under

17   Stephanie Dotson's name and approved by one person,

18   Mark Waldrop; is that right?

19        A    That's correct.  If they're a legitimate

20   business expense, it comes out of the corporate pie on

21   a pre-approved budget for business activities stated

22   to me by Mr. Waldrop.  It doesn't matter the method of

23   payment or who made the payment.

24        Q    But the point is, these trips, the three PC

25   trip and the Dominican Republic trip, were not

1   submitted for expense approval to Ronnie Rollins, were
2   they?
3       A    Not on the expense report, but I imagine the
4   budgetary item containing an allotment for these trips
5   was in the budget that was approved by Ronnie as part
6   of the board.
7       Q    Did it occur to you in the course of your
8   investigation and the formation of your opinions that
9   Mark Waldrop may have wanted to conceal the expenses
10  of these trips from Mr. Rollins?
11      A    I never got that indication from
12  Mr. Waldrop.
13      Q    Okay.  Well, did it occur to you?  I mean,
14  your job as a forensic accountant is to look behind
15  what people tell you, isn't it?
16      A    Yes, sir.  That's true.
17      Q    I mean, you can't accept everything a person
18  tells you as true, can you?
19      A    That's correct.
20      Q    Even a client?  You can't even assume a
21  client tells you all the truth, can you?
22      A    Correct.
23      Q    Did it ever occur to you as an accountant
24  who has the experience that you've described to us
25  that Mr. Waldrop was trying to hide the cost of these

1    PC trips and this Dominican trip from Mr. Rollins by

2    having the costs submitted under his assistant's name

3    so that Mr. Rollins did not get a look at them and

4    have to approve them?

5         A    Not in the least.  I believe there's

6    corporate records that show budgeted amounts against

7    actual amounts that are available for the CFO, CEO and

8    the board to look at to compare actual run rates of

9    expenses to budgets.  And as long as they're

10   legitimate business expenses, who paid for them or the

11   method of payment is -- is not relevant.

12        Q    You did not speak with Ronnie Rollins in

13   connection with your investigation, did you?

14        A    That's correct.

15        Q    Do you think it's possible that Ronnie

16   Rollins, if he had been asked to approve the trip,

17   say, to the Dominican Republic, would have looked at

18   it and said what is this, was there an agenda, were

19   there any meetings, any program materials, how much

20   time did you spend on business when you were in the

21   Dominican Republic?  Is it possible he might have

22   asked those kinds of questions if he had been asked to

23   approve those expenses?

24        A    I don't know the gentleman enough to say

25   what he would or would not say to whatever extent.

142

1        Q    But it's possible?

2        A    It's possible, yeah.

3        Q    And is it also possible that Ronnie Rollins

4    would have been very, very upset if he had known that

5    Mark Waldrop took a number of people to the Dominican

6    Republic with no meeting agenda, with no formal

7    meetings or programs and with no program materials?

8        A    It's possible.

9        Q    Is it also possible that Mark Waldrop did

10    not want to have that confrontation and so he

11    submitted those expense reimbursement requests through

12    his assistant?

13        A    That's possible as well.

14            MR. DANIEL:  Okay.  We'll take a few minutes

15        and I'll see if I can wrap it up.

16            MR. HENRY:  Great.

17            (Whereupon, a recess was taken from 2:12

18        p.m. until 2:28 p.m.)

19    BY MR. DANIEL:

20        Q    Mr. Powell, on page 14 of your report marked

21    exhibit one, you opined that the deficiency of the

22    expense report reimbursement process is not a problem

23    associated with an individual employee but is a

24    systemic problem.  Do you see that?

25        A    Yes, sir.

1      Q    What's the basis of that opinion?

2      A    If you look into -- I think it's the IRS

3  code section 274 on documentation required under

4  certain activities regarding travel, it requires

5  business relationships.  Yet, when you look to the

6  policy manual for CHSI under substantiation of

7  expenses, it does not include whatsoever the words

8  business relationships, nor do any of the expense

9  report forms used by CHSI ask for any business

10  relationships.

11          So I believe, unless somebody knew the IRS

12  code or was trained systematically to always be

13  thinking of that, the majority of the times where

14  business relationships were supposed to be included in

15  expense reports were not due to the deficiencies of

16  the guide and the forms used.

17      Q    Do you think that Mark Waldrop did not

18  understand what was required in order to submit an

19  expense reimbursement request that would pass muster

20  under Internal Revenue Service and company guidelines?

21      A    I couldn't answer that for him.

22      Q    The same thing about Ms. Dotson.  Do you

23  think she knew what was necessary to submit a proper

24  expense reimbursement request, one that met the

25  requirements of the company and IRS guidelines?

144

1        A    Of the limited expense reports I saw

2   Ms. Dotson submit, she did a great job explaining in

3   detail a lot of elements, including business

4   relationships when they were known at the time,

5   especially in the area of Waterford crystal.

6        Q    Well, as you indicated, you did not look at

7   all the expense reports that Mr. Mimms looked at or

8   that Mr. Edwards looked at; is that right?

9        A    That's correct.

10       Q    You only looked at a relatively small

11  number; is that right?

12       A    That's correct.

13       Q    Now, considering the fact that you only

14  reviewed a fraction of the documentation available in

15  this matter that was reviewed fully by Quentin Mimms

16  and by Chris Edwards, do you believe you have enough

17  information to form the opinions that you've expressed

18  in your report?

19            MR. HENRY:  Object to the form, but you may

20       answer.

21            THE WITNESS:  In regard to the systemic

22       problem?

23  BY MR. DANIEL:

24       Q    In regard to anything you opine in this

25  report.  You only reviewed a small fraction of what

1    Quentin Mimms looked at, a small fraction of what

2    Chris Edwards looked at, and yet you've offered a

3    number of opinions.  Do you feel you have sufficient

4    information to express the opinions that you gave in

5    this report?

6         A    Yes, sir.  I do.

7         Q    And what's the basis of that opinion?

8         A    Based on my experience as an auditor,

9    understanding systems, internal controls, checks and

10   balances, and the documents I reviewed to form the

11   conclusions based on the scope assigned to me by

12   Gearhiser's firm.

13        Q    And all of your opinions are based on -- in

14   part on what you were told by Mark Waldrop and

15   Stephanie Dotson; is that right?

16        A    That's correct.

17        Q    And you've not done anything to verify the

18   information Mr. Dotson -- Mr. Waldrop or Ms. Dotson

19   gave you, have you?

20        A    That's correct.

21        Q    Would it have raised a red flag for you when

22   you were a chief financial officer if a management

23   employee was discovered to have submitted 80 percent

24   of his or her expense reimbursements through a

25   subordinate without getting approval from his or her

146

1  supervisor?

2      A    No, sir.

3      Q    That would not have bothered you at all?

4      A    No, sir.  We have a very good -- in my

5  experience, we have a very good budgetary environment,

6  understanding actual run expense rates to the budget,

7  and with a lot of VPs that travel internationally in

8  my experience, I would expect their assistants to have

9  a higher expense report volume because their job

10  responsibilities were to do those items.

11      Q    Have you had experience in your professional

12  career with organizations that participate in Medicare

13  and Medicaid programs?

14      A    Yes, sir.

15      Q    Tell me about that experience.

16      A    Well, it's back in the cobwebs of my mind in

17  the early years of Coopers, auditing nursing homes and

18  other healthcare facilities that did have Medicare and

19  Medicaid funding and the cost reports associated with.

20      Q    That would have been 1979 to 1982; is that

21  right?

22      A    Yes, sir.

23      Q    Since 1982, have you had any experience with

24  organizations that participated in Medicare and

25  Medicaid programs?

1        A     As a professional?

2        Q     Yes.

3        A     No, sir.

4        Q     Have you had experience with accountable

5   plans as defined in IRS regulations or Medicare and

6   Medicaid regulations?

7        A     I have in accountable plans in the IRS

8   regulations, yes.

9        Q     Okay.  What experience do you have?

10       A     The recency of how I've experienced 16 of

11  the last 18 years making sure our expense reports line

12  up with the accountable plan as defined by the IRS.

13       Q     Now, Mr. Waldrop teaches as an adjunct

14  professor at Southern Adventist University.  Did you

15  know that?

16       A     I was aware of that.  Yes, sir.

17       Q     And do you know he has a -- he's a certified

18  nursing home administrator?

19       A     I wasn't aware of that.

20       Q     Do you know he has certification in the

21  subacute administration from a professional

22  organization that's known as ACHCA, A-C-H-C-A?

23       A     I'm not aware of that.

24       Q     And, of course, you know he has a BS in

25  long-term-care administration and a master's in health

1    service administration?  Do you know that?

2         A    Yes, sir.

3         Q    Would you expect Mr. Waldrop to have

4    knowledge of the Medicare and Medicaid guidelines,

5    including allowable expense guidelines?

6         A    Medicare/Medicaid, yes.  Allowable expense

7    guidelines in reference -- is that to IRS?

8         Q    That's right.  Or Medicare and Medicaid.

9         A    Less to the IRS, but more Medicare and

10   Medicaid.

11        Q    I'm speaking Medicare and Medicaid now.  You

12   would expect him to have that knowledge?

13        A    Yes, sir.

14        Q    Okay.  And would you have expected

15   Mr. Waldrop to know the requirements necessary to

16   substantiate reimbursement requests under Medicare and

17   Medicaid guidelines?

18        A    I would assume so.

19        Q    You referenced at one point in your report

20   to a second trip to the Dominican Republic.  This one

21   was by a Financial Services group.  This is on page 21

22   in your report.  Do you see that?

23        A    That was the trip we've already discussed.

24        Q    Excuse me.

25        A    I believe you're looking at page 22 to 23 of

149

1    my report, sir.

2         Q    That's right.  I'm sorry.  Page 23.  You're

3    right.

4         A    That's all right.

5         Q    And you say -- you say at the bottom of page

6    22, Ethica trip to Dominican Republic not an isolated

7    incident.  Do you see that?

8         A    Yes, sir.

9         Q    And then you refer to this Financial

10   Services Dominican Republic trip in 2013 and you have

11   a list of people whom you say attended that meeting.

12   Do you see that?

13        A    Yes, sir.

14        Q    Now, you got this list of attendees from

15   Gary Henry who, in turn, got it from Mark Waldrop; is

16   that right?

17        A    That's correct.

18        Q    You did not do anything to confirm that all

19   these people attended the meeting, did you?

20        A    I did not.

21        Q    Do you have any knowledge of whether or not

22   this trip was submitted under a budget at Community

23   Health?

24        A    I do not.

25        Q    Do you have any knowledge about how this

1  trip was paid for?

2      A    It appears to be paid for off of Stephanie

3  Dotson's expense report.

4      Q    So when you say that the Ethica trip to the

5  Dominican Republic is not an isolated incident, what's

6  the basis of that statement other than what you've

7  said here about this Financial Services trip?

8      A    Just that, that Mr. Waldrop's trip to the

9  Dominican Republic through Ethica was not the only

10  trip taken by other people in the company towards the

11  Dominican Republic and that evidently there's -- I

12  can't say it's a culture yet because this is just a

13  second incident, but there are other instances where

14  other groups have gone out to the Dominican Republic.

15      Q    All right.  Do you have other trips other

16  than the one cited here?

17      A    No, sir.

18      Q    I'm just looking -- I'm trying to make sure

19  I've got everything.  So you just have this one trip?

20  That's the basis of your statement, that the Ethica

21  trip was not an isolated incident?

22      A    Yes, sir.

23      MR. DANIEL:  All right.  That's all I have

24      at this time.  We have asked for copies of

25      Mr. Powell's notes of his meeting with Mark

151

1      Waldrop and I understand you will produce those

2      to us.

3           After we receive and review those notes,

4      we'll reserve the right to continue the

5      deposition by telephone if necessary with respect

6      to any questions we have about those notes.

7      Subject to that reservation, that's all I have at

8      this time.

9           MR. HENRY:  And we'll reserve signature.

10          (Whereupon, the deposition was adjourned at

11     2:43 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

152

1                          DISCLOSURE

2    STATE OF GEORGIA            Deposition of Richard Powell

3    COUNTY OF COBB              Date: June 22nd, 2017

4              Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
5    Judicial Council of Georgia, I make the following
     disclosure:
6
               I am a Georgia Certified Court Reporter.  I
7    am here as a representative of American Court
     Reporting Company, Inc.
8
               I am not disqualified for a relationship of
9    interest under provisions of O.C.G.A. 9-11-28(c).

10             American Court Reporting Company, Inc., was
     contacted by the offices of Harold T. Daniel, Jr.,
11   Esq.,  to provide court reporting services for this
     deposition.
12
               American Court Reporting Company, Inc., will
13   not be taking this deposition under any contract that
     is prohibited by O.C.G.A. 15-14-37(a) and (b).
14
               American Court Reporting Company, Inc., has
15   no exclusive contract to provide reporting services
     with any party to the case, any counsel in the case,
16   or any reporter or reporting agency from whom a
     referral might have been made to cover this
17   deposition.

18             American Court Reporting Company, Inc., will
     charge its usual and customary rates to all parties in
19   the case, and a financial discount will not be given
     to any party to this litigation.
20

21             This the 22nd day of June, 2017.

22

23

24                           _____
                             BONNIE L. SMITH, RPR, CCR
25                              CCR-B-2432

153

1                    C E R T I F I C A T E

2     STATE OF GEORGIA)

3     COUNTY OF COBB)

4         I hereby certify that the foregoing transcript

5     was taken down, as stated in the caption, and the

6     proceedings were reduced to typewriting under my

7     direction and control.

8         I further certify that the transcript is a true

9     and correct record of the evidence given at the said

10    proceedings.

11        I further certify that I am neither a relative or

12    employee or attorney or counsel to any of the parties,

13    nor financially or otherwise interested in this

14    matter.

15        This the 22nd day of June, 2017.

16

17

18

19

20

21    _____

22        BONNIE L. SMITH, RPR, CCR B-2432

23

24

25

154

1                    E R R A T A   S H E E T

2   In Re:  Mark A. Waldrop v. Community Health Systems,
            Inc.
3           United States District Court
            File No. 4:16-CV-235-HLM
4
    Deposition of Richard Powell, taken on June 22nd,
5   2017.

6   I have read the transcript of my deposition and find
    that no changes are necessary _____.
7                                 Richard Powell

8   or

9   Having read the transcript of my deposition, I wish to
    make the following changes:  (Please state reason.)
10

11  Page _____,  Line _____:

12  Page _____,  Line _____:

13  Page _____,  Line _____:

14  Page _____,  Line _____:

15

16

17

18

19

20  _____

21   Richard Powell

22

23

24

25

Mark A. Waldrop v.
Community Health Systems, Inc.

Richard Andrew Powell
June 22, 2017

## $

**$1 (2)**
93:7,8
**$100 (2)**
65:16,16
**$11,000 (1)**
19:15
**$113.78 (2)**
96:14;97:6
**$12,000 (1)**
20:10
**$16,839.27 (1)**
108:8
**$17,500 (1)**
107:5
**$200 (9)**
69:2,9,15,16,20,22,
23;70:2,6
**$206,655.25 (1)**
134:6
**$210 (1)**
19:16
**$24,000 (1)**
138:3
**$25 (4)**
65:15,17,20;69:5
**$28,200 (1)**
107:19
**$400 (2)**
124:14,15
**$5,000 (1)**
20:1
**$50,000 (1)**
111:8
**$500 (2)**
87:15;93:13
**$7,500 (1)**
20:4
**$750 (3)**
48:8,8;127:13
**$750,000 (1)**
48:3

## [

**[Ronnie (1)**
120:21
**[sic] (1)**
96:16

## A

**able (2)**
53:6;103:24
**above (5)**
55:4;61:25;114:11,
11;125:3
**absolute (1)**
106:20
**accept (1)**
140:17

**acceptable (1)**
49:11
**accordance (1)**
68:16
**according (5)**
71:22;72:16;74:23;
89:24;96:23
**accordingly (1)**
37:4
**address (1)**
42:22
**account (5)**
70:17;72:12;
102:22;106:11;136:3
**accountable (3)**
147:4,7,12
**accountant (9)**
5:1,4,10,13,18;
10:4;13:14;140:14,
23
**accountants (1)**
13:10
**accounting (7)**
9:10,14;10:1,23;
11:11;67:20;131:6
**accounts (5)**
11:22,23,25,25;
72:13
**accumulate (1)**
52:2
**accuracy (2)**
12:1,4
**ACHCA (1)**
147:22
**A-C-H-C-A (1)**
147:22
**acknowledge (1)**
37:2
**actions (2)**
15:18;16:11
**activities (6)**
85:20;119:24;
121:18;135:4;
139:21;143:4
**activity (1)**
117:23
**acts (5)**
15:20;17:24;18:7,
16,21
**actual (6)**
70:19;71:9;131:7;
141:7,8;146:6
**actually (6)**
30:25;49:20;58:2;
60:19;64:3;71:7;
74:25;85:5;91:2,3;
96:24;98:10;100:23;
112:8;119:9;120:13;
129:19;131:18
**Adaptive (1)**
52:1
**add (2)**
67:14;118:14
**added (10)**
65:10,25;68:1;

**69:9,14;116:20,23;**
**118:16;133:15,16**
**adding (2)**
92:8;118:10
**addition (2)**
11:9;43:15
**additional (2)**
127:17;134:18
**address (1)**
42:22
**adequate (1)**
47:19
**adjourned (1)**
151:10
**adjunct (1)**
147:13
**administration (3)**
147:21,25;148:1
**administrative (7)**
53:11;70:3;83:21;
86:14,17;88:17;
99:20
**administrator (1)**
147:18
**adopted (2)**
67:22,23
**advance (10)**
74:24;75:2,5;
93:16,19,22;94:4;
121:13;123:19;
130:10
**advances (2)**
68:7;93:25
**Adventist (1)**
147:14
**advice (1)**
92:16
**affidavit (1)**
31:10
**again (19)**
15:3;19:16;38:23;
41:7;44:17;59:13;
79:8;84:11;85:16;
97:3;100:3;103:24;
112:6;119:5;120:8;
125:6;126:1;127:1;
129:8
**against (4)**
14:11;16:4,18;
141:6
**agenda (14)**
113:20,22,24,25;
114:12;119:11,13;
121:4,6;126:10;
129:4,6;141:18;
142:6
**agendas (3)**
114:8,18;138:21
**ago (1)**
24:20
**agree (2)**
85:6;89:6
**agreement (2)**

