# In The Matter Of:

*Mark A. Waldrop v.*
*Community Health Systems, Inc.*

---

*Carlton Dwight Scott*
*March 31, 2017*

---

*American Court Reporting Company, Inc.*
*52 Executive Park South*
*Suite 5201*
*Atlanta, Georgia 30329-2217*
*(404) 892-1331 - (800) 445-2842*

Original File 75614-1.TXT
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


MARK A. WALDROP,

        Plaintiff,

    vs.                         Civil Action File

                              No:4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS, INC.,

        Defendant.



        The deposition of CARLTON DWIGHT SCOTT,
taken on behalf of the Defendant, taken pursuant
to agreement of counsel, taken for all purposes
authorized by the Federal Rules of Civil
Procedure; the reading and signing of the
deposition being waived; taken before Bonnie L.
Smith, RPR, Certified Court Reporter, commencing
at 8:55 a.m., on this the 31st day of March,
2017, at 121 North 3rd Avenue, Chatsworth,
Georgia.

2

1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3        GARY L. HENRY, ESQ.
         Gearhiser, Peters, Elliott & Cannon, PLLC
4        320 McCallie Avenue
         Chattanooga, Tennessee 37402
5        423-756-5171
         ghenry@gearhiserpeters.com
6

7    For the Defendant:

8        HAROLD T. DANIEL, JR., ESQ.
         LATOYA BRISBANE, ESQ.
9        Holland & Knight, LLP
         1180 West Peachtree Street, Suite 1800
10       Atlanta, Georgia 30309
         404-817-8500
11       harold.daniel@hklaw.com
         latoya.brisbane@hklaw.com
12

13   ALSO PRESENT:  Mark Waldrop
                    Ronnie Rollins
14

15

16

17

18

19

20

21

22

23

24

25

3

1                       C O N T E N T S

2                     E X A M I N A T I O N

3                                                        Page

4    Cross-Examination by Ms. Brisbane..................4

5

6                        E X H I B I T S

7                                                       Page
     Defendant's            Description              Marked
8
     Exhibit 1        Subpoena                          13
9
     Exhibit 2        Independent Construction          21
10                    Superintendent Agreement

11   Exhibit 3        Independent Contractor and        30
                      Indemnity Agreement
12
     Exhibit 4        Form W-9 Request for Taxpayer     40
13                    Identification Number and
                      Certification
14
     Exhibit 5        Dwight Scott Masonry Invoice      41
15
     Exhibit 6        Handwritten Dwight Scott Masonry  44
16                    Invoice

17   Exhibit 7        2015 Form 1099-Misc               45

18

19

20

21

22

23

24

25

4

```
 1                    P R O C E E D I N G S
 2               (Whereupon,
 3                    CARLTON DWIGHT SCOTT
 4          Was called as a witness and, having first been
 5          duly sworn, was examined and testified as
 6          follows:)
 7                    CROSS-EXAMINATION
 8     BY MS. BRISBANE:
 9          Q    Can you start by just stating your full name
10     for the record?
11          A    Carlton Dwight Scott.
12          Q    Have you ever been deposed before?
13          A    Have I ever been what?
14          Q    Have you ever been deposed before?  Have you
15     ever been in a deposition in a setting like this
16     before?
17          A    No.
18          Q    So I'm just going to explain how this works.
19     I'm going to ask you a series of questions.  Answer
20     truthfully to the best of your ability.  If there's
21     anything you're confused about in my question, ask me
22     to clarify it or if you can't hear me, just ask me to
23     repeat the question.  You have to give verbal answers.
24     So no shaking your head -- you know, shaking your head
25     or nodding.
```

1      A     I understand.

2      Q     If at any time you need a break, let us know

3 and we can take a break.  We'll just have you answer

4 the question that's -- if there's a question pending,

5 we'll have you answer that one.  Okay?

6      A     Okay.

7      Q     Do you have any questions about how this

8 process works?

9      A     No.

10      Q     Okay.  Let's start by asking what did you do

11 to prepare for today for this deposition.

12      A     Honestly?

13      Q     Yes, honestly.

14      A     I went to the closet, got my bill book and

15 that's it.

16      Q     Okay.  Did you review -- other than your

17 bill book, did you review any other documents?

18      A     I don't have any to review.

19      Q     Okay.  And did you meet with Mr. Henry over

20 here, Gary Henry?

21      A     Today's the first time I ever saw him.

22      Q     Okay.  Did you speak to your daughter,

23 Stephanie Dotson, about this case at all?

24      A     No, not -- no, not nothing other than I had

25 to come.  She came with me today --

6

1     Q     Okay.

2     A     -- but I didn't discuss the case with her.

3     Q     Okay.

4     A     It's hard to discuss something when you

5     don't know nothing about it.

6     Q     Okay.  And did you speak to Mr. Waldrop over

7     there?

8     A     No, sir -- no, ma'am.

9     Q     I'm just going to get a little bit of

10    background information on you.  Can you tell me where

11    you currently live?

12    A     4850 Smyrna Church Road.

13    Q     And are you married?

14    A     Yes.

15    Q     What's your wife's name?

16    A     Melissa.

17    Q     Melissa Scott?

18    A     Yeah.

19    Q     And do you have children?

20    A     I have two.

21    Q     What are their names?

22    A     Stephanie and Bradley.

23    Q     And Stephanie, is her last name Dotson,

24    Stephanie Dotson?

25    A     Yes.

7

1        Q    And she used to work at CHSI; is that right?

2        A    At what?

3        Q    Community Health Services.

4        A    Yeah, I guess.  Integra.  There's so many

5   names, I don't know.  But, yeah, we know what we're

6   talking about.  Yeah, she worked there.

7        Q    And she used to work for Mr. Waldrop as his

8   secretary?

9        A    Yes.

10        Q    Did you graduate from high school?

11        A    Yes.

12        Q    Did you go to college?

13        A    No.

14        Q    Do you have any advanced degrees or

15   certificates?

16        A    I have a builder's license.

17        Q    You have a builder's license?  And how did

18   you -- what did you have to do to get your builder's

19   license.

20        A    Well, you have to pay the fees and you have

21   to go to school, you know, to their seminars to keep

22   it updated.

23        Q    And you said you have to go to school first.

24   Like, what type of classes do you need to take to get

25   your builder's license?

1      A     I didn't have to take any.  I've been doing

2   this for 40-something years and we ain't had to have a

3   building license but the last 15, 18 years and I was

4   grandfathered in.

5      Q     Okay.  And you said you have to take

6   seminars to keep up your license.  What type of

7   seminars do you have to take?

8      A     Whatever they require that year.

9      Q     How many -- how many do you take a year?

10     A     Well, it depends if it's a four-hour class

11  or an eight-hour class.  You have to have so many

12  hours and it's not the same every time.

13     Q     Generally how many hours do you need to

14  take?

15     A     Eight most of the time.

16     Q     About eight.  Okay.  Did you attend any

17  technical schools or anything like that?

18     A     (No verbal response.)

19     Q     And what is your primary profession?

20     A     I build, lay block and brick, construction.

21     Q     Construction?

22     A     Yeah.

23     Q     And how long have you been practicing

24  construction?

25     A     Well, I started contracting in '77, still in

9

1  high school.

2       Q     And what type of -- what type of work do you

3  generally do in terms of the type of construction,

4  contracting?

5       A     Well, it depends on -- most of the time I

6  lay block and brick.  But, I mean, I've built houses

7  from start to finish.  I've built carpet mills, I

8  mean, you know, but that's over a 40 -- 40-year

9  period.

10      Q     And how many houses have you built from

11  start to finish as you mentioned earlier?

12      A     I don't know.  Several.

13      Q     More than --

14      A     A bunch.

15      Q     More or less than 10?

16      A     More.

17      Q     More or less than 50?

18      A     Probably less.  I don't know.

19      Q     And where do you currently work?

20      A     I'm self-employed.  I work lots of places.

21      Q     You said you're self-employed?

22      A     Yeah.

23      Q     You have your own company?

24      A     Yeah.

25      Q     What's the name of your company?

1        A       Dwight Scott Masonry.

2        Q       And you primarily focus on masonry?

3        A       I do now.

4        Q       You said you do now.  Since when have you

5    focused on masonry?

6        A       Well, used to you done any and everything to

7    stay busy.  But the more sophisticated everybody's

8    got, they look at it that you're cutting in on them

9    and, you know, I chose that and that's what I do most

10   of the time.

11       Q       And when did you make that transition?

12       A       I don't know.

13       Q       Was it more or less than 10 years ago?

14       A       More.

15       Q       More?  More or less than 20 years ago?

16       A       Less.

17       Q       So about somewhere between 10 and 20 years

18   ago was when you started to focus on masonry work; is

19   that right?

20       A       Yes.  But during that time, I still built

21   four or five houses in the last 12 years.

22       Q       Is your company registered with the State of

23   Georgia?

24       A       The city of Florida?

25       Q       The State of Georgia.  Is your company,

11

1    Dwight Scott Masonry, registered with the State of

2    Georgia?

3         A    I don't know.

4         Q    Did you register your company with the State

5    of Georgia, with the Secretary of State?

6         A    No.

7         Q    Did you register your company with any other

8    state?

9         A    No.

10        Q    Do you have a general contractor's

11   license --

12        A    Yes.

13        Q    -- for Georgia?

14        A    Yeah.

15        Q    You do?  Can you tell me your license

16   number?

17        A    No.  If you go online, you can look it up.

18   It will show up.

19        Q    What is your -- your general contractor's

20   license listed under?

21        A    Dwight Scott.

22        Q    Is it under your name?

23        A    Dwight Scott.

24        Q    Dwight Scott?  Have you ever supervised any

25   contracting work?

1      A     Yeah.  Uh-huh.  Yes, ma'am.

2      Q     Okay.  And can you describe some of your

3 experience with that?

4      A     I don't know how to describe it.

5      Q     Okay.  Can you tell me some of the jobs

6 you've overseen?

7      A     I can -- I can name thousands, but I don't

8 understand.  I mean, what would you like to know?  I

9 mean, I'm on a house over there now that's probably a

10 $12 million home and I'm there every day working

11 supervising.

12     Q     Okay.  And it's -- you were hired to

13 supervise that work?

14     A     And to work.  My crew is there and I'm to

15 supervise work.

16     Q     Are you supervising the masonry work or the

17 entire job?

18     A     Whatever occurs that needs to be done to

19 make my job better.

20     Q     And that -- and that job -- you said to make

21 your job better?

22     A     To make it more efficient that I don't have

23 problems to come up later on.

24     Q     Sure.  But what is your job?  You said to

25 make your job more efficient.  What is your job in

1    that particular --

2         A    To satisfy the customer.

3         Q    What work are you contracted to do in

4    that -- on that job?

5         A    I take care of all the masonry work, pouring

6    footings, getting, you know --

7         Q    So your job in that -- on that job is to do

8    masonry work?

9         A    Yeah.

10        Q    Okay.  I am going to give you a copy of the

11   subpoena that you were given.  I'm going to mark that

12   as exhibit one.

13             (Defendant's Exhibit 1 was marked for

14        identification.)

15   BY MS. BRISBANE:

16        Q    And have you seen that document before?

17        A    Yeah.  I have it here.

18        Q    Can you flip to exhibit A on page five?  So

19   the subpoena asked you to bring a list of documents

20   that are on -- I'm sorry.  Page four.  Did you read

21   that?

22        A    Can I read it?

23        Q    No, I said have you read it.

24        A    Yeah.

25        Q    And do you have any documents responsive to

1    these requests with you today?

2        A    I brought all I've got.

3        Q    You brought all you've got?

4        A    Yeah.

5        Q    Do you mind if you'd hand those over please?

6        A    This right here is a copy of the bill and

7    this is where it come from.

8        Q    Okay.  All right.  And I'm going to go

9    through each of these document requests that are on

10   this list.  I'm sorry.  What is this?  Is this your

11   form 1099 from Integra Rehabilitation?  Is this what

12   you received for the job that you did in 2014-2015?

13       A    Correct.

14       Q    All right.

15       A    I want my bill book back.

16       Q    Yeah.  We're going to try to see if we can

17   make copies of all of this before --

18       A    I've got you a copy there.

19       Q    So to just kind of go through this just to

20   make sure that we have everything, the first -- the

21   first request asks for any and all documents and

22   communications, including and not limited to

23   contracts, invoices, work logs, reports, timesheets,

24   checklists, approval forms, e-mails and correspondence

25   that relate to work under your independent

15

1     construction agreement dated April 14th, 2014, with

2     Integra Rehabilitation.  Are you saying that this is

3     all the documents you have related to that job; is

4     that right?

5          A     That's it.

6          Q     Okay.  Number two on the subpoena says

7     produce any and all documents and communications that

8     relate to the masonry work you performed on 1013

9     Riverbirch Parkway, Dalton, Georgia 30721.  Is this

10    all the documents you have related to the masonry work

11    that you've done on that?

12         A     That's it.

13         Q     Okay.  It says produce any and all documents

14    and communications that relate to your subcontracting

15    work you performed with Kim L. Woods Construction,

16    Inc.  Do you have any other documents relating to the

17    subcontracting work you did for Kim L. Woods

18    Construction?

19         A     On this particular job?

20         Q     Uh-huh.

21         A     No, ma'am.  I have no more information.

22         Q     Okay.  Number four says produce any and all

23    documents and communications that relate in any way to

24    work you performed for CHSI or its subsidiaries,

25    including Integra Rehabilitation.  Are these all the

1    documents for the work you completed for CHSI or
2    Integra or any subsidiaries of CHSI?
3        A    What's the question now?
4        Q    Are these all the documents you have related
5    to work you performed with CHSI -- for CHSI or its
6    subsidiaries?
7        A    Yeah.
8        Q    Did you do any other jobs for CHSI or any of
9    its subsidiaries?
10       A    Have I ever done anything else?
11       Q    Yes.
12       A    Well, I don't understand -- y'all got a lot
13   of different names and a lot of different companies,
14   but I titled everything under Ethica.
15       Q    Okay.
16       A    And I don't have no idea -- I can't tell you
17   the timeframe.  Y'all got computers.  You can go back
18   and look.  But one other time another party called me
19   and asked me to look at a building.  And I looked at
20   it and then I got them some quotes together to do some
21   remodeling.  They chose not to do the remodeling and I
22   received $500 for my services.
23       Q    Okay.  You said this was with Ethica?
24       A    Yeah.  I am assuming it's Ethica.  I mean, I
25   don't -- it's -- it's this -- this group.

1      Q     And do you recall when that occurred?

2      A     No.

3      Q     Was it more or less than 10 years ago?

4      A     Probably 10, 12 years ago.  I don't know.  I

5  can't answer that.

6      Q     So you're not exactly sure, but you think

7  it's around 10 to 12 years?

8      A     I'm saying it could be.

9      Q     Do you think it could be five years or less

10  ago?

11      A     No.  I don't think so.  But, then again, I

12  can't say that it ain't because a good friend of mine

13  died and I went to the funeral home to see him Monday

14  and he done vinyl siding for me.  And when I got out

15  of the funeral home, they had a thing on him that said

16  he'd been selling insurance for 19 years.  I'd have

17  said four or five.  So I don't know.  I don't have a

18  good timeframe.

19      Q     Do you remember who you -- who your contact

20  was regarding this job that you did with Ethica and

21  the quotes?

22      A     Yeah.  Yeah.

23      Q     Who was your contact?

24      A     Pam Clayton.

25      Q     Pam Clayton?  And do you remember anything

18

1   else about that job that you did with Ethica?

2        A    No.  They called me.  I went and looked at

3   it.  I got the prices together.  They decided they

4   didn't want to do anything at that time.  I got paid

5   for the services I had rendered and I forgot about it

6   until you started asking me.

7        Q    And?

8        A    That's all that I have ever --

9        Q    Okay.  And did you -- do you have in your

10  files, you know, old or new, any documents related to

11  that job?

12       A    I'm -- I'm going to simplify this.  I've

13  never sent a text message.  I've never turned a

14  computer on.  I don't do no more with records than I

15  have to.  When I do a job, I am responsible for that

16  job for one year as far as liability.  After that, all

17  that I keep up with is the monetary, the money, for

18  tax purposes.  And when the time limit's up on that, I

19  do away with that.

