IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

COPY

MARK A. WALDROP,                        )
                                        )
              Plaintiff,                )  CASE FILE NO.
v.                                      )  4:16-CV-235-HLM
                                        )
COMMUNITY HEALTH SYSTEMS, INC.,         )
                                        )
              Defendant.                )


The Deposition of:
CHRISTOPHER S. EDWARDS, CPA, CVA

Pursuant to stipulations herein,
Taken at the offices of:
Holland & Knight, LLP
1180 West Peachtree Street, Suite 1800
Atlanta, Georgia  30309
Before Mildred R. Hornblower, CCR
On April 14, 2017
Commencing at approximately 10:01 a.m.
JANICE S. BAKER & ASSOCIATES, INC.
Certified Court Reporters
P.O. Box 1649
Jonesboro, Georgia 30237-1649

770-478-1415

APPEARANCES BY COUNSEL


ON BEHALF OF THE PLAINTIFF:

Gary L. Henry, Esq.

Gearhiser, Peters, Elliott & Cannon, PLLC

320 McCallie Avenue

Chattanooga, Tennessee   37402

423-756-5171

ghenry@gearhiserpeters.com


ON BEHALF OF THE DEFENDANT:

Harold T. Daniel, Jr., Esq.

Latoya Brisbane, Esq.

Holland & Knight, LLP

1180 West Peachtree Street

Suite 1800

Atlanta, Georgia   30309

404-817-8509

harold.daniel@hklaw.com

404-817-8559

latoya.brisbane@hklaw.com


ALSO PRESENT:

Kathleen Elliott - Alvarez & Marsal, Inc.

Paul A. Cable - Community Health Systems, Inc., Representative

1                    INDEX OF EXAMINATIONS

2

3    CHRISTOPHER S. EDWARDS, CPA, CVA, Witness

4                                                        PAGE

5    Cross-Examination by Mr. Henry..........................4

6    Direct Examination by Mr. Daniel, Jr...................129

7    Further Cross-Examination by Mr. Henry.................133

8

9

10                 INDEX OF PLAINTIFF'S EXHIBITS

11

12   NUMBER                   DESCRIPTION              PAGE

13     1               Notice of Deposition            13

14     2               Report                          20

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                    P R O C E E D I N G S
 2                                              10:01 a.m.
 3        (The court reporter's disclosure was made
 4              available to all parties.)
 5              MR. HENRY:  If you could swear him in,
 6        please.
 7   Whereupon,
 8              CHRISTOPHER S. EDWARDS, CPA, CVA,
 9   having been first duly sworn, was examined and testified as
10   follows:
11                       CROSS-EXAMINATION
12   BY MR. HENRY:
13        Q    Mr. Edwards, we met briefly before we went on
14   the record.  For the record, my name is Gary Henry.
15   I'm an attorney in Chattanooga, Tennessee, and I
16   represent Mr. Waldrop in conjunction with this
17   litigation, pending in the U.S. District Court for the
18   Northern District of Georgia, against Community Health
19   Systems.
20              If you could please state your full name for
21   the record.
22        A    Sure, Christopher Shepherd Edwards.
23        Q    I understand, from some of the documents I've
24   seen, that you've given a deposition before?
25        A    I have.
```

1      Q    So you're familiar with how the process

2   works?

3      A    I am.

4      Q    Well, I'm not going to go through all the

5   normal ground rules I normally go through because you

6   have experience with this.  We'll just jump right in.

7      A    Okay.

8      Q    Mr. Edwards, if you would tell me where you

9   live.

10     A    216 Carriage Trail, Macon, Georgia.

11     Q    Do you have any education past high school?

12     A    I graduated from the University of Georgia in

13   March of 1989.

14     Q    What kind of degree did you get from UGA?

15     A    I got a bachelor's of business administration

16   and accounting.

17     Q    Other than the bachelor's, have you received

18   any other degrees?

19     A    No other degrees or postgraduate work.

20     Q    Do you hold any licenses?

21     A    I'm a certified public accountant in the

22   State of Georgia.

23     Q    How long have you been a certified public

24   accountant?

25     A    It was effective -- my two-year anniversary

1    according to Georgia law -- I guess since May of 1991.

2         Q    Do you have to undergo any kind of continuing

3    education to keep your license current?

4         A    I do.

5         Q    What kind of education do you have to

6    undergo?

7         A    There are several pathways for CPE,

8    continuing professional education.  For our State of

9    Georgia license, we're required to take a certain

10   number of CPE hours every -- I believe that's an every

11   two-year period.  We have similar requirements to be

12   members in good standing of the American Institute of

13   Certified Public Accountants.  They're on a three-year

14   cycle.  We also have a set of requirements for CPE to

15   maintain good standing with the Georgia Society of

16   CPAs.  I am also a certified valuation analyst, and

17   they have their separate paths for CPE that runs on a

18   three-year cycle.  The long and short of it is, to keep

19   all that where it needs to be, I need to have 40 to 60

20   hours of CPE a year.

21        Q    Are you current?

22        A    Yes, I am.

23        Q    You mentioned that you are a certified

24   valuation analyst?

25        A    Correct.

1          Q     What does that mean?

2          A     A certified valuation analyst is a credential

3     given by the National Association of Certified

4     Valuation Analysts, which was formed, I believe, in

5     1991 by a group of CPAs that recognized that valuation

6     needed to have some standard framework around it,

7     because accountants were commonly being requested to do

8     valuation-type work but had no framework around it.

9     You were getting a lot of very different reports and

10    valuation opinions.  It was formed for the purpose of

11    codifying a set of professional standards and ethics,

12    and again, adopting a framework on how a properly and

13    prudently performed valuation should be conducted.

14         Q     What do you have to do in order to become a

15    certified valuation analyst?

16         A     I would need to look at their credential

17    matrix again.  I can tell you what I had to do.  I had

18    to -- this was years ago -- you had to take a five-day,

19    I think it was, course.  It's an intense course put on

20    by NACVA, the National Association of Certified

21    Valuation Analysts; you have to pass a four-part

22    uniform exam that is very comprehensive -- it takes all

23    day to take that exam; you also have to submit a case

24    study for peer review and reviewed by the NACVA board,

25    that's a 75-hour project; you have to have references;

1    and you have to be a CPA to start with.  That is no

2    longer the case.  They collapsed two credentials into

3    one and got rid of that requirement.  For me, I also

4    had to be a CPA and had to demonstrate -- I can't

5    remember what it was -- but some number of hours of

6    professional work in the field.

7         Q    How long have you had your CVA?

8         A    I believe since 2001.

9         Q    You are currently employed by McNair,

10   McLemore, Middlebrooks & Company?

11        A    Correct.

12        Q    Which is the first time, in all the

13   depositions I've had in this case, that I actually said

14   the full name.  We have been commonly referring to your

15   employer as 3M.

16        A    As do we.

17        Q    Okay.  Good.  When I say "3M," that's what

18   I'm referring to.

19        A    Correct, understood.

20        Q    What is your position with 3M?

21        A    I'm a partner with the firm, and I'm the

22   director of our litigation valuation and forensics

23   practice group.

24        Q    How long have you been with 3M?

25        A    Since December 2013.

1    Q    Did you come in as a partner?

2    A    I did not.

3    Q    How long have you been a partner with 3M?

4    A    Since January 1st of this year.

5    Q    How long have you been over the litigation

6    valuation and forensics practice group?

7    A    Since the beginning.  That was the reason we

8    got together.  They wanted to develop a litigation

9    practice within the firm.

10    Q    Okay.  That would have been in December of

11    2013?

12    A    Correct.

13    Q    What is the litigation valuation and

14    forensics practice group?

15    A    As far as what practice areas are we dealing

16    with?

17    Q    However you would describe it.

18    A    We have a number of CPAs and professionals in

19    our office that have various credentials, whether they

20    are CPAs, like we discussed, or ABVs, which is

21    accredited in business valuation, as given by the

22    AICPA; we have people who are CFFs, certified in

23    financial forensics; we have CFEs, certified fraud

24    examiners; we have CITPs, which is certified

25    information technology professionals and others.

1    Collectively, when utilizing those credentials, we're

2    doing forensic work, fraud reviews, litigation cases as

3    expert witnesses or consultants, and then also business

4    valuation, not necessarily within litigation but for

5    estate and gift.  Okay?

6         So we have several partners who focus on

7    different aspects of that, but one of the objectives of

8    me joining 3M was to put together a cohesive

9    identifiable group.  There are a number of people

10   involved with it.  I'm slated as the director, but it's

11   really kind of a group of about three or four partners

12   that function in that role.

13   Q    You may have answered this, so forgive me if

14   I'm repeating myself:  How long have you been a partner

15   with 3M?

16   A    Since January 1st of this year.  They offered

17   me a partnership when I made my move, and I declined

18   it, because it was based purely on my reputation in the

19   community since I was already working in Macon for 25

20   years as a partner at another firm, and I wanted to

21   prove my mettle outright.

22   Q    When you say "January 1st of this year," you

23   mean 2017?

24   A    Correct.

25   Q    Where did you work for 25 years in Macon

1    prior to joining 3M?

2         A     Another CPA firm by the name of Clifton,

3    Lipford, Hardison & Parker.

4         Q     Do you have a catchy acronym for that, like

5    3M?

6         A     CLHP.

7         Q     CLHP, that's what I'll refer to it as.  You

8    said you were there for 25 years?

9         A     Just shy of 25 years.

10        Q     When did you start working at CLHP?

11        A     May 22, 1989.

12        Q     Was that the first job you had after getting

13   your CPA license?

14        A     Yes.

15        Q     What did you do for CLHP?

16        A     The same thing I do for 3M.  Also, throughout

17   those 25 years at CLHP, in addition to developing a

18   litigation practice, litigation valuation and

19   forensics, I also had a traditional practice with

20   audits, governmental audits, nonprofits, businesses,

21   commercial enterprises, also a full tax practice, too.

22        Q     Is your employment at 3M more limited?

23        A     As of January 1st, I transitioned out of all

24   my audit and tax work to other partners so we can focus

25   on development of what we call LVF practice.

1      Q      That would be litigation valuation and

2    forensics practice?

3      A      Correct.

4      Q      Are you being paid for your testimony here

5    today?

6      A      Yes, I am.

7      Q      What are you being paid?

8      A      We have an engagement letter signed with

9    Holland & Knight establishing a time based on normal

10   hourly rates.

11     Q      Which is what?  What is your normal hourly

12   rate?

13     A      For me, currently it's $285 an hour.

14     Q      You said the engagement is with Holland &

15   Knight?

16     A      Correct.

17     Q      So counsel for Community Health Services?

18     A      Correct.

19     Q      What is your understanding of why you're here

20   today?

21     A      To give a report and testimony regarding the

22   work I did for Holland & Knight on this engagement and

23   my analysis of various aspects of CHS's accounting and

24   expense reporting, focused on the termination of Mark

25   Waldrop.

1        Q    Let me show you a document.

2        (Plaintiff's Exhibit No. 1 was marked for

3             identification.)

4   BY MR. HENRY:

5        Q    Mr. Edwards, I just handed you what's been

6   marked as Exhibit 1.  Have you seen Exhibit 1 before?

7        A    Yes, I have.

8        Q    Is it your understanding that you are here to

9   testify on behalf of Community Health Systems with

10  regard to some of the topics listed in Exhibit 1?

11       A    Yes, that's my understanding.

12       Q    Let's go through those.  I know it can be

13  tedious, but I want to make sure we're on the same page

14  as to what you're here for.  If you would take Exhibit

15  1 and turn to -- I think it's page 8, Topic 11 -- if

16  you would read that to yourself and let me know when

17  you're finished, please.

18       A    Item 11:  All facts and circumstances that

19  refer or relate in any way to expense reimbursement

20  requests submitted by, one, Rollins, two, Taylor,

21  three, Mr. Waldrop, four, Ms. Dotson, and five, any

22  person who has performed duties formerly assigned to

23  Mr. Waldrop.

24       Q    Are you prepared to testify on behalf of

25  Community Health Systems in regards to Topic No. 11

1    which you just read into the record?

2         A    Yes, I am.

3         Q    Did you speak to anybody at Community Health

4    Systems to prepare yourself to testify on Topic 11?

5         A    Other than through the preparation of my

6    report, not since.

7         Q    Did you review any documents to prepare

8    yourself to testify with regard to Topic 11?

9         A    Only my report.

10        Q    Let's go to Topic 14, which I think begins at

11   the bottom of page 8 and carries over to page 9.

12   You're free to read it into the record, if you would

13   like, but you can just read it to yourself and let me

14   know when you're done.

15        A    I'll read it into the record.  Item 14:  All

16   facts and circumstances that refer or relate in any way

17   to the official audit, which is described in paragraph

18   46 of the counterclaim portion of the Answer and

19   Defenses to the Plaintiff's Amended Complaint and

20   Amended Counterclaim of Defendant Community Health

21   Systems, Inc., document 29, including, but not limited

22   to, the improprieties perpetrated by Mr. Waldrop that

23   were previously unknown to Rollins or your board as

24   alleged in paragraph 47 of the Answer and Defenses to

25   Plaintiff's Amended Complaint and Amended Counterclaim

1      of Defendant, Community Health Systems, Inc.

2          Q      Are you prepared to testify on behalf of

3      Community Health Systems with regard to Topic 14 as you

4      just read it?

5          A      Yes.

6          Q      Did you review any documents to prepare

7      yourself to testify with regard to Topic 14?

8          A      As before, only my report.

9          Q      Did you speak with anyone at Community Health

10     Systems to prepare yourself to testify with regard to

11     Topic 14?

12         A      Not after the preparation of my report.

13         Q      The next topic is Topic 15 on page 9 of

14     Exhibit 1.  Again, you're free to read that into the

15     record or you can read it to yourself.

16         A      I'll read it.  Item 15:  All facts and

17     circumstances that refer or relate, in any way, to my

18     expense reimbursement -- to any expense reimbursement

19     request or expense reports submitted by Mr. Waldrop or

20     Ms. Dotson that you allege were improperly submitted by

21     Mr. Waldrop or Ms. Dotson.

22         Q      Are you prepared to testify today on behalf

23     of Community Health Systems with regard to Topic 15?

24         A      Yes, I am.

25         Q      Did you review any documents to prepare

1    yourself to testify with regard to Topic 15?

2        A    As before, only my report previously

3    tendered.

4        Q    Did you speak with anyone at Community Health

5    Systems to prepare yourself to testify with regard to

6    Topic 15?

7        A    No, sir.

8        Q    Topic 18?

9        A    I'll read it.  All projects and third-party

10   engagements for which you contend Mr. Waldrop should

11   have obtained a project charter authorization.

12       Q    Are you prepared to testify on behalf of

13   Community Health Systems with regard to Topic 18?

14       A    Yes, I am.

15       Q    Did you speak with anyone at Community Health

16   Systems to prepare yourself to testify with regard to

17   Topic 18?

18       A    Only during the preparation of my report and

19   not thereafter.

20       Q    Have you reviewed any documents?

21       A    Only my report.

22       Q    All right.  Topic 19?

23       A    I'll read it.  All facts and circumstances

24   that refer or relate, in any way, to your claim that

25   Mr. Waldrop's activities with regard to DeBrock Poodles

1    constitute a cause for Mr. Waldrop's termination.

2        Q    Are you prepared to testify on behalf of

3    Community Health Systems with regard to Topic 19?

4        A    Yes, I am.

5        Q    Did you talk to anyone at Community Health

6    Systems to prepare yourself to testify to Topic 19?

7        A    Not after preparation of my report.

8        Q    Did you review any documents to prepare

9    yourself to testify in regard to Topic 19?

10       A    Only my report.

11       Q    Topic 20, which is on page 10?

12       A    I'll read it.  All facts and circumstances

13   that refer, in any way, to your claim that

14   Mr. Waldrop's activities at Southern Adventist

15   University constitutes a cause for Mr. Waldrop's

16   termination.

17       Q    Are you prepared to testify on behalf of

18   Community Health Systems with regard to Topic 20?

19       A    Yes, I am.

20       Q    Did you review any documents to prepare

21   yourself to testify with regard to Topic 20?

22       A    Only my report.

23       Q    Did you speak with anyone at Community Health

24   Systems to prepare yourself to testify with regard to

25   Topic 20?

1         A    No, not after the preparation of my report,

2    no.

3         Q    Topic 21?

4         A    Topic 21, I'll read it.  All facts and

5    circumstances that refer or relate, in any way, to your

6    claim that the renovation of the Dalton, Georgia,

7    office constitutes a cause of Mr. Waldrop's

8    termination.

9         Q    Are you prepared to testify on behalf of

10   Community Health Systems with regard to Topic 21?

11        A    Yes, I am.

12        Q    Did you review any documents to prepare

13   yourself to testify with regard to Topic 21?

14        A    Only my report.

15        Q    Did you speak with anyone at Community Health

16   Systems to prepare yourself to testify with regard to

17   Topic 21?

18        A    Not beyond the preparation of my report.

19        Q    Is it your understanding that the topics just

20   described are the ones that you have been designated

21   for to testify on behalf of Community Health Systems in

22   Exhibit 1 and no others?

23        A    Give me a moment.

24        Q    Sure.  If you need, I can provide a list

25   again.

Page 19

1     A     Did you list Item 18?

2     Q     Let me double-check to be sure.  Yes, sir, I

3    asked you about Item 18.

4     A     Yes, I believe that's what we discussed.

5     Q     You've experienced testifying in connection

6    with litigation, correct?

7     A     Yes.

8     Q     Do you understand the difference between

9    factual testimony and expert testimony?

10    A     I believe I do.

11    Q     What are you providing here today?

12    A     Factual testimony and a summarization of

13   factual items that are the product of an analysis of

14   those facts conducted by me.

15    Q     And you are being paid to provide that

16   testimony today?

17    A     Correct.

18    Q     By Holland & Knight?

19    A     Correct.

20    Q     Other than the work you've done in connection

21   with Mr. Waldrop's termination, have you done any other

22   work for Community Health Systems?

23    A     I have not.

24    Q     This is the only engagement you've had?

25    A     Absolutely.  Are you talking about me

1    individually?

2         Q    Yes.

3         A    Correct, yes.

4         Q    You didn't do any work for Community Health

5    Systems when you were with CLHP?

6         A    I did not.  I did not even know what CHS even

7    meant until I was approached about this.

8         Q    You've got a document in front of you today,

9    and I'm pretty sure I know what it is, but if you would

10   please identify the document that is in front of you.

11        A    Sure.  This is a copy of my aforementioned

12   report, without exhibits.  It does have Exhibit 1,

13   which is my CV, because it was part of the file that

14   was printed, but it is a copy of the report.

15        Q    I have a copy of your report without Exhibit

16   1.  If that is a copy, would you have a problem with us

17   making that Exhibit 2 to your deposition?

18        A    That's fine.  It's not executed, and there

19   are annotations on it.

20        Q    The reason I ask that -- you're okay with the

21   court reporter keeping this?

22        A    Sure.

23             MR. HENRY:  Let's make that Exhibit 2.

24        (Plaintiff's Exhibit No. 2 was marked for

25             identification.)

1    BY MR. HENRY:

2         Q    Let's talk about Exhibit 2.  If you would

3    describe for me your engagement with Community Health

4    Systems.

5         A    Okay.  We first learned -- when I say "we," I

6    mean 3M, Randy Nichols, the partner in charge of the

7    CHS audit tax client in our office -- we first learned

8    of Mr. Waldrop's termination on June 28th or June 29th.

9    That was the communication made to Randy Nichols,

10   presumably by Ronnie Rollins.  I'm actually not quite

11   sure.

12        He asked me to come chat with him about it,

13   and we discussed the need for, based on information he

14   got, again, presumably from Mr. Rollins, that there

15   appears to be some fraud involved in the process of

16   reviewing Mr. Waldrop's work history, that he may need

17   to involve me in that.  We began discussing, very

18   briefly, with -- I'm trying to remember her name -- one

19   of the ladies over at CHS just to get some background

20   information.

21        Q    Let's see if this trips your memory.  Was it

22   Lorraine Taylor?

23        A    No, it was Angela.

24        Q    Angela Hammock?

25        A    Hammock.  Thank you.  We chatted with Angela

1    Hammock and talked about how expense reports are

2    handled.  For me, I had no idea how operations work at

3    CHS.  I've never been part of that client work.  We

4    talked about it generally.  I learned of the Workday

5    software that was utilized and so forth.  We made a

6    tentative game plan, so to speak, to address expense

7    reporting protocols.  Okay?  In doing that, we began

8    obtaining information, given review-only access to

9    Workday so we could extract expense reports.  We spent

10   some days, a couple of weeks, probably, extracting data

11   and pulling it down.

12          Then when Mr. Waldrop filed his complaint,

13   when you filed that, we were notified of that, I

14   believe by Holland & Knight -- again, it was coming to

15   Randy Nichols at the time -- saying, Hey, hold off.

16   We're not quite sure what we need to do here, but

17   obviously, we're going to have to answer a complaint so

18   we might need you for that.  Just hold off.  We just

19   stopped doing what we were doing.  All we had

20   accomplished, at that point really, was getting a

21   subset of information of expense reports that we did

22   some very top-level analysis of, how many dollars were

23   in the population period of all expense reports, how

24   were they stratified by amount, by person, very

25   high-level stuff.

1             Then ultimately, Holland & Knight contacted

2    us -- it would have been through Mark Lange -- about

3    engaging us as consultants to go in and do some

4    follow-up work on the work that was already done by CHS

5    in developing their cause for termination and to go in

6    and analyze the records that they had utilized and any

7    others that might become available.  Basically, analyze

8    the records they had utilized, to reinforce and

9    substantiate, additionally through the preparation of a

10   report, their findings.

11            We were retained -- I believe our engagement

12   letter is dated after the complaint, so be July 28th,

13   and we did not begin work on this engagement until

14   really the middle of August.  I think everybody was

15   trying to get their feet underneath them to develop how

16   they wanted to proceed.  At that time, we commenced

17   fieldwork and reviewing the documents on the subject

18   and so forth.

19       Q    Okay.  Let's look at Exhibit 2.  I

20   understand -- specifically page 53 -- I understand it's

21   not executed, but do you know the date that you

22   generated Exhibit 2?

23       A    Do you mean the issued date or the notarized

24   date or the submitted date?

25       Q    Okay.  When did you issue Exhibit 2?

Page 24

1    A    I don't know the exact date.  It would have

2    been September 15th, maybe, of 2016.  Is there an

3    executed copy around here somewhere?

4    Q    I'll represent to you that I know it has been

5    executed at some point, but I haven't seen it.

6              MR. DANIEL, JR.:  We can provide you a copy

7              of the executed one.

8    BY MR. HENRY:

9    Q    I'm not really concerned about it.  I'm just

10   trying to get a general idea of the time frame.  So

11   middle of September?

12   A    That's when I issued it.  I did it via

13   e-mail, and again, we'd have to look at what the actual

14   notarization date is.  I'm recollecting it was around

15   September 15th.

16   Q    Okay.  I believe you said you started working

17   on this and doing your forensic analysis in the middle

18   of August?

19   A    Yes, really more like the third week in

20   August, and we had another engagement out of town, one

21   of the ones I was transitioning out of -- so that was

22   the last week of August that we had that engagement, so

23   it would have been the third week in August that we

24   were working on the fieldwork intensely on this

25   project.

1        Q    So from the time you started working

2   intensely on this project until the time you issued

3   Exhibit 2, we're talking three to four weeks?

4        A    That's a fair statement.

5        Q    Did you have any assistance from others at 3M

6   in preparing Exhibit 2?

7        A    I prepared Exhibit 2 completely and wholly by

8   myself.  I had staff working on the engagement,

9   analyzing and doing the things I asked them to do.

10       Q    So the actual printed word, which is Exhibit

11  2, is your work product solely?

12       A    Solely.

13       Q    Did you have any other CPAs assisting you

14  with your investigation?

15       A    I had my main associate, John Hartman.  He's

16  a CFE, certified fraud examiner.  He's young and

17  doesn't have a CPA, because that's really not what we

18  do.  I utilized other staff in the office on

19  accumulating data.  We had to populate databases and

20  build a database set.  We used even clerical people,

21  even, to do that, but it was reviewed by John and me

22  and others when needed.

23       Q    So I understand you probably had some staff

24  performing some clerical functions, who else did you

25  have working with you, besides Mr. Hartman, that were

1    performing what I would call (indecipherable)

2    functions?

3        A    Just John Hartman.

4        Q    All right.  Let's jump into the report.

5    Specifically, let's start with page 3, line 8.

6             In that sentence you say:  Generally, I am

7    also relying on statements and/or testimony given by

8    others affiliated and familiar with the matters related

9    to the subject business and employment of Mark Waldrop.

10            Who are the others that you received a

11   statement and/or testimony from?

12       A    The people that we met with and received

13   information from primarily were, originally, Angela

14   Hammock.  Once we started our intense work on the

15   expert consulting engagement, I would say, we had far

16   less involvement with Ms. Hammock.

17            Chiefly, our client contact and information,

18   of which there was a great deal of discussion

19   transpiring between us, would have been with Lorraine

20   Taylor, the CFO of CHS, with Ronnie Rollins, the

21   president and CEO of CHS, and additionally, with Joe

22   Wall, who was the chairman of the CHS board.  From a

23   client contact perspective, that is essentially it.

24   There were others that offered information.  When we

25   were talking about e-mails, we talked to an IT person,

1    but as far as acquiring primary information, it would

2    have been Lorraine Taylor and Ronnie Rollins.

3         Q     Did you interview or speak to anyone outside

4    of Community Health Systems in connection with your

5    engagement?

6         A     No, sir.

7         Q     You never spoke with Mr. Waldrop?

8         A     I did not.

9         Q     Starting towards the bottom of page 3 and

10   moving over to page 4 of Exhibit 2, you list a number

11   of documents that you reviewed in connection with your

12   report?

13        A     Correct.

14        Q     I'm interested specifically in the employee

15   travel reimbursement policy for CHS, as proposed for

16   revision, together with review annotations by Waldrop,

17   which is the bullet point beginning at line 12 of page

18   4.

19        A     Okay.

20        Q     Tell me about that document.  What was that

21   document?

22        A     Well, that document, if I recall correctly,

23   is the document that was in process of being created

24   and adopted by CHS in the manner in which it adopts

25   policies and such, and it involved revisions to and

1    enhancements to the expense reimbursement process.   The

2    annotations I've been referring to are handwritten

3    notes on the document itself, printed presumably in

4    Mr. Waldrop's hand, is how it was related to us.

5    That's what document that is.

6          Q     Was that document provided to you, or did you

7    pull it from one of the programs you had access to?

8          A     It was provided to me.

9          Q     Do you recall who provided it to you?

10         A     I sure do.   Lorraine Taylor.

11         Q     What significance, if any, did you attach to

12   Mr. Waldrop's annotations?

13         A     As I'm doing these analyses, as I'm commonly

14   doing in these analyses, part of what I'm looking to do

15   is to develop an impression of the thought process and

16   demeanor of the people under my review.   Having

17   handwritten documents, signed letters, signed chain

18   e-mail correspondence about a document, things such as

19   that are helpful to me in trying to ascertain the

20   feelings and sentiments of the person I'm reviewing.

21         So his annotations were helpful to me in

22   developing that impression of how Mr. Waldrop likely

23   felt.   I have no idea how he felt, but how he likely

24   felt about the changes that were being proposed to

25   these policies.

1      Q      Based on your review of those annotations,

2    how do you feel that Mr. Waldrop likely felt about the

3    proposed changes?

4      A      I do not believe he was in favor of that.

5      Q      Was the policy in effect at the time of his

6    termination?

7      A      I do not believe so.

8      Q      Do you know if the policy had been put into

9    effect since his termination?

10     A      I'm not certain of that.

11     Q      Would it be fair to say that, at the time you

12   issued your report, Exhibit 2, in the middle of

13   September, that the policy had not been adopted by

14   Community Heath Systems?

15     A      It may or may not have been.  I was not

16   questioning about that.  My review period did not

17   include the subsequent dates.

18     Q      So sitting here today, you don't know if

19   Community Health Systems actually adopted the policy

20   that Mr. Waldrop annotated?

21     A      Correct, I do not know.

22     Q      Turning over to page 5, line 3, online

23   research related to presence of personality of Mark

24   Waldrop.  Can you tell me what "presence of

25   personality" means?

1      A    Again, just developing an overall impression

2    of Mr. Waldrop, who is an individual I've never met.  I

3    have no particular characterization of his personality,

4    so I will get online, as I do with everyone, and review

5    and try to get a feel of what that person's interests

6    are and conduct and behavior.  It's a very subjective

7    process, and, you know, may or not be salient to the

8    review I'm doing, but it's a process that I do.

9      Q    Well, was there anything of significance that

10   you discovered from your online research regarding the

11   presence and the personality of Mark Waldrop?

12     A    Partly in the DeBrock Poodles that we'll

13   discuss, I'm sure later on.

14     Q    We will.

15     A    I'm sure we will.  That's why we're here.  It

16   was helpful in seeing if maybe on Facebook, or some

17   other place, the breadth and extent of the poodle

18   business that Mr. Waldrop was involved with.

19     Q    Other that some significance with respect to

20   DeBrock Poodles, was there anything else that was

21   significant about your research in helping you to

22   determine the presence and personality of Mark Waldrop?

23     A    I was able to get good information on

24   Southern Adventist University, that I assume we'll also

25   talk about, particularly related to course catalogs and

1    other information about SAU and Mr. Waldrop's role with

2    them.

3        Q    One of the documents that you stated you

4    reviewed was the letter of CHS to Waldrop dated

5    August 16, 2016?

6        A    Correct.

7        Q    When, in the course of your research and

8    actual, what I would call, intensive forensic work, did

9    you review that letter?

10       A    It would have been -- the first time I saw

11   that letter would have been in the meeting we had with

12   Joe Wall.  I mentioned earlier that he was one of the

13   client representatives that I obtained information

14   from.  That would have been probably a week before I

15   started my work.  Probably right about the date that he

16   issued that letter.

17       Q    Okay.  So you just, at this point -- I want

18   to make sure I heard correctly -- before you started

19   your work or right at the outset?

20       A    Right at the outset, correct.

21       Q    Are you aware of whether Community Health

22   Systems provided any written notice to Mr. Waldrop

23   regarding the reasons for his termination, prior to

24   that letter?

25       A    I do believe, prior to that letter, there was

1    another letter that had an offer of a separation

2    agreement, but that was not prior to the termination.

3    To answer your question specifically, I'm not aware of

4    any particular document, written document, prior to

5    Mr. Waldrop's termination.  What they related to

6    Mr. Waldrop orally, I do not have that information.  I

7    don't know.

8         Q    Did Mr. Wall, in the course of your interview

9    with him, disclose anything about a meeting that

10   occurred with Mr. Waldrop on June 28, 2016?

11        A    I'm sure we talked about it, and Mr. Wall did

12   explain to me the meetings that he was a participant of

13   with Mr. Waldrop in the weeks before that.  I believe

14   Mr. Waldrop had some concerns about working

15   relationships with Mr. Rollins and perhaps a couple of

16   other things.  I know that Mr. Wall and Mr. Waldrop had

17   a meeting at least one time about that, and perhaps

18   more than one.

19        Q    How often, in the course of your engagement,

20   did you speak to Mr. Rollins?

21        A    Mr. Rollins, that week that we were there

22   doing what I termed earlier as "fieldwork," Mr. Rollins

23   was pretty much available that whole week.  He was in

24   and out somewhat.  During that week, I had a great deal

25   of interaction with Lorraine Taylor, and Mr. Rollins a

1    fair amount, too.

2         Q    Between those two, who would you say you had

3    the greater amount of interaction with?

4         A    Lorraine Taylor.

5         Q    Comparatively, how much more interaction did

6    you have with Ms. Taylor than you did with Mr. Rollins?

7         A    70/30, weighted towards Taylor.

8         Q    Okay.  Let's talk about expense reports.

9              Describe for me, please, your understanding

10   of how the expense reimbursements were handled by

11   Community Health Systems while Mr. Waldrop was

12   employed.

13        A    Since 1990 or the period covered by my

14   review?

15        Q    The period covered by your review.

16        A    Okay.  Good.

17        Q    I don't expect you to talk about anything

18   that's not in your report, time period-wise.

19        A    Okay.  Broadly summarized, I would say that,

20   one, CHS had an established protocol and process on how

21   expense reports and employees seeking reimbursement for

22   expenses incurred in the performance of their job were

23   to be handled.  Those documents cover a number of

24   items, such as the requirement that support be

25   provided, that it only be for business purposes, and so

1     forth.  My point is there was an established and

2     published policy by CHS with training to employees.

3     That's first and foremost.

4          Secondly, they utilized their Workday

5     software in the months and years that we're talking

6     about in my report.  They utilized the Workday

7     software, which is a comprehensive administrative tool.

8     It is a lot of things, but it enables a paperless

9     expense report process from the standpoint that

10    employees can log in under their user credentials and

11    submit online, so to speak -- but it's internal --

12    expense reports together with all the supporting

13    documentation they are providing with it.

14          Those expense reports are then automatically

15    queued up to whoever their immediate supervisor is

16    throughout the organization.  That supervisor, it's my

17    understanding, could pull up that expense report,

18    complete with detail, review it, and there is an

19    electronic approval process that is provided within

20    that Workday.  So that supervisor, whoever the person

21    may be, tenders their approval, and then the expense

22    report is forwarded on to the accounts payable

23    department for payment.

24          Q    Does the accounts payable department perform

25    any kind of review?

1       A    I don't believe so.  I believe their review

2  is limited to what's typical in departments like that,

3  and that's to make sure that there is clerical accuracy

4  on submissions and what may appear in an accounts

5  payable ledger or something else.  As far as reviewing

6  the validity of an expense report, I do not believe

7  they are involved.

8       Q    You said you don't believe they are involved.

9  Do you know whether or not they're involved.

10      A    They're probably not involved.  I believe

11 they are not involved.  Again, I said I do not believe

12 they're involved.

13      Q    But your understanding of the approval

14 process for expense reports came from your review of

15 their written policies and interviews you had with CHSI

16 personnel; is that correct?

17      A    Correct.

18      Q    You never submitted an expense report through

19 CHSI?

20      A    No, I have not.

21      Q    So your knowledge of accounts payable's

22 function, with regard to expense reimbursement

23 requests, is based on things you were told by

24 Mr. Rollins, Ms. Taylor, and the other individuals that

25 you spoke to in connection with your engagement?

1        A      Correct, as to the extent it's also covered

2    in the written policies, and I can't quote that chapter

3    and verse here, but to the extent there's reference in

4    there about how the expense report might chain through

5    the system, it might be in there, but otherwise through

6    my reviews.

7        Q      So if that's not referenced in the written

8    policy, then your belief, with regard to accounts

9    payable's role, is based on your interviews with CHSI

10   employees; is that correct?

11       A      That's correct.

12       Q      So if there was any inaccuracy in what you

13   were told by CSHI's employees, with regard to that

14   process, that could potentially affect your conclusions

15   in Exhibit 2, couldn't it?

16       A      It could.  If I may, in the 28 years of doing

17   audits -- and I was also engaged many times in helping

18   businesses and organizations develop their internal

19   control structure -- internal controls are something of

20   a specialty area for me.  It's also required as part of

21   the audit process.

22              It would be -- when you term the "accounts

23   payable process," that can be very broad or very

24   specific and very narrowly defined, depending on how

25   you're using that term.  It would be inappropriate for

Page 37

1     the accounts payable process, speaking collectively

2     here, to be part of the approval process.  Their

3     function would only be in the actual performance of

4     paying the approved expense report.

5                You typically do not see, in fact -- I can't

6     recall an instance in all the years of auditing --

7     where an expense report had any approval function

8     whatsoever by anyone other than their supervisor or

9     whomever they filed it with.  It's not an AP function.

10               So my point is, of course, if Ms. Taylor told

11    me something factually incorrect, so be it, but it

12    makes sense to me what she was saying to me, because

13    that's what I see in the field.

14         Q    Based on your experience with other issues

15    like this?

16         A    Correct.

17         Q    Okay.  Did Ms. Taylor, or anybody with

18    Community Health Systems, provide any internal audits

19    that were performed by CHSI in the course of your

20    review?

21         A    Provided to me, you mean?

22         Q    Yes.

23         A    I have no document from CHS.

24         Q    Are you aware there was an internal audit

25    performed in early 2016 with regard to expense reports?

1      A     I'm aware of that.  That was discussed at the

2   first meeting I had with Angela Hammock.

3      Q     Was an internal audit report provided to you?

4      A     No, it was not.

5      Q     What specifically did Ms. Hammock tell you

6   about their report?

7      A     Very little.  That was my comment to my

8   staff, We're going to find this out on our own.  She

9   was apprehensive of whatever the circumstance was at

10  the time.  Obviously, Mr. Waldrop had been terminated.

11  She was not very forthcoming with me.  She was

12  concerned she was stepping outside the boundaries of

13  her job.

14     Q     Okay.

15     A     She was cooperative, but she felt like she

16  had a particular role, and that's it.

17     Q     Why did you speak to Ms. Hammock?

18     A     Remember I spoke to you earlier about how we

19  first started this?

20     Q     I understand.  That was probably a poor

21  question.

22           Why was Ms. Hammock the one presented to you

23  to talk about this initially?  Do you know?

24     A     I don't know.  That was a decision made by

25  others at CHS.  I do know that Ms. Hammock's role, as

1    it was given to me by her to be, was part of the

2    internal audit function.  She had gotten her CFEs, so

3    she's trying to think along the terms of fraud

4    prevention and awareness.  We're dealing with a fraud,

5    so it seems natural, I suppose, for them to have me

6    first speak with Ms. Hammock.  You would have to ask

7    them.

8         Q    Did Ms. Hammock describe for you the process

9    that was utilized for this internal audit?  Did she

10   just mention, Hey, typically we did an internal audit?

11        A    I'm sure she gave me a little bit of detail

12   about it, Gary, not a lot.  I'm sure she mentioned

13   probably that the hospital had done some work reviewing

14   expense reports and had some recommendations, perhaps,

15   but I saw no documents.  She did not give me findings

16   or conclusions.  I think she was probably feeling -- I

17   don't know how she felt, I'm guessing -- that that was

18   for me to figure out.

19        Q    Okay.  Let's talk about this process you

20   described as it relates to Mr. Waldrop.

21        A    Okay.

22        Q    If Mr. Waldrop were to submit an expense

23   report for reimbursement, what is your understanding of

24   how the process would work?

25        A    Okay.  Mr. Waldrop, obviously, was in an

Page 40

1    office outside of Macon.  So he was in Dalton, and

2    Workday was very accommodating to this process in that

3    regard, because he could submit his expense reports

4    online -- I shouldn't use that word -- but internally

5    online.  Electronically, is what I'm trying to say.

6         As I told you before, that gets queued up and

7    Mr. Rollins, his supervisor responsible for reviewing

8    his expense reports -- it's queued up in whatever they

9    call it.  Their daily to-do list, perhaps.  Mr. Rollins

10   can then access the expense report, do whatever he

11   determines he needs to do to it, and either approve it

12   or not approve it.  That approval is electronic.

13        You said as relates to Mr. Waldrop?

14   Q    Yeah.  Now I'm about to ask you as it relates

15   to Stephanie Dotson.

16   A    I thought that was the next question.

17   Q    Very perceptive.

18   A    It's my understanding, and it follows with

19   the processes and protocols that I read, that all

20   expense reports are to be approved by their direct

21   supervisor.  Mr. Rollins was Mr. Waldrop's direct

22   supervisor.  Mr. Waldrop was Ms. Dotson's direct

23   supervisor.  So the same process occurring for

24   Mr. Waldrop's expense reports for Mr. Rollins' review,

25   would be the same of Ms. Dotson's expense reports by

1    Mr. Waldrop with one critical difference:  By being in

2    the same office, Mr. Waldrop had greater access to be

3    able to stick his head around the corner and go, Hey,

4    Stephanie, what is this?  I need another receipt on

5    this.  This doesn't make sense to me.  Why are we

6    seeking this?  Why is it being expensed through Integra

7    versus whatever it may be.

8         My point is, if there are questions in his

9    review process that he's obliged to do, that he has

10   with it, he can go vet those questions

11   contemporaneously with Ms. Dotson.  Mr. Rollins did not

12   have that same ease of access with regard to

13   Mr. Waldrop's expense reports.

14   Q   In your review and work in connection with

15   this engagement, did you run across any expense reports

16   that Mr. Waldrop submitted that were not approved by

17   Mr. Rollins?

18   A   I don't believe so.  It would not have made

19   it through the accounts payable process, because that's

20   the electronic pathway.  It can't go without an

21   approval, is my understanding.

22   Q   So did you only review the expense reports

23   that were actually reimbursed?

24   A   Yes.

25   Q   So sitting here today, you did not review or

1    have not reviewed, to the extent that they exist, any

2    expense reimbursement requests that were rejected by an

3    immediate supervisor?

4        A    I believe you're correct.

5        Q    How did the expense reimbursement request

6    process work with regard to Mr. Rollins' request for

7    reimbursement?

8        A    Insofar as he is at the top of the pyramid in

9    the governance -- not governance -- the operations of

10   CHS, he has no direct supervisor, other than the board.

11   As a matter of efficiency and making things move along,

12   it's my understanding that his reports are reviewed by

13   Ms. Taylor.  I believe that's correct.

14            Again, she can stick her head around the door

15   and go, Ronnie, what is this?  It makes no sense to me.

16   You didn't add a receipt for such and such an item.

17   Okay.  I'll go get it.  Whatever it may be.

18            She would also have, as they both did, access

19   to each other's calendars and I believe probably their

20   e-mail.  The extent Ms. Taylor needed to answer a

21   question that had arisen in her head about some item in

22   his report, to the extent she doesn't see it directly

23   in his calendar or something like that, she could just

24   ask him a question.

25        Q    I'm not trying to ask a tricky question here.

Page 43

1    I just want to be sure I understand the basis of what

2    you just said.

3         A    Okay.

4         Q    I believe you said earlier that you didn't

5    review any expense reimbursement requests that were not

6    approved.

7         A    I believe that's correct.

8         Q    So the only expense reimbursement request

9    that you saw would have been the ones that were

10   actually approved?

11        A    Correct.

12        Q    Are you aware, or did you learn in the

13   process of your engagement, that there actually were

14   circumstances where Ms. Taylor would've asked

15   Mr. Rollins for additional support for his expense

16   reports?

17        A    Not actual occurrences, no.

18        Q    Correct me if I'm wrong, but that wouldn't

19   show up, that dialogue wouldn't show up on a final

20   expense report that had been approved, would it?

21        A    Not necessarily.  I suppose Workday does

22   permit annotation to files.  I suppose somebody could

23   say, I chatted with Ronnie about this and whatever it

24   may be.  To answer your question, no, I did not review

25   rejected expense reports.  To the extent they may

Page 44

1      exist, it must be the result of me having pulled data

2      from paid expense reports.

3           In Workday, I could go back, Gary, and

4      probably look at the sequential numbering of the

5      various expense reports -- there are a lot of them --

6      and ascertain if there were any outside of sequence

7      that might have been rejected expense reports.  I did

8      not do that.

9           Q    In the course of your review of expense

10     reports and the Workday program, you had access only, I

11     think is what you said.  Right?

12          A    View only.

13          Q    View only.  Did you see any annotations or

14     notes regarding support for expense reimbursement

15     requests?

16          A    It might be hard to know if the annotation

17     was made by the person seeking reimbursement or the

18     person approving it, so -- were there annotations?

19     Yes.  Is it always clear who wrote that?  Not always.

20     It may be an inference at best.

21          Q    In your view and in your study of this and

22     your engagement, it's of some significance to you that

23     Mr. Waldrop was in Dalton, and Mr. Rollins was in

24     Macon?

25          A    I believe that is significant, yes.

1          Q     Let's look at your report, Exhibit 2,

2     specifically page 10 of 53.

3                Starting at line 16, you state:  We have

4     conducted comprehensive analyses of the expense

5     reporting behavior of Dotson and Waldrop, and have

6     determined a habitual and willful neglect by Waldrop in

7     his duty to approve payment of only legitimate business

8     expenses of Dotson that are both reasonable in nature

9     and properly documented.

10               What do you base that conclusion on?

11         A     I base that conclusion, that statement

12    rather, on the fact that, in our review, we saw

13    clearly -- for me clearly -- receipts and expense

14    reports and supporting documents for items that were

15    outside of the policies and guidelines of CHS and

16    should have been, in my thinking, caught on review and

17    that item rejected.

18         Q     Okay.  You include what you call, by way of

19    example, not as an exhaustive list, a list of those

20    expenses, correct?

21         A     I do on page 11.

22         Q     It actually carries over to, gosh, page --

23         A     34.

24         Q     -- 34.  You've got a 53-page report here, and

25    23 pages of it, roughly, are expenses that you claim

Page 46

1    were inappropriate; is that right?

2         A    Yes, that's correct.

3         Q    The list that you provide, starting on page

4    11, includes expense reimbursement requests for both

5    Stephanie Dotson and Mark Waldrop?

6         A    That's correct.

7         Q    With regard to Mr. Waldrop's expenses that

8    are disclosed in your report, did Mr. Rollins approve

9    all of those?

10        A    According to protocol, yes, he would have.

11        Q    Is it fair to say that Mr. Rollins approved

12   excessive, inadequately documented, or wholly

13   unauthorized expenses?

14        A    There are expense reports that include wholly

15   unauthorized expenses and the process involved

16   Mr. Rollins' approval and he approved them.  So I think

17   the answer is yes.

18        Q    Okay.  Have you seen Mr. Rollins' employment

19   agreement?

20        A    Mr. Rollins, I do not believe I've seen his.

21        Q    I'll represent to you that Mr. Rollins has an

22   employment agreement.

23        A    Okay.

24        Q    There has been testimony in this case that

25   Mr. Rollins' employment agreement is substantially the

1     same as Mr. Waldrop's.

2          MR. DANIEL, JR.:  I object to the form of the

3     question.

4     BY MR. HENRY:

5     Q    I'm making a representation.  Based on that

6     representation, with the understanding that that's a

7     representation --

8     A    Okay.

9     Q    -- how is Mr. Rollins' approval of excessive,

10    inadequately documented, or wholly unauthorized

11    expenses submitted by Mr. Waldrop different from

12    Mr. Waldrop's approval of Ms. Dotson's expenses that

13    you are claiming are excessive, inadequately

14    documented, or wholly unauthorized?

15    A    Let's talk about this for a minute, Gary.

16    Looking at these 23 pages, there are a number of items

17    coming from Mr. Waldrop's expense report and others

18    that come from Ms. Dotson's.  I believe that the

19    distinction between Mr. Rollins' approval of

20    Mr. Waldrop's expense report, which may have included

21    or I've seen did include wholly unauthorized or

22    inadequate documentation, is the same for Mr. Waldrop's

23    review of Ms. Dotson's.

24          My concern also includes the fact that

25    through Ms. Dotson, while there are items of

1    Mr. Waldrop's that lack sufficient support -- and

2    that's part of my consideration here -- if he sent a

3    Ferrari through on his expense report, that would be

4    wholly unauthorized.  So I would have checked the box

5    on that one.  If there was an apparently valid expense

6    but without sufficient support, I've got it in here,

7    too.  So adequate support is part of this as well.

8         I think what we're fighting, in most cases,

9    from a dollar perspective materially so, is that many

10   of Mr. Waldrop's line items here relate to the nature

11   of his support.  Maybe there's annotations on there

12   that can be unexplained.  Maybe it includes meals that

13   may, on their face, appear to be okay, and then we

14   learn in the process that it was just a work lunch with

15   Ms. Dotson, so maybe that is really outside the scope

16   of business activity.

17        As contrasts to Ms. Dotson's reports that

18   showed way off the mark, in my thinking and my opinion,

19   items sought for reimbursement that could have no

20   legitimate business purpose, but because Mr. Waldrop

21   reviewed them, nobody else saw then.

22        So I think there's a distinction to be

23   considered here that the expenses that Mr. Rollins was

24   reviewing of Mr. Waldrop's, many times appears to be

25   meals or lodging and the presumption is that that was

Page 49

1      for a legitimate business activity.

2             It was upon CHS's review that led to the

3      determination that they realized, Wait a minute, that

4      lodging was not necessary.  It may have appeared to

5      Mr. Rollins that was something Mark was doing that he

6      needed to stay in a hotel room.  I don't think that's

7      the same as supporting lead crystal through

8      Ms. Dotson's report to be seen only by Mr. Waldrop and

9      nobody else.  I think there's a distinction there.  All

10     of these are on the same list because there are

11     multiple criteria that pulls them into this list.

12     Q     You list three criteria.  Tell me if I'm

13     wrong, but you list three criteria here on page 11,

14     line 13.  Excessive, inadequately documented, or wholly

15     unauthorized or a combination of the three?

16     A     Correct.

17     Q     Are those the criteria you are talking about?

18     A     Yes, they are.

19     Q     So is it your testimony that there would be

20     no expense included on this list, that spans, you know,

21     over 20 pages, that would not be at least excessive,

22     inadequately documented, or wholly authorized?

23     A     Yes.

24            MR. HENRY:  I need to take a break.

25            MR. DANIEL, JR.:  Me, too.

1            (A short break was taken.)

2                  MR. HENRY:  Back on.

3      BY MR. HENRY:

4            Q    Mr. Edwards, before the break, we were

5      talking about this very lengthy list of expenses that

6      you have identified as being either excessive,

7      inadequately documented, wholly unauthorized, or a

8      combination of the three, and I want to go through some

9      of these with a little bit more specificity.

10                  What is your understanding of Community

11     Health Systems' reimbursement policy with regard to

12     cellular telephones?

13           A    My understanding -- and I hope I am correct

14     in my recollection of this -- but my understanding is

15     that CHS has mobile contracts with whoever it is,

16     Verizon, perhaps, and will provide company phones to

17     employees.  Therefore, expectations of how it's used is

18     predetermined, I guess, in that regard.

19                  In Mr. Waldrop's case, he did not have a

20     company-issued phone, is my understanding, and he

21     purchased his own phone, I guess, and then submitted

22     those monthly statements for reimbursement as a

23     business expense.

24           Q    So is it your understanding that

25     Mr. Waldrop's use of a personal phone violated CHS's

1    policies in some way?

2         A    In a sense.  I understand your question.

3    Gary, when we were looking at this, one of the items

4    that made the mobile technology germane to me was that

5    there is a company protocol in place if you had a

6    company-issued phone.  Arguably, the mere existence of

7    a personal phone is outside of CHS guidelines.  Phones

8    are provided, so that helps throw it in the bucket to

9    put a check box next to it that we're going to include

10   it on this list.

11              Other things are relevant in that regard,

12   talking about mobile technology, and that is all of the

13   associated accessories that kept flooding through.

14   Okay?  If you have a company-provided phone, you'd be

15   given company accessories.  If you lost your charger,

16   presumably, the company would provide it to you.

17              Also, as you know, elsewhere in my report, we

18   talk about use of this phone for nonbusiness purposes.

19   However, it's demonstrative to me that, if there's

20   nonbusiness use, you want to settle them out, right --

21   at least that's my claim -- but there's 100 percent

22   reimbursement for the phone.  So for a variety of

23   reasons, it's included in this table.

24        Q    Does Mr. Rollins have a company-issued

25   cellular telephone?

1      A     I believe he does.

2      Q     Is Mr. Rollins receiving 100 percent expense

3    reimbursement for his company-issued cellular

4    telephone?

5      A     I believe, being that it is a company

6    telephone, that it's paid in full.  So to the extent

7    that Mr. Rollins or anyone else with a company-issued

8    phone is using it for personal expenses, that could be

9    approved.

10      Q     Accessories would also be reimbursed for a

11    company-issued telephone, correct?

12      A     The company would provide it.  When you say

13    "reimbursement," it threw me off.  If the company is

14    providing the phone, then you're just handed the item.

15    It doesn't go through a reimbursement process.  It

16    instead goes through an accounts payable process which

17    is a different review protocol.

18      Q     So in the case of Mr. Rollins, let's say,

19    with a company-issued cellular telephone, does the

20    company pay that bill directly, or does Mr. Rollins pay

21    that bill and seek reimbursement?

22      A     I could be mistaken, but I believe the

23    company pays that directly as a fleet phone expense.

24      Q     Who within the company would know the answer

25    to that question definitively?

1        A      I'm sure Lorraine Taylor would.

2        Q      Are you aware of any authorization that

3    Mr. Rollins gave to Mr. Waldrop to use his personal

4    cellular telephone and seek reimbursement for the same,

5    so long as he was using it, at least in part, for

6    business purposes?

7        A      Am I aware about any specific authorization

8    by Mr. Rollins?  Is that your question?

9        Q      Yes.

10       A      No, I'm not aware of any specific

11   authorization.

12       Q      Hypothetically, if Mr. Rollins had told

13   Mr. Waldrop he didn't need to separate out his business

14   calls from his personal calls, would that change your

15   conclusions in Exhibit 2?

16              MR. DANIEL, JR.:  Object to the form of the

17       question.

18              THE WITNESS:  Any factual change or

19       revelation would impact my table in Exhibit 2, so

20       I guess the answer would be yes.

21   BY MR. HENRY:

22       Q      Looking at page 19 of your report, which is

23   Exhibit 2, there are a series of charges towards the

24   bottom to a place called Kermit's Key West Key Lime

25   Shop, which you have identified as being excessive,

1      inadequately documented, or wholly unauthorized.   Do

2      you see those?

3            A     Yes.

4            Q     Why did you identify those charges in your

5      report?

6            A     Okay.   These were, as pies go -- and I'm not

7      an expert in key lime pies, though I do think they were

8      delicious -- as pies go, these are quite expensive, so

9      it met the excessive criteria, in my opinion, there.

10     Additionally, to the extent that these were client

11     gifts or employee gifts, which is not altogether clear

12     in the first place, but to the extent that they are,

13     that may be beyond the normal expected gifting expected

14     of employees or for clients.

15            In other words, if Mr. Waldrop, who is a

16     chief operating officer -- he's in the C-Suite, if he

17     feels it's in the company's best interest to give a

18     gratuity or some sort of a small gift to someone he may

19     have met in regard to opening a new facility or

20     whatever it may be, at some point, that is excessive.

21     Giving someone a $5 gift card to Carabbas -- I'm making

22     that up, of course -- is quite different than giving

23     someone Wedgwood crystal or sending flowers for

24     hundreds of dollars to someone you've met on business.

25            Q     Is there a specific expense in here that

1    relates to flowers?

2          A     There is.

3          Q     Okay.

4          A     We can look for it.

5          Q     Maybe on a break.  I don't want to get us off

6    these key lime pies just yet.

7                One of the expenses on page 19 for key lime

8    pies is for $211.71.  Do you see that, the second one,

9    I believe.

10         A     Yes.

11         Q     Is it your testimony that's an excessive

12   amount to pay for a gratuity or a gift to an employee?

13         A     I believe that is for two pies.  I think the

14   92.77 is more or less the per-pie charge.

15         Q     Then my question would be:  Is that

16   excessive, in your view, for a gift to an employee or a

17   gratuity to a client or a customer?

18         A     I believe, Gary, in the context of dealing

19   with nonprofit organizations such as CHS that has

20   statutory limitations on how it may expense items and

21   incur costs and so forth, that is outside of CHS

22   guidelines of the scope of what is an acceptable

23   gratuity.

24         Q     And the CHS guidelines that you're referring

25   to would be both statutory and their written policies

1    that you identified earlier?

2         A    Yes, I don't believe I identified any

3    statutory regs, I'm just saying --

4         Q    You just said -- maybe I misunderstood you,

5    but I thought you referenced statutes in your answer.

6         A    I did.  When you file your Form 990 as a

7    nonprofit organization, if you read the instructions

8    for that, there are all kinds of things you have to be

9    careful of to be reasonable in your cost in order to

10   maintain your nonprofit status.

11        Q    Do you know who prepares CHSI's Form 990s?

12        A    I assume someone in my firm.

13        Q    At 3M?

14        A    Yes.

15        Q    Have the expenses you've identified in

16   Exhibit 2 been deducted as unreasonable expenses from

17   CSHI's Form 990?

18        A    I have no preparation responsibilities with

19   the 990.  I do not know if there were any adjustments.

20   I just don't know.

21        Q    Okay.  What is your understanding of CSH's

22   written or oral policies regarding gifts to employees?

23        A    That they should be reasonable in amount and

24   what it is.  You don't want to give someone an

25   inappropriate gift.  I know there was dialogue between

1    Mr. Rollins and Ms. Taylor and Mr. Waldrop, at one

2    point, about the excessiveness of company gifts in

3    relation to the Tiffany boxes that Mr. Waldrop had

4    ordered.  I'm not sure what a Tiffany box is, but in

5    the review, it's from the Tiffany Company, and it's a

6    gift box that contains different things.  They're

7    expensive, and they carry with it the Tiffany Company

8    air of excess.  For a nonprofit, Mr. Rollins was very

9    disturbed by that, and directed on the spot to

10   Mr. Waldrop to cease any such gift-giving activities.

11   This is completely inappropriate for our company.

12        Q    When did that conversation take place between

13   Mr. Rollins, Ms. Taylor, and Mr. Waldrop?

14        A    I can go back and look, Gary, because I know

15   it's on a prior expense report where you can see they

16   were submitted for reimbursement.  I want to say it was

17   several years before Mr. Waldrop's termination.

18        Q    Okay.  Did you find any expense reimbursement

19   request for Tiffany gift boxes after that conversation

20   took place that was submitted by either Ms. Dotson or

21   Mr. Waldrop?

22        A    I don't believe I did, but that's when the

23   Wedgwood crystal started to come on the scene.

24        Q    So is it your understanding that Wedgwood

25   crystal was not given as a common practice as gifts to

Page 58

1    employees, prior to this conversation about Tiffany

2    gift boxes?

3         A    I would have to look at dates, but it's my

4    recollection that the Wedgwood crystal, as purchased

5    items out for reimbursement, came after Mr. Rollins'

6    instruction to cease any such gifts.

7         Q    Well, the first -- let's look at your report,

8    page 11.  The first expense you identify for Waterford

9    Wedgwood crystal is from Ms. Dotson for August 13,

10   2012.  Do you see that?

11        A    I do.

12        Q    Is it your understanding that Waterford

13   Wedgwood crystal was not an expense for gifts prior to

14   that date?

15        A    No, this is the day my population of data

16   started.  I went on Workday.  At the end of summer

17   2012, all expense reports prior to August or July of

18   2012, around that time, were paper documents.  I didn't

19   go back that far.  I didn't have time.

20        Q    Was there some kind of time limitation put on

21   your work?

22        A    Well, I was sensitive to the fact that

23   Holland & Knight and CHS needed an answer to

24   Mr. Waldrop's claim.  I wanted to do my verification of

25   work prior to their filing of their answer.

Page 59

1        Q      Are there any charges for Tiffany gift boxes

2    listed in your 20-plus-page identification of improper

3    expense reimbursement requests?

4        A      No, there should not be, because I think that

5    was earlier.

6        Q      Who did you work with at CHS from an IT

7    perspective?

8        A      I can't remember the two individuals.  I may

9    have it in the field notes.  I don't recall.

10       Q      It wasn't Ms. Taylor or Mr. Rollins?

11       A      No.

12       Q      What is your understanding of employee access

13   to Workday records at CHSI?

14       A      I would like to give you a broad

15   understanding as my understanding of that is probably

16   very broad.  It's a large organization, a lot of

17   employees are siloed in departments.  My broad

18   understanding of that is that all users of Workday --

19   which doesn't include every employee presumably, I

20   don't know that, though -- the users of Workday are

21   given stratified credentials based on where they

22   operate in the company.  They may be able to log on and

23   see only time sheets and expense report submissions.

24   Or they may be able to log on and see something else or

25   everything.  It's credential based.

1      Q     Do you know anything about Mr. Rollins'

2   access to Workday?

3      A     A little bit.  I did discuss with him his

4   utilization of Workday.  I was trying to comprehend how

5   Workday was functioning.  I do know Mr. Rollins has

6   access to Workday.  That's how he reviewed expense

7   reports.  I don't believe he had carte blanche access.

8   That's not something that would generally be given to

9   someone, unless they had a downright stated reason to

10  need it, even the president and CEO.  I don't know.  I

11  would expect that his credentials had some limitation

12  to it just from a control standpoint.

13     Q     But you don't know that for a fact?

14     A     I don't know that as a fact.

15     Q     What about Ms. Taylor?

16     A     Same comment.  I would expect that her

17  credentials probably would give her greater access

18  because of her role as a financial officer, a lot of

19  fingers in a lot of different pots.  I would expect --

20  do not know factually -- but I would expect that even

21  she would have some limitation on credentials.

22     Q     To be clear, you don't know that?

23     A     I do not.  I do know -- this is important,

24  Gary, let me add this -- as I said, Workday is

25  credential based and Workday does track who did what

1      when, so to the extent that someone had greater access

2      to Workday and the notion that someone may have altered

3      someone else's something, there would be an audit trail

4      of that having occurred.

5           Q    The audit trail that you just described,

6      that's your word.  There may be a more technical term.

7      I'm going to go with your terminology.  The audit trail

8      in Workday, would it reflect just edits or would it

9      reflect viewings that didn't result in edits?

10          A    I do not know.  I would not expect it to log

11     viewing, but it could.

12          Q    Okay.  Going back to the Waterford Wedgwood

13     crystal, was it common practice at Community Health

14     Systems for supervisors to provide Waterford Wedgwood

15     crystal gifts to their reports?

16          A    To their what?

17          Q    To the people who reported to them.  As a

18     common practice by others, besides Mr. Waldrop, would

19     that affect your analysis in Exhibit 2?

20          MR. DANIEL, JR.:  Object to the form of the

21          question.

22     BY MR. HENRY:

23          Q    I understand it's hypothetical.

24          A    I don't think it would, Gary, from the

25     standpoint that my criteria are still met.  In the

1    published CHS guidelines, there is enough information

2    in there to guide employees, whoever that may be, on

3    knowing what is unreasonable and what is unauthorized,

4    particularly given that there's training that coincided

5    with these policies.  The fact that others may have

6    done it, 2 wrongs, 10 wrongs, 100 wrongs don't somehow

7    make it right.  My criteria, I think, would still

8    survive.

9         Q    The guidelines that you are referring to, are

10   those the Community Health Services of Georgia

11   guidelines as revised and adopted on June 24, 2014,

12   that's referenced in footnote 5 on page 9 of your

13   report?  Is that what you're talking about?

14        A    Yes, it is.  Just going back to page 4, the

15   documents that I mentioned, surmised on.  At least that

16   document that you are referring to, with my footnote

17   No. 5.

18        Q    Okay.  Whatever documents -- you had at least

19   that the document -- what other documents?

20        A    I'm trying to recall specifically.  I'm on

21   page 4, line 3 -- I'm sorry -- line 5 -- there's a

22   reference that Community Health Services of Georgia

23   associate handbook, that had some information in there

24   about corporate resources and such.  Line 8 is the one

25   that you refer to as my footnote 5.  Line 9 is CHS

1   corporate guidelines revised October 13, 2013.

2       Q    Do you know if that first document identified

3   on line 5 of page 4, if that was made an exhibit to

4   your report at any point?

5       A    I would have to look.  I don't know.

6       Q    Have you noted all the exhibits to your

7   report somewhere in your report?

8       A    I should have.

9       Q    Let's look at page 23 of your report.

10  There's a line item in there, and candidly, I think it

11  appears in other places, but at different times, but

12  this is the one I found first, I guess.  It has a date,

13  and it has a question mark on the date that would

14  normally be expense report 104-3384 for a financial

15  management conference.  Do you see that?

16      A    I do.

17      Q    What is that financial conference expense?

18      A    Gary, I would have to go pull that expense

19  report and look at the supporting detail.  If you have

20  it, maybe we can look at it.

21      Q    I'm not sure if I have it or not.  Do you

22  know what financial services is at CHSI?

23      A    Can you give me some context?

24      Q    It's just a description -- I don't know if

25  you call it a department or a segment or a division of

1    CHSI financial services.

2        A    I guess it's common in the vernacular.  You

3    have your financial office.  Yeah, people might

4    commonly refer to it that way.

5        Q    Who's in charge of financial services at

6    CHSI?

7        A    Presumably, Lorraine Taylor.  Again, you're

8    using financial services as a proper noun.  I'm not

9    sure we're talking about apples to apples.  She's the

10   CFO.

11       Q    Did you ever run across, in your review of

12   the expense reimbursement requests, situations where,

13   persons other than the immediate supervisor of the

14   person with the expenses, actually approved those

15   expenses?  That was a mouthful.  If you followed it,

16   great.  If not, I can try to get it clearer.

17       A    No, I followed the question, Gary.  I don't

18   recall any instance where the review path was different

19   than what it should have been.  We did have the entire

20   universe of expense reports available to us, but we

21   were focused on the individuals in the C-Suite, and

22   Mr. Rollins and Ms. Dotson.

23            I don't recall an instance where Ms. Dotson's

24   report was approved by anyone other that Waldrop and

25   Waldrop's was approved by anyone else than Mr. Rollins.

1    I'm not saying that didn't occur.  I just don't recall

2    seeing that.

3         Q    Do you recall seeing any situation where

4    Mr. Rollins' expenses were submitted for reimbursement

5    by Ms. Dotson?

6         A    No, I did not.

7         Q    Assuming hypothetically that occurred, would

8    that be a violation of corporate guidelines?

9              MR. DANIEL, JR.:  Object to the form of the

10             question.

11             THE WITNESS:  The hypothetical question, if I

12             restate it, is would the submission of

13             Mr. Rollins' expense reports out for reimbursement

14             by Ms. Dotson be outside of CHS guidelines, is

15             your question?

16   BY MR. HENRY:

17        Q    Yes.

18        A    I don't know, because regardless of -- do you

19   mean prepared?  In other words, Ms. Taylor's still is

20   going to get queued up in Workday to review

21   Mr. Rollins' expense report, regardless of who pushed

22   the button to get it into the system.

23        Q    Let's be sure we're both talking apples to

24   apples, and not just apples and oranges.  My

25   understanding is Ms. Dotson would submit expenses for

1      activities that Mr. Waldrop actually engaged in; is

2      that correct?

3           A     Yes, I believe that's correct.

4           Q     And Ms. Dotson would actually incur that

5      expense on her own credit card, right?

6           A     At times, yes.

7           Q     And then Ms. Dotson would then turn around

8      and submit that expense for reimbursement, right?

9           A     On her own expense report.

10          Q     On her own expense report?

11          A     Correct.

12          Q     And Mr. Waldrop would have been the approving

13     supervisor for those expenses?

14          A     Correct.

15          Q     That -- correct me if I'm wrong -- is a

16     situation that you contend violates the guidelines,

17     right?

18          A     No, that's where I think we may have a

19     disconnect.  If, for instance, another hypothetical, if

20     Mr. Waldrop says, Hey, Stephanie, I need to run up to

21     Chicago for a conference.  Please book me an airline

22     ticket and hotel room for three nights.

23          Q     Okay.

24          A     Stephanie does it on her credit card and

25     seeks reimbursement.  Mark is going to be the one

1    approving it.  Like you said in your hypothetical, I

2    don't think that's outside of guidelines, as long as

3    the expense is valid.

4           I don't take it to mean that the expenses on

5    Ms. Dotson's expense report have to pertain only to

6    Mrs. Dotson's items.  It's more important that those

7    expenses sought for reimbursement were valid business

8    expenses, because from a corporate standpoint, it's all

9    coming out of the corporate pie.  Whether it's

10   Mr. Waldrop seeking the reimbursement or Ms. Dotson

11   might not matter, it's just was it a valid expense, a

12   legitimate expense.

13        Q    Okay.

14        A    I'm not sure I answered your question.

15        Q    I think you may have.  Am I incorrect in

16   saying that one of the concerns you raise in your

17   report is that Mr. Waldrop was approving expenses?

18        A    I understand --

19        Q    That Ms. Dotson was submitting for items he

20   was doing?  Is that not --

21        A    That is correct, Gary, but those items were

22   not legitimate, regardless of who was requesting that.

23        Q    Okay.

24        A    That's my distinction.  A legitimate business

25   expense is a legitimate business expense.  To the

1    extent that any one person incurs it on behalf of

2    themselves or another, as long as it's documented who

3    it's for and it's legitimate, then it should be paid as

4    a reimbursement.

5        Q    That may inform your answer to my original

6    question.  Let me reask it.

7            If Mr. Rollins asked Ms. Dotson to book a

8    flight and Ms. Dotson did so and incurred the expense

9    and submitted a reimbursement request for approval by

10   Mr. Waldrop, that's the normal protocol, right?

11       A    Yes.

12       Q    Would that be a violation of the corporate

13   guidelines?

14           MR. DANIEL, JR.:  Object to the form of the

15       question.

16           THE WITNESS:  I don't think so, provided that

17       it was a legitimate expense in the first place.

18   BY MR. HENRY:

19       Q    So it all goes back to the legitimacy of the

20   expense, irrespective of who was approving it?

21       A    I believe it's an overarching principle for

22   sure, but let me supplement my answer, Gary.  That

23   hypothetical, not to repeat, but Mark Waldrop would be

24   approving Stephanie Dotson's report, which included an

25   item for Mr. Rollins that she did at his instruction,

1    the point there is it still got reviewed.  If

2    Mr. Waldrop was looking at it, he could go, Stephanie,

3    why do you have a $1,600 flight to Chicago on here?  He

4    better get sufficient explanation.  He might need to

5    pick up the phone and call Ronnie.  Did you tell

6    Stephanie to do this?  I sure did.  Okay.

7           But it was reviewed.  That's the important

8    protocol.  The review is an invested activity, and that

9    needs to occur routinely.

10      Q    How would you describe your working

11   relationship with Mr. Rollins?

12      A    My relationship?

13      Q    Uh-huh.

14      A    Cordial, cooperative, available when asked.

15   I did not find him to be -- I may be going outside of

16   your question -- I didn't find him to be embittered by

17   this.  It was a cordial interaction.

18      Q    Did he ever tell you that he wished or

19   thought that maybe Mr. Waldrop should be put in jail?

20      A    I never heard that.  Certainly not that I

21   recall.

22      Q    Would it surprise you if he said something

23   like that?

24      A    Emotions run high when people consider

25   themselves to be victims.  People could say any number

1    of things.  So would it surprise me?  No.

2        Q    Let's move on to DeBrock Poodles, which we

3    have touched on briefly, but if you would, just tell me

4    in your own words what Mr. Waldrop did wrong with

5    regard to DeBrock Poodles.

6        A    Okay.  Well, Mr. Waldrop was operating a

7    business for the DeBrock Poodles.  I believe that's not

8    contested from the standpoint that he bred animals and

9    sold them and he built up his pedigree for those

10    animals through dog shows and whatnot, which I

11    understand that's how you do it.

12        As far as what was inappropriate about that,

13    to the extent that he utilized corporate resources in

14    the conduct of that personal business, that, by

15    definition, would be outside of CHS protocols.  By

16    example, I think what you're also asking is -- we've

17    already discussed utilization of the phone that

18    Mr. Waldrop used as his personally owned phone that was

19    100 percent reimbursed by the company on the pretense

20    of being for business purposes.  We already talked

21    about that a little bit.

22        I also talked about in my report about

23    utilizing the Dalton office building space as part of

24    his emergency preparedness plan as a disaster recovery

25    emergency plan.  In other words, to guarantee the care

1    and well-being of his animals in the event that his

2    kennels at his home are unusable.  He decided that he

3    could store the animals at his office, which would've

4    been properly outfitted to accommodate that.  That's a

5    utilization of a corporate resource.  Those are two

6    examples.

7         Q    Real quick -- I came off the expense reports

8    a little too soon.  The total amount that you disclose

9    in Exhibit 2 for expenses that were inappropriately

10   submitted and reimbursed is 238,235.76; is that right?

11        A    Yes, that's correct.

12        Q    Can Mr. Waldrop's, in your view, violation of

13   company guidelines be cured if he reimbursed that

14   amount to the company?

15        A    If Mr. Waldrop reimbursed the company, I

16   guess that's -- I guess that's a legal question first

17   of all -- but I guess someone would need to determine

18   if these are the extent of the damages caused by these

19   actions, and to the extent there are others, no.  To

20   the extent there were no other damages and this fully

21   remunerated the company, then perhaps, yes.

22        Q    Okay.  The last expense for Ms. Dotson, dated

23   December 10, 2016, which is after both her and

24   Mr. Waldrop's termination, correct?

25        A    It sure is.  Perhaps it's a typographical

Page 72

1    error, but the expense report number is sequential to

2    the one above it, which was June 9th.  What I need to

3    check is to see -- my expectation is that that's a typo

4    on the date.  It may not be.  We can check.  But that

5    with the sequential nature of that report -- due to the

6    sequential nature of these expense reports, that report

7    being 1086396 and one three months earlier is only 16

8    sequences before, it tells me that's a date typo.

9         Q    Okay.  All right.  Now we can move back to

10   DeBrock Poodles.

11             In your testimony, you identified two issues

12   that I believe, in your contention, violate the company

13   guidelines, and that is the reimbursement of the cell

14   phone that was used for the DeBrock Poodles enterprise,

15   and the listing of the Dalton office space as a

16   temporary location?

17        A    That was my testimony a few moments ago.

18   Elsewhere, we discussed, in the report and we already

19   covered expenses.  I'm not sure if they're overlapping

20   again, but there is a suspicion that the cleaning

21   supplies, the many, many bottles of cleaning supplies

22   that were in the office or warehouse facility used by

23   the offices, were really for the care and maintenance

24   of the animals.

25        Q    Are you talking about the cleaning supplies

1    depicted in the picture on page 39 of your report?

2         A    Correct.

3         Q    Were those cleaning supplies expensed to the

4    company?

5         A    I believe they were.  I believe that we had

6    receipts to Costco or Sam's or Walmart that showed

7    Lysol on there.

8         Q    Would you have included that on your list?

9         A    I should have.

10        Q    Can you find it for me on your list?

11        A    Well, I can identify Walmart on my list.

12   Whether or not that's one of the ones with receipts

13   attached that included the Lysol, I don't know what we

14   have on the table here today.

15        Q    Well, there's a voluminous exhibit to your

16   report, which is expense reports that we're talking

17   about here?

18        A    Correct.

19        Q    Were all of the expense reports that you

20   reference in your report included in that exhibit?

21        A    Yes.

22        Q    So if those cleaning supplies were submitted

23   for reimbursement -- and by "cleaning supplies," I'm

24   talking about the ones that are depicted on page 39 of

25   your report -- if those were submitted for

1    reimbursement, that expense report would be included in

2    the exhibit to your report?

3         A    It should be, should be.  Even if the fact --

4    since we're on the poodle section of this -- even if

5    they're not costed out on the receipt, whatever it may

6    be, their presence here in the office infers to me --

7    maybe not to someone else -- but to me infers that they

8    were intended to be used at that location quite

9    possibly for the care of the animals.  There are some

10   assumptions, but that's why I disclose in my report

11   that they are there, but make your own decision.

12        Q    You have an office at 3M, right?

13        A    I do.

14        Q    Do you ever have personal items shipped to

15   your office at 3M?

16        A    I do.

17        Q    Do you ever temporarily store personal items

18   at your office at 3M?

19        A    Not really, but on occasion, I'm sure I must

20   have.

21        Q    Is that a violation of any of 3M's corporate

22   guidelines?

23        A    No.

24        Q    Who did cleaning at the Dalton office?

25        A    Ms. Dotson is my understanding.

1          Q     Would cleaning supplies for the office itself

2     be an appropriate expense to be reimbursed by the

3     company under corporate guidelines?

4          A     I believe it would.  The question then comes

5     in regarding the quantity of the supplies.  I would

6     think one bottle would last you six months.

7          Q     Is it your testimony that cleaning supplies

8     submitted for reimbursement were excessive?

9          A     Yes.

10         Q     What do you base that on?

11         A     Nothing about it, but just a general sense

12    of, given the size of that office, whatever it is,

13    1,100 square feet, I have cleaning supplies at my

14    house, and I know the rate at which we go through them,

15    even with regular cleaning, and that volume of cleaning

16    supplies seemed to me to be excessive.

17         Q     So you're basing that on your personal

18    experience?

19         A     There's not an otherwise scientific way I

20    would determine that.  It's an observation.

21         Q     You didn't do any studies of cleaning

22    services or anything like that to form your conclusions

23    on Exhibit 2?

24         A     I did not.  In Exhibit 2 as pertains to the

25    cleaning supplies?

1       Q     Correct.

2       A     Yeah.  Fair limitation.

3       Q     You were referring to this DeBrock Poodles --

4  I used the word "enterprise," but you referred to it as

5  a "business."  Why do you use the word "business"?

6       A     Okay.  I guess that's kind of a subjective

7  question that maybe can be answered with a subjective

8  response.  Mr. Waldrop provided a resource to the

9  poodle community through the Poodle Club of America.

10  He was part of that, he was building a pedigree by

11  showing the animals in dog shows and was getting

12  champion status or grand champion status, whatever the

13  case may be, and was breeding animals and making them

14  available for sale.

15          It did not appear to me to be a mere hobby,

16  that -- Hey, I've got a litter of puppies.  Does

17  anybody want a dog?  It was published on the Internet,

18  he made himself available to the public to contact him

19  about toy poodles, perhaps to buy toy poodles, he did

20  sell toy poodles.  To me, that's a business.  You used

21  the word "enterprise," that's more far-reaching than a

22  business to me, but nonetheless, I think he was engaged

23  in this, I'm sure at a loss, but still for the purposes

24  of prosecuting this poodle business.

25          Q     Are you aware of any specific instances in

1    which the Dalton office was used to conduct the

2    business of DeBrock Poodles?

3         A    Only in reference to Mr. Waldrop's disaster

4    plan where he listed that as an alternate site to store

5    the animals.

6         Q    You're basing that on -- I don't know what

7    this is, but it looks like important information there

8    on page 37.  It's a screenshot or something?

9         A    Correct.

10        Q    Where it says "temporary location

11   information"?

12        A    Yes -- well, in part.

13        Q    Okay.

14        A    That's where he does mention the address in

15   relation to DeBrock Poodles, but elsewhere in his -- I

16   think I included a screenshot, snapshot -- on the next

17   page, page 38, where he actually describes his

18   emergency/disaster preparedness plan, which states

19   using the office location for that purpose.

20        Q    Where did this screenshot come from on page

21   38?

22        A    I don't remember if this is something I

23   scanned out of a paper document that I was looking at

24   or if I found it online.  There was a lot online.  I

25   can tell you this:  This reappears in my exhibits to

1    this report in its whole state, and from looking at

2    that, I would know if it was a scanned document or if

3    it was taken from the Internet research.

4        Q    If it was a scanned document, who would have

5    provided the original of the document?

6        A    To me?

7        Q    Yes.

8        A    Lorraine Taylor.  By the way, may I?

9        Q    Go ahead.

10       A    Since we're still on the topic, you can see

11   on page 38, the last two sentences say:  I keep a

12   supply of cleaning and sanitizing supplies on hand at

13   all times.

14            He's talking about this in the context of the

15   animals at the same time in the context of this

16   alternative storage site.  That's what this is.  That

17   leads more down the path of why I included the picture

18   of the cleaning supplies.

19       Q    Were you provided a compact disc or DVD

20   containing documents relating to DeBrock Poodles by

21   CHSI?

22       A    I don't recall.  What I do recall, Gary, is

23   in the conference room that CHS had set aside for this

24   matter, there were a bunch of file boxes and whatnot,

25   and we scanned like crazy.  That's the last thing we

1   did on the last day we were there before we went to

2   Darien, Georgia, to that audit.   Among those documents

3   were CDs and DVDs, and I tried to review them all.

4   There could have been one on DeBrock, I just don't

5   recall.

6        Q    You reviewed the scanned documents?

7        A    Uh-huh.

8        Q    Did you do any of the actual scanning?

9        A    John Hartman and I did it together.   We did

10   it and sent a hefty bill.   We had to do it.   That's

11   something I would've liked someone else in my office to

12   do, but we were pressed for time and had to get it

13   done.

14        Q    I understand.   Do you know where Community

15   Health Systems obtained the documents provided to you

16   in connection with DeBrock Poodles?

17        A    Ms. Taylor did a lot of the online research

18   the same as I did.

19        Q    Okay.

20        A    I know she was able to find information, such

21   as the Facebook data and all that, to come to the early

22   conclusions, but also, it's my understanding, that when

23   they went to the Dalton office after termination, they

24   retrieved all the records, and there were some records

25   there that relate to Southern Adventist University and

Page 80

1    DeBrock Poodles.  It was a supplement to their earlier

2    research.

3        Q    Do you know anything about a break-in at the

4    Dalton office?

5        A    A break-in?  I know about the flood.  I think

6    I do know about the break-in.  I do recall hearing

7    about a break-in, I think.  I might need to retract

8    that, because I'm not clear in my recollection.

9        Q    Okay.  If Mr. Rollins had authorized

10   Mr. Waldrop to use the (706)270-4265 cellular telephone

11   number for both business and personal purposes and seek

12   reimbursement from Community Health Systems for the

13   full amount of the bill, would that change your

14   conclusions with regard to DeBrock Poodles in your

15   report?

16            MR. DANIEL, JR.:  Object to the form of the

17            question.

18            THE WITNESS:  Gary, you asked me that

19            question earlier, maybe in a slightly different

20            context.  The answer I'm going to give you is no.

21            It certainly covers my impression of the gravity

22            of the expense item, but just because Mr. Rollins,

23            who was not omnipotent in the CHS organization,

24            gives an approval for something, does not make it

25            compliant with guidelines.  He would be out of

1          line there, too.  I don't think it would change.

2          I'm trying to evaluate these items based on them

3          themselves, and if there was -- pick anything you

4          want to pick, Wedgwood crystal, we'll use that as

5          an example, I find that to be way out of CHS

6          guidelines.  The fact that Mr. Rollins'

7          hypothetically may have said, You know what, go

8          buy a bunch of Wedgwood, it doesn't really change

9          that.  It changes how it gets dealt with.

10   BY MR. HENRY:

11        Q    How does it change how it gets dealt with?

12        A    Well, it goes to the weight of the damages, I

13   guess.  Your question is would it change my impression

14   of whether it would be within guidelines or not, and it

15   wouldn't.  If the board approved it, it would, because

16   guidelines are adopted by the board.

17        Q    It's your understanding that Mr. Rollins does

18   not have the authority to approve items such as that?

19        A    I think he is under the same guidelines as

20   Mr. Waldrop.  Obviously, as the CEO, he has greater

21   thresholds for this and that, but to the extent that

22   we're talking about policies that do not establish

23   positional thresholds, I would assume so.

24        Q    He's subject to the same guidelines?

25        A    Yes.

1      Q    So if he had approved the use of a personal

2    cell phone for both business and personal purposes, he

3    would be in violation of the guidelines as well,

4    correct?

5          MR. DANIEL, JR.:  Object to the form of the

6          question.

7          THE WITNESS:  In the way that we're

8          discussing it, I think the answer would be yes.

9    BY MR. HENRY:

10     Q    If his employment contract was substantially

11   the same as Mr. Waldrop's and he was in violation of

12   the guidelines, would there be cause for his

13   termination?

14         MR. DANIEL, JR.:  Object to the form of the

15         question.

16         THE WITNESS:  I'm not sure that's something

17         I'm well situated to answer.  Okay?  You look at

18         the termination clauses and if you want to do a

19         bright-line test, there's no materiality in these

20         policies.  There is no materiality, you can commit

21         fraud up to $500 per month.  It's not in there.

22         So if you want to take a bright-line test,

23         I'm sure you could peg most people on a singular

24         item.  I think you look at the context of the

25         overall behavior in making that decision.  At

1          least I would.

2     BY MR. HENRY:

3          Q     You've been designated to testify today with

4     regard to Topic No. 19, right?

5          A     Yes, we already covered that.

6          Q     Let's read it again.  You read it into the

7     record.  "All facts and circumstances that refer or

8     relate to your claim that Mr. Waldrop's activities

9     regarding DeBrock Poodles constitute a cause for

10    Mr. Waldrop's termination."

11         A     I believe I've answered you that it does.

12         Q     So again, my hypothetical question is this:

13    If Mr. Rollins authorized the use of this cellular

14    telephone number for both business and personal use to

15    be reimbursed by the company, would you say it's a

16    violation of corporate guidelines?

17              MR. DANIEL, JR.:  Object to the form of the

18         question.

19    BY MR. HENRY:

20         Q     Would that not also be cause for Mr. Rollins'

21    termination if his employment agreement is

22    substantially the same as Mr. Waldrop's?

23              MR. DANIEL, JR.:  Objection.

24              THE WITNESS:  I think it would be cause.

25         Whether people act on cause is a different

1      question.

2  BY MR. HENRY:

3      Q    CHS acted on the cause -- the perceived cause

4  at least, on Mr. Waldrop, didn't it?  They terminated

5  him.

6      A    Of course they acted, yes.

7      Q    To your knowledge, they didn't provide any

8  written notice of the reason they were terminating him

9  until August 16, 2016?

10     A    We've already discussed that, yes.  I do not

11 believe -- I know there are contract requirements in

12 termination, that's what we're discussing here, but I

13 also know that CHS had developed their cause prior to

14 the termination.

15     Q    How do you know that?

16     A    From my interviews with them, the conduct of

17 the expense review, I believe we already talked about

18 how Angela and I believe Brooke conducted their expense

19 analysis.  Through interviews.  Obviously I wasn't

20 there.

21     Q    Based on things you were told?

22     A    Based on things I was told.

23     Q    So if what you were told is inaccurate, that

24 would change your answer, right --

25          MR. DANIEL, JR.:  Object to the form of the

1         question.

2     BY MR. HENRY:

3         Q     -- about whether they established cause

4     before they terminated him?

5              MR. DANIEL, JR.:  Object to form.

6              THE WITNESS:  I understand what you're

7         driving at here, and as I answered you earlier,

8         any change in perceived or known facts may change

9         my conclusion; however, historical evidence in the

10        form of those expense reports was known, it was

11        documented, it was there.  To me, that is

12        sufficient cause.

13    BY MR. HENRY:

14        Q     Have you physically seen the cleaning

15    supplies that are depicted in the picture on page 39 of

16    your report?

17        A     I do not believe so.

18        Q     Have you ever been to the Dalton storage

19    office --

20        A     I have not.

21        Q     -- storage facility?  Let's move on to

22    Southern Adventist University.

23              MR. DANIEL, JR.:  Want to take a lunch break?

24              MR. HENRY:  If the food is here, let's go to

25        a break.  It's a good place to stop.

1          (A lunch break was taken.)

2               MR. HENRY:  Back on.

3     BY MR. HENRY:

4          Q    Mr. Edwards, before we took the lunch break,

5     we'd been talking about DeBrock Poodles and were about

6     to start talking about Southern Adventist University.

7     I want to talk to you about Southern Adventist.

8               What's the issue with regard to Mark Waldrop

9     and Southern Adventist University?

10         A    Principally, that he was working for

11    compensation without approval of CHS.

12         Q    Is that it in a nutshell?

13         A    That is it in a nutshell.  We tried -- in our

14    analysis, we were going through and making sure we were

15    able to substantiate that he was in the conduct of

16    being on the faculty at SAU, and clearly he was, based

17    on the catalog and syllabi, then additionally with what

18    the contract with SAU demonstrated.

19         Q    Look at page 37.  You refer to interviews

20    conducted by you of CHS executive management and the

21    board chair.  The board chair, that's Joe Wall,

22    correct?

23         A    Correct.

24         Q    Who did you interview with regard to Southern

25    Adventist University in CHS executive management?

1        A      Lorraine Taylor and Ronnie Rollins.

2        Q      Did either Mr. Rollins or Ms. Taylor tell you

3    they recruited Mr. Waldrop's students to work in the

4    organization?

5        A      I was aware that the company, CHS, viewed the

6    participation by Mr. Waldrop at Southern Adventist

7    University, SAU, as good for the company and raising

8    the awareness of CHS and as a potential recruiting

9    tool.

10       Q      It's not so much that executive management

11   was not aware that Mr. Waldrop was teaching at Southern

12   Adventist University, it was more the scope of his

13   services and the fact that he was getting paid; is that

14   fair?

15       A      That he was getting paid without their

16   awareness and approval, yes.

17       Q      Did Mr. Rollins tell you he had had a

18   conversation with Mr. Waldrop in which Mr. Waldrop

19   asked if the money he received from teaching at

20   Southern Adventist University needed to be reimbursed

21   to the company?

22       A      I don't recall that.

23       Q      He didn't disclose that to you?

24       A      If he did, I certainly don't recall.

25       Q      If such a conversation had taken place, would

1    that change your conclusions with regard to Southern

2    Adventist University in Exhibit 2?

3              MR. DANIEL, JR.:  Object to the form of the

4         question.

5              THE WITNESS:  Gary, in my report, I didn't

6         make a reference to -- I need to make a reference.

7    BY MR. HENRY:

8         Q    Sure.

9         A    The fact that -- I'm on page 43 of my

10   report -- I have in italics on the upper third of the

11   page some of the information regarding the employment

12   agreement with Mr. Waldrop that says:  An employee

13   shall not engage in any outside employment without the

14   express written consent of the board of directors of

15   the company.

16              So to answer your question, if Mr. Rollins

17   had approved it, whether it was orally or in writing,

18   it would still be in violation, because it is not with

19   the consent and approval of the board of directors.

20        Q    Okay.  How could Mr. Waldrop have cured the

21   issues with regard to Southern Adventist University

22   that you identified in Exhibit 2?

23              MR. DANIEL, JR.:  Object to the form of the

24        question.

25              THE WITNESS:  As with the earlier discussion

1          about that, I'm not sure I'm in the right position

2          to make statements about what cures could be, but

3          I think, as far as curing, from a remuneration

4          standpoint, turning over his contract proceeds

5          from teaching would go to reducing any damages

6          that may result from that.  It does not eliminate

7          the cause.

8     BY MR. HENRY:

9          Q     How much did Mr. Waldrop get paid from

10    teaching at Southern Adventist University?

11         A     I don't know how many semesters he taught

12    under contract agreements such as the ones I included

13    in my report, but if you look at page 41, there is an

14    adjunct employment agreement dated May 6 of 2011,

15    $2,169.  If you look on page 42, there is a similar

16    agreement five years later for a fee of $2,343.  Under

17    the assumption the average fee is around $2,200 and he

18    taught at least one course a year, that would be

19    approximately $11,000 just from '11 to '16.  Earlier

20    dates, of course, are referred to in the catalogs that

21    we would have to go back to and at the present, too.

22         Q     Where did you obtain the two documents you

23    referenced in your report, the one on page 41 and the

24    one on page 42?

25         A     These were on-site, if I recall correctly, at

1    the CHS offices when I was doing my fieldwork.  They

2    were provided to me through Lorraine Taylor as

3    available documentation to review.  I would need to ask

4    her, but I believe she obtained them through the

5    records office at the Dalton office.

6         Q    Did she tell you that's where she got that?

7         A    I think she did, but I need to refer to my

8    notes to get more specific on that.

9         Q    The Dalton office, describe for me the issues

10   regarding the Dalton office as it relates to

11   Mr. Waldrop's termination.

12        A    Okay, there were several, I guess.  In no

13   particular order, there were contracts that were let

14   regarding the renovation work done at that office as

15   well as repair work done as a result of a plumbing

16   flood.  Mr. Waldrop did not have the authority to bind

17   the company in such a contract or his assigns that he

18   was working with.

19             There is also a breach of protocol dealing

20   with the conservation of corporate resources,

21   maximization of monetary efficiency by obviating the

22   use of the HSRE, which stands for the Health Systems

23   Real Estate, Inc., which is a subsidiary organization

24   of CHS that works to manage and direct all construction

25   and real property acquisitions, construction, repairs,

1    so on and so forth.

2              He also obviated the use of ECP Distributors,

3    which is also another subsidiary of CHS that is a

4    supplier, both internally and to third parties outside

5    the organization, of office furniture, fixtures, and

6    whatnot.

7              The reason that's important is because, in

8    essence, through the use of ECP, the company saves

9    gross margin dollars that are paid to an unrelated

10   third-party vendor rather than preserving those funds

11   by getting items at cost.  Similarly, with HSRE, the

12   real estate subsidiary, HSRE is familiar with the

13   board's policies, the strategic direction making sure

14   corporate branding is consistent and directives of

15   management and the board are followed accordingly from

16   engagement to engagement.  By excluding HSRE and going

17   outside of the system, there was no ability to control

18   cost.  That's one of the HSRE functions.  To whit, the

19   actual cost was 30 percent more -- I believe it was --

20   than what was even bid for the restoration work.  So

21   those were concerns.

22             Additionally, the cost of the renovation

23   seems to me, and I believe seemed to the board, to be

24   excessive for a less-than-1,100-square-foot building.

25   The cost to renovate seemed quite high, and those costs

Page 92

1       were not budgeted and approved for payment.  I'm

2       probably leaving something out, but that's a start.

3               Of course, I did leave out the fact that

4       Ms. Dotson, working in concert with Mr. Waldrop as the

5       supervisor of that office, you know, executed a

6       contract to include one with her father to oversee

7       construction activities, which would be absolutely

8       pointless given HSRE provides that function.

9       Q       You talked about ECP Distributors and HSRE

10      quite a bit in your answer just now.  I want to look at

11      line 19 on page 44.  Are you there?

12      A       Yes, I am.

13      Q       "Utilization of these two companies," I think

14      you're referring to ECP and HSRE there, aren't you?

15      A       Yes, I am.

16      Q       "Utilization of these two companies was

17      required throughout CHS and special authorization would

18      be required to deviate from this policy."  My question

19      is:  Would an authorization from Mr. Rollins to use

20      local people to do this project be a "special

21      authorization" as you used that term in Exhibit 2?

22      A       I don't think so in this case, if for no

23      other reason than the contract exceeded $100,000, and I

24      believe that was a threshold that required board

25      approval.

1        Q    What are you basing that opinion on?  A

2   written document somewhere?

3        A    I'm basing it on the charter authorization

4   process.  I guess it's relevant, regardless of whether

5   Mr. Rollins were to approve it as a specialty

6   renovation and whatnot, Mark Waldrop would still not

7   have been authorized to bind the company in a contract.

8   That would've been signed through the corporate office

9   just as everything else would have been done.

10       Q    Every contract has to be signed through the

11  corporate office?

12       A    It's certainly not all-inclusive.  I'm sure

13  there are times and instances perhaps not, but as a

14  general statement, Mr. Waldrop was not authorized to

15  bind the company in any contract.

16       Q    Okay.  In the course of your engagement, did

17  you take a look or investigate other projects that were

18  occurring at the time of the Dalton renovation?

19       A    No, sir.

20       Q    So you didn't look into whether HSRE or ECP

21  Distributors were busy on other projects at this time?

22       A    I did not.

23       Q    Did anyone say anything to you about that?

24       A    Not that I recall.

25       Q    In your interviews with Mr. Rollins?

Page 94

1      A    Not that I recall.

2      Q    Or Ms. Taylor?

3      A    Not that I recall.

4      Q    Are you aware that there were three other

5 construction projects going on at this time, and that's

6 why Mr. Rollins told Mr. Waldrop to engage local people

7 to do this project?

8           MR. DANIEL, JR.:  Object to the form of the

9      question.

10          THE WITNESS:  In conversation, there may have

11     been some reference to that.  There wasn't a

12     declarative statement to me, but to the extent it

13     was said, perhaps so.

14 BY MR. HENRY:

15     Q    Who would have said that to you?

16     A    Either Lorraine Taylor or Ronnie Rollins.

17     Q    I'm going to look at the figures you use in

18 your report here, specifically the table that is on

19 page 47.  There's another table on page 48.  Tell me if

20 I'm reading your report incorrectly, but I believe, if

21 I'm correct, the table on page 47 is the actual cost as

22 spent on the renovation.  Is that correct?

23     A    I'm not sure I follow your question.  Maybe

24 you can restate it.  I think both of these were related

25 to that property.  When you say "renovation," are you

1    saying that in contrast to repair from the flooding?

2        Q    I'm not trying to.  Maybe that's why I'm

3    asking the question.  Were both of these, the cost

4    we're talking about here, combined that relate to this

5    property and the construction, the remodeling or

6    renovation or repair?

7        A    That should be combined.

8        Q    Okay.  How much were the insurance proceeds

9    that you referenced?

10       A    If I remember correctly, it was around

11   150,000.

12       Q    Is it the 149,697 figure on line 24?

13       A    Yes, that's what I'm asserting here.

14       Q    So it's your testimony that you combined the

15   figures on the table on page 47 and 48, the tables on

16   those two pages, and that's the total cost of the

17   project?

18       A    Yes, sir.

19       Q    If you subtract that amount from the 149,697

20   insurance proceeds, that would be the cost in excess of

21   the insurance proceeds?

22       A    Plus, as I said on page 48, $13,658 paid to

23   Dwight Scott, so if you add those, it's 290,000, Take

24   away, roughly, 150,000, leaves 140,000.

25       Q    What were the insurance proceeds to be used

Page 96

1     for specifically?

2          A     The repair caused by the flooding.   Is that

3     what you mean?

4          Q     Yes, that's what I meant.   There was flood

5     damage, and a claim was made to the insurance company,

6     right?

7          A     Correct.

8          Q     This is what the insurance company would have

9     to pay?

10         A     Correct.

11         Q     It wasn't just repair that was done, was it?

12         A     Well, that's what the insurance adjustor

13    provided payment for.   At the time, there was other

14    work done, too.   When all this started -- I believe I

15    said this in my report -- there was some build-out work

16    being done on the unused bay -- there were three bays

17    in that property -- that was going to be built out.

18               Mark Waldrop mentioned that he would like to

19    do some renovations to his unit, his space, so he

20    started the process of getting quotes and whatnot.   I

21    describe all that in my report.   Presumably, there was

22    renovation work done irrespective of the damage, and

23    then there was work done to repair the damage

24    additionally.

25         Q     So the $277,653 plus the 13,658 would be the

Page 97

1    total cost for both the repair to the damage and the

2    renovation, right?

3         A    Yes.

4         Q    How much of the amount that was actually

5    spent is related to the claims that would otherwise

6    have been covered by insurance?

7         A    I'd have to assume, I guess, that it was

8    $149,000 plus the deductible.

9         Q    What was actually spent on that work?

10        A    I'm not sure I had the breakdown of did they

11   utilize all 149,000 for the repairs for the flood.  The

12   149,000, I assume all went in concert with the work

13   being done.

14        Q    You just don't know if the actual cost to

15   repair, just repairs, exceeded the amount of insurance

16   proceeds available?  You talked about the renovation.

17        A    I understand.  I'm trying to see if my

18   description of the vendors gives me a little insight

19   into that.  As I sit here right now, certainly without

20   all the detail, I cannot tell you if the actual repairs

21   were more or less than the amount reimbursed or of the

22   claim.

23        Q    Which suites were affected by the flood?

24        A    The one that Mark Waldrop's office was in and

25   adjacent, I believe, had some water damage with wall

1    creep, things like that.

2        Q    Mr. Waldrop was in Suite C, correct?

3        A    Yes.

4        Q    If you look at the table on page 47, the very

5    top is Suite A, insurance repairs; Suite B, insurance

6    repairs?

7        A    Right.

8        Q    Were all three suites affected by the flood?

9        A    I believe that's the inference.

10       Q    Do you know if there were any plans to

11   renovate these three suites prior to the flood?

12       A    Yeah, I think I just spoke of that.

13       Q    You did.  Okay.

14       A    I believe it was a conscious decision by CHS

15   to build out whichever one of these suites needed to be

16   built out.  I think it was Suite B.  It's my

17   recollection that there were discussions ongoing about

18   renovating Suite C and not approved budgets and

19   approval in that regard.

20       Q    Page 46, line 16, it says:  On April 28,

21   2014, within a month of signing a construction contract

22   with Kim Ellis [phonetic] Construction, the CHS offices

23   suffered water damage from apparent "flooding" caused

24   "ostensibly" by a faulty water fitting beneath the

25   kitchen sink.

1          Your use of quotations around the word

2     "flooding" and the use of the word "ostensibly," are

3     those intended to infer that there wasn't flooding

4     caused by a faulty fitting?

5          A    Certainly not with regard to flooding.  I put

6     quotes around "flooding," because, to me, flooding is

7     rising waters on the river, or something.  "Water

8     damage" could have been used there, too.  I used

9     "ostensibly," simply because I don't know what the

10    actual causes were of the flood.  Ostensibly, it was

11    because of the fitting.  I assume the insurance

12    adjustor would've looked at it as well.

13         Q    You are not meaning to suggest, through the

14    use of your language, that Mr. Waldrop intentionally

15    caused this flooding?

16         A    Not at all.

17         Q    The next sentence:  The event was disclosed

18    to CHS management and was couched as merely a minor

19    cleanup and limited mitigation effort.  Was it

20    Mr. Waldrop that made the disclosure that you

21    reference?

22         A    I believe so, because I believe this was part

23    of the ongoing discussions about going through

24    renovations and the dialogue that was occurring there.

25    It could've been Ms. Dotson.  I know there was dialogue

1    going on between Ms. Dotson, you know, and the home

2    office in regard to the flood.  It could be both,

3    actually.

4        Q    It was couched as a purely minor cleanup and

5    limited mitigation.  Is your answer the same that it

6    would have been either Ms. Dotson or Mr. Waldrop who

7    "couched" --

8        A    Yes.

9        Q    -- the damage?

10       A    Yes.

11       Q    Sitting here today, do you have reason to

12   doubt that the cost to repair the damage caused by the

13   flooding would be roughly equivalent to $149,697 that

14   the insurance company was willing to pay?

15       A    I think I answered that a moment ago.  The

16   presumption was the repairs were made in accordance

17   with the claim, and that was the claim amount.

18       Q    Well, you've given some testimony today about

19   the scope of cleaning supplies that were required for

20   this office.  Do you think that $149,697 worth of

21   damage that would have been paid by the insurance

22   company would be "a minor cleanup and mitigation

23   effort"?

24       A    That's a subjective opinion, but I do not

25   believe that's minor.

1          Q      One of the things you said about the issues

2     with the Dalton office is the costs were not budgeted

3     and approved.  I think you said that.  Right?

4          A      Yes.

5          Q      What is your understanding of the budgeting

6     process at Community Health Systems?

7          A      For something like this, SHRE would have been

8     employed, they would have been utilized for the

9     project.  If there is evidence that says they're busy

10    doing something else, so be it, but my understanding of

11    the process is SHRE would get involved at some point.

12    That for renovations like this, there's someone who's

13    going to initiate that.  In this case, let's say it's

14    Mr. Waldrop.

15            He may do some initial concept vetting,

16    things like that, but ultimately, it's going to come

17    through the C-Suite, the chief executive and operating

18    offices, to be provisioned in their budget, which they

19    have to have a capital actual budget and operational

20    budget.  An operational budget would include repairs,

21    but would not necessarily include capital items of this

22    nature.  A separate approval would be required, I

23    believe, of a real estate venture and renovation like

24    this.

25            With that would be an approved budget, there

Page 102

1    would be cost estimates, so on and so forth, and they

2    would have been approved through normal channels.

3    Depending on the size and scope of it, approval from

4    the board of directors as well.  And then a contract

5    would be let, once approved, and ordinarily would be

6    signed by somebody authorized to sign those contracts.

7         Q    In the course of your engagement, did you

8    have any discussions regarding a Selectica program?

9         A    I don't recognize that name.

10        Q    You'd never heard of the Selectica program

11   software?

12        A    No.

13        Q    In the course of your consultation and

14   investigation, did you interview Connie Stoval at

15   Community Health Systems?

16        A    I do not believe so.  The reason I answer

17   that way, Gary, is because, while I was there during

18   that feverish week, several people came in.

19        Q    You don't have a specific memory?

20        A    I didn't get anything constructive from those

21   individuals.

22        Q    Okay.  You just don't have any specific

23   memory of speaking to Ms. Stoval, though it's possible

24   you did in the manner that you just described?

25        A    Correct.

1        Q    I believe you mentioned somewhere in here

2   that the contract that Ms. Dotson signed with her

3   father was in the name of an entity she wasn't employed

4   by.

5        A    Correct.

6        Q    Did anyone that you interviewed with CHSI

7   explain why the contract may have been in the name of

8   that entity, instead of Community Health Systems?

9        A    Can I ask you to clarify the question?  Are

10  you saying, did anyone give discourse to me about why

11  it would be appropriate that it would be or a suspicion

12  of why it would be?

13       Q    Suspicion.

14       A    The same as I have.  The suspicion is it

15  obviates controls, and CHS is fairly solid with

16  different subsidiaries and departments of subsidiaries,

17  and they come together at the top, of course, but they

18  are siloed individually.  If something is initiated

19  through Ethica, the people at Integra wouldn't know

20  anything about it.  It may not rise to the level -- it

21  may not hit the radar at the parent level if it's

22  coming through an unusual channel.

23            I mean, if there's going to be a repair and

24  renovation done at the Dalton office, that should have

25  come through CHS level.  There's a process there.

1    Running it through Integra, it's my belief, and I

2    believe it's shared by Ronnie Rollins and Lorraine

3    Taylor, that that was done to obscure that contract.

4         Q    You are using the phrase "silo," so I'm going

5    to try to use that phrase to make sure we're speaking

6    the same language.   You said earlier that all contracts

7    have to be approved by the home office, corporate

8    office?

9         A    Right.

10        Q    Would that be true for all of these different

11   silos that you're referring to?

12        A    I believe so, but there is going to be some

13   context there as well, as far as contracts that bind

14   the company to an operational agreement versus one that

15   binds the company to a utilization of resources, money.

16   By and large, when we're talking about the expenditure

17   of capital dollars, that should be handled at the

18   parent level.

19        Q    I guess what I'm confused about is why

20   would -- if all contracts have to be approved at the

21   corporate level, company level, no matter which silo

22   they are filtered through, what advantage would there

23   be to submitting a contract through Integra as opposed

24   to some other entity?

25        A    I understand your question.   Putting it

1       through Integra, going through a different chain of

2       ascension, is just going to appear differently when it

3       gets to the parent company.  Your question is:  If

4       they've all got to be signed at the parent level, then

5       what difference does it make?  I completely understand

6       that.  What I'm needing to get clear about, and looking

7       at my notes, if I have it in there, is are there

8       thresholds, and I just don't recall.  I don't recall if

9       there is an individual Integra, for example, that might

10      have been authorized to contract $20,000.  I just don't

11      recall.

12              My observation is that clearly should have

13      gone up through CHS.  There's no reason I can discern

14      why it didn't.  Had it gone through CHS, it would've

15      clearly been visible to the C-Suite because there is no

16      other layer for it to have to go through if it rises

17      directly to the C-Suite.  It doesn't get lost in the

18      minutia of operations and big business.

19      Q       Did Integra occupy any of the three suites?

20      A       I believe they were the ones going in the one

21      that was being outfitted, Suite B, maybe.  Yes,

22      Integra -- you can see from my table on page 47 --

23      Q       Suite B?

24      A       I was thinking I had the name of the company

25      in there.  I'm not sure I recall which suite Integra

Page 106

1    was in versus the other.

2         Q    Okay.  It appears that expenses and invoices

3    for Suite B were invoiced to Integra, based on your

4    chart?

5         A    Well, that's my recollection.  As I said, and

6    I stopped myself because I wasn't sure, but I believe

7    Suite B was Integra.  With Suite B having an ongoing

8    renovation project that's been approved and having it

9    built out, having the contract come up through the

10   Integra silo is to be expected.  Running a CHS contract

11   through the Integra silo -- to keep using that term --

12   is going to disguise the true nature of the contract.

13   It's for CHS, the Dalton office of CHS, but it's coming

14   up through the Integra chain at the same time Integra

15   had authorized and approved renovations ongoing.  It

16   might be difficult to --

17        Q    So it's your testimony that the expenses

18   relating to whatever suite Integra was in, should have

19   come up through Integra, and the expenses relating to

20   CHS should have come up through CHS?

21        A    I believe they would have been invoiced.

22   This is something that probably is going to need some

23   clarification.  I'll go back and consult my notes, but

24   I believe they're going to be invoiced to the entity

25   that's utilizing the space.  As far as how it comes for

1      payment, I think it would be appropriate for the

2      Integra suite to have Integra invoices come up through

3      Integra, because there's people in the Integra

4      organization that are responsible for that project.

5      Okay?

6              I also realized -- what I'm thinking as

7      well -- is, if it's capital in nature, why isn't it

8      just being done at the parent level?  Again, why wasn't

9      SHRE being used.  That kind of pulls it all together.

10     There may be multiple reasons.  The answer is, my

11     belief is, that contract was run up through the Integra

12     silo because it would appear to be a contract amidst

13     the other valid contracts for construction items.

14         Q    We're talking specifically about the contract

15     between Ms. Dotson that she signed with her father.

16         A    I understand.

17         Q    That contract was to oversee repair and

18     renovation work?

19         A    Correct.

20         Q    And, at least in part, Integra benefited from

21     the repair and restoration work, correct?

22         A    The work was done.

23         Q    Partly for Integra?

24         A    Yes.

25         Q    At least partly for Integra?

1      A    Yes, but the question still remains was it

2    done in excess of cost and all the other reasons that

3    we cited in here, not to mention --

4      Q    You said one of them came through the Integra

5    silo outside of CHS.  My point is Integra did get a

6    benefit under the contract, right?  They were a

7    beneficiary under the contract, right?

8      A    Presumably so.  I would want to look, Gary,

9    at the contract with Mr. Scott.  I don't have it with

10   me today.  I have it in my exhibits.  I can't recall if

11   it specified oversight of just Suite A or B or C.  I

12   just don't recall.  It was more critically important to

13   me that it was executed by somebody who is not

14   authorized to execute any contract through any silo.

15     Q    Okay.  Do you know if the contract that

16   Ms. Dotson signed with her father went through multiple

17   drafts?

18     A    I don't know.

19     Q    Did you review any initial drafts or any

20   other drafts of the contract?

21     A    I doubt there were other drafts.

22     Q    So you didn't?

23     A    No.

24     Q    In your interviews with Community Health

25   Systems representatives in the course of your

1    engagement, did anyone tell you that the party to the

2    contract was changed to Integra at the request of the

3    home office?

4         A    No, they did not.

5         Q    Project charter authorizations.

6         A    Okay.

7         Q    When did the project charter authorization

8    process first get implemented at Community Health

9    Systems?

10        A    It's been a while back, 2005, if I recall,

11   2005, 2006.

12        Q    Please describe to me, in your own words,

13   what the project charter authorization is.

14        A    It is a protocol established by Community

15   Health Systems to ensure that corporate resources,

16   whether they be in staff time and utilization or in

17   actual dollars expended or perhaps just strategic

18   initiatives and alliances, that corporate resources and

19   assets are protected and preserved and follow the

20   board's directives.  Okay?

21             If I have a project charter authorization

22   process, that is to specify a particular area.  It's

23   not necessarily a dollar amount.  It may be just a

24   shifting paradigm that might affect the whole

25   organization or one might affect one of the silos.  So

1    you have a project sponsor, the person who wants to

2    make something happen.  It's their idea.  They do a

3    little vetting of it to make sure they are not being

4    boneheaded in their thought process.  Once they believe

5    it's a viable initiative, whatever it may be, and good

6    for the company, then they would start the project

7    charter authorization process.

8            In that process they describe what the

9    initiative is, how it benefits the company, what the

10   anticipated resources are going to be required, was

11   there rollout time, whatever it may be that's related

12   to that project.  It gets reviewed by the C-Suite, the

13   chief executive officer, CFO, COO.  All three of them

14   must agree on the project charter.  It's not a

15   two-out-of-three vote.  It's unanimous consent that

16   it's good for the company, and that, depending on the

17   size of the resources that may be affected or other

18   matters, that may also require board notice and

19   approval.

20       Q    Are there any projects that did not have to

21   go through the project charter authorization process?

22       A    I'm sure there are.

23       Q    Well, what is your understanding of the

24   distinction between those that do and those that don't?

25       A    Well, projects that are not going to require

1      a large amount of corporate resources just in terms of

2      dollars.  There are other resources that can come into

3      play, but let's just talk about dollars.  A project

4      that may cost $10,000, for example, and affects only

5      one of the subsidiaries, probably wouldn't need a

6      project charter.  Instead, it would probably need the

7      normal approval process like paying an invoice or

8      something like that.

9           If a project affects two entities, a

10     subsidiary, or more or all of them, that becomes part

11     of the overarching strategic process.  It needs to be

12     analyzed and vetted by that process.  It if it affects

13     one entity only and is of a lesser scope of resources,

14     then it may not require a separate project charter.

15          Q    So is it a function of both the number of

16     entities that are involved and the dollar amount?

17          A    They're not mutually inclusive, but yes.

18          Q    Let me see if I understand.  Let's say you

19     have a project that's only going to cost $10,000, but

20     it might affect four entities, you might have to run it

21     through project charter authorization for the same cost

22     for just one entity and it might not be?

23          A    That's what I was saying, yes.

24          Q    Okay.  Let's look at the specific ones that

25     you reference.

Page 112

1                The Mark Hunt consulting agreement, beginning

2       on page 49.  It appears the cost of that contract was

3       $15,000, right?

4            A    Yes.

5            Q    It was between Community Health Systems of

6       Georgia, LLC, and Mark Hunt, right?

7            A    Right.

8            Q    Just one entity for a cost of $15,000?

9            A    That's what I've written here, yes.

10           Q    And it's your contention that that contract,

11      which was with one entity for $15,000, required the use

12      of the project charter authorization?

13           A    Well, there are several comments I can make

14      about that, Gary.  It was a contract signed with one

15      entity, but that doesn't necessarily mean it affects

16      just one entity.  It may affect more entities, more

17      organizational entities, one.

18                Two, the Community Health Services of

19      Georgia, LLC, wasn't even a functioning organization.

20      It exists, it's organized, but it was never utilized as

21      an organization.  There is a problem right there.

22      Given the nature -- while the fees may be lower --

23      actually, that's a recurring fee, too, by the way.  I

24      didn't specify that.  That was $15,000 per month or per

25      period, but it went on longer than that.  I should've

Page 113

1    put that in there.

2             Yeah, the nature of what the contract was

3    intended to do would have ramifications over the entire

4    organization.  It's not siloed to just one entity.  You

5    wouldn't sign a contract with just one entity -- you

6    wouldn't sign a contract with four entities, you would

7    just sign one contract.  For something like this, I

8    would expect it to be signed by CHS as the parent, not

9    a nonfunctioning LLC.

10       Q    Your claim that this LLC was nonfunctioning,

11   what is that based on?

12       A    I was asking Lorraine Taylor, because there

13   were all kinds of names flying around in something as

14   large as CHS.  I was asking her what was CHS of

15   Georgia, LLC, used for, and she told me it was

16   something that was, you know, created but never

17   utilized.  It stayed on the shelf.

18       Q    You based your testimony on your discussions

19   with Ms. Taylor?

20       A    Yes.

21       Q    I was hoping that I had a copy of that

22   contract.  My intent was to print off a copy of all

23   your exhibits, but I am not seeing a copy of that

24   contract.  Let's look at the second one you identified,

25   Health Trust TCP.

Page 114

1      A     Can I add one other comment?

2      Q     Sure.

3      A     I failed to put in here the nature of the

4  contract was for a recurring fee for a period of time.

5  If I'm not mistaken, the ultimate amount being paid to

6  Mark Hunt exceeded $100,000, so under that criteria, it

7  should have received a project charter.  It's not in my

8  report.

9      Q     When Community Health Systems hired you to

10 perform this forensic accounting, did that come through

11 a project charter authorization?

12     A     I was hired by Holland & Knight.

13     Q     Has 3M done work on behalf of Community

14 Health Systems in the past?

15     A     Sure.

16     Q     Have those contracts gone through a project

17 charter authorization?

18     A     I do not know specifically, but I do know

19 that that is something that gets reviewed by the board,

20 and you have audit committees.  I promise you, they're

21 on top of it.

22     Q     Healthcare Trust and ECP, page 50, walk me

23 through the issue there.  I read your report.  There's

24 a lot going on there.  I want to hear, in your own

25 words, what the issue is.

1          A     As I say in here, it remains unclear to me

2     what Mr. Waldrop's motivation was for doing this at

3     all.  Rather than trying to assume that, I just chose

4     that to be irrelevant for the time being.  I do know

5     that it went so far as signing a confidentiality

6     agreement, and in my thinking, in my opinion, if you

7     are signing a confidentiality agreement, then you are

8     disclosing corporate assets, potentially.  Why else

9     would you sign it?  Particularly, if it's in the future

10    as it says here.  I'm assuming it would survive

11    bilateral exchange of information, so that alarmed me

12    right off the bat, a signed confidentiality agreement.

13          The other thing that's really more troubling

14    is from the standpoint that ECP is a wholly-owned

15    subsidiary of CHS.  The board, you know, chose to have

16    ECP.  There were strategic reasons why the board,

17    presumably, felt ECP was important to be part of the

18    organization.  We discussed some of its function

19    already.

20          So to go and try to replace that entity with

21    another one, for all I know, Mr. Waldrop had an

22    ownership share in Health Trust.  I'm not making that

23    allegation.  I'm saying I don't know.  But by going

24    through the project charter authorization process

25    through completion, that would have been vetted.  First

1    of all, someone may have said, Why are we doing this?

2    I'm not signing off on it.  Boom.  Dead.  Gone.  You

3    wouldn't sign a confidentiality agreement at that

4    point.  To me, it needed the project charter

5    authorization, because it was going to compete with or

6    replace or obviate altogether the entirety of a

7    subsidiary organization of CHS.  That's big to me.

8         Q    Was one of Mr. Waldrop's duties as COO to

9    come up with strategies to make the company run more

10   efficiently from an operations standpoint?

11        A    I would certainly think so.

12        Q    Would that include investigating cheaper

13   alternatives to the way the company is currently

14   conducting business?

15        A    It might.  Clearly, as COO, he's going to be

16   charged first and foremost with making sure the

17   operations of the company follow the directives of the

18   board of directors and the president, to make sure

19   everything is running as it's intended to be run.  Yes,

20   of course, there is some obvious requirement or

21   responsibility, I suppose, that the COO make sure

22   corporate resources are maximized and that things are

23   efficient.

24        Q    I think you said part of the reason a project

25   charter authorization exists is so that the company can

1    analyze how much of the company's resources are going

2    to be used on a project.

3         A    That's correct.  To continue answering your

4    question, of course Mr. Waldrop, as the COO, is going

5    to be looking at ways to benefit the company.  It's

6    part of his responsibility.  It's also supported in the

7    expense reports that it's his responsibility.  If

8    you're to the point of signing a confidentiality

9    agreement, in my thinking, you've gone too far.  That's

10   what the project charter process is.

11         I'm sure that CHS doesn't want every little

12   thing to come along for a project charter for this,

13   because they'll get run crazy with requests.  But that

14   doesn't mean that you should hold back on getting a

15   project charter authorization until some greater point

16   is past, the point of no return.  It's there to be

17   used.  As a member of the C-Suite, he sponsored this as

18   a supervising manager.  He's part of the C-Suite, and

19   the very three people who are to approve project

20   charters are available to him and more accessible to

21   him than any other group, so why would you not utilize

22   the project charter authorization to properly vet this

23   initiative, particularly when it's going to require the

24   disclosure of financial information?  I asked you a

25   question.  I apologize.

1          Q     No, no, you were testifying rhetorically.

2                Part of what you put on the project charter

3     authorization form -- if I understood your testimony

4     correctly -- is the anticipated cost of project, right?

5          A     That is a factor.

6          Q     If you are consulting with someone to

7     determine whether they could provide a cheaper

8     alternative for your health care record needs, how can

9     that that person tell you how much they're going to

10    charge if they don't have access to the records?

11         A     I agree.  That's why you get a project

12    charter authorized so that you can do that.  That's why

13    I said a moment ago, Gary, that there's not a finite

14    point on a time line or project line that says, Okay.

15    Now let's go get the project charter authorization.

16    Some of them need to occur earlier in the process than

17    others.

18         Q     What I'm trying to understand, specifically

19    with regard to this, how could Mr. Waldrop have filled

20    out a project charter authorization without knowing how

21    much the project was going to cost?

22         A     He may have had to put in the project

23    authorization, "unknown," but we will establish and not

24    to exceed an amount.  However he wants to do it.  He or

25    Lorraine or Ronnie or whoever, all three of them have

1    got to consent that this is worth doing.  If the cost

2    is not clear, then it's not clear.

3        Q    So it's your testimony that Mr. Waldrop

4    should have really done two project charter

5    authorizations:  One to get this confidentiality

6    agreement approved, and then a subsequent one after

7    information was disclosed, potentially approving the

8    entire project with Health Trust; is that correct?

9        A    I don't really think that's what I'm saying.

10   First of all, to the extent that a confidentiality

11   agreement is to be signed, I'm not even sure Mark

12   Waldrop would be the person to do it.  I would expect

13   that would come from the CEO, Ronnie Rollins.  He's at

14   the top of the food chain, so he's over everybody in

15   the organization.  I don't think Mark should have been

16   signing it anyway.

17       Q    So you're saying that Mark Waldrop's duties

18   did not include signing confidentiality agreements to

19   see whether there were options available to make the

20   company run more efficiently?

21       A    I'm not sure that's what I'm saying.  I'm

22   saying here that I believe he should've gotten a

23   project charter authorization to, either be authorized

24   to sign a confidentiality agreement or for the perfect

25   person to sign a confidentiality agreement if it's

Page 120

1      determined it's worth proceeding.

2          Q    What can Mr. Waldrop do without a project

3      charter authorization?  Does he have authority to do

4      anything?

5          A    Anyone can sponsor a charter authorization

6      request, so that's virtually anyone.  What can he do?

7      As COO, typically the COOs are not the ones out there

8      signing anything.  That's part of the segregation of

9      duties in your control structure.  You want the

10     authorities that bind the company vested in as few

11     people as possible, ideally.

12         Q    Was that CHSI's policy that the COO could not

13     bind the company to a contract?

14         A    The CEO?

15         Q    COO.

16         A    That is what I was led to believe.  That's my

17     understanding, yes.  In my interviews with Lorraine

18     Taylor and Ronnie Rollins, I specifically asked the

19     question:  Was Mr. Waldrop authorized to sign contracts

20     on behalf of the company?  The answer I was given was,

21     No, absolutely not.  If there's an error in that

22     statement, then we'll deal with it accordingly.

23         Q    All right.  Omni Sales.  Why was a project

24     charter authorization required with respect to Omni

25     Sales?

1        A     One of potentially several reasons.  One, the

2   cost of the Omni Sales would have far exceeded that

3   project charter authorization threshold of $100,000,

4   requiring board consent and approval.  That was one

5   reason.  The other reason is that Omni Sales

6   potentially could be deployed in multiple facilities

7   even outside organizational silos, to keep using that

8   word.  I know that here we're talking about Omni Sales

9   being used in particular pilot deployments, but

10  ultimately, if they were going to be using Omni Sales,

11  if CHS determines Omni Sales to be a worthwhile

12  investment, it may be utilized throughout the

13  organization.  Chiefly, it was an expensive item.

14       Q    If Mr. Ronnie Rollins had authorized

15  Mr. Waldrop to expand Omni Sales to other facilities,

16  would that change your conclusion whether this was a

17  breach of his contract?

18            MR. DANIEL, JR.:  Object to the form of the

19       question.

20            THE WITNESS:  No, it does not change my

21       opinion, because Mr. Rollins would also have been

22       required to get Ms. Taylor's consent for a project

23       charter authorization.

24  BY MR. HENRY:

25       Q    So again, if Mr. Rollins had instructed

Page 122

1    Mr. Waldrop to expand the Omni Sales pilot to other

2    facilities and his contract was substantially the same

3    as Mr. Waldrop's, would he then be subject to

4    termination for cause?

5              MR. DANIEL, JR.:  Object to the form of the

6         question.

7              THE WITNESS:  The reason why I hesitated with

8         my answer there -- I'll be forthright with you on

9         this -- is the utilization of Omni Sales was

10        known.  It was an actively pursued concept, and so

11        the project charter authorization -- I'm trying to

12        remember if they actually had one already in

13        existence for the pilot deployment.  That's why

14        I'm stammering a little bit.  I can't remember if

15        one existed for the pilot deployment.

16             My comments go further to say that the pilot

17        deployment was expanded beyond the initial project

18        charter authorization that was given, beyond the

19        original lease.  So to me, that's something that

20        would have required, either an update to the

21        earlier project charter authorization and

22        reporting to the board, Hey, we've done Omni Sales

23        for 120 days.  It's great.  Let's do this, or

24        whatever, or to the extent there wasn't one, if

25        the board approved something, it doesn't have to

1           have project authorization.  If it comes before

2           the board, they can discuss it and do what they

3           want to do. if there's going to be an internal

4           expansion of that, I would think it would have to,

5           either go back to the board or get to the board

6           through the project authorization process.  That's

7           why I hesitated.

8      BY MR. HENRY:

9           Q    So if something has been preapproved by the

10     board, there's no need for a project charter

11     authorization?

12          A    Yes.

13          Q    And with regard to Omni Sales, the issue is

14     not so much the pilot, it's the expansion of the pilot?

15          A    Absolutely.  The pilot was known.

16          Q    My question was:  If Mr. Rollins had

17     instructed Mr. Waldrop to expand the pilot program --

18          A    I recall the question, and it would not

19     change my opinion.  Your further question, would that

20     subject Mr. Rollins to termination for cause?

21     Potentially so.

22          Q    Okay.  LG CNS Healthcare Solutions,

23     electronic health care records.  Again, why was a

24     project charter authorization required for that

25     particular contract?

Page 124

1        A      Okay.  Well, again, one of several reasons,

2    that is a wholesale deployment of a new strategy and

3    operational paradigm.  Okay?  Going from -- you're

4    going from one AHR to another or from not having one to

5    having one; either way, it's a global paradigm shift,

6    so I think that meets the criteria for a project

7    charter authorization.

8             Also, to the extent that -- actually, it

9    doesn't matter.  Whether it's a joint project between

10   CHS and LG or just a vendor relationship with LG, the

11   cost was going to be substantial.  That too would've

12   required project charter authorization to the level of

13   getting board approval.

14       Q      Do you know if the LG project was ever

15   implemented?

16       A      I do not believe it was.

17       Q      Your report indicates that a project charter

18   authorization was actually prepared by Mr. Waldrop in

19   May of 2016?

20       A      Correct.  It was not approved.

21       Q      It was not approved.  You don't know, sitting

22   here today, whether that project has actually been

23   implemented?

24       A      I don't.  When I completed my report, I moved

25   on to other things.

1       Q    Line 19 on page 52 of your report, beginning

2    where it says:  The above items are merely a

3    representation or sample of other projects that were

4    not authorized according to the protocols that were

5    established by CHS and were well known to Waldrop.

6    There are other circumstances that indicate in the

7    observed books and records of CHS that infer a

8    malaligned attitude by Waldrop in contravention of

9    existing protocols.

10            What other projects?

11       A    Gary, I don't recall, as I sit here.  As I

12   told you, we were working at a feverish pace during

13   that week of fieldwork.  I knew I needed to address

14   project charter authorizations.  I had two bankers'

15   boxes of contracts -- well, of the things I wanted to

16   review that would possibly require project charter

17   authorizations, maybe 20 separate initiatives.  These

18   are the 5 I got finished with.

19       Q    I understand you were under a time crunch.

20   You talked about that before, but it's a pretty bold

21   statement here, "there are other circumstances

22   indicated in the observed books and records of CHS that

23   inform a malaligned attitude of Waldrop in

24   contravention of the best interest of the company."

25   That's a pretty significant conclusion.

1       A     Yeah, that's not a conclusion on project

2    charters, that's an overall conclusion.  So, yes, that

3    is a conclusion.  I did not offer, you know, opinions

4    and conclusions.  I normally have a separate section

5    that wraps this all up.  Then I do that, but I'm making

6    the observation that it may come up, in the context of

7    deposition, and that's why I wanted to be able to share

8    with you, yes, I was looking at all kinds of

9    information, whether we're talking about the most

10   nebulous-looking thing that you might consider or

11   hundreds of thousands of dollars of property sales that

12   are all happening not in the way they should have.

13            Something like Health Trust.  That may have

14   been in contravention to the best interest of CHS.  It

15   should have been vetted.  The horribly -- that's my

16   word -- horribly excessive expense reports is to me

17   indicative of malaligned interest against the company.

18            Looking at e-mail exchanges -- this is not

19   people telling me things but looking at e-mail

20   exchanges and other documents where I see the vitriol,

21   that, particularly late in the employment of

22   Mr. Waldrop, seemed to be pervasive.  I just walked

23   away, when I was done with all this, with about --

24   well, there's a number of places that it just seems

25   like Mr. Waldrop was acting in his own interest to the

1    exclusion of that of CHS.

2         Q    When you say there was vitriol pervasive in

3    his e-mails, do any specific e-mails come to mind?

4         A    And other documents.  We talked earlier about

5    that expense policy that was under revision, and the

6    comments that were presumably in Mark's hand had the

7    feel of trying to get to a gotcha mentality, or

8    whatever it may be.  Through my interviews, and I'd

9    seen other things, but also through my interviews and

10   discussions with Lorraine and the conversations that

11   she would have with Mr. Waldrop, there's just an

12   overall observation by me that he was acting for his

13   best personal interest and not that of the company.

14        Q    Did you interview anybody that worked under

15   Mr. Waldrop, in the course of your engagement?

16        A    I did not.

17        Q    So this vitriol that you described, was it

18   aimed at Mr. Rollins and Ms. Taylor, primarily?

19        A    The vitriolic comments, yes.  The malaligned

20   interest, that's everything that I saw, irrespective of

21   Mr. Rollins.  It had nothing to do with him.

22        Q    When is the last time you spoke with

23   Mr. Rollins?

24        A    Probably the last day I was there for that

25   week.

1    Q    I'm talking about in general, not just with

2    respect to this engagement.

3    A    In general, two.  I don't know Mr. Rollins.

4    Q    You don't deal with him?

5    A    No.

6    Q    How about 3M?  How much work does 3M do for

7    Community Health Systems?

8    A    CHS is a large organization.  There's a great

9    deal of work that needs to be done.  There are multiple

10   audits for the different subsidiaries.

11   Q    As a partner with 3M, do you have access

12   through 3M's financial reports and records?

13   A    Actually, I don't.  You would think I would.

14   About a year ago, our IT department siloed all of the

15   departments.  I can only see my department.

16   Q    So you can only see the work done by -- I

17   want to get the name right -- litigation valuation

18   forensic practice group?

19   A    That is correct.

20   Q    Sitting here today, do you have any knowledge

21   regarding a transaction involving "Global," the word

22   "Global," "Global" transaction involving Community

23   Health Systems?

24   A    No, that's not familiar to me.

25   Q    You mentioned Randy Nichols earlier.  I think

1    he's the one who initially contacted you about this,

2    right?

3         A    Correct.

4         Q    Is Randy Nichols a close personal friend of

5    Mr. Rollins?

6         A    I don't know how they characterize their

7    relationship.  They've known each other for many years.

8              MR. HENRY:  Let me take a good look at my

9         notes.  I might be close to done.

10    (A short break was taken.)

11             MR. HENRY:  I'm finished.

12             MR. DANIEL, JR.:  I have a few questions for

13        clarification.

14                      DIRECT EXAMINATION

15    BY MR. DANIEL, JR.:

16        Q    Mr. Edwards, based upon your experience as an

17    accountant, what is the purpose of requiring approval

18    of expense reimbursement requests?

19        A    Well, there would be a litany of things

20    there, probably, but first and foremost is to provide

21    the function and safeguarding of corporate assets to

22    make sure that costs that are reimbursed by the company

23    have been reviewed to make sure they are permissible,

24    that they align with corporate policy.  You may have a

25    prohibited transaction because of who you are, what

1    type of organization you are.  Chiefly, it's to ensure

2    that costs have been vetted for the purposes of being

3    allowable and permissible for the company.

4         Q    What is the purpose of requiring a receipt or

5    some record of expense to be submitted with the expense

6    reimbursement request?

7         A    Okay.  Outside of the obvious notion of

8    verifying and proving that an expense actually

9    occurred, under the IRS accountable plan rules, you

10   have to have that.  So if the company is going to take

11   a deduction for expenses that were reimbursed to an

12   employee, under an accountable plan, they have to be

13   able to support the expense.  One, to prove the

14   validity of the expense, that it actually occurred, and

15   that the reviewer has something to authenticate the

16   expense with.

17        Q    What problem or problems, if any, did you

18   find with respect to the submittal of Mark Waldrop's

19   reimbursement requests by his assistant, Stephanie

20   Dotson, and then Mark Waldrop approved the request?

21        A    Do you mean costs of Mr. Waldrop's on Ms.

22   Dotson's report?  Is that what you meant?  You said,

23   "submitting his expenses."

24        Q    That's right.  I'm asking:  What problem, if

25   any, do you find in the situations where Stephanie

1    Dotson would submit expense reimbursement requests,

2    allegedly incurred by Mr. Waldrop, under her name?

3         A     Correct.  Well, under the CHS review

4    process -- and we already discussed that everybody has

5    their expense report reviewed by their immediate

6    supervisor -- if Mr. Waldrop's expenses, valid or

7    otherwise, but if they are appearing on Ms. Dotson's

8    expense report, then he is going to review his own

9    items, and then it goes no further.

10        If Mr. Waldrop had his own expenses incurred

11   by him or for him that were on his expense report, they

12   would be reviewed by someone outside the Dalton office,

13   presumably, would have the ability then to ask

14   questions and determine if the expense was permissible

15   or not.  Basically, Mr. Waldrop's expenses coming

16   through on Ms. Dotson's expense report are tantamount

17   to having unrefuted expenses.

18        Q     If someone wanted to get an accurate picture

19   of the expense reimbursements paid to Mark Waldrop

20   during the time Mr. Waldrop was employed at Community

21   Health, how would this have been done?

22        A     If somebody wanted to review -- if for

23   example Ronnie Rollins, as supervising reviewer of

24   Mr. Waldrop's expense reports, wanted to do a global

25   review of Mr. Waldrop's expenses, he would go into

Page 132

1    Workday and would be able to pull up all of

2    Mr. Waldrop's expense reports.  However, if Mr. Waldrop

3    has put his expenses through Ms. Dotson's expense

4    report, then Ronnie Rollins would not have the

5    opportunity to see all the expenses incurred by

6    Mr. Waldrop.

7        Q    You were asked some questions about the

8    Dalton renovations and repairs.  Do you know whether or

9    not some of the expenses related to those renovations

10   and repairs were put on expense reimbursement requests

11   of Stephanie Dotson's?

12       A    They were.

13       Q    When you did -- looking at your report,

14   Exhibit 2, when you had total expenses on page 47, do

15   these include expense reimbursements that were paid to

16   Stephanie Dotson with respect to renovations and

17   repairs for the Dalton office?

18       A    I believe in only two instances.  At least

19   two on page 48, we show a vendor and Stephanie Dotson,

20   and that's for the painting of the senior partner that

21   was hanging in the office and reimbursement for the

22   refrigerator.  All these others were expenses

23   associated with the Dalton office renovation and

24   repairs that were paid to a third-party vendor.

25       Q    Do you know whether or not there were other

1    expense reimbursements paid to Stephanie Dotson for

2    renovation and repairs at the Dalton office that are

3    not reflected on the schedule pages, 47 and 48, of your

4    report?

5         A    I would have to go back and look at the time

6    period if there's expense reports, but, yes, I believe

7    so.

8              MR. DANIEL, JR.:   That's all I have.

9              MR. HENRY:   Because he asked some questions,

10        so of course, I have follow-up on his questions.

11                     FURTHER CROSS-EXAMINATION

12   BY MR. HENRY:

13        Q    You're saying that the problem with

14   Mr. Waldrop including his expenses on Ms. Dotson's

15   expense report is that Mr. Waldrop would approve those

16   expenses, and it would go no further?  Is that what you

17   said?

18        A    From a review perspective, yes.

19        Q    That's based on your understanding that the

20   accounts payable department at Community Health Systems

21   doesn't perform any kind of review of the expense

22   reports?

23        A    That's correct.

24        Q    I think you testified earlier that you don't

25   know whether they do.  Right?

Page 134

1          A     I did, and additionally, I said I would

2     expect that they didn't.

3          Q     Specific to Community Health Systems, you

4     don't know?

5          A     Correct.

6          Q     Okay.  The expenses that you just testified

7     were submitted by Stephanie Dotson with regard to the

8     renovation of the Dalton office, that are not included

9     on the tables referenced by Mr. Daniel on pages 47 and

10    48 of your report, those expenses that she submitted

11    that aren't reflected there, can you show me, on the

12    voluminous expense reports you identified on the

13    20-plus pages of your report, which expenses were

14    submitted that relate to the repair and renovation that

15    were not included on the chart?

16         A     I will attempt to do that.

17         Q     Okay.

18         A     If I remember correctly, we have on page 24

19    in August of 2014 -- actually, it's July, August,

20    September, the same time as the renovations were going

21    on, there are receipts here or expense items from Home

22    Depot.  I saw another one, Hobby Lobby.  There is

23    another one I saw just a moment ago, Lowe's, if I

24    remember correctly, in looking -- we can go look, but

25    my recollection is some of those items were ostensibly

1    to be used in the office renovation, but it may have

2    been difficult to tell for certain.

3         Q     So there is a charge for Lowe's on page 24

4    for 52.28, August 14, 2014?

5         A     Yes.

6         Q     Is it your recollection that was in

7    connection with --

8         A     That's what I'm saying.  I recall looking at

9    some receipts, and there may have been an inference

10   there.  Maybe there had been some scribble that it was

11   related to the office repair, but more often than not,

12   those things, we were unable to determine for certain

13   what it was.

14        Q     So it could have been related to the

15   renovation, and it could not have been?

16        A     Correct.  We would need to go take a look at

17   those particular receipts to see if they disclose more

18   information to us.

19        Q     Sitting here today, do you know why you would

20   have included an expense reimbursement request from

21   Lowe's or Home Depot or Hobby Lobby as being

22   inappropriate in your report, if they were not related

23   to the renovation and repair?

24        A     If they were not related to the renovation

25   and repair, than they would have been included, most

1    likely, for the fact that they were unnecessary for

2    business purposes.  The other thing that caused us to

3    look at some of these expense items, is both

4    Mr. Waldrop and Ms. Dotson -- certainly Ms. Dotson --

5    used their own personal credit card, and if CHS had

6    utilized purchasing cards or had CHS credit cards

7    issued to employees, then others might have the

8    opportunity to see the detail of the charges.  So there

9    is some speculation on my part, at times, when I'm

10   looking at a receipt, where it's not clear on its face

11   that it was for an office purpose or business purpose.

12   It may also have been for a personal purpose.

13        Q    How much were you paid total to generate

14   Exhibit 2?

15        A    To generate Exhibit 2, I'll go back and look

16   up my billing.

17        Q    I want to be sure I ask the question the way

18   I intended to ask it.

19             All the work that you did to generate Exhibit

20   2 was either done by you or those working with you, how

21   much were you paid?

22        A    I'm going to estimate $30,000.

23        Q    How much have you been paid for your services

24   after generating Exhibit 2?

25        A    I was talking about all of it together.  The

1    reason I'm hesitating, Gary, is because Randy Nichols

2    billed before January 1st, so I'm just not clear on

3    what he billed.

4         Q    Did he bill in connection with this project?

5         A    It was on his list, but it was my time.  He

6    was the partner.

7         Q    He submitted your time?

8         A    Yeah.  I know what my time is.  It adds up to

9    around $30,000.  I have no idea if he submitted it all.

10   You said paid.

11        Q    Right.  The time that has been expanded in

12   this resulted in a fee of $30,000 approximately?

13        A    Approximately.

14        Q    The time you spent here today to give factual

15   testimony has generated how much in fees?

16        A    Today would be $2,500.  There's review time

17   and things like that.

18             MR. HENRY:  That's it.

19             MR. DANIEL, JR.:  I have no further

20        questions.  The witness will reserve the right to

21        read and sign the deposition.

22             (The deposition was concluded at 2:25 p.m.)

23

24

25

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF CHEROKEE

I hereby certify that the foregoing deposition was reported as stated in the caption and the questions and the answers thereto were reduced to writing by me; that the foregoing 137 pages represent a true, correct, and complete transcript of the evidence given on April 14, 2017, by the witness, CHRISTOPHER S. EDWARDS, CPA, CVA, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I was contracted by Janice S. Baker & Associates, Inc., court reporting firm to provide court reporting services for this deposition; I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that Janice S. Baker & Associates, Inc., is not a party to a contract prohibited by O.C.G.A. 15-14-37 or Article 7.C of the Rules and Regulations of the Board.

This, the 28th day of April, 2017.

Mildred R. Hornblower, CCR

Certified Court Reporter

Certificate No. 2785

Page 139

DISCLOSURE

STATE OF GEORGIA

COUNTY OF CHEROKEE

Pursuant to Article 8.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I was contacted by the offices of Janice S. Baker & Associates, Inc., to provide court reporting services for this deposition and am not taking this deposition under any contract that is prohibited by either Georgia law or the Georgia Board of Court Reporting rules.

Janice S. Baker & Associates, Inc., has no contract/agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. The firm will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.


This, the 28th day of April, 2017.

_Mildred R. Hornblower, CCR_

Mildred R. Hornblower, CCR

Certified Court Reporter

Certificate No. 2785

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF _____


        Before me, this day, personally appeared CHRISTOPHER

S. EDWARDS, CPA, CVA, who, being duly sworn, states that the

foregoing transcript of his testimony taken in this matter, on

the date, and at the time and place set out on the title page

hereof, constitutes a true and accurate transcript of said

testimony.


Sworn to and subscribed before me this ____ day of

_____, 2017, in the jurisdiction aforesaid.


_____ NOTARY PUBLIC


[  ] No changes made to the Errata Sheet; therefore, I am

returning only this signed and notarized certificate.

[  ] I am returning this signed, notarized certificate and

Errata Sheet with changes noted.



_____

CHRISTOPHER S. EDWARDS, CPA, CVA, WITNESS

ERRATA SHEET OF:  CHRISTOPHER S. EDWARDS, CPA, CVA

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____  Line No._____.

Change:_____

_____

_____

ERRATA SHEET OF:  CHRISTOPHER S. EDWARDS, CPA, CVA

(continued)

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

ERRATA SHEET OF:  CHRISTOPHER S. EDWARDS, CPA, CVA

(continued)

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

ERRATA SHEET OF:  CHRISTOPHER S. EDWARDS, CPA, CVA

(continued)

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

ERRATA SHEET OF:  CHRISTOPHER S. EDWARDS, CPA, CVA

(continued)

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____ Line No.____.

Change:_____

_____

_____

Reason: _____

ERRATA SHEET OF:  CHRISTOPHER S. EDWARDS, CPA, CVA

(continued)

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____

_____

Page No._____  Line No._____.

Change:_____

_____

_____

Reason: _____



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,    )
            )
  Plaintiff,      )
            ) Case No. 4:16-cv-235-HLM
vs.         )
            ) JURY TRIAL DEMANDED
COMMUNITY HEALTH SYSTEMS, )
INC.,         )
            )
  Defendant.     )

---

## NOTICE OF DEPOSITION OF DEFENDANT
## COMMUNITY HEALTH SYSTEMS, INC.

---

TO: Community Health Systems, Inc.
   c/o Harold T. Daniel, Jr., Esq.
   Holland & Knight LLP
   Regions Plaza, Suite 1800
   1180 West Peachtree Street
   Atlanta, Georgia 30309

   Plaintiff Mark A. Waldrop (hereinafter "Mr. Waldrop"), by and through

counsel and pursuant to Federal Rule of Civil Procedure 30, hereby gives notice

that Mr. Waldrop will take the corporate deposition by oral examination of De-

fendant Community Health Systems, Inc., whose address is 213 Third Street, Ma-

con, Georgia 31201.   The deposition will commence on Monday, February 28,

2017 at 10:00 a.m. ET at the offices of Hall, Bloch, Garland & Meyer, 577 Mul-

berry Street, Suite 1500, Macon, Georgia 31201.  The deposition may be continued to another date, time, or location to accommodate Defendant's designation of multiple officers, directors, managing agents, or other persons who consent to testify on Defendant's behalf.  The deposition will be recorded stenographically.  Pursuant to Federal Rule of Civil Procedure 30(b)(6), a list of matters for examination is attached hereto as *Exhibit I*.  You are invited to attend and participate.

DATED this  21st  day of February, 2017.

Respectfully submitted,

GEARHISER, PETERS, ELLIOTT
& CANNON, PLLC

By: _____

R. Wayne Peters (Ga. Bar #573700)
(wpeters@gearhiserpeters.com)
Gary L. Henry (Ga. Bar #107821)
(ghenry@gearhiserpeters.com)
320 McCallie Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 756-5171
Facsimile: (423) 266-1605
*Attorneys for Plaintiff Mark A. Waldrop*

2

## CERTIFICATE OF COMPLIANCE

Counsel, in compliance with LR 7.1D, NDGa, hereby certifies that this document has been prepared with one of the font and point selections approved by the Court in LR 5.1B, NDGa. Specifically, this document has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

GEARHISER, PETERS, ELLIOTT &
CANNON, PLLC

By: _____

3

## MATTERS FOR EXAMINATION

Plaintiff Mark D. Waldrop (hereinafter "Mr. Waldrop"), by and through counsel and pursuant to Federal Rule of Civil Procedure 30(b)(6), submits the following matters for examination with respect to the deposition of Defendant:

### Instructions

1.    On the date specified in the Notice of Deposition of Defendant Community Health Systems, Inc., you must be prepared to testify with regard to the matters listed below.  Pursuant to Federal Rule of Civil Procedure 30(b)(6), you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf, about information known or reasonably available to you.  You may set out the matters on which each person designated will testify.

2.    You are required to supplement any testimony on the matters listed below to the extent required by Federal Rule of Civil Procedure 26(e).

### Definitions

For the purposes of these matters for examination, the following definitions shall apply:

1.    As used herein, the term "communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever



1

made, including, but not limited to, correspondence, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between or among two or more persons.

2. As used herein, the term "document" means any medium upon which intelligence or information can be recorded or retrieved and any writing or other tangible thing from which data or information can be obtained or translated through detection devices to reasonably usable form, whether printed, recorded, reproduced by any process, or written or produced by hand, whether or not claimed to be privileged or exempt from production for any reason. Set forth below is a list of examples of writings and tangible things which are included in this definition. This list is not an exclusive listing of the writings and tangible things included within this definition, but is intended to aid you in preparing for your deposition. Such examples include the following, including the original and each copy, regardless of origin and location: letters, newspaper clippings, tape recordings, reports, agreements, communications (including intra-company communications), correspondence, telegrams, memoranda, summaries, forecasts, photographs, models, statistical statements, graphs, laboratory and engineering reports and notebooks, charts, plans, drawings, minutes or records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, customer lists,

reports, summaries, interviews, reports or summaries of investigations, opinions, or reports of consultants, appraisals, records, or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade papers, periodicals, order forms, diaries, calendars, telexes, cables, contracts, insurance policies, handwritten notes, drafts of any documents, working papers, sketches, indexes, lists, tapes, microfilms, data sheets, data processing cards, revisions of drafts of any documents, invoices, prom-issory notes, surveys, computer printouts, computer disk storage, e-mails, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced.  The term "document" also includes any elec-tronically stored information.  In addition to the items on the forgoing list, any comment or notation appearing on any of the documents described above, and not part of the original text, is considered a separate document, and any draft or pre-liminary form of any document is also considered a separate document.

3.    As used herein, the term "identity" means such information as would enable a reasonably intelligent person to locate, describe, distinguish, understand, evaluate, or analyze the subject matter, including, but not limited to, descriptions, identifying marks, dates, amounts, terms, names, parties, values, numbers, labels, provisions, witnesses, signatories, writers, drafts, representatives, agents, officers, employees, opinions, conclusions, and custodians of the subject matter.  When

used in reference to a natural person, the term "identity" includes the full name, present or last known address, and present or last known business affiliation and job title of the person.  When used in reference to a governmental entity, corpora-tion, or unincorporated business association, the term "identity" includes the full name, principal place of business address, and state or country of incorporation or organization of the person.

4.     As used herein, the term "Mr. Waldrop" refers to Plaintiff Mark A. Waldrop, each of his agents, representatives, attorneys, and each person acting or purporting to act on his behalf.

5.     As used herein, the term "Ms. Dotson" refers to Stephanie Dotson, each of her agents, representatives, attorneys, and each person acting or purporting to act on her behalf.

6.     As used herein, the term "or" appearing in any matter upon which ex-amination is requested shall not be read so as to eliminate any part of the matter, but, whenever applicable, it should have the same meaning as "and."  For example, a matter upon which examination is requested stating "refer or relate in any way to" should be read as "refer and relate in any way to" if a matter that does both ex-ists.

7.     As used herein, the term "person" means:  (1) any natural individual

in any capacity whatsoever; (2) any public or private entity or organization, including divisions, departments, and other units therein; or (3) any governmental entity, whether local, state, or federal, including divisions, departments, and other units therein.

8.     As used herein, the term "Pleadings" refers to:   (1) the Complaint filed on July 26, 2016; (2) the Answer, Defenses, and Counterclaim of Defendant Community Health Systems, Inc. filed on September 21, 2016; (3) the Answer to Counterclaim filed on October 4, 2016; (4) the Amended Complaint filed on December 12, 2016; (5) the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc. filed on December 15, 2016; (6) the Answer to Amended Counterclaim of Defendant Community Health Systems, Inc. filed on December 29, 2016; and (7) any amendments or supplements to the documents listed in this definition.

9.     As used herein, the phrase "refer or relate in any way to" shall mean to be in any way logically or factually connected with the matter that is the subject of the matter upon which examination is requested.

10.     As used herein, the term "representative" means any and all agents, employees, servants, officers, directors, attorneys, or any other persons acting or purporting to act on your behalf in this case.

11.     As used herein, the term "Rollins" refers to Ronnie D. Rollins, each of his agents, representatives, attorneys, and each person acting or purporting to act on his behalf.

12.     As used herein, the term "Taylor" refers to Lorraine Taylor, each of her agents, representatives, attorneys, and each person acting or purporting to act on her behalf.

13.     As used herein, the terms "you," "your," "yourself," or "yourselves" refer to Defendant Community Health Systems, Inc., each of its agents, representatives, attorneys, and each person acting or purporting to act on its behalf.

## MATTERS FOR EXAMINATION

1.     All facts or circumstances that refer or relate in any way to the execution of the Employment Agreement of Mark A. Waldrop, a copy of which is attached to the Amended Complaint as *Exhibit 1* (Doc. 27-1).

2.     All facts or circumstances that refer or relate in any way to the execution of an employment agreement by Rollins.

3.     All facts or circumstances that refer or relate in any way to the execution of an employment agreement by Taylor.

4.     All facts or circumstances that refer or relate in any way to the proceedings at the meetings of your board of directors since January 1, 2010, includ-

ing, but not limited to, the subjects discussed and actions taken at each such meeting and any proceedings conducted in executive session.

5.      All facts and circumstances that refer or relate in any way to the proceedings at the meetings of any audit committee of your board of directors since January 1, 2010, including, but not limited to, the subjects discussed and actions taken at each such meeting and any proceedings conducted in executive session.

6.      All facts or circumstances that refer or relate in any way to the budgets approved by your board of directors since fiscal year 2010-2011.

7.      Your functional and legal organizational charts and the relationships between each entity listed on those charts.

8.      All facts or circumstances that refer or relate in any way to any policies concerning the use of the Workday program by your representatives, including, but not limited to, the use of the Workday program by: (1) Rollins; (2) Taylor; (3) Mr. Waldrop; (4) Ms. Dotson; and (5) any person who has performed the duties formerly assigned to Mr. Waldrop.

9.      All facts or circumstances that refer or relate in any way to any policies concerning the use of the Selectica program by your representatives, including, but not limited to, the use of the Selectica program by: (1) Rollins; (2) Taylor; (3) Mr. Waldrop; (4) Ms. Dotson; and (5) any person who has performed the duties

formerly assigned to Mr. Waldrop.

10.    All facts and circumstances that refer or relate in any way to your procedures for approving expense reimbursement requests from January 1, 2010 to the present.

11.    All facts and circumstances that refer or relate in any way to expense reimbursement requests submitted by: (1) Rollins; (2) Taylor; (3) Mr. Waldrop; (4) Ms. Dotson; and (5) any person who has performed the duties formerly assigned to Mr. Waldrop.

12.    All facts and circumstances that refer or relate in any way to your voluntary employees beneficiary association plan (VEBA), including the VEBA's structure, the investment of the VEBA's excess reserves or funds, and the overall performance of the VEBA.

13.    All facts and circumstances that refer or relate in any way to the "internal investigation consisting of employee interviews and the review and collection of various documentation and relevant information" described in Paragraph 35 of the counterclaim portion of the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc. (Doc. 29).

14.    All facts and circumstances that refer or relate in any way to the "offi-

8

cial audit" described in Paragraph 46 of the counterclaim portion of the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc. (Doc. 29), including, but not limited to, the "improprieties perpetrated by Mr. Waldrop that were previously unknown to . . . Rollins or [your] Board" as alleged in Paragraph 47 of the Answer and Defenses to Plaintiff's Amended Complaint and Amended Counterclaim of Defendant Community Health Systems, Inc.

15. All facts and circumstances that refer or relate in any way to any expense reimbursement requests or expense reports submitted by Mr. Waldrop or Ms. Dotson that you allege were improperly submitted by Mr. Waldrop or Ms. Dotson.

16. All facts and circumstances that refer or relate in any way to expense reimbursement requests submitted in connection with your leadership development program.

17. Mr. Waldrop's paid time off since January 1, 2010.

18. All projects and third-party engagements for which you contend Mr. Waldrop should have obtained a Project Charter Authorization.

19. All facts and circumstances that refer or relate in any way to your claim that Mr. Waldrop's activities with regard to DeBrock Poodles constitute a cause for Mr. Waldrop's termination.

20.   All facts and circumstances that refer or relate in any way to your claim that Mr. Waldrop activities at Southern Adventist University constitutes a cause for Mr. Waldrop's termination.

21.   All facts and circumstances that refer or relate in any way to your claim that the renovation of your Dalton, Georgia office constitutes a cause for Mr. Waldrop's termination.

22.   All facts and circumstances that refer or relate in any way to your termination of Mr. Waldrop's employment, including all facts and circumstances that refer or relate in any way to any notice you provided to Mr. Waldrop of the cause for Mr. Waldrop's termination.

23.   All communications you or your representatives have had with any person that refer or relate in any way to Mr. Waldrop's termination.

24.   All communications you or your representatives have had with any person that refer or relate in any way to Ms. Dotson's termination.

25.   All communications, facts, or circumstances that refer or relate in any way to the allegations in the Pleadings.


EXHIBIT D  2

C. EDWARDS
4/14/17

Reported by:
MILDRED R. HORNBLOWER, CCR

# Mark A. Waldrop

## vs.

# Community Health Systems, Inc.

# Report of Christopher S. Edwards

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,

     Plaintiff,

vs.                                                          Case No. 4:16-cv-235-HLM

COMMUNITY HEALTH SYSTEMS, INC.

     Defendant

---

## REPORT OF CHRISTOPHER S. EDWARDS, CPA, CVA

1     I, Christopher S. Edwards, being duly sworn, deposes and states the following:

2     ### WITNESS QUALIFICATIONS

3     I am Christopher Shepard Edwards and am the director of the *Litigation, Valuation, and Forensic*

4     *Practice Group* of the certified public accounting firm of MCNAIR, MCLEMORE, MIDDLEBROOKS & CO.,

5     LLC[1]. My business address is 389 Mulberry Street, Post Office Box One, Macon, Georgia, 31202. I am

6     over 21 years of age and I am competent to proffer an opinion in the matters set forth in this report.

7     I am a **Certified Public Accountant,** duly authorized to practice in the State of Georgia as well as

8     a **Certified Valuation Analyst** as credentialed by the *National Association of Certified Valuation Analysts*.

9     I am in my twenty-eighth year of the practice of public accounting and have extensive and diversified

10     experience in the areas of audit, tax, forensic examination, valuation, and litigation. I have served as expert

11     consultant and/or expert witness on many occasions and have often performed analyses of the type and

---

[1] A Georgia limited liability company licensed to practice public accounting in Georgia.

1  nature of those supporting the conclusions herein.  Attached herewith, as Exhibit "1", is a true and accurate

2  copy of my curricula vitae in which my qualifications are described in more detail.

### PUBLICATIONS AUTHORED BY WITNESS WITHIN THE PRECEDING TEN YEARS

4  The curricula vitae attached as Exhibit "1" references, at a minimum, various speaking engagements

5  and published authorships.  I have not been published on professional subject matter in the past ten years.

### LISTING OF OTHER CASES IN THE PRECEDING FOUR YEARS

7  The curricula vitae attached as Exhibit "1" references and includes all cases in the preceding four

8  years in which I have provided expert testimony either at deposition or trial.

### COMPENSATION ARRANGEMENT

10  Compensation paid to me or my firm is charged on a time-applied basis and, therefore, my fees in

11  this matter are in no way contingent on the outcome, report, findings, or any otherwise result of my analysis.

12  Fees accumulate at the standard hourly rates in use at my firm which include my hourly rate of up to $250

13  per hour.  Expenses associated with this engagement will be separately invoiced at actual costs.  There have

14  been no expenses incurred in the performance of this engagement that are significant or for which

15  reimbursement has been sought.

### OBJECTIVES AND NATURE OF ASSIGNMENT

17  At the request of Holland & Knight, LLP, we have been retained as expert consultants and asked to

18  perform certain financial and forensic and analyses in the above referenced matter.  Specifically, we have

19  been asked to investigate selected matters that pertain to the employment and subsequent termination of

20  Mr. Mark A. Waldrop (hereafter, "Waldrop"), formerly the Chief Operating Officer of COMMUNITY

21  HEALTH SYSTEMS, INC. (hereafter, "CHS" or Defendant).

22

# BASIS FOR OPINIONS AND METHODOLOGY

In the performance of this expert consultation engagement and in rendering the following opinions, I am relying on my own judgment as premised in my education, training, and professional experience. I am drawing inferences and conclusions based upon factors and data which I, or those on our staff and under my direct supervision, have personally reviewed and analyzed. Accordingly, references to "I" or "we" in the context of this report are made synonymously, except where an opinion or conclusion is stated in which case the context of "I" is specific and intended.

Generally, I am also relying on statements and/or testimony given by others affiliated and familiar with the matters related to the subject business and employment of Mark Waldrop. I am relying on facts and information perceived by me or made known to me in conducting my professional analyses of the financial affairs of Mark Waldrop and the related financial and operational reporting of CHS. The records, documents, and data on which I am relying, as well as the methods, practices, and analyses applied by me in the performance of this engagement, are generally of the type, nature, and scope relied upon and, performed by, similar experts in forming opinions or inferences upon this type of subject matter as to its investigation, financial analysis, and reporting.

# DOCUMENTS REVIEWED AND RELIED UPON

Notwithstanding the generality of the foregoing, I have specifically reviewed and deemed relevant the following documents and references:

- Complaint filed July 26, 2016 by Mark A. Waldrop.
- Letter of Waldrop to CHS dated July 1, 2016.
- "Offer of Separation Agreement" from CHS to Waldrop dated July 6, 2016.
- Letter of CHS to Waldrop dated August 16, 2016.
- Employment agreement between CHS and Waldrop dated January 1, 2009.

- Official expense reports, to the extent they exist, of Waldrop as tendered to CHS for payment for the period of July 1, 2011 through June 30, 2016.

- Official expense reports, to the extent they exist, of Stephanie Dotson as approved by Waldrop and then tendered to CHS for payment.

- The *Community Health Services of Georgia Associate Handbook: A Guide for Our Associates* (undated).

- Minutes of selected CHS board meetings.

- CHS' *Corporate Governance Policies and Procedural Guidelines* effective May 5, 2009.

- CHS' *Corporate Guidelines* revised October 13, 2013 and effective June 24, 2014.

- "Acknowledgement of Receipt" of CHS Associate Handbook signed by Mark A. Waldrop and Stephanie J. Dotson on June 4, 2014.

- "Employee Travel and Reimbursement Policy" for CHS as proposed for revision, together with review annotations by Waldrop.

- Corporate documents related to the acquisition of the Dalton business office, subsequent water damage mitigation and repairs, and later renovation.

- Corporate documents related to various management projects, project charter authorizations, and utilization of CHS resources prior to CHS executive suit and/or board approval.

- Internal and external documents related to Mark Waldrop's relationship and involvement with Southern Adventist University.

- Corporate email records.

- The Outlook calendar of Mark Waldrop.

- Various documents and online research related to extra-business activities of Waldrop, particularly in relation to *"DeBrock Poodles"* and *"Designs by Malyse"*.

1    • Interviews and disclosures from CHS executive officers, selected staff, and selected board

2        members.

3    • Online research related to the presence of personality of Mark Waldrop.

4    • Various other corporate records and documents related to this matter.

5                                        **BACKGROUND**

6        Mark Anthony Waldrop (herein, "Waldrop"), born May 18, 1967, currently resides at 9686 Bowen

7    Trail, Ooltewah, TN 37363.  His tenure with CHS began on March 11, 1990 when he accepted the position

8    of Administrator in Training at Bel-Air Health Care Center located in Tennessee for an annual salary of

9    $20,000.  While at "Bel-Air" he was promoted to Assistant Administrator within six months and received

10   a 20% raise in compensation.  By October of 1990, he was promoted to the position of Administrator at

11   Quinton Memorial in Dalton, Georgia wherein his compensation was again raised to $32,000 annually.

12   After nearly four years, he relocated to Dublin, Georgia where he took the position of Administrator of the

3    Dublinair Rehab Center.

14       In January of 1995, Waldrop resigned his position and employment to pursue other opportunities

15   but returned to the employ of CHS in July of 1996, at an annual compensation of $75,000, to be the Director

16   of Rehab Services for Care More, Inc. with offices in Dalton, Georgia.  After two years in this role, he was

17   promoted to the position of Vice President of Integra Rehabilitation, Inc. for annual compensation of

18   $120,000.  In October of 2001, he was promoted to the position of Chief Operations Officer of Care More

19   Management Company, Inc. with a salary of $200,000.

20       In October of 2003, he was promoted to the position of President of Clinical Services, Inc. d/b/a

21   Ethica Health and Retirement Communities at an annual salary of $275,000.  In August of 2005 he was

22   again promoted, this time to the position of Executive Vice President of Community Health Systems, Inc.

23   for an annual salary of $500,000, beginning January 1, 2006.  In the coming months thereafter, on June 20,

24   2006, Waldrop executed an Employment Agreement with CHS wherein he accepted fiduciary

1    responsibilities and obligations. The agreement was replaced and re-executed on January 1, 2009 along

2    with a salary adjustment to $562,680.

3    On July 1, 2010, Waldrop was promoted to the position of Chief Operating Officer of Community

4    Health Systems, Inc. at an annual salary of $880,000. He continued in this capacity and on August 10, 2011

5    he was recognized by the CHS board as its apparent successor as Chief Executive Officer. It was at this

6    time that the board authorized CHS to purchase a $9,000,000 "key man" life insurance policy on Waldrop.

7    He continued to receive compensation adjustments such that his annual salary exceeded one million dollars

8    at $1,020,161 on January 1, 2015 and at $1,045,665 on January 1, 2016.

9    Waldrop's employment with CHS came to an end upon his termination on June 28, 2016. The

10   Decision to terminate Mr. Waldrop's employment was after the CHS board and legal counsel conducted an

11   investigation into the relationship between CHS's CEO (Mr. Rollins) and Waldrop in response to claims

12   Waldrop had made about Mr. Rollins. The result of the investigation satisfied the board that the claims

13   made of Mr. Rollins were unfounded. Furthermore, the investigation revealed a number of improprieties

14   perpetrated by Mr. Waldrop which were previously unknown by both the executive management and the

15   board of directors. The facts and circumstances of Waldrop's alleged improprieties precipitating his

16   termination are the subject of this report.

### DETAILED REVIEW AND ANALYSES

#### "*Fiduciary Duties and Obligations*"

19   As mentioned supra, Waldrop executed employment agreements[2] with CHS on June 20, 2006 and

20   again on January 1, 2009, while serving as an Executive Vice President of CHS, both of which obligated

21   Waldrop to various fiduciary duties. Additionally, effective July 1, 2010, he began serving as an officer of

22   CHS by agreeing to serve as its Chief Operating Officer (COO), a role which has increased and statutory

---

[2] Employment Agreement dated January 1, 2009 is attached herein as Exhibit 2.

1   fiduciary responsibilities.  While he very may have been obligated to adhere to fiduciary duties via other

2   mechanisms[3], Waldrop clearly was bound by them as early as June 20, 2006.  Through his execution of the

3   employment agreements, his signed receipts of employee handbooks, and given his level of training in an

4   executive capacity, it is reasonable to assume that Waldrop knew, or should have known, his obligations

5   and responsibilities as a fiduciary to CHS.  For the purposes of this engagement, we are examining records

6   and documents that are, generally, encompassed by this fiduciary period.

7                              "*Gross Negligence:  Expense Reporting*"

8        In his letter to Mark Waldrop on August 23, 2016, CHS Chairman Joe Wall wrote the following in

9   regard to excessive and abusive expense reports:

10        "*You submitted hundreds of thousands of dollars in business expenses for reimbursement*

11        *under your assistant's name rather than under your name so as to conceal from your*

12        *direct supervisor the nature and magnitude of the unauthorized gifts, awards,*

13        *consumables, travel, office supplies, cleaning supplies, and other questionable items for*

14        *which you obtained reimbursement from CHSI.*"

15        Section 4 of the aforementioned Employment Agreement states as follows: "*Reimbursement of*

16   *Business Expenses. The Company shall pay all reasonable and necessary travel and business expenses*

17   *incurred by Employee directly related to Employee's performance of Employee's responsibilities and duties*

18   *for the Company under this Agreement Employee shall submit to the Company statements that justify in*

19   *reasonable detail all expenses so incurred. Employee shall submit all reimbursements hereunder for a*

20   *particular calendar year no later than forty-five (45) days after it ends, and payment shall occur not later*

21   *than March 15 immediately following the end of the calendar year to which the reimbursement relates.*"

---

[3] Other mechanisms may include statutory provisions under the Georgia Trade Secrets Act of 1990 at OCGA 10-1-760

through 10-1-767 (2011) or under prior CHS employee handbooks and personnel policies.

1    Section I(1) of the Community Health Systems, Inc. "*Corporate Governance Policies and*

2    *Procedural Guidelines*"[4], which was adopted by the CHS board of directors at its May 5th, 2009 board

3    meeting, states: "*Advances, allowances or reimbursements will be paid to an employee for any business*

4    *expenses that are paid or incurred by the employee in connection with his or her services as an employee*

5    *that would otherwise be deductible and are substantiated in accordance with paragraph 2 below .....*".

6    Section I(2) of that document continues to state: "*In order to receive reimbursement or an advance*

7    *or allowance for expenses, the expense must be attributable to the CHSI's or the applicable Tax-Exempt*

8    *Subsidiary's tax-exempt activities, and the employee must submit sufficient information to identify the*

9    *nature of each expense.*"

10    In that same section and in regard to the type and nature of the documentary evidence that an

11    employee must include in the submission of their expense reports, subsections I(2)(iv) and I(2)(v) state:

12    "(iv) *a business reason must be shown for the expense; and (v) every element must be substantiated by*

13    *adequate records supported by documentary evidence (such as receipts)*".

14    The second paragraph of the first page of this document defines a "Covered Person" by stating that

15    "*The Policy shall be applicable to all members of the Board of Directors of CHSI, the members of any*

16    *committees formed by the Board of Directors of CHSI and **to each officer and employee of CHSI** (each, a*

17    "*Covered Person*")" (emphasis added). Section L of that document, captioned "Protection and Proper Use

18    of Assets of the Organization", discusses the personal duty and responsibility of Covered Persons by stating

19    "*Every Covered Person has a personal responsibility to protect the assets of the Organization from misuse*

20    *or misappropriation.*".

---

[4] Attached herein as Exhibit 11.

1    This document was revised and adopted[5] by the CHS board of directors in its June 24, 2014 board

2    meeting wherein Mark Waldrop was present.  There were no material changes to the expense

3    reimbursement policies.

4    Waldrop was aware of the policies, was trained on the policies, and was instrumental in guiding the

5    development of policies governing CHS and its employees.  Notwithstanding the above referenced

6    guidelines that were adopted and published by CHS, as an officer and a member of executive management,

7    Waldrop owed a duty of loyalty to CHS to include prudence and diligence in his decisions to expend or

8    obligate the company's assets.  This duty and responsibility includes decisions by him to spend, directly,

9    the resources of the company as well as his knowing approval of expense reports submitted to him for

10    review and authorization by those under his direct supervision, to include his administrative assistant,

11    Stephanie Dotson (herein, "Dotson").  Accordingly, his singular approval of Dotson's expense reports,

12    which included items that were not directly related with her duties as an employee of CHS and that were

13    submitted for reimbursement, is tantamount to his own direct expending of corporate resources for his own

14    use.

15    Throughout the period covered by our investigation, Waldrop was employed by CHS as its Chief

16    Operating Officer and Dotson was employed by CHS as Waldrop's administrative assistant.  Together the

17    two employees work in the CHS corporate satellite office in Dalton, Georgia wherein no other persons were

18    staffed.  In the conduct of her employment at CHS, Dotson incurred expenses that were directly related to

19    her employment and, in accordance with CHS policies and management protocols, she submitted her

20    expense reports to Waldrop for his exclusive approval.  Her expense reports were not reviewed or approved

21    by any person or party and Waldrop was the only individual making determination as to the appropriateness

---

[5] The Community Health Services of Georgia "Corporate Guidelines", as revised and adopted on June 24, 2014, is

attached herein as Exhibit 12.

1   and legitimacy of her requested expense reimbursement reports.  Accordingly, Waldrop's duty to review

2   and approve Dotson's expense reports is of paramount importance to the CHS organization and he is to be

3   held accountable to that process.

4       Similarly, Waldrop incurred expenses in the conduct of his employment at CHS.  As an officer of

5   the Company, his expense reports were to be submitted to the CHS president (Mr. Rollins) for his review

6   and approval.  Mr. Rollins' review and approval duties in no way extended to include the expense reports

7   of Dotson.

8       Both Dotson and Waldrop, as employees of CHS, were aware of the Company's policies regarding

9   its "Accountable Plan" for expense reimbursements.  As evidenced by those expense reports that included

10  deductive portions of otherwise legitimate business receipts (i.e., such as reducing a meal receipt from the

11  actual receipt amount to the reimbursable amount exclusive of the cost of alcohol), it is clear that both

12  Dotson and Waldrop were aware of the fact that only those expenses that were directly related to legitimate

13  CHS business operations were to be submitted for reimbursement.

14      Despite the clear fact that both Waldrop and Dotson knew, or certainly should have known, of the

15  CHS guidelines, policies, and protocols, both Waldrop and Dotson colluded to contravene and circumvent

16  those policies for personal gain.  We have conducted comprehensive analyses of the expense reporting

17  behavior of both Dotson[6] and Waldrop[7] and have determined a habitual and willful neglect by Waldrop in

18  his duty to approve for payment only the legitimate businesses of Dotson that are both reasonable in nature

19  and properly documented. By way of example and not as an exhaustive list, we noted the following

20  submissions for reimbursement by either Dotson or Waldrop:

21

---

[6] All expense reports, during the analysis period, for Stephanie Dotson are attached herein at Exhibit 13.

[7] All expense reports, during the analysis period, for Mark Waldrop are attached herein at Exhibit 14.

1 • Purchases for grocery items for personal use

2 • Mobile technology and service fees for devices not on the CHS corporate plan

3 • Excessive and/or unnecessary gifts (Waterford crystal alone in excess of $50,000)

4 • Family vacations disguised as business trips

5 • Unauthorized business trips

6 • Unnecessary lodging

7 • Unsupported taxi expenses

8 • Unauthorized staff trips, including Royal Caribbean cruises

9 • Technology purchases, phone chargers, cases, accessories, and cloud storage

10 • Items with no receipt

11   As a result of our analyses, we have identified **$238,235** through the combined submission of

12 expense reports of Waldrop and Dotson that are outside of CHS guidelines and policies.  These following

3 expense items were found to be either excessive, inadequately documented, wholly unauthorized, or a

14 combination of the three:

| Emp | Report | Date | Vendor | Amount |
|-----|--------|------|--------|--------|
| Dotson | 1010609 | 06/25/12 | Verizon | 134.06 |
| Dotson | 1010609 | 06/28/12 | Walmart | 46.55 |
| Dotson | 1010609 | 06/29/12 | Summer Beach Resort Lodging | 1,091.15 |
| Dotson | 1011186 | 07/12/12 | Office Depot | 143.86 |
| Dotson | 1012115 | 07/25/12 | Verizon | 177.14 |
| Dotson | 1012115 | 08/02/12 | Office Depot | 335.90 |
| Dotson | 1012253 | 08/13/12 | Waterford Wedgewood | 6,508.81 |
| Waldrop | 1012334 | 08/03/12 | AT&T | 133.10 |
| Dotson | 1012627 | 08/20/12 | Hobby Lobby | 42.07 |
| Dotson | 1012627 | 08/20/12 | Walmart | 211.04 |
| Dotson | 1012627 | 08/21/12 | Murray County Clerks Office | 37.00 |
| Dotson | 1012627 | 08/21/12 | Waterford Wedgewood | 591.71 |
| Waldrop | 1012876 | 09/03/12 | AT&T | 218.87 |
| Dotson | 1012878 | 08/28/12 | Verizon | 141.67 |
| Dotson | 1012878 | 08/29/12 | Edible Arrangements | 95.05 |
| Dotson | 1012878 | 09/20/12 | Verizon | 143.98 |
| Dotson | 1013476 | 09/05/12 | Office Depot | 262.11 |

| Dotson | 1013476 | 09/06/12 | Home Depot | 26.58 |
|--------|---------|----------|------------|-------|
| Dotson | 1013476 | 09/10/12 | Waterford Wedgewood | 1,161.30 |
| Dotson | 1013476 | ?? | LongHorn | 53.00 |
| Dotson | 1013710 | 09/10/12 | Chick-fil-a | 7.79 |
| Dotson | 1013710 | 09/11/12 | Starbucks | 4.81 |
| Dotson | 1013710 | 09/11/12 | Strip | 725.28 |
| Dotson | 1013710 | 09/12/12 | Rosa Mexicano | 976.94 |
| Dotson | 1013710 | 09/14/12 | Twelve | 8,987.06 |
| Dotson | 1013710 | 09/17/12 | Twelve | 39.72 |
| Dotson | 1013710 | 09/18/12 | Yard House | 22.00 |
| Waldrop | 1014157 | 09/21/12 | The Spiced Apple | 32.00 |
| Waldrop | 1014157 | 10/03/12 | AT&T | 111.72 |
| Waldrop | 1014157 | ?? | Ritz-Carlton | 17.00 |
| Waldrop | 1014486 | 09/21/12 | The Spiced Apple | 32.00 |
| Waldrop | 1014486 | 10/03/12 | AT&T | 111.72 |
| Waldrop | 1014486 | ?? | Ritz-Carlton | 17.00 |
| Dotson | 1014490 | 08/17/12 | Apple | 100.00 |
| Dotson | 1014490 | 09/25/12 | Verizon | 131.57 |
| Dotson | 1014490 | 09/26/12 | Ritz-Carlton | 30.22 |
| Dotson | 1014831 | 10/03/12 | Amazon | 79.00 |
| Dotson | 1014831 | 10/04/12 | John Wiley & Sons, Inc. | 1,665.69 |
| Waldrop | 1015104 | 10/08/12 | BK S. Regional Garage | 6.40 |
| Waldrop | 1015104 | 10/08/12 | Tampa Convention Center | 2.25 |
| Waldrop | 1015104 | 10/09/12 | Bahama Breeze | 63.00 |
| Waldrop | 1015104 | 10/09/12 | Gift Shop | 7.98 |
| Waldrop | 1015104 | 10/09/12 | South Regional Garage | 6.40 |
| Waldrop | 1015104 | 10/10/12 | South Regional Garage | 9.50 |
| Waldrop | 1015104 | 10/11/12 | Hertz | 253.96 |
| Waldrop | 1015104 | 10/11/12 | Marathon | 39.95 |
| Waldrop | 1015104 | 10/13/12 | Z-Market | 1.93 |
| Waldrop | 1015104 | 10/16/12 | Crawer's Deli | 5.05 |
| Waldrop | 1015104 | ?? | Cab | 119.00 |
| Waldrop | 1015104 | ?? | Twelve | 17.00 |
| Waldrop | 1015526 | 07/15/12 | Riverwalk Cantina | 164.00 |
| Waldrop | 1015526 | 07/16/12 | Lone Star | 12.74 |
| Waldrop | 1015526 | 10/22/12 | Gaylord Palms | 166.00 |
| Waldrop | 1015526 | 10/23/12 | Gaylord Palms | 41.00 |
| Waldrop | 1015526 | 10/23/12 | Paradies Shops | 3.20 |
| Waldrop | 1015526 | 10/24/12 | Gaylord Palms | 28.00 |
| Waldrop | 1015526 | 10/24/12 | Gaylord Palms | 41.35 |
| Waldrop | 1015526 | 10/24/12 | Paradies Shops | 3.99 |
| Waldrop | 1015526 | 10/25/12 | ?? | 2.79 |
| Waldrop | 1015526 | ?? | ?? | 25.00 |
| Dotson | 1015632 | 10/30/12 | Las Palmas | 37.00 |

| Dotson | 1015632 | 10/30/12 | Waterford Wedgewood | 592.00 |
| Dotson | 1015632 | 10/31/12 | All Seasons Self Storage | 56.33 |
| Dotson | 1015632 | 10/31/12 | Hobby Lobby | 213.79 |
| Dotson | 1015632 | 10/31/12 | USPS | 29.44 |
| Dotson | 1015632 | 11/01/12 | Hobby Lobby | 413.23 |
| Dotson | 1015632 | 11/20/12 | Verizon | 142.23 |
| Dotson | 1016045 | 11/01/12 | Ace Hardware | 131.18 |
| Dotson | 1016045 | 11/01/12 | Ace Hardware | -11.21 |
| Dotson | 1016045 | 11/08/12 | Ace Hardware | 66.96 |
| Dotson | 1016045 | 11/08/12 | Ace Hardware | -6.51 |
| Waldrop | 1016262 | 10/31/12 | Publix | 3.54 |
| Waldrop | 1016262 | 11/05/12 | ?? | 2.94 |
| Waldrop | 1016262 | 11/06/12 | Market Deli | 5.41 |
| Waldrop | 1016262 | 11/07/12 | Market Cafe | 4.32 |
| Waldrop | 1016262 | 11/07/12 | Roller Coaster | 140.00 |
| Waldrop | 1016262 | 11/08/12 | Baja Fresh | 3.23 |
| Waldrop | 1016262 | ?? | Yellow Checker Star | 39.00 |
| Waldrop | 1016262 | ?? | Yellow Checker Star | 28.00 |
| Waldrop | 1016267 | 11/16/12 | ?? | 138.32 |
| Waldrop | 1016267 | 11/16/12 | ?? | 653.20 |
| Waldrop | 1016590 | 11/05/12 | TaxiPass | 24.90 |
| Waldrop | 1016590 | 11/17/12 | ?? | 2.94 |
| Waldrop | 1016590 | 11/18/12 | Paradies Shops | 2.99 |
| Waldrop | 1016590 | 12/03/12 | AT&T | 134.25 |
| Waldrop | 1016590 | ?? | Hampton Inn | 7.00 |
| Dotson | 1016610 | 06/14/12 | Michael's | 82.89 |
| Dotson | 1016610 | 10/22/12 | Amy's Hallmark | 59.13 |
| Dotson | 1016610 | 11/09/12 | Walmart | 68.13 |
| Dotson | 1016610 | 11/12/12 | Dollar General | 11.29 |
| Dotson | 1016610 | 11/16/12 | Donut Palace | 8.28 |
| Dotson | 1016610 | 11/18/12 | Lynn's Hallmark | 58.20 |
| Dotson | 1016610 | 11/19/12 | Starbucks | 8.67 |
| Dotson | 1016610 | 11/27/12 | AAA | 99.00 |
| Dotson | 1016610 | 11/27/12 | FTD | 144.08 |
| Dotson | 1016610 | 11/27/12 | Office Depot | 72.93 |
| Dotson | 1016610 | 11/28/12 | Amazon | 36.16 |
| Dotson | 1016610 | 11/28/12 | The UPS Store | 329.46 |
| Waldrop | 1017212 | 11/29/12 | ?? | 2.94 |
| Waldrop | 1017212 | 11/30/12 | Essentials | 4.50 |
| Waldrop | 1017212 | 12/01/12 | Essentials | 5.00 |
| Waldrop | 1017212 | 12/01/12 | Market Cafe | 8.65 |
| Waldrop | 1017212 | 12/02/12 | Essentials | 2.25 |
| Waldrop | 1017212 | 12/02/12 | Walgreens | 1.99 |
| Waldrop | 1017212 | 12/03/12 | Wolfgang Puck | 2.89 |

| Waldrop | 1017212 | 12/04/12 | Tin Lizzy's | 32.00 |
|---|---|---|---|---|
| Waldrop | 1017212 | 12/04/12 | W Atlanta Midtown | 10.00 |
| Waldrop | 1017212 | 12/05/12 | McDonalds | 1.27 |
| Waldrop | 1017212 | 12/06/12 | CVS | 3.04 |
| Waldrop | 1017212 | ?? | Desert Cab | 10.00 |
| Waldrop | 1017212 | ?? | Diamond Taxi Receipt | 35.00 |
| Waldrop | 1017212 | ?? | TaxiPass | 45.00 |
| Waldrop | 1017212 | ?? | Yellow-Checker-Star | 45.00 |
| Waldrop | 1017212 | ?? | Yellow-Checker-Star | 20.00 |
| Waldrop | 1017212 | ?? | ?? | 30.00 |
| Waldrop | 1017212 | ?? | ?? | 13.00 |
| Waldrop | 1017212 | ?? | ?? | 8.00 |
| Waldrop | 1017212 | ?? | ?? | 9.00 |
| Waldrop | 1017212 | ?? | ?? | 4.00 |
| Waldrop | 1017212 | ?? | ?? | 18.00 |
| Waldrop | 1017212 | ?? | ?? | 15.00 |
| Waldrop | 1017553 | 12/13/12 | The Silver Moon | 117.00 |
| Waldrop | 1017553 | 01/03/13 | AT&T | 126.25 |
| Waldrop | 1017553 | ?? | Ritz-Carlton | 5.00 |
| Waldrop | 1017553 | ?? | Ritz-Carlton | 8.00 |
| Waldrop | 1017553 | ?? | Ritz-Carlton | 12.00 |
| Dotson | 1017589 | 12/10/12 | The UPS Store | 116.58 |
| Dotson | 1017589 | 12/11/12 | Wedgwood | 580.65 |
| Dotson | 1017589 | 12/12/12 | Office Depot | 286.51 |
| Dotson | 1017589 | 12/13/12 | Dillard's | 191.19 |
| Dotson | 1017589 | 12/13/12 | Michael's | 24.00 |
| Dotson | 1017589 | 12/13/12 | Olive Garden | 13.50 |
| Dotson | 1017589 | 12/13/12 | TJ Maxx | 26.17 |
| Dotson | 1017589 | 12/14/12 | The UPS Store | 110.04 |
| Dotson | 1017589 | 12/18/12 | Hobby Lobby | 25.68 |
| Dotson | 1017589 | 12/18/12 | The UPS Store | 146.59 |
| Dotson | 1017589 | 12/20/12 | Verizon | 148.46 |
| Dotson | 1017965 | 12/21/12 | Big Lots | 188.99 |
| Dotson | 1017965 | 12/25/12 | Verizon | 138.08 |
| Dotson | 1018337 | 01/04/13 | Walmart | 79.61 |
| Dotson | 1018337 | 01/07/13 | Dollar General | 56.74 |
| Dotson | 1018337 | 01/07/13 | Sonic | 2.09 |
| Dotson | 1018337 | 01/07/13 | The Spiced Apple | 59.73 |
| Dotson | 1018337 | 01/08/13 | Big Lots | 10.60 |
| Dotson | 1018535 | 01/15/13 | Cracker Barrel | 14.32 |
| Waldrop | 1018539 | ?? | ?? | 10.00 |
| Dotson | 1018792 | 01/17/13 | Summer Beach Resort Lodging | 1,178.89 |
| Dotson | 1018792 | 01/22/13 | Olive Garden | 18.26 |
| Dotson | 1018792 | 01/22/13 | Starbucks | 5.03 |

| Waldrop | 1018991 | 02/03/13 | AT&T | 135.01 |
|---|---|---|---|---|
| Dotson | 1018993 | 01/25/13 | Verizon | 137.86 |
| Dotson | 1018993 | 01/26/13 | Walmart | 39.72 |
| Dotson | 1018993 | 01/28/13 | The UPS Store | 24.90 |
| Dotson | 1018993 | 01/31/13 | Delta | 536.80 |
| Dotson | 1018993 | 01/31/13 | Delta | 536.80 |
| Dotson | 1018993 | 01/31/13 | Delta | 536.80 |
| Dotson | 1018993 | 01/20/16 | Lowe's | 632.16 |
| Dotson | 1019650 | 01/31/13 | Kmart | 27.44 |
| Dotson | 1019650 | 01/31/13 | Office Depot | 125.64 |
| Dotson | 1019650 | 02/05/13 | Lowe's | -189.79 |
| Dotson | 1019650 | 02/07/13 | Lynn's Hallmark | 84.01 |
| Dotson | 1019650 | 02/07/13 | Waterford Wedgewood | 245.13 |
| Dotson | 1019650 | 02/08/13 | ?? | 36.57 |
| Dotson | 1019650 | 02/08/13 | ?? | 102.82 |
| Dotson | 1019650 | 02/08/13 | Curt's Restaurant | 9.37 |
| Waldrop | 1019654 | 02/11/13 | Paradies Shops | 6.78 |
| Waldrop | 1019654 | 02/13/13 | Grab and Go | 2.68 |
| Waldrop | 1019654 | 02/13/13 | McDonalds | 1.95 |
| Waldrop | 1019654 | ?? | Taxi Cab | 30.00 |
| Waldrop | 1019654 | ?? | Taxi Cab | 35.00 |
| Waldrop | 1020061 | 02/11/13 | Paradies Shops | 3.99 |
| Waldrop | 1020061 | 02/14/13 | Twelve | 8.00 |
| Waldrop | 1020061 | 03/03/13 | AT&T | 140.39 |
| Waldrop | 1020061 | ?? | ?? | 8.00 |
| Dotson | 1020084 | 02/15/13 | Los Reves Mexican Restaurant | 21.00 |
| Dotson | 1020084 | 02/18/13 | Cracker Barrel | 33.33 |
| Dotson | 1020084 | 02/18/13 | Walmart | 30.58 |
| Dotson | 1020084 | 02/19/13 | Walmart | 165.68 |
| Dotson | 1020084 | 02/21/13 | Factory Outlet Store | 14.95 |
| Dotson | 1020084 | 02/21/13 | The Spiced Apple | 59.15 |
| Dotson | 1020419 | 02/25/13 | Verizon | 139.92 |
| Dotson | 1020419 | 02/26/13 | USPS | 66.88 |
| Dotson | 1020419 | 03/04/13 | The Spiced Apple | 34.93 |
| Waldrop | 1020497 | 02/27/13 | ?? | 2.94 |
| Waldrop | 1020497 | ?? | Desert Cab | 35.00 |
| Waldrop | 1020497 | ?? | Yellow Checker Star | 30.00 |
| Waldrop | 1020497 | ?? | Yellow Checker Star | 9.00 |
| Waldrop | 1020497 | ?? | Yellow Checker Star | 12.00 |
| Waldrop | 1020903 | 03/03/13 | Atlanta Airport Hartsfield -Jackson, Int. | 1.92 |
| Waldrop | 1020903 | 03/05/13 | Dillards | 5.00 |
| Waldrop | 1020903 | 03/05/13 | Dillards | 73.03 |
| Waldrop | 1020903 | 03/08/13 | Starbucks | 7.94 |

| Waldrop | 1020903 | 03/12/13 | ?? | 2.94 |
|---|---|---|---|---|
| Waldrop | 1020903 | ?? | Sawgrass - Golf & Resort Spa | 8.00 |
| Waldrop | 1020903 | ?? | Twelve | 10.00 |
| Waldrop | 1020903 | ?? | ?? | 5.00 |
| Waldrop | 1021578 | 03/18/13 | Sheraton Suites | 176.70 |
| Waldrop | 1021578 | 04/03/13 | AT&T | 138.09 |
| Dotson | 1021584 | 03/18/13 | Dollar General | 12.07 |
| Dotson | 1021584 | 03/18/13 | Rosetta Stone | 346.68 |
| Dotson | 1021584 | 03/21/13 | Walmart | 51.65 |
| Dotson | 1021584 | 03/26/13 | Bed Bath & Beyond | 48.12 |
| Dotson | 1021584 | 04/20/13 | Verizon | 436.00 |
| Dotson | 1022005 | 03/28/13 | Cellular Sales of North Georgia | 130.17 |
| Dotson | 1022005 | 04/03/13 | ?? | 101.28 |
| Dotson | 1022005 | 04/03/13 | Bo South | 5.44 |
| Dotson | 1022005 | 04/03/13 | Stephanie Dotson | 10.00 |
| Dotson | 1022557 | 04/10/13 | Walmart | 141.53 |
| Dotson | 1022557 | 04/15/13 | Yvonnes Flowers and Gifts | 160.50 |
| Dotson | 1022557 | 04/16/13 | Walmart | 6.26 |
| Waldrop | 1022583 | 04/10/13 | Cheesecake Factory | 137.00 |
| Waldrop | 1022583 | 04/10/13 | Cheesecake Factory | 116.39 |
| Waldrop | 1022583 | 04/17/13 | Mellow Mushroom | 78.00 |
| Dotson | 1022626 | 04/19/13 | Waterford Wedgewood | 6,351.52 |
| Dotson | 1023373 | 04/25/13 | Stephanie Dotson | 120.00 |
| Dotson | 1023373 | 04/29/13 | Bursch Travel | 30.00 |
| Dotson | 1023373 | 04/29/13 | Nature's Table Bistro - Atlanta Airport | 19.21 |
| Dotson | 1023373 | 04/29/13 | Park-N-Ride | 5.00 |
| Dotson | 1023373 | 04/29/13 | Verostar | 75.00 |
| Dotson | 1023373 | 05/02/13 | Delta | 40.00 |
| Dotson | 1023373 | 05/02/13 | Verizon | 167.47 |
| Dotson | 1023373 | ?? | Spa | 14.00 |
| Waldrop | 1024072 | ?? | ?? | 7.00 |
| Dotson | 1024073 | 05/14/13 | TJ Maxx | 55.44 |
| Dotson | 1024073 | 05/16/13 | Paper Princess | 84.16 |
| Dotson | 1024666 | 05/25/13 | Verizon | 337.01 |
| Dotson | 1024666 | 05/30/13 | Summer Beach Resort Lodging | 1,067.93 |
| Dotson | 1024666 | 05/30/13 | Summer Beach Resort Lodging | 1,377.57 |
| Dotson | 1024666 | 05/30/13 | USPS | 21.30 |
| Dotson | 1024666 | 06/03/13 | ?? | 76.10 |
| Dotson | 1024666 | 06/03/13 | ?? | 192.66 |
| Dotson | 1024666 | 06/03/13 | Olive Garden | 19.00 |
| Dotson | 1024666 | 06/04/13 | ?? | 204.06 |
| Dotson | 1024666 | 06/04/13 | ?? | 204.06 |
| Dotson | 1024666 | 06/04/13 | Dairy Queen | 6.28 |
| Dotson | 1024666 | 06/05/13 | ?? | 969.70 |

| Dotson | 1024666 | 06/05/13 | Renaissance | 848.22 |
|--------|---------|----------|-------------|--------|
| Waldrop | 1025264 | 06/08/13 | Peppers Mexican | 41.31 |
| Waldrop | 1025264 | 06/09/13 | Michaels | 57.61 |
| Waldrop | 1025264 | 06/09/13 | Michaels | 4.64 |
| Waldrop | 1025264 | 06/09/13 | TJ Maxx | 82.96 |
| Waldrop | 1025264 | 06/09/13 | Walmart | 245.77 |
| Waldrop | 1025264 | 06/10/13 | ?? | 15.78 |
| Waldrop | 1025264 | 06/10/13 | PeachMac | 32.09 |
| Waldrop | 1025264 | 06/10/13 | Ritz-Carlton | 72.13 |
| Waldrop | 1025264 | 06/10/13 | Tasty's | 46.01 |
| Waldrop | 1025264 | 06/11/13 | Adventure Landing | 212.84 |
| Waldrop | 1025264 | 06/13/13 | CVS | 244.23 |
| Waldrop | 1025264 | 06/13/13 | Great Harvest Bread Co. | 13.36 |
| Waldrop | 1025264 | 06/13/13 | Great Harvest Bread Co. | 11.50 |
| Waldrop | 1025264 | 06/13/13 | Harris Teeter | 21.52 |
| Waldrop | 1025264 | 06/13/13 | Harris Teeter | 2.99 |
| Waldrop | 1025264 | 06/13/13 | Harris Teeter | 20.44 |
| Waldrop | 1025264 | 06/13/13 | Taco Bell | 2.33 |
| Waldrop | 1025264 | 06/14/13 | Parkway Grille | 33.84 |
| Waldrop | 1025264 | 06/17/13 | OPS Pizza Kitchen | 73.79 |
| Waldrop | 1025264 | 06/18/13 | Public House Restaurant | 103.00 |
| Waldrop | 1025264 | ?? | Ritz-Carlton | 19.00 |
| Dotson | 1025266 | 05/24/13 | Red Lobster | 31.00 |
| Dotson | 1025266 | 06/09/13 | Chili's | 41.50 |
| Dotson | 1025266 | 06/09/13 | Walmart | 12.00 |
| Dotson | 1025266 | 06/09/13 | Walmart | 224.41 |
| Dotson | 1025266 | 06/11/13 | Olive Garden | 21.00 |
| Dotson | 1025266 | 06/12/13 | Publix | 25.40 |
| Dotson | 1025266 | 06/13/13 | Bursch Travel | 1,902.60 |
| Dotson | 1025266 | 06/13/13 | Bursch Travel | 889.20 |
| Dotson | 1025266 | 06/13/13 | Chick-fil-a | 11.72 |
| Dotson | 1025266 | 06/13/13 | Joe's 2nd Street Bistro | 2,500.16 |
| Dotson | 1025266 | 06/14/13 | Paulos | 40.00 |
| Dotson | 1025266 | 06/15/13 | Chick-fil-a | 15.94 |
| Dotson | 1025266 | 06/18/13 | Bursch Travel | 1,600.00 |
| Dotson | 1025266 | 06/20/13 | Walmart | 228.52 |
| Waldrop | 1025417 | 06/20/13 | Cheesecake Factory | 69.00 |
| Dotson | 1025607 | 06/24/13 | Office Depot | 45.03 |
| Dotson | 1025607 | 06/25/13 | Verizon | 136.97 |
| Dotson | 1025607 | 06/26/13 | Waterford Wedgewood | 7,906.44 |
| Dotson | 1025607 | 06/28/13 | Bursh Travel | 13,194.91 |
| Dotson | 1025607 | 06/28/13 | The Spiced Apple | 43.00 |
| Dotson | 1025607 | 06/28/13 | USPS | 21.95 |
| Dotson | 1026141 | 07/03/13 | Apple | 100.00 |

| Dotson | 1026141 | 07/03/13 | Bursch Travel | 225.00 |
|---|---|---|---|---|
| Dotson | 1026141 | 07/09/13 | The Filling Station | 25.00 |
| Dotson | 1026141 | 07/10/13 | Amazon | 229.89 |
| Waldrop | 1026156 | 07/08/13 | Marshalls | 2.22 |
| Dotson | 1026452 | 07/17/13 | The UPS Store | 28.12 |
| Dotson | 1026452 | 07/18/13 | The UPS Store | 18.70 |
| Dotson | 1026766 | 07/24/13 | Apple | 19.00 |
| Dotson | 1026766 | 08/08/13 | Verizon | 158.76 |
| Dotson | 1027446 | 08/09/13 | Kmart | 17.29 |
| Dotson | 1027446 | 08/12/13 | Chick-fil-a | 6.22 |
| Waldrop | 1027833 | 09/03/13 | AT&T | 135.47 |
| Dotson | 1027993 | 08/27/11 | Dollar General | 35.75 |
| Dotson | 1027993 | 08/26/13 | Office Depot | 139.46 |
| Dotson | 1027993 | 08/27/13 | Office Depot | 6.36 |
| Dotson | 1027993 | 08/27/13 | The Spiced Apple | 76.00 |
| Dotson | 1027993 | 08/29/13 | Walmart | 100.58 |
| Dotson | 1028194 | 08/08/13 | Hobby Lobby | 48.11 |
| Dotson | 1028194 | 09/03/13 | USPS | 13.97 |
| Dotson | 1028194 | 09/20/13 | Verizon | 157.22 |
| Waldrop | 1028639 | 09/05/13 | AT&T | 31.79 |
| Waldrop | 1028639 | 09/05/13 | Walgreens | 2.69 |
| Waldrop | 1028639 | 09/06/13 | Panera Bread | 4.68 |
| Waldrop | 1028639 | 09/06/13 | Raceway | 1.64 |
| Waldrop | 1028639 | 09/09/13 | ?? | 2.94 |
| Waldrop | 1028639 | 09/11/13 | Walgreens | 2.69 |
| Waldrop | 1028639 | 09/12/13 | Areas USA ATL, LLC | 1.92 |
| Waldrop | 1028639 | ?? | Twelve | 65.00 |
| Waldrop | 1028639 | ?? | Twelve | 70.00 |
| Dotson | 1028643 | 09/04/13 | Hyatt House | 133.63 |
| Dotson | 1028643 | 09/10/13 | Summer Beach Resort Lodging | 1,140.26 |
| Dotson | 1028643 | 09/10/13 | Summer Beach Resort Lodging | 1,306.17 |
| Dotson | 1028643 | 09/10/13 | Walmart | 42.29 |
| Dotson | 1028643 | 09/12/13 | Waterford Wedgewood | 5,876.64 |
| Dotson | 1029244 | 09/19/13 | The UPS Store | 28.87 |
| Dotson | 1029244 | 09/20/13 | Bath & Body Works | 68.69 |
| Dotson | 1029244 | 09/20/13 | Bursch Travel | 1,600.00 |
| Waldrop | 1030328 | 09/26/13 | Sponge Market | 2.15 |
| Waldrop | 1030328 | 10/10/13 | North News Travels Fast | 3.09 |
| Waldrop | 1030328 | ?? | ?? | 37.00 |
| Dotson | 1030872 | 10/02/13 | AAA | 106.00 |
| Dotson | 1030872 | 10/02/13 | Walmart | 30.61 |
| Dotson | 1030872 | 10/03/13 | Amazon | 79.00 |
| Dotson | 1030872 | 10/08/13 | Lowe's | 32.83 |
| Dotson | 1030872 | 10/14/13 | Twelve Hotel | 135.00 |

| | | | | |
|---|---|---|---|---|
| Dotson | 1030872 | 10/18/13 | Lowe's | 107.99 |
| Dotson | 1030872 | 10/20/13 | Verizon | 151.02 |
| Dotson | 1030872 | 10/22/13 | Waterford Wedgewood | 801.36 |
| Dotson | 1030872 | 10/23/13 | Chick-fil-a | 6.09 |
| Waldrop | 1031612 | 10/29/13 | Inmotion Entertainment | 37.43 |
| Waldrop | 1031612 | 10/30/13 | Paradies Shops | 4.93 |
| Waldrop | 1031612 | 10/31/13 | Taxi Cab | 25.00 |
| Waldrop | 1031612 | ?? | ExecuCar | 40.00 |
| Waldrop | 1031612 | ?? | Taxi Cab | 40.00 |
| Waldrop | 1031612 | ?? | Taxi Cab | 15.00 |
| Waldrop | 1031612 | ?? | Taxi Cab | 35.00 |
| Dotson | 1031629 | 10/25/13 | Edna's Restaurant | 28.00 |
| Dotson | 1031629 | 10/25/13 | Verizon | 153.14 |
| Dotson | 1031629 | 11/01/13 | USPS | 14.97 |
| Dotson | 1031629 | 11/04/13 | Lowe's | 32.89 |
| Waldrop | 1032504 | 11/10/13 | Hobby Lobby | 52.32 |
| Waldrop | 1032504 | 11/12/13 | Rays on the Creek | 92.00 |
| Waldrop | 1032504 | 11/14/13 | Brookstone | 181.88 |
| Waldrop | 1032504 | 11/14/13 | Tailwind CHA | 2.75 |
| Waldrop | 1032504 | 11/15/13 | Hyatt | 9.18 |
| Waldrop | 1032504 | 11/17/13 | Areas USA ATL, LLC | 8.43 |
| Waldrop | 1032504 | 11/20/13 | Inmotion Entertainment | 16.04 |
| Waldrop | 1032504 | 12/03/13 | AT&T | 124.90 |
| Dotson | 1032505 | 11/07/13 | The UPS Store | 38.51 |
| Dotson | 1032505 | 11/10/13 | Lynn's Hallmark | 11.15 |
| Dotson | 1032505 | 11/14/13 | Hobby Lobby | 75.99 |
| Dotson | 1032505 | 11/18/13 | Starbucks | 8.70 |
| Dotson | 1032505 | 11/18/13 | Vinny's on Windward | 379.74 |
| Dotson | 1032505 | 11/20/13 | Starbucks | 4.86 |
| Dotson | 1032505 | 11/20/13 | The Pecan | 26.70 |
| Dotson | 1032505 | 11/23/13 | Taco Bell | 6.59 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 187.54 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 211.71 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 92.77 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 92.77 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 104.11 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 92.49 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 107.96 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 104.11 |
| Dotson | 1032505 | 11/25/13 | Kermit's Key West Key Lime Shoppe | 104.11 |
| Dotson | 1032505 | 11/26/13 | Lowe's | 38.00 |
| Dotson | 1032505 | 11/26/13 | The UPS Store | 92.48 |
| Dotson | 1033830 | 11/25/13 | Verizon | 296.06 |
| Dotson | 1033830 | 12/09/13 | Hobby Lobby | 37.03 |

| | | | | |
|---|---|---|---|---|
| Dotson | 1033830 | 12/10/13 | The UPS Store | 42.92 |
| Dotson | 1033830 | 12/12/13 | Bath & Body Works | 69.96 |
| Dotson | 1033830 | 12/12/13 | Lynn's Hallmark | 6.43 |
| Dotson | 1033830 | 12/12/13 | Walmart | 188.44 |
| Dotson | 1033830 | 12/16/13 | Curt's Restaurant | 15.59 |
| Dotson | 1033830 | 12/18/13 | The UPS Store | 97.60 |
| Dotson | 1033830 | 12/20/13 | Walmart | 8.53 |
| Waldrop | 1033844 | 11/13/13 | AT&T | 25.43 |
| Waldrop | 1033844 | 12/06/13 | The Spiced Apple | 30.08 |
| Waldrop | 1033844 | 12/09/13 | Vinnys on Windward | 915.00 |
| Waldrop | 1034814 | ?? | Twelve | 12.00 |
| Dotson | 1034831 | 12/23/13 | Dollar General | 37.08 |
| Dotson | 1034831 | 12/23/13 | The Spiced Apple | 60.00 |
| Dotson | 1034831 | 12/25/13 | Verizon | 150.88 |
| Dotson | 1034831 | 01/03/14 | Bowman's Restaurant | 33.06 |
| Dotson | 1034831 | 01/07/14 | Office Depot | 239.70 |
| Dotson | 1034831 | 01/07/14 | The Pool Place | 19.12 |
| Dotson | 1034831 | 01/07/14 | The Pool Place | 179.16 |
| Dotson | 1034831 | 01/09/14 | Dollar General | 45.58 |
| Dotson | 1034831 | 01/10/14 | USPS | 61.05 |
| Dotson | 1034831 | 01/15/14 | Sonic | 1.99 |
| Dotson | 1034831 | 01/16/14 | Chick-fil-a | 4.77 |
| Dotson | 1034831 | 01/16/14 | The Spiced Apple | 60.00 |
| Dotson | 1034831 | 01/16/14 | Walmart | 31.99 |
| Dotson | 1034831 | 02/20/14 | Buddakan NY LP | 982.82 |
| Waldrop | 1035490 | 02/03/14 | AT&T | 11.96 |
| Dotson | 1036028 | 01/25/14 | Verizon | 144.78 |
| Dotson | 1036028 | 02/04/14 | Walmart | 73.28 |
| Waldrop | 1036426 | 02/15/14 | AT&T | 486.16 |
| Waldrop | 1037001 | 02/20/14 | DuaneReade | 8.91 |
| Waldrop | 1037001 | 02/21/14 | Cosmic Diner | 65.00 |
| Waldrop | 1037001 | 02/22/14 | Prime Tavern | 103.00 |
| Waldrop | 1037001 | 02/25/14 | Hyatt | 131.10 |
| Waldrop | 1037001 | 02/28/14 | Starbucks | 5.49 |
| Waldrop | 1037001 | 03/03/14 | AT&T | 144.83 |
| Waldrop | 1037001 | ?? | Taxi | 24.00 |
| Waldrop | 1037001 | ?? | TaxiPass | 160.00 |
| Dotson | 1037003 | 02/19/14 | Starbucks | 5.72 |
| Dotson | 1037003 | 02/20/14 | Starbucks | 9.47 |
| Dotson | 1037003 | 02/27/14 | The UPS Store | 53.90 |
| Waldrop | 1038466 | 03/06/14 | Hyatt | 131.10 |
| Waldrop | 1038466 | 03/10/14 | Maggianos | 63.00 |
| Waldrop | 1038466 | 03/14/14 | Hyatt | 131.10 |
| Waldrop | 1038466 | ?? | ?? | 21.00 |

| | | | | |
|---|---|---|---|---|
| Waldrop | 1038466 | ?? | ?? | 10.00 |
| Waldrop | 1038466 | ?? | ?? | 7.00 |
| Dotson | 1038471 | 02/25/14 | Verizon | 144.76 |
| Dotson | 1038471 | 02/28/14 | Dollar General | 54.71 |
| Dotson | 1038471 | 03/04/14 | Verizon | 111.27 |
| Dotson | 1038471 | 03/16/14 | ?? | 18.15 |
| Dotson | 1038471 | 03/16/14 | Starbucks | 5.51 |
| Dotson | 1039865 | 03/25/14 | Verizon | 152.09 |
| Dotson | 1039865 | 03/26/14 | USPS | 14.23 |
| Dotson | 1039865 | 03/28/14 | AT&T | 74.20 |
| Dotson | 1039865 | 04/01/14 | Kmart | 191.59 |
| Dotson | 1039865 | 04/01/14 | Kroger | 46.46 |
| Dotson | 1039865 | 04/03/14 | Walmart | 17.29 |
| Dotson | 1039865 | 04/07/14 | Dollar General | 4.24 |
| Dotson | 1039865 | 04/07/14 | TJ Maxx | 63.53 |
| Dotson | 1039865 | 04/09/14 | Bugs & Kisses | 125.06 |
| Dotson | 1039865 | 04/16/14 | Donut Palace | 19.90 |
| Dotson | 1039865 | 04/16/14 | The Spiced Apple | 62.00 |
| Waldrop | 1039867 | 03/31/14 | Crochet Creations | 163.20 |
| Waldrop | 1039867 | 04/03/14 | The Spiced Apple | 20.17 |
| Waldrop | 1039867 | 04/13/14 | Friendly Gus | 7.06 |
| Waldrop | 1040607 | 04/28/14 | ?? | 16.95 |
| Waldrop | 1040607 | 04/28/14 | Hardee's | 68.85 |
| Waldrop | 1040607 | 04/30/14 | Glenn Curtis | 19.08 |
| Waldrop | 1040607 | 04/30/14 | Ridgewood | 547.06 |
| Waldrop | 1040607 | 04/30/14 | Wood Dale | 115.10 |
| Waldrop | 1040607 | 05/01/14 | Los Reves Mexican | 28.00 |
| Waldrop | 1040607 | 05/03/14 | AT&T | 139.89 |
| Dotson | 1041146 | 04/28/14 | Lowe's | 49.14 |
| Dotson | 1041146 | 04/29/14 | Dollar General | 38.33 |
| Dotson | 1041146 | 04/29/14 | Dollar General | 37.52 |
| Dotson | 1041146 | 04/29/14 | Office Depot | 154.01 |
| Dotson | 1041146 | 05/01/14 | Lowe's | 37.08 |
| Dotson | 1041146 | 05/01/14 | Then Meander Shoppe | 138.33 |
| Dotson | 1041146 | 05/07/14 | ?? | 220.00 |
| Dotson | 1041146 | ?? | Dollar General | 3.18 |
| Dotson | 1041147 | 04/25/14 | Verizon | 148.44 |
| Dotson | 1041147 | 04/29/14 | Gondolier Pizza | 31.00 |
| Dotson | 1041147 | 04/30/14 | Fuki Steak House | 26.88 |
| Dotson | 1041147 | 05/01/14 | The UPS Store | 67.11 |
| Dotson | 1041147 | 05/02/14 | Gondolier Pizza | 22.00 |
| Dotson | 1041147 | 05/05/14 | Waterford Wedgewood | 5,565.60 |
| Dotson | 1041147 | 05/07/14 | Bath & Body Works | 64.30 |
| Dotson | 1041147 | ?? | Hallmark | 38.11 |

| Waldrop | 1041420 | 04/19/14 | Communications Electronics | 31.79 |
|---------|---------|----------|----------------------------|-------|
| Waldrop | 1041420 | 05/05/14 | Chevron | 1.23 |
| Waldrop | 1041420 | 05/06/14 | Brogens | 107.00 |
| Waldrop | 1041420 | 05/07/14 | Shell | 0.82 |
| Waldrop | 1041420 | 05/12/14 | Citgo | 15.50 |
| Dotson | 1041421 | 05/13/14 | Mapco | 70.47 |
| Dotson | 1041421 | 05/14/14 | All Seasons Self Storage | 204.03 |
| Dotson | 1041421 | 05/14/14 | All Seasons Self Storage | 50.81 |
| Dotson | 1041421 | 05/15/14 | All Seasons Self Storage | 280.00 |
| Dotson | 1042189 | 05/05/14 | Summer Beachresort | 2,134.29 |
| Dotson | 1042189 | 05/16/14 | Lynn's Hallmark | 23.30 |
| Dotson | 1042189 | 05/20/14 | LongHorn | 36.50 |
| Dotson | 1042189 | 05/20/14 | Lowe's | 138.76 |
| Dotson | 1042189 | 05/20/14 | Waterford Wedgewood | 48.15 |
| Dotson | 1042189 | 05/20/14 | Waterford Wedgewood | 32.10 |
| Dotson | 1042189 | 05/22/14 | ?? | 25.86 |
| Dotson | 1042189 | 05/22/14 | Lowe's | 33.46 |
| Dotson | 1042189 | 05/25/14 | Verizon | 156.71 |
| Dotson | 1042189 | 05/28/14 | Summer Beachresort | 1,658.97 |
| Dotson | 1042189 | 05/28/14 | Summer Beachresort | 1,140.26 |
| Dotson | 1042189 | 05/29/14 | Lowe's | 4.18 |
| Dotson | 1042189 | 05/29/14 | The UPS Store | 34.97 |
| Waldrop | 1042609 | 05/22/14 | Subway | 24.88 |
| Waldrop | 1042609 | 05/29/14 | 138 Market Street | 154.00 |
| Waldrop | 1042609 | 05/29/14 | Republic Parking System | -5.00 |
| Waldrop | 1042609 | 06/02/14 | Hyatt | 133.49 |
| Waldrop | 1042609 | 06/03/14 | AT&T | 143.58 |
| Waldrop | 1043381 | 05/22/14 | Marshalls | 175.77 |
| Waldrop | 1043381 | 06/02/14 | Jo-Ann | 61.10 |
| Waldrop | 1043381 | 06/02/14 | TJ Maxx | 81.28 |
| Waldrop | 1043381 | 06/03/14 | HomeGoods | 220.73 |
| Waldrop | 1043381 | 06/05/14 | Cheesecake Factory | 25.00 |
| Waldrop | 1043381 | 06/05/14 | Hyatt | 148.54 |
| Waldrop | 1043381 | 06/06/14 | Hyatt | 131.10 |
| Waldrop | 1043381 | 06/10/14 | Cheesecake Factory | 25.00 |
| Waldrop | 1043381 | 06/10/14 | Hyatt | 362.52 |
| Waldrop | 1043381 | 06/10/14 | Wadsworth | 72.76 |
| Waldrop | 1043381 | 06/11/14 | Marshalls | 59.89 |
| Waldrop | 1043381 | 06/11/14 | Publix | 187.40 |
| Waldrop | 1043381 | 06/12/14 | Harbor Wear | 11.77 |
| Waldrop | 1043381 | 06/17/14 | Cracker Barrel | 6.79 |
| Waldrop | 1043381 | 06/17/14 | Hyatt | 182.06 |
| Waldrop | 1043381 | 06/18/14 | Cheesecake Factory | 83.00 |
| Waldrop | 1043381 | 06/25/14 | TJ Maxx | 35.26 |

| | | | | |
|---|---|---|---|---|
| Dotson | 1043384 | 05/30/14 | Office Depot | 16.96 |
| Dotson | 1043384 | 06/03/14 | The UPS Store | 23.58 |
| Dotson | 1043384 | 06/03/14 | Walmart | 33.55 |
| Dotson | 1043384 | 06/07/14 | Walmart | 395.96 |
| Dotson | 1043384 | 06/08/14 | Ritz-Carlton | 30.00 |
| Dotson | 1043384 | 06/12/14 | Joe's 2nd Street Bistro | 2,204.00 |
| Dotson | 1043384 | 06/12/14 | Ritz-Carlton | 30.00 |
| Dotson | 1043384 | 06/13/14 | Harris Teeter | 2.35 |
| Dotson | 1043384 | 06/17/14 | Family Dollar | 12.46 |
| Dotson | 1043384 | 06/18/14 | Bursch Travel | 2,028.00 |
| Dotson | 1043384 | 06/18/14 | Bursch Travel | 2,800.00 |
| Dotson | 1043384 | 06/19/14 | Delta | 339.00 |
| Dotson | 1043384 | ?? | Financial Mgmt Conference | 850.00 |
| Waldrop | 1043843 | 06/20/14 | HomeGoods | 13.07 |
| Waldrop | 1043843 | 06/25/14 | Chick-fil-A | 1.70 |
| Waldrop | 1043843 | 07/03/14 | AT&T | 139.39 |
| Dotson | 1044198 | 06/19/14 | The Spiced Apple | 25.00 |
| Dotson | 1044198 | 06/20/14 | Panera Bread | 12.05 |
| Dotson | 1044198 | 06/20/14 | The Spiced Apple | 33.00 |
| Dotson | 1044198 | 06/23/14 | The Spiced Apple | 36.78 |
| Dotson | 1044198 | 06/24/14 | Walmart | 210.76 |
| Dotson | 1044198 | 06/25/14 | Hyatt House | 224.72 |
| Dotson | 1044198 | 06/25/14 | Verizon | 150.51 |
| Dotson | 1044198 | 06/26/14 | Apple | 100.00 |
| Dotson | 1044198 | 06/26/14 | Dollar General | 16.92 |
| Dotson | 1044198 | 06/26/14 | S Store | 60.33 |
| Dotson | 1044198 | 06/27/14 | USPS | 7.05 |
| Dotson | 1044198 | 06/27/14 | Walmart | 66.94 |
| Dotson | 1044198 | 06/28/14 | Bursch Travel | 12,213.87 |
| Dotson | 1044198 | 06/28/14 | Bursch Travel | 225.00 |
| Dotson | 1044198 | 06/29/14 | DCL Cruise Reservation | 2,112.64 |
| Dotson | 1044198 | 06/30/14 | Bursch Travel | 1,921.50 |
| Dotson | 1044198 | 06/30/14 | Bursch Travel | 50.00 |
| Dotson | 1044198 | 06/30/14 | Bursch Travel | 50.00 |
| Dotson | 1044198 | 09/10/14 | Super Shuttle | 70.00 |
| Dotson | 1044198 | 09/10/14 | Super Shuttle | 70.00 |
| Dotson | 1044198 | 09/11/14 | Super Shuttle | 114.00 |
| Dotson | 1044198 | 09/15/14 | Super Shuttle | 70.00 |
| Waldrop | 1044933 | 07/12/14 | Diuark Bistro | 80.00 |
| Waldrop | 1044933 | 07/12/14 | Old Jesualem | 84.00 |
| Waldrop | 1044933 | 07/13/14 | Spiaggia | 2,087.53 |
| Waldrop | 1044933 | 07/13/14 | Spiaggia | -747.93 |
| Waldrop | 1044933 | 07/14/14 | Old Jesualem | 80.00 |
| Waldrop | 1044933 | 07/14/14 | Quartino | 86.00 |

| | | | | |
|---|---|---|---|---|
| Waldrop | 1044933 | 07/15/14 | Atlanta Bread | 72.00 |
| Waldrop | 1044933 | 07/15/14 | Paradies Shops | 2.96 |
| Dotson | 1045672 | 07/07/14 | The UPS Store | 27.07 |
| Dotson | 1045672 | 07/08/14 | Walmart | 61.09 |
| Dotson | 1045672 | 07/15/14 | Walmart | 19.41 |
| Dotson | 1045672 | 07/16/14 | The Cheesecake Factory | 171.00 |
| Dotson | 1045672 | 07/17/14 | Hyatt House | 181.26 |
| Dotson | 1045672 | 07/17/14 | Hyatt House | 299.98 |
| Dotson | 1045672 | 07/17/14 | Jason's Deli | 93.62 |
| Dotson | 1045672 | 07/23/14 | LongHorn | 48.00 |
| Dotson | 1045672 | 07/23/14 | Waterford Wedgewood | 1,985.60 |
| Dotson | 1045672 | 07/23/14 | Waterford Wedgewood | 54.57 |
| Dotson | 1045672 | 07/25/14 | Verizon | 154.62 |
| Dotson | 1045672 | 07/30/14 | Harry & David | 657.99 |
| Dotson | 1045672 | 07/30/14 | Kangaroo Express | 10.29 |
| Dotson | 1045672 | ?? | Financial Mgmt Conference | 900.00 |
| Dotson | 1045672 | ?? | NAHC | 800.00 |
| Dotson | 1046531 | 08/05/14 | Hobby Lobby | 59.88 |
| Dotson | 1046531 | 08/05/14 | Office Depot | 432.03 |
| Dotson | 1046531 | 08/05/14 | The UPS Store | 40.04 |
| Dotson | 1046531 | 08/06/14 | Amazon | 53.50 |
| Dotson | 1046531 | 08/06/14 | Hyatt House | 171.10 |
| Dotson | 1046531 | ?? | Payless Wireless | 101.98 |
| Waldrop | 1046717 | 08/13/14 | Hyatt | 135.61 |
| Waldrop | 1046717 | 08/13/14 | Shells | 2.14 |
| Dotson | 1047017 | 08/14/14 | Lowe's | 52.28 |
| Dotson | 1047017 | 08/15/14 | Home Depot | 305.27 |
| Dotson | 1047017 | 08/20/14 | Chick-fil-a | 7.04 |
| Dotson | 1047017 | 08/20/14 | Chick-fil-a | 7.61 |
| Waldrop | 1047040 | 09/03/14 | AT&T | 593.32 |
| Dotson | 1047297 | 08/20/14 | Hyatt House | 256.52 |
| Dotson | 1047297 | 08/26/14 | Office Depot | 67.27 |
| Dotson | 1047297 | 08/27/14 | Amazon | 884.53 |
| Dotson | 1047297 | 08/28/14 | Walmart | 88.29 |
| Dotson | 1048464 | 08/25/14 | Verizon | 146.32 |
| Dotson | 1048464 | 08/29/14 | The UPS Store | 45.87 |
| Dotson | 1048464 | 09/03/14 | Union Recorder | 286.25 |
| Dotson | 1048464 | 09/04/14 | Office Depot | 188.18 |
| Dotson | 1048464 | 09/04/14 | Walmart | 33.29 |
| Dotson | 1048464 | 09/06/14 | Dublin Courier Herald | 259.75 |
| Dotson | 1048464 | 09/08/14 | Office Depot | 69.82 |
| Dotson | 1048464 | 09/10/14 | Delta | 50.00 |
| Dotson | 1048464 | 09/10/14 | Delta | 35.00 |
| Dotson | 1048464 | 09/10/14 | Hilton Hotels & Resorts | 260.18 |

| | | | | |
|---|---|---|---|---|
| Dotson | 1048464 | 09/10/14 | Prime 112 | 1,048.00 |
| Dotson | 1048464 | 09/10/14 | Willy's Mexicana Grill | 10.18 |
| Dotson | 1048464 | 09/13/14 | Royal Caribbean International - Chops Grille | 382.66 |
| Dotson | 1048464 | 09/15/14 | LongHorn | 22.00 |
| Dotson | 1048464 | 09/15/14 | Starbucks | 6.00 |
| Dotson | 1048464 | 09/15/14 | Super Shuttle | 80.00 |
| Dotson | 1048464 | ?? | Central Cab | 12.00 |
| Dotson | 1048464 | ?? | Yellow Cab | 18.00 |
| Waldrop | 1049002 | 09/23/14 | Golden Pantry | 2.77 |
| Waldrop | 1049002 | 10/03/14 | AT&T | 162.43 |
| Dotson | 1049318 | 09/19/14 | USPS | 5.95 |
| Dotson | 1049318 | 09/23/14 | Hyatt House | 262.20 |
| Dotson | 1049318 | 09/23/14 | Hyatt House | 142.50 |
| Dotson | 1049318 | 09/23/14 | Hyatt House | 142.50 |
| Dotson | 1049318 | 09/24/14 | Hyatt House | 551.81 |
| Dotson | 1049318 | 09/25/14 | Verizon | 170.15 |
| Dotson | 1049318 | 10/01/14 | Kmart | 69.45 |
| Waldrop | 1049790 | 10/05/14 | King Cab | 35.00 |
| Waldrop | 1049790 | 10/05/14 | Tailwind CHA | 5.63 |
| Waldrop | 1049790 | 10/06/14 | ?? | 13.13 |
| Waldrop | 1049790 | 10/06/14 | Banquets | 3.00 |
| Waldrop | 1049790 | 10/06/14 | Taxi Cab | 33.00 |
| Waldrop | 1049790 | 10/06/14 | Taxi Cab | 40.00 |
| Waldrop | 1049790 | 10/06/14 | Travel Traders | 6.28 |
| Waldrop | 1049790 | 10/07/14 | Areas USA ATL, LLC | 4.65 |
| Waldrop | 1049790 | 10/07/14 | Qdoba | 2.42 |
| Waldrop | 1049790 | 10/07/14 | Taxi Cab | 30.00 |
| Waldrop | 1049790 | 10/07/14 | Taxi Cab | 35.00 |
| Waldrop | 1049790 | 10/07/14 | Taxi Cab | 22.00 |
| Dotson | 1049791 | 10/03/14 | Amazon | 99.00 |
| Dotson | 1049791 | 10/08/14 | The Atlanta Journal Constitution | 1,752.00 |
| Dotson | 1049791 | 10/09/14 | Walmart | 174.11 |
| Dotson | 1049791 | 10/04/15 | Belks | 209.91 |
| Waldrop | 1050609 | 10/15/14 | Resaca | 2.02 |
| Waldrop | 1050609 | 10/18/14 | Hyatt | 141.17 |
| Waldrop | 1050609 | 11/03/14 | AT&T | 164.62 |
| Dotson | 1050611 | 10/10/14 | ?? | 27.90 |
| Dotson | 1050611 | 10/13/14 | Los Reves Mexican Restaurant | 29.00 |
| Dotson | 1050611 | 10/13/14 | Office Depot | 124.88 |
| Dotson | 1050611 | 10/13/14 | The UPS Store | 27.66 |
| Dotson | 1050611 | 10/15/14 | Bassett Furniture | 1,980.70 |
| Dotson | 1050611 | 10/15/14 | Keurig | 34.66 |
| Dotson | 1050611 | 10/16/14 | Jason's Deli | 76.47 |

| Dotson | 1050611 | 10/22/14 | The UPS Store | 23.16 |
|---|---|---|---|---|
| Dotson | 1050611 | 10/22/14 | The UPS Store | 25.10 |
| Dotson | 1050616 | 10/23/14 | Nathan Greene | 1,576.19 |
| Dotson | 1050918 | 10/25/14 | Verizon | 118.79 |
| Dotson | 1050918 | 10/28/14 | The Chop Shop | 20.29 |
| Dotson | 1050918 | 10/28/14 | The UPS Store | 44.31 |
| Dotson | 1050918 | 10/29/14 | ?? | 39.06 |
| Dotson | 1050918 | 10/28/17 | Bi-Lo | 36.67 |
| Dotson | 1050918 | 10/01/14 | Office Depot | 55.26 |
| Dotson | 1051516 | 11/04/14 | LongHorn | 33.13 |
| Dotson | 1051516 | 11/05/14 | Edible Arrangements | 89.65 |
| Dotson | 1051516 | 11/05/14 | Gallery Collection | 300.44 |
| Dotson | 1051516 | 11/06/14 | Walmart | 49.00 |
| Dotson | 1051516 | 11/06/14 | Walmart | 91.50 |
| Dotson | 1051813 | 11/04/14 | Hyatt House | 265.00 |
| Dotson | 1051813 | 11/07/14 | GA Assoc of Healthcare Executives | 55.00 |
| Waldrop | 1052361 | 11/10/14 | McDonalds | 1.07 |
| Waldrop | 1052361 | 11/11/14 | Cheesecake Factory | 59.00 |
| Waldrop | 1052361 | 11/12/14 | Cheesecake Factory | 101.00 |
| Waldrop | 1052361 | 11/14/14 | AAA Parking | 13.00 |
| Waldrop | 1052361 | 11/16/14 | Walmart | 15.07 |
| Waldrop | 1052361 | 12/03/14 | AT&T | 150.50 |
| Waldrop | 1052361 | ?? | AAA Parking | 15.00 |
| Dotson | 1052367 | 11/14/14 | Walmart | 22.90 |
| Dotson | 1052367 | 11/19/14 | The UPS Store | 18.49 |
| Dotson | 1052367 | 11/20/14 | AAA | 100.00 |
| Dotson | 1052367 | 11/20/14 | Walmart | 37.99 |
| Dotson | 1053390 | 12/01/14 | Jo-Ann | 19.07 |
| Dotson | 1053390 | 12/02/14 | Cochran Furniture, Inc. | 1,072.62 |
| Dotson | 1053390 | 12/03/14 | Office Depot | 135.82 |
| Dotson | 1053390 | 12/04/14 | TJ Maxx | 42.34 |
| Dotson | 1053390 | 12/09/14 | Bath & Body Works | 89.04 |
| Dotson | 1053390 | 12/09/14 | The UPS Store | 110.77 |
| Dotson | 1053390 | 12/09/14 | Walmart | 138.14 |
| Dotson | 1053390 | 12/20/14 | Verizon | 97.45 |
| Waldrop | 1053472 | 12/02/14 | HomeGoods | 79.62 |
| Waldrop | 1053472 | 12/02/14 | The Spiced Apple | 33.95 |
| Waldrop | 1053472 | 12/03/14 | Hyatt | 131.10 |
| Waldrop | 1053472 | 12/05/14 | Gift Shop | 2.50 |
| Waldrop | 1053472 | 12/05/14 | Tequileria | 3.45 |
| Waldrop | 1053472 | 12/10/14 | Cheesecake Factory | 59.00 |
| Waldrop | 1053472 | ?? | ?? | 10.00 |
| Waldrop | 1053472 | ?? | Ritz-Carlton | 25.00 |
| Waldrop | 1053472 | ?? | Transtyle | 65.00 |

| | | | | |
|---|---|---|---|---|
| Dotson | 1053756 | 12/10/14 | Hyatt House | 285.69 |
| Dotson | 1053756 | 12/11/14 | Hyatt House | 131.10 |
| Dotson | 1053756 | 12/11/14 | Hyatt House | 131.10 |
| Dotson | 1053756 | 12/11/14 | Hyatt House | 131.10 |
| Dotson | 1053756 | 12/12/14 | Hyatt House | 265.00 |
| Dotson | 1053756 | 12/16/14 | Harry & David | 234.30 |
| Dotson | 1053756 | 12/16/14 | Harry & David | 145.51 |
| Dotson | 1053756 | 12/17/14 | Lynn's Hallmark | 14.80 |
| Dotson | 1053756 | 12/17/14 | The UPS Store | 28.32 |
| Dotson | 1053756 | 12/18/14 | Hyatt House | 40.00 |
| Dotson | 1053955 | 12/19/14 | Delta | 311.20 |
| Dotson | 1054043 | 12/02/14 | Walmart | 373.21 |
| Dotson | 1054288 | 01/20/14 | Verizon | 97.98 |
| Dotson | 1054288 | 12/19/14 | Hyatt House | 278.53 |
| Dotson | 1054288 | 12/29/14 | Hobby Lobby | 368.12 |
| Dotson | 1054288 | 12/30/14 | Delta | 320.20 |
| Waldrop | 1054911 | 12/16/14 | Krystals | 1.69 |
| Waldrop | 1054911 | 01/03/15 | AT&T | 154.62 |
| Waldrop | 1054911 | 01/04/15 | TJ Maxx | 8.72 |
| Waldrop | 1054911 | 01/06/15 | Cheesecake Factory | 29.00 |
| Waldrop | 1054911 | 01/06/15 | Hyatt | 11.07 |
| Waldrop | 1054911 | 01/07/15 | Hyatt | 142.08 |
| Waldrop | 1055320 | 01/13/15 | JetSet Market | 10.85 |
| Waldrop | 1055320 | 01/13/15 | Paschals | 15.64 |
| Waldrop | 1055320 | 01/15/15 | Hyatt | 134.10 |
| Dotson | 1055865 | 01/07/15 | Amazon | 64.90 |
| Dotson | 1055865 | 01/07/15 | Delta | 214.00 |
| Dotson | 1055865 | 01/08/15 | Panera Bread | 35.79 |
| Dotson | 1055865 | 01/08/15 | The UPS Store | 20.58 |
| Dotson | 1055865 | 01/15/15 | Kmart | 9.52 |
| Dotson | 1055865 | 01/19/15 | Marlow's Tavern | 36.00 |
| Dotson | 1055865 | 01/20/15 | Hyatt House | 142.08 |
| Dotson | 1055865 | 01/20/15 | Hyatt House | 4.77 |
| Dotson | 1055865 | 01/20/15 | LongHorn | 22.01 |
| Dotson | 1055865 | 01/21/15 | Verizon | 5.79 |
| Dotson | 1055865 | 01/23/15 | Verizon | 103.31 |
| Dotson | 1055865 | 01/26/15 | Cochran Furniture, Inc. | 2,352.34 |
| Dotson | 1055865 | 01/27/15 | Hobby Lobby | 76.41 |
| Dotson | 1055865 | 01/28/15 | Vicki Batten | 2,703.00 |
| Dotson | 1055865 | 01/29/15 | Two Sisters and Jane, Inc. | 2,425.67 |
| Waldrop | 1055866 | 02/03/15 | AT&T | 156.82 |
| Waldrop | 1056515 | 02/03/15 | Office Max | 152.93 |
| Dotson | 1057081 | 02/04/15 | FedEx | 13.85 |
| Dotson | 1057081 | 02/11/15 | Hobby Lobby | 74.73 |

| Dotson | 1057081 | 02/19/15 | Ingles | 66.65 |
| Dotson | 1057081 | 02/19/15 | Starkey Printing Co. | 556.53 |
| Dotson | 1057081 | 02/19/15 | Walmart | 156.84 |
| Dotson | 1057081 | 02/20/15 | Verizon | 113.84 |
| Dotson | 1057423 | 02/24/15 | Walmart | 9.43 |
| Waldrop | 1057424 | 02/12/15 | AT&T | 130.64 |
| Waldrop | 1057424 | 03/03/15 | AT&T | 161.34 |
| Waldrop | 1057424 | ?? | ?? | 15.00 |
| Waldrop | 1057424 | ?? | ?? | 30.00 |
| Waldrop | 1057424 | ?? | ?? | 40.00 |
| Dotson | 1058812 | 02/25/15 | ?? | 32.12 |
| Dotson | 1058812 | 02/25/15 | Verizon | 556.04 |
| Dotson | 1058812 | 03/02/15 | FedEx | 84.80 |
| Dotson | 1058812 | 03/02/15 | The Spiced Apple | 35.00 |
| Dotson | 1058812 | 03/03/15 | Walmart | 73.01 |
| Dotson | 1058812 | 03/04/15 | The Spiced Apple | 29.00 |
| Dotson | 1058812 | 03/04/15 | Two Sisters and Jane, Inc. | 2,425.67 |
| Dotson | 1058812 | 03/06/15 | Two Sisters and Jane, Inc. | 1,840.16 |
| Dotson | 1058812 | 03/11/15 | Kohl's | 31.31 |
| Dotson | 1058812 | 03/11/15 | Walmart | 77.40 |
| Dotson | 1058812 | 03/11/15 | Walmart | 16.60 |
| Dotson | 1058812 | 03/12/15 | The Spiced Apple | 110.00 |
| Dotson | 1058812 | 03/16/15 | Office Depot | 238.00 |
| Dotson | 1058812 | 03/17/15 | Dollar General | 20.75 |
| Dotson | 1058812 | 03/17/15 | TJ Maxx | 13.22 |
| Dotson | 1058812 | 03/18/15 | Donut Palace | 32.80 |
| Dotson | 1058812 | 03/18/15 | Ingles | 10.29 |
| Dotson | 1058812 | 03/18/15 | The Spiced Apple | 81.00 |
| Waldrop | 1059172 | 02/20/15 | Hobby Lobby | 38.59 |
| Waldrop | 1059172 | 02/20/15 | Lowes | 61.09 |
| Waldrop | 1059172 | ?? | AT&T | 302.91 |
| Dotson | 1059230 | 03/19/15 | Lowe's | 61.52 |
| Dotson | 1059230 | 03/19/15 | Office Depot | 5.29 |
| Dotson | 1059230 | 03/25/15 | Jaymie Salley | 3,214.00 |
| Waldrop | 1060369 | 03/15/15 | Bed, Bath & Beyond | 17.46 |
| Waldrop | 1060369 | 04/07/15 | Walgreens | 5.60 |
| Waldrop | 1060369 | 04/08/15 | Walgreens | 18.36 |
| Waldrop | 1060369 | 04/09/15 | Henry's Louisiana Grill | 131.05 |
| Dotson | 1060370 | 03/25/15 | Verizon | 106.04 |
| Dotson | 1060370 | 03/27/15 | Lowe's | 19.02 |
| Dotson | 1060370 | 03/31/15 | Bath & Body Works | 40.28 |
| Dotson | 1060370 | 04/03/15 | The Spiced Apple | 25.00 |
| Dotson | 1060370 | 04/03/15 | Walmart | 51.53 |
| Dotson | 1060444 | 04/15/15 | Harry & David | 215.24 |

| Dotson | 1060444 | 04/17/15 | Ingles | 26.06 |
|---|---|---|---|---|
| Dotson | 1060856 | 04/17/15 | FedEx | 32.88 |
| Dotson | 1060856 | 04/20/15 | Ingles | 5.33 |
| Dotson | 1060856 | 04/21/15 | Verizon | 63.58 |
| Waldrop | 1061977 | 05/05/15 | Hyatt | 170.58 |
| Waldrop | 1062181 | 05/13/15 | ?? | 1.52 |
| Dotson | 1062671 | 04/25/15 | Verizon | 107.65 |
| Dotson | 1062671 | 04/29/15 | Walmart | 113.86 |
| Dotson | 1062671 | 05/05/15 | Bath & Body Works | 53.53 |
| Dotson | 1062671 | 05/06/15 | Lynn's Hallmark | 25.33 |
| Dotson | 1062671 | 05/13/15 | TLF Lawrence Mayer | 64.15 |
| Dotson | 1062671 | 05/16/15 | Dollar General | 11.66 |
| Dotson | 1062671 | 05/19/15 | FedEx | 44.13 |
| Waldrop | 1062959 | 05/25/15 | RaceTrac | 4.24 |
| Waldrop | 1062959 | 05/26/15 | QuikTrip | 2.58 |
| Waldrop | 1062959 | 06/03/15 | AT&T | 170.48 |
| Dotson | 1062971 | 05/26/15 | Dollar General | 19.33 |
| Dotson | 1062971 | 05/28/15 | Lawrence Mayer Florist | 88.71 |
| Dotson | 1062971 | 05/28/15 | The Flower Mart | 105.94 |
| Waldrop | 1063877 | 06/03/15 | Michaels | 13.08 |
| Waldrop | 1063877 | 06/04/15 | Jo-Ann | 2.28 |
| Waldrop | 1063877 | 06/07/15 | HomeGoods | 110.28 |
| Dotson | 1063930 | 02/19/15 | Hobby Lobby | 27.64 |
| Dotson | 1063930 | 06/01/15 | Walmart | 5.10 |
| Dotson | 1063930 | 06/03/15 | Bi-Lo | 41.71 |
| Dotson | 1063930 | 06/05/15 | Florist at Windward | 70.71 |
| Dotson | 1063930 | 06/05/15 | Lawrence Mayer Florist | 60.89 |
| Dotson | 1063930 | 06/09/15 | LongHorn | 25.00 |
| Dotson | 1063930 | 06/10/15 | Belks | 39.74 |
| Dotson | 1063930 | 06/11/15 | Dollar General | 78.10 |
| Dotson | 1063930 | 06/11/15 | USPS | 10.20 |
| Dotson | 1063930 | 06/20/15 | Verizon | 137.23 |
| Waldrop | 1064642 | 06/15/15 | Target | 83.63 |
| Waldrop | 1064642 | 06/15/15 | TJ Maxx | 65.20 |
| Waldrop | 1064642 | 06/17/15 | Harbor Wear | 182.90 |
| Waldrop | 1064642 | ?? | ?? | 100.54 |
| Waldrop | 1064642 | ?? | Jo-Ann | 26.99 |
| Waldrop | 1064642 | ?? | Jo-Ann | 15.86 |
| Waldrop | 1064642 | ?? | Publix | 362.36 |
| Waldrop | 1064642 | ?? | Tastys Fresh Burgers | 39.33 |
| Dotson | 1064643 | 06/13/15 | Walmart | 394.89 |
| Dotson | 1064643 | 06/16/15 | Walmart | 11.46 |
| Dotson | 1064643 | 06/18/15 | Harris Teeter | 14.21 |
| Dotson | 1064643 | 06/19/15 | ?? | 11.00 |

| Dotson | 1064643 | 06/20/15 | Hardees | 10.76 |
|--------|---------|----------|---------|-------|
| Waldrop | 1064882 | 03/16/15 | TJ Maxx | 16.04 |
| Waldrop | 1064882 | 06/12/15 | Brookstone | 32.09 |
| Waldrop | 1064882 | 06/12/15 | McDonalds | 1.59 |
| Waldrop | 1064882 | 06/13/15 | Target | 50.32 |
| Waldrop | 1064882 | 06/14/15 | Barbara Jeans | 63.00 |
| Waldrop | 1064882 | 06/15/15 | Peppers Mexican | 54.00 |
| Waldrop | 1064882 | 06/17/15 | Arte Pizza | 30.80 |
| Waldrop | 1064882 | 06/18/15 | Harris Teeter | 34.37 |
| Waldrop | 1064882 | 06/20/15 | Barbara Jeans | 37.00 |
| Waldrop | 1064882 | 06/24/15 | Hyatt | 5.00 |
| Waldrop | 1064882 | 06/29/15 | AT&T | 164.87 |
| Waldrop | 1065558 | 06/28/15 | Krystals | 2.07 |
| Waldrop | 1065558 | 06/28/15 | Raceway | 6.55 |
| Waldrop | 1065558 | 06/29/15 | ?? | 25.13 |
| Waldrop | 1065558 | 06/29/15 | Gaylord Hotel | 5.50 |
| Dotson | 1065559 | 06/25/15 | Verizon | 90.17 |
| Dotson | 1065559 | 06/29/15 | Walmart | 214.60 |
| Dotson | 1065559 | 06/30/15 | Office Depot | 116.42 |
| Dotson | 1065559 | 07/01/15 | Fed-Ex | 38.24 |
| Dotson | 1065559 | 07/02/15 | Del Frisco's Grille | 380.17 |
| Dotson | 1065559 | 07/02/15 | Ritz-Carlton | 22.00 |
| Dotson | 1065559 | 07/02/15 | Yellow Cab | 32.00 |
| Dotson | 1065559 | 07/02/15 | Yellow Cab | 35.00 |
| Dotson | 1065559 | 07/03/15 | Chick-fil-a | 5.50 |
| Dotson | 1065559 | 07/05/15 | Ritz-Carlton | 1,110.18 |
| Dotson | 1065559 | 07/05/15 | Ritz-Carlton | 422.08 |
| Dotson | 1065559 | 07/05/15 | Ritz-Carlton | 72.00 |
| Dotson | 1065559 | 07/06/15 | Sunshineinabottle.com | 518.78 |
| Dotson | 1065559 | 07/08/15 | Amazon | 57.94 |
| Dotson | 1065559 | 07/08/15 | Vdara | 267.68 |
| Dotson | 1065559 | 07/13/15 | TJ Maxx | 70.90 |
| Dotson | 1065559 | 07/01/16 | Office Depot | 112.69 |
| Dotson | 1066680 | 07/15/15 | The UPS Store | 21.13 |
| Dotson | 1066680 | 07/22/15 | Los Reves Mexican Restaurant | 22.00 |
| Dotson | 1066680 | 07/23/15 | Hobby Lobby | 78.08 |
| Dotson | 1066680 | 07/23/15 | Lowe's | 18.60 |
| Dotson | 1066680 | 07/25/15 | Verizon | 106.36 |
| Dotson | 1066680 | 07/29/15 | Lowe's | 4.25 |
| Dotson | 1067299 | 07/31/15 | Edible Arrangements | 256.83 |
| Dotson | 1067299 | 08/06/15 | ?? | 34.30 |
| Dotson | 1067299 | 08/06/15 | FedEx | 23.05 |
| Dotson | 1067911 | 07/25/15 | Jane | 15.96 |
| Waldrop | 1067912 | 08/18/15 | Chick-fil-A | 1.66 |

| Waldrop | 1067912 | 08/30/15 | AT&T | 156.48 |
|---|---|---|---|---|
| Dotson | 1068401 | 08/27/15 | Bath & Body Works | 147.66 |
| Dotson | 1068401 | 08/27/15 | PayPal | 2,814.00 |
| Dotson | 1068401 | 08/27/15 | Walmart | 263.80 |
| Dotson | 1068759 | 08/28/15 | ?? | 44.00 |
| Dotson | 1068759 | 08/31/15 | Frances Florist | 128.35 |
| Dotson | 1068759 | 09/01/15 | Vdara | 222.88 |
| Dotson | 1068759 | 09/02/15 | Hobby Lobby | 23.55 |
| Dotson | 1068759 | 09/02/15 | Walmart | 216.78 |
| Dotson | 1068759 | 10/19/15 | Delta | 1,048.20 |
| Dotson | 1069627 | 08/25/15 | Verizon | 102.44 |
| Dotson | 1069627 | 09/04/15 | The Spiced Apple | 35.00 |
| Dotson | 1069627 | 09/09/15 | Dollar General | 45.69 |
| Dotson | 1069627 | 09/09/15 | FedEx | 146.38 |
| Dotson | 1069627 | 09/11/15 | Amazon | 89.82 |
| Dotson | 1069627 | 09/11/15 | The Spiced Apple | 33.00 |
| Dotson | 1069627 | 09/15/15 | Starbucks | 4.44 |
| Dotson | 1069627 | 09/16/15 | The Spiced Apple | 33.46 |
| Waldrop | 1070166 | 09/17/15 | Crowne Plaza | 19.00 |
| Waldrop | 1070166 | 09/29/15 | AT&T | 162.48 |
| Waldrop | 1070509 | 09/30/15 | Starbucks | 15.43 |
| Waldrop | 1070509 | ?? | ?? | 21.00 |
| Waldrop | 1070509 | ?? | ?? | 35.00 |
| Dotson | 1070511 | 09/21/15 | Hallmark | 79.17 |
| Dotson | 1070511 | 09/21/15 | Hobby Lobby | 31.82 |
| Dotson | 1070511 | 09/21/15 | Walmart | 122.54 |
| Dotson | 1070511 | 09/23/15 | Ace Hardware | 22.44 |
| Dotson | 1070511 | 09/25/15 | The Spiced Apple | 35.00 |
| Dotson | 1071227 | 09/25/15 | Verizon | 98.29 |
| Dotson | 1071227 | 10/03/15 | Amazon | 99.00 |
| Dotson | 1071227 | 10/06/15 | LongHorn | 38.00 |
| Dotson | 1071227 | 10/06/15 | Waterford Wedgewood | 1,260.82 |
| Dotson | 1071227 | 10/06/15 | Waterford Wedgewood | 6,291.13 |
| Dotson | 1071227 | 10/06/15 | Waterford Wedgewood | 6,329.05 |
| Dotson | 1071227 | 10/06/15 | Waterford Wedgewood | 337.05 |
| Waldrop | 1071502 | 10/01/15 | VeriFone | 13.39 |
| Waldrop | 1071502 | 10/01/15 | VeriFone | 22.16 |
| Waldrop | 1071502 | 10/01/15 | VeriFone | 15.37 |
| Waldrop | 1071502 | 10/04/15 | Kiosk #87 | 9.90 |
| Waldrop | 1071502 | 10/05/15 | El Puente 3 | 3.00 |
| Waldrop | 1071502 | 10/05/15 | Fig Tree Restaurant & Little Rhein Steak House | 60.50 |
| Waldrop | 1071502 | ?? | Ace Parking | 7.00 |
| Waldrop | 1071502 | ?? | ?? | 35.00 |

| | | | | |
|---|---|---|---|---|
| Dotson | 1071578 | 10/13/15 | Lynn's Hallmark | 134.49 |
| Dotson | 1071578 | 10/14/15 | Verizon | 213.95 |
| Waldrop | 1072411 | 10/19/15 | Boars Head | 13.48 |
| Waldrop | 1072411 | 10/20/15 | Aria Resort and Casino | 170.00 |
| Waldrop | 1072411 | 10/20/15 | VeriFonets | 20.38 |
| Waldrop | 1072411 | 10/21/15 | Chili's | 19.13 |
| Waldrop | 1072411 | 10/21/15 | Union Cab | 18.30 |
| Waldrop | 1072411 | 10/21/15 | Vdara | 335.44 |
| Waldrop | 1072411 | 10/28/15 | ?? | 34.00 |
| Waldrop | 1072411 | ?? | ?? | 47.00 |
| Waldrop | 1072411 | ?? | ?? | 40.25 |
| Waldrop | 1072411 | ?? | ?? | 45.00 |
| Waldrop | 1072411 | ?? | ?? | 25.00 |
| Waldrop | 1072411 | ?? | ?? | 21.00 |
| Dotson | 1074015 | 10/21/15 | Walmart | 80.65 |
| Dotson | 1074015 | 10/22/15 | ?? | 35.00 |
| Dotson | 1074015 | 10/22/15 | Racetrac | 13.55 |
| Dotson | 1074015 | 10/22/15 | Starbucks | 4.44 |
| Dotson | 1074015 | 10/25/15 | Verizon | 98.27 |
| Dotson | 1074015 | 10/28/15 | Walmart | 44.67 |
| Dotson | 1074015 | 10/30/15 | Home Depot | 66.04 |
| Dotson | 1074015 | 10/30/15 | The Spiced Apple | 50.00 |
| Dotson | 1074015 | 11/02/15 | FedEx | 14.45 |
| Dotson | 1074015 | 11/02/15 | Lowe's | 90.93 |
| Dotson | 1074015 | 11/04/15 | LongHorn | 25.00 |
| Dotson | 1074015 | 11/04/15 | Shell Station | 22.65 |
| Dotson | 1074015 | 11/04/15 | U-Haul | 117.66 |
| Dotson | 1074015 | 11/06/15 | Kay Knight - owner of a VERBO condo | 2,900.00 |
| Dotson | 1074015 | 11/09/15 | Hobby Lobby | 105.24 |
| Dotson | 1074015 | 11/10/15 | Ruth's Chris Steak House | 419.65 |
| Dotson | 1074015 | 11/13/15 | Panera Bread | 62.00 |
| Dotson | 1074015 | 11/13/15 | Two Sisters and Jane, Inc. | 423.72 |
| Waldrop | 1074171 | 11/29/15 | AT&T | 170.97 |
| Dotson | 1074195 | 11/20/15 | Lowe's | 163.69 |
| Dotson | 1075244 | 11/25/15 | Verizon | 104.56 |
| Dotson | 1075244 | 11/30/15 | The UPS Store | 28.21 |
| Dotson | 1075244 | 12/03/15 | Vdara | 591.58 |
| Dotson | 1075244 | 12/03/15 | Walmart | 204.77 |
| Dotson | 1075244 | 12/07/15 | The Spiced Apple | 35.00 |
| Dotson | 1075244 | 12/09/15 | Office Depot | 8.55 |
| Waldrop | 1077245 | 12/14/15 | Ritz-Carlton | 22.00 |
| Waldrop | 1077245 | 01/13/16 | Hardee's | 1.92 |
| Dotson | 1077628 | 12/16/15 | Hobby Lobby | 26.57 |

| Dotson | 1077628 | 12/16/15 | The UPS Store | 57.12 |
|--------|---------|----------|---------------|-------|
| Dotson | 1077628 | 12/29/15 | Office Depot | 53.49 |
| Dotson | 1077628 | 01/20/16 | Verizon | 102.81 |
| Waldrop | 1078330 | 01/18/16 | City Wide Cab Co. | 80.00 |
| Waldrop | 1078330 | 01/18/16 | Renaissance | 80.00 |
| Waldrop | 1078330 | 01/18/16 | Walgreens | 4.07 |
| Waldrop | 1078330 | 01/27/16 | Hyatt | 164.18 |
| Waldrop | 1078924 | 02/09/16 | Alexandria Union Cab | 20.33 |
| Waldrop | 1078924 | 02/10/16 | Hitch | 21.32 |
| Dotson | 1078925 | 01/25/16 | Verizon | 237.11 |
| Dotson | 1078925 | 01/25/16 | Verizon | -134.71 |
| Dotson | 1078925 | 01/27/16 | Walmart | 37.47 |
| Dotson | 1078925 | 01/28/16 | The UPS Store | 19.96 |
| Dotson | 1078925 | 02/11/16 | Verizon | 2.99 |
| Waldrop | 1080180 | 03/03/16 | Hyatt | 180.19 |
| Dotson | 1080572 | 02/17/16 | Ace Hardware | 29.92 |
| Dotson | 1080572 | 02/25/16 | Kangaroo Express | 10.67 |
| Dotson | 1080572 | 02/25/16 | Lowe's | 96.25 |
| Dotson | 1080572 | 03/07/16 | Payless Wireless | 23.52 |
| Dotson | 1080572 | 03/20/16 | Verizon | 101.60 |
| Waldrop | 1081007 | 02/28/16 | Verizon | 155.02 |
| Waldrop | 1081007 | 02/29/16 | Mellow Mushroom | 5.26 |
| Waldrop | 1081430 | 03/14/16 | Billy Goat | 12.93 |
| Waldrop | 1081430 | 03/14/16 | Hyatt | 18.00 |
| Waldrop | 1081430 | 03/15/16 | Hyatt | 3.14 |
| Waldrop | 1081430 | 03/15/16 | Hyatt | 30.00 |
| Waldrop | 1081430 | 03/15/16 | Hyatt | 18.00 |
| Waldrop | 1081430 | 03/15/16 | Taxi Cab | 59.70 |
| Waldrop | 1081430 | 03/16/16 | Hyatt | 28.00 |
| Waldrop | 1081430 | 03/17/16 | Chattanooga Airport | 36.00 |
| Waldrop | 1081430 | 03/17/16 | Hyatt | 1,001.40 |
| Waldrop | 1081430 | 03/17/16 | Yellow Cab | 58.20 |
| Dotson | 1082388 | 03/16/16 | Hobby Lobby | 8.56 |
| Dotson | 1082388 | 03/16/16 | Hobby Lobby | 8.55 |
| Dotson | 1082388 | 03/25/16 | Verizon | 126.15 |
| Dotson | 1082388 | 03/25/16 | Verizon | -24.55 |
| Dotson | 1082388 | 03/26/16 | Walmart | 34.64 |
| Dotson | 1082388 | 03/30/16 | Panera Bread | 142.58 |
| Dotson | 1082388 | 03/30/16 | TJ Maxx | 61.99 |
| Dotson | 1083551 | 04/26/16 | The UPS Store | 36.38 |
| Dotson | 1085126 | 05/04/16 | The UPS Store | 29.05 |
| Dotson | 1085126 | 05/05/16 | Costco Wholesale | 193.75 |
| Dotson | 1085126 | 05/17/16 | Lowe's | 12.65 |
| Dotson | 1085126 | 05/19/16 | The UPS Store | 59.32 |

| Dotson | 1085805 | 05/31/16 | Dollar Store | 31.03 |
| Dotson | 1085805 | 06/02/16 | Amazon | 54.50 |
| Dotson | 1085805 | 06/02/16 | The UPS Store | 78.52 |
| Dotson | 1085805 | 06/20/16 | Verizon | 130.01 |
| Dotson | 1085805 | 06/20/16 | Verizon | -26.63 |
| Waldrop | 1086380 | 04/28/16 | Verizon | 102.67 |
| Waldrop | 1086380 | 05/18/16 | Springhill Suites | 2.34 |
| Waldrop | 1086380 | 06/06/16 | Flash Foods | 2.15 |
| Waldrop | 1086380 | 06/09/16 | The Villas | 1,205.46 |
| Waldrop | 1086380 | ?? | GA Hospital Assoc | 550.00 |
| Dotson | 1086396 | 09/10/16 | Corner Drugs | 224.54 |
| | | | | **238,235.76** |

## *"DeBrock Poodles"*

In his letter to Mark Waldrop on August 23, 2016, CHS Chairman Joe Wall wrote the following in regard to the toy poodle business operated by Waldrop:

> *"You operated the DeBrock Poodles business owned by you and your wife out of CHSI's Dalton, Georgia office.  Indeed, at least one online website for DeBrock Poodles lists the contact telephone number for that business as the telephone number for the mobile telephone for which you submitted requests for 100% expense reimbursement to CHSI for many years – and received 100% expense reimbursement for many years – and also provided to internal and external personas as your CHSI phone number."*

The genesis of this comment was the result of the internal investigation performed prior to Waldrop's termination once it became apparent to CHS executives and board members that he was engaging in inappropriate behavior and was utilizing CHS resources without the consent and knowledge of CHS executive management and its board of directors.

As a part of our investigation, it was necessary to learn of the nature of Waldrop's toy poodle business.  Through research, interviews with executive management, and available documentation, it is clearly apparent that Waldrop was conducting a business of breeding, training, and showing toy poodles.

1    Online research[8] reveals that Waldrop was indeed a breeder of poodles and was very active in the

2    "toy poodle" industry as well as with the *Poodle Club of America*.  For example, the following post from

3    the *Poodle Club of America's*

4    Facebook page shows that

5    Waldrop is the owner of prize

6    winning animals:

7

8    The exhibition of animals is a

9    critical part of the process in

10    building a pedigree for an

11    animal lineage so as to bring

12    higher yields on litters bred

13    for sale. Additional research

14    shows similar information on

15    the *American Kennel Club*

16    website as follows:

17



[8] A collection of documents, from various websites and relative to the Poodle business, is attached at Exhibit 3.

McNair, McLemore, Middlebrooks & Co., LLC
389 Mulberry Street - P.O. Box One - Macon, Georgia 31201
Page 35 of 53

Furthermore, the *Poodle Club of America's* website shows, as can be seen below, that Waldrop is a breeder and exhibitionist of toy poodles and, importantly, that he can be reached at (706) 270-4265, which is a mobile phone that was for business purposes and for which all expenses were paid by CHS.

Waldrop endeavored to become a board member of the *Poodle Club of American Foundation* and, as can be seen from excerpts from his board member application below, he was actively engaged in the business of breeding and exhibiting toy poodles:

The Poodle Club of America Foundation, Inc.

**Poodle Club of America Foundation Board Member Application**

(Please type or print CLEARLY in black ink. Please answer all questions).

**Applicant's Name:** Mark Waldrop

**Telephone:** (706) 270-4265

**Email:** waldropmc@centurytel.net

**Home Address:**

9686 Bowen Trail

Ooltewah, TN 37363

**Date of application:** March 25, 2014 **Are you at least 21 years of age?** Yes.

**Please briefly describe why you want to be a Member of the Foundation Board:**

As a breeder, I am interested in research and the development of knowledge that enhances the health of the poodle. I am willing to volunteer my time and am committed to The Poodle Club of America Foundation, because I support the purpose of giving something back to the breed that gives us so much!

> **Briefly summarize your history in the sport of purebred dogs:**
>
> I have been actively involved in exhibiting and breeding toy poodles since 2003.  After fearing that I
> would not be able to have animals in my home due to asthma, I have been able to live successfully with
> poodles while managing my asthma.
>
> **Describe your personal philosophy on Health Testing of Breeding Stock:**
> I consistently test breeding stock for prcd-PRA Progressive Retinal Atrophy, CERF eyes and patellar
> luxation, etc.
>
> **Are you able to travel for Foundation Meetings and/or Functions?** Yes ___x___  or  No _____
> **Are you comfortable with teleconferenceing and the use of the internet?** Yes ___x___  or  No _____

In the above excerpts, it is notable that Waldrop again uses his CHS business phone as the manner in which he should be contacted.  He affirms his willingness to make himself available for meetings either in person or via teleconferencing, which could presumably be during normal business hours while he would otherwise be expected to perform his duties of CHS business matters.

Not only has Waldrop used CHS business assets and resources in the conduct of his poodle business as demonstrated by the use of his CHS business mobile for contacting him, he also was willing to utilize the CHS business offices for the housing of his animals as demonstrated herein on his "Important Information" sheet:

> **Important Information**
>
> Name of Dog:  Darben  Debrooks  Magnolia - Maggs
> Identification: _____
> List of Medications: _____
>
> Special Information (Shy, aggressive, blind, deaf, intact for breeding, physical ailments, etc.)
> _____
> _____
>
> Physical Description of Dogs (age/birthday, weight, color)
> DoB - 3-11-13, white
> intact
> Contact Information:      at Carlton Tucker
> Mark Waldrop                9065 cherry Avenue
> 9686 Bowen Trail           Orangevale, CA
> Ooltewah, Tennessee 37363   95662
> (706) 270-4265 or (423) 996-4567
>
> Temporary Location Information:
> 1013 Riverburch Parkway
> Dalton, Georgia 30721

On a document of Waldrop's captioned "Emergency / Disaster Preparedness Plan", shown below, he so states his intent to use the CHS business offices as part of his poodle business by having it serve as a secondary animal storage location and actually lists the CHS office address in the document:

---

**Emergency/Disaster Preparedness Plan**

**9686 Bowen Trail**

**Ooltewah, Tennessee 37363**

**(706) 270-4265 or (423) 396-4567**

I have safe and adequate number of enclosures for my dogs.  My dogs could be moved by family or friends to a safer location if necessary.  One location that I could move my dogs to in an emergency is 1013 Riverburch Parkway, Dalton, Georgia 30721. My vehicles could be used to move my dogs if necessary at once, should an emergency situation arise.  I estimate that it would take 30 minutes or less (based on a practice disaster drill conducted on June 22, 2014), to load all dogs into vehicles.  I have food, water and a supply of medications for at least seven days available.  I have copies of important documents to include photos of dogs in multiple locations, both onsite and offsite.  My dogs are micro-chipped or have collars with names for identification purposes.  I keep a supply of cleaning and sanitizing supplies on hand at all times.  In the event of an emergency, my employer would allow me to return home.

---

1

2       Additionally, it is notable that he states that he "keeps a supply of cleaning and sanitizing supplies

3    on hand at all times" and that in the event of an emergency, his employer would allow him to return home.

4    The comment regarding the "cleaning and sanitizing supplies" is germane insofar as we have discovered

5    that Waldrop included in his expense reports, as demonstrated supra, an inordinate amount of purchasing

6    of just such supplies at levels exceeding any reasonable needs for the Dalton building.

7       As shown earlier, Section 4 of the Employment Agreement between Waldrop and CHS states as

8    follows:

9          *"Reimbursement of Business Expenses. The Company shall pay all reasonable and*

10          *necessary travel and business expenses incurred by Employee directly related to*

11          *Employee's performance of Employee's responsibilities and duties for the Company*

12          *under this Agreement Employee shall submit to the Company statements that justify in*

13          *reasonable detail all expenses so incurred. Employee shall submit all reimbursements*

14          *hereunder for a particular calendar year no later than forty-five (45) days after it ends,*

15          *and payment shall occur not later than March 15 immediately following the end of the*

16          *calendar year to which the reimbursement relates."*

1    The agreement clearly states that only those expenses that relate **directly** to the employee's

2    performance of his employee's responsibilities duties will be reimbursed (emphasis added).  The costs

3    associated with the mobile phone used by Waldrop for his poodle

4    business were included on his expense reports tendered to CHS for

5    payment in contravention to the above referenced Employment

6    Agreement and corporate policies/guidelines to which he was clear

7    aware and bound. Additionally, the sanitization chemicals and supplies

8    that appear excessive for any reasonably anticipated business use and

9    referred to as part of Waldrop's disaster plan were also expensed by



10    him for payment by CHS. The photographic images taken at the office and at the storage warehouse utilized

11    by the office, reveal excessive cleaning and sanitation chemicals as shown in the picture herein.

12    The document excerpts discussed above and as shown in Exhibit 3 are merely a sampling of the

13    available information that we have reviewed and considered.  The evidence herein clearly shows that

14    Waldrop was engaged in the business of breeding, exhibiting, and establishing a valuable pedigree of toy

15    poodles at a significant cost of resources and time.  Furthermore, the evidence clearly shows that Waldrop

16    was utilizing CHS business assets and resources for this business, without the knowledge or consent of CHS

17    and in violation of his Employment Agreement.

18    *"Southern Adventist University"*

19    In his letter to Mark Waldrop on August 23, 2016, CHS Chairman Joe Wall wrote the following in

20    regard to the outside compensation that Waldrop received from *Southern Adventist University* (SAU):

21    *"You served on the faculty of Southern Adventist University teaching multiple courses*

22    *and participating in campus-related activities, for which you received compensation, that*

23    *never were disclosed to the CHSI Board in violation of the terms of your Employment*

24    *Agreement."*

1      As with the poodle business, CHS executives and board members became aware of this activity

2 prior to Waldrop's termination and as a result of conducting of their internal investigation of him.

3      Interviews conducted by me of CHS executive management and board chair reveal that CHS was

4 aware that Waldrop was active with SAU, however, they believed it was merely a two-week seminar course

5 offered to the university as a charitable gratuity in support of higher education, awareness of long-term care

6 issues, and in bolstering the name recognition of CHS.   Not until their investigation did executive

7 management become aware of the fact that Waldrop was actually receiving compensation for his

8 instructional services.

9      A review of the on-line syllabus documents and course catalogs of SAU clearly show that Waldrop

10 was involved at level that far exceeded the brief seminar classes once believed[9].  As an example, the syllabus

11 and catalog records show the Waldrop to be an instructor, at a minimum, for the following sessions:

12  • Undergraduate Catalogs showing Waldrop as member of faculty for:
13       o 2003/2004
14       o 2008/2009
15       o 2011/2012
16       o 2014/2015
17       o 2015/2016
18
19  • Syllabus documents showing Waldrop as a course instructor for:
20       o Fall of 2012
21       o Summer 2013
22       o Fall of 2013
23       o Summer 2014
24       o Fall of 2014
25       o Summer 2015
26       o Summer 2016
27       o Winter 2016
28

---

[9] A sample of Southern Adventist University only information pertaining to Mark Waldrop's instructional duties and relations with the institution is attached herein at Exhibit 4.

1       It is evident too that Waldrop did in fact receive compensation for his instructional services as shown

2  on example SAU Instructor Agreements for May of 2011 and May of 2016 as presented below:

---

### SOUTHERN ADVENTIST UNIVERSITY
### Collegedale, TN 37315

#### ADJUNCT EMPLOYMENT AGREEMENT FOR ACADEMIC YEAR 2011-2012

May 6, 2011

NAME: Waldrop, Mark                                       ID# 302133

Your employment as an adjunct instructor for Southern Adventist University has been approved. The details of your employment are as follows:

| | |
|---|---|
| Courses: | LTCA 432-A General Administration of the LTC Facility II 3.0 hrs |
| Term/Year: | Second Summer Session 2011 |
| Total Remuneration: | $2,169.00 |
| Department/School: | School of Business Management – 10040 |
| Chair/Dean: | Don Van Ornam |

#### CONDITIONS OF EMPLOYMENT

1. If for any reason you are unable to fully complete the assignment, compensation will be adjusted on a proportional basis based on contract hours.

2. A current résumé and an official transcript of your undergraduate and graduate credits will be submitted to the Vice President for Academic Administration.

3. Adjunct instructors are neither voting members of the faculty, nor are they eligible for staff benefits.

4. All members of the teaching faculty are under obligation to become familiar with and abide by the general administrative practices and requirements of the university as found in the *Adjunct Faculty Handbook, Faculty Handbook,* and the *University Catalog.* It is also important for teaching faculty to be familiar with regulations relating to student behavior as found in the *Student Handbook.* These and other pertinent publications of the university can be obtained from the department chair/school dean.

5. Earnings will be paid according to the institutional payment schedule in the form of direct deposit to the employee's choice of banking institution. The "Direct Deposit of Payroll" form must be filled out and submitted to Human Resources.

#### AGREEMENT

Please return this agreement with your signature. The university will not release earnings until this agreement and other required documents are in your employee file.

_____ (Appointee)              05-13-11 (Date)

_____ (Department Chair)    5/2/11 (Date)

_____ (Vice President for Academic Administration)    5/11/11 (Date)

Return to Human Resources

---

3

# Memo

To:    Lisa Kuhlman

CC:    Stephanie Dotson

From:   Mark Waldrop

Date:   5/5/2016

Re:     Communications moving forward

I received the adjunct employment agreement for the upcoming summer class. Enclosed you will find an executed copy for your files. Moving forward, I prefer that you please direct any emails or correspondences to my personal email address at waldropmc@centurytel.net and remove my work email from your records. I look forward to working with you in your new role.

---

## SOUTHERN ADVENTIST UNIVERSITY
### Collegedale, TN 37315

### ADJUNCT EMPLOYMENT AGREEMENT FOR ACADEMIC YEAR 2016-2017

May 4, 2016

NAME: Waldrop, Mark                            ID# 302133

Your employment as an adjunct instructor for Southern Adventist University has been approved. The details of your employment are as follows:

| | |
|---|---|
| Course: | LTCA 432 General Admin II of the LTC Facility     3.0 hrs. |
| Term/Year: | Summer Session I, 2016-17 (May 23-June 3) |
| Total Remuneration: | $2,343.00 |
| Department/School: | Business - 10040 |
| Chair/Dean: | Mark Hyder |

### CONDITIONS OF EMPLOYMENT

1. If for any reason you are unable to fully complete the assignment, compensation will be adjusted on a proportional basis based on contract hours.

2. A current résumé and an official transcript of your undergraduate and graduate credits will be submitted to the Vice President for Academic Administration.

3. Adjunct instructors are neither voting members of the faculty, nor are they eligible for staff benefits.

4. All members of the teaching faculty are under obligation to become familiar with and abide by the general administrative practices and requirements of the university as found in the *Adjunct Faculty Handbook*, *Faculty Handbook*, and the *University Catalog*. It is also important for teaching faculty to be familiar with regulations relating to student behavior as found in the *Student Handbook*. These and other pertinent publications of the university can be obtained from the department chair/school dean.

5. Earnings will be paid according to the institutional payment schedule in the form of direct deposit to the employee's choice of banking institution. The "Direct Deposit of Payroll" form must be filled out and submitted to Human Resources.

### AGREEMENT

Please return this agreement with your signature. The university will not release earnings until this agreement and other required documents are in your employee file.

| | |
|---|---|
| (Appointee) | 05-04-2016 (Date) |
| (Department Chair/School Dean) | 5-4-16 (Date) |
| (Vice President for Academic Administration) | 05.04.16 (Date) |

1      The Employment Agreement under which Waldrop was bound addresses the requirement that all

2  compensation to the employee shall be derived exclusively from CHS and any outside compensation is

3  prohibited without the prior written consent of the Board of Directors.  Specifically, that Section 1 of the

4  Employment Agreement reads as follows:

5      *"Employment.  Employee shall serve as the Executive Vice President, Integration*

6      *Services and shall perform the duties set forth on Exhibit 1 attached hereto, in addition*

7      *to those duties reasonably assigned to Employee from time to time by the President of the*

8      *Company or the Board of Directors of the Company. Employee shall be employed on a*

9      *full-time basis and shall report directly to the President of the Company. Employee shall*

10     *be subject to the Company's policies and procedures in effect from time to time. Employee*

11     *shall perform the duties assigned to him faithfully, diligently and to the best of his ability,*

12     *and Employee shall not engage in any outside employment without the express written*

13     *consent of the Board of Directors of the Company."*

14     The directive and intent of this clause is unambiguous and any limiting threshold or statement of

15  materiality is conspicuously absent such that the interpretation of this item is to be strictly construed.

16                          *"Dalton Office"*

17     In his letter to Mark Waldrop on August 23, 2016, CHS Chairman Joe Wall wrote the following in

18  regard to the various matters related to the CHS offices in Dalton, Georgia, where he worked:

19     *"After the flooding of CHSI's Dalton, Georgia office in 2014, you authorized renovations*

20     *and refurbishments of the office space that cost in excess of one hundred thousand dollars*

21     *more than the insurance proceeds received in connection with CHSI's property claim.  In*

22     *connection with that project, you also authorized the engagement of your then-assistant's*

23     *father in an Independent Construction Superintendent Agreement role when a general*

24     *contractor already had been retained to oversee and complete the renovations and*

1    *refurbishments and you did not provide the Board information to address the issue of*

2    *independence, private inurement or the possibility of an excess benefit transaction."*

3        As a large non-profit organization, CHS must maintain the high standards associated with its

4    organizational mission and charter.  To that end and to insure that accountabilities are transparent to the

5    public, CHS has necessarily committed significant resources in the development of personnel and ethics

6    policies to insure internal controls are well designed and are effectively deployed.  Also, as a non-profit that

7    is accountable to a board of directors and to its charitable purpose, CHS works to maximize efficiencies

8    and increase the effectiveness of its charitable dollars.  To that end, it has developed divisions and subsidiary

9    companies to provide services to the organization at a reduced cost and on a consistent basis throughout the

10   organization.  One such subsidiary is its *Health Systems Real Estate, Inc.* (HSRE) that works internally to

11   handle construction projects and to oversee general contractor progress.  This is necessary to insure that

12   business and construction projects are vetted, reviewed, duly authorized, and follow the CHS initiatives and

13   directives consistent with board-approved actions.  Additionally, CHS owns another organization, *ECP*

14   *Distributors* (ECP), to provide furniture and fixtures to the various CHS entities and facilities, as well as to

15   sell to third parties.  The existence and utilization of ECP allows CHS and its subsidiaries to save the gross

16   margin dollars that it would otherwise have to pay an outside retailer or distributor.  As with the HSRE, the

17   utilization of ECP, which is internally directed by CHS as to strategic directions, preferred choices, and cost

18   principles, insures consistency and maximized efficiencies throughout the organization.

19       Utilization of these two companies was required throughout CHS and a special authorization would

20   be required to deviate from this policy.  Through its investigation performed prior to Waldrop's termination

21   and continuing with our analysis, the CHS executive management team and board learned that Waldrop

22   had intentionally and deceptively violated these protocols in demonstrating his clear breach of fiduciary

23   duties and excessive spending that is grossly negligent and antithetical to the principles of a non-profit

24   organization.

1       The office space in which Waldrop operated in Dalton, Georgia was quite small at only 1,014 square

2   feet, which is ample to supply the office needs of a mere two persons.  Despite the small size of the office

3   space, the funds expended for it are quite large.  In summary[10], CHS leased the office space in the Dalton

4   building in January of 2008, paid $30,523 for leasehold improvements plus another $111,586 for furniture,

5   fixtures, and equipment.  The building became available for purchase in September of 2013 and CHS

6   acquired it for just under $100 per square foot (*ie., the building is 5,671 total square feet divided into three*

7   *suites, one of which is the CHS office*).  In late 2013, CHS decided to perform renovations and a build-out

8   of the third suite to house another subsidiary business and so it began having plans drawn by TU Parks

9   Construction for this purpose.  At this time, Waldrop indicated he wanted to perform some renovations on

10  his office suite together with some new furniture.  This was included in the project being developed by TU

11  Parks Construction and the estimated cost for the CHS suite was $72,379.  The project, while developing,

12  had not proceeded to the point of authorization by CHS executive management or the board of directors.

13  Unbeknownst to CHS, Waldrop sought to receive other project bids from Neal Saxon and another from

14  Kim L. Woods Construction, Inc.  Due to the pressures exerted by Waldrop in an effort to manipulate the

15  project and at differing costs, TU Parks Construction withdrew from the project development.

16      Without authorization from CHS executive management and its board of directors, on March 31,

17  2014 Dotson, who served as Waldrop's administrative assistant, executed and entered into a construction

18  contract agreement with Kim L Woods Construction to complete the project on their suite at an estimated

19  cost of $102,310, though actual payments were $136,584.  Dotson had no authority to obligate CHS or to

20  execute any contracts on its behalf.  Furthermore, Dotson executed the contract, believed to be at Waldrop's

21  knowledge and direction, through Integra Rehabilitation, which is another CHS subsidiary.  Integra

22  Rehabilitation does not employ Dotson and utilizes review and authorization channels that differ from that

---

[10] A detailed chronology of this Dalton project is attached hereto as Exhibit _____.

1  of CHS with the result that the project costs and the contract itself were not immediately available to CHS

2  executive management. The execution of this construction contract in the manner stated herein and as

3  evidenced by the factual material, was clearly unauthorized and was intentionally deceptive in that it

4  obviated the executive management and board of directors the ability to consider the prudence and propriety

5  of the project or the utilization of HSRE to insure adherence to CHS policies and organizational cost

6  principles.

7      Without authorization from CHS executive management and its board of directors, Dotson also

8  executed on April 15, 2014 an Independent Contractor and Indemnity Agreement on behalf of Integra

9  Rehabilitation with her father, Dwight Scott.  The contract was for Scott to serve as the Construction

10  Superintendent, over this otherwise unauthorized Dalton construction project, for a fee equal to 10% of the

11  amount ultimately paid to Kim L Woods Construction, Inc.'s.  Again, the mere notion of and need for a

12  construction superintendent is suspect given the existence of HSRE, which chiefly serves that very purpose.

13  Also, as with the Kim L Woods Construction contract, this contract executed by Dotson again circumvented

14  the CHS policies and approval process along with denying the board of directors the opportunity to review

15  the contract for propriety and potential conflicts of interest.

16      On April 28, 2014, within a month of signing the construction contract with Kim L Woods

17  Construction, the CHS offices suffered water damage from an apparent "flooding" caused, ostensibly, by a

18  faulty water fitting beneath the kitchen sink. The event was disclosed to CHS management but was couched

19  as merely a minor clean-up and limited mitigation effort. The mitigation efforts took place right away and

20  were believed by CHS management to be effective and satisfactory.  An insurance claim was filed and an

21  adjuster assigned to it with the result that significant renovation work and furniture replacement was

22  recommended.  Kim L Woods Construction, though not authorized to commence work on the project,

23  submitted repair quotes to the insurance company wherein a claim was processed in the net amount of

24  $149,697.

1    As part of the repair and renovation work, new furniture was to be purchased and, to that purpose,

2  Waldrop requested quotes from Office Coordinators, Inc. (OCI).  ECP Distributors, as mentioned above is

3  a subsidiary of CHS, submitted its proposal for furniture same furniture and it was lower than the one

4  provided by OCI for the same furnishings.  OCI was allowed to revise their quote and ultimately Waldrop

5  contracted with OCI for the furnishings despite that fact that, if ECP had been used, the gross margin on

6  supplied furniture sales would have remained within the CHS umbrella organization for savings of between

7  $5,000 and $10,000.

8    The detail of costs and payments to K L Woods Construction related to the Dalton construction

9  project discussed above are as follows:

| Invoice | Date | Description | Amount | Invoiced to | Paid by* |
|---------|------|-------------|--------|-------------|----------|
| 4214 | 7/16/14 | Suite A – Insurance Repairs | $ 23,910.00 | CHS | Integra |
| 4215 | 7/16/14 | Suite B – Insurance Repairs | 24,958.80 | Integra | Integra |
| 4266 | 9/19/14 | Suite A – Renovations | 7,524.22 | CHS | CHS |
| 4267 | 9/19/14 | Suite B – Renovations | 15,556.72 | Integra | Integra |
| 4285 | 11/6/14 | Suite A | 521.18 | CHS | Integra |
| 4286 | 11/6/14 | Suite B | 1,443.78 | Integra | Integra |
| 4287 | 11/6/14 | Moving Furniture | 4,542.00 | ?? | Integra |
| 4313 | 12/15/14 | Suite C – Renovation | 58,127.37 | ?? | Integra |
|  |  | **Total** | **$ 136,584.07** |  |  |

10

11    Payments for the renovation work made to other vendors are as follows:

| Vendor | Date | Invoice | Description | Amount | Invoice to | Paid by* |
|--------|------|---------|-------------|--------|------------|----------|
| Worth Construction | 4/28/14 | 2570 | Restoration Items - Mitigation | $17,064.60 | Integra | CHS |
| A&H Services, LLC | 5/28/14 | 14021 | Installation of CAT 5 drops | 5,550.00 | CHS | CHS |
| A&H Services, LLC | 5/28/14 | 14021 | Discount (Over 25%) | -1,406.00 | CHS | CHS |
| ECP Distributors | 8/4/14 | 1183336 | Furniture | 8,499.67 | Integra | Integra |
| Technical Services Audio Visual | 12/8/14 | 1214-36 | Technology installs re water damage & remodel | 13,705.86 | CHS | CHS |
| Michael Smith Designs, Inc. | 8/21/14 | 104 | Cabinets & Vanities (80% of contract) & Counter Top | 8,025.00 | Community Health Center | Integra |

| | | | | | | |
|---|---|---|---|---|---|---|
| Michael Smith Designs, Inc. | 10/9/14 | 118 | Cabinets & Vanities & Counter Top | 4,912.91 | Integra | Integra |
| OCI | 7/8/14 | 6574 | Furniture | 58,440.59 | Integra | Integra |
| OCI | 7/8/14 | 6574 | Furniture | -866.44 | Integra | Integra |
| Laney Carter | 7/2/14 | 2071 | Design Consultation | 6,000.00 | CHS | Integra |
| Laney Carter | 9/19/14 | 2074 | Design Consultation | 1,450.92 | CHS | Integra |
| Stephanie Dotson | 7/14/14 | N/A | Reimbursement for refrigerator | 3,010.05 | CHS | CHS |
| Mark Waldrop | 10/12/14 | N/A | Supplies and equip for renovation | 1,447.41 | Integra | Integra |
| Stephanie Dotson | 10/23/14 | N/A | Purchase of *"The Senior Partner"* | 1,576.19 | CHS | CHS |
| | | | | | | |
| | | | **Total** | **$127,410.76** | | |

The total costs for the renovations and furniture, as shown above, are $277,653 plus another $13,658 paid to Dwight Scott under the unauthorized independent contractor agreement.   Detailed documents concerning this unauthorized renovation project are attached herewith as Exhibit 6.

*"Project Charter Authorizations"*

In his letter to Mark Waldrop on August 23, 2016, CHS Chairman Joe Wall wrote the following in regard to Waldrop's various failures to adhere to and comply with CHS policies relative to the process of authorizing project charters:

> *"On numerous occasions, you failed to engage in and/or complete CHSI's project charter*
>
> *authorization process, resulting in the commencement of numerous projects and the*
>
> *engagement of third-parties to perform work on behalf of CHSI without the standard*
>
> *approval of the Chief Executive Officer and/or the Chief Financial Officer and the Board.*
>
> *CHSI is aware of several instances in which you provided false information to CHSI*
>
> *employees and third-parties regarding project charter authorization by CHSI's Chief*
>
> *Executive Officer and the Board as required when, in fact, such authorization was never*
>
> *provided on behalf of the organization in any way."*

1       While it is not uncommon and may be appropriate for management to expend time and resources in

2  vetting a project in developing it as a proposition for project authorization, CHS's policies nonetheless

3  required "Project Charter Authorizations" before significant company resources can be expended or before

4  a project can continue to execution.  As a result of its investigation of Waldrop prior to his termination, it

5  became clear to CHS executive management and board members, that Waldrop failed to follow the required

6  protocols and unilaterally executed, or caused to be executed, contracts without the necessary approval.  In

7  our subsequent review, we focused on the following non-exhaustive projects and/or unauthorized contracts:

8  <div align="center">Mark Hunt consulting agreement</div>

9       On September 4, 2015, Mark Waldrop executed a contract between Community Health Services of

10  Georgia, LLC and *Mark Hunt* that was styled as a "Consulting Agreement"[11].  The description of the

11  services to be performed were vague insofar as the contract did not provide sufficient detail for executive

12  management to be able to determine their purpose.  Those services, which were to take place over a 45-day

13  period for a fee of $15,000, were simply stated as follows:

14     • Perform review of Company's Policy and Procedures;

15     • Perform strategic organizations assessment including SWOT analysis including due diligence

16       analysis of current location/providers;

17     • Evaluate current staffing patterns and efficiency;

18     • Margin improvement opportunities;

19     • Financial comparative analysis:

20     • Recommend financial and quality metrics;

21     • Evaluate gEHRiMed contract

---

[11] The contract and related documents are attached herein as Exhibit 7.

1    Based on my interviews with executive management, the product of Hunt's consulting agreement,

2    which was located among the files in Waldrop's office, was merely a brief and poorly formatted report

3    bereft of any meaningful recommendations or conclusions.  Regardless of the nature of the contract, or even

4    of its efficacy, Waldrop was in no way authorized to execute this contract and there was no opportunity for

5    CHS to properly vet this project as part of its normal authorization procedures.

### Health Trust / ECP

7    On February 19, 2016, on his own volition, Waldrop executed a "Mutual Confidentiality

8    Agreement"[12] with *Healthtrust Purchasing Group, L.P.* to develop a purchasing alternative to ECP

9    Distributors, Inc., which was discussed above as a wholly owned subsidiary of CHS.  While it is unclear as

10   to Waldrop's motivations in trying to eliminate ECP from organizational purchasing, it is very clear that no

11   other members of executive management or the board of directors was aware that this agreement had been

12   executed.  The existence of ECP and its utilization throughout the organization is a matter of strategic

13   initiative and no evaluation or consulting project with regard to is should have been commenced without

14   proper approvals, which Waldrop could not do unilaterally.

15   While it is not clear whether or not there was an expenditure of monetary resources by CHS in

16   connection with this agreement, it is clear that Waldrop utilized company resources in the form of his and

17   other staff person's time on an assignment that did not have the approval of management, even from an

18   exploratory or conceptual point of view.  Furthermore, the fact that he was unauthorized to sign the

19   confidentiality agreement puts in jeopardy the confidential information and trade secrets that he shared,

20   without proper consents, with a third party and competitor.  This constitutes a breach in his fiduciary duties

21   to CHS and demonstrates poor managerial and executive judgment.

22

---

[12] The  Mutual Confidentiality Agreement and other information attached herein as Exhibit 8.

## Omnicells

1

2          Omnicells are devices, not unlike a sophisticated vending machine, that are used in hospitals,

3   nursing facilities, and like organizations to dispense medicines in a secure manner to obviate the need to

4   utilize a hospital pharmacy.  Instead, these appliances can be placed strategically around the facility so that

5   physicians and nurses can access needed drugs and supplies far more quickly.  The efficacy of these units

6   is suitable in many situations, but not all.

7          CHS wanted to explore the use of Omnicells in their facilities and, according to protocols, authorized

8   a project charter to utilize them in pilot locations.  Accordingly, a study was made of the devices, costs were

9   explored, pilot facilities for use were selected, and a vendor identified.  As a result, Omnicells were ordered

10  under a lease agreement and placed as intended.

11         However, through the actions and directions of Waldrop, the initial lease purchases were expanded

12  to include many other facilities at a cost exceeding one million dollars.  These additional leases were not

13  approved or authorized for purchase and, by virtue of his unilateral actions in "authorizing" them, precluded

14  the executive management and the board members from learning the results of the pilot deployment,

15  concluding on their efficacy, and applying those conclusions to utilization in other facilities, if any.  These

16  unauthorized actions by Waldrop are, again, a breach of his fiduciary duties owing to CHS as a part of its

17  executive management.  Documents demonstrating these actions are attached hereto as Exhibit 9.

## LG CNS Healthcare Solutions

19         Waldrop initiated the development of an Electronic Health Records (EHR) software system to be

20  utilized in the CHS "Ethica" facilities.  This was a topic of some degree of discussion among the executive

21  management team due the concerns previously shared among themselves regarding the current state of the

22  EHR software currently in use by CHS.

23         Through Waldrop's efforts and direction, he partnered with *LG CNS Healthcare Solutions* (LG) in

24  developing a custom software to be used by CHS and its subsidiaries.  Considerable progress was made in

1   this regard which culminated in LG's demonstration of the software and related application set to the

2   executive management team on May 9, 2016.  Estimates of costs, technology purchasing requirements,

3   training, etc. had already been determined and in a "roll out" plan presented as part of LG's demonstration.

4   As learned from my interviews with CHS executive management, it was clearly apparent to them that LG

5   felt it was presenting a very nearly finished software product and that they were essentially prepared to

6   deploy it on a large scale in all facilities pending the outcome of the demonstration and "final approval"

7   from the executive management.

8        If LG had been a normal "vendor" bearing all costs itself in marketing a product for sale, then this

9   breach of protocols may not have been so egregious.  However, the software development with LG was

10  more of a joint venture with CHS and there are cost sharing obligations for which CHS may be responsible.

11  The extent of those obligations are unclear at this point as we have yet to locate any contracts with LG

12  despite the fact that they have referred to existence of an agreement.  Furthermore, company resources, both

13  time and monetary, have already been expended on this project despite the fact it never was authorized.

14       A project charter authorization was prepared by Waldrop in May of 2016, after the tensions had

15  surfaced that lead to CHS' investigation of him and subsequent termination, but it was never authorized.

16  As such, the executive management and the board of directors did not have a chance to review the project,

17  to vet it from within the organization, or to determine the viability of it going forward.  Documents

18  demonstrating the LG project are attached herein as Exhibit 10.

19       The items above are merely a representational sample of other project that were not authorized

20  according to the protocols that were established by CHS and were well known to Waldrop.  There are other

21  circumstances indicated in the observed books and records of CHS that infer a maligned attitude of Waldrop

22  in contravention of the best interests of the company.

23

24

1      Further affiant sayeth not.

Submitted this _____ of September, 2016,

_____

CHRISTOPHER S. EDWARDS, CPA CVA

Sworn to and subscribed before me

This _____ day of _____, 2016

_____

Notary Public

# EXHIBIT 1

**Curricula Vitae for**

**Christopher S. Edwards, CPA, CVA**

## Christopher S. Edwards, CPA, CVA
*Curricula Vitae*

September 6th, 2016

I am both a Certified Public Accountant and Certified Valuation Analyst in my twenty-eighth year of practice with the field of public accounting and practice at McNAIR, McLEMORE, MIDDLEBROOKS & Co., LLC (MMM) in Macon, Georgia, where I serve as the director of the firm's *Litigation, Valuation & Forensic Practice Group*. My experiences have been diverse enabling me to develop expertise in the areas of audit, litigation support services, valuation, computer consulting, management advisory services, forensics, and in various tax areas. MMM is one of the largest public accounting firms in the middle Georgia area with a diverse client and practice base in providing professional auditing, accounting, and tax services, as well as non-traditional specialty services.

I am responsible for the firm's litigation, valuation, and forensics (LVF) practice and have been responsible for more than 60,000 hours of professional services in this area. I have acted as an expert witness or consultant in over 175 different cases and I have experience in giving expert testimony in various litigation areas. My LVF practice has included work in the areas of business valuations, claims analysis, divorce and domestic litigation, lost business profits and wages, corporate fraud, embezzlement, professional malpractice, retirement benefits analysis, condemnation actions, minority shareholder rights, business buyouts, criminal cases, illegal gambling rings, partnership split-ups, child support modifications, fictitious vendor and fictitious employee schemes, and extensive work in the areas of corporate and individual bankruptcy matters. I am experienced in investigating multi-state fraud and RICO matters. I have been retained by large regulatory and enforcement agencies, such as the *Federal Bureau of Investigation*, the *Georgia Bureau of Investigation*, the *Federal Trade Commission* out of Washington, DC, and the *Georgia Secretary of State*, for the purposes of investigating the commission of multi-million dollar frauds impacting multiple states. I have testified, at deposition, trial, grand jury, or at arbitration hearings, on 74 occasions and have prepared cases for trial numerous other times that settled on the eve of trial. I have also tendered many sworn affidavits attesting to my professional opinion on litigated and contested matters which have been instrumental in the ensuing case settlement. Within the bankruptcy arena, I have considerable experience in litigating and consulting on fraudulent and preferential adversaries as well as providing in depth solvency/valuation opinions and testimony. I have served as the court-appointed accountant in well over 1,000 bankruptcy cases. I have been retained and appointed by courts to serve as examiner, to mediate litigation prior to trial, and to serve as trustee of corporate assets. I have valuable experience in performing valuations of small businesses, family limited partnerships, ESOPs, and fractional business interests.

I have direct and meaningful LVF experience in many industries to include, but not limited to, manufacturing, wholesale distributors, retail stores, imminent domain (ie., condemnation), hospitals, physician practices, governments, not-for-profits, schools and school boards, construction contractors, Sarbanes-Oxley "404" matters, manufacturing, information technology companies, churches, stock brokers and brokerage accounts, web-based businesses, and many other areas.

I graduated with honors from a local college preparatory school and received my BBA from the *University of Georgia*. I am a *Certified Public Accountant* (CPA) and a member in good standing of the *American Institute of CPAs* and the *Georgia Society of CPAs*. I am also credentialed as a *Certified Valuation Analyst* (CVA), which is recognized as a leading credential in business valuation, and also a practicing member of the *National Association of Certified Fraud Examiners*. I currently serve as chair on the Advisory Board of the *Georgia Southern University Center for Forensic Studies in Accounting & Business*. I am a past member of the Executive Board of the Georgia Society of CPAs statewide *Litigation Services Committee* and I am currently a member of the Georgia Society of CPAs *Litigation & Valuation* services section. For three years I chaired the State of Georgia Professional Ethics Board Committee for CPAs where I served for ten years administering and adjudicating cases of ethics violations allegedly committed by member CPAs in the state. I have spoken publicly at professional conferences on many occasions covering various topics such as auditing standards, litigation practices, business valuation, forensic accounting, and information technology. Such presentations include the annual *Georgia Association of Regional Commissions Conference* (2007, 2008, 2009, 2010, 2012, 2014), the *Georgia Southern University Forensic Accounting and Education Conference* (2008, 2010, 2012, 2013, 2016), the *Georgia Department of Transportation SAAG Conference* (2006, 2007, 2008) and *Issues in Condemnation Conference* (2014, 2015). I have lectured on dozens of occasions to colleges, law schools, and professional groups on a wide variety of LVF, auditing, and IT topics. Additionally, my articles on litigation, valuation, and professional ethics have been published in Georgia circulated professional journals. Cases in which I have been involved have been featured in leading news outlets such as *CBS News, Wall Street Journal* and *Money Magazine*. I have served on various boards throughout the state and was jointly responsible for the board oversight function for financial statement presentation and investment management of over $100 million in liquid assets.

Following is a list of cases in which I have testified as an expert at trial or by deposition:

1. *In Re MARCY JILL SANDERS v. VERNON CLETE SANDERS*. Civil Action No. 2014-CV-247, Marital Dissolution, Monroe County, Georgia, Superior Court. -- May 26th, 2016. Expert witness testimony regarding value of businesses owned and operated by husband and which are subject to division as marital property. Retained by the plaintiff. Deposition.

2. *In Re DEPARTMENT OF TRANSPORTATION v. 1.70 ACRES OF LAND, AND CHARLOTTE TOLER; RAY E TOLER; WILLIAM T. TOLER; J.M. HUBER CORPORATION, INDIVIDUALLY*. Civil Action No. 0005-12179, Condemnation of Real Property, Wilkinson County, Georgia, Superior Court. -- May 4th, 2016. Expert witness testimony regarding business losses and diminution in business value relative to kaolin mineral mining, incident to condemnation. Retained by the petitioner. Jury Trial.

3. *In Re Elizabeth E. Espy vs. MILES V. ESPY*, Civil Action No. 15-CV-177-RS, Lee County Superior Court. December 21, 2015. Expert witness testimony regarding the valuation issues of the defendant's ownership in a certified public accounting firm as a marital asset. Retained by the plaintiff. Court Hearing.

4. *In Re STATE OF GEORGIA VS. (NAME WITHHELD)*, Bibb County, December 2nd, 2015. Grand jury testimony regarding an embezzlement, asset misappropriation, and fictitious employee scheme allegedly perpetrated by a corporate employee. Retained by the victim company at request of the District Attorney. Grand Jury

5. *In Re DEPARTMENT OF TRANSPORTATION v. 0.605 acres of land; certain easement rights; certain access rights; The Lamar Company, LLC, INDIVIDUALLY*. Civil Action No. 14CV60892, Condemnation of Real Property, Bibb County, Georgia, Superior Court. -- November 13th, 2015. Expert witness testimony regarding business or other losses relative to the loss or relocation of a billboard structure. Retained by petitioner. Deposition.

6. *In Re The Post-Confirmation Committee for Small Loans, Inc., et a. vs. W. Derek Martin, et al*, Case No. 1:13-cv-00195-WLS, U.S. District Court for the Middle District of Georgia, Albany Division. March 19th, 2015. Expert witness testimony regarding my opinion of solvency in relation to "The Money Tree" consolidated entity and SEC financial reporting. Retained by the defendant. Deposition.

7. *In Re Erika Yoder VS. RONALD YODER*, Civil Action No. 2014-V-110199-N, Houston County Superior Court. February 3rd, 2015. Expert witness testimony regarding the valuation issues of family business as a marital asset. Retained by the plaintiff. Court Hearing.

8. *In Re Johnny L. Gayton VS. FAYE DURRANCE GAYTON,* Civil Action No. 2013-V-107909-K, Houston County Superior Court. December 3rd, 2014. Expert witness testimony regarding the plaintiff's multi-year income analysis, asset tracing in identifying marital assets, and value of medical practices. Retained by the defendant. Deposition.

9. *In Re STATE OF GEORGIA VS. (NAME WITHHELD)*, Butts County, January 14th, 2014. Grand jury testimony regarding an alleged embezzlement, asset misappropriation, and lagging scheme perpetrated by a governmental employee. Retained by the State of Georgia District Attorney Richard Milam. Grand Jury

10. *In Re David G. Puryear VS. MICHELE M. PURYEAR*, Civil Action No. 12DV-0138, Dooly County Superior Court. December 13th, 2013. Expert witness testimony regarding the plaintiff's multi-year income analysis and asset tracing in identifying marital assets. Retained by the defendant. Deposition.

11. *In Re DEPARTMENT OF TRANSPORTATION v. 0.087 ACRES OF LAND, AND RIVER STREET CORNERS, LLC; SECURITY LIFE OF DENVER INSURANCE COMPANY; EMILY JANICE WARD, CHARLES JEFFERSON JONES, DWIGHT CHARLES JONES, AS TRUSTEES OF THE CHARLES H. JONES FAMILY TRUST, II; BANK OF AMERICAN CORPORATION; CITY OF MACON; ROYAL HOSPITALITY, INC. AND ROYAL HOSPITALITY GROUP, INC., INDIVIDUALLY*. Civil Action No. 09CV51094, Condemnation of Real Property, Bibb County, Georgia, Superior Court. -- November 8th, 2013. Expert witness testimony regarding business valuation relative to the operation of a limited service hotel franchise. Retained by petitioner. Trial.

12. *In Re DEPARTMENT OF TRANSPORTATION v. 0.087 ACRES OF LAND, AND RIVER STREET CORNERS, LLC; SECURITY LIFE OF DENVER INSURANCE COMPANY; EMILY JANICE WARD, CHARLES JEFFERSON JONES, DWIGHT CHARLES JONES, AS TRUSTEES OF THE CHARLES H. JONES FAMILY TRUST, II; BANK OF AMERICAN CORPORATION; CITY OF MACON; ROYAL HOSPITALITY, INC. AND ROYAL HOSPITALITY GROUP, INC., INDIVIDUALLY*. Civil Action No. 09CV51094, Condemnation of Real Property, Bibb County, Georgia, Superior Court. -- October 14th, 2013. Expert witness testimony regarding business valuation relative to the operation of a limited service hotel franchise. Retained by petitioner. Deposition.

13. *In Re Roy Reuben Chandler, III*, Chapter 7, Case No. 10-51845-JPS, Adversary Proceeding No. 12-5056, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- March 20th, 2013. Expert witness testimony regarding the solvency of the debtor. Retained by the trustee, Joy R. Webster. Deposition.

Christopher S. Edwards, CPA, CPA
Curricula Vitae, continued

14. *In Re STATE OF GEORGIA VS. (NAME WITHHELD)*, Clayton County, August 17th, 2012. Continuing grand jury testimony regarding an alleged asset misappropriation, expense padding, and kick-back scheme perpetrated by a service contractor. Retained by the State of Georgia District Attorney.

15. *In Re STATE OF GEORGIA VS. (NAME WITHHELD)*, Clayton County, July 13th, 2012. Grand jury testimony regarding an alleged asset misappropriation, expense padding, and kick-back scheme perpetrated by a service contractor. Retained by the State of Georgia District Attorney.

16. *In Re DEPARTMENT OF TRANSPORTATION v. 1.70 ACRES OF LAND, AND CHARLOTTE TOLER; RAY E TOLER; WILLIAM T. TOLER; J.M. HUBER CORPORATION, INDIVIDUALLY.* Civil Action No. 0005-12179, Condemnation of Real Property, Wilkinson County, Georgia, Superior Court. – June 29th, 2012. Expert witness testimony regarding business losses and diminution in business value relative to kaolin mineral mining, incident to condemnation. Retained by the petitioner. Jury Trial.

17. *In Re DEPARTMENT OF TRANSPORTATION v. 1.70 ACRES OF LAND, AND CHARLOTTE TOLER; RAY E TOLER; WILLIAM T. TOLER; J.M. HUBER CORPORATION, INDIVIDUALLY.* Civil Action No. 0005-12179, Condemnation of Real Property, Wilkinson County, Georgia, Superior Court. – June 8th, 2012. Expert witness testimony regarding business losses and diminution in business value relative to kaolin mineral mining, incident to condemnation. Retained by the petitioner. Deposition.

18. *In Re Paul Moronese VS. JANET GUZZARD MORONESE*, Civil Action No. 2010-CV-65, Monroe County Superior Court. January 10th, 2012. Expert witness court testimony regarding business valuation of defendant corporation. Retained by the defendant. Court Hearing.

19. *In Re STATE OF GEORGIA VS. SOHAIL IND SOHANI*, Civil Action No. 2010-CV-02172, Clayton County Superior Court. June 20th, 2011. Expert witness court testimony regarding alleged federal and state tax evasion in a related gambling operation. Retained by the State of Georgia. Jury trial.

20. *In Re WALTER CRAIG McCROBA*, Chapter 7, Case No. 09-53754-JDW, United States Bankruptcy Court for the Middle District of Georgia, Macon Division – March 14th, 2011. Testimony regarding the value of the sale of the debtor's dental practice. Retained by the trustee, William M. Flatau. Court Hearing.

21. *In Re COACHWORKS HOLDING, INC.*, Chapter 11, Case No. 09-51096-JDW, United States Bankruptcy Court for the Middle District of Georgia, Macon Division – April 29th, 2010. Court hearing on Motion to Compel Production. Testimony regarding insider fraudulent and third party preferential transfers and the records required to enable final conclusion on same. Retained by Official Unsecured Creditors Committee. Court Hearing.

22. *In Re STATE OF GEORGIA VS. PAULA COWAN*, Bibb County, April 6th, 2010. Grand jury testimony regarding the alleged asset misappropriation perpetrated by Paula Cowan as director of the day school operations of Riverside United Methodist Church. Retained by the State of Georgia. Grand Jury.

23. *In Re MARY NEVILLE V. MIDDLE GEORGIA REGIONAL COMMISSION*, September 1st, 2009. DOL Court hearing providing testimony regarding the standard of care, negligence, and competency of former employee of the Middle Georgia Regional Commission. Retained by the Commission. Court Hearing.

24. *In Re STATE OF GEORGIA VS. (NAME WITHHELD)*, Lamar County, June 11th, 2008. Grand jury testimony regarding the alleged asset misappropriation perpetrated by former Lamar County Sheriff Office employee while in charge of drug interdiction unit. Retained by the State of Georgia. Grand Jury.

25. *In Re HOUSTON STEEL FABRICATORS, LLC*, Chapter 7, Case No. 05-50456-JDW, United States Bankruptcy Court for the Middle District of Georgia, Macon Division – January 23rd, 2008. Expert witness court testimony on an Objection to Discharge by General Steel. Testimony included analyses of corporate co-mingling of funds and asset tracing. Retained by General Steel. Court Hearing.

26. *In Re DEPARTMENT OF TRANSPORTATION v. 0.341 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; and HENRY H. HOLMAN; LISA B. HOLMAN, INDIVIDUALLY.* Civil Action No. 05-CV-057, Condemnation of Real Property, Taylor County, Georgia, Superior Court. – October 30th, 2006. Expert witness testimony regarding business damages and diminution in business value to a hunting lodge, incident to condemnation. Retained by the petitioner. Jury trial.

27. *In Re DEPARTMENT OF TRANSPORTATION v. 0.341 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; and HENRY H. HOLMAN; LISA B. HOLMAN, INDIVIDUALLY.* Civil Action No. 05-CV-057, Condemnation of Real Property, Taylor County, Georgia, Superior Court. – October 16th, 2006. Expert witness testimony regarding business damages and diminution in business value to a hunting lodge, incident to condemnation. Retained by the petitioner. Deposition.

Christopher S. Edwards, CPA, CPA
Curricula Vitae, continued

28. *In Re BIBB COUNTY V. PROPERTY COMMONLY KNOWN AS 635-665 RIVERSIDE DRIVE, et al.* Civil Action No. 03-CV-20630, Condemnation of Real Property, Bibb County, Georgia, Superior Court. – March 3rd, 2006. Expert witness testimony regarding lost profits and diminution in business value to a car dealership, incident to condemnation. Retained by the plaintiff. Case settled after mediation. Deposition.

29. *In Re ACCESS INTEGRATED NETWORKS, INC., (claimant) VS. TELECOM CONSULTANTS, INC., (respondent).* American Arbitration Association, Atlanta, Georgia. Case No. 30 117 Y 01146 04 – June 23, 2005. Expert witness testimony attesting to value of respondent's property interest in contract with claimant. Retained by the respondent. Arbitration Hearing.

30. *In Re CHARLOTTE JACKSON and PATTY ANDERSON (claimants) VS. ACCESS INTEGRATED NETWORKS, INC. (respondent).* American Arbitration Association, Atlanta, Georgia. Case No. 30 181 Y 00986 04 – February 22, 2005. Expert witness testimony attesting to value of claimants property interest in contracts with respondent. Retained by the claimants. Arbitration Hearing.

31. *In Re OLIN WOOTEN AND ATLANTIC COAST CARRIERS, INC. vs. BANK OF HAZLEHURST, SYNOVOUS FINANCIAL CORP., ALTAMAHA BANK & TRUST, AMANDA LETICIA VARNADORE, ADORNA L. POWELL, and KENNETH D. MCLEOD.* United States District Court, Southern District of Georgia, Brunswick Division. Civil Action No. CV203-100. – August 26, 2004. Expert witness testimony regarding typical practices and practice standards in the certified public accountancy industry as relates to the plaintiff. Deposition.

32. *In Re NANCY C. HARVEY and MORGAN D. HARVEY vs. NANCY DOZIER and DOUGLAS DOZIER,* Monroe Superior Court, Civil Action No. 2003-CV-81, Monroe County, Georgia. – August 10, 2004. Expert witness testimony regarding the diminution of value of plaintiff's business and related business interruption claim incident to personal physical injury. Retained by the plaintiff. Jury trial.

33. *In Re NANCY C. HARVEY and MORGAN D. HARVEY vs. NANCY DOZIER and DOUGLAS DOZIER,* Monroe Superior Court, Civil Action No. 2003-CV-81, Monroe County, Georgia. – July 28, 2004. Expert witness testimony regarding the diminution of value of plaintiff's business and related business interruption claim incident to personal physical injury. Retained by the plaintiff. Deposition.

34. *In Re FEDERAL TRADE COMMISSION vs. STEWART FINANCE HOLDINGS COMPANY, INC., et al,* United States District Court, Northern District of Georgia, Atlanta Division; Civil Action No. 1:03-CV-2648-JTC, Atlanta, Georgia. – May 10, 2004. Expert witness court testimony regarding contemptuous conduct on behalf of the defendants and interim reporting on forensic investigation. Retained by the Federal Trade Commission. Court Hearing.

35. *In Re STATE OF GEORGIA ex rel. CATHY COX, Commissioner of Securities of the State of Georgia vs. JOHN BENJAMIN STEWART, JR., UNION HOSIERY, INC., STEWART CASH ADVANCE, INC., PINEWOOD HUNTING, INC., STEWART & LAWRENCE INSURANCE AGENCY OF GEORGIA, INC., PREFERRED CHOICE AUTO CLUB, INC., THE POINT RENTAL PURCHASE, INC., STEWART FAMILY INVESTMENTS, LP, STEWART INSURANCE, LTD., J&J REINSURANCE, LTD., and STEWART MORTGAGE COMPANY, INC.,* Greene Superior Court, Civil Action No. 03-CV-448, Greene County, Georgia. – February 16, 2004. Expert witness court testimony regarding contemptuous conduct on behalf of the defendants and interim reporting on forensic investigation. Retained by the State of Georgia. Court Hearing.

36. *In Re STATE OF GEORGIA ex rel. CATHY COX, Commissioner of Securities of the State of Georgia vs. JOHN BENJAMIN STEWART, JR., UNION HOSIERY, INC., STEWART CASH ADVANCE, INC., PINEWOOD HUNTING, INC., STEWART & LAWRENCE INSURANCE AGENCY OF GEORGIA, INC., PREFERRED CHOICE AUTO CLUB, INC., THE POINT RENTAL PURCHASE, INC., STEWART FAMILY INVESTMENTS, LP, STEWART INSURANCE, LTD., J&J REINSURANCE, LTD., and STEWART MORTGAGE COMPANY, INC.,* Greene Superior Court, Civil Action No. 03-CV-448, Greene County, Georgia. – December 10, 2003. Expert witness court testimony regarding the financial status and professional conduct of the individual defendant. Case involved investigation of over $38,000,000 in fraud cash transactions. Retained by the State of Georgia. Court Hearing.

37. *In Re DEPARTMENT OF TRANSPORTATION v. 0.018 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; and KAM ME CHOW; YUN PIK KWAN CHOW, INDIVIDUALLY.* Civil Action No. 99-00564, Condemnation of Real Property, Glynn County, Georgia, Superior Court. – March 26th and 27th, 2003. Expert witness testimony regarding lost profits and diminution in business value to a restaurant, incident to condemnation. Retained by the defendant. Jury trial.

38. *In Re DEPARTMENT OF TRANSPORTATION V. 0.1385 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; AND SOUND BUILDERS & INVESTMENT CORPORATION; and FREDERICA BANK & TRUST.* Civil Action No. 99-01509, Condemnation of Real Property, Glynn County, Georgia, Superior Court. – January 23rd, 2003. Expert witness testimony regarding the value of lost business profits and diminution in property value, related to condemnation of property and easements, of a motel servicing both extended stay and daily customers. Retained by the defendant. Deposition.

Christopher S. Edwards, CPA, CPA
Curricula Vitae, continued

39. *In Re DEPARTMENT OF TRANSPORTATION v. 0.018 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; and KAM ME CHOW; YUN PIK KWAN CHOW, INDIVIDUALLY*. Civil Action No. 99-00564, Condemnation of Real Property, Glynn County, Georgia, Superior Court. – November 14th, 2002. Expert witness testimony regarding the value of lost business profits from restaurant incident to condemnation of real property and fixtures. Retained by the defendant. Deposition.

40. *In Re JENNIE MORGAN FOULKES v. GUY DONALD FOULKES*, Bibb Superior Court, Civil Action No. 00-CV-11523, Bibb County, Georgia. – October 30, 2002. Expert witness court testimony regarding the fair value of husband's interest in medical practice and surgery center. Divorce case. Retained by the plaintiff (wife). Jury trial.

41. *In Re JENNIE MORGAN FOULKES v. GUY DONALD FOULKES*, Bibb Superior Court, Civil Action No. 00-CV-11523, Bibb County, Georgia. – October 23, 2002. Expert witness testimony regarding the fair value of husband's interest in medical practice and surgery center. Divorce case. Retained by the plaintiff (wife). Deposition.

42. *In Re DWIGHT C. McDOWELL*, Chapter 7, Case No. 98-54657-RFH, United States Bankruptcy Court for the Middle District of Georgia (Macon) – June 19, 2002. Expert witness court testimony on tax ramifications associated with ownership interest in businesses, property, and causes of action. Business entities are a complex mire of interrelated transactions and interlocking directories. Testimony directly related to the tax effect to the trustee of selling those interests rather than abandonment. Retained by the trustee. Court Hearing.

43. *In Re DEPARTMENT OF TRANSPORTATION v. 0.079 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; AND AMBUBHAI M. PATEL, et al.* Civil Action No. 99-00718, Condemnation of Real Property, Glynn County, Georgia, Superior Court. – May 10th, 2002. Expert witness testimony regarding the value of lost business profits from motel incident to condemnation of real property and fixtures. Retained by the defendant. Jury trial.

44. *IN RE DEPARTMENT OF TRANSPORTATION v. 0.079 ACRES OF LAND, AND CERTAIN EASEMENT RIGHTS; AND AMBUBHAI M. PATEL, ET AL.* Civil Action No. 99-00718, Condemnation of Real Property, Glynn County, Georgia, Superior Court. – April 25th, 2002. Expert witness testimony regarding the value of lost business profits from motel incident to condemnation of real property and fixtures. Retained by the defendant. Deposition.

45. *In Re DAN K. RIVERS v. M.W. CARMICHAEL, et al*, Civil Action No. 99-V-369, Minority Shareholder Dissent, Butts County, Georgia, Superior Court. – March 26th, 2002. Expert witness court testimony regarding valuation of minority interest in closely held business and attendant damages under dissenting shareholder claim. Retained by the plaintiff. Jury trial.

46. *In Re DAN K. RIVERS v. M.W. CARMICHAEL, et al*, Civil Action No. 99-V-369, Minority Shareholder Dissent, Butts County, Georgia, Superior Court. – March 26th, 2002. Expert witness court testimony regarding corporate liability on wrongful termination, standard business practices, and apparent intent of corporate offices based analysis of financial records. Retained by the plaintiff. Jury trial.

47. *In Re PAMELA S. NEAL F/K/A PAMELA GAY TRITT v. WILLIAM RICHARD TRITT*, Civil Action, Divorce (Modification of Child Support), Houston County, Georgia, Superior Court. -- October 25th, 2001. Expert witness court testimony regarding cash flow analysis and valuation of benefit stream from several closely held businesses. Retained by the plaintiff. Jury trial.

48. *In Re STATE OF GEORGIA v. ANITA STEPHENS*, Criminal Action, 99-F-045-F, Twiggs County, Georgia, Superior Court – July 10th, 2001. Court testimony regarding the defendant's alleged skimming of school activity funds from the Twiggs County Board of Education. Testimony involved detailed analysis, asset tracing, and forensic accounting. Retained by the State. Jury trial.

49. *In Re COLUMBUS BANK & TRUST vs. RICHARD J. DENZIK and PATRICIA C. DENZIK*, Adversary No. 98-4072 in the Denzik Chapter 7 Case No. 98-41035-RFH, United States Bankruptcy Court for the Middle District of Georgia, Columbus Division – June 5th through June 6th, 2001. Expert witness testimony at trial regarding frauds committed by defendant in concealing income and net worth from the creditor. Retained by CB&T. Bench trial.

50. *In Re COLUMBUS BANK & TRUST vs. RICHARD J. DENZIK and PATRICIA C. DENZIK*, Adversary No. 98-4072 in the Denzik Chapter 7 Case No. 98-41035-RFH, United States Bankruptcy Court for the Middle District of Georgia, Columbus Division – May 15, 2001. Expert witness testimony at deposition regarding frauds committed by defendant in concealing income and net worth from the creditor. Retained by CB&T. Bench trial.

51. *In Re JAMES EDWARD SLAPPEY*, Chapter 12, Case No. 00-10784-JTL, United States Bankruptcy Court for the Middle District of Georgia, Columbus Division – December 5, 2000. Expert witness court testimony on feasibility of confirmation of Chapter 12 plan of reorganization and interpretation of the Internal Revenue Code regarding Chapter 12 debtor rights to file section 1398 short-year election. Retained by the debtor. Court Hearing.

Christopher S. Edwards, CPA, CPA
Curricula Vitae, continued

52. *In Re KMART CORPORATION v. 21ST CENTURY PETS, INC., et al*, Civil Action 98-74831, U.S. District Court for the Eastern District of Michigan, Southern District – August 21st, 2000 Expert witness testimony regarding the tax returns and business practices of the defendant as well as typical business practices of closely held and commonly owned businesses. Retained by the defendant. Deposition.

53. *In Re SEA ISLAND ISLAND COTTON TRADING, INC.*, Chapter 7, Case No. 98-60161-JSD, *SEA ISLAND COTTON TRADING, INC. vs. EAGLE BANK AND TRUST*, Adversary Proceeding No. 99-06023A-JSD, United States Bankruptcy court for the Southern District of Georgia, Statesboro Division – Deposition on May 12th, 2000. Continuation of February 21st, 2000 deposition. Expert witness testimony in regard to banking practices and preferential payment aspects of over-drafting. Retained by the trustee. Deposition.

54. *In Re STATE OF GEORGIA v. ANITA STEPHENS*, Criminal Action, 99-F-045-F, Twiggs County, Georgia, Superior Court – April 12, 2000. Expert witness court testimony regarding the defendant's alleged skimming of school activity funds from the Twiggs County Board of Education. Testimony involved detailed analysis and forensic accounting. Retained by the State. Jury trial.

55. *In Re TERRY B. DICKERSON v. SCOTTIE KAYLOR and GENESIS INVESTMENT CORPORATION, INC.*, Civil Action 1999CV08594, Fulton County, Georgia, Superior Court – March 30, 2000. Expert witness court testimony regarding the financial condition of the defendant relative to the plaintiff's motion for the appointment of a receiver / custodian. Retained by the defendant. Bench trial. Subsequently ordered by the Court to serve as co-mediator. Court Hearing.

56. *In Re HERCULES AUTOMOTIVE PRODUCTS, INC.*, Chapter 7, Case No. 96-10514-JDW, *HERCULES AUTOMOTIVE PRODUCTS, INC. vs. WEDGESTONE FINANCIAL, et al*, Untied States Bankruptcy Court for the Middle District of Georgia, Macon Division -- March 2nd, 2000. Expert witness testimony in regard to generally accepted accounting principles regarding accounting concepts for corporate mergers and acquisitions. Retained by the trustee. Bench trial.

57. *In Re SEA ISLAND ISLAND COTTON TRADING, INC.*, Chapter 7, Case No. 98-60161-JSD, *SEA ISLAND COTTON TRADING, INC. vs. EAGLE BANK AND TRUST*, Adversary Proceeding No. 99-06023A-JSD, United States Bankruptcy court for the Southern District of Georgia, Statesboro Division – February 21st, 2000. Expert witness testimony in regard to banking practices and preferential payment aspects of over drafting. Retained by the trustee. Deposition.

58. *In Re HERCULES AUTOMOTIVE PRODUCTS, INC.*, Chapter 7, Case No. 96-10514-JDW, *HERCULES AUTOMOTIVE PRODUCTS, INC. vs. WEDGESTONE FINANCIAL, et al*, Untied States Bankruptcy Court for the Middle District of Georgia, Macon Division -- January 19th, 2000. Expert witness testimony in regard to debtor solvency, bankruptcy standards, and generally accepted accounting principles. Representing the trustee. Bench trial.

59. *In Re CORTEZ VS. ROBITZSCH*, Civil Action 98-CV-2342, Divorce (Modification of Child Support), Bibb County, Georgia, Superior Court. -- December 6th, 1999. Expert witness testimony to present an earnings analysis and depiction of cash flow benefits received by a party from a closely held business. Retained by the plaintiff. Jury trial.

60. *In Re HERCULES AUTOMOTIVE PRODUCTS, INC.*, Chapter 7, Case No. 96-10514-JDW, *HERCULES AUTOMOTIVE PRODUCTS, INC. vs. WEDGESTONE FINANCIAL, et al*, Untied States Bankruptcy Court for the Middle District of Georgia, Macon Division -- Deposition on June 28th, 1999. Expert witness testimony in regard to debtor solvency, preference actions and ordinary course, and reasonableness of management and acquisition fees. Retained by the trustee. Deposition.

61. *In Re SHEETEX, INC.*, Chapter 7, Case No. 98-52263-JDW, *SHEETEX, INC. vs. LEISA MADONIAN*, United States Bankruptcy Court for the Middle District of Georgia, Room B, Macon Division – April 28th, 1999. Expert witness deposition testimony regarding alleged frauds committed, or where complicit, by defendant as well as testimony on solvency of the debtor corporation, Ponzi schemes, greater percentage tests, and asset tracing. Retained by the trustee. Deposition.

62. *In Re SAMUEL MADONIAN.*, Chapter 11, Pending Involuntary Case, United States Bankruptcy Court for the Middle District of Georgia, Room B, Macon Division – September 29th, 1998. Expert witness, in hearing on motion for appointment for interim trustee, regarding the effects and inferences drawn from detailed financial transaction registers in identifying frauds. Retained by the creditor. Court Hearing.

63. *In Re D&D HINES ENTERPRISES, INC. vs. TRIAD SYSTEMS CORPORATION* Civil Action No. 94-52-3-MAC, Business Valuation and Lost Profits, Bibb County, Georgia, Deposition. -- March 5, 1997. Expert witness testimony regarding the valuation of business entity as to the cash flow and profits, accounting software effectiveness, and lost profits. Retained by the defendant. Deposition.

Christopher S. Edwards, CPA, CPA
Curricula Vitae, continued

64. *In Re BURRESS v. BURRESS* Civil Action No. 96-CV-11055, Divorce Action, Bibb County, Georgia, Superior Court. -- February 4, 1997. Jury trial. Expert witness testimony regarding the valuation and allocation of marital assets, tax implications of alimony, and valuation of retirement assets. Retained by the plaintiff. Jury trial.

65. *In Re LOCAL GOVERNMENT UNDERWRITERS, INC.*, Chapter 7, Case No. 93-52287, *NATIONSBANK, INC. v. J. COLEMAN TIDWELL, TRUSTEE*, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- May 20, 1996. Expert witness testimony regarding the equities of substantive consolidation. Retained by the trustee. Court Hearing.

66. *In Re CODY'S OF LOWNDES COUNTY, INC.*, Chapter 7, Case No. 92-70064, *WALTER W. KELLEY, TRUSTEE v. STRAUSBURGER ENTERPRISES*, Adversary Proceeding Number 94-7028, United States Bankruptcy Court for the Middle District of Georgia (Valdosta) – April 4th, 1996. Expert witness testimony regarding the valuation and solvency of business in preference adversary. Retained by the trustee. Bench trial.

67. *In Re OWEN WILLIAMS vs. BIBB COUNTY, GEORGIA et al*, Civil Action No. 93-203-3-Mac, United States District Court, Judge Fitzpatrick -- August 8, 1995. Expert witness testimony regarding the valuation and allocation of retirement benefits and "front pay" incident to wrongful termination. Retained by the defendant. Jury trial.

68. *In Re LOCAL GOVERNMENT UNDERWRITERS, INC.*, Chapter 7, Case No. 93-52287, *J. COLEMAN TIDWELL, TRUSTEE v. ADIEN E. BARNES, III*, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- February 22, 1995. Expert witness testimony regarding compromise of adversary. Retained by the trustee. Bench trial.

69. *In Re PUBLIC SCHOOLS UNDERWRITERS, INC.*, Chapter 7, Case No. 93-52288, *J. COLEMAN TIDWELL, TRUSTEE v. ADIEN E. BARNES, III*, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- February 22, 1995. Expert witness testimony regarding compromise of adversary. Retained by the trustee. Bench trial.

70. *In Re ARRINGTON v. ARRINGTON*, Civil Action No. 94CV4018, Divorce Action, Bibb County, Georgia, Superior Court. -- February 2, 1995. Expert witness testimony regarding the valuation and allocation of marital assets. Retained by the plaintiff (wife). Jury trial.

71. *In Re ADIEN E. BARNES, III*, Chapter 11, Case No. 93-515414, *WILLIAM M. FLATAU, TRUSTEE v. ADIEN E. BARNES, III*, Adversary Proceeding No. 93-5121, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- October 24, 1994. Expert witness testimony regarding compromise of adversary. Retained by the trustee. Bench trial.

72. *In Re ADIEN EMMETT BARNES, III*, Chapter 11, Case No. 93-51514, *WILLIAM M. FLATAU, TRUSTEE v. ADIEN E. BARNES, III*, Adversary Proceeding No. 93-5121, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- August 24 and September 1 of 1994. Expert witness testimony regarding valuation of claim incident to shareholder pass-through transactions. Retained by the trustee. Deposition.

73. *In Re GLASSTREAM BOATS, INC.*, Chapter 7, Case No. 89-70417, *WALTER W. KELLEY, TRUSTEE v. BOMBARDIER CAPITAL, INC. and A.L. KIRKLAND, JR.* Adversary Proceeding No. 92-7018, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- April 26, 1993. Expert witness testimony regarding valuation and analysis of preference action. Retained by the trustee. Deposition.

74. *In Re OTIS REDDING, III*, Chapter 11, Case No. 91-53859, United States Bankruptcy Court for the Middle District of Georgia, Macon Division -- August 31, 1992. Expert witness court testimony on feasibility of confirmation plan. Retained by the debtor. Court Hearing.

# EXHIBIT 2

**January 1, 2009 Employment Agreement**

# EXHIBIT 3

**Documents related to DeBrock Poodles**

# EXHIBIT 4

**Documents related to Southern Adventist University**

# EXHIBIT 5

**Chronology of Dalton project**

# EXHIBIT 6

**Documents related to Dalton renovation project**

# EXHIBIT 7

**Documents related to the Mark Hunt Consulting Agreement**

# EXHIBIT 8

**Documents related to Healthtrust Purchasing Group, LP**

# EXHIBIT 9

**Documents related to the deployment of Omnicells**

# EXHIBIT 10

**Documents related to "LG CNS Healthcare Solutions"**

# EXHIBIT 11

**CHS Corporate Governance Policies and Procedural Guidelines**

**Adopted May 5, 2009**

# EXHIBIT 12

**CHS Corporate Governance Policies and Procedural Guidelines**

**Adopted June 24, 2014**

# EXHIBIT 13

**Expense Reports of Stephanie Dotson**

# EXHIBIT 14

**Expense Reports of Mark Waldrop**