IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,                    :

       PLAINTIFF,              :

    VS.                             :     CASE NO.  4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS,           :
INC.,
                         :

       DEFENDANT.

APRIL 26, 2017          MACON, GEORGIA              9:00 A.M.

    Deposition of **DIANA WILKES**, called before Laura M.

Jackson, Certified Court Reporter, State of Georgia,

Certificate No. B-959, testimony taken in the offices of

Smith, Hawkins, Hollingsworth & Reeves, 688 Walnut Street,

Macon, Georgia, beginning at approximately 9:00 a.m., April

26, 2017.

Now Offering Video Conferencing

# Hawthorne & Webb Court Reporting

149 River Hills Lane
Macon, Georgia 31211
Phone:  478.746.2295
LAURA@HAWTHORNE-WEBB.COM

APPEARANCES:

FOR THE PLAINTIFF:            MR. GARY L. HENRY
                             Gearhiser, Peters, Elliott
                             & Cannon
                             320 McCallie Avenue
                             Chattanooga, Tennessee  37402
                             ghenry@gearhiserpeters.com


FOR THE DEFENDANT:           MR. HAROLD T. DANIEL
                             Holland & Knight
                             Regions Plaza
                             Suite 1800
                             1180 West Peachtree Street
                             Atlanta, Georgia  30309
                             harold.daniel@hklaw.com


ALSO PRESENT:                MR. MARK WALDROP, Plaintiff
                             MS. LORRAINE TAYLOR
                             MS. MICHELLE MOORE-ANDREWS


REPORTER'S NOTE:             Witness RESERVES reading and
                             signing of the document.


**INDEX**

CROSS EXAMINATION                              3
BY MR. HENRY


————————————————

**EXHIBITS**

EXHIBIT DESCRIPTION & NO.                ID'D AT PAGE

PLAINTIFF'S EXHIBIT NO. 1                     61
EXPENSE REIMBURSEMENT REPORT

PLAINTIFF'S EXHIBIT NO. 2                     88
WALL'S QUESTIONS FOR WILKES

1   STIPULATIONS:

2           (It is stipulated and agreed by and between counsel

3       appearing for the respective parties that those

4       stipulations governing the taking of the deposition of

5       JOE WALL will likewise govern the taking of the

6       deposition of DIANA WILKES.)

7                   ————————————————

8                       **DIANA WILKES**

9               Witness having been first

10               duly sworn, testified on

11               CROSS EXAMINATION

12   BY MR. HENRY:

13       Q    Ms. Wilkes, we met briefly before the deposition

14   started but just for the record, my name is Gary Henry and I

15   represent Mark Waldrop in this litigation that we're here

16   about today that's pending against Community Health Systems.

17   If you would, just state your full name for the record.

18       A    Diana Hopper Wilkes.

19       Q    Have you ever given a deposition before?

20       A    I have.

21       Q    Okay.  So you're probably familiar with how the

22   process works but I'll just go over a few things and we can

23   get started.  First, I'm going to ask you some questions.

24   I'm not trying to be tricky or unclear so if I ask you a

25   question you don't understand, let me know and I'll do my

1  best to rephrase it.  However, if I ask a question and you

2  answer it, I'm going to assume you understood it.  Is that

3  fair?

4        A    Yes.

5        Q    Okay.  And you've done a great job with it just now

6  but if you would please, give verbal answers.  Often in

7  normal conversation, it's common to say uh-huh or uh-uh or

8  shake your head, nod your head, but that doesn't really come

9  across on the transcript.  So if you do that, and it probably

10 will happen, I'll say is that a yes or is that a no?  I'm not

11 trying to be rude.  I'm just trying to be sure your answer

12 shows up on the transcript.  Okay?

13       A    I understand.

14       Q    All right.  If at any time you need a break, let me

15 know.  We'll accommodate.  The only exception to that is if

16 there's a question pending, I'd like to go ahead and get an

17 answer before we break.  Okay?

18       A    I understand.

19       Q    All right.  I don't think we're going to be here

20 too long so hopefully, we won't have too many breaks but

21 we'll see.

22       Ms. Wilkes, if you would, just tell me where you live.

23       A    I live at 515 Park Circle and that's in Forsyth,

24 Georgia.

25       Q    Okay.  And how far away is Forsyth from Macon?

```
1        A    It's about 30 miles.

2        Q    How long have you lived there?

3        A    Five years.

4        Q    Where did you live before that?

5        A    I lived in Rome, Georgia.

6        Q    How long did you live in Rome?

7        A    Three years.

8        Q    Do you have family in Rome?

9        A    I don't.

10       Q    Any relatives over the age of 18 that live in the

11   northwest Georgia area?

12       A    I don't.

13       Q    And just so --

14       A    Well, northwest Georgia.  I have some family in

15   Douglasville, Georgia, which I would not really consider that

16   northwest but --

17       Q    Well, just so you know, the reason I'm asking is

18   this is a case where a jury has been requested and so I just

19   want to be sure that there's no relationships or anything

20   from a potential jury pool.  And with you saying you lived in

21   Rome, that's actually where the case is pending --

22       A    Okay.

23       Q    -- so I just wanted to be sure that we covered

24   that.  But you don't have any relatives in the Rome area?

25       A    I don't.
```

1    Q    Are you married?

2    A    I am.

3    Q    What's your husband's name?

4    A    Barry Wilkes.

5    Q    What does Mr. Wilkes do for a living?

6    A    He is a full-time nursing student right now.

7    Q    Where?

8    A    At Gordon in Barnesville.

9    Q    How long has he been a nursing student?

10   A    He's been back in school a year now.

11   Q    What did he do before that?

12   A    Prior to that he worked for a DME company that's

13   owned by Navicent and he delivered and set up oxygen

14   equipment.

15   Q    Is he a preacher?  Part-time preacher?

16   A    He's not.

17   Q    Okay.  I don't know where I got that idea but I

18   heard that somewhere.

19   A    He's my Sunday School teacher.

20   Q    Maybe that's what it was.  Okay.

21   A    Maybe.

22   Q    Where are you currently employed?

23   A    Community Health Services of Georgia.

24   Q    How long have you been an employee of Community

25   Health Services of Georgia?

```
1        A    I've been employed for eight years this November.

2        Q    We have in the course of this case discussed what I

3   call affiliates of Community Health Systems.  Is your actual

4   employer Community Health Systems or is it one of these

5   affiliates?

6        A    Right now, my employer is Ethica --

7        Q    Okay.

8        A    -- which is a member organization of Community

9   Health Services.

10       Q    How long have you been employed by Ethica?

11       A    By Ethica?  I would say since 2011.

12       Q    Okay.  And before becoming an employee of Ethica,

13  did you work for another affiliate of Community Health

14  Systems?

15       A    I did.

16       Q    Which one?

17       A    Community Health Foundation.

18       Q    And I'm sorry, how long did you say you have been

19  with Ethica?

20       A    With Ethica, since 2011.

21       Q    So how long were you with Community Health

22  Foundation?

23       A    I started in November of 2009.

24       Q    Was that the first --

25       A    Yes.
```

1      Q    -- job you had?  Okay.

2      A    Yes.

3      Q    Where were employed prior to November of 2009?

4      A    I was employed with Golden Living Centers.

5      Q    Is that an entity that Randy Coody had an ownership

6  interest in?

7      A    No.

8      Q    No?  Okay.  Sounds familiar to me.  What is Golden

9  Living Centers?

10     A    Before it divested recently it was a national

11  healthcare company.  It's a long-term care.

12     Q    Is the one that Randy Coody had some ownership

13  interest in, Golden Age?

14     A    That sounds familiar.

15     Q    Okay.  That's where I was getting that from, just

16  so you know. How long were you with Golden Living Centers?

17     A    I was with Golden Living from 2004 to 2009.

18     Q    All right.  And before Golden Living Centers?

19     A    I was with another healthcare company, USA

20  Healthcare.

21     Q    Is that a long-term care --

22     A    It is.

23     Q    -- entity?  How long were you with them?

24     A    I was with them from 1998 to 2004.

25     Q    All right.  Before USA Healthcare?

1  A I was at Coleman Healthcare.  I'm sorry, Gadsden

2 Healthcare for just a short period of time.  It was also

3 another healthcare company.

4  Q In Alabama?

5  A It was.

6  Q And how long were you with Gadsden?

7  A Less than a year, and it was my first full-time

8 employment.

9  Q Do you have any formal education past high school?

10  A I do.  I have a bachelor's degree in business.

11  Q Where did you receive your bachelor's?

12  A From Athens University in Alabama.

13  Q And would that have been in '97?

14  A No.  I actually did not finish the bachelor's until

15 2014 when I was working with this organization.

16  Q Okay.

17  A Prior to that, I had been in college since 1997 but

18 had changed majors.  So I completed it during my employment

19 with this organization.

20 (OFF THE RECORD)

21  Q MR. HENRY:  Ms. Wilkes, what is your current title?

22  A I'm the Senior Vice-President of Inpatient

23 Services.

24  Q For Ethica?

25  A For Community Health Services of Georgia.

1      Q      How long have you had that title?

2      A      Since January, I believe.

3      Q      January of this year?

4      A      I believe so.  Yes.

5      Q      What was your title before Senior Vice-President of

6  Inpatient Services?

7      A      Senior Vice-President of Skilled and Provider

8  Services.

9      Q      Also for Community Health Systems of Georgia?

10     A      Yes.

11     Q      How long did you hold that title?

12     A      I believe that title change was in July of last

13  year.

14     Q      Or after Mr. Waldrop's termination?

15     A      I'm not quite sure when it went into effect.  It

16  was discussed -- Mark and I discussed it before his leaving

17  but I can't recall if the actual title change occurred before

18  or after.

19     Q      Okay.  And what was your title before Senior Vice-

20  President of Skilled -- what was it again?

21     A      I was the President of Ethica.

22     Q      And how long had you been President of Ethica?

23     A      I was President of Ethica for a two-year period, I

24  believe.

25     Q      So from approximately mid-2014 to mid-2016?

1     A     Yes.

2     Q     And before being President of Ethica, what was your

3   title?

4     A     I was a regional President with Ethica.

5     Q     Okay.  How long did you have that title?

6     A     Probably a year.  I started in 2009 and I know that

7   I did outreach until 2011 so a year to two years.

8     Q     If you would, describe your duties as President of

9   Ethica.

10     A     I provided leadership support to the leadership

11   team of Ethica and also multiple regional vice-presidents and

12   provided leadership and consulting services to our skilled

13   nursing centers.

14     Q     As President of Ethica, who was your supervisor?

15     A     Mark Waldrop.

16     Q     How would you describe your working relationship

17   with Mark Waldrop?

18     A     Mark and I had good and bad times together.

19     Q     Okay.

20     A     Obviously, he saw something in me that caused him

21   to promote me several times.  He awarded me in front of the

22   group several times but there were also very negative times

23   in our relationship.

24         Mark led by fear and intimidation and there were times I

25   didn't feel secure in the organization or in my relationship

1  with Mark.  So it was tumultuous, at best.

2      Q    Can you provide an example of a time when Mr.

3  Waldrop led by fear and intimidation?

4      A    You know, one thing that comes to mind, several

5  years ago, I couldn't really tell you the date but Mark was

6  very reactionary to anything that happened.  So we had a

7  maintenance person that was in one of our nursing centers

8  working after hours that suffered an acute event and he

9  passed away.  He was working.

10      The next morning, I called Mark to make him aware and he

11  was very upset that something like that could have happened

12  in one of our centers and as a matter of fact, he said how

13  did you let something like this happen?  That was a very

14  stressful situation for me because it was not something that

15  we could have prevented.  It was not unusual that someone

16  could be working in our centers after hours particularly in

17  maintenance.  And I was more concerned for the well-being of

18  the associates there and Mark was very upset that that was

19  something that he would have to provide information to Ronnie

20  about.

21      Another example is, you know, if I was not available to

22  answer the telephone, that would make Mark very angry and he

23  would often call a direct report of mine and has said

24  negative things to them about me not being able to answer the

25  phone.  And there were very legitimate reasons not to answer

1 the telephone.

2        Mark would pick inopportune times to do a center visit

3 and then call and berate me for the outcome knowing that

4 there was an important event, like a holiday luncheon coming

5 up.  A lot of it was just approach and his style.

6        Q    Who is your current supervisor?

7        A    Ronnie Rollins.

8        Q    How would you compare Ronnie Rollins' managerial

9 behavior to Mr. Waldrop's?

10       A    Did you say how would I compare it?

11       Q    Uh-huh (affirmative).

12       A    My impression of Ronnie now is very different than

13 what my impression of Ronnie was prior to Mark's leaving.  I

14 did not have a lot of exposure to Ronnie though Mark did

15 speak negatively about him when he was employed.  My

16 impression of Ronnie now is that he's kind, he's supportive.

17 We've been able to make a tremendous amount of progress in a

18 short period of time working directly with he and Lorraine.

19 It's been very positive.

20       Q    I want to ask you about some specific events that

21 occurred while Mr. Waldrop was COO of Community Health

22 Systems.  The first one is what has been referred to as the

23 LG pilot.

24       A    Okay.

25       Q    Are you familiar with that?

1      A    I am.

2      Q    What is the LG pilot?

3      A    LG is a company that we are working with for an

4  electronic health record and we've completed the pilot phase

5  of that at this point.  But it is a pilot project to decide

6  whether we wanted to move forward with the implementation of

7  an electronic health record with LG.

8      Q    Did you say that has been implemented?

9      A    It's being implemented.

10     Q    Being implemented.  Okay.  When did the LG pilot

11  program start?  When did you first start looking into this?

12     A    I would have to reference a calendar or a document

13  but it's been several years.

14     Q    While Mr. Waldrop was COO?

15     A    Yes.

16     Q    Okay.  What was your involvement in the LG pilot

17  project?

18     A    I was the project sponsor.

19     Q    What does that mean?

20     A    It means that I was the person in leadership that

21  sponsored putting the project forward to Mr. Waldrop.

22     Q    What was the status of the LG pilot at the time Mr.

23  Waldrop was terminated?

24     A    It was still in the pilot phase.  So we were

25  piloting it at two of our skilled nursing centers.

1    Q    Which two?

2    A    At Meadows and Scott.

3    Q    Where is the Meadows facility located?

4    A    It's in Vidalia.

5    Q    Where is the Scott facility?

6    A    It's in Soperton.

7    Q    Where is that?  What state?

8    A    Down south.

9    Q    Down south?

10   A    Georgia.

11   Q    South Georgia?

12   A    South Georgia.

13        MR. DANIEL:  You passed it on Interstate 16.

14        MR. HENRY:   Okay.

15   Q    MR. HENRY:  Soperton?

16   A    I believe it's Soperton.  There's lots of little

17   communities down there that we're in.  I believe it's

18   Soperton.

19   Q    Okay.  Do you recall a meeting that occurred in

20   early, I believe it was early 2016, in which Mr. Rollins

21   asked when he was going to see the LG pilot?

22   A    I don't recall.  I don't recall a meeting in

23   particular about LG with Mr. Rollins.

24   Q    Do you recall telling either Mr. Waldrop or Mr.

25   Rollins that you did not feel comfortable showing the LG

1    pilot until you were confident it was a good fit for Ethica?

2        A    I don't recall.  I don't recall that conversation.

3    I do recall showing them.  I do recall us having a meeting at

4    Meadows and demonstrating it.  I'm not sure of the timeframe.

5        Q    Well, do you recall any time when Mr. Rollins

6    demanded to see the LG pilot?

7        A    No.

8        Q    Okay.  During the investigatory phase of this pilot

9    program, was that one of your concerns that you didn't want

10   to show it to anybody above you until you were sure it would

11   be a good fit for Ethica?

12       A    No.  Mark was aware of it from the very beginning.

13   Had attended multiple meetings, had seen a demonstration.  I

14   had no concerns about LG.

15       Q    Tell me about this showing of the LG software at

16   the Meadows facility.  When was that?

17       A    Sometime early 2016, I would say.

18       Q    Okay.  How did that go?

19       A    I think it went well.

20       Q    Are you familiar with the term C Suite?

21       A    Yes.

22       Q    What is the C Suite?

23       A    That's the executive suite where the titles of CEO,

24   COO, and CFO.

25       Q    Okay.  So during the period that Mr. Waldrop was

```
 1   COO, the C Suite would have been Mr. Rollins as CEO, Mr.

 2   Waldrop as COO, and Ms. Taylor as CFO?

 3        A    Correct.

 4        Q    Who was present for the presentation of the LG

 5   software at Meadows?

 6        A    It was Jill Snow, Sylvia Rowe, and I from Ethica.

 7   And then Ronnie Rollins, Mark Waldrop, and Lorraine Taylor

 8   from the system.  And then there were multiple staff from the

 9   nursing center that we toured with and that did

10   demonstrations of the various tools of the product.

11        Q    Okay.  So three representatives of Ethica, the C

12   Suite, and then various employees at the Meadows facility?

13        A    Correct.

14        Q    Have you ever heard that Mr. Rollins complained

15   about how expensive it was for all of the members of the C

16   Suite to be present for that demonstration?

17        A    No.

18        Q    Would it surprise you Mr. Rollins would have made a

19   complaint like that?

20        A    I'm not aware that he made a complaint like that.

21        Q    Hypothetically, if he did, would that be surprising

22   to you?

23        A    I don't know what I would make of a comment like

24   that.  It was an important project.

25        Q    Something that you feel justified having the C
```

1    Suite there?

2        A    Yes.

3        Q    And this demonstration occurred, I think you said,

4    sometime in early 2016?

5        A    I believe so.

6        Q    But it has not yet been implemented, as it?

7        A    It's in the implementation process now.

8        Q    How much longer will it take for it to be fully

9    implemented?

10       A    We're trying to do a responsible roll out of that.

11   It's a significant undertaking for a health system so it will

12   likely take a year for every building to be on LG.

13       Q    When did the implementation process begin?

14       A    That began within the last 60 days.  I'm terrible

15   with dates.  If I had a calendar, I could probably tell you

16   exactly but it's been recent.

17       Q    Okay.  So would it be fair to say that after this

18   meeting where you demonstrated the software at the Meadows,

19   it took approximately a year for the implementation to begin?

20       A    The timing of that sounds close.

21       Q    And your testimony is that that meeting at the

22   Meadows was a success?

23       A    I felt it was successful.  Yes.

24       Q    I'm going to talk about time and attendance.

25       A    Okay.

1     Q     Did you participate or attend a meeting or showcase

2  of time and attendance vendors in Las Vegas?

3     A     I did.

4     Q     When was that?  The best you can do right now.

5     A     I really hate to guess about that.  It's been over

6  a year, I would say.

7     Q     While Mr. Waldrop was COO?

8     A     Yes.

9     Q     Who was present for that meeting in Las Vegas?

10    A     Sure.  That was Mark Waldrop, Blair Lake, and

11 Michelle Andrews, and I.

12    Q     What was the purpose of y'all going to Las Vegas?

13    A     The original purpose of Blair and I going to Las

14 Vegas was for a demonstration or for a trade show.  We had

15 been piloting VIKUS, which is an applicant tracking and

16 behavioral testing system.

