IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARK A. WALDROP,                         :

        PLAINTIFF,                    :

    VS.                                  :      CASE NO.  4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS,       :
INC.,
                                :

        DEFENDANT.

| APRIL 26, 2017 | MACON, GEORGIA | 1:45 P.M. |

Deposition of **MARISELA ESPINOZA,** called before Laura M. Jackson, Certified Court Reporter, State of Georgia, Certificate No. B-959, testimony taken in the offices of Smith, Hawkins, Hollingsworth & Reeves, 688 Walnut Street, Macon, Georgia, beginning at approximately 1:45 p.m., April 26, 2017.

Now Offering Video Conferencing

# HAWTHORNE & WEBB COURT REPORTING

149 River Hills Lane
Macon, Georgia 31211
Phone:  478.746.2295
LAURA@HAWTHORNE-WEBB.COM

APPEARANCES:

FOR THE PLAINTIFF:            MR. GARY L. HENRY
                             Gearhiser, Peters, Elliott
                             & Cannon
                             320 McCallie Avenue
                             Chattanooga, Tennessee  37402
                             ghenry@gearhiserpeters.com


FOR THE DEFENDANT:           MR. HAROLD T. DANIEL
                             Holland & Knight
                             Regions Plaza
                             Suite 1800
                             1180 West Peachtree Street
                             Atlanta, Georgia  30309
                             harold.daniel@hklaw.com


ALSO PRESENT:                MR. MARK WALDROP, Plaintiff
                             MS. TERESA MOODY
                             MS. LORRAINE TAYLOR


REPORTER'S NOTE:             Witness RESERVES reading and
                             signing of the document.


**INDEX**

CROSS EXAMINATION                               3
BY MR. HENRY

━━━━━━━━━━━━━

**EXHIBITS**

EXHIBIT NO. & DESCRIPTION                 ID'D ON PAGE

PLAINTIFF'S EXHIBIT NO. 1                      12
EMAILS BETWEEN DOTSON AND ESPINOZA

```
 1  STIPULATIONS:

 2          (It is stipulated and agreed by and between counsel

 3      appearing for the respective parties that those

 4      stipulations governing the taking of the deposition of

 5      JOE WALL will likewise govern the taking of the

 6      deposition of MARISELA ESPINOZA.)

 7                      ─────────────────

 8                      MARISELA ESPINOZA

 9                  Witness having been first

10                    duly sworn, testified on

11                  CROSS EXAMINATION

12  BY MR. HENRY:

13      Q    Ms. Espinoza, my name is Gary Henry and I represent

14  Mark Waldrop in some litigation that's pending against

15  Community Health Systems, Incorporated.  I'm an attorney from

16  Chattanooga.  We've never met before, have we?

17      A    No.

18      Q    If you would, please state your full name for the

19  record.

20      A    Marisela Espinoza.

21      Q    Have you ever given a deposition before?

22      A    No, I haven't given one.

23      Q    Okay.  Just go over a few brief things with you at

24  the outset and then we're going to get started because I

25  don't think we're going to be here very long today.
```

1        First of all, I'm going to be asking you a series of

2   questions.  I'm not trying to trick you or trip you up or get

3   you to say anything that's not true.  I'm just trying to get

4   some information from you.

5        A    Okay.

6        Q    So if I ask you a question and you don't understand

7   it or it doesn't make sense to you, let me know and I'll do

8   my best to make it clear.

9        A    I will.

10        Q    If I ask you a question and you answer it, I'm

11   going to assume you understood it.  Is that fair?

12        A    That's fair.

13        Q    You're doing a great job with this so far but when

14   I ask you a question, please answer verbally so that we can

15   get your answer on the transcript.

16        A    Okay.

17        Q    It's easy and common to slip into saying uh-huh or

18   uh-uh or shaking your head, nodding your head.  So at times,

19   I might say is that a yes or is that a no.

20        A    Okay.

21        Q    And if I do that, I'm not trying to be rude.  I'm

22   just trying to be sure what you say shows up.

