# In The Matter Of:

*Mark A. Waldrop v.*
*Community Health Systems, Inc.*

---

*Stephanie Dotson*
*January 30, 2017*

---

*American Court Reporting Company, Inc.*
*52 Executive Park South*
*Suite 5201*
*Atlanta, Georgia 30329-2217*
*(404) 892-1331 - (800) 445-2842*

Original File 74943.TXT
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


MARK A. WALDROP,

       Plaintiff,

    vs.                       Civil Action File

                               No:4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS, INC.,

       Defendant.



        The videotaped deposition of STEPHANIE
DOTSON, taken on behalf of the Defendant, for all
purposes authorized by the Federal Rules of Civil
Procedure; the reading and signing of the
deposition being reserved; taken before Bonnie L.
Smith, RPR, Certified Court Reporter, commencing
at 9:50 a.m., on this the 30th day of January,
2017, at 320 McCallie Avenue, Chattanooga,
Tennessee.

2

1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3         GARY L. HENRY, ESQ.
          Gearhiser, Peters, Elliott & Cannon, PLLC
4         320 McCallie Avenue
          Chattanooga, Tennessee 37402
5         423-756-5171
          ghenry@gearhiserpeters.com
6

7    For the Defendant:

8         HAROLD T. DANIEL, JR., ESQ.
          LATOYA BRISBANE, ESQ.
9         Holland & Knight, LLP
          1180 West Peachtree Street, Suite 1800
10        Atlanta, Georgia 30309
          404-817-8500
11        harold.daniel@hklaw.com
          latoya.brisbane@hklaw.com

12

13   ALSO PRESENT:  Mark A. Waldrop, Plaintiff
                    Peter Ausburn, Videographer
14

15

16

17

18

19

20

21

22

23

24

25

3

1                    C O N T E N T S

2                 E X A M I N A T I O N

3                                              Page

4   Cross-Examination by Mr. Daniel....................5

5   Redirect Examination by Mr. Henry................225

6   Recross-Examination by Mr. Daniel................230

7

8                   E X H I B I T S

|  | Defendant's | Description | Page Marked |
|---|---|---|---|
| 9 |  |  |  |
| 10 | Exhibit 1 | Associate Performance Appraisal | 18 |
| 11 | Exhibit 2 | Dwight Scott Invoice | 48 |
| 12 | Exhibit 3 | Independent Contractor and Indemnity Agreement | 53 |
| 13 |  |  |  |
| 14 | Exhibit 4 | 5/13/15 Strategy Meeting Transcript | 104 |
| 15 | Exhibit 5 | E-Mail Correspondence | 128 |
| 16 | Exhibit 6 | E-Mail Correspondence | 137 |
| 17 | Exhibit 7 | Acknowledgment of Receipt of Associate Handbook | 144 |
| 18 |  |  |  |
| 19 | Exhibit 8 | Associate Handbook | 144 |
| 20 | Exhibit 9 | Expense Reports of Threshold | 155 |
| 21 | Exhibit 10 | E-Mail Correspondence | 164 |
| 22 | Exhibit 11 | Expense Report | 168 |
| 23 | Exhibit 12 | Calculations for Lodging Justification | 175 |
| 24 | Exhibit 13 | Expense Report | 177 |
| 25 | Exhibit 14 | Expense Report | 182 |

4

1                          **E X H I B I T S**

2      **Defendant's**              **Description**              **Page
                                                          Marked**

3      Exhibit 15       E-Mail Correspondence              189

4      Exhibit 16       E-Mail Correspondence              195

5      Exhibit 17       Expense Report                     196

6      Exhibit 18       Expense Report                     198

7      Exhibit 19       Waterford Inventory                200

8      Exhibit 20       Copy of Photograph                 201

9      Exhibit 21       Copy of Photograph                 205

10     Exhibit 22       Expense Report                     211

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1                P R O C E E D I N G S
 2            VIDEOGRAPHER:  This will be the videotaped
 3       deposition of Stephanie Dotson in the case of
 4       Waldrop versus Community Health Services,
 5       Incorporated.  Today's date is January 30th,
 6       2017, and the time is 9:50 a.m.  We are now on
 7       the video record.  Will all counsel present
 8       please identify yourselves for the record?
 9            MR. DANIEL:  Harold Daniel.  I'm here for
10       Community Health Services -- Systems,
11       Incorporated.
12            MR. HENRY:  Gary Henry, here for the
13       plaintiff, Mark Waldrop.
14            MS. BRISBANE:  Latoya Brisbane here for
15       Community Health Systems.
16            VIDEOGRAPHER:  You may now swear the
17       witness.
18            (Whereupon,
19                     STEPHANIE DOTSON
20       Was called as a witness and, having first been
21       duly sworn, was examined and testified as
22       follows:)
23                     CROSS-EXAMINATION
24  BY MR. DANIEL:
25       Q    Good morning.
```

6

1     A     Good morning.

2     Q     Would you state your full name for the

3  record?

4     A     Yes.  Stephanie Joy Scott Dotson.

5     Q     Scott is your maiden name?

6     A     Yes, sir.

7     Q     Ms. Dotson, I have a number of questions to

8  ask you.  If you do not understand a question or need

9  me to repeat the question, will you let me know?

10     A     Yes, sir.

11     Q     And this is not meant to be an ordeal.  So

12  if you need a break or if you want to take one, just

13  let me know.  Because we will take breaks

14  periodically, but just let me know if you --

15     A     Thank you.

16     Q     -- need one at a time I don't suggest it.

17     A     All right.  Thank you.

18     Q     Tell me about your background.  Where did

19  you grow up?

20     A     I was born in Dalton, Georgia, Whitfield

21  County, and I've lived in Chatsworth, Murray County,

22  all my life.

23     Q     Where did you go to high school?

24     A     Murray County High School in Chatsworth,

25  Georgia.

1    Q    Did you have any formal education after high
2  school?

3    A    I did.  I attended Dalton State College for
4  a while and took some courses.  But that's it.  I
5  never graduated.

6    Q    You never obtained a degree?

7    A    No, sir.

8    Q    Okay.

9    A    Huh-uh.

10    Q    What year did you finish high school?

11    A    I graduated in 2000.

12    Q    And what were the years you attended Dalton?

13    A    I took just a little bit of time off right
14  after high school.  But then, you know, that next
15  year, I -- it may have even been the fall.  I can't
16  recall exactly.  But -- but I started then.  In fact,
17  I even went back some years later and took a few more
18  classes.  But I found out I was expecting, so I
19  discontinued my education there.

20    Q    And what courses did you take in college?

21    A    Several math classes.  There was an English
22  class.  Just your basic core classes.

23    Q    You mentioned you were expecting.  Tell me
24  about your family.  Are you married?

25    A    I am.  Yes, sir.  I got married in September

8

1    of 2007 and got pregnant with my daughter and she was

2    born in December of 2009.  She's seven.

3         Q    What is your husband's name?

4         A    Timothy Dotson.

5         Q    What is his occupation?

6         A    He is a lineman with Georgia Power Southern

7    Company.

8         Q    And do you just have the one child?

9         A    Yes, sir.

10        Q    What is her name?

11        A    Finley Caroline Dotson.

12        Q    And how old is she now?

13        A    She's seven.

14        Q    Where do your parents live?

15        A    My parents actually live right next door to

16   us in Chatsworth.

17        Q    And what are their names?

18        A    Carlton Dwight Scott and Melissa Carol

19   Saylors Scott.

20        Q    What was your father's -- or, is your

21   father's vocation?

22        A    He is actually self-employed.  And he is a

23   brick/block/stone mason.

24        Q    What's the name under which he operates?

25        A    Dwight Scott Masonry.

1    Q    Okay.  What is your -- tell me about your

2    full-time employment after you finished high school.

3    What was your first job?

4    A    Actually, when I was still in high school, I

5    worked with a firm called Minor, Bell and Neal in

6    Dalton, Georgia, and I was their runner.  I was on the

7    early release program and so I would go to school and

8    leave early and report to work.

9         And I worked there for a while and after

10   high school, they actually offered me a full-time job

11   working in the real estate department.  A good group

12   of people but just was not what I wanted to do.  I

13   knew that's not what I wanted to do.

14        So I worked there for a good while and then

15   had an opportunity to work at another firm in town for

16   Greg Kinnamon's office.  I worked there for a while

17   and learned about a position at Regency Park Nursing

18   and Rehabilitation in Dalton, Georgia, in the front

19   office as a receptionist.

20        And I had volunteered -- as a child, I would

21   volunteer in the summers at a local nursing home where

22   I live and the geriatric population just kind of had a

23   special place in my heart.  And so when I heard about

24   the opportunity, I decided to interview for the job

25   and got the job in April of 2001 I believe.

1            And I worked there for over a year and was

2    called upon by Community Health because they had a

3    position open actually just down on the corner.  They

4    had a vacancy in their front office and they had asked

5    me if I would be interested in coming on board to work

6    with the corporate office.

7         Q    What year was this?

8         A    2002.

9         Q    So the first two jobs you had were for law

10   firms?

11        A    Yes, sir.

12        Q    And your job -- you said front office.  Were

13   you a receptionist?

14        A    Yes, sir.

15        Q    A runner?  You said runner?

16        A    Yeah.  For the -- for the law firms, yes, I

17   was.  I was a runner.  And then when I went on full

18   time in both locations, I worked in the real estate

19   department.  So I would type land descriptions and,

20   you know, go to the courthouse to get copies of

21   records, make bank deposits, answer the phone when the

22   receptionist would be out or gone to lunch.  Just --

23   we had a copy center in the back.  I would assist

24   there.  So just various things I would help do.

25        Q    Okay.  And at Regency, what was your job

11

1   description?

2        A     At Regency Park, I was I guess the main

3   greeter.  I was the first person that they would see.

4   But I would answer the phone.  I was the

5   administrative assistant to the administrator.  I

6   assisted with, you know, families making deposits into

7   trust funds, making appointments for the beauty shop

8   schedule.

9              If -- if associates or family members wanted

10  to have lunch, then I would get -- you know, take

11  their money and see to it that the cafeteria knew

12  about it and that sort of thing.  Just -- just a

13  myriad of things that I did in that role.

14       Q     Okay.  When you went to work at Community

15  Health, I think you said in the front office?

16       A     Yes, sir.

17       Q     And that was in an office in Dalton?

18       A     Uh-huh.

19       Q     What did you do?

20       A     Onset, my basic job function was to assist a

21  lady by the name of Eden Lusk.  She was Mark's direct

22  report, Mr. Waldrop.  She worked directly for him as

23  his assistant and then I just kind of helped her and

24  the others in the office.  It wasn't just her,

25  but there were -- we had several members in the office

12

1  and, you know, whether I had to set up meetings or,

2  you know, order lunch or, you know, just help with,

3  you know, day-to-day tasks, then I was the person for

4  that job.

5       Q    Did your responsibilities include typing or

6  working with a computer?

7       A    Yes, sir.

8       Q    And what did you do?

9       A    Everything from newsletters to memos, to

10  expense reports, to leave requests, to basic everyday

11  communications via e-mail.  Really just anything the

12  job called for, but I did work on the computer a good

13  bit.

14       Q    When you first started to work at Community

15  Health, to whom did you report?

16       A    I reported to Eden Lusk.

17       Q    And how long did you remain in that

18  position?

19       A    I can't honestly tell you how long I

20  reported to her.  I'm not sure.  At least a year.

21       Q    What was your rate of compensation when you

22  started at Community Health?

23       A    I can't say for sure.  I want to think it

24  was around $12 per hour.  But, again, that's just a

25  guess, it's been so long ago.

13

1    Q    All right.  Did your job change at some

2  point at Community Health?

3    A    Yes, sir.  It did.  Eden Lusk informed

4  Mr. Waldrop that she had decided to go into business

5  and open up a boutique here in Chattanooga.  And so

6  she was going to work a notice and then at that point,

7  I would take over her -- her position, which was

8  providing direct support to Mr. Waldrop.

9    Q    And you think that was approximately 2003?

10    A    Yes, sir.  2003.

11    Q    Now, at that time, how many people were in

12  the office in Dalton?

13    A    There were -- I'm trying to count the number

14  of offices we had.  Approximately 10 people give or

15  take.

16    Q    What was Mr. Waldrop's position at that

17  time?

18    A    I can't say for sure.  We had some -- we had

19  several different reorgs while I was there and it's

20  hard to recall exactly what he was.  I want to think

21  he was -- I want to think he was chief operations

22  officer for Ethica.  But, then again, I can't say for

23  sure.  It could have been Community Health.  I'm not

24  really sure.  He had several titles.  It could have

25  been senior vice president of Clinical Services.  I'm

14

1    not sure.  He had several titles.

2         Q    Okay.  Tell me, once you became assistant to

3    Mr. Waldrop, what did you do for him?

4         A    Basically, I was his assistant.  I would

5    keep track of his calendar, his -- his mail, his

6    e-mail at times, schedule meetings for him, book trips

7    for him.  Really anything that he needed to have done,

8    I was -- I was kind of his right-hand man and did what

9    Eden had always done before me.

10        Q    Did you do any work for anyone else after

11   you took this position?

12        A    No.

13        Q    Did your job change over time from the time

14   you took on this new position as assistant to

15   Mr. Waldrop until you left the company?

16        A    To be fair, it was always changing.  It was

17   very busy, very fast paced.  You know, we -- we had a

18   lot to say grace over over the years.  You know, we

19   would acquire new centers and business opportunities

20   and that sort of thing.

21             So I think the basic functions were always

22   the same, but it just got, you know, bigger over time,

23   more demand and that sort of thing.

24        Q    And describe to me how it got bigger.  What

25   did that mean to you and your daily functions?

15

1      A      Well, because Mark was over more than just
2  our office.  We had nursing centers.  We had pharmacy,
3  rehab, medical distribution, home health and hospice.
4  There were several -- there were several branches to
5  what we did and he kind of was tasked with overseeing
6  all of that.
7            So just day-to-day responsibilities grew
8  leaps and bounds over time as we acquired new centers
9  or as we had mergers and that sort of thing.  We just
10  got bigger.
11      Q      Now, at some point in time, the Dalton
12  office -- or, your Dalton office moved; is that right?
13      A      Yes, sir.
14      Q      And when did that occur?
15      A      That occurred in approximately 2007.  I want
16  to think that is -- that is the year because that's
17  the year I was getting married.  2006 or 2007.
18            We had been at the other Dalton location --
19  I'm not exactly sure when they moved in because I
20  wasn't with them at that point.  I was in the nursing
21  center.  But the place where we were previously had
22  extensive mold issues that we had worked with the
23  landlord or attempted to work with the landlord to
24  correct and it just -- and flooding.
25            Just very random -- you know, we could be in

16

1    the office and then all of the sudden the ceiling

2    tiles fall out and you're flooded.  And so there was a

3    couple of dentists upstairs and it was just not a good

4    situation.  We had stayed and, you know -- we liked

5    our location and it was good for everybody, but it was

6    just not safe, so --

7         Q    When you moved to the new location, what was

8    the address?

9         A    1013 River Birch Parkway, Suite 1, in

10   Dalton, Georgia.

11        Q    And who moved to this location, 1013 River

12   Birch Parkway?

13        A    At the initial time that we moved, myself

14   and Mark Waldrop and then Integra Rehabilitation,

15   which is a member organization under Community Health.

16             They -- they had an office across town and I

17   can't remember how it came about, if Mr. Rollins

18   wanted to sell the building or -- or how exactly it

19   came about, I can't remember, for them to move with

20   us, but we had the space.

21             It was actually just really a shell of a

22   building and we had the opportunity to go in and kind

23   of customize the space.  And so they were able to

24   secure an office next door.

25        Q    Was the Integra office in a separate suite

1  from your office?

2      A    Yes, sir.

3      Q    And the office in which you worked, who else

4  was located in that office?

5      A    Just Mark Waldrop and myself.

6      Q    Just generally describe to me how the office

7  was designed.

8      A    Our office, when you walked in the front

9  door, the interior -- or, the first room was just

10  really an open lobby space where my desk was.  As you

11  walked past the lobby area, there was just a -- it's a

12  very small office.  So there was a short hallway.  To

13  the left we had a conference space and then just right

14  past the conference area was Mr. Waldrop's office.

15          To the right we had a very small storage

16  closet/copy room where we kept supplies and also we

17  had our copier in there.  Next door to that on the

18  right was the kitchen and then in the back was the

19  restroom.

20      Q    And if you wanted to go from the office

21  suite which you worked -- this is -- I think you said

22  number one?

23      A    Yes, sir.

24      Q    If you wanted to go then to the Integra

25  suite, was there an internal door or did you have to

18

1   go outside and walk around?

2       A    No, sir.  We had to walk around.  We had --

3   there were actually two entrances -- well, three where

4   we could access Integra.  They had the front door, of

5   course, next to us.  And on the back side of our

6   office, we actually gave them a -- a good-sized room

7   so that they could provide outpatient rehab.  So there

8   was an entryway there.  And then, of course, they had

9   a back door to their office.  We had one point of

10  entry in our office, but they had three.

11      Q    Did anyone report to you?

12      A    Ever?

13      Q    Well, in this job, in this job as executive

14  assistant when you moved to the River Birch Parkway

15  office.

16      A    Not when we moved to River Birch.  Prior to

17  that, we did have a girl.  When I was promoted to

18  Eden's position, that left my position vacant and so

19  we needed someone in the front office to assist.  And

20  I believe we had two different -- we had one lady who

21  came and she was with us for a little while, just

22  didn't work out, and then we had another lady who we

23  hired later.

24          (Defendant's Exhibit 1 was marked for

25      identification.)

19

1   BY MR. DANIEL:

2        Q     Let me show you a document that's been

3   marked as exhibit one to your deposition.

4        A     Okay.

5        Q     And I'll just ask you to look at the first

6   page and tell me if you know what it is.

7        A     Yes.  It is a performance evaluation.

8        Q     When you had a performance evaluation -- it

9   appears that you signed it down at the bottom.

10       A     Yes, sir.

11       Q     Okay.  When you had a performance evaluation

12   like this in writing, did you sit down and talk to

13   Mr. Waldrop about it?

14       A     Yes, sir.

15       Q     Tell me, if you recall, this one is dated

16   November 3rd, 2015.  Do you remember this particular

17   one?

18       A     Yes.

19       Q     Okay.  Please tell me what you recall about

20   the performance evaluation.

21       A     We -- we did -- it was very much -- as I

22   recall, very much just like we did any other

23   performance evaluation where Mr. Waldrop would -- we

24   typically would just go to the conference room.  He

25   did this for his direct reports.  Go to the conference

1    room and then would just kind of go down line by line

2    over each area and, you know, provide feedback, you

3    know, any -- if there were any areas of concern or

4    constructive criticism at that time, he would offer

5    that up or he would also say -- you know, at the end

6    of the evaluation, you know, before I would sign, it

7    was -- or anybody would sign, it was, you know, is

8    there anything that I can do to -- you know, to help

9    you be more successful in your position.

10            So it was very much open dialogue.  But it

11   was -- it was very consistent.  It was like this every

12   time did he them.

13       Q    Did you have a good working relationship

14   with Mr. Waldrop?

15       A    Yes, sir.

16       Q    Did Mr. Waldrop ever confide in you?

17       A    Yes, sir.

18       Q    Did he ever tell you that he expected to

19   become the CEO of Community Health?

20       A    No.  He never told me that he expected to

21   be.  No, he did not.

22       Q    Did he tell you he wanted to become the CEO?

23       A    No.  He did state that, you know, on down

24   the line if Mr. Rollins ever, you know, did decide to

25   make a career change or slow down, you know, that sort

1    of thing, that there was a possibility that he could

2    go into that role.  But that was the extent of it.

3          Q    Did he ever tell you that anyone on the

4    board of directors had spoken about that possibility?

5          A    Not that I recall.

6          Q    Did you ever have any conversations with

7    Mr. Waldrop about the possible sale of Community

8    Health?

9          A    Yes.  He did say a couple of times that

10   Mr. Rollins had mentioned it.  Nothing -- it was

11   nothing written in stone.  I think it was maybe just a

12   conversation that had been had just knowing that it

13   was a possibility.

14         Q    Did he say what Mr. Rollins had told him?

15         A    No, he did not.

16         Q    Did he ever talk about what he might receive

17   if the company were sold?

18         A    He did not.

19         Q    Tell me, after you moved to the River Birch

20   Parkway office, what did you do every day?

21         A    It -- every day was different.  Of course, I

22   had the -- the main functions that always stayed the

23   same.  I answered incoming calls, you know, greeted

24   visitors if and when they came in, you know, worked on

25   e-mail, prepared reports or presentations, you know,

22

1    whatever we had going on at the time.

2            And then I would also assist if anything --

3    you know, if anyone else needed assistance with

4    anything, if the ladies next door ever needed

5    anything.  You know, there were days when I would run

6    errands for the office.  So it just changed.  No two

7    days were ever the same.

8        Q    Did you have access to Mr. Waldrop's e-mail?

9        A    Yes, sir.

10       Q    Did you respond to e-mails sent to him on

11   his behalf?

12       A    If Mr. Waldrop asked me to, yes, I would.

13       Q    And how would you do that?

14       A    Typically if Mr. Waldrop was on the road

15   and, you know, he would kind of give me the heads up

16   be on the lookout for this, because he was very big

17   on, you know, not wanting people to have to wait on

18   him.  And if he would be on the road, you know, cell

19   phone and e-mail service could kind of be up in the

20   air.  So he would just give me a heads up to be on the

21   lookout.

22            And if and when I would receive the e-mail,

23   I would usually call him and go over it with him and

24   be sure to note exactly what he wanted me to say

25   before I sent it on his behalf.  If I ever called and

1  couldn't get him, then I just -- I wouldn't just send

2  it.  I wanted to wait until, you know, he could know

3  exactly what was said.

4       Q    When you responded to an e-mail sent to

5  Mr. Waldrop on his behalf, could the person receiving

6  that response tell that you were responding rather

7  than Mr. Waldrop himself?

8       A    Probably not.

9       Q    So it appeared that Mr. Waldrop was

10  responding?

11      A    Uh-huh.

12      Q    Is that right?  You have to say it verbally.

13      A    Yes, sir.  I'm sorry.  Yes, sir.  Unless it

14  was a situation where, you know, it was more -- if it

15  was more informal.  You know, sometimes I would say

16  thanks, Stephanie, or, you know -- Mark's direct

17  reports knew that, you know, a lot of times I would

18  respond on his behalf.  So they may, you know, have

19  that heads up that it could be me.

20      Q    How many direct reports did Mr. Waldrop

21  have?  And I know this may have changed.  Let's just

22  say in 2015.

23      A    In 2015?  He would have had Diana Wilks,

24  Michelle Moore-Andrews, Blair Lake, Robin Leake, Chris

25  Johnson, Lynne and Steve King, Lucy Rogers.  That's

24

1   all I can recall right now.

2        Q     How much did Mr. Waldrop travel?

3        A     He traveled a good bit of the time.

4        Q     Could you -- excuse me.

5        A     Probably at least three days a week,

6   sometimes more, sometimes less.  I would say probably

7   within the last year, he traveled the least that he

8   had traveled in a long time.  But it was, you know,

9   not odd for him to be gone, you know, three or more

10  days a week.

11       Q     So does that mean that he was generally in

12  the office in Dalton about two days a week?

13       A     Yes, sir.  And, again, sometimes more,

14  sometimes less.  It would depend on what he had to do.

15  For example, if it was a time when, you know, he was

16  attending a seminar or something, he could be gone all

17  week.  Or if he had the holiday luncheon schedule

18  where he wanted to get around to all the associates,

19  he might be gone all week.  And then other weeks, you

20  know, he would need just some time to catch up from

21  being gone so much, so he might be in the office all

22  week.  So --

23       Q     I think you mentioned earlier that one of

24  your job responsibilities was to schedule meetings and

25  book trips for Mr. Waldrop.

25

1      A     Yes, sir.

2      Q     Can you tell me the purpose of his business

3  travel?  What was he doing when he left the Dalton

4  office and went on the road?

5      A     When he went on the road, he would either be

6  doing center or site visits.  He would be meeting with

7  people inside the system.  There would be times when

8  he would have to meet with people outside the system

9  if they were a vendor that we were looking to do

10  business with.  He would travel for continuing

11  education.  To keep up his licensure, he would have to

12  have so many hours every year, so he would have to

13  attend various conferences and that sort of thing.

14      Q     When Mr. Waldrop was traveling, what did you

15  do?  What work would you do when he was out of the

16  office?

17      A     When Mr. Waldrop was out of the office, I

18  would be doing a lot of catch-up work.  When Mark was

19  in the office, it was extremely busy.  It was amazing

20  at the volume of work that went through our office.

21          And so a lot of times, you know, we would

22  put out the -- you know, the big fires, things that

23  needed immediate attention, and then there would be

24  things left for me to work on just to kind of catch up

25  after he had left, things that I could do

26

1    independently that didn't require, you know, him to be

2    there.  So a lot of it was just playing catch up.

3        Q    Did you have a lot of guests in the Dalton

4    office?

5        A    We did not.  Huh-uh.  Unless there -- unless

6    we had meetings, we didn't.  We didn't -- we didn't

7    even have a vacant office.  So a lot of times if

8    people were in town or something like that, they would

9    just go next door because they had a much larger

10   space.  So we didn't have many people in our office.

11       Q    And by next door, you mean the Integra

12   office?

13       A    Yes, sir.  Uh-huh.

14       Q    When Mr. Waldrop was in the Dalton office,

15   did you sometimes have lunch together?

16       A    We did.  Uh-huh.

17       Q    And how often did this occur?

18       A    It was not very frequent.  If we had a lot

19   of work going on, I might run and grab something or

20   if, you know, we had people in town or something like

21   that, I would run get lunch.  You know, there was a

22   few occasions where we would run out to get lunch.

23   But for the most part, if we had lunch, we had it in

24   the office.

25       Q    Did you have to travel as a part of your job

1  responsibilities?

2       A    I did at times, but not extensively.

3       Q    And what travel did you have?

4       A    If we had off-site meetings with the

5  leadership or presidential council, then I would be in

6  attendance.  But, really, that's -- that's the only

7  time.

8       Q    What was the presidential council?

9       A    The presidential council was comprised of

10  Mark's direct reports and they were mainly, like, the

11  VPs in their respective organization that Mark

12  oversaw.  So it was just -- it was truly leadership

13  that he pulled together.

14       Q    Did you attend presidential council

15  meetings?

16       A    Yes, sir.

17       Q    Where were they held?

18       A    Sometimes they would be held in Dalton.

19  Sometimes they would be held off-site.  I know most

20  recently we had started having meetings down at

21  ElderCare Pharmacy.  It just seemed to be a good

22  location for those coming from the south and they

23  didn't have to come all the way to our office.  But we

24  tried to do them in-house as much as we could.

25       Q    And where was the ElderCare Pharmacy?

1       A       In Acworth.

2       Q       And is that a Community Health organization?

3       A       Yes, sir.

4       Q       Did they have a conference room at ElderCare

5  Pharmacy?

6       A       Yes, sir.  They did.  They do.

7       Q       When meetings were held in Acworth, did that

8  require you and Mr. Waldrop to stay overnight?

9       A       It did if we had a dinner planned that night

10 with the group.  Otherwise, we would just drive down

11 the same day.

12      Q       If you did stay overnight, where did you

13 stay for those Acworth meetings?

14      A       I believe it was the Hyatt House in Atlanta.

15 I can't say 100 percent for sure, but I want to think

16 that was where we stayed last.

17      Q       And is this Hyatt House located just north

18 of the perimeter highway near the Cobb Energy Center?

19      A       Yes, sir.

20      Q       Okay.  How far is that Hyatt House from the

21 ElderCare office -- ElderCare Pharmacy office in

22 Acworth?

23      A       I can't say.  I would not even know how to

24 guess.

25      Q       Why did Mr. Waldrop, if you know, stay at

1    the Hyatt House as opposed to someplace in Acworth?

2        A    Well, we had a good -- we had a good

3    relationship with the people there.  We had a good

4    rate.  It was a clean facility.  It was free of

5    bedbugs and that sort of thing.  We always checked the

6    registry.  You would be surprised how many are not.

7    And so, you know, it was just a good location.  We

8    could kind of get in and off the interstate and, you

9    know, there were several places to eat and it was a

10   safe area.

11       Q    On holiday occasions and Mr. Waldrop's

12   birthday, Boss' Day, times like this, did you

13   sometimes solicit gifts for Mr. Waldrop?

14       A    I did.  Members of leadership council

15   would -- and it started years ago.  They would call

16   and inquire what can we do; what can we get him; you

17   know, we'd like to get something nice; can we all chip

18   in together.

19           And so it was just kind of a known thing

20   every year at Christmas and Boss' Day and his

21   birthday, I would reach out to the group and, you

22   know, ask if anybody had any input, you know, if they

23   wanted to chip in.  It was totally voluntary.  But --

24   and they always took me up on that.  They were just

25   very busy and so it was one less thing they had to

30

1    think about.

2          Q     Was there a suggested amount?

3          A     Yeah, we would always, you know, talk and,

4    you know, get feedback.  And, again, everybody wanted

5    to do something nice.  I mean, it could be anywhere

6    from, you know, 25, 50 -- I'm trying to think if we

7    ever gave more than that -- 75 maybe.  But it was an

8    amount that, you know, the group was comfortable with.

9          Q     When you made these solicitations for gifts

10   for Mr. Waldrop, did you discuss the purpose for which

11   the money might be used?

12         A     Yes, sir.

13         Q     What did you say?

14         A     Well, sometimes I would just suggest

15   feedback from the group.  A lot of times people would

16   give suggestions and so I would share that with the

17   group.  You know, this is what was suggested or if I

18   knew that there was something that he enjoyed, I would

19   offer that up.

20               And then, you know, we'd let the group

21   decide or a lot of times they would just say whatever

22   you want to do.  You know, just do whatever.  You have

23   our blessing.  We just want to help.

24         Q     Do you remember any particular suggestions

25   about how that money might be used that were passed

1  on?

2      A    Yes.  We would send -- Mr. Waldrop and his

3  wife would attend the Westminster Kennel Club dog show

4  every year.  And so we would, you know, chip in, you

5  know, to help offset expenses for that.  I want to

6  think one time we sent them to a cabin somewhere.  Or,

7  you know, one time we got him, like, a -- one of the

8  Tervis tumblers and a sweatshirt or something.  I

9  mean, it was just always something different.

10     Q    How much money would you typically raise in

11  these solicitations?

12     A    Well, depending upon the amount -- everyone

13  always gave.  I mean, there was never a time when they

14  didn't.  So, you know, I would say at least $300 or

15  more depending on how much we gave and what the

16  occasion was.  They -- we wouldn't typically do

17  something as big for, you know, Boss' Day or even for

18  his birthday as we did for Christmas.

19     Q    What was largest amount that you raised?

20     A    Oh, goodness.  I want to think at one

21  time -- I honestly can't say.  At one time, he did

22  have more direct reports.  There were, like, maybe 15

23  or 16 and a couple more even that wanted to chip in on

24  it.  And so, you know, if they gave 50 or $75,

25  whatever that is.  I don't know right off the top of

32

1    my head.

2         Q     Do you remember soliciting donations for a

3    gift to Mr. Waldrop so that he could attend a dog show

4    in Italy?

5         A     No, I do not.

6         Q     Do you know if he ever attended a dog show

7    in Italy?

8         A     I do not.  I know he had some dog friends

9    who live in Italy I believe, but I don't know if he

10   ever attended a dog show in Italy.

11        Q     What do you mean, dog friends?

12        A     Oh.  Friends who were kind of in the

13   business, that enjoyed going to the shows to see the

14   show dogs and that sort of thing.

15        Q     When was your -- when did your employment at

16   Community Health end?

17        A     On Tuesday -- I believe it was Tuesday, June

18   the 28th, 2016.

19        Q     What were the circumstances under which your

20   employment ended?

21        A     I was told that -- do you want to know what

22   happened that day or do you --

23        Q     Yes.  Tell me what happened.

24        A     Okay.  On that day, I had came back from

25   lunch and was going to be meeting with a lady about

33

1    refinancing our home.  And the lady from the bank

2    came.  We were meeting in the conference room.  And

3    she had gotten a phone -- we were discussing some

4    things.  In the middle of our meeting, she had gotten

5    a phone call.  So I told her I was just going to run

6    to the restroom real quick while she finished up her

7    phone call.

8            And when I got back, she and I resumed our

9    meeting and I suddenly heard a -- I didn't know what

10   it was, but it was a very loud, unusual sound.  And so

11   I asked her just to hold tight for just a second and I

12   just kind of peeped around the corner -- again, it's a

13   small office -- and saw a gentleman drilling the lock

14   on the door, you know, to which I -- I said, you know,

15   if you don't mind, I'll be with you in just a second.

16           I was in complete shock, just really caught

17   offguard.  And so I opened the door and I saw Jimmy

18   Patton, Teresa Moody and Angela Hammack talking next

19   door to one of the ladies at Integra Rehabilitation.

20   Their office is next door.

21           And I don't recall the girl's name.  She had

22   not been on board long before the office was closed.

23   So I don't have her name.  But she was the

24   receptionist.  And she had kind of stepped outside and

25   was talking with them.

34

1          And when they saw me, I heard somebody say
2   there she is.  And so Mr. Patton and Teresa Moody and
3   Angela Hammack came over.  They shook my hand.  I
4   welcomed them in the office and, you know, just said,
5   hey, you know, how can I help you.  Because I didn't,
6   of course, know that they were coming.
7          And Mr. Patton said that they just needed to
8   talk with me for a few minutes.  And so at that point,
9   I asked him if he could give me just a moment, that I
10  had been in the middle of a meeting and I just needed
11  to excuse the lady that was in the conference room, to
12  which he was -- he was okay with.
13         And so I told the lady that, you know,
14  something had come up.  I needed to cut our meeting
15  short and if she didn't mind -- you know, if she could
16  just pack up, I would be in touch later and we would
17  finish up, to which she, you know, just kind of -- it
18  was very awkward.  But she said okay, no problem,
19  shook my hand and I saw her out.
20         And then Mr. Patton asked if we could sit
21  down and talk, me -- him, myself and the two ladies.
22  So I took them in the conference room.  And he -- he
23  made just a little bit of small talk and said, you
24  know, I don't know if we've ever been formally
25  introduced; I may have seen you at a holiday luncheon,

1  but I'm Jimmy Patton and we just need to ask you a few

2  questions and had made the statement the more you

3  cooperate with us, the better things will be for you

4  and just started asking me all kinds of questions.

5           He did pretty much onset of the conversation

6  let me know that effective immediately the office was

7  closed.  He said that -- and, again, the details -- I

8  can't remember everything I think because I was in

9  such a state of shock.  I was really caught offguard.

10  So I can't recall everything that was said in the

11  conversation.

12           However, he did say that, you know, at the

13  same time that our conversation was happening, there

14  were other conversations happening throughout the

15  organization, that I was not to contact anyone inside

16  the organization, and just several times throughout

17  that conversation, you know, reiterated that the more

18  that I complied or, you know, the more that I

19  cooperated with them, the better things would be for

20  me.

21           And so, you know, I tried to answer his

22  questions to the best of my ability, you know, with

23  the disclosure of, you know, this is the best that I

24  can recall right now under the circumstances.  And he

25  was very -- he was trying to be very laid back about

36

1    it, but he was very matter of fact.  And so I was

2    uneasy anyway not really knowing this guy or being

3    comfortable with him.  You know, it was just a very --

4    it was a very tough conversation.

5              We probably met for 30, 40 minutes I would

6    guess.  I can't say for sure.  He sat across from me.

7    Angela Hammack sat to his left.  And then to my right

8    was Teresa Moody.

9              He -- like I said, he asked me many, many

10   questions.  And then as the meeting was almost over,

11   he asked me if I had anything company owned and to

12   which I said this cell phone here the company pays for

13   and I also have an iPad at home.  I said you're

14   welcome to -- you know, to follow me home to get it if

15   you'd like or, you know, I can make arrangements and

16   he said that he would be following me home to get

17   that.

18             He gave me an opportunity to get any of my

19   personal belongings.  He said, you know, you don't

20   have to get everything today.  I know this has been a

21   hard day.  You know, you're kind of going through a

22   lot right now, so just know that you can come back

23   anytime you want to.  But if there's anything you want

24   to get today and take with you that's personal, then

25   you're welcome to do so.

1             At that point, I mean, of course, I wasn't

2    expecting anything like this.  So I grabbed a

3    kitchen -- or, a trash bag out of the kitchen and just

4    put some of my personal belongings in it, pictures and

5    that sort of thing.  In fact, I was so shaken that I

6    had left a couple of pictures and one of the ladies

7    brought them outside and say, hey, you're going to

8    want to take these.

9             Mr. Patton told me that he would follow me

10   home.  It was just him that went that day.  But he

11   followed me to my home.  And I had called my husband

12   ahead of time.  He was home with our daughter.  He got

13   home before me that -- or, he usually got home before

14   me.

15            And I just asked him to please have my iPad

16   ready with the charger.  The case always stayed on it

17   to protect it, but to have that ready, that I would be

18   coming home to get that, and that I had lost my job.

19   And I said we can talk more about it later.  You know,

20   I really don't have a whole lot to tell you, but, you

21   know, we'll talk about it later but if you could

22   please have that ready.

23            And, of course, I didn't want my daughter

24   to -- you know, to be there.  I was very upset.  So I

25   didn't want her to be there when all that went on.

38

1    And so he was a gentleman and he met me at the door

2    with it.  I took it to Mr. Patton.  He stayed in his

3    vehicle the whole time.  And -- and that was it.

4         Q    Did Teresa Moody say anything during that

5    meeting?

6         A    I don't think either of them -- her or

7    Angela said much except for -- in fact, they pretty

8    much kept their head down the whole meeting.  But at

9    one point, when Mr. Patton -- because he really

10   didn't -- I didn't understand.  Was the office closed

11   permanently?  Was this a temporary thing?  I didn't

12   really understand.  Is my job eliminated?  There was a

13   lot of gray area.

14             And so I -- you know, I asked him.  I said,

15   well, when do you think I should expect to hear

16   something.  And he said -- he looked at the ladies and

17   he said do you think by Friday, we could let her know

18   something by Friday, to which -- I believe it was

19   Angela that said yes.  It could have been Teresa.  But

20   they didn't say very much that I remember, that I

21   recall.

22        Q    Were you acquainted with either Teresa Moody

23   or Angela Hammack before this meeting?

24        A    Yes, sir.  I knew both of them.

25        Q    What did Mr. Patton say to you that

1    indicated to you that you had lost your job?

2         A    He said that the decision had been made to

3    close the Dalton office effective immediately.  And I

4    asked him what that meant.  And he said, you know,

5    that they didn't really know right now, that he

6    couldn't offer me a lot of information other than the

7    fact that the office was -- was going to be closed and

8    that, you know, simultaneously other conversations

9    were going on.

10             And I asked him if Mr. Waldrop was aware.

11   And he said that he was aware.  And I said -- I asked

12   him if -- were they going to get someone else to come

13   in; you know, would I -- and he said -- his reply to

14   me was something to the effect of, no, and I've

15   already called to see if there's anything else in the

16   organization that, you know, you might -- that might

17   be a fit for you, but there's nothing.  And so at that

18   point, I realized that that was -- you know, he meant

19   that was it.

20        Q    Did Mr. Patton ask you any questions?

21        A    He did.  He asked me several questions.

22        Q    What were they and tell me your answers.

23        A    The best -- the best that I can recall, it

24   was just kind of all-across-the-board questions.  He

25   asked me things like did I ever sign contracts, to

1  which I told him, yes, I did sign contracts sometimes.

2          He asked me if I could tell him a couple --

3  you know, any of the contracts that I had signed

4  recently.  And I told him that I had just signed one.

5  Community Health has a contract system and they had

6  been talking in presidential council meetings about,

7  you know, being sure that we have everything on file

8  for these contractors and that sort of thing.  We need

9  to be sure that we've got their insurance and all of

10  that.

11          And I couldn't remember if we had one for

12  our lawn service and so I had reached out to Connie

13  Stovall who is over the contract software Selectica

14  and had been working with her on that to get one,

15  because we did not have one for our lawn-care guys.

16  And --

17      Q     And what was that?

18      A     Selectica?  That is the -- the contract

19  software.

20      Q     Okay.

21      A     That's the system I guess.  Everything is

22  kind of done electronically that way where they get an

23  E-signature and all that and a copy goes to the

24  contractor.

25          He asked me if I had also signed a contract

1    with my dad for the -- when we had the flood in our

2    office.  And I told him, yes, that I thought I

3    remembered doing that.  And he asked me if there were

4    any other contracts.  And I can't -- I couldn't recall

5    if I had signed any outside of that or not.

6              He asked me if Mr. Waldrop had ever given me

7    any high-spot or atta-boy money or anything like that,

8    to which I had told him no.  And he asked me if I had

9    ever received compensation from Mr. Waldrop personally

10   for doing anything, you know, like that.  And I told

11   him that I did recall one time that he did -- this

12   last time that he taught at Southern Adventist

13   University in the long-term-care program, they always

14   pay him for teaching those classes and Mr. Waldrop did

15   give me money this time for assisting him with that

16   because we had to come in a lot on weekends and that

17   sort of thing.

18             And so he -- he said he felt like, you know,

19   since I had helped him do that course, even though I

20   didn't teach it, I did a lot of computer-based stuff

21   for it and making the copies and everything, that he

22   did want to share that with me.

23        Q    How much did he share with you?

24        A    I want to think it was around 1,500.  But,

25   again, I mean, it's been a while, so I can't say for

1    sure.

2            He asked me if Mr. Waldrop ever sent my

3    family and I on trips for anything and I told him no.

4    What else did he ask me?  Oh.  He asked me if I ever

5    expensed things for Mark on my expense report, to

6    which I told him yes.  You know, most of the time I

7    did expense his trips and that sort of thing because

8    he would be on the road and so I would make those

9    arrangements for him.

10           He also asked me what was in our warehouse

11   that -- we had an off-site storage space because our

12   office was so small.  I told him that in our

13   warehouse, we had some leftover carpet squares and

14   tile from when we had the flood -- we had extras that

15   we wanted to keep in case there were accidents -- that

16   we had files.  We had -- Mark had some of his

17   certificates or diplomas, framed diplomas and things,

18   over there and that we also had our Waterford crystal

19   there.

20           He at that point asked me, when I mentioned

21   Waterford crystal, who the Waterford crystal was for;

22   was it for people in the organization.  And I told him

23   that, yes, it was primarily for people inside the

24   organization.  However, like, for example, Gary Howard

25   was with Hamilton Medical Center for years and years

43

1   as the CEO.  When he retired, he would send him -- we

2   sent him a piece.  When the lady at Southern Adventist

3   University that we had worked with to get our

4   administrators over the years, when she retired, we

5   would send a piece.

6          So it always had to do with the business.

7   It wasn't just I've got a friend who's having a baby;

8   let me send her something.  It was nothing ever like

9   that, to which he replied, well, we know what's in

10  there because we've been over there to -- we've

11  already cut the locks off and replaced them, which I

12  was glad because then he could see that I was being

13  truthful with him and wasn't trying to hide anything.

14         I'm trying to think what else he asked me.

15  There was just so much that day.  I can't remember.  I

16  might come across something else and, if I do, I'll

17  definitely let you know.

18     Q    Back to the contract you signed.  I was a

19  little unclear about the one -- was it Selectica?

20     A    Yes.  Selectica is the actual software

21  program that we use to manage contracts.

22     Q    Okay.

23     A    Connie Stovall is the gatekeeper of the

24  contracts and that is the software that she uses.  And

25  so we were just really wanting to do an audit just to

44

1  make sure that everybody that provided services for

2  us, that they were covered.  And that just prompted us

3  to, you know, get with him to let him know that -- or,

4  to let her know that we didn't have one but needed to

5  get one on file.

6      Q    Okay.  Do you recall about when that

7  contract was signed?

8      A    I do not.

9      Q    Do you know approximately how much it

10  involved, what the contract amount was?

11      A    The monthly amount was between two and $300

12  I think for the monthly maintenance and for him to

13  keep the irrigation running and to change out plants

14  and that sort of thing and do new pine straw when it

15  needed it.

16      Q    Okay.  So this was -- this was a lawn

17  service --

18      A    Yes, sir.

19      Q    -- for the office there?

20      A    Yes, sir.  That maintained our property.

21      Q    And the software was related to managing

22  that?

23      A    Yes.  Managing all the contracts.  That's

24  how they keep up with all the contracts in the system.

25  It is run through -- now, it's my understanding that

1  they're run through and managed by Selectica, the

2  software.

3      Q    So this would be contracts other than the

4  contract for the lawn service?

5      A    Yes.

6      Q    And what other contracts do you believe were

7  managed by this software?

8      A    Oh, goodness.  I would say any -- anybody

9  that the system was doing business with would have to

10  have a contract on file and it was probably kept

11  through Selectica.  So it would be not just for us.

12  It would be for the whole organization.

13          You know, if they had somebody come in and,

14  you know, agree to change out light bulbs, you know,

15  once a quarter or whatever, you know, they would get a

16  contract with them, get a copy of their insurance and

17  have them on file too.

18          Because it -- I don't really know how it

19  works or if maybe it talks to Workday which is our --

20  the finance package, but I know that they had to have

21  all that information in Workday before they could

22  issue them a W-2 at the end of year, the different

23  businesses and that sort of thing.  So from a

24  financial standpoint, they had to have all that

25  information also.

46

1      Q      Are you familiar with something called the

2  charter authorization process?

3      A      The charter authorization process?  No,

4  unless that is -- unless that is where -- if it was

5  like a project charter where there would be something

6  that, you know, they wanted to do system-wide and they

7  would bring it before, you know, the leadership with

8  bids and details and that sort of thing and then they

9  would sign off on it.  Now, if that's what you're

10  talking about, yes, I'm familiar with that.

11      Q      That's what I'm talking about.

12      A      Okay.

13      Q      Tell me what you understand that to be.

14      A      Okay.  It's my understanding that when you

15  have a big scope of work, like if it's a big project

16  like, for example, Workday where you're -- you know,

17  thousands and thousands and thousands of dollars

18  that's going to be spent, then there is a -- there is

19  a form that you fill out that kind of details and

20  outlines the project, you know, what kind of timeline

21  you're looking at, that sort of thing, pricing.

22  Sometimes they may have different vendors come in and

23  give their -- their bid or their presentation, that

24  sort of thing, and then he would -- whomever would get

25  leadership to look over it, get buy-in and that sort

47

1   of thing before they moved to next steps.

2       Q     Did -- this contract with Selectica that you

3   signed, did you go through this project charter

4   process?

5       A     No, sir.  We did not, not for lawn care.

6       Q     Why not?

7       A     Because it was my understanding that if it

8   was something nominal like that, it was a -- I guess

9   like a contract service, it's not impacting the system

10  as far as huge dollars, but it's like a maintenance,

11  something that needs to be done.  And so it wasn't

12  like a -- there was not a need to bring everybody

13  together to agree on the lawn-care company.

14      Q     Did anyone tell you that?

15      A     No.

16      Q     Did you verify that understanding with

17  anyone else?

18      A     No, sir.  I did not.

19      Q     Did you discuss that subject with

20  Mr. Waldrop?

21      A     We did discuss that a contract did need to

22  be signed.  We got -- we were -- we had been doing

23  business with them for a good while and so they were

24  already running through our finance department.  They

25  knew that they were a vendor and that sort of thing,

1   much like the guy who comes to shred documents and

2   that sort of thing.  So, you know, we had never been

3   told that we needed to do, like, a formal project

4   charter since it wasn't, you know, a large amount of

5   money.

6       Q    Did you -- withdrawn.  Did you specifically

7   discuss with Mr. Waldrop the question of whether or

8   not to go through the project charter process with

9   respect to this Selectica contract?

10      A    No, sir.

11           (Defendant's Exhibit 2 was marked for

12      identification.)

13  BY MR. DANIEL:

14      Q    Okay.  I'll show you this document.  This is

15  marked as exhibit two to your deposition.  I'll ask

16  you to look at it and tell me if you can identify it.

17      A    Yes, sir.  I can.

18      Q    What is this?

19      A    This is the invoice for the general

20  contracting oversight work that was performed after we

21  had experienced the flood in our office.  We had our

22  office, the office -- prior to the flood, we had

23  actually purchased the building and we had wanted to

24  do some renovation to join the second and the third

25  bay, because there was a need for more office space.

1             So we had obtained three bids, which is

2     the -- the process.  We had obtained three bids for

3     the work to be done.  And we decided to put it on hold

4     because we just didn't have the money in the budget at

5     the time to do that.

6             So when the flood took place, you know, it

7     was terrible and unfortunate that it happened, but,

8     you know, we were in a state of emergency.  And so,

9     you know, we didn't have another place to go.  We had

10    several people -- that was our primary office space,

11    so we were in a bit of a dilemma and, again, just a

12    state of emergency.

13            And so we had the three bids obtained from

14    the prior work.  So the day of the flood, Mr. Waldrop

15    called Mr. Rollins to inform him, you know, what had

16    happened.  And Mr. Rollins had, you know, told Mark

17    that, you know, he appreciated him letting him know

18    what was going on, but that he trusted that, you know,

19    he was going to be using contractors in the area to

20    get the work done and get the office back in running

21    order since -- I think we -- I want to say we had

22    three buildings in the works at the time.  And so our

23    in-house team who would typically, you know, assist

24    with things like that, they were all hands on deck.

25            And so Mark wanted to -- to have my dad kind

1    of oversee the job because he had been in business for

2    years and years, born and raised in the area, had

3    contractors that we could call on.  He felt like that

4    they would, you know, put us a top priority, be fair,

5    give us good pricing and that sort of thing, and

6    wanted him to oversee it because, of course, our job

7    was still business as usual.

8              We had to still -- you know, work didn't

9    stop just because we were in a state of emergency.

10   And so he wanted to contract with him to oversee the

11   completion of that project and to also do some outside

12   work.

13        Q    Look at the third page of exhibit two.  Just

14   tell me if that's your signature.

15        A    Yes, sir.

16        Q    Did you submit this contract marked exhibit

17   two through the project charter process?

18        A    That, I don't recall.  I am pretty sure that

19   I did.  I can't say 100 percent sure that I did, but I

20   am almost positive that I did.  And then the

21   invoice -- we don't send invoices through Selectica.

22   We -- I would send those to the finance department

23   because they -- I know they had him set up in Workday

24   with his liability insurance and that sort of thing.

25   But I'm almost positive -- I can't say 100 percent

51

1   sure on that, but I'm almost positive it was in

2   Selectica.

3       Q    What was your father expected to do under

4   this contract?

5       A    Under this contract, he was just going to

6   provide general oversight of the job.  He would, you

7   know, work with the contractors to come in if changes

8   needed to be made structurally.  There were a few

9   times when we ran into problems where what they wanted

10  to do didn't -- wasn't going to work structurally and

11  so he would come in, make recommendations, that sort

12  of thing, and work with them throughout the process.

13      Q    Was he paid this sum of $13,658.41?

14      A    He was after the completion of the project.

15      Q    Are you familiar with an entity known as

16  Health Systems Real Estate, Inc.?

17      A    Yes, sir.

18      Q    What does that entity do?

19      A    It is my understanding that they do pretty

20  much exactly what my dad was contracted to do for that

21  job.  They oversee.  They line up the subcontractors.

22  They kind of oversee the day-to-day operations for the

23  job and that sort of thing.

24      Q    Had your father ever overseen any work

25  before for Community Health?

52

1      A     No, I don't believe he had.  Huh-uh.

2      Q     Did you consult anyone at Health Systems

3   Real Estate, Inc., about this -- about this repair job

4   at the Dalton office?

5      A     No, sir.  I did not.  When Mr. Waldrop

6   called Mr. Rollins the day to let him know that the

7   office had flooded, he had him on speaker phone that

8   day and I was able to hear that, you know, he wanted

9   us to just, you know, do whatever we needed to do to

10   get the problem fixed.

11          He understood that we were going to be using

12   local contractors and he just expected Mark to handle

13   it.  So I didn't feel that there was, you know, any

14   need for me to reach out.  I knew that they wouldn't

15   necessarily be familiar with my dad and he wouldn't be

16   familiar with them since he does work locally.  We

17   just did what Mr. Rollins asked us to do.

18      Q     Did you tell Mr. Rollins that you had

19   elected to sign a contract with your father for this

20   work?

21      A     No, sir.

22      Q     To your knowledge, was Mr. Rollins ever

23   informed that your father had been selected to do this

24   work?

25      A     No, sir.  He didn't ask for any specifics of

1    who was doing anything.  He never called me to get

2    status updates or project updates throughout the

3    process.  So I did not share that with him.

4              (Defendant's Exhibit 3 was marked for

5         identification.)

6    BY MR. DANIEL:

7         Q    Let me show you a document that is marked

8    exhibit three to your deposition.  I'll ask you to

9    look at this and tell me if you know what it is.

10        A    Yes.  This is an independent contractor

11   agreement between Kim Woods and Integra

12   Rehabilitation.

13        Q    If you'll look at the fourth page of this

14   document marked exhibit three, do you see your

15   signature?

16        A    Yes, sir.

17        Q    Tell me what the purpose of this contract

18   was.

19        A    The purpose of this contract was Mr. Woods

20   was going to be the main contractor that we used.  And

21   so in order for us to get him set up, we had to have a

22   contract from him.  We had to have a copy of his

23   insurance and that sort of thing so we could get him

24   set up in our Workday and contract system.

25        Q    Before you signed this contract on behalf of

54

1    Integra Rehabilitation, did you discuss it with

2    Mr. Waldrop?

3        A    Yes, I did.

4        Q    Tell me about that discussion.

5        A    I -- I -- when I learned that I needed to

6    get a contract and copies of insurance and everything

7    for them, I let Mark know that we needed to -- that we

8    would have to get a contract with him in place.  And I

9    had -- he had told me to work with Connie to get --

10   however we needed to set it up, the contract, but just

11   to be sure that, you know, we covered ourself in here

12   if anything happened.

13            And then he told me just to go ahead and

14   sign the contract.  I can't remember if he was on the

15   road that day or not.  But the same with the other,

16   with -- with my dad, just to go ahead and sign it

17   since I would be the one working with them day to day

18   on the -- or, as invoices would come in and that sort

19   of thing.

20       Q    Who was Connie?

21       A    Connie Stovall is the gatekeeper of the

22   contracts at the corporate level for us.

23       Q    Why was the contract made between Integra

24   Rehabilitation and Kim L. Woods Construction, Inc.?

25       A    The reason that it was through Integra is

1    because I -- Mark and I was not sure how we needed to

2    run this through as far as invoices and that sort of

3    thing.  And so he had asked me to reach out to the

4    finance department and find out how we needed to

5    handle this.

6            Because the way the company is set up, there

7    are so many LLCs and that sort of thing, we were not

8    sure how they had it set up from an insurance and

9    liability standpoint.  So we didn't know who checks

10   were going to be made payable to and that sort of

11   thing.  And so we needed all that to be in order from

12   a financial standpoint.

13           And so I had reached out -- I reached out on

14   several occasions to Teresa Moody, Maricella Espinoza,

15   and Lorraine Taylor as these different invoices and

16   things would come in because I wasn't sure how we

17   needed to code it and that sort of thing.  And so they

18   had communicated to me that it was going to be through

19   Integra and so that's how they told me to -- that the

20   contract needed to read.

21       Q    Okay.  Who told you that?

22       A    I can't remember if it was Lorraine or

23   Teresa, but one of the two in finance.  Because I

24   wasn't sure how it was all set up and I knew they

25   would know -- Lorraine would know how it was all set

56

1   up.  And I can't remember if I just wasn't able to

2   track Lorraine down and I called Teresa or if Teresa

3   had Lorraine call me.  I can't remember for sure.

4        Q    The work that was to be done by Kim L. Woods

5   Construction, Inc., under the contract marked exhibit

6   three, was this the work that your father was to

7   oversee pursuant to the terms of the contract marked

8   exhibit two?

9        A    Yes, sir.  Uh-huh.

10       Q    The contract marked exhibit three with Kim

11  L. Woods Construction, Inc., was it submitted through

12  the project charter process?

13       A    No, sir.  It was not.

14       Q    Why not?

15       A    It was not -- it was not put through the

16  project charter process, number one, because it was a

17  state of emergency.  We kind of needed to get moving.

18  In fact, we called Kim Woods the day that we were

19  standing in water and he sent guys out, moved out

20  furniture.  We were trying to salvage as much as we

21  could.

22            But since we did not -- since we did not --

23  or, since we had already approved the three bids

24  prior, we had already gone through that process.  So I

25  was not aware that a project charter needed to be done

57

1    in this situation because it was such a state of

2    emergency and time sensitive and we had already been

3    told just to handle it.

4              We knew that it had to be done.  And so

5    since we had already done the legwork prior to getting

6    bids obtained when we wanted to make these changes

7    initially, we already had that done.  So we felt like,

8    you know, we had covered that base.

9         Q    Let me make sure I understand what --

10        A    Okay.

11        Q    -- the situation was with the Dalton office.

12   At some point, it was decided you would remodel that

13   office?

14        A    We had talked about it.  We wanted to -- and

15   not even necessarily remodel it.  We wanted to make

16   improvements.  Since we owned the building -- since we

17   had acquired ownership of the building, it was more

18   feasible for us to make the second and third offices

19   adjoined space, a combined space, because we had

20   grown.

21             And the folks who were at our old office --

22   and I hope I'm not confusing you.  Because it is very

23   confusing, I know.  But the office on the corner where

24   when I left the nursing center and I went to the

25   office on the corner, there was still an office full

58

1   of folks there.

2            The rent for that building when -- when we

3   left was around $5,500 a month and it would go up

4   annually.  They would look at it.  It would go up a

5   percentage.  And so we had done the math and after

6   getting the bids, it -- it was going to be in our best

7   interests to combine those two offices.

8            The reason that we were going to -- that it

9   even required work is because the previous tenant in

10  that office was a chiropractor.  They did X-rays.

11  There was lead in the walls and that sort of thing.

12  And it was very much a clinical setting, not an office

13  setting.

14            And so we knew some improvements needed to

15  be made.  But if we could get to the point where we

16  could make those improvements, we would be saving

17  significant dollars that the system would be out every

18  month from renting the other building that was really

19  not safe from all the mold and the flood.

20            And so that was the whole reason we obtained

21  bids to begin with.  But then in looking at the budget

22  and, you know, trying to be more cost conscious and

23  cut money where we could, save money where we could,

24  we opted just to hold off on that.

25            But then when the flood happened, it put us

59

1  in a situation where we could do these improvements.

2  You know, it was unfortunate that it happened, but it

3  was good for the system because it allowed us to do

4  what really needed to be done and not be out what it

5  would have cost us to do it.

6          So -- so since it did -- you know, it was a

7  state of emergency, we didn't -- I didn't realize that

8  a project charter should be done because of the

9  conversation that I had heard between Mr. Rollins and

10 Mr. Waldrop.

11    Q    I believe that you indicated that you had

12 gotten several bids for that work.

13    A    Uh-huh.

14    Q    From whom did you get these bids?

15    A    We got a bid from Kim Woods Construction.

16 We got a bid from -- I believe it's TU Parks

17 Construction.  And then there was another gentleman.

18 He was an older gentleman, but I can't remember his

19 name.  I can't recall his name, but he was an older

20 gentleman.

21          I met with all three of them.  They came

22 out.  We kind of went over everything we had wanted to

23 do and they provided us with a bid.  I can't think of

24 his name.

25    Q    Are you familiar with an entity called ECP

60

1    Distributors?

2        A    Yes, sir.

3        Q    And is that a subsidiary of Community

4    Health?

5        A    Yes, sir.

6        Q    What do they do?

7        A    They are a medical distribution company, but

8    then they also have furniture, office supplies, and

9    that sort of thing.  So it's not just medical supplies

10   and equipment.

11       Q    Did you consult with them about this

12   project?

13       A    We -- I did not consult with them one on

14   one.  I did work with -- and I'm trying to remember if

15   it was this or the initial, but I worked with them

16   about some furniture that they were going to -- to see

17   if their prices were going to be better than what we

18   could get in an effort to save money.  But I didn't

19   work with them, like, on day-to-day things for the

20   project.

21       Q    What did you learn when you worked with

22   them?

23       A    They were not going to -- if my memory

24   serves me correct, we were not going to be saving

25   money to go with them.  We were going to be saving

61

1    money to go with the company that we went with to

2    provide the furniture for us.  Because that's all I

3    would have worked with them on would have been

4    contents like that.

5        Q    Before you signed the contract that's marked

6    as exhibit three, the contract with Kim L. Woods

7    Construction, Inc., did you make any effort to confirm

8    that this was the lowest bid or the lowest amount you

9    could get the work done for?

10       A    Yes.  Kim and I did --

11       Q    What did you do?

12       A    Kim and I did talk about that on site.

13       Q    Okay.  What did you and Kim say or discuss?

14       A    Just making sure that, you know, Kim, this

15   is the best, you know, price that we can get.  You

16   know, we're having to watch our dollars.  You know,

17   that sort of thing.

18            Kim was very fair.  I felt like, you know,

19   he was a good, honest guy to work with.  So I guess I

20   trusted him.  This is not my profession and so it was

21   a little bit out of my comfort zone.  I did kind of

22   grow up in this.  But, you know, also just knowing

23   that my dad was in talks with Kim and that sort of

24   thing, knowing where, you know -- and, there again,

25   you know, that was the good thing about having him

62

1   oversee this project because he knew what pricing --

2   you know, he knew what -- how to price things.

3        And so he was able to -- that was a good

4   safeguard that we had in place to ensure that we

5   weren't paying for things that we shouldn't be paying

6   for.  That was the main reason we had him oversee the

7   job.

8        Q    Did you consider having Health Systems Real

9   Estate, Inc., look at this contract before you signed

10  it and give you an opinion as to whether or not it was

11  an appropriate contract?

12       A    No, sir.  I did not.  I worked with Connie

13  Stovall and asked her what -- what contract they used

14  and she sent me the -- just the same contract that

15  they use.  So that's the contract that I used since

16  that is not my area of expertise.

17       Q    Did Connie Stovall look at the numbers with

18  you?

19       A    No, she did not.

20       Q    Did anyone look with you at the numbers in

21  this Stovall -- excuse me.  Withdrawn.  Did anyone

22  look at you -- with you at the numbers in the contract

23  marked exhibit three before you signed it?

24       A    I feel certain -- I mean, I can't say

25  100 percent sure, but I feel certain that Mr. Waldrop

63

1   and I looked at it.  We looked at everything as it

2   came in, the bids for the different things for the

3   various things within the project.  We looked at

4   everything and went over it in great detail just to

5   ensure that, you know, everything looked in order.

6        Q    Other than Mr. Waldrop, did anyone review

7   this contract marked exhibit three with you before you

8   signed it?

9        A    No, sir.

10       Q    Okay.  Would you like to take a short break?

11       A    I'm good to keep going unless y'all want to

12   take a break.  That's fine with me.

13            MR. DANIEL:  Let's take a short break.

14            MR. HENRY:  Yeah.  I was about to say I need

15       to take a little short break.

16            VIDEOGRAPHER:  Going off video, 11:09 a.m.

17       Off video record.

18            (Whereupon, a recess was taken from 11:09

19       a.m. until 11:20 a.m.)

20            VIDEOGRAPHER:  Tape two, 11:20 a.m.  Back on

21       video record.

22   BY MR. DANIEL:

23       Q    Tell me how this flood at the Dalton office

24   occurred.

25       A    We -- Mark had actually taken a week of PTO

64

1    the whole week prior to the flood.  And I think the

2    last day or last couple of days before the flood, I

3    had had my wisdom teeth taken out.  And so neither of

4    us were in the office on that Friday.

5            I got a call early Monday morning indicating

6    from one of the ladies next door that the office was

7    flooded, that, you know, they saw water coming out of

8    the door when they were on site.

9            I rushed to the office.  I called Mark to

10   let him know what had happened.  And, of course, we

11   both, you know, got to the office and, you know, not

12   knowing what's going on.  And in talking with the

13   ladies next door, they had indicated that one of the

14   ladies had been in on Saturday night doing some work

15   and everything was fine; everything was good.  So that

16   kind of helped establish a little bit of a timeline.

17           But sometime between Saturday night and

18   Monday morning, the -- the sprayer in the kitchen sink

19   somehow -- we don't know if it was pressure or what

20   caused it, but it popped out of the wall and was just

21   flooding the office with water.

22           So when we came in on that Monday morning, I

23   think one of the maintenance men said there was like

24   three or four inches of water that we were standing

25   in.

1      Q     Before your father signed this contract
2    that's marked exhibit two to oversee the work of the
3    general contractor at the River Birch office, had he
4    ever done oversight work for a contract like this
5    before?
6      A     That I'm not sure about.  He's been in
7    business for several years and he's worked with
8    commercial and residential customers.  And so I know
9    that he's had big projects before, but I don't know if
10   he's ever had one related to a flood in an office
11   setting like ours.
12     Q     I'm just talking about oversight work.
13     A     Yes.  Yes, sir.
14     Q     Has he done oversight work?
15     A     Yes, sir.
16     Q     For general contractor?
17     A     Yes.  And for homeowners.  You know, they
18   just kind of wanted him to oversee the building or the
19   renovation of their home.  He -- he can do that also.
20     Q     You used the word PTO.  What does that mean?
21     A     I'm sorry.  Paid time off.
22     Q     All right.  And what is paid time off?
23     A     Paid time off is basically just vacation
24   days that you have accrued with your tenure over the
25   years.

66

1          Q     So let me make sure I understand.  If an

2     employee of Community Health had wanted to take a day

3     off, did he or she have the option of saying, with the

4     supervisor's approval, I'd like to take a PTO day?

5          A     Yes, sir.

6          Q     And that meant that the employee would be

7     paid for the day although the employee would not work

8     that day?

9          A     Yes, sir.

10          Q     If the employee wanted to take a day off and

11     did not want to -- or did not have a PTO day available

12     or did not want to take it, would the employee be paid

13     for work that day?

14          A     No, they would not.

15          Q     And how -- how did an employee notify the

16     employer that I want to take a PTO day or I elect not

17     to, but I still want to be off?

18          A     Right.  There was a form that they would

19     fill out and it was a -- it was a leave form.  And on

20     that leave form you could request, you know, paid with

21     -- leave with pay, without pay.  You know, you could

22     pretty much indicate whatever the purpose was.  You

23     could state what it was.

24                And then when we went to the electronic

25     system with Workday, it tracked all of that.  So you

67

1    could actually go in and generate a leave request or

2    that you wanted to be off without pay, that sort of

3    thing, how many hours you wanted to take, what the

4    purpose was.  You know, you could be as detailed as

5    you wanted to be in that.  It would go to your

6    supervisor for approval and then it would be kept in

7    the system.

8         Q    Did an employee at Community Health get a

9    certain number of PTO days?

10        A    Yes.  And I can't recall -- I know you got

11   it based on your tenure.  I can't remember what the

12   increments were, but I think you topped out at like 20

13   days plus a personal leave day.

14        Q    And is a personal leave day different?

15        A    Or like a floating holiday I guess, like

16   a -- like a bonus day that you could use however.

17        Q    And was there some way that the employee and

18   Community Health kept track of the PTO days available?

19        A    Yes.  They did that through the finance

20   department.  Because it would have to be reflected on

21   paychecks and that sort of thing, so they kept up with

22   all that.

23        Q    I asked you a number of questions about the

24   meeting with Mr. Patton and Angela Hammack and Teresa

25   Moody on June 28th, 2016.  Did you tell me everything

1  that you can recall about that meeting?

2       A     Everything that I can recall, yes.  Now, I

3  did -- when Mr. Patton had asked me about expense

4  reports and that sort of thing, I had told him as we

5  were leaving -- I don't think we were even sitting

6  down or we could have even been in my driveway -- but

7  I did tell him, you know, to the best of my ability, I

8  explained everything, but if he had a question, you

9  know, certainly please give me the opportunity to, you

10  know, clarify or, you know, provide more information

11  if, you know, there was any question on anything.

12            And I at that time had even told him that on

13  my desk there was a couple of forms for the Georgia

14  Hospital Association.  It was a convention that was

15  coming up and Mark needed to attend that.

16            And I had registered Mark -- we would try to

17  register as far in advance as we could to save the

18  company money, like for the early bird and that sort

19  of thing.  The same with hotel rooms.  If you booked

20  early, you got in the group lot or whatever.

21            And there were -- it bounced back, the same

22  with the hotel.  When I had put Mr. Waldrop's -- when

23  I had given them the information, it had bounced back,

24  that he was having issues with his card or something

25  like that.  Mark was out of town.

1           And so we had already expensed all of that
2    under his expense report.  And it was like a day or
3    two later I guess we had gotten notification that, for
4    whatever reason, it was kicking back and it wasn't
5    accepting his card.  And so I had just gone in and put
6    it under my credit card because we still wanted for
7    him to get the good rate, the room -- I think there
8    were only maybe two rooms left even at the rate and
9    that sort of thing.  And so little things like that.
10           I knew they would see both forms out and it
11   would look like I expensed it and he expensed it, but
12   I -- but that didn't happen.  I never expensed it.  I
13   knew Mark would just make it good later, you know,
14   when I could talk with him about what all had
15   happened.  So just little things like that.
16           If -- you know, if he had questions about,
17   you know, little things, just give me an opportunity
18   to -- you know, to let me answer his question or
19   provide more detail.
20           And he had told me that I should hear
21   something on that Friday.  And I said, well, is it
22   okay if I call you on Friday if I don't hear anything.
23   And he said, yes, either call me or Lorraine Taylor or
24   Ronnie Rollins and don't talk to anybody else.  And so
25   I told him that I would not.

1          And Friday came and it was actually 4th of
2     July weekend.  And so it was in the afternoon probably
3     around 3:00 or so.  I was afraid people might be
4     getting ready to go out of town.  So I put in a call
5     to Lorraine Taylor just to ask, you know, so do I come
6     to work on Monday, have things changed, you know, what
7     are next steps.

8          And when I couldn't get her, I called
9     Mr. Patton and I didn't get him.  I had to leave him a
10    voicemail.  But he called me right back and had said
11    that he was on a conference call and that -- that
12    he -- that there -- they had found discrepancies in
13    the answers that I had given and that I would be
14    getting a separation notice -- or, I would be getting
15    communication from the corporate attorney.

16         And I said, well, you know, if you remember
17    when we talked, I asked, you know, if there's anything
18    that I can clarify or, you know, anything that could
19    change the circumstance.  You know, obviously this was
20    detrimental to my family.  You know, please give me
21    the opportunity to talk about it or, you know, if
22    there's some kind of misunderstanding.  I didn't know.
23    I was just grasping for straws.

24         And he said, no, that I just -- you know,
25    just remember what we talked about as far as, you

1    know, you cooperate with us, the better things will be

2    and that I would be hearing from the attorney.  And

3    then that's the last conversation I had with him.

4              I did ask him at that point -- I said so

5    you're telling me that I no longer have a job.  And he

6    said that is correct.  And I said am I being fired.

7    He said, no, I'm not saying that.  He said I just

8    don't have all the details, but you'll get that

9    communication from our corporate attorney.  I said

10   okay, thank you.

11             I said, well, since you're telling me that I

12   no longer have a job, do you at least give me

13   permission to reach out to human resources so that I

14   can make arrangements as far as getting money out of

15   my 401(k) and that sort of thing.  And he said yes.

16             And so I immediately got off the phone with

17   him and reached out to Blair Lake who was over human

18   resources and, you know, said whatever you can do to

19   help me as far as speeding this along with the benefit

20   company to be able to release my 401(k) funds, I would

21   appreciate it; you know, what else do I need to do.

22   So --

23        Q    Did you have any other contact from the

24   company after that?

25        A    No, I did not.  Well, I take that back.  I

72

1    didn't receive a phone call.  But I had communicated

2    to Mr. Patton that -- the company did reimburse me for

3    my phone, but it was in my name.  It was still under

4    contract.  So there were expenses, you know, accrued

5    there.  And also about my vacation time.

6              And he told me that the board would take all

7    that under review and once they had an opportunity to

8    meet, that someone would get back with me to let me

9    know if they were going to pay me my vacation time and

10   the -- for the phone or not, that it was at their

11   discretion.  I asked him if there was any type of

12   severance or anything like that.  And, there again, he

13   said I can't share any details with you.

14             So for, I don't know, maybe a couple of

15   weeks -- I can't say for sure -- I had e-mailed

16   Lorraine Taylor with a copy of the phone bill that was

17   due and something from Verizon Wireless saying, you

18   know, how much longer I had the contract for the

19   phone, that sort of thing, and had also inquired about

20   my vacation time, because I had several days and just

21   didn't know if that was going to be money that I was

22   going to be able to have to support my family or not.

23             And she finally got back with me.  I was

24   copied -- I was either copied on an e-mail or she sent

25   it to me and copied the finance department and told

1  them to go ahead and release the check for Verizon

2  Wireless and to pay me for my vacation time, which I

3  appreciated.

4        Q    Have you had any further contact with the

5  company since?

6        A    No.  Not except for just working with HR on

7  my 401(k) stuff, but that's been over for a while.

8        Q    Has that been resolved?

9        A    Yes, sir.

10       Q    Are you currently employed?

11       A    I am.  Yes, sir.

12       Q    And where are you employed now?

13       A    With Transit Alliance Group, Incorporated.

14       Q    And what's your job there?

15       A    My job is director and compliance manager.

16  And I am housed in the North Georgia area, in

17  Chatsworth, and we have 20 -- 20 I believe contracts.

18  We contract with the State to provide transportation.

19  And so we broker with these third parties to provide

20  that transportation.

21       Q    Is this the only job you've had since you

22  left Community Health?

23       A    Yes, sir.

24       Q    How long were you unemployed?

25       A    I was unemployed from June the 28th -- well,

74

1    I was in limbo those days.  I didn't know if I had a

2    job or not.  And then I came on board with them

3    September 1st.

4        Q    When you were working as executive assistant

5    to Mr. Waldrop, did you have any knowledge about his

6    financial situation?

7        A    Like, what do you mean, knowledge?

8        Q    Did you know what his compensation was?

9        A    No, I did not.

10       Q    Did he ever talk to you about his financial

11   affairs?

12       A    No.

13       Q    Did Mr. Waldrop ever give you advice about

14   financial matters?

15       A    No.

16       Q    Did you pay any of Mr. Waldrop's personal

17   bills?

18       A    Like, what do you mean, personal bills?

19       Q    Well, anything that was not related to

20   business.

21       A    There would be times when I would be out

22   running errands, whether it was, you know, to get

23   cleaning supplies for the office or I had a personal

24   errand to run and I would ask Mark, hey, do you need

25   anything while I'm out.  And if he would need

75

1    something, I would pick it up and then he would just

2    pay me back.  It was just kind of out of -- just out

3    of courtesy.  Hey, I'm going across town.  He doesn't

4    live here.  You know, I'm happy to pick it up for you.

5              There were several time when, you know, I

6    would be going to get things and he would need some

7    supplies and I would just pick that up, pay for it

8    separate, and then he would pay me back.

9        Q    Did you help him with his checkbook or check

10   writing?

11       A    No.

12       Q    Did you assist Mr. Waldrop in the

13   preparation of any of his personal tax returns?

14       A    No.

15       Q    Were you aware of any financial problems

16   that Mr. Waldrop may have had while you were working

17   as his executive assistant?

18       A    No.

19       Q    Did you ever assist Mr. Waldrop in

20   connection with any loan applications?

21       A    I did not assist him in filling out any loan

22   applications.  When Mr. Waldrop's daughter was getting

23   married out in Montana, I know that he was in the

24   process of going through a bank transaction there.

25   And I'm not really sure.  I can't remember if it was a

1   refinance or what exactly he was doing.  But I know he

2   had me to either fax or e-mail the forms in for him

3   because they didn't go through or they needed them

4   sent again or something.  But I didn't fill out

5   anything for him.

6        Q    Do you know whether or not any vendors or

7   contractors of Community Health ever made any loans to

8   Mr. Waldrop?

9        A    No.

10       Q    Do you know whether or not any vendors or

11  contractors of Community Health ever made any gifts to

12  Mr. Waldrop?

13       A    No.  The only thing I can remember is one

14  time Scott Forrester, who was an insurance salesman,

15  he had invited him to a ballgame one time he had

16  tickets for and I can't recall if he went or not.  I

17  think he did, but I could be wrong about that.  But

18  no.

19       Q    To your knowledge, did any vendors or

20  contractors of Community Health ever pay any money to

21  Mr. Waldrop for any purpose, this is, to pay him

22  personally?

23       A    No, not to my knowledge.

24       Q    What do you know about the Montana property

25  of Mr. Waldrop?

1     A     I know that he has -- well, he had two

2   houses out there and he recently purchased another one

3   that was kind of on the property.  But, I mean, that's

4   really all I know about it.  Like, I don't know how

5   much he paid for it or how much land's there or

6   anything like that.

7     Q     Did you ever travel to Montana and visit the

8   property?

9     A     I did.  One time he was gracious enough to

10   let my family and I go out.  My daughter was eight

11   months old.  And my daughter, my mom and myself flew

12   out, and my dad and my husband and my in-laws drove

13   out and we spent some time out there.

14     Q     Was that the only time you were ever there?

15     A     Yes, sir.

16     Q     Describe the property for me.  What was it

17   like?

18     A     Gravel driveway.  You -- the house is

19   located on a hill, the main house, a little cabin, and

20   then off kind of to the side down below a little bit

21   is I guess kind of like a mother-in-law suite.  It's

22   just a smaller little guest house.

23           And then the other property, I vaguely just

24   remember kind of driving by it.  It was not very well

25   kept at the time and I -- I didn't really have any

78

1  reason to even notice it, so I can't really describe

2  what the third property was.  But I know they were

3  just all located right there together.

4        Q    Did you notice any change in Mr. Waldrop in

5  2015 or 2016?

6        A    Yes.  He was very stressed.

7        Q    Okay.  And how did you notice that he was

8  stressed?

9        A    He was just very -- well, he was in the

10  office more.  He didn't travel as much.  You know, he

11  tried to stay in the office more to save dollars.  He

12  was getting a lot -- having a lot more communication

13  with Mr. Rollins and, you know, I think it was just --

14  I could just tell it was kind of intense.

15            His behavior towards me didn't change.  You

16  know, he wasn't, you know, inappropriate or, you know,

17  irate or, you know, anything.  You know, he was always

18  the same pretty much all the time.  But I could just

19  tell.

20            He was never one to just want to come in and

21  just talk about things or -- but I could just tell.  I

22  think when you work with somebody that close, when

23  there's just the two of you in the office, you can

24  tell, you know, even if it's -- if it's, you know, a

25  big life event or something.

79

1          You know, I know he had some changes.  His

2    daughter got married.  And, I mean, there was a lot.

3    It was -- you know, but -- so you can just kind of

4    tell.  You can get a feel for somebody.  And I could

5    just get a feel that he was very -- very stressed out.

6        Q    When did you first notice that he was

7    stressed out?

8        A    It would have been in -- probably around the

9    first of 2015 if I had to guess.  We had a meeting.

10   We always had an annual meeting in Atlanta.  Because

11   the Georgia Healthcare Association held a convention

12   there every year that Mark attended and several of our

13   co-workers would be attending that meeting also.  And

14   so since everybody would be together in that general

15   location, Mark would always have just a real good

16   update meeting.  And it was just very tense.

17          There had been -- I just kind of heard some

18   sidebar conversations about us losing UPL money and

19   that sort of thing and just -- you know, we really

20   needed to button down the hatches and, you know, as a

21   team be cost conscious.  Are we doing everything we

22   can to save money system-wide, you know, that sort of

23   thing, just --

24          You know, I mean, he didn't want to -- he

25   didn't come off as, you know, panicked or threatened

1  or anything like that.  But I just know from working

2  with him for so long, he was just very anxious about

3  that, you know, just -- it was just a different feel

4  starting after about that time.

5      Q    Did this change up to the point that you

6  stopped working with the company?

7      A    You mean his stress level?

8      Q    Yeah.  That's right.

9      A    No.  It was about the same.  It was

10  pretty -- he -- he was different.

11      Q    Did you notice any other ways in which you

12  would say he was different?

13      A    No.  I mean, he -- he always held people

14  very accountable.  So he -- and he was always kind

15  of -- I don't want to say in their business, but he

16  knew what was going on in their business.  And so that

17  didn't -- you know, that didn't really change.  It was

18  just -- I just felt like he was under a lot of

19  pressure I guess.

20      Q    How would you describe Mr. Waldrop's

21  relationship with Ronnie Rollins during this time,

22  2015 and the first half of 2016?

23      A    I think that -- well, I didn't have -- I

24  didn't see much interaction with Mark and Ronnie

25  because they, you know, obviously weren't in the same

1    office and I didn't see Mr. Rollins very often to be

2    completely honest, you know.

3            So I didn't, you know, have a lot of that

4    one on one, but I would hear conversations because,

5    again, it is such a small office.  You know, even with

6    his door closed, I would hear things.  And it was

7    just -- it was just very -- it was very intense.

8            Like, I -- there would be times when

9    Mr. Rollins would, you know, maybe ask things or want

10   information and he might not just come right out and

11   say it or ask it, but you could tell that he was very

12   upset on the phone and just -- maybe he just didn't

13   like what Mark was telling him or it wasn't the answer

14   he was looking for or something.

15           It was just real tense and just made me, you

16   know, a little bit nervous.  I guess I could just tell

17   there was friction.  Like, it was just kind of heavy.

18       Q    Before 2015, what -- how would you describe

19   the relationship between Mr. Waldrop and Mr. Rollins?

20       A    It was very professional.  I guess Mark just

21   knew what his expectations were and he just kind of

22   trusted Mark to run his business like he had always

23   done it.  And there was not a whole lot of, I guess,

24   oversight or kind of getting in the weeds just for

25   lack of a better term.

82

1          You know, if Ronnie called, it was, you

2    know, just checking in or, you know, if they -- if

3    there was a meeting maybe that he wanted to have, he

4    would kind of get with Mark or whatever.  But it was

5    very light hearted.  You know, he would always pick up

6    the phone and -- or, when I would pick up the phone,

7    it was, hey, Ms. Stephanie, how are you today, I mean,

8    just very, you know -- which Mr. Rollins was always

9    very professional and friendly to me.  I can -- I can

10   say that.

11       Q    Did you learn that in late 2015, Mr. Rollins

12   gave a check of $250,000 to Mr. Waldrop?

13       A    Yes, sir.

14       Q    How did you learn about that?

15       A    Mr. Waldrop called me the morning after.  He

16   was actually headed to a meeting and I can't remember

17   where he was going.  But he was just a little bit

18   nervous that, you know, he had that kind of money on

19   him.

20          And so I don't know if he was telling me

21   from a standpoint, you know, if something were to

22   happen, I've got this check or, you know -- but it had

23   been kind of heavy and so I think when -- when that

24   happened, I think Mark was a little bit maybe at ease,

25   I guess, because it was almost like, okay, almost

1    like -- I hate to say extending an olive branch, but

2    just kind of -- he just kind of sat back a little bit,

3    Mr. Rollins did.  It was almost just like a, okay,

4    this is a good thing, you know.

5         Q    Did Mr. Waldrop say anything else about the

6    $250,000 check?

7         A    Huh-uh.  No, sir.

8         Q    Was Mr. Waldrop ever critical of Ronnie

9    Rollins?

10        A    Critical in what --

11        Q    Did he ever criticize him?

12        A    You know, he would say that Mr. Rollins --

13   let me back up.  I will say that, you know, he never

14   really had a whole lot to say, you know, about him.

15   He respected him in his role and, you know, as his

16   supervisor.  And he did, you know.

17             And, you know, he had always been cordial to

18   him.  But, you know, the last few months, Mr. Rollins

19   had been contacting Mark's direct reports and I guess

20   he felt a little bit undermined because, you know, the

21   direct reports would call Mark and say, hey, Ronnie's

22   calling me; what's going on with this; you know, why

23   is he asking me this stuff; why is he trying to get in

24   my business.

25             And they felt like -- they -- they -- it

84

1    came across as they felt like Ronnie was almost trying

2    to work against Mark and it was not a united front.

3    And Mark had always worked hard for it to be a united

4    front.

5              And, of course, when that would happen, on

6    many occasions, I heard Mark say, you know, if Ronnie

7    calls you, if he wants to meet with you, you meet him.

8    If that's what he wants to do, you make it happen.

9    You know, he encouraged that.

10             I feel like he probably felt on many

11   occasions that, you know, Ronnie was not conducting

12   himself appropriately from a business standpoint, but

13   he respected the fact that, you know, he was his boss

14   and if he felt the need to do that, then he could do

15   that.

16        Q    And by this, do you mean that Mr. Rollins

17   could contact Mark Waldrop's direct reports if he

18   wanted to?

19        A    Yes.

20        Q    Was that what he was complaining about?

21        A    Yes, I mean -- well, I guess Ronnie had

22   never done that before.  He had always looked to Mark

23   to run his business and would just kind of -- it had

24   always been a good relationship.  Even if -- and I'm

25   not saying this is the case, but even if Mark maybe

1    did things a little different than Ronnie had, he was

2    fine with that because the end result was what he

3    wanted.

4            So, I mean, it worked out just fine.  He

5    wasn't critical that way.  Because he trusted Mark to

6    run his business.  But for the last -- you know, '15

7    and '16, it was just a -- it was a different -- it was

8    a different working relationship.  It was almost like

9    Mark would learn about things secondhand from his

10   people and it would almost make him look like he was

11   carved out, you know.

12           And so the people under him was kind of like

13   I don't know what to do; this is foreign to me; how am

14   I supposed to handle this.  Because I feel like, you

15   know, he's maybe wanting me to say or do something,

16   but -- I don't know.  I feel like they were just in a

17   bad situation.  And then they would call Mark and Mark

18   would have no -- I mean, he wouldn't even know the

19   meeting was going to happen.

20           So, I mean, he -- you know, he couldn't

21   really say a lot.  It was just, you know, if

22   Mr. Rollins wants to meet with you or whatever, then

23   by all means meet with him.

24      Q    And who are these direct reports --

25      A    Diana --

1      Q     -- do you recall?

2      A     Diana Wilks, Michelle Andrews.  I don't know

3  if he did that with Blair Lake, but I know with --

4  with Michelle and with Diana.

5      Q     Did Mr. Waldrop ever tell you that he

6  thought that Ronnie Rollins was targeting him?

7      A     Yes, he did.

8      Q     What did he say?

9      A     It had just gotten really heavy on several

10  occasions.  And when I say heavy, the conversations

11  were very confrontational.  And it's almost like

12  sometimes Mark would answer his questions, but they

13  would kind of talk in circles almost a little bit.

14  And Mark would answer the question, but it wouldn't be

15  exactly the answer Mr. Rollins wanted and so then it

16  would get more heated.  And I feel like maybe he just

17  couldn't please him.

18          And so, you know, he felt a little bit

19  picked on I guess.  Like, what is the problem; you

20  know, he's always paid me to do a job and trusted me

21  to do a job.  And I think it was that more than

22  anything.  You know, what's changed; why do you feel

23  like, you know, you've got to go behind me or -- or

24  get in the weeds with this stuff.

25          Because as far as -- you know, as far as I

1  could tell, it was business as usual for us.  So for

2  me, nothing had changed.  I mean, I know that, you

3  know, losing that funding -- that money is huge.  I

4  mean, I understand that.  And with that comes a huge

5  burden of responsibility.

6         You know, we still need to work as

7  efficiently and offer the service that we're known to

8  offer, but we've got to do it with less money.  So, I

9  mean, I understand that and I know emotions run high.

10  I mean, we're caring for a lot of people here.  But it

11  was just really intense.

12       Q    Did Mr. Waldrop ever say that Ronnie Rollins

13  had lied to him?

14       A    There were conversations that would come up

15  and it was more of that's not what was said; that's

16  not what he said; that's not what I was told; that's

17  not what we were told to do.  I don't know that he

18  just ever came right out and said Ronnie lied to me.

19  I can't say that he ever said that.  I can't say that

20  he didn't, but that doesn't --

21       Q    Did Mr. Waldrop ever tell you that he had a

22  concern that he might be fired?

23       A    He did.  It -- when he got to the point

24  where he felt like he couldn't do anything to please

25  Mr. Rollins and it prompted Mr. Rollins to kind of go

88

1  behind his back to his people, I think he felt very

2  insecure about that.  Because that had never happened

3  before.

4         But then, there again, when Mr. Rollins gave

5  him that money, you know, Mark was like, okay, well,

6  you know, maybe it was just the -- you know, that

7  initial stress of this UPL being taken away.  You

8  know, it's a lot.  Maybe -- you know, maybe Ronnie

9  sees that, okay, I was being a little overbearing and,

10 you know, this is his way of saying, you know, I'm

11 sorry; let's work through this.  You know, I think

12 that's how Mark took that.

13     Q    When -- what was the timeframe in which he

14 expressed some concern that he might be fired?

15     A    It was in early 2016.  In fact, because I

16 remember thinking, okay, now, he just gave you this

17 money.  So, you know, don't worry.  You know, maybe

18 he -- maybe he is -- you know, if he's -- and I don't

19 know -- in his defense, I don't know Mr. Rollins that

20 well.  And so maybe his way is not saying, hey, I'm

21 sorry or, you know, hey, I hate that it's gotten

22 heated the last few months, but, you know, I know your

23 work ethic; you know mine; let's, you know, shake it

24 out.

25         That's really how I took that, as a, okay,

1    they're going to be -- this was just a bump in the

2    road.  You're going to have it when you work together

3    this long and -- because I know at the end of the day,

4    Mark still respected him and I knew Ronnie respected

5    Mark or he wouldn't be here.

6            So I was really just hoping it was going to

7    be one of those deals where the guys could just work

8    it out.  But I could tell that, you know, he was just

9    still very cautious.  Very cautious.

10    Q    Did Mr. Waldrop ever tape any telephone

11    conversations?

12    A    Yes, he did.

13    Q    How did you know about that?

14    A    Mark had asked me to sit in on a few

15    conversations over the phone, that he was going to be

16    taping it.  Because, there again, I don't have that

17    working relationship with Mr. Rollins.  And so for

18    Mark to just come in and say this, this and this

19    happened, you would probably never believe it.  Just

20    like if he were to tell you or you, without knowing

21    him -- it's fair -- you wouldn't know.

22            And so he almost felt like not only, you

23    know, did he need to do that to ensure that that's

24    really what was said, but I think he did it also in a

25    way that he went back and listened to it and wanted to

90

1   be sure, okay, I'm not taking this out of context;

2   this is really what he said.

3           Or there were times when, you know, he felt

4   like he would have to go back and revisit it because

5   maybe something else had come up and he went back and

6   referred to it and was like, see, he said it right

7   here; this is what he wanted to do and that's what

8   I've done, but now he's saying something different.

9           So I think he almost did it like a

10  self-check for him but also just to guarantee that,

11  okay, I'm really hearing this like he's saying it.

12      Q    Did Mr. Waldrop tape conversations with

13  persons other than Mr. Rollins?

14      A    Not that I'm aware of.

15      Q    How many times --

16      A    Not that I can recall.

17      Q    -- would you say Mr. Waldrop taped

18  conversations with Ronnie Rollins?

19      A    I can't say for sure.

20      Q    How many times did you sit in on the

21  conversation and listen to it while it was being

22  taped?

23      A    Uh-huh.  I can't give you a for-sure number.

24  There were several times when I sat in on it, but I

25  can't tell you an exact number.

1    Q    And what was the timeframe these tapes were

2  made?

3    A    I really can't say.  I would say, if I had

4  to guess -- and it's just a guess -- I would say

5  around February or March.  But I can't state for sure

6  on a date.

7    Q    February or March of 2016?

8    A    Yes, sir.

9    Q    What happened to the tapes after they were

10  made?

11    A    Well, he didn't actually make tapes that I

12  know of.  They were just recorded on his cell phone.

13  And he had sent them to me just to be sure in case,

14  with this cloud business or whatever, that it didn't

15  get lost or anything like that, which they wouldn't

16  all transfer to my phone -- or, to my -- to where he

17  had sent them.

18         And I can't remember now if he sent them to

19  my phone or to my e-mail.  I can't remember where he

20  sent those.  But to my knowledge, that's all he did

21  with them, unless he made a copy that I don't know

22  about.  I didn't do anything with them.

23    Q    Did you ever transcribe the tapes?

24    A    No, sir.

25    Q    Did you ever duplicate them?

1     A    No, sir.

2     Q    Do you know where they are today?

3     A    I do not.

4     Q    After your employment ended at Community
5 Health, did you have conversations with Mr. Waldrop?

6     A    I did.  I had a few conversations with him,
7 but it was mostly having to do with a job, you know,
8 just asking Mark, you know, please keep me in mind.
9 I've got a seven year old child.  We've lost half of
10 our income and we live on family property.  You know,
11 not trying to give you a big guilt story, but it's
12 real life and, you know, bills don't stop just because
13 you don't have a job.

14          And so, you know, we had a good working
15 relationship.  I knew I could work well with him.  And
16 so it was mainly just, hey, if you -- you know, he had
17 a -- he had a couple of leads.  And, you know, he
18 said, hey, all I can do is, you know, put in a good
19 word for you.  I'll certainly do that, but I can't
20 guarantee anything.  And so he would just check in
21 from time to time.

22     Q    Did Mr. Waldrop tell you about the
23 circumstances under which his employment at Community
24 Health ended?

25     A    All that I could gather from Mark was that

1    he didn't -- he didn't really know at the time.  You

2    know, he didn't know what had happened, just like I

3    didn't know what had happened.

4            You know, I was concerned because I

5    couldn't -- I knew I couldn't even file for

6    unemployment without a separation notice.  They didn't

7    give me anything the day that they came up.  And so I

8    had absolutely nothing to go by.  And so I didn't know

9    until much later, I think after he had gotten a

10   letter, what he had even been let go for, but

11   certainly not at the onset.  I had no idea.

12       Q    How did you learn about the letter?

13       A    He called to tell me about the letter.

14       Q    What did he say?

15       A    I can't say word for word.  I can't recall.

16   I was just -- to be completely honest from you -- with

17   you, from June the 28th until I was able to secure

18   employment, my life was turned upside down.  So I was

19   all over the place with emotion and really just not --

20   didn't have my head in the game to be completely

21   honest with you, which I know is understandable.

22           But just he had outlined several things and

23   I can't even recall what they all were.  But there

24   were just several things that -- reasons that they had

25   stated for letting him go.  But I can't even recall

94

1   all of them.  I can't remember how many there were.  I

2   know that there were several, but I can't remember how

3   many.

4        Q    Did you have any discussions with him about

5   the handling of expense reimbursements?

6        A    As far as -- you mean after we were let go?

7        Q    That's right.

8        A    What do you mean exactly?

9        Q    Well, did he mention that as one of the

10  reasons that he was let go?

11       A    Yes.  That was one of the reasons, yes.

12       Q    And what did he say about that?

13       A    What did he say about it?  I don't really

14  remember him saying a whole lot about it other than

15  just kind of outlining the bullets or the -- you know,

16  the reasons.  And I think he was just a little bit

17  shocked that that was it.

18            Because it had been -- we had just -- it had

19  just been business as usual I guess.  For as long as I

20  had been there, it had always been done the same way

21  and we had never been told to do it any different.

22  And so I think he was just a little bit shocked by it.

23            And I was too, really, because I knew, you

24  know -- and anytime we did anything out of the

25  ordinary, like with the flood, I would always call the

1    finance department and find out how we needed to
2    handle it.
3            Or, like -- and I know this is a terrible
4    example, but working under him, I never wanted people
5    to just be like, oh, just let it go because she works
6    for Mark.  If I didn't do something right or if there
7    was a better way to do it, I wanted them to show me a
8    better way to do it or how it would be better to do it
9    because I wanted it to be in line because that is a
10   reflection on him and me as his assistant.  I wanted
11   to do the job right.
12           But there were several time when the girls
13   would say -- the girls, Maricella Espinoza and Teresa
14   Moody -- no, you give us too much detail; you don't
15   have to break it out; you know, we don't worry about
16   you; you know, you always -- but I wanted it to be
17   that way.
18           And so when he told me that was one of the
19   things, I was shocked.  Because I knew of the many
20   times that I had said -- I mean, in 15 years, you
21   know, working for a company, you know, you get to know
22   them pretty good.  And I was like, girls, if there's
23   ever anything I'm not doing right, just tell me.  If I
24   need to code it different --
25           The same way with those invoices.  I mean, I

96

1   had no idea how we needed to handle some of that.  So,

2   of course, I had to get guidance from them because I

3   wouldn't know where to code it, you know, who to send

4   it through, that sort of thing.

5          So I think he was just surprised and I was

6   surprised.  And so there wasn't a whole lot said

7   because we didn't know we had done anything wrong I

8   guess.

9      Q    What was Teresa Moody's job at Community

10  Health?

11     A    Honestly, I don't know what her title is.

12  She -- she was just always my go-to girl.  I don't

13  know if she was maybe over the finance and then

14  Lorraine was her direct report.  Because roles did

15  change many times during my tenure with CHS.

16         And so I can't -- I don't know exactly what

17  she did.  I know that she, you know, was maybe like a

18  secretary or something when boards -- when the board

19  would meet.  I don't even really know.  But I know

20  that she was one of the key players in the finance

21  department and she would be my go-to person if I had a

22  question.

23     Q    Was Mr. Waldrop ever critical of Lorraine

24  Taylor?

25     A    Yes and no.  Mark and Lorraine had always

1    had a wonderful relationship.  They had always worked
2    very, very well together, always on the same page.
3    And -- and I won't even say critical.  I think he was
4    concerned.
5              Because Lorraine kind of started to change a
6    little bit.  And I would say probably within the last
7    two, two and a half years, three years maybe, just a
8    significant change.
9              Lorraine had always been one that was, you
10   know, a real team player, would vet things out.  Let's
11   talk about it; you know, let's get on the same page.
12   And there had just been, I guess, a lot of discord,
13   kind of unsettling.
14             She -- there was a lady -- and I don't know
15   when they brought her on board -- but Angela Hammack
16   was hired and she and Lorraine worked very, very
17   closely together.  And Angela -- almost every member
18   on leadership council started having issues with
19   Angela.  And it -- it would be nitpicky things to
20   things that, you know, you wouldn't even really think
21   about.
22             And so it got to be a huge problem.  Because
23   one day it would be HR that she was into it with.  One
24   day it was information services.  You know, it was --
25   it was just not a good situation.  And so on several

1    occasions, you know, Mark would, you know, call

2    Lorraine and be like, okay, Lorraine, this is what's

3    happening; this is what I'm hearing from my people;

4    you know, what's going on.  You know, just try to work

5    through things.

6          And I think it really got to a point where

7    Lorraine was defensive of that.  Like, why are you

8    picking on my person.  You know, it's almost like she

9    couldn't see what everybody else could see.

10         And I don't know what their relationship is.

11   I don't know, you know, how her and Angela work

12   together.  I don't know anything like that.  They may

13   hate each other.  I don't know.  But I know that

14   that's kind of where the discord started.  And from

15   then on, it just kind of compounded.

16         Lorraine was always one that you could call,

17   you could confide in.  As far as, you know, if you had

18   a question, if you had a problem, she would work you

19   through -- walk you threw it.  She'd get on board,

20   kind of give you a different way to look at things.

21         But she was just -- she got to where she was

22   very much almost standoffish.  She wouldn't come to

23   meetings.  You know, she would be coming and then bow

24   out last minute or, you know, Mark could call with an

25   issue that, hey, this is what's going on, but it would

99

1    be like, no, that's not what's going on at all.

2              I think it was just -- I think that

3    relationship drove a huge wedge between not only

4    Lorraine and Mark but Lorraine and several members of

5    the presidential council, the leadership team.  They

6    just really lost a lot of respect because she couldn't

7    be a team player.

8              And it was almost like that behavior kind of

9    carried over into -- you know, the behavior that

10   Angela had displayed was kind of carrying over into

11   our group and we had always had a really good group.

12   I mean, we were results driven.  We -- you know, we

13   talked things out before we did it and it was just --

14   it was just not a good situation.

15       Q    What was the timeframe that this occurred?

16       A    I would say probably within the last two and

17   a half to three years.  In fact, I had even, you know,

18   thought, you know, could she have something medically

19   going on because it was so out of character for

20   Lorraine.  It was a stark contrast to the Lorraine

21   that I had always known for so many years.

22       Q    Were you involved in a consideration of --

23   of a new Workday software?  It's a time-and-attendance

24   project.

25       A    Yes, sir.  I was.  Uh-huh.

1     Q     Okay.  Tell me about the time-and-attendance
2  project.
3     A     Okay.  So we had a meeting down in Acworth I
4  believe at ElderCare Pharmacy where we had the
5  different vendors come in, Workday, Stromberg I think,
6  and there might have been one more.  I can't recall
7  exactly.  But we had -- because they liked to have the
8  three bids or whatever and then they'll kind of narrow
9  it down and then they'll do their presentations.
10           And we had most of the group -- I would say
11  most everybody on the group wanted to go one way, but
12  Lorraine and -- Lorraine was giving major pushback,
13  major, major pushback and we had never seen this
14  before.  Because always, you know, even if something
15  did come up -- we're not always going to agree.  And
16  that's fine.  Because sometimes you figure out, okay,
17  well, that is not the best way to do it.
18           But there was no compromise on this
19  situation.  And Mark was so concerned about it that we
20  had a dinner one evening with not all of leadership
21  council but some of the key players in leadership
22  council just to -- just to discuss it.
23           Because you could tell he was -- it's almost
24  like he took it personal because Lorraine was a
25  friend.  And for there to be such -- I mean, it was a

1    lot of drama.  And for everybody to not be on the same

2    page, I think, you know, Mark hated that, but he was

3    concerned for her as a person.  And the pushback that

4    he was getting from some of the others, he didn't want

5    that relationship not to be salvaged.

6            And so I think, you know, in talking with

7    the team, you know, pretty much the bottom line was,

8    you know, yes, we all feel very passionate about this,

9    but, you know, is this a battle that we want to -- do

10   we want to pick this battle or are we just going to go

11   with it.  You know, if this is what they want to do,

12   then we need to get on board and we need to support

13   them.  Because we don't need to draw a line in the

14   sand.  That's the worst thing we can do.  We need to

15   come together as a team.

16           And so then I think maybe a few days after

17   that, Mark had talked with Lorraine and she was still

18   not happy at all with that situation.  Because Mark

19   had said, you know, hey, I've talked to the team and

20   we're in favor of -- you know, we'll go ahead and do

21   what you want to do, you know.  And she was not happy

22   about that either.

23           And so it was just decided to table it

24   because it was such a huge expense.  Let's just don't

25   do anything right now.  And the last account that I

1    had, that's where it was.

2       Q    Did you ever have any conversation yourself

3    with any of the other direct reports to Mark Waldrop

4    about this changed relationship or attitude of

5    Lorraine?

6       A    No.  Really, I think everybody -- because we

7    are such a close group, it was almost like they hated

8    it.  Like, I cannot believe this is happening.  So --

9    so they didn't really say a whole lot about it.  It

10   was just one of those things where, you know, at the

11   meeting you're just looking at each other like, oh,

12   man, it makes me sick that we're even here.

13          So, I mean, it's like -- she's still a part

14   of our team, so we didn't want to run her down and

15   badmouth her.  But it was like, you know, we got to

16   the point where is it us; you know, are we the

17   problem; you know, what could we do different maybe

18   that's causing this or, you know -- but then, you

19   know, everybody kind of felt the same, that, you know,

20   we try to be as accommodating as we can.

21          And that's one thing that I can say about

22   Mark.  He is not a -- he does not like confrontation.

23   And so he was always one that, yes, if it's worth

24   fighting for, let's absolutely fight for it.  But if

25   it's not something to get in the weeds over, let's

1    don't.  I mean, if we can get to where we need to go

2    and do it some way that's going to please them but

3    still get the same results, let's do it.  Let's don't

4    fuss about it.

5            And so I think collectively as a group it

6    was a problem because it was causing other problems.

7    It was causing some friction, you know, within the

8    different teams and Mark would have to try to fix the

9    problem.  But, I mean, he also didn't want to get in

10   Lorraine's business either and try to make it look

11   like, you know, he's stirring the pot or anything like

12   that.  So he would tell his people, you know, just do

13   what needs to be done, you know, just let them --

14       Q    Who are other people on the team who had

15   these concerns?

16       A    Diana Wilks, Michelle Moore-Andrews, Blair

17   Lake, Chris Johnson.  I don't know if Lynne King

18   really had any run-ins.  But, really, it was just

19   those key -- those key leaders.  Robin Leake --

20       Q    Did they express their concerns to you or in

21   your presence?

22       A    Yeah.  I mean, like that meeting, you know,

23   there that night, it was -- it was almost like as a

24   group let's talk about it.  You know, not -- not

25   talking about her, but it was almost like, okay, how

1  can we fix this; you know, how can we salvage this

2  relationship.

3          But it wasn't like, you know, go to a

4  meeting and then Mark called me or Michelle called me

5  or Blair called me and be like what is up with

6  Lorraine.  You know, it was nothing like that.  None

7  of the -- none of the backbiting stuff.

8          (Defendant's Exhibit 4 was marked for

9      identification.)

10 BY MR. DANIEL:

11     Q    I'm going to show you a document that's been

12 marked as exhibit four to your deposition.  Tell me if

13 you know what this is.

14     A    This may have been when we had dinner that

15 night to talk about time and attendance and the

16 situation with Lorraine, but I could be wrong.  If

17 it's not that, I don't remember what we would have

18 done this for.

19          MR. DANIEL:  Mr. Henry, I'm not sure why

20      this doesn't have a Bates number.  Do you know?

21          MS. BRISBANE:  I don't think it was --

22          MR. HENRY:  That's what I was wondering

23      myself.  But it's --

24          THE WITNESS:  Why it doesn't what?

25          MR. HENRY:  Did we produce this?

1           MS. BRISBANE:  No, I don't think it was

2       produced.  I think it came to us after we did our

3       last production.  But we'll get a Bates number.

4           MR. DANIEL:  We'll attend to that.  I don't

5       mean to pull a surprise out of the hat.

6           MR. HENRY:  No, no, no.  That's -- that's

7       fine.  I haven't had a chance to go through the

8       20,000 pages or whatever it is you had anyway,

9       so --

10  BY MR. DANIEL:

11      Q    Ms. Dotson, looking at exhibit four, do

12  you -- does this refresh your memory as to anything or

13  do you think you can tell me whether or not you

14  prepared it or someone else prepared it?

15      A    I can't say for sure, but the way that this

16  looks, this doesn't -- I'm not going to say that I

17  didn't do it.  But, like, the last -- the fact --

18  fact:  The culture between Angela and Renee is bad and

19  it is affecting the whole organization -- I don't see

20  me writing it like that.

21          I'm not going to say that I didn't, but if I

22  did -- you know, and, there again, I know it probably

23  doesn't seem possible for our office to be as busy as

24  I tell you it was, but it was extremely busy.  And if

25  I didn't make notes on things, it was like I couldn't

1   retain it all.  It would happen so fast.

2           And so to swear to you that I didn't do

3   this, I can't say that I swear to you that I didn't do

4   it, but I can't swear to you that I did either.  But

5   if I did do this, then it had to be for that dinner

6   meeting.

7       Q    Did Mr. Waldrop ever express the thought or

8   recommendation that Angela Hammack should be fired?

9       A    Yes.

10      Q    And to whom did he say that?

11      A    He had a very tough situation -- or, very

12  tough conversation with Lorraine one day.  And I want

13  to think maybe this is -- if this did come from

14  anywhere, maybe that's where it was from or it was

15  time and attendance.

16          But I know that Mark had a very tough

17  conversation with Lorraine.  He would always try to --

18  I won't even say hint around that, you know, Angela's

19  causing major problems, because he didn't hint around

20  to her.  But he would say it in a way that -- he would

21  say it in a way that wasn't accusing her but a way

22  that, hey, you just need to look into this; you know,

23  it may not be happening exactly like you're being told

24  that things are happening; because when they're

25  getting out there and they're meeting with some of

1    these people, it's going a different way.

2              And so, finally, one day Mark and Lorraine

3    were having a conversation.  And I can't remember if

4    Lorraine called Mark or they were on another call and

5    she was like, hey, I need to talk to you about

6    something and it was very heated, you know, and it was

7    almost like what's your problem with Angela; you know,

8    what is -- why do you have it out for her.

9              And Mark's defense was, you know, I don't,

10   Lorraine, but just do you see what's happening; this

11   team that we've worked so hard to pull together is

12   falling apart and she's the common denominator.

13             And, you know, I don't think he ever came

14   right out and said she will do this to you too, but

15   what -- you know, what would keep her from doing this

16   to you too.  But pretty much that was, you know --

17             And I think maybe then she had used the --

18   you know, she was very upset.  And it was almost like,

19   well, then I'll just fire her then; you know, if

20   that's what you want me to do, that's what I'll --

21   then I'll fire her.  I'll do this or, you know,

22   whatever.

23             It was very heated and Mark had never had

24   that kind of conversation with her before.  But she --

25   it was a situation where Mark either needed to say

1   something or he needed to shut up about it.  I mean,
2   it had gotten to that point.  Either back it up or
3   don't bring it up again.  And so he had to back it up.
4   And he did.
5           And, you know, the relationship -- and even,
6   you know, after the conversation, I can remember, you
7   know, Mark, you know, really trying to stay in touch
8   with Lorraine.  He didn't want her to feel like she
9   was on this island.  You know, she was not -- didn't
10  need to put herself on an island.  She's still a part
11  of the team.  You know, you asked me for feedback.  I
12  gave it to you.  You know, but Mark was saying I'm not
13  telling you to fire her; I'm just saying this is a
14  problem.
15      Q    In exhibit four, around the middle of the
16  first page, there's a -- a bullet point that says LT,
17  quote, I'll fire her, but then I'm going to start
18  calling things like I see them, closed quote.  Do you
19  see that?
20      A    Yes, sir.
21      Q    I mean, I don't know if LT represents
22  Lorraine Taylor --
23      A    Lorraine Taylor.
24      Q    -- or not, but it might.
25      A    Yeah.  I would think so.  Uh-huh.

1    Q    You think that's similar to what she said in

2  that conversation?

3    A    Yes, I do.

4    Q    Do you recall sometime in the spring of 2016

5  that there was a break-in at the Dalton office?

6    A    Yes, sir.

7    Q    Tell me about that.

8    A    Do you just want to know about the break-in

9  or do you want to know about leading up to the

10  break-in.

11    Q    I want to know everything.  Give me the

12  leading-up part first.

13    A    Okay.

14    Q    Then we'll take a short break in a minute

15  and order for lunch.

16         MR. HENRY:  Sure.

17  BY MR. DANIEL:

18    Q    Tell me everything about the break-in.

19    A    On that Friday -- and I apologize.  I don't

20  know the exact date, but I want to think around maybe

21  the 31st of March.  And the only reason I remember is

22  because my daughter had a carnival at her school that

23  evening that I was going to attend.

24         And that morning Mark had came in and he was

25  just -- I could tell something was wrong.  And, you

1   know, just trying to make a little bit of small talk.

2   Fridays are usually busy, but just trying to make a

3   little bit of small talk.

4          Mark was ready to go to the board about --

5   now, the best that I can recall, Mark was to the point

6   where he was going to have to get some relief.  He was

7   worrying himself about this and, you know, the stress

8   was getting more than he could handle.

9          I mean, like, I could tell physically he was

10  just different.  Like, it was weighing on him.  And so

11  he had made up his mind that he was going to go to --

12  if I'm remembering correctly, that he was going to

13  drive down and talk to Mr. Wall.

14         Well, before he had an opportunity to do

15  that, he had a conversation with Blair Lake in human

16  resources.  And there was some confusion as to who was

17  supposed to lead a meeting.

18         Ronnie had started sitting in on a few

19  meetings and had started calling a few meetings and

20  was just kind of orchestrating how they were to play

21  out, who was supposed to do what and that sort of

22  thing.

23         Well, there was a little bit of confusion

24  and Blair had called about it.  And if I remember

25  right, either Ronnie had called or Ronnie had sent an

1   e-mail.  I think maybe he sent an e-mail and said that

2   he wanted to have a conference call first thing with

3   Mark and Ronnie -- I mean Mark and Blair.  I'm sorry.

4           And so Mark said I'm going to go in here and

5   I'm going to take this call and if you don't care,

6   just sit in on it with me.  And I believe it's one

7   that he recorded.  And so I did.

8           And in talking -- in hearing the

9   conversation, Blair was very confused.  Mark was very

10  confused.  Ronnie was not confused.  And so he was

11  walking them through what he said -- or, how he said

12  he wanted it to be.

13          And I'm sorry, but to back up, I'm

14  remembering now.  One of the ladies that he had asked

15  to hold the meeting was kind of not even -- she didn't

16  really even have anything to do with it.  So I think

17  that's what caused a little bit of, you know, them to

18  scratch their head a little bit.  Like, this is

19  totally different.

20      Q    Who was that?

21      A    Tracie Clark.  And, in fact, the last

22  meeting that they were at had gotten so intense that

23  one of the girls had gotten physically sick in the

24  bathroom.  Like, it was just really a heated

25  conversation/meeting, you know.

1          And so then she had asked -- he had asked

2     this lady -- it was their understanding that he had

3     asked her to lead this meeting and she was a nervous

4     wreck.  She was scared, didn't understand.  You know,

5     so I think she was kind of talking to Blair about it.

6     Blair went to Mark and so they had this conversation

7     with Ronnie.

8          And it was not -- it was not a pleasant

9     conversation.  And in the conversation, Mark [sic]

10    proceeded to tell Mark that it was his job -- just

11    paraphrasing -- that it was his job, that if he had

12    questions, that he needed to call and ask him about it

13    to clarify; don't assume anything.

14         Q    Who said this?

15         A    Ronnie said this.

16         Q    Ronnie said this to Mark?

17         A    Yes.  He said don't assume anything; you

18    call me and you ask me; it's your job.  And so Mark

19    said okay.

20         Well, the conversation was over.  And in

21    talking with Mark, I said don't go to Mr. Wall.  This

22    is your opportunity.  Call Ronnie and express your

23    concerns to him.  This is your -- this is your time.

24    Almost kind of like with the situation with Lorraine.

25    Either say something now or don't bring it up again.

1   I mean, it was that serious.  Because it was the

2   perfect time.  Ronnie had said, if you have questions,

3   call me.  And so Mark did that.

4           So he picked up the phone and he called

5   Ronnie.  And I don't remember how long they talked,

6   but Mark had never had a conversation like this with

7   Ronnie before ever.  Even when it had been heated, it

8   had never been like this, I mean, to the point where

9   Mr. Rollins got up -- told Mark to hang on, that he

10  got up and he closed his door.  I mean, it was not a

11  good situation.

12          And they had a very, very, very heated

13  conversation.  And I think Mark pretty much got

14  everything off of his chest.  Ronnie I think felt like

15  he had a good conversation with Mark about it.

16          But before that conversation, there had

17  been -- there had been an e-mail back and forth where

18  Ronnie had -- and I can't remember exactly what it was

19  about, but Ronnie had pretty much circled back around

20  to Mark and was summing up, okay, so on this, this,

21  this, this and this, this is where the project stands.

22  And some of it made Mark look like he didn't know what

23  was going on.  And that was not -- that was not the

24  situation.

25          And so Ronnie -- Mark responded back to

1    Ronnie.  And that's what caused this whole

2    conversation, needing the clarification and that sort

3    of thing.  And I should have mentioned that first,

4    but, again, I'm just now remembering it.

5            It was a very heavy, heavy e-mail between

6    Mark and Ronnie.  And, you know, Mark had a deadline

7    on when he was supposed to get his responses back to

8    Ronnie.  But he wanted to go ahead and have this

9    conversation with him because Ronnie had said, now,

10   you know, if you've got concerns, tell me now -- or,

11   call me anytime.  So Mark did that.

12           Well, after the conversation, you know, it

13   was very heavy.  Mark spent a lot of time, you know,

14   going back over, you know, things that he had written

15   down and that sort of thing.  I think he may have even

16   played the conversation back.  I can't remember for

17   sure.  But Mark worked the rest of the day.

18           And I had actually -- he left just a few

19   minutes before I did.  I changed clothes to go to the

20   carnival.  And then early that next morning, we got a

21   phone -- I got a phone call.  And I can't remember --

22   I would say around the 4:00 o'clock hour timeframe.

23           I got a phone call that the alarm at the

24   office had gone off.  Well, it was nothing -- I mean,

25   it's happened several times before.  I'd go over.

1    There would be nothing.

2            This particular -- and I would always call

3    Bernice Cash who was next door at Integra because she

4    was kind of over that office.  And I'd be like, okay,

5    it's one of us, so I just want to give you the heads

6    up; this is what's happening.  And a lot of times she

7    would meet me there or if it was, like, early in the

8    morning, one of her girls may already be there, one of

9    the ladies in the office.  That happened a couple of

10   times.

11           This particular time, I was really kind of

12   nonchalant about it really because it had been -- you

13   know, it had happened a couple of times.  And so I

14   asked the lady.  I said, well, I tell you what; can

15   you send the officer out like I know you always do and

16   just call me back and tell me if it's anything.

17   Because I had this small child; my husband -- you

18   know, he had worked late or something the night before

19   and I hated to have to get her up.  Well -- which I

20   ended up working that out.

21           But they called back to say, yes, there's

22   been a break-in.  So when I get there, I notice that

23   if you're standing in front of our office, the right

24   glass door was busted out and it was just kind of

25   laying in pieces on the floor -- the mat.  And there

116

1    was a footprint on it.

2           And I -- I mean, my first reaction was

3    shock.  I mean, I just did not expect it to really be

4    something this time.  But long story short, you know,

5    the officer was kind of going over, you know, I was

6    over here in Rocky Face when I got the call.  I got

7    here in so many minutes.  You know, I looked to see if

8    I could see anybody.

9           But the crazy thing is, the side door that's

10   actually the back little panel of our office that we

11   gave to Integra to provide outpatient rehab, it has

12   that entrance -- the patient entrance door, it was

13   unlocked.

14          So the police officer said, well, apparently

15   they didn't check to see if there were any unlocked

16   doors.  They just knew what they were looking for.

17   And this is coming from the police officer.  And he

18   said can you maybe just walk in, see if you see

19   anything out of place, you know, anything like that.

20   And I said sure.

21          And so I walked in and nothing looked

22   disturbed.  I mean, it was the craziest thing.

23   Everything looked like it was in order.  We had

24   computers.  We had a TV.  We had a high-dollar

25   conference -- video conference system.  We had what

1    they call a rack in the little copy area that had all

2    the equipment.  But nothing was touched.  They didn't

3    take anything.

4              And so, of course, that time of night, I

5    couldn't get in touch with anybody to come and secure

6    the door.  So I called my husband and he had some

7    scrap wood at home that he was able to bring in and

8    he -- he boarded up the door until the next day till

9    we could get -- or, it might have been Monday; I think

10   it was Monday -- till we could get somebody out to

11   replace the glass.

12        Q    Did Mr. Waldrop report the break-in to

13   Ronnie Rollins?

14        A    Yes, he did.

15        Q    Was this a telephone conversation which you

16   overheard?

17        A    No, it was not.

18        Q    Was anyone ever arrested or held accountable

19   for the break-in?

20        A    No, sir.

21        Q    Did Mr. Waldrop ever express any suspicion

22   about who had caused the break-in?

23        A    He said he could not see who did it.

24   Huh-uh.

25        Q    Did Mr. Waldrop ever accuse Ronnie Rollins

1 of making the break-in?

2　　　A　　He never said that Ronnie did it, no.  But,

3 you know, he just said that I hate that the

4 conversation went like it did on Friday and then this

5 has happened.  It's never -- he's never had a

6 conversation like that and then that happened.  But he

7 never said I think Ronnie did this; I -- you know, I

8 suspect he did this; I wonder if he had a hand in

9 this.  He never said that to me.

10　　　Q　　The break-in had occurred earlier on

11 Saturday morning?

12　　　A　　Uh-huh.

13　　　Q　　Is that right?

14　　　A　　Yes, sir.

15　　　Q　　And this is after that conversation on

16 Friday?

17　　　A　　Yes.

18　　　Q　　Okay.

19　　　A　　Yeah, that was like a Friday mid-morning

20 conversation and then it would have been less than 24

21 hours later that it happened.

22　　　Q　　Do you associate the two in any way, the

23 very difficult telephone conversation with the

24 break-in?

25　　　A　　I -- I think it is odd that it happened.  I

1    mean, it's a crazy coincidence.  I just don't -- I

2    guess, I'm not saying that he did it or he had

3    anything -- I have no idea if he did or if he didn't.

4    But our office is kind of see-through.  And in my

5    mind, I'm thinking, okay, they've passed a doctor's

6    office on the corner where there are known drugs.

7            You know, if this is somebody thinking let

8    me get in here and get some pills or something like

9    that, you know, they took a gamble to come to our

10   office that's right on the road visible for everybody

11   to see, bust in a front door, when there was one on

12   the side -- because that's the only entrance to our

13   office.  You know, why didn't somebody bust a window

14   or check the perimeter and get the door on the side?

15   I mean, it was just odd to me.  I don't know who did

16   it, but it's very -- it's crazy to me.  It's weird.

17       Q    Did Mr. Waldrop ever express a concern that

18   someone had bugged the Dalton office?

19       A    He never expressed a concern that somebody

20   bugged it, but he wanted to be sure that it had not

21   been bugged.  And he said the reason for that is

22   because nobody took anything, nothing seemed to be out

23   of place from what we could tell.

24            Of course, you know, in our office, there's

25   a bunch of paperwork.  I mean, that would be easy to

1   kind of go through and just put back.  But there were

2   no visible signs that, you know, they had -- nothing

3   was turned over.  Cabinets weren't dumped out.  I

4   mean, it didn't look -- you would not think that there

5   had been a robbery.

6           In fact, I got on the phone with the alarm

7   company and said, you know, how -- you know, number

8   one -- which it was a good thing that I did because we

9   found out that the glass-break sensor that we had on

10  the front door didn't actually pick up the break, that

11  it was the sensor in -- either at the end of the hall

12  or in Mark's office that had picked it up.

13          But they could tell someone went in the

14  conference room, came out, in Mark's office, which

15  joins the conference room by French doors, went back

16  in the conference room.  You know, they could tell how

17  long they were there.  And they weren't in there for a

18  long period of time.  And so he just wanted to be sure

19  that nothing had been done like that.

20      Q   Was the alarm -- did it have a loud sound or

21  was it --

22      A   You know, it -- surprisingly, it was not as

23  loud as I thought it was going to be.  And it was kind

24  of -- I had the guy come out and show me.  It's almost

25  like it was kind of hidden in like the side of the

1  building and so there was a little bit of a buffer and

2  so it kind of muffled it a little bit.

3      Q    Did you have anyone come out and what's call

4  sweep the office to make sure it's not bugged?

5      A    Yes.  Mark did.

6      Q    Okay.  And when did that occur?

7      A    That happened probably within -- oh, I don't

8  know for sure -- maybe two weeks of the office

9  being -- I mean, it wasn't like the next day or

10  anything like that.

11      Q    And what was the result of that exercise?

12      A    They -- there were a couple of what he

13  called a hot spot or a fuzzy spot, but he couldn't --

14  the gentleman couldn't say for sure.  But he said that

15  he felt like, you know, it should be fine.

16      Q    And that meant that it was not bugged?

17      A    Right.  Uh-huh.

18          MR. DANIEL:  So let's take a short break for

19      lunch --

20          MR. HENRY:  Okay.

21          MR. DANIEL:  -- or at least to order lunch.

22          MR. HENRY:  Yeah.

23          VIDEOGRAPHER:  Going off video, 12:34 p.m.

24      Off video record.

25              (Whereupon, a recess was taken from 12:34

1      p.m. until 12:47 p.m.)

2           VIDEOGRAPHER:  Tape three, 12:47 p.m.  Back

3      on video record.

4  BY MR. DANIEL:

5      Q    You mentioned that at some point in 2016,

6  Mr. Waldrop had told you that he was thinking about

7  going to speak to Joe Wall, the chairman of the board.

8      A    Uh-huh.  Yes, sir.

9      Q    When was that when he first mentioned it?

10     A    It would have been sometime -- I want to say

11 sometime in March, the same day as the conversation he

12 had with Mr. Rollins.

13     Q    And you discouraged him from doing that as I

14 recall.

15     A    Yes.

16     Q    At some point later in time, did you learn

17 that he had, in fact, gone to see Mr. Wall?

18     A    Yes.  Uh-huh.

19     Q    And how did you learn that?

20     A    He told me.

21     Q    What did he say?

22     A    He actually came by the office and told me

23 that he was going to meet with Mr. Wall.

24     Q    When was that?

25     A    I can't recall exactly when, what that date

1   was.  I'm sorry.

2          Q      Sometime after March of 2016?

3          A      Yes, sir.

4          Q      What did he say he was going to tell

5   Mr. Wall?

6          A      He -- he didn't really go into a whole lot

7   of detail with me.  He just said that he felt like it

8   was time that he went down and talked with Mr. Wall

9   about some of his concerns and to see if there would

10  be any way that we -- that he could help remedy the

11  situation and kind of help salvage the relationship.

12         Q      Did he discuss with you the possibility that

13  he might resign from employment at Community Health?

14         A      When he went to talk with Mr. Wall?

15         Q      That's right.

16         A      No.

17         Q      Did he ever discuss the possibility of

18  resigning?

19         A      No.  He -- he said, you know, a time or two

20  that he didn't know if, you know, Ronnie was wanting

21  to fire him, if he wanted him to resign.  You know, he

22  didn't know, you know, really what Ronnie was hoping

23  that he would do I guess.  But he never said that he

24  was going to resign that I remember.

25         Q      Did Mr. Waldrop later give you a report on

124

1  his conversation with Mr. Wall?

2       A    He did.  He -- and I'll be completely honest

3  with you.  My memory is just not what it should be.

4  Over the years, it has been so fast paced that I'm

5  telling you I feel like I can't keep it all in, which

6  is why I was the queen of sticky notes.

7            But I had a total hysterectomy back in

8  December unexpectedly and I'm still just a little bit

9  foggy.  I'm not trying to place blame at all, but I'm

10  terrible with dates and getting into the weeds on some

11  of these details and I do apologize.

12            But he did tell me that he met with

13  Mr. Wall, that Mr. Wall was very glad that he came

14  down and met with him and that he shared his concerns

15  with him and that he did very much feel like it was a

16  situation that could be remedied.

17            He said that he felt like he had great

18  value, brought a lot to the organization, was key in

19  making it what it had been.  Again, just kind of

20  putting together my -- this is what I took from the

21  conversation.  He didn't give those words exactly,

22  but --

23       Q    Was he -- was he telling you what Mr. Wall

24  said?

25       A    Yes.  Yes, sir.

1      Q    Did he tell you what he said to Mr. Wall?

2      A    No, not really in -- in great detail.  It

3   was something that, you know, after he would have the

4   conversations with Ronnie and, you know, he would ask

5   me, you know, kind of self-check, am I reading into

6   this; you know, is it me; did he -- am I thinking too

7   much into this; you know, be honest with me if I am;

8   this is serious here.

9           You know, and so he would kind of talk with

10  me along those lines.  But he didn't -- you know, he

11  didn't have like a list of things that he went over

12  that he was going to talk to Mr. Wall about.  He was

13  just -- I think -- I think the purpose was to go to

14  him man to man to see what they could do to fix it.

15     Q    Did he ever say anything else about his

16  conversation with Mr. Wall after that or any other

17  conversation with Mr. Wall?

18     A    I mean, we -- you know, we would talk about

19  it, you know, every now and then, you know, and he'd,

20  you know, talk back to -- I mean, but it's not like,

21  you know, he would come in and give me a rundown

22  report or anything like that.  It was just, you

23  know -- just very -- I don't know.

24          I think Mark was very nervous about going to

25  meet with him.  I think he hated the thoughts of

126

1    having to do it.  He had never done anything like that

2    before.  So he was scared to death to do it.  But I

3    think he felt better after he talked with him because

4    he had just kind of reassured him that, you know,

5    thank you for coming.

6         Mark's always had the kind of a saying that

7    a customer who brings a concern to your attention is

8    the best kind of customer because they're the one that

9    cares enough for you to fix it.

10        And so I think in his mind, you know, him

11   going to Mr. Wall -- I don't think he meant it as like

12   a slap on Ronnie's hand or anything like that.  I

13   think he just felt like maybe this was like a

14   last-ditch effort.  Like, he didn't want to have to do

15   it, but he felt like it was either do it or I'm going

16   to break.  It was just so much.  And so he -- you

17   know, he did feel better after he talked with

18   Mr. Wall.

19        Q    Did Mr. Waldrop ever tell you anything about

20   another conversation he had with Joe Wall on

21   June 28th, 2016?

22        A    I can't say.  Oh, that he had -- that was

23   his first day back to work after he had been on

24   vacation for his daughter's wedding I believe.  And

25   he -- he may have called me that morning to let me

1    know.

2           I'm pretty sure he called me that morning to

3    let me know that Mr. Wall had called and asked him to

4    come meet with him at Mark Lange's office maybe in

5    Atlanta and that he would be there that day.  Because

6    I was the keeper of his schedule and he would always

7    let me know if he wasn't going to be in the office.

8           Q    Did he tell you about that conversation?

9           A    Huh-uh.  No.  No, other than when -- you

10   know, several days after all that had happened, you

11   know, and they said that the office was closed, just

12   reaching out to check on him; you know, how are you

13   doing; how's the family.

14          Because, again, when you work with somebody

15   for this many years, you're invested in their -- you

16   know, their well-being as a person, you know.  So I

17   was just reaching out to him and I was like are you

18   okay.  And he was pretty much like I -- you know, it's

19   been good to work with you, but, you know, I can't

20   really share any details with you, which was kind of

21   shocking to me.  But, you know, now I understand why

22   he had to be the way that he had to be.  But it was

23   just very kind of cut and dry.

24          Q    And what do you understand now?

25          A    Well, I mean, I guess, I understand now that

128

1     he knew that it could maybe come to this and so he

2     didn't want to say anything maybe that he shouldn't

3     say, you know, until he could -- I don't know.  I

4     guess -- I guess he just didn't want to say something

5     he shouldn't say and so he didn't.  He was very --

6     very matter of fact and cut and dry.

7                (Defendant's Exhibit 5 was marked for

8          identification.)

9     BY MR. DANIEL:

10        Q    I want to show you a document that's marked

11    as exhibit five to your deposition.  I'd ask you to

12    look at this and tell me if you know what it is.

13        A    Okay.  Let me see here.  Yes.  So

14    Ms. Brienza is someone who is a colleague or an

15    acquaintance of Mark's brother, Dwayne.

16                And in -- and I can't remember exactly how

17    it came about, but somehow they got hooked up.  Maybe

18    Mark gave him -- or, maybe Dwayne gave Mark her number

19    or vice versa.  I can't remember.  But Mark had been

20    wanting to update his bio and resume and all that.

21                Southern Adventist University asks for that

22    from time to time, where he is the -- like an adjunct

23    professor for the summer and fall classes.  And he

24    had -- he had actually had, back probably maybe even a

25    couple of years ago, had Lynne King -- or maybe longer

1    than that -- work on it also for him, but it just

2    wasn't really, I guess, up-to-date.  He just never

3    really was pleased with it.

4             And so when he -- he had been talking about

5    wanting to get this done and then he -- he had came in

6    that day or one day and had asked me just to -- to

7    reach out to her and send her what we had, you know,

8    what our most current documents were, send it to her

9    so she could just kind of revamp it, refresh it, you

10   know, that sort of thing.  And so she's the lady who I

11   worked with to get that done for Mark.

12        Q    Did Mr. Waldrop interview for any other jobs

13   to your knowledge while you were his executive

14   assistant?

15        A    No.

16        Q    Was this resume finalized, the one that's

17   attached to exhibit five?

18        A    Yes.  This looks like to my knowledge the

19   last one.

20        Q    And once the resume was prepared and

21   finalized, what did he do with it?

22        A    I don't know that -- I don't know that he

23   did anything with it.  We had it on file for in case

24   we needed to use it.  I know, if I'm not mistaken, I

25   went ahead and forwarded it to Southern Adventist

1  University for this time.

2           And I believe they also used it when Mark

3  had to do -- he was tasked with a -- an event for the

4  class where several people from our organization came

5  to kind of lend their expertise.  It was kind of like

6  an open forum panel discussion.  And I believe we used

7  it for that.  I could be wrong, though, on the dates

8  on that.  I can't remember exactly when that was.  But

9  I know that was the purpose.  That's what I was under

10  the impression we would be using this for.

11        Q    You mentioned earlier the term UPL.  What

12  does that mean?

13        A    You know, I always heard it called UPL.  I

14  don't know if it's upper payment limit/level, but it

15  has something to do -- something to do with that.  A

16  lot of this stuff I would just kind of hear over the

17  years and I may not know exactly what it means, but I

18  just kind of know the context in which it's use.

19        Q    Were any of these intense conversations

20  between Mr. Waldrop and Ronnie Rollins dealing with

21  UPL?

22        A    I can't remember if that was ever brought up

23  or not.

24        Q    Okay.  The term VEBA, V-E-B-A, tell me what

25  that is.

1       A    I have no idea what VEBA means, but I do

2    know that it has to do with, like, a self-funded

3    insurance plan, which is what we moved to.

4       Q    Was Mr. Waldrop a co-trustee of the VEBA

5    plan?

6       A    Yes.  I believe he was, yes.

7       Q    Who were the other co-trustees?

8       A    I can't say for sure.  I didn't really

9    handle all that.  I just knew if he had a VEBA meeting

10   or something like that.  I didn't handle any of the

11   detail of that.

12      Q    Were any of these intense conversations

13   between Ronnie Rollins and Mr. Waldrop about VEBA?

14      A    It seems like that was mentioned.

15      Q    And do you know the nature of those

16   conversations?

17      A    I don't.  I'm so sorry.

18      Q    What about the term CapEx?  What does that

19   mean to you?

20      A    That I'm not sure about either.

21      Q    Were any of those intense conversations

22   between Mr. Rollins and Mr. Waldrop about CapEx

23   issues?

24      A    It seems like that was brought up a couple

25   of times in the heavy conversations.  And I know Mark

1    can't tell me if I'm on the right track or not as far

2    as if that's what that is.  But if it had to do with,

3    like, spending X amount of dollars before it went for

4    approval or anything -- I'm not sure what CapEx is,

5    but I know that they did talk about that in one of the

6    really intense conversations and protocol.

7         Q    Did you ever observe Mr. Waldrop break down

8    and cry?

9         A    He did get very emotional on the day that he

10   went to see -- no.  Oh, I can't remember if it was the

11   day he went to see Mr. Wall or if it was the morning

12   that he was going to go see Mr. Wall.  He couldn't

13   decide and then Ronnie wanted to have a call.

14            But he did -- he did break down that morning

15   and just -- I don't know.  It was -- it was sad.  I

16   had never seen Mark like that before.  He was -- he

17   looked -- I don't know this to be a fact, but it

18   looked like he had not had a whole lot of sleep.  And

19   I know he had just really, really been worried.  And I

20   think he was just very emotional.

21            I mean, to get to the point where you feel

22   it necessary to take such a huge step I know is

23   emotionally draining.  And so I think it just -- it

24   just all kind of -- it was just really real to him.

25   And I think he knew in the back of his mind what the

1    impact could be, you know.  He, you know, could

2    possibly not have a job or -- and he knows that that

3    would impact me also.

4            And so I think Mark felt like that it was

5    something that he had to do in order to -- I guess,

6    for lack of a better word, just to kind of see where

7    he stood and see -- you know, to see what Mr. Rollins

8    wanted to do.

9        Q    You mentioned Southern Adventist University

10   earlier.  What -- what was your knowledge about

11   Mr. Waldrop's role at Southern Adventist University?

12       A    It was my understanding that he was just an

13   adjunct professor and he would teach a class every

14   summer for two weeks over general concepts of the

15   long-term-care facility.  They kind of divided it into

16   different sections.

17           We weren't the only company that

18   participated.  But Mark and Scott Edens, who was also

19   with the company, he participated -- well, still does

20   to my knowledge and has for several years.  And then

21   recently they had started an online course that was

22   several weeks in the fall.  And I would assist him

23   with those classes when it would come around.

24       Q    What assistance did you give Mr. Waldrop

25   with respect to those classes?

1      A      I would assist him with the -- I guess -- I

2   guess, the -- the course material.  I would type

3   things up for him.  I would make copies of the

4   syllabus, tests, quizzes, that sort of thing, articles

5   that he would have the students read.

6              There would be times when -- it seemed like

7   every time the class came around, they would have a

8   big board meeting and so Mark would ask me to go sit

9   in.  We would try to work it around, you know,

10  appointments that he knew he needed to have.

11             So he would work it to where I would be

12  there on a day when they were taking a test or, you

13  know, they needed to do some reading.  So I wasn't

14  teaching the class.  I was just kind of sitting in

15  while he could go attend to CHS work.  But, I mean,

16  basically that was -- that was what I did.  He did the

17  grading and that sort of thing.

18      Q      Did you actually go to the campus at

19  Southern Adventist University?

20      A      Yes, sir.  Uh-huh.

21      Q      How many times approximately?

22      A      I would typically go at least once -- at

23  least once a year, sometimes twice if there would be a

24  meeting that he needed to attend or, you know,

25  something like that and could not be there.

1           But for the most part, usually just the

2    board meeting when it would come around and then if

3    there was any other time, you know, that he needed me

4    to.  But for the most part, he was the one.

5           Q    And the school I think is in Collegedale,

6    Tennessee?

7           A    Yes, sir.

8           Q    How far is that from Dalton?

9           A    Oh, I don't know.  45 minutes to an hour

10   maybe.

11          Q    And when you went to the school, would you

12   stay all day?

13          A    No.  It was from 8:00 until noon.  So the

14   class was always over at noon.

15          Q    Okay.  Were you ever at Southern Adventist

16   University at the same time that Mr. Waldrop was

17   there?

18          A    Yes.  There was a couple of times I would

19   have to bring him things and so he would be there.  He

20   would just step out.  And then I can't remember if

21   there was maybe a time or two when he would have to

22   leave early to get to a meeting or something and then

23   I would just kind of sit in maybe while they took the

24   test or whatever.  He would teach and then I would

25   take over.

1      Q     When you went to Southern Adventist

2   University on those occasions, did you do this on your

3   personal time or PTO time or was it company time?

4      A     No, it was company time.

5      Q     So these were not days you reported as

6   personal leave or PTO?

7      A     No, sir.

8      Q     Did Mr. Waldrop work on any of these

9   Southern Adventist University matters in his office?

10      A     Yes, sir.

11      Q     And what did he do?

12      A     He would -- not long ago, we kind of had to

13   restructure everything.  Some things had changed in

14   the books and regulations and that sort of thing.  And

15   so, you know, we kind of had to change the class up

16   and revamp it a little bit.

17           And not only that, but they had made -- they

18   would do like a -- I can't think of the word I'm

19   looking for, but they would do like a -- like a

20   questionnaire or, you know, like things they could do

21   different or things they needed to add and things

22   internally, you know, that they wanted to change.

23           Because he was actually critiqued on the

24   class itself.  And so there were certain things that

25   the school wanted to have included in the material and

1  so, of course, we incorporated all of that and made

2  the changes.

3          And then there would be times when -- he

4  didn't usually grade at work except for the online

5  course.  All that was done online and so he, you

6  know -- sometimes we would stay late or we'd come in

7  on the weekends and we would get it done there, get

8  everything graded and uploaded.

9      Q    Was Mr. Waldrop paid for his teaching at

10  Southern Adventist University?

11     A    Yes, he was.

12     Q    Do you know how much?

13     A    I don't.  I don't know how much.

14          (Defendant's Exhibit 6 was marked for

15          identification.)

16  BY MR. DANIEL:

17     Q    I handed you a document marked exhibit six.

18  This appears to be some calendar entries from your

19  calendar.

20     A    Yes.

21     Q    Do you recognize these?

22     A    Yes, sir.

23     Q    And the first page, it references work with

24  Stephanie on SAU quiz/final/syllabus revisions, online

25  class.  What does that refer to?

138

1      A     These are just calendar entries just because
2  my memory is horrible.  If I would be out somewhere or
3  I would be at home or even if I would get up to use
4  the restroom at night, I might think about something.
5  Oh, my gosh, I forgot to do that.  And so I would
6  either e-mail myself on things that we needed to do or
7  these were actual entries in the calendar and this
8  would just prompt us -- you know, because it would be
9  so busy, we would have to carve out time for us.  This
10  would, like, have to be something on the calendar that
11  we would have to get to.  Because it would get so
12  busy, it just wouldn't get done if we didn't make time
13  for it.
14      Q     The next page says print SAU quizzes/final
15  and keys for meeting with Mark.  What does that refer
16  to?
17      A     I can't say for sure, but it looks like the
18  date -- it was probably right before the class started
19  or was getting ready to start.
20           And so what I would do is I would make a
21  packet of information for every day that had the date
22  and that sort of thing, what day it was, and it had
23  copies of quizzes or articles or the syllabus that
24  Mark needed to hand out with the class and it was just
25  easier for him to take that packet every day to class

1   with him because it had everything he needed.

2            And so we would meet about it, go over, you

3   know, last-minute things if there was anything else we

4   needed to do.

5        Q    All right.  The next page says subject,

6   Stephanie at SAU today.

7        A    Yes.

8        Q    Does that refer do you think to one of the

9   days you went to campus?

10       A    Yes, sir.  Yes, sir.

11       Q    The next page says work on SAU outline class

12   stuff with Steph.

13       A    Uh-huh.  Same thing.  We were just working

14   on the class.

15       Q    That would have been working there in the

16   office?

17       A    Yes, sir.

18       Q    The next one says meet with Stephanie re SAU

19   syllabus, make changes NAB continuing ed slides,

20   February 23rd meeting.

21       A    Uh-huh.

22       Q    What does that refer to?

23       A    I don't -- I don't actually know what that

24   refers to.  I know what the first part is because

25   we -- you know, we were making changes to the

1    syllabus.  We would always have to change the dates

2    and that sort of thing.  And the NAB continuing

3    education slides I believe is a course that Mark

4    attended and he wanted to share that with the

5    students.

6        Q    Okay.  So is it fair to say that you, over a

7    period of several years, devoted time while you were

8    at the office in Dalton working on matters for

9    Southern Adventist University?

10       A    Yes, sir.  And it was my understanding that

11   the reason that we did this is because they kind of --

12   they didn't really give us cream of the crop, I guess,

13   or allowed us to cherrypick administrators in

14   training.  But by us participating, we got to know

15   these students on a different level to see if it

16   was -- you know, if they were good associates to

17   potentially bring on board for us.

18            So it was a -- it was a win for us.  So I

19   didn't really look at it like we were working for

20   Southern because -- I mean, even though we were, but I

21   knew we were also getting benefit from it also.

22   Because we -- and we got some really good

23   administrators out of that class.

24            So I didn't -- I didn't really feel like

25   that was, I guess, a conflict since it was -- you

1    know, that's why we were doing the class.  So I didn't

2    feel bad about -- I didn't think it was wrong to work

3    on it at work.

4        Q    Did Mr. Waldrop teach these classes year

5    round?

6        A    No.  The in-person summer class was for two

7    weeks every summer, two consecutive weeks.  And then

8    the one in the fall, we may have only done that a

9    couple of times.  But it was -- and I forget.  I want

10   to think eight weeks, but it could not be eight weeks.

11   But it was -- we did that at least once or twice in

12   the fall.

13       Q    What did Mr. Waldrop to your knowledge tell

14   Ronnie Rollins or anyone at Community Health about his

15   teaching role at Southern Adventist University?

16       A    I don't know what conversations he had with

17   them because he -- I'm pretty sure he was already

18   doing that before I came on board.  But I know that

19   they were -- that Mr. Rollins was aware of it because

20   I remember there was a time when they were having a

21   board retreat and they were going to go bird hunting

22   or something like that.  And Mark had inquired about,

23   you know, borrowing a gun or something from my husband

24   because he didn't -- you know, he wasn't an avid

25   hunter.  And, of course, my husband did not mind.

```
 1              But he had communicated with Ronnie that
 2   there was going to be a -- it seems like maybe the
 3   long-term-care banquet was going to be during one of
 4   those nights that he was going to be at the board
 5   retreat.
 6              And so he had called Ronnie just to make him
 7   aware of that, you know, to let him know that he would
 8   be missing it, would that be okay, and Ronnie told him
 9   that it was more important for him to attend the
10   banquet because that's how we did get administrators
11   and that it was important, you know, for Mark to do
12   that, because he did teach the students and he needed
13   to be there for that, to represent Community.  And so
14   Mark ended up not going on that retreat and went to
15   the long-term-care banquet instead.
16        Q    This was a banquet at Southern Adventist
17   University?
18        A    Yes.  Well, it was either -- I think it was
19   at Southern.  There was a couple times they were
20   off-site, but I think that was at Southern.
21        Q    But it was their banquet?
22        A    Yes, sir.
23        Q    Okay.
24              MR. HENRY:  Hal, just so you know, the
25        food's here.  So whenever you get to a good
```

143

1        stopping point --

2            MR. DANIEL:  Good.  I'll wrap this up in a

3        moment and we'll do it.

4            MR. HENRY:  Yeah.  I didn't want to

5        interrupt you.

6    BY MR. DANIEL:

7        Q    Tell me what -- withdrawn.  To your

8    knowledge, did anyone in management at Community

9    Health know that Mr. Waldrop was being paid for his

10   teaching at Southern Adventist University?

11       A    That, I don't know.  I can't say for a fact.

12   I know that -- when you say management, I know Scott

13   Edens is also in management.  He, I believe, was a

14   regional vice president with Ethica.  And he also

15   teaches the course.  And so I don't know if he's said

16   anything or whatever.  They could have knowledge.  But

17   I didn't -- I don't ever remember calling and saying

18   that Mark gets paid for it.

19       Q    Was there a distinction between the summer

20   course, this two weeks, and the course that

21   Mr. Waldrop taught in the fall?

22       A    It was --

23       Q    Were they separate?

24       A    Yeah.

25       Q    And did Mr. Edens, did he teach the summer

144

1    course?

2         A    He did both.

3         Q    He did both?

4         A    Yeah.  Basically, they just wanted to offer

5    it online for the folks who couldn't be in person for

6    the two weeks.

7         Q    To your knowledge, was Mr. Edens paid for

8    his work -- teaching work?

9         A    I assume that he was.

10        Q    You're not sure?

11        A    I didn't see a contract, but I would -- I

12   just assumed they all did.

13        Q    Okay.  Great.

14             MR. DANIEL:  Well, fine.  This is a good

15        time to take a break.

16             VIDEOGRAPHER:  Going off video, 1:17 p.m.

17        Off video record.

18             (Whereupon, a recess was taken from 1:17

19        p.m. until 2:03 p.m.)

20             VIDEOGRAPHER:  2:03 p.m.  Back on video

21        record.

22             (Defendant's Exhibit 7 and Exhibit 8 were

23        marked for identification.)

24   BY MR. DANIEL:

25        Q    Ms. Dotson, I've handed you two documents

1    here which really should be considered together.  One

2    is marked as exhibit seven to your deposition.  The

3    other is marked exhibit eight.  Look first at exhibit

4    eight and just tell me if you recognize it.

5         A    Yes.  It's the associate handbook.

6         Q    Are you familiar with it?

7         A    Yes, sir.

8         Q    And then exhibit seven, do you know what

9    that is?

10        A    Yes.  It's just acknowledging that I

11   received a copy of the handbook and that I was to read

12   it.

13        Q    Okay.  Did you read it?

14        A    I read through it.  I didn't read it cover

15   to cover.

16        Q    Tell me what the policy was at Community

17   Health for reimbursement of expenses.  How did you go

18   about obtaining reimbursement for a business-related

19   expense?

20        A    I would -- I would obtain receipts for any

21   purchases made or if it was for mileage, I had to

22   document mileage.  And we were to complete an expense

23   report.  Used to, there was a document that we filled

24   out.  It was an Excel spreadsheet that -- where we had

25   to fill in the date, the -- what the expense was, the

1    amount, that sort of thing, that totaled out at the

2    bottom and we would submit it to our supervisor for

3    approval.  And then when we changed over to Workday,

4    it was all done electronically.  So we would upload it

5    to the system.

6         Q     Who approved your business expenses?

7         A     Mark Waldrop.

8         Q     Who approved Mr. Waldrop's business

9    expenses?

10        A     Ronnie Rollins.

11        Q     Did you assist Mr. Waldrop in the

12   preparation of his expense reimbursement requests?

13        A     Yes, sir.

14        Q     And what did you do?

15        A     I would type them up.  Even though we didn't

16   have to use the old Excel spreadsheet form, I still

17   used it just as a way to keep track of everything.

18   Because it would, you know -- he could go a lot of

19   places in one week.  So it was just easier for me to

20   kind of keep track of it that way.

21              And so I would put it in the Excel

22   spreadsheet and attach copies of all the receipts or

23   documentation and upload it into Workday for approval.

24        Q     And when you completed a -- withdrawn.  When

25   you completed a request for reimbursement on behalf of

**147**

1  Mr. Waldrop, what did you do with it after it was

2  completed?

3       A    After it was completed, I would go over it

4  with Mark just to make sure that I hadn't missed

5  anything, make sure that I had everything in there

6  right.  And then I would scan it into our system and

7  then upload it that way and then I kept a hard copy in

8  our office.

9       Q    And when you scanned it into the system,

10  what -- what happened to it then?

11       A    I did a -- we had a scan to e-mail feature

12  so I could scan it to my e-mail and then I would just

13  save it and attach it as an attachment.

14       Q    Well, how was it submitted -- how was one of

15  Mr. Waldrop's requests for reimbursement submitted for

16  approval?

17       A    It would be uploaded into the Workday system

18  and it would electronically notify Mr. Rollins that

19  there was an outstanding expense report that needed

20  his attention.

21       Q    And how did he learn that the reimbursement

22  request had been approved?

23       A    I can't remember.  I know there was a

24  feature that you could be notified.  I don't know if

25  that was enabled or not.  But Maricella Espinoza would

1   normally -- in finance -- she would normally send an

2   e-mail letting Mark know that his check in the amount

3   of so-and-so would be deposited on a certain day or

4   was deposited.

5        Q    Okay.  And did you on occasion submit

6   expense reimbursements of Mr. Waldrop under your name?

7        A    Yes.  If I used my American Express card or

8   a card to pay for it, yes, I did.

9        Q    And why did you do that?

10       A    When I came to work with Eden, she had told

11  me that I would need to obtain my own American Express

12  card because there would be times -- she said I needed

13  to get one that didn't have a limit.  Because there

14  would be times when we would have big purchases that I

15  would have to make and that I'd be responsible for

16  doing that with my card.  That's how she had always

17  done it and that's how I would be expected to do it.

18  So that's how I'd always done it.

19       Q    When you prepared a request for

20  reimbursement for Mr. Waldrop and submitted it under

21  your name, who approved it?

22       A    If it was an expense that I incurred,

23  whether it be for myself or for Mark, if it was on my

24  expense report, he approved it.  Mark did.

25       Q    And so it did not go to Mr. Rollins?

1      A     No.  Not if I expensed it, no.

2      Q     Did you think that it was wrong to submit

3   Mr. Waldrop's expense reports under your name?

4      A     No, because that's -- when I got the job,

5   that's how she told me that it was to be done and how

6   it had been done.  So I just -- that's the way I was

7   taught to do it.  So I never questioned it.  I just

8   assumed that was policy since we didn't have a company

9   card.

10     Q     And who told you this?

11     A     Eden Lusk.

12     Q     Did she put this in writing?

13     A     No, she did not.

14     Q     When you were paid a reimbursement of an

15   expense incurred by Mr. Waldrop, did you ever give him

16   the money?

17     A     No, because I would have been the one to pay

18   for it.  So I would have to pay my bill for it.

19     Q     Were there any occasions on which you

20   submitted a reimbursement request for Mr. Rollins

21   under your name when you did not actually pay the

22   expense yourself?

23     A     Not to my knowledge, no.

24     Q     After you prepared these requests for

25   reimbursement for Mr. Waldrop which you then submitted

1    under your name, did you review them with Mr. Waldrop?

2         A    Yes.  Most of the time we would do that or

3    when he went to approve it, he would go -- whether it

4    be on the computer or back when we had a hard copy,

5    all of it would be there.

6         Q    How did Mr. Waldrop indicate his approval of

7    these reimbursement requests which had been submitted

8    by you on his behalf under your name?

9         A    Back the old way, we had to sign -- he had

10   to sign off on them.  All supervisors did.  And then

11   we would e-mail them to the financial department and

12   then they would cut the check that way.

13            But then when we moved to Workday,

14   everything was done electronically.  So it was the

15   same -- you know, he would get an e-mail notification

16   in his in-box that he had, you know, this, this, and

17   this that he had to go in and review.  And he would be

18   able to click on it and go from there to approve it.

19        Q    Did you ever submit an expense reimbursement

20   for any other employee of the company other than

21   Mr. Waldrop and, of course, yourself?

22        A    I can't say for sure on that.  Because I

23   know there were a couple of times when we had people

24   hired and I don't know if they were set up in the

25   system maybe and I did it for them.

1          If I did, I can't recall that.  But I know

2    we had an associate by the name of Trevor Matchim and

3    we helped him.  And Eric Griesel, we did help him a

4    little bit.  But I can't say -- I can't say that I did

5    and I can't say that I didn't.  But if I did, it would

6    have had their name on it if it was an expense that

7    they incurred.

8          Q     Do you recall ever submitting any expense

9    reimbursement on behalf of Ronnie Rollins?

10         A     No, I do not.

11         Q     Did Mr. Waldrop approve the expense request

12   of his direct reports?

13         A     Yes, sir.

14         Q     Did he do this personally or did he

15   sometimes delegate that to you?

16         A     He would sometimes delegate that to me.

17         Q     And when he delegated it to you, how did you

18   determine whether or not the expense request was

19   appropriate?

20         A     Most of the time, if Mark was on the road,

21   he would call in and I would just go over with him

22   what all was in his in-box that needed his approval.

23   And we would talk about it.

24               There were times when -- well, pretty much,

25   you know, I knew what to expect.  It's going to be

1  lodging, meals, you know, mileage, parking, that sort

2  of thing.  So, I mean, it was, you know, usually the

3  same kind of stuff.

4          But there were times when we didn't have

5  proper documentation or something like that and we

6  would have to ask for more information.

7      Q    You knew that an expense report should be

8  accompanied with proper documentation?

9      A    Yes, sir.

10     Q    And tell me what that documentation would

11  consist of.

12     A    If it were a charge for lodging, you would

13  have the hotel bill.  If you went out for a meal, you

14  know, it would have the date, you know, what area you

15  were in.  It all kind of needed to match up.

16          Of course, mileage, I mean, it could -- that

17  could vary.  You know, you could run into a situation

18  where there's road construction or something and that

19  could, you know, get you off the beaten path.  So that

20  was not always consistent.

21          But for the most part, as long as they had

22  their backup, like, for their phone bills and for any

23  supplies, they would have Office Depot receipts and

24  that sort of thing.

25     Q    If an expense reimbursement request applied

1  to a specific client or meeting or other business

2  purpose, should that -- should that client meeting or

3  other business purpose be stated on the expense

4  reimbursement request?

5      A    Yes.  I tried to do that as much as I could.

6  Uh-huh.

7      Q    And did you always do it yourself when you

8  submitted expense reimbursements for yourself and on

9  behalf of Mr. Waldrop?

10     A    Yes.  I did try to be mindful of that.  I

11 mean, there may have been times when I made a mistake

12 and didn't, but I did try to be consistent and

13 detailed.

14     Q    Do you recall a time in late 1915 or early

15 19' -- excuse me.  Strike that.

16         MR. HENRY:  You don't recall that, do you?

17         THE WITNESS:  No.

18 BY MR. DANIEL:

19     Q    Do you recall a time in late 2015 or early

20 2016 when you learned about an internal audit of

21 expense requests at Community Health?

22     A    Yes, sir.

23     Q    How did you learn about that?

24     A    I recall a conversation that Mark and

25 Lorraine had.  I think she may have called him and

1  told him that an audit had been done internally.  She

2  said that there was a lady that Ronnie had brought on

3  board to do an internal audit of expense reports and

4  that they had gone over -- which is something that I

5  thought was always done.

6          I just -- I knew we had auditors in every

7  year.  I just assumed that they did it every year, but

8  apparently they did not.  But that she -- the lady had

9  gone in and had done an internal audit and they had

10 found some things that needed to be corrected, whether

11 it be expenses that shouldn't have been expensed or

12 they needed additional documentation, that sort of

13 thing.

14         And she had compiled a list of people who

15 they found deficiencies in during the audit, which

16 she -- you know, she told Mark that, you know, they --

17 she even had some discrepancies in her own expense

18 reports, you know, for him not to, you know, think

19 anything about it.  But she did want to share the list

20 with him and -- you know, just so that he could know

21 the findings of the audit.

22    Q    And did she do that?

23    A    Yes, she did.

24    Q    Did you see the list as well?

25    A    Yes, sir.

1            (Defendant's Exhibit 9 was marked for

2       identification.)

3  BY MR. DANIEL:

4       Q    Let me show you a document which has been

5  marked as exhibit nine and ask you if you know what

6  this is.

7       A    Yes.  I believe -- yeah, this is the -- the

8  report that Lorraine sent to Mark with the findings.

9       Q    Did you have discussion with -- with

10  Mr. Waldrop about this report?

11       A    I did.  There were -- well, when Mark got

12  the list -- and I can't remember if he forwarded it to

13  me.  I think he did or he may have just made a copy.

14  But he had asked me to follow up with his direct

15  reports.

16            If there were discrepancies on anything that

17  they -- that was tied to their name, that he wanted

18  them to go ahead and get it fixed, be proactive.

19  There were a couple of receipts on Mark's -- one of

20  his expense reports or two of his expense reports.  I

21  think it was one.  But there were two receipts that

22  did not transfer over and so he wanted those taken

23  care of also, which we did.

24            But I reached out to each person on the list

25  and shared with them what the findings were and then

1   they were supposed to do just like we did, go into

2   Workday, get it fixed or whatever, and remedy the --

3   the problem.

4       Q    When you saw the summary marked exhibit nine

5   to your deposition, do you see your name at the top?

6       A    Yes, sir.

7       Q    Was that a surprise to you?

8       A    No.  No, not really.  Because I do expense a

9   lot of things for Mark because he does travel a lot.

10  Him being in the position that he was in, you know,

11  there are a lot of expenses for travel.

12           Not only that, but we also have in our

13  budget for the Waterford crystal.  So every year we

14  get that for us and then we also pick it up for

15  Integra just because it's cheaper if we buy in bulk.

16  And so, yeah, I mean, that didn't surprise me that I

17  was at the top.

18      Q    And you say that you had Waterford crystal

19  in the budget?

20      A    Yes, sir.

21      Q    What do you mean?

22      A    Every year for -- for Christmas and then

23  also at the midyear convention, Mark would always give

24  members of the leadership council a piece of Waterford

25  crystal just as a way of saying thank you for your

1    service.

2            And, you know, he liked to do it at the

3    midyear because the families were there and a lot of

4    times top leadership would have to travel a lot and so

5    it was his way too for the family saying thank you.

6    You know, your sacrifices that you make with them not

7    being home, you know, a good bit of time, this is --

8    you know, we want to thank you for this too.

9            So he would always do that and that sort of

10    thing.  And then we would always do like a -- like

11    something small for birthdays for his -- for his

12    leadership.

13    Q    And did you also give Waterford crystal to

14    outside parties, people not employed by Community

15    Health?

16    A    We did if it was a situation where -- like I

17    had mentioned earlier with Gary Howard at Hamilton

18    Medical Center -- we're, you know, affiliated with

19    them on the skilled nursing side -- and like the lady

20    at Southern Adventist University and like if there was

21    ever a -- like a high-level meeting that they would go

22    to.

23            I think there was one time I know Mark and

24    Ronnie and Lorraine had gone to meet with somebody at

25    a hospital I believe.  I could be wrong, but I think

1  it was at a hospital.  And, you know, he had asked

2  Mark to take care of sending something.

3        So if it was something having to do with

4  business, then, you know, we felt it appropriate to do

5  something.

6     Q    Whose budget were you referring to when you

7  said the Waterford was in the budget?

8     A    That would be in mine and Mark's budget.  We

9  would have to do a line-item budget every year and

10  then I would always at the -- just because, there

11  again, it was so fast paced in our office, lots of

12  information coming in and going out, I would always do

13  like a spreadsheet that just kind of listed out

14  everything, like conventions and what month it was

15  going to be in and that sort of thing, so we would

16  kind of know where to plan our dollars.

17        And the other benefits -- I believe it was

18  other benefits -- that was where we put this money so

19  that we would have money to do throughout the year for

20  everybody.

21        And we would -- we would purchase the

22  Waterford at different time.  You know, that was kind

23  of a variable.  We never had like, okay, in January

24  we're doing this.  We purchased it in -- at an outlet

25  in Dawsonville and so it was discounted.

1          But if we bought it in bulk, which is why I

2     started picking up Integra's, then we got a much

3     better rate.  So it saved the company money.  So we

4     would just try to get it all at one time because it

5     was in the budget and, you know, we wanted to be able

6     to use it, so we'd just go ahead and use it.

7          Q    Who approved this budget?

8          A    That I'm not sure about.  Mark and I would

9     go over it.  We would submit it to the finance

10    department, to Lorraine Taylor's team.  And I don't

11    know if, you know, they would take each budget to

12    Ronnie or if it's just something that, once they got

13    everybody's budget or plan system-wide, they took it

14    to the board and they passed it as a -- you know, each

15    individual member organization.  They may have done it

16    that way.  I'm not sure.

17         Q    And how was the Waterford crystal listed on

18    the budget?

19         A    It -- I believe it said Waterford crystal.

20         Q    Did it indicate --

21         A    Or it may have said birthday and anniversary

22    gifts.  I'm not sure.  Miscellaneous gifts.

23         Q    And did you keep copies of these budgets?

24         A    Yes.  Uh-huh.

25         Q    And to your knowledge, did anyone other than

1    Mark Waldrop approve this budget?

2        A    To my knowledge, to say for 100 percent

3    sure, no.  I know we had to send all of our budgets to

4    them and they compiled them.  But I don't know what

5    the approval process was outside of that.

6            I know that they're -- I know they were

7    reviewed because they would come back and we would

8    have to make some cuts, make some changes.  I mean,

9    there was a process.  And they would meet -- it seems

10   like they would meet like for a week around April or

11   something like that and they would meet with each

12   individual member organization and go over their

13   budgets line by line and then they would -- that would

14   give them time to make tweaks and edits before the

15   board had their meeting.

16           But, there again, I don't know if they did

17   them individually with the board or as a whole.  I

18   don't know how they presented them.  I never attended

19   a board meeting, so I don't know.

20       Q    While you were working as executive

21   assistant for Mark Waldrop, did he ever allow any of

22   his direct reports to have their expense

23   reimbursements approved by their assistants?

24       A    No.

25       Q    Do you know of any other time at Community

161

1   Health that an assistant approved or submitted expense

2   reimbursement reports for his or her supervisor?

3       A    For his or her -- that submitted them?

4       Q    Yeah.  I just want to know --

5       A    Yes.

6       Q    -- do you know of anyone else who did this.

7       A    Yes.

8       Q    And we're talking about doing the same thing

9   that you did.

10      A    Yes.

11      Q    That is, submit -- in this case, you

12  submitted expense reimbursements for Mark Waldrop.

13      A    Yes.

14      Q    And you submitted them under your name, so

15  he approved them.

16      A    Well, no.  If I submitted an expense report

17  for Mark for things that he paid for, they would be

18  under his name and it would go to Ronnie.  Now, if it

19  was an expense -- if he was going to go to Atlanta for

20  the Georgia Healthcare Association convention and I

21  paid for the hotel, made those arrangements or

22  whatever and it was under my name, then I put it under

23  my name and then he would have to approve it, yes.

24      Q    I'm asking do you know of anyone else at

25  Community Health who did something similar to the

162

1    latter.

2        A    I know that Candace Jenkins in human

3    resources compiles expense reports for Blair Lake.  I

4    know that Ylice Crews does it for Diana Wilks.

5    Michelle Moore-Andrew's assistant, Eden Lusk -- she

6    worked with Mark, left, and then came back to the

7    company in a different role -- she does it for

8    Michelle.

9            It was just something I -- I just assumed

10   all assistants did.  Because every now and then, they

11   would have to call and say, hey, what was the meeting

12   on so-and-so; you know, I need to make a note of it on

13   the expense report or whatever and so -- but, now, to

14   say if they uploaded it in Workday for them, I don't

15   know.  But I know they compiled expense reports and

16   got documentation for them.

17       Q    Well, do you know that those assistants to

18   Michelle Andrews or the other people you mentioned, do

19   you know that as a matter of fact that they actually

20   submitted those expense reimbursements under their own

21   names rather than under the supervisors' names?

22       A    No, I can't say that.  No.

23       Q    What percentage of Mark Waldrop's expense

24   reimbursement requests were submitted under his name

25   as opposed to under your name?

1     A    If it was mileage, of course, that's

2  something that he would have to submit because I

3  couldn't do that.  He would be using his car.  And, of

4  course, his cell phone, that sort of thing, those

5  things were always.  But I would say probably, if I

6  had to guess, maybe 60 or 70 percent roughly.

7     Q    Okay.  Let me make sure I understand what

8  you're saying.

9     A    Would be on my expense report.

10     Q    Oh.  Okay.  So that means 30 to 40 percent

11  would have been under Mark Waldrop's name and

12  submitted to Ronnie Rollins for approval?

13     A    Yes.  And that's just kind of guessing off

14  the top of my head.  I -- you know, I can't say

15  100 percent yes or no.  But that would be my guess.

16  Because I didn't do a lot of travel.

17     Q    Did this ever bother you?

18     A    No.

19     Q    You knew that the purpose of having expense

20  reimbursement requests approved by a superior was so

21  the superior could know what was going on, didn't you?

22     A    Yeah.  Yes.  And I guess the reason I didn't

23  question it -- I guess I thought at first it was a

24  little odd, but Eden said that's the way they had

25  always done it.  So I just assumed since they didn't

1   have a company card that -- you know, I just did what

2   I was told to do.  And that's what she told me to do,

3   so that's how I always did it.

4       Q    Did you ever, you know, talk to Mark Waldrop

5   about it and say, you know, I'm really not sure I'm

6   comfortable with submitting this large number of

7   expense reimbursement requests under my name?

8       A    No, I did not.

9       Q    Did you have any discussion with him at all

10  about that at any time?

11      A    No, I did not.  I just did the job she told

12  me to do.  I didn't -- I mean, I didn't question it.

13  I thought, well, since we don't have a company credit

14  card, if that's how they -- you know, how they do it,

15  that's just -- you know, I wasn't -- I didn't know to

16  ask, so --

17          (Defendant's Exhibit 10 was marked for

18      identification.)

19  BY MR. DANIEL:

20      Q    Let me show you this document.  It's marked

21  as exhibit 10 to your deposition.

22      A    Okay.

23      Q    The first page is an e-mail.

24      A    Okay.

25      Q    It appears to be to you.  Do you know what

1   this is?

2       A    Let's see.  Yes.  This looks like copies of

3   my expense reports from July the 8th, 2015, through

4   February the 11th of 2016.

5       Q    Did you ask for this?

6       A    Yes, sir.  I -- I asked for several

7   documents when I was working on our plan for the

8   coming year.

9       Q    And what was the purpose of asking for it?

10      A    Just to kind of get an idea of -- because,

11  there again, it is so fast paced, I wanted to be sure

12  that I was capturing everything.  I didn't want us to

13  be over and have to explain why we're over in an area

14  if I, you know, forgot that, oh, he goes to this

15  convention at this time or roughly how much do we

16  spend on telephone, so I can be sure that we've got

17  enough money in the budget.

18          We didn't have access -- or, I didn't have

19  access to go in and pull a lot of the reports that the

20  other member organization presidents could.  And so I

21  didn't -- there was no way for me to kind of go in and

22  see how expenses were running and that sort of thing.

23  I had to rely on the finance team to provide all that

24  to me.  And I wanted to ensure that I captured as much

25  as I could when I do the -- pull the budget together

166

1   to go over it with Mark.

2       Q    When you prepared an expense reimbursement

3   request to be submitted under your name, it sometimes

4   would contain expense reimbursement requests for you

5   personally, would it not?

6       A    Yes.

7       Q    And so sometimes there would be some for

8   Mark and some for you under the same reimbursement

9   request?

10      A    Yes, sir.

11      Q    If a person in management looked at exhibit

12  nine and saw your name at the top with $37,570, how

13  would that person know how many of those were for you

14  personally as opposed to Mr. Waldrop?

15      A    Well, they should be able to look at my

16  expense report.  Because I would -- I would try to

17  make a -- always make a note of it.  I could have, you

18  know, made mistakes.

19          But like, for example, if Mark's going to

20  the Workday conference, I mean, I didn't do a whole

21  lot of travel, so most of the time travel was for him.

22  Now, if we had, you know, a big meeting or something

23  like when we were doing the leadership development

24  classes with Ronnie and Lorraine, then, you know, that

25  would be a big expense that I would capture on my

167

1    expense report.

2           But for the most part I didn't do a whole

3    lot of travel, but I would put in there, you know,

4    Mark's Workday registration and lodging or whatever.

5    So, I mean, it had his name tied to it.  So I could

6    tell that way, when I was preparing the budget, that,

7    oh, yeah, he did do that then.  So --

8        Q    So the only way that one would know which of

9    the expenses included in this total of $37,570 were

10   expenses for you as opposed to Mr. Waldrop would be to

11   go -- to look at the backup --

12       A    Yes, sir.

13       Q    -- to go through the expense reports and

14   tabulate them?

15       A    Yes, sir.

16       Q    Now, if you look at this same exhibit nine

17   and you look over to the fourth page, you will see

18   that Mr. Waldrop's name is found there down toward the

19   bottom.  And it shows his total as being $10,155.  Do

20   you see that?

21       A    Uh-huh.  Yes, sir.

22       Q    Now, if you look at these without having

23   access to the backup, it appears to be a bit

24   misleading as to what Mr. Waldrop's expenses were for

25   this period, does it not?

168

1        A       Yes, sir.

2        Q       Was there an attempt by Mr. Waldrop to

3   conceal some of the expenses he was incurring from

4   Ronnie Rollins?

5        A       No.  In fact, the only time that he ever --

6   the only time Mark ever made a comment about it was

7   Mark was attending a convention.  And I want to think

8   it was the midyear in Atlanta that Georgia Healthcare

9   Association does.  And Ronnie knew that he was going

10  to be going to that -- to those meetings.  It's a

11  week-long thing.  And he kept him on the phone pretty

12  much the whole time.  You know, there were things

13  going on.

14              So Mark wasn't able to -- Mark wasn't able

15  to attend the sessions.  So he didn't get the credit

16  that he needed to maintain his licensure and -- I

17  mean, the company -- you know, the company lost money

18  because he wasn't able to take part in those.

19       Q       In late 2015, early 2016, was it your

20  observation that Mr. Waldrop had less contact with

21  Ronnie Rollins than he had had in the past?

22       A       No, I felt like there was more -- there was

23  more contact.

24              (Defendant's Exhibit 11 was marked for

25       identification.)

1  BY MR. DANIEL:

2      Q     Let me show you this document that's marked

3  exhibit 11.

4      A     Okay.

5      Q     And I'll ask you if you recognize this as

6  one of the expense reports which you did complete at

7  Community Health.

8      A     Yes.  Uh-huh.

9      Q     Is that your signature at the bottom of the

10  first page?

11      A     Yes, sir.

12      Q     And looking at the -- at the items attached

13  on the second and third pages of exhibit 11, I see a

14  receipt from Bath and Body Works and one from Walmart.

15      A     Yes, sir.

16      Q     Do you see those?

17      A     Yes, sir.

18      Q     There's no indication there as to what the

19  business purpose of those was, is there?

20      A     I just put on the receipt that it was office

21  supplies and drinks -- or, on the worksheet.  But, no,

22  I did not write them on the receipt.  That's my

23  mistake.

24      Q     And can you tell from looking at that Bath

25  and Body Works what those purchases were?

1      A     No, you cannot.

2      Q     And I believe that receipt continues on the

3   second page, doesn't it?

4      A     Yes, sir.  It does.

5      Q     And then you look over the fourth page and

6   there's a Pay Pal indication that was sent from

7   Pay Pal to you --

8      A     Uh-huh.

9      Q     -- confirming a payment of $2,814.  And it

10  says down in the legend about in the middle of the

11  page that it was payment in full for Mark Waldrop's

12  rental at Amelia Island from June 11th, 2016, to

13  June 18th, 2016.  Do you see that?

14     A     Yes, sir.

15     Q     And there was some indication that said he

16  may have to change his reservation.  Do you know

17  whether or not he did?

18     A     Yes.  We were going to change that date

19  because he was not going to attend the convention that

20  year because of dollars.

21     Q     Okay.  And did you get the money back?

22     A     No, we did not.

23     Q     And why not?

24     A     To be quite honest, Mark was going to --

25  if -- the plan was that if he could not use that

1    reservation for the convention, which is where he had

2    stayed, you know, several years in the past because we

3    would have our group meeting there since we were all

4    together -- if it just so happened that he couldn't

5    attend, then he was going to write the company a check

6    and just use that week -- that week at a later date,

7    but -- or he was going to use it when they had the --

8    there was another convention that they were going to

9    have at Amelia Island and he was going to try to work

10   it out so that we could use it when he was going to be

11   there for that.

12         But we were waiting to hear back on the

13   dates from the owner of that rental because they were

14   in the process of -- they were only going keep two or

15   three, maybe four renters through the year.  I guess

16   maybe because they had gotten in paid down and they

17   didn't have to rent it out as much and they were going

18   to be staying there more as the owner.

19         And so we were waiting to hear back from

20   them if that was going to be feasible or not, so --

21   and then, of course, employment ended before we ever

22   got to see that through, so --

23   Q    So what happened to the deposit?

24   A    They kept the money and we didn't get to --

25   and we didn't -- he didn't go.

1      Q     When you were -- withdrawn.  Now, this was

2  not a credit card.  This was Pay Pal; right?

3      A     Correct.

4      Q     Was there any reason Mr. Waldrop could not

5  have done Pay Pal to pay for this himself?

6      A     I guess he could have.  I don't remember if

7  he was on the road or what.  We had trouble this last

8  time getting them nailed down on a date.  I would

9  reach out to Mr. Batten and his wife and was having

10  trouble reaching -- making contact with them.

11          And he had indicated that his wife had been

12  sick and had been in the hospital or something and had

13  asked me if I could take care of it this way.  And so

14  that's why I just took it upon myself to handle it

15  like I had done other reservations before.

16      Q     Did Mr. Waldrop have any credit cards?

17      A     I don't know.  He used to have an American

18  Express.  But they had gotten his identity mixed up

19  with somebody else's at one time and it was a long

20  process.

21          I know we would use his Sun Trust debit

22  card.  Most of the time, if I used it for anything, it

23  was a debit card.  Not all places would take a debit

24  card.  When you're doing a reservation like that, it

25  would have to be a credit card.

1          He may have had one I think that I had on
2    file in case I ever did need it, but I didn't use it
3    that much.  So I couldn't even tell you what kind it
4    was.

5          Q    Was there any reason that you could not have
6    used Mr. Waldrop's credit card, the one you had on
7    file, instead of your own and then submitted the
8    reimbursement request under his name instead of
9    submitting it under yours?

10         A    I would always try to check with Mark first
11   just to find out, you know, since it was a debit card,
12   is it okay to use this; do you want to use it; do I
13   need to put it on mine; how do you want to handle it.

14         And most of the time, he would just tell me
15   to take care of it since I was overseeing everything
16   else.  So I didn't -- I didn't even think twice about
17   it.  It was something that I had always done.  So,
18   honestly, I did not even give it a second thought.  I
19   just did it like business as usual.

20         Q    Did you ever suggest to Mr. Waldrop that he
21   apply for a credit card, say an American Express
22   credit card, give it to you and let you use it to make
23   his purchases on his card --

24         A    No, sir.

25         Q    -- and then submit those under his name?

174

1       A     No, sir.

2       Q     If one of the persons, direct reports to

3    Mr. Waldrop, had submitted this same expense

4    reimbursement request and you were asked to approve

5    it, would you have approved it?

6       A     Yes.  I would have asked, you know, just for

7    clarification on what the supplies were for.  But,

8    yeah, I would have thought it was, you know -- it was

9    a fine expense based on what I -- you know, previous

10   -- the way we had always done it.  I wouldn't have

11   thought anything about it.

12      Q     So before approval, you would have, for

13   example, looked at that Bath and Body Works receipt,

14   which goes on for two pages, and asked what are those

15   items?

16      A     Yes, I would have.  And just to answer your

17   question, we would -- I would look for when this would

18   go on sale and I would get it for our office.  We have

19   a very small office, but our ductwork is shared with

20   the offices next door and they were forever burning

21   popcorn and all this other stuff.

22            We had all kinds of crazy smells coming from

23   over there.  And also for when we went to the

24   restroom, we wanted to have, you know, air freshener

25   for when we went to the restroom.  And so that's what

175

1    that's for.

2         Q    Before you booked this condominium at Amelia

3    Island, Florida, for Mr. Waldrop, did you compare the

4    cost of this condominium with other available lodging

5    at Amelia Island?

6         A    We did.  In fact, I had reached out to the

7    Ritz just to get, like, what a daily rate would be.

8    And then by the time we included parking, valet

9    charges, that sort of thing, it was going to be

10   cheaper for Mark to stay there.  Because that way we

11   could have our meeting there.  You know, he was able

12   to cook.  He didn't have to eat out every meal.  We

13   could have folks over and do refreshments and that

14   sort of thing in-house.  So it was -- it looked

15   cheaper to do it there.

16              (Defendant's Exhibit 12 was marked for

17         identification.)

18   BY MR. DANIEL:

19        Q    Let me show you this document marked exhibit

20   12.  I'll ask if that is the analysis that you did

21   where you're comparing the condominium rental rate

22   with the Ritz-Carlton.

23        A    Yes, it does look like the one that I did.

24        Q    If I'm reading this correctly, it appears to

25   show that the Ritz-Carlton would have been less

1  expensive than the condominium.

2       A    Well, the one big difference in the two are

3  that, for the Ritz, there is no meeting space.

4       Q    You mean the Ritz-Carlton in Amelia Island

5  does not have meeting space?

6       A    No, they do, but it was going to be

7  significantly more for us to rent a room for our group

8  to come together and have a big annual meeting.  We'd

9  have a dinner one night and then the last day of the

10  -- the last day on that Friday, we would always have

11  like a day-long meeting because everybody was there.

12       Q    How many people were going to attend this

13  meeting?

14       A    It would be Mark, myself, Diana Wilks,

15  Michelle Moore-Andrews, Blair Lake, Steve and Lynne

16  King, Chris Johnson.  I don't know if I said Robin

17  Leake or not.  I don't think I'm forgetting anybody.

18  So about nine people.

19       Q    And after your investigation, did you

20  determine that the condominium -- withdrawn.  Down at

21  the bottom, it shows two extra nights --

22       A    Uh-huh.

23       Q    -- $804.  What was that for?

24       A    Because if we -- let me remember how I did

25  that.  Because we would have -- he would have to stay

**177**

1    over an extra day because of that meeting that we had

2    on Friday.  And so when I called to get the rates, the

3    five nights I think was Sunday, Monday, Tuesday,

4    Wednesday, Thursday.  Was that right?  Because he came

5    in -- I think the difference was with the condo, you

6    had to come in on -- it was like a

7    Saturday-to-Saturday rental.  That was the only way

8    you could do it.  You had to -- they booked it like

9    seven days.

10        Q    So in this case, we're going to have to add

11   two additional nights; is that right?

12        A    Yes.  Yes.

13            (Defendant's Exhibit 13 was marked for

14        identification.)

15   BY MR. DANIEL:

16        Q    Ms. Dotson, I've handed you another expense

17   report.  This one's marked exhibit 13 to your

18   deposition.

19        A    Yes, sir.

20        Q    Look at this and see if you can confirm that

21   this is an expense report that you completed and

22   submitted to Community Health.

23        A    Yes.  It does.

24        Q    Now, the first -- well, the second page of

25   exhibit 13 appears to be a copy of a Verizon telephone

1  bill.

2      A      Yes, sir.

3      Q      Was this for your telephone?

4      A      Yes, sir.

5      Q      Did you use your company-provided telephone

6  for company business?

7      A      Yes.

8      Q      Did you have a personal telephone you also

9  used for company business?

10     A      We didn't until maybe January of '16, around

11 about that time.

12     Q      And why did you get a personal phone to use

13 for business then?

14     A      It was just suggested that it would be a

15 good idea to separate the two.

16     Q      Who suggested it?

17     A      I believe -- I can't recall if Mark had a

18 conversation with Lorraine and maybe she suggested it

19 or if this is just a conversation that Mark had with

20 me, that he was going to get one and he recommended

21 that I get one.

22            Before I had always -- and he was the same

23 way -- we had always just used our phone for personal

24 or business.  Because a lot of the times when you're

25 at work, you know, you might get a personal call.  You

1  know, if the school calls for my child or whatever, it
2  was acceptable that I could use it for that.
3      Q    Did Mr. Waldrop ever advise you not to use
4  your company-provided telephone?
5      A    No.
6      Q    Did Mr. Waldrop ever say to you that he
7  didn't want to use the company phone because he didn't
8  want Ronnie Rollins knowing who he was talking to?
9      A    Not that I recall.
10      Q    When did Mr. Waldrop obtain a personal
11  telephone, one that he paid for as opposed to the
12  company?
13      A    Right.  I can't remember the exact date.  It
14  would have been around the same time that I got mine.
15  But I don't know when that would have been.  Maybe in
16  January.  That's just a guess.
17      Q    This would be January 2016?
18      A    Uh-huh.  Yes, sir.
19      Q    Okay.  Looking further at exhibit 13 there,
20  on the last two pages there are some receipts for
21  Waterford crystal.  Do you see those?
22      A    Yes.
23      Q    And as I understand it, for the Waterford
24  crystal, you had to drive from Dalton to Cumming.
25      A    To Dawsonville.

1     Q     Dawsonville.  Okay.  You drove from Dalton

2  to Dawsonville, which is over -- I think this shop is

3  on Georgia 400.

4     A     I'm not sure.  I'm terrible with directions.

5  I don't know.

6     Q     Well, it's in a shopping center there near

7  Dawsonville?

8     A     Yes, sir.  Uh-huh.

9     Q     And so you made this trip a number of times

10  over the years to --

11     A     Yes.

12     Q     -- purchase the Waterford crystal?

13     A     Yes.

14     Q     And were you the one who decided which

15  particular items of Waterford crystal to purchase?

16     A     For the most part.  A lot of times when I

17  got there and I could find out what kind of deal we

18  could get on them, then I would call Mark and say,

19  okay, these are kind of our options, trying to keep in

20  mind what we've given in the past.  You certainly

21  don't want to give the same thing.  It defeats the

22  purpose.

23          So I would call him and we would kind of

24  consult on let's do this or let's do this, you know.

25  So, you know, it wasn't just me picking it out.  We

1    tried to make a decision together.

2         Q    Was it Mr. Waldrop's idea to give Waterford

3    crystal as gifts?

4         A    That was in place before I ever came on

5    board.  So I don't know whose idea it was to do the

6    Waterford crystal.  It was just something that was

7    already in place before I came on board.

8         Q    All right.  On the last page of exhibit 13,

9    there's a receipt for LongHorn.  I assume that's

10   LongHorn Steakhouse --

11        A    Yes, sir.

12        Q    -- $38.  What was that for?

13        A    That was, while I was over in Dawsonville --

14   my mother-in-law actually went with me.  And I can't

15   remember if that's the time when I took -- one time I

16   took my husband's truck and it was loaded pretty

17   heavy.  In fact, we had one year purchased tarps and

18   bungee cords because I didn't -- you know, they were

19   calling for rain or something, but we needed to get

20   the inventory picked up because they had been holding

21   it for us or -- sometimes they would do that.  Not

22   every time, but sometimes they would hold it for us.

23             And so she had gone with me just to help get

24   everything loaded and just kind of help keep a watch,

25   you know, going over the mountain, making sure nothing

1   happened, nothing fell out.  You know, being a woman,

2   that's kind of a man's job, but I -- you know, I just

3   took her along with me to help with that.

4       Q    And so is this receipt for a lunch for you

5   and your mother-in-law?

6       A    Yes, sir.  It is.

7       Q    And so you considered this an appropriate

8   business expense, to have lunch on your trip to pick

9   up the Waterford crystal?

10      A    You know, I probably should -- I should have

11  just split that and not done it.  I should not have

12  expensed it.  I guess I was thinking at the time she

13  was helping me get it back, making sure it didn't fall

14  off, and so I kind of thought, well, that was the

15  least the company could do.  If nothing fell off and

16  got busted, it was worth way more than the $19 her

17  lunch would have been.  So that's my fault.  I should

18  have -- I guess I should have taken that off.

19           (Defendant's Exhibit 14 was marked for

20       identification.)

21  BY MR. DANIEL:

22      Q    Let me show you this document marked exhibit

23  14 to your deposition.

24      A    Okay.

25      Q    I ask you if you can recognize this as a

1   copy of another expense report which you completed and

2   signed.

3       A    Yes.  This does look like one that I

4   submitted and signed.

5       Q    Okay.  Look on the seventh page.  It's the

6   one that has what we call a control number at the

7   bottom.  The last three numbers are 303.

8       A    Okay.

9       Q    There are several receipts there at the top.

10  Two of them are marked time and attendance.

11      A    Yes, sir.

12      Q    Do you see that?

13      A    Uh-huh.

14      Q    And one is for Starbucks, total of $4.44.

15  What was that for?

16      A    That was because I had stopped to get

17  breakfast on the way to that meeting.

18      Q    And did you consider that an appropriate

19  expense item for reimbursement?

20      A    I did.  Yes, sir.

21      Q    The next one is a Race Trac 618 receipt.

22      A    Uh-huh.

23      Q    And it shows Extra Spearmint and Extra

24  Peppermint.  Do you see those?

25      A    Yes, sir.

184

1      Q    And what was that?

2      A    Those -- I had taken gum for the meeting.  A

3  lot of times, especially if we're in one room and

4  we've all had lunch, people ask for drinks and that

5  sort of thing.  And I had also picked up a couple of

6  snacks just because we were at ElderCare Pharmacy.  We

7  weren't in our location.  And so, you know, just to

8  have on hand in case anybody wanted some snacks.

9      Q    All right.  Then there's a Walmart receipt

10  and several things there, face tissue, Wet Wipes and

11  so forth.

12      A    Yes, sir.

13      Q    Did you consider those to be appropriate for

14  expense reimbursement?

15      A    I did.  The -- now, the drinks -- we had

16  started meeting at ElderCare a good bit and one of the

17  ladies had made a comment about -- she would always

18  want to know how many people were coming and she kind

19  of laughed and said, well, y'all are eating up our

20  drink budget or something like that; you know, we

21  really hadn't planned on -- you know, just kind of in

22  a joking manner.  And I mentioned it to Mark and said,

23  hey, would it be okay to maybe when we go, just as a

24  kind gesture, let's take some to replenish their

25  stock.

185

1          Because, like I said, we were meeting there

2     more frequently.  And they would be day-long meetings

3     because we had everybody in one space and we wanted to

4     maximize our time.  So just out of courtesy, we would,

5     you know, take drinks to replenish their stock.

6          Q    Okay.  And the page of exhibit 14 that has

7     the control number 305 at the bottom, if you'll look

8     up in the top, right-hand corner, there appears to be

9     a receipt for a lunch that you and Mark had.  Do you

10    see that?

11         A    Yes.

12         Q    And did you consider that to be an

13    appropriate item for reimbursement?

14         A    Yes, sir.  That particular event -- we would

15    have monthly financial calls just to see where

16    everybody was on their budgets and it would be an

17    all-day-long event that would start at 8:00 or 8:30,

18    8:15 in the morning and go -- I think our last call

19    was at 4:00 o'clock.

20          We did have -- I think at one time, we had a

21    break maybe from 12:00 to 1:00.  But that was always

22    people calling Mark, you know, having these sidebar

23    conversations.  And so we didn't really have a chance

24    to stop and eat lunch.  And so I would run out and get

25    lunch and get back to the office to assist him.

1           I had to be there because they would

2     constantly send in, you know, new documents, you know,

3     where things had been updated for calls and that sort

4     of thing.  So I needed to be there to do that.

5          Q     Okay.  On the next page, there's a -- the

6     one that's 306 as the control number at the bottom --

7     there's another LongHorn receipt.  Do you see that?

8          A     I do.

9          Q     What was that for?

10         A      It looks like back in Dawsonville.  And that

11    was the time -- I think that was the time I had to

12    rent a U-Haul to get everything back.  Yeah, I only

13    did that the one time.  We had so much to bring back.

14    I think Integra had like 20-something gifts and then

15    we had several and I couldn't get them all in.

16         Q     And so did that cover lunch for yourself?

17         A     Yes, sir.

18         Q     And did you consider that an appropriate

19    expense reimbursement?

20         A     I did.

21         Q     The next page appears to be the U-Haul

22    reimbursement request.

23         A     Uh-huh.

24         Q     Do you see that?

25         A     Yes, sir.

1      Q    Is that the U-Haul you rented because you

2   had such a large shipment of Waterford to pick up?

3      A    Yes, sir.

4      Q    Okay.  Back to the prior page, the one on

5   306, the top right, there's a Ruth's Chris Steakhouse

6   receipt.  Do you see that one?

7      A    Yes.  Yes, sir.

8      Q    And what was purpose of that?

9      A    I believe the purpose of that meeting was to

10  discuss the issue with the time and attendance and the

11  issues with Lorraine.  This was with that group of

12  people that Mark pulled together, the key leadership

13  that kind of had input in that project, and that was

14  from that meeting.

15     Q    All right.  I can see -- some of this

16  appears to be cut off.  It looks like it says MW,

17  Steph and Blair.

18     A    Yes.  And then Chris, Diana and Michelle.

19     Q    All right.  Go to the page please that has

20  control number 308 at the bottom.  It appears to be a

21  copy of a check for $2,900 --

22     A    Yes, sir.

23     Q    -- to Kay Knight.  Do you see that?

24     A    Yes, sir.

25     Q    What was that for?

188

```
 1        A     That was for the convention at Amelia Island
 2   for myself.  I would go down that week to assist with
 3   the big meeting that we would have with key leadership
 4   and then any -- you know, if anything else came up
 5   that week that I needed to assist with or schedule
 6   meetings with people, I could do that while I was
 7   there.
 8        Q     All right.  And then the next page -- 309 is
 9   the control number --
10        A     Yes.
11        Q     -- shows a little more information about
12   this unit.  And it says guests would be four adults,
13   two children.  Who were they?
14        A     At the time, the four adults was going to be
15   me, my mom, my dad and my brother.
16        Q     What about the two children?
17        A     The two children was going to be my daughter
18   and my niece.
19        Q     Okay.  Now, you say at the time.  Did that
20   change?
21        A     Well, it was kind of up in the air if my
22   youngest niece was going to get to go or not because
23   she was so small.  My brother went through an
24   unexpected divorce in January of this year and we were
25   just a little bit unsure as to how much leeway he was
```

1  going to have.

2      Q     Now, if you had booked a room for yourself

3  at the Ritz-Carlton Hotel at Amelia Island, you could

4  have stayed seven nights for less than $2,900, could

5  you not?

6      A     Yes, I could have.

7      Q     Did you discuss with Mr. Waldrop the fact

8  you were renting a condominium for yourself and some

9  family members at this rate as opposed to getting a

10 room at a pretty nice hotel, the Ritz-Carlton?

11     A     No, I did not.

12     Q     He knew about it when he approved the

13 expense report, didn't he?

14     A     Yes, sir.

15         (Defendant's Exhibit 15 was marked for

16         identification.)

17 BY MR. DANIEL:

18     Q     Let me show you a document that's marked

19 exhibit 15 to your deposition --

20     A     Okay.

21     Q     -- and ask you to look at this.  And this

22 appears to be a series of e-mails.

23     A     Uh-huh.

24     Q     But can you tell me what they're about?

25     A     Let's see here.  Yes, this is -- this is

1    communication between my mom and I.  She -- she went

2    with me every year.  She went to stay with my child so

3    that if I had to be out or when I attended the meeting

4    and the dinner and that sort of thing, she provided

5    childcare while I could be away for work.

6           And it was just kind of a -- she looked at

7    it like a girls' trip, a time that we could get away

8    and just be together in between meetings and that sort

9    of thing.  And she had been just the weekend before --

10    or, a few days before saying any word, are we going to

11    get to go, are we going to get to go.

12           And so I was just letting her know that, no,

13    no Amelia Island, because we needed to save money in

14    the budget, which we knew, you know, that was a

15    possibility.  So she wasn't shocked.  She was just

16    kind of sad.  That's all that was.

17       Q   It looks like the dates that you're

18    discussing here for condominium rental in exhibit 15

19    overlap the one that you -- we were dealing with,

20    exhibit 14.  Do you see that?

21       A   Let me see.  Yes.  And I think I was just

22    checking prices on those is all that was.

23       Q   That's -- in exhibit 15 you were checking

24    prices?

25       A   Right.  Yes, sir.

1      Q    But in exhibit 14, you actually sent the

2  money, didn't you?

3      A    Yes.  I think -- I think my mom was getting

4  at, since we can't do that, to plan another trip for

5  us, not convention week.  She -- my mom just -- she'll

6  throw things out there and just kind of research it.

7  She'll get ahead of the game sometimes.  And so she

8  was just -- I think maybe my brother -- that was the

9  week that he was going to have his girls again.

10            You know, with that whole divorce situation,

11  it was not a good situation, and so we had a lot of

12  variables, a lot of unknowns.  And so my mom was just

13  kind of throwing out some dates and that sort of

14  thing.  And just to kind of appease her, I was

15  checking and that sort thing, to see if it would be

16  something we could swing.

17      Q    Okay.  I'm not sure I understand.  It

18  appears to me, if you look at exhibit 14, that you

19  actually rented a condominium in November of 2015 at

20  Amelia Island; is that right?

21      A    Yes, in anticipation of going for that.

22      Q    And this was the one you rented for four

23  adults and two children?

24      A    Yes.

25      Q    And then in March of 2016 -- strike that.

**192**

1   And the rental dates for that rental that you did sign

2   on for in exhibit 14, the rental dates are June 11th

3   to 18th, 2016; is that right?

4        A    Yes.

5        Q    And then it appears in March of 2016 -- this

6   is before the time that you had rented this

7   condominium -- you make other inquiries about renting

8   a condominium at Amelia Island for an overlapping

9   period, June 15th to 19th.

10        A    Uh-huh.

11        Q    And I'm not sure I understand why.  If

12   you've already rented a condominium, why are you --

13   why are you checking out a second one?

14        A    Because we weren't going to be able to stay

15   there for that.  I did not -- I didn't know at the

16   time when I booked it that we weren't going to be able

17   to go.  The company was not going.  Well, the company

18   went, but that Mark was not going to go, so there

19   would be no need for me to go.

20             So when I was talking with my mom, that was

21   the week that she still had out there.  But I didn't

22   even know that I would be able to go that week.  Do

23   you see what I'm saying?  I didn't put in to be off on

24   vacation for that week or anything like that.  I still

25   hadn't talked with Mark about that.

```
 1           So this was kind of just some preliminary --
 2   you know, if we weren't going to get to go then and we
 3   were doing something a little different that was going
 4   to be cheaper, that sort of thing, not -- I mean, I
 5   wasn't going to book two places, if that makes any
 6   sense.
 7       Q    Well, let's go back to exhibit 14.  That
 8   money was paid down.  The check was written and sent.
 9       A    Yes.
10       Q    Did anyone stay in that condominium?
11       A    No.
12       Q    No?
13       A    Huh-uh.
14       Q    Did you get the money back?
15       A    No.
16       Q    Why not?
17       A    We just lost the money because we couldn't
18   go.
19       Q    And why couldn't you go?
20       A    Because the company -- Mark said we did not
21   need to go to Amelia Island that year.  We needed to,
22   you know, not have all those extra expenses for
23   mileage and for food and for all of that.  So we just
24   didn't do anything with it.  So we didn't go.
25       Q    Did others from Community Health go to
```

1    Amelia Island for that meeting?

2         A    I don't know.  I know that some of the other

3    member organizations like Ethica and Integra

4    Rehabilitation did go, but we didn't go.

5         Q    They're a part of Community Health; right?

6         A    Right.

7         Q    Okay.

8         A    I'm sorry.

9         Q    So as far as you know, this condominium just

10   sat idle --

11        A    Yes.

12        Q    -- that you paid for?

13        A    Uh-huh.

14        Q    Did you make any attempt to get a refund?

15        A    No.

16        Q    Why not?

17        A    Because I really didn't know what to tell

18   the lady.  It was non-refundable.  So I knew I would

19   have to kind of beg for it because we were, you know,

20   out of our window and I didn't -- I didn't know that

21   she would just have pity on me and say, oh, I'll send

22   you your money back.  Because I know that's income she

23   counts on too, so --

24             MR. DANIEL:  Do you want to take a short

25        break?

1          MR. HENRY:  Sure.

2          VIDEOGRAPHER:  Going off video, 3:13 p.m.

3     Off video record.

4          (Whereupon, a recess was taken from 3:13

5     p.m. until 3:24 p.m.)

6          VIDEOGRAPHER:  Tape four, 3:24 p.m.  Back on

7     the video record.

8  BY MR. DANIEL:

9     Q    I think you mentioned earlier Blair Lake was

10 a direct report to Mark Waldrop.

11    A    Yes, sir.

12    Q    What was Mr. Lake's position with the

13 company?

14    A    He was over human resources.

15         (Defendant's Exhibit 16 was marked for

16    identification.)

17 BY MR. DANIEL:

18    Q    I hand you exhibit 16, some e-mail

19 correspondence.  The last one is from you to Blair

20 Lake, May 3rd, 2016.  You said it's in the mail.

21 You're apparently referring to $2,000 in cash.  Do you

22 see that?

23    A    Yes, sir.

24    Q    What was the purpose of sending Mr. Lake

25 $2,000 in cash?

1      A     That was just a joke.  You've got to know

2   Blair.  He's very -- he's very light hearted, but

3   he -- you know, kind of a dry sense of humor.  He was

4   just letting me know when the Workday Rising

5   conference was going to be in Chicago so I could get

6   that put into Mark's expense report -- I mean, Mark's

7   calendar.

8           And I just said thanks for the heads up.

9   And then he -- and then I guess that means -- when he

10  said you can send me the 2,000 starting today, it's in

11  the mail, was just a -- I mean, it was just part of

12  that joke I'm assuming.  I don't remember that e-mail.

13  But knowing Blair, that's what it was.

14           (Defendant's Exhibit 17 was marked for

15          identification.)

16  BY MR. DANIEL:

17      Q     Look at exhibit 17 to your deposition.  I

18  believe this is another expense report.  It's not

19  signed by you.  This copy's not.  Do you know if you

20  completed this report?

21      A     Yes, it does look like an expense report I

22  would have submitted.  I don't know why I didn't sign

23  it.

24      Q     If you'll turn to the page that has control

25  number at the bottom 223 in exhibit 17.

197

1        A     Yes.

2        Q     There, someone's written B-day gifts for and

3    then a number of initials and names.  What were those

4    gifts for?

5        A     Those were I believe birthday gifts for

6    presidential council, information services, for Lucy

7    Rogers, Roger Forgey, Perry Kemp and Sarah Thompson.

8    These were some of Mark's direct reports at the time.

9    You know, I told you it would change from time to

10   time.  And at one time, everybody in IS was under

11   Mark.  So they were in with this number of his direct

12   reports.

13            And he had suggested that we get an oil and

14   balsamic gift pack.  I can't remember if he had been

15   somewhere and saw the card or had had it, but he

16   suggested that we get that for everybody for their

17   birthday gifts for the coming year.  So that's what

18   that is.

19       Q     Okay.  Look over at the page that has the

20   control number 227 at the bottom.  Do you see that

21   page?

22       A     Yes.

23       Q     And that's a bill from the Ritz-Carlton.

24   This is the Ritz-Carlton in Buckhead, Atlanta.

25       A     Uh-huh.

1      Q    What was that for?

2      A    That is for a -- I think that was when we

3  had the strategy meeting with leadership council --

4  presidential council where we were thinking of, you

5  know, ideas to bring in more revenue; you know,

6  what's -- what's an idea that you've got that, you

7  know, maybe we could expand the system.  Just kind of

8  getting input from everybody as far as thoughts for

9  the future of ways to bring in additional revenue.

10     Q    Now, it says up there, in paren, Mark and

11 Steph --

12     A    Yes.

13     Q    -- by 422.08.

14     A    Yes.

15     Q    What does that mean?

16     A    That was probably, I'm assuming, our

17 overnight room each.

18     Q    What was the gift policy at Community

19 Health?

20     A    I don't know that we really had a policy.

21 There was no written or formal policy for gifts that I

22 was aware of.

23          (Defendant's Exhibit 18 was marked for

24      identification.)

25 BY MR. DANIEL:

1    Q    Let me show you exhibit 18 to your

2  deposition and ask you to look at this and see if you

3  confirm -- can confirm that this is a copy of an

4  expense report that you completed.

5    A    Yes, that does look like a expense report I

6  submitted.

7    Q    Now, this expense report asks for

8  reimbursement for a number of key-lime pies that were

9  shipped to various people.

10   A    Yes.

11   Q    Do you see that?

12   A    Yes, sir.

13   Q    And if you'll look at the control page that

14  has 848 at the bottom, it appears one of these pies

15  was actually sent to you.

16   A    Yes, sir.

17   Q    What was the purpose of sending these

18  key-lime pies to various people?

19   A    Mark had me send out one to everybody for

20  Thanksgiving.

21   Q    Did Mr. Waldrop give you the list of people

22  who were to receive these pies?

23   A    I'm sure we talked about it and I just wrote

24  the names down.  I can't recall that day exactly how

25  the conversation went, but I'm sure I just jotted them

200

1  down.

2      Q    I just want to know if he's the one who

3  decided to whom the pies should be sent.

4      A    Oh, yes, sir.

5      Q    Okay.  Thank you.

6          (Defendant's Exhibit 19 was marked for

7          identification.)

8  BY MR. DANIEL:

9      Q    Let me show you exhibit 19.  This is a

10  fairly thick document, but I just want to show you I

11  think just one page of it, the third page.  It has

12  control number 061 at the bottom.  Do you see that

13  page?

14      A    Yes, sir.

15      Q    Is this an inventory that you made of the

16  Waterford crystal on hand in the Dalton office on

17  July 7th, 2015?

18      A    No, I did not do this spreadsheet.

19      Q    Do you know who did this?

20      A    I do not.

21      Q    How about the first two pages?  Do you know

22  who did that?

23      A    No, sir.

24      Q    Okay.

25      A    Now, I did do this page.

1      Q     Which page?

2      A     062.

3      Q     All right.  And what does that show?

4      A     That was what we had on hand at the time.

5      Q     And that date would be July 7th, 2015?

6      A     I guess that was the last time I had updated

7  that particular spreadsheet.  Yes.

8      Q     And can you tell me why you had all of that

9  crystal on hand on July 7th, 2015?

10      A     Yes, sir.  In the budget, we would budget X

11  amount of dollars.  And so we would go ahead and we

12  would purchase that and -- and use all of our

13  resources when we could get the discount.  So we would

14  get, you know, the gifts that we needed for that year

15  and then we would also get any extra pieces like for

16  retirements and that sort of thing, so that we would

17  have extra pieces to send out if we needed something.

18           And from time to time, when an occasion like

19  that would come up, Mark would ask, you know, what do

20  we have in the -- in the warehouse.  So I tried to

21  keep an inventory so I could kind of get an idea for

22  what he might want to send.

23           (Defendant's Exhibit 20 was marked for

24       identification.)

25  BY MR. DANIEL:

202

1     Q     Let me show you a document marked exhibit

2   20.  Tell me if you recognize what this photograph

3   depicts.

4     A     Yes, sir.  I do.

5     Q     What's that?

6     A     It is some of the Waterford inventory that

7   we had on hand.  It also had some files, some of

8   the -- I don't -- I don't know exactly what you call

9   them, but when the H1N1 scare came about, the face

10  masks, we had -- they had sent several up to us and we

11  kept those housed in the warehouse.

12          There's also -- you can see the bottom of a

13  cooler and it's where our freezer had gone out at the

14  office and I wasn't able to get a repairman out quick

15  enough, so I had to run to -- I think I might have

16  went to Lowe's to get a cooler and then one of the

17  stores to get some ice to put our food on ice so it

18  didn't spoil.

19    Q     Okay.  Where are the face masks in this

20  photograph?

21    A     If you'll look on top of the filing cabinet,

22  those white boxes, and then if you'll look just to the

23  right of the filing cabinet, the blue and the brown

24  box, those were full of those masks that I believe we

25  got from ECP Distributors.

1        Q     Tell me about what you know about the
2  DeBrock Poodle business.
3        A     The DeBrock Poodle business is -- from what
4  I could gather was a hobby that turned into, you know,
5  a little bit of revenue that Mark just kind of did on
6  the side.  He raised a few show-breed poodles in his
7  home.  He had a lady that would take care of them
8  while he was at work.  And he would show them or
9  sometimes he would sell them.  If they weren't a puppy
10  that he could use, then he would sell those.
11        Q     Did you ever see any of these poodles?
12        A     I did.
13        Q     Where did you see them?
14        A     There were a few occasions, not many, but
15  where Mark would have to take one of the puppies in,
16  like if it had had a baby and maybe the vet needed to
17  check the babies or something, shots or something like
18  that, and he would have to leave work to go pick them
19  up and usually he would bring -- you know, bring it in
20  and let me see it and hold it just for a minute and
21  then he would take it back and crate it in his car.
22        Q     So he'd have the poodle in his car at the
23  office?
24        A     Yes, sir.  There were a couple of times that
25  he brought -- he would bring it in and put it in the

1    bathroom or something with a towel over it if it was

2    extremely hot.  That didn't usually happen, though.

3    He usually just kept the air on in his car and would

4    go out several times and check on it.

5         Q    This was the bathroom at the office?

6         A    Yes, sir.

7         Q    Did you have any role in dealing with the

8    books and records of the poodle business?

9         A    No.  I would have -- he would ask me every

10   now and then if I would type up a form for him or

11   something like that, but I didn't keep his records for

12   him.

13        Q    Did you understand that Mr. Waldrop made

14   some money from the poodle business?

15        A    Yes, sir.

16        Q    And what was your understanding?

17        A    Just that when he would sell the dog, he

18   would make -- he would make some money.  I know he --

19   just in hearing conversations, I know he put a lot

20   into them also, having the puppies microchipped and

21   all their vaccinations and that sort of thing.  So I

22   know he had money in them.  I don't know how much he

23   made off of them after all of his expenses were

24   incurred, but I do know that he generated a profit.

25        Q    Did you know that Mr. Waldrop had listed the

1    River Birch office in Dalton as an emergency shelter
2    for the poodles if needed?
3         A    Yes.  That was on a form that I had -- I
4    think that I had typed up.  It was on there.
5         Q    Were you prepared to deal with the poodles
6    in the event they had to come to the office on an
7    emergency basis?
8         A    No, sir.  In fact, the reason that
9    Mr. Waldrop had communicated that he even wanted me to
10   type that up is because they have -- I don't know the
11   name for them, but I guess inspectors that come around
12   just to make sure that they're not in bad situations.
13   And so he just wanted to have something -- I don't
14   know if he had to have like an emergency plan on hand
15   in a notebook or something.  But that never happened.
16        Q    So you only had occasional drop-in visits of
17   the poodles?
18        A    Yes, sir.
19             (Defendant's Exhibit 21 was marked for
20        identification.)
21   BY MR. DANIEL:
22        Q    Please look at exhibit 21.  This is a
23   photograph.  Can you show me what that -- tell me what
24   that depicts?
25        A    Yes, sir.  On the bottom in the

206

1    priority-mail boxes are some of the olive oil and
2    balsamic vinegar gift sets that was referenced in a
3    previous expense report.  Again, we didn't have a very
4    big office, so we kept a lot of our things in the
5    supply -- or, in the warehouse.  So that was that.
6            The boxes on that middle rack are actually
7    candles that we had left over that we had purchased at
8    one time for birthdays or something like that.  So
9    those were extras for those.
10           The Lysol cleaning supplies, that is -- and,
11   actually, I can't say 100 percent, but probably, my
12   guess, the other two boxes on top are also the Lysol
13   cleaner.  Mr. Waldrop had asked me -- one time I was
14   going to Walmart to get some supplies for the office
15   and he asked me if I could look and see if they had
16   this particular brand of Lysol cleaner, which they did
17   not.
18           And we had later found out that it had
19   been -- that it was going to be discontinued and
20   that's what he liked to use with his puppies at home.
21   And so he had asked me one day if I could look on the
22   Internet and see if there was anyplace that had them
23   in stock so that we could get some ordered.
24           We did find a place.  I can't remember now
25   where it was.  But we found a place and he ordered

1    several cases of it.  It was shipped to our office.

2    And we were either going to be having a meeting the

3    very next day or the day that we got it he was going

4    to be going out of town.  I can't remember which.  But

5    just in kind of a we don't really have time to deal

6    with this right now, you know, we need to do

7    something -- but we need to do something with it,

8    because the office is not big and it was right in

9    front of the door, I took the extras over to the

10   warehouse to house them.

11          And, you know, Mark periodically would say,

12   hey, next time -- don't make a special trip, but next

13   time you're over there, if you'll grab a box of my

14   cleaning supplies and bring them, you know, I'd

15   appreciate it.  So that's what that was.

16        Q    Did Mr. Waldrop pay for these cleaning

17   supplies with his own personal funds?

18        A    Yes, sir.  He -- I either placed the order

19   for him and used his card or I bought them and he

20   reimbursed me.  I'm not sure which.

21        Q    So this was an occasion in which you used

22   Mr. Waldrop's credit card?

23        A    No.

24        Q    You did not use --

25        A    Oh, oh, oh.  That, I can't remember.  I

1  don't know if I used his Sun Trust card for this or if

2  he paid me back with a check.  I'm not sure.  But one

3  way or the other, he did pay for it.  Even if he had

4  to reimburse me, he paid for it.

5      Q    Were there other occasions on which

6  Mr. Waldrop would reimburse you for any advances you

7  made on his behalf?

8      A    Yes.  Yes.

9      Q    What were some other situations where he

10  would do that?

11     A    Similar, you know, if he was out and needed

12  something picked up and I was going to be at Walmart,

13  just to save him time and having to drive across town,

14  I would just pick it up and then I would always pay

15  for it separate and give him a receipt.

16     Q    Okay.  The second page is a photograph of

17  some surgical masks.  What --

18     A    Yeah.

19     Q    Why are those in the office?

20     A    Those are the masks that I was referring to.

21  When all the situation with the H1N1 came out, they

22  wanted to have some in the area.  And so I don't know

23  if they expire.  If they did, they're probably

24  expired.  But that's what that was.  And we just kept

25  them in the warehouse in case we ever needed them.

1      Q    What did you do to prepare for this

2   deposition?

3      A    Well, really, there wasn't a lot I could do.

4   I didn't have any notes.  And like I said, a lot of

5   times I would make notes because it would be so fast

6   paced.  There's no way you can remember every little

7   detail.  Now, when --

8              THE WITNESS:  Your last name's leaving me.

9              MR. HENRY:  Henry.

10              THE WITNESS:  Henry.  When Mr. Henry called

11         to make me aware of the deposition, I guess he

12         could tell I was very nervous.  I had never done

13         anything like this before.  And, you know, he

14         said if it will make you feel better, I'll be

15         happy to kind of go over with you what to expect,

16         just kind of give you a rundown of how a

17         deposition goes, because I had never done one

18         before.  But that was basically it.

19              MR. DANIEL:  Mr. Henry, do you represent the

20         witness?

21              MR. HENRY:  I do not.

22   BY MR. DANIEL:

23      Q    Okay.  Just tell me what you said to

24   Mr. Henry and what he said to you.

25      A    Basically, he told me that, you know, you

1    guys would have up to seven hours that we could talk

2    things out.  You know, he said they can -- you know,

3    he can ask you anything he wants to ask you.  He may

4    ask about your family.  He may ask about education.

5    You know, he can ask anything he wants to ask.

6            You may wonder, you know, what does this

7    have to do with that.  Don't -- just answer his

8    questions.  Tell the truth.  Don't, you know,

9    purposely withhold anything.  Don't -- don't worry

10   about what you're -- how you're going to answer a

11   question is going to impact our case.  That's his job.

12           You know, if I -- because I did express to

13   him my concern over, you know, not only nerves but

14   just, you know, it's been some time.  I had been with

15   the company for a long time and trying to remember

16   every little detail is overwhelming and, you know, you

17   can forget and make mistakes.

18           And, you know, so there's that aspect of it

19   and then just still the brain fog that I have from my

20   surgery.  I'm just very apprehensive about that.  But

21   he just assured me that if I come to a situation where

22   I honestly can't remember that, you know, I can't

23   remember/I do not recall is acceptable.

24           But that was -- that was basically it.  He

25   didn't give me any -- any specifics or, you know,

211

1    anything I need to think about or study or prepare

2    for.  He just, you know, was just very general.

3              (Defendant's Exhibit 22 was marked for

4         identification.)

5    BY MR. DANIEL:

6         Q    Okay.  Let me show you a document that's

7    marked exhibit 22 and ask you to look at it and tell

8    me if you can recognize this as a copy of an expense

9    report that you prepared.

10        A    Okay.  So these are two separate expense

11   reports --

12        Q    Okay.

13        A    -- in here.

14        Q    Do you recognize them both as expense

15   reports that you prepared?

16        A    Yes, sir.  They look like something I

17   prepared.

18        Q    Okay.  If you would, look at the last two

19   pages.  These appear to be copies of a calendar.

20        A    Okay.

21        Q    Can you tell if these are copies of your

22   calendar for the periods indicated?

23        A    No, this -- this would be Mark's.

24        Q    Those are Mark's calendars?

25        A    Well, let's see.  The first one would be.

1  Let me see.  Yes, they would be Mark's calendar.

2      Q    Did you have access to his calendar --

3      A    Yes.

4      Q    -- when you worked for him?

5      A    Yes, sir.

6      Q    If you'll look at the first of the two

7  pages.  This is the one that has control number -- it

8  doesn't have one for some reason.  It's June 2nd to

9  June 8th, 2014.  Do you see that one?

10     A    June 2nd?  I'm sorry.  What now?  Oh.  Okay.

11 I'm sorry.  We're still on the calendar.  Yes.

12     Q    Do you see that page?

13     A    Yes.

14     Q    It appears to say up at the top under

15 June 2nd, girls at Amelia Island.  Do you see that?

16     A    Yes.

17     Q    What does that mean, if you know?

18     A    I believe that is the year that Mark's wife

19 and daughters went down the week before convention and

20 stayed.

21     Q    Okay.

22     A    I'm pretty sure.

23     Q    And then the next -- on the next page, a

24 period of June 9th to June 15th, 2014, under Thursday,

25 June 12th, it says GHCA summer convention, Amelia

1   Island.  Do you see that?

2        A    Yes, sir.

3        Q    So that would have been a convention that

4   would have been the week after that first entry, the

5   June 6th -- June 2nd to 6th?

6        A    Yes, sir.

7        Q    Now, if you'll look at the expense reports,

8   it appears that there are amounts sought for the

9   convention.  This would be under 9/13 -- the 9/13/13

10  report.  And the amount sought for the convention

11  is -- I believe, if you add them up, it's $2,546.41.

12  We may have to get you a calculator to add a couple of

13  these together.  But do you see what I'm talking

14  about?

15       A    Yes, sir.

16       Q    And it appears that there were seven nights

17  for you and eight nights for Mark Waldrop.  Does that

18  appear to be correct?

19       A    It does.

20       Q    And then if you'll look at the second

21  expense report, the one 5/30/14, there it appears you

22  have Summer Beach lodging during GHCA convention, Mark

23  and Stephanie, total of $4,933.52.  And you would have

24  to add some receipts to get to that total, but do you

25  see that?

1        A    Yes, sir.  I see that total.

2        Q    Now, on this receipt, there appears to be an

3   undocumented charge for May 5th, 2014, for $2,134.29.

4   Do you see that?

5        A    No, I don't see that.  You said on May the

6   5th?

7        Q    It's the expense report for May 30th.

8        A    Okay.  May 30th.

9        Q    Okay.  It's the page that has -- well,

10  again, for some reason, we don't have a control number

11  at the bottom.  But it's the page behind the expense

12  report form.  It has the title posted charges,

13  American Express US, manage your credit card, online

14  statement.  Do you see that?

15       A    Yes.

16       Q    The expense I'm talking about there is

17  apparently on your card, $2,134.29.  Do you see that?

18       A    Yes, sir.

19       Q    Now, was this for Mark Waldrop's family for

20  that June 2nd to June 6th time period?

21       A    I couldn't say for sure on that.  Because I

22  can't remember how much they had to pay.  So I

23  couldn't say for sure on that.

24       Q    Did you ever -- did you ever take a trip and

25  go -- stay in a condominium or hotel at company

**215**

1    expense when you really were not on company business?

2         A    No, sir.

3         Q    Did Mr. Waldrop to your knowledge?

4         A    No, sir.

5         Q    In this case, this charge does not appear to

6    be documented.  Do you know whether or not he

7    reimbursed the company for it?

8         A    I feel sure Mark did.

9         Q    Do you know of occasions in which he did

10   reimburse the company for matters that you charged for

11   him on your American Express that were not company

12   business?

13        A    No, not right off.

14        Q    Well, let me ask you this.  In doing these

15   expense reports, if you go to a restaurant like the

16   Lighthouse here in Chattanooga which has been

17   recommended to me --

18             MR. HENRY:  The Boathouse?

19             MR. DANIEL:  Huh?

20             MR. HENRY:  Is it the Boathouse?

21             MR. DANIEL:  I don't know.

22   BY MR. DANIEL:

23        Q    If you go to a restaurant or -- strike that.

24   While you were employed at Community Health, if you

25   had gone to a restaurant and you had a tab that

1    included alcohol, you were not supposed to deduct or

2    seek reimbursement for the alcohol --

3        A    Right.

4        Q    -- from the company, were you?

5        A    Right.  No.  No.

6        Q    And so typically your expense report would

7    say -- let's say you went out and you had a big night

8    and you spent $100 on food and $50 on wine.

9        A    Uh-huh.

10       Q    Big celebration.

11       A    Right.

12       Q    And at the end when you submit your expense

13   report, you only submit it for $100 instead of 150; is

14   that right?

15       A    Right.  Yes, sir.

16       Q    Now, if that was on your credit card and you

17   paid for it, you're out $150, aren't you?

18       A    Yes.

19       Q    So if Mr. Waldrop is the one who was

20   drinking all that wine, did he pay you back?

21       A    Yes.

22       Q    What, he just wrote you a check?

23       A    Yes.

24       Q    Did this happen frequently?

25       A    No, not frequently.  But from time to time,

1  it would happen, yes.

2      Q    Have you ever met Mr. Waldrop's wife and

3  children?

4      A    Yes, sir.

5      Q    Do you -- do you know that one of the

6  children has a business?  I think it's called Designs

7  by --

8      A    Malyse.

9      Q    -- Malyse?

10      A    Malyse.

11      Q    Okay.  I wasn't sure if I was pronouncing

12  that right.

13      A    Uh-huh.

14      Q    What do you know about that business?

15      A    I know that they were in the airport going

16  on a family trip one time and his old oldest daughter,

17  Madison, was doing some sketches and Mark's wife,

18  Christine, had commented on, you know, how good they

19  were, that sort of thing, had a friend take a look at

20  them and thought, you know -- just making sure she

21  wasn't too biased and kind of got her input on it and

22  said, no, I really think she's got a niche for this

23  kind of thing.

24          And it just kind of took off from there.

25  They eventually opened up a store in downtown

1    Chattanooga.  They were, you know, doing orders, maybe

2    even taking some custom orders.  But I don't -- I

3    don't even know if they're still in business.  We

4    haven't talked about it in a long time.

5          Madison had gone off to school and they had

6    had some big life changes and, honestly, I just -- we

7    had gotten so busy, I didn't ask for any kind of

8    update.  But I did know about the business.

9        Q    Did you ever assist in handling the books

10   and records of the business?

11       A    No, sir.

12       Q    Did you have any involvement in it at all?

13       A    No.

14       Q    Did you talk to Mr. Waldrop about this

15   deposition before today?

16       A    No.

17       Q    No conversations?

18       A    No.

19          MR. DANIEL:  Let's take about five minutes.

20       I'll confer with Latoya and we'll see if we can

21       wrap this up.

22          MR. HENRY:  Okay.

23          VIDEOGRAPHER:  Going off video, 3:59 p.m.

24       Off video record.

25          (Whereupon, a recess was taken from 3:59

1      p.m. until 4:06 p.m.)

2           VIDEOGRAPHER:  4:06 p.m.  Back on video

3      record.

4  BY MR. DANIEL:

5      Q    What was the process for reimbursing the

6  company for something the company had paid for that

7  was really not a valid business purpose?

8      A    We would just write a check back to

9  whichever member organization it was, if it was CHS or

10  Integra or whomever.  They would just write a check

11  back to them.

12     Q    All right.  You'd have to explain it I'm

13  sure; right?

14     A    Yes.

15     Q    And so what backup would you give them?

16     A    Like, for example, there was a time when

17  Mark had registered for -- I think it might have been

18  a Workday or a conference similar to that and we had

19  expensed it, but then he ended up not being able to

20  go, but we were within the window that we could get

21  our money back.

22          And so I believe I called Teresa Moody or

23  Maricella Espinoza to find out what I needed to do in

24  order to write that check back.  And they just told me

25  to write a check to the company, and then I included a

**220**

1   copy of the registration and maybe even -- I don't

2   know if they sent me any kind of cancellation or not,

3   but if they would have sent something, then, you know,

4   I would have tried to attach that too.  But if not, I

5   could put that in there.

6        Q    So if Mr. Waldrop did, in fact, reimburse

7   Community Health for this item that appears to be, you

8   know, an undocumented charge that's on exhibit 22, the

9   one I was asking you about, that would have been

10  documented by, number one, a check --

11       A    Yes, sir.

12       Q    -- and, number two, some backup?

13       A    Yes, sir.

14       Q    Okay.

15       A    Unless -- unless I made an error, which is

16  totally possible.  I mean, I'm human and we all make

17  mistakes and certainly, you know, if I -- if I made an

18  error, you know, I would have been happy to have

19  reimbursed the company or paid that back if that was

20  something that I did in error.  But it would not have

21  been on purpose.  I wouldn't have done it on purpose.

22            I would still be happy to -- you know, to do

23  that.  If I made an error like that, I would be happy

24  to make that right.

25       Q    Well, according to your associate

1    performance appraisal, you didn't make a lot of

2    errors, but -- you don't have to answer that.

3            If Mr. Waldrop had -- strike that.  If

4    Mr. Waldrop did submit reimbursement for this

5    particular item we've been talking about, you would

6    have done the paperwork for it; is that right?

7        A    Most likely, yes.  Uh-huh.

8        Q    When a -- when a trip was canceled or a

9    reservation was canceled and the time for refund had

10   passed, did Mr. Waldrop or anyone working with the two

11   of you reimburse the company for that?

12       A    No, sir.

13       Q    That just -- the company just absorbed that

14   expense?

15       A    Yes, sir.  And, you know, as a rule of

16   thumb, we really tried to not let that be an issue.  I

17   know life happens and things come up sometimes out of

18   our control.  But, certainly, you know -- and I will

19   say that there are others in the organization that are

20   known for dropping out last minute.  We did not have

21   that reputation.

22           If we -- you know, we tried to be good

23   stewards and, you know, we knew that it was not our

24   money.  And if we signed up for something, we tried to

25   go unless something came up and it was going to cost

1    way more either to get out of it or to go ahead and

2    go, that we didn't need to do that, and we --

3           You know, like, for example, there was a

4    time -- and it may have been last -- I think it may

5    have even been maybe in April of this year when we

6    were doing -- I had spoke about the budget reviews

7    when we'd meet for the week-long meeting.  And we had

8    decided upon a location in Atlanta that was a good

9    central location for everybody.

10          And then, like, a few days before,

11   Mr. Rollins decided that he wanted to be involved in

12   that process, which was fine, but he wanted to have it

13   in Macon.  And so we had to pay I think like a

14   thousand-or-so dollars to cancel for that week because

15   we had, you know, had it reserved.

16          So things like that would come up.  But,

17   certainly, Mark was never one to say, okay, sign me up

18   for it and if I can't go, you know, it's okay.  I

19   mean, if he put it on his calendar, he tried every way

20   in the world to get there.  So we didn't make a habit

21   of that because we didn't want to waste the money.

22   So, you know, if it did happen, it was not planned.

23      Q    Did I understand you to say a few minutes

24   ago that there was a time when Mr. Waldrop did pay for

25   some of these business travel expenses with his own

223

1   credit card before he started asking you to handle it

2   for him?

3        A    Yeah, there would be times when -- I mean,

4   sometimes he would.  It wasn't that I always did it.

5   Sometimes he would say, no, just use my card; you can

6   put it on my card.  Like if he, you know, needed to

7   have, you know, X -- you know, he needed to use his

8   card to -- you know, to get at a higher status so that

9   we didn't have to pay baggage fees when he traveled

10  and that sort of thing that would save the company

11  money, you know, he would say use my card; I need to

12  get the points so that I can -- you know, because they

13  might waive a change fee or it would be cheaper if

14  something happened.  And so there were benefits that

15  way.  And so sometimes we would use his card.

16       Q    I asked you earlier about the telephone

17  calls that you sat in on, the ones that --

18       A    Yes, sir.

19       Q    -- were recorded.

20       A    Yes, sir.

21       Q    And I think you indicated those were always

22  with Ronnie Rollins; is that right?

23       A    To my knowledge.  Now, there could have been

24  other people on the call.  But I can't remember

25  exactly which ones he taped and which ones he didn't.

1    Q    So did you sit in on telephone calls with

2  Mr. Waldrop and listen in when he did not record them?

3    A    Yes, sir.

4    Q    Okay.  And were people other than Ronnie

5  Rollins involved in those calls?

6    A    Yes, sir.

7    Q    Who else?

8    A    Gosh.  It could be -- it could be anybody

9  that directly reported to Mark or, you know, if we

10  were to get a call from -- in other words, it wasn't

11  odd for me to go in and listen on a call.  Like if

12  he -- he may say what are your thoughts on this, you

13  know, just to get feedback, bounce off ideas.  So it

14  wasn't odd for me to sit in.

15         And not only that, but, again, our office

16  was so small that, you know, I could hear a lot of the

17  conversation anyway, you know, if the call was on

18  speaker phone.  So there would just be sometimes when

19  Mark would need me to not be doing anything else and

20  just listen in on a call, like if we had a

21  presidential council call or something like that.

22    Q    Did you ever listen in on calls between Mark

23  Waldrop and Lorraine Taylor?

24    A    Yes.  There were times.

25    Q    Do you know approximately how many times?

1        A     I don't.  I'm sorry.

2        Q     Did Mr. Waldrop ever tell you not to use

3   e-mail?

4        A     No, he did not.

5        Q     He never did anything to discourage your use

6   of e-mail?

7        A     No, he did not.

8        Q     Did he use e-mail on a frequent basis?

9        A     He did.  Uh-huh.

10             MR. DANIEL:  That's all I have at this time.

11             MR. HENRY:  I just have a few --

12             THE WITNESS:  Okay.

13             MR. HENRY:  -- short followup questions.

14                    REDIRECT EXAMINATION

15   BY MR. HENRY:

16        Q     If you would look at exhibits two and three.

17   I know there have been a lot of exhibits.  But

18   specifically it's the one -- the contract with your

19   father and the contract with Kim Woods Construction.

20        A     Yes.  Let's see.  Oh.  Okay.  Sorry.

21        Q     That's okay.

22        A     Okay.

23        Q     I just wanted to be sure I understood your

24   testimony earlier.  Did you submit or go through the

25   project charter authorization process for both

226

1   exhibits two and three?

2       A    No, we did not.

3       Q    Okay.  I guess I thought that I heard you

4   say that you did with regard to one of those exhibits.

5   So I just wanted to clarify.  You did not?

6       A    No.

7       Q    Okay.  You also earlier described a -- I

8   think you called it a heavy telephone call between

9   Mr. Rollins and Mr. Waldrop.

10      A    Yes, sir.

11      Q    I think it was the day before the break-in.

12      A    Yes, sir.

13      Q    All right.  Do you recall what month that

14  was in 2016?

15      A    I want to think it was March.  Maybe March

16  the 30th or 31st.  I know it was at the end of the

17  month I'm pretty sure.

18      Q    Okay.

19      A    My daughter had a carnival.  That's why I'm

20  trying to -- I think I --

21      Q    Right.  How long before you were terminated

22  was the break-in?

23      A    Well, if the -- if it happened on March the

24  30th or the 31st, it was less than 24 hours.  So it

25  would have been, you know, either March 31st or

1  April 1st, something like that.  Something -- I'm not

2  exact on my dates.  So then from just say April 1st --

3  throw that out there -- May, June, July.  Almost four

4  months.

5       Q    If -- strike that.  Could it be possible

6  that that telephone conference occurred in May instead

7  of March?

8       A    It could have.  Again, I'm just not --

9       Q    Okay.

10      A    -- real clear on my dates.  I'm sorry.

11      Q    No.  Fair enough.

12      A    I'm not saying it didn't.  It could have

13  happened in April.  But I'm not saying it didn't

14  happen in May.

15      Q    Okay.  Did any other Community employees or

16  representatives ever ask you to submit expense reports

17  on their behalf?

18      A    No, not that I can remember.

19      Q    Even in their -- even in their individual

20  name?  For example, did Mr. Rollins ever ask you to

21  submit a business expense reimbursement request?

22      A    No.  Mr. Rollins never asked me to do that.

23      Q    Okay.

24      A    Huh-uh.  Now, there might have been things

25  like leadership development that we did that he was a

1    part of that I would expense.  But I never turned in

2    an expense report for Ronnie ever.

3        Q    When you say that there might have been a

4    leadership council expense that you would have

5    submitted, would that have been in your own name?

6        A    Yes.  Leadership development, we would hold

7    meetings in Atlanta where we had a group of

8    hand-selected -- there was an interview process that

9    they had go through -- individuals to participate in a

10   true leadership development program.  And Mark, Ronnie

11   and Lorraine were all present.

12            We would have speakers come in.  We would

13   dive deeper into what we were already doing and just

14   kind of tighten up some loose areas.  We even had them

15   do kind of like a Shark Tank thing at the end, you

16   know, where they kind of had to come up with a

17   business plan and present it and that sort of thing to

18   see if they got buy-in.  And then I would just expense

19   that.  Even though it was for everybody, I still

20   expensed that.

21       Q    Okay.  You've testified some today about

22   budgeted expenses.

23       A    Yes, sir.

24       Q    When would you receive the budget for a

25   given year?  Let me ask it this way.  Did you know

229

1    what your budget was for 2015 before 2015 started?

2        A    I don't ever remember anybody giving me a

3    copy of a budget.

4        Q    Okay.

5        A    That's why, you know, I was not real clear

6    as to what the approval process was because I never

7    got anything in return.  It was just always -- you

8    know, we kind of itemize it out really just for us so

9    we know what it is.  And then what they did with it

10   after that, I was -- you know, I wasn't sure.

11            We didn't get -- every now and then, they

12   would send us like a -- if I would ask for like our

13   monthly financial to see how we were doing.  Mark had

14   calls with all the member organizations every month

15   and we would get their financials.  We didn't always

16   get ours.  He would have me call and say, you know --

17   or, call and get a copy because he would ask me and I

18   would say I don't really know where we are.  So I

19   never really got, I guess, like this is what your

20   budget is.

21       Q    Do you know what Community's budget year

22   was?

23       A    No.

24       Q    Was it January 1st to December 31st or --

25       A    No.  It was July 1st to June 30th.

230

```
 1              MR. HENRY:  I think that's it.
 2              MR. DANIEL:  Let me ask you one more
 3         question, maybe two.
 4                      RECROSS-EXAMINATION
 5    BY MR. DANIEL:
 6         Q    In this intense telephone call that you
 7    described between Mr. Waldrop and Mr. Rollins, did
 8    either person yell or raise his voice?
 9         A    They raised their voice.  There was -- I
10    don't recall any yelling.  But there was -- there was
11    some raised voices during the call.
12         Q    Did anyone use profanity?
13         A    Not that I recall.  Huh-uh.  No, sir.
14              MR. DANIEL:  That's all I have at this time.
15         Thank you.
16              MR. HENRY:  All right.  You have -- I was
17         going to say you have the right to read and sign
18         your deposition if you want to reserve that
19         right.  Some people waive it if -- but that's
20         totally up to you.
21              I can't really give you any kind of legal
22         advice on whether you should or shouldn't.  The
23         court reporter will want to know whether you want
24         to review the transcript or if you waive that
25         right.
```

1          THE WITNESS:  Okay.

2          MR. HENRY:  So --

3          THE WITNESS:  Yeah, I would like to review

4     it.

5          MR. HENRY:  Then I'll get it to her to look

6     at.

7          VIDEOGRAPHER:  Going off video.  This

8     concludes the videotaped deposition of Stephanie

9     Dotson.  The time is 4:22 p.m.  We are now off

10    video record.

11          (Whereupon, the deposition was concluded at

12    4:22 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

232

1                            DISCLOSURE

2      STATE OF GEORGIA              Deposition of Stephanie Dotson

3      COUNTY OF COBB               Date: January 30th, 2017

4               Pursuant to Article 10.B of the Rules and
       Regulations of the Board of Court Reporting of the
5      Judicial Council of Georgia, I make the following
       disclosure:
6
                I am a Georgia Certified Court Reporter.  I
7      am here as a representative of American Court
       Reporting Company, Inc.
8
                I am not disqualified for a relationship of
9      interest under provisions of O.C.G.A. 9-11-28(c).

10              American Court Reporting Company, Inc., was
       contacted by the offices of Harold Daniel, Esq., to
11     provide court reporting services for this deposition.

12              American Court Reporting Company, Inc., will
       not be taking this deposition under any contract that
13     is prohibited by O.C.G.A. 15-14-37(a) and (b).

14              American Court Reporting Company, Inc., has
       no exclusive contract to provide reporting services
15     with any party to the case, any counsel in the case,
       or any reporter or reporting agency from whom a
16     referral might have been made to cover this
       deposition.
17
                American Court Reporting Company, Inc., will
18     charge its usual and customary rates to all parties in
       the case, and a financial discount will not be given
19     to any party to this litigation.

20              This the 30th day of January, 2017.

21

22

23     _____
                                BONNIE L. SMITH, RPR, CCR
24                                   CCR-B-2432

25

233

1                    C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF COBB)

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    proceedings were reduced to typewriting under my

7    direction and control.

8         I further certify that the transcript is a true

9    and correct record of the evidence given at the said

10   proceedings.

11        I further certify that I am neither a relative or

12   employee or attorney or counsel to any of the parties,

13   nor financially or otherwise interested in this

14   matter.

15        This the 30th day of January, 2017.

16

17

18

19

20

21

22

23

24   _____

25            BONNIE L. SMITH, RPR, CCR B-2432

234

1                    E R R A T A   S H E E T

2    In Re:   Mark A. Waldrop v. Community Health Systems,
               Inc.
3              United States District Court
               File No. 4:16-CV-235-HLM
4
     Deposition of Stephanie Dotson, taken on January 30th,
5    2017.

6    I have read the transcript of my deposition and find
     that no changes are necessary _____.
7                                     Stephanie Dotson

8    or

9    Having read the transcript of my deposition, I wish to
     make the following changes:  (Please state reason.)
10

11   Page _____,  Line _____:

12   Page _____,  Line _____:

13   Page _____,  Line _____:

14   Page _____,  Line _____:

15

16

17

18

19

20   _____

21     Stephanie Dotson

22

23

24

25

Mark A. Waldrop v.
Community Health Systems, Inc.

Stephanie Dotson
January 30, 2017

**$**

**$10,155 (1)**
167:19
**$100 (2)**
216:8,13
**$12 (1)**
12:24
**$13,658.41 (1)**
51:13
**$150 (1)**
216:17
**$19 (1)**
182:16
**$2,000 (2)**
195:21,25
**$2,134.29 (2)**
214:3,17
**$2,546.41 (1)**
213:11
**$2,814 (1)**
170:9
**$2,900 (2)**
187:21;189:4
**$250,000 (2)**
82:12;83:6
**$300 (2)**
31:14;44:11
**$37,570 (2)**
166:12;167:9
**$38 (1)**
181:12
**$4,933.52 (1)**
213:23
**$4.44 (1)**
183:14
**$5,500 (1)**
58:3
**$50 (1)**
216:8
**$75 (1)**
31:24
**$804 (1)**
176:23

**[**

**[sic] (1)**
112:9

**A**

**ability (2)**
35:22;68:7
**able (20)**
16:23;52:8;56:1;
62:3;71:20;72:22;
93:17;117:7;150:18;
159:5;166:15;
168:14,14,18;175:11;
192:14,16,22;202:14;
219:19

**absolutely (2)**
93:8;102:24
**absorbed (1)**
221:13
**acceptable (2)**
179:2;210:23
**accepting (1)**
69:5
**access (6)**
18:4;22:8;165:18,
19;167:23;212:2
**accidents (1)**
42:15
**accommodating (1)**
102:20
**accompanied (1)**
152:8
**according (1)**
220:25
**account (1)**
101:25
**accountable (2)**
80:14;117:18
**accrued (2)**
65:24;72:4
**accuse (1)**
117:25
**accusing (1)**
106:21
**acknowledging (1)**
145:10
**acquaintance (1)**
128:15
**acquainted (1)**
38:22
**acquire (1)**
14:19
**acquired (2)**
15:8;57:17
**across (6)**
16:16;36:6;43:16;
75:3;84:1;208:13
**actual (2)**
43:20;138:7
**actually (30)**
8:15,22;9:4,10;
10:3;16:21;18:3,6;
48:23;63:25;67:1;
70:1;82:16;91:11;
114:18;116:10;
120:10;122:22;
128:24;134:18;
136:23;139:23;
149:21;162:19;
181:14;191:1,19;
199:15;206:6,11
**Acworth (6)**
28:1,7,13,22;29:1;
100:3
**add (5)**
136:21;177:10;
213:11,12,24
**additional (3)**

**154:12;177:11;**
**198:9**
**address (1)**
16:8
**adjoined (1)**
57:19
**adjunct (2)**
128:22;133:13
**administrative (1)**
11:5
**administrator (1)**
11:5
**administrators (4)**
43:4;140:13,23;
142:10
**adults (3)**
188:12,14;191:23
**advance (1)**
68:17
**advances (1)**
208:6
**Adventist (16)**
41:12;43:2;128:21;
129:25;133:9,11;
134:19;135:15;
136:1,9;137:10;
140:9;141:15;
142:16;143:10;
157:20
**advice (2)**
74:13;230:22
**advise (1)**
179:3
**affairs (1)**
74:11
**affecting (1)**
105:19
**affiliated (1)**
157:18
**afraid (1)**
70:3
**afternoon (1)**
70:2
**again (28)**
12:24;13:22;24:13;
30:4;33:12;35:7;
41:25;49:11;61:24;
72:12;76:4;81:5;
88:4;89:16;105:22;
108:3;112:25;114:4;
124:19;127:14;
158:11;160:16;
165:11;191:9;206:3;
214:10;224:15;227:8
**against (1)**
84:2
**ago (5)**
12:25;29:15;
128:25;136:12;
222:24
**agree (3)**
45:14;47:13;
100:15

**agreement (1)**
53:11
**ahead (12)**
37:12;54:13,16;
73:1;101:20;114:8;
129:25;155:18;
159:6;191:7;201:11;
222:1
**air (4)**
22:20;174:24;
188:21;204:3
**airport (1)**
217:15
**alarm (3)**
114:23;120:6,20
**alcohol (2)**
216:1,2
**all-across-the-board (1)**
39:24
**all-day-long (1)**
185:17
**Alliance (1)**
73:13
**allow (1)**
160:21
**allowed (2)**
59:3;140:13
**almost (27)**
36:10;50:20,25;
51:1;82:25,25;83:3;
84:1;85:8,10;86:11,
13;89:22;90:9;97:17;
98:8,22;99:8;100:23;
102:7;103:23,25;
107:7,18;112:24;
120:24;227:3
**along (3)**
71:19;125:10;
182:3
**although (1)**
66:7
**always (74)**
14:9,16,21;21:22;
29:5,24;30:3;31:9,
13;37:16;41:13;43:6;
78:17;79:10,15;
80:13,14;81:22;82:5,
8;83:17;84:3,22,24;
86:20;94:20,25;
95:16;96:12,25;97:1,
2,9;98:16;99:11,21;
100:14,15;102:23;
106:17;115:2,15;
126:6;127:6;130:13;
135:14;140:1;
148:16,18;152:20;
153:7;154:5;156:23;
157:9,10;158:10,12;
163:5,25;164:3;
166:17;173:10,17;
174:10;176:10;
178:22,23;184:17;
185:21;208:14;

**223:4,21;229:7,15**
**amazing (1)**
25:19
**Amelia (14)**
170:12;171:9;
175:2,5;176:4;188:1;
189:3;190:13;
191:20;192:8;
193:21;194:1;
212:15,25
**American (6)**
148:7,11;172:17;
173:21;214:13;
215:11
**amount (13)**
30:2,8;31:12,19;
44:10,11;48:4;61:8;
132:3;146:1;148:2;
201:11;213:10
**amounts (1)**
213:8
**analysis (1)**
175:20
**Andrews (2)**
86:2;162:18
**Angela (15)**
33:18;34:3;36:7;
38:7,19,23;67:24;
97:15,17,19;98:11;
99:10;105:18;106:8;
107:7
**Angela's (1)**
106:18
**anniversary (1)**
159:21
**annual (2)**
79:10;176:8
**annually (1)**
58:4
**answered (1)**
21:23
**anticipation (1)**
191:21
**anxious (1)**
80:2
**anyplace (1)**
206:22
**apart (1)**
107:12
**apologize (2)**
109:19;124:11
**apparently (4)**
116:14;154:8;
195:21;214:17
**appear (3)**
211:19;213:18;
215:5
**appeared (1)**
23:9
**appears (20)**
19:9;137:18;
164:25;167:23;
175:24;177:25;

Mark A. Waldrop v.
Community Health Systems, Inc.

Stephanie Dotson
January 30, 2017

185:8;186:21;
187:16,20;189:22;
191:18;192:5;
199:14;212:14;
213:8,16,21;214:2;
220:7
**appease (1)**
191:14
**applications (2)**
75:20,22
**applied (1)**
152:25
**apply (1)**
173:21
**appointments (2)**
11:7;134:10
**appraisal (1)**
221:1
**appreciate (2)**
71:21;207:15
**appreciated (2)**
49:17;73:3
**apprehensive (1)**
210:20
**appropriate (8)**
62:11;151:19;
158:4;182:7;183:18;
184:13;185:13;
186:18
**appropriately (1)**
84:12
**approval (12)**
66:4;67:6;132:4;
146:3,23;147:16;
150:6;151:22;160:5;
163:12;174:12;229:6
**approve (6)**
150:3,18;151:11;
160:1;161:23;174:4
**approved (13)**
56:23;146:6,8;
147:22;148:21,24;
159:7;160:23;161:1,
15;163:20;174:5;
189:12
**approximately (6)**
13:9,14;15:15;
44:9;134:21;224:25
**April (6)**
9:25;160:10;222:5;
227:1,2,13
**area (13)**
17:11,14;20:2;
29:10;38:13;49:19;
50:2;62:16;73:16;
117:1;152:14;
165:13;208:22
**areas (2)**
20:3;228:14
**around (24)**
12:24;18:1,2;
24:18;33:12;41:24;
58:3;70:3;79:8;91:5;

106:18,19;108:15;
109:20;113:19;
114:22;133:23;
134:7,9;135:2;
160:10;178:10;
179:14;205:11
**arrangements (4)**
36:15;42:9;71:14;
161:21
**arrested (1)**
117:18
**articles (2)**
134:4;138:23
**aspect (1)**
210:18
**assist (15)**
10:23;11:20;18:19;
22:2;49:23;75:12,19,
21;133:22;134:1;
146:11;185:25;
188:2,5;218:9
**assistance (2)**
22:3;133:24
**assistant (13)**
11:5,23;14:2,4,14;
18:14;74:4;75:17;
95:10;129:14;
160:21;161:1;162:5
**assistants (3)**
160:23;162:10,17
**assisted (1)**
11:6
**assisting (1)**
41:15
**associate (4)**
118:22;145:5;
151:2;220:25
**associates (3)**
11:9;24:18;140:16
**Association (4)**
68:14;79:11;
161:20;168:9
**assume (4)**
112:13,17;144:9;
181:9
**assumed (5)**
144:12;149:8;
154:7;162:9;163:25
**assuming (2)**
196:12;198:16
**assured (1)**
210:21
**Atlanta (8)**
28:14;79:10;127:5;
161:19;168:8;
197:24;222:8;228:7
**atta-boy (1)**
41:7
**attach (3)**
146:22;147:13;
220:4
**attached (2)**
129:17;169:12

**attachment (1)**
147:13
**attempt (2)**
168:2;194:14
**attempted (1)**
15:23
**attend (14)**
25:13;27:14;31:3;
32:3;68:15;105:4;
109:23;134:15,24;
142:9;168:15;
170:19;171:5;176:12
**attendance (5)**
27:6;104:15;
106:15;183:10;
187:10
**attended (8)**
7:3,12;32:6,10;
79:12;140:4;160:18;
190:3
**attending (3)**
24:16;79:13;168:7
**attention (3)**
25:23;126:7;
147:20
**attitude (1)**
102:4
**attorney (3)**
70:15;71:2,9
**audit (7)**
43:25;153:20;
154:1,3,9,15,21
**auditors (1)**
154:6
**authorization (3)**
46:2,3;225:25
**available (3)**
66:11;67:18;175:4
**avid (1)**
141:24
**aware (9)**
39:10,11;56:25;
75:15;90:14;141:19;
142:7;198:22;209:11
**away (3)**
88:7;190:5,7
**awkward (1)**
34:18

**B**

**babies (1)**
203:17
**baby (2)**
43:7;203:16
**back (74)**
7:17;10:23;17:18;
18:5,9;32:24;33:8;
35:25;36:22;43:18;
49:20;63:20;68:21,
23;69:4;70:10;71:25;
72:8,23;75:2,8;83:2,
13;88:1;89:25;90:4,

5;108:2,3;111:13;
113:17,19,25;114:7,
14,16;115:16,21;
116:10;120:1,15;
122:2;124:7;125:20;
126:23;128:24;
132:25;144:20;
150:4,9;160:7;162:6;
170:21;171:12,19;
182:13;185:25;
186:10,12,13;187:4;
193:7,14;194:22;
195:6;203:21;208:2;
216:20;219:2,8,11,
21,24;220:19
**backbiting (1)**
104:7
**background (1)**
6:18
**backup (5)**
152:22;167:11,23;
219:15;220:12
**bad (4)**
85:17;105:18;
141:2;205:12
**badmouth (1)**
102:15
**bag (1)**
37:3
**baggage (1)**
223:9
**ballgame (1)**
76:15
**balsamic (2)**
197:14;206:2
**bank (3)**
10:21;33:1;75:24
**banquet (5)**
142:3,10,15,16,21
**base (1)**
57:8
**based (2)**
67:11;174:9
**basic (4)**
7:22;11:20;12:10;
14:21
**Basically (7)**
14:4;65:23;134:16;
144:4;209:18,25;
210:24
**basis (2)**
205:7;225:8
**Bates (2)**
104:20;105:3
**Bath (3)**
169:14,24;174:13
**bathroom (3)**
111:24;204:1,5
**Batten (1)**
172:9
**battle (2)**
101:9,10
**bay (1)**

48:25
**B-day (1)**
197:2
**Beach (1)**
213:22
**beaten (1)**
152:19
**beauty (1)**
11:7
**became (1)**
14:2
**become (2)**
20:19,22
**bedbugs (1)**
29:5
**beg (1)**
194:19
**begin (1)**
58:21
**behalf (11)**
22:11,23;5:18;
53:25;146:25;150:8;
151:9;153:9;208:7;
227:17
**behavior (3)**
78:15;99:8,9
**behind (3)**
86:23;88:1;214:11
**Bell (1)**
9:5
**belongings (2)**
36:19;37:4
**below (1)**
77:20
**benefit (2)**
71:19;140:21
**benefits (3)**
158:17,18;223:14
**Bernice (1)**
115:3
**best (16)**
35:22,23;39:23,23;
58:6;61:15;68:7;
100:17;110:5;126:8
**better (13)**
35:3,19;60:17;
71:1;81:25;95:7,8,8;
126:3,17;133:6;
159:3;209:14
**biased (1)**
217:21
**bid (5)**
46:23;59:15,16,23;
61:8
**bids (12)**
46:8;49:1,2,13;
56:23;57:6;58:6,21;
59:12,14;63:2;100:8
**big (20)**
22:16;25:22;31:17;
46:15,15;65:9;78:25;
92:11;134:8;148:14;
166:22,25;176:2,8;

188:3;206:4;207:8;
216:7,10;218:6
**bigger (3)**
14:22,24;15:10
**bill (5)**
72:16;149:18;
152:13;178:1;197:23
**bills (4)**
74:17,18;92:12;
152:22
**bio (1)**
128:20
**Birch (7)**
16:9,12;18:14,16;
21:19;65:3;205:1
**bird (2)**
68:18;141:21
**birthday (6)**
29:12,21;31:18;
159:21;197:5,17
**birthdays (2)**
157:11;206:8
**bit (33)**
7:13;12:13;24:3;
34:23;49:11;61:21;
64:16;77:20;81:16;
82:17,24;83:2,20;
86:13,18;94:16,22;
97:6;110:1,3,23;
111:17,18;121:1,2;
124:8;136:16;151:4;
157:7;167:23;
184:16;188:25;203:5
**Blair (18)**
23:24;71:17;86:3;
103:16;104:5;
110:15,24;111:3,9;
112:5,6;162:3;
176:15;187:17;
195:9,19;196:2,13
**blame (1)**
124:9
**blessing (1)**
30:23
**blue (1)**
202:23
**board (24)**
10:5;21:4;33:22;
72:6;74:2;96:18;
97:15;98:19;101:12;
110:4;122:7;134:8;
135:2;140:17;
141:18,21;142:4;
154:3;159:14;
160:15,17,19;181:5,7
**boarded (1)**
117:8
**boards (1)**
96:18
**Boathouse (2)**
215:18,20
**Body (3)**
169:14,25;174:13

**bonus (1)**
67:16
**book (3)**
14:6;24:25;193:5
**booked (5)**
68:19;175:2;177:8;
189:2;192:16
**books (3)**
136:14;204:8;
218:9
**born (3)**
6:20;8:2;50:2
**borrowing (1)**
141:23
**boss (1)**
84:13
**Boss' (3)**
29:12,20;31:17
**both (8)**
10:18;38:24;64:11;
69:10;144:2,3;
211:14;225:25
**bother (1)**
163:17
**bottom (17)**
19:9;101:7;146:2;
167:19;169:9;
176:21;183:7;185:7;
186:6;187:20;
196:25;197:20;
199:14;200:12;
202:12;205:25;
214:11
**bought (2)**
159:1;207:19
**bounce (1)**
224:13
**bounced (2)**
68:21,23
**bounds (1)**
15:8
**boutique (1)**
13:5
**bow (1)**
98:23
**box (2)**
202:24;207:13
**boxes (4)**
202:22;206:1,6,12
**brain (1)**
210:19
**branch (1)**
83:1
**branches (1)**
15:4
**brand (1)**
206:16
**break (15)**
6:12;63:10,12,13,
15;95:15;109:14;
120:10;121:18;
126:16;132:7,14;
144:15;185:21;

194:25
**breakfast (1)**
183:17
**break-in (13)**
109:5,8,10,18;
115:22;117:12,19,22;
118:1,10,24;226:11,
22
**breaks (1)**
6:13
**brick/block/stone (1)**
8:23
**Brienza (1)**
128:14
**bring (14)**
46:7;47:12;108:3;
112:25;117:7;
135:19;140:17;
186:13;198:5,9;
203:19,19,25;207:14
**brings (1)**
126:7
**Brisbane (4)**
5:14,14;104:21;
105:1
**broker (1)**
73:19
**brother (4)**
128:15;188:15,23;
191:8
**brought (7)**
37:7;97:15;124:18;
130:22;131:24;
154:2;203:25
**brown (1)**
202:23
**Buckhead (1)**
197:24
**budget (27)**
49:4;58:21;156:13,
19;158:6,7,8,9;159:5,
7,11,13,18;160:1;
165:17,25;167:6;
184:20;190:14;
201:10,10;222:6;
228:24;229:1,3,20,21
**budgeted (1)**
228:22
**budgets (4)**
159:23;160:3,13;
185:16
**buffer (1)**
121:1
**bugged (5)**
119:18,20,21;
121:4,16
**building (9)**
16:18,22;48:23;
57:16,17;58:2,18;
65:18;121:1
**buildings (1)**
49:22
**bulbs (1)**

194:25
**bulk (2)**
156:15;159:1
**bullet (1)**
108:16
**bullets (1)**
94:15
**bump (1)**
89:1
**bunch (1)**
119:25
**bungee (1)**
181:18
**burden (1)**
87:5
**burning (1)**
174:20
**business (50)**
13:4;14:19;25:2,
10;32:13;43:6;45:9;
47:23;50:1,7;65:7;
74:20;80:15,16;
81:22;83:24;84:12,
23;85:6;87:1;91:14;
94:19;103:10;146:6,
8;153:1,3;158:4;
169:19;173:19;
178:6,9,13,24;182:8;
203:2,3;204:8,14;
215:1,12;217:6,14;
218:3,8,10;219:7;
222:25;227:21;
228:17
**businesses (1)**
45:23
**business-related (1)**
145:18
**bust (2)**
119:11,13
**busted (2)**
115:24;182:16
**busy (9)**
14:17;25:19;29:25;
105:23,24;110:2;
138:9,12;218:7
**button (1)**
79:20
**buy (1)**
156:15
**buy-in (2)**
46:25;228:18

## C

**cabin (2)**
31:6;77:19
**cabinet (2)**
202:21,23
**Cabinets (1)**
120:3
**cafeteria (1)**
11:11
**calculator (1)**

213:12
**calendar (13)**
14:5;137:18,19;
138:1,7,10;196:7;
211:19,22;212:1,2,
11;222:19
**calendars (1)**
211:24
**call (53)**
22:23;29:15;33:5,
7;50:3;56:3;64:5;
69:22,23;70:4,11;
72:1;83:21;85:17;
94:25;98:1,16,24;
107:4;111:2,5;
112:12,18,22;113:3;
114:11,21,23;115:2,
16;116:6;117:1;
121:3;132:13;
151:21;162:11;
178:25;180:18,23;
183:6;185:18;202:8;
223:24;224:10,11,17,
20,21;226:8;229:16,
17;230:6,11
**called (41)**
5:20;9:5;10:2;
12:12;22:25;37:11;
39:15;46:1;49:15;
52:6;53:1;56:2,18;
59:25;64:9;70:8,10;
82:1,15;93:13;104:4,
4,5;107:4;110:24,25;
113:4;115:21;117:6;
121:13;126:25;
142:6;153:25;177:2;
209:10;217:6;
219:22;226:8
**calling (6)**
83:22;108:18;
110:19;143:17;
181:19;185:22
**calls (10)**
21:13;84:7;179:1;
185:15;186:3;
223:17;224:1,5,22;
229:14
**came (5)**
16:17,19;18:21;
21:24;32:24;33:2;
34:3;59:21;63:2;
64:22;70:1;74:2;
84:1;87:18;93:7;
105:2;107:13;
109:24;120:14;
122:22;124:13;
128:17;129:5;130:4;
134:7;141:18;
148:10;162:6;177:4;
181:4,7;188:4;202:9;
208:21;221:25
**campus (2)**

134:18;139:9

**can (63)**
20:8;24:1;25:2;
29:16,16,17;34:5;
35:24;36:15,22;
37:19;39:23;48:16,
17;61:15;65:19;68:1,
2;70:18;71:14,18;
76:13;78:23;79:3,4,
22;82:9,9;90:16;
92:18;101:14;
102:20,21;103:1;
104:1,1;105:13;
108:6;110:5;115:14;
116:18;165:16;
169:24;177:20;
182:25;187:15;
189:24;196:10;
199:3;201:8;202:12;
205:23;209:6;210:2,
3,5,17;211:8,21;
218:20;223:5,12;
227:18
**cancel (1)**
222:14
**canceled (2)**
221:8,9
**cancellation (1)**
220:2
**Candace (1)**
162:2
**candles (1)**
206:7
**CapEx (3)**
131:18,22;132:4
**capture (1)**
166:25
**captured (1)**
165:24
**capturing (1)**
165:12
**car (4)**
163:3;203:21,22;
204:3
**card (33)**
68:24;69:5,6;
148:7,8,12,16;149:9;
164:1,14;172:2,22,
23,24,25;173:6,11,
21,22,23;197:15;
207:19,22;208:1;
214:13,17;216:16;
223:1,5,6,8,11,15
**cards (1)**
172:16
**care (7)**
47:5;111:5;155:23;
158:2;172:13;
173:15;203:7
**career (1)**
20:25
**cares (1)**
126:9

**caring (1)**
87:10
**Carlton (1)**
8:18
**carnival (3)**
109:22;114:20;
226:19
**Carol (1)**
8:18
**Caroline (1)**
8:11
**carpet (1)**
42:13
**carried (1)**
99:9
**carrying (1)**
99:10
**carve (1)**
138:9
**carved (1)**
85:11
**case (13)**
5:3;37:16;42:15;
84:25;91:13;129:23;
161:11;173:2;
177:10;184:8;
208:25;210:11;215:5
**cases (1)**
207:1
**Cash (3)**
115:3;195:21,25
**catch (3)**
24:20;25:24;26:2
**catch-up (1)**
25:18
**caught (2)**
33:16;35:9
**caused (4)**
64:20;111:17;
114:1;117:22
**causing (4)**
102:18;103:6,7;
106:19
**cautious (2)**
89:9,9
**ceiling (1)**
16:1
**celebration (1)**
216:10
**cell (4)**
22:18;36:12;91:12;
163:4
**center (8)**
10:23;15:21;25:6;
28:18;42:25;57:24;
157:18;180:6
**centers (3)**
14:19;15:2,8
**central (1)**
222:9
**CEO (3)**
20:19,22;43:1
**certain (5)**

62:24,25;67:9;
136:24;148:3
**certainly (7)**
68:9;92:19;93:11;
180:20;220:17;
221:18;222:17
**certificates (1)**
42:17
**chairman (1)**
122:7
**chance (2)**
105:7;185:23
**change (21)**
13:1;14:13;20:25;
44:13;45:14;70:19;
78:4,15;80:5,17;
96:15;97:5,8;136:15,
22;140:1;170:16,18;
188:20;197:9;223:13
**changed (9)**
22:6;23:21;70:6;
86:22;87:2;102:4;
114:19;136:13;146:3
**changes (8)**
51:7;57:6;79:1;
137:2;139:19,25;
160:8;218:6
**changing (1)**
14:16
**character (1)**
99:19
**charge (4)**
152:12;214:3;
215:5;220:8
**charged (1)**
215:10
**charger (1)**
37:16
**charges (2)**
175:9;214:12
**charter (12)**
46:2,3,5;47:3;48:4,
8;50:17;56:12,16,25;
59:8;225:25
**Chatsworth (4)**
6:21,24;8:16;73:17
**Chattanooga (3)**
13:5;215:16;218:1
**cheaper (5)**
156:15;175:10,15;
193:4;223:13
**check (24)**
73:1;75:9;82:12,
22;83:6;92:20;
116:15;119:14;
127:12;148:2;
150:12;171:5;
173:10;187:21;
193:8;203:17;204:4;
208:2;216:22;219:8,
10,24,25;220:10
**checkbook (1)**
75:9

**checked (1)**
29:5
**checking (5)**
82:2;190:22,23;
191:15;192:13
**checks (1)**
55:9
**cherrypick (1)**
140:13
**chest (1)**
113:14
**Chicago (1)**
196:5
**chief (1)**
13:21
**child (6)**
8:8;9:20;92:9;
115:17;179:1;190:2
**childcare (1)**
190:5
**children (6)**
188:13,16,17;
191:23;217:3,6
**chip (4)**
29:17,23;31:4,23
**chiropractor (1)**
58:10
**Chris (5)**
23:24;103:17;
176:16;187:5,18
**Christine (1)**
217:18
**Christmas (3)**
29:20;31:18;
156:22
**CHS (3)**
96:15;134:15;
219:9
**circled (1)**
113:19
**circles (1)**
86:13
**circumstance (1)**
70:19
**circumstances (3)**
32:19;35:24;92:23
**clarification (2)**
114:2;174:7
**clarify (4)**
68:10;70:18;
112:13;226:5
**Clark (1)**
111:21
**class (17)**
7:22;130:4;133:13;
134:7,14;135:14;
136:15,24;137:25;
138:18,24,25;139:11,
14;140:23;141:1,6
**classes (9)**
7:18,21,22;41:14;
128:23;133:23,25;
141:4;166:24

**clean (1)**
29:4
**cleaner (2)**
206:13,16
**cleaning (4)**
74:23;206:10;
207:14,16
**clear (3)**
227:10;229:5
**click (1)**
150:18
**client (2)**
153:1,2
**Clinical (2)**
13:25;58:12
**close (3)**
39:3;78:22;102:7
**closed (8)**
33:22;35:7;38:10;
39:7;81:6;108:18;
113:10;127:11
**closely (1)**
97:17
**closet/copy (1)**
17:16
**clothes (1)**
114:19
**cloud (1)**
91:14
**Club (1)**
31:3
**Cobb (1)**
28:18
**code (3)**
55:17;95:24;96:3
**coincidence (1)**
119:1
**colleague (1)**
128:14
**collectively (1)**
103:5
**College (2)**
7:3,20
**Collegedale (1)**
135:5
**combine (1)**
58:7
**combined (1)**
57:19
**comfort (1)**
61:21
**comfortable (3)**
30:8;36:3;164:6
**coming (14)**
10:5;27:22;34:6;
37:18;64:7;68:15;
98:23;116:17;126:5;
158:12;165:8;
174:22;184:18;
197:17
**comment (2)**
168:6;184:17
**commented (1)**

217:18

**commercial (1)**
65:8

**common (1)**
107:12

**communicated (4)**
55:18;72:1;142:1;
205:9

**communication (4)**
70:15;71:9;78:12;
190:1

**communications (1)**
12:11

**Community (44)**
5:4,10,15;10:2;
11:14;12:14,22;13:2,
23;16:15;20:19;21:7;
28:2;32:16;40:5;
51:25;60:3;66:2;
67:8,18;73:22;76:7,
11,20;92:4,23;96:9;
123:13;141:14;
142:13;143:8;
145:16;153:21;
157:14;160:25;
161:25;169:7;
177:22;193:25;
194:5;198:18;
215:24;220:7;227:15

**Community's (1)**
229:21

**Company (53)**
8:7;14:15;21:17;
36:11,12;47:13;55:6;
60:7;61:1;68:18;
71:20,24;72:2;73:5;
80:6;95:21;120:7;
133:17,19;136:3,4;
149:8;150:20;159:3;
162:7;164:1,13;
168:17,17;171:5;
178:6,9;179:7,12;
182:15;192:17,17;
193:20;195:13;
210:15;214:25;
215:1,7,10,11;216:4;
219:6,6,25;220:19;
221:11,13;223:10

**company-provided (2)**
178:5;179:4

**compare (1)**
175:3

**comparing (1)**
175:21

**compensation (3)**
12:21;41:9;74:8

**compiled (3)**
154:14;160:4;
162:15

**compiles (1)**
162:3

**complaining (1)**
84:20

**complete (3)**
33:16;145:22;
169:6

**completed (8)**
146:24,25;147:2,3;
177:21;183:1;
196:20;199:4

**completely (4)**
81:2;93:16,20;
124:2

**completion (2)**
50:11;51:14

**compliance (1)**
73:15

**complied (1)**
35:18

**compounded (1)**
98:15

**comprised (1)**
27:9

**compromise (1)**
100:18

**computer (3)**
12:6,12;150:4

**computer-based (1)**
41:20

**computers (1)**
116:24

**conceal (1)**
168:3

**concepts (1)**
133:14

**concern (7)**
20:3;87:22;88:14;
119:17,19;126:7;
210:13

**concerned (4)**
93:4;97:4;100:19;
101:3

**concerns (6)**
103:15,20;112:23;
114:10;123:9;124:14

**concluded (1)**
231:11

**concludes (1)**
231:8

**condo (1)**
177:5

**condominium (14)**
175:2,4,21;176:1,
20;189:8;190:18;
191:19;192:7,8,12;
193:10;194:9;214:25

**conducting (1)**
84:11

**confer (1)**
218:20

**conference (19)**
17:13,14;19:24,25;
28:4;33:2;34:11,22;
70:11;111:2;116:25,
25;120:14,15,16;
166:20;196:5;

219:18;227:6

**conferences (1)**
25:13

**confide (2)**
20:16;98:17

**confirm (4)**
61:7;177:20;199:3,
3

**confirming (1)**
170:9

**conflict (1)**
140:25

**confrontation (1)**
102:22

**confrontational (1)**
86:11

**confused (3)**
111:9,10,10

**confusing (2)**
57:22,23

**confusion (2)**
110:16,23

**connection (1)**
75:20

**Connie (7)**
40:12;43:23;54:9,
20,21;62:12,17

**conscious (2)**
58:22;79:21

**consecutive (1)**
141:7

**consider (5)**
62:8;183:18;
184:13;185:12;
186:18

**consideration (1)**
99:22

**considered (2)**
145:1;182:7

**consist (1)**
152:11

**consistent (3)**
20:11;152:20;
153:12

**constantly (1)**
186:2

**Construction (8)**
54:24;56:5,11;
59:15,17;61:7;
152:18;225:19

**constructive (1)**
20:4

**consult (4)**
52:2;60:11,13;
180:24

**contact (7)**
35:15;71:23;73:4;
84:17;168:20,23;
172:10

**contacting (1)**
83:19

**contain (1)**
166:4

**contents (1)**
61:4

**context (2)**
90:1;130:18

**continues (1)**
170:2

**continuing (3)**
25:10;139:19;
140:2

**contract (50)**
40:5,13,18,25;
43:18;44:7,10;45:4,
10,16;47:2,9,21;48:9;
50:10,16;51:4,5;
52:19;53:17,19,22,
24,25;54:6,8,10,14,
23;55:20;56:5,7,10;
61:5,6;62:9,11,13,14,
15,22;63:7;65:1,4;
72:4,18;73:18;
144:11;225:18,19

**contracted (1)**
51:20

**contracting (1)**
48:20

**contractor (5)**
40:24;53:10,20;
65:3,16

**contractors (8)**
40:8;49:19;50:3;
51:7;52:12;76:7,11,
20

**contracts (12)**
39:25;40:1,3;41:4;
43:21,24;44:23,24;
45:3,6;54:22;73:17

**contrast (1)**
99:20

**control (12)**
183:6;185:7;186:6;
187:20;188:9;
196:24;197:20;
199:13;200:12;
212:7;214:10;221:18

**convention (17)**
68:14;79:11;
156:23;161:20;
165:15;168:7;
170:19;171:1,8;
188:1;191:5;212:19,
25;213:3,9,10,22

**conventions (1)**
158:14

**conversation (48)**
21:12;35:5,11,13,
17;36:4;59:9;71:3;
90:21;102:2;106:12,
17;107:3,24;108:6;
109:2;110:15;111:9;
112:6,9,9,20;113:6,
13,15,16;114:2,9,12,
16;117:15;118:4,6,
15,20,23;122:11;

124:1,21;125:16,17;
126:20;127:8;
153:24;178:18,19;
199:25;224:17

**conversation/meeting (1)**
111:25

**conversations (24)**
21:6;35:14;39:8;
79:18;81:4;86:10;
87:14;89:11,15;
90:12,18;92:5,6;
125:4;130:19;
131:12,16,21,25;
132:6;141:16;
185:23;204:19;
218:17

**cook (1)**
175:12

**cooler (1)**
202:13,16

**cooperate (2)**
35:3;71:1

**cooperated (1)**
35:19

**copied (3)**
72:24,24,25

**copier (1)**
17:17

**copies (10)**
10:20;41:21;54:6;
134:3;138:23;
146:22;159:23;
165:2;211:19,21

**copy (19)**
10:23;40:23;45:16;
53:22;72:16;91:21;
117:1;145:11;147:7;
150:4;155:13;
177:25;183:1;
187:21;199:3;211:8;
220:1;229:3,17

**copy's (1)**
196:19

**cordial (1)**
83:17

**cords (1)**
181:18

**core (1)**
7:22

**corner (6)**
10:3;33:12;57:23,
25;119:6;185:8

**corporate (4)**
10:6;54:22;70:15;
71:9

**corrected (1)**
154:10

**correctly (2)**
110:12;175:24

**correspondence (1)**
195:19

**cost (5)**
58:22;59:5;79:21;

175:4;221:25
**co-trustee (1)**
131:4
**co-trustees (1)**
131:7
**council (16)**
27:5,8,9,14;29:14;
40:6;97:18;99:5;
100:21,22;156:24;
197:6;198:3,4;
224:21;228:4
**counsel (1)**
5:7
**count (1)**
13:13
**counts (1)**
194:23
**County (3)**
6:21,21,24
**couple (22)**
16:3;21:9;31:23;
37:6;40:2;64:2;
68:13;72:14;92:17;
115:9,13;121:12;
128:25;131:24;
135:18;141:9;
142:19;150:23;
155:19;184:5;
203:24;213:12
**course (28)**
18:5,8;21:21;34:6;
37:1,23;41:19;50:6;
64:10;84:5;96:2;
117:4;119:24;
133:21;134:2;137:1,
5;140:3;141:25;
143:15,20,20;144:1;
150:21;152:16;
163:1,4;171:21
**courses (2)**
7:4,20
**court (1)**
230:23
**courtesy (2)**
75:3;185:4
**courthouse (1)**
10:20
**cover (3)**
145:14,15;186:16
**covered (3)**
44:2;54:11;57:8
**co-workers (1)**
79:13
**crate (1)**
203:21
**craziest (1)**
116:22
**crazy (4)**
116:9;119:1,16;
174:22
**cream (1)**
140:12
**credit (13)**

69:6;164:13;
168:15;172:2,16,25;
173:6,21,22;207:22;
214:13;216:16;223:1
**Crews (1)**
162:4
**critical (5)**
83:8;10;85:5;
96:23;97:3
**criticism (1)**
20:4
**criticize (1)**
83:11
**critiqued (1)**
136:23
**crop (1)**
140:12
**CROSS-EXAMINATION (1)**
5:23
**cry (1)**
132:8
**crystal (18)**
42:18,21,21;
156:13,18,25;157:13;
159:17,19;179:21,24;
180:12,15;181:3,6;
182:9;200:16;201:9
**culture (1)**
105:18
**Cumming (1)**
179:24
**current (1)**
129:8
**currently (1)**
73:10
**custom (1)**
218:2
**customer (2)**
126:7,8
**customers (1)**
65:8
**customize (1)**
16:23
**cut (7)**
34:14;43:11;58:23;
127:23;128:6;
150:12;187:16
**cuts (1)**
160:8

**D**

**dad (8)**
41:1;49:25;51:20;
52:15;54:16;61:23;
77:12;188:15
**daily (2)**
14:25;175:7
**Dalton (28)**
6:20;7:3,12;9:6,18;
11:17;13:12;15:11,
12,18;16:10;24:12;
25:3;26:3,14;27:18;

39:3;52:4;57:11;
63:23;109:5;119:18;
135:8;140:8;179:24;
180:1;200:16;205:1
**Daniel (50)**
5:9,9,24;19:1;
48:13;53:6;63:13,22;
104:10,19;105:4,10;
109:17;121:18,21;
122:4;128:9;137:16;
143:2,6;144:14,24;
153:18;155:3;
164:19;169:1;
175:18;177:15;
182:21;189:17;
194:24;195:8,17;
196:16;198:25;
200:8;201:25;
205:21;209:19,22;
211:5;215:19,21,22;
218:19;219:4;
225:10;230:2,5,14
**date (13)**
5:5;91:6;109:20;
122:25;138:18,21;
145:25;152:14;
170:18;171:6;172:8;
179:13;201:5
**dated (1)**
19:15
**dates (10)**
124:10;130:7;
140:1;171:13;
190:17;191:13;
192:1,2;227:2,10
**daughter (11)**
8:1;37:12,23;
75:22;77:10,11;79:2;
109:22;188:17;
217:16;226:19
**daughters (1)**
212:19
**daughter's (1)**
126:24
**Dawsonville (7)**
158:25;179:25;
180:1,2,7;181:13;
186:10
**day (61)**
21:20,21;28:11;
29:12,20;31:17;
32:22,24;36:21;
37:10;43:15;49:14;
52:6,8;54:15,17,17;
56:18;64:2;66:2,4,7,
8,10,11,13,16;67:13,
14,16;69:2;89:3;
93:7;97:23,24;
106:12;107:2;
114:17;117:8;121:9;
122:11;126:23;
127:5;129:6,6;132:9,
11;134:12;135:12;

138:21,22,25;148:3;
176:9,10;177:1;
199:24;206:21;
207:3,3;226:11
**day-long (2)**
176:11;185:2
**days (19)**
22:5,7;24:5,10,12;
64:2;65:24;67:9,13,
18;72:20;74:1;
101:16;127:10;
136:5;139:9;177:9;
190:10;222:10
**day-to-day (4)**
12:3;15:7;51:22;
60:19
**deadline (1)**
114:6
**deal (3)**
180:17;205:5;
207:5
**dealing (3)**
130:20;190:19;
204:7
**deals (1)**
89:7
**death (1)**
126:2
**debit (4)**
172:21,23,23;
173:11
**DeBrock (2)**
203:2,3
**December (3)**
8:2;124:8;229:24
**decide (3)**
20:24;30:21;
132:13
**decided (9)**
9:24;13:4;49:3;
57:12;101:23;
180:14;200:3;222:8,
11
**decision (2)**
39:2;181:1
**deck (1)**
49:24
**deduct (1)**
216:1
**deeper (1)**
228:13
**defeats (1)**
180:21
**Defendant's (21)**
18:24;48:11;53:4;
104:8;128:7;137:14;
144:22;155:1;
164:17;168:24;
175:16;177:13;
182:19;189:15;
195:15;196:14;
198:23;200:6;
201:23;205:19;211:3

**defense (2)**
88:19;107:9
**defensive (1)**
98:7
**deficiencies (1)**
154:15
**definitely (1)**
43:17
**degree (1)**
7:6
**delegate (2)**
151:15,16
**delegated (1)**
151:17
**demand (1)**
14:23
**denominator (1)**
107:12
**dentists (1)**
16:3
**department (11)**
9:11;10:19;47:24;
50:22;55:4;67:20;
72:25;95:1;96:21;
150:11;159:10
**depend (1)**
24:14
**depending (2)**
31:12,15
**depicts (2)**
202:3;205:24
**deposit (1)**
171:23
**deposited (2)**
148:3,4
**deposition (21)**
5:3;19:3;48:15;
53:8;104:12;128:11;
145:2;156:5;164:21;
177:18;182:23;
189:19;196:17;
199:2;209:2,11,17;
218:15;230:18;
231:8,11
**deposits (2)**
10:21;11:6
**Depot (1)**
152:23
**describe (6)**
14:24;17:6;77:16;
78:1;80:20;81:18
**described (2)**
226:7;230:7
**description (1)**
11:1
**descriptions (1)**
10:19
**designed (1)**
17:7
**Designs (1)**
217:6
**desk (2)**
17:10;68:13

detail (8)
63:4;69:19;95:14;
123:7;125:2;131:11;
209:7;210:16
detailed (2)
67:4;153:13
details (7)
35:7;46:8,19;71:8;
72:13;124:11;127:20
determine (2)
151:18;176:20
detrimental (1)
70:20
development (4)
166:23;227:25;
228:6,10
devoted (1)
140:7
dialogue (1)
20:10
Diana (8)
23:23;85:25;86:2,
4;103:16;162:4;
176:14;187:18
difference (2)
176:2;177:5
different (31)
13:19;18:20;21:21;
31:9;45:22;46:22;
55:15;63:2;67:14;
80:3,10,12;85:1,7,8;
90:8;94:21;95:24;
98:20;100:5;102:17;
103:8;107:1;110:10;
111:19;133:16;
136:21;140:15;
158:22;162:7;193:3
difficult (1)
118:23
dilemma (1)
49:11
dinner (6)
28:9;100:20;
104:14;106:5;176:9;
190:4
diplomas (2)
42:17,17
direct (20)
11:21;13:8;19:25;
23:16,20;27:10;
31:22;83:19,21;
84:17;85:24;96:14;
102:3;151:12;
155:14;160:22;
174:2;195:10;197:8,
11
directions (1)
180:4
directly (2)
11:22;224:9
director (1)
73:15
directors (1)

21:4
disclosure (1)
35:23
discontinued (2)
7:19;206:19
discord (2)
97:12;98:14
discount (1)
201:13
discounted (1)
158:25
discourage (1)
225:5
discouraged (1)
122:13
discrepancies (3)
70:12;154:17;
155:16
discretion (1)
72:11
discuss (11)
30:10;47:19,21;
48:7;54:1;61:13;
100:22;123:12,17;
187:10;189:7
discussing (2)
33:3;190:18
discussion (4)
54:4;130:6;155:9;
164:9
discussions (1)
94:4
displayed (1)
99:10
distinction (1)
143:19
distribution (2)
15:3;60:7
Distributors (2)
60:1;202:25
disturbed (1)
116:22
dive (1)
228:13
divided (1)
133:15
divorce (2)
188:24;191:10
doctor's (1)
119:5
document (18)
19:2;48:14;53:7,
14;104:11;128:10;
137:17;145:22,23;
155:4;164:20;169:2;
175:19;182:22;
189:18;200:10;
202:1;211:6
documentation (6)
146:23;152:5,8,10;
154:12;162:16
documented (1)
215:6;220:10

documents (5)
48:1;129:8;144:25;
165:7;186:2
dog (7)
31:3;32:3,6,8,10,
11;204:17
dogs (1)
32:14
dollars (10)
46:17;47:10;58:17;
61:16;78:11;132:3;
158:16;170:20;
201:11;222:14
donations (1)
32:2
done (52)
14:7,9;40:22;
47:11;49:3,20;56:4,
25;57:4,5,7;58:5;
59:4,8;61:9;65:4,14;
81:23;84:22;90:8;
94:20;96:7;103:13;
104:18;120:19;
126:1;129:5,11;
137:5,7;138:12;
141:8;146:4;148:17,
18;149:5,6;150:14;
154:1,5,9;159:15;
163:25;172:5,15;
173:17;174:10;
182:11;209:12,17;
220:21;221:6
door (31)
8:15;16:24;17:9,
17,25;18:4,9;22:4;
26:9,11;33:14,17,19,
20;38:1;64:6,8,13;
81:6;113:10;115:3,
24;116:9,12;117:6,8;
119:11,14;120:10;
174:20;207:9
doors (2)
116:16;120:15
Dotson (10)
5:3,19;6:4,7;8:4,
11;105:11;144:25;
177:16;231:9
down (34)
10:3;19:9,12;20:1,
23,25;27:20;28:10;
34:21;38:8;56:2;
68:6;77:20;79:20;
93:18;100:3,9;
102:14;110:13;
114:15;123:8;
124:14;132:7,14;
167:18;170:10;
171:16;172:8;
176:20;188:2;193:8;
199:24;200:1;212:19
downtown (1)
217:25
draining (1)

132:23
drama (1)
101:1
draw (1)
101:13
drilling (1)
33:13
drink (1)
184:20
drinking (1)
216:20
drinks (4)
169:21;184:4,15;
185:5
drive (4)
28:10;110:13;
179:24;208:13
driven (1)
99:12
driveway (2)
68:6;77:18
driving (1)
77:24
drop-in (1)
205:16
dropping (1)
221:20
drove (3)
77:12;99:3;180:1
drugs (1)
119:6
dry (3)
127:23;128:6;
196:3
ductwork (1)
174:19
due (1)
72:17
duly (1)
5:21
dumped (1)
120:3
duplicate (1)
91:25
during (7)
38:4;80:21;96:15;
142:3;154:15;
213:22;230:11
Dwayne (2)
128:15,18
Dwight (2)
8:18,25

**E**

earlier (9)
24:23;118:10;
130:11;133:10;
157:17;195:9;
223:16;225:24;226:7
early (12)
9:7,8;64:5;68:18,
20;88:15;114:20;

115:7;135:22;
153:14,19;168:19
ease (1)
82:24
easier (2)
138:25;146:19
easy (1)
119:25
eat (3)
29:9;175:12;
185:24
eating (1)
184:19
ECP (2)
59:25;202:25
ed (1)
139:19
Eden (8)
11:21;12:16;13:3;
14:9;148:10;149:11;
162:5;163:24
Edens (4)
133:18;143:13,25;
144:7
Eden's (1)
18:18
edits (1)
160:14
education (5)
7:1,19;25:11;
140:3;210:4
effect (1)
39:14
effective (2)
35:6;39:3
efficiently (1)
87:7
effort (3)
60:18;61:7;126:14
eight (6)
77:10;141:10,10;
145:3,4;213:17
either (23)
25:5;38:6,22;
69:23;72:24;76:2;
101:22;103:10;
106:4;107:25;108:2;
110:25;112:25;
120:11;126:15;
131:20;138:6;
142:18;207:2,18;
222:1;226:25;230:8
ElderCare (8)
27:21,25;28:4,21,
21;100:4;184:6,16
elect (1)
66:16
elected (1)
52:19
electronic (1)
66:24
electronically (4)
40:22;146:4;

147:18;150:14
**eliminated (1)**
    38:12
**else (23)**
    14:10;17:3;22:3;
    39:12,15;42:4;43:14,
    16;47:17;69:24;
    71:21;83:5;90:5;
    98:9;105:14;125:15;
    139:3;161:6,24;
    173:16;188:4;224:7,
    19
**else's (1)**
    172:19
**e-mail (26)**
    12:11;14:6;21:25;
    22:8,19,22;23:4;
    72:24;76:2;91:19;
    111:1,1;113:17;
    114:5;138:6;147:11,
    12;148:2;150:11,15;
    164:23;195:18;
    196:12;225:3,6,8
**e-mailed (1)**
    72:15
**e-mails (2)**
    22:10;189:22
**emergency (9)**
    49:8,12;50:9;
    56:17;57:2;59:7;
    205:1,7,14
**emotion (1)**
    93:19
**emotional (2)**
    132:9,20
**emotionally (1)**
    132:23
**emotions (1)**
    87:9
**employed (4)**
    73:10,12;157:14;
    215:24
**employee (9)**
    66:2,6,7,10,12,15;
    67:8,17;150:20
**employees (1)**
    227:15
**employer (1)**
    66:16
**employment (8)**
    9:2;32:15,20;92:4,
    23;93:18;123:13;
    171:21
**enabled (1)**
    147:25
**encouraged (1)**
    84:9
**end (9)**
    20:5;32:16;45:22;
    85:2;89:3;120:11;
    216:12;226:16;
    228:15
**ended (7)**

32:20;92:4,24;
    115:20;142:14;
    171:21;219:19
**Energy (1)**
    28:18
**English (1)**
    7:21
**enjoyed (2)**
    30:18;32:13
**enough (5)**
    77:9;126:9;165:17;
    202:15;227:11
**ensure (4)**
    62:4;63:5;89:23;
    165:24
**entity (3)**
    51:15,18;59:25
**entrance (3)**
    116:12,12;119:12
**entrances (1)**
    18:3
**entries (3)**
    137:18;138:1,7
**entry (2)**
    18:10;213:4
**entryway (1)**
    18:8
**equipment (2)**
    60:10;117:2
**Eric (1)**
    151:3
**errand (1)**
    74:24
**errands (2)**
    22:6;74:22
**error (4)**
    220:15,18,20,23
**errors (1)**
    221:2
**E-signature (1)**
    40:23
**especially (1)**
    184:3
**Espinoza (4)**
    55:14;95:13;
    147:25;219:23
**establish (1)**
    64:16
**estate (5)**
    9:11;10:18;51:16;
    52:3;62:9
**ethic (1)**
    88:23
**Ethica (3)**
    13:22;143:14;
    194:3
**evaluation (6)**
    19:7,8,11,20,23;
    20:6
**even (54)**
    7:15,17;26:7;
    28:23;31:17,23;
    41:19;57:15;58:9;

68:5,6,12;69:8;78:1,
    24;81:5;84:24,25;
    85:18;93:5,10,23,25;
    96:19;97:3,20;99:17;
    100:14;102:12;
    106:18;108:5;
    111:15,16;113:7;
    114:15;128:24;
    138:3;140:20;
    146:15;154:17;
    173:3,16,18;192:22;
    205:9;208:3;218:2,3;
    220:1;222:5;227:19,
    19;228:14,19
**evening (2)**
    100:20;109:23
**event (5)**
    78:25;130:3;
    185:14,17;205:6
**eventually (1)**
    217:25
**everybody (21)**
    16:5;30:4;44:1;
    47:12;79:14;98:9;
    100:11;101:1;102:6,
    19;119:10;158:20;
    176:11;185:3,16;
    197:10,16;198:8;
    199:19;222:9;228:19
**everybody's (1)**
    159:13
**everyday (1)**
    12:10
**everyone (1)**
    31:12
**exact (4)**
    90:25;109:20;
    179:13;227:2
**exactly (22)**
    7:16;13:20;15:19;
    16:18;22:24;23:3;
    51:20;76:1;86:15;
    94:8;96:16;100:7;
    106:23;113:18;
    122:25;124:21;
    128:16;130:8,17;
    199:24;202:8;223:25
**EXAMINATION (1)**
    225:14
**examined (1)**
    5:21
**example (9)**
    24:15;42:24;46:16;
    95:4;166:19;174:13;
    219:16;223:3;227:20
**Excel (3)**
    145:24;146:16,21
**except (3)**
    38:7;73:6;137:4
**excuse (4)**
    24:4;34:11;62:21;
    153:15
**executive (5)**

18:13;74:4;75:17;
    129:13;160:20
**exercise (1)**
    121:11
**Exhibit (76)**
    18:24;19:3;48:11,
    15;50:13,16;53:4,8,
    14;56:5,8,10;61:6;
    62:23;63:7;65:2;
    104:8,12;105:11;
    108:15;128:7,11;
    129:17;137:14,17;
    144:22,22;145:2,3,3,
    8;155:1,5;156:4;
    164:17,21;166:11;
    167:16;168:24;
    169:3,13;175:16,19;
    177:13,17,25;179:19;
    181:8;182:19,22;
    185:6;189:15,19;
    190:18,20,23;191:1,
    18;192:2;193:7;
    195:15,18;196:14,17,
    25;198:23;199:1;
    200:6,9;201:23;
    202:1;205:19,22;
    211:3,7;220:8
**exhibits (4)**
    225:16,17;226:1,4
**expand (1)**
    198:7
**expect (4)**
    38:15;116:3;
    151:25;209:15
**expectations (1)**
    81:21
**expected (5)**
    20:18,20;51:3;
    52:12;148:17
**expecting (3)**
    7:18,23;37:2
**expense (90)**
    12:10;42:5,7;68:3;
    69:2;94:5;101:24;
    145:19,22,25;146:12;
    147:19;148:6,22,24;
    149:3,15,22;150:19;
    151:6,8,11,18;152:7,
    25;153:3,8,21;154:3,
    17;155:20,20;156:8;
    160:22;161:1,12,16,
    19;162:3,13,15,20,
    23;163:9,19;164:7;
    165:3;166:2,4,16,25;
    167:1,13;169:6;
    174:3,9;177:16,21;
    182:8;183:1,19;
    184:14;186:19;
    189:13;196:6,18,21;
    199:4,5,7;206:3;
    211:8,10,14;213:7,
    21;214:7,11,16;
    215:1,15;216:6,12;

221:14;227:16,21;
    228:1,2,4,18
**expensed (10)**
    42:5;69:1,11,11,
    12;149:1;154:11;
    182:12;219:19;
    228:20
**expenses (16)**
    31:5;72:4;145:17;
    146:6,9;154:11;
    156:11;165:22;
    167:9,10,24;168:3;
    193:22;204:23;
    222:25;228:22
**expensive (1)**
    176:1
**experienced (1)**
    48:21
**expertise (2)**
    62:16;130:5
**expire (1)**
    208:23
**expired (1)**
    208:24
**explain (2)**
    165:13;219:12
**explained (1)**
    68:8
**express (12)**
    103:20;106:7;
    112:22;117:21;
    119:17;148:7,11;
    172:18;173:21;
    210:12;214:13;
    215:11
**expressed (2)**
    88:14;119:19
**extending (1)**
    83:1
**extensive (1)**
    15:22
**extensively (1)**
    27:2
**extent (1)**
    21:2
**extra (7)**
    176:21;177:1;
    183:23,23;193:22;
    201:15,17
**extras (3)**
    42:14;206:9;207:9
**extremely (3)**
    25:19;105:24;
    204:2

**F**

**Face (4)**
    116:6;184:10;
    202:9,19
**facility (2)**
    29:4;133:15
**fact (24)**

Mark A. Waldrop v.
Community Health Systems, Inc.

Stephanie Dotson
January 30, 2017

7:16;36:1;37:5;
38:7;39:7;56:18;
84:13;88:15;99:17;
105:17,18;111:21;
120:6;122:17;128:6;
132:17;143:11;
162:19;168:5;175:6;
181:17;189:7;205:8;
220:6

**fair (6)**
14:16;50:4;61:18;
89:21;140:6;227:11

**fairly (1)**
200:10

**fall (8)**
7:15;16:2;128:23;
133:22;141:8,12;
143:21;182:13

**falling (1)**
107:12

**familiar (7)**
46:1,10;51:15;
52:15,16;59:25;
145:6

**families (2)**
11:6;157:3

**family (13)**
7:24;11:9;42:3;
70:20;72:22;77:10;
92:10;127:13;157:5;
189:9;210:4;214:19;
217:16

**far (15)**
28:20;47:10;55:2;
68:17;70:25;71:14,
19;86:25,25;94:6;
98:17;132:1;135:8;
194:9;198:8

**fast (6)**
14:17;106:1;124:4;
158:11;165:11;209:5

**father (7)**
51:3,24;52:19,23;
56:6;65:1;225:19

**father's (2)**
8:20,21

**fault (1)**
182:17

**favor (1)**
101:20

**fax (1)**
76:2

**feasible (2)**
57:18;171:20

**feature (2)**
147:11,24

**February (4)**
91:5,7;139:20;
165:4

**fee (1)**
223:13

**feedback (5)**
20:2;30:4,15;

108:11;224:13

**feel (21)**
52:13;62:24,25;
79:4,5;80:3;84:10;
85:14,16;86:16,22;
101:8;108:8;124:5,
15;126:17;132:21;
140:24;141:2;
209:14;215:8

**fees (1)**
223:9

**fell (2)**
182:1,15

**felt (26)**
41:18;50:3;57:7;
61:18;80:18;83:20,
25;84:1,10,14;86:18;
87:24;88:1;89:22;
90:3;102:19;113:14;
121:15;123:7;
124:17;126:3,13,15;
133:4;158:4;168:22

**few (19)**
7:17;26:22;34:8;
35:1;51:8;83:18;
88:22;89:14;92:6;
101:16;110:18,19;
114:18;190:10;
203:6,14;222:10,23;
225:11

**fight (1)**
102:24

**fighting (1)**
102:24

**figure (1)**
100:16

**file (8)**
40:7;44:5;45:10,
17;93:5;129:23;
173:2,7

**files (2)**
42:16;202:7

**filing (2)**
202:21,23

**fill (4)**
46:19;66:19;76:4;
145:25

**filled (1)**
145:23

**filling (1)**
75:21

**finalized (2)**
129:16,21

**finally (2)**
72:23;107:2

**finance (13)**
45:20;47:24;50:22;
55:4,23;67:19;72:25;
95:1;96:13,20;148:1;
159:9;165:23

**financial (9)**
45:24;55:12;74:6,
10,14;75:15;150:11;

185:15;229:13

**financials (1)**
229:15

**find (6)**
55:4;95:1;173:11;
180:17;206:24;
219:23

**findings (3)**
154:21;155:8,25

**fine (10)**
63:12;64:15;85:2,
4;100:16;105:7;
121:15;144:14;
174:9;222:12

**finish (2)**
7:10;34:17

**finished (2)**
9:2;33:6

**Finley (1)**
8:11

**fire (5)**
107:19,21;108:13,
17;123:21

**fired (4)**
71:6;87:22;88:14;
106:8

**fires (1)**
25:22

**firm (2)**
9:5,15

**firms (2)**
10:10,16

**first (29)**
5:20;9:3;10:9;
11:3;12:14;17:9;
19:5;79:6,9;80:22;
108:16;109:12;
111:2;114:3;116:2;
122:9;126:23;
137:23;139:24;
145:3;163:23;
164:23;169:10;
173:10;177:24;
200:21;211:25;
212:6;213:4

**fit (1)**
39:17

**five (4)**
128:11;129:17;
177:3;218:19

**fix (4)**
103:8;104:1;
125:14;126:9

**fixed (3)**
52:10;155:18;
156:2

**flew (1)**
77:11

**floating (1)**
67:15

**flood (13)**
41:1;42:14;48:21,
22;49:6,14;58:19,25;

63:23;64:1,2;65:10;
94:25

**flooded (3)**
16:2;52:7;64:7

**flooding (2)**
15:24;64:21

**floor (1)**
115:25

**Florida (1)**
175:3

**fog (1)**
210:19

**foggy (1)**
124:9

**folks (4)**
57:21;58:1;144:5;
175:13

**follow (3)**
36:14;37:9;155:14

**followed (1)**
37:11

**following (1)**
36:16

**follows (1)**
5:22

**followup (1)**
225:13

**food (3)**
193:23;202:17;
216:8

**food's (1)**
142:25

**footprint (1)**
116:1

**foreign (1)**
85:13

**forever (1)**
174:20

**forget (2)**
141:9;210:17

**forgetting (1)**
176:17

**Forgey (1)**
197:7

**forgot (2)**
138:5;165:14

**form (8)**
46:19;66:18,19,20;
146:16;204:10;
205:3;214:12

**formal (3)**
7:1;48:3;198:21

**formally (1)**
34:24

**forms (3)**
68:13;69:10;76:2

**Forrester (1)**
76:14

**for-sure (1)**
90:23

**forth (2)**
113:17;184:11

**forum (1)**

130:6

**forwarded (2)**
129:25;155:12

**found (8)**
7:18;70:12;120:9;
154:10,15;167:18;
206:18,25

**four (3)**
64:24;104:12;
105:11;108:15;
171:15;188:12,14;
191:22;195:6;227:3

**fourth (3)**
53:13;167:17;
170:5

**framed (1)**
42:17

**free (1)**
29:4

**freezer (1)**
202:13

**French (1)**
120:15

**frequent (2)**
26:18;225:8

**frequently (1)**
185:2;216:24,25

**freshener (1)**
174:24

**friction (2)**
81:17;103:7

**Friday (12)**
38:17,18;64:4;
69:21,22;70:1;
109:19;118:4,16,19;
176:10;177:2

**Fridays (1)**
110:2

**friend (3)**
43:7;100:25;
217:19

**friendly (1)**
82:9

**friends (3)**
32:8,11,12

**front (13)**
9:18;10:4,12;
11:15;17:8;18:4,19;
84:2,4;115:23;
119:11;120:10;207:9

**full (5)**
6:2;10:17;57:25;
170:11;202:24

**full-time (2)**
9:2,10

**function (1)**
11:20

**functions (3)**
14:21,25;21:22

**funding (1)**
87:3

**funds (3)**
11:7;71:20;207:17

**furniture (4)**
56:20;60:8,16;61:2
**further (2)**
73:4;179:19
**fuss (1)**
103:4
**future (1)**
198:9
**fuzzy (1)**
121:13

**G**

**gamble (1)**
119:9
**game (2)**
93:20;191:7
**Gary (3)**
5:12;42:24;157:17
**gatekeeper (2)**
43:23;54:21
**gather (2)**
92:25;203:4
**gave (13)**
18:6;30:7;31:13,
15,24;36:18;82:12;
88:4,16;108:12;
116:11;128:18,18
**general (7)**
48:19;51:6;65:3,
16;79:14;133:14;
211:2
**generally (2)**
17:6;24:11
**generate (1)**
67:1
**generated (1)**
204:24
**gentleman (6)**
33:13;38:1;59:17,
18,20;121:14
**Georgia (12)**
6:20,25;8:6;9:6,18;
16:10;68:13;73:16;
79:11;161:20;168:8;
180:3
**geriatric (1)**
9:22
**gesture (1)**
184:24
**gets (1)**
143:18
**GHCA (2)**
212:25;213:22
**gift (4)**
32:3;197:14;
198:18;206:2
**gifts (13)**
29:13;30:9;76:11;
159:22,22;181:3;
186:14;197:2,4,5,17;
198:21;201:14
**girl (2)**

18:17;96:12
**girls (7)**
95:12,13,22;
111:23;115:8;191:9;
212:15
**girls' (1)**
190:7
**girl's (1)**
33:21
**given (5)**
41:6;68:23;70:13;
180:20;228:25
**giving (2)**
100:12;229:2
**glad (2)**
43:12;124:13
**glass (2)**
115:24;117:11
**glass-break (1)**
120:9
**goes (4)**
40:23;165:14;
174:14;209:17
**Good (49)**
5:25;6:1;9:11,14;
12:12;16:3,5;20:13;
24:3;27:21;29:2,2,3,
7;47:23;50:5;59:3;
61:19,25;62:3;63:11;
64:15;69:7,13;79:15;
83:4;84:24;92:14,18;
95:22;97:25;99:11,
14;113:11,15;120:8;
127:19;140:16,22;
142:25;143:2;
144:14;157:7;
178:15;184:16;
191:11;217:18;
221:22;222:8
**goodness (2)**
31:20;45:8
**good-sized (1)**
18:6
**gosh (2)**
138:5;224:8
**go-to (2)**
96:12,21
**grab (2)**
26:19;207:13
**grabbed (1)**
37:2
**grace (1)**
14:18
**gracious (1)**
77:9
**grade (1)**
137:4
**graded (1)**
137:8
**grading (1)**
134:17
**graduated (2)**
7:5,11

**grasping (1)**
70:23
**Gravel (1)**
77:18
**gray (1)**
38:13
**great (4)**
63:4;124:17;125:2;
144:13
**greeted (1)**
21:23
**greeter (1)**
11:3
**Greg (1)**
9:16
**grew (1)**
15:7
**Griesel (1)**
151:3
**group (20)**
9:11;28:10;29:21;
30:8,15,17,20;68:20;
73:13;99:11,11;
100:10,11;102:7;
103:5,24;171:3;
176:7;187:11;228:7
**grow (2)**
6:19;61:22
**grown (1)**
57:20
**guarantee (1)**
90:10;92:20
**guess (51)**
11:2;12:25;28:24;
36:6;40:21;47:8;
61:19;67:15;69:3;
77:21;79:9;80:19;
81:16,20,23;82:25;
83:19;84:21;86:19;
91:4,4;94:19;96:8;
97:12;119:2;123:23;
127:25;128:4,4;
129:2;133:5;134:1,2;
140:12,25;163:6,15,
22,23;171:15;172:6;
179:16;182:12,18;
196:9;201:6;205:11;
206:12;209:11;
226:3;229:19
**guessing (1)**
163:13
**guest (1)**
77:22
**guests (2)**
26:3;188:12
**guidance (1)**
96:2
**guilt (1)**
92:11
**gum (1)**
184:2
**gun (1)**
141:23

**guy (4)**
36:2;48:1;61:19;
120:24
**guys (4)**
40:15;56:19;89:7;
210:1

**H**

**H1N1 (2)**
202:9;208:21
**habit (1)**
222:20
**Hal (1)**
142:24
**half (4)**
80:22;92:9;97:7;
99:17
**hall (1)**
120:11
**hallway (1)**
17:12
**Hamilton (2)**
42:25;157:17
**Hammack (7)**
33:18;34:3;36:7;
38:23;67:24;97:15;
106:8
**hand (12)**
34:3,19;118:8;
126:12;138:24;
184:8;195:18;
200:16;201:4,9;
202:7;205:14
**handbook (2)**
145:5,11
**handed (3)**
137:17;144:25;
177:16
**handle (12)**
52:12;55:5;57:3;
85:14;95:2;96:1;
110:8;131:9,10;
172:14;173:13;223:1
**handling (2)**
94:5;218:9
**hands (1)**
49:24
**hand-selected (1)**
228:8
**hang (1)**
113:9
**happen (11)**
69:12;82:22;84:5,
8;85:19;106:1;204:2;
216:24;217:1;
222:22;227:14
**happened (32)**
32:22,23;49:7,16;
54:12;58:25;59:2;
64:10;69:15;82:24;
88:2;89:19;91:9;
93:2,3;114:25;115:9,

13;118:5,6,21,25;
121:7;127:10;
147:10;171:4,23;
182:1;205:15;
223:14;226:23;
227:13
**happening (8)**
35:13,14;98:3;
102:8;106:23,24;
107:10;115:6
**happens (1)**
221:17
**happy (7)**
75:4;101:18,21;
209:15;220:18,22,23
**hard (6)**
13:20;36:21;84:3;
107:11;147:7;150:4
**Harold (1)**
5:9
**hat (1)**
105:5
**hatches (1)**
79:20
**hate (4)**
83:1;88:21;98:13;
118:3
**hated (4)**
101:2;102:7;
115:19;125:25
**head (5)**
32:1;38:8;93:20;
111:18;163:14
**headed (1)**
82:16
**heads (5)**
22:15,20;23:19;
115:5;196:8
**Health (46)**
5:4,10,15;10:2;
11:15;12:15,22;13:2,
23;15:3;16:15;20:19;
21:8;28:2;32:16;
40:5;51:16,25;52:2;
60:4;62:8;66:2;67:8,
18;73:22;76:7,11,20;
92:5,24;96:10;
123:13;141:14;
143:9;145:17;
153:21;157:15;
161:1,25;169:7;
177:22;193:25;
194:5;198:19;
215:24;220:7
**Healthcare (3)**
79:11;161:20;
168:8
**hear (10)**
38:15;52:8;69:20,
22;81:4,6;130:16;
171:12,19;224:16
**heard (8)**
9:23;33:9;34:1;

59:9;79:17;84:6;
130:13;226:3
**hearing (5)**
71:2;90:11;98:3;
111:8;204:19
**heart (1)**
9:23
**hearted (2)**
82:5;196:2
**heated (7)**
86:16;88:22;107:6,
23;111:24;113:7,12
**heavy (10)**
81:17;82:23;86:9,
10;114:5,5,13;
131:25;181:17;226:8
**held (7)**
27:17,18,19;28:7;
79:11;80:13;117:18
**help (14)**
10:24;12:2;20:8;
30:23;31:5;34:5;
71:19;75:9;123:10,
11;151:3;181:23,24;
182:3
**helped (4)**
11:23;41:19;64:16;
151:3
**helping (1)**
182:13
**HENRY (31)**
5:12,12;63:14;
104:19,22,25;105:6;
109:16;121:20,22;
142:24;143:4;
153:16;195:1;209:9,
9,10,10,19,21,24;
215:18,20;218:22;
225:11,13,15;230:1,
16;231:2,5
**herself (1)**
108:10
**hey (17)**
34:5;37:7;74:24;
75:3;82:7;83:21;
88:20,21;92:16,18;
98:25;101:19;
106:22;107:5;
162:11;184:23;
207:12
**hidden (1)**
120:25
**hide (1)**
43:13
**high (9)**
6:23,24;7:1,10,14;
9:2,4,10;87:9
**high-dollar (1)**
116:24
**higher (1)**
223:8
**high-level (1)**
157:21

**high-spot (1)**
41:7
**highway (1)**
28:18
**hill (1)**
77:19
**himself (4)**
23:7;84:12;110:7;
172:5
**hint (2)**
106:18,19
**hired (3)**
18:23;97:16;
150:24
**hobby (1)**
203:4
**hold (7)**
33:11;49:3;58:24;
111:15;181:22;
203:20;228:6
**holding (1)**
181:20
**holiday (1)**
24:17;29:11;34:25;
67:15
**home (18)**
9:21;15:3;33:1;
36:13,14,16;37:10,
11,12,13,13,18;
65:19;117:7;138:3;
157:7;203:7;206:20
**homeowners (1)**
65:17
**honest (7)**
61:19;81:2;93:16,
21;124:2;125:7;
170:24
**honestly (6)**
12:19;31:21;96:11;
173:18;210:22;218:6
**hooked (1)**
128:17
**hope (1)**
57:22
**hoping (2)**
89:6;123:22
**horrible (1)**
138:2
**hospice (1)**
15:3
**Hospital (4)**
68:14;157:25;
158:1;172:12
**hot (2)**
121:13;204:2
**hotel (7)**
68:19,22;152:13;
161:21;189:3,10;
214:25
**hour (3)**
12:24;114:22;
135:9
**hours (5)**

25:12;67:3;118:21;
210:1;226:24
**House (8)**
28:14,17,20;29:1;
77:18,19,22;207:10
**housed (2)**
73:16;202:11
**houses (1)**
77:2
**Howard (2)**
42:24;157:17
**how's (1)**
127:13
**HR (2)**
73:6;97:23
**huge (7)**
47:10;87:3,4;
97:22;99:3;101:24;
132:22
**Huh (1)**
215:19
**Huh-uh (9)**
7:9;26:5;52:1;
83:7;117:24;127:9;
193:13;227:24;
230:13
**human (6)**
71:13,17;110:15;
162:2;195:14;220:16
**humor (1)**
196:3
**hunter (1)**
141:25
**hunting (1)**
141:21
**husband (6)**
37:11;77:12;
115:17;117:6;
141:23,25
**husband's (2)**
8:3;181:16
**Hyatt (4)**
28:14,17,20;29:1
**hysterectomy (1)**
124:7

---

**I**

**ice (2)**
202:17,17
**idea (10)**
93:11;96:1;119:3;
131:1;165:10;
178:15;181:2,5;
198:6;201:21
**ideas (2)**
198:5;224:13
**identification (21)**
18:25;48:12;53:5;
104:9;128:8;137:15;
144:23;155:2;
164:18;168:25;
175:17;177:14;

182:20;189:16;
195:16;196:15;
198:24;200:7;
201:24;205:20;211:4
**identify (2)**
5:8;48:16
**identity (1)**
172:18
**idle (1)**
194:10
**immediate (1)**
25:23
**immediately (3)**
35:6;39:3;71:16
**impact (3)**
133:1,3;210:11
**impacting (1)**
47:9
**important (2)**
142:9,11
**impression (1)**
130:10
**improvements (4)**
57:16;58:14,16;
59:1
**inappropriate (1)**
78:16
**in-box (2)**
150:16;151:22
**Inc (7)**
51:16;52:3;54:24;
56:5,11;61:7;62:9
**inches (1)**
64:24
**include (1)**
12:5
**included (5)**
136:25;167:9;
175:8;216:1;219:25
**income (2)**
92:10;194:22
**incoming (1)**
21:23
**Incorporated (4)**
5:5,11;73:13;137:1
**increments (1)**
67:12
**incurred (2)**
148:22;149:15;
151:7;204:24
**incurring (1)**
168:3
**independent (1)**
53:10
**independently (1)**
26:1
**indicate (3)**
66:22;150:6;
159:20
**indicated (6)**
39:1;59:11;64:13;
172:11;211:22;
223:21

**indicating (1)**
64:5
**indication (3)**
169:18;170:6,15
**individual (1)**
159:15;160:12;
227:19
**individually (1)**
160:17
**individuals (1)**
228:9
**inform (1)**
49:15
**informal (1)**
23:15
**information (12)**
39:6;45:21,25;
68:10;23:191:10;
97:24;138:21;152:6;
158:12;188:11;197:6
**informed (2)**
13:3;52:23
**in-house (3)**
27:24;49:23;
175:14
**initial (3)**
16:13;60:15;88:7
**initially (1)**
57:7
**initials (1)**
197:3
**in-laws (1)**
77:12
**in-person (1)**
141:6
**input (4)**
29:22;187:13;
198:8;217:21
**inquire (1)**
29:16
**inquired (2)**
72:19;141:22
**inquiries (1)**
192:7
**insecure (1)**
88:2
**inside (3)**
25:7;35:15;42:23
**inspectors (1)**
205:11
**instead (5)**
142:15;173:7,8;
216:13;227:6
**insurance (8)**
40:9;45:16;50:24;
53:23;54:6;55:8;
76:14;131:3
**Integra (17)**
16:14,25;17:24;
18:4;26:11;33:19;
53:11;54:1,23,25;
55:19;115:3;116:11;
156:15;186:14;

194:3;219:10

**Integra's (1)**
159:2

**intense (9)**
78:14;81:7;87:11;
111:22;130:19;
131:12,21;132:6;
230:6

**interaction (1)**
80:24

**interested (1)**
10:5

**interests (1)**
58:7

**interior (1)**
17:9

**internal (4)**
17:25;153:20;
154:3,9

**internally (2)**
136:22;154:1

**Internet (1)**
206:22

**interrupt (1)**
143:5

**interstate (1)**
29:8

**interview (3)**
9:24;129:12;228:8

**into (23)**
11:6;13:4;21:2;
51:9;97:23;99:9,10;
106:22;123:6;
124:10;125:5,7;
133:15;146:23;
147:6,9,17;152:17;
156:1;196:6;203:4;
204:20;228:13

**introduced (1)**
34:25

**inventory (4)**
181:20;200:15;
201:21;202:6

**invested (1)**
127:15

**investigation (1)**
176:19

**invited (1)**
76:15

**invoice (2)**
48:19;50:21

**invoices (5)**
50:21;54:18;55:2,
15;95:25

**involved (4)**
44:10;99:22;
222:11;224:5

**involvement (1)**
218:12

**iPad (2)**
36:13;37:15

**irate (1)**
78:17

**irrigation (1)**
44:13

**island (16)**
108:9,10;170:12;
171:9;175:3,5;176:4;
188:1;189:3;190:13;
191:20;192:8;
193:21;194:1;
212:15;213:1

**issue (4)**
45:22;98:25;
187:10;221:16

**issues (5)**
15:22;68:24;97:18;
131:23;187:11

**Italy (4)**
32:4,7,9,10

**item (4)**
183:19;185:13;
220:7;221:5

**itemize (1)**
229:8

**items (3)**
169:12;174:15;
180:15

---

**J**

**January (7)**
5:5;158:23;178:10;
179:16,17;188:24;
229:24

**Jenkins (1)**
162:2

**Jimmy (2)**
33:17;35:1

**job (45)**
9:3,10,24,25;10:12,
25;11:20;12:4,12;
13:1;14:13;18:13,13;
24:24;26:25;37:18;
38:12;39:1;50:1,6;
51:6,21,23;52:3;
62:7;71:5,12;73:14,
15,21;74:2;86:20,21;
92:7;13:9;11:96:9;
112:10,11,18;133:2;
149:4;164:11;182:2;
210:11

**jobs (2)**
10:9;129:12

**Joe (2)**
122:7;126:20

**Johnson (3)**
23:25;103:17;
176:16

**join (1)**
48:24

**joins (1)**
120:15

**joke (2)**
196:1,12

**joking (1)**

---

184:22

**jotted (1)**
199:25

**Joy (1)**
6:4

**July (7)**
70:2;165:3;200:17;
201:5,9;227:3;
229:25

**June (22)**
32:17;67:25;73:25;
93:17;126:21;
170:12,13;192:2,9;
212:8,9,10,15,24,
25;213:5,5;214:20,
20;227:3;229:25

---

**K**

**Kay (1)**
187:23

**keep (17)**
14:5;25:11;42:15;
44:13,24;63:11;92:8;
107:15;124:5;
146:17,20;159:23;
171:14;180:19;
181:24;201:21;
204:11

**keeper (1)**
127:6

**Kemp (1)**
197:7

**Kennel (1)**
31:3

**kept (14)**
17:16;38:8;45:10;
67:6,18,21;77:25;
147:7;168:11;
171:24;202:11;
204:3;206:4;208:24

**key (7)**
96:20;100:21;
103:19,19;124:18;
187:12;188:3

**key-lime (2)**
199:8,18

**keys (1)**
138:15

**kicking (1)**
69:4

**Kim (14)**
53:11;54:24;56:4,
10,18;59:15;61:6,10,
12,13,14,18,23;
225:19

**kind (140)**
9:22;11:23;14:8;
15:5;16:22;20:1;
22:15,19;25:24;29:8,
19;32:12;33:12,24;
34:17;36:21;39:24;
40:22;46:19,20;

---

49:25;51:22;56:17;
59:22;61:21;64:16;
65:18;70:22;75:2;
77:3,20,21,24;78:14;
79:3,17;80:14;81:17,
21,24;82:4,18,23;
83:2,2;84:23;85:12;
86:13;87:25;94:15;
97:5,13;98:14,15,20;
99:8,10;100:8;
102:19;107:24;
110:20;111:15;
112:5,24;115:4,11,
24;116:5;119:4;
120:1,23,25;121:2;
123:11;124:19;
125:5,9;126:4,6,8;
127:20,23;129:9;
130:5,5,16,18;
132:24;133:6,15;
134:14;135:23;
136:12,15;140:11;
146:20;152:3,15;
158:13,16,22;163:13;
165:10,21;173:3;
180:17,19,23;181:24;
182:2,14;184:18,21,
24;187:13;188:21;
190:6,16;191:6,13,
14;193:1;194:19;
196:3;198:7;201:21;
203:5;207:5;209:15,
16;217:21,23,24;
218:7;220:2;228:14,
15,16;229:8;230:21

**kinds (2)**
35:4;174:22

**King (4)**
23:25;103:17;
128:25;176:16

**Kinnamon's (1)**
9:16

**kitchen (4)**
17:18;37:3,3;64:18

**knew (36)**
9:13;11:11;23:17;
30:18;38:24;47:25;
52:14;55:24;57:4;
58:14;62:1,2;69:10,
13;80:16;81:21;89:4;
92:15;93:5;94:23;
95:19;116:16;128:1;
131:9;132:25;
134:10;140:21;
151:25;152:7;154:6;
163:19;168:9;
189:12;190:14;
194:18;221:23

**Knight (1)**
187:23

**knowing (8)**
21:12;36:2;61:22,
24;64:12;89:20;

---

179:8;196:13

**knowledge (19)**
52:22;74:5,7;
76:19,23;91:20;
129:13,18;133:10,20;
141:13;143:8,16;
144:7;149:23;
159:25;160:2;215:3;
223:23

**known (6)**
29:19;51:15;87:7;
99:21;119:6;221:20

**knows (1)**
133:2

---

**L**

**lack (2)**
81:25;133:6

**ladies (11)**
22:4;33:19;34:21;
37:6;38:16;64:6,13,
14;111:14;115:9;
184:17

**lady (17)**
11:21;18:20,22;
32:25;33:1;34:11,13;
43:2;97:14;112:2;
115:14;129:10;
154:2,8;157:19;
194:18;203:7

**laid (1)**
35:25

**Lake (10)**
23:24;71:17;86:3;
103:17;110:15;
162:3;176:15;195:9,
20,24

**Lake's (1)**
195:12

**land (1)**
10:19

**landlord (2)**
15:23,23

**land's (1)**
77:5

**Lange's (1)**
127:4

**large (3)**
48:4;164:6;187:2

**larger (1)**
26:9

**largest (1)**
31:19

**last (30)**
24:7;28:16;41:12;
64:2,2;71:3;83:18;
85:6;88:22;97:6;
98:24;99:16;101:25;
105:3,17;111:21;
129:19;172:7;176:9,
10;179:20;181:8;
183:7;185:18;

195:19;201:6;209:8;
211:18;221:20;222:4
**last-ditch (1)**
126:14
**last-minute (1)**
139:3
**late (6)**
82:11;115:18;
137:6;153:14,19;
168:19
**later (13)**
7:17;18:23;34:16;
37:19,21;69:3,13;
93:9;118:21;122:16;
123:25;171:6;206:18
**Latoya (2)**
5:14;218:20
**latter (1)**
162:1
**laughed (1)**
184:19
**law (2)**
10:9,16
**lawn (4)**
40:12;44:16;45:4;
47:5
**lawn-care (2)**
40:15;47:13
**laying (1)**
115:25
**lead (3)**
58:11;110:17;
112:3
**leaders (1)**
103:19
**leadership (20)**
27:5,12;29:14;
46:7,25;97:18;99:5;
100:20,21;156:24;
157:4,12;166:23;
187:12;188:3;198:3;
227:25;228:4,6,10
**leading (1)**
109:9
**leading-up (1)**
109:12
**leads (1)**
92:17
**Leake (3)**
23:24;103:19;
176:17
**leaps (1)**
15:8
**learn (9)**
60:21;82:11,14;
85:9;93:12;122:16,
19;147:21;153:23
**learned (3)**
9:17;54:5;153:20
**least (10)**
12:20;24:5,7;
31:14;71:12;121:21;
134:22,23;141:11;

182:15
**leave (12)**
9:8;12:10;66:19,
20,21;67:1,13,14;
70:9;135:22;136:6;
203:18
**leaving (2)**
68:5;209:8
**leeway (1)**
188:25
**left (15)**
14:15;17:13;18:18;
25:3,24,25;36:7;
37:6;57:24;58:3;
69:8;73:22;114:18;
162:6;206:7
**leftover (1)**
42:13
**legal (1)**
230:21
**legend (1)**
170:10
**legwork (1)**
57:5
**lend (1)**
130:5
**less (9)**
24:6,14;29:25;
87:8;118:20;168:20;
175:25;189:4;226:24
**letter (3)**
93:10,12,13
**letting (5)**
49:17;93:25;148:2;
190:12;196:4
**level (3)**
54:22;80:7;140:15
**liability (2)**
50:24;55:9
**licensure (2)**
25:11;168:16
**lied (2)**
87:13,18
**life (6)**
6:22;78:25;92:12;
93:18;218:6;221:17
**light (3)**
45:14;82:5;196:2
**Lighthouse (1)**
215:16
**liked (4)**
16:4;100:7;157:2;
206:20
**likely (1)**
221:7
**limbo (1)**
74:1
**limit (1)**
148:13
**limit/level (1)**
130:14
**line (9)**
20:1,1,24;51:21;

95:9;101:7,13;
160:13,13
**line-item (1)**
158:9
**lineman (1)**
8:6
**lines (1)**
125:10
**list (7)**
125:11;154:14,19,
24;155:12,24;199:21
**listed (3)**
158:13;159:17;
204:25
**listen (5)**
90:21;224:2,11,20,
22
**listened (1)**
89:25
**little (44)**
7:13;18:21;34:23;
43:19;61:21;63:15;
64:16;69:9,15,17;
77:19,20,22;81:16;
82:17,24;83:2,20;
85:1;86:13,18;88:9;
94:16,22;97:6;110:1,
3,23;111:17,18;
116:10;117:1;121:1,
2;124:8;136:16;
151:4;163:24;
188:11,25;193:3;
203:5;209:6;210:16
**live (6)**
8:14,15;9:22;32:9;
75:4;92:10
**lived (1)**
6:21
**LLCs (1)**
55:7
**loaded (2)**
181:16,24
**loan (2)**
75:20,21
**loans (1)**
76:7
**lobby (2)**
17:10,11
**local (2)**
9:21;52:12
**locally (1)**
52:16
**located (4)**
17:4;28:17;77:19;
78:3
**location (10)**
15:18;16:5,7,11;
27:22;29:7;79:15;
184:7;222:8,9
**locations (1)**
10:18
**lock (1)**
33:13

**locks (1)**
43:11
**lodging (5)**
152:1,12;167:4;
175:4;213:22
**long (19)**
12:17,19,25;24:8;
33:22;73:24;80:2;
89:3;94:19;113:5;
116:4;120:17,18;
136:12;152:21;
172:19;210:15;
218:4;226:21
**longer (4)**
71:5,12;72:18;
128:25
**LongHorn (3)**
181:9,10;186:7
**long-term-care (4)**
41:13;133:15;
142:3,15
**look (55)**
19:5;46:25;48:16;
50:13;53:9,13;58:4;
62:9,17,20,22;69:11;
85:10;98:20;103:10;
106:22;113:22;
120:4;128:12;
140:19;145:3;
166:15;167:11,16,17,
22;170:5;174:17;
175:23;177:20;
183:3,5;185:7;
189:21;191:18;
196:17,21;197:19;
199:2,5,13;202:21,
22;205:22;206:15,
21;211:7,16,18;
212:6;213:7,20;
217:19;225:16;231:5
**looked (15)**
38:16;63:1,1,3,5;
84:22;116:7,21,23;
132:17,18;166:11;
174:13;175:14;190:6
**looking (11)**
25:9;46:21;58:21;
81:14;102:11;
105:11;116:16;
136:19;169:12,24;
179:19
**lookout (2)**
22:16,21
**looks (5)**
105:16;129:18;
138:17;165:2;
186:10;187:16;
190:17
**loose (1)**
228:14
**Lorraine (47)**
55:15,22,25;56:2,
3;69:23;70:5;72:16;

96:14,23,25;97:5,9,
16;98:2,2,7,16;99:4,
4,20,20;100:12,12,
24;101:17;102:5;
104:6,16;106:12,17;
107:2,4,10;108:8,22,
23;112:24;153:25;
155:8;157:24;
159:10;166:24;
178:18;187:11;
224:23;228:11
**Lorraine's (1)**
103:10
**losing (2)**
79:18;87:3
**lost (7)**
37:18;39:1;91:15;
92:9;99:6;168:17;
193:17
**lot (61)**
14:18;23:17;25:18,
21;26:2,3,7,18;30:15,
21;36:22;37:20;
38:13;39:6;41:16,20;
68:20;78:12,12;79:2;
80:18;81:3,23;83:14;
85:21;87:10;88:8;
94:14;96:6;97:12;
99:6;101:1;102:9;
114:13;115:6;123:6;
124:18;130:16;
132:18;146:18;
156:9,9,11;157:3,4;
163:16;165:19;
166:21;167:3;
178:24;180:16;
184:3;191:11,12;
204:19;206:4;209:3,
4;221:1;224:16;
225:17
**lots (1)**
158:11
**loud (3)**
33:10;120:20,23
**Lowe's (1)**
202:16
**lowest (2)**
61:8,8
**LT (2)**
108:16,21
**Lucy (2)**
23:25;197:6
**lunch (19)**
10:22;11:10;12:2;
26:15,21,22,23;
32:25;109:15;
121:19,21;182:4,8,
17;184:4;185:9,24,
25;186:16
**luncheon (2)**
24:17;34:25
**Lusk (5)**
11:21;12:16;13:3;

149:11;162:5
**Lynne (4)**
  23:25;103:17;
  128:25;176:15
**Lysol (3)**
  206:10,12,16

## M

**Macon (1)**
  222:13
**Madison (2)**
  217:17;218:5
**maiden (1)**
  6:5
**mail (3)**
  14:5;195:20;
  196:11
**main (5)**
  11:2;21:22;53:20;
  62:6;77:19
**mainly (2)**
  27:10;92:16
**maintain (1)**
  168:16
**maintained (1)**
  44:20
**maintenance (3)**
  44:12;47:10;64:23
**major (4)**
  100:12,13,13;
  106:19
**makes (2)**
  102:12;193:5
**making (11)**
  11:6;7;41:21;
  61:14;118:1;124:19;
  139:25;172:10;
  181:25;182:13;
  217:20
**Malyse (3)**
  217:8,9,10
**man (4)**
  14:8;102:12;
  125:14,14
**manage (2)**
  43:21;214:13
**managed (2)**
  45:1,7
**management (4)**
  143:8,12,13;
  166:11
**manager (1)**
  73:15
**managing (2)**
  44:21,23
**manner (1)**
  184:22
**man's (1)**
  182:2
**many (26)**
  13:11;23:20;25:12;
  26:10;29:6;36:9,9;

55:7;67:3;84:6,10;
90:15,20;94:1,3;
95:19;96:15;99:21;
116:7;127:15;
134:21;166:13;
176:12;184:18;
203:14;224:25
**March (12)**
  91:5,7;109:21;
  122:11;123:2;
  191:25;192:5;
  226:15,15,23,25;
  227:7
**Maricella (4)**
  55:14;95:13;
  147:25;219:23
**Mark (178)**
  5:13;15:1;16:14;
  17:5;25:18;27:11;
  42:5,16;49:16,25;
  52:12;54:7;55:1;
  63:25;64:9;68:15,16,
  25;69:13;74:24;
  79:12,15;80:24;
  81:13,20,22;82:4,24;
  83:21;84:2,3,6,17,22,
  25;85:5,9,17,17;
  86:12,14;88:5,12;
  89:4,5,14,18;92:8,25;
  95:6;96:25;98:1,24;
  99:4;100:19;101:2,
  17,18;102:3,22;
  103:8;104:4;106:16;
  107:2,4,23,25;108:7,
  12;109:24;110:4,5;
  111:3,3,4,9;112:6,9,
  10,16,18,21;113:3,6,
  9,13,15,20,22,25;
  114:6,6,11,13,17;
  121:5;125:24;127:4;
  128:18,18,19;129:11;
  130:2;131:25;
  132:16;133:4,18;
  134:8;138:15,24;
  140:3;141:22;
  142:11,14;143:18;
  146:7;147:4;148:2,
  23,24;151:20;
  153:24;154:16;
  155:8,11;156:9,23;
  157:23;158:2;159:8;
  160:1,21;161:12,17;
  162:6,23;163:11;
  164:4;166:1,8;168:6,
  7,14,14;170:11,24;
  173:10;175:10;
  176:14;178:17,19;
  180:18;184:22;
  185:9,22;187:12;
  192:18,25;193:20;
  195:10;197:11;
  198:10;199:19;
  201:19;203:5,15;

207:11;213:17,22;
214:19;215:8;
219:17;222:17;
224:9,19,22;228:10;
229:13
**marked (49)**
  18:24;19:3;48:11,
  15;50:16;53:4,7,14;
  56:5,7,10;61:5;
  62:23;63:7;65:2;
  104:8,12;128:7,10;
  137:14,17;144:23;
  145:2,3;155:1,5;
  156:4;164:17,20;
  168:24;169:2;
  175:16,19;177:13,17;
  182:19,22;183:10;
  189:15,18;195:15;
  196:14;198:23;
  200:6;201:23;202:1;
  205:19;211:3,7
**Mark's (21)**
  11:21;23:16;27:10;
  83:19;107:9;120:12,
  14;126:6;128:15;
  155:19;158:8;
  166:19;167:4;196:6,
  6;197:8;211:23,24;
  212:1,18;217:17
**married (5)**
  7:24,25;15:17;
  75:23;79:2
**masks (5)**
  202:10,19,24;
  208:17,20
**mason (1)**
  8:23
**Masonry (1)**
  8:25
**mat (1)**
  115:25
**match (1)**
  152:15
**Matchim (1)**
  151:2
**material (2)**
  134:2;136:25
**math (2)**
  7:21;58:5
**matter (3)**
  36:1;128:6;162:19
**matters (4)**
  74:14;136:9;140:8;
  215:10
**maximize (1)**
  185:4
**may (37)**
  5:16;7:15;23:18,
  21;34:25;46:22;
  75:16;98:12;104:14;
  106:23;114:15;
  115:8;126:25;
  130:17;141:8;

153:11,25;155:13;
159:15,21;170:16;
173:1;195:20;210:3,
4,6;213:12;214:3,5,7,
8;222:4,4;224:12;
227:3,6,14
**maybe (61)**
  21:11;30:7;31:22;
  45:19;69:8;72:14;
  81:9,12;82:3,24;
  84:25;85:15;86:16;
  88:6,8,8,17,18,20;
  90:5;96:13,17;97:7;
  101:16;102:17;
  106:13,14;107:17;
  109:20;111:1;
  116:18;121:8;
  126:13;127:4;128:1,
  2,17,18,24,25;
  135:10,21,23;142:2;
  150:25;163:6;
  171:15,16;178:10,18;
  179:15;184:23;
  185:21;191:8;198:7;
  203:16;218:1;220:1;
  222:5;226:15;230:3
**meal (2)**
  152:13;175:12
**meals (1)**
  152:1
**mean (82)**
  14:25;24:11;26:11;
  30:5;31:9,13;32:11;
  37:1;41:25;62:24;
  65:20;74:7,18;77:3;
  79:2,24;80:7,13;
  82:7;84:16,21;85:4,
  18,20;87:2,4,9,10;
  94:6,8;95:20,25;
  99:12;100:25;
  102:13;103:1,9,22;
  105:5;108:1,21;
  110:9;111:3;113:1,8,
  10;114:24;116:2,3,
  22;119:1,15,25;
  120:4;121:9;125:18,
  20;127:25;130:12;
  131:19;132:21;
  134:15;140:20;
  152:2,16;153:11;
  156:16,21;160:8;
  164:12;166:20;
  167:5;168:17;176:4;
  193:4;196:6,11;
  198:15;212:17;
  220:16;222:19;223:3
**means (5)**
  85:23;130:17;
  131:1;163:10;196:9
**meant (6)**
  6:11;39:4,18;66:6;
  121:16;126:11
**medical (5)**

15:3;42:25;60:7,9;
157:18
**medically (1)**
  99:18
**meet (18)**
  25:8;72:8;84:7,7;
  85:22,23;96:19;
  115:7;122:23;
  125:25;127:4;139:2,
  18;157:24;160:9,10,
  11;222:7
**meeting (64)**
  25:6;32:25;33:2,4,
  9;34:10,14;36:10;
  38:5,8,23;67:24;
  68:1;79:9,10,13,16;
  82:3,16;85:19;100:3;
  102:11;103:22;
  104:4;106:6,25;
  110:17;111:15,22;
  112:3;131:9;134:8,
  24;135:2,22;138:15;
  139:20;153:1,2;
  157:21;160:15,19;
  162:11;166:22;
  171:3;175:11;176:3,
  5,8,11,13;177:1;
  183:17;184:2,16;
  185:1;187:9,14;
  188:3;190:3;194:1;
  198:3;207:2;222:7
**meetings (18)**
  12:1;14:6;24:24;
  26:6;27:4,15,20;28:7,
  13;40:6;98:23;
  110:19,19;168:10;
  185:2;188:6;190:8;
  228:7
**Melissa (1)**
  8:18
**member (8)**
  16:15;97:17;
  159:15;160:12;
  165:20;194:3;219:9;
  229:14
**members (6)**
  11:9,25;29:14;
  99:4;156:24;189:9
**memory (4)**
  60:23;105:12;
  124:3;138:2
**memos (1)**
  12:9
**men (1)**
  64:23
**mention (1)**
  94:9
**mentioned (14)**
  7:23;21:10;24:23;
  42:20;114:3;122:5,9;
  130:11;131:14;
  133:9;157:17;
  162:18;184:22;195:9

**mergers (1)**
15:9
**met (6)**
36:5;38:1;59:21;
124:12,14;217:2
**Michelle (10)**
23:24;86:2,4;
103:16;104:4;162:5,
8,18;176:15;187:18
**microchipped (1)**
204:20
**middle (5)**
33:4;34:10;108:15;
170:10;206:6
**mid-morning (1)**
118:19
**midyear (3)**
156:23;157:3;
168:8
**might (25)**
21:16;24:19,21;
26:19;30:11,25;
39:16,16;43:16;70:3;
81:10;87:22;88:14;
100:6;108:24;117:9;
123:13;138:4;
178:25;201:22;
202:15;219:17;
223:13;227:24;228:3
**mileage (6)**
145:21,22;152:1,
16;163:1;193:23
**mind (9)**
33:15;34:15;92:8;
110:11;119:5;
126:10;132:25;
141:25;180:20
**mindful (1)**
153:10
**mine (4)**
88:23;158:8;
173:13;179:14
**Minor (1)**
9:5
**minute (4)**
98:24;109:14;
203:20;221:20
**minutes (7)**
34:8;36:5;114:19;
116:7;135:9;218:19;
222:23
**Miscellaneous (1)**
159:22
**misleading (1)**
167:24
**missed (1)**
147:4
**missing (1)**
142:8
**mistake (2)**
153:11;169:23
**mistaken (1)**
129:24

**mistakes (3)**
166:18;210:17;
220:17
**misunderstanding (1)**
70:22
**mixed (1)**
172:18
**mold (2)**
15:22;58:19
**mom (7)**
77:11;188:15;
190:1;191:3,5,12;
192:20
**moment (2)**
34:9;143:3
**Monday (7)**
64:5,18,22;70:6;
117:9,10;177:3
**money (45)**
11:11;30:11,25;
31:10;41:7,15;48:5;
49:4;58:23,23;60:18,
25;61:1;68:18;71:14;
72:21;76:20;79:18,
22;82:18;87:3,8;
88:5,17;149:16;
158:18,19;159:3;
165:17;168:17;
170:21;171:24;
190:13;191:2;193:8,
14,17;194:22;204:14,
18,22;219:21;
221:24;222:21;
223:11
**Montana (3)**
75:23;76:24;77:7
**month (6)**
58:3,18;158:14;
226:13,17;229:14
**monthly (4)**
44:11,12;185:15;
229:13
**months (4)**
77:11;83:18;88:22;
227:4
**Moody (9)**
33:18;34:2;36:8;
38:4,22;55:14;67:25;
95:14;219:22
**Moody's (1)**
96:9
**Moore-Andrews (3)**
23:24;103:16;
176:15
**Moore-Andrew's (1)**
162:5
**more (42)**
7:17;14:23;15:1;
20:9;23:14,15;24:6,9,
13;30:7;31:15,22,23;
35:2,17,18;37:19;
48:25;57:17;58:22;
68:10;69:19;78:10,

11,12;86:16,21;
87:15;100:6;110:8;
142:9;152:6;168:22,
23;171:18;176:7;
182:16;185:2;
188:11;198:5;222:1;
230:2
**morning (15)**
5:25;6:1;64:5,18,
22;82:15;109:24;
114:20;115:8;
118:11;126:25;
127:2;132:11,14;
185:18
**most (17)**
26:23;27:19;42:6;
100:10,11;129:8;
135:1,4;150:2;
172:10;152:21;
166:21;167:2;
172:22;173:14;
180:16;221:7
**mostly (1)**
92:7
**mother-in-law (3)**
77:21;181:14;
182:5
**mountain (1)**
181:25
**move (1)**
16:19
**moved (12)**
15:12,19;16:7,11,
13;18:14,16;21:19;
47:1;56:19;131:3;
150:13
**moving (1)**
56:17
**much (52)**
19:21,22;20:10;
24:2,21;26:9;27:24;
31:10,15;35:5;38:7,8,
20;41:23;43:15;44:9;
48:1;51:20;56:20;
58:12;66:22;72:18;
77:5,5;78:10,18;
80:24;93:9;95:14;
98:22;101:7;107:16;
113:13,19;124:15;
125:7;126:16;
127:18;137:12,13;
151:24;153:5;159:2;
165:15,24;168:12;
171:17;173:3;
186:13;188:25;
204:22;214:22
**muffled (1)**
121:2
**Murray (2)**
6:21,24
**MW (1)**
187:16
**myriad (1)**

11:13
**myself (10)**
16:13;17:5;34:21;
77:11;104:23;138:6;
148:23;172:14;
176:14;188:2

# N

**NAB (2)**
139:19;140:2
**nailed (1)**
172:8
**name (39)**
6:2,5;8:3,10,24;
11:21;33:21,23;
59:19,19,24;72:3;
148:6,21;149:3,21;
150:1,8;151:2,6;
155:17;156:5;
161:14,18,22,23;
162:24,25;163:11;
164:7;166:3,12;
167:5,18;173:8,25;
205:11;227:20;228:5
**names (5)**
8:17;162:21,21;
197:3;199:24
**name's (1)**
209:8
**narrow (1)**
100:8
**nature (1)**
131:15
**Neal (1)**
9:5
**near (2)**
28:18;180:6
**necessarily (2)**
52:15;57:15
**necessary (1)**
132:22
**need (39)**
6:8,12,16;24:20;
35:1;40:8;47:12,21;
48:25;52:14;63:14;
71:21;74:24,25;75:6;
84:14;87:6;89:23;
95:24;101:12,12,13,
14;103:1;106:22;
107:5;108:10;
148:11;162:12;
173:2,13;192:19;
193:21;207:6,7;
211:1;222:2;223:11;
224:19
**needed (65)**
14:7;18:19;22:3,4;
25:23;34:7,10,14;
44:4,15;48:3;51:8;
52:9;54:5,7,10;55:1,
4,11,17,20;56:17,25;
58:14;59:4;68:15;

76:3;79:20;95:1;
96:1;107:25;108:1;
112:12;129:24;
134:10,13,24;135:3;
136:21;138:6,24;
139:1,4;142:12;
147:19;148:12;
151:22;152:15;
154:10,12;168:16;
181:10,19;186:4;188:5;
190:13;193:21;
201:14,17;203:16;
205:2;208:11,25;
219:23;223:6,7
**needing (1)**
114:2
**needs (2)**
47:11;103:13
**neither (1)**
64:3
**nerves (1)**
210:13
**nervous (5)**
81:16;82:18;112:3;
125:24;209:12
**new (7)**
14:14,19;15:8;
16:7;44:14;99:23;
186:2
**newsletters (1)**
12:9
**next (32)**
7:14;8:15;16:24;
17:17;18:5;22:4;
26:9,11;33:18,20;
47:1;64:6,13;70:7;
114:20;115:3;117:8;
121:9;138:14;139:5,
11,18;174:20;
183:21;186:5,21;
188:8;207:3,12,12;
212:23,23
**nice (3)**
29:17;30:5;189:10
**niche (1)**
217:22
**niece (2)**
188:18,22
**night (10)**
28:9;64:14,17;
103:23;104:15;
115:18;117:4;138:4;
176:9;216:7
**nights (7)**
142:4;176:21;
177:3,11;189:4;
213:16,17
**nine (5)**
155:5;156:4;
166:12;167:16;
176:18
**nitpicky (1)**
97:19

**nobody (1)**
119:22

**nominal (1)**
47:8

**nonchalant (1)**
115:12

**None (2)**
104:6,7

**non-refundable (1)**
194:18

**noon (2)**
135:13,14

**normally (2)**
148:1,1

**north (2)**
28:17;73:16

**note (3)**
22:24;162:12;
166:17

**notebook (1)**
205:15

**notes (4)**
105:25;124:6;
209:4,5

**notice (9)**
13:6;70:14;78:1,4,
7;79:6;80:11;93:6;
115:22

**notification (2)**
69:3;150:15

**notified (1)**
147:24

**notify (2)**
66:15;147:18

**November (2)**
19:16;191:19

**number (29)**
6:7;13:13;17:22;
56:16;67:9,23;90:23,
25;104:20;105:3;
120:7;128:18;164:6;
180:9;183:6;185:7;
196:25;197:3,11,20;
199:8;200:12;212:7;
214:10;220:10,12

**numbers (4)**
62:17,20,22;183:7

**Nursing (6)**
9:17,21;15:2,20;
57:24;157:19

# O

**observation (1)**
168:20

**observe (1)**
132:7

**obtain (3)**
145:20;148:11;
179:10

**obtained (6)**
7:6;49:1,2,13;57:6;

**58:20

obtaining (1)**
145:18

**obviously (2)**
70:19;80:25

**occasion (4)**
31:16;148:5;
201:18;207:21

**occasional (1)**
205:16

**occasions (12)**
26:22;29:11;55:14;
84:6,11;86:10;98:1;
136:2;149:19;
203:14;208:5;215:9

**occupation (1)**
8:5

**occur (3)**
15:14;26:17;121:6

**occurred (5)**
15:15;63:24;99:15;
118:10;227:6

**o'clock (2)**
114:22;185:19

**odd (6)**
24:9;118:25;
119:15;163:24;
224:11,14

**off (43)**
7:13;29:8;31:25;
43:11;46:9;58:24;
63:16,17;65:21,22,
23;66:3,10,17;67:2;
71:16;77:20;79:25;
113:14;114:24;
121:23,24;144:16,17;
150:10;152:19;
163:13;182:14,15,18;
187:16;192:23;
195:2,3;204:23;
215:13;217:24;
218:5,23,24;224:13;
231:7,9

**offer (6)**
20:4;30:19;39:6;
87:7,8;144:4

**offered (1)**
9:10

**offguard (2)**
33:17;35:9

**office (133)**
9:16,19;10:4,6,12;
11:15,17,24,25;
13:12;15:2,12,12;
16:1,16,24,25;17:1,3,
4,6,8,12,14,20;18:6,9,
10,15,19,21;20:22;6;
24:12,21;25:4,16,17,
19,20;26:4,7,10,12,
14,24;27:23;28:21,
21;33:13,20;22;34:4;
35:6;38:10;39:3,7;
41:2;42:12;44:19;

**48:21,22,22,25;
49:10,20;52:4,7;
57:11,13,21,23,25,
25;58:10,12;60:8;
63:23;64:4,6,9,11,21;
65:3,10;74:23;78:10,
11,23;81:1,5;105:23;
109:5;114:24;115:4,
9,23;116:10;119:4,6,
10,13,18,24;120:12,
14;121:4,8;122:22;
127:4,7,11;136:9;
139:16;140:8;147:8;
152:23;158:11;
169:20;174:18,19;
185:25;200:16;
202:14;203:23;
204:5;205:1,6;206:4,
14;207:1,8;208:19;
224:15

**officer (5)**
13:22;115:15;
116:5,14,17

**offices (4)**
13:14;57:18;58:7;
174:20

**offset (1)**
31:5

**off-site (4)**
27:4,19;42:11;
142:20

**often (2)**
26:17;81:1

**oil (2)**
197:13;206:1

**old (7)**
8:12;57:21;77:11;
92:9;146:16;150:9;
217:16

**older (2)**
59:18,19

**oldest (1)**
217:16

**olive (2)**
83:1;206:1

**once (8)**
14:2;45:15;72:7;
129:20;134:22,23;
141:11;159:12

**one (145)**
6:12,16;8:8;17:22;
18:9,20;19:3,15,17;
24:23;29:25;31:6,7,7,
20,21;33:19;37:6;
38:9;40:4,11,14,15;
41:11;43:19;44:4,5;
54:17;55:23;56:16;
60:13,14;64:6,13,23;
65:10;76:13,15;77:2,
9;78:20;81:4,4;89:7;
94:9,11;95:18;96:20;
97:9,23,23;98:16;
100:6,11,20;102:10,

**21,23;106:12;107:2;
111:6,14,23;115:5,8,
8;119:11;120:8;
126:8;129:6,16,19;
132:5;135:4;139:8,
18;141:8;142:3;
145:1;146:19;
147:14;148:13;
149:17;155:19,21;
157:23;159:4;167:8;
169:6,14;172:19;
173:1,6;174:2;
175:23;176:2,9;
178:20,21;179:11;
180:14;181:15,17;
183:3,6,14,21;184:3,
16;185:3,20;186:6,
13;187:4,6;190:19;
191:22;192:13;
195:19;197:10;
199:14,19;200:2,11;
202:16;203:15;
206:8,13,21;208:2;
209:17;211:25;
212:7,8,9;213:21;
216:19;217:5,16;
220:9,10;222:17;
225:18;226:4;230:2

**ones (3)**
223:17,25,25

**one's (1)**
177:17

**online (6)**
133:21;137:4,5,24;
144:5;214:13

**only (23)**
27:6;69:8;73:21;
76:13;77:14;89:22;
99:3;109:21;119:12;
133:17;136:17;
141:8;156:12;167:8;
168:5,6;171:14;
177:7;186:12;
205:16;210:13;
216:13;224:15

**Onset (3)**
11:20;35:5;93:11

**open (5)**
10:3;13:5;17:10;
20:10;130:6

**opened (2)**
33:17;217:25

**operates (1)**
8:24

**operations (2)**
13:21;51:22

**opinion (1)**
62:10

**opportunities (1)**
14:19

**opportunity (10)**
9:15,24;16:22;
36:18;68:9;69:17;

**70:21;72:7;110:14;
112:22

opposed (6)**
29:1;162:25;
166:14;167:10;
179:11;189:9

**opted (1)**
58:24

**option (1)**
66:3

**options (1)**
180:19

**orchestrating (1)**
110:20

**ordeal (1)**
6:11

**order (11)**
12:2;49:21;53:21;
55:11;63:5;109:15;
116:23;121:21;
133:5;207:18;219:24

**ordered (2)**
206:23,25

**orders (2)**
218:1,2

**ordinary (1)**
94:25

**organization (17)**
16:15;27:11;28:2;
35:15,16;39:16;
42:22,24;45:12;
105:19;124:18;
130:4;159:15;
160:12;165:20;
219:9;221:19

**organizations (2)**
194:3;229:14

**others (4)**
11:24;101:4;
193:25;221:19

**Otherwise (1)**
28:10

**ours (2)**
65:11;229:16

**ourself (1)**
54:11

**out (131)**
7:18;10:22;16:2;
18:22;25:15,17,22;
26:22;29:21;34:19;
37:3;40:12;44:13;
45:14;46:19;52:14;
55:3,4,13,13;56:19,
19;58:17;59:4,22;
61:21;64:3,7,20;
66:19;67:12;68:25;
69:10;70:4;71:13,14,
17;74:21,25;75:2,2,
21,23;76:4;77:2,10,
12,13,13;79:5,7;
81:10;85:4,11;87:18;
88:24;89:8;90:1;
94:24;95:1,15;97:10;

Mark A. Waldrop v.
Community Health Systems, Inc.

Stephanie Dotson
January 30, 2017

98:24;99:13,19;
100:16;105:5;
106:25;107:8,14;
110:21;115:15,20,24;
116:19;117:10;
119:22;120:3,9,14,
24;121:3;127:12,17;
129:7;135:20;138:2,
9,24;140:23;145:24;
146:1;152:13;
155:24;158:12,13;
171:10,17;172:9;
173:11;175:6,12;
180:17,25;182:1;
185:4,24;190:3;
191:6,13;192:13,21;
194:20;199:19;
201:17;202:13,14;
204:4;206:18;207:4;
208:11,21;210:2;
216:7,17;219:23;
221:17,20;222:1;
227:3;229:8
**outlet (1)**
158:24
**outline (1)**
139:11
**outlined (1)**
93:22
**outlines (1)**
46:20
**outlining (1)**
94:15
**outpatient (2)**
18:7;116:11
**outside (8)**
18:1;25:8;33:24;
37:7;41:5;50:11;
57:16;74:1;160:5
**outstanding (1)**
147:19
**over (70)**
10:1;13:7;14:13,
18,18,22;15:1,8;20:2;
22:23;34:3;36:10;
40:13;42:18;43:4,10;
46:25;59:22;63:4;
65:24;71:17;73:7;
89:15;93:19;96:13;
99:9,10;102:25;
112:20;114:14,25;
115:4;116:5,6;120:3;
124:4;125:11;
130:16;133:14;
135:14,25;139:2;
140:6;146:3;147:3;
151:21;154:4;
155:22;159:9;
160:12;165:13,13;
166:1;167:17;170:5;
174:23;175:13;
177:1;180:2,10;
181:13,25;195:14;

197:19;204:1;206:7;
207:9,13;209:15;
210:13
**overbearing (1)**
88:9
**overheard (1)**
117:16
**overlap (1)**
190:19
**overlapping (1)**
192:8
**overnight (3)**
28:8,12;198:17
**oversaw (1)**
27:12
**oversee (10)**
50:1,6,10;51:21,
22;56:7;62:1,6;65:2,
18
**overseeing (2)**
15:5;173:15
**overseen (1)**
51:24
**oversight (6)**
48:20;51:6;65:4,
12,14;81:24
**overwhelming (1)**
210:16
**own (7)**
148:11;154:17;
162:20;173:7;
207:17;222:25;228:5
**owned (2)**
36:11;57:16
**owner (2)**
171:13,18
**ownership (1)**
57:17

**P**

**paced (5)**
14:17;124:4;
158:11;165:11;209:6
**pack (2)**
34:16;197:14
**package (1)**
45:20
**packet (2)**
138:21,25
**page (40)**
19:6;50:13;53:13;
97:2,11;101:2;
108:16;137:23;
138:14;139:5,11;
164:23;167:17;
169:10;170:3,5,11;
177:24;181:8;183:5;
185:6;186:5,21;
187:4,19;188:8;
196:24;197:19,21;
199:13;200:11,11,13,
25;201:1;208:16;

212:12,23;214:9,11
**pages (7)**
105:8;169:13;
174:14;179:20;
200:21;211:19;212:7
**paid (25)**
51:13;65:21,22,23;
66:7,12,20;77:5;
86:20;137:9;143:9,
18;144:7;149:14;
161:17,21;171:16;
179:11;193:8;
194:12;208:2,4;
216:17;219:6;220:19
**Pal (4)**
170:6,7;172:2,5
**panel (2)**
116:10;130:6
**panicked (1)**
79:25
**paperwork (2)**
119:25;221:6
**paraphrasing (1)**
112:11
**paren (1)**
198:10
**parents (2)**
8:14,15
**Park (2)**
9:17;11:2
**parking (2)**
152:1;175:8
**Parks (1)**
59:16
**Parkway (4)**
16:9,12;18:14;
21:20
**part (15)**
26:23,25;102:13;
108:10;109:12;
135:1,4;139:24;
152:21;167:2;
168:18;180:16;
194:5;196:11;228:1
**participate (1)**
228:9
**participated (2)**
133:18,19
**participating (1)**
140:14
**particular (9)**
19:16;30:24;115:2,
11;180:15;185:14;
201:7;206:16;221:5
**parties (2)**
73:19;157:14
**passed (4)**
30:25;119:5;
159:14;221:10
**passionate (1)**
101:8
**past (5)**
17:11,14;168:21;

171:2;180:20
**path (1)**
152:19
**patient (1)**
116:12
**Patton (14)**
33:18;34:2,7,20;
35:1;37:9;38:2,9,25;
39:20;67:24;68:3;
70:9;72:2
**pay (29)**
41:14;66:21,21;
67:2;72:9;73:2;
74:16;75:2,7,8;76:20,
21;148:8;149:17,18,
21;170:6,7;172:2,5,5;
207:16;208:3,14;
214:22;216:20;
222:13,24;223:9
**payable (1)**
55:10
**paychecks (1)**
67:21
**paying (2)**
62:5,5
**payment (3)**
130:14;170:9,11
**pays (1)**
36:12
**peeped (1)**
33:12
**people (43)**
9:12;13:11,14;
22:17;25:7,8;26:8,10,
20;29:3;30:15;42:22,
23;49:10;70:3;80:13;
85:10,12;87:10;88:1;
95:4;98:3;103:12,14;
107:1;130:4;150:23;
154:14;157:14;
162:18;176:12,18;
184:4,18;185:22;
187:12;188:6;199:9,
18,21;223:24;224:4;
230:19
**Peppermint (1)**
183:24
**per (1)**
12:24
**percent (9)**
28:15;50:19,25;
62:25;160:2;163:6,
10,15;206:11
**percentage (2)**
58:5;162:23
**perfect (1)**
113:2
**performance (6)**
19:7,8,11,20,23;
221:1
**performed (1)**
48:20
**perimeter (2)**

28:18;119:14
**period (6)**
120:18;140:7;
167:25;192:9;
212:24;214:20
**periodically (2)**
6:14;207:11
**periods (1)**
211:22
**permanently (1)**
38:11
**permission (1)**
71:13
**Perry (1)**
197:7
**person (12)**
11:3;12:3;23:5;
96:21;98:8;101:3;
127:16;144:5;
155:24;166:11,13;
230:8
**personal (18)**
36:19,24;37:4;
67:13,14;74:16,18,
23;75:13;100:24;
136:3,6;178:8,12,23,
25;179:10;207:17
**personally (5)**
41:9;76:22;151:14;
166:5,14
**persons (2)**
90:13;174:2
**pharmacy (7)**
15:2;27:21,25;
28:5,21;100:4;184:6
**phone (33)**
10:21;11:4;22:19;
33:3,5,7;36:12;52:7;
71:16;72:1,3,10,16,
19,8I:12;82:6,6;
89:15;91:12,16,19;
113:4;114:21,21,23;
120:6;152:22;163:4;
168:11;178:12,23;
179:7;224:18
**photograph (4)**
202:2,20;205:23;
208:16
**physically (2)**
110:9;111:23
**pick (12)**
75:1,4,7;82:5,6;
101:10;120:10;
156:14;182:8;187:2;
203:18;208:14
**picked (5)**
86:19;113:4;
120:12;181:20;
184:5;208:12
**picking (3)**
98:8;159:2;180:25
**pictures (2)**
37:4,6

Mark A. Waldrop v.
Community Health Systems, Inc.

Stephanie Dotson
January 30, 2017

**piece (3)**
43:2,5;156:24
**pieces (3)**
115:25;201:15,17
**pies (5)**
199:8,14,18,22;
200:3
**pills (1)**
119:8
**pine (1)**
44:14
**pity (1)**
194:21
**place (14)**
9:23;15:21;49:6,9;
54:8;62:4;93:19;
116:19;119:23;
124:9;181:4,7;
206:24,25
**placed (1)**
207:18
**places (4)**
29:9;146:19;
172:23;193:5
**plaintiff (1)**
5:13
**plan (9)**
131:3,5;158:16;
159:13;165:7;
170:25;191:4;
205:14;228:17
**planned (3)**
28:9;184:21;
222:22
**plants (1)**
44:13
**play (1)**
110:20
**played (1)**
114:16
**player (2)**
97:10;99:7
**players (2)**
96:20;100:21
**playing (1)**
26:2
**pleasant (1)**
112:8
**please (12)**
5:8;19:19;37:15,
22;68:9;70:20;86:17;
87:24;92:8;103:2;
187:19;205:22
**pleased (1)**
129:3
**plus (1)**
67:13
**pm (18)**
121:23;122:1,1,2;
144:16,19,19,20;
195:2,5,5,6;218:23;
219:1,1,2;231:9,12
**point (25)**

13:2,6;15:11,20;
18:9;34:8;37:1;38:9;
39:18;42:20;57:12;
58:15;71:4;80:5;
87:23;98:6;102:16;
108:2,16;110:5;
113:8;122:5,16;
132:21;143:1
**points (1)**
223:12
**police (2)**
116:14,17
**policy (5)**
145:16;149:8;
198:18,20,21
**Poodle (5)**
203:2,3,22;204:8,
14
**poodles (5)**
203:6,11;205:2,5,
17
**popcorn (1)**
174:21
**popped (1)**
64:20
**population (1)**
9:22
**position (12)**
9:17;10:3;12:18;
13:7,16;14:11,14;
18:18,18;20:9;
156:10;195:12
**positive (3)**
50:20,25;51:1
**possibility (6)**
21:1,4,13;123:12,
17;190:15
**possible (4)**
21:7;105:23;
220:16;227:5
**possibly (1)**
133:2
**posted (1)**
214:12
**pot (1)**
103:11
**potentially (1)**
140:17
**Power (1)**
8:6
**pregnant (1)**
8:1
**preliminary (1)**
193:1
**preparation (2)**
75:13;146:12
**prepare (2)**
209:1;211:1
**prepared (11)**
21:25;105:14,14;
129:20;148:19;
149:24;166:2;205:5;
211:9,15,17

**preparing (1)**
167:6
**presence (1)**
103:21
**present (3)**
5:7;228:11,17
**presentation (1)**
46:23
**presentations (2)**
21:25;100:9
**presented (1)**
160:18
**president (2)**
13:25;143:14
**presidential (9)**
27:5,8,9,14;40:6;
99:5;197:6;198:4;
224:21
**presidents (1)**
165:20
**pressure (2)**
64:19;80:19
**pretty (21)**
35:5;38:7;50:18;
51:19;66:22;78:18;
80:10;95:22;101:7;
107:16;113:13,19;
127:2,18;141:17;
151:24;168:11;
181:16;189:10;
212:22;226:17
**previous (3)**
58:9;174:9;206:3
**previously (1)**
15:21
**price (2)**
61:15;62:2
**prices (3)**
60:17;190:22,24
**pricing (3)**
46:21;50:5;62:1
**primarily (1)**
42:23
**primary (1)**
49:10
**print (1)**
138:14
**Prior (7)**
18:16;48:22;49:14;
56:24;57:5;64:1;
187:4
**priority (1)**
50:4
**priority-mail (1)**
206:1
**proactive (1)**
155:18
**Probably (20)**
23:8;24:5,6;36:5;
45:10;70:2;79:8;
84:10;89:19;97:6;
99:16;105:22;121:7;
128:24;138:18;

163:5;182:10;
198:16;206:11;
208:23
**problem (11)**
34:18;52:10;86:19;
97:22;98:18;102:17;
103:6,9;107:7;
108:14;156:3
**problems (4)**
51:9;75:15;103:6;
106:19
**proceeded (1)**
112:10
**process (21)**
46:2,3;47:4;48:8;
49:2;50:17;51:12;
53:3;56:12,16,24;
75:24;160:5,9;
171:14;172:20;
219:5;222:12;
225:25;228:8;229:6
**produce (1)**
104:25
**produced (1)**
105:2
**production (1)**
105:3
**profanity (1)**
230:12
**profession (1)**
61:20
**professional (2)**
81:20;82:9
**professor (1)**
128:23;133:13
**profit (1)**
204:24
**program (4)**
9:7;41:13;43:21;
228:10
**project (23)**
46:5,15,20;47:3;
48:3,8;50:11,17;
51:14;53:2;56:12,16,
25;59:8;60:12,20;
62:1;63:3;99:24;
100:2;113:21;
187:13;225:25
**projects (1)**
65:9
**promoted (1)**
18:17
**prompt (1)**
138:8
**prompted (2)**
44:2;87:25
**pronouncing (1)**
217:11
**proper (2)**
152:5,8
**property (8)**
44:20;76:24;77:3,
8,16,23;78:2;92:10

**protect (1)**
37:17
**protocol (1)**
132:6
**provide (10)**
18:7;20:2;51:6;
61:2;68:10;69:19;
73:18,19;116:11;
165:23
**provided (3)**
44:1;59:23;190:4
**providing (1)**
13:8
**PTO (9)**
63:25;65:20;66:4,
11,16;67:9,18;136:3,
6
**pull (4)**
105:5;107:11;
165:19,25
**pulled (2)**
27:13;187:12
**puppies (3)**
203:15;204:20;
206:20
**puppy (1)**
203:9
**purchase (4)**
158:21;180:12,15;
201:12
**purchased (5)**
48:23;77:2;158:24;
181:17;206:7
**purchases (2)**
145:21;148:14;
169:25;173:23
**purpose (22)**
25:2;30:10;53:17,
19;66:22;67:4;76:21;
125:13;130:9;153:2,
3;163:19;165:9;
169:19;180:22;
187:8,9;195:24;
199:17;219:7;
220:21,21
**purposely (1)**
210:9
**pursuant (1)**
56:7
**pushback (3)**
100:12,13;101:3
**put (27)**
25:22;37:4;49:3;
50:4;56:15;58:25;
68:22;69:5;70:4;
92:18;108:10;120:1;
146:21;149:12;
158:18;161:22;
167:3;169:20;
173:13;192:23;
196:6;202:17;
203:25;204:19;
220:5;222:19;223:6

**putting (1)**
124:20

## Q

**quarter (1)**
45:15
**queen (1)**
124:6
**questionnaire (1)**
136:20
**quick (2)**
33:6;202:14
**quite (1)**
170:24
**quiz/final/syllabus (1)**
137:24
**quizzes (2)**
134:4;138:23
**quizzes/final (1)**
138:14
**quote (2)**
108:17,18

## R

**Race (1)**
183:21
**rack (2)**
117:1;206:6
**rain (1)**
181:19
**raise (2)**
31:10;230:8
**raised (5)**
31:19;50:2;203:6;
230:9,11
**ran (1)**
51:9
**random (1)**
15:25
**rate (8)**
12:21;29:4;69:7,8;
159:3;175:7,21;
189:9
**rates (1)**
177:2
**rather (2)**
23:6;162:21
**re (1)**
139:18
**reach (6)**
29:21;52:14;55:3;
71:13;129:7;172:9
**reached (6)**
40:12;55:13,13;
71:17;155:24;175:6
**reaching (3)**
127:12,17;172:10
**reaction (1)**
116:2
**read (7)**
55:20;134:5;

145:11,13,14,14;
230:17
**reading (3)**
125:5;134:13;
175:24
**ready (6)**
37:16,17,22;70:4;
110:4;138:19
**real (13)**
9:11;10:18;33:6;
51:16;52:3;62:8;
79:15;81:15;92:12;
97:10;132:24;
227:10;229:5
**realize (1)**
59:7
**realized (1)**
39:18
**Really (84)**
12:11;13:24;14:7;
16:21;17:10;27:6;
33:16;35:9;36:2;
37:20;38:9,12;39:5;
43:25;45:18;58:18;
59:4;75:25;77:4,25;
78:1;79:19;80:17;
83:14;85:21;86:9;
87:11;88:25;89:6,24;
90:2,11;91:3;93:1,
19;94:13,23;96:19;
97:20;98:6;99:6,11;
102:6,9;103:18,18;
108:7;111:16,24;
115:11,12;116:3;
123:6,22;125:2;
127:20;129:2,3;
131:8;132:6,19,19,
24;140:12,19,22,24;
145:1;156:8;164:5;
184:21;185:23;
194:17;198:20;
207:5;209:3;215:1;
217:22;219:7;
221:16;229:8,18,19;
230:21
**reason (15)**
54:25;58:8,20;
62:6;69:4;78:1;
109:21;119:21;
140:11;163:22;
172:4;173:5;205:8;
212:8;214:10
**reasons (4)**
93:24;94:10,11,16
**reassured (1)**
126:4
**recall (44)**
7:16;13:20;19:15,
19,22;21:5;24:1;
33:21;35:10,24;
38:21;39:23;41:4,11;
44:6;50:18;59:19;
67:10;68:1,2;76:16;

86:1;90:16;93:15,23,
25;100:6;109:4;
110:5;122:14,25;
151:1,8;153:14,16,
19,24;178:17;179:9;
199:24;210:23;
226:13;230:10,13
**receipt (14)**
169:14,20,22;
170:2;174:13;181:9;
182:4;183:21;184:9;
185:9;186:7;187:6;
208:15;214:2
**receipts (8)**
145:20;146:22;
152:23;155:19,21;
179:20;183:9;213:24
**receive (5)**
21:16;22:22;72:1;
199:22;228:24
**received (2)**
41:9;145:11
**receiving (1)**
23:5
**recently (4)**
27:20;40:4;77:2;
133:21
**receptionist (4)**
9:19;10:13,22;
33:24
**recess (5)**
63:18;121:25;
144:18;195:4;218:25
**recognize (7)**
137:21;145:4;
169:5;182:25;202:2;
211:8,14
**recommendation (1)**
106:8
**recommendations (1)**
51:11
**recommended (2)**
178:20;215:17
**record (15)**
5:7,8;6:3;63:17,21;
121:24;122:3;
144:17,21;195:3,7;
218:24;219:3;224:2;
231:10
**recorded (3)**
91:12;111:7;
223:19
**records (4)**
10:21;204:8,11;
218:10
RECROSS-EXAMINATION (1)
230:4
**REDIRECT (1)**
225:14
**refer (4)**
137:25;138:15;
139:8,22
**referenced (1)**

206:2
**references (1)**
137:23
**referred (1)**
90:6
**referring (3)**
158:6;195:21;
208:20
**refers (1)**
139:24
**refinance (1)**
76:1
**refinancing (1)**
33:1
**reflected (1)**
67:20
**reflection (1)**
95:10
**refresh (2)**
105:12;129:9
**refreshments (1)**
175:13
**refund (2)**
194:14;221:9
**regard (1)**
226:4
**Regency (3)**
9:17;10:25;11:2
**regional (1)**
143:14
**register (1)**
68:17
**registered (2)**
68:16;219:17
**registration (2)**
167:4;220:1
**registry (1)**
29:6
**regulations (1)**
136:14
**rehab (3)**
15:3;18:7;116:11
**Rehabilitation (7)**
9:18;16:14;33:19;
53:12;54:1,24;194:4
**reimburse (6)**
72:2;208:4,6;
215:10;220:6;221:11
**reimbursed (3)**
207:20;215:7;
220:19
**reimbursement (33)**
145:17,18;146:12,
25;147:15,21;
148:20;149:14,20,25;
150:7,19;151:9;
152:25;153:4;161:2;
162:24;163:20;
164:7;166:2,4,8;
173:8;174:4;183:19;
184:14;185:13;
186:19,22;199:8;
216:2;221:4;227:21

**reimbursements (6)**
94:5;148:6;153:8;
160:23;161:12;
162:20
**reimbursing (1)**
219:5
**reiterated (1)**
35:17
**related (3)**
44:21;65:10;74:19
**relationship (16)**
20:13;29:3;80:21;
81:19;84:24;85:8;
89:17;92:15;97:1;
98:10;99:3;101:5;
102:4;104:17;108:5;
123:11
**release (3)**
9:7;71:20;73:1
**relief (1)**
110:6
**rely (1)**
165:23
**remain (1)**
12:17
**remedied (1)**
124:16
**remedy (2)**
123:10;156:2
**remember (64)**
16:17,19;19:16;
30:24;32:2;35:8;
38:20;40:11;43:15;
54:14;55:22;56:1,3;
59:18;60:14;67:11;
70:16,25;75:25;
76:13;77:24;82:16;
88:16;91:18,19;94:1,
2,14;104:17;107:3;
108:6;109:21;
110:24;113:5,18;
114:16,21;123:24;
128:16,19;130:8,22;
132:10;135:20;
141:20;143:17;
147:23;155:12;
172:6;176:24;
179:13;181:15;
196:12;197:14;
206:24;207:4,25;
209:6;210:15,22;
214:22;223:24;
227:18;229:2
**remember/I (1)**
210:23
**remembered (1)**
41:3
**remembering (3)**
110:12;111:14;
114:4
**remodel (2)**
57:12,15
**Renee (1)**

105:18
**renovation (2)**
  48:24;65:19
**rent (4)**
  58:2;171:17;176:7;
  186:12
**rental (8)**
  170:12;171:13;
  175:21;177:7;
  190:18;192:1,1,2
**rented (5)**
  187:1;191:19,22;
  192:6,12
**renters (1)**
  171:15
**renting (3)**
  58:18;189:8;192:7
**reorgs (1)**
  13:19
**repair (1)**
  52:3
**repairman (1)**
  202:14
**repeat (1)**
  6:9
**replace (1)**
  117:11
**replaced (1)**
  43:11
**replenish (2)**
  184:24;185:5
**replied (1)**
  43:9
**reply (1)**
  39:13
**report (42)**
  9:8;11:22;12:15;
  18:11;42:5;69:2;
  96:14;117:12;
  123:25;125:22;
  145:23;147:19;
  148:24;152:7;155:8,
  10;161:16;162:13;
  163:9;166:16;167:1;
  177:17,21;183:1;
  189:13;195:10;
  196:6,18,20,21;
  199:4,5,7;206:3;
  211:9;213:10,21;
  214:7,12;216:6,13;
  228:2
**reported (4)**
  12:16,20;136:5;
  224:9
**reporter (1)**
  230:23
**reports (36)**
  12:10;19:25;21:25;
  23:17,20;27:10;
  31:22;68:4;83:19,21;
  84:17;85:24;102:3;
  149:3;151:12;154:3,
  18;155:15,20,20;

160:22;161:2;162:3,
  15;165:3,19;167:13;
  169:6;174:2;197:8,
  12;211:11,15;213:7;
  215:15;227:16
**represent (2)**
  142:13;209:19
**representatives (1)**
  227:16
**represents (1)**
  108:21
**reputation (1)**
  221:21
**request (16)**
  66:20;67:1;146:25;
  147:22;148:19;
  149:20;151:11,18;
  152:25;153:4;166:3,
  9;173:8;174:4;
  186:22;227:21
**requests (10)**
  12:10;146:12;
  147:15;149:24;
  150:7;153:21;
  162:24;163:20;
  164:7;166:4
**require (2)**
  26:1;28:8
**required (1)**
  58:9
**research (1)**
  191:6
**reservation (4)**
  170:16;171:1;
  172:24;221:9
**reservations (1)**
  172:15
**reserve (1)**
  230:18
**reserved (1)**
  222:15
**residential (1)**
  65:8
**resign (3)**
  123:13,21,24
**resigning (1)**
  123:18
**resolved (1)**
  73:8
**resources (6)**
  71:13,18;110:16;
  162:3;195:14;201:13
**respect (3)**
  48:9;99:6;133:25
**respected (4)**
  83:15;84:13;89:4,4
**respective (1)**
  27:11
**respond (2)**
  22:10;23:18
**responded (2)**
  23:4;113:25
**responding (2)**

23:6,10
**response (1)**
  23:6
**responses (1)**
  114:7
**responsibilities (4)**
  12:5;15:7;24:24;
  27:1
**responsibility (1)**
  87:5
**responsible (1)**
  148:15
**rest (1)**
  114:17
**restaurant (3)**
  215:15,23,25
**restroom (5)**
  17:19;33:6;138:4;
  174:24,25
**restructure (1)**
  136:13
**result (2)**
  85:2;121:11
**results (2)**
  99:12;103:3
**resume (3)**
  128:20;129:16,20
**resumed (1)**
  33:8
**retain (1)**
  106:1
**retired (2)**
  43:1,4
**retirements (1)**
  201:16
**retreat (3)**
  141:21;142:5,14
**return (1)**
  229:7
**returns (1)**
  75:13
**revamp (2)**
  129:9;136:16
**revenue (3)**
  198:5,9;203:5
**review (6)**
  63:6;72:7;150:1,
  17;230:24;231:3
**reviewed (1)**
  160:7
**reviews (1)**
  222:6
**revisions (1)**
  137:24
**revisit (1)**
  90:4
**right (76)**
  6:17;7:13;8:15;
  13:1;15:12;17:13,15,
  18;23:12;24:1;31:25;
  35:24;36:7,22;39:5;
  65:22;66:18;70:10;
  78:3;80:8;81:10;

87:18;90:6;94:7;
  95:6,11,23;101:25;
  107:14;110:25;
  115:23;118:13;
  119:10;121:17;
  123:15;132:1;
  138:18;139:5;147:6;
  172:2;177:4,11;
  179:13;181:8;184:9;
  187:5,15,19;188:8;
  190:25;191:20;
  192:3;194:5,6;201:3;
  202:23;207:6,8;
  215:13;216:3,5,11,
  14,15;217:12;219:12,
  13;220:24;221:6;
  223:22;226:13,21;
  230:16,17,19,25
**right-hand (2)**
  14:8;185:8
**Rising (1)**
  196:4
**Ritz (2)**
  175:7;176:3
**Ritz-Carlton (7)**
  175:22,25;176:4;
  189:3,10;197:23,24
**River (7)**
  16:9,11;18:14,16;
  21:19;65:3;205:1
**road (11)**
  22:14,18;25:4,5;
  42:8;54:15;89:2;
  119:10;151:20;
  152:18;172:7
**robbery (1)**
  120:5
**Robin (3)**
  23:24;103:19;
  176:16
**Rocky (1)**
  116:6
**Roger (1)**
  197:7
**Rogers (2)**
  23:25;197:7
**role (7)**
  11:13;21:2;83:15;
  133:11;141:15;
  162:7;204:7
**roles (1)**
  96:14
**Rollins (61)**
  16:17;20:24;21:10,
  14;49:15,16;52:6,17,
  18,22;59:9;69:24;
  78:13;80:21;81:1,9,
  19;82:8,11;83:3,9,12,
  18;84:16;85:22;86:6,
  15;87:12,25,25;88:4,
  19;89:17;90:13,18;
  113:9;117:13,25;
  122:12;130:20;

131:13,22;133:7;
  141:14,19;146:10;
  147:18;148:25;
  149:20;151:9;
  163:12;168:4,21;
  179:8;222:11;
  223:22;224:5;226:9;
  227:20,22;230:7
**Ronnie (66)**
  69:24;80:21,24;
  82:1;83:8;84:1,6,11,
  21;85:1;86:6;87:12,
  18;88:8;89:4;90:18;
  110:18,25,25;111:3,
  10;112:7,15,16,22;
  113:2,5,7,14,18,19,
  25;114:1,6,8,9;
  117:13,25;118:2,7;
  123:20,22;125:4;
  130:20;131:13;
  132:13;141:14;
  142:1,6,8;146:10;
  151:9;154:2;157:24;
  159:12;161:18;
  163:12;166:24;
  168:4,9,21;179:8;
  223:22;224:4;228:2,
  10
**Ronnie's (2)**
  83:21;126:12
**room (18)**
  17:9,16;18:6;
  19:24;20:1;28:4;
  33:2;34:11,23;69:7;
  120:14,15,16;176:7;
  184:3;189:2,10;
  198:17
**rooms (2)**
  68:19;69:8
**roughly (2)**
  163:6;165:15
**round (1)**
  141:5
**rule (1)**
  221:15
**run (17)**
  22:5;26:19,21,22;
  33:5;44:25;45:1;
  55:2;74:24;81:22;
  84:23;85:6;87:9;
  102:14;152:17;
  185:24;202:15
**rundown (2)**
  125:21;209:16
**run-ins (1)**
  103:18
**runner (4)**
  9:6;10:15,15,17
**running (5)**
  44:13;47:24;49:20;
  74:22;165:22
**rushed (1)**
  64:9

**Ruth's (1)**
187:5

## S

**sacrifices (1)**
157:6
**sad (2)**
132:15;190:16
**safe (3)**
16:6;29:10;58:19
**safeguard (1)**
62:4
**sale (2)**
21:7;174:18
**salesman (1)**
76:14
**salvage (3)**
56:20;104:1;
123:11
**salvaged (1)**
101:5
**same (31)**
14:22;21:23;22:7;
28:11;35:13;54:15;
62:14;68:19,21;
78:18;80:9,25;94:20;
95:25;97:2,11;101:1;
102:19;103:3;
122:11;135:16;
139:13;150:15;
152:3;161:8;166:8;
167:16;174:3;
178:22;179:14;
180:21
**sand (1)**
101:14
**Sarah (1)**
197:7
**sat (6)**
36:6,7;83:2;90:24;
194:10;223:17
**Saturday (3)**
64:14,17;118:11
**Saturday-to-Saturday (1)**
177:7
**SAU (5)**
137:24;138:14;
139:6,11,18
**save (9)**
58:23;60:18;68:17;
78:11;79:22;147:13;
190:13;208:13;
223:10
**saved (1)**
159:3
**saving (3)**
58:16;60:24,25
**saw (8)**
33:13,17;34:1,19;
64:7;156:4;166:12;
197:15
**saying (21)**

66:3;71:7;72:17;
84:25;88:10,20;90:8,
11;94:14;108:13;
119:2;126:6;143:17;
156:25;157:5;163:8;
190:10;192:23;
227:12,13
**Saylors (1)**
8:19
**scan (3)**
147:6,11,12
**scanned (1)**
147:9
**scare (1)**
202:9
**scared (2)**
112:4;126:2
**schedule (2)**
11:8;14:6;24:17,
24;127:6;188:5
**school (15)**
6:23,24;7:2,10,14;
9:2,4,7,10;109:22;
135:5,11;136:25;
179:1;218:5
**scope (1)**
46:15
**Scott (8)**
6:4,5;8:18,19,25;
76:14;133:18;143:12
**scrap (1)**
117:7
**scratch (1)**
111:18
**second (11)**
33:11,15;48:24;
57:18;169:13;170:3;
173:18;177:24;
192:13;208:16;
213:20
**secondhand (1)**
85:9
**secretary (1)**
96:18
**sections (1)**
133:16
**secure (3)**
16:24;93:17;117:5
**seek (1)**
216:2
**seem (1)**
105:23
**seemed (3)**
27:21;119:22;
134:6
**seems (4)**
131:14,24;142:2;
160:9
**sees (1)**
88:9
**see-through (1)**
119:4
**selected (1)**

52:23
**Selectica (10)**
40:13,18;43:19,20;
45:1,11;47:2;48:9;
50:21;51:2
**self-check (2)**
90:10;125:5
**self-employed (1)**
8:22
**self-funded (1)**
131:2
**sell (4)**
16:18;203:9,10;
204:17
**seminar (1)**
24:16
**send (20)**
23:1;31:2;43:1,5,8;
50:21,22;96:3;
115:15;129:7,8;
148:1;160:3;186:2;
194:21;196:10;
199:19;201:17,22;
229:12
**sending (3)**
158:2;195:24;
199:17
**senior (1)**
13:25
**sense (2)**
193:6;196:3
**sensitive (1)**
57:2
**sensor (2)**
120:9,11
**sent (25)**
22:10,25;23:4;
31:6;42:2;43:2;
56:19;62:14;72:24;
76:4;91:13,17,18,20;
110:25;111:1;155:8;
170:6;191:1;193:8;
199:15;200:3;
202:10;220:2,3
**separate (6)**
16:25;75:8;143:23;
178:15;208:15;
211:10
**separation (2)**
70:14;93:6
**September (2)**
7:25;74:3
**series (1)**
189:22
**serious (2)**
113:1;125:8
**serves (1)**
60:24
**service (7)**
22:19;40:12;44:17;
45:4;47:9;87:7;157:1
**Services (6)**
5:4,10;13:25;44:1;

97:24;197:6
**sessions (1)**
168:15
**set (10)**
12:1;50:23;53:21,
24;54:10;55:6,8,24,
25;150:24
**sets (1)**
206:2
**setting (3)**
58:12,13;65:11
**seven (9)**
8:2,13;92:9;145:2,
8;177:9;189:4;210:1;
213:16
**seventh (1)**
183:5
**Several (39)**
7:21;11:25;13:19,
24;14:1;15:4,4;29:9;
35:16;39:21;49:10;
55:14;59:12;65:7;
72:20;75:5;79:12;
86:9;90:24;93:22,24;
94:2;95:12;97:25;
99:4;114:25;127:10;
130:4;133:20,22;
140:7;165:6;171:2;
183:9;184:10;
186:15;202:10;
204:4;207:1
**severance (1)**
72:12
**shake (1)**
88:23
**shaken (1)**
37:5
**share (8)**
30:16;41:22,23;
53:3;72:13;127:20;
140:4;154:19
**shared (3)**
124:14;155:25;
174:19
**Shark (1)**
228:15
**shell (1)**
16:21
**shelter (1)**
205:1
**shipment (1)**
187:2
**shipped (2)**
199:9;207:1
**shock (3)**
33:16;35:9;116:3
**shocked (4)**
94:17,22;95:19;
190:15
**shocking (1)**
127:21
**shook (2)**
34:3,19

**shop (2)**
11:7;180:2
**shopping (1)**
180:6
**short (10)**
17:12;34:15;63:10,
13,15;109:14;116:4;
121:18;194:24;
225:13
**shots (1)**
203:17
**show (27)**
19:2;31:3;32:3,6,
10,14;48:14;53:7;
95:7;104:11;120:24;
128:10;155:4;
164:20;169:2;
175:19,25;182:22;
189:18;199:1;200:9,
10;201:3;202:1;
203:8;205:23;211:6
**show-breed (1)**
203:6
**shows (5)**
32:13;167:19;
176:21;183:23;
188:11
**shred (1)**
48:1
**shut (1)**
108:1
**sick (3)**
102:12;111:23;
172:12
**side (8)**
18:5;77:20;116:9;
119:12,14;120:25;
157:19;203:6
**sidebar (1)**
79:18;185:22
**sign (14)**
20:6,7;39:25;40:1;
46:9;52:19;54:14,16;
150:9,10;192:1;
196:22;222:17;
230:17
**signature (3)**
50:14;53:15;169:9
**signed (19)**
19:9;40:3,4,25;
41:5;43:18;44:7;
47:3,22;53:25;61:5;
62:9,23;63:8;65:1;
183:2,4;196:19;
221:24
**significant (2)**
58:17;97:8
**significantly (1)**
176:7
**signs (1)**
120:2
**similar (4)**
109:1;161:25;

208:11;219:18
**simultaneously (1)**
    39:8
**sink (1)**
    64:18
**sit (9)**
    19:12;34:20;89:14;
    90:20;111:6;134:8;
    135:23;224:1,14
**site (3)**
    25:6;61:12;64:8
**sitting (3)**
    68:5;110:18;
    134:14
**situation (25)**
    16:4;23:14;57:1,
    11;59:1;74:6;85:17;
    97:25;99:14;100:19;
    101:18;104:16;
    106:11;107:25;
    112:24;113:11,24;
    123:11;124:16;
    152:17;157:16;
    191:10,11;208:21;
    210:21
**situations (2)**
    205:12;208:9
**six (1)**
    137:17
**sketches (1)**
    217:17
**skilled (1)**
    157:19
**slap (1)**
    126:12
**sleep (1)**
    132:18
**slides (2)**
    139:19;140:3
**slow (1)**
    20:25
**small (13)**
    17:12,15;33:13;
    34:23;42:12;81:5;
    110:1,3;115:17;
    157:11;174:19;
    188:23;224:16
**smaller (1)**
    77:22
**smells (1)**
    174:22
**snacks (2)**
    184:6,8
**so-and-so (2)**
    148:3;162:12
**software (8)**
    40:13,19;43:20,24;
    44:21;45:2,7;99:23
**sold (1)**
    21:17
**solicit (1)**
    29:13
**solicitations (2)**

30:9;31:11
**soliciting (1)**
    32:2
**somebody (11)**
    34:1;45:13;78:22;
    79:4;117:10;119:7,
    13,19;127:14;
    157:24;172:19
**somehow (2)**
    64:19;128:17
**someone (7)**
    18:19;39:12;72:8;
    105:14;119:18;
    120:13;128:14
**someone's (1)**
    197:2
**someplace (1)**
    29:1
**sometime (5)**
    64:17;109:4;
    122:10,11;123:2
**sometimes (29)**
    23:15;24:6,6,13,
    14;26:15;27:18,19;
    29:13;30:14;40:1;
    46:22;86:12;100:16;
    134:23;137:6;
    151:15,16;166:3,7;
    181:21,22;191:7;
    203:9;221:17;223:4,
    5,15;224:18
**somewhere (3)**
    31:6;138:2;197:15
**sorry (14)**
    23:13;65:21;88:11,
    21;111:3,13;123:1;
    131:17;194:8;
    212:10,11;225:1,20;
    227:10
**sort (75)**
    11:12;14:20,23;
    15:9;20:25;25:13;
    29:5;32:14;37:5;
    40:8;41:17;42:7;
    44:14;45:23;46:8,21,
    24,25;47:25;48:2;
    50:5,24;51:11,23;
    53:23;54:18;55:2,7,
    10,17;58:11;60:9;
    61:17,23;67:2,21;
    68:4,18;69:9;71:15;
    72:19;79:19,22;96:4;
    110:21;114:2,15;
    129:10;134:4,17;
    136:14;138:22;
    140:2;146:1;152:1,
    24;154:12;157:9;
    158:15;163:4;
    165:22;175:9,14;
    184:5;186:3;190:4,8;
    191:13,15;193:4;
    201:16;204:21;
    217:19;223:10;

228:17
**sought (2)**
    213:8,10
**sound (2)**
    33:10;120:20
**south (1)**
    27:22
**Southern (20)**
    8:6;41:12;43:2;
    128:21;129:25;
    133:9,11;134:19;
    135:15;136:1,9;
    137:10;140:9,20;
    141:15;142:16,19,20;
    143:10;157:20
**space (13)**
    16:20,23;17:10,13;
    26:10;42:11;48:25;
    49:10;57:19,19;
    176:3,5;185:3
**speak (1)**
    122:7
**speaker (2)**
    52:7;224:18
**speakers (1)**
    228:12
**Spearmint (1)**
    183:23
**special (2)**
    9:23;207:12
**specific (1)**
    153:1
**specifically (2)**
    48:6;225:18
**specifics (2)**
    52:25;210:25
**speeding (1)**
    71:19
**spend (1)**
    165:16
**spending (1)**
    132:3
**spent (4)**
    84:18;77:13;
    114:13;216:8
**split (1)**
    182:11
**spoil (1)**
    202:18
**spoke (1)**
    222:6
**spoken (1)**
    21:4
**spot (2)**
    121:13,13
**sprayer (1)**
    64:18
**spreadsheet (6)**
    145:24;146:16,22;
    158:13;200:18;201:7
**spring (1)**
    109:4
**squares (1)**

42:13
**standing (3)**
    56:19;64:24;
    115:23
**standoffish (1)**
    98:22
**standpoint (5)**
    45:24;55:9,12;
    82:21;84:12
**stands (1)**
    113:21
**Starbucks (1)**
    183:14
**stark (1)**
    99:20
**start (3)**
    108:17;138:19;
    185:17
**started (17)**
    7:16;12:14,22;
    27:20;29:15;35:4;
    97:5,18;98:14;
    110:18,19;133:21;
    138:18;159:2;
    184:16;223:1;229:1
**starting (2)**
    80:4;196:10
**state (13)**
    6:2;7:3;20:23;
    35:9;49:8,12;50:9;
    56:17;57:1;59:7;
    66:23;73:18;91:5
**stated (2)**
    93:25;153:3
**statement (2)**
    35:2;214:14
**status (2)**
    53:2;223:8
**stay (14)**
    28:8,12,13,25;
    78:11;108:7;135:12;
    137:6;175:10;
    176:25;190:2;
    192:14;193:10;
    214:25
**stayed (8)**
    16:4;21:22;28:16;
    37:16;38:2;171:2;
    189:4;212:20
**staying (1)**
    171:18
**Steakhouse (2)**
    181:10;187:5
**step (2)**
    132:22;135:20
**Steph (3)**
    139:12;187:17;
    198:11
**Stephanie (10)**
    5:3,19;6:4;23:16;
    82:7;137:24;139:6,
    18;213:23;231:8
**stepped (1)**

33:24
**steps (2)**
    47:1;70:7
**Steve (2)**
    23:25;176:15
**stewards (1)**
    221:23
**sticky (1)**
    124:6
**still (24)**
    9:4;50:7,8;57:25;
    66:17;69:6;72:3;
    87:6;89:4,9;101:17;
    102:13;103:3;
    108:10;124:8;
    133:19;146:16;
    192:21,24;210:19;
    212:11;218:3;
    220:22;228:19
**stirring (1)**
    103:11
**stock (3)**
    184:25;185:5;
    206:23
**stone (1)**
    21:11
**stood (1)**
    133:7
**stop (3)**
    50:9;92:12;185:24
**stopped (2)**
    80:6;183:16
**stopping (1)**
    143:1
**storage (2)**
    17:15;42:11
**store (1)**
    217:25
**stores (1)**
    202:17
**story (2)**
    92:11;116:4
**Stovall (6)**
    40:13;43:23;54:21;
    62:13,17,21
**strategy (1)**
    198:3
**straw (1)**
    44:14
**straws (1)**
    70:23
**stress (3)**
    80:7;88:7;110:7
**stressed (4)**
    78:6,8;79:5,7
**Strike (5)**
    153:15;191:25;
    215:23;221:3;227:5
**Stromberg (1)**
    100:5
**structurally (2)**
    51:8,10
**students (4)**

134:5;140:5,15;
142:12
**study (1)**
211:1
**stuff (9)**
41:20;73:7;83:23;
86:24;104:7;130:16;
139:12;152:3;174:21
**subcontractors (1)**
51:21
**subject (2)**
47:19;139:5
**submit (15)**
50:16;146:2;148:5;
149:2;150:19;159:9;
161:11;163:2;
173:25;216:12,13;
221:4;225:24;
227:16,21
**submitted (24)**
56:11;147:14,15;
148:20;149:20,25;
150:7;153:8;161:1,3,
12,14,16;162:20,24;
163:12;166:3;173:7;
174:3;177:22;183:4;
196:22;199:6;228:5
**submitting (3)**
151:8;164:6;173:9
**subsidiary (1)**
60:3
**successful (1)**
20:9
**sudden (1)**
16:1
**suddenly (1)**
33:9
**suggest (3)**
6:16;30:14;173:20
**suggested (7)**
30:2,17;178:14,16,
18;197:13,16
**suggestions (2)**
30:16,24
**Suite (5)**
16:9,25;17:21,25;
77:21
**sum (1)**
51:13
**summary (1)**
156:4
**summer (8)**
128:23;133:14;
141:6,7;143:19,25;
212:25;213:22
**summers (1)**
9:21
**summing (1)**
113:20
**Sun (2)**
172:21;208:1
**Sunday (1)**
177:3

**superior (2)**
163:20,21
**supervisor (4)**
67:6;83:16;146:2;
161:2
**supervisors (1)**
150:10
**supervisors' (1)**
162:21
**supervisor's (1)**
66:4
**supplies (12)**
17:16;60:8,9;
74:23;75:7;152:23;
169:21;174:7;
206:10,14;207:14,17
**supply (1)**
206:5
**support (3)**
13:8;72:22;101:12
**supposed (6)**
85:14;110:17,21;
114:7;156:1;216:1
**sure (83)**
12:20,23;13:18,23,
24;14:1;15:19;22:24;
28:15;36:6;40:7,9;
42:1;44:1;50:18,19;
51:1;54:11;55:1,8,16,
24;56:3;57:9;61:14;
62:25;65:6;66:1;
72:15;75:25;90:1,19;
91:5,13;104:19;
105:15;109:16;
114:17;116:20;
119:20;120:18;
121:4,8,14;127:2;
131:8,20;132:4;
138:17;141:17;
144:10;147:4,5;
150:22;159:8,16,22;
160:3;163:7;164:5;
165:11,16;180:4;
181:25;182:13;
191:17;192:11;
195:1;199:23,25;
205:12;207:20;
208:2;212:22;
214:21,23;215:8;
217:11,20;219:13;
225:23;226:17;
229:10
**surgery (1)**
210:20
**surgical (1)**
208:17
**surprise (3)**
105:5;156:7,16
**surprised (3)**
29:6;96:5,6
**surprisingly (1)**
120:22
**suspect (1)**

118:8
**suspicion (1)**
117:21
**swear (4)**
5:16;106:2,3,4
**sweatshirt (1)**
31:8
**sweep (1)**
121:4
**swing (1)**
191:16
**sworn (1)**
5:21
**syllabus (4)**
134:4;138:23;
139:19;140:1
**system (19)**
25:7,8;40:5,21;
44:24;45:9;47:9;
53:24;58:17;59:3;
66:25;67:7;116:25;
146:5;147:6,9,17;
150:25;198:7
**Systems (5)**
5:10,15;51:16;
52:2;62:8
**system-wide (3)**
46:6;79:22;159:13

**T**

**tab (1)**
215:25
**table (1)**
101:23
**tabulate (1)**
167:14
**talk (32)**
19:12;21:16;30:3;
34:8,21,23;37:19,21;
61:12;69:14,24;
70:21;74:10;78:21;
86:13;97:11;103:24;
104:15;107:5;110:1,
3,13;123:14;125:9,
12,18,20;132:5;
151:23;164:4;210:1;
218:14
**talked (13)**
57:14;70:17,25;
99:13;101:17,19;
113:5;123:8;126:3,
17;192:25;199:23;
218:4
**talking (19)**
33:18,25;40:6;
46:10,11;64:12;
65:12;101:6;103:25;
111:8;112:5,21;
129:4;161:8;179:8;
192:20;213:13;
214:16;221:5
**talks (2)**

45:19;61:23
**Tank (1)**
228:15
**Tape (5)**
63:20;89:10;90:12;
122:2;195:6
**taped (3)**
90:17,22;223:25
**tapes (4)**
91:1,9,11,23
**taping (1)**
89:16
**targeting (1)**
86:6
**tarps (1)**
181:17
**tasked (2)**
15:5;130:3
**tasks (1)**
12:3
**taught (3)**
41:12;143:21;
149:7
**tax (1)**
75:13
**Taylor (8)**
55:15;69:23;70:5;
72:16;96:24;108:22,
23;224:23
**Taylor's (1)**
159:10
**teach (6)**
41:20;133:13;
135:24;141:4;
142:12;143:25
**teaches (1)**
143:15
**teaching (6)**
41:14;134:14;
137:9;141:15;
143:10;144:8
**team (14)**
49:23;79:21;97:10;
99:5,7;101:7,15,19;
102:14;103:14;
107:11;108:11;
159:10;165:23
**teams (1)**
103:8
**teeth (1)**
64:3
**telephone (15)**
89:10;117:15;
118:23;165:16;
177:25;178:3,5,8;
179:4,11;223:16;
224:1;226:8;227:6;
230:6
**telling (7)**
71:5,11;81:13;
82:20;108:13;124:5,
23
**temporary (1)**

38:11
**tenant (1)**
58:9
**Tennessee (1)**
135:6
**tense (2)**
79:16;81:15
**tenure (3)**
65:24;67:11;96:15
**Teresa (14)**
33:18;34:2;36:8;
38:4,19,22;55:14,23;
56:2,2;67:24;95:13;
96:9;219:22
**term (4)**
81:25;130:11,24;
131:18
**terminated (1)**
226:21
**terms (1)**
56:7
**terrible (4)**
49:7;95:3;124:10;
180:4
**Tervis (1)**
31:8
**test (2)**
134:12;135:24
**testified (2)**
5:21;228:21
**testimony (1)**
225:24
**tests (1)**
134:4
**thanks (2)**
23:16;196:8
**Thanksgiving (1)**
199:20
**thick (1)**
200:10
**thinking (7)**
88:16;119:5,7;
122:6;125:6;182:12;
198:4
**third (7)**
48:24;50:13;57:18;
73:19;78:2;169:13;
200:11
**Thompson (1)**
197:7
**though (6)**
41:19;130:7;
140:20;146:15;
204:2;228:19
**thought (14)**
41:2;86:6;99:18;
106:7;120:23;154:5;
163:23;164:13;
173:18;174:8,11;
182:14;217:20;226:3
**thoughts (3)**
125:25;198:8;
224:12

**thousand-or-so (1)**
222:14
**thousands (3)**
46:17,17,17
**threatened (1)**
79:25
**three (26)**
18:3,10;24:5,9;
49:1,2,13,22;53:8,14;
56:6,10,23;59:21;
61:6;62:23;63:7;
64:24;97:7;99:17;
100:8;122:2;171:15;
183:7;225:16;226:1
**threw (1)**
98:19
**throughout (5)**
35:14,16;51:12;
53:2;158:19
**throw (2)**
191:6;227:3
**throwing (1)**
191:13
**thumb (1)**
221:16
**Thursday (2)**
177:4;212:24
**tickets (1)**
76:16
**tied (2)**
155:17;167:5
**tight (1)**
33:11
**tighten (1)**
228:14
**tile (1)**
42:14
**tiles (1)**
16:2
**till (2)**
117:8,10
**time-and-attendance (2)**
99:23;100:1
**timeframe (4)**
88:13;91:1;99:15;
114:22
**timeline (2)**
46:20;64:16
**times (48)**
14:6;21:9;23:17;
25:7,21;26:7;27:2;
29:12;30:15,21;
35:16;51:9;74:21;
81:8;90:3,15,20,24;
95:20;96:15;114:25;
115:6,10,13;137:25;
134:6,21;135:18;
137:3;141:9;142:19;
148:12,14;150:23;
151:24;152:4;
153:11;157:4;
178:24;180:9,16;
184:3;203:24;204:4;

209:5;223:3;224:24,
25
**Timothy (1)**
8:4
**tissue (1)**
184:10
**title (2)**
96:11;214:12
**titles (2)**
13:24;14:1
**today (8)**
36:20,24;82:7;
92:2;139:6;196:10;
218:15;228:21
**Today's (1)**
5:5
**together (21)**
26:15;27:13;29:18;
47:13;78:3;79:14;
89:2;97:2,17;98:12;
101:15;107:11;
124:20;145:1;
165:25;171:4;176:8;
181:1;187:12;190:8;
213:13
**told (49)**
20:20;21:14;32:21;
33:5;34:13;37:9;
40:1,4;41:2,8,10;
42:3,6,12,22;48:3;
49:16;54:9,13;55:19,
21;57:3;68:4,12;
69:20,25;72:6,25;
87:16,17;94:21;
95:18;106:23;113:9;
122:6,20,22;142:8;
148:10;149:5,10;
154:1,16;164:2,2,11;
197:9;209:25;219:24
**took (23)**
7:4,13,17;14:11,
14;29:24;34:22;38:2;
49:6;88:12,25;
100:24;119:9,22;
124:20;135:23;
159:13;172:14;
181:15,16;182:3;
207:9;217:24
**top (13)**
31:25;50:4;156:5,
17;157:4;163:14;
166:12;183:9;185:8;
187:5;202:21;
206:12;212:14
**topped (1)**
67:12
**total (7)**
124:7;167:9,19;
183:14;213:23,24;
214:1
**totaled (1)**
146:1
**totally (4)**

29:23;111:19;
220:16;230:20
**touch (3)**
34:16;108:7;117:5
**touched (1)**
117:2
**tough (4)**
36:4;106:11,12,16
**toward (1)**
167:18
**towards (1)**
78:15
**towel (1)**
204:1
**town (9)**
9:15;16:16;26:8,
20;68:25;70:4;75:3;
207:4;208:13
**Trac (1)**
183:21
**Tracie (1)**
111:21
**track (6)**
14:5;56:2;67:18;
132:1;146:17,20
**tracked (1)**
66:25
**training (1)**
140:14
**transaction (1)**
75:24
**transcribe (1)**
91:23
**transcript (1)**
230:24
**transfer (2)**
91:16;155:22
**Transit (1)**
73:13
**transportation (2)**
73:18,20
**trash (1)**
37:3
**travel (15)**
24:2;25:3,10;
26:25;27:3;77:7;
78:10;156:9,11;
157:4;163:16;
166:21,21;167:3;
222:25
**traveled (4)**
24:3,7,8;223:9
**traveling (1)**
25:14
**Trevor (1)**
151:2
**tried (11)**
27:24;35:21;78:11;
153:5;181:1;201:20;
220:4;221:16,22,24;
222:19
**trip (8)**
180:9;182:8;190:7;

191:4;207:12;
214:24;217:16;221:8
**trips (2)**
14:6;24:25;42:3,7
**trouble (2)**
172:7,10
**truck (1)**
181:16
**true (1)**
228:10
**truly (1)**
27:12
**trust (3)**
11:7;172:21;208:1
**trusted (5)**
49:18;61:20;81:22;
85:5;86:20
**truth (1)**
210:8
**truthful (1)**
43:13
**try (13)**
68:19;98:4;102:20;
103:8,10;106:17;
134:9;153:10,12;
159:4;166:16;171:9;
173:10
**trying (18)**
13:13;30:6;35:25;
43:13,14;56:20;
58:22;60:14;83:23;
84:1;92:11;108:7;
110:1,2;124:9;
180:19;210:15;
226:20
**TU (1)**
59:16
**Tuesday (3)**
32:17,17;177:3
**tumblers (1)**
31:8
**turn (1)**
196:24
**turned (4)**
93:18;120:3;203:4;
228:1
**TV (1)**
116:24
**tweaks (1)**
160:14
**twice (3)**
134:23;141:11;
173:16
**two (57)**
10:9;18:3,20;22:6;
24:12;34:21;44:11;
48:15;50:13,17;
55:23;56:8;58:7;
63:20;65:2;69:3,8;
77:1;78:23;97:7,7;
99:16;118:22;121:8;
123:19;133:14;
135:21;141:6,7;

143:20;144:6,25;
155:20,21;171:14;
174:14;176:2,21;
177:11;178:15;
179:20;183:10;
188:13,16,17;191:23;
193:5;200:21;
206:12;211:10,18;
212:6;220:12;
221:10;225:16;
226:1;230:3
**type (6)**
10:19;72:11;134:2;
146:15;204:10;
205:10
**typed (1)**
205:4
**typically (7)**
19:24;22:14;31:10,
16;49:23;134:22;
216:6
**typing (1)**
12:5

---

## U

**U-Haul (3)**
186:12,21;187:1
**unclear (1)**
43:19
**under (41)**
8:24;16:15;32:19;
35:24;51:3,5;56:5;
69:2,6;72:3,7;80:18;
85:12;92:23;95:4;
130:9;148:6,20;
149:3,21;150:1,8;
161:14,18,22,22;
162:20,21,24,25;
163:11;164:7;166:3,
8;173:8,9,25;197:10;
212:14,24;213:9
**undermined (1)**
83:20
**understandable (1)**
93:21
**understood (2)**
52:11;225:23
**undocumented (2)**
214:3;220:8
**uneasy (1)**
36:2
**unemployed (2)**
73:24,25
**unemployment (1)**
93:6
**unexpected (1)**
188:24
**unexpectedly (1)**
124:8
**unfortunate (2)**
49:7;59:2
**unit (1)**

188:12
**united (2)**
  84:2,3
**University (16)**
  41:13;43:3;128:21;
  130:1;133:9,11;
  134:19;135:16;
  136:2,9;137:10;
  140:9;141:15;
  142:17;143:10;
  157:20
**unknowns (1)**
  191:12
**Unless (10)**
  23:13;26:5,5;46:4,
  4;63:11;91:21;
  220:15,15;221:25
**unlocked (2)**
  116:13,15
**unsettling (1)**
  97:13
**unsure (1)**
  188:25
**unusual (1)**
  33:10
**up (110)**
  6:19;12:1;13:5;
  20:5;22:15,19,20;
  23:19;24:20;25:11,
  24;26:2;29:24;30:19;
  33:6;34:14,16,17;
  44:24;50:23;51:21;
  53:21,24;54:10;55:6,
  8,24;56:1;58:3,4;
  61:22;67:21;68:15;
  75:1,4,7;80:5;82:5,6;
  83:13;87:14;90:5;
  93:7;100:15;104:5;
  108:1,2,3,3;109:9;
  110:11;111:13;
  112:25;113:4,9,10,
  20;115:6,19,20;
  117:8;120:10,12;
  128:17;130:22;
  131:24;134:3;
  136:15;138:3;
  142:14;143:2;
  146:15;150:24;
  152:15;155:14;
  156:14;159:2;
  172:18;181:20;
  182:9;184:5,19;
  185:8;187:2;188:4,
  21;196:8;198:10;
  201:19;202:10;
  203:19;204:10;
  205:4,10;208:12,14;
  210:1;212:14;
  213:11;217:25;
  218:21;219:19;
  221:17,24,25;222:16,
  17;228:14,16;230:20
**update (3)**

79:16;128:20;
  218:8
**updated (2)**
  186:3;201:6
**updates (2)**
  53:2,2
**UPL (5)**
  79:18;88:7;130:11,
  13,21
**upload (3)**
  146:4,23;147:7
**uploaded (3)**
  137:8;147:17;
  162:14
**upon (4)**
  10:2;31:12;172:14;
  222:8
**upper (1)**
  130:14
**upset (3)**
  37:24;81:12;
  107:18
**upside (1)**
  93:18
**upstairs (1)**
  16:3
**up-to-date (1)**
  129:2
**use (35)**
  43:21;62:15;67:16;
  129:24;130:18;
  138:3;146:16;159:6,
  6;170:25;171:6,7,10;
  172:21;173:2,12,12,
  22;178:5,12;179:2,3,
  7;201:12;203:10;
  206:20;207:24;
  223:5,7,11,15;225:2,
  5,8;230:12
**used (20)**
  30:11,25;53:20;
  62:13,15;65:20;
  107:17;130:2,6;
  145:23;146:17;
  148:7;172:17,22;
  173:6;178:9,23;
  207:19,21;208:1
**uses (1)**
  43:24
**using (4)**
  49:19;52:11;
  130:10;163:3
**usual (4)**
  50:7;87:1;94:19;
  173:19
**usually (9)**
  22:23;37:13;110:2;
  135:1;137:4;152:2;
  203:19;204:2,3

**V**

**vacancy (1)**

10:4
**vacant (2)**
  18:18;26:7
**vacation (7)**
  65:23;72:5,9,20;
  73:2;126:24;192:24
**vaccinations (1)**
  204:21
**vaguely (1)**
  77:23
**valet (1)**
  175:8
**valid (1)**
  219:7
**value (1)**
  124:18
**variable (1)**
  158:23
**variables (1)**
  191:12
**various (5)**
  10:24;25:13;63:3;
  199:9,18
**vary (1)**
  152:17
**VEBA (5)**
  130:24;131:1,4,9,
  13
**V-E-B-A (1)**
  130:24
**vehicle (1)**
  38:3
**vendor (2)**
  25:9;47:25
**vendors (5)**
  46:22;76:6,10,19;
  100:5
**verbally (1)**
  23:12
**verify (1)**
  47:16
**Verizon (3)**
  72:17;73:1;177:25
**versa (1)**
  128:19
**versus (1)**
  5:4
**vet (2)**
  97:10;203:16
**via (1)**
  12:11
**vice (3)**
  13:25;128:19;
  143:14
**video (19)**
  5:7;63:16,17,21;
  116:25;121:23,24;
  122:3;144:16,17,20;
  195:2,3,7;218:23,24;
  219:2;231:7,10
**VIDEOGRAPHER (13)**
  5:2,16;63:16,20;
  121:23;122:2;

144:16,20;195:2,6;
  218:23;219:2;231:7
**videotaped (2)**
  5:2;231:8
**vinegar (1)**
  206:2
**visible (2)**
  119:10;120:2
**visit (1)**
  77:7
**visitors (1)**
  21:24
**visits (2)**
  25:6;205:16
**vocation (1)**
  8:21
**voice (2)**
  230:8,9
**voicemail (1)**
  70:10
**voices (1)**
  230:11
**volume (1)**
  25:20
**voluntary (1)**
  29:23
**volunteer (1)**
  9:21
**volunteered (1)**
  9:20
**VPs (1)**
  27:11

**W**

**W-2 (1)**
  45:22
**wait (2)**
  22:17;23:2
**waiting (2)**
  171:12,19
**waive (3)**
  223:13;230:19,24
**Waldrop (143)**
  5:4,13;11:22;13:4,
  8;14:3,15;16:14;
  17:5;19:13,23;20:14,
  16;21:7;22:12,14;
  23:5,7,9,20;24:2,25;
  25:14,17;26:14;28:8,
  25;29:13;30:10;31:2;
  32:3;39:10;41:6,9,
  14;42:2;47:20;48:7;
  49:14;52:5;54:2;
  59:10;62:25;63:6;
  74:5,13;75:12,16,19;
  76:8,12,21,25;78:4;
  81:19;82:12,15;83:5,
  8;86:5;87:12,21;
  89:10;90:12,17;92:5,
  22;96:23;102:3;
  106:7;117:12,21,25;
  119:17;122:6;

123:25;126:19;
  129:12;130:20;
  131:4,13,22;132:7;
  133:24;135:16;
  136:8;137:9;141:4,
  13;143:9,21;146:7,
  11;147:1;148:6,20;
  149:15,25;150:1,6,
  21;151:11;153:9;
  155:10;160:1,21;
  161:12;164:4;
  166:14;167:10;
  168:2,20;172:4,16;
  173:20;174:3;175:3;
  179:3,6,10;189:7;
  195:10;199:21;
  204:13,25;205:9;
  206:13;207:16;
  208:6;213:17;215:3;
  216:19;218:14;
  220:6;221:3,4,10;
  222:24;224:2,23;
  225:2;226:9;230:7
**Waldrop's (23)**
  13:16;17:14;22:8;
  29:11;68:22;74:16;
  75:22;80:20;84:17;
  133:11;146:8;
  147:15;149:3;
  162:23;163:11;
  167:18,24;170:11;
  173:6;181:2;207:22;
  214:19;217:2
**walk (2)**
  18:1,2;98:19;
  116:18
**walked (3)**
  17:8,11;116:21
**walking (1)**
  111:11
**wall (23)**
  64:20;110:13;
  112:21;122:7,17,23;
  123:5,8,14;124:1,13,
  13,23;125:1,12,16,
  17;126:11,18,20;
  127:3;132:11,12
**walls (1)**
  58:11
**Walmart (4)**
  169:14;184:9;
  206:14;208:12
**wants (5)**
  84:7,8;85:22;
  210:3,5
**warehouse (7)**
  42:10,13;201:20;
  202:11;206:5;
  207:10;208:25
**waste (1)**
  222:21
**watch (2)**
  61:16;181:24

**water (4)**
56:19;64:7,21,24
**Waterford (21)**
42:18,21,21;
156:13,18,24;157:13;
158:7,22;159:17,19;
179:21,23;180:12,15;
181:2,6;182:9;187:2;
200:16;202:6
**way (51)**
27:23;40:22;55:6;
67:17;85:5;88:10,20;
89:25;94:20;95:7,8,
17,25;98:20;100:11,
17;103:2;105:15;
106:20,21,21;107:1;
118:22;123:10;
127:22;146:17,20;
147:7;149:6;150:9,
12;156:25;157:5;
159:16;163:24;
165:21;167:6,8;
172:13;174:10;
175:10;177:7;
178:23;182:16;
183:17;208:3;209:6;
222:1,19;223:15;
228:25
**ways (2)**
80:11;198:9
**wedding (1)**
126:24
**wedge (1)**
99:3
**Wednesday (1)**
177:4
**weeds (4)**
81:24;86:24;
102:25;124:10
**week (22)**
24:5,10,12,17,19,
22;63:25;64:1;
146:19;160:10;
171:6,6;188:2,5;
191:5,9;192:21,22,
24;212:19;213:4;
222:14
**weekend (2)**
70:2;190:9
**weekends (2)**
41:16;137:7
**week-long (2)**
168:11;222:7
**weeks (11)**
24:19;72:15;121:8;
133:14,22;141:7,7,
10,10;143:20;144:6
**weighing (1)**
110:10
**weird (1)**
119:16
**welcome (2)**
36:14,25

**welcomed (1)**
34:4
**well-being (1)**
127:16
**weren't (10)**
62:5;80:25;120:3,
17;133:17;184:7;
192:14,16;193:2;
203:9
**Westminster (1)**
31:3
**Wet (1)**
184:10
**What's (17)**
8:24;43:9;64:12;
73:14;83:22;86:22;
98:2,4,25;99:1;107:7,
10;115:6;121:3;
198:6,6;202:5
**whenever (1)**
142:25
**Whereupon (7)**
5:18;63:18;121:25;
144:18;195:4;
218:25;231:11
**whichever (1)**
219:9
**white (1)**
202:22
**Whitfield (1)**
6:20
**whole (20)**
37:20;38:3,8;
45:12;58:20;64:1;
81:23;83:14;94:14;
96:6;102:9;105:19;
114:1;123:6;132:18;
160:17;166:20;
167:2;168:12;191:10
**whomever (2)**
46:24;219:10
**who's (1)**
43:7
**Whose (2)**
158:6;181:5
**wife (6)**
31:3;172:9,11;
212:18;217:2,17
**Wilks (5)**
23:23;86:2;103:16;
162:4;176:14
**win (1)**
140:18
**window (3)**
119:13;194:20;
219:20
**wine (2)**
216:8,20
**Wipes (1)**
184:10
**Wireless (2)**
72:17;73:2
**wisdom (1)**

64:3
**withdrawn (6)**
48:6;62:21;143:7;
146:24;172:1;176:20
**withhold (1)**
210:9
**within (7)**
24:7;63:3;97:6;
99:16;103:7;121:7;
219:20
**without (5)**
66:21;67:2;89:20;
93:6;167:22
**witness (10)**
5:17,20;104:24;
153:17;209:8,10,20;
225:12;231:1,3
**woman (1)**
182:1
**wonder (2)**
118:8;210:6
**wonderful (1)**
97:1
**wondering (1)**
104:22
**wood (1)**
117:7
**Woods (9)**
53:11,19;54:24;
56:4,11,18;59:15;
61:6;225:19
**word (7)**
65:20;92:19;93:15,
15;133:6;136:18;
190:10
**words (2)**
124:21;224:10
**work (78)**
9:8,15;10:5;11:14;
12:12,14;13:6;14:10;
15:23;18:22;25:15,
18,20,24;26:19;
46:15;48:20;49:3,14,
20;50:8,12;51:7,10,
12,24;52:16,20,24;
54:9;56:4,6;58:9;
59:12;60:14,19;61:9,
19;64:14;65:2,4,12,
14;66:7,13;70:6;
78:22;84:2;87:6;
88:11,23;89:2,7;
92:15;98:4,11,18;
126:23;127:14,19;
129:1;134:9,11,15;
136:8;137:4,23;
139:11;141:2,3;
144:8,8;148:10;
171:9;178:25;190:5;
203:8,18
**Workday (18)**
45:19,21;46:16;
50:23;53:24;66:25;
99:23;100:5;146:3,

23;147:17;150:13;
156:2;162:14;
166:20;167:4;196:4;
219:18
**worked (27)**
9:5,9,14,16;10:1,
18;11:22;15:22;17:3,
21;21:24;43:3;60:15,
21;61:3;62:12;65:7;
84:3;85:4;97:1,16;
107:11;114:17;
115:18;129:11;
162:6;212:4
**working (23)**
9:11;12:6;20:13;
40:14;54:17;73:6;
74:4;75:16;80:1,6;
85:8;89:17;92:14;
95:4,21;115:20;
139:13,15;140:8,19;
160:20;165:7;221:10
**works (6)**
45:19;49:22;95:5;
169:14,25;174:13
**worksheet (1)**
169:21
**world (1)**
222:20
**worried (1)**
132:19
**worry (3)**
88:17;95:15;210:9
**worrying (1)**
110:7
**worst (1)**
101:14
**worth (2)**
102:23;182:16
**wrap (2)**
143:2;218:21
**wreck (1)**
112:4
**write (6)**
169:22;171:5;
219:8,10,24,25
**writing (4)**
19:12;75:10;
105:20;149:12
**written (5)**
21:11;114:14;
193:8;197:2;198:21
**wrong (8)**
76:17;96:7;104:16;
109:25;130:7;141:2;
149:2;157:25
**wrote (2)**
199:23;216:22

**X**

**X-rays (1)**
58:10

**Y**

**y'all (2)**
63:11;184:19
**year (35)**
7:10,15;10:1,7;
12:20;15:16,17;24:7;
25:12;29:20;31:4;
45:22;79:12;92:9;
134:23;141:4;154:7,
7;156:13,22;158:9,
19;165:8;170:20;
171:15;181:17;
188:24;190:2;
193:21;197:17;
201:14;212:18;
222:5;228:25;229:21
**years (24)**
7:12,17;14:18;
29:15;42:25,25;43:4;
50:2,2;65:7,25;
95:20;97:7,7;99:17,
21;124:4;127:15;
128:25;130:17;
133:20;140:7;171:2;
180:10
**yell (1)**
230:8
**yelling (1)**
230:10
**Ylice (1)**
162:4
**youngest (1)**
188:22

**Z**

**zone (1)**
61:21

**0**

**061 (1)**
200:12
**062 (1)**
201:2

**1**

**1 (2)**
16:9;18:24
**1,500 (1)**
41:24
**1:00 (1)**
185:21
**1:17 (2)**
144:16,18
**10 (3)**
13:14;164:17,21
**100 (7)**
28:15;50:19,25;
62:25;160:2;163:15;

206:11
**1013 (2)**
  16:9,11
**11 (3)**
  168:24;169:3,13
**11:09 (2)**
  63:16,18
**11:20 (2)**
  63:19,20
**11th (3)**
  165:4;170:12;
  192:2
**12 (2)**
  175:16,20
**12:00 (1)**
  185:21
**12:34 (2)**
  121:23,25
**12:47 (2)**
  122:1,2
**12th (1)**
  212:25
**13 (5)**
  177:13,17,25;
  179:19;181:8
**14 (8)**
  182:19,23;185:6;
  190:20;191:1,18;
  192:2;193:7
**15 (7)**
  31:22;85:6;95:20;
  189:15,19;190:18,23
**150 (1)**
  216:13
**15th (2)**
  192:9;212:24
**16 (5)**
  31:23;85:7;178:10;
  195:15,18
**17 (3)**
  196:14,17,25
**18 (2)**
  198:23;199:1
**18th (2)**
  170:13;192:3
**19 (2)**
  200:6,9
**19' (1)**
  153:15
**1915 (1)**
  153:14
**19th (1)**
  192:9
**1st (5)**
  74:3;227:1,2;
  229:24,25

---

**2**

**2 (1)**
  48:11
**2,000 (1)**
  196:10

**2:03 (2)**
  144:19,20
**20 (5)**
  67:12;73:17,17;
  201:23;202:2
**20,000 (1)**
  105:8
**2000 (1)**
  7:11
**2001 (1)**
  9:25
**2002 (1)**
  10:8
**2003 (2)**
  13:9,10
**2006 (1)**
  15:17
**2007 (3)**
  8:1;15:15,17
**2009 (1)**
  8:2
**2014 (3)**
  212:9,24;214:3
**2015 (17)**
  19:16;23:22,23;
  78:5;79:9;80:22;
  81:18;82:11;153:19;
  165:3;168:19;
  191:19;200:17;
  201:5,9;229:1,1
**2016 (21)**
  32:18;67:25;78:5;
  80:22;88:15;91:7;
  109:4;122:5;123:2;
  126:21;153:20;
  165:4;168:19;
  170:12,13;179:17;
  191:25;192:3,5;
  195:20;226:14
**2017 (1)**
  5:6
**20-something (1)**
  186:14
**21 (2)**
  205:19,22
**22 (3)**
  211:3,7;220:8
**223 (1)**
  196:25
**227 (1)**
  197:20
**23rd (1)**
  139:20
**24 (2)**
  118:20;226:24
**25 (1)**
  30:6
**28th (5)**
  32:18;67:25;73:25;
  93:17;126:21
**2nd (5)**
  212:8,10,15;213:5;
  214:20

---

**3**

**3 (1)**
  53:4
**3:00 (1)**
  70:3
**3:13 (2)**
  195:2,4
**3:24 (2)**
  195:5,6
**3:59 (2)**
  218:23,25
**30 (2)**
  36:5;163:10
**303 (1)**
  183:7
**305 (1)**
  185:7
**306 (2)**
  186:6;187:5
**308 (1)**
  187:20
**309 (1)**
  188:8
**30th (6)**
  5:5;214:7,8;
  226:16,24;229:25
**31st (5)**
  109:21;226:16,24,
  25;229:24
**3rd (2)**
  19:16;195:20

---

**4**

**4 (1)**
  104:8
**4:00 (2)**
  114:22;185:19
**4:06 (2)**
  219:1,2
**4:22 (2)**
  231:9,12
**40 (2)**
  36:5;163:10
**400 (1)**
  180:3
**401k (3)**
  71:15,20;73:7
**422.08 (1)**
  198:13
**45 (1)**
  135:9
**4th (1)**
  70:1

---

**5**

**5 (1)**
  128:7
**5/30/14 (1)**
  213:21

**50 (2)**
  30:6;31:24
**5th (2)**
  214:3,6

---

**6**

**6 (1)**
  137:14
**60 (1)**
  163:6
**618 (1)**
  183:21
**6th (3)**
  213:5,5;214:20

---

**7**

**7 (1)**
  144:22
**70 (1)**
  163:6
**75 (1)**
  30:7
**7th (3)**
  200:17;201:5,9

---

**8**

**8 (1)**
  144:22
**8:00 (2)**
  135:13;185:17
**8:15 (1)**
  185:18
**8:30 (1)**
  185:17
**848 (1)**
  199:14
**8th (2)**
  165:3;212:9

---

**9**

**9 (1)**
  155:1
**9/13 (1)**
  213:9
**9/13/13 (1)**
  213:9
**9:50 (1)**
  5:6
**9th (1)**
  212:24