**15:21;43:16**
**ahead (1)**
45:25
**air (1)**
90:18
**airfare (2)**
91:8;94:5
**airline (1)**
91:11;92:2
**allegation (1)**
18:17
**allegations (1)**
16:3
**alleged (2)**
13:19;14:11
**allegedly (4)**
16:24;30:19;119:2;
120:9
**allocated (2)**
11:10;47:10
**allotment (1)**
140:4
**allow (2)**
12:11;53:11
**allowable (2)**
148:5,6
**allowances (1)**
68:7
**allowed (1)**
66:14
**allowing (1)**
91:17
**alone (1)**
11:8
**along (1)**
47:13
**Alside (1)**
8:5
**Although (5)**
62:17;83:11;
104:20;107:1;135:17
**always (4)**
62:11;87:8;127:16;
143:12
**amended (6)**
14:1,2;18:18;
20:23,25;43:17
**America (3)**
7:1;91:24;92:11
**American (4)**
92:13,19,23;93:10
**among (2)**
13:24;60:1
**amount (22)**
19:11;48:10;49:17;
50:16,24;52:18;
56:15;57:9;65:24;
66:9,24;67:11;69:4;
70:8;73:17;97:5;
106:13;107:5,12,18;
118:20;127:8
**amounts (13)**
45:22;46:3;49:25;

**50:5,8,21;122:20;**
**125:12;134:10,19,20;**
**141:6,7**
**analogy (1)**
75:1
**analysis (2)**
42:13;48:17
**analyze (1)**
17:22
**analyzed (1)**
45:14
**and/or (1)**
77:16
**ANDREW (2)**
4:3,11
**answer's (2)**
58:6,7
**anyplace (1)**
103:25
**apologize (1)**
109:15
**apparently (1)**
81:2
**appear (5)**
8:12;34:4,22;
60:12;96:3
**appearance (1)**
63:19
**appears (14)**
6:15;8:8;10:7;
15:1;26:11;27:25;
34:16,25;40:2;75:20;
96:7;107:25;108:13;
150:2
**appendix (22)**
6:14,19;13:23;
15:3;20:23;21:5;
23:14;24:19;32:24;
33:1,8,16,19,22;
41:13,18;42:1;43:2;
44:19,22;46:17;
104:22
**apples (1)**
108:12
**applied (5)**
42:5,7;56:18;
65:22;82:2
**apply (3)**
47:6;48:12;65:21
**appreciation (1)**
117:25
**appropriate (6)**
39:17;65:24;67:11;
103:18,21;138:19
**appropriately (1)**
66:16
**approval (16)**
52:11;54:13;79:23;
80:8,24;82:20;84:8,
16;91:18;99:6;106:5;
123:4;136:14,22;
140:1;145:25
**approve (10)**

**12:**12,14;51:10;
84:20,22;99:10;
130:14;141:4,16,23
**approved (38)**
11:21;12:21,23;
51:6,11;52:7;54:23;
60:23,24;62:19;
79:20;80:14,16,18,
19;81:3,6;82:9,10;
84:14,15;85:11;
94:23,23;105:13,16,
17;106:1;122:24;
130:6;133:5;136:4,
18;137:1,13;138:7;
139:17;140:5
**approving (4)**
54:15,17,22;
130:16
**approximately (2)**
10:9;20:5
**April (1)**
15:6
**April/May (1)**
30:20
**area (7)**
4:18;13:7;24:9;
51:22;102:7;103:12;
144:5
**areas (1)**
25:3
**argue (1)**
124:19
**around (1)**
20:9
**article (3)**
118:2;121:13,20
**articles (3)**
121:16,25;130:3
**assertion (1)**
128:21
**assigned (1)**
145:11
**assignment (2)**
19:9;21:20
**assistance (3)**
6:9;53:6;129:1
**assistant (10)**
53:13;54:11,24;
70:3;83:21;85:9,20;
86:17;99:20;142:12
**assistants (1)**
146:8
**assistant's (1)**
141:2
**associate (6)**
37:22;71:25;73:8;
74:13;110:2,3
**associated (7)**
25:11;40:11;42:21;
106:13;126:13;
142:23;146:19
**Association (1)**
13:2

**assume (9)**
69:13;82:6;109:19,
20;110:11;111:4;
120:16;140:20;
148:18
**assuming (2)**
69:25;125:12
**assumption (5)**
31:13,18,19;32:3;
138:14
**assumptions (2)**
20:13,15
**assure (1)**
31:4
**Atlanta (2)**
91:9;101:25
**attend (2)**
83:4;117:11
**attendance (4)**
76:18;116:13;
117:13;131:15
**attended (13)**
30:19,25;112:20;
113:13;119:9;120:9,
13,25;122:4;129:13,
19;149:11,19
**attendees (2)**
121:22;149:14
**attending (6)**
76:16;89:16;
117:17;120:17;
122:9;130:1
**attorney (1)**
102:1
**attorneys (1)**
13:11
**attribute (1)**
76:22
**attributed (7)**
36:1;91:8;96:15,
20;97:5,22;100:9
**audit (17)**
24:6,11,24;25:5;
44:3,4,9,14;55:10,17,
21,23;56:3;126:20;
130:23;131:1,2
**audited (4)**
42:14;126:15,17,
23
**auditing (1)**
146:17
**auditor (1)**
145:8
**auditors (1)**
10:18
**author (2)**
6:6;79:19
**authority (1)**
101:18
**authorized (1)**
80:18
**authorship (1)**
28:5

**available (5)**
55:14;85:22;131:7;
141:7;144:14
**award (1)**
108:25
**awards (4)**
62:15,15;73:1;
137:2
**aware (44)**
17:11,15;22:8;
38:3;56:10,17;64:13;
65:17,19;66:21;
75:25;76:13;77:11;
80:2;86:19,20;93:22;
94:7,13,13,25;
101:22;102:5,16;
113:21;115:4;
118:18;119:17,20;
121:14,24;122:2,10;
123:10;129:3;130:2;
132:17,23;133:17,18,
23;147:16,19,23
**away (1)**
122:7

**B**

**back (10)**
8:13;14:14;23:20;
28:7;31:25;40:21;
73:2;90:11;123:22;
146:16
**background (4)**
20:25;42:1;49:5;
94:14
**balances (1)**
145:10
**banks (1)**
60:15
**base (1)**
134:24
**based (26)**
18:10,11;23:24;
34:13;39:13;42:6;
43:15;47:18;49:1;
50:18;51:12,18;
57:13;59:19;61:19,
24;66:11;82:16;
89:23;108:13,22;
125:2,22;145:8,11,13
**baseline (1)**
83:2
**basic (2)**
42:5,16
**basically (4)**
45:15;117:1;
118:12;134:12
**basis (15)**
23:22;41:22;62:3;
67:9;74:20,23;76:6;
105:15;108:14,14;
138:2;143:1;145:7;
150:6,20

**Bates (12)**
22:22,23;32:25,25;
33:21;34:2;45:2,3;
95:7;104:20,24;
105:1
**became (7)**
9:17;64:11,17;
76:1;78:2,23;79:13
**becomes (1)**
89:15
**becoming (1)**
34:19
**beforehand (1)**
34:20
**began (2)**
8:18;20:11
**begin (1)**
112:14
**beginning (11)**
6:25;22:22;23:3;
32:25;42:19;44:5;
45:3;70:16;76:12;
78:9;134:15
**begins (1)**
15:13
**behalf (6)**
69:16;82:3;97:14,
18,25;98:4
**behind (2)**
120:15;140:14
**below (7)**
32:18;35:4;62:8;
68:17;70:20;97:3;
107:16
**benefit (5)**
24:4;83:13;91:5;
95:12;96:24
**benefited (1)**
91:3
**benefits (17)**
52:3;71:25;72:1,2,
23;73:7,8;106:12,14,
16,22;107:2,6,11;
108:3;135:13,15
**benefits/incentives (1)**
71:24
**Besides (2)**
63:3;76:15
**best (6)**
7:16,21;8:1,7;36:2;
79:9
**better (1)**
74:25
**beyond (1)**
18:2
**biannual (1)**
74:22
**big (1)**
127:13
**bill (4)**
19:14;20:6;87:25;
88:2
**billed (2)**

**19:**11,13
**billing (1)**
19:20
**bills (1)**
90:19
**birthday (1)**
108:24
**bit (4)**
19:5;54:21;93:8;
127:23
**board (16)**
47:12;48:20;52:10,
10;76:19;77:16;79:3;
102:2,3;105:17;
127:12,19;130:15;
137:5;140:6;141:8
**bonding (1)**
126:11
**book (2)**
85:24;86:12
**booking (2)**
53:17;85:20
**books (5)**
53:14,15,15;
124:18,24
**boss (1)**
88:18
**bothered (1)**
146:3
**bottom (10)**
40:4;45:1;59:22;
78:6;79:18;110:12;
120:4,20;128:13;
149:5
**bought (2)**
75:2,5
**boxes (3)**
64:21,24;65:4
**bracketed (1)**
121:2
**brackets (1)**
120:15
**breach (1)**
57:10
**break (6)**
37:21;41:3;61:3,5;
102:7;108:21
**breakdown (1)**
107:1
**breakout (2)**
72:12;108:16
**bring (1)**
124:23
**broken (1)**
108:22
**brought (2)**
12:5;121:19
**BS (1)**
147:24
**buckets (1)**
25:13
**budget (45)**
11:7;43:22;46:24;

51:14,17;52:8,12;
54:20;62:15,19,22;
72:20,24;84:15;90:1;
103:23,25;105:7,14;
106:1;109:9,12;
112:4,9;127:9,21;
128:6,8,16,22;
130:16;131:6,11;
136:4,25;137:1,4,6;
138:3,4,13;139:21;
140:5;146:6;149:22
**budgetary (6)**
42:16;108:14;
130:20;137:21;
140:4;146:5
**budgeted (16)**
62:14,18;66:13;
67:10;74:21;86:5;
103:22;106:13;
109:6;111:17;135:7,
12,23;136:4;137:25;
141:6
**budgeting (6)**
43:10,18;47:7;
51:25;53:22;70:18
**budgets (8)**
11:3;52:9;105:15,
17;123:14;127:14;
128:25;141:9
**bulk (1)**
103:6
**Bursch (1)**
98:12
**business (66)**
4:16;11:15;53:16,
24,24;57:13;61:24,
25;65:9;66:11;68:8;
70:17,21;83:19;86:7;
93:17;111:13,15,19,
21,22;115:25;116:4,
10,11,15;117:6,13,
17,20,21,23;118:2,
19,21;119:21,24;
120:2;121:18;122:8;
124:2,4,7,19;125:2,3,
6,23;126:5;129:6;
134:5,21;136:8,9;
138:15;139:2,9,20,
21;141:10,20;143:5,
8,9,14;144:3
**businesses (2)**
4:20;10:2
**buy (1)**
137:3
**buying (1)**
74:24

**C**

**calendar (1)**
108:13
**call (1)**
63:13

**called (4)**
4:4;42:9;51:25;
98:6
**came (7)**
11:22;40:14,16;
49:20;54:1;71:8;78:8
**can (29)**
6:2,23;7:21;10:15;
14:13;27:4,18;30:6;
32:8;67:3;70:17;
73:2;76:9;90:8,10;
93:16;104:24;111:8,
11;112:3,13;116:16;
118:21;124:6,8;
128:3;140:18,21;
142:15
**card (35)**
56:9,13,14;57:11;
58:4;59:19;82:1,19;
83:6,7,19;85:21,24;
86:1,21,22;87:2,11,
15,21,24;89:19;
91:12;92:10,13,19,
23;93:10,13;98:8,16;
99:24,24;102:15,18
**cards (20)**
56:25;57:6,9,12,19,
24;58:1,3;59:2,6,18;
60:1,6,7,9,15;86:19;
87:4,23;109:1
**career (2)**
78:9;146:12
**case (27)**
6:4;7:3,6,8,10,13,
18,20,23,24,25;8:3,6;
13:1;14:8;17:17;
31:14;38:10;42:1;
46:14;72:10;81:17;
82:17;85:16;87:19;
94:14;115:22
**cases (4)**
6:23;13:21;81:15;
85:17
**cash (3)**
102:15,18,22
**cash-flow (1)**
10:24
**casual (1)**
118:22
**catch (1)**
114:13
**categories (10)**
13:20;23:21;70:13;
71:21,24;72:9;73:11;
108:5,20;134:2
**categorize (2)**
25:9,13
**category (23)**
17:21;23:21;45:12,
20,21;70:24,25;
71:17;72:15,20,24;
106:15;109:5;111:2,
17;116:18;135:13,15,

20,25;136:25;138:6,9
**cause (5)**
94:14,15,15,17,20
**cease (1)**
9:12
**celebration (1)**
74:14
**center (18)**
48:19;51:24;52:2,
6;72:25;80:15;
105:14;106:2;
107:11;109:25;
110:7,19;112:5;
127:9,14;135:8;
138:8;139:13
**centers (2)**
11:10;51:21
**central (1)**
11:9
**CEO (7)**
54:7;79:20;81:3;
84:8;130:10;131:8;
141:7
**CEO/CFO/COO/board (1)**
77:19
**certain (9)**
11:9;32:11,12,14;
49:2;95:6;96:2;
118:20;143:4
**certification (3)**
13:4,5;147:20
**certified (10)**
5:3,10,13,17;10:4;
13:1,3,6,14;147:17
**cetera (1)**
126:11
**CFO (16)**
9:1,10,12;18:15;
42:6;43:23;60:22;
76:18;79:4;87:4,21,
23;101:15;131:7,10;
141:7
**chain (1)**
12:16
**chairman (1)**
102:1
**challenge (3)**
17:10;46:2,11
**challenged (1)**
17:13
**chance (2)**
34:14;121:21
**change (4)**
64:13;75:16,22;
79:4
**changed (1)**
64:11
**changes (1)**
35:17
**changing (2)**
60:15,15
**characterization (1)**
38:5

**charge (3)**
56:13;102:14,15
**charged (5)**
71:20;81:25;82:18;
88:3;136:3
**charges (1)**
92:14
**charging (1)**
84:6
**chart (6)**
49:17,20,25;50:11;
131:19,21
**Chattanooga (1)**
4:14
**cheaper (1)**
75:3
**checked (1)**
55:4
**checks (1)**
145:9
**chief (15)**
8:19,22,23;9:5;
10:13;11:12;12:10;
53:2;64:15;75:14;
79:24;101:11;
105:22,23;145:22
**Chris (3)**
46:5;144:16;145:2
**Christine (3)**
22:6;59:10,24;60:5
**Christmas (3)**
62:15;72:25;
108:24
**Christopher (1)**
21:9
**CHSI (19)**
16:15;17:3;23:3,4;
24:7;25:2;42:17;
43:23;47:8,17,19;
48:20;95:18;101:11;
104:24;108:14;
120:21;143:6,9
**CHSI's (3)**
15:18;32:13;43:9
**Cindy (1)**
8:4
**citation (1)**
29:16
**citations (1)**
39:8
**cite (6)**
36:4;38:12;48:25;
67:21;114:24,24
**cited (7)**
29:19;39:5;40:18,
19;46:21;94:20;
150:16
**citing (2)**
39:18;48:24
**citings (1)**
39:7
**City (1)**
112:18

**claiming (1)**
51:5
**clear (2)**
81:7;136:12
**clearly (1)**
91:13
**clerk (1)**
12:1
**C-level (1)**
100:22
**client (7)**
124:12,12,13,15,
20;140:20,21
**client-attorney (1)**
28:8
**closed (1)**
15:22
**cobwebs (1)**
146:16
**cocktail (1)**
117:4
**code (2)**
143:3,12
**collection (1)**
32:20
**colon (1)**
35:13
**column (2)**
71:15,16
**columns (1)**
24:25
**combination (2)**
102:14;110:7
**coming (4)**
30:14;75:8;86:7;
91:2
**comment (2)**
48:22;64:19
**comments (1)**
115:10
**committed (8)**
15:19;16:8,18,25;
17:6,24;18:7,21
**common (3)**
83:17;91:22;99:21
**commonly (1)**
92:11
**communicated (1)**
27:22
**Community (44)**
6:5;14:2,6,7;16:4,
18;17:25;18:7,21;
22:23;24:15;47:7;
48:15;51:3,9,15;
54:4;55:3,7;62:22;
63:1,6,9;64:7,16,17;
65:21;66:20;67:2,22;
73:19;78:1,23;79:5;
86:18;93:5,15;94:9;
114:21;128:25;
130:10;131:10;
133:19;149:22
**companies (7)**

10:18,24;11:1,11,
13;32:13;57:11
**company (20)**
11:7;47:9;63:22,
24;64:10;67:13;70:4;
74:23,25;76:1;79:13;
84:17;89:13,25;
93:19;97:22;101:15;
143:20,25;150:10
**company's (1)**
83:25
**compare (2)**
33:5;141:8
**comparing (1)**
108:11
**comparison (1)**
108:17
**compensation (1)**
93:4
**compiled (4)**
71:11,12;95:4,8
**complaint (6)**
14:1;18:18;20:24,
25;21:1;43:17
**complaints (1)**
15:17
**complete (1)**
51:23
**completed (2)**
11:20;100:4
**compliance (1)**
101:3
**comprehensiveness (2)**
12:1,4
**conceal (2)**
123:8;140:9
**concern (3)**
25:12;52:21;60:10
**concerned (2)**
83:25;125:22
**concerning (1)**
18:15
**concerns (4)**
24:10;25:9,14;
44:13
**concerns/issues (1)**
25:7
**conclusion (7)**
17:23;42:8;45:15;
47:20,20;60:17;
134:4
**conclusions (7)**
23:24;57:8,12;
60:13;133:24,25;
145:11
**condoning (1)**
75:21
**conducted (1)**
119:22
**conference (1)**
29:9
**confirm (6)**
37:21;47:16;60:18;