20       Q    So the job with Ethica you would have

21  reported on your taxes?

22       A    Ma'am?

23       Q    The job with Ethica you would have reported

24  on your taxes?

25       A    Sure.  Yeah.

1      Q     And how long do you keep your tax

2   information for?

3      A     Seven years.

4      Q     Do you know whether or not any of the tax

5   information that you've had for the last seven years

6   has the information regarding the Ethica job?

7      A     Do I know?

8      Q     Yes.  Off the top of your head, can you tell

9   me whether or not you think those seven years have it?

10      A     Well, I can tell you that they didn't send

11   me any information.  Because anything under $600, a

12   company's not required to send a 1099.  So, therefore,

13   Ethica would have not sent anything.

14      Q     Okay.  And if you can -- going back to the

15   subpoena, exhibit number one, the fifth and final

16   category there says produce any and all documents and

17   communications that relate to trips you took with

18   Stephanie Dotson from June 30th, 2010, to June 28th,

19   2016.

20      A     What page are you on?

21      Q     Page four.

22           MR. HENRY:  I'll show him.  Number five;

23      right?

24           MS. BRISBANE:  Yes, number five.

25           THE WITNESS:  Produce any and all documents

20

1        and communications that -- I don't have any

2        documents.  I have -- I took trips, yeah.

3    BY MS. BRISBANE:

4        Q    Okay.  You said you took trips with her.

5    Can you recall any trips that you took that were

6    related to her job with -- as Mr. Waldrop's secretary?

7        A    Can I recall any jobs that I went with

8    her --

9        Q    I'm sorry.  Any trips.

10        A    Any trips that I went with her that was

11    related to her job with Mr. Waldrop?

12        Q    Yes.

13        A    No, ma'am.  I've never went on a trip with

14    her that was related to her job.

15        Q    Did you ever go to Amelia Island with her?

16        A    Never.

17        Q    Did your wife ever go to Amelia Island with

18    her?

19        A    Yes.

20        Q    Okay.  How many times did your wife go to

21    Amelia Island with your daughter, Stephanie Dotson?

22        A    Ma'am, I couldn't tell you if my life

23    depended on it.

24        Q    Was it more or less than five time?

25        A    I'd say less, but I don't know.

1      Q     Do you remember when those trips occurred?

2      A     Huh-uh.

3      Q     I'm sorry.  You have to --

4      A     No, ma'am.  I don't.

5      Q     I'm going to give you another document and

6   this will be marked as exhibit two.

7            (Defendant's Exhibit 2 was marked for

8         identification.)

9            MR. HENRY:  I'm going to kind of keep up

10        with these exhibits just to make sure that we

11        don't get them --

12           THE WITNESS:  This one's mine.

13           MR. HENRY:  Yeah, that one's yours.  I know.

14        I'm just going to try to keep it organized.

15           THE WITNESS:  Okay.  Are we through with

16        this one?

17           MS. BRISBANE:  Yes.

18           MR. HENRY:  Yeah.

19   BY MS. BRISBANE:

20        Q     Can you go ahead and tell me what that

21   document is please?

22        A     It appears to be the agreement that I signed

23   with Integra Rehabilitation.

24        Q     Okay.  And if you turn to page two, is that

25   your signature?

22

1      A      Yeah.  Yes.

2      Q      Okay.  The contract is dated April 14th,

3  2014.  Do you see that on page one, the effective

4  date?

5      A      Do what now?

6      Q      If you look at the top right corner on the

7  first page --

8      A      This right here?

9      Q      It's on that page as well.  So it's dated in

10  April 2014; is that right?

11      A      That's what it says.

12      Q      Okay.  How long before you signed this

13  contract did CHSI or Integra Rehabilitation contact

14  you regarding the work that you were hired to do under

15  this contract?

16      A      I couldn't tell you that, ma'am.  I don't

17  know.

18      Q      Was it within a week of when you signed this

19  contract?

20      A      I'd say that it was maybe longer than that.

21  You could go back and look at the bids that I went out

22  and got for them.  They have a record of that.  I'm

23  satisfied I don't.

24      Q      Okay.  So you -- you got bids for them

25  before you signed this contract?

1        A     Yes, I did.  Yes.

2        Q     How long did it take you to get the bids?

3        A     I can't remember that.

4        Q     How long does it generally take you to get

5    bids?

6        A     It depends on how fast everybody moves.

7        Q     Does it normally take you -- for a job of

8    this size, does it normally take you a month?

9        A     I would ask for a month.

10        Q     So about -- you would ask for --

11        A     It could have been a week.  It could have

12    been a month.  It depends on how -- how much everybody

13    was wanting to go after the job and get it.

14        Q     Okay.  You said you generally ask for a

15    month, though?

16        A     I said I would in this situation if they

17    asked me to have a timeframe.  But they didn't ask me

18    for no timeframe.

19        Q     They didn't ask you for a timeframe?  And by

20    that, you mean CHSI didn't?

21        A     In getting the bids.

22        Q     In getting the bids.  Okay.  So when people

23    don't ask you for a timeframe -- in your jobs

24    generally, if people don't ask you for a timeframe,

25    how quickly do you try to get the bids?

1      A     Whenever I can get them together, I turn

2  them in.

3      Q     Okay.  And how long does that generally

4  take?

5      A     Ma'am, I don't know.  Sometimes it's a week;

6  sometimes it's a month.

7      Q     Is it less --

8      A     Say from one day to 30 days if you've got to

9  have a timeframe.

10      Q     One day to 30 days?

11      A     Yeah.

12      Q     Okay.  Do you know -- why were you called in

13  to do this job?  What happened that made them ask you

14  to do some work for you -- work for them?  Sorry.

15      A     Can it be my opinion or does it got to be

16  proven paperwork?

17      Q     Why do you believe they brought you in?

18      A     Why do I believe?

19      Q     Sure.

20      A     For the same reason that I have never sat

21  down and had a personal conversation with Mark

22  Waldrop.  I've never talked to him on the telephone.

23  I've never sent him a text message.  I've never had

24  anything other than just casual conversation in group

25  meetings, one on one passing.  But I have had years of

25

1    people that have worked for him that talk about the

2    high standards that he maintains, about the

3    white-glove inspections and how he runs a tight ship

4    and how he has always treated everybody with the same

5    respect.

6              And I know it don't mean nothing to you or

7    to anybody else in this room, but my salvation means

8    more to me than anything in this world.  You can't put

9    a dollar amount on it.  You can't buy me to deviate

10   from what I believe and how I feel.  And when somebody

11   meets that criteria, I hold them to the highest

12   standards.

13             And I feel like in the years that he's been

14   there and the people that I have worked for, he has

15   heard of the work.  He has saw the different jobs that

16   I have done.  And that is what caused him to want me

17   to be there and to be a part of it.

18        Q    Okay.  So Mr. Waldrop is the person who

19   contacted you about the job?

20        A    No, ma'am.  I told you.  I have never talked

21   to him -- to Mark on the phone.

22        Q    Okay.  Who brought you in on the job?

23        A    His secretary, which is my daughter, called

24   me.

25        Q    Ms. Dotson called you?

26

1      A      Right.

2      Q      What did she say to you when she brought you

3  in on this job?

4      A      She told me that they were -- well, let's

5  back up.  Before this ever even happened, Mark was

6  looking to move from where they were over there out

7  from the hospital and the whole -- they had a mold

8  issue.  They had problems there.  He was looking at

9  building or buying.

10             They found this building over there.  His

11  secretary, which is my daughter, called me and wanted

12  me to go look at the building.  I went and looked at

13  the building, walked through it, and I told him --

14  told her to tell him the location, with the way that

15  things were already set up, with the landscape, with

16  everything, that he would be far better off to buy

17  than to build.

18      Q      When did that occur?

19      A      I couldn't tell you.  You can go back and

20  look and see when they bought it.

21      Q      And did you get paid for that consultation?

22      A      No, I didn't.

23      Q      Okay.

24      A      I never received a penny.

25      Q      Okay.  And you said -- and going back to my

1  original question, what was said to you when they

2  hired you for this job?  When they first contacted you

3  about this job related to this contract, what did

4  Ms. Dotson say to you?

5       A    She told me that they were looking to have

6  to remodel.  There was some issues with -- I can't

7  even remember.  They was going to have to make some

8  changes in there.  They wanted good contractors and so

9  I got the bids for them.  And the understanding was is

10  that I would overlook and see and make sure that they

11  done the job in a timely manner and were professional

12  about it and do what was right more or less, not get

13  hung out.

14          I mean, you read all the time -- you hear

15  all the time about people getting took to the

16  cleaners.  And I feel like the reason -- like I said,

17  this is my opinion -- I feel like the reason Mark got

18  me is I'm here every day in this town working.  I know

19  the contractors.  I know the people.  He's in health.

20  And I feel with all my heart that he trusted me.  I

21  felt like that I was the best link to getting the best

22  product at the best price honestly and that's why they

23  contacted me I feel like.

24       Q    But he's never -- Mr. Waldrop's never spoken

25  to you?

1       A       You mean never spoke?  We speak.  I spoke to
2    him out there.
3       Q       Prior to this job, you said you never had a
4    conversation with Mr. Waldrop?
5       A       No, that ain't what I said.  I said I had
6    never called him on the phone nor he had never called
7    me.  We had never had a conversation on the telephone.
8       Q       Oh.  Okay.
9       A       We had never texted.  I said our
10   conversations that we had had were amongst other
11   people or just passing.
12      Q       Okay.  Did you have any conversations with
13   Mr. Waldrop about this job?
14      A       I talked through Stephanie.
15      Q       Did you have -- ever have any direct
16   conversations with Mr. Waldrop regarding this job?
17      A       I can't say whether I did or didn't.  I
18   don't -- I don't know.  I couldn't -- I can remember
19   at the end I had to get them the painters in there to
20   repaint and to redo some caulking and when I was in
21   there going through a walk through, I can't say
22   whether he was there or not.  I don't know.  I can't
23   remember.
24      Q       But if you had any conversations with
25   Mr. Waldrop about this job, someone else would have

1    been in the room?

2         A    Sure.  Yeah.  My daughter would have been

3    there at least.

4         Q    Your daughter would have been there?

5         A    Yeah.  Yeah.  At least her or some of the

6    other contractors.  But I feel like I'm 99.9 percent

7    sure that all of mine was done through my daughter.

8    He'd have questions.  She'd ask.  I would answer.

9         Q    So Ms. Dotson would tell you Mr. Waldrop had

10   a question about X thing and --

11        A    Yes.

12        Q    -- she would direct those questions to you?

13        A    Yeah.  And I would either answer the

14   question then or I would find out.

15        Q    The contracting -- just to clarify, they

16   brought you in because they wanted to remodel the

17   space and then you got bids.  Is that fair to say?

18        A    I got what?

19        Q    Bids.

20        A    Bids?  Yes.  Uh-huh.

21        Q    During this process, did a flood occur at

22   that space while you were undergoing this process?

23        A    Yeah.  Yes.

24        Q    Can you tell me a little bit about the

25   flood?

1      A     It had water damage.

2      Q     And how did that change your job?

3      A     It didn't change mine.

4      Q     How did it affect your job at all?

5      A     It had -- things had to be done on a

6  different scale.  It had to be stepped in.  It had to

7  be done.  It had to be addressed.

8      Q     If you can look back at the contract, if you

9  look at section 1.1, scope of work, it says that you

10  were tasked with overseeing the services and

11  workmanship described in exhibit A.  Do you see that?

12      A     Yeah.

13            (Defendant's Exhibit 3 was marked for

14         identification.)

15  BY MS. BRISBANE:

16      Q     Okay.  I am going to put a document marked

17  as exhibit three in front of you.  Can you tell me if

18  that's a copy of exhibit A referred to as exhibit A in

19  section 1.1?

20      A     Can I tell you what?

21      Q     If exhibit three, the document that was just

22  placed in front of you, is the exhibit A that's

23  described in 1.1 -- in section 1.1 of your contract.

24      A     I guess it is.  Are you asking me if this is

25  a breakdown of this paragraph?

1      Q     No.  I'm asking -- if you'll look in the

2  first sentence, the third line of the first sentence

3  in section 1.1 --

4      A     Oversight of project will be performed in a

5  professional manner?

6      Q     Yes.  I'm sorry.  That's the second

7  sentence.  I thought it was a comma.  It says

8  contractor agrees to monitor and oversee workmanship

9  as construction superintendent the services described

10  in exhibit A herein provided and agreed upon by

11  independent contractor Kim L. Woods Construction,

12  Inc., at the location of said company as described

13  herein.  What I'm asking you -- it says the services

14  described in exhibit A.  Do you see that?

15      A     Yeah.  Right here.

16      Q     Okay.  Is that a copy of exhibit A?

17            MR. HENRY:  You're referring to exhibit

18       three?

19            MS. BRISBANE:  I'm sorry.  Exhibit three.

20  BY MR. HENRY:

21      Q     Is exhibit three a copy of exhibit A that

22  was described in section 1.1?

23            THE WITNESS:  Is it?  I don't know.

24            MR. HENRY:  I can't -- I'm just trying to

25       help you organize the documents.  I can't --

32

1    BY MR. HENRY:

2         Q    He can't respond.

3              MR. HENRY:  I can't respond.

4              THE WITNESS:  Well, I can't either.  I don't

5         understand what you're saying.  I asked you is

6         this a breakdown of what this says.

7    BY MS. BRISBANE:

8         Q    Okay.  Section 1.1, you see it refers to

9    exhibit A?

10        A    Yeah.

11        Q    The document you have in your hand right now

12   that has that sticker that says exhibit three --

13        A    Yeah.

14        Q    -- is that exhibit A?

15        A    Yeah.  I'd say it is.

16        Q    Okay.  Do you know whether Kim L. Woods ever

17   signed a copy of exhibit A or exhibit three?

18        A    If you'll read in that contract, I can't

19   answer for him; he can't answer for me.

20        Q    Sure.  Does that mean you don't know?

21        A    That means -- well, if I did, I wouldn't

22   answer for him.

23        Q    Okay.

24        A    And the contract that I signed, if you'll --

25   if you'll read it, it says that I don't answer for him

33

1   and he don't answer for me.

2        Q    Yes.  But my question was did you know

3   whether or not he signed it.

4        A    I don't know.

5        Q    Okay.  How were you involved in the hiring

6   of Kim L. Woods Construction?

7        A    I went and got bids and he was one of the

8   ones that I got a bid from.

9        Q    So did he give you the best bid?

10       A    Well, the bids I got -- I can't remember.

11  It was within -- I'm going to say within $3,000 of

12  each other.  I mean, I -- and I'm talking about

13  remembrance.  You can go back and look.  I don't know,

14  but I'd say it was within $3,000.  And being that

15  close, I felt like he was more qualified, more able to

16  go in, do the job, get it done, than the other one

17  was.

18       Q    And what was the basis of your opinion that

19  he was more qualified?

20       A    I've been working with all of them for 30

21  years.

22       Q    So you had a previous -- you had previous

23  experiences with Kim L. Woods; is that right?

24       A    I had before that, during that, and have

25  now.

34

1      Q      And what did you do on a day-to-day basis

2    or --

3      A      It could change.  I'm doing something today

4    I ain't never done before.

5      Q      Sure.  But --

6      A      You'll have to be more specific.

7      Q      With regards to this job and this contract,

8    the work that you did under this contract, what did

9    you personally do on a day-to-day basis related to

10   this contract and this job?

11     A      I answered questions.  I went by.  I looked

12   at the jobs.  I answered any questions that come up.

13   I tried to protect the building.  I mean, like, one

14   thing I remember -- and why it happened, I don't

15   know -- but I told them from the start that the

16   filters had to be changed every week.  Every week.  I

17   said if you don't, it will cause problems with the

18   units.  And I had to get onto them for not changing

19   the filters.  I remember that.

20            But overall, the job went smooth, had no

21   problems.  Like I said, at the end, I remember we had

22   to have -- we had to have some caulking redone and

23   some painting fixed.  But other than that, I was well

24   satisfied.

25     Q      Okay.  When you said you had to get onto

1   them about changing the filters, are you referring to

2   Kim L. Woods?

3        A    When I say get onto, I had to remind them.

4        Q    By them, are you referring to Kim L. Woods

5   Construction?

6        A    His employees.

7        Q    His employees?  And in terms of the caulking

8   and the painting, was that also Kim L. Woods

9   Construction?

10       A    Yes, ma'am.

11       Q    And how often did you usually visit the work

12  site?