17    Q     VIKUS?

18    A     VIKUS.  Uh-huh (affirmative).

19    Q     Can you spell that?

20    A     V-I-K-U-S.

21    Q     Okay.

22    A     And Blair had wanted to go to that trade show and

23 made me aware of it and I had agreed to go with him.  It

24 morphed into the four of us going to then go through the

25 trade show, which we did, and meet with two time and

1    attendance vendors.  That wasn't the original intent of that

2    trip.

3        Q    What time and attendance vendors did you meet with

4    in Las Vegas?

5        A    I believe that we met with Workday and what's the

6    other one?

7        Q    Kronos?

8        A    It was either Kronos or there was a third.  There

9    were three time attendance vendors that we spoke with.  I

10   don't recall which two it was on that trip.  I know Workday

11   was one of those.  It was either Kronos or the other time and

12   attendance vendor.

13       Q    Okay.

14       A    It had an unusual name.

15       Q    So originally, just you and Mr. Lake went out

16   there?

17       A    That was the intention, originally, was that Blair

18   and I were going to go out and look at some alternatives for

19   applicant tracking and behavioral testing.  And then it

20   morphed into the four of us going out and looking at time and

21   attendance vendors.

22       Q    Okay.  When it morphed into the four of you going

23   out, had you and Mr. Lake already gone to Las Vegas or did

24   the four of you go?

25       A    The four of us went.

1      Q     Okay.  Who paid your expenses?

2      A     The company.

3      Q     Did you feel that was a legitimate expense for the

4   company?

5      A     I think that the original intention of the meeting

6   -- we go to conventions and trade shows --

7      Q     Uh-huh (affirmative).

8      A     -- so that's a legitimate expense.  What that

9   meeting shifted into probably didn't require that all four of

10  us attend that but conferences and trade shows are something

11  that we have expensed with the organization before.

12     Q     And who made the decision for Ms. Andrews and Mr.

13  Waldrop to attend this conference?

14     A     My understanding in conversation with Blair is that

15  Mark made that request.

16     Q     Have you ever heard anybody complain about the cost

17  of that trip?

18     A     I was asked about that trip in general by Joe Wall

19  during his investigation post Mark's employment.

20     Q     Would that have been on July 8th, 2016?

21     A     That sounds about right.

22     Q     Is that the only time that anybody said anything

23  about that trip to you?

24     A     I'm sure that it has come up but typically, during

25  the course of the investigation.

1      Q     Other than this discussion you've had with Mr. Wall

2   on or about July 8th, 2016, which we'll come back to later,

3   has anyone at CHSI or any of its affiliates expressed concern

4   over the cost of that trip?

5      A     It has been a topic that has been discussed but I

6   don't know all the specifics around what those concerns are

7   beyond my personal involvement of being questioned about that

8   trip from Joe.

9      Q     Anybody else questioned you about it?

10     A     No.  Not formally questioned me.

11     Q     Have you had discussions with anybody else at

12  Community Health Systems about it?

13     A     I recall it coming up in general discussion.  We've

14  done quite a lot of training around reimbursable expenses.

15     Q     Did you have discussions with Ms. Taylor about it?

16     A     I'm sure that we have.  I'm sure it's come up in

17  conversation.

18     Q     Any discussions with Mr. Rollins about it?

19     A     It's likely come up in conversations.  I don't

20  recall anything specific.

21     Q     How much was the total cost?

22     A     I don't know.

23     Q     Do you know how much your total cost was?

24     A     I don't.

25     Q     Did you submit the expense reimbursement request?

1        A    I don't recall.

2        Q    Who would have submitted it if you didn't do it?

3        A    Well, there were times that if it was a group like

4   that, there were times that Stephanie Dotson would make those

5   arrangements.  I had an assistant that could have made those

6   arrangements and expensed it through my expense report.  I

7   just don't recall the specific amount or who.  I don't recall

8   who coordinated that trip.

9        Q    What is your assistant's name?

10        A    My assistant's name at the time was Ylice Crews.

11   Y-L-I-C-E.

12        Q    How long was Ms. Crews your assistant?

13        A    She was my assistant until I moved into the Senior

14   VP role so until --

15        Q    July-ish of 2016?

16        A    Probably.  Yeah.  I would have to look at Workday

17   to tell you exactly.

18        Q    Was she your assistant during the period that Mr.

19   Waldrop was COO?

20        A    Yes.

21        Q    Okay.  When Ms. Crews was your assistant, would she

22   sometimes make travel arrangements for you?

23        A    She would.

24        Q    Would she ever incur expenses on your behalf?

25        A    She used either the corporate American Express or

1   my personal credit card and she prepared my expense reports

2   in Workday and then those were submitted to Mark.  But I

3   don't recall her expensing any travel that she would have

4   paid for and been reimbursed for.

5        Q    Did Ms. Crews ever incur expenses for which she

6   sought reimbursement?

7        A    Oh, yes.

8        Q    And how did that process work?

9        A    The same as it does today.  She completed an

10  expense report in Workday and then that comes to me for

11  approval.

12       Q    Does anybody else have to approve it?

13       A    For my assistant?  I don't believe so.

14       Q    Okay.  You said that Ethica had a corporate

15  American Express card?

16       A    Uh-huh (affirmative).

17       Q    You are currently employed by Community Health

18  Systems of Georgia.  Correct?

19       A    Correct.

20       Q    Does Community Health Systems of Georgia have the

21  corporate American Express Card?

22       A    I don't have one with Community Health Services of

23  Georgia.  I'm not familiar with what they have or don't have.

24  I have a personal American Express that I use for expenses.

25       Q    And you seek reimbursement for those?

1        A     I do if it's within guidelines.  Yes.

2        Q     Okay.  Who is your current assistant?

3        A     I have Tina Pruett.

4        Q     Does Ms. Pruett ever make travel arrangements or

5   similar arrangements on your behalf?

6        A     She does using my American Express.

7        Q     Are you familiar with a Time and Attendance

8   Committee?

9        A     I am.

10       Q     Were you a member of that committee?

11       A     I was.  Yes.

12       Q     What was the Time and Attendance Committee tasked

13   with?

14       A     We were looking for a time and attendance vendor

15   and also a scheduling vendor.

16       Q     Okay.  When was the committee formed?

17       A     That's over a year ago.

18       Q     Well, let's see if we can pin it down.  Would it

19   have been 2015?

20       A     Possibly 2015.  Yeah.

21       Q     Early or late 2015?

22       A     I don't know.  I would have to look at a calendar

23   or a document around that.  I know what precipitated the need

24   for that was a CMS regulation, payroll based journal entry.

25   We refer to it as PBJ.  It was a requirement that was coming

```
 1   up that required us to do an electronic entry of hours that
 2   were worked and our current time and attendance system.
 3       It was going to be difficult.  We've done it but it was
 4   going to be difficult to do that and comply so the committee
 5   was formed, really, with the intention of looking at a time
 6   and attendance system that could be implemented prior to PBJ
 7   coming into play.
 8       Q    Okay.  Do you know when PBJ went into effect?
 9       A    We're submitting that now.  I think it was
10   September of this last year.
11       Q    So September of '16?
12       A    I believe so.  Again, I'd have to look at something
13   to tell you for sure but it seems like it was fall --
14       Q    Okay.
15       A    -- when we began submitting it.
16       Q    Who else was on this committee, Time and Attendance
17   Committee?
18       A    It was a large group:  Mark Waldrop, Blair Lake,
19   Michelle Andrews, Lorraine Taylor, Ken McDonald, Angela
20   Hammock, Kim Sheffield, and she led the committee, and I.  I
21   could be missing somebody but it was a fairly large group.
22       Q    Okay.  And Kim Sheffield chaired the committee?
23       A    She did.
24       Q    What was her title at the time?
25       A    She's the VP of financial reporting for Ethica.
```

1      Q     Is that what she is currently?

2      A     She's moved to SAS.  I'm not sure if she was

3  employed with SAS, which is a member organization, or if she

4  was still employed at Ethica during that time.  But I believe

5  her title is still VP of financial reporting.

6      Q     Who is Ms. Sheffield's supervisor?

7      A     Lorraine Taylor.

8      Q     Okay.  Do you recall the Time and Attendance

9  Committee settling on two potential time and attendance

10 vendors?

11     A     I do.

12     Q     And those were Workday and Kronos?

13     A     I believe so.  Yes.

14     Q     Which one did you prefer?

15     A     I ultimately voted for Workday with contingencies

16 that they were able to make certain improvements.  I was torn

17 between the two.  Kronos was the only time and attendance

18 software that was already working through the presubmission

19 of PBJ but clearly -- it was clear to me that Mark did not

20 want Kronos, that he was advocating for Workday.  And it's

21 very difficult in my relationship with Mark to disagree with

22 him on something.

23     Q     So is it your testimony that you felt coerced or

24 pressured into voting for Workday?

25     A     Yes, I did.  There were multiple conference calls,

1   meetings, dinners before meetings where I felt like the

2   mission of that was to make me vote for Workday and

3   ultimately, I did.

4        Q    What did Ms. Taylor want?

5        A    Lorraine was an advocate for the right system and

6   believed that Kronos was it.

7        Q    You said you ultimately voted for Workday.

8   Correct?

9        A    I did.

10       Q    So was a vote taken?

11       A    It was.

12       Q    And what was the result of that vote?

13       A    The majority was Workday.

14       Q    How did Ms. Taylor react to that?

15       A    I don't recall her reaction during that meeting.

16       Q    You don't recall whether she stormed out of the

17   meeting?

18       A    I don't.  I don't recall.

19       Q    What time and attendance program was ultimately

20   approved by the committee?

21       A    There was not one that was ultimately implemented.

22   We've had to basically work through our Application Support

23   Department and Financial Services and Payroll to create

24   something that would provide that transmission to the state.

25   So ultimately, there was not a decision made.

1      Q     Was this vote for Workday by the committee ever

2  reversed or changed?

3      A     No.  We never implemented Workday.

4      Q     Did Mr. Waldrop ever indicate that those who

5  reported to him on the committee should vote in favor of

6  Kronos --

7      A     No.

8      Q     -- to keep the peace?

9      A     No.  No.  He was -- my perception was that he was

10  very much advocating for Workday.  I do recall a conversation

11  with him where he said that he was going to allow Lorraine

12  Taylor to make that decision and that if operations didn't

13  stand up for what they wanted, then financial services would

14  rule the organization.  So it was very contentious.

15      Q     You testified about Blair Lake who attended this

16  conference in Las Vegas --

17      A     He did.

18      Q     -- and he was a member of this committee.

19  Correct?

20      A     He was, yes.

21      Q     What's your opinion of Blair Lake's

22  trustworthiness?

23      A     Blair and I have always had a good working

24  relationship.  He, unfortunately, I believe, was pulled into

25  somewhat of a manipulative role and relationship particularly

1   against Angela Hammock.  I was, unfortunately, also pulled

2   into that, too.  So my personal opinion of Blair is that he's

3   a decent person, and he and I have had a positive working

4   relationship together.

5        Q    Do you have any reason to believe that if he were

6   in a deposition like you are, he would tell a lie?

7        A    I don't.

8        Q    Did you have any conversations with Ms. Taylor

9   after this vote by the Time and Attendance Committee?

10       A    No, I didn't have any personal conversations with

11   her about that.

12       Q    Did you ever hear Ms. Taylor say that she would get

13   back at Mark for this issue about the Time and

14   Attendance Committee?

15       A    No.

16       Q    Have you ever heard anybody say that she said that?

17       A    No.

18       Q    How do you believe the time and attendance issue

19   affected Ms. Taylor's relationship with Mr. Waldrop?

20       A    I know that they disagreed about vendors and I

21   believe that the way that it was handled put them in

22   opposition with each other.  They had a close relationship

23   that I witnessed or perceived, but that was something that

24   they just didn't agree on publicly.  So I can't answer for

25   either one what it did personally for their relationship.

1   But they did have that disagreement over time and attendance

2   systems.

3        Q    What did you do to prepare for your deposition

4   today?

5        A    I met with my attorney.

6        Q    Mr. Daniel?

7        A    Yes.

8        Q    Review any documents?

9        A    We reviewed -- I did review the LG project charter,

10  the pilot.

11       Q    Anything else?

12       A    There was a stack of papers.  I do recall the LG

13  project charters.

14       Q    Did you listen to any tape recordings?

15       A    I did not.

16       Q    Did you review any transcripts of tape recordings?

17       A    I didn't.

18       Q    Did you speak with anyone within Community Health

19  Systems to prepare for your deposition?

20       A    We've had general conversations about business but

21  nothing specific to prepare for the deposition.

22       Q    With whom at CHSI did you have these conversations?

23       A    Well, Michelle and Ronnie and Lorraine and I work

24  very closely together.

25       Q    Have you been present for any conversations between

1  Ronnie Rollins and Lorraine Taylor that relate to this

2  litigation?

3      A    We've had general discussions.  Quite a lot around

4  just what's acceptable and appropriate expense reimbursement.

5  We've done some training around that.  We've not had any

6  formal meetings to discuss the litigation.

7      We did discuss that I was going to be deposed and I met

8  with the attorney and reviewed some documents and discussed

9  just in general, particularly, my conversation with Joe Wall

10  when he was conducting the internal investigation.

11      Q    That conversation occurred on July 8th, 2016.

12  Right?

13      A    Sometime around there.  Yeah.

14      Q    After Mr. Waldrop was --

15      A    It was.  It was after.

16      Q    How much were you making as President of Ethica?

17      A    260-265?

18      Q    Thousand?

19      A    Yes.

20      Q    How much did you make as Senior Vice-President of,

21  I forget the title -- skilled something?

22      A    Skilled and Provider Services?

23      Q    Skilled and Provider Services.

24      A    I don't believe there was a compensation change.

25      Q    Okay.

1    A    Matter of fact, I know there wasn't a compensation

2   change because when that position was discussed with me, Mark

3   and I were talking about just the strategic operational

4   positioning and he told me that he basically had to fight to

5   keep my salary what it was even though my title was going to

6   be demoted.

7    Q    So you were going from President of Ethica to

8   Senior Vice-President of Skilled and Provider Services?

9    A    Correct.

10   Q    Did you view that as a demotion?

11   A    My understanding of it when I had dinner with Mark

12  was that it was clearly a demotion and that anyone under me

13  was going to have to have a title change as well, that had a

14  Senior VP role.  I was very unhappy about that and requested

15  to meet with he and Ronnie to discuss it.

16   Q    Before you met with Mr. Waldrop and Mr. Rollins,

17  did Mr. Waldrop tell you why you were receiving this

18  perceived demotion?

19   A    He did not.  He did not articulate it very well.  I

20  understood it as a demotion versus what I know that it was

21  now.  When I became very upset about that and requested a

22  meeting with he and Ronnie, we sat down and Ronnie explained

23  that the strategic operational positioning was something that

24  was occurring to position us to be more recognizable as a

25  health system and that I was actually being promoted to

```
 1   Senior Vice-President of the health system versus the

 2   President of Ethica.  And that was not at all how that was

 3   communicated to me at that restaurant.

 4       Q    So there again, that would be an example of Mr.

 5   Rollins being cooperative and a good boss.  Right?

 6       A    That's an example of Ronnie being able to

 7   demonstrate a clear message and that occurred in front of

 8   Mark --

 9       Q    Okay.

10       A    -- in Ronnie's office.

11       Q    What are you making now as a Senior VP of Inpatient

12   Services for Community Health Systems of Georgia?

13       A    I'm currently at $328,000.

14       Q    Let me take a quick break.

15       A    Okay.

16   (BREAK)

17       Q    MR. HENRY:  I want to go back to a couple of things

18   that we have already talked about.  Who is Robin Leake?

19       A    She is no longer with our system but she led Home

20   Health and Hospice with Steward.

21       Q    When did she leave employment?

22       A    It was after Mark left but I don't recall the exact

23   month.

24       Q    Okay.  So she was employed for a period of time

25   after Mark's termination?
```

```
1        A     She was.

2        Q     Who was her supervisor after Mark was terminated?

3        A     I believe that was Ronnie.

4        Q     I believe I remember you saying that she was on

5    this Time and Attendance Committee, was she?

6        A     No, I don't -- I don't.  She may have been.  It was

7    a big group.

8        Q     Okay.  So this list of folks that you gave me is

9    not exclusive.  There may be others?

10       A     Oh, yes.  It was a big group.  I could have added

11   one or left one out.  Robin may have been on that.  She was

12   here with us at the time and part of Leadership Council.

13       Q     But you don't remember her being that committee,

14   specifically?

15       A     She probably was.  She probably was, just being a

16   member of Leadership Council.

17       Q     Do you remember how she voted on this question

18   between Workday and Kronos?

19       A     No, I don't recall.

20       Q     Okay.

21       A     The majority was Workday.

22       Q     Who is Lynn King?

23       A     Lynn King is the VP of Community Relations.

24       Q     Is that the same title she had when Mr. Waldrop was

25   COO?
```

1       A       I believe so.   Yes.

2       Q       Who was her supervisor when Mark Waldrop was COO?

3       A       Mark.

4       Q       Who is her supervisor now?

5       A       I am.

6       Q       Was she on this committee?

7       A       She was.

8       Q       How did she vote?

9       A       I don't recall how she voted.

10      Q       Were there any people on this committee that

11      reported to Mark that voted for Kronos?

12      A       I don't recall any voting for Kronos.

13      Q       Did you have a meal with Mr. Waldrop at the

14      Bonefish Grill in Macon, Georgia, after the vote on these

15      time and attendance issues?

16      A       Specific to these issues?   I don't recall.   Mark

17      and I did have dinner there several times for update meetings

18      but I don't recall a dinner for that specific issue.   I

19      believe that's where we had dinner to talk about strategic

20      operational positioning.

21      Q       Okay.

22      A       There was a group of us that had dinner and I don't

23      know if it was the entire Leadership Council.   I recall Blair

24      and Michelle and Mark and I being there.   Robin was likely

25      also there.

1    Q    Okay.

2    A    And we specifically discussed the time and

3  attendance project and that was prior to the vote.

4    Q    Do you recall any instance where you've had a meal

5  with Mr. Waldrop at the Bonefish Grill after the vote?

6    A    I know that we had dinner there to talk about

7  strategic operational positioning.  Mark and I often did

8  update meetings at different restaurants.

9    Q    Do you recall telling Mr. Waldrop at the Bonefish

10  Grill in Macon, Georgia, that Ken McDonald had told you that

11  Lorraine Taylor said she would get even with Mr. Waldrop --

12    A    No.

13    Q    -- on the time and attendance issues?

14    A    No, I don't.  I don't recall that.

15    Q    Who is Ken McDonald?

16    A    He is the VP of Financial Services.

17    Q    And his supervisor is Ms. Taylor?

18    A    Yes.  Ken was supportive of Kronos.  And Ken and I

19  had multiple conversations about the differences between

20  Kronos and Workday and unfortunately, the entire committee

21  was aware that there was tension between Mark and Lorraine

22  about Kronos and Workday.

23    Q    And you were actually, I think you said, you were

24  in favor of Kronos.