23        A    Understood.

24        Q    Again, I don't think we're going to go very long

25   but if at any time you need a break, let me know and we'll

```
 1  accommodate.
 2       A    I will.  Thank you.
 3       Q    All right.  Ms. Espinoza, what is your current job
 4  title?
 5       A    Director of Financial Services.
 6       Q    And how long have you been the Director of
 7  Financial Services?
 8       A    Five or six years, I'm not --
 9       Q    That's fine.  Five or six years is fine.  Just do
10  the best you can.  And that's for Community Health Systems?
11       A    Correct.
12       Q    Which sometimes I refer to as CHSI --
13       A    That's fine.
14       Q    -- so you'll know what I'm talking about.  And who
15  do you report to?
16       A    Teresa Moody.
17       Q    All right.  Who is in the room with us right now.
18  Right?
19       A    Yes.
20       Q    And who does Ms. Moody report to?
21       A    Lorraine Taylor.
22       Q    Who's also in the room with us right now.
23       A    Yes.
24       Q    Okay.  What are your duties as Director of
25  Financial Services?
```

1       A    It's a number of duties.  Prepare financial

2  statements, prepare bank reconciliation, cash management,

3  mainly, is what I do.  I analyze cash on a daily basis.

4  Accounts Payable for CHS and for a few other companies.

5  Pretty much provide support as a corporate office to a number

6  of companies that I have mainly in cash, making cash

7  transfers.

8       Q    We've taken a number of depositions in this case

9  and it has come out in prior depositions that Community

10 Health Systems has a number of what I call affiliate

11 companies.  Do you actually work for Community Health Systems

12 or some other company?

13      A    Currently, yes.  Yes, I was working for Community

14 Health Systems.  I'm under System Administrative Services

15 now.

16      Q    When did you come under System Administrative

17 Services or SAS?

18      A    July of last year.

19      Q    So prior to that time your actual employer was

20 Community Health Systems?

21      A    Correct.

22      Q    Okay.  Has your direct report always been Teresa

23 Moody?  Strike that.  Has your supervisor always been Teresa

24 Moody?

25      A    Always since I've been working for the company?

1    Q    Yes.

2    A    No.  Not always.

3    Q    When did she become your supervisor?

4    A    She has been my supervisor and I've reported to

5  other people at different points in time.  Currently, I've

6  been reporting to Teresa.  I cannot remember the year, I

7  mean, it's been a while, but I cannot remember what year I

8  started reporting back to her and have been since.

9    Q    Okay.  Let's see if we can kind of narrow it down a

10 little bit.  Are you familiar with the fact that Mr.

11 Waldrop's employment was terminated?

12   A    I'm familiar.  Yes.

13   Q    Okay.  Do you know when that occurred?

14   A    I do not.

15   Q    Were you reporting directly to Teresa Moody at the

16 time Mr. Waldrop was terminated?

17   A    I don't know of the time that he was terminated but

18 I have been reporting to Teresa for a number of years.  I'm

19 sorry I can't remember the exact year that she became my

20 supervisor.

21   Q    Have you reported to her since 2015?

22   A    Yes, I have.

23   Q    Okay.  Where do you currently live?

24   A    Warner Robins.

25   Q    What's your address?

1     A     425 Brantley Ridge.

2     Q     Okay.  How did you learn that Mr. Waldrop had been

3  terminated?

4     A     There was a communication through email.

5     Q     From whom?

6     A     Teresa, my supervisor, sent it to me.

7     Q     How many people does Teresa Moody supervise?  Let

8  me ask it this way.  Did the communication you received from

9  Teresa Moody go to all of the other people she supervises?

10    A     I don't remember.

11    Q     But you were not the only one that received the

12 communication, were you?

13    A     I do not know.  I got it.  I don't remember who it

14 all went to.

15    Q     Okay.  As Director of Financial Services, have you

16 had any involvement in expense reimbursement requests?

17    A     Yes, I have.

18    Q     What has been your involvement, in a general way,

19 with expense reimbursement requests?

20    A     Process the payment.

21    Q     Okay.  From your perspective, how does that process

22 work?

23    A     Can you be more specific?

24    Q     Sure.  How do you know that you need to process an

25 expense reimbursement request?