104:25;120:12;
149:18
**conflict (1)**
117:25
**confrontation (1)**
142:10
**conjecture (2)**
134:25;135:1
**connected (1)**
74:7
**connection (10)**
20:17;37:20;38:9;
68:3,9,22;109:9;
112:9;117:13;141:13
**consider (6)**
15:5;23:6;41:16;
66:9;90:3;124:17
**considered (6)**
13:25,25;21:6;
41:15;44:23;134:21
**considering (1)**
144:13
**consistent (1)**
20:9
**consistently (3)**
49:3;62:18,18
**constantly (1)**
49:4
**contained (7)**
23:11;27:16,20;
28:3;29:12;41:17;
130:19
**containing (2)**
47:12;140:4
**contains (2)**
6:20;130:16
**contend (1)**
137:24
**content (1)**
30:9
**context (1)**
81:12
**continually (2)**
5:9,12
**continue (1)**
151:4
**continued (1)**
75:21
**continues (1)**
45:3
**continuous (1)**
74:22
**contract (1)**
53:10
**contradictory (1)**
82:24
**control (6)**
40:4;78:6;79:17;
95:8;96:8;128:13
**controller (1)**
11:23
**controls (1)**
145:9

**convention (10)**
29:9,10;75:9;83:4,
5;84:1;91:10;93:18;
131:15;132:16
**conventions (4)**
89:11;90:20;
131:19,20
**conversations (2)**
38:9;118:22
**converted (1)**
64:7
**COO (10)**
16:15;62:5,20;
76:15;77:13;85:19;
86:12;96:16;107:11;
120:21
**Coopers (2)**
10:5;146:17
**copier (1)**
75:2
**copies (1)**
150:24
**copy (6)**
14:24;15:1;37:1;
40:19;61:14;104:21
**copying (1)**
121:15
**core (3)**
62:15;72:25;
108:24
**corporate (37)**
15:22;43:9,18;
49:10;53:25;63:13,
18,25;64:3;66:14;
70:18;75:20,23;
82:23;83:18;84:17,
85:21;86:7,19,20,22;
87:2,4,9,21,23,24;
91:24;92:7,11;
100:20;101:2;126:9;
131:6;139:20;141:6
**corporation (18)**
9:18;63:17;64:8,8,
12,18;69:19;76:2;
78:2,23;79:6,14;
86:6;87:25;89:22;
90:4;124:24;137:6
**corporations (2)**
10:10;124:23
**corrections (4)**
35:1,5,7,12
**correctly (1)**
69:20
**correspond (1)**
39:4
**cost (26)**
11:9;48:19;51:21,
24;52:1,6;66:2;
72:25;74:17,25;
80:15;92:2;105:14;
106:2;107:11;
109:25;110:7,18;
112:5;127:9,14;

135:8;138:8;139:12;
140:25;146:19
**costs (2)**
52:2;67:20;133:13;
134:4;141:2
**council (5)**
76:20,21;77:20,21;
79:4
**counsel (10)**
25:23;26:12;27:8,
22;30:9,12,14;32:11;
34:12,16
**counterclaim (4)**
14:2,7,11,18
**counterclaims (1)**
14:12
**counting (1)**
25:5
**country (1)**
88:18
**couple (1)**
66:5
**course (3)**
31:13;115:21;
140:7;147:24
**court (2)**
17:14;20:24
**cover (4)**
40:9,11;93:25;
117:6
**covered (7)**
25:4,12;85:5;
106:24;111:2;117:2;
128:5
**CPA (10)**
4:17,22;8:10,14,17,
18;9:19,24;10:8,8
**created (3)**
24:25;25:13;49:23
**creates (1)**
90:25
**credential (1)**
13:6
**credentialed (1)**
13:2
**credentials (2)**
10:9;17:13
**credit (43)**
56:9,13,24;57:9,11,
12,19,23;58:1,3,4;
59:2,6,18;60:1,6,7,8;
82:1,19;83:6,7;85:21,
24;86:19,21,22;87:2,
4,11,15,21,23,24;
89:19;91:12;92:10;
93:10,13;98:8,16;
102:14,18
**CROSS-EXAMINATION (1)**
4:7
**cruise (12)**
119:1,3,11,22;
120:6,25;121:5,8,11;
122:9,21,21

**cruises (5)**
114:10;120:18;
122:11,13;125:2
**crystal (68)**
49:18;50:1,6,9,12,
16,24;51:5;52:14;
61:24;62:11,23;
63:14,19,22;64:1;
65:6;66:3,10;69:2,3;
70:7,12;71:2,19;72:6,
14;73:14,18,22,23;
74:8,11,17;75:7,9;
76:1,5,16;77:17;78:8,
16;79:2;102:13;
103:5,11,14,20,25;
104:3;106:23;107:3;
108:8,19,23;109:6;
110:21;135:11,18,19,
23;136:2,7,13,16,21,
24;144:5
**culture (13)**
62:12;63:13,16,19,
24,25;64:3,5;66:14;
74:23;75:20,23;
150:12
**current (2)**
5:1;6:17
**CV (3)**
6:15,17;10:7

## D

**Dalton (4)**
73:18;74:8;88:7;
133:2
**DANIEL (46)**
4:8;5:20,24;14:14,
21;26:7;27:2;28:13,
24;30:4;31:25;32:6;
34:8;36:25;37:5,18,
25;38:7;41:2,5,6;
55:19;58:17;61:3,11,
21;67:8;69:12;73:2,
5;74:3;90:11,15;
95:23;102:6,11;
104:15;105:3,5;
111:25;123:22;
124:1;142:14,19;
144:23;150:23
**data (1)**
57:8
**date (10)**
27:18;39:13,17;
40:6,17;75:7;93:8;
113:20;115:4;116:10
**dated (6)**
14:3;15:6;33:24;
36:7;38:18;115:7
**dates (3)**
6:24;27:11;89:17
**Daubert (2)**
17:10,10
**day (4)**

Mark A. Waldrop v.
Community Health Systems, Inc.

Richard Andrew Powell
June 22, 2017

73:19;79:7,9;91:4
**days (1)**
  19:1
**deal (2)**
  13:7,12
**dealing (1)**
  31:3
**dealt (1)**
  13:13
**debit (13)**
  56:9,14,24;57:19,
  23;58:1;59:2,18;
  60:1,1,9,15;82:1
**December (6)**
  7:7;14:3;24:13;
  44:6;55:22,24
**deception (1)**
  17:2
**deceptive (2)**
  85:8,14
**decided (1)**
  9:18
**declare (1)**
  62:20
**deduct (6)**
  116:14,17;117:11;
  118:5;124:9;132:12
**deducted (4)**
  118:17;125:20;
  126:8,13
**deductibility (1)**
  115:25
**deductible (16)**
  65:7,8;66:24;
  68:16,23;70:8;117:8;
  118:12,14;124:5,5,
  16,17;125:10,18,25
**deducting (1)**
  118:10
**deduction (5)**
  65:12,18;116:6;
  126:22;139:2
**deductions (1)**
  116:16
**Defendant (1)**
  14:2
**Defendant's (13)**
  5:22;14:19;26:5,
  25;28:11,22;30:2;
  32:4;34:6;61:9;
  95:21;104:13;111:23
**defenses (2)**
  14:1,6
**deficiencies (1)**
  143:15
**deficiency (2)**
  12:6;142:21
**deficient (1)**
  12:3
**defined (6)**
  25:1;53:10;63:18;
  101:11;147:5,12
**defines (1)**

121:2
**definition (2)**
  63:18;74:2
**definitive (2)**
  101:4,13
**degree (1)**
  44:15
**delineate (2)**
  36:2;127:17
**delineated (1)**
  23:24
**department (1)**
  47:14
**departmental (1)**
  51:20
**departure (1)**
  18:13
**depend (1)**
  75:17
**depends (1)**
  74:1
**deposition (56)**
  6:1;7:20;8:9;
  14:23;20:7;21:7;
  22:5,12;26:9,19;
  27:4;28:15,20;30:6;
  31:15;32:8,19;34:10;
  35:23;36:8;38:19;
  39:2,16;43:22;44:2,
  18;46:18;48:11;
  51:19;52:17;57:17;
  58:8,23,24;59:1,5,10,
  14,23;61:13;64:20;
  77:7;87:10,13;92:12;
  95:2,25;97:9;104:18,
  23;112:2;114:5;
  115:6;128:11;151:5,
  10
**depositions (18)**
  21:2,2,4,6,12,14,
  17,22;22:2,14;23:9,
  14,18;26:21;42:4,15;
  43:3,19
**derived (1)**
  49:6
**describe (3)**
  10:15;11:5;63:13
**described (3)**
  20:21;126:12;
  140:24
**description (1)**
  96:23
**detail (4)**
  106:10,13;137:5;
  144:3
**determine (15)**
  14:10;16:8,11,13;
  17:22;23:22;24:3;
  37:3;42:7,10;44:14;
  45:13;57:24;72:5;
  73:6
**determined (7)**
  50:15;55:8;70:17;

75:14;110:19;127:3;
133:21
**development (3)**
  114:20;115:2,15
**devoted (2)**
  19:8;118:21
**Diana (3)**
  22:10;86:21;87:5
**difference (3)**
  67:14;69:9;73:7
**different (12)**
  17:23;24:8;27:11;
  42:7;45:14;59:25;
  60:8;62:5;71:20,23;
  72:13;107:17
**differential (1)**
  65:23
**difficult (1)**
  16:23
**digits (2)**
  57:18;59:19
**direct (18)**
  11:21,22;12:7,21;
  22:11;54:7;62:6;
  80:5,7;84:20;85:12;
  90:5;94:3,24;108:16;
  120:17,22;121:2
**directed (1)**
  37:12
**direct-line (1)**
  53:4
**directly (3)**
  80:4;86:23;115:15
**director (1)**
  76:19
**directors (1)**
  48:21
**directors/Stephanie (1)**
  77:20
**Dirksen (1)**
  48:7
**disagree (3)**
  35:6;37:18;38:5
**disallow (1)**
  67:13
**disciplinary (1)**
  5:17
**disclose (1)**
  55:24
**disclosed (1)**
  129:7
**discount (2)**
  74:24;75:3
**discoverable (1)**
  37:3
**discovered (2)**
  60:8;145:23
**discrepancy (1)**
  108:1
**discrimination (1)**
  18:17
**discriminatory (4)**
  17:24;18:7,16,21

**discuss (4)**
  63:25;112:13;
  119:1;128:1
**discussed (5)**
  37:22;110:25;
  123:20;138:12;
  148:23
**discusses (1)**
  114:6
**discussion (5)**
  34:13;70:20;
  112:12,14;131:14
**discussions (7)**
  16:13;17:1;25:19;
  38:12,14;87:3;118:2
**divided (1)**
  97:1
**divorce (1)**
  7:24
**document (27)**
  5:20,25;14:22;
  26:8;27:3,24;28:14,
  25;29:7;30:5;32:7;
  34:9;35:22;40:1,14;
  61:13,15;71:8;95:24;
  96:1,5;104:16,17,22;
  105:4,10;112:1
**documentation (3)**
  112:7;143:3;
  144:14
**documents (29)**
  13:24;21:3;22:22,
  24,25;23:2,5,5,7,19;
  24:18;32:25;33:1,8,
  17,19;34:4;36:24;
  37:9;41:14,17,25;
  44:23;45:2,7;109:11;
  114:12;121:22;
  145:10
**dollars (5)**
  66:5,6;73:22;
  89:10;106:20
**Dominican (27)**
  128:1,2,17;129:4,
  13,20,23;130:5,19;
  131:12;137:8,9;
  138:5,19;139:8,25;
  141:1,17,21;142:5;
  148:20;149:6,10;
  150:5,9,11,14
**done (11)**
  13:14,16;53:14;
  55:21;91:20;92:4,6;
  94:6;100:21;109:4;
  145:17
**Dotson (119)**
  21:8;23:10;24:16;
  25:21;26:2;28:18;
  29:3,17,20;31:4,9,22;
  41:8;42:3,11;43:8,
  13;45:23;46:20;
  47:13;49:8;50:4,12;
  51:4;52:13,18;53:6;

54:24;55:25;56:6,7,
15,18,22;57:2,19;
58:2,9;59:2;60:4,19;
63:9;64:2;65:3;69:1,
15;70:6;72:7;73:11,
20;74:6,16;76:19;
78:20;80:11,23;82:2,
10,18;83:5,23;84:1,6,
6;85:5;88:6,12,23;
89:7;90:16;91:10;
92:1;93:24;97:10,13,
17,24;98:3,19,25;
99:5,18;100:5;
102:22;103:6,10;
108:8;109:8;110:4,8,
10;112:8;113:25;
122:5,8,13;123:13;
128:10;129:2;130:6,
21;131:15,25;132:8,
15,21,25;133:19;
135:12;136:17,21;
137:10,16,20;143:22;
144:2;145:15,18,18
**Dotson/presidential (1)**
  77:20
**Dotson's (20)**
  24:2;26:19;28:19;
  29:8;52:23;54:16;
  55:9;58:23;59:5,23;
  67:20;80:21;84:25;
  92:12;94:22;101:7;
  122:3,24;139:17;
  150:3
**double (1)**
  18:12
**doubt (6)**
  46:1,3,10;50:20;
  75:22;101:13
**down (10)**
  30:17;32:18;40:4;
  45:1;52:8;107:16;
  108:21,22;122:1;
  138:4
**downstream (1)**
  47:10
**Dr (1)**
  8:4
**draft (6)**
  34:14,17;35:1,6,12,
  16
**Drive (1)**
  4:13
**Due (3)**
  26:24;28:8;143:15
**duly (1)**
  4:5
**during (5)**
  18:14;59:7;60:6;
  119:24;128:8
**duties (4)**
  10:16,17;16:14;
  29:9
**dysfunctional (2)**

89:22;90:3
**dysfunctionality (1)**
90:25

# E

**earlier (11)**
20:21;35:22;37:6,
15;60:22;77:22;
81:24;103:16;
112:22;120:1;138:12
**early (4)**
7:6;19:1;24:7;
146:17
**eating (1)**
96:25
**EDI (1)**
11:11
**edit (1)**
34:19
**editing (1)**
34:18
**editor (1)**
35:7
**edits (1)**
34:17
**Edwards (5)**
21:9;46:5;144:8,
16;145:2
**Edwards' (2)**
46:8,11
**effect (2)**
54:15;63:1
**efficiently (1)**
89:14
**eight (10)**
24:18;32:8,19;
34:1;39:1,1;42:19;
52:16;59:25;60:7
**either (17)**
6:24;7:5;23:7;
25:20;48:15;50:1;
56:6;64:1;67:13;
82:1;100:9,11;
105:12,25;116:17;
118:9;133:15
**elements (5)**
13:9;16:22;25:1;
49:2;144:3
**eligible (1)**
16:14
**else (8)**
23:15;25:16;29:25;
40:21;41:17;51:10;
74:14;121:14
**else's (2)**
91:14;99:24
**e-mail (31)**
27:22;30:8,10,18;
31:1;32:10,19;33:2,4,
6,13,24;34:5,12,23;
35:4,9;39:5,13,15;
40:1,9,10,11,15,19,

25;61:14;113:3,9;
115:7
**e-mails (3)**
36:6;38:18,25
**embezzlement (1)**
13:18
**emphasis (1)**
68:1
**employed (4)**
8:19;51:16;54:5;
55:3
**employee (34)**
11:20;12:12,22;
22:10;62:12,16;
65:10,25;66:22,23;
67:15;68:2,3,8,9,10,
20,22,23;69:3,10,21,
22;97:22;99:14;
100:22;116:20;
117:24,25,25;127:23;
135:13;142:23;
145:23
**employees (24)**
4:23;19:21;24:3,5;
25:5;47:19;49:14;
65:11;66:20;70:4;
76:15,17,18;77:12,
18;86:18;95:13;
97:23;98:3;104:10;
118:7,11,15;125:13
**employees' (1)**
23:11
**employee's (2)**
12:8;116:24
**employment (8)**
9:21;15:21;18:14;
43:16;53:10;101:18,
21,24
**encompasses (1)**
100:7
**end (7)**
24:12;52:4;76:12;
84:16;86:6;100:14;
135:2
**ending (2)**
23:4;44:5
**enforcement (2)**
13:9,10
**engage (1)**
9:9
**engaged (7)**
6:25;7:4,10,25;
18:25;19:4;20:20
**engagement (2)**
17:16;18:2
**engagements (1)**
8:12
**engaging (1)**
10:10
**enlarged (1)**
18:2
**enough (4)**
60:16;101:9;

**entire (3)**
44:10;66:16;98:15
**entities (10)**
9:6,10,13,15,16;
12:11;51:21;52:9;
53:5;127:12
**entitled (6)**
66:23;69:17,24;
70:6;74:9,16
**entity (5)**
8:14,19;47:8,12;
86:13
**environment (4)**
83:18;87:9;100:20;
146:5
**error (1)**
42:24
**especially (2)**
24:9;144:5
**et (1)**
126:11
**Ethica (6)**
30:20;128:16;
149:6;150:4,9,20
**evade (1)**
104:4
**evaluate (1)**
47:5
**even (7)**
63:21;82:14,18;
85:23;135:5;140:20,
20
**event (4)**
38:6;89:14;113:7;
116:11
**events (8)**
76:16;99:20,22;
100:1;122:12;125:1;
128:7;135:3
**everybody (1)**
89:11
**evidence (13)**
50:23;97:12,16,23;
98:2;100:10;105:12,
25;112:7;119:21;
130:9,13;131:9
**evidently (2)**
130:16;150:11
**exact (2)**
109:23;115:4
**exactly (4)**
89:24;93:1;98:5;
101:22
**examine (1)**
17:19
**examined (1)**
4:5
**examiner (2)**
13:2,6
**Examiners (1)**
13:3
**example (4)**