13       A    I can't tell you that.  Sometimes it was

14  more than once in a day and sometimes it wasn't.

15       Q    Did you visit it every day?

16       A    No.

17       Q    About how many times a week did you --

18       A    I don't know.

19       Q    You don't know?

20       A    I don't know.

21       Q    You don't remember at all?

22       A    I don't remember at all.  I wouldn't even

23  attempt to answer that.

24       Q    Okay.

25       A    That's like asking me how many times I left

36

1    the job yesterday.  I couldn't tell you if my life

2    depended on it.  When it's just something you do and

3    it's your everyday thing, you don't -- you don't have

4    a mindset of it.  You don't think about it, you know.

5              I mean, I forgot about this job.  I'll be

6    honest with you.  I was totally shocked when I was

7    asked about this.

8         Q    In terms of the things -- besides the

9    filters and the caulking and the painting, do you

10   recall if there were any other issues you had to point

11   out to Kim L. Woods Construction or his employees that

12   needed to be fixed?

13        A    Look, I got the most qualified people that I

14   felt like I could get to do the job.  If I had went

15   out and got somebody that was going to require me to

16   be there and to be standing over them and to be able

17   to give you a long list for reasons of why I should

18   have been hired, I wouldn't have been doing my job to

19   start with.

20             I got the best people that I could get.  It

21   went smoothly.  We had not -- did not have a lot of

22   issues.  They were so minor that I'm not recalling

23   them.  And if there were issues, they were minor stuff

24   that I should have been able to take care of and did.

25   And so, therefore, I would not point out and throw

37

1    anybody under the bus.

2            I was well satisfied with the way they done,

3    the way they conducted their job, and so, therefore,

4    I'm not trying to come up with anything to say that

5    deemed me necessary to be there to getting onto them

6    or fixing or anything else.

7            I done my job best from the getgo when I got

8    what I felt like was the best, just like -- and I know

9    I'm saying more than I ought to, but whatever this is

10   all about, when they hired you, they should have felt

11   like they was getting the best.  If they didn't, they

12   messed up.  The same way with that.

13           And I'm just an old country boy from the old

14   school.  I'm just going to speak from the heart and

15   tell you how it is.  They got what they felt like was

16   the best.  Whether it was the right decision or the

17   wrong decision, based on what you think or come up

18   with, morally and from the heart, I feel Mark Waldrop

19   done what he felt like was best for the company and I

20   can't go past that.

21       Q    Mr. Scott, do you know anything about the

22   company that you just referred to?

23       A    Do I know anything about them?

24       Q    CHSI.  What do you know about CHSI?

25       A    I don't know nothing about them.

38

1      Q     Okay.  Now, to go back to my previous
2  question, you said -- I asked whether or not there
3  were any other issues that you had to point out to Kim
4  L. Woods.
5      A     And I --
6      Q     You said -- you said that you didn't want to
7  throw anyone under a bus by pointing out any others.
8      A     No, I said --
9      Q     Let me finish my question, sir.  I would
10  like to remind you that you're under oath.  So whether
11  or not you want to push anyone under a bus is -- you
12  have to tell me the truth.  Okay?
13            Were there any other issues that you recall
14  that you had to point out besides the caulking, the
15  painting and the filters?
16      A     No, ma'am.  And you didn't tell all of what
17  I said.  I'm sure it's being recorded.
18      Q     It is.
19      A     I said that they were so minor that I dealt
20  with them and that there was no problem and when I
21  done that, I was doing what I was hired to do.  And to
22  sit here and to nitpick and to try to come up with
23  something to justify me being there, to throw them
24  under the bus, I wouldn't do it.
25      Q     So you don't recall any other --

39

1      A      No.

2      Q      -- specific issues?

3      A      No.  Not with Kim L. Woods.

4      Q      Thank you.  When there was an issue or you

5  had --

6      A      Pardon?

7      Q      You said when there was an issue or you had

8  a question about the work or the work site, to whom

9  did you report?  Was that your daughter?

10     A      My daughter.  And if it was something that I

11 needed to address to the -- to Kim's boys to take care

12 of, I told them.

13     Q      And Ms. Dotson was also your primary contact

14 with regards to Integra Rehabilitation and this job

15 generally; is that right?

16     A      Uh-huh.  Correct.

17     Q      How often did you speak with her about the

18 job?

19     A      I don't have a clue.

20     Q      Do you think it was a daily basis?  A weekly

21 basis?

22     A      Well, there again, we talked more than once

23 in a week.  But, you know, to say on a daily basis,

24 no.

25     Q      And did you work with anyone else other than

40

1    Ms. Dotson from Integra Rehabilitation or Community

2    Health Services, Inc.?

3        A    No, ma'am.

4        Q    In addition to your general contract, your

5    supervisory role on this job, didn't you also do some

6    subcontracting work for K.L. Woods on some masonry?

7        A    I have done work for Kim ever since he

8    opened the doors of his business.

9        Q    Yes.  I'm talking about on this particular

10   job.  Didn't you also do some subcontracting work?

11       A    Yes.  That's what that bill is right there.

12       Q    Okay.  And how did you become the person who

13   did the masonry work on the job?  Did Kim L. Woods ask

14   you to do that?

15       A    I do all his masonry work.

16       Q    And how much were you paid for that job?

17       A    It's on the bill there.

18       Q    Well, can you read it for me then?

19       A    $1,000.

20       Q    Okay.  Thank you.  I'm going to give you

21   another document.  This is going to be exhibit four.

22            (Defendant's Exhibit 4 was marked for

23        identification.)

24            THE WITNESS:  Are we through with this one?

25            MR. HENRY:  Probably.  Let me just --

41

1          MS. BRISBANE:  Yeah.  We're done with that.

2    BY MS. BRISBANE:

3      Q    Looking at that document, is that a copy of

4    your W-9 that was provided by Integra Rehabilitation

5    that you -- I'm sorry -- that you provided to --

6    strike that.  Is that a copy of the W-9 you provided

7    to Integra Rehabilitation when you started this job?

8      A    It appears to be.

9      Q    And the name that you provided was Dwight

10   Scott Masonry; is that right?

11     A    Yes.

12     Q    Okay.  Thank you.

13          (Defendant's Exhibit 5 was marked for

14          identification.)

15   BY MS. BRISBANE:

16     Q    I'm going to give you another document

17   marked exhibit five.

18     A    Are you through with this one?

19     Q    Yes.  Do you recognize that document?

20     A    Uh-huh.

21     Q    What is it?

22     A    It's the bill for services.  Right there is

23   the 1099.

24     Q    It's the bill for the work you did on -- the

25   work that you did under the contract that was exhibit

42

1   two?

2         A     Right.  Right.  Yes, ma'am.

3         Q     Okay.  Did you provide Integra

4   Rehabilitation or Community Health Services any other

5   invoices related to this job?

6         A     No, ma'am.

7         Q     Okay.  The contract --

8         A     Well --

9         Q     I'm sorry.

10        A     When you say invoices, are you meaning

11  bills?

12        Q     Yes.  Bills.

13        A     No, ma'am.

14        Q     No?  If you look down halfway through, it

15  says that you were contracted to oversee renovation

16  scope of work performed at a rate of 10 percent of

17  final build-out/renovation costs.  Do you see that?

18        A     Yeah.

19        Q     How did you determine the final total for

20  the final build-out?

21        A     My -- my contract was just to oversee Kim

22  Woods.

23        Q     Yes.

24        A     Yeah.  And that's where I -- as to how I

25  arrived at that, what the total cost of the job was

43

1    didn't involve me.

2        Q    Okay.  But how did you find out the total

3    cost of the job, of Kim L. Woods' job?

4        A    Integra provided me with that.

5        Q    And did they provide you any documentation

6    showing that?

7        A    No, ma'am.

8        Q    Or did they just tell you orally?

9        A    It was orally.

10       Q    And when you say Integra told you that, was

11   that Ms. Dotson who told you?

12       A    Right.

13       Q    Okay.  So you never saw any invoices from

14   Kim L. Woods?

15       A    No, ma'am.

16       Q    Did Integra or Community Health Services pay

17   this bill in full?

18       A    Did they what?

19       Q    Did they pay the bill completely?

20       A    Yes, ma'am.  Uh-huh.

21       Q    And it was -- according to the 1099 that you

22   provided, it was Integra --

23            THE WITNESS:  Hand that here a minute.

24            MR. HENRY:  Sure.

25   BY MS. BRISBANE:

44

1      Q     It was Integra Rehabilitation that paid you;
2  is that right?
3      A     Yeah.  That's exactly right.
4      Q     And were you paid any other amounts in
5  connection to this job besides the amount of the
6  invoice and the -- the amount -- the $1,000 for the
7  masonry work?
8      A     No, ma'am.
9      Q     Okay.  If we can take a brief break, I will
10 let you know if we're done -- if I am done questioning
11 you.  Mr. Henry may have some additional questions.
12     A     I'm satisfied they've got a copy of this.
13 If you need a copy, I'd like for you to get it and
14 give it back to me because I want to retain this in my
15 records --
16     Q     Sure.
17     A     -- till my seven years is up.
18     Q     Okay.
19           (Whereupon, a recess was taken from 9:48
20     a.m. until 9:57 a.m.)
21           (Defendant's Exhibit 6 was marked for
22     identification.)
23 BY MR. HENRY:
24     Q     I'm going to give you a document marked
25 exhibit six.  Can you just confirm that that is the --

45

1   the bill for the work that you did, the masonry work

2   that you did for Kim L. Woods on the Integra building?

3        A    Yes.

4             (Defendant's Exhibit 7 was marked for

5        identification.)

6   BY MR. HENRY:

7        Q    And for exhibit seven, can you verify that

8   that is a copy of the 1099 that you provided earlier

9   to us?

10       A    Yes.

11       Q    I have a few more questions and then I'll

12  let --

13       A    Do you want this back or is this --

14       Q    Just put them there.

15            MR. HENRY:  Yeah.  I'll stick them -- these

16       tend to leave the room --

17            THE WITNESS:  What?

18            MR. HENRY:  These tend to leave the room if

19       we don't keep them in a nice neat stack.  So I'm

20       going to do that.

21            THE WITNESS:  What was that one?  Oh.

22       That's supposed to be before that.

23            MR. HENRY:  Yeah.

24  BY MS. BRISBANE:

25       Q    So I just have a few more questions and then

46

1    Mr. Henry is going to ask you a few.  First, can you

2    tell me the size of your company, of Dwight Scott

3    Masonry?

4         A    The size of it?

5         Q    Yes.  How many employees do you have?

6         A    Let's see.  Seven besides myself.

7         Q    Okay.  And is that the same number of people

8    you had at the time that you worked on the job at --

9    for Integra?

10        A    I can't answer that.  I'd have to -- I'd

11   have to go back and look.  I've had as high as 20

12   employees.

13        Q    And did you personally do the masonry work

14   on that building, the Integra building, or did you

15   have one of your employees do it?

16        A    I had more than one out there.

17        Q    Okay.  Do you recall about how many you had

18   working on it, the masonry work?

19        A    I'd say I had three or four.

20        Q    Three or four?  Okay.

21        A    But, now, I don't know.  I mean, if y'all

22   got cameras that shows that many, I don't know.  I'd

23   say three or four, but, you know, I don't know.

24        Q    And do you recall the -- how large Kim L.

25   Woods' operation was at the time that he worked on

47

1   Integra -- the Integra building?

2          A     How large --

3          Q     Yes.

4          A     -- his company was?

5          Q     Uh-huh.

6          A     Pretty big.

7          Q     Can you give me a ball-park figure in terms

8   of how many employees you think he had?

9          A     No.

10         Q     Was it more or less than 50?

11         A     Oh, it's less than 50.

12         Q     More or less than 25?

13         A     More or less.

14         Q     So around 25?

15         A     I don't know.

16         Q     Okay.

17         A     I don't have a clue.

18         Q     Okay.

19         A     That would be like asking me how many is

20  over there in that building where we work.  I don't

21  know.

22         Q     Okay.  Do you recall at all whether it was

23  more or less than, like, 40?

24         A     Do what?

25         Q     Was it less than 40?

1        A     I'd say it was.  I mean, 40 is a big --

2        Q     Was Kim L. Woods' company larger or smaller

3   than your company?

4        A     They're larger.

5        Q     They're larger.  Okay.  Are they

6   significantly larger than your company?

7        A     I'd say they are.

8        Q     Okay.  Had you ever supervised Kim L. Woods'

9   construction work prior to the job you did for Integra

10  Rehabilitation?

11       A     Be more specific.

12       Q     Under your contract for this job, you were

13  tasked with supervising Kim L. Woods Construction.

14  Had you ever had -- were you ever hired to supervise

15  them for any other job?

16       A     I have got them to do several jobs for me.

17  You can deem it ever how you want to.

18       Q     Were you responsible on those jobs for

19  supervising Kim L. Woods' work?  I'm not asking

20  whether or not you hired them.  I'm asking whether or

21  not you were responsible for --

22       A     If they hadn't have done it, it would have

23  come back to me, yes.

24       Q     So -- I'm just trying to get some

25  clarification.

49

1        A    If you're asking me if I could produce more

2    contracts like this that I have signed, I normally

3    don't sign contracts.  I don't normally do it.  But it

4    being who it was and what it was, that's the way they

5    do things and I signed it.  Everything I do is by

6    handshake and word of mouth.

7        Q    Okay.  But that's not the question I'm

8    trying to ask you.

9        A    And I have supervised their jobs.  But for

10   you to say, okay, Mr. Scott, prove it, I can't.

11       Q    Again, this is not quite my question.  I'm

12   asking whether or not you've ever been hired to -- for

13   the specific purpose of supervising K.L. Woods' work

14   before.

15            MR. HENRY:  Kim L. Woods?

16   BY MR. HENRY:

17       Q    I'm sorry.  Kim L. Woods Construction work.

18       A    I have had jobs.  Say I got this one.  Say

19   this one.  They said, Dwight, do this job.  It did

20   not -- and it didn't specify Kim Woods, but I called

21   Kim Woods in.  I would have to supervise and make sure

22   they done the job because that company hired me for X

23   amount of dollars.

24       Q    Okay.  So you have been --

25       A    I have done that before.

50

1    Q    Okay.  So you have been hired to oversee a
2  job and then Kim L. Woods was --
3    A    And then I have subcontracted and got him.
4    Q    Kim L. Woods?
5    A    Yes.
6    Q    Okay.  Thank you.  And do you recall about
7  the total amount of time that you spent on the Integra
8  job?
9    A    No.  I told you I couldn't even remember how
10 many times I left yesterday.
11    Q    Okay.  Did you or your wife ever receive any
12 pieces of Waterford crystal from Ms. Dotson?
13    A    Never.
14    Q    Did you ever receive any Waterford crystal
15 from Mr. Waldrop?
16    A    Never.
17         MS. BRISBANE:  No further questions.
18    Mr. Henry's going to --
19         MR. HENRY:  Give me just a moment.
20         MS. BRISBANE:  Sure.
21         MR. HENRY:  No questions.
22         THE WITNESS:  Huh?
23         MR. HENRY:  No questions.
24         MS. BRISBANE:  Well, in that case --
25         MR. HENRY:  We're done.

51

1          (Whereupon, a discussion was held off the

2     record.)

3          MR. HENRY:  Mr. Scott, I just described to

4     you off the record that you have the right to

5     read and sign your transcript; correct?

6          THE WITNESS:  Yeah.

7          MR. HENRY:  And you have waived that right;

8     right?

9          THE WITNESS:  Yeah.

10          MR. HENRY:  Okay.  He waived it.

11          (Whereupon, the deposition was concluded at

12     10:05 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

52

1                              DISCLOSURE

2     STATE OF GEORGIA              Deposition of CARLTON DWIGHT
                                    SCOTT
3     COUNTY OF COBB                Date: March 31st, 2017

4              Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
5     Judicial Council of Georgia, I make the following
      disclosure:

6

7              I am a Georgia Certified Court Reporter.  I
      am here as a representative of American Court
      Reporting Company, Inc.