25    A    I was in favor of Kronos --

```
1        Q     In your heart of hearts --
2        A     -- but I ultimately voted --
3        Q     -- you were in favor of Kronos.
4        A     -- I ultimately voted for Workday but Ken and I had
5    multiple discussions about Kronos and the fact that it was
6    really the only time and attendance vendor that could handle
7    PBJ at the time that we felt like we needed it.  And again,
8    neither of those, ultimately, were implemented and we had to
9    create an internal system to submit that which has not been
10   the easiest.
11       Q     You said the entire committee was aware of tension
12   between Ms. Taylor and Mr. Waldrop.  I think that's what you
13   said.  Correct?
14       A     I believe so.  Uh-huh (affirmative).
15       Q     How did that tension manifest itself?
16       A     Ultimately, we were on a conference call on a
17   meeting with Mark after the vote and he told me that he was
18   going to let Lorraine make the decision and the rest of the
19   committee was basically dismissed.
20       Q     So this tension didn't manifest itself until after
21   the vote?
22       A     It was -- the day of the vote, there was quite a
23   lot of tension.  I knew that there was tension because Mark
24   told me that there was prior to that.  That Financial
25   Services wanted to go with Kronos and that Operations wanted
```

1    to go with Workday and we couldn't reach an agreement so they

2    were going to call for a vote.  I don't think that was the

3    most professional way to handle it.

4        Mark was very manipulative and he would manipulate

5    conversations with you about things -- about Kronos and

6    Workday.  He, at one point, had me believing that Financial

7    Services was against Operations.  I believe he probably had a

8    lot of people feeling a lot of tension between Operations and

9    Financial Services that I now believe was something that was

10   created by him.

11       We are working incredibly well together now.  We work

12   incredibly well with Lorraine, with Angela, with Teresa, Ken,

13   the entire team.  There is not tension between Financial

14   Services.  And I don't think the tension was warranted then

15   at the level of Mark and Lorraine.  They should have been

16   able to work through that.

17       I ultimately, with my organization, was the one harmed

18   because we couldn't reach an agreement because we never

19   implemented a time tracking system that we needed in order to

20   fully comply.  We're doing it but it's difficult.  My

21   organization's the one that really lost in this situation.

22       Q    Were you involved in any business process meetings

23   while Mr. Waldrop was COO?

24       A    Yes.

25       Q    Was there an actual committee?

```
 1        A     There was.

 2        Q     What was it called?

 3        A     Business Process Committee --

 4        Q     Okay.

 5        A     -- I think it was.

 6        Q     That makes sense to me but was --

 7        A     Yes.  I think it was Business Process Committee.

 8        Q     Okay.  And who was on that committee?

 9        A     Again, it was a big group.  I'm sure I'll miss

10   somebody but it was some Operational leaders, Financial

11   Services, and IT.

12        Q     Was Mr. Waldrop on the committee?

13        A     He was.

14        Q     Was Ms. Taylor on the committee?

15        A     Yes.

16        Q     Was Mr. Rollins on the committee?

17        A     No.

18        Q     Okay.  And what was the purpose of forming this

19   committee?

20        A     My understanding of it was to prioritize what

21   application support and IS was doing to progress different

22   programs that support Operations and Financial Services.

23        Q     Was part of the purpose to develop an expense

24   reimbursement policy?

25        A     I don't know if that was through that committee but
```

1    we did, ultimately, go through revising and implementing an

2    expense reimbursement.  The implementation of the revised

3    version didn't actually occur until, I think, after Mark

4    left.

5         Q    When did the process of developing the expense

6    reimbursement policy begin?

7         A    I don't recall the date.

8         Q    Was it while Mr. Waldrop was COO?

9         A    It was.

10        Q    2015?

11        A    I'm not sure.  2015 or '16.

12        Q    Did the committee ever review proposed expense

13   policies?

14        A    I don't recall the topics of all the meetings but I

15   recall being a part of several discussions.  Ethica has had

16   some expense policies that we shared with the group that I

17   think were ultimately adopted.

18        Q    Talking about Ethica --

19        A    Uh-huh (affirmative).

20        Q    -- I know you were the President of Ethica.

21        A    Yes.

22        Q    Were there representatives or employees of Ethica

23   that were in Financial Services and were there employees that

24   were in Operations?

25        A    I'm not sure I'm following the question.

```
 1        Q     Well, I mean, it's probably because it was a poor
 2   question.  But my understanding is that you have a group of
 3   folks that are in Financial Services --
 4        A     Correct.
 5        Q     -- and basically, their supervisor is Ms. Taylor?
 6        A     Correct.
 7        Q     Then you have a group of folks that are in
 8   Operations --
 9        A     Correct.
10        Q     -- and those folks reported to Mr. Waldrop --
11        A     Correct.
12        Q     -- when he was COO?
13        A     Correct.  Yes.
14        Q     So within Ethica, were there any Financial Services
15   folks in Ethica or was it all Operations or is that even a
16   fair question?
17        A     It's a question that probably has a few answers --
18        Q     Okay.
19        A     -- and again, it's my ill recollection of dates but
20   Financial Services transitioned to SAS and that's a member
21   organization.  And so we centralized Financial Services and
22   Lorraine is the CFO.  So yes, she provides that leadership
23   support to Financial Services.  At one point, and I think it
24   had already transitioned when I took the president's role,
25   but at one point, those Financial Service associates were
```

1    employed by Ethica.

2        Q    Okay.

3        A    But I believe at what point I took over, they were

4    already reporting to Lorraine.  But they're dedicated to

5    Ethica.  So for example, Ken McDonald's name has come up.

6    When I was President of Ethica, he was the VP of Financial

7    Services and he supported me and Ethica with financial

8    reporting.

9        Q    And that's why I asked the question.

10       A    Okay.

11       Q    Because I think you had mentioned that Ken McDonald

12   was affiliated in some way with Ethica but --

13       A    He was providing support.

14       Q    Okay.

15       A    Financial Services is centralized but they

16   typically have a member organization or two that they're

17   supporting.

18       Q    Okay.

19       A    Yeah.

20       Q    Okay.  Going back to the expense reimbursement

21   policy, proposed expense reimbursement policy.  Do you recall

22   a conference call in which this proposed expense

23   reimbursement policy was discussed?

24       A    I recall several conference calls.

25       Q    Okay.  Do you recall one specifically that Mr.

1    Waldrop participated in?

2        A    Yes.

3        Q    Were there more than one that he participated in?

4        A    I don't recall right off-hand.  We worked through

5    differences between the different member organizations

6    particularly in levels of reimbursement.  I don't recall if

7    he sat through all of those or I do recall, particularly, one

8    that he was on.

9        But there were -- Operations was really kind of

10   negotiating within itself.  There are some member

11   organizations that, you know, their rule was that you could

12   expense meals up to a certain dollar amount.  And that might

13   be a little different from another member organization.  So

14   just trying to work through some of those details.  I

15   remember Operations being very involved in that.

16       Q    Coming up with a uniform -- was part of the purpose

17   of coming up with a uniform policy on issues like that?

18       A    Issues like?

19       Q    Meal reimbursements up to a certain amount?

20       A    Meal reimbursements up to a certain amount, hotel

21   stays up to a certain amount.

22       Q    In your experience as an employee on the Operations

23   side --

24       A    Uh-huh (affirmative).

25       Q    -- did you notice that traveling was more common

1  for Operational folks than Financial Services folks?

2      A    There's a good bit of travel.  Typically, it's

3  whomever has a license that requires CEUs.  Those are the

4  folks that are going to travel more for conferences, per say.

5  We did also Operations and Financial Services together.  We'd

6  go on reward trips that were not necessarily conference-

7  specific.

8      There were conferences that Financial Services went on

9  that Operations didn't go on so I don't know, specifically,

10  the number of conferences between Financial and Operational.

11  I know that there were several per year that I attended for

12  my CEUs, for my license.

13      Q    Was there ever any travel required that was

14  unrelated to, you said, CEUs?

15      A    Uh-huh (affirmative).

16      Q    Continuing Education Units is what that is.

17      A    Uh-huh (affirmative).

18      Q    Was there ever any travel required that was not

19  related to Continuing Education?

20      A    Yes, there were.  We would travel for business,

21  just in general.  And we also, like I said, we, over the

22  course of my employment have taken several trips outside of

23  the country that were more reward related that didn't have

24  anything to do with business.  But there was business travel.

25  I recall a group of us pretty early on in the process with

```
 1   LG, going out to Texas and meeting with the folks from LG and

 2   touring their operations.  Mark had suggested that we do that

 3   as part of due diligence.  So yes, I mean, there were trips

 4   that didn't center around CEUs that were business-related and

 5   also trips that were not business-related.

 6       Q    Getting back to my question, original question, in

 7   light of that background.  Was it your experience that

 8   Operational folks traveled more than Financial Services

 9   folks?

10       A    I don't really know.  I don't know the number of

11   conferences that Operations attended versus Financial

12   Services.  I really was not a part of Financial Services

13   conferences.

14       Q    All right.  Going back to this conference call, I

15   think the one you said you specifically remember --

16       A    Uh-huh (affirmative).

17       Q    -- that Mr. Waldrop was involved in.  Was a

18   proposed expense policy discussed during that conference

19   call?

20       A    Yes.  I believe so.

21       Q    Who participated in that conference call?

22       A    I don't recall all the members but I know Financial

23   Services, there were members of Financial Services and

24   members of Operations that were on that call.

25       Q    Okay.  Were there any concerns expressed during
```

```
 1   that conference call about the expense reimbursement policy
 2   that was being proposed?
 3       A     Like I said, we were really on the Operational side
 4   negotiating what specifics needed to be placed in there in
 5   regards to dollar amounts and that sort of thing because
 6   there were some inconsistencies between just the practice.
 7   We all follow what's considered reimbursable expense from a
 8   Medicare/Medicaid guideline.  But there were various nuances
 9   with how that was administrated in the different member
10   organizations as far as amounts go.  And so I do specifically
11   recall Operations kind of negotiating and just tossing back
12   and forth what seemed reasonable to put into the final draft
13   of the policy.
14       Q     Do you recall a discussion concerning the use of
15   MapQuest to determine mileage?
16       A     I do.  I do.
17       Q     Tell me about that.
18       A     MapQuest or any other, Google Maps, would be
19   something that would be used to support mileage.
20       Q     Were any concerns expressed by the people on this
21   conference call about the use of MapQuest or Google Maps or
22   some similar program?
23       A     I believe so.  You know, we are now piloting a
24   product that is going to make that more easy.  I don't recall
25   all the specific concerns around that other than, you know,
```

1   having to do that multiple times.

2      And so I think what we ultimately agreed to with the

3   group was if you, you know, within five or six times within a

4   month if you travel from Location A to Location B, you can

5   support that with that supporting documentation, initially,

6   rather than having to do it every single time.

7      I don't recall all of the debate and discussion.  I do

8   know that we are piloting now a product called TripLog that's

9   going to make that process a bit easier.

10     Q   Okay.  During this conference call, did Mr. Waldrop

11   express any concerns about the proposed expense policy?

12     A   I don't recall.  I don't recall any specific people

13   or conversations.  I just recall a lot of general discussion.

14     Q   Do you recall anybody on that conference call

15   thinking that this expense policy was creating a gotcha

16   scenario?

17     A   No.

18     Q   Did you feel it was creating that kind of scenario

19   between Financial Services and Operational?

20     A   No.  I didn't, personally, have any issues with the

21   refinement of an expense reimbursement policy.  It's easier

22   to administer.

23      I was aware of an audit that occurred because Mark had

24   sent me the results of that audit and I had to counsel with a

25   couple of my associates who -- one in particular that I

```
1    recall that had had a glass of wine at a restaurant or a
2    hotel that she was staying at and there was an expense report
3    audit that was completed and Mark shared those results with
4    me and asked me to counsel with her and get her to repay the
5    company for that.
6         Q    Did you feel that was an appropriate thing to
7    counsel her about?
8         A    I thought that one glass of wine was probably
9    something that we needed to talk about.  It had happened a
10   bit in the past.  It didn't seem terribly excessive.  It
11   seemed like something that probably just slipped through the
12   cracks.
13        Our associates know that they're not supposed to expense
14   alcohol so I didn't feel like she had done it intentionally
15   or had done anything wrong.  Mark had a really negative
16   reaction to that expense report audit.  When he shared that,
17   he was very upset.  He was very, very upset and asked that we
18   would do that and make corrections with our staff.
19        Q    This audit that Mr. Waldrop shared with you, and it
20   resulted in this counseling of this associate on alcohol
21   expense, who prepared that audit?
22        A    Financial Services.  I'm not sure --
23        Q    You're not sure who, specifically --
24        A    I can't recall the name of the person.  Mark told
25   me at the time.
```

1      Q      Brooke Davis?

2      A      Yes.  That sounds right.

3      Q      Did Angela Hammock?  Did her name come up in

4  connection with that audit?

5      A      No.

6      Q      The audit that Mr. Waldrop shared with you, when

7  did this occur?  When did he share it with you?

8      A      I'm not sure.  It was 2016.

9      Q      February of 2016?

10     A      It was early 2016.

11     Q      Okay.

12     A      It was several months before he left.

13     Q      Who all was included in that audit?

14     A      I'm not sure.  He sent me all of my direct reports,

15  anybody associated with Ethica.

16     Q      Did you have any expenses that were caught in that

17  audit?

18     A      I don't believe so.

19     Q      This incident regarding the employee who submitted

20  an alcohol expense for reimbursement, --

21     A      Uh-huh (affirmative).

22     Q      -- was that the only incident from that audit that

23  you discussed with Mr. Waldrop?

24     A      That's one I recall discussing.  It was an Excel

25  spreadsheet and it had several.  There was one associate that

```
1    I think had expensed two of the same meals in one day.  Maybe

2    it was two breakfasts that they expensed in one day.  There

3    were several people on the list.  I particularly recall the

4    alcohol --

5        Q    Okay.

6        A    -- because that was something that stood out but

7    there were several things on the list.  Several people.

8        Q    But the only ones you saw were the people that were

9    your direct reports?

10       A    Right.  Or just people that were employed within

11   Ethica.  So it was my member organization.

12       Q    Okay.  So Ethica representatives?

13       A    Yeah.  Because the person that ultimately expensed

14   that wine wasn't my direct report but she reported to someone

15   that directly reported to me so it was --

16       Q    Okay.

17       A    -- people within my member organization.

18       Q    Okay.  What is your understanding of the purpose of

19   that audit?

20       A    It's just an expense reimbursement audit.

21       Q    Did you feel that that audit was being used to hurt

22   anyone in the organization?

23       A    No.

24       Q    More just to help?

25       A    It's just an audit.  We do a lot of audits.
```

1    Q    Do you recall Ms. Taylor saying that the purpose of

2    the audit was not to hurt anybody but just to help people

3    make sure they keep their expense reports in line?

4    A    She did talk about the audit at a Leadership

5    Council meeting.  I don't recall her exact words but it

6    didn't feel negative.  It felt negative from Mark.  Mark had

7    a really negative reaction to that expense audit.

8    Q    Was Mark ever positive?

9    A    He was.  Mark and I have had good times.  Yeah, he

10   was.

11   Q    Would you characterize him as a good boss?

12   A    No, I wouldn't.

13   Q    Because of all this negativity you've been

14   testifying about?

15   A    Because of his fear management.

16   Q    Fear management and intimidation?

17   A    And intimidation and manipulation, and I can give

18   lots of examples around that.  It wasn't all bad.  I care

19   about Mark.  I don't wish him harm.  You know, certainly this

20   has not been pleasant but he was not effective.  He was not

21   effective.  He treated people poorly and there's a lot of

22   people that would be glad to tell you about those things.

23   Q    People inside Community Health Systems?

24   A    Absolutely.

25   Q    People outside Community Health Systems?

1        A      I don't know but --

2        Q      People that report to Lorraine Taylor?

3        A      I mean, I'm sure but people that report to me, --

4        Q      People that report to Ronnie Rollins?

5        A      -- people that report to Mark.  There are people

6    that have had bad experiences with Mark.  You know, I can

7    only speak for myself and at the end it was probably better

8    than it had been.

9        Mark was -- Mark had grown really paranoid toward the

10   end of his employment and said a lot of things that really

11   didn't make a lot of sense but was very convincing and had me

12   believing that Ronnie had done some heinous things.  But

13   Mark's description of Ronnie to me and the conversations we

14   had are very different from what I've experienced personally

15   with Ronnie and we've been working together for now almost a

16   year.

17       I worried for Mark.  I worried about him toward the end.

18   It was paranoid and it was irrational and I wish he would

19   have sought counsel from Michelle and I before he went to the

20   board.  I wish he would have been more rational.  He probably

21   would still be here today and we would all still be working

22   together.  Though at times it was unpleasant, I would still

23   be working for him.

24       Q      Going back to this expense reimbursement policy

25   that was discussed on the conference call.  Did that policy

1  ever go into effect?

2      A    It's in effect now.  I don't know the date that it

3  went into effect.

4      Q    Do you know if it went into effect before or after

5  Mr. Waldrop's termination?

6      A    It was close to that time period but I don't recall

7  the date exactly.

8      Q    Did Mr. Waldrop indicate that he was allowed to

9  implement that expense policy even before it became

10  effective?

11     A    We did talk about just expenses in general and how

12  those should be handled.

13     Q    Were those discussions connected in any way to this

14  expense reimbursement policy that y'all were considering?

15     A    It likely was.

16     Q    Was it your understanding that Mr. Waldrop wanted

17  to go ahead and start abiding by that expense policy so that

18  the Operational folks could get used to doing it?

19     A    I don't recall that specific conversation.  None of

20  the expense policy that we've recently educated on and have

21  implemented now is very different from just good judgment.  I

22  mean, it's beyond some dollar amounts and specifics that we

23  agreed to, none of it was really significantly different than

24  what we had known to be the practice before.  We just more

25  formalized it, tried to make it more seamless across all the

1  member organizations, and provided some education around it.

2        Q    During the time that Mr. Waldrop was COO, was the

3  use of company credit cards encouraged or discouraged?

4        A    I don't recall if they were encouraged or

5  discouraged.  I know I had one.  I don't know who else might

6  have had one.

7        Q    But there were times that you would incur expenses

8  on your personal credit card?

9        A    Yes.

10        Q    How often did you incur expenses on your personal

11  credit card as opposed to the company credit card?

12        A    Less frequently.

13        Q    If you had a company credit card, --

14        A    Uh-huh (affirmative).

15        Q    -- why would you ever expense anything on your

16  personal credit card?

17        A    I might not have had it with me at the time.  I

18  used the company credit card, I would say 90 percent of the

19  time, or better.  But so did other people within the

20  organization because it's a clinical services card, or it was

21  a clinical services card.