1    A    When an expense reimbursement request has been

2  entered into the system, it will sit there pending until it

3  gets approved.

4    Q    Okay.

5    A    Once that is approved, at that point I can release

6  the payment.  The system will not let me release a payment

7  without it being approved.

8    Q    Okay.  And when you say system, are we talking

9  about Workday?

10    A    Workday.

11    Q    Do you receive some kind of notification that

12  there's an expense reimbursement request that needs to be

13  processed?

14    A    A Workday notification?

15    Q    Yes.

16    A    No.

17    Q    Do you approve all expense reimbursement requests

18  for payment?  Or do you process them for payment?

19    A    Yeah.  I do not approve any.  I don't process all,

20  I mean, it just depends.  If you could be more specific, I

21  could let you know if I do process those particular ones or

22  not.

23    Q    Have you ever processed any expense reimbursement

24  payments for expense reimbursement requests submitted by

25  Stephanie Dotson?

```
 1        A     Yes.

 2        Q     How often would you work with Stephanie Dotson on

 3   expense reimbursement request issues?

 4        A     Issues?

 5        Q     Matters, generally?

 6        A     I didn't work with her on issues for expense

 7   reports or matters or -- I'm not quite sure I'm

 8   understanding.  I'm sorry.

 9        Q     That's fine.  That's fine.  And it may be a poor

10   question.  That's exactly what I want you to do if you don't

11   understand, is let me know.  I'm trying to think of a good

12   way to ask this.  How regularly were you in contact with

13   Stephanie Dotson about expense reimbursement requests?

14        A     Again, I really was not, unless you mean contact as

15   far as her emailing me about expense reports?

16        Q     Yes.

17        A     Or her giving me calls about expense reports?

18        Q     Either.

19        A     Seldom.

20        Q     Seldom?  Would Stephanie Dotson ever reach out to

21   you for assistance in coding expenses?

22        A     Related to expense reports or other expenses?

23        Q     Expenses in general.

24        A     There were a number of invoices were mailed

25   directly to their office which she was responsible for
```

1    looking them over and she would sign off on it, put a code,

2    and send to me.  Yes.

3        Q    What was the purpose of the code?

4        A    So that it would be allocated to the correct

5    expense, whatever expense account she wanted it coded to --

6        Q    Okay.

7        A    -- there was a code there so that once it got

8    entered into the system, it was entered into that expense

9    account that was written on that invoice.

10        Q    How would you describe your working relationship

11    with Stephanie Dotson?

12        A    Good.

13        Q    Good?  As director of Financial Services, do you

14    have any responsibilities or role with regard to budgets?

15        A    My only part in budgets is more of data entry.

16        Q    Okay.  And what do you mean by data entry?

17        A    Enter the information that's provided to me for

18    budgets.

19        Q    And who, typically, would provide that data for

20    you?

21        A    Usually the communication was between Stephanie.

22    She would send it to me.

23            MR. HENRY:  Let's go ahead and make that Exhibit 1.

24            COURT REPORTER:  Oh, let me put a one on it.

25        Sorry.

1          MR. HENRY:  That's all right.

2    (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 1)

3          Q    MR. HENRY:  Ms. Espinoza, you have in front of you

4    a document that's been marked as Exhibit 1.  What is Exhibit

5    1?

6          A    Okay.  I'm sorry your question was?

7          Q    I was just asking you, generally, what is Exhibit

8    1?

9          A    An email back and forth with Stephanie.

10         Q    Is Exhibit 1 an example of the communications you

11   would have with Ms. Dotson regarding budgeting?

12         A    Yes.

13         Q    Is it fairly typical of your communications with

14   Ms. Dotson?

15         A    Fairly typical, just her asking questions and --

16         Q    Yes.

17         A    Yeah.  Uh-huh (affirmative).

18         Q    And it looks like y'all are very cordial

19   communicating with each other.  Right?  Would you say that's

20   fair?

21         A    That's fair.  Yes.

22         Q    Did you ever have any reason to distrust anything

23   that Ms. Dotson was communicating to you regarding budgets?

24         A    Would you repeat that again?  Distrust?

25         Q    Sure.  Did you have any reason to mistrust anything

1  that Ms. Dotson was submitting to you with regards to

2  budgets?