22:6;31:10;49:14;
93:17
**examples (1)**
95:10
**exceeds (1)**
19:24
**Excel (6)**
24:8,24;25:7;
42:13;44:10;51:23
**except (2)**
33:21;110:11
**exception (2)**
46:16;126:1
**exceptions (1)**
87:8
**excerpts (1)**
71:10
**excess (7)**
65:9;66:15;67:11,
13;69:25;75:4;111:7
**excesses (1)**
66:18
**excluding (1)**
95:13
**excuse (9)**
8:4;29:17;48:6;
58:18;94:1;107:13;
110:9;134:16;148:24
**executing (1)**
86:4
**executive (8)**
53:9,13,17;54:10;
64:15;75:15;79:24;
105:22
**executives (5)**
49:11,14;77:16;
83:19;88:17
**Exhibit (152)**
5:22;6:1,7;12:25;
13:24;14:19,23;15:4;
16:3,17;20:12;21:5;
22:21;23:15,17;
24:21;25:14,17;26:5,
9,25;27:4,9,16,20,24;
28:4,11,14,22;29:1,
12,14,18;30:2,5,17;
31:15,21;32:4,7,18;
33:5,9,11,15,15,20,
25;34:4,6,10,24;
35:19,23;36:3,8;
38:19,24;39:4,15,23;
40:2;41:12,14,22;
42:18;43:17;44:1,17;
46:18,24;47:21;
49:16;51:14;52:17;
57:17,17;58:14,15,
18,19,24,25;59:14;
61:9,13,16,23;63:12;
66:8;67:17;71:5,7,9,
22;72:16,18;76:11;
77:7,8,24;78:7;79:12,
16;84:12;95:1,2,5,9,
17,21,25;96:2,9;97:4,

9,21;99:13;100:3,9;
103:4;104:13,17,23;
106:8,18;107:6,9,19,
22;108:4,10,18;
109:8,13,24;110:18;
111:3,23;112:2,16;
113:2;114:5,7,9;
115:6,9,23;128:11;
134:16;142:21
**exhibits (2)**
39:1;113:6
**expanded (1)**
29:7,8
**expect (6)**
83:18;85:19;
138:15;146:8;148:3,
12
**expected (1)**
148:14
**expended (2)**
50:1;122:20
**expense (170)**
11:18,19;12:2,20;
16:12;17:21;23:10,
11,21;24:2,6,16;25:3,
6;32:21,23;33:11,12,
17,23;42:14,17;
43:10,18,20,22;44:3;
46:16,19;50:16;51:2,
4,9;52:22;53:18,24,
24;54:6,11,16,23,25;
55:4,9,18;56:8,11;
57:1,14,15,20;59:3,
20;60:9,23;65:9,23;
66:16,23;67:11,20;
68:20,21;70:22;
75:23;80:12;81:6,25;
82:8,19,21,25;83:8,
12,14,23,24;84:3,5,
13,17,18,20,22,25;
85:4,10;86:4,7;88:12,
15,18,24;89:3,7,19,
20;90:5,17,21;91:2,5,
7,16;92:10;93:17;
94:17,21;95:6,11,13;
96:5,21,23;97:8,13,
21;98:4,19,20,24;
99:3,5,8,17;100:4,12,
21,24;101:7;103:21;
106:11;108:5;
116:18,20;117:7;
122:25;124:2,4,8;
130:6,17;133:20;
134:2,9,19;135:4;
136:6,8,9,12;138:6;
139:20;140:1,3;
142:11,22;143:8,15,
19,24;144:1,7;
145:24;146:6,9;
147:11;148:5,6;
150:3
**expensed (13)**
49:17;50:5,9,12,

24;62:19;122:13;
135:7;136:2,17,21,
24;139:12
**expenses (95)**
11:15;12:12,15;
23:11;24:4,17;25:1,2,
4,10;42:9,11;45:13,
16,22;48:19;49:4,7;
51:5,10;52:6,19;53:7,
12,15;54:17,18,19,
23;55:25;56:19,22;
57:25;58:2,5;60:20;
61:24,24;66:10,11;
67:21;68:8;74:7,21;
79:20;80:4,6,14,17,
18,21,22;81:2,5,5,10,
22;85:6;86:5,8;
88:10,14,19;89:5,6;
90:2;93:25;95:12;
97:24;103:19;116:6,
14,23;117:2;118:5,
13;125:2,9,24;126:2,
7,16;130:24;131:5,8;
132:12;133:5;
134:21;137:11;
139:16;140:9;141:9,
10,23;143:7
**expensing (1)**
53:23
**experience (14)**
18:10,15;42:5;
99:19;101:14;
140:24;145:8;146:5,
8,11,15,23;147:4,9
**experienced (1)**
147:10
**experiencing (1)**
44:15
**expert (13)**
6:3;14:24;15:2,5;
17:13;18:11;19:4;
23:8;34:14;45:25;
49:1;50:18;81:13
**explain (2)**
108:1,2
**explained (1)**
25:14
**explaining (1)**
144:2
**explicitly (3)**
62:17;98:16;
127:20
**Express (5)**
92:13,19,23;93:10;
145:4
**expressed (2)**
23:17;144:17
**extended (1)**
31:7
**extent (3)**
44:8;65:12;141:25
**external (3)**
10:18,18;131:2

**extremely (1)**
101:16

## F

**facilities (5)**
47:4,11;53:3;
85:19;146:18
**fact (19)**
24:4;33:19;59:18;
60:14;75:8,25;80:10;
94:21;100:21;108:7;
109:23;115:2;
131:23;136:6,16,20;
138:20;139:16;
144:13
**factors (1)**
75:17
**facts (1)**
134:18
**factual (2)**
35:5,12
**fair (1)**
10:12
**falls (1)**
108:25
**family (3)**
57:7;132:21;
133:14
**far (3)**
83:25;122:7;
125:21
**father (1)**
57:7
**federal (10)**
17:14;65:7,18;
66:25;117:12;118:6;
124:3;125:10,25;
126:8
**feel (2)**
35:7;145:3
**felt (4)**
12:3;18:10;47:18;
49:1
**few (1)**
142:14
**fifth (3)**
72:3;110:2,8
**figure (4)**
48:7,22;92:9;
106:21
**file (4)**
24:8,24;25:8;44:10
**filed (1)**
47:17
**filings (2)**
20:24;42:5
**fills (1)**
83:8
**financial (31)**
8:19,22,23;9:5;
10:13,19,20;11:12;
12:10;13:20;30:20;

47:13;51:20;52:4;
98:15;101:3,12;
105:16,23;106:2;
109:9,18;126:17;
130:23;131:1;135:8;
139:13;145:22;
148:21;149:9;150:7
**find (18)**
23:10;24:16;29:24;
32:11;40:25;41:2;
42:4;54:2;59:15;
70:21;76:9;77:6;
85:8,14;113:2,3,5;
135:3
**findings (3)**
17:20;24:9;44:12
**fired (2)**
53:20;86:16
**firm (7)**
4:17,21,23;5:1;
8:24;102:1;145:12
**firms (3)**
8:21;9:1;124:23
**first (13)**
4:4;5:3;10:3;
17:18;63:22;71:24;
77:8,9;106:10,12,17;
107:19;108:18
**fiscal (4)**
109:10;110:19;
112:5,9
**five (21)**
6:23;25:3;28:14;
45:2,4;46:23;57:17;
58:16,19,24;70:12;
71:1,4,20,23;72:8,10;
109:14,15,17;114:11
**flag (2)**
12:19;145:21
**flavor (1)**
48:18
**flip (1)**
29:22
**Florida (3)**
5:5,10;10:4
**flows (1)**
106:14
**fly (1)**
91:9
**focus (1)**
45:12
**focused (2)**
24:9;44:12
**Folks (1)**
7:18
**followed (5)**
11:19;15:15;20:25;
53:22,23
**following (3)**
20:24;35:5,11
**follows (1)**
4:6
**followup (1)**

32:11
**food (2)**
12:16;96:15
**footnote (4)**
29:19;39:24,24;
40:20
**footnotes (4)**
27:10,15;39:6,8
**forensic (5)**
4:19;10:1;13:12,
13;140:14
**form (12)**
9:18;11:19,20;
35:25;41:19;55:11;
69:6;73:25;84:19;
144:17,19;145:10
**formal (11)**
113:16,17,24;
119:13,15;121:6,7;
126:10;129:22;
138:21;142:6
**formation (3)**
20:17;41:16;140:8
**formed (2)**
8:10,17;13:8;29:12
**forming (4)**
23:16;31:14,20;
115:21
**forms (2)**
143:9,16
**formulate (1)**
23:19
**formulated (1)**
42:2
**forth (1)**
110:25
**forward (1)**
52:3
**forwarded (2)**
113:10,11
**found (9)**
16:20,25;44:20;
59:16;67:17;95:11;
100:23;134:4;135:4
**four (33)**
17:20;23:20,23,24;
25:13;27:4,16,20,24;
28:4;35:23;38:25;
39:4;42:8;45:12,15;
49:3;57:18;58:14,18;
59:19;76:12;77:7,8,
24;78:7;79:13,16;
84:12;100:7,8;134:2;
137:11
**fourth (3)**
72:2;110:1,8
**fraction (3)**
144:14,25;145:1
**framework (1)**
23:23
**fraud (20)**
13:2,3,6,8,9,12,13,
19,20,22;14:11,18;

32:11
**food (2)**
15:19;16:4,9,18,19,
22,25;17:6
**front (3)**
84:16;86:5;115:8
**full (8)**
4:9;70:6;103:21;
127:15;133:8,11;
137:13,16
**fully (4)**
76:13;77:10,11;
144:15
**funding (1)**
146:19
**further (3)**
56:4;127:17;
139:11
**future (1)**
81:15

## G

**gain (1)**
42:12
**gained (2)**
43:15;51:18
**gaining (1)**
43:8
**Gary (4)**
35:7;36:6;115:7;
149:15
**gather (2)**
23:15;134:17
**gathered (1)**
139:8
**gathering (1)**
121:20
**gave (10)**
31:11,16;64:15;
77:2,6;82:17;104:21;
117:22;145:4,19
**Gearhiser (3)**
6:4;21:21;23:9
**Gearhiser's (1)**
145:12
**general (4)**
13:16,17;72:12;
76:6
**generalized (1)**
45:19
**generally (7)**
10:16;11:5;66:5;
73:21;76:3;87:16;
116:2
**generate (1)**
59:20
**generated (1)**
119:19
**gentleman (1)**
141:24
**Georgia (2)**
53:3;133:3
**getaways (1)**
126:9

**gets (2)**
92:3;124:12
**GHCA (3)**
29:9;75:9;131:15
**gift (23)**
62:25;63:3,5,9;
64:21,24;65:4,10,12,
24;66:1,9,23;67:15;
69:11,15,15;78:8;
108:24;124:14,15,20,
22
**Gifting (1)**
104:3
**gifts (19)**
63:20,24;64:11,16,
22;65:6,18,21;66:15,
19;72:25;74:22;
75:15,25;76:13;
77:11;104:5,9;109:1
**given (13)**
11:20;22:19;42:21;
63:20;66:19;69:3,15;
74:12,12;75:10;
77:23;104:10;108:23
**giving (7)**
31:5;63:14,21,24;
64:1;74:22;76:4
**Global (2)**
9:3;10:15
**goes (3)**
45:4;59:21;87:25
**good (4)**
87:20;121:4;146:4,
5
**governance (1)**
15:22
**grammatical (1)**
42:24
**Great (2)**
142:16;144:2
**group (6)**
13:8;47:13;63:17;
98:15;100:1;148:21
**groups (2)**
89:9;150:14
**guess (1)**
113:19
**guessing (1)**
102:1
**guide (9)**
25:2,11,13;67:22,
23;68:19,25;82:25;
143:16
**guidelines (17)**
15:21;47:1,6;
65:13,18;69:10;
115:24;116:3;
117:12;118:19;
139:1;143:20,25;
148:4,5,7,17
**guides (4)**
68:6;82:24;89:23,
24

**H**

**habits (1)**
96:25
**half (2)**
10:9;26:18;36:14;
57:5;60:14
**halls (1)**
89:12
**hand (6)**
5:25;14:22;33:11;
73:18;75:12;112:1
**handed (4)**
62:11;77:17;82:1;
114:12
**handle (2)**
91:3;92:14
**handled (2)**
51:9;117:5
**handling (2)**
11:14;102:21
**happen (3)**
69:14;82:6;125:17
**happened (5)**
36:20;56:10,17;
82:14;125:15
**happens (1)**
83:11
**Health (45)**
6:5;14:2,7,7;16:4,
18;17:25;18:8,22;
22:23;24:16;47:7;
48:15;51:3,10,15;
54:4;55:3,7;62:23;
63:1,6,10;64:7,16,17;
65:21;66:20;67:2,22;
73:19;78:2,23;79:5;
86:18;93:5,15;94:9;
114:21;129:1;
130:10;131:10;
133:19;147:25;
149:23
**healthcare (5)**
118:2;121:12,20;
130:2;146:18
**heavily (1)**
43:21
**hectic (1)**
92:7
**held (1)**
111:9
**help (4)**
6:12;13:17;53:6;
77:6
**helped (1)**
23:23
**Henry (36)**
28:8,9;30:18;
32:20;33:24;34:25;
35:8;36:6,25;37:2,8;
38:2;40:24;41:4;
55:11;58:15;61:6,18;

69:6;73:25;102:8;
105:1;112:23,24;
113:4,8,10;115:7;
119:5;120:10;
129:15;132:4;
142:16;144:19;
149:15;151:9
**here's (1)**
121:25
**hide (1)**
140:25
**high (1)**
57:5
**higher (4)**
55:15;75:12;85:1;
146:9
**himself (3)**
82:11;83:12;86:16
**hired (2)**
53:21;86:15
**Hixson (1)**
4:13
**hold (1)**
70:2
**holiday (1)**
78:16
**home (1)**
147:18
**homes (1)**
146:17
**Hometown (1)**
7:18
**hotel (4)**
89:12,17;90:19;
94:5
**hour (1)**
19:17
**hourly (1)**
19:16
**hours (5)**
19:8,10;36:15;
61:4;92:8
**human (2)**
10:23,25
**hundred (2)**
66:5,6
**hypothetical (1)**
67:1
**hypothetically (2)**
60:12;87:22

**I**

**ID (2)**
85:23,24
**idea (2)**
78:7;117:19
**identification (13)**
5:23;14:20;26:6;
27:1;28:12,23;30:3;
32:5;34:7;61:10;
95:22;104:14;111:24
**identified (10)**

21:21,23;22:25;
25:7;32:24;33:8;
38:25;39:15;71:1;
134:3
**identify (7)**
13:17;17:24;18:6;
30:7;35:22;55:18;
112:3
**identifying (1)**
18:20
**imagine (7)**
20:8;40:10;89:10,
13;92:6;98:12;140:3
**important (1)**
49:13
**imposed (1)**
104:4
**impression (1)**
61:20
**improper (3)**
49:8,10;60:17
**inaccurate (1)**
72:18
**Inc (11)**
6:5;7:19;8:5,20;
9:3,4;10:14,15,15;
14:3;22:24
**incentive (2)**
72:21,23
**incentives (9)**
106:12,14,16,22;
107:2,6,11;108:4;
135:15
**incident (4)**
149:7;150:5,13,21
**include (2)**
109:16;143:7
**included (11)**
10:17,23;30:9;
43:7;54:16,25;76:18;
103:22;128:7,18;
143:14
**includes (1)**
13:10
**including (3)**
81:21;144:3;148:5
**income (3)**
69:10;117:12;
118:6
**incorporated (1)**
21:4
**incremental (2)**
125:13;133:13
**Inc's (1)**
17:25
**incur (1)**
124:8
**incurred (5)**
68:2,9,22;98:21;
130:25
**independently (2)**
30:24;128:25
**indicate (3)**

13:1,24;98:2
**indicated (2)**
31:1;144:6
**indication (2)**
15:4;140:11
**indications (1)**
16:25
**indirect (1)**
84:19
**Indirectly (2)**
84:15;132:4
**individual (4)**
16:24;55:16;106:4;
142:23
**individually (2)**
39:5;89:18
**individuals (5)**
32:12,14;96:25;
105:22;120:17
**Industries (2)**
8:20;10:14
**infer (1)**
110:22
**information (37)**
7:2;12:2;13:25;
17:22;23:16;28:3;
29:11;30:12,14;31:5,
8,11,16,21;32:12;
41:14;42:10,12;
44:11,23;45:13;
47:18;49:5;54:2;
76:22;77:6,23;96:2;
123:15;127:17;
130:18;134:18;
137:20;139:6;
144:17;145:4,18
**informed (1)**
43:24
**initial (2)**
34:14;72:20
**initially (2)**
5:14;15:16
**initiate (1)**
13:18
**inquire (3)**
59:1;78:19;102:17
**inquired (1)**
60:4
**inquiry (7)**
18:6,9;62:25;63:8;
73:6,10,13
**installment (2)**
19:24;20:3
**instance (1)**
129:9
**instances (2)**
15:19;150:13
**instituted (2)**
115:3,5
**institutions (1)**
10:19
**instructions (1)**
64:14

Mark A. Waldrop v.
Community Health Systems, Inc.