8

9              I am not disqualified for a relationship of
      interest under provisions of O.C.G.A. 9-11-28(c).

10             American Court Reporting Company, Inc., was
      contacted by the offices of Latoya Brisbane, Esq., to
11    provide court reporting services for this deposition.

12             American Court Reporting Company, Inc., will
      not be taking this deposition under any contract that
13    is prohibited by O.C.G.A. 15-14-37(a) and (b).

14             American Court Reporting Company, Inc., has
      no exclusive contract to provide reporting services
15    with any party to the case, any counsel in the case,
      or any reporter or reporting agency from whom a
16    referral might have been made to cover this
      deposition.

17

18             American Court Reporting Company, Inc., will
      charge its usual and customary rates to all parties in
      the case, and a financial discount will not be given
19    to any party to this litigation.

20             This the 31st day of March, 2017.

21

22

23                          _____
                            BONNIE L. SMITH, RPR, CCR
24                               CCR-B-2432

25

53

1                   C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF COBB)

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    proceedings were reduced to typewriting under my

7    direction and control.

8         I further certify that the transcript is a true

9    and correct record of the evidence given at the said

10   proceedings.

11        I further certify that I am neither a relative or

12   employee or attorney or counsel to any of the parties,

13   nor financially or otherwise interested in this

14   matter.

15        This the 31st day of March, 2016.

16

17

18

19

20

21   _____

22            BONNIE L. SMITH, RPR, CCR B-2432

23

24

25

Mark A. Waldrop v.
Community Health Systems, Inc.

Carlton Dwight Scott
March 31, 2017

**$**

**$1,000 (2)**
40:19;44:6
**$12 (1)**
12:10
**$3,000 (2)**
33:11,14
**$500 (1)**
16:22
**$600 (1)**
19:11

**A**

**ability (1)**
4:20
**able (3)**
33:15;36:16,24
**according (1)**
43:21
**addition (1)**
40:4
**additional (1)**
44:11
**address (1)**
39:11
**addressed (1)**
30:7
**advanced (1)**
7:14
**affect (1)**
30:4
**again (3)**
17:11;39:22;49:11
**ago (6)**
10:13,15,18;17:3,4,
10
**agreed (1)**
31:10
**agreement (2)**
15:1;21:22
**agrees (1)**
31:8
**ahead (1)**
21:20
**ain't (4)**
8:2;17:12;28:5;
34:4
**always (1)**
25:4
**Amelia (3)**
20:15,17,21
**amongst (1)**
28:10
**amount (5)**
25:9;44:5,6;49:23;
50:7
**amounts (1)**
44:4
**answered (2)**
34:11,12

**appears (2)**
21:22;41:8
**approval (1)**
14:24
**April (3)**
15:1;22:2,10
**around (2)**
17:7;47:14
**arrived (1)**
42:25
**assuming (1)**
16:24
**attempt (1)**
35:23
**attend (1)**
8:16
**away (1)**
18:19

**B**

**back (14)**
14:15;16:17;19:14;
22:21;26:5,19,25;
30:8;33:13;38:1;
44:14;45:13;46:11;
48:23
**background (1)**
6:10
**ball-park (1)**
47:7
**based (1)**
37:17
**basis (6)**
33:18;34:1,9;
39:20,21,23
**become (1)**
40:12
**besides (4)**
36:8;38:14;44:5;
46:6
**best (11)**
4:20;27:21,21,22;
33:9;36:20;37:7,8,11,
16,19
**better (3)**
12:19,21;26:16
**bid (2)**
33:8,9
**bids (13)**
22:21,24;23:2,5,21,
22,25;27:9;29:17,19,
20;33:7,10
**big (2)**
47:6;48:1
**bill (11)**
5:14,17;14:6,15;
40:11,17;41:22,24;
43:17,19;45:1
**bills (2)**
42:11,12
**bit (2)**
6:9;29:24

**block (2)**
8:20;9:6
**book (3)**
5:14,17;14:15
**bought (1)**
26:20
**boy (1)**
37:13
**boys (1)**
39:11
**Bradley (1)**
6:22
**break (3)**
5:2,3;44:9
**breakdown (2)**
30:25;32:6
**brick (2)**
8:20;9:6
**brief (1)**
44:9
**bring (1)**
13:19
**BRISBANE (17)**
4:8;13:15;19:24;
20:3;21:17,19;30:15;
31:19;32:7;41:1,2,
15;43:25;45:24;
50:17,20,24
**brought (6)**
14:2,3,24;17;
25:22;26:2;29:16
**build (2)**
8:20;26:17
**builder's (4)**
7:16,17,18,25
**building (12)**
8:3;16:19;26:9,10,
12,13;34:13;45:2;
46:14,14;47:1,20
**build-out (1)**
42:20
**build-out/renovation (1)**
42:17
**built (4)**
9:6,7,10;10:20
**bunch (1)**
9:14
**bus (4)**
37:1;38:7,11,24
**business (1)**
40:8
**busy (1)**
10:7
**buy (2)**
25:9;26:16
**buying (1)**
26:9

**C**

**called (10)**
4:4;16:18;18:2;
24:12;25:23,25;

**26:11;28:6,6;49:20**
**came (1)**
5:25
**cameras (1)**
46:22
**Can (35)**
4:9;5:3;6:10;11:15,
17;12:2,5,7,7;13:18,
22;14:16;16:17;19:8,
10,14;20:5,7;21:20;
24:1,15;26:19;28:18;
29:24;30:8,17,20;
33:13;40:18;44:9,25;
45:7;46:1;47:7;48:17
**care (3)**
13:5;36:24;39:11
**CARLTON (2)**
4:3,11
**carpet (1)**
9:7
**case (3)**
5:23;6:2;50:24
**casual (1)**
24:24
**category (1)**
19:16
**caulking (5)**
28:20;34:22;35:7;
36:9;38:14
**cause (1)**
34:17
**caused (1)**
25:16
**certificates (1)**
7:15
**change (3)**
30:2,3;34:3
**changed (1)**
34:16
**changes (1)**
27:8
**changing (2)**
34:18;35:1
**checklists (1)**
14:24
**children (1)**
6:19
**chose (2)**
10:9;16:21
**CHSI (11)**
7:1;15:24;16:1,2,5,
5,8;22:13;23:20;
37:24,24
**Church (1)**
6:12
**city (1)**
10:24
**clarification (1)**
48:25
**clarify (2)**
4:22;29:15
**class (2)**
8:10,11

**classes (1)**
7:24
**Clayton (2)**
17:24,25
**cleaners (1)**
27:16
**close (1)**
33:15
**closet (1)**
5:14
**clue (2)**
39:19;47:17
**college (1)**
7:12
**comma (1)**
31:7
**communications (6)**
14:22;15:7,14,23;
19:17;20:1
**Community (4)**
7:3;40:1;42:4;
43:16
**companies (1)**
16:13
**company (15)**
9:23,25;10:22,25;
11:4,7;31:12;37:19,
22;46:2;47:4;48:2,3,
6;49:22
**company's (1)**
19:12
**completed (1)**
16:1
**completely (1)**
43:19
**computer (1)**
18:14
**computers (1)**
16:17
**concluded (1)**
51:11
**conducted (1)**
37:3
**confirm (1)**
44:25
**confused (1)**
4:21
**connection (1)**
44:5
**construction (16)**
8:20,21,24;9:3;
15:1,15,18;31:9,11;
33:6;35:5,9;36:11;
48:9,13;49:17
**consultation (1)**
26:21
**contact (4)**
17:19,23;22:13;
39:13
**contacted (3)**
25:19;27:2,23
**contract (18)**
22:2,13,15,19,25;

American Court Reporting Company, Inc.

Mark A. Waldrop v.
Community Health Systems, Inc.

Carlton Dwight Scott
March 31, 2017

27:3;30:8,23;32:18,
24;34:7,8,10;40:4;
41:25;42:7,21;48:12
**contracted (2)**
  13:3;42:15
**contracting (4)**
  8:25;9:4;11:25;
  29:15
**contractor (2)**
  31:8,11
**contractors (3)**
  27:8,19;29:6
**contractor's (2)**
  11:10,19
**contracts (3)**
  14:23;49:2,3
**conversation (4)**
  24:21,24;28:4,7
**conversations (4)**
  28:10,12,16,24
**copies (1)**
  14:17
**copy (12)**
  13:10;14:6,18;
  30:18;31:16,21;
  32:17;41:3,6;44:12,
  13;45:8
**corner (1)**
  22:6
**correspondence (1)**
  14:24
**cost (2)**
  42:25;43:3
**costs (1)**
  42:17
**country (1)**
  37:13
**crew (1)**
  12:14
**criteria (1)**
  25:11
CROSS-EXAMINATION (1)
  4:7
**crystal (2)**
  50:12,14
**currently (2)**
  6:11;9:19
**customer (1)**
  13:2
**cutting (1)**
  10:8

**D**

**daily (2)**
  39:20,23
**Dalton (1)**
  15:9
**damage (1)**
  30:1
**date (1)**
  22:4
**dated (3)**

15:1;22:2,9
**daughter (9)**
  5:22;20:21;25:23;
  26:11;29:2,4,7;39:9,
  10
**day (2)**
  12:10;24:8,10;
  27:18;35:14,15
**days (2)**
  24:8,10
**day-to-day (2)**
  34:1,9
**dealt (1)**
  38:19
**decided (1)**
  18:3
**decision (1)**
  37:16,17
**deem (1)**
  48:17
**deemed (1)**
  37:5
**Defendant's (7)**
  13:13;21:7;30:13;
  40:22;41:13;44:21;
  45:4
**degrees (1)**
  7:14
**depended (2)**
  20:23;36:2
**depends (4)**
  8:10;9:5;23:6,12
**deposed (2)**
  4:12,14
**deposition (3)**
  4:15;5:11;51:11
**describe (2)**
  12:2,4
**described (7)**
  30:11,23;31:9,12,
  14,22;51:3
**determine (1)**
  42:19
**deviate (1)**
  25:9
**died (1)**
  17:13
**different (4)**
  16:13,13;25:15;
  30:6
**direct (2)**
  28:15;29:12
**discuss (2)**
  6:2,4
**discussion (1)**
  51:1
**document (12)**
  13:16;14:9;21:5,
  21;30:16,21;32:11;
  40:21;41:3,16,19;
  44:24
**documentation (1)**
  43:5

**documents (17)**
  5:17;13:19,25;
  14:21;15:3,7,10,13,
  16,23;16:1,4;18:10;
  19:16,25;20:2;31:25
**dollar (1)**
  25:9
**dollars (1)**
  49:23
**done (24)**
  10:6;12:18;15:11;
  16:10;17:14;25:16;
  27:11;29:7;30:5,7;
  33:16;34:4;37:2,7,
  19;38:21;40:7;41:1;
  44:10,10;48:12;
  49:22,25;50:25
**doors (1)**
  40:8
**Dotson (12)**
  5:23;6:23,24;
  19:18;20:21;25:25;
  27:4;29:9;39:13;
  40:1;43:11;50:12
**down (2)**
  24:21;42:14
**duly (1)**
  4:5
**during (3)**
  10:20;29:21;33:24
**DWIGHT (10)**
  4:3,11;10:1;11:1,
  21,23,24;41:9;46:2;
  49:19

**E**

**earlier (2)**
  9:11;45:8
**effective (1)**
  22:3
**efficient (2)**
  12:22,25
**Eight (2)**
  8:15,16
**eight-hour (1)**
  8:11
**either (2)**
  29:13;32:4
**else (6)**
  16:10;18:1;25:7;
  28:25;37:6;39:25
**e-mails (1)**
  14:24
**employees (7)**
  35:6,7;36:11;46:5,
  12,15;47:8
**end (2)**
  28:19;34:21
**entire (1)**
  12:17
**Ethica (9)**
  16:14,23,24;17:20;

18:1,20,23;19:6,13
**even (4)**
  26:5;27:7;35:22;
  50:9
**everybody (3)**
  23:6,12;25:4
**everybody's (1)**
  10:7
**everyday (1)**
  36:3
**exactly (2)**
  17:6;44:3
**examined (1)**
  4:5
**exhibit (34)**
  13:12,13,18;19:15;
  21:6,7;30:11,13,17,
  18,18,21,22;31:10,
  14,16,17,19,21,21;
  32:9,12,14,17,17;
  40:21,22;41:13,17,
  25;44:21,25;45:4,7
**exhibits (1)**
  21:10
**experience (1)**
  12:3
**experiences (1)**
  33:23
**explain (1)**
  4:18

**F**

**fair (1)**
  29:17
**far (2)**
  18:16;26:16
**fast (1)**
  23:6
**feel (8)**
  25:10,13;27:16,17,
  20,23;29:6;37:18
**fees (1)**
  7:20
**felt (7)**
  27:21;33:15;36:14;
  37:8,10,15,19
**few (3)**
  45:11,25;46:1
**fifth (1)**
  19:15
**figure (1)**
  47:7
**files (1)**
  18:10
**filters (5)**
  34:16,19;35:1;
  36:9;38:15
**final (4)**
  19:15;42:17,19,20
**find (2)**
  29:14;43:2
**finish (3)**

9:7,11;38:9
**first (10)**
  4:4;5:21;7:23;
  14:20,21;22:7;27:2;
  31:2,2;46:1
**five (8)**
  10:21;13:18;17:9,
  17;19:22,24;20:24;
  41:17
**fixed (2)**
  34:23;36:12
**fixing (1)**
  37:6
**flip (1)**
  13:18
**flood (2)**
  29:21,25
**Florida (1)**
  10:24
**focus (2)**
  10:2,18
**focused (1)**
  10:5
**follows (1)**
  4:6
**footings (1)**
  13:6
**forgot (2)**
  18:5;36:5
**form (1)**
  14:11
**forms (1)**
  14:24
**found (1)**
  26:10
**four (9)**
  10:21;13:20;15:22;
  17:17;19:21;40:21;
  46:19,20,23
**four-hour (1)**
  8:10
**friend (1)**
  17:12
**front (2)**
  30:17,22
**full (2)**
  4:9;43:17
**funeral (2)**
  17:13,15
**further (1)**
  50:17

**G**

**Gary (1)**
  5:20
**general (3)**
  11:10,19;40:4
**Generally (7)**
  8:13;9:3;23:4,14,
  24;24:3;39:15
**Georgia (6)**
  10:23,25;11:2,5,

Mark A. Waldrop v.
Community Health Systems, Inc.