22        So if we had a training at the training center in Gray,

23  then the person responsible for ordering food with that would

24  use that card.  We would use it for conferences that maybe I

25  wasn't attending.  It wasn't my personal company credit card,

```
1    it was the CSI company credit card so there could have been
2    times that I didn't have it and expensed it.  Other times
3    would have been mileage reimbursement.  Those sort of things
4    aren't attached to a credit card.
5         Q    Are you familiar with Global Homes in Macon?
6         A    Say that again.
7         Q    Global Homes in Macon?
8         A    Global --
9         Q    Global facility?
10        A    -- Global REIT?
11        Q    Possibly.
12        A    It's a company.
13        Q    Yeah.
14        A    Yeah.  It's an investment company that owns a
15   nursing center in Macon.
16        Q    Did you have any involvement in the potential
17   acquisition of those homes by Community Health Systems?
18        A    I did.
19        Q    What was your involvement?
20        A    Well, we had, I'm trying to think who all Global
21   REIT was involved with.  We had several centers that had a
22   lease that was coming up and I don't recall the change of
23   ownership.  I don't recall how all of that occurred but we
24   were leasing the building.  They were owned by one owner who
25   I believe transitioned those to Global REIT.  It was two
```

1    buildings in the eastern part of the state.

2        Q    Were there any in Macon?

3        A    There's one in Macon now.

4        Q    Was that one that's in Macon, was it in Macon at

5    the time Mr. Waldrop was COO?

6        A    Yes.

7        Q    Do you recall touring that facility --

8        A    I do.

9        Q    -- in March or April of 2016?

10       A    I do.

11       Q    Do you recall which it was?  March or April?

12       A    I don't.

13       Q    Who all toured that facility with you?

14       A    I recall Ken McDonald, Lorraine Taylor, Ronnie, and

15   I toured the building.

16       Q    So two members of the C Suite?

17       A    Uh-huh (affirmative).

18       Q    But not Mr. Waldrop?

19       A    No.  Not that I recall.

20       Q    Did you think that was odd?

21       A    No.

22       Q    Why not?

23       A    I don't remember why he would have or would not

24   have toured it.  I don't really recall how that came about

25   but it wasn't unusual that I would be involved in a

```
 1   transaction that involved a nursing center.  Mark sometimes
 2   was involved and sometimes wasn't.  It didn't strike me as
 3   being something of significance.
 4        Q    Was Mr. Waldrop already in Macon at the time of
 5   this tour?
 6        A    I'm not sure.
 7        Q    You don't recall him being in Macon for meetings at
 8   this time?
 9        A    I don't recall.
10        Q    Did you ever tell Mr. Rollins that you did not need
11   Mr. Waldrop's help with regard to these facilities?
12        A    I don't recall saying that.
13        Q    Well, when you say you don't recall saying that, is
14   it possible that you did?
15        A    I don't think so.
16        Q    So you didn't say that?
17        A    I don't believe that I said that.  No.
18        Q    Okay.  Were you aware at the time that Mr. Waldrop
19   was COO that he was teaching courses at Southern Adventist
20   University?
21        A    I was.
22        Q    How did you become aware of that?
23        A    Just in discussion with Mark.
24        Q    Did Ethica ever recruit students that Mr. Waldrop
25   taught?
```

1      A      We did.

2      Q      How many?

3      A      Over the years, I don't recall.  I know he and

4   Scott Edens both taught classes at Southern and typically, it

5   was in the summer.  And we would typically interview one to

6   two of those candidates.  Over the years, we've probably

7   hired several but I don't know the exact number.

8      Q      So it wasn't a secret was it that Mr. Waldrop was

9   teaching at Southern Adventist University?

10     A      It wasn't to me.

11     Q      In fact, his teaching at Southern Adventist

12  University led to the recruitment of employees for Ethica?

13     A      Sometimes it did.

14     Q      Were these good employees?

15     A      For the most part.

16     Q      Are any of them still with the company?

17     A      Several are.  Uh-huh (affirmative).

18     Q      You mentioned Scott Edens --

19     A      Uh-huh (affirmative).

20     Q      -- having also taught at Southern Adventist

21  University.

22     A      He did.

23     Q      Is he still an employee of Community Health

24  Systems?

25     A      He's not.

1    Q    What was his position?

2    A    He was a regional VP for Ethica.

3    Q    Did he report to you?

4    A    He did.

5    Q    Why was he terminated or was he terminated from his

6  position?

7    A    His position was eliminated.  That was not while he

8  was reporting to me.  That has occurred recently.

9    Q    Were you involved in any of the decisions to

10  eliminate his position?

11    A    I was.

12    Q    Why was his position eliminated?

13    A    Because he was managing a very small subset of

14  nursing centers and we were going through a reorganization

15  with Ethica on the Operations side and we gave him the option

16  of taking other centers in other parts of the state.  And

17  travel was not something that he wanted to do.  It was a very

18  amicable separation.  I wouldn't say that he was terminated.

19  That particular position that he was in was not one that was

20  going to be available anymore and so he chose to leave.  And

21  we still have contact and work with him.

22    Q    He wasn't terminated because he taught at Southern

23  Adventist University?

24    A    No.  No.

25    Q    Did you ever request that Stephanie Dotson submit

```
 1   expense reimbursement requests on behalf of Ethica?

 2        A    I don't recall asking her to do that.

 3        Q    Let me show you a document.

 4             MR. HENRY:  I'm going to have the court reporter

 5        mark this as one.  That's for Mr. Daniel.

 6             COURT REPORTER:  Okay.

 7   (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 1.)

 8        Q    MR. HENRY:  You have in front of you what's been

 9   marked as Exhibit 1.

10        A    Uh-huh (affirmative).

11        Q    Is Exhibit 1 an expense reimbursement request or

12   expense report?

13        A    Yes.

14        Q    Do you recognize the signature at the bottom of

15   Exhibit 1?

16        A    I think it's Stephanie's.

17        Q    Have you seen her signature before?

18        A    I don't recall it looking that messy but yes, I

19   have seen it before and I can make out the last name.

20        Q    Sitting here today, do you have any reason to

21   believe that is not her signature?

22        A    No.  I don't.

23        Q    Okay.  If you look at the second --

24        A    Uh-huh (affirmative).

25        Q    -- line item on this expense report.  It says,
```

1    "Ethica Leadership Team Meeting at the Waverly --

2         A    Uh-huh (affirmative).

3         Q    -- from January 22, 2014."

4         A    Yes.

5         Q    Do you recall that Leadership Team Meeting at the

6    Waverly?

7         A    I don't recall it specifically but we have met

8    there before.  Yes.

9         Q    Okay.  So is that an expense that was incurred on

10   behalf of Ethica?

11        A    It was for the Ethica Leadership Team Meeting.  I

12   don't recall if I was in that position or if Mark was leading

13   Ethica at the time.  But yes, it states Ethica Leadership

14   Team Meeting.

15        Q    Okay.  Let's see, I think you testified earlier

16   that you had been an employee of Ethica since 2011.

17        A    Uh-huh (affirmative).

18        Q    Is that right?

19        A    Yes.  And it's possible that I was the president at

20   this time.  I'd have to look at something to tell you.  I

21   think it was 2014 when I went into that role.

22        Q    Yeah.  You said, I think you said mid 2014 was when

23   you took over that --

24        A    So I don't recall if it was mine or not but it

25   doesn't surprise me that Stephanie would have scheduled that

1  for us.  Particularly, if there was another meeting

2  surrounding that and I see above that that we had a PC

3  meeting the same place.

4      Q   Uh-huh (affirmative).

5      A   So when she was booking that for the PC meeting, it

6  doesn't surprise me that she would also book the same room

7  for Ethica, just not to duplicate efforts.

8      Q   In fact, it looks like if you go one down, the

9  third one, that there was a managed care meeting at the

10  Waverly.

11      A   I see that.

12      Q   And coded to Ronnie.

13      A   I see that.

14      Q   So having Ms. Dotson submit expense reimbursement

15  requests for Ethica or Ronnie is not surprising to you?

16      A   I can't speak for what she did for Ronnie but her

17  addressing a meeting for us in conjunction with PC on the

18  Ethica side is not surprising to me.  No.

19      Q   Okay.

20      A   It's not something that occurred frequently.

21      Q   There's no approval signature on Exhibit 1.  Is

22  there?

23      A   I don't see.  No, there's not.

24      Q   Okay.  Under Community Health Systems' normal

25  process for approving expenses --

1     A     Uh-huh (affirmative).

2     Q     -- who would have approved this expense report?

3     A     Mark.  You know, I don't do paper copies.  I don't

4  know.  I believe we had Workday at the time but in Workday,

5  there is also an electronic approval process.  So sometimes

6  expense reports that are generated on paper like this are

7  done as a supporting document to Workday so I don't think I

8  could tell you the approval flow unless I looked at Workday.

9     Q     Workday, itself?

10     A     Yeah.

11     Q     Okay.  Is there anything in Exhibit 1 that violated

12  Community Health Systems' expense reimbursement requests that

13  were in effect on February 6th, 2014?

14          MR. DANIEL:  Be sure and take time to read that.

15     Q     MR. HENRY:  Yes, please.  And that's true with any

16  question I ask.  Take whatever time you need to give a

17  truthful answer.

18     A     The one thing that I'm not consistently seeing that

19  has, I believe, been standing practice is there's not always

20  a detailed receipt to back up a general receipt.  Certainly,

21  I could be looking at something incorrectly.  For example,

22  this Los Reyes Mexican restaurant, there's a dollar amount

23  and a tip and I think it says Mark and Stephanie up top.  But

24  there's not any detail.  There's not a detailed receipt that

25  goes with that.

1    Q    Not any detail of what they actually ate?

2    A    Right.  What was consumed as part of that.  There

3    are in others but not in that one.  And I don't see that

4    there is one for Red Lobster either.

5        I am familiar with the Leadership Development Program

6    and the trip that we took at the end of that.  There's quite

7    a lot in this document around flights.  And I recall some of

8    the names that are on this.

9    Q    So other than the lack of a detailed receipt for

10   the expenses to Los Reyes Mexican restaurant and Red Lobster

11   and possibly others that don't have a detailed receipt --

12   A    Yeah.  I'd like to state possibly others.

13   Q    Yeah.

14   A    So those are the two that stuck out but there are

15   some that are more detailed and some that are more general.

16   Q    Is the lack of a detailed receipt the only thing

17   you see that could be potentially violative of the expense

18   reimbursement request policies?

19   A    Based on my familiarity with it and my knowledge,

20   those are the things that stick out to me.

21   Q    Okay.  And you took your time and reviewed that

22   document.  Correct?

23   A    I did.

24   Q    Are you aware of any policy that would make Ms.

25   Dotson's submission of Ethica Leadership Team Meeting

1    expenses inappropriate?

2         A    It's not customary but I'm not familiar with it

3    being a violation of anything.  Typically, expenses that are

4    incurred from one member organization are expensed by the

5    member organization just for simplicity and accounting

6    purposes so that it doesn't have to be broken up.  I'm not

7    surprised that she did because it looks like it was in

8    conjunction other meetings that she was coordinating.  That's

9    not a common practice.

10        Q    Okay.  Do you consider that to be fraudulent?

11        A    For her to --

12        Q    Submit that expense reimbursement?

13        A    -- to submit an expense reimbursement that has an

14   Ethica meeting that she scheduled?

15        Q    Uh-huh (affirmative).

16        A    No.

17        Q    Did Ethica have an office in Dalton?

18        A    It did.

19        Q    Where was that office located?

20        A    Originally it was located on West Waugh Avenue and

21   more recently we share space with Integra and that's on Saw

22   Grass, I think, or off Saw Grass.

23        Q    River Broach Parkway?  Did you ever have an office

24   there?

25        A    I remember West Waugh and I remember Saw Grass.

1    Q    Do you remember having --

2    A    I was at the one on West Waugh.

3    Q    Okay.  Do you recall Ethica having an office space

4    that was in the same building as Community Health Systems'

5    office?

6    A    Yes.  Yes.  That's the one I recall as Saw Grass.

7    Q    You recall that as Saw Grass?

8    A    Yeah.

9    Q    Why did Ethica move from West Waugh to what you

10   remember as Saw Grass?

11   A    The number of staff that we had at West Waugh had

12   dwindled and I don't recall who and why and all the details

13   but there wasn't as many people there anymore.  And we had

14   had some issues with the leaseholder making improvements the

15   way that they needed to be made.  And I can't recall if that

16   lease had come up or if we broke that lease but as an effort

17   to resolve all of that, we moved in with Integra.

18   Q    Was the issue that the leaseholder or the property

19   owner wasn't resolving, did it have to do with mold?

20   A    There was a mold issue.  Yes.

21   Q    Okay.  Who owns the building on what you recall as

22   Saw Grass?

23   A    I've never seen the legal document around that.  I

24   assume that it's Community Health Services.

25   Q    Okay.  So it's Community Health Services or one of

1  its affiliates?

2       A     Yeah.

3       Q     Okay.

4       A     And then I don't know if we're leasing it or own

5  it.  I know we occupy it but I've not seen the lease on that

6  particular property.

7       Q     So Ethica is not paying rent to an unaffiliated

8  third party for the use of that space?

9       A     I don't recall how that -- I know that someone pays

10 the lease and that we kind of divvy up, typically, now I'm

11 speaking for something that I am not personally responsible

12 for.  But I can tell you how things typically work.  And that

13 is that, you know, it's based on square footage and how many

14 associates you have and it is budgeted and then allocated

15 back it based on that.  I don't recall, specifically, how we

16 handled that particular office.  I know when it was West

17 Waugh, Ethica paid for the lease.

18      Q     So whoever owned the property, as leaseholder, you

19 had problems with?

20      A     Uh-huh (affirmative).  Yes.

21      Q     You mentioned budgeted expenses?

22      A     Uh-huh (affirmative).

23      Q     What is your understanding of how Community Health

24 Systems' budgetary process works?

25      A     That's a really broad question.  Very broad

 1  question.  So I can answer for the budget process within

 2  Ethica.

 3      Q    Okay.

 4      A    As the President of Ethica, I led the Operations

 5  team through a budgeting process that was really based on

 6  historical expenses and revenues.  So Financial Services

 7  historically would roll forward expenses based on a twelve-

 8  month flip back period and then from there, Operations would

 9  have various meetings to review market changes, if we needed

10  to look at revenue changes, if we knew expenses were going to

11  go up, if we knew utilities were going to go up.  If we

12  understood that just the cost of doing business was going up

13  a certain percentage, we would increase expenses to reflect

14  that.  And we would also look back at the historical trend.

15  If there were accounts that were not necessarily spent fully,

16  we would assess why and we might downgrade that budget.  But

17  it was a pretty robust process on the Ethica side.

18      Q    Ok.  So when you would work with Financial Services

19  to, I'm going to use the word forecast --

20      A    Uh-huh (affirmative).

21      Q    -- the amount of money you would need for the

22  upcoming year, what happened after that process was

23  completed?

24      A    Typically, Financial Services would prepare the

25  start of the budget.  I'm specifically thinking about skilled

1    nursing and our individual nursing centers.

2         Q    Uh-huh (affirmative).

3         A    So they would prepare that based off of a twelve-

4    month flip back and then that nursing center administrator

5    with the RVP and a representative, typically a financial

6    analyst that worked closely with the nursing center, would

7    meet.  Sometimes department head staff would come in from

8    that nursing center.  It was really up to the operational

9    leader as to how they wanted to manage those.  But they had a

10   review of that and they would assess those things that I

11   mentioned.

12        You know, did they need to look at wage adjustments?

13   Did they need to increase or decrease census for any reason?

14   They would make changes to that budget.

15        And then the RVPs and the analyst would typically

16   present that budget to myself and members of Financial

17   Services that were supporting Ethica as a kind of a second

18   step review.  And then we would prepare that in a

19   consolidated format and present that to Mark and Lorraine.

20   And then from there, you know, my understanding is from there

21   that they then presented that to Ronnie.  But I don't really

22   know what all happened after my presentation to Mark and

23   Lorraine.

24        Q    So after your representation to Mr. Waldrop and Ms.

25   Taylor, the budget would go through some process you don't

1   know and get approval?

2       A    Well, it would go through, yeah.  I mean,

3   ultimately, there was an approval process that it would go

4   through and we would hear back from Mark that we could

5   implement that plan.

6       Q    And what did that mean?  Implement the plan.  Could

7   you spend that money?

8       A    Yeah.  We were authorized to work within that

9   budget.

10      Q    Without having to go back for further approval?

11      A    Well, if it was an exceptional expense outside of

12  that budget --

13      Q    Right.

14      A    -- yes, we would.

15      Q    And if it fell within the budget, you didn't have

16  to get additional approval in order to spend that money?

17      A    No.  Not operational expenses.  Not day-to-day.

18      Q    What if you had an expense that was outside of

19  budget or beyond the amount allocated in the budget?

20      A    If it were an exceptional expense, which from my

21  understanding with Mark, was anything that required a capital

22  expenditure.  So typically, five thousand or more.  I would

23  prepare a capital expense request and submit that to Mark.

24      Q    Do you know what happened to that request after you

25  submitted it?

1    A    I know what should happen to it but what happened

2  to it, no.  I would typically get back either a

3  recommendation to proceed or there would be a phone call or

4  follow-up email with further discussion.

5    Q    Who ultimately approved these requests for

6  additional expenditures?

7    A    Mark would approve those.

8    Q    Did Financial Services approve on that at all, to

9  your knowledge?

10    A    I know there were times that Mark would have

11  discussions with Lorraine specifically if it were something

12  significant.  Sometimes around a project that we were doing

13  in a building.  I do recall one time we were looking at doing

14  a pretty significant renovation or upgrade to a nursing

15  center and I prepared a packet with our development group and

16  I recall sitting down and having that conversation with Mark,

17  Ronnie, and Lorraine.

18    But the day-to-day, we have a lot of skilled nursing

19  centers and there's a lot of equipment that needs to be

20  replaced from time to time.  So HVAC units or a lift that

21  would go down, something that was operational in nature, day-

22  to-day that wasn't necessarily strategic, Mark and I would

23  handle that process.  That's my knowledge of it.

24    Q    Are you familiar with the Leadership Development

25  Program?

```
1          A    I am.

2          Q    What was that?

3          A    That was program that had a lot of us within the

4    health system representing various member organizations went

5    through for leadership development.

6          Q    Learning how to be a good leader?

7          A    Well, we learned about the system.  We did some,

8    what I would consider and what I recall being referred to as

9    master degree level work.  So there were books we went

10   through.  Went through a financial management book.  We went

11   through at least two or three college level texts, not fully

12   through the books but through various studies of those.  So

13   it was a program to progress our understanding of the

14   business, was my perception of that.

15         Q    And you participated in this program?

16         A    I did.

17         Q    How many people participated in the program?

18         A    It was a large group.  I don't know the exact

19   number.

20         Q    Did this program require travel?

21         A    It did.  We typically met in a central location and

22   everyone traveled there for the leadership development

23   training.

24         Q    And, ultimately, who was responsible for the

25   Leadership Development Program?
```

1      A     Mark.

2      Q     Did you ever contribute money towards gifts for Mr.

3  Waldrop?

4      A     I did.

5      Q     What types of gifts did you contribute money?

6      A     Typically, birthdays and Christmas-type gifts.

7      Q     Did you do that voluntarily?

8      A     I wouldn't have not given.

9      Q     Feel pressured to contribute?

10      A     It was just an understanding.  It was something

11  that we were going to do.  Stephanie typically coordinated

12  that and the dollar amount varied.  I recall giving up to

13  $100 and as little as $40.