3      A    What she was submitting, mistrust?  No.  I did not

4  question what she sent.  No.

5      Q    How about with regard to expense reports?

6      A    Did not question her expense reports.

7      Q    Do you consider her to be trustworthy?

8      A    I don't know her very well to answer that question.

9      Q    Did you ever have any opportunity to work with Mr.

10 Waldrop when he was an employee at Community Health Systems?

11     A    No.

12     Q    Are you aware of any instances where budget

13 information submitted by Stephanie Dotson contained amounts

14 for Waterford crystal?

15     A    I do not know.

16     Q    You don't recall ever seeing anything like that?

17     A    No.

18     Q    Okay.  How about for gifts for employees?  Any

19 budget items that you recall seeing?

20     A    The budget amounts that I got from them were not

21 detailed in nature.  It was, basically, a dollar amount for

22 certain expense accounts.  The example here on this email as

23 far as the detail here is where in order for them to work on

24 their budget, I would provide reports directly out of Workday

25 based on historical, you know, anything that she might could

1   use to help them prepare their budget.

2        Q    Okay.

3        A    But as far as me receiving detail, what was making

4   up their budget, no, I did not receive details.

5        Q    Okay.  When the expense reimbursement request came

6   to you for processing, did you perform any kind of analysis

7   of the request or did you just process it for payment?

8        A    My job was only to process it for payment.  I have

9   no authority to look at any of that or question anything.

10   That was not my job.  No.

11        Q    Did you ever look at expense reimbursement requests

12   to determine the extent to which the request was documented?

13        A    No.

14        Q    Okay.  Did anybody in Financial Services perform

15   that function?

16        A    I do not know.

17        Q    But you did not?

18        A    I did not.

19        Q    Are you familiar with some renovation/construction

20   work that occurred at the Dalton office?

21        A    Vaguely.  Yes.

22        Q    Did you work with Stephanie Dotson with regard to

23   coding expenses and invoices relating to that work?

24        A    I did not work with her.  I don't recall working

25   with her on coding expenses.

1      Q     Did you do any kind of coding of expenses with

2  regard to that work in Dalton?

3      A     I do not remember.  What I do remember was some

4  insurance reimbursements and asking what they were and where

5  do we need to code this?  But specifically, I don't remember

6  helping with coding any other --

7      Q     Did you ever examine any expense reimbursement

8  requests submitted by Stephanie Dotson for quality?

9      A     I don't understand.  For quality?

10     Q     Let me ask it this way.  Did you ever tell

11  Stephanie Dotson that the level of detail provided for her

12  expense reimbursement requests were beyond sufficient?

13     A     No.   Never.  No.

14     Q     Never said that?  Okay.

15     A     No.

16     Q     Are you familiar with an internal audit that was

17  performed by Brooke Davis and Angela Hammock in early 2016?

18     A     No.

19     Q     Didn't have any involvement in that internal audit

20  at all?

21     A     No.

22     Q     Okay.  As Director of Financial Services, how often

23  do you interact with Lorraine Taylor?

24     A     Not often.  My direct supervisor is Teresa.

25     Q     How often do you interact with Teresa Moody?

1    A    Daily, when we're in the office together.

2    Q    Have you ever heard Teresa Moody say anything

3  negative about Mr. Waldrop?

4    A    Never.

5    Q    Have you ever heard Lorraine Taylor say anything

6  negative about Mr. Waldrop?

7    A    Never.

8    Q    As Director of Financial Services, do you work with

9  Angela Hammock?

10    A    I do not work with her.  No.

11    Q    Do you interact with her?

12    A    Yeah.  In the office.  Yes.

13    Q    Have you ever heard Angela Hammock say anything

14  negative about Mr. Waldrop?

15    A    No.

16         MR. HENRY:  Let's take a break.  May be close.

17  (BREAK)

18    Q    MR. HENRY:  Ms. Espinoza, how did you learn that

19  Stephanie Dotson had been terminated?

20    A    I did -- it was not officially told to me.  I don't

21  remember how I learned.

22    Q    Were you surprised when you learned that she had

23  been terminated?