Richard Andrew Powell
June 22, 2017

**intangibles (1)**
126:12
**integration (1)**
62:7
**intended (2)**
123:8;138:7
**intent (5)**
16:23;17:1;48:22;
81:4;121:3
**intention (2)**
37:19;110:20
**intentionally (2)**
17:2;42:2
**internal (28)**
10:22;15:16,18;
24:5,11,24;42:13;
44:3,3,4,9,14;55:17,
20,22;56:3;65:13;
104:4;115:23;116:5;
118:19;126:19,23;
131:4,5;139:1;
143:20;145:9
**internationally (1)**
146:7
**interpersonal (1)**
91:1
**interrogatories (1)**
46:14
**interview (25)**
16:13;25:18;26:12;
27:6,10,14,19;28:17;
29:3,16,20,24;35:20;
36:3,4;38:23;39:3,9,
19,25;43:3,14;76:7,
23;78:22
**interviewed (1)**
6:11
**into (10)**
11:22;12:4;67:14;
83:21;90:25;103:2;
115:23;116:18;
135:13;143:2
**invalid (10)**
17:21,21;23:21;
42:9;45:12,16;49:4;
134:9,19;135:4
**invalidated (1)**
23:22
**inventory (6)**
73:17;74:15,18;
103:11,20;104:3
**inverse (2)**
53:14;86:11
**inversion (1)**
53:16
**investigate (1)**
57:24
**investigation (9)**
15:16,18;16:7;
75:13;102:13;123:6,
7;140:8;141:13
**investigations (2)**
13:19;56:4

**investigators (1)**
16:23
**involved (7)**
7:13;13:19,22;
59:7;62:7;101:15;
116:12
**IRS (13)**
47:1,6;65:10,24;
66:9;143:2,11,25;
147:5,7,12;148:7,9
**isolated (3)**
149:6;150:5,21
**issue (5)**
25:12;60:6;64:23;
85:25;92:24
**issues (4)**
24:10;25:10,14;
44:13
**item (14)**
22:22;64:22;67:10;
70:19,22;72:21;
83:12;96:8,11;97:19;
98:25;111:7;114:11;
140:4
**items (17)**
17:21;23:23;53:23;
54:25;90:23;94:17;
95:7;97:3,21;100:7;
103:21;106:11;
108:5;129:7,8;
130:17;146:10

**J**

**James (1)**
8:3
**January (2)**
57:20;62:14
**job (6)**
62:6,8;69:21;
140:14;144:2;146:9
**Joe (2)**
7:8;21:9
**joined (1)**
63:22
**Julie (1)**
7:23
**July (4)**
24:12;44:5;55:24;
108:15
**jump (3)**
57:7,12;60:13
**June (29)**
7:7;20:8;27:11,12,
21,21;30:9;33:13,25;
35:21,21;36:5,5,7,9;
38:13,17,18;39:6,6,9,
20,25;40:14;57:21;
62:14;75:9;108:15;
115:8
**Junior (1)**
8:3
**justified (3)**

100:25;133:12,20
**justify (1)**
101:9

**K**

**Katherine (1)**
7:9
**kept (1)**
53:12
**kinds (1)**
141:22
**knew (18)**
16:3;37:23;54:4;
81:24;98:3,5,8,13,17,
22,24;99:2,9,17;
100:1;101:25;
143:11,23
**knowing (1)**
96:25
**knowledge (11)**
42:5;99:21,25;
123:19;128:24;
130:11;137:20;
148:4,12;149:21,25
**knowledgeable (1)**
101:2
**known (11)**
8:14,20;13:7;
17:10;98:9,13,14;
99:3;142:4;144:4;
147:22

**L**

**labeled (3)**
22:22;32:25;45:2
**laid (1)**
82:12
**Lake (1)**
4:13
**large (2)**
55:8;89:10
**Las (2)**
91:9;93:18
**last (23)**
5:2;6:19,20;7:14;
8:3;22:21;23:4;29:2,
5,6;33:3,21;36:13;
39:24;40:2;42:6;
57:18;59:19;61:15;
77:10;110:2;132:19;
147:11
**lasting (1)**
126:10
**later (4)**
54:21;76:20;77:21;
94:16
**latter (1)**
26:18
**law (4)**
13:10;124:3,4;
125:11

**laws (4)**
65:7;66:25;117:12;
124:22
**lawyers (1)**
21:25
**layout (1)**
86:2
**leadership (7)**
62:10;76:21;77:21;
89:9;114:20;115:2,
15
**leads (1)**
121:2
**Leake (1)**
99:16
**learn (7)**
17:4;40:13;59:6;
102:12;123:6,8,18
**learned (2)**
60:7;130:24
**least (2)**
82:7;141:5
**leave (1)**
9:18
**led (1)**
56:3
**ledger (1)**
72:12
**Lee (1)**
7:9
**left (1)**
71:16
**legitimate (12)**
53:23,24;57:13;
84:3,17;86:6;90:1;
111:21;136:8,9;
139:19;141:10
**legitimately (1)**
86:5
**lending (1)**
10:19
**less (4)**
19:5;65:16;134:8;
148:9
**letter (4)**
94:10,11,15,16
**level (3)**
44:14;105:17;
137:5
**levels (1)**
55:15
**liaison (1)**
10:17
**licensed (7)**
5:3,6,7,9,12,14;
10:3
**licensors (1)**
10:21
**life (3)**
60:16;63:18;92:7
**light (1)**
127:18
**likelihood (2)**

88:23;89:1
**likely (2)**
89:2;134:20
**limit (6)**
65:10;87:15;91:7;
92:14,19;93:13
**limitation (5)**
65:17,20;66:9;
104:4,6
**limited (1)**
144:1
**limits (1)**
65:16
**line (14)**
42:19;43:5;44:1;
47:22;67:19;70:16;
76:12;105:6;115:13;
121:1;127:2;134:3,
16;147:11
**line-item (1)**
127:21
**lines (4)**
46:25;71:10;
110:12;126:6
**lining (1)**
25:4
**list (19)**
6:20;21:6;22:3,15;
28:17;30:18;41:14;
57:18;58:12;113:5;
119:2;120:8;129:12,
14;131:24;132:3,24;
149:11,14
**listed (11)**
6:24;17:21;21:15;
23:14;46:17;62:23;
73:14;99:14;107:18;
129:19;132:9
**listing (1)**
94:16
**lists (1)**
30:22
**literature (1)**
65:15
**litigation (2)**
4:18;10:1
**little (6)**
19:5,15;54:21;
93:8;127:23;134:8
**live (1)**
4:12
**LLC (6)**
4:22;7:19;8:10,18;
9:19,24
**logical (1)**
88:11
**long (6)**
4:25;36:13;127:23;
131:24;132:19;141:9
**long-term-care (1)**
147:25
**look (55)**
6:14;10:7;15:12;

30:5;17;32:18;33:14,
15;34:9;44:19;45:1;
52:5;59:13,14;61:12;
62:4;67:16;70:22,25;
71:15;72:8;77:5;
95:1,15,16,17;100:3;
103:2;104:24;106:8;
107:9,16,22;108:3;
109:24;111:6,6;
112:3;114:4,4;115:6,
23;121:1,23;128:3,9,
12;132:24;134:1;
140:14;141:3,8;
143:2,5;144:6
**looked (12)**
20:22;21:1;24:1,7,
15;41:25;141:17;
144:7,8,10;145:1,2
**Looking (12)**
22:21;23:18;34:23;
43:15;57:16;99:12;
100:19;106:22;
111:16;113:19;
148:25;150:18
**looks (1)**
112:4
**Lorraine (17)**
21:8;32:15;43:21;
48:10;51:19;52:5,10;
96:12;97:2,5,16;
99:15;100:15;104:9;
105:13,24;131:10
**lot (8)**
43:13;73:23;74:2;
80:11;88:17;107:17;
144:3;146:7
**Lucy (1)**
99:15
**lunch (2)**
102:7,8
**Lybrand (1)**
10:5

**M**

**machine (1)**
75:2
**maintained (1)**
53:12
**major (1)**
72:23
**majority (4)**
34:2;118:24;
134:20;143:13
**making (3)**
75:25;121:16;
147:11
**management (13)**
4:19;10:1,24;17:2,
25;18:8,14,22;47:9,9,
12;53:8;145:22
**managing (1)**
127:14

**manual (1)**
143:6
**many (1)**
19:8;59:2,6;62:8;
74:4;75:18;76:3;
85:4;89:5;92:8;
94:21;126:9
**marital (1)**
7:24
**mark (105)**
5:20;6:5;21:8;
22:6;25:19,21,22,24;
26:13;27:7,10;28:6;
29:7;31:16;32:11;
34:13,13,21;35:4,11,
15,20;36:1,3,5,12;
38:12;39:9,20,25;
43:4;45:23;46:20;
51:6;52:1,5,12;57:1;
60:5,18;75:25;76:7,
23;77:18,23;80:6,16,
22;81:25;82:8,10,19,
21;83:3,23,25;84:2,
13;85:6,9;86:11,23;
89:6;90:2,4,17,19,19,
19,22;91:8,9,13,16;
92:3;95:14;96:12;
97:1;98:18,24;99:6;
104:10;105:15,18,19;
106:1;109:5;110:2;
112:5,8;115:10;
120:21;122:19;
130:20;136:18,22;
138:7;139:18;140:9;
142:5,9;143:17;
145:14;149:15;
150:25
**marked (69)**
5:22,25;6:7;13:23;
14:19,22;15:4;16:2,
17;20:12;21:5;23:14;
25:17;26:5,8,25;27:3,
9;28:11,14,22,25;
29:13,18;30:2,5;
31:21;32:4,7;34:6,
10;35:19,23;36:7;
38:19;39:23;41:12,
13,21;42:18;46:17,
23;47:21;49:16;
51:14;52:17;58:13,
24,25;61:9,13,16,22;
63:12;66:8;67:17;
95:2,21,25;97:8;
103:4;104:13,17;
108:9;111:23;112:1,
15;115:22;142:20
**Mark's (1)**
89:8
**married (2)**
57:6;124:12
**master's (1)**
147:25
**material (1)**

128:10
**materials (8)**
114:15,17;119:18;
121:10;129:25;
138:22;141:19;142:7
**matter (2)**
18:25;19:5,20;
37:21;57:14;75:13;
78:20;86:8;108:7;
127:10;139:22;
144:15
**matters (2)**
42:21;118:21
**MAW (2)**
40:4;128:12
**maximum (1)**
69:3
**May (22)**
7:6;19:1,2,13,14;
20:9;25:22;26:18;
27:11;29:23;35:21;
38:13,14;47:6;55:11;
57:4;69:6;76:23;
79:8;137:1;140:9;
144:19
**maybe (3)**
86:20;89:5;100:8
**meals (1)**
90:19
**mean (11)**
6:10;12:8;16:20;
40:16;42:22;63:14;
117:1,10;120:24;
140:13,17
**means (1)**
120:22
**meant (3)**
73:11;121:17;
135:22
**measured (1)**
48:19
**Medicaid (11)**
47:1,6;146:13,19,
25;147:6;148:4,8,10,
11,17
**Medicare (14)**
47:1,6;146:12,18,
24;147:5;148:4,8,9,
11,16
**Medicare/Medicaid (1)**
148:6
**medium (2)**
4:19;10:2
**meet (5)**
25:20,22,24;26:2;
41:7
**meeting (30)**
36:13,16,22;89:11,
15;91:4,10;94:4;
96:12,15,19,22;98:7;
101:25;111:14,16,19;
113:20,22,24;114:1,
16,19;119:19;122:4;

139:8;142:6;149:11,
19;150:25
**meetings (25)**
30:19,25;90:20;
107:16,17,23;111:2,
7,8,12;113:16,17;
114:8;119:16;121:8;
129:22;132:1,18;
138:9,13,21;139:7,8;
141:19;142:7
**Meler-Mick (1)**
8:4
**member (1)**
130:15
**members (6)**
76:19,19;77:16;
79:3,4;133:14
**memo (1)**
32:18
**mental (1)**
61:20
**mentioned (4)**
6:4;23:13;104:1;
114:7
**messenger (1)**
34:19
**met (3)**
36:12;139:9;
143:24
**method (4)**
57:14;86:8;139:22;
141:11
**methodology (3)**
41:23,23;43:6
**Michelin (1)**
10:21
**Mick (1)**
8:3
**middle (2)**
33:18;79:18
**might (3)**
22:8;58:15;141:21
**million (6)**
48:5,8,8;93:7,8;
127:13
**Mimms (14)**
14:25;15:6;18:11;
21:9;23:8;44:18;
45:8;50:18;59:15,17;
134:3;144:7,15;
145:1
**Mimms' (14)**
15:2,25;17:19;
23:20;44:2;46:2;
49:21;57:3,16;59:13;
71:8,12;102:25;
134:10
**mind (5)**
16:24;86:11;101:5;
124:10;146:16
**minute (1)**
112:14
**minutes (1)**

142:14
**misappropriations (1)**
13:18
**miscellaneous (1)**
109:1
**moment (1)**
24:20
**monetary (1)**
104:5
**month (7)**
7:12;19:13,14;
20:8,9;92:8;106:14
**months (1)**
19:5
**more (15)**
8:23;18:3;25:24;
54:2;81:6;86:16;
89:3;90:2;99:25;
100:8;101:4,13;
117:3;123:9;148:9
**Moss (1)**
4:13
**most (6)**
21:22;43:24;52:21;
59:25;60:7;101:2
**motel (1)**
53:15
**move (1)**
116:18
**Mrs (1)**
51:4
**much (13)**
13:21;19:14,25;
20:2,5;48:18;69:17,
24;72:6;127:24;
138:25;139:7;141:19
**multiple (2)**
53:2;127:12
**must (3)**
68:21;103:15;
118:20
**muster (1)**
143:19
**myself (1)**
26:24

**N**

**name (25)**
4:9,21;6:10;7:24;
35:4;50:25;52:23;
54:12;55:9;56:1;
70:17;80:13,15,23;
82:20;84:7;85:10;
88:20;90:22;91:17;
94:23;136:7,13;
139:17;141:2
**named (1)**
22:10
**names (12)**
24:2;30:19;112:19,
20,23;113:5,7;119:5;
120:8,16,16;121:3

**name's (1)**
122:4
**Nancy (1)**
7:9
**nature (6)**
9:23,25;72:12;
106:11;108:22;
127:21
**necessarily (1)**
55:13
**necessary (11)**
16:11;65:9,23;
111:22;115:24;
116:3,4;134:5;
143:23;148:15;151:5
**need (4)**
71:4;87:21;92:3;
94:3;95:16
**needed (1)**
49:2
**needs (1)**
88:11
**new (18)**
102:6;111:1;
112:13,18;113:13,16;
114:10;115:14;
116:15,23;117:17,21;
118:5;122:12,12,21;
123:19;125:1
**next (5)**
7:23;23:25;24:1,
23;135:6
**nice (1)**
124:13
**nine (10)**
22:25;23:2,5;
24:18;34:10,24;
38:19;115:6,9;134:4
**nobody (1)**
100:1
**nondeductible (1)**
133:15
**non-deductible (2)**
116:18;124:3
**non-nursing (1)**
47:11
**non-profit (9)**
47:9;64:8,12,17;
76:2;78:2,23;79:5,13
**nor (1)**
143:8
**note (7)**
56:24;70:11;103:5;
132:15,18,21;133:1
**noted (4)**
52:16;84:25;
103:14;113:12
**notes (12)**
36:16,18,22;37:1,6,
17,19,24;38:4;
150:25;151:3,6
**notice (1)**
122:3

**noting (1)**
25:2
**notwithstanding (2)**
136:5;138:20
**November (1)**
30:21
**number (31)**
25:5,6,6;33:21;
34:1,10;40:4;48:3,9,
12;56:24;57:23;
59:19;60:5;77:14;
78:5,6;79:18;96:8;
104:21,24;105:2;
113:12;115:13;
128:13,15;131:18;
135:6;142:5;144:11;
145:3
**numbered (1)**
34:24
**numbers (6)**
34:3;46:2,7,11;
58:4;95:8
**numerous (4)**
15:19;63:20;76:14;
77:11
**nursing (4)**
47:3,10;146:17;
147:18

## O

**Object (4)**
55:11;69:6;73:25;
144:19
**obtain (1)**
68:20
**occasion (8)**
56:7,12;82:7,7,14;
121:24;124:7;133:18
**occasions (4)**
63:20;72:1;73:7;
78:21
**occur (4)**
122:2;140:7,13,23
**occurred (2)**
98:10;119:24
**occurrences (1)**
75:19
**occurs (1)**
89:15
**off (4)**
48:3,5,7;150:2
**offer (3)**
7:20;16:16;139:15
**offered (4)**
8:8;17:5;56:25;
145:2
**offering (2)**
34:16;70:5
**offhand (1)**
63:7
**office (14)**
36:21;40:22;53:2,

17;54:3;57:10;73:19;
74:9;85:18;86:2,13;
88:6,7;133:2
**officer (16)**
8:19,22,23;9:5;
10:14;11:12;12:10;
53:2;64:15;75:15;
79:24;101:2,12;
105:22,24;145:22
**offsite (1)**
126:11
**Once (3)**
11:21;20:19;52:7
**one (124)**
6:1,7;7:5;8:21,24;
12:25;13:24;14:12;
15:4;16:3,17,20,20,
22;17:18,22;20:12;
21:6;22:23;23:3,4,8,
15,17,21;25:17,24;
27:9;29:14,18;31:15,
21;33:3,10;34:3;
35:20;36:7,9;38:18,
18;39:23;41:14,22;
42:19;43:16,17;44:1;
45:2,12;46:18,24;
47:22;49:17;51:14;
52:17;55:4,21,23;
60:11;61:23;62:8;
63:13;66:8;67:17,23;
71:5,7,24;72:1,2,3,
10,15,22;76:11;78:5;
79:12;82:7,7,14;
85:16;86:20,22;87:5,
11,15;90:7;91:13;
93:13;94:17,19;95:2;
96:8,14,18,21;99:2;
101:12;103:5,13;
104:23;106:12;
107:5;108:4,10;
109:25;110:6;
112:16;115:23;
116:16;117:5;
121:18;123:8;
128:15;132:15;
134:17;137:9;
139:17;142:21;
143:24;148:19,20;
150:16,19
**ones (4)**
21:15,19;24:19;
110:8
**ongoing (2)**
63:18,23
**only (22)**
12:14;29:16;35:24;
38:13;39:3;48:22,25;
55:7,17;64:21;71:10;
81:17;85:16;88:7;
93:12;109:16;129:7;
136:17;144:10,13,25;
150:9
**open (1)**