Carlton Dwight Scott
March 31, 2017

13;15:9

**getgo (1)**
37:7

**given (1)**
13:11

**good (3)**
17:12,18;27:8

**graduate (1)**
7:10

**grandfathered (1)**
8:4

**group (2)**
16:25;24:24

**guess (2)**
7:4;30:24

## H

**halfway (1)**
42:14

**hand (3)**
14:5;32:11;43:23

**handshake (1)**
49:6

**happened (3)**
24:13;26:5;34:14

**hard (1)**
6:4

**head (3)**
4:24,24;19:8

**Health (5)**
7:3;27:19;40:2;
42:4;43:16

**hear (2)**
4:22;27:14

**heard (1)**
25:15

**heart (3)**
27:20;37:14,18

**held (1)**
51:1

**help (1)**
31:25

**Henry (29)**
5:19,20;19:22;
21:9,13,18;31:17,20,
24;32:1,3;40:25;
43:24;44:11,23;45:6,
15,18,23;46:1;49:15,
16;50:19,21,23,25;
51:3,7,10

**Henry's (1)**
50:18

**herein (2)**
31:10,13

**high (4)**
7:10;9:1;25:2;
46:11

**highest (1)**
25:11

**hired (11)**
12:12;22:14;27:2;
36:18;37:10;38:21;

48:14,20;49:12,22;
50:1

**hiring (1)**
33:5

**hold (1)**
25:11

**home (3)**
12:10;17:13,15

**honest (1)**
36:6

**Honestly (3)**
5:12,13;27:22

**hospital (1)**
26:7

**hours (2)**
8:12,13

**house (1)**
12:9

**houses (3)**
9:6,10;10:21

**Huh (1)**
50:22

**Huh-uh (1)**
21:2

**hung (1)**
27:13

## I

**idea (1)**
16:16

**identification (7)**
13:14;21:8;30:14;
40:23;41:14;44:22;
45:5

**Inc (3)**
15:16;31:12;40:2

**including (2)**
14:22;15:25

**independent (2)**
14:25;31:11

**information (6)**
6:10;15:21;19:2,5,
6,11

**inspections (1)**
25:3

**insurance (1)**
17:16

**Integra (24)**
7:4;14:11;15:2,25;
16:2;21:23;22:13;
39:14;40:1;41:4,7;
42:3;43:4,10,16,22;
44:1;45:2;46:9,14;
47:1,1;48:9;50:7

**invoice (1)**
44:6

**invoices (4)**
14:23;42:5,10;
43:13

**involve (1)**
43:1

**involved (1)**

33:5

**Island (3)**
20:15,17,21

**issue (3)**
26:8;39:4,7

**issues (7)**
27:6;36:10,22,23;
38:3,13;39:2

## J

**job (69)**
12:17,19,20,21,24,
25,25;13:4,7,7;14:12;
15:3,19;17:20;18:1,
11,15,16,20,23;19:6;
20:6,11,14;23:7,13;
24:13;25:19,22;26:3;
27:2,3,11;28:3,13,16,
25;30:2,4,33:16;
34:7,10,20;36:1,5,14,
18;37:3,7;39:14,18;
40:5,10,13,16;41:7;
42:5,25;43:3,3;44:5;
46:8;48:9,12,15;
49:19,22;50:2,8

**jobs (10)**
12:5;16:8;20:7;
23:23;25:15;34:12;
48:16,18;49:9,18

**June (2)**
19:18,18

**justify (1)**
38:23

## K

**keep (7)**
7:21;8:6;18:17;
19:1;21:9,14;45:19

**Kim (29)**
15:15,17;31:11;
32:16;33:6,23;35:2,4,
8;36:11;38:3;39:3;
40:7,13;42:21;43:3,
14;45:2;46:24;48:2,
8,13,19;49:15,17,20,
21;50:2,4

**Kim's (1)**
39:11

**kind (2)**
14:19;21:9

**KL (2)**
40:6;49:13

## L

**landscape (1)**
26:15

**large (2)**
46:24;47:2

**larger (4)**
48:2,4,5,6

last (4)
6:23;8:3;10:21;
19:5

**later (1)**
12:23

**lay (2)**
8:20;9:6

**least (2)**
29:3,5

**leave (2)**
45:16,18

**left (2)**
35:25;50:10

**less (18)**
9:15,17,18;10:13,
15,16;17:3,9;20:24,
25;24:7;27:12;47:10,
11,12,13,23,25

**liability (1)**
18:16

**license (9)**
7:16,17,19,25;8:3,
6;11:11,15,20

**life (2)**
20:22;36:1

**limited (1)**
14:22

**limit's (1)**
18:18

**line (1)**
31:2

**link (1)**
27:21

**list (3)**
13:19;14:10;36:17

**listed (1)**
11:20

**little (2)**
6:9;29:24

**live (1)**
6:11

**location (2)**
26:14;31:12

**logs (1)**
14:23

**long (7)**
8:23;19:1;22:12;
23:2,4;24:3;36:17

**longer (1)**
22:20

**look (15)**
10:8;11:17;16:18,
19;22:6,21;26:12,20;
30:8,9;31:1;33:13;
36:13;42:14;46:11

**looked (4)**
16:19;18:2;26:12;
34:11

**looking (4)**
26:6,8;27:5;41:3

**lot (3)**
16:12,13;36:21

**lots (1)**

9:20

## M

**ma'am (20)**
6:8;12:1;15:21;
18:22;20:13,22;21:4;
22:16;24:5;25:20;
35:10;38:16;40:3;
42:2,6,13;43:7,15,20;
44:8

**maintains (1)**
25:2

**manner (2)**
27:11;31:5

**many (15)**
7:4;8:9,9,11,13;
9:10;20:20;35:17,25;
46:5,17,22;47:8,19;
50:10

**mark (6)**
13:11;24:21;25:21;
26:5;27:17;37:18

**marked (1)**
13:13;21:6,7;
30:13,16;40:22;
41:13,17;44:21,24;
45:4

**married (1)**
6:13

**Masonry (19)**
10:1,2,5,18;11:1;
12:16;13:5,8;15:8,
10;40:6,13,15;41:10;
44:7;45:1;46:3,13,18

**may (1)**
44:11

**maybe (1)**
22:20

**mean (15)**
9:6,8;12:8,9;16:24;
23:20;25:6;27:14;
28:1;32:20;33:12;
34:13;36:5;46:21;
48:1

**meaning (1)**
42:10

**means (2)**
25:7;32:21

**meet (1)**
5:19

**meetings (1)**
24:25

**meets (1)**
25:11

**Melissa (2)**
6:16,17

**mentioned (1)**
9:11

**message (2)**
18:13;24:23

**messed (1)**
37:12

**million (1)**
  12:10
**mills (1)**
  9:7
**mind (1)**
  14:5
**mindset (1)**
  36:4
**mine (4)**
  17:12;21:12;29:7;
  30:3
**minor (3)**
  36:22,23;38:19
**minute (1)**
  43:23
**mold (1)**
  26:7
**moment (1)**
  50:19
**Monday (1)**
  17:13
**monetary (1)**
  18:17
**money (1)**
  18:17
**monitor (1)**
  31:8
**month (5)**
  23:8,9,12,15;24:6
**morally (1)**
  37:18
**More (33)**
  9:13,15,16,17;10:7,
  13,14,15,15;12:22,
  25;15:21;17:3;18:14;
  20:24;25:8;27:12;
  33:15,15,19;34:6;
  35:14;37:9;39:22;
  45:11,25;46:16;
  47:10,12,13,23;
  48:11;49:1
**most (4)**
  8:15;9:5;10:9;
  36:13
**mouth (1)**
  49:6
**move (1)**
  26:6
**moves (1)**
  23:6
**much (2)**
  23:12;40:16
**myself (1)**
  46:6

**N**

**name (7)**
  4:9;6:15,23;9:25;
  11:22;12:7;41:9
**names (3)**
  6:21;7:5;16:13
**neat (1)**
  45:19
**necessary (1)**
  37:5
**need (4)**
  5:2;7:24;8:13;
  44:13
**needed (2)**
  36:12;39:11
**needs (1)**
  12:18
**new (1)**
  18:10
**nice (1)**
  45:19
**nitpick (1)**
  38:22
**nodding (1)**
  4:25
**nor (1)**
  28:6
**normally (4)**
  23:7,8;49:2,3
**number (7)**
  11:16;15:6,22;
  19:15,22,24;46:7

**O**

**oath (1)**
  38:10
**occur (2)**
  26:18;29:21
**occurred (2)**
  17:1;21:1
**occurs (1)**
  12:18
**Off (4)**
  19:8;26:16;51:1,4
**often (2)**
  35:11;39:17
**old (3)**
  18:10;37:13,13
**once (2)**
  35:14;39:22
**one (21)**
  5:5;13:12;16:18;
  18:16;19:15;21:16;
  22:3;24:8,10,25,25;
  33:7,16;34:13;40:24;
  41:18;45:21;46:15,
  16;49:18,19
**ones (1)**
  33:8
**one's (2)**
  21:12,13
**online (1)**
  11:17
**onto (4)**
  34:18,25;35:3;37:5
**opened (1)**
  40:8
**operation (1)**
  46:25

**opinion (3)**
  24:15;27:17;33:18
**orally (2)**
  43:8,9
**organize (1)**
  31:25
**organized (1)**
  21:14
**original (1)**
  27:1
**others (1)**
  38:7
**ought (1)**
  37:9
**out (14)**
  17:14;22:21;26:6;
  27:13;28:2;29:14;
  36:11,15,25;38:3,7,
  14;43:2;46:16
**over (9)**
  5:19;6:6;9:8;12:9;
  14:5;26:6,10;36:16;
  47:20
**overall (1)**
  34:20
**overlook (1)**
  27:10
**oversee (4)**
  31:8;42:15,21;50:1
**overseeing (1)**
  30:10
**overseen (1)**
  12:6
**Oversight (1)**
  31:4
**own (1)**
  9:23

**P**

**page (8)**
  13:18,20;19:20,21;
  21:24;22:3,7,9
**paid (5)**
  18:4;26:21;40:16;
  44:1,4
**painters (1)**
  28:19
**painting (4)**
  34:23;35:8;36:9;
  38:15
**Pam (2)**
  17:24,25
**paperwork (1)**
  24:16
**paragraph (1)**
  30:25
**Pardon (1)**
  39:6
**Parkway (1)**
  15:9
**part (1)**
  25:17

**particular (3)**
  13:1;15:19;40:9
**party (1)**
  16:18
**passing (2)**
  24:25;28:11
**past (1)**
  37:20
**pay (3)**
  7:20;43:16,19
**pending (1)**
  5:4
**penny (1)**
  26:24
**people (10)**
  23:22,24;25:1,14;
  27:15,19;28:11;
  36:13,20;46:7
**percent (2)**
  29:6;42:16
**performed (6)**
  15:8,15,24;16:5;
  31:4;42:16
**period (1)**
  9:9
**person (2)**
  25:18;40:12
**personal (1)**
  24:21
**personally (2)**
  34:9;46:13
**phone (2)**
  25:21;28:6
**pieces (1)**
  50:12
**placed (1)**
  30:22
**places (1)**
  9:20
**please (2)**
  14:5;21:21
**point (4)**
  36:10,25;38:3,14
**pointing (1)**
  38:7
**pouring (1)**
  13:5
**practicing (1)**
  8:23
**prepare (1)**
  5:11
**Pretty (1)**
  47:6
**previous (3)**
  33:22,22;38:1
**price (1)**
  27:22
**prices (1)**
  18:3
**primarily (1)**
  10:2
**primary (2)**
  8:19;39:13

**Prior (2)**
  28:3;48:9
**Probably (4)**
  9:18;12:9;17:4;
  40:25
**problem (1)**
  38:20
**problems (2)**
  12:23;26:8;34:17,
  21
**process (3)**
  5:8;29:21,22
**produce (6)**
  15:7,13,22;19:16,
  25;49:1
**product (1)**
  27:22
**profession (1)**
  8:19
**professional (2)**
  27:11;31:5
**project (1)**
  31:4
**protect (1)**
  34:13
**prove (1)**
  49:10
**proven (1)**
  24:16
**provide (2)**
  42:3;43:5
**provided (4)**
  31:10;41:4,5,6,9;
  43:4,22;45:8
**purpose (1)**
  49:13
**purposes (1)**
  18:18
**push (1)**
  38:11
**put (3)**
  25:8;30:16;45:14

**Q**

**qualified (3)**
  33:15,19;36:13
**quickly (1)**
  23:25
**quite (1)**
  49:11
**quotes (2)**
  16:20;17:21

**R**

**rate (1)**
  42:16
**read (8)**
  13:20,22,23;27:14;
  32:18,25;40:18;51:5
**reason (3)**
  24:20;27:16,17

**reasons (1)**
36:17
**recall (2)**
17:1;20:5,7;36:10;
38:13,25;46:17,24;
47:22;50:6
**recalling (1)**
36:22
**receive (2)**
50:11,14
**received (3)**
14:12;16:22;26:24
**recess (1)**
44:19
**recognize (1)**
41:19
**record (4)**
4:10;22:22;51:2,4
**recorded (1)**
38:17
**records (2)**
18:14;44:15
**redo (1)**
28:20
**redone (1)**
34:22
**referred (2)**
30:18;37:22
**referring (3)**
31:17;35:1,4
**refers (1)**
32:8
**regarding (4)**
17:20;19:6;22:14;
28:16
**regards (2)**
34:7;39:14
**register (2)**
11:4,7
**registered (2)**
10:22;11:1
**Rehabilitation (12)**
14:11;15:2,25;
21:23;22:13;39:14;
40:1;41:4,7;42:4;
44:1;48:10
**relate (5)**
14:25;15:8,14,23;
19:17
**related (10)**
15:3,10;16:4;
18:10;20:6,11,14;
27:3;34:9;42:5
**relating (1)**
15:16
**remember (14)**
17:19,25;21:1;
23:3;27:7;28:18,23;
33:10;34:14,19,21;
35:21,22;50:9
**remembrance (1)**
33:13
**remind (2)**

35:3;38:10
**remodel (2)**
27:6;29:16
**remodeling (2)**
16:21,21
**rendered (1)**
18:5
**renovation (1)**
42:15
**repaint (1)**
28:20
**repeat (1)**
4:23
**report (1)**
39:9
**reported (2)**
18:21,23
**reports (1)**
14:23
**request (1)**
14:21
**requests (2)**
14:1,9
**require (2)**
8:8;36:15
**required (1)**
19:12
**respect (1)**
25:5
**respond (2)**
32:2,3
**response (1)**
8:18
**responsible (3)**
18:15;48:18,21
**responsive (1)**
13:25
**retain (1)**
44:14
**review (3)**
5:16,17,18
**right (28)**
7:1;10:19;14:6,8,
14;15:4;19:23;22:6,
8,10;26:1;27:12;
31:15;32:11;33:23;
37:16;39:15;40:11;
41:10,22;42:2,2;
43:12;44:2,3;51:4,7,8
**Riverbirch (1)**
15:9
**Road (1)**
6:12
**role (1)**
40:5
**room (4)**
25:7;29:1;45:16,18
**runs (1)**
25:3

**S**

**salvation (1)**

25:7
**same (5)**
8:12;24:20;25:4;
37:12;46:7
**sat (1)**
24:20
**satisfied (4)**
22:23;34:24;37:2;
44:12
**satisfy (1)**
13:2
**saw (3)**
5:21;25:15;43:13
**saying (4)**
15:2;17:8;32:5;
37:9
**scale (1)**
30:6
**school (5)**
7:10,21,23;9:1;
37:14
**schools (1)**
8:17
**scope (2)**
30:9;42:16
**SCOTT (13)**
4:3,11;6:17;10:1;
11:1,21,23,24;37:21;
41:10;46:2;49:10;
51:3
**second (1)**
31:6
**secretary (5)**
7:8;11:5;20:6;
25:23;26:11
**section (6)**
30:9,19,23;31:3,
22;32:8
**self-employed (2)**
9:20,21
**selling (1)**
17:16
**seminars (3)**
7:21;8:6,7
**send (2)**
19:10,12
**sent (3)**
18:13;19:13;24:23
**sentence (3)**
31:2,2,7
**series (1)**
4:19
**Services (10)**
7:3;16:22;18:5;
30:10;31:9,13;40:2;
41:22;42:4;43:16
**set (1)**
26:15
**setting (1)**
4:15
**Seven (6)**
19:3,5,9;44:17;
45:7;46:6

**Several (2)**
9:12;48:16
**shaking (2)**
4:24,24
**ship (1)**
25:3
**shocked (1)**
36:6
**show (2)**
11:18;19:22
**showing (1)**
43:6
**shows (1)**
46:22
**siding (1)**
17:14
**sign (2)**
49:3;51:5
**signature (1)**
21:25
**signed (9)**
21:22;22:12,18,25;
32:17,24;33:3;49:2,5
**significantly (1)**
48:6
**simplify (1)**
18:12
**sit (1)**
38:22
**site (2)**
35:12;39:8
**situation (1)**
23:16
**six (1)**
44:25
**size (3)**
23:8;46:2,4
**smaller (1)**
48:2
**smooth (1)**
34:20
**smoothly (1)**
36:21
**Smyrna (1)**
6:12
**somebody (2)**
25:10;36:15
**someone (1)**
28:25
**Sometimes (4)**
24:5,6;35:13,14
**somewhere (1)**
10:17
**sophisticated (1)**
10:7
**sorry (10)**
13:20;14:10;20:9;
21:3;24:14;31:6,19;
41:5;42:9;49:17
**space (2)**
29:17,22
**speak (5)**
5:22;6:6;28:1;

37:14;39:17
**specific (4)**
34:6;39:2;48:11;
49:13
**specify (1)**
49:20
**spent (1)**
50:7
**spoke (2)**
28:1,1
**spoken (1)**
27:24
**stack (1)**
45:19
**standards (2)**
25:2,12
**standing (1)**
36:16
**start (6)**
4:9;5:10;9:7,11;
34:15;36:19
**started (4)**
8:25;10:18;18:6;
41:7
**State (6)**
10:22,25;11:1,4,5,8
**stating (1)**
4:9
**stay (1)**
10:7
**Stephanie (7)**
5:23;6:22,23,24;
19:18;20:21;28:14
**stepped (1)**
30:6
**stick (1)**
45:15
**sticker (1)**
32:12
**still (2)**
8:25;10:20
**strike (1)**
41:6
**stuff (1)**
36:23
**subcontracted (1)**
50:3
**subcontracting (4)**
15:14,17;40:6,10
**subpoena (4)**
13:11,19;15:6;
19:15
**subsidiaries (4)**
15:24;16:2,6,9
**superintendent (1)**
31:9
**supervise (4)**
12:13,15;48:14;
49:21
**supervised (3)**
11:24;48:8;49:9
**supervising (5)**
12:11,16;48:13,19,

Mark A. Waldrop v.
Community Health Systems, Inc.