14      Q     And you say it was something you were not not going

15  to do?  I think that's what you said or something to that

16  effect.

17      A     That is what I said.  Yes.

18      Q     Why was it something you were not not going to do?

19      A     Because Mark received a card with everybody's

20  signature on it that contributed, was my understanding.

21      Q     And you didn't want your name to be conspicuously

22  absent from that card?

23      A     I didn't.  And I didn't begrudgingly contribute.

24  It, you know, saved me time not to have to purchase something

25  individually but there was a particular time that I had

 1   purchased something individually and ended up contributing to

 2   the group because I felt like if my name didn't appear on

 3   that card that it would not be looked at very favorably.

 4        Q    Were there ever any people that were asked to

 5   contribute toward a gift for Mr. Waldrop that did not

 6   contribute?

 7        A    I'm not sure.

 8        Q    Did you ever receive any gifts or rewards for your

 9   service?

10        A    From Mr. Waldrop?

11        Q    From the --

12        A    From the company?  We -- Mark -- I received several

13   pieces of crystal over the year from Mark.  Typically, it was

14   an annual gift, often two pieces a year.  And that was

15   typically done in conjunction with our Leadership Council

16   dinner.

17        And then Mark did take us on several reward trips.  The

18   way that those were conveyed to me was that we don't do

19   bonuses and incentives for VPs and above.  So he would take

20   us on trips that were typically a combination of some work

21   days and some weekend days that were pleasure trips.

22        Q    You weren't the only one that received these gifts

23   were you?

24        A    No.

25        Q    Recognition rewards?

1    A    No.  It was Leadership Council.  Typically, Mark's

2  direct reports.

3    Q    Do you feel that it was appropriate for you to

4  receive those types of items?  Those trips?

5    A    I enjoyed them.

6    Q    Okay.

7    A    Yeah.  I enjoyed those types of things.

8    Q    As an employee of Community Health Systems, do you

9  feel that it was appropriate for you to receive those items

10  and take those trips?

11    A    There were indications toward the end that they

12  might not be appropriate.  I also took my team on a trip.  It

13  wasn't budgeted this last time.  It had been budgeted before

14  but it was approved.

15    There was a situation that came up.  And I believe it

16  was around the Global Center that you're referencing in Macon

17  where Ken McDonald and I had to get on a conference call with

18  Ronnie and Mark was very upset about that because he did not

19  want Ronnie to know that we were on that trip and had quite a

20  bit of reaction.  But we were able to make that conference

21  call and the trip didn't come up.  But that was a strong

22  indication to me that we probably weren't doing the right

23  thing by going on that trip.  And that was not what I

24  understood from Mark.  I understood that those were trips

25  that people knew about.

1    Q    I just want to be sure I understand your testimony.

2  Was that trip you're describing where this conference call

3  took place, that was the one that you did for Ethica?

4    A    That was one that I did for Ethica.  Yes.

5    Q    That was not included in the budget?

6    A    It was not.  No.

7    Q    So were some of these trips included in the budget?

8    A    Some of them had been.  Uh-huh (affirmative).

9    Q    An approved expense?

10   A    It was in the budget.  Yeah.  In a consolidated

11 manner.  I can't say who saw those budgeted expenses or not.

12 When I presented my plan to Mark, they were in there.  Mark

13 was aware because we had discussed it.  But if they had been

14 planned, they're planned to non-reimbursable, nondeductible

15 expenses.  And when we presented that, they're in a

16 consolidated rolled up format.  So to be able to see that the

17 trip was planned -- it's not very visible, but it was

18 planned.  But we were all aware that it was in there -- at my

19 level, anyway.

20   Q    Would Financial Services and the work that you did

21 with them to prepare your budget see these trips as part of

22 your budget?

23   A    Typically, they would know that there's a large

24 expense in nondeductible.

25   Q    Would they know though, would it be apparent to

1  them that it was trips?

2      A    I would think at the level of folks supporting

3  Ethica, yes.  I can't really answer for above that but I know

4  that one year Ken and I did put it in the plan so he was

5  aware.  Yeah.

6      Q    I have one more subject I want to ask you about and

7  I think it would be a better time to take a break after we do

8  that.

9      A    Okay.

10     Q    Well, maybe, give me about five minutes, five or

11  ten minutes to cover one more subject.

12          MR. DANIEL:  Sure.

13     Q    MR. HENRY:  I know we're getting close.  I didn't

14  want to make you think I would make you sit here too much

15  longer.  But I do want to cover this.  Then we can take a

16  break, unless you need one now.

17     A    I'm okay.

18     Q    Okay.  What are Omnicells?

19     A    Omnicells are -- the best way to describe them as a

20  medication cabinet.  So they are a dispensing mechanism for

21  medications for after-hour order changes for our patients and

22  for emergency medications for our patients.

23     Q    Have Omnicells been placed in Community Health

24  Systems' facilities?

25     A    Yes.

1    Q    Were you involved in the decision to place those

2    Omnicell units in those facilities?

3    A    I was part of the group that looked at those, yes,

4    and was in favor of it.

5    Q    Was the Omnicell, I'll call it project, piloted in

6    the same way that the LG Electronic Health Record was

7    piloted?

8    A    I wasn't the project sponsor on that so I don't

9    know that I can answer that question.  I do recall us having

10   one to two Omnicell cabinets in a couple of nursing centers.

11   But I'm not quite sure with how -- all the details of that

12   project.

13   Q    Do you recall a conference call in which it was

14   discussed the potential expansion of Omnicell units to other

15   facilities?

16   A    We did ultimately expand it to other facilities.  I

17   don't recall specific discussions around it.

18   Q    Do you recall a conference call with Mark Waldrop,

19   Lorraine Taylor, Michelle Moore-Andrews, Ken McDonald, and

20   you in which that subject was discussed?

21   A    I'd have to look at a calendar.  I mean, that

22   sounds like a logical group to have a discussion around

23   Omnicell.

24   Q    What is your recollection of Mr. Waldrop's response

25   to the idea of expanding the Omnicells to other facilities?

1      A     We ultimately did it so I don't recall him not

2  being supportive of it.  I do recall something around the

3  financing of that project.

4      Q     Okay.  What do you recall?

5      A     Okay.  I'm trying to remember.  It's been a minute.

6  There was an issue around the Omnicells and it was, I

7  believe, related to whether we financed that or expensed it.

8  I can't recall the outcome and all the details around that

9  right off.  I need to think about that for a little bit.  But

10  I do recall there was something around it.

11      Q     Do you recall Mr. Waldrop saying that he would have

12  to get with Mr. Rollins before he got in the boat with the

13  idea of expanding Omnicells to other facilities?

14      A     I don't remember that specifically but he could

15  have said that.  I don't recall.

16      Q     Was it your understanding that Mr. Waldrop felt he

17  needed to get Mr. Rollins' approval before taking that step?

18      A     I don't recall that specifically.

19          MR. HENRY:  Now would be a good time for a break.

20  (BREAK)

21      Q     MR. HENRY:  Ms. Wilkes, looking back at Exhibit 1,

22  I think we were talking about detailed receipts not being

23  included in Exhibit 1.  Do you recall that?

24      A     Yes.

25      Q     Is the requirement for a detailed receipt a part of

1    the new expense reimbursement policy or was it in effect --

2    strike that.  Was the requirement of a detailed credit card

3    receipt a part of the policy that was in effect on February

4    6th, 2014?

5         A    It was from my member organization.  I can't speak

6    to if there were differences but just Medicare/Medicaid

7    guidelines.  When you are having an audit, typically, from

8    the state on expenses, you want to have detailed receipts and

9    the names of the people who attended the meal and what the

10   business purpose was.  Those things are standard and have

11   been for years as far as expensable reimbursements.

12        Q    And I'm assuming that if you require a detailed

13   receipt and the failure to provide a detailed receipt would

14   be a violation of the policy, then the failure to provide a

15   receipt at all would also be a violation of the policy?

16        A    I would agree.  Yeah.

17        Q    Okay.  How did you learn that Mr. Waldrop had been

18   terminated?

19        A    There was a memo sent out to Mark's direct reports

20   by Mr. Rollins.

21        Q    Was the memo from Mr. Rollins or was it from Mr.

22   Wall?

23        A    The memo, I believe, was from Mr. Wall but the

24   email was from Mr. Rollins.  I'd have to look at it to tell

25   you for sure, though.

1      Q     Okay.   Were you surprised?

2      A     I was.

3      Q     Why?

4      A     Well, we were on a conference call related to

5  something else operationally.   Mark was a member of that.

6  And the email came out and I remember being surprised.

7      Mark had -- I think I told you, Mark toward the end

8  became really paranoid and he had called me and led me

9  through a series of questions in order for me to get to the

10  outcome that he had gone to the board about his perceived

11  mistreatment by Ronnie.

12      And this was after he had gone to the board but

13  obviously, before the memo came out.   And so, was I surprised

14  that something had happened?   No.   Not necessarily.   I was

15  surprised it occurred on the day that it did because it was

16  just a very normal course of business.   And then that email

17  occurred in the afternoon.   So it was surprising.   Yes.

18      Q     I'm a little confused about what you just said with

19  regard to Mr. Waldrop leading you through a series of

20  questions.

21      A     Uh-huh (affirmative).

22      Q     Can you explain that --

23      A     Sure.

24      Q     -- in greater detail?

25      A     Yeah.

```
1        Q    Mark called me a couple of weeks before his leaving

2   the organization and it was in the evening.  He called me.  I

3   was at home.  And he said something to the extent of I want

4   to tell you what I've done but I can't tell you but you can

5   ask me questions.  And so I began asking him questions.  And

6   he led me through pretty lengthy conversation until I said

7   have you gone to the board?  Is that what you did?  And he

8   said yes, that he had gone to the board.

9        He asked what I thought about that.  The only thing I

10  recall saying to him was that I felt like he had drawn a line

11  in the sand, that something would happen as a result.  I

12  didn't know at that point -- I only knew what Mark had told

13  me.  Mark was really going through something at that time.

14  He had told me that he thought that Ronnie had broken into

15  his office.  He told me that after that that he felt Ronnie

16  had slashed his tires when he was staying in a hotel in

17  Macon, that he had sent Christine away because he was

18  fearful.

19       I was worried for Mark.  Mark was very convincing that

20  those things were happening or at least, that they were real

21  to Mark.  And so I knew things were escalating when he called

22  and took me through those series of questions and ultimately

23  told me that he had went to the board.  I don't recall if he

24  said he had went to Joe, specifically, but that he had went

25  to the board.
```

1    Q    Okay.  Have you discussed Mr. Waldrop's termination

2    with anyone outside of Community Health Services?

3    A    My husband.

4    Q    Other than your husband?

5    A    No.

6    Q    After you received the memo from either Mr. Rollins

7    or Mr. Wall indicating that Mr. Waldrop had been terminated,

8    I believe you said you were on -- were you on a conference

9    call at the time?

10    A    I was on a conference call at the time.  Yeah.

11    Q    Did Mr. Waldrop's termination come up in the course

12    of that conference call?

13    A    It didn't.

14    Q    Did you have any discussions with Mr. Rollins

15    regarding Mr. Waldrop's termination after June 28th?

16    A    Not until I began reporting to him and we had some

17    initial conversation just about my duties and his

18    expectations.  Nothing specific to Mark.  It was primarily

19    when I was talking about allegations that Mark had made.  It

20    was with Joe Wall during that investigation.

21    Q    Okay.  Did you ever have any discussions after Mr.

22    Waldrop's termination with Ms. Taylor regarding Mr. Waldrop's

23    termination?

24    A    We've had general discussions in the course of just

25    working together.  But the formal investigation, my

1  conversations were limited to Joe Wall.  And there were

2  several of us that were interviewed as a part of that and Joe

3  asked that we not discuss that.  So we didn't.  We really

4  didn't discuss it internally as a team for a while.  Just not

5  knowing what we didn't know.

6       Q    And when you say you've had general discussions

7  with Ms. Taylor, what general discussions have you had with

8  Ms. Taylor?

9       A    We all work really closely together so I know a lot

10 of the discussions were around my deposition and, just in

11 general, the allegations that Mark had made against Ronnie.

12 More so, just my personal experiences with some of that.

13      Q    I believe you testified earlier that you haven't

14 reviewed any deposition transcripts.

15      A    No, I haven't.

16      Q    Has anybody told you what's been testified to in

17 prior depositions in this case?

18      A    I have not spoken with anybody specifically about

19 their deposition.

20      Q    Well, has Ms. Taylor had any discussions with you

21 about the deposition she witnessed in this case?

22      A    I know several of the people that have been deposed

23 and I know that we've had the right to a corporate witness

24 but I don't know all of them she sat through.

25      Q    Has Mr. Rollins or Ms. Taylor told you what other

```
1   witnesses have testified to in this case?

2       A    I don't recall things specifically.

3       Q    I'm not asking you to recall specific things they

4   might have told you.  I'm asking you whether they have

5   discussed other witnesses' testimony in this case with you?

6       A    I can't recall specific conversations about a

7   particular witness' testimony.  No.  We've had general

8   discussions and I have shared some of my concerns with Mark's

9   behavior toward the end of his employment.  But I don't

10  recall specific deposition questions that they've shared.  I

11  don't recall any of those specifically.  No.

12      Q    Have you ever heard Mr. Rollins say that he was

13  unhappy with how Community Health Systems was going and that

14  is why Mr. Waldrop was terminated?

15      A    No.

16      Q    Have you ever heard anybody say Mr. Rollins said

17  that?

18      A    Mark has told me that Ronnie was unhappy with the

19  performance of the VEBA.

20      Q    Okay.  When's the last time you spoke to Mr.

21  Waldrop?  Other than today?

22      A    Probably, we probably spoke at some point the day

23  the memo came out.

24      Q    Before or after the memo came out?

25      A    Before.
```

1    Q    So you haven't spoken to Mr. Waldrop since he was

2    terminated?

3    A    No.

4    Q    So my question was, has anybody told you that Mr.

5    Rollins said that he was unhappy with how Community Health

6    Systems was going and that is why Mr. Waldrop was terminated?

7    A    No.

8    Q    Were you present for a meeting on Tom Hill Road at

9    which Mr. Wall was present after Mr. Waldrop's termination?

10   A    Tom Hill Road.  There was a meeting.  I don't know

11   what address it was at.  The Next Step Care office, I

12   believe, was where that meeting was held.

13   Q    Okay.  Did Mr. Rollins say during that meeting that

14   Mr. Waldrop made allegations against him and Mark was now

15   gone?

16   A    I don't recall the specific discussion around that.

17   Q    Did he say anything like that?

18   A    I don't remember anything feeling negative.

19   Q    You have testified earlier about an interview that

20   you had with Mr. Wall after Mr. Waldrop's termination.

21   Correct?

22   A    Correct.

23   Q    And I believe you agreed with me that that

24   interview took place on July 8th, 2016?

25   A    Somewhere around there.  Yes.

1      Q      It was a Friday?

2      A      I don't recall.  I'd have to look at my calendar.

3  But it was after Mark's termination.  I feel like it was

4  within a week or so of that.  Yes.

5  (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 2.)

6      Q      MR. HENRY:  Okay.  Now you've got in front of you

7  what's been marked by the court reporter as Exhibit 2.  Now

8  if you'll take a second and look over Exhibit 2 and let me

9  know when you're ready for me to ask you some questions about

10 it.

11     A      Okay.  I'm ready.

12     Q      Did Mr. Wall ask you the questions that are listed

13 on Exhibit 2 during his interview of you?

14     A      Yes.  They're familiar.  Uh-huh (affirmative).

15     Q      Okay.  The first two items appear to be statements

16 rather than questions.  Do you see that?

17     A      I do.

18     Q      Do you recall Mr. Wall making those comments to

19 you?

20     A      I do.

21     Q      Let's start with the first question which is

22 actually item number three.  "Have you been or were you ever

23 uncomfortable about anything that you were asked to do by any

24 person that you consider your superior in the organization?"

25 Did Mr. Wall ask you that question?

1      A      He did.

2      Q      And how did you respond?

3      A      I believe I recall telling him that I had never

4  been asked to do anything unethical or illegal.

5      Q      Okay.  Anything else that you told him in response

6  to that question?

7      A      I can't recall if I discussed with him instances

8  where Mark might have made me feel uncomfortable by asking me

9  to do things I -- I'm recalling that I may have had that

10  discussion but I don't remember specifically.  I do remember

11  telling him that I had not been asked to do anything

12  unethical or illegal.

13      Q      Well, did Mr. Waldrop ever ask you to do anything

14  that you were uncomfortable doing?

15      A      He did.

16      Q      What?

17      A      Well, there were several occasions when,

18  particularly toward the end, he would have phone

19  conversations with peers of mine and have me listen in to

20  those phone calls.  Felt very unprofessional.  I also felt

21  like he was having people listen in to phone calls with me.

22  Again, it was just -- it was paranoid.  It didn't quite feel

23  right and that had happened a couple of times over the course

24  of my employment but more so toward the end of his

25  employment, he asked me to do that.

1    Q    Who was he talking to in these conversations that

2  he asked you to listen in on?

3    A    One time it was Robin Leake.

4    Q    Okay.

5    A    And I don't recall the subject, exactly, but he was

6  unhappy about something and I listened in on the

7  conversation.

8    Q    Anybody else that you listened in on a conversation

9  with?

10    A    That's the one I recall specifically.  There was

11  more than one but I recall that one specifically.

12    Q    Okay.  Other than listening in on conversations

13  with your peers, was there anything else that Mr. Waldrop

14  asked you to do that you were uncomfortable doing?

15    A    I don't recall anything specifically.

16    Q    Okay.  Let's move on to item number four.  "Are

17  there any policies or procedures that you consider unfair or

18  harsh or unnecessary?"

19    A    No.

20    Q    Do you recall Mr. Wall asking you that question?

21    A    I do and I responded no.

22    Q    Okay.  Number five.  "Do you have or have you

23  detected among any associates a fear of being fired or

24  terminated?  If so, is this feeling a part of our

25  organization's culture?"  Do you recall Mr. Wall asking you

1   those questions?

2      A    I don't recall that question specifically.  I do

3   recall him asking me about targeting and if I had any reason

4   to believe that Mark was targeted.  I did share with Mr. Wall

5   that Mark had called me after he went to the board and I did

6   relay to him that I relayed to you previously of how that

7   conversation went.  And that I thought that Mark expected

8   that Ronnie might be terminated or that he might be

9   terminated.  I don't recall all of the wording of that

10  question.  It was more around the targeting and my

11  conversation with Mark about him having gone to the board.

12     Q    Okay.  Look at item number six.

13     A    Uh-huh (affirmative).

14     Q    "Are you familiar with the term targeting?  Is it

15  commonly used in our organization among our associates?"  Is

16  that the question that you were responding to?

17     A    I recall a targeting question and I recall

18  responding to him that I was familiar with the term

19  targeting.  It's an HR term.  It's somewhat of a buzz word

20  and we've had an allegation of targeting.  I don't recall

21  specifics around it but targeting has come up.  Again, it's

22  more of an HR buzz word and no, it's not something that is

23  commonly used in our organization.