24    A    No.  I don't remember what my reaction was, quite

25  honestly.

1    Q    Okay.  This communication that you received from

2  Teresa Moody indicating that Mr. Waldrop had been terminated,

3  what specifically did it say?

4    A    I don't remember specifically.

5    Q    Do you remember anything about what it said?

6    A    I'm sorry.  I don't remember the terminology.  I

7  just do know that in the email, it just said that Mark

8  Waldrop was no longer with the company.  But I do not

9  remember specifics or wordings or any of that.  I don't.  I'm

10  sorry.

11    Q    Did it indicate that he had been terminated for

12  cause?

13    A    I don't remember.

14    Q    Do you still have this communication?

15    A    I guess it would be in my email.  I would have to

16  go back and look.  I don't remember what I did with it.

17        MR. HENRY:  Okay.  I'd make a request that a search

18     be made for that email and the produced if it is there.

19        MR. DANIEL:  Your request is noted.

20    Q    MR. HENRY:  Ms. Espinoza, what did you do to

21  prepare for your deposition?

22    A    I spoke to Mr. Hal.  Just, basically, him guiding

23  me through what a deposition was.  I've never been deposed

24  so --

25        Q    And I'm not really interested in hearing about

```
1   your conversations with Mr. Daniel.  Did you speak to anybody

2   else to prepare for your deposition?

3        A    No.

4        Q    You didn't speak to Lorraine Taylor?

5        A    No.

6        Q    You didn't speak to Teresa Moody?

7        A    No.

8        Q    You didn't speak to Ronnie Rollins?

9        A    No.

10       Q    Did you review any documents?

11       A    I looked back at my email, you know, emails that I

12  had.  You know, trying to -- quite honestly, I did not know

13  what this was going to bring so trying to remember dates or

14  instances and looking back at some email.  That was all.

15       Q    Do you recall looking at the email that Teresa

16  Moody sent you?

17       A    I don't remember seeing that one.  I'm sorry.  No.

18  I do not remember coming across that one.  I was

19  specifically, I think, looking more for, I guess, emails

20  between Stephanie and I.

21       Q    Okay.

22       A    You know, with anything.  You know, questions,

23  coding.  I mean, yeah.  I didn't know what to expect here.

24            MR. HENRY:  I think that's all I have.

25            MR. DANIEL:  I have no questions and the witness
```

1        will reserve the right to read and sign the deposition.

2            MR. HENRY:  Thank you.

3    **(DEPOSITION CONCLUDED 2:14 P.M.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D I S C L O S U R E


STATE OF GEORGIA,

COUNTY OF BIBB:


Deposition of:  MARISELA ESPINOZA


Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

    I am a Georgia Certified Court Reporter.  I am here as a representative of Hawthorne & Webb Court Reporting.

    Hawthorne & Webb Court Reporting was contacted by the offices of Mr. Gary Henry to provide court reporting services for this deposition.  Hawthorne & Webb Court Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

    Hawthorne & Webb Court Reporting has no contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Hawthorne & Webb Court Reporting will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

    Dated:  APRIL 26, 2017


_____, CCR B-959
Certified Court Reporter

CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY;

I, Laura M. Jackson, CCR, B-959, CERTIFY that acting in such capacity on DATE, I reported the testimony of **MARISELA ESPINOZA**, and on the foregoing pages, numbered 3 through 19, both inclusive, have transcribed a true, accurate and complete transcript of the same.

I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or the outcome thereof.

WITNESS my hand and official seal this 16th day of May, 2017.

_____

Certificate Number B-959

CERTIFICATE OF WITNESS

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

```
MARK A. WALDROP,               :
          PLAINTIFF,           :
                               :
     VS.                       :     CASE NO.  4:16-CV-235-HLM
                               :
COMMUNITY HEALTH SYSTEMS, INC.:
          DEFENDANT.           :
```

DEPOSITION OF:  MARISELA ESPINOZA          April 26, 2017

     (  )I wish to make the following correction(s):

PAGE/ LINE/     CORRECTION              /     REASON

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

     (  )I have read the foregoing pages of my testimony and
wish to make no corrections.