88:2
**openly (6)**
135:7,23;136:2,24;
137:25;139:12
**operating (2)**
42:11;53:2
**operations (1)**
10:22
**opine (1)**
139:11;144:24
**opined (4)**
66:10;110:24;
124:25;142:21
**opinion (32)**
16:16;17:5;41:20;
49:1;61:23;62:3,21;
65:20;66:7;70:5,16;
75:16,22;100:24;
101:5,16;103:18;
115:18;118:4;125:9,
22;126:14;127:22;
133:11;134:17;
136:5,23;138:2,18;
139:15;143:1;145:7
**opinions (14)**
20:17;23:16;29:13;
31:14,20;37:10;
41:16,22;115:21;
140:8;144:17;145:3,
4,13
**opportunity (2)**
58:11,22
**opposed (3)**
10:10;21:19;
118:22
**oranges (1)**
108:12
**order (8)**
23:19;34:19;89:18;
116:5;117:6,8;
132:12;143:18
**organization (2)**
127:5;147:22
**organizations (2)**
146:12,24
**originally (1)**
86:15
**others (11)**
7:9,19;8:5;21:19;
24:17;42:12,21;
64:16;85:7;87:7;89:5
**otherwise (3)**
68:15,23;83:20
**out (39)**
11:10;32:11;53:7,
9;54:1;55:14;62:11,
17;63:20,24;64:21;
66:15;69:22;74:22;
75:10;76:4;77:17;
81:22;82:12;83:1,6,
8;84:4;86:7,15;91:2;
92:2,9,16;93:20;
99:25;106:21;

108:23;113:9;
114:12;124:14;
137:2;139:20;150:14
**out-of-pocket (1)**
69:19
**outside (1)**
52:2;60:11;102:23
**over (7)**
10:22;12:6;19:15;
45:4;53:2;58:21;
59:22;70:4;71:5;
85:19;89:9;93:7,8;
114:6;128:12;
131:24;133:25
**overall (7)**
47:23;72:19;100:1,
20;127:5,10,18
**overhead (1)**
47:10
**oversight (1)**
69:20
**own (22)**
11:7;12:12,15;
18:22;24:25;50:25;
53:14,17,18;54:17,
17,17,22;56:1,9;
57:10;69:22;83:19;
85:22;92:2;98:8;
137:19
**owner (2)**
9:15;12:15

## P

**pace (1)**
92:7
**page (111)**
6:19;12:25;15:11,
13;17:18;22:21;
24:19;29:2,5,6,17,18,
22;32:18,24;33:1,18,
22;39:22,23;40:2,3;
41:21;42:18;44:1;
45:1,4;46:23;47:21;
49:16;52:16;59:14,
22,22;61:15,22;
63:12;66:8;67:16;
70:11,15;71:1;76:11;
77:8,14;78:5,5,6;
79:12,16,17,19;
84:12;95:17;96:8;
100:14;103:4;
104:23;105:6;
106:15,18;107:5,9,
19,22;108:4,9,12,18;
109:24;110:1,2,3,6,
14,18;111:3;112:15;
114:9,24;115:13;
119:1;120:1,4,5;
122:5,16;124:25;
125:7,23;126:6;
127:1;128:2,3,12,13;
129:19;131:16,20,24;

133:24,25;134:16,16;
135:2,6;142:20;
148:21,25;149:2,5
**pages (13)**
45:3;51:13;106:10,
17;109:8,14,15,17;
110:4,8;129:10;
131:23;132:9
**paid (33)**
19:22,23,25;20:2;
55:5;56:8;57:15;
58:2;60:19;68:2,7,8,
21;69:22,23;80:15;
81:22;82:22;83:16,
23;86:9;90:23;92:1,
9;96:23;98:21;99:10,
22;102:14;104:10;
141:10;150:1,2
**paper (2)**
75:2,4
**papers (2)**
37:6,20
**paragraph (7)**
15:12,12;17:18;
25:12;42:19;43:5;
68:17
**paragraphs (1)**
34:25
**Parkes (1)**
7:1
**Parkes' (1)**
7:6
**part (14)**
15:12;24:7;33:25;
57:4;58:5;62:6,12,
19;63:16,17,23;
66:14;140:5;145:14
**participants (1)**
139:7
**participate (1)**
146:12
**participated (2)**
119:3;146:24
**particular (4)**
51:22;72:11;122:4;
127:21
**parties (2)**
98:9;117:4
**party (4)**
43:24;57:11;74:13;
78:17
**pass (1)**
143:19
**passed (1)**
28:9
**passing (1)**
115:10
**past (1)**
92:23
**pay (7)**
56:14;67:11;82:25;
83:5,7,12;93:19
**payable (4)**

11:23,23,25,25
**payables (1)**
91:1
**paying (3)**
42:11;90:7;102:18
**payment (8)**
12:13,23;19:24;
57:14;60:23;139:23,
23;141:11
**payments (1)**
20:3
**pays (1)**
136:9
**PC (19)**
108:24,24;114:10;
119:1;120:6;122:13;
123:19;125:1,10,24,
25;137:7,8;138:3,4,
18;139:8,24;141:1
**people (25)**
13:7,11;30:25;
43:19;57:6;62:7,10,
10;89:16;91:4;96:19,
22;112:19;119:2,8;
120:9,13;125:21;
129:12,19;140:15;
142:5;149:11,19;
150:10
**per (1)**
72:12
**perceived (1)**
89:23
**percent (9)**
45:16,17;47:24,24;
83:1;134:9,13,19;
145:23
**percentage (6)**
47:22;49:10;127:4,
11;132:7,11
**percentages (4)**
48:3,24;49:9;127:6
**perceptions (1)**
43:20
**performed (3)**
24:6;131:25;133:2
**performing (2)**
132:8,25
**perhaps (1)**
132:4
**period (8)**
24:12;44:5,16;
55:23;59:7;60:6;
72:7;75:11
**person (13)**
12:14;25:20,23;
26:2;36:12;38:14;
41:8;60:25,25;86:12;
136:17;139:17;
140:17
**personal (6)**
26:24;60:16;89:19,
20;118:1;137:19
**personally (2)**

104:11;136:12
**persons (4)**
6:11;30:19;106:1;
130:1
**petty (1)**
102:21
**phone (1)**
86:1
**photocopies (1)**
121:16
**physically (1)**
77:16
**picture (2)**
127:10,18
**pie (4)**
53:25;84:4;86:7;
139:20
**piece (6)**
63:21;66:2;69:3;
78:16;136:6,13
**pieces (3)**
74:4,11;103:11
**place (3)**
79:13;113:20;
116:10
**placed (1)**
24:25
**places (1)**
111:1
**plaintiffs (1)**
8:5
**Plaintiff's (1)**
14:1
**plan (12)**
47:23;105:7;
107:10;109:25;
110:1,3,7,18;111:6;
114:21;127:4;147:12
**plane (1)**
121:25
**planning (1)**
118:2
**plans (2)**
147:5,7
**played (1)**
102:4
**please (12)**
5:21;6:14;14:14;
30:5;31:25;34:9;
61:12;67:16;90:11;
95:1;123:22;128:3
**plural (1)**
42:25
**pm (5)**
102:10,10;142:18,
18;151:11
**pocket (6)**
69:22;81:22;83:1;
91:2;92:2;93:21
**point (9)**
16:21;20:6;54:22;
72:14;83:3;91:25;
99:4;139:24;148:19

**policies (1)**
15:22
**policy (12)**
11:18,19;12:3;
54:4;63:1,3,4,5,9;
64:11;93:23;143:6
**pop (1)**
131:8
**population (1)**
81:21
**portion (2)**
93:22;125:19
**posed (1)**
42:2
**position (6)**
34:21;74:20;86:16;
101:12;135:22;137:2
**possession (1)**
37:11
**possible (9)**
124:2;141:15,21;
142:1,2,3,8,9,13
**possibly (4)**
18:12;75:17;87:7,8
**post (1)**
57:10
**potential (3)**
17:24;18:7,21
**POWELL (24)**
4:3,11,22;8:10,14,
17,18;9:19,24;27:16,
20;28:25;29:12;
33:25;37:16,20;38:1,
4,8;61:12,16;68:20;
102:12;142:20
**Powell's (1)**
150:25
**practice (7)**
9:9,13,23,25;
10:11;51:3;85:9
**practices (1)**
100:25
**pre-approved (3)**
54:19;90:1;139:21
**predated (2)**
78:22;79:4
**predecessor (1)**
92:17
**preparation (6)**
11:3;20:11;25:16;
33:20;41:15,24
**prepare (9)**
26:14,17;33:9;
43:6;88:12,14,18;
128:16,25
**prepared (16)**
16:2;26:20;28:18,
20;29:13;52:12;
88:24;89:3;90:21;
91:16;99:5;114:15;
121:10,13;129:25;
130:3
**preparers (1)**

10:19
**prepares (1)**
127:15
**preparing (3)**
25:17;31:19;
115:22
**presence (3)**
25:23;75:21;79:3
**present (5)**
76:3,14;77:11,17;
113:6
**presentation (2)**
79:2;82:16
**presented (6)**
52:10;61:25;66:12;
76:14,17;77:12;
109:11,14;125:3;
134:10
**president (1)**
96:16
**presidential (2)**
76:20;79:4
**presidents (1)**
53:5
**presume (1)**
103:17
**pretty (1)**
13:21
**previous (2)**
15:13;18:10
**previously (3)**
58:13;80:10;127:3
**price (1)**
75:3
**primarily (4)**
4:18;20:22;21:1;
43:3
**prior (3)**
26:18;33:12;34:4
**private (3)**
9:9,13;10:11
**privilege (1)**
28:8
**Probably (2)**
20:9;53:19
**problem (4)**
85:25;142:22,24;
144:22
**problems (2)**
44:14,15
**procedure (2)**
42:11;93:16
**procedures (2)**
31:8;42:7
**proceeding (1)**
17:14
**proceedings (1)**
5:17
**process (12)**
42:16,17;43:21;
46:24;47:7;51:14,17;
52:4;54:20;101:23;
137:21;142:22

**processed (2)**
84:5;95:12
**processes (2)**
43:9,25
**produce (2)**
41:1;151:1
**produced (2)**
24:5;37:10
**product (1)**
61:20
**production (3)**
22:24;37:12;
121:21
**profession (2)**
4:16,17
**professional (5)**
101:14;135:1;
146:11;147:1,21
**professor (1)**
147:14
**profit (1)**
64:8
**program (11)**
109:1;114:15,17,
21;115:3,16;119:18;
121:10;138:22;
141:19;142:7
**programs (9)**
113:16,17;119:15;
121:7;129:22;
138:22;142:7;
146:13,25
**prompted (1)**
15:16
**pronounce (1)**
7:24
**proper (5)**
47:20;53:22,22;
138:6;143:23
**properly (4)**
53:20;74:21;
103:22;118:9
**proprietor (1)**
4:17
**provide (2)**
9:25;121:22
**provided (9)**
26:12;44:11;47:18;
51:20,22;52:9;95:11;
105:16;131:11
**provides (1)**
106:12
**public (6)**
5:4,10,13,17;10:4;
13:14
**publicly (1)**
47:17
**pull (2)**
13:9;55:15
**pulled (3)**
95:6;96:2,7
**punishing (1)**
75:1

**purchase (3)**
70:7;74:7;110:20
**purchased (8)**
69:1;71:19;72:6;
103:6,15,16;108:8;
136:21
**purchases (5)**
52:14;70:12;73:14;
103:19;135:19
**pure (1)**
127:11
**purported (2)**
131:24,25
**purpose (14)**
18:8;70:17,21;
111:11,21;116:11;
120:2;122:8;125:23;
126:5;129:6;134:5;
138:15;139:9
**purposes (8)**
61:25;66:11;118:6;
124:9;125:3,6;126:1,
8
**put (4)**
12:4;86:16;108:19;
138:4
**putting (1)**
135:13

## Q

**qualification (1)**
90:8
**quantify (1)**
13:17
**Quentin (13)**
14:25;15:2,6;
17:19;18:11;21:9;
23:8,20;44:18;50:18;
57:3;144:15;145:1
**quite (1)**
138:25
**quote (4)**
15:19,22;67:23;
98:17
**quoted (1)**
68:6

## R

**raised (2)**
24:10;145:21
**range (1)**
19:10
**rate (1)**
19:16
**rates (2)**
141:8;146:6
**rather (1)**
90:17
**reach (2)**
43:11;45:14
**reached (2)**

17:23;42:8
**reaching (1)**
66:7
**read (47)**
14:6,14,15;15:9,14,
24,25;18:18;20:25;
21:12,14,19;22:2,9,
12,14,15;23:9,13;
26:21;28:19;31:25;
32:1;34:14;35:16,19;
43:19;46:5;58:8,22;
59:5,10;65:16;67:4,
5;73:2,3;82:24;
90:11,12;92:12;94:8,
10,12;121:25;123:22,
23
**reader (1)**
49:5
**reading (3)**
26:19;63:3;81:12
**really (9)**
39:14;48:14;70:20;
75:17,22;124:10;
126:4;134:24;138:14
**reason (23)**
12:3;25:11;26:23;
46:1,3,10;48:23;50:5,
8,20;72:17;90:16;
91:15,19;93:9,12,24;
94:2,5;102:17;
117:17;124:7,20
**reasonable (3)**
65:8;111:22;134:5
**reasons (6)**
94:8,16,19;118:4;
125:23;131:25
**recall (20)**
7:13;29:21;33:10;
36:14;37:8;40:12;
59:8;64:22;65:14;
66:4;73:21;76:3,6;
78:11;87:12,16,17;
114:3;118:23;138:9
**receipt (3)**
82:2;91:13,17
**receipts (2)**
56:25;59:20
**receivables (1)**
91:1
**receive (3)**
69:17;70:6;151:3
**received (20)**
28:3;29:7;30:8;
32:10;34:12,22;
35:25;39:4;40:1,7,9,
10;61:15;65:11;
69:10;77:18;112:24;
113:3;119:23;133:21
**receiving (3)**
65:25;67:15;78:16
**recency (1)**
147:10
**recent (1)**

65:15
**recess (3)**
61:7;102:9;142:17
**recipient (1)**
69:21
**recipients (1)**
76:5
**recognition (6)**
62:12,16;71:25;
73:8;74:13;117:24
**recognize (3)**
14:24;61:14;
104:18
**recollection (3)**
7:16;8:1,7
**reconciliation (1)**
92:1
**record (12)**
4:10;14:15;32:1;
38:3;40:24;61:18;
67:5;73:3;89:18;
90:12;123:23;136:11
**recorded (1)**
72:15
**recording (1)**
70:19
**records (6)**
40:19;46:19;56:12;
70:18;131:6;141:6
**red (2)**
12:19;145:21
**redactions (1)**
61:19
**refer (14)**
27:10;38:17,23;
46:24;49:9;51:14;
62:9;67:19;70:20;
78:15;79:23;105:7;
110:15;149:9
**reference (8)**
15:14;46:25;95:18;
102:24;118:24;
120:5;135:17;148:7
**referenced (7)**
21:3;23:7;24:19;
29:25;33:18;95:7;
148:19
**references (2)**
32:20;100:15
**referred (8)**
33:12;35:20;78:21;
79:1;82:15;96:5;
104:22;119:25
**referring (12)**
27:15;36:6,9;
38:21,24;39:14,21;
44:4;77:1;78:10;
79:11;94:11
**refers (4)**
59:17;78:4,7;96:14
**regard (2)**
144:21,24
**regarding (5)**

15:17;29:3;79:2;
100:16;143:4
**regardless (4)**
53:25;70:8;90:23;
136:9
**register (1)**
99:23
**registration (4)**
83:6,7;93:20;94:4
**registrations (1)**
90:20
**regulations (3)**
147:5,6,8
**reimburse (1)**
92:4
**reimbursed (8)**
45:23;67:12;69:4,
8;92:3;133:8;137:16;
138:16
**reimbursement (77)**
11:14,18;12:20;
42:17;43:20;51:3;
52:22;54:11,23;56:8,
15,19,22;57:1,20,25;
59:3,21;60:9,20,24,
25;66:22,24;67:12,
21;68:21;69:16,17,
24,24;70:7;74:6,9,16;
80:12;82:3,21;83:8,
24;84:7,18;85:1,4;
88:11,12,20,24;89:4,
7;90:5,18,21;91:16;
94:21;95:6;97:18;
98:4,20;99:5,8;100:4,
25;101:8;111:18;
122:19,25;130:6;
133:12,22;137:10;
138:20;142:11,22;
143:19,24;148:16
**reimbursements (8)**
43:10,23;46:20;
51:9;68:7;85:10;
94:18;145:24
**relate (2)**
33:2,3
**related (7)**
36:3;52:3;71:11;
89:8,10;115:15;
125:19
**relates (2)**
47:3;116:21
**relating (5)**
35:5,12;37:13;
46:19;133:13
**relationship (2)**
54:2;58:4
**relationships (7)**
116:11;118:1;
143:5,8,10,14;144:4
**relative (4)**
16:12;25:10;
100:21;114:9
**relatively (1)**

144:10

**relevance (1)**
100:18

**Relevant (3)**
21:20,22;141:11

**relied (5)**
37:9;43:21;45:24

**rely (1)**
29:11

**relying (2)**
42:20;43:1

**remaining (1)**
134:18

**remember (8)**
7:15;85:2;87:3,10,
14;92:15,20;93:2

**remind (1)**
49:4

**Remington (4)**
8:20;9:3;10:14,14

**RemSource (2)**
9:3;10:15

**rent (1)**
110:15

**repaid (1)**
133:19

**repeat (2)**
14:13;127:1

**repeated (2)**
49:3;126:6

**repeatedly (1)**
48:23

**report (187)**
6:3,6,10,14;11:18,
19,21,22;12:7,20,21,
22,25;13:23;14:24;
15:2,4,5,9,11,25;
16:2,16;17:5,19,20,
20;18:11;20:12,16;
21:5;22:11;23:8,12,
14,19,20,23;24:1,6;
25:3,17;27:9,15;
29:13,18,22;30:1;
31:20,21;32:24;
33:12,16,16,20;
34:15,17;35:1,6,12,
16,19;36:4;39:23;
40:18;41:12,13,15,
21,24;42:13,18,22;
43:6,10,22;44:18,19,
22;45:20,24;46:2,4,5,
8,11,17,22,23;47:21;
48:24;49:2,2,16,21;
50:18,20;51:4,13;
52:16;53:18;54:6,7;
55:16,17,18,23;57:3,
16,18;58:5;59:13,15;
60:12,14;61:22;
63:12;64:6;66:8;
67:16,17;70:11,15;
71:5,7,8,10,13;76:11;
80:3;83:8;85:12;
88:15;89:20;90:5;