Carlton Dwight Scott
March 31, 2017

49:13
**supervisory (1)**
40:5
**supposed (1)**
45:22
**Sure (16)**
12:24;14:20;17:6;
18:25;21:10;24:19;
27:10;29:2,7;32:20;
34:5;38:17;43:24;
44:16;49:21;50:20
**sworn (1)**
4:5

**T**

**talk (1)**
25:1
**talked (4)**
24:22;25:20;28:14;
39:22
**talking (3)**
7:6;33:12;40:9
**tasked (2)**
30:10;48:13
**tax (3)**
18:18;19:1,4
**taxes (2)**
18:21,24
**technical (1)**
8:17
**telephone (2)**
24:22;28:7
**tend (2)**
45:16,18
**terms (4)**
9:3;35:7;36:8;47:7
**testified (1)**
4:5
**texted (1)**
28:9
**therefore (3)**
19:12;36:25;37:3
**third (1)**
31:2
**though (1)**
23:15
**thought (1)**
31:7
**thousands (1)**
12:7
**three (10)**
30:17,21;31:18,19,
21;32:12,17;46:19,
20,23
**throw (3)**
36:25;38:7,23
**tight (1)**
25:3
**till (1)**
44:17
**timeframe (8)**
16:17;17:18;23:17,

18,19,23,24;24:9
**timely (1)**
27:11
**times (4)**
20:20;35:17,25;
50:10
**timesheets (1)**
14:23
**titled (1)**
16:14
**today (4)**
5:11,25;14:1;34:3
**Today's (1)**
5:21
**together (3)**
16:20;18:3;24:1
**told (10)**
25:20;26:4,13,14;
27:5;34:15;39:12;
43:10,11;50:9
**took (5)**
19:17;20:2,4,5;
27:15
**top (2)**
19:8;22:6
**total (4)**
42:19,25;43:2;50:7
**totally (1)**
36:6
**town (1)**
27:18
**transcript (1)**
51:5
**transition (1)**
10:11
**treated (1)**
25:4
**tried (1)**
34:13
**trip (1)**
20:13
**trips (7)**
19:17;20:2,4,5,9,
10;21:1
**trusted (1)**
27:20
**truth (1)**
38:12
**truthfully (1)**
4:20
**try (4)**
14:16;21:14;23:25;
38:22
**trying (4)**
31:24;37:4;48:24;
49:8
**turn (2)**
21:24;24:1
**turned (1)**
18:13
**two (6)**
6:20;15:6;21:6,24;
42:1

**type (5)**
7:24;8:6;9:2,2,3

**U**

**under (14)**
11:20,22;14:25;
16:14;19:11;22:14;
34:8;37:1;38:7,10,11,
24;41:25;48:12
**undergoing (1)**
29:22
**units (1)**
34:18
**up (15)**
8:6;11:17,18;
12:23;18:17,18;21:9;
26:5,15;34:12;37:4,
12,17;38:22;44:17
**updated (1)**
7:22
**upon (1)**
31:10
**used (3)**
7:1,7;10:6
**usually (1)**
35:11

**V**

**verbal (2)**
4:23;8:18
**verify (1)**
45:7
**vinyl (1)**
17:14
**visit (2)**
35:11,15

**W**

**W-9 (2)**
41:4,6
**waived (2)**
51:7,10
**Waldrop (12)**
6:6;7:7;20:11;
24:22;25:18;28:4,13,
16,25;29:9;37:18;
50:15
**Waldrop's (2)**
20:6;27:24
**walk (1)**
28:21
**walked (1)**
26:13
**water (1)**
30:1
**Waterford (2)**
50:12,14
**way (6)**
15:23;26:14;37:2,
3,12;49:4

**week (7)**
22:18;23:11;24:5;
34:16,16;35:17;
39:23
**weekly (1)**
39:20
**What's (3)**
6:15;9:25;16:3
**Whenever (1)**
24:1
**Whereupon (4)**
4:2;44:19;51:1,11
**white-glove (1)**
25:3
**whole (1)**
26:7
**wife (3)**
20:17,20;50:11
**wife's (1)**
6:15
**within (4)**
22:18;33:11,11,14
**witness (13)**
4:4;19:25;21:12,
15;31:23;32:4;40:24;
43:23;45:17,21;
50:22;51:6,9
**Woods (24)**
15:15,17;31:11;
32:16;33:6,23;35:2,4,
8;36:11;38:4;39:3;
40:6,13;42:22;43:14;
45:2;48:13;49:15,17,
20,21;50:2,4
**Woods' (6)**
43:3;46:25;48:2,8,
19;49:13
**word (1)**
49:6
**work (51)**
7:1,7;9:2,19,20;
10:18;11:25;12:13,
14,15,16;13:3,5,8;
14:23,25;15:8,10,15,
17,24;16:1,5;22:14;
24:14,14;25:15;30:9;
34:8;35:11;39:8,8,
25;40:6,7,10,13,15;
41:24,25;42:16;44:7;
45:1,1;46:13,18;
47:20;48:9,19;49:13,
17
**worked (5)**
7:6;25:1,14;46:8,
25
**working (4)**
12:10;27:18;33:20;
46:18
**workmanship (2)**
30:11;31:8
**works (2)**
4:18;5:8
**world (1)**

25:8
**wrong (1)**
37:17

**Y**

**y'all (3)**
16:12,17;46:21
**year (3)**
8:8,9;18:16
**years (18)**
8:2,3;10:13,15,17,
21;17:3,4,7,9,16;
19:3,5,9;22:25;
25:13;33:21;44:17
**yesterday (2)**
36:1;50:10

**1**

**1 (1)**
13:13
**1.1 (7)**
30:9,19,23,23;31:3,
22;32:8
**10 (7)**
9:15;10:13,17;
17:3,4,7;42:16
**10:05 (1)**
51:12
**1013 (1)**
15:8
**1099 (5)**
14:11;19:12;41:23;
43:21;45:8
**12 (3)**
10:21;17:4,7
**14th (2)**
15:1;22:2
**15 (1)**
8:3
**18 (1)**
8:3
**19 (1)**
17:16

**2**

**2 (1)**
21:7
**20 (3)**
10:15,17;46:11
**2010 (1)**
19:18
**2014 (3)**
15:1;22:3,10
**2014-2015 (1)**
14:12
**2016 (1)**
19:19
**25 (2)**
47:12,14
**28th (1)**

19:18

**3**

**3 (1)**
  30:13
**30 (3)**
  24:8,10;33:20
**30721 (1)**
  15:9
**30th (1)**
  19:18

**4**

**4 (1)**
  40:22
**40 (4)**
  9:8;47:23,25;48:1
**40-something (1)**
  8:2
**40-year (1)**
  9:8
**4850 (1)**
  6:12

**5**

**5 (1)**
  41:13
**50 (3)**
  9:17;47:10,11

**6**

**6 (1)**
  44:21

**7**

**7 (1)**
  45:4
**77 (1)**
  8:25

**9**

**9:48 (1)**
  44:19
**9:57 (1)**
  44:20
**99.9 (1)**
  29:6

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Georgia

| | |
|---|---|
| Mark A. Waldrop | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   4:16-CV-00235-HLM |
| | ) |
| Community Health Systems, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                                        Dwight Scott
                         4850 Smyrna Church Road, Chatsworth, Georgia 30705
                              *(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  Murray County Courthouse | Date and Time: |
|---|---|
| 121 North 3rd Avenue | |
| Chatsworth, GA 30705 | 03/31/2017 9:00 am |

      The deposition will be recorded by this method:  _____

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
            See the attached Exhibit A.


      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   03/24/2017
                   *CLERK OF COURT*
                                                             OR
      _____          _____
          *Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  _____
Community Health Systems, Inc. _____ , who issues or requests this subpoena, are:

Holland & Knight LLP, Latoya Brisbane, 1180 West Peachtree St., Suite 1800, Atlanta, GA 30309, (404) 817-8500, latoya.brisbane@hklaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**PLAINTIFF'S EXHIBIT**

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  4:16-CV-00235-HLM

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                             *Server's signature*

                                        _____
                                             *Printed name and title*

                                        _____
                                             *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| MARK A. WALDROP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| v. | ) | |
| | ) | **4:16-cv-00235-HLM** |
| COMMUNITY HEALTH | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT COMMUNITY HEALTH SYSTEMS, INC.'S SUBPOENA DUCES TECUM TO ATTEND AND TESTIFY TO DWIGHT SCOTT

To:   Dwight Scott
      4850 Smyrna Church Road
      Chatsworth, Georgia 30705

PLEASE TAKE NOTICE that Community Health Systems, Inc., Defendant in the above-styled action, will take the deposition of Dwight Scott on March 31, 2017, at 9:00 a.m. The deposition shall take place at Murray County Courthouse, 121 North 3rd Avenue, Chatsworth, GA 30705. Mr. Scott will testify and produce at such deposition for inspection and copying the following documents and materials attached hereto as Attachment A. The deposition shall be taken for the

purposes of discovery, cross-examination and all other purposes allowed under the

Federal Rules of Civil Procedure, and shall be taken before a Notary Public or

some other officer duly authorized by law to administer oaths.   The deposition

shall be recorded stenographically and by videotape.   The deposition will continue

from hour to hour and day to day until complete.

You are invited to attend and protect your interests as allowed by law.

This 24th day of March, 2017.

**HOLLAND & KNIGHT LLP**

Harold T. Daniel Jr.
Georgia Bar No. 204000
Latoya Brisbane
Georgia Bar No. 935818
Regions Plaza, Suite 1800
1180 West Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 817-8500
Facsimile:  (404) 881-0470
E-Mail:  harold.daniel@hklaw.com
           latoya.brisbane@hklaw.com

*Counsel for Defendant*
*Community Health Systems, Inc.*

#50165625_v1

## ATTACHMENT A

## I.   DEFINITIONS

1.   As used herein, the term "Lawsuit" refers to the civil action filed on July 26, 2016, by Plaintiff Mark A. Waldrop against Defendant Community Health Systems, Inc. in the United States District Court, Northern District of Georgia, Rome Division, Civil Action File No. 4:16-CV-00235-HLM.

2.   As used herein, the term "Waldrop" refers to Plaintiff, Mark A. Waldrop.

3.   As used herein, the term "CHSI" refers to Defendant, Community Health Systems, Inc.

4.   "Document" or "documents" means any non-privileged writing or other correspondence or tangible thing, whether signed or unsigned, in draft or final form, an original or a copy, in your custody or control.  This definition includes, but is not limited to, the following items, whether printed, recorded, microfilmed, electronically, optically or magnetically stored, or reproduced by any process, or written or produced by hand:  checks, billing statements, customer service records, credit information, appointment books, proposals, agreements, estimates, contracts, purchase orders, letters, telegrams, telexes, intraoffice or interoffice communications, memoranda, reports, business records, instructions,

specifications, notes, notebooks, lists, personnel records, scrapbooks, diaries,

drafts, work papers, calendars, plans, diagrams, pictures, photographs,

photocopies, promotional material, charts, graphs, exhibits, displays, descriptions,

drafts, minutes of meetings and/or conferences and/or telephone and/or other

conversations or communications, recordings, press releases, published or

unpublished or pending speeches or articles, publications, transcripts of telephone

conversations, telephone logs, telephone bills, messenger and/or courier logs,

messenger and/or courier receipts, records of the transmittal or receipt of

correspondence and/or documents and/or other tangible materials, records

reflecting charges to clients or others for the transmittal or receipt of

correspondence and/or documents and/or other tangible materials, ledgers,

financial statements, microfilm, tape or disk (disc) recordings, e-mails and all

attachments, including from any personal email accounts, written or electronically

or magnetically stored calculations, computer printouts or any other tangible thing

that stores, contains or preserves facts and/or opinions and/or information, or

which in any way refers to, relates or reflects the fact or substance of any

communication or other transmittal of fact and/or opinions and/or information, in

any way whatsoever.  This definition also includes, but is not limited to,

electronically stored data from which information can be obtained either directly or

2

by translation through detection devices or readers, and any such document is to be produced in a reasonably legible and usable form.  This definition includes the original item (or copy thereof if the original is not available) and all copies which differ in any respect from the original, including copies containing any notation, underlining, marking, or information not on the original.

5.      As used herein, the term "communication" includes, without limitation, communications by whatever means transmitted (i.e., whether oral, written, electronic, or other methods used), as well as any note, memorandum or other record thereof.

6.      As used herein, "person" is defined as any natural person or any business, legal, or governmental entity or association.

7.      As used herein, "relate to" means concerning, regarding, relating to, referring to, describing, evidencing, or constituting.  This term should be given the broadest possible interpretation.

8.      As used herein, the terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

3

9.     The use of the singular form of any word includes the plural and vice

versa.

## II.    DOCUMENT REQUESTS

1.     Produce any and all documents and communications, including but not limited to contracts, invoices, work logs, reports, timesheets, checklist, approval forms, emails, and correspondence, that relate to work performed under your Independent Construction Superintendent Agreement dated April 14, 2014 with Integra Rehabilitation.

2.     Produce any and all documents and communications that relate to masonry work you performed at 1013 Riverburch Parkway, Dalton, GA 30721.

3.     Produce any and all documents and communications that relate to any subcontracting work you performed for Kim L. Woods Construction, Inc.

4.     Produce any and all documents and communications that related to any work you performed for CHSI or its subsidiaries, including but not limited to Integra Rehabilitation.

5.     Produce any and all documents and communications that relate to trips you took with Stephanie Dotson from June 30, 2010 to June 28, 2016.

4

## CERTIFICATE OF SERVICE

This is to certify that on March 24, 2017, a copy the foregoing **Defendant Community Health Systems, Inc.'s Subpoena Duces Tecum to Attend and Testify to Dwight Scott** was served via first class mail and email to the following parties:

R. Wayne Peters, Esq.
Gary L. Henry, Esq.
Gearhiser, Peters, Elliott & Cannon, PLLC.
320 McCallie Avenue
Chattanooga, Tennessee 37402
E-Mail: wpeters@gearhiserpeters.com
E-Mail: ghenry@gearhiserpeters.com

This 24th day of March 2017.

**HOLLAND & KNIGHT LLP**

Harold T. Daniel Jr.
Georgia Bar No. 204000
Latoya Brisbane
Georgia Bar No. 935818
Regions Plaza, Suite 1800
1180 West Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 817-8500
Facsimile:  (404) 881-0470
E-Mail:  harold.daniel@hklaw.com
         latoya.brisbane@hklaw.com

*Counsel for Defendant*
*Community Health Systems, Inc.*

5

INDEPENDENT CONSTRUCTION SUPERINTENDENT AGREEMENT

This Independent Contractor and Indemnity Agreement is made and entered into as of 4/14/2014 ("Effective Date") by and between **Integra Rehabilitation** having its principal place of business at 1013 Riverburch Parkway, Suite Two, Dalton GA 30721("Company") and **Dwight Scott** having its principal place of business at, **4850 Smyrna Church Road, Chatsworth, GA 30705** ("Contractor"). Company and Contractor are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties."

Company desires to engage Contractor as Construction Superintendent to provide professional oversight of the work performed by Construction Contractor, Kim L. Woods Construction, Inc. pursuant to the terms and conditions set forth herein, desires to provide such services.

In consideration of the mutual promises, premises and agreements herein contained, receipt of which is hereby acknowledged, Company and Contractor agrees as follows:

1.  Services.

    1.1 Scope of Work. Oversight of project will be performed in a professional manner. Contractor, agrees to monitor and oversee workmanship as Construction Superintendent, the Services described in "Exhibit A" herein provided and agreed upon by Independent Contractor Kim L. Woods Construction, Inc. at the location of said Company, as described herein. Superintendent will consult with Construction Contractor and Company as deemed necessary for the duration of contract. Superintendent will be available to meet with all parties as needed and report progress to the Company timely or at the will of the Company and or Construction Contractor.