24     Q    Number seven.  "In your opinion, what is the

25  difference between targeting and being held accountable?"  Do

1    you recall Mr. Wall asking you that question?

2        A    I don't recall that question specifically.  I

3    recall us discussing targeting specifically.

4        Q    Do you have an opinion on the difference between

5    targeting and being held accountable?

6        A    I really don't know the definition.  I would have

7    to do some HR research around that with how they're

8    interpreting targeting these days.

9        I understand being held accountable as just being

10   accountable for your role and outcomes.  In the position of

11   the organization, I'm certainly familiar with being held

12   accountable and holding other people accountable, and

13   targeting seems more negative.

14       Q    But you don't recall Mr. Wall asking you that

15   question on item seven?

16       A    I don't recall those specific words.  I more recall

17   conversation around targeting.

18       Q    Okay.  At that's when you gave him the information

19   regarding the call you had with Mr. Waldrop and the

20   questioning you did?

21       A    Yes, and that was more a response to question five

22   around that fear of being fired or terminated.  I don't

23   recall specifically those questions and conversations.  It

24   was more so around targeting and I did relay that I thought

25   Mark was fearful at the end.  And I relayed the allegations

1  that Mark had relayed to me that I shared with you earlier.

2  That he had confided in me that he thought Ronnie had broken

3  into his office and that Ronnie had slashed his tires.  And I

4  did communicate that to Joe.

5       Q    In the course of this interview, you told him that?

6       A    I did.

7       Q    Okay.  Number eight.  "Are you aware of the gift

8  items such as Waterford crystal stored in the storage unit in

9  Dalton?  Is there more than one unit?"  Do you recall Mr.

10  Wall asking you those questions?

11      A    I do recall talking about the Waterford Crystal and

12  I communicated that I had received it as a gift quite a few

13  times over the course of my employment.  I wasn't familiar

14  with what was stored or wasn't stored in the Dalton unit.

15  And I don't recall specifically talking about that with Joe

16  beyond just whether I was familiar with Waterford Crystal as

17  a gift.

18      Q    As an employee of Community Health Systems, do you

19  feel that the purchase of Waterford Crystal for Community

20  Health Systems associates is an appropriate business expense?

21      A    If it was an approved business expense then I would

22  say yes.

23      Q    Okay.  Finally, number nine.  "Do you feel any

24  discomfort or insecurity caused be the SOP reorganization? "

25  Do you recall Mr. Wall asking you that question?

1      A      I do and I recall relaying to him what I relayed to

2   you earlier and that was that the way that was communicated

3   and my understanding of the SOP under Mark's leadership

4   versus now is different and was even different then.  It was

5   communicated very negatively to me, personally.  I believe

6   that was a pretty consistent message that Mark had when he

7   was sharing the SOP was that it was definitely a downward

8   movement for me and I was very unhappy about that.  And met

9   with he and Ronnie and I did share that with Joe.  And I

10  shared with Joe that my understanding of what the SOPs

11  intention was changed after I met with Mark and Ronnie.

12      Q      The SOP reorganization, just to clarify, is when

13  you went from being President of Ethica to Senior Vice-

14  President of Skilled and Provider Services?

15      A      Correct.

16      Q      How long before Mr. Waldrop's termination did you

17  have this meeting with Mr. Waldrop and Mr. Rollins where this

18  SOP issue was discussed?

19      A      I don't recall the date.  It was, I believe those

20  discussions around SOP happened in conjunction with preparing

21  the budget for the next fiscal year.  And so that would have

22  been in the spring.

23      Q      Okay.  So at the time that Mr. Wall asked you the

24  question in item number nine on Exhibit 2, was your response

25  yes or no?

1    A    I don't recall specifically.  I recall having a

2    discussion of how the SOP organization was relayed to me and

3    my reaction to that but I don't recall specifically saying

4    yes or no.

5    Q    Well, did you feel any discomfort or insecurity

6    caused by the SOP reorganization at the time that Mr. Wall

7    interviewed you?

8    A    No.  I was very comfortable with what the intention

9    of it was after I had an opportunity to meet with Mark and

10   Ronnie.  And that was prior to Mark's leaving.

11   Q    Okay.  Have you been interviewed by Mr. Daniel or

12   Ms. Brisbane regarding Mr. Waldrop in the last 60 days?

13   A    What is Ms. Brisbane's first name?

14   Q    Latoya.

15   A    Yes.

16   Q    When was that?

17   A    We had some interview questions, oh, gosh, it's

18   been over a month or so ago and then we did a preparation

19   meeting for the deposition last week.

20   Q    I'm not focusing on the deposition preparation

21   meeting.  We're focusing on the first one you described.

22   A    Okay.

23   Q    Where did that meeting take place?

24   A    In their office in Atlanta.

25   Q    I don't want you tell me specifically what you were

```
1    asked or how you responded.  I am going to ask you if you

2    were asked about certain subjects.

3         A    Okay.

4         Q    Were you asked about Mr. Waldrop's alcohol

5    consumption?

6         A    I was.

7         Q    Were you asked about Mr. Waldrop's religious

8    beliefs?

9         A    I don't recall specifically the religious beliefs.

10        Q    Were you asked about Mr. Waldrop's consumption of

11   meat?

12        A    I don't recall specifically talking about that.

13        Q    Were you asked about Mr. Waldrop's observance of

14   religious holidays?

15        A    I do not recall specifically discussing that

16   either.

17        Q    Were you asked about the location of the

18   headquarters of Mr. Waldrop's church?

19        A    I don't recall that.

20        Q    So you do recall specifically being asked about

21   alcohol?

22        A    I do.  I do.

23        Q    Were you asked about Mr. Waldrop going to clubs?

24        A    I was.

25        Q    Did you ever invite Mr. Waldrop to go to clubs when
```

```
 1   he was an employee of Community Health Systems?

 2        A    I don't recall who invited who but it was something

 3   that we did, typically in conjunction with a meeting.  If

 4   there were several of us in the Atlanta area, we've gone

 5   several times to clubs.

 6        Q    When you say we, you mean you?

 7        A    Mark and I.  There are others that have been, too.

 8        Q    Lorraine Taylor?

 9        A    Lorraine has been in the past.  Yes.

10        Q    Michelle Moore-Andrews?

11        A    Yes.

12        Q    Ronnie Rollins?

13        A    No.

14        Q    Have you ever witnessed Mr. Waldrop inebriated?

15        A    Yes.

16        Q    How many times?

17        A    We would go out and dance and drink and have a good

18   time.  So many times over the course of my employment we've

19   done that.

20        Q    Is there a policy at Community Health Systems that

21   governs employee's religious beliefs?

22        A    No, not that I'm aware of.

23        Q    Is there a policy at Community Health Systems that

24   governs employee's consumption of meat?

25        A     No, not that I know of.
```

1    Q    Is there a policy at Community Health Systems that

2  governs the employee's consumption of alcohol while not

3  working?

4    A    Not that I'm aware of.

5    Q    When you would go to these nightclubs with Mr.

6  Waldrop and at times Ms. Andrews and Ms. Taylor, was that on

7  company time?

8    A    No.  It was typically after meetings and if we were

9  staying overnight.

10   Q    Have you ever witnessed Mr. Waldrop inebriated on

11 company time?

12   A    No.

13   Q    Who told you that you needed to go to Holland &

14 Knight's Offices in Atlanta for questioning or for

15 discussions with Mr. Daniel or Ms. Brisbane?

16   A    I believe that came up at a meeting.  I hate to

17 guess.  It was a scheduled meeting.

18   Q    Do you know who else was interviews or had meetings

19 with Mr. Daniel or Ms. Brisbane in Atlanta?

20   A    No.  I wasn't -- I was privy to the meeting that I

21 attended but not to whom else might have been interviewed.

22 In general discussion recall them being in the Macon office

23 one day and there being people in and out but I don't -- I

24 didn't sit through anyone else's.  I wasn't part of

25 scheduling those so I couldn't say specifically who all they

```
1   interviewed.
2       Q    Are you aware of any negative comments that
3   Lorraine Taylor has made about Mr. Waldrop since his
4   termination?
5       A    Other than through the course of the investigation,
6   we've all shared experiences but nothing -- I don't recall
7   anything specifically.
8       Q    Has Ms. Taylor ever shared with you any of her
9   frustrations with Mr. Rollins?
10      A    With Mr. Rollins?
11      Q    Yes.
12      A    No.
13      Q    Are you friends on Facebook or connected on
14  LinkedIn with Mr. Waldrop?
15      A    We may be on LinkedIn together.
16      Q    How about Christine Waldrop?
17      A    I'd have to look.  I don't recall seeing any posts
18  or anything with her but it's possible that we are on
19  LinkedIn together.
20      Q    Do you recall sending a LinkedIn request to
21  Christine Waldrop?
22      A    I don't.
23      Q    You don't recall sending one to her after this
24  litigation was filed?
25      A    I don't.
```

```
 1        Q     Did anyone instruct you to send a LinkedIn request
 2   to Ms. Waldrop?
 3        A     No.
 4              MR. HENRY:  Let's take a brief break.  We might be
 5        done.
 6              THE WITNESS:  Okay.
 7   (BREAK)
 8              MR. HENRY:  I do have a couple of more questions.
 9              MR. DANIEL:  We suspected you would.
10              MR. HENRY:  But only a couple.  Not many.
11        Q     MR. HENRY:  Okay.  Ms. Wilkes, before we took that
12   brief break, we were talking about the meeting that you had
13   in Holland & Knight's offices in Atlanta.  Do you recall
14   that?
15        A     I do.
16        Q     Were any of your direct reports interviewed in
17   Atlanta?
18        A     I believe they spoke with Scott Edens.  I'm not
19   sure where they spoke with him.
20        Q     Okay.
21        A     And he wasn't my direct report.
22        Q     Okay.  When did he leave the company?
23        A     It's been recent, within the last couple of weeks.
24        Q     And this interview meeting in Atlanta would have
25   taken place while he was still employed?
```

1       A      Correct.

2       Q      Have you had any conversations with Ms. Taylor or

3  Mr. Rollins about the contents of tape-recorded telephone

4  calls?

5       A      No.

6            MR. HENRY:  I believe that's all I have.

7            MR. DANIEL:  I have no questions.  The witness will

8        reserve the right to read and sign the deposition.

9  **(DEPOSITION CONCLUDED 12:28 P.M.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D I S C L O S U R E

STATE OF GEORGIA,

COUNTY OF BIBB:


Deposition of:  DIANA WILKES


Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as a representative of Hawthorne & Webb Court Reporting.

Hawthorne & Webb Court Reporting was contacted by the offices of Mr. Gary Henry to provide court reporting services for this deposition.  Hawthorne & Webb Court Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

Hawthorne & Webb Court Reporting has no contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Hawthorne & Webb Court Reporting will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Dated:  APRIL 26, 2017.


_____, CCR B-959
Certified Court Reporter

CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY;

I, Laura M. Jackson, CCR, B-959, CERTIFY that acting in such capacity on DATE, I reported the testimony of **Diana Wilkes**, and on the foregoing pages, numbered 3 through 101, both inclusive, have transcribed a true, accurate and complete transcript of the same.

I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or the outcome thereof.

WITNESS my hand and official seal this 16th day of May, 2017.

_____

Certificate Number B-959

CERTIFICATE OF WITNESS
IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

———————————

MARK A. WALDROP,                    :
          PLAINTIFF,                :
                                    :
     VS.                            :      CASE NO.  4:16-CV-235-HLM
                                    :
COMMUNITY HEALTH SYSTEMS, INC.:
          DEFENDANT.                :

DEPOSITION OF:  DIANA WILKES                    April 26, 2017

     (  )I wish to make the following correction(s):

PAGE/ LINE/      CORRECTION                /      REASON

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

     (  )I have read the foregoing pages of my testimony and
wish to make no corrections.


                         _____
                         Diana Wilkes

Sworn to and subscribed before me
This ____ day of _____, 2017.

_____
Notary Public

## Community Health Services of Georgia

### Expense Report - (920)

| Name: | Stephanie B. Dotson | | | | Mileage @ | 0.560 | | Date: | 2.6.14 | |

| Date | Location/Purpose | Meals | Lodging | Air Fare | Seminar/Meetings | Miles | Taxi | Amount | Supplies | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/21-1/24 | PC Meeting at The Waverly/ Meeting at Twelve Atlantic Station Hotel in four meeting space | 70.02 | | | 1150.79 | 207 | 5.00 | 120.92 | | 1341.73 |
| 1/22/2014 | Ethics Leadership Team Meeting at The Waverly (PLEASE CODE TO CHS) | | | | 875.44 | | | 0.00 | | 875.44 |
| 1/24/2014 | Managed Care Meeting at The Waverly (PLEASE CODE TO HONHOS) | | | | 787.33 | | | 0.00 | | 787.33 |
| 1/27/2014 | BBtech Travel- LDP change fee for Shelley Marshall's flight/ deposit for LDP meeting | | 261.00 | | 500.00 | | | 0.00 | | 761.00 |
| 1/31/2014 | LDP offsite meeting in February- hotel accommodations | | 12845.15 | | | | | 0.00 | | 12845.15 |
| 2/3/2014 | Walmart- computer wipes/USB flash drive/Apple Tech Support call/extra mouse (3) for the office and LDP/ Deposit for Carmine's dinner (LDP offsite meeting) | 320.00 | | | | | | 0.00 | 92.28 | 412.28 |
| 2/4/2014 | Leadership Development Program in Atlanta/ Cake for Geneen, Ramsay/Rocky Face Post Office | 1157.38 | 368.88 | | | 236 | -76.00 | 209.16 | 150.00 | 1884.42 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| | | | | | | | | 0.00 | | 0.00 |
| Subtotals (A) | | 1547.40 | 13475.03 | 0.00 | 3313.56 | 443.00 | 81.00 | 331.30 | 242.28 | 18909.57 |

| Miscellaneous: | | | | |
|---|---|---|---|---|
| Dues/Licenses: | | 9092 | | 0.00 |
| Taxes & Licenses: | | 9660 | | 0.00 |
| Other Benefits: | | 5085 | | 0.00 |
| Telephone: | | 9064 | | 144.78 |
| | | | | |
| | | | | |
| | | | Subtotal | 144.78 |
| | | | Subtotal (A) | 18,909.57 |
| | | | Grand Total | 19,054.35 |

Signature

Approval Signature


PLAINTIFF'S EXHIBIT
1
04-26-2017
WILKES
PENGAD 800-631-6989

☒ Bursch Travel - Let us help plan your dream vacation

Bursch Travel/American Express
15 locations to serve you
Contact information
www.burschtravel.com



Travel Services
Representative

COMMUNITY HEALTH SERVICES OF GA
MARK WALDROP
1013 RIVERBURCH PARKWAY SUITE ONE
DALTON GA 30721

## PASSENGER INFORMATION

Company Name: ETHICA HEALTH AND RETIREMENT
Date Issued: January 27, 2014
Agent: MARY JO
First Name: SHELLEY MOORE

Account No.: 7064280158
Agency Confirmation: 4AWB3D
Invoice #: 064462
Last Name: MARSHALL

## CONFIRMATION INFORMATION

TICKET CONFIRMATION FOR DELTA IS GDAMCA

## FLIGHT ▲ DELTA

**Tuesday February 18, 2014**

Air Vendor: DELTA
From: ATLANTA
To: LGA
Seat: 29-A **RESERVED**
Aircraft: M80
Operated By: DELTA

Flight Number: 2386
Departs: 04:45 PM
Arrives: 07:02 PM
Ticket Confirmation: GDAMCA
Class of Service: [ X ] ECONOMY CLASS
Flight Type: NON-STOP

BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY | DEPART TERMINAL S | ARRIVE TERMINAL D | MILES 756 | FLIGHT DURATION 2.17 HRS

## FLIGHT ▲ DELTA

**Thursday February 20, 2014**

Air Vendor: DELTA
From: LGA
To: ATLANTA
Seat: 28-D **RESERVED**
Aircraft: M80
Operated By: DELTA

Flight Number: 1147
Departs: 08:00 PM
Arrives: 10:44 PM
Ticket Confirmation: GDAMCA
Class of Service: [ T ] ECONOMY CLASS
Flight Type: NON-STOP

BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY | DEPART TERMINAL D | ARRIVE TERMINAL S | MILES 756 | FLIGHT DURATION 2.44 HRS

## INVOICE INFORMATION

Invoice #: 064462
Air Fare: $ 261.39
Taxes And Carrier
Imposed Fees: $ 41.61
Admin/Penalty Fee: $ 200.00
Exchanged Fare: $ -292.00
Total Air Fare: $ 211.00
Service Fee: $ 25.00
Total: $ 236.00
Total Payment: $ 236.00

## PAYMENT HISTORY

| Date | Form of Payment | Credit Card Number/Type | Amount |
|------|-----------------|-------------------------|--------|
| 01/27/14 | Credit Card | XXXX XXXXXX X8009/AX | $ 236.00 |
| 01/27/14 | Exchanged Ticket | T-0067330881362 | -$ 292.00 |

## GENERAL INFORMATION

TICKET NUMBER(S):   E0067331824603
SERVICE FEE MCO:    8900627588344

EXCHANGE DOCUMENT(S): T-0067330881352

## REMARKS

GOVT ISSUED PHOTO ID REQUIRED TO BOARD AIRCRAFT.
TRIP PROTECTION INSURANCE IS RECOMMENDED,
CHECK ALL DOCUMENTS FOR ACCURACY.
PRICES ARE SUBJECT TO INCREASE PRIOR TO YOUR FULL
PAYMENT ON ANY TRIP INCLUDING AIR.
AFTER FULL PAYMENT PRICES ARE NOT SUBJECT TO
INCREASE EXCEPT FOR INCREASES IN GOVERNMENT
IMPOSED TAXES AND FEES.
FOR BAGGAGE ALLOWANCE/FEE INFORMATION
VISIT WWW.BURSCHTRAVEL.COM
TICKETS ARE NONREFUNDABLE. PENALTY APPLIES TO
ANY CHANGES MADE
PLEASE RECONFIRM ALL FLIGHTS PRIOR TO DEPARTURE
CHECK IN NO LATER THAN 90 MINUTES PRIOR TO
DEPARTURE FOR DOMESTIC FLIGHTS AND 2 HOURS FOR
INTERNATIONAL FLIGHTS OR BOARDING MAY BE DENIED
SEAT ASSIGNMENTS ARE NOT GUARNTEED
CHANGES AND CANCELLATIONS MUST BE MADE PRIOR TO
YOUR DEPARTURE FLIGHT OR YOU COULD LOSE YOUR
TICKET.

OnQueue™ - © 2013 MagnaTech - all rights reserved  ::  Travel Agency Systems by Magnatech

Stephanie Dotson
_____

| | |
|---|---|
| **From:** | Mary Jo Follmuth <MaryJoF@burschtravel.com> |
| **Sent:** | Thursday, January 30, 2014 12:53 AM |
| **To:** | Stephanie Dotson |
| **Subject:** | Travel Itinerary/Invoice for SHELLEY.MOORE MARSHALL – Travel Date February 18, 2014 |

Stephanie,

I have attached the invoice to change Shelley's ticket.  Click on the link below.