                              _____
                              Marisela Espinoza

Sworn to and subscribed before me
This ___ day of _____, 2017.

_____
Notary Public

From:      Stephanie Dotson
To:        Marisela Espinoza
Sent:      3/1/2016 10:02:38 AM
Subject:   Re: FY2017

Thank you, sweet girl!

On Mar 1, 2016, at 9:51 AM, Marisela Espinoza <mespinoza@chs-ga.org> wrote:

No problem at all Stephanie. I do hope you begin to feel better soon!
Take care!
Marisela

---

From: Stephanie Dotson
Sent: Tuesday, March 01, 2016 9:47 AM
To: Marisela Espinoza
Subject: Re: FY2017

Unfortunately, I'm out of the office for the second day with the stomach virus unexpectedly. I will look over everything tomorrow and will get back to you. Everything looks good except for your question about the insurance. We did not do anything with that, payroll, etc., so we will not need to eliminate that from the plan, but will need to ensure that it is included. I'll get back with you tomorrow on everything else. Thank you so much for your help!

On Mar 1, 2016, at 9:18 AM, Marisela Espinoza <mespinoza@chs-ga.org> wrote:

Good morning Stephanie,
My apologies for taking so long to get back with you on this!

A few things I noted:
Contracts
   <!--[if !supportLists]-->-      <!--[endif]-->Owen Security is paid on a quarterly basis. I see that you have divided the budget to all months, should it be changed to be budgeted in the months that we actually pay them? I see payments happen in: March, June, September and December.
   <!--[if !supportLists]-->-      <!--[endif]-->Southern Coffee's budget was listed under contract services. Looking at the invoices that have been paid in the past, it looks like we have been coding this cost to Soft Drinks – Kitchen. It is ok wherever you decide to leave it, we'll just make sure that beginning July, we code the invoices accordingly.
   <!--[if !supportLists]-->-      <!--[endif]-->Active Imaging's budget was listed under contract services. It looks like only toners are purchased from them and payments to them have been coded to Office Supplies & Equipment. If you decide to keep the budget under contract services, let's also make a note that beginning July, we'll need to code the invoices to them to contract services.
   <!--[if !supportLists]-->-      <!--[endif]-->Mitchell's Disposal – it looks like there is already $33.00 budgeted under Utilities-Garbage. Maybe we need to remove from contract services.
   <!--[if !supportLists]-->-      <!--[endif]-->Ricoh – It looks like there is already a budget for this under Equipment Leases. Maybe we need to remove from contract services.

Taxes & Licenses
   <!--[if !supportLists]-->-      <!--[endif]-->The Annual payment to City of Dalton for the business license usually gets processed in January of each year. I see the it was budgeted in July for the 2017 FYE. Should it be moved to January instead?

Insurance – Other
   <!--[if !supportLists]-->-      <!--[endif]-->There is an annual premium payment to Genworth Life and Annuity Insurance for Mark. This payment is made every July and it has been for $15,903.55 for the past four years. I don't see this amount in the budget, will it be something that will no longer be renewed?

These are just some things that I notices while looking at your planning. I'm sorry I did not look closely at all of the Travel budget amounts. Not sure that I can be too much help with that, but if you find you still need more reports out of workday, please don't hesitate to ask.

Thank you!!!
Marisela

---

From: Stephanie Dotson
Sent: Friday, February 26, 2016 3:49 PM
To: Marisela Espinoza
Subject: FY2017
Importance: High

It's Friday and my brain is fried, so please take a look and let me know if this appears to be in order. I didn't see a place for the rest of contact services, but I may just be overlooking it. If you don't mind, please send it back to me once you've had an opportunity to review and I'll let Mark take one final look on Tuesday. Thanks so much for ALL of your help! I hope you have a great weekend!

**Stephanie Dotson**
Executive Assistant



CONFIDENTIAL

1013 Riverburch Parkway, Suite One
Dalton, Georgia 30721
Telephone: (706) 428-0158 ext. 2381
Fax: (478) 621-2162
sdotson@chs-ga.org

*"To provide Georgia direct access to health services."*

CONFIDENTIAL

CHSL 0010781