94:3,17,24;95:1;
96:6;97:4,8,13,21;
99:3,13;100:9,12,14,
18,19;102:25;103:4;
105:6;108:9,12;
110:25;112:12,15;
113:12;115:22;
120:1,5;121:2;
122:16;123:20;
125:1;126:6;127:3;
128:3;129:10;131:8,
14;132:9;134:10;
140:3;142:20,22;
143:9;144:18,25;
145:5;146:9;148:19,
22;149:1;150:3

**reported (11)**
11:23,24;50:22;
52:18;66:16,19;
69:25;70:12;86:23;
116:19;117:24

**reporter (6)**
14:16;32:2;67:6;
73:4;90:13;123:24

**reporting (3)**
10:20;53:4;69:20

**reports (39)**
12:2;15:5;16:12;
23:10;24:2,3,6,16;
25:6;32:21,23;33:11,
12,17,23;42:14;
43:19;44:3;46:16;
53:25;54:16;55:5,9;
62:6;67:21;81:6;
86:4;88:18;95:11,13;
99:17;100:21;
120:17;131:7;
143:15;144:1,7;
146:19;147:11

**represent (4)**
45:15;103:10;
106:10;109:15

**represented (1)**
134:8

**Republic (25)**
128:2,2,17;129:5,
14,20,23;130:5,19;
131:12;137:8,9;
138:5,19;139:25;
141:17,21;142:6;
148:20;149:6,10;
150:5,9,11,14

**request (18)**
6:4;36:23;37:1,2,
12,16;38:6;60:24;
88:14;90:22;91:16;
98:20;99:5,9;100:4;
122:25;143:19,24

**requested (9)**
14:16;32:2;42:10;
59:21;67:6;73:4;
90:13;123:24;137:4

**requests (23)**

52:22;54:6,12,24;
57:1,20;59:3;60:10;
80:12;85:1,5;88:13,
24;89:4,7;90:5,18;
94:22;95:6;101:8;
137:10;142:11;
148:16

**require (1)**
90:4

**required (4)**
54:6;132:12;143:3,
18

**requirement (2)**
111:18;139:4

**requirements (5)**
116:8,14;118:18;
143:25;148:15

**requires (1)**
143:4

**reservation (1)**
151:7

**reservations (1)**
91:11

**reserve (2)**
151:4,9

**resolution (1)**
117:25

**resource (1)**
10:25

**resources (1)**
10:23

**respect (7)**
31:10;97:20;98:18;
114:19;134:13;
135:11;151:5

**respective (1)**
128:8

**respectively (1)**
47:25

**respond (1)**
37:4

**responded (2)**
28:7;37:14

**responding (2)**
35:3;77:15

**response (10)**
37:14;77:9,18;
78:5,22;79:19;
101:14;117:22;
119:23;128:15

**responses (30)**
16:12;27:6,10,14,
19;28:5,10;29:3,17,
20;35:20;36:5;38:24;
39:3,9,20,25;43:4;
46:13;58:25;76:7,10,
23;77:2,3,5;79:11;
112:25;114:1,4

**responsibilities (10)**
10:25;43:7,12;
53:11;62:5,7,9,20;
89:9;146:10

**responsibility (6)**

11:2,5,13,17;70:2;
127:14

**responsible (4)**
10:20;48:21;53:4;
89:15

**restate (3)**
31:24;67:3;90:10

**result (1)**
44:13

**resulted (1)**
15:23

**results (1)**
44:2

**retainer (2)**
19:23,25

**retirement (1)**
74:13

**return (6)**
9:13;10:19;67:14;
116:17,19;118:10

**returned (1)**
27:7

**returns (1)**
126:13

**revealed (1)**
15:19

**revenue (12)**
48:3;65:13;104:5;
115:23;116:5;
118:19;126:19,23;
127:5,13;139:1;
143:20

**revenues (3)**
47:23;48:14,20

**review (9)**
11:21;44:8;45:7,
17;46:13,18;56:11;
102:21;151:3

**reviewed (14)**
11:22;25:6;28:9;
44:10;45:8;47:17;
55:21,23;99:3;
131:11;144:14,15,25;
145:10

**reviewing (2)**
44:2;110:17

**reviews (3)**
118:3;121:13,20

**revise (1)**
115:18

**revised (1)**
115:14

**RICHARD (5)**
4:3,11;8:14,17;
35:11

**right (120)**
7:8,16;8:10;14:4,
22;15:7;19:6;24:23,
25;27:12;28:1;33:9;
34:17;35:2,4,8,9;
36:1,25;38:1,15;39:2,
19;40:3;48:4,6,18,21;
50:25;51:1;54:18,25;

55:5,10;58:9,14,19,
21;59:11;61:1;63:7;
64:22;68:12;69:5;
70:9,23;71:5,21;72:3,
9;76:24;80:8,13;
82:11,22;83:14;84:2,
14;86:24;88:3,8,13,
21,25;92:25;95:9;
97:10;99:6,10;
103:16;106:24;
107:7;108:9;111:20;
112:23;113:13,18;
115:3;117:4,9;119:6;
120:4,18;122:7,14,
17;123:1;125:7;
126:8,24;127:16,22;
130:7;132:5;133:9;
134:10,25;135:14,24;
136:2,7,18;137:11,
14;138:16,23;139:13,
18;144:8,11;145:15;
146:21;148:8;149:2,
3,4,16;150:15,23;
151:4

**Robert (1)**
7:8

**Robin (1)**
99:15

**Rogers (1)**
99:15

**role (2)**
76:15;102:3

**roles (6)**
13:11;43:7,12;
53:10;62:4;89:8

**Rollins (56)**
21:7;32:15;52:8;
54:7,13;63:21;64:15,
20;75:15,24;76:13,
16;77:10;79:3,24;
80:7,20,24;82:9;84:8,
14,22;85:12;88:21;
90:6;91:18;94:1,3,
24;96:16,21;97:12;
99:15;100:10,11;
104:8;105:13,23;
120:22,24;123:4,7,9,
18;130:10,13;131:9;
136:14,23;140:1,10;
141:1,3,12,16;142:3

**Rollins' (1)**
15:17

**Rollins] (1)**
120:21

**Ronnie (36)**
21:7;32:14;54:7;
75:15;77:10;79:3,24;
80:7,19,24;82:9;84:8,
14,22;88:21;90:6;
91:18;94:2,24;96:12;
97:1;99:15;100:8;
105:13,23;120:22,24;
123:3;130:9;136:14,

23;140:1,5;141:12,
15;142:3
**room (4)**
89:16;91:4;98:7;
99:22
**rooms (1)**
89:12
**roughly (1)**
48:18,21
**RR (4)**
77:10;78:8;79:20;
81:3
**Rubbermaid (1)**
10:21
**rules (3)**
18:13,14;87:9
**ruling (1)**
65:15
**run (2)**
141:8;146:6
**running (4)**
89:22;127:12,19;
137:6

**S**

**S&B (1)**
7:19
**Sabry (1)**
7:23
**salary (1)**
52:2
**salary-related (1)**
52:3
**sale (1)**
9:16
**same (10)**
8:24;43:5;86:7;
97:5;102:18;112:4;
114:17;119:25;
129:8;143:22
**sample (1)**
44:16
**satisfy (1)**
116:5
**saw (5)**
29:16;57:3;100:11;
102:24;144:1
**saying (11)**
49:9;68:6;70:20;
86:11;87:14;100:1;
106:19;114:25;
117:8;126:4;127:8
**scheduled (1)**
111:9
**scope (13)**
17:16;18:1,1;
21:20,22;38:5;45:11;
57:4;58:5;60:11;
100:19;102:23;
145:11
**second (10)**
7:8;18:6;22:23;

71:25;78:6,15;79:12;
95:17;148:20;150:13
**section (3)**
24:1;41:22;143:3
**security (1)**
57:10
**seek (6)**
56:7,15,22;83:8;
122:19;136:13
**seeking (2)**
60:25;84:6
**seeks (1)**
69:16
**seemed (1)**
63:23
**select (4)**
21:17,18;23:2,5
**semiannual (1)**
108:16
**seminar (3)**
111:14,16,19
**seminars (7)**
107:17,18,23;
111:2,7;138:10,14
**Senator (1)**
48:7
**send (1)**
52:3
**senior (1)**
60:25
**sent (8)**
28:7,18;29:4;
33:24;35:8;40:25;
43:14;106:2
**sentence (4)**
77:10;78:15;82:15;
134:15
**sentences (1)**
15:24
**separate (1)**
29:6
**September (2)**
5:2;96:11
**Service (1)**
65:13;68:23;104:5;
115:24;116:5;
118:19;126:19,23;
139:1;143:20;148:1
**services (21)**
4:19;10:2;20:6;
30:21;47:13;51:20;
52:4;68:3,10;89:25;
98:15;105:16;106:2;
109:9,18;130:24;
135:8;139:13;
148:21;149:10;150:7
**set (10)**
27:25;49:14;72:20;
74:24;86:14;89:11,
12,12;98:6;99:21
**setting (2)**
98:14;99:20
**seven (11)**

15:11;21:18;30:6,
17;36:8;39:1,1,15;
108:4,20;115:13
**seventh (1)**
71:16
**several (5)**
45:3;51:13;66:5;
73:22;114:7
**shall (1)**
29:22
**share (1)**
26:13
**shelf (1)**
74:15
**shelves (1)**
74:18
**shocked (1)**
100:23
**show (15)**
26:8;27:3;28:14,
25;32:7;89:19;93:18;
95:24;99:23;103:24;
104:16;117:3;
122:16;127:20;141:6
**showed (2)**
52:14;94:16
**showing (4)**
33:22;57:9;131:5,
19
**shown (4)**
20:23;41:25;43:2;
62:13
**shows (4)**
49:17,25;50:11;
91:13
**side (2)**
53:11;70:3
**sign (2)**
31:10;83:5
**signature (1)**
151:9
**signed (2)**
97:9;100:5
**significance (1)**
13:4
**significant (1)**
127:15
**similar (1)**
27:24
**simply (3)**
55:5;72:2;79:10
**single (5)**
89:14;98:24;99:2;
136:6,12
**sit (4)**
52:8;78:25;109:3;
112:6
**sitting (4)**
74:14,17;75:4;88:6
**situation (9)**
65:21;82:12;83:22;
84:11,23,24;99:12;
101:15;124:11

**situations (3)**
12:5;81:25;82:4
**six (15)**
29:1,12;40:2;
47:21;57:5;58:25;
60:14;61:16;77:14;
79:12;105:6;114:5,7;
126:7;128:11
**six-month (3)**
24:12;44:5,16
**size (1)**
137:6
**small (9)**
4:19;10:2;49:10;
127:6,9,13;144:10,
25;145:1
**software (1)**
51:25
**sole (2)**
4:17;6:6
**solely (1)**
91:7
**somebody (6)**
75:1;99:21,22,24;
101:1;143:11
**somebody's (1)**
88:2
**somehow (1)**
135:4
**someone (3)**
12:19;72:5;110:17
**sometime (1)**
92:23
**somewhere (1)**
78:12
**sorry (4)**
31:24;105:1;
123:21;149:2
**sought (7)**
57:25;60:20;66:22;
69:23;74:6;83:24;
93:25
**source (2)**
23:19;96:1
**sources (1)**
20:22
**Southern (1)**
147:14
**space (1)**
96:15
**span (2)**
57:5;60:14
**speak (4)**
41:10;98:16;101:9;
141:12
**speaking (1)**
148:11
**special (2)**
72:1;73:7
**specific (8)**
7:12;17:20;19:2;
27:6;58:3;106:15;
117:23;118:25

**specifically (24)**
7:13;16:19;21:7;
29:21;37:16;40:12;
44:11;46:21,25;59:8;
65:14;66:4;73:21;
78:11;87:12;104:1;
105:21;106:1;114:3;
116:1;118:23;123:5;
132:14;139:3
**spelled (1)**
62:17
**spend (12)**
70:13,22,24,25;
71:17,20,23;72:8,15,
20;124:14;141:20
**spending (1)**
49:10
**spent (3)**
132:8;134:17;
139:2
**spite (2)**
136:20;139:15
**Spousal (5)**
116:16,19,22;
125:12;126:1
**spouse (2)**
117:2;122:3
**spouses (8)**
113:13;116:13,14;
117:10,17;118:8;
125:19;133:13
**spouses' (1)**
118:13
**spouse's (2)**
117:1,13
**spreadsheet (1)**
51:23
**stage (1)**
26:16
**stand (1)**
11:8
**standard (2)**
18:12;42:10
**standpoint (1)**
127:11
**Stanfield (1)**
7:9
**Stanley (1)**
10:21
**start (2)**
58:21;60:17
**started (1)**
25:4
**starting (1)**
20:23
**state (16)**
4:9;5:5,6,7,13;
17:14;38:3;40:24;
53:3;61:18,23;
104:12;112:19;
125:23;129:9;134:3
**stated (21)**
17:18;20:15;31:15,

20;34:21;48:10,13;
64:20;66:7;77:19;
86:11;94:15;109:5;
114:10,11,11;125:7;
126:5;128:7;129:9;
139:21
**statement (16)**
10:12;42:20,21,23;
67:9;75:18,19;80:1;
81:1,11,20,23;84:12;
127:2;150:6,20
**statements (4)**
42:25;43:1,2;
126:17
**States (3)**
6:25;44:23;83:18
**status (1)**
79:5
**stayed (1)**
132:15
**staying (1)**
86:13
**steal (1)**
127:23,24
**Stephanie (77)**
21:8;24:2,16;
25:19,21;26:2;28:18;
29:3,8,17,20,25;
31:22;41:7;43:4;
45:23;46:20;50:12;
52:1,13,18,23;53:6;
54:16,24;56:7,15,18,
22;57:2;58:9;59:1;
60:4,19;67:19;76:8;
80:11,22;82:2,10,18;
83:5,22;84:25;88:23;
89:7;90:16;92:1;
94:22;95:12;96:24;
97:9,13,17,24;98:3,
14,19,25;99:4,18;
100:5;103:6;109:5;
110:3;112:8;122:13,
24;129:1;130:20;
131:15;132:8;
136:17,21;139:17;
145:15;150:2
**steps (1)**
16:10
**still (8)**
65:22;66:13;75:20;
82:21;83:12,24;
103:20;138:6
**storage (2)**
74:8;103:12
**strategic (3)**
96:12;114:21;
118:1
**strengthening (1)**
118:1
**Strike (1)**
94:1
**stuff (1)**
86:14

**subacute (1)**
147:21
**subject (2)**
5:16;151:7
**subjected (1)**
17:9
**submission (2)**
101:7;130:20
**submit (13)**
12:13;54:6,11;
80:11;85:10;90:4;
91:18;97:13,17,24;
143:18,23;144:2
**submittal (1)**
109:10
**submitted (37)**
24:17;49:7;51:4;
52:23;54:24;58:12,
23;80:23,23;82:20;
84:8;85:5,12;88:20;
90:22;94:22,24;
98:19,25;99:6,17;
109:8,17;112:8;
123:3,13;130:5;
136:22;137:10,21;
138:23;139:16;
140:1;141:2;142:11;
145:23;149:22
**submitting (7)**
12:22;55:8,25;
84:7;90:17;91:17;
98:4
**subordinate (1)**
145:25
**subpoena (1)**
36:23
**subsequent (2)**
39:5;135:5
**subset (2)**
23:20;49:4
**subsets (3)**
42:8;45:12,15
**substantiate (4)**
56:25;115:25;
139:2;148:16
**substantiated (2)**
68:16,24
**substantiation (4)**
25:1,10;116:8;
143:6
**substantive (2)**
31:8;57:8
**suburb (1)**
4:14
**sufficient (3)**
118:5;126:7;145:3
**suggesting (2)**
35:1,16
**suggests (1)**
59:25
**summarize (1)**
13:21
**summarized (1)**

108:13
**summer (2)**
9:17;29:8
**supervision (1)**
11:14
**supervisor (8)**
12:8,21;79:20;
80:5,7;81:3;120:22;
146:1
**supplemental (1)**
37:14
**supplied (3)**
31:22;34:3;37:7
**supplies (3)**
72:2,3;73:15
**support (4)**
4:18;10:1;51:21;
59:3
**supported (1)**
37:10
**supporting (1)**
21:3
**supposed (1)**
143:14
**supposedly (1)**
132:25
**sure (9)**
12:1;25:3;41:4;
95:4;108:11;136:11;
138:25;147:11;
150:18
**surmise (2)**
101:6,6
**surprise (6)**
54:1;57:4;86:3,10;
103:12;127:20
**surprised (1)**
56:5
**surprising (1)**
75:11
**sworn (1)**
4:5
**synergies (1)**
62:9
**system (4)**
12:5,11;55:2;80:4
**systematically (1)**
143:12
**systemic (2)**
142:24;144:21
**Systems (5)**
6:5;14:3;17:25;
22:24;145:9

**T**

**tab (2)**
24:9;44:12
**table (1)**
108:12
**tabs (1)**
24:8
**tail (1)**

76:12
**talk (1)**
91:8
**talked (1)**
80:10
**talking (14)**
21:21;24:17;32:17;
67:2;84:18,19,19;
91:6;105:10;121:15;
126:18;131:2,2,4
**task (2)**
18:20;20:20
**tasks (5)**
18:2;131:25;132:8,
24;133:1
**tax (18)**
10:19;65:7,18;
66:25;67:13;115:25;
116:17,19;117:12;
118:6,10;124:3,4,9;
125:11,25;126:8,13
**Taylor (19)**
21:8;32:15;48:10;
52:11;76:18;97:5,17;
98:12,17;99:15;
100:10,11,15,22;
101:17;104:9;
105:13,24;131:10
**Taylor's (2)**
43:21;51:19
**teaches (1)**
147:13
**team (1)**
51:20
**telephone (4)**
38:8;41:10;133:2;
151:5
**tells (4)**
83:4;91:10;140:18,
21
**tend (1)**
35:6
**Tennessee (3)**
4:13;5:7,13
**term (2)**
12:7;18:14
**terminate (2)**
9:20;101:18
**terminated (6)**
73:20;75:11;94:9;
101:20,24;102:2
**termination (12)**
15:15,23;75:8;
93:6,8;94:20;100:16,
25;101:10;102:4;
103:9;135:5
**terms (2)**
13:16,17
**testified (5)**
4:5;6:25;7:5,15;
92:18
**testify (2)**
7:11;8:6