    1.2 Contractor's warranties. Contractor warrants that:

    A.  Services will be performed in a competent and highly professional manner; and

    B.  All information communicated to Construction Supervisor by Construction Contractor shall be made to the Company Administrator or other representative appointed by the Company Administrator.

    C.  Superintendent agrees to report to Company immediately of any failure or unsatisfactory performance of Services or foregoing standards, on the part of Construction Contractor.

    D.  Superintendent acting as liaison between Construction Contractor and or Company will communicate concerns or note progress as deemed necessary to or by either party aforementioned.

2.  Remittance.

    2.1 Compensation. The Company agrees to compensate Superintendent at the rate of 10% of the overall cost paid to Construction Contractor by the Company to complete project described herein as specified in Construction Contractor contract below, upon completion of work.

3.  Independent Contractor. The parties of this agreement are Independent contractors, and neither party hereto is the agent of the other, and neither party has any right to make any representation on behalf of



PLAINTIFF'S
EXHIBIT
2

Page 1 of 12

CONFIDENTIAL

CHSI_0000890

the other. All persons designated by a party to perform services pursuant to this agreement shall be the employees of that party and will not be employees of the other party. Each party shall be responsible for withholding their own federal and state income taxes and unemployment insurance.

By: _Stephen J Dixon_                    By: _Dwight W Scott_

Name: _Stephen J Dixon_             Name: _DWIGHT SCOTT_

Title: _Executive Assistant_            Title: _OWNER-OPERATOR_

Date: _04/15/14_                              Date: _4-15-2014_

CONFIDENTIAL

CHSI_0000891



("Exhibit A")

## INDEPENDENT CONTRACTOR AND INDEMNITY AGREEMENT

This Independent Contractor and Indemnity Agreement is made and entered into as of 3/31/2014 ("Effective Date") by and between Integra Rehabilitation having its principal place of business at 1013 Integra ("Company") and Kim L. Woods Construction, Inc., having its principal place of business at, Kim L. Woods Construction Inc., ("Contractor") and Company and Contractor are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties."

     Company desires to engage Contractor to perform certain services for Company, and Contractor, pursuant to the terms and conditions set forth herein, desires to provide such services.

     In consideration of the mutual promises, premises and agreements herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, Company and Contractor agreed as follows:

1.     Services. Contractor shall provide the Services at the location of the Company as described herein.

    1.1.    <u>Scope of Work.</u>  All work will be preformed in a professional manner and will conform to all common building practices and shall be completed within Three (3) Months of the Effective Date of this Agreement. Contractor agrees to furnish materials and labor in accordance with the following specifications:

        A.   _____

            I.    See Approved Bid, Scope of Work, Rendering, Estimate, or other Contractor documentation, hereby incorporated by reference, and attached as Exhibit A, for complete Scope of Work.

    1.2.    <u>Contractor's warranties</u>. Contractor warrants that:

        A.   The Services will be performed in a competent and highly professional manner by individuals who are fully qualified to perform them;and

        B.   Contractor and its employees and/or sub-contractors, if applicable, shall adhere to the Conduct Guidelines,hereby incorporated by reference and attached as Exhibit B.

        C.   All information communicated by or on behalf of Contractor to Company shall be made to the Company Administrator or other representative as specified by the Company Administrator.

        D.   Contractor agrees to notify Company immediately of any failure to provide the Services or to otherwise meet the foregoing standard.

        E.   Contractor shall be responsible for any applicable fees, permits, and taxes (including withholding taxes) other than sales tax that may be required of Contractor by law as a result of the performance of the Services.



PLAINTIFF'S
EXHIBIT
3
PENGAD 800-631-6989

Page 3 of 12

CONFIDENTIAL

1.3.   Unsatisfactory Performance of Services.   Upon reasonable notice from Company of any unsatisfactory performance of Services, Contractor will, at Nursing Center's request and as quickly as possible, perform such Services in a manner that is satisfactory to Nursing Center. If Contractor fails to do so, Company may at its sole discretion, and in addition to any other legal rights Company may have, reduce the scope of the Services or terminate this Agreement.

2.   Remittance.

2.1.   Compensation.   Contractor shall submit a detailed invoice to Company upon completion of work.

    A.   Compensation. The total cost of work for the herein reference project to be performed by Contractor and payable by Company shall be:

        I.   Total cost of work which includes removal/disposal of all debris associated with work: $102.309,89.

        II.   Deposit amount, if required: $ _____.

        III.   10% Retainer: $ 10.230.99

    B.   Payment Terms. Payment terms are net 30 unless otherwise specified herein.

    C.   Contractor's Affidavit.   If the total cost of work to be performed as described herein is greater than $10.000.00, a 10% retainer will be held for 30 days after completion of work and completion of the attached "Contractor's Affidavit" by the Contractor, hereby incorporated by reference and attached as Exhibit C.

    D.   Additional Services or Expenses.   Upon authorization by the Company Administrator, this agreement will cover any additional work and/or fees required to complete this project.

        I.   Unauthorized Services or Expenses.   Payment by Company for Services or expenses not previously approved or agreed to by Company in writing shall be at Nursing Center's sole discretion.

CONFIDENTIAL

3.   Personnel. Contractor hereby assumes all legal responsibility as the employer or principal of the individual representatives, employees, associates, independent contractors, or agents (collectively, "Personnel"), used by Contractor to perform the Services, including responsibility for payment of wages, medical insurance, employee benefits and all other compensation due such Personnel and in compliance with all federal, state, and local tax requirements, including withholding of taxes, related to performance of Services by Contractor and Personnel.

4.   Insurance. At all times during the term of this Agreement, Contractor shall maintain in full force and effect, insurance coverage in an amount deemed adequate for the industry in which each operates. Contractor shall be solely responsible for paying any deductible or self-insured retention applicable to any claims implicated under the insurance specified in this Section. Contractor further agrees to furnish to Company copies of all certificates of insurance or other evidence satisfactory to Company that all required insurance has been procured and is in force prior to the Effective Date.

5.   Independent Contractor Status. Contractor acknowledges that Contractor and all Personnel providing any portion of the Services are representatives, employees, associates, independent contractors or agents of Contractor.  Contractor shall be considered to be an independent contractor under this Agreement and not an agent or employee of Nursing Center. Any Personnel providing any portion of the Services shall likewise not be considered to be representatives, employees, associates, independent contractors or agents of Nursing Center. Any provision which may appear to give Company the right to direct Contractor or its Personnel as to the details of their activities shall mean that such individuals shall follow the desires of Company only in determining the results to be achieved by Contractor in performing the Services.

6.   Indemnification and Hold Harmless.  Contractor covenants and agrees to fully defend, protect, indemnify and hold harmless Nursing Center, its officers, directors, agents, trustees, heirs, shareholders, employees, servants, affiliated organizations, subsidiaries, successors, assigns and representatives against each and every claim, workers' compensation claim, lien, demand or cause of action and any liability, costs, payment of benefits, expenses (including reasonable attorney fees and expenses) damage or loss or connection therewith that may be made or asserted by any third parties, additional subcontractors hired by Contractor or employees of Contractors, including additional subcontractors and their employees as contemplated by O.C.G.A. § 34-9-8 on account of personal injury, death, property damage or worker's compensation claim caused by, arising out of or in any way incidental to, or in connection with the independent contractor relationship between Contractor and Company or in the performance of service hereunder.

7.   Term and Termination. The term of this Agreement shall begin on the Effective Date and shall expire upon completion of work. This Agreement may be terminated prior to expiration by either Party:

   7.1.   For cause, including, without limitation, breach of any term or provision of this Agreement, upon ten (10) days written notice to the other Party and provided that such other Party shall have the right to cure such breach within such ten (10) day period; or

   7.2.   Without cause upon thirty (30) days written notice to the other Party. In the event that this Agreement is terminated for any reason other than by Company for breach by Contractor of its obligations hereunder, Contractor shall be entitled to payment for Services satisfactorily rendered prior to the effective date of such termination.

Page 5 of 12

8.    <u>General Provisions.</u>

8.1.    <u>Headings.</u>    The headings of the Sections of this Agreement are inserted only as a matter of convenience and for reference, and they in no way define, limit or describe the scope or intent of any provision of this Agreement, nor will they be construed to *affect,* in any manner, the terms and provisions hereof or the interpretation or construction thereof.

8.2.    <u>Waiver of Breach</u>. One party's waiver, expressed or implied, of any default by the other party of any provision of this Agreement is not a waiver of any other default.   A party's waiver of any default shall not affect the right of that party to require performance of the defaulted provision at any future time.

8.3.    <u>Severability.</u> If any of the provisions of this Agreement shall be declared invalid or unenforceable under applicable law, said provisions shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining provisions of the Agreement.

8.4.    <u>Independent Contractor.</u> The parties of this Agreement are independent contractors, and neither party hereto is the agent of the other, and neither party has any right to make any representation on behalf of the other.   All persons designated by a party to perform services pursuant to this agreement shall be employees of that party and will not be employees of the other party.  Each party shall be responsible for withholding their own federal and state income taxes and unemployment insurance.

8.5.    <u>Arbitration.</u>    Any claim, controversy and/or dispute arising out of or in connection with this agreement which cannot be mutually resolved by the parties hereto shall be settled by arbitration.    Each party hereto shall designate an arbitrator and these two arbitrators shall thereupon confer and select a third arbitrator who shall chairman the panel.  The arbitrators shall then meet at a location as a majority of them shall determine and by majority decision shall render their decision as to the matter in dispute.  The decision of the arbitrators shall be conclusive. Each party shall bear the expense of its own arbitrator and an equal share of the expense of the third arbitrator.   To the extent not otherwise herein provided, the arbitration shall be conducted in accordance with the rules then in effect of the American Arbitration Association and judgment may be entered in any court of competent jurisdiction.

8.6.    <u>Assignment.</u>  Neither party shall assign this Agreement in whole or in part without the written consent of the other which shall not be unreasonably withheld.  Any attempted assignment of this Agreement in violation of the provisions of this section is void.

8.7.    <u>Non-Discrimination.</u> All services provided by the parties hereunder shall be in compliance with all applicable Federal and State laws prohibiting discrimination on the basis of *race,* color, religion, *sex,* national origin, handicap, or veteran status.

8.8.    <u>Non-Exclusivity.</u> Nothing herein shall be construed to restrict the right of the parties to negotiate or contract with others for the services described herein.

8.9.    No Personal Liability.  No elected official, director, officer, agent or employee of either Party shall be charged personally or held contractually liable by or to the other party under any term or provision of this Agreement or because of any breach thereof or because of its or their execution, approval or attempted execution of this Agreement.

CONFIDENTIAL                                                                 CHSI_0016106

8.10.   <u>Use of Name or Logo.</u>  No party to this Agreement shall use the name or the logo of the other party to this Agreement in any promotional or advertising material, unless review and approval in writing of the intended use is first obtained from the party whose name is to be used.

8.11.   <u>Third Party Beneficiaries</u>.  It is the explicit intention of the parties that no other person or entity is or shall be entitled to bring any action to enforce any provision of this Agreement against either of the parties, and that the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by the parties or their respective successors and assigns as permitted under this Agreement.

8.12.   <u>Governing law</u>.  This agreement shall be governed by the laws of the State of Georgia.

8.13.   <u>Amendments.</u>  No modification, alteration or amendment of this Agreement shall be effective unless contained in a writing signed by both Parties and that specifically refers to this Agreement.

8.14.   <u>Counterparts.</u>  This Agreement may be executed and delivered, including by facsimile transmission or by electronic transmission in Adobe portable document format ("PDF file") in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

8.15.   <u>Entire Agreement</u>.  This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions, agreements or understandings, whether written or oral.  No amendment to this Agreement or its attachments are effective or binding on either party unless agreed to in writing signed by both parties.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement, or have caused this Agreement to be duly executed on their behalf, as of the day and year first hereinabove set forth.

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

CONFIDENTIAL                                                    CHSI_0016107

EXHIBIT  A
Scope  of  Work

SCOPE OF WORK  BEGINS ON NEXT PAGE REMAINDER OF

THIS PAGE INTENTICNALLY  LEFT BLANK

CONFIDENTIAL                                                          CHSI_0016108

EXHIBIT B
## Conduct Guideline for Independent Contractors

Contractor and Contractor's employees and/or sub-contractors agree to adhere to the following guideline regarding the Skilled Nursing Center:

1. The Nursing Center is considered the patients' home. Patient's Rights must be honored. These include but are not limited to:

    1.1. Respect patients and family members. When entering a patient's room, knock and ask permission to enter each time.

    1.2. Please ask permission if it is necessary to move something or make a request to Key Nursing Center Personnel that nursing center staff move it.

    1.3. Comply with language and dress code standards.

        1.3.1. Loud and unacceptable language is not allowed

        1.3.2. Come fully dressed with Nursing Center ID (shirt, hat, or badge).

    1.4. Clean working and living conditions must be maintained.

        1.4.1. Control dust, as some patients have respiratory problems.

        1.4.2. Control noise.

        1.4.3. Clean up your work area before you leave for the day.

    1.5. Only use public restrooms. Do not use patient's restrooms.

    1.6. Adhere to the smoking policy of the nursing center.

2. Communication Path shall flow as follows and Key Nursing Center Personnel are defined as the Administrator, Director of Nursing and Environmental Services Manager.

    2.1. The Nursing Center's Administrator serves as the Skilled Nursing Center Project Manager.

    2.2. From Contractor's on-site Project Manager to the appropriate Key Nursing Center Personnel for answers to Contractor questions or for requests for assistance from nursing center staff.

    2.3. From Key Nursing Center Personnel to Contractor's on-site Project Manager if an issue arises that must be addressed associated with patient, staff or visitor safety or if there is a question about the scope of work.

    2.4. Key Nursing Center Personnel will not direct Contractor's employees and Contractor will not direct or seek answers from nursing center staff other than Key Nursing Center Personnel.

    2.5. Contractor's on-site Project Manager will bring any changes in scope of work or cost of work to the attention of the Nursing Center Administrator.

3. Scope of Work and Schedule

CONFIDENTIAL

3.1. Review the scope of the work and the schedule with the Administrator and/or Environmental Services Manager.

3.2. Give advance notification to Key Nursing Center Personnel when free access to patient rooms is required so that they may provide required advance notification to the family members of affected patients.

4. Responsibility

4.1. Key Contractor personnel must give 24-hour contact numbers to Administrator and/or Environmental Services Manager.

4.2. Project Management is the responsibility of the Nursing Center Administrator.

4.3. It is the responsibility of the Contractor to provide notification to the Center Project Manager of any hazardous materials/chemicals that the Contractor may bring to the work site PRIOR to the work starting and provide the appropriate educational materials (MSDS, etc...) regarding the hazardous materials/chemical.

4.4. It is the responsibility of the Center Project Manager and/or Center Safety Officer to provide contractors with the following information:

4.4.1. Hazardous Chemicals to which they may be exposed while on the job site; MSDS/Right to Know Station.

4.4.2. Precautions the employees may take to lessen the possibility of exposure by usage of appropriate protective measures (PPE).

5. Assessment of Environment of Care Security

5.1. Be alert for wandering patients.

5.2. Maintain building security at all times.

5.2.1. Shut and lock doors behind you.

5.2.2. Do not let anyone through a secure door.

5.2.3. Notify a staff member if a patient wanders into a work area.

6. Handling of Tools

6.1. Do not let tools out of your sight.

6.2. Do not leave tools unattended.

7. Burning and fire watch

7.1. Obtain a Burn Permit from the Environmental Services Manager 48 hours before any burning or welding.

7.2. Maintain a fire watch with fire extinguisher during burning.

8. Interruption of nursing center safety systems

8.1. When life safety systems (fire alarm or sprinkler, egress lighting, etc.) must be disarmed, first notify the Environmental Services Manager.

CONFIDENTIAL

CHSI_0016110

8.2. Give the Environmental Services Manager 48 hour notice before working on the sprinkler system.

8.3. Leave all systems in full operating condition each night.

8.4. Maintain and re-label, if necessary, all fire and smoke walls. Consult with the Environmental Services Manager regarding the requirements.