Thanks,
Mary Jo

Bursch Travel
220 Division Street
Waite Park, MN 56387
320-251-3180 - Phone
320-251-3391 - Fax

Please click here to view your itinerary online.

If receiving on a PDA, please scroll down to view itinerary.

**Note:** The attached .ics file(s) contain(s) travel information that can be inserted into your iCal compliant calendar. Please disregard if not applicable.

_____

If you can't click on the link(s) above or if your itinerary does not display correctly, simply copy the link (excluding the brackets) from below and paste it into your browser window's address field.

Online itinerary: [http://magna.magnatech.com/OnQueue/3RD/Feb-18-2014022020143RD3334353A3437343835393336.htm]
If the itinerary is still not appearing, please advise your travel agent.

_____

Bursch Travel
220 Division Street
Waite Park MN 56387
320-251-3180 - Phone
320-251-3391 - Fax

–
COMMUNITY HEALTH SERVICES OF GA
MARK WALDROP
1013 RIVERBURCH PARKWAY SUITE ONE

1

DALTON GA 30721

Passenger Information

Company Name: ETHICA HEALTH AND RETIREMENT
Account No.: 7064280158
Date Issued: January 27, 2014
Agency Confirmation: 4AWB3D
Agent: MARY JO
Invoice #: 064462
First Name: SHELLEY.MOORE
Last Name: MARSHALL
CONFIRMATION INFORMATION
TICKET CONFIRMATION FOR DELTA IS GDAMCA


FLIGHT

Tuesday February 18, 2014
http://www.flightstats.com/go/FlightStatus/flightStatusByFlight.do?airline=DL&flightNumbe
r=2386&departureDate=2014-02-18
http://magna.magnatech.com/GetMap.html?LGA%20airport
http://www.delta.com/traveling checkin/index.jsp
Air Vendor: DELTA
Flight Number: 2386
From: ATLANTA
Departs: 04:45 PM
To: LGA
Arrives: 07:02 PM
Seat: 29-A **RESERVED**
Ticket Confirmation: GDAMCA
Aircraft: M80
Class of Service: [ X ] ECONOMY CLASS
Operated By: DELTA
Flight Type: NON-STOP
BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY
DEPART TERMINAL S
ARRIVE TERMINAL D
MILES 756
FLIGHT DURATION 2.17 HRS


FLIGHT

Thursday February 20, 2014
http://www.flightstats.com/go/FlightStatus/flightStatusByFlight.do?airline=DL&flightNumbe
r=1147&departureDate=2014-02-20
http://magna.magnatech.com/GetMap.html?ATL%20airport
http://www.delta.com/traveling checkin/index.jsp
Air Vendor: DELTA
Flight Number: 1147
From: LGA
Departs: 08:00 PM
To: ATLANTA
Arrives: 10:44 PM
Seat: 28-D **RESERVED**
Ticket Confirmation: GDAMCA
Aircraft: M80
Class of Service: [ T ] ECONOMY CLASS
Operated By: DELTA
Flight Type: NON-STOP

2

BAGGAGE ALLOWANCES - BAGGAGE FEES MAY APPLY
DEPART TERMINAL D
ARRIVE TERMINAL S
MILES 756
FLIGHT DURATION 2.44 HRS


INVOICE INFORMATION

Invoice #:064462
Air Fare:$ 261.39
Taxes And Carrier Imposed Fees:$ 41.61
Admin/Penalty Fee$ 200.00
Exchanged Fare:$ -292.00
Total Air Fare:$ 211.00
Service Fee:$ 25.00
Total:$ 236.00
Total Payment:$ 236.00


PAYMENT HISTORY

01/27/14
Credit Card
XXXX XXXXXX X8009/AX
$ 236.00
01/27/14
Exchanged Ticket
T-0067330881362
-$ 292.00


GENERAL INFORMATION

TICKET NUMBER(S):    E0067331824603
SERVICE FEE MCO:     8900627588344
EXCHANGE DOCUMENT(S): T-0067330881362


REMARKS

GOVT ISSUED PHOTO ID REQUIRED TO BOARD AIRCRAFT.
TRIP PROTECTION INSURANCE IS RECOMMENDED.
CHECK ALL DOCUMENTS FOR ACCURACY.
PRICES ARE SUBJECT TO INCREASE PRIOR TO YOUR FULL
PAYMENT ON ANY TRIP INCLUDING AIR.
AFTER FULL PAYMENT PRICES ARE NOT SUBJECT TO
INCREASE EXCEPT FOR INCREASES IN GOVERNMENT
IMPOSED TAXES AND FEES.
FOR BAGGAGE ALLOWANCE/FEE INFORMATION
VISIT WWW.BURSCHTRAVEL.COM
TICKETS ARE NONREFUNDABLE. PENALTY APPLIES TO
ANY CHANGES MADE
PLEASE RECONFIRM ALL FLIGHTS PRIOR TO DEPARTURE
CHECK IN NO LATER THAN 90 MINUTES PRIOR TO
DEPARTURE FOR DOMESTIC FLIGHTS AND 2 HOURS FOR
INTERNATIONAL FLIGHTS OR BOARDING MAY BE DENIED
SEAT ASSIGNMENTS ARE NOT GUARNTEED
CHANGES AND CANCELLATIONS MUST BE MADE PRIOR TO
YOUR DEPARTURE FLIGHT OR YOU COULD LOSE YOUR
TICKET.

add $25.⁰⁰ Prof fee
from bursch as listed
on Amex 1/27/14

*Managed Care +*
*Medicaid RFP*
*Task Force Mts - Ronnie*
*Hunter*

the Renaissance Atlanta Waverly Hotel & Convention Center
**BANQUET CHECK DETAIL**

Check #:      574373
Check Date: 01/24/14
Manager:     ll
Room:         MULTIPLE

Community Health System
Community Health System Meetin
1613 RIVERBURCH PARK
DALTON, GA 30721-8888

Page #: 1
Bill Method: NA
Tax Exempt: N
BEO #: 600400

Friday, January 24, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|----------|----------|------|-----------|----------|-------|
| **Food** | | | | | |
| Coffee Break, Cobb | | | | | |
| | 1 | Freshly Brewed Starbucks Regular Coffee | 68.00 | 68.00 | |
| | 1 | Freshly Brewed Starbucks Decaffeinated Coffee | 68.00 | 68.00 | |
| | 1 | Assorted Tazo Teas | 68.00 | 68.00 | |
| | | Food SUBTOTAL | | 204.00 | |
| **Audio Visual** | | | | | |
| Meeting, Cobb | | | | | |
| | 1 | LCD Meeting Room Package including 3500 Lumens Projector, Projector Cart, Tripod Screen and Power | 395.00 | 395.00 | |
| | | Audio Visual SUBTOTAL | | 395.00 | |

|  |  |
|---|---|
| Bqt Service Charge 24% | 48.96 |
| AV Service Charge 24% | 94.80 |
| State Sales Tax 6% | 15.18 |
| AV State Sales Tax 6% | 29.39 |
| **GRAND TOTAL** | **787.33** |

MARRIOTT CONFIDENTIAL AND PROPRIETARY INFORMATION



PC Meeting
on 1/20

**the Renaissance Atlanta Waverly Hotel & Convention Center**
**BANQUET CHECK DETAIL**

| | | |
|---|---|---|
| Check #:  628657 | Community Health System | Page #: 1 |
| Check Date: 01/20/14 | Ethica Health and Retirement C | Bill Method: NA |
| Manager:  /EC/ | 1013 RIVERBURCH PARK | Tax Exempt: N |
| Room:  MULTIPLE | DALTON, GA 30721-8888 | BEO #: 725554 |

Monday, January 20, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|---|---|---|---|---|---|
| **Food** | | | | | |
| Continuous Break, Stately | | | | | |
| | 2 | Still Bottled Waters | 3.25 | 6.50 | |
| | 1 | Freshly Brewed Starbucks Regular Coffee | 68.00 | 68.00 | |
| | 1 | Assorted Soft Drinks | 4.00 | 4.00 | |
| | 1 | Assorted Tazo Teas | 68.00 | 68.00 | |
| | | Food SUBTOTAL | | 146.50 | |
| **Audio Visual** | | | | | |
| Meeting, Stately | | | | | |
| | 1 | LCD Meeting Room Package including 3500 Lumens Projector, Projector Cart, Tripod Screen and Power | 395.00 | 395.00 | |
| | | Audio Visual SUBTOTAL | | 395.00 | |
| **Room Rental** | | | | | |
| Meeting, Stately | | | | | |
| | 1 | Stately | 350.00 | 350.00 | |
| | | Room Rental SUBTOTAL | | 350.00 | |

| | |
|---|---|
| Bqt Service Charge 24% | 119.16 |
| AV Service Charge 24% | 94.80 |
| State Sales Tax 6% | 15.94 |

MARRIOTT CONFIDENTIAL AND PROPRIETARY INFORMATION

30

### the Renaissance Atlanta Waverly Hotel & Convention Center
### BANQUET CHECK DETAIL

Check #:     628857                Community Health System           Page #: 2
Check Date: 01/20/14         Ethica Health and Retirement C       Bill Method: NA
Manager:   /EC/                  1013 RIVERBURCH PARK           Tax Exempt: N
Room:      MULTIPLE             DALTON, GA 30721-8888            BEO #: 725554

Monday, January 20, 2014

| CATEGORY | QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|----------|----------|------|------------|----------|-------|
| | | | AV State Sales Tax 6% | | 29.39 |
| | | | GRAND TOTAL | | 1,150.79 |

MARRIOTT CONFIDENTIAL AND PROPRIETARY INFORMATION

Ethical Leadership
Team Meeting
— Drain $875.44
total

the Renaissance Atlanta Waverly Hotel & Convention Center
**BANQUET CHECK DETAIL**

Check #:       518354
Check Date: 01/21/14
Manager:      //
Room:         MULTIPLE

Community Health System
Community Health System Meetin
1013 RIVERBURCH PARK
DALTON, GA 30721-8888

Page #: 1
Bill Method: NA
Tax Exempt: N
BEO #: 600345

Tuesday, January 21, 2014

| CATEGORY QUANTITY | ITEM | UNIT PRICE | SUBTOTAL | TOTAL |
|---|---|---|---|---|
| **Food** | | | | |
| Coffee Break, Stately | | | | |
| 6 | Still Bottled Waters | 3.25 | 19.50 | |
| 4 | Assorted Soft Drinks | 4.00 | 16.00 | |
| 1 | Assorted Tazo Teas | 68.00 | 68.00 | |
| 1 | Freshly Brewed Starbucks Regular Coffee | 68.00 | 68.00 | |
| | Food SUBTOTAL | | 171.50 | |
| **Room Rental** | | | | |
| Meeting, Stately | | | | |
| 1 | Stately | 350.00 | 350.00 | |
| | Room Rental SUBTOTAL | | 350.00 | |
| | Bqt Service Charge 24% | | 125.16 | |
| | State Sales Tax 6% | | 17.80 | |
| | **GRAND TOTAL** | | | 664.46 |

the Renaissance Atlanta Waverly Hotel & Convention Center
RETAIL OUTLET CHECK DETAIL

COMMUNITY HEALTH SYSTEM
COMMUNITY HEALTH SYSTEM M
Event Dates 01/21/14 to 01/21/14
Invoice Number ****DRAFT****

```
          & & & 402 & & &
********* ROOM SERVICE *********
241 CHARLES                    3

TBL 1/1        6312   GST 8
          STATELY/ROOM
          21JAN 14 11:25AM

          MIXED/GREEN
   1 OPEN FOOD COLD       7.00
   1 SALMON SPINACH      16.00
   2 TURKEY CLUB         28.00
   1 SALMON CEASAR       16.00
   1 CHIX SPINACH        14.00
   1 CHIX CEASAR         14.00
   1 CHOP SALAD          14.00
   1 CRAB CAKE SAND      14.00
   1 DESSERT              5.00
   1 TOSCAN BURGER       12.00
   1 SOFT DRINK           3.50
   3 SOFT DRINK           9.00
   1 ICED TEA             3.00
     Sub-Total:         155.50
     DELIVERY CHARGE      13.00
     20% RS SVC CHG      31.10
          Tax            11.38
          Total:        210.98
     CHARGE TIP $        10.00
     1A000864
     ROOM/ACCT CHG       210.98
----241 CLOSED 21JAN  1:48PM----
```



**TWELVE**
HOTEL & RESIDENCES
ATLANTIC STATION.

Community Health Services of Georgia
United States

Date      01-27-14
Time      04:50 PM
Room
Conf. No.  3725156
Recpt. No. 129703

| | **Credit Card Receipt** | | |
|---|---|---|---|
| Date | Description | Exp Date | Amount |
| 01-27-14 | American Express  XXXXXXXXXX8009 | XX/XX | 500.00 USD |
| | Arrival | Departure | Group ID / Room Type |
| | 02-04-14 | 02-05-14 | 4214260 |

Guest Signature _____

Cashier No.   1

Room deposit for LDP 2/5

**TWELVE Hotels & Residences ATLANTIC STATION**
361 17th Street | NW Atlanta, GA 30308
M: 404-961-1212 | F: 404-961-2121
TWELVE ATLANTIC STATION is located at the corner of 17th & Market Street

PO BOX 4001
ACWORTH, GA 30101

| Manage Your Account & View Your Usage Details | Account Number | Date Due |
|---|---|---|
| My Verizon at www.verizonwireless.com | 820138869-00001 | 02/20/14 |
| Address Changed? — go to vzw.com/changeaddress | Invoice Number | 6995332899 |

KEYLINE
/3070554466/

STEPHANIE DOTSON
4854 SMYRNA CHURCH RD
CHATSWORTH, GA  30705-5446

## Quick Bill Summary

Dec 26 - Jan 25

| | |
|---|---|
| Previous Balance (see back for details) | $150.88 |
| Payment — Thank You | −$150.88 |
| **Balance Forward** | **$.00** |
| Monthly Charges | $127.98 |
| Usage and Purchase Charges | $9.95 |
| Verizon Wireless' Surcharges and Other Charges & Credits | $2.63 |
| Taxes, Governmental Surcharges & Fees | $4.22 |
| **Total Current Charges** | **$144.78** |

**Total Charges Due by February 20, 2014**        **$144.78**

**2014 Resolution — Go Paperless**
Sign up for paperless billing and save postage, reduce clutter and help the environment. Visit go.vzw.com/gogreen to learn more.

| Pay from Wireless | Pay on the Web | Questions: |
|---|---|---|
| #PMT (#768) | My Verizon at www.verizonwireless.com | 1.800.922.0204 or *611 from your wireless |

VE

Bill Date          January 25, 2014
Account Number     820138869-00001
Invoice Number     6995332899

## Total Amount Due

STEPHANIE DOTSON
4854 SMYRNA CHURCH RD
CHATSWORTH, GA  30705-5446

will be submitted to credit card on 02/18/14
DO NOT MAIL PAYMENT                               $144.78

PO BOX 660108
DALLAS, TX  75266-0108

/7526601085/

☐  Check here and fill out the back of this slip if your billing address
    has changed or you are adding or changing your email address

6995332899010820138869000010000144780000144787

DA VINCIOS PIZZA OF MIDTOWN
127B N PEACHTREE ST NW
ATLANTA GA 30309
404-789-7800

Merchant ID: 510299124
Term ID: 3004

## Sale

AMEX
XXXXXXXXXXX8009
Entry Method: Manual
Apprvd: Online    Batch#: 000004
02/05/14              07:45:46
AVS Code: Y

Inv#: 00000023 Appr Code: 122198

Amount:       $      26.68
Tip:                  3.00
Total:               ------
                     29.68

Customer Copy

THANK YOU

---

LongHorn 5302
1301 Lovers Lane Rd
Calhoun, GA 30701
****Take Out****

Check # :47597

NJ
02:51 PM 02/04/2014
Transaction #:1715393229

Card Number                Auth Code
xxxxxxxxxxxx 5555           753997
                              Visa
dotson/ stephanie

Check Amount               9.08

Tip....                    2.00

Total..                   10.08

X _____
Cardmember agrees to pay total in
accordance with agreement governing
use of such card.

Restaurant Copy

---

LDP
Tips $20

Cor Air
Cake (box)

# 605-866

## Walmart
Save money. Live better.

( 706 ) 279 - 1905
MANAGER RICKY BARTLETT
2646 E WALNUT AVE
DALTON GA 30721
ST# 0669 OP# 00000207 TE# 53 TR# 08890
** RETRIEVED TRANSACTION 48604498466 **
ZSS CS UP 20 06628346O11O    1.88 X
ZSS CS UP 20 06628346O11O    1.88 X
4G USB DRIVE 061966900200    7.97 X
WIPES        007487666S0     2.88 X
WIPES        007488766680    2.88 X
PC MOUSE     088537022063   19.88 X
**   RETRIEVED ITEMS COMPLETE
              SUBTOTAL      37.37
WMH HDWR     088537016394   16.88 X
WMH HDWR     088537016394   16.88 X
              SUBTOTAL      69.13
       TAX 1  6.000 %        4.15
                TOTAL       73.28
              AMEX TEND     73.28

ACCOUNT #         **** **** **8 009 S
APPROVAL # 585061
REF # 403600465412
TERMINAL # 03007223

     02/04/14    09:18:56

        CHANGE DUE       0.00

## # ITEMS SOLD 8

TC# 1660 7298 9170 9342 823

Our Guaranteed Low Prices
Are Unbeatable with Ad Match!
02/04/14      09:18:57

***CUSTOMER COPY***

CONFIDENTIAL

PC meeting

**RED LOBSTER 0392**
2579 Cobb Parkway
Smyrna, GA 30080-3009
Check # :22370

Table 9
Terrance J
11:41 01/20/2014                    Gst 1
Transaction #:1584654029

ID # 0271 26376 9818

```
* We value your opinion. Please *
* tell us about your dining      *
* experience by completing an    *
* on-line survey within 7 days of*
* your visit. You could win a    *
* $1,000 Grand Prize or 1 of 100 *
* $50 prizes. Winners are drawn  *
* monthly!!                      *
*                                *
* To complete the survey and enter*
* the contest, go to             *
* www.RedLobsterSurvey.com and   *
* enter the ID on this receipt.  *
* NO PURCHASE NECESSARY. Void where*
* prohibited. See Official Rules at*
* www.RedLobsterSurvey.com.      *
*                                *
* Valoramos su opinión. Complete la*
* encuesta sobre su experiencia  *
* gastronómica en                *
* www.RedLobsterSurvey.com.      *
*********************************
(OFFER EXPIRES Jan 27, 2014)
```

Card Number              Auth Code
xxxxxxxxxx 9995            035910
dotson stephanie           Visa

**Check Amount        22.78**

Tip Not Included

Suggested tip amounts      15% - $3.22
are provided for your      18% - $3.87
convenience.               20% - $4.30

Tip.... 3.22

Total... 26 --

X _____
Cardmember agrees to pay total in
accordance with agreement governing
use of such card.