**testimony (10)**
6:20;7:20;8:9,9;
40:7;59:23;74:15;
100:15;135:10;136:1
**theft (2)**
85:23,24
**Theoretically (1)**
90:24
**therefore (1)**
62:20
**thinking (1)**
143:13
**third (14)**
7:18;72:1;96:15,
18,21;106:15,18;
107:9,22;109:24;
110:6,14,17;111:3
**though (1)**
55:20;135:5
**thousand (1)**
73:22
**three (37)**
9:6,15,16;10:24,
25;11:10,13;12:11;
25:15;26:9;27:11;
34:24;35:13,16;
36:14;41:21;42:18;
44:1;45:4,21;57:7;
67:19;96:19,22,24;
97:1;110:4;125:1,10,
24,25;126:6;127:2;
137:8;138:18;139:8,
24
**throughout (1)**
53:3
**ticket (4)**
91:11,12,13;92:7
**tie (2)**
106:18,20
**Tiffany (3)**
64:21,23;65:3
**Tim (2)**
122:6,8
**timeframe (2)**
7:12,21
**timekeepers (1)**
19:19
**times (11)**
52:18;54:5;76:4,
14;77:12;79:1,11;
85:1;89:3;114:7;
143:13
**timing (1)**
26:24
**Timothy (1)**
7:1
**today (6)**
9:23;19:9;20:7;
78:25;109:3;112:6
**today's (1)**
85:22
**together (2)**
52:5,14

**told (12)**
22:15;58:8;60:22;
75:14;77:22;82:3;
105:18,19;112:22;
113:25;114:20;
145:14
**Tom (1)**
122:4
**took (5)**
79:13;95:5;126:22;
132:21;142:5
**tool (1)**
51:25
**top (7)**
12:16;15:12;32:18;
34:24;49:13;78:4;
122:5
**total (11)**
48:3,20;57:23;
59:18;107:5,12,18,
23;134:6,8,9
**totals (2)**
47:23;127:5
**toward (1)**
135:2
**towards (2)**
15:18;150:10
**trade (1)**
93:18
**trained (1)**
143:12
**transact (1)**
83:19
**transacted (2)**
24:4;117:20
**transaction (2)**
83:20;102:19
**transactions (3)**
70:19;86:4;98:10
**transitioned (2)**
76:20;77:21
**transmitted (1)**
30:12
**travel (6)**
53:15,18;90:18;
98:13;143:4;146:7
**traveling (1)**
114:14
**treated (2)**
118:9;133:14
**trial (1)**
8:9
**tried (2)**
9:15;25:9
**trip (67)**
30:20,21;98:15;
112:13,15,18,20;
113:13,16;114:10;
115:14,25;116:4,6,7,
15,15,23;117:2,18,
21,23;118:6;119:24;
122:12,21;123:20;
125:1;128:1,5,17,21;

129:5,13,19,23;
130:1,4,5,11,14,19,
24,25;131:11;
132:13;137:7,9;
138:3,5,19;139:25,
25;141:1,16;148:20,
23;149:6,10,22;
150:1,4,7,8,10,19,21
**trips (29)**
110:24,25;118:20;
121:19;122:20,25;
123:3,9,16,19;
125:10,24,25;132:16,
22,25;137:7,8,11,22,
24;138:4,19;139:12,
24;140:4,10;141:1;
150:15
**true (12)**
31:5,16,22;68:19;
80:2;81:10,20,23;
82:15;84:13;140:16,
18
**truth (1)**
140:21
**try (1)**
40:25
**trying (8)**
17:4;40:13;48:18;
72:5;92:9;106:21;
140:25;150:18
**Turn (3)**
44:17;122:24;
149:15
**turning (1)**
83:21
**two (64)**
11:10;12:25;14:23;
15:24;17:23;18:2,4;
19:5;20:20,24;22:21;
24:19,22;32:18,24;
33:2,5,9,11,11,15,15,
18,19,20,22;34:3,4;
36:14;44:17;45:20;
52:7,13;57:6,17;
59:14;61:4;68:17;
70:16;77:8;88:7;
95:1,5,17;96:2;97:3,
4,21;99:13;100:7,9;
104:23,23;105:21;
106:10,17;110:12;
114:9;115:13;
116:16;117:5;
122:13;125:2;135:6
**two-person (5)**
53:1,17;54:3;
85:18;86:2
**typed (2)**
27:25;113:9
**typed-out (1)**
113:19
**Typically (3)**
63:16;75:10;
124:22

**U**

**uncommon (1)**
126:14
**unconventional (1)**
135:3
**under (64)**
15:5;17:21;32:24;
49:3;50:25;52:23;
53:10;54:12;55:9;
56:1;62:15;65:7,10,
13,17;66:25;68:19;
69:18;70:12;72:15;
73:14;75:23;80:4,12,
15,23;82:12,20;84:7;
85:10;88:20;89:25;
90:22;91:16;93:16;
94:22;101:23;
106:11,15;108:20,25;
111:2,17;117:11;
118:18;120:1;124:3,
4,22;125:10;135:19,
25;136:7,13,25;
138:6;139:1,16;
141:2;143:3,6,20;
148:16;149:22
**underlying (4)**
46:19;53:5;56:11;
57:11
**underscore (1)**
68:12
**underscored (1)**
68:1
**understood (4)**
14:17;35:24;
112:19;129:13
**undertake (2)**
16:7;18:20
**undertaken (1)**
15:20
**unique (2)**
58:1;59:18
**United (2)**
6:25;83:18
**universe (1)**
48:20
**University (1)**
147:14
**unless (5)**
46:21;108:15;
117:5;137:4;143:11
**unlimited (1)**
92:14
**unsuccessful (2)**
9:16,17
**untrue (3)**
80:1,2;81:1
**unusual (5)**
53:16;60:13;
100:23;101:16
**up (31)**
20:6;25:4;33:22;

48:19;55:15;57:9;
67:12;72:20;75:8;
78:4;83:5;86:14;
89:11,12,12,19;
94:16;98:7,14;99:20,
22,23;101:16;
114:13;117:3;
121:19;127:20;
131:6,8;142:15;
147:12
**upon (3)**
29:11;125:3,22
**upset (1)**
142:4
**USA (2)**
9:3;10:15
**use (4)**
12:7;56:13;80:3;
108:18
**used (23)**
33:8,20;41:19,23;
42:15;43:6;45:20;
57:11,19;59:2,20;
60:9;64:5;70:18;
71:1;72:10;75:2;
85:21;96:1;98:7;
121:19;143:9,16
**uses (2)**
83:7;91:12
**using (4)**
53:20;58:1;64:3;
85:23
**usually (1)**
12:5
**utilities (1)**
110:15

**V**

**valid (11)**
61:24;62:21;66:11,
17;75:23;124:2,4,7,
19;125:2;134:21
**validate (1)**
31:8
**value (5)**
62:15;69:2;108:24;
118:11;124:13
**values (1)**
72:25
**various (5)**
13:21;25:18;43:19,
20;110:24
**varying (2)**
77:15,19
**Vegas (5)**
91:9;93:18
**verify (10)**
30:24;45:22;46:7;
77:23;118:21;119:8;
120:12;128:20;
129:18;145:17
**versus (8)**

6:5;7:1,9,19;8:4,5;
91:3;131:7
**via (4)**
27:22;40:10,15;
84:15
**view (2)**
16:14;89:22
**violation (1)**
15:21
**volume (7)**
55:18;57:13;75:7,
12;86:3;89:10;146:9
**voluntarily (1)**
9:20
**VPs (1)**
146:7

**W**

**W-2 (13)**
65:11,15;66:16;
67:14;69:10,14,21;
70:1,3;116:20;
118:15;133:15,16
**W-2s (5)**
66:19,21;116:24;
118:11;125:13
**Waldrop (200)**
6:5;14:11;15:17,
20,20,23;16:4,8,11,
17;17:1,6;19:11;
21:8,25;22:6,7,11;
25:21,22,24;26:13,
19;27:7,11;29:8;
30:13,13,15;31:3,9,
16;34:13;35:15,21;
36:1,5,12;37:13;38:9,
13,24;39:9,20,25;
42:3;43:8,13,15;
45:23;46:20;47:12;
49:8;50:4,15,24;51:6,
11,15;52:13,19;54:5,
10,15,22;55:3,4,8,25;
56:6,8,12,21;57:1,19;
58:2;59:10,24;60:5,5,
19;63:8,21;64:1,16,
20;65:1;66:20;69:1,
16;72:6;73:10,19;
75:14,25;76:4,14,17,
23;77:23;78:4,19;
79:1,11;80:12,16,22;
81:2,25;82:8,11,19,
22;83:3,23,25;84:2,
13;85:6,9;86:23;
87:1,14,20;88:6,10;
90:4;91:8,9,9;93:3,15,
18;93:5;94:2,8,23;
95:14;98:18,24;99:6;
102:2,4,22;103:9;
104:10;105:19;
106:2;109:7;110:2,9,
9;112:8,25;113:10;
114:20;115:11;

117:22,24;119:6,23;
120:10,21;121:19;
122:19;123:8,13;
126:5,12;128:7,24;
129:7,15;130:7,20;
132:3,5;133:5,19;
135:12;136:6,12,18,
22;137:14,21;139:18,
22;140:9,12,25;
142:5,9;143:17;
145:14,18;147:13;
148:3,15;149:15;
151:1
**Waldrop's (38)**
28:10;47:22;48:19;
51:22;52:22;54:11;
56:19;59:23,24;62:4;
72:24;80:6;85:2;
87:10;88:19;89:6;
90:17,19,19,20,22;
91:13,17;94:20;
100:16;101:7,18,20;
105:7,14;112:5;
127:4,9;128:21;
135:5,7;139:12;
150:8
**Wall (1)**
21:9
**Waterford (61)**
49:18;50:1,5,9,11,
16,24;51:5;52:14;
61:23;62:11,23;
63:14,22;64:1;65:6;
66:2,10;69:2;70:7,
12;71:2,11;72:6,14;
73:14,18;74:8,11,17;
75:7;76:1,4,16;78:8,
16;102:13;103:5,11,
14,20,25;104:3;
106:23;107:2;108:8,
19,23;109:6;110:20;
135:11,18,19,23;
136:2,7,13,16,20,23;
144:5
**way (15)**
35:3;51:2,8;55:7,
17;84:6;99:13,16;
103:13;110:22,23;
111:5,8,11;122:1
**ways (2)**
116:17;117:6
**wedding (3)**
124:13,14,20
**week (5)**
37:7,15;92:8;
126:10;132:16
**wellness (1)**
108:25
**what's (12)**
13:4;39:20;67:9;
74:20;76:6;100:18;
116:3,4;138:2;143:1;
145:7;150:5

**whatsoever (1)**
143:7
**Whereupon (11)**
4:2;14:15;32:1;
61:7;67:5;73:3;
90:12;102:9;123:23;
142:17;151:10
**wherever (1)**
138:4
**whole (2)**
81:21;86:2
**who's (3)**
22:6;92:10;99:14
**wife (2)**
22:6;59:25
**Wilks (3)**
22:10;86:21;87:5
**Wilson (1)**
7:19
**withdrawn (8)**
17:12;18:1;27:19;
41:13;55:22;59:9;
122:11;123:7
**within (2)**
67:20;127:3
**without (5)**
57:8;101:13;129:1;
130:23;145:25
**witness (12)**
4:4;14:17;32:3;
55:13;67:7;69:8;
74:1;81:13;90:14;
105:4;123:25;144:21
**word (3)**
42:20,23;64:5
**wording (2)**
45:20;68:25
**words (8)**
18:3;26:17;64:3;
68:2,12,15;126:4;
143:7
**work (12)**
13:12,14;19:12;
20:11;26:16;37:6,19;
38:10;45:11;61:19;
86:14;100:20
**work/reading (1)**
114:13
**Workday (1)**
55:14
**worked (6)**
8:16;10:10;11:8;
32:12;51:3,17
**working (8)**
4:18,25;8:14,18;
10:5,8;89:13;92:7
**worksheet (12)**
44:11,12;47:23;
105:7;107:10;
109:25;110:1,3,7,18;
111:6;127:4
**worksheets (2)**
24:8;112:4

**world (1)**
85:23
**worldwide (1)**
13:7
**worry (1)**
99:23
**Worst (1)**
72:10
**wrap (1)**
142:15
**write (1)**
6:12
**writing (1)**
6:10
**written (7)**
6:3;17:5;77:2,2,5;
129:25;138:21
**wrong (1)**
75:7

**Y**

**year (24)**
5:2;11:8;48:12;
72:11,13;77:19,19;
78:1,9;84:16;86:6;
106:6;107:12,18,23;
108:13,15;109:10;
110:19,21;112:5,9;
128:8;138:4
**years (24)**
6:20;7:14;42:6;
47:24;50:9;57:5;
60:15;62:13,13;
123:15;146:17;
147:11
**York (17)**
111:1;112:13,18;
113:13,16;114:10;
115:14;116:15,23;
117:18,21;118:5;
122:12,12,21;123:20;
125:1

**0**

**0006442 (1)**
23:3
**0007033 (1)**
95:18
**0018034 (2)**
23:4;104:24
**003703 (1)**
40:4
**029 (1)**
47:24
**033 (1)**
47:24

**1**

**1 (1)**
5:22

**1:00 (1)**
102:10
**10 (7)**
6:20;7:14;20:9;
61:9,13;79:17;84:12
**10:47 (1)**
61:7
**10:57 (1)**
61:8
**100 (2)**
19:10;83:1
**101 (1)**
53:8
**10-minute (1)**
61:5
**11 (10)**
43:5;49:16;95:21,
25;96:9;97:9;100:3;
108:9,12;134:16
**11,000 (1)**
19:24
**12 (19)**
70:15;89:16,17;
104:13,17;105:6;
106:8,18;107:6,10,
19,23;108:4,19;
109:8,13,24;110:18;
111:3
**12:07 (1)**
102:9
**13 (7)**
15:13;44:1;46:25;
72:24;103:4;111:23;
147:2
**14 (6)**
46:25;70:11;71:1;
79:17;84:12;142:20
**15 (7)**
29:18;47:22;63:12;
76:11;91:4,4;103:16
**15th (6)**
14:3;27:21;38:13,
17,18;115:8
**16 (4)**
42:6;61:22;66:8;
147:10
**17 (8)**
112:15;114:25;
115:13;120:1;
122:16;125:7,24;
126:6
**17,000 (1)**
107:12
**17,400 (1)**
107:13
**18 (5)**
42:6;119:1;120:4,
20;147:11
**18034 (1)**
105:3
**19 (2)**
120:5;122:5
**1979 (1)**

146:20
**1980 (3)**
5:5,10;10:4
**1982 (2)**
146:20,23
**1990 (2)**
78:13,17
**1995 (1)**
5:8
**1st (5)**
19:2;24:12;44:5;
55:24;108:15

**2**

**2 (1)**
14:19
**2.7 (3)**
52:18;85:1;89:3
**2:12 (1)**
142:17
**2:28 (1)**
142:18
**2:43 (1)**
151:11
**20 (5)**
124:25;127:1;
128:2,3;129:10
**2006 (1)**
8:13
**2007 (6)**
7:16,21;8:1,7,13;
9:6
**2008 (4)**
7:17,22;8:2,7
**2009 (3)**
7:7,7;67:22
**2010 (8)**
50:16,25;57:20;
62:14;63:1;71:20;
72:7;131:20
**2011 (4)**
50:1,6;112:13;
115:14
**2012 (12)**
47:24;48:15;72:24;
105:7,14;106:3;
107:10;108:7;
109:10,12,15;110:19
**2013 (15)**
30:20,21;47:25;
48:15;106:6;109:12,
16;112:5,9;115:3;
119:1;122:21;
123:14;131:12;
149:10
**2014 (6)**
25:2;67:23;96:11;
120:6;122:21;123:14
**2015 (6)**
9:16;24:13;44:5,6;
55:24;71:20
**2016 (14)**

9:6,17;14:3;24:7;
50:1,6,17,25;57:21;
62:14;63:2;72:7;
103:15;131:20
**2017 (10)**
15:6;19:1;33:25;
38:13;39:10,20,25;
40:14;76:23;115:8
**21 (3)**
129:10,19;148:21
**21st (1)**
15:6
**22 (2)**
148:25;149:6
**23 (2)**
148:25;149:2
**24 (5)**
39:23;131:16,20,
23;132:9
**25 (1)**
131:23
**26 (2)**
131:24;132:9
**274 (1)**
143:3

### 3

**3 (1)**
26:5
**30 (2)**
45:17;134:13
**30-plus (1)**
134:19
**30th (4)**
27:11;35:21;76:23;
108:15
**31st (3)**
25:22;38:13,14
**33 (2)**
59:15,22
**34 (4)**
59:22;133:24;
134:16;135:2
**35 (3)**
29:17;67:16;
133:25
**36 (1)**
100:14
**3699 (1)**
128:12
**3713 (1)**
78:6
**3721 (1)**
79:18

### 4

**4 (1)**
26:25
**41 (5)**
57:24;58:1,3;
59:18;60:8

### 5

**5 (1)**
28:11
**58,600 (1)**
107:24

### 6

**6 (1)**
28:22
**6708 (1)**
4:13

### 7

**7 (1)**
30:2
**70 (2)**
45:16;134:9
**7038 (1)**
96:8
**70s (1)**
13:8
**75 (1)**
65:15
**750 (1)**
48:5
**78 (1)**
39:24
**7th (3)**
33:13,25;96:11

### 8

**8 (1)**
32:4
**8,000 (2)**
70:4;86:12
**80 (2)**
19:10;145:23
**8th (8)**
27:11;35:21;36:5,
9;39:6,20,25;40:14

### 9

**9 (1)**
34:6
**9/18/14 (1)**
95:18
**90 (1)**
63:23
**90s (1)**
78:12
**96 (1)**
103:11
**990s (1)**
47:17
**9th (8)**
27:12,21;30:9;
35:21;36:5,7;39:6,9