9.  Phone Use

9.1. The use of cell phones is restricted to exterior areas only.

9.2. See the Environmental Services Manager if access to another phone is needed.

10. Infection control

10.1. Control dust and fumes with industry standard practices such as the use of dust curtains and proper ventilation.

10.2. Obtain approval (Patients may have respiratory conditions.)

10.3. Debris Removal from the Key Nursing center Personnel of the path of travel for debris removal.

10.4. Cover and remove all debris in such a manner as to maintain a safe and clean building.

11. Utility Management

11.1. Schedule utility interruptions with the Environmental Services Manager 48 hours in advance.

11.2. Review lock-out/tag-out procedures with the Environmental Services Manager.

12. Safety Information

12.1. Contractor should conduct weekly safety meetings attended by Environmental Services Manager.

CONFIDENTIAL

# EXHIBIT C
## Contractor's Affidavit

This document is required to be completed if the *total cost of the project described within this Agreement is $10,000.00 or greater.*

---

Contractor Instructions: *Complete this form 30 days AFTER the completion of the project and submit it to the Company to receive the 10% retainer fee.*

---

GEORGIA, ___COUNTY

     In person before the undersigned officer authorized to administer oaths came _____(the "Affiant"},_____(official title} of _____("Contractor"}, who was the Contractor in charge of building and construction of the at _____("Company") located at         (property address}.

     The Affiant says that         ("Contractor"} has been in direct charge of the construction and completion of the improvements and building placed on said Property, and the Affiant states that said improvements have now been fully completed in accordance with the contract and are within the boundary lines.

     The Affiant further says that         ("Company") located at         (the "Owner or Managing Agent"} has paid in full the agreed price or reasonable value of all labor, materials, fixtures, supplies, etc. used in making said improvements and that all Contractor's, suppliers, material men, and laborers have been paid in full the agreed price or reasonable value of all labor or supplies furnished or services rendered. The Affiant says that there are no contracts pending and not yet terminated and that no disputes exist regarding contracts made in the improvements of said Property and that the contract price has been paid in full.

     The Affiant further says that there are no unpaid bills of any nature, for labor, material, or services for any improvements made on said Property, either in the construction or repair of any improvements thereon, and that there are no fixtures now installed in said building that have not been paid for in full, and that there are no retention title contracts, bills of sale, or other encumbrances of record affecting title to any personal property installed on said Property. Affiant states that the Contractor hereby acknowledges receipt of payment in full for all amounts due and owing for making all of the improvements on said Property aforementioned, and the Contractor hereby waives, relinquishes, and releases any and all rights to any lien on said Property for labor or material furnished.

     The Affiant further says that he has personal knowledge of the matters herein stated and is authorized and fully qualified to make this affidavit.

<br>

| | |
|---|---|
| | _____              |
| | Affiant's Signature             Date |

Sworn to and subscribed by on this

_____day of _____, 20_

_____

(Notary Public)
Seal:

CONFIDENTIAL

| Form **W-9**<br>(Rev. January 2005)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | **Give form to the**<br>**requester. Do not**<br>**send to the IRS.** |
|---|---|---|

**Print or type   See Specific Instructions on page 2.**

Name (as shown on your income tax return)
**C Dwight Scott**

Business name, if different from above
**Dwight Scott Masonry**

Check appropriate box: [✓] Individual/ Sole proprietor   [ ] Corporation   [ ] Partnership   [ ] Other ▶ ..............   [✓] Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**4850 Smyrna Church Road**

City, state, and ZIP code
**Chatsworth GA 30705**

Requester's name and address (optional)
**Integra Rehabilitation**
**1013 Riverburch Parkway, Suite Two**
**Dalton, GA 30721**

List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note: If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
**Redacted**

or

Employer identification number

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here   Signature of U.S. person ▶   *C. [signature]*      Date ▶ 4/14/2014

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to

   1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

   2. Certify that you are not subject to backup withholding, or

   3. Claim exemption from backup withholding if you are a U.S. exempt payee.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

Foreign person. If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

   1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

   2. The treaty article addressing the income.

   3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

Cat. No. 10231X                Form **W-9** (Rev. 1-2005)



PLAINTIFF'S
EXHIBIT
4
PENGAD 800-631-6989

CONFIDENTIAL

CHSI_0001116

# INVOICE

**Dwight Scott**
**d/b/a Dwight Scott Masonry**

4850 Smyrna Church Road
Chatsworth, GA  30705

cds22@alltel.net

| | |
|---|---|
| INVOICE NO. | 1072015 |
| DATE | January 7, 2015 |
| CUSTOMER ID | Integra Rehabilitation |

TO       Integra Rehabilitation
         1013 Riverburch Parkway, Suite Two
         Dalton, GA 30721

| SALESPERSON | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| Dwight Scott | Integra Rehabilitation | Due within 30 days of receipt | 2/7/15 |

| QUANTITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 1 | General Contracting Oversight of work performed at | 10% of final invoice | 13,658.41 |
| | 1013 Riverburch Parkway (Suites One, Two and Three) | | |
| | Dalton, Georgia 30721 | | |
| | | | |
| | Contracted to oversee rennovation scope of work performed | | |
| | at a rate of 10% of final buildout/rennovation cost. | | |
| | Final Total of project $136,584.07 @ 10% =$13,658.41 | | |
| | *Invoices submitted by Kim L. Woods Construction | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| SUBTOTAL | $ | 13,658.41 |
| SALES TAX | | |
| TOTAL | $ | 13,658.41 |

Make all checks payable to Dwight Scott Masonry
**THANK YOU FOR YOUR BUSINESS!**

CHSI_0001117

## INDEPENDENT CONSTRUCTION SUPERINTENDENT AGREEMENT

This Independent Contractor and Indemnity Agreement is made and entered into as of 4/14/2014 ("Effective Date") by and between **Integra Rehabilitation** having its principal place of business at 1013 Riverburch Parkway, Suite Two, Dalton GA 30721("Company") and **Dwight Scott** having its principal place of business at, **4850 Smyrna Church Road, Chatsworth, GA 30705** ("Contractor").  Company and Contractor are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties."

Company desires to engage Contractor as Construction Superintendent to provide professional oversight of the work performed by Construction Contractor, Kim L. Woods Construction, Inc. pursuant to the terms and conditions set forth herein, desires to provide such services.

In consideration of the mutual promises, premises and agreements herein contained, receipt of which is hereby acknowledged, Company and Contractor agrees as follows:

1. Services.

   1.1 Scope of Work. Oversight of project will be performed in a professional manner. Contractor, agrees to monitor and oversee workmanship as Construction Superintendent, the Services described in "Exhibit A" herein provided and agreed upon by Independent Contractor Kim L. Woods Construction, Inc. at the location of said Company, as described herein. Superintendent will consult with Construction Contractor and Company as deemed necessary for the duration of contract. Superintendent will be available to meet with all parties as needed and report progress to the Company timely or at the will of the Company and or Construction Contractor.

   1.2 Contractor's warranties. Contractor warrants that:

      A.   Services will be performed in a competent and highly professional manner; and

      B.   All information communicated to Construction Supervisor by Construction Contractor shall be made to the Company Administrator or other representative appointed by the Company Administrator.

      C.   Superintendent agrees to report to Company immediately of any failure or unsatisfactory performance of Services or foregoing standards, on the part of Construction Contractor.

      D.   Superintendent acting as liaison between Construction Contractor and or Company will communicate concerns or note progress as deemed necessary to or by either party aforementioned.

2. Remittance.

   2.1 Compensation. The Company agrees to compensate Superintendent at the rate of 10% of the overall cost paid to Construction Contractor by the Company to complete project described herein as specified in Construction Contractor contract below, upon completion of work.

3. Independent Contractor. The parties of this agreement are independent contractors, and neither party hereto is the agent of the other, and neither party has any right to make any representation on behalf of

CONFIDENTIAL

CHSI_0001118

the other. All persons designated by a party to perform services pursuant to this agreement shall be the employees of that party and will not be employees of the other party.  Each party shall be responsible for withholding their own federal and state income taxes and unemployment insurance.

By: _____

Name: Stephanie J Dyson

Title: Executive Assistant

Date: 04/15/14

By: _____

Name: Dwight Scott

Title: OWNER - OPERATOR

Date: 4-15-2014

CONFIDENTIAL

CHSI_0001119

# INVOICE

Dwight Scott
d/b/a Dwight Scott Masonry

4850 Smyrna Church Road
Chatsworth, GA  30705

cds22@alltel.net

| | |
|---|---|
| INVOICE NO. | 1072015 |
| DATE | January 7, 2015 |
| CUSTOMER ID | Integra Rehabilitation |

TO      Integra Rehabilitation
        1013 Riverburch Parkway, Suite Two
        Dalton, GA 30721

| SALESPERSON | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| Dwight Scott | Integra Rehabilitation | Due within 30 days of receipt | 2/7/15 |

| QUANTITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 1 | General Contracting Oversight of work performed at | 10% of final invoice | 13,658.41 |
| | 1013 Riverburch Parkway (Suites One, Two and Three) | | |
| | Dalton, Georgia 30721 | | |
| | | | |
| | Contracted to oversee renovation scope of work performed | | |
| | at a rate of 10% of final buildout/rennovation cost. | | |
| | Final Total of project $136,584.07 @ 10% =$13,658.41 | | |
| | *Invoices submitted by Kim L. Woods Construction | | |

| | | |
|---|---|---|
| SUBTOTAL | $ | 13,658.41 |
| SALES TAX | | |
| TOTAL | $ | 13,658.41 |

Make all checks payable to Dwight Scott Masonry
THANK YOU FOR YOUR BUSINESS!



PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
5

CONFIDENTIAL

DWIGHT SCOTT MASONRY                    269256

| CUSTOMER'S ORDER NO. | | DEPARTMENT | | DATE 12/12/2014 | |
|---|---|---|---|---|---|

NAME ETHICA

ADDRESS KIM LWOODS CONST

CITY, STATE, ZIP DALTON, GEORGIA 30720

| SOLD BY | | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RETD | PAID OUT |
|---|---|---|---|---|---|---|---|

| QUANTITY | | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | | LABOR FOR LAYING | | |
| 2 | | ROCK & BLOCK ON | | |
| 3 | | COLUMNS | $1,000.00 | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | thank you | | |
| 10 | | | | |
| 11 | | Dwight Scott | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |

PLAINTIFF'S EXHIBIT 6
PENGAD 800-631-6989

☐ CORRECTED (if checked)

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br><br>Integra Rehabilitation<br>1013 Riverburch Parkway<br>Suite 2<br>Dalton, GA 30721<br>+1 (866) 261-8090 | 1 Rents<br>$ | OMB No. 1545-0115<br><br>2015<br>Form 1099-MISC | Miscellaneous Income |
|---|---|---|---|
| | 2 Royalties<br>$ | | |
| PAYER'S federal identification number<br>20-3253779 | RECIPIENT'S identification number<br>252215079 | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | Copy B<br>For Recipient |
| RECIPIENT'S name, street address, city or town, state or province, country, and ZIP or foreign postal code<br>C Dwight Scott<br>4850 SMYRNA CHURCH ROAD<br>CHATSWORTH, Georgia 30705 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ |
| | 7 Nonemployee compensation<br>$ 13,658.41 | 8 Substitute payments in lieu of dividends or interest<br>$ |
| | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ |
| Account number (see instructions) | FATCA filing requirement ☐ | 11 | 12 |
| | | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$ | 17 State/Payer's state no. | 18 State income<br>$ |

Form 1099-MISC   (keep for your records)   www.irs.gov/form1099misc   Department of the Treasury - Internal Revenue Service

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

DETACH BEFORE MAILING
MANUFACTURED ON OCR LASER BOND PAPER USING HEAT RESISTANT INKS



## Instructions for Recipient

**Recipient's identification number.** For your protection, this form may show only the last four digits of your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN). However, the issuer has reported your complete identification number to the IRS.

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**FATCA filing requirement.** If the FATCA filing requirement box is checked, the payer is reporting on this Form 1099 to satisfy its chapter 4 account reporting requirement. You also may have a filing requirement. See the Instructions to Form 8938.

**Amounts shown may be subject to self-employment (SE) tax.** If your net income from self-employment is $400 or more, you must file a return and compute your SE tax on Schedule SE (Form 1040). See Pub. 334 for more information. If no income or social security and Medicare taxes were withheld and you are still receiving these payments, see Form 1040-ES (or Form 1040-ES(NR)). Individuals must report these amounts as explained in the box 7 instructions on this page. Corporations, fiduciaries, or partnerships must report the amounts on the proper line of their tax returns.

**Form 1099-MISC incorrect?** If this form is incorrect or has been issued in error, contact the payer. If you cannot get this form corrected, attach an explanation to your tax return and report your income correctly.

**Box 1.** Report rents from real estate on Schedule E (Form 1040). However, report rents on Schedule C (Form 1040) if you provided significant services to the tenant, sold real estate as a business, or rented personal property as a business.

**Box 2.** Report royalties from oil, gas, or mineral properties, copyrights, and patents on Schedule E (Form 1040). However, report payments for a working interest as explained in the box 7 instructions. For royalties on timber, coal, and iron ore, see Pub. 544.

**Box 3.** Generally, report this amount on the "Other income" line of Form 1040 (or Form 1040NR) and identify the payment. The amount shown may be payments received as the beneficiary of a deceased employee, prizes, awards, taxable damages, Indian gaming profits, or other taxable income. See Pub. 525. If it is trade or business income, report this amount on Schedule C or F (Form 1040).

**Box 4.** Shows backup withholding or withholding on Indian gaming profits. Generally, a payer must backup withhold if you did not furnish your taxpayer identification number. See Form W-9 and Pub. 505 for more information. Report this amount on your income tax return as tax withheld.

**Box 5.** An amount in this box means the fishing boat operator considers you self-employed. Report this amount on Schedule C (Form 1040). See Pub. 334.

**Box 6.** For individuals, report this amount on Schedule C (Form 1040).

**Box 7.** Shows nonemployee compensation. If you are in the trade or business of catching fish, box 7 may show cash you received for the sale of fish. If the amount in this box is SE income, report it on Schedule C or F (Form 1040), and complete Schedule SE (Form 1040). You received this form instead of Form W-2 because the payer did not consider you an employee and did not withhold income tax or social security and Medicare tax. If you believe you are an employee and cannot get the payer to correct this form, report the amount from box 7 on Form 1040, line 7 (or Form 1040NR, line 8). You must also complete Form 8919 and attach it to your return. If you are not an employee but the amount in this box is not SE income (for example, it is income from a sporadic activity or a hobby), report it on Form 1040, line 21 (or Form 1040NR, line 21).

**Box 8.** Shows substitute payments in lieu of dividends or tax-exempt interest received by your broker on your behalf as a result of a loan of your securities. Report on the "Other income" line of Form 1040 (or Form 1040NR).

**Box 9.** If checked, $5,000 or more of sales of consumer products was paid to you on a buy-sell, deposit-commission, or other basis. A dollar amount does not have to be shown. Generally, report any income from your sale of these products on Schedule C (Form 1040).

**Box 10.** Report this amount on Schedule F (Form 1040).

**Box 13.** Shows your total compensation of excess golden parachute payments subject to a 20% excise tax. See the Form 1040 (or Form 1040NR) instructions for where to report.

**Box 14.** Shows gross proceeds paid to an attorney in connection with legal services. Report only the taxable part as income on your return.

**Box 15a.** May show current year deferrals as a nonemployee under a nonqualified deferred compensation (NQDC) plan that is subject to the requirements of section 409A, plus any earnings on current and prior year deferrals.

**Box 15b.** Shows income as a nonemployee under an NQDC plan that does not meet the requirements of section 409A. This amount is also included in box 7 as nonemployee compensation. Any amount included in box 15a that is currently taxable is also included in this box. This income is also subject to a substantial additional tax to be reported on Form 1040 (or Form 1040NR). See "Total Tax" in the Form 1040 (or Form 1040NR) instructions.

**Boxes 16–18.** Shows state or local income tax withheld from the payments.

**Future developments.** For the latest information about developments related to Form 1099-MISC and its instructions, such as legislation enacted after they were published, go to www.irs.gov/form1099misc.