Guest Copy

---

Table 912
MJ
07:09 PM 01/20/2014
Transaction #:1587944029

LongHorn 5302
1301 Lovers Lane Rd
Calhoun, GA 30701

Check # :19001

Table 912
MJ
19:09:37 01/20/2014

Guest No. 1

1 Water
1 Firecracker Wrap              8.49
1 Wild West Shrimp              9.29
                    ─────────────
          Subtotal      17.78
          Sales Tax      1.24

19:09:37 01/20/2014   Please pay this amount
                      Total     19.02

Tip Not Included

Suggested tip amounts      15% - $2.67
are provided for your      18% - $3.20
convenience.               20% - $3.56

(9999)Visa                    19.02

    Amount Due     0.00
      Change       0.00

Bar

Name: OK

```
*********************************
Join our LongHorn Hospitality Club
for great deals and a FREE appetizer
with purchase of 1 adult dinner entree
www.longhornsteakhouse.com/join
*********************************
* * * * * * * * * *
Keith Rauch
Managing Partner

(706) 624-4250
```

---

LongHorn 5302
1301 Lovers Lane Rd
Calhoun, GA 30701
Check # :19001



Manuel Ortiz
LOS REYES MEXICAN RE
1235 GLENWOOD AVE
DALTON, GA 30721

TERMINAL I.D.: 1      LXX7241I
MERCHANT #: 1      QA000759157

VISA
xxxxxxxxxxxx5555          SEQ: 3
SALE
BATCH: 000127   INV: 000031
DATE JAN 20, 14   TIME: 10:48
TRAN CODE:786364 AUTH: 682159
AVS RESPONSE: B

BASE              $20.23

TIP              4.77

TOTAL            25 --

STEPHANIE DOTSON

1235 Glenwood Ave
Dalton GA 30721
706-226-0032

CUSTOMER COPY

POSTED CHARGES

| | |
|---|---|
| Transaction Date: | 01/27/2014 Mon |
| Transaction Description: | BURSCH TRAVEL AGENCYWAITE PARK MN |
| | 012709 TRAVEL AGENCY |
| | TRAVEL AGENCY SERVICE |

| From: | To: | Carrier: | Class: |
|---|---|---|---|
| N/A | N/A | YY | |
| N/A | | | |
| N/A | | | |
| N/A | | | |

Ticket Number: 090733182480<br>— Change for Shelley<br>Marshall's field (WP)

| | |
|---|---|
| | Passenger Name: MARSHALL/SHELLEY,MOO |
| | Document Type: TRAVEL AGENCY FEE |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 25.00 |
| Doing Business As: | AIRLINES RPRTING CORPTAF |
| Merchant Address: | 3000 WILSON BLVD |
| | STE 300 |
| | ARLINGTON |
| | VA |
| | 22201-3862 UNITED STATES |
| Reference Number: | 320140280239388743 |
| Category: | Travel - Travel Agencies |

| | |
|---|---|
| Transaction Date: | 01/28/2014 Tue |
| Transaction Description: | TWELVE ATLANTIC STATATLANTA GA |
| | 3990669 404991888 |

| Arrival Date | Departure Date |
|---|---|
| 02/04/14 | 02/09/14 |

| | |
|---|---|
| | LODGING |
| | CARD EPOSIT |
| | 4049918869 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 500.00 |
| Doing Business As: | TWELVE ATLANTIC STATION |
| Merchant Address: | 361 17TH ST NW |
| | ATLANTA |
| | GA |
| | 30363-1078 UNITED STATES |
| Reference Number: | 320140280247846627 |
| Category: | Travel - Lodging |

| | |
|---|---|
| Transaction Date: | 01/31/2014 Fri |
| Transaction Description: | DOUBLETREE GSTSTE NYNEW YORK NY |
| | 0002092415 (212)719-1600 |

| Arrival Date | Departure Date |
|---|---|
| 01/29/14 | 01/30/14 |

| | |
|---|---|
| | LODGING |
| | (212)719-1600 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 12,845.15 |
| Doing Business As: | DOUBLETREE GST STE NY FD |
| Merchant Address: | 1568 BROADWAY |
| | NEW YORK |
| | NY |
| | 10036-8201 UNITED STATES |
| Reference Number: | 320140310278586659 |
| Category: | Travel - Lodging |

| | |
|---|---|
| Transaction Date: | 01/31/2014 Fri |
| Transaction Description: | RENAISSANCE WAVERLY ATLANTA GA |
| | 685 LODGING |
| | Arrival Date   Departure Date |
| | 01/29/14   01/30/14 |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 1,150.79 |
| Doing Business As: | RENAISSANCE WAVERLY |
| Merchant Address: | 2450 GALLERIA PKWY SE |
| | ATLANTA |
| | GA |
| | 30339-3130 UNITED STATES |
| Reference Number: | 320140310283961040 |
| Category: | Travel - Lodging |

| | |
|---|---|
| Transaction Date: | 01/31/2014 Fri |
| Transaction Description: | RENAISSANCE WAVERLY ATLANTA GA |
| | 684 LODGING |
| | Arrival Date   Departure Date |
| | 01/21/14   01/30/14 |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 873.44 |
| Doing Business As: | RENAISSANCE WAVERLY |
| Merchant Address: | 2450 GALLERIA PKWY SE |
| | ATLANTA |
| | GA |
| | 30339-3130 UNITED STATES |
| Reference Number: | 320140310283901334 |
| Category: | Travel - Lodging |

| | |
|---|---|
| Transaction Date: | 02/01/2014 Sat |
| Transaction Description: | RENAISSANCE WAVERLY ATLANTA GA |
| | 665 LODGING |
| | Arrival Date   Departure Date |
| | 01/24/14   01/31/14 |
| | LODGING |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 787.33 |
| Doing Business As: | RENAISSANCE WAVERLY |
| Merchant Address: | 2450 GALLERIA PKWY SE |
| | ATLANTA |
| | GA |
| | 30339-3130 UNITED STATES |
| Reference Number: | 320140320297650539 |
| Category: | Travel - Lodging |

| | |
|---|---|
| Transaction Date: | 02/03/2014 Mon |
| Transaction Description: | APPLE ONLINEUSA APPLCUPERTINO CA |
| | 2912025507 3 APPLE ONLINE STORES |
| | APPLE ONLINE STORES |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 19.00 |
| Doing Business As: | APPLE WEB STORE |
| Merchant Address: | 12545 RIATA VISTA CIR |
| | AUSTIN |
| | TX |
| | 78727-6524 UNITED STATES |
| Reference Number: | 320140340321930223 |

| | |
|---|---|
| Category: | Merchandise & Supplies - Internet Purchase |

| | |
|---|---|
| Transaction Date: | 02/04/2014 Tue |
| Transaction Description: | WAL-MART SUPERCENTERDALTON GA |
| | 33682124 DISCOUNT STORE |
| | DISCOUNT STORE |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 73.28 |
| Doing Business As: | WALMART SUPERCENTER |
| Merchant Address: | 702 SW 8TH ST |
| | BENTONVILLE |
| | AR |
| | 72716-6299 UNITED STATES |
| Reference Number: | 320140350335243488 |
| Category: | Merchandise & Supplies - Wholesale Stores |

| | |
|---|---|
| Transaction Date: | 02/03/2014 Mon |
| Transaction Description: | CARMINE'S 44TH CARMINEW YORK NY |
| | 170012 NEW YORK NEW YORK,NY |
| | NEW YORK NEW YORK,NY |
| | FOOD/BEVERAGE    $320.00 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 320.00 |
| Doing Business As: | CARMINE'S |
| Merchant Address: | 200 W 44TH ST |
| | NEW YORK |
| | NY |
| | 10036-3908 UNITED STATES |
| Reference Number: | 320140350338382362 |
| Category: | Restaurant - Restaurant |

| | |
|---|---|
| Transaction Date: | 02/04/2014 Tue |
| Transaction Description: | DA VINCI'S PIZZA OF 404-249-7800 |
| | 95363534036 USFC30309 |
| | USFC30309 |
| Cardmember Name: | STEPHANIE J DOTSON |
| Amount $: | 29.88 |
| Doing Business As: | DA VINCIS PIZZA OF MIDTOW |
| Merchant Address: | 1270 W PEACHTREE ST NW |
| | ATLANTA |
| | GA |
| | 30309 UNITED STATES |
| Reference Number: | 320140350348040584 |
| Category: | Restaurant - Restaurant |

**REVISED #3**

<u>ESTIMATED INVOICE</u>

**DoubleTree Suites**
BY HILTON™
NEW YORK CITY – TIMES SQUARE
1568 Broadway
New York, NY 10036

Date:     1/31/2014

From:     Zaida Lopez

| To: | MARY JO FOLLMUTH |
|---|---|
| Company: | BURSCH TRAVEL |
| Address: | 1411 1ST AVENUE SW |
|  | AUSTIN, MN 55912 |
| Phone #: | 507-437-8773 |
| Email: | MARYJOE@BURSCHTRAVEL.COM |

| Group Name: | COMMUNITY HEALTH SERVICES OF GEORGIA |
|---|---|

| Arrival: | Tuesday, February 18, 2014 |
|---|---|
| Departure: | Friday, February 21, 2014 |

|  | King | Dbl/Dbl | Conference |
|---|---|---|---|
| Single | $ 259.00 | $ - | $ - |
| Double | $ 259.00 | $ - | $ - |
| Triple | $ 289.00 | $ - | $ - |
| Quad | $ 319.00 | $ - | $ - |

| # of Suites | Suite Type |  | Rate |  | Nights |  |  |  | Total |
|---|---|---|---|---|---|---|---|---|---|
|  |  | x |  | x |  |  | = |  | $ - |
| 15 | Single | x | $ 259.00 | x | 3 |  | = |  | $ 11,655.00 |
| 1 | Single | x | $ 259.00 | x | 2 |  | = |  | $ 518.00 |
|  |  | x |  | x |  |  | = |  | $ - |
|  |  |  |  |  |  |  | Sub-Total Suites: |  | $ 12,173.00 |

| State Sales Tax | 8.875% | $ 1,080.35 |
|---|---|---|
| City Sales Tax | 5.875% | $ 715.16 |
| NYC Occupancy Tax | $4.00 | $ 188.00 |
| Javits Center Fee | $1.50 | $ 70.50 |
| Total Cost Suite & Tax: | | $ 14,227.02 |

Please be advised:
In the event of a group arrival a mandatory porterage fee will be assessed. This fee has
been estimated at (1) bag per person and will be charged at $7.75* roundtrip plus applicable taxes.
The baggage count will be conducted upon group arrival. The prepaid amount is only an estimate.

Porterage will be charged based on actual bag count as conducted and agreed upon by the Bell Captain
and the group contact. The difference will be required to be paid in full by the group at check-in.

*Porterage fee subject to change according to labor requirements.

| INDIVIDUAL ARRIVAL | | |
|---|---|---|
| BAGGAGE HANDLING | | |
| # of Bags | Cost Per Bag | Total Cost |
| 14 | $7.75 | $ 108.50 |
| Add 8.875% Sales Tax | | $ 9.63 |
| Total Porterage Costs: | | $ 118.13 |

| Contracted Room Nights |  | Contracted Performance |  | 90% of Contracted Room Nights | Current Pick-up |  | Variance |
|---|---|---|---|---|---|---|---|
| 48 | x | 90% | = | 43 | 47 |  |  |
|  |  |  | Total Revenue Owed for Performance Damages | | | $ |  |

| FULL AMERICAN BREAKFAST | | |
|---|---|---|
| # of People | Price | Total Cost |
|  | $28.00 | $ - |

| BANQUET CHARGES | | |
|---|---|---|
| BEO # |  | $ - |
| BEO # |  | $ - |
| Total Banquet Charges | | $ - |

| GRAND TOTAL : | $ 14,345.15 |
|---|---|

**Payment Instructions:**

| 1ST DEPOSIT | AMOUNT: | $ 1,500.00 | DUE ON OR BEFORE: | 1/13/2014 |
|---|---|---|---|---|
| 2ND DEPOSIT | AMOUNT: |  | DUE ON OR BEFORE: |  |
| REMAINING BALANCE | AMOUNT: |  | DUE ON OR BEFORE: | 1/28/2014 |

Incidental charges are to be paid on an individual basis upon check-out.

| DEPOSITS: | | |
|---|---|---|
| Date Check Received or CC Charged | Check # | Amount |
| 01/21/14 | CC-8009 | $ (1,500.00) |
| 30-Jan | CC-8009 | $ (12,845.15) |
|  |  | $ - |

| BALANCE DUE : | $ - | (0.00) |
|---|---|---|

*Please remit payment to the attention of the Doubletree Suites by Hilton - Times Square.*
*c/o Zaida Lopez, Event Manager, 1568 Broadway, New York, NY 10036.*

Please call the Event Manager directly at (212) 803-6329 for any questions or concerns regarding this statement.
Thank you for choosing the DoubleTree Guest Suites!



| Invoice # |
|---|
| CHG – 020414 – AS |

| Date |
|---|
| February 6, 2014 |

# TWELVE
### HOTELS & RESIDENCES

| Group | Community Health of Georgia |
|---|---|
| Address | |
| Atnn: | Stephanie Dotson |

| DATE | DESCRIPTION | ARRIVAL DATE | DEPARTURE DATE | PRICE | QUANTITY | TOTAL |
|---|---|---|---|---|---|---|
| **Event Details** | | | | | | |
| *February 4, 2014* | Miscellaneous | | | | | |
| MEETING | Screen & projector | | | $75.00 | 1 | $75.00 |
| | | | | | | |
| *February 5, 2014* | Room Fee | | | | | |
| MEETING | Space Rental – Cellar | | | $500.00 | 1 | $500.00 |
| | | | | | | |
| | Beverage | | | | | |
| | Assorted Sodas | | | $3.50 | 42 | $147.00 |
| | Regular Coffee & Tea (gallon) | | | $55.00 | 3 | $165.00 |
| | | | | | | |
| | Catering | | | | | |
| | Chef's selection of assorted mini desserts | | | $48.00 | 1 | $48.00 |
| | Sliced fresh fruit platter | | | $65.00 | 1 | $65.00 |
| | Assorted breakfast pastries | | | $42.00 | 1 | $42.00 |
| | Platter of Hummus Platter | | | $60.00 | 1 | $60.00 |
| | Turkey club | | | $10.00 | 1 | $10.00 |
| | Full Green Salad with Chicken | | | $15.00 | 3 | $45.00 |
| | Tomato Bisque Soup | | | $6.00 | 3 | $18.00 |
| | Full Green Salad | | | $11.00 | 1 | $11.00 |
| | Full Cesar Salad | | | $11.00 | 1 | $11.00 |
| | Chicken Sandwich | | | $12.00 | 4 | $48.00 |
| | Margherita Pizza | | | $14.00 | 1 | $14.00 |
| | Full Green Salad with Salmon | | | $16.00 | 1 | $16.00 |
| | Quesadilla | | | $9.00 | 2 | $18.00 |
| | Grilled cheese | | | $9.00 | 1 | $9.00 |
| | Shrimp Salad | | | $13.00 | 1 | $13.00 |
| | Trail Mix | | | $1.75 | 2 | $3.50 |
| | Yogurt | | | $2.75 | 3 | $8.25 |
| | | | | | | |
| | Miscellaneous | | | | | |
| | Screen & projector | | | $75.00 | 1 | $75.00 |
| | | | | | | |
| **Accommodations** | | | | | | |
| | 318 Stephanie Dotson | 2/4/2014 | 2/5/2014 | $159.00 | 1 | $159.00 |
| | 508 Mark Waldrop | 2/4/2014 | 2/5/2014 | $159.00 | 1 | $159.00 |
| | | | | | | |
| **Guest Incidentals** | | | | | | |
| | 318 Stephanie Dotson | Overnight Valet Parking | | $28.00 | 1 | $28.00 |
| | 508 Mark Waldrop | Overnight Valet Parking | | $28.00 | 1 | $28.00 |

*lods*

*parris*



| Invoice # |
|---|
| CHG - 020414 - AS |

| Date |
|---|
| February 6, 2014 |

| Group | Community Health of Georgia |
|---|---|
| Address | |
| Attn: | Stephanie Dotson |

| DATE | DESCRIPTION | ARRIVAL DATE | DEPARTURE DATE | PRICE | QUANTITY | TOTAL |
|---|---|---|---|---|---|---|
| Summary of Charges | | | | | | |
| | | | | Room Rental | | $500.00 |
| | | | | Beverages | | $312.00 |
| | | | | Catering | | $439.75 |
| | | | | Service Charge | | $172.90 |
| | | | | Tax @ 8% | | $113.97 |
| | | | | Miscellaneous | | $150.00 |
| | | | | Accomodations | | $318.00 |
| | | | | Accomodations Tax @ 16% | | $50.88 |
| | | | | Guest Incidentals | | $56.00 |
| | | | | Total Charges | | $2,113.50 |
| Payment Details | | | | | | |
| | | | | Advance Deposit | | $500.00 |
| | | | | Payment 2 | | $1,613.50 |
| Terms: Balance Due Upon Final Receipt of Invoice | | | | Balance Due: | | $0.00 |

(handwritten annotations: exp. SUP, food, supplies, lodging, parking)

TWELVE Hotel Atlantic Station - 361 17th Street, NW - Atlanta, GA 30363

lObby
at TWELVE



**TWELVE**
HOTEL & RESIDENCES
ATLANTIC STATION.

Stephanie Dotson
United States

Room No.   318
Folio No.   130066
Invoice No.
Arrival   02-04-14
Departure   02-05-14

Page No.   1 of 1

**Guest Folio**

Cashier   173

Group Block :   COMM_016
Company :   Community Health

*Thank you for staying with us !*          02-06-14

| Date | Description | | Charges | Credits |
|------|-------------|--|---------|---------|
| 02-05-14 | In Room Dining | Line# 318 : CHECK# 4225 | 29.00 | |
| 02-05-14 | American Express | | | 29.00 |
| | | Total | 29.00 | 29.00 |
| | | Balance | 0.00 | |

**Signature:** _____

*I agree that my liability for this bill is not waived and I agree to be held personally liable in the event that the indicated person, company or third party fails to pay for any part of these charges.*

Issues to be discussed with all management associates on Friday:

1- Everything discussed here is to be completely confidential and is not to be talked about to anyone outside this meeting. I am obligated to share anything said here to other members of the Board of Directors, but only if I determine that it should be made known to them as part of this ongoing matter.

2- Our purpose here is to clear the air within the organization and move forward & put this issue behind us as fast as possible.

3- Have you been or were you ever uncomfortable about anything that you were asked to do by any person that you consider your superior in the organization?

4- Are there any policies or procedures that you consider unfair or harsh or unnecessary?

5- Do you have or have you detected among any associates a fear of being fired or terminated? If so, is this feeling a part of our organization's culture?

6- Are you familiar with the term "targeting"? Is it commonly used in our organization among our associates?

7- In your opinion, what is the difference between "targeting" & being held accountable ?

8- Are you aware of the gift items, such as Waterford crystal, stored in the storage unit in Dalton? ? Is there more than one unit?

9- Do you feel any discomfort or insecurity caused by the SOP re-organization?



PLAINTIFF'S
EXHIBIT
2
04-26-2017
PENGAD 800-631-6909
WILKES