# In The Matter Of:

*Mark A. Waldrop v.*
*Community Health Systems, Inc.*

---

*Ronnie Rollins*
*December 8, 2016*

---

*American Court Reporting Company, Inc.*
*52 Executive Park South*
*Suite 5201*
*Atlanta, Georgia 30329-2217*
*(404) 892-1331 - (800) 445-2842*

Original File 74876.TXT

**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


MARK A. WALDROP,

        Plaintiff,

    vs.                              Civil Action File

                                           No:4:16-CV-235-HLM

COMMUNITY HEALTH SYSTEMS, INC.,

        Defendant.


                     -o0o-


        The deposition of RONNIE ROLLINS, taken on

behalf of the Plaintiff, taken pursuant to

agreement of counsel, taken for all purposes

authorized by the Federal Rules of Civil

Procedure; the reading and signing of the

deposition being reserved; taken before Bonnie L.

Smith, RPR, Certified Court Reporter, commencing

at 10:02 a.m., on this the 8th day of December,

2016, at 1180 West Peachtree Street, Suite 1800,

Atlanta, Georgia.

2

1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3        GARY L. HENRY, ESQ.
         Gearhiser, Peters, Elliott & Cannon, PLLC
4        320 McCallie Avenue
         Chattanooga, Tennessee 37402
5        423-756-5171
         ghenry@gearhiserpeters.com
6

7    For the Defendant:

8        HAROLD T. DANIEL, JR., ESQ.
         LATOYA BRISBANE, ESQ.
9        Holland & Knight, LLP
         1180 West Peachtree Street, Suite 1180
10       Atlanta, Georgia 30309
         404-817-8500
11       harold.daniel@hklaw.com

12
     ALSO PRESENT:  Mark A. Waldrop, Plaintiff
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                      C O N T E N T S

2                   E X A M I N A T I O N

3                                                      Page

4     Cross-Examination by Mr. Henry.....................4

5

6                      E X H I B I T S

7                                                      Page
      Plaintiff's            Description             Marked
8
      Exhibit 1        Subpoena                        4
9
      Exhibit 2        Employment Agreement            24
10
      Exhibit 3        E-Mail Correspondence           37
11
      Exhibit 4        Copy of Check                   57
12
      Exhibit 5        E-Mail Correspondence           73
13
      Exhibit 6        5/15/16 Letter to Mark Waldrop  100
14                     from Ronnie Rollins

15    Exhibit 7        E-Mail Correspondence           109

16    Exhibit 8        7/1/16 Letter to Community Health 124
                       Services, Inc., from Mark Waldrop
17
      Exhibit 9        7/6/16 Letter to Mark Waldrop   127
18                     from Holland & Knight

19    Exhibit 10       8/16/16 Letter to Mark Waldrop  130
                       from Community Health Services
20                     of Georgia

21

22

23

24

25

4

```
1                    P R O C E E D I N G S
2              (Whereupon,
3                      RONNIE ROLLINS
4        Was called as a witness and, having first been
5        duly sworn, was examined and testified as
6        follows:)
7                    CROSS-EXAMINATION
8    BY MR. HENRY:
9        Q    Mr. Rollins, we met briefly before the
10   deposition started, but for the record my name is Gary
11   Henry and I represent Mark Waldrop in some litigation
12   pending with the United States District Court for the
13   Northern District of Georgia against Community Health
14   Systems, Incorporated.
15              (Plaintiff's Exhibit 1 was marked for
16        identification.)
17   BY MR. HENRY:
18        Q    I want to go ahead and show you a document
19   that's already been marked as exhibit one.
20   Mr. Rollins, have you seen exhibit one before?
21        A    Let me get my glasses.
22        Q    Sure.  Sure.
23        A    I've seen a document that looks something
24   like this.
25        Q    Well, I'll represent to you that this is a
```

5

1    subpoena that was issued in this case that I believe

2    was served on November 24th.  Do you recall getting

3    served with a subpoena on that day?

4         A    Yes, I do.

5         Q    Okay.  This deposition is being taken

6    pursuant to this subpoena but subject to agreement of

7    counsel to have it start at 9:00 o'clock -- at

8    10:00 o'clock rather than 9:00 o'clock and occur in

9    this office instead of in the office that's listed in

10   the subpoena.  I just wanted to state that on the

11   record.

12             MR. DANIEL:  We'll stipulate that.

13             MR. HENRY:  Okay.

14   BY MR. HENRY:

15        Q    Have you ever given a deposition before?

16        A    Yes, I have.

17        Q    Okay.  So you're probably familiar with how

18   this process works, but I did want to go over just a

19   few guidelines.

20             I'll be asking you some questions today.

21   It's not my intent to trick you or make you say

22   something that's not true.  I'm here to basically get

23   some information.  So if at any time I ask a question

24   and you don't understand it or it's confusing, feel

25   free to ask me to rephrase it.  I'll try my best to do

6

1   that.  But I'm going to be depending on you to tell me

2   that.  Okay?

3       A    Okay.

4       Q    All right.  As a corollary to that, if you

5   answer a question I ask, I'm going to assume that you

6   understood it.  Is that fair?

7       A    I understand.

8       Q    Okay.  You are under oath.  So even though

9   there's not a judge here or a jury here, it's the same

10  oath you would give in court.  And you understand that

11  you've taken an oath to tell the truth?

12      A    (No verbal response.)

13      Q    Okay.  The court reporter will be taking

14  down everything we say.  So be sure to give verbal

15  answers instead of nodding your head or saying uh-huh

16  or huh-uh.  That way it's clear on the record what

17  your answer is.  Okay?

18      A    Okay.  I will.

19      Q    Okay.

20      A    I'll answer that way.  I may shake my head

21  and give you a verbal answer both.

22      Q    That's fine.  And the reason I bring that up

23  is it's easy to fall into that.  You know, I

24  anticipate that this will be conversational, and when

25  you're in a conversation, it's easy to fall into

7

1    uh-huh or huh-uh.  But if I say is that a yes or is

2    that a no, I'm not trying to be rude.  I'm just trying

3    to be sure that I know what you're saying and the

4    court reporter knows what you're saying.  Okay?

5         A    Yes.

6         Q    Okay.  There you go.  We're off on the right

7    foot.  If at any time you need a break, let us know.

8    I'm not really sure how long this will last today, but

9    I anticipate that we will need to take a few breaks.

10   Just let me know.  We'll be happy to accommodate.  The

11   only exception to that would be, if a question is

12   pending, I would like to get your answer before we

13   take a break.  Okay?

14        A    Yes.

15        Q    All right.  There you go.  All right.  Well,

16   let's go ahead and just get started.  If you would

17   please, state your full name for the record.

18        A    My name is Ronnie Dale Rollins.

19        Q    Where do you live, Mr. Rollins?

20        A    I live at 199 Atlanta Road, Gray, Georgia

21   31032.

22        Q    Are you married?

23        A    I am married.

24        Q    And what is your wife's name?

25        A    My wife's name is Sherry Bridges Rollins.

8

```
1        Q     Any children?
2        A     Yes.
3        Q     How many?
4        A     Two.
5        Q     Are any of them still living at home?
6        A     One is still living at home.
7        Q     Are they boys?  Girls?  One girl and one
8    boy?
9        A     We have two boys.
10       Q     One of which still lives at home?  How old
11   is the one who still lives at home?
12       A     He is 17 years old.
13       Q     Okay.  And the one who no longer lives at
14   home, what is his name?
15       A     His name is Chandler Brooks.
16       Q     And where does Chandler live?
17       A     Chandler lives in Gray, Georgia.
18       Q     Okay.  Do you have any formal education,
19   Mr. Rollins?
20       A     Do I have formal or does Chandler?
21       Q     No, you.  I'm sorry.  You, Mr. Rollins.
22       A     I do have formal education.
23       Q     Okay.  Did you receive a bachelor's degree?
24       A     I did.  I have received a bachelor's degree.
25       Q     Okay.  What was your degree in?
```

9

```
1        A      A bachelor's degree in accounting.

2        Q      From where?

3        A      The University of Georgia.

4        Q      What year did you receive that?

5        A      I graduated in 1980.

6        Q      Anything past a bachelor's degree?

7        A      CPA certification in 1982.

8        Q      Is that still active?

9        A      Yes.

10       Q      What states do you have the CPA

11   certification in?

12       A      Georgia.

13       Q      Any others?

14       A      I'm not certified in any other state.

15       Q      Okay.  Other than your bachelor's degree and

16   your CPA certification, have you received any other

17   formal educational training?

18       A      No, I have not received formal training.

19       Q      Okay.  What is your current job?

20       A      I'm a healthcare executive.

21       Q      Okay.  Where?

22       A      I'm employed by Community Health Services of

23   Georgia.

24       Q      What is your title?

25       A      My title is president and chief executive
```

1  officer.

2       Q    How long have you been in that position?

3       A    I have been in the position of president and

4  chief executive officer since approximately 2010 --

5       Q    Okay.

6       A    -- 2011.  Somewhere in that neighborhood.

7       Q    When did your employment with CHSI,

8  Community Health Systems, begin?

9       A    My employment with Community Health Systems

10  began in 2003.

11       Q    All right.  So you were not hired as the

12  chief executive officer and president when you first

13  came?

14       A    No, sir.  That's not correct.  I was hired

15  as president in 2003.

16       Q    Okay.  And you became president and CEO in

17  2010 to 2011 timeframe?

18       A    Approximately that timeframe.

19       Q    Okay.  What duties did you have as president

20  when you came in 2003?

21       A    As president of the organization, I was

22  charged with the executive leadership of the

23  organization, including all functions identified in

24  the bylaws and my job description I was provided.

25       Q    Did anything change with regard to your

1    duties for Community when you took on the additional

2    title of CEO?

3        A    My duties as CEO were very similar to the

4    role that I had as president.  It became a reflection

5    of the oversight of the entire organization that had

6    changed significantly in size and scope from 2003 to

7    approximately 2010.

8        Q    When you say changed significantly, what do

9    you mean?

10       A    It had grown significantly.

11       Q    Okay.  What does Community Health Systems,

12   Incorporated, do?  What's its business?

13       A    The business of Community Health Services of

14   Georgia is to operate an integrated post-acute

15   healthcare delivery system.

16       Q    I'm going to see if I can say that back.

17   Operate -- well, say it again.  I want to be sure.

18       A    An integrated post-acute --

19       Q    Okay.

20       A    -- healthcare delivery system.

21       Q    What do you mean by integrated post-acute?

22       A    Post-acute refers to activities that occur

23   after the acute-care setting.  And the acute-care

24   setting is the hospital.

25       Q    Okay.

1      A     So it's care provided after a stay in a

2   hospital.

3      Q     All right.  And when you say integrated --

4      A     Integrated indicates that there are multiple

5   services being provided, and it's the nature of the

6   integration combination of those services to deliver

7   care in more than one setting.

8      Q     How much larger is Community Health Systems

9   today than it was when you started in 2003?

10     A     In what regard would you like larger by?

11     Q     Well, you had said it had grown

12  significantly.

13     A     Yes.

14     Q     So I guess what I'm asking is how do you

15  measure that.

16     A     Okay.  The growth that I had referred to was

17  growth in revenues.  And it had -- at that point in

18  time from memory -- again, I don't recall the specific

19  numbers.

20     Q     Sure.  I understand.

21     A     But it had -- it had more than doubled in

22  size from 2003 to 2010 or '11 or that approximate

23  timeframe.

24     Q     Okay.

25     A     And the number of beds, which is another

1    measure of one of the services, may have been

2    approximately the same.  I don't recall the specifics,

3    but -- and then, thirdly, the number of services

4    offered had grown.

5         Q    Okay.

6         A    So these are three criteria that quickly

7    came to mind.

8         Q    Okay.  How about after you became CEO?  Did

9    that growth continue?

10        A    Yes.

11        Q    In all three areas?

12        A    The growth of the organization has continued

13   from 2003 to present.

14        Q    How about from 2011 to present?

15        A    Yes.  The organization has continued to grow

16   from 2011 to president.

17        Q    Okay.  I'm just trying to see if there has

18   been a change in the growth of the organization since

19   you became CEO.  That's why I'm pointing to 2010-2011

20   timeframe.

21        A    No.  It's performed similar.  It's had

22   continuous growth from 2003 to present.

23        Q    Okay.  I want to go back briefly.  You said

24   that you had given depositions previously; right?

25        A    Yes, I have previously given a deposition.

14

```
 1      Q     How many have you given previously?
 2      A     I can recall one.
 3      Q     All right.  When was that?
 4      A     I gave a deposition approximately 20 years
 5  ago.
 6      Q     So before your time with Community Health
 7  Systems?
 8      A     Yes, sir.
 9      Q     Okay.  So --
10      A     Prior to Community Health.
11      Q     We're getting into 2017, so sometimes that's
12  close.
13      A     Just allow me an opportunity to think before
14  I answer your question.
15      Q     Yes, please do so.
16      A     Yes, prior to being employed by Community
17  Health Systems.
18      Q     All right.  Did that deposition have
19  anything to do with Community Health Systems or was it
20  completely unrelated?
21      A     No, my deposition had nothing to do with
22  Community Health Systems.
23      Q     What did your deposition involve?  What kind
24  of case was it?
25      A     A deposition was given in a medical
```

15

1  malpractice case.

2      Q    Okay.  Did you testify as an expert in that

3  case?

4      A    No, I did not.

5      Q    So you were just a witness?

6      A    I was a witness.

7      Q    Were you a party?

8      A    No, sir.  I was not a party.

9      Q    What did you do before coming to Community

10 Health in 2003?  What was your job?

11     A    Prior to 2003, I was employed by Health

12 Scholarships, Inc.

13     Q    Health Scholarships, Inc.?

14     A    Yes.

15     Q    And what business was Health Scholarships,

16 Inc., involved in?

17     A    Skilled nursing services primarily.

18     Q    And what were your duties with Health

19 Scholarships, Inc.?

20     A    I was president.

21     Q    Is Health Scholarships, Inc., still in

22 existence?

23     A    Health Scholarships, Inc., is in existence

24 today.

25     Q    All right.  Where is it located?

1      A     Health Scholarships, Inc., is located in

2  Macon, Georgia.

3      Q     Is it in any way affiliated with Community

4  Health?

5      A     Health Scholarships, Inc., is a 501c3

6  subsidiary of Community Health Systems, Inc.

7      Q     Does Community Health Systems, Inc., have

8  any other 501c3 affiliates?

9      A     Yes, Community Health Systems has other

10  501c3 affiliates.

11      Q     All right.  What are the names of those

12  affiliates?

13      A     I don't know that I can recall the exact

14  legal name of each of the 501c3 affiliates.  I can

15  give you an approximate name.

16      Q     Sure.  That's fine.  Just however you think

17  of them.

18      A     Clinical Services, Inc., is a 501c3

19  affiliate.  Health Systems Facilities, Inc., is a

20  501c3 affiliate.  Piedmont Regional Health, Inc., is a

21  501c3 affiliate.

22      Q     All right.

23      A     Community Ancillary Services, Inc., is a

24  501c3 affiliate.  Steward Health Services, Inc., is a

25  501c3 affiliate.

1    Q    Did you say Steward?

2    A    Steward.

3    Q    Steward.  Okay.  All right.

4    A    Home and Community Services, Inc., is an

5  affiliate.  Community Health Ventures, Inc., is a

6  for-profit subsidiary affiliate.

7    Q    What was the name of that one again?

8    A    Community Health Ventures, Inc.

9    Q    And it's for profit?

10   A    Yes, it is a for-profit corporation.

11   Q    All right.  Any others that you can think

12 of?

13   A    There may be.  I don't -- I'm trying to

14 recall all of them off the top of my head.

15   Q    Sure.

16   A    But that's approximately -- give me just a

17 moment to think.

18   Q    Sure.  Take your time.

19   A    Give me just a moment.

20   Q    Okay.

21   A    That's what I recall at this moment.

22   Q    Okay.  And I understand that prior to 2003,

23 you worked for one of those affiliates, Health

24 Scholarships, Inc.  Have you worked for any of the

25 other affiliates in the past or presently?

18

1       A    I do not believe I've been employed by any
2   of the other affiliates at any point in time.
3       Q    Okay.  When did you start working for Health
4   Scholarships, Inc.?
5       A    I began working for Health Scholarships,
6   Inc., in 2002.
7       Q    So you were there for about a year?
8       A    I was employed by Health Scholarships, Inc.,
9   for about a year.
10      Q    Prior to that, where were you employed?
11      A    Prior to 2002, I was employed by Care More
12  Management Company, Inc.
13      Q    Care More?  Is that --
14      A    C-A-R-E, space, M-O-R-E, two words.
15      Q    Okay.  What did you do for Care More?
16      A    I served as president of Care More
17  Management Company, Inc.
18      Q    All right.  How long were you in that
19  position?
20      A    I was employed by Care More Management
21  Company, Inc., from 1997 through 2002.
22      Q    You can probably guess where I'm going next.
23  What did Care More Services, Inc., do?
24      A    Care More Management Services --
25      Q    I'm sorry.  Yes.

1       A     -- operated skilled nursing facilities

2   primarily.

3       Q     Okay.  Prior to 1997?

4       A     Prior to 1997, I was employed by Care More,

5   Inc.

6       Q     What was your position with Care More, Inc.?

7       A     From 1994 through 1996, I was employed by

8   Care More, Inc., as president.

9       Q     Okay.  And prior to 1994?

10      A     Prior to 1994, I was employed from 1986

11  through 1993 as chief financial officer of Care More,

12  Inc.

13      Q     Okay.  Now, we're getting close going back

14  to when you got your CPA certification.  So maybe

15  there won't be too many more.  Prior to 1986?

16      A     Prior to 1986, I served as a partner with

17  Mauldin and Jenkins CPAs from 1985 to 1986.

18      Q     Did --

19      A     Mauldin Jenkins CPAs.  Excuse me.

20      Q     So that was a CPA firm?

21      A     That's correct.

22      Q     Any involvement in your tenure at Mauldin in

23  the skilled nursing home industry?

24      A     Yes.

25      Q     Okay.  How so?  How were you involved in the

20

1    skilled nursing home industry in a CPA firm?

2        A     In public accounting, from 1980 through

3    1986, I worked as a staff accountant on clients that

4    included skilled nursing facilities and had a primary

5    practice area in skilled nursing facilities in 1985

6    and 1986 when I served as partner there.

7        Q     Okay.  And does that get us back to when you

8    got your CPA certification?

9        A     Yes, sir.

10       Q     All right.  So you have basically been

11   involved in some way, shape or form with skilled

12   nursing since you got your certification as a CPA?

13       A     That is correct.

14       Q     Okay.  This medical malpractice case that

15   you gave a deposition in, where was that case pending?

16       A     I don't know which court system it was in,

17   but --

18       Q     Right.  Just the best you can do.

19       A     It was in Dalton, Georgia.

20       Q     Okay.

21       A     That's --

22       Q     Do you recall the names of any of the

23   parties?

24       A     Care More, Inc.

25       Q     So did you give testimony then as a

1    representative of Care More, Inc., in that case?

2         A    Yes, I did.

3         Q    All right.  Was there a claim pending

4    against Care More, Inc.?

5         A    Yes, there was.

6         Q    What was the nature of that claim?

7         A    The drowning of a resident at a skilled

8    nursing facility operated by Care More, Inc., that was

9    alleged by the family of the resident.

10        Q    What was the name of the patient that

11   drowned?

12        A    I don't recall at this moment.  I don't

13   recall.

14        Q    Do you recall who represented Care More,

15   Inc., in that litigation?

16        A    I don't recall.

17        Q    Do you recall who represented the plaintiff

18   in that litigation?

19        A    I can't recall the name.  I can see -- I can

20   see the person, but I can't recall the name.  That's

21   been --

22        Q    I understand.

23        A    -- a long time ago.

24        Q    A long time ago.  Okay.  All right.  Are you

25   on social media at all?  LinkedIn?

1      A    I have an account -- I may have an account

2   on LinkedIn.  I don't know that I've ever used it.

3      Q    Okay.

4      A    I have a Facebook account, but I don't

5   recall that I've ever posted anything.

6      Q    It's about like me.  I don't really use it

7   either.  So LinkedIn and Facebook.  Are you on

8   Twitter?

9      A    No.

10     Q    I'm trying to think of the name of all these

11  new-fangled things nowadays.  All you can recall

12  sitting here are LinkedIn and Facebook; is that

13  correct?

14     A    Yeah.  I haven't done anything else.

15     Q    All right.  What did you do to prepare to

16  give your deposition here today?

17     A    I listened to some audio recordings that

18  were provided by our counsel --

19     Q    Okay.

20     A    -- of some conversations that had occurred,

21  some of which I was involved in, some of which I was

22  not involved in.  And I chatted for a few minutes with

23  Hal who told me to just go in and be relaxed and tell

24  the truth.

25     Q    Yeah, I'm not trying to find out what he

23

1    told you.  But that's good advice.

2        A    I mean, that's --

3        Q    I understand.

4             MR. DANIEL:  The fact of the meeting is

5        something you can talk about, but you're not to

6        talk about what we discussed.

7             THE WITNESS:  Yeah.  Okay.

8    BY MR. HENRY:

9        Q    Okay.  Other than reviewing the audio

10   recordings and speaking to Mr. Daniel, did you do

11   anything else to prepare?

12       A    No, sir.

13       Q    You didn't review any other documents?

14       A    No, sir.

15       Q    Okay.  Do you have an employment agreement

16   with Community Health Systems?

17       A    I do have an employment agreement with

18   Community Health Systems.

19       Q    Okay.  I'm going to -- are you familiar with

20   the terms of that agreement generally?

21       A    Generally.

22       Q    Okay.

23       A    I have not reviewed it recently if that's

24   the question.

25       Q    I'm going to go ahead and show this to you.

24

1    We can mark that the next exhibit.

2              (Plaintiff's Exhibit 2 was marked for

3         identification.)

4    BY MR. HENRY:

5         Q     Mr. Rollins, have you -- you've seen exhibit

6    two before?

7         A     Yes, sir.

8         Q     To the best of your recollection, is your

9    employment agreement similar to exhibit two?

10        A     My employment agreement is very similar to

11   exhibit two.

12        Q     Okay.  The date of exhibit two appears to be

13   June 20th, 2006.  Is that when you signed or when your

14   employment agreement was executed as well?

15        A     No, it is not.  My employment agreement was

16   not signed the 20th day of June 2006.

17        Q     When was yours signed?

18        A     My employment agreement was signed -- I do

19   not recall the specific date, but it was signed in

20   2002.

21        Q     Okay.

22        A     It may have been amended at this time.  I

23   just don't recall.

24        Q     I understand.  Was your employment agreement

25   with Health Scholarships, Inc.?

25

1      A     Yes.  I had an employment agreement with

2   Health Scholarships, Inc.

3      Q     Okay.  Was that agreement at any time

4   changed to reflect your employment with Community

5   Health Systems?

6      A     I do not recall if it was restated and

7   amended or if it was assumed.

8      Q     Okay.

9      A     I'm not sure of the transfer specifically.

10  But essentially it became an agreement very similar to

11  this agreement upon my employment with Community

12  Health Systems, Inc.

13     Q     Okay.  So it is your understanding that the

14  agreement you had with Health Scholarships, Inc., is

15  still in effect today as your agreement with Community

16  Health Systems --

17     A     No.

18     Q     -- either through amendment or to change the

19  name of the party or something?

20     A     My employment agreement was -- with

21  Community Health Systems, Inc., was amended in 2009.

22  I do know it happened at that time.  It was amended.

23     Q     And it appears from exhibit two that

24  Mr. Waldrop's agreement was, likewise, amended and

25  restated in 2009.

26

1      A      That's correct.

2      Q      Would that have been the same time yours was

3  amended and restated?

4      A      Yes.  The agreements were amended and

5  restated at the same time.

6      Q      Was there something that was occurring at

7  the company that gave rise to the need to amend and

8  restate those agreements in 2009?

9      A      There was actually a change in the law.  We

10  were advised by legal counsel that we needed to amend

11  and restate the agreements for some provision.

12      Q      Okay.

13      A      I don't recall the specifics.

14      Q      You don't recall the specifics?

15      A      That's a legal issue.  ERISA or something.

16  I don't know.

17      Q      There was a reason you did it, not just,

18  hey, we need to restate these, but there was a legal

19  reason for it?

20      A      Absolutely.  There was a reason -- an

21  employment law reason that the agreements needed to be

22  amended and restated.

23      Q      What is the last time that you had -- well,

24  strike that.  Have you ever reviewed Mr. Waldrop's

25  employment agreement, exhibit two?

1      A      Yes.

2      Q      When was the last time you did that?

3      A      The last time I reviewed it was 2009.

4      Q      Do you recall looking at it at any time

5  between 2009 and today?

6      A      I've seen it --

7      Q      Okay.

8      A      -- between then and now, yes.

9      Q      Do you recall any specific times that you've

10 seen it?

11     A      I specifically saw it when -- I believe when

12 we -- when Community Health Systems, Inc., was served

13 with litigation.  I think there was a copy attached to

14 the lawsuit or with something that came along.

15     Q      Okay.

16     A      Something that occurred along the way, one

17 of the documents that was filed, it was attached and

18 included in there.

19     Q      Do you recall any instance where you

20 reviewed the agreement after 2009 but before receiving

21 papers in this lawsuit?

22     A      No, sir.

23     Q      Did you review the agreement between

24 January 1st, 2016, and June 28th, 2016?

25     A      No, sir.

28

1    Q    And by agreement, just so the record's

2  clear, I'm referring to exhibit two.  The answer is

3  the same?

4    A    The answer is the same.  I did not look at

5  the agreement.

6    Q    Of course, you're familiar with the fact

7  that Mr. Waldrop was terminated as a Community Health

8  Systems employee in June of 2016; correct?

9    A    I am aware that Mr. Waldrop was terminated.

10    Q    Okay.  When did you learn of that

11  termination?

12    A    I learned he was to be -- he was to be

13  terminated some days before June 28th.

14    Q    How did you learn about it?

15    A    I was -- I attended a meeting of the board

16  of Community Health Systems, Inc., and learned about

17  it at that meeting.

18    Q    Are you a member of the board for Community?

19    A    I'm a member of the board of Community

20  Health Systems, Inc.

21    Q    Are you a full member with voting privileges

22  and everything?

23    A    Yes, I'm a full member of the board.

24    Q    Was a vote taken on whether to terminate

25  Mr. Waldrop?

1       A     I'm not sure if they voted on that.  I was

2   attending but not participating.

3       Q     Is there a reason you weren't participating?

4       A     Yes.  I had had charges of misconduct filed

5   against me by Mr. Waldrop and I was there to learn my

6   fate, was I going to be exonerated of those charges or

7   were they -- or was I -- or was I going to receive

8   some type of action against me.

9       Q     What were Mr. Waldrop's charges of

10  misconduct against you?

11      A     His charges were I had lied in

12  correspondence, e-mails to him, and that I was

13  targeting him for termination.

14      Q     Were either of those charges true?

15      A     Both of those charges are untrue.

16      Q     Okay.  How did the board address those

17  charges?

18      A     The board informed me that the charges

19  against me from their investigation had been

20  determined they were unfounded, which was what I was

21  looking for.  I wanted to determine the extent of the

22  charges against me.  Quite frankly, I wasn't too

23  concerned about Mr. Waldrop.

24      Q     Well, he had accused you of targeting him

25  for termination and lying.  So I guess you're pretty

30

1    upset at him.  Is that a fair statement?

2        A    I think that upset is the wrong word.

3        Q    What word would you use?

4        A    I learned that Mr. Waldrop had stolen from

5    the -- stolen money from the company.  Being my

6    protege that I had put forward to the board of

7    directors to be my successor and that he had stolen

8    from the company, he had betrayed the trust of me.  He

9    betrayed the trust of our board.  He had totally

10   disregarded every responsibility that he had.

11           And so I was by that point in time

12   ambivalent toward Mr. Waldrop.  I didn't really care.

13   I wanted the police to come and arrest him would have

14   been my -- would have been a better solution by me.

15           But I -- I was hurt.  I was deeply, deeply

16   hurt.  And I'm deeply hurt today that he would have

17   that type of conduct that he would steal and betray

18   the trust of so many people.

19       Q    I'm assuming -- correct me if I'm wrong --

20   that the board informing you that the charges were

21   unfounded that the board conducted some type of

22   investigation; is that correct?

23       A    Yes.  The board had conducted their

24   investigation.

25       Q    Okay.  Were you involved in that

31

1    investigation?

2        A    No.  I was interviewed was my only

3    involvement.

4        Q    Who interviewed you?

5        A    I was interviewed by Joe Wall and Mark

6    Lange.

7        Q    Was anybody else present during the

8    interview?

9        A    No.

10       Q    When was that interview?

11       A    Between the middle of May and early June

12   2016.

13       Q    Other than that interview, did you have any

14   other interviews as part of the investigation of the

15   board?

16       A    I had two interviews by each of them.  I had

17   an initial interview and a follow-up interview.

18       Q    And were Mr. Wall and Mr. Lange involved in

19   both of those interviews?

20       A    They each interviewed me twice separately.

21       Q    Okay.  I just want to be sure I understand.

22       A    A total of four.

23       Q    There were four interviews.  Okay.  I got

24   it.

25       A    A total of four interviews.

32

```
1       Q    That's what I thought you said, but I just
2   wanted to be sure.  Did they ever interview you
3   together?
4       A    No.  I was not interviewed together.
5       Q    Were all four of these interviews -- did
6   they occur between the middle of May and early June
7   2016?
8       A    Yes, they did.
9       Q    Was anybody present to take notes during
10  those interviews?
11      A    No.
12      Q    Did you take any notes?
13      A    No.
14      Q    Did you notice if Mr. Lange or Mr. Wall took
15  notes?
16      A    Yes, I believe they both took notes.
17      Q    Have you seen those notes?
18      A    No, I have not.
19      Q    What were they interviewing you about
20  specifically?
21      A    Specifically about the charges by
22  Mr. Waldrop that I had lied in e-mails and that I was
23  targeting him for termination.
24      Q    Did they give you any specific instance that
25  Mr. Waldrop had mentioned of targeting?
```

33

1       A      Yes.

2       Q      What were those specific instances?

3       A      Mr. Wall shared with me that Mark Waldrop

4   had met with him and had a discussion mid May and that

5   in his discussion, Mr. Waldrop had indicated that I

6   was targeting him and was writing e-mails full of

7   lies.

8       Q      Had Mr. Waldrop ever said anything to you

9   about writing e-mails full of lies?

10      A      Mr. Waldrop did state to me that he felt

11  like I had written an e-mail that was full of lies and

12  that I was targeting him.

13      Q      Okay.  Did you listen to one of the

14  tape-recordings of that conversation in preparation

15  for the deposition today?  Is that one of the things

16  you listened to?

17      A      Yes, I listened to the conversation.

18      Q      Okay.

19      A      I was not aware it was being recorded, but I

20  did listen to it.

21      Q      What was Mr. Waldrop's position with the

22  company at the time he was terminated?

23      A      Mr. Waldrop served as chief operating

24  officer of Community Health Services, Inc., or

25  Community Health Services of Georgia.

1    Q    Is there a difference between Community

2  Health Systems, Inc., and Community Health Systems of

3  Georgia?

4    A    Yes, sir.  It's a -- Community Health

5  Services of Georgia is a d/b/a name.  The legal name

6  is Community Health Systems, Inc., d/b/a Community

7  Health Systems of Georgia and I may use those

8  intermittently.

9    Q    That's fine.  I understand.  I just wanted

10  to be sure it wasn't a separate entity.  But it's a

11  d/b/a.  If you say Community Health Systems of Georgia

12  and Community Health Systems, Inc., you're talking

13  about the same entity?

14    A    Exactly.

15    Q    How would you describe your working

16  relationship with Mr. Waldrop as COO?

17    A    Until about 10:00 o'clock on May 13th, I

18  thought I had a great relationship with Mr. Waldrop.

19  He was my chosen successor that I promoted to the

20  board.

21    Q    And then I'm assuming that it was a

22  telephone call at 10:00 o'clock on -- what date did

23  you say again?

24    A    I think it was May 13th I believe is the

25  date.  I believe that's the date.  There were actually

1   two phone calls that day, one at 10:00 o'clock and one

2   shortly after that.

3          Q    Both of those calls involved Mr. Waldrop?

4          A    Yes.

5          Q    What was the first call about?

6          A    The first call at 10:00 o'clock was with

7   Mark Waldrop and Blair Lake to clarify the leadership

8   of a meeting of the board of trustees of our Voluntary

9   Employee Benefit Association.

10         Q    VEBA?

11         A    VEBA.

12         Q    That's the acronym I've seen.

13         A    Good.  Then we can --

14         Q    We can short circuit that thankfully.

15         A    Thankfully.

16         Q    Were you a trustee of the VEBA?

17         A    No, sir.  I was not a trustee of the VEBA.

18         Q    Who were the trustees of the VEBA?

19         A    The trustees of the VEBA were Mark Waldrop,

20   Blair Lake and Lorraine Taylor.

21         Q    What position does Blair Lake have with --

22   strike that.  At the time of this call, what position

23   did Blair Lake have with -- well, let me just start

24   over.  Did Blair Lake have a position with Community

25   Health Systems at the time of that call?

36

1      A     Blair Lake was not employed directly by

2    Community Health Systems, Inc., at that time.

3      Q     Who was he employed by?

4      A     Blair Lake was employed by a subsidiary of

5    Community Health Systems called System Administrative

6    Services.

7      Q     Which is not one of the affiliates according

8    to my list.

9      A     It's not a 501c3 member of Community Health

10   Systems, Inc.  It is an LLC subsidiary.

11     Q     And I believe you said the other trustee was

12   Lorraine Taylor?

13     A     That's correct.

14     Q     What was her position?

15     A     She was -- Lorraine Taylor served as a VEBA

16   trustee.

17     Q     Right.  But with the Community Health

18   Systems company, affiliates.

19     A     Lorraine Taylor is employed as the chief

20   financial officer of Community Health Systems.

21     Q     So what was your role with regard to the

22   VEBA?

23     A     My role with regard to the VEBA was the VEBA

24   is sponsored by Community Health Systems, Inc., and as

25   CEO of Community Health Systems, I was responsible as

1    the conduit between the board and its VEBA.

2         Q    Okay.

3         A    I'm the person who recommended formation of

4    the VEBA to the board.  I have the board interaction.

5         Q    This call at 10:00 o'clock on May 13th, what

6    was the issue with regard to leadership on the VEBA

7    that you were discussing?

8         A    Leadership of -- or, chairing of the meeting

9    of the VEBA trustees was the issue.

10        Q    And why was that something that needed to be

11   discussed?

12        A    Late in the afternoon preceding the 13th, I

13   had received a phone call from another vice president

14   within a health system affiliate that she had been

15   informed that she was going to be chairing the VEBA

16   trustee meeting and she was confused and scared and

17   looking for help on what she should do.  She was

18   looking for guidance on how to conduct the meeting.

19        Q    Was that a Tracie Clark?

20        A    Tracie Clark was the vice president.

21             (Plaintiff's Exhibit 3 was marked for

22        identification.)

23   BY MR. HENRY:

24        Q    I'm going to show you a document that's been

25   marked as exhibit three and give you a second to take

38

1    a look at that.  I just wanted to be sure you've had

2    time to review it.  Have you had time to review it?

3         A    I'm familiar with it.

4         Q    Okay.  Exhibit three appears to be an e-mail

5    with a memo attached from you to Mark Waldrop,

6    Lorraine Taylor and Blair Lake.  Do you recall sending

7    that e-mail and memo?

8         A    Yes, I do.

9         Q    And those are the three trustees of the

10   VEBA?

11        A    That's correct.

12        Q    I want to point your attention to the first

13   bullet point on page two.  There's some -- well,

14   there's one acronym there that I would like for you to

15   describe for me.  We've talked about VEBA.  What is

16   NSC?

17        A    Next Step Care.

18        Q    Next Step Care.  Okay.  And what is Next

19   Step Care?

20        A    Next Step Care is a care management

21   organization that's also a member of our health

22   system.

23        Q    Okay.  Is that the organization that Tracie

24   Clark is involved in?

25        A    That's correct.

39

1      Q     Okay.  When you say that the VEBA will fall
2   under the purview of NSC, including day-to-day
3   management, what do you mean by that?

4      A     The day-to-day management, as indicated in
5   the next sentence, what NSC will do is handle the
6   calls with service providers and engage the members as
7   needed.  They were providing direct care management
8   on -- to members of our health system that needed
9   assistance with their care.

10     Q     So with that falling under the purview of
11  Next Step Care, what did you envision Tracie Clark's
12  involvement to be with the VEBA?

13     A     Exactly what she was doing.  They were
14  providing care management.  They are a care management
15  organization.  That's what they do.  They would
16  provide care management operations to the VEBA so that
17  we could enhance our services -- so the VEBA could
18  enhance its services to our associates.

19     Q     This meeting that you discussed at
20  10:00 o'clock on May 13th regarding the VEBA, did you
21  expect Ms. Clark or anyone from NSC to have any
22  involvement in that meeting?

23     A     She would be a participant in the meeting.

24     Q     When you say a participant, what do you
25  mean?

1      A      Tracie Clark and her staff, as they had done

2  in some earlier meetings, would take and report on the

3  contacts with associates and with our service

4  providers, particularly our pharmaceuticals and

5  physician services, to make sure that for those

6  associates who had asked for help -- and we had 100 at

7  that point in time -- there's 500 or so now we've had

8  contacts with -- that they would actually have contact

9  with them, report back to the group the results of how

10 our care management was interacting with our service

11 providers working in conjunction with our staff to

12 improve the health and wellness of our system

13 associates that we're serving.

14      Q      You never intended -- if I'm understanding

15 you correctly, you never intended for Tracie Clark to

16 actually lead the meeting of the VEBA trustees when

17 you sent exhibit three?

18      A      No.  I sent it to the -- this is to the VEBA

19 trustees.  The trustees -- the chairman of the

20 trustees would lead the meeting.  This is how the

21 VEBA -- we're providing additional -- our health

22 system is providing additional resources to the VEBA

23 that it's not had.

24      Q      Do you believe it would be a fair

25 interpretation of your statement in that first bullet

1  point that Next Step Care would be taking the lead at
2  the trustee meeting?
3      A    I do not believe that to be a fair -- no, I
4  don't believe that to be fair at all.
5      Q    Okay.
6      A    I believe it describes -- the followup
7  sentence describes exactly what it means.  They want
8  to work with service providers and engage the members.
9  That's what they do.  That's what a care management
10 organization does.
11     Q    Prior to March 16th, 2016, who or what
12 entity had been handling calls with service providers
13 and engaging the members as needed?
14     A    I'm unsure.  It was a needed service.
15     Q    Okay.  So you're not sure who was doing that
16 beforehand?
17     A    I'm not -- I was not attending the meetings.
18 I was giving direction on how our health system was
19 going to support our associates.  Our health system is
20 funding the VEBA.  All we're saying is we're going to
21 provide support for managing -- using our health
22 system associates, Next Step Care, to manage the
23 health of our associates to improve outcomes in their
24 wellness, the same way with our business operations
25 and the same way with the administration.

42

1     Q     And I'm not trying to ask a trick question.

2   I'm just trying to be sure I understand your answer.

3   Who was handling calls with service providers and

4   engaging the members as needed prior to Next Step Care

5   doing it?

6     A     I don't know.

7     Q     Okay.

8     A     I was providing direction.

9     Q     What is your understanding of the role of

10   the trustees of the VEBA?

11     A     The trustees of the VEBA actually have

12   oversight for the VEBA.  Similar to the board of

13   directors, they're appointed as trustees.  They're not

14   management.  They are trustees and so they have a

15   responsibility for general oversight and direction and

16   reported to me ultimately because I'm the conduit to

17   the board of directors of Community Health Services.

18     Q     When you say they reported to you, you

19   mean --

20     A     The VEBA.

21     Q     -- the VEBA?

22     A     The VEBA trustees.  Because, again, I

23   recommended to the board.  I, the CEO, was directed by

24   the board of directors of Community Health Services to

25   see that the VEBA was formed.

1     Q     Okay.

2     A     And I got the persons named as trustee so I

3  can provide -- serve as the conduit and I can assure

4  the board that the VEBA trustees are functioning and

5  doing their job as trustees.

6     Q     So the trustees are ultimately accountable

7  to the board of Community Health Systems?

8     A     Absolutely.

9     Q     And you were -- of course, you're a member

10  of the board as you testified.  But your role was to

11  be the -- conduit is your word -- liaison, mouthpiece

12  for the board?

13     A     I am the conduit, the liaison with the board

14  of directors for our organization as CEO, including

15  the VEBA.

16          MR. HENRY:  I need a break.

17          MR. DANIEL:  Okay.

18          (Whereupon, a recess was taken from 11:00

19     a.m. until 11:13 a.m.)

20  BY MR. HENRY:

21     Q     Before we took our break, we were talking

22  about this VEBA meeting that was the subject of the

23  10:00 o'clock call on May 13th.  What was that

24  meeting -- what was the agenda for that meeting?

25     A     The agenda for?

44

1     Q    The VEBA meeting.  What were y'all supposed

2    to talk about or what were the VEBA trustees supposed

3    to talk about?

4     A    I don't recall.

5     Q    Do you -- do you believe it was about --

6          MR. HENRY:  Thank you, Mark.  A lawyer

7      getting buried in paperwork here.  What a

8      surprise.

9    BY MR. HENRY:

10    Q    Do you have any reason to think it might

11   have been about the handling calls with service

12   providers or engaging the members as needed?

13    A    I don't -- I'm not even aware I had seen an

14   agenda at that point in time.

15    Q    Was the VEBA around this period looking for

16   new service providers?

17    A    No.

18    Q    No?  Okay.

19    A    We had transitioned service providers.

20    Q    Transitioned service providers?

21    A    They had changed.

22    Q    Do you know if the new service providers

23   were going to be making any kind of presentation or

24   appearing at the VEBA trustee meeting?

25    A    At -- when I wrote this message or when are

45

1   you talking about?

2        Q    At any time.  Well, let's start with what

3   you just asked.  When you wrote that message.

4        A    No.

5        Q    How about when you had the May 10th call --

6   May 13th -- I'm sorry -- call with Mr. Waldrop and

7   Mr. Lake?

8        A    As I recall, John Hearn was handling the

9   meeting agenda and there had been several things

10  discussed.  I -- I was busy on a lot of other matters

11  and the VEBA really -- I can't say when I saw it or if

12  I saw it.

13       Q    Okay.  John Hearn, who is he?

14       A    John Hearn is the consultant engaged by our

15  organization to help with benefit administration --

16  actually, planning our benefit program.

17       Q    Okay.  You'll have to forgive me for what

18  I'm about to ask because it's probably going to make

19  you think, wow, what does he really know about

20  anything.  How does a VEBA work generally?

21       A    Okay.  I'm -- I'm going to give --

22       Q    And it's so elementary, it's probably hard

23  to answer.

24       A    I'm not going to give a tax answer.

25       Q    Oh, please don't do that.

46

1       A      Well, there are a lot of different

2    directions.  Let me try to summarize that for you.

3       Q      Please.

4       A      We'll see where we go.  A VEBA, as the name

5    implies, is an association.  It's sponsored by an

6    organization.  It's an entity that is tax exempt and,

7    as such, the sponsorship in our organization allows us

8    to run a quasi insurance program inside the VEBA for

9    health benefits where we can partially fund the cost

10   of health benefits and purchase reinsurance --

11      Q      Okay.

12      A      -- as the name implies for certain types of

13   claims that exceed certain limits to reduce the

14   exposure and the risk to the VEBA of being financially

15   unable to meet its obligation.  It is separate and

16   apart from the corporation that sponsors it.

17      Q      Okay.

18      A      So it is not a subsidiary.  So how about

19   that?  Is that what you're looking for?

20      Q      That actually helps quite a bit.  I

21   appreciate that explanation.  I was trying to -- I'd

22   like for you to elaborate on how the VEBA is funded.

23      A      How it's -- funding for a VEBA in our

24   case --

25      Q      Not everybody.

47

1    A    -- not everybody?

2    Q    Right.

3    A    In our case, VEBA funding is through

4  individual contributions by associates, by associates

5  on behalf of dependent family members and by the

6  sponsoring company, in this case Community Health

7  Services.

8    Q    Okay.  So associates/employees contribute to

9  it?

10   A    Yes.  Associates in our lingo/vernacular are

11  employees.

12   Q    Right.  I just wanted to be sure I had an

13  understanding of what you were saying.  Okay.  Did the

14  board of directors for Community hold a meeting in

15  November of 2015?

16   A    The board of directors of Community Health

17  Services met in November of 2015.

18   Q    Okay.  Was the VEBA discussed during that

19  meeting?

20   A    Yes.  The VEBA was discussed during the

21  board meeting.

22   Q    And what was discussed about the VEBA?

23   A    Again, I don't know the specific question

24  that was asked.  However, a board member asked about

25  the VEBA reserves that were to be funded from -- that

48

1    were to be funded from the premiums paid by the

2    company and the members and had those funds been

3    identified, determined, were they available for

4    investment as intended by the board in the current

5    VEBA plan.

6         Q    Who asked that question?

7         A    Jimmy Patton.

8         Q    And he is an investor; correct?

9         A    He's a what?

10        Q    Does he work for an investment firm?

11        A    Jimmy Patton is -- yes, he's employed by a

12   wealth management firm, I guess, if that's what you're

13   referring to.

14        Q    Yes.  It is.  What was it that caused Jimmy

15   Patton to ask about the reserves for the VEBA?

16        A    Jimmy Patton's firm was selected to be the

17   custodian for the reserve fund to be created from the

18   VEBA and so he had been looking to see if the funds

19   were available to be invested as anticipated by the

20   board for the last two years approximately.

21        Q    What specifically did he ask?

22        A    I do not recall what he specifically asked.

23        Q    But he was curious as to whether there had

24   been any reserve funds available for investment

25   generally speaking?  Is that fair?

49

1      A    I don't think that is fair.  I think he was

2  looking to see if we were executing the plan and, if

3  so, when they could expect the funds to be deposited.

4  It was already determined.

5      Q    Was Mr. Waldrop present for this meeting?

6      A    Yes.

7      Q    Okay.  Any of the other VEBA trustees?

8      A    Lorraine Taylor was at the meeting.

9      Q    Okay.  Was Mr. Lake?

10     A    No.  Mr. Lake was not at the meeting.

11     Q    Okay.

12     A    Nor did he typically attend board meetings.

13     Q    Is it typical for there to be a recorder or

14  secretary that would take minutes at these board

15  meetings?

16     A    Some board meetings they are and some

17  they're not.

18     Q    Okay.  Who does that?

19     A    Who does what?

20     Q    Takes minutes.

21     A    Lorraine Taylor is responsible for minutes

22  of the meetings.

23     Q    Were any minutes taken of the November

24  meeting in 2015?

25     A    Yes.  I'm sure there were, yes.

1    Q    Have you seen those minutes?

2    A    I'm sure I have.

3    Q    Do you typically get minutes after the board

4 meetings to review?

5    A    Yes.  All board members get copies of the

6 minutes.  And so I'm sure I've seen them.  I don't

7 recall those specifically.

8    Q    Is it a common practice of the board to

9 approve minutes at a subsequent meeting?

10    A    Yes.  The board typically approves minutes

11 from a previous meeting at a subsequent meeting.

12    Q    Okay.  Do you know -- well, when was the

13 next meeting after November of 2015?

14    A    I'm not sure of the exact date, but --

15    Q    Just generally.

16    A    Generally it was either February or March.

17    Q    To whom was Mr. Patton directing his

18 question about the VEBA?

19    A    Mr. Patton directed the question to me I

20 believe.

21    Q    Okay.

22    A    They typically directed questions like that

23 to me.

24    Q    And how did you respond?

25    A    I don't recall my exact words.  I don't

1  recall exactly what I said, but I did inform the board

2  that -- as I recall, that the VEBA had not performed

3  according to plan.  However, we were working with our

4  adviser and would be getting back with them on the

5  funding of the VEBA and the prospects for reserve

6  investment.

7       Q    Was it disappointing to you that the VEBA

8  had not performed according to plan?

9       A    I'm not sure disappointing is a word that

10  I'd describe that.  The VEBA had not performed

11  according to plan.  So, yeah, anything that doesn't

12  perform according to plan I'm probably disappointed.

13  Although, I'm probably more interested in what can we

14  do.  I think what I'm more worried about than being

15  disappointed -- there's no need looking back -- is

16  what are we going to do differently.

17       Q    Okay.  Did you approach Mr. Waldrop or any

18  of the other VEBA trustees after the November meeting

19  about what could be changed with regard to the VEBA?

20       A    At any time after the meeting?

21       Q    Well, I would say within a day of the

22  meeting breaking.

23       A    I may well have.  I don't remember within a

24  day.  But soon after the meeting, I'm sure I followed

25  up.  I'm confident I did something in the not too

52

1    distant future after that meeting.

2          Q     Okay.

3          A     I would have taken action on behalf of our

4    organization.

5          Q     Do you recall what action you took?

6          A     Yes.

7          Q     What was it?

8          A     I asked that we have a meeting with our

9    consultant who had advised us on the VEBA and let him

10   know that we needed to improve our performance.  We

11   needed to have a plan that would get the investment

12   funds that were anticipated according to the plan.

13         Q     Who would you have had that meeting with or

14   discussed that with specifically?

15         A     Persons who I might have discussed that with

16   would include Mark Waldrop --

17         Q     Okay.

18         A     -- Lorraine Taylor, John Hearn.

19         Q     Did you have a meeting or did you discuss

20   the issue with Mark Waldrop or Lorraine Taylor

21   immediately after the board meeting broke?

22         A     Yes.

23         Q     Were you angry?

24         A     No.

25         Q     What did you say to them immediately after

53

1  the meeting broke?

2      A     I don't know the exact words.  I don't

3  recall.

4      Q     Okay.

5      A     I know what I told both of them in general

6  was that we had to improve the performance of the VEBA

7  and we -- bottom line.

8      Q     Would it surprise you to hear that

9  Mr. Waldrop or Ms. Taylor felt threatened by the way

10  you discussed that with them after the meeting?

11      A     I would be shocked.

12      Q     You would?  Okay.

13      A     I would be very surprised.  Very, very

14  surprised.

15      Q     Switching gears slightly, have there been

16  efforts or discussions about selling Community Health

17  Systems?

18      A     With whom are you talking?  What are you --

19      Q     Well, in general, has Community Health

20  Systems been investigating the prospect of a potential

21  sale?

22      A     No.

23      Q     No?  Did you ever discuss a potential sale

24  with Mr. Waldrop or Ms. Taylor?

25      A     I answered numerous questions from

54

1   Mr. Waldrop regarding potential transactions or sales
2   of Community Health Systems.
3        Q    Okay.  The way you're saying that sounds
4   like it was something that was almost frustrating for
5   you.  Is that fair?
6        A    No.
7        Q    Okay.
8        A    I'm giving you volume.  There were a number
9   of questions is what I'm trying to tell you.  So to
10  answer your question, I know there were a number of
11  instances.
12       Q    And I'm not trying to mischaracterize what
13  you're saying.  I'm just trying to understand your
14  reaction to that I guess.  When did these
15  conversations start generally?
16       A    I don't recall the specific date.  Probably
17  as far back as 2010 --
18       Q    Okay.
19       A    -- periodically.
20       Q    Would it always be Mr. Waldrop that would
21  initiate those questions or conversations?
22       A    Yes.
23       Q    Why?
24       A    Why what?
25       Q    Why would he initiate conversations about

55

1    that?

2        A    I don't know.

3        Q    Was there anything going on in the company

4    that would make a reasonable person think that the

5    company was going to be sold?

6        A    No.

7        Q    Do you recall a breakfast meeting with

8    Mr. Waldrop and Ms. Taylor on the day after the

9    November 2015 board meeting?

10       A    Not specifically.  No, I don't.

11       Q    Do you recall discussing a potential golden

12   parachute arrangement with Mr. Waldrop and Ms. Taylor

13   on the day after the board meeting?

14       A    Probably I did on -- that was a conversation

15   that -- I could have done that on any number of times

16   based on a question from Mr. Waldrop about what would

17   happen and what if.  A lot of what-if scenarios.

18       Q    Do you recall what you told him at any time

19   about golden parachutes?

20       A    Sure.  It's a common practice, which is how

21   I would refer to it.

22       Q    What did you specifically tell him?

23       A    I don't know what I specifically told him

24   that day.

25       Q    Do you recall indicating that if the company

56

1    were to be sold, Mr. Waldrop and Ms. Taylor might

2    receive a golden parachute in the $5 million to

3    $8 million range?

4         A    I don't recall that conversation.

5              MR. DANIEL:  Can you read the question back?

6         I'm not sure I understood it.

7              MR. HENRY:  If I need to rephrase, I can.

8              MR. DANIEL:  I just want to make sure I

9         heard the question right.

10             (Whereupon, the record was read by the

11        reporter as requested.)

12             MR. DANIEL:  Thank you.

13   BY MR. HENRY:

14        Q    I should add the word each on that question.

15   Do you recall having that conversation?

16        A    That particular day, no.  I can tell you I

17   don't remember that conversation that day.  I don't

18   remember that conversation.

19        Q    Do you remember at any time indicating that

20   if the company were to be sold, Mr. Waldrop and

21   Ms. Taylor would receive a golden parachute in the

22   range of $5 million to $8 million each?

23        A    No.

24        Q    Do you recall at any time indicating that if

25   the company were to be sold, you would receive a

1    golden parachute in excess of $10 million?

2        A     No.

3        Q     Do you recall at any time indicating that if

4    the company were to be sold, each board member would

5    receive a golden parachute of approximately $250,000?

6        A     No.

7        Q     Do those figures that I've just asked you

8    about in your opinion sound reasonable as golden

9    parachute amounts if the company had been sold?

10       A     Under a scenario if the company were to be

11   sold, a company the size of Community Health Services,

12   those are reasonable -- those are reasonable

13   estimates.

14       Q     Okay.  I'm going to show you another

15   document.  And that's four.

16            (Plaintiff's Exhibit 4 was marked for

17   identification.)

18   BY MR. HENRY:

19       Q     Mr. Rollins, I've just handed you what the

20   court reporter has marked as exhibit four.  I'm going

21   to ask you some questions about the check that is on

22   page one of exhibit four.  Do you recognize that

23   check?

24       A     Yes, I do.

25       Q     Okay.  Is that your signature on the check?

58

1       A    Yes, it is.

2       Q    All right.  What is Alta -- pronounce that

3   for me if you don't mind.  Altahama?

4       A    Altamaha.

5       Q    Altamaha Investment Holdings, Inc.?

6       A    Altamaha Investment Holdings, Inc., is a

7   corporation that I own.

8       Q    You individually own?

9       A    I personally own Altamaha Investment

10  Holdings, Inc.

11      Q    Are there any other owners?

12      A    There are no other owners of Altamaha

13  Investment Holdings, Inc.

14      Q    I'm going to say AIH.  Okay?  What business

15  does AIH conduct?

16      A    Altamaha Investment Holdings is my personal

17  investment holding company.

18      Q    Okay.  It's a little hard to read the check

19  on exhibit four.  What's the amount of that check?

20      A    $250,000.

21      Q    So you recall giving this check to

22  Mr. Waldrop, don't you?

23      A    Yes, I do.

24      Q    Okay.  Why did you do that?

25      A    I gave Mr. Waldrop the check to encourage

59

1    him to not quit Community Health Services of Georgia.

2         Q    It appears that the date of exhibit four is

3    12/14/2015.

4         A    That's correct.

5         Q    Was there something happening around that

6    time that made you fearful that Mr. Waldrop would

7    quit?

8         A    Mr. Waldrop had been asking repeated

9    questions for two or three or four or five years --

10   approximately since ACA came out, the Affordable Care

11   Act, speculating, asking about was the company going

12   to be sold, was Community Health Services of Georgia

13   going to be sold, and he had threatened to leave.

14            And he also told me at that time -- we'd

15   become aware that Life Care Centers of America was

16   having difficulties and, as he shared with me numerous

17   times, he's been recruited almost continuously by Life

18   Care Centers of America.

19        Q    Okay.

20        A    I was trying to convince him not to leave.

21        Q    You valued him that much?

22        A    Mark's been a -- Mark was a 25-year

23   associate who I had groomed and trained to be my -- my

24   personal successor as the leader of Community Health

25   Services.  I didn't want to see him leave.

1      Q    Would it be fair to say that even though

2   this money came from a checking account for AIH, that

3   this is actually your personal funds?

4      A    I own Altamaha Investment Holdings, Inc.

5      Q    Okay.  So -- okay.  That answers the

6   question.  How did you deliver this to Mr. Waldrop,

7   this check?

8      A    I delivered it personally to him at a dinner

9   meeting.

10     Q    If you would please, just walk me through

11  that dinner meeting.

12     A    We had dinner.  I thanked him.  I knew

13  things were difficult with him.  He was sharing he had

14  expenses with children in college and his wife was

15  driving an old car and didn't have a new one and he --

16  all the things he had shared with me personally about

17  his experience and that he was concerned about

18  healthcare and that all the changes with companies

19  being sold and health systems being disrupted.

20          And I listened to him and I wanted to let

21  him know he was a personal friend of mine in addition

22  to being a 25-year valued person and my chosen

23  successor and that I didn't want to see him quit too

24  soon, to see it through, that everything was going to

25  be okay, that our organization was strong.  It was

61

1    sound and nothing -- we were going to make it.  We

2    were going to be the survivor.  We were perfectly

3    positioned.

4            I reiterated everything about our

5    organization, how and why it had been formed and all

6    the reasons why it was the right -- we were in the

7    right position at the right time to succeed.  And I

8    was trying my best to encourage him.  I was trying to

9    offer encouragement.

10        Q    Have you ever written similar checks to

11   other associates or employees of Community Health

12   Systems?

13        A    Yes.

14        Q    In this amount?

15        A    Larger.

16        Q    Larger?  Did you ever do it before to

17   Mr. Waldrop?

18        A    Yes.

19        Q    Oh.  Okay.  How many times before?

20        A    Well, I did it to Mr. Waldrop several years

21   ago when he bought a piece of property in Montana.  He

22   was trying to buy a piece of property and I wired the

23   funds -- I don't know the exact amount; I don't recall

24   it -- to help him do that because he was trying at

25   that point in time to have a place to retire in and to

1    go out west where his kids could enjoy time and it was

2    his dream.  He was looking for a dream.  So I bought

3    some property for him there.  Actually, the property

4    is titled in his name.  I wired the funds to pay for

5    it.

6            And as far back as 2000 -- forgive me if I

7    don't remember the specific date, but I actually gave

8    Mr. Waldrop, Dean Shuford, and Freddie Walter right at

9    $1 million worth of bonds each following completion of

10   a merger in 2003 to encourage them -- looking back on

11   it, to encourage them to stay, that we had

12   accomplished exactly the mission that I had been on

13   for five or six years, a successful transition from

14   for profit to not for profit, and that we were going

15   to be great and I wanted them to stay and continue to

16   work.  So those are instances that I recall

17   immediately.

18       Q    Could there be others that you just don't

19   recall?

20       A    Those are the only guys.  Those are pretty

21   big numbers.

22       Q    Oh, yeah.  I wasn't trying to imply they

23   weren't.  I was just --

24       A    I thought it was a great thing to do to

25   encourage them.

1      Q    Okay.  At the dinner meeting where you

2  delivered exhibit four to Mr. Waldrop, did you discuss

3  anything else with regards to the company?

4      A    I don't recall.

5      Q    Do you recall discussing potential

6  repositioning of associates?

7      A    Oh, I'm confident -- we had been discussing

8  that for two months.  I'm sure it was mentioned during

9  the dinner.  That started back before then, so I'm

10 sure it was mentioned.  I don't remember how.

11     Q    Okay.  What were those discussions

12 specifically about repositioning?

13     A    It was actually -- strategic organizational

14 positioning was the project that we called it.  And it

15 was positioning our health system to match up with

16 other health systems in the acute-care environment.

17          We probably discussed Navicent, Piedmont,

18 WellStar, Athens.  You pick and choose any large

19 health system in the state or nation and they were a

20 part of that.  So we had a discussion about how we

21 were positioning our organization to do business with

22 them.

23     Q    How would this -- these proposals or

24 discussions about repositioning effect Mr. Waldrop's

25 role in the company?

64

1      A     Not greatly.  It didn't effect him a lot

2  actually.  It had very little to do with him.

3      Q     Would it involve moving people out from

4  under Mr. Waldrop to other positions?

5      A     There were -- strategically there were some

6  positions moved from under him and some moved to him.

7  That's what positioning is about, to make us match up

8  against other health systems.

9      Q     So it was going in both directions?

10      A     Yes.

11      Q     Maybe some people moving away from

12  Mr. Waldrop and maybe some people moving under him

13  that weren't previously under him?

14      A     Correct.

15      Q     In the course of reviewing some things in

16  this case, I have come across a phrase, upper payment

17  limit, UPL?

18      A     Yes.  UPL.

19      Q     What is that?

20      A     Upper payment limit is a Medicare program

21  that provides for payment in certain qualifying

22  institutions, a payment for the difference between

23  Medicare and Medicaid to qualifying providers.  It's

24  additional revenue stream for skilled nursing

25  facilities and hospitals.

1      Q     Has Community benefited in the past from UPL

2  payments?

3      A     Absolutely.  UPL is the single greatest

4  thing that ever happened to Community Health Systems.

5      Q     Well, the reason I asked about this is I

6  came across an article that discussed some issues that

7  Community Health Systems had faced with UPL recently.

8  I say recently.  Within the last two or three years.

9      A     The last two or three years, yeah.

10     Q     Could you tell me about those issues?

11     A     The issue -- I mean, there was a single

12  issue with UPL.

13     Q     Okay.

14     A     The CMS regional office in Atlanta, Centers

15  for Medicaid and Medicare Services, determined that,

16  in their opinion, certain nursing facilities within

17  our health system that were receiving those funds no

18  longer qualified.  And some of them -- some of them

19  did qualify; some didn't.  And on those that did not

20  qualify in their opinion, they wanted recoupment of

21  funds.

22     Q     Okay.  Why didn't they qualify according to

23  CMS?

24     A     They didn't qualify according to CMS because

25  they were funded through -- the UPL payments were

66

1   funded through a development authority rather than a
2   hospital authority.

3       Q    And in CMS's view to your understanding,
4   what's the significance of the difference between a
5   development authority and a hospital authority?

6       A    I don't know.  The dispute's really between
7   the State of Georgia and the federal government and
8   CMS.  But I think maybe they didn't like the name.
9   The statute's identical.  It's a legal issue the State
10  of Georgia and CMS will work out.

11      Q    And that's what -- I had gathered some of
12  that from reading the article.  But it appeared that
13  it was a particular issue that Community would be
14  having to deal with or could potentially have to deal
15  with.  I understand it's between the State of Georgia
16  and the federal government, but --

17      A    No, we're actually not dealing with it.
18  It's not our issue.  I wish we could.  We would have
19  if we could have, but we couldn't.

20      Q    All right.  Did you discuss UPL with
21  Mr. Waldrop during the meeting where you delivered
22  exhibit four?

23      A    Okay.  What's exhibit four?

24      Q    That's the check.  I'm sorry.  I'm just
25  trying to keep the record straight.

67

1          A     I don't recall.

2          Q     Okay.  Did Mr. Waldrop express any concerns

3     about UPL to you at any time?

4          A     At any time?

5          Q     Maybe a better way to ask that is this.  You

6     had indicated previously I believe -- correct me if

7     I'm wrong -- that Mr. Waldrop was concerned about the

8     financial stability of the organization, of Community

9     Health Systems, because of ACA and other issues.  Is

10    that fair?

11         A     Yeah, that's fair.

12         Q     Okay.

13         A     It's fair with the addition that also the

14    size of our organization relative to the big health

15    systems.  It was really more about that, ACA and

16    Medicare in general and large health systems.

17         Q     In the context of Mr. Waldrop expressing

18    those concerns, did he ever mention anything about

19    UPL?

20         A     We talked about UPL regularly.  But within

21    those conversations specifically, I don't recall.

22         Q     Has -- well, is Community Health Systems

23    still receiving UPL payments?

24         A     Yes, on certain facilities we still receive

25    UPL payments.

1    Q    The ones that CMS has determined do qualify?

2    A    Yeah.  Yes, qualifying facilities according

3  to them still continue to receive UPL payments.

4    Q    How -- proportionally, how many facilities

5  qualify for UPL payments according to CMS in relation

6  to the ones that don't?

7    A    With regard to the centers?

8    Q    That was a horrible question.  Let me try

9  again.  When you're looking at Community Health

10  Systems facilities, what percentage qualify under

11  CMS's determination and what percentage don't?

12    A    I think I understand.  I don't know the

13  percentage.  I can't do the math.  But two facilities

14  still continue to qualify.

15    Q    Okay.

16    A    And approximately 25 or 30 don't.

17    Q    So Community is still receiving UPL payments

18  for two facilities?

19    A    That's correct.

20    Q    But no more?  No others?

21    A    I believe that's correct.

22    Q    Has Community had to refund any money to the

23  State of Georgia or to the federal government for past

24  payments?

25    A    Community Health Services has refunded no

69

1    money to CMS or the State of Georgia for prior

2    payments.  Nor do we expect to I might add.

3        Q    So it's not booked as a potential liability

4    or anything to the company?

5        A    No, it's not.

6        Q    Going back to the VEBA, when Mr. Patton

7    raised the question about reserves of the VEBA at the

8    November meeting, did you believe that Mr. Waldrop or

9    any of the other VEBA trustees had been mismanaging or

10   not managing the VEBA appropriately?

11       A    Mismanaging the VEBA?  No.

12       Q    Okay.

13       A    No, we had not been mismanaging the VEBA.

14       Q    Well, it wasn't performing as it was

15   supposed to; right?

16       A    The VEBA had not performed as planned.

17       Q    Did you believe that the trustees were to

18   blame for that in any way?

19       A    No, not at all.

20       Q    What did you blame that on, if anything?

21       A    Two or three things.  First, we -- I didn't

22   know -- that was actually the question I asked is

23   what's gone wrong.  It was, first, look at the advice

24   of the consultant.  Because everything should have

25   been actuarially confirmed.  We paid a firm a lot of

70

1   money to tell us what to do with the VEBA.

2           So it was either -- either bad advice --

3   what I believe was either bad advice or facts --

4   sometimes they just don't work out.  But more

5   importantly, what we had to do was make the changes

6   needed to make it successful.  That's what I was

7   focused on.

8       Q    Okay.

9       A    I couldn't change the past.

10      Q    Right.  I know.  I'm just trying to get an

11  idea of -- well, I guess I'll just ask it this way.

12  What changes did you feel needed to be made in order

13  to make it perform?

14      A    I didn't know the changes.  I felt like we

15  needed to speak -- the VEBA trustees, up to and

16  including me as a representative of the board, needed

17  to speak with our consultant and make sure the numbers

18  that they were quoting us -- it was one of two or

19  three things:  Our funding wasn't enough or our

20  estimates of how much it was going to cost or the cost

21  was too high.  I wasn't sure either way.  And we

22  needed to get our consultant to tell us what to do.

23  We were looking for advice.

24      Q    Well -- and that's Mr. Hearn?

25      A    Hearn.

1      Q     He was the consultant?

2      A     Yes.

3      Q     All right.

4      A     Mr. Hearn is the consultant with the benefit

5  company.

6      Q     Did he ever tell you what changes could be

7  made or give you advice on what changes could be made

8  to cause the VEBA to perform as planned?

9      A     Yes.

10      Q     And what were those?  What was that advice?

11      A     He recommended a series of actions,

12  separating some of the TPA services that we were doing

13  and not use a single-source, third-party

14  administrator, that we look at the funding and then

15  plan design.  So pretty -- pretty straightforward.  He

16  made -- he made recommendations and, as far as I know,

17  we followed them.

18      Q     Were these recommendations followed while

19  Mr. Waldrop was still an employee and a trustee of the

20  VEBA?

21      A     Yes.

22      Q     Okay.  Do you recall when these

23  recommendations were implemented?

24      A     Most of them went into effect January 1st,

25  2016.

1       Q    Were they yielding results on January --

2    well, strike that.  Between January 1st when most of

3    these went into effect and the time that you sent

4    exhibit three, had those recommendations yielded

5    positive results?

6       A    I don't know.  I believe -- I hope so.

7       Q    Okay.

8       A    But I didn't know at the time I wrote this

9    message, no.

10      Q    Did exhibit three have anything to do with

11   the recommendations that Mr. Hearn and his firm made?

12      A    Yes.

13      Q    Okay.  What specifically on exhibit three

14   was in response to the recommendations that Mr. Hearn

15   made?

16      A    Based on my conversation with Mr. Hearn -- I

17   don't recall the exact date.  It was after the

18   November meeting.  And early in 2016 it became

19   apparent in my discussion with him that we needed

20   to -- not that he was going to -- these were changes

21   that we needed to do operationally to give us the

22   ability to determine the results we were looking for,

23   that this is what we needed to do.  And he explained

24   it to our board.  He came and made a great

25   presentation in April.

1      Q    Okay.  When you would have discussions with

2   Mr. Hearn, were Mr. Waldrop or any of the other VEBA

3   trustees involved?

4      A    Sometimes.

5      Q    Sometimes?  But you did have some where the

6   VEBA trustees were not participating?

7      A    That's true.

8      Q    I want to talk about your call with

9   Mr. Waldrop on May 12th, 2016.  And to help us

10  contextualize that call, I want to show you exhibit

11  five.

12          (Plaintiff's Exhibit 5 was marked for

13          identification.)

14  BY MR. HENRY:

15      Q    Have you seen exhibit five before?

16      A    Yes, I have.

17      Q    You sent exhibit five; right?

18      A    I sent exhibit five.

19      Q    Okay.  The issues that are addressed in

20  exhibit five were discussed -- or, were the subject of

21  discussions with Mr. Waldrop prior to you sending this

22  e-mail; correct?

23      A    That is correct.

24      Q    Tell me about that conversation.

25      A    The conversation that Mark and I had on the

74

1   phone earlier in the afternoon that this refers to?

2       Q    Let's start even before that.  What prompted

3   that call?

4       A    I think our -- to my recollection, our call

5   on the afternoon was a regular call, just a normal

6   call, talking about issues.  We hadn't spoken in a few

7   days.

8       Q    Is that typically how you would interact

9   with Mr. Waldrop, just have calls about issues that

10  the company is facing and go through maybe a checklist

11  like this?

12      A    Sometimes a followup e-mail.  But mostly we

13  talked.  We've known each other 25 years.  We just

14  talked about what was going on, just to make sure that

15  we were together on what we were doing.

16      Q    All right.  Well, let's go through each item

17  in your e-mail specifically.  The first item is EHR,

18  which is another acronym.  What is EHR?

19      A    Electronic health record.

20      Q    Okay.  And what was the history behind your

21  discussion of this topic, electronic health records?

22      A    On Monday before this or recently -- shortly

23  before this, there had been a meeting at one of our

24  nursing centers where Diana Wilks and her team showed

25  Mark, Lorraine, me -- there may have been others --

1    the work that had been done on electronic health

2    record with -- that they had been working on with LG.

3        Q    What is electronic health record?

4        A    Electronic health record is a digital

5    document that would replace the manual paper set of

6    documents that you have if you go into a doctor's

7    office or a hospital and you see them flipping charts.

8    It's an electronic chart instead of a paper chart.

9        Q    Okay.  So Community was working with or had

10   received a demonstration from LG on moving toward

11   electronic health records?

12       A    Potentially actually using them for

13   electronic health record.  They were using it in that

14   center as a pilot program.

15       Q    Okay.  What was your involvement in that

16   pilot program prior to the demonstration?

17       A    I really hadn't had any involvement.

18       Q    Okay.  Who was taking the lead on behalf of

19   the company for that?

20       A    I didn't know.  I assumed Mark was because

21   in our strategic plan, the electronic health record is

22   underneath him.  It's an area of responsibility that

23   he had on our strategic plan.  So he was strategically

24   responsible for our health system.

25       Q    Okay.  You asked the question who are they

1    in reference to LG CNS.  Do you know who LG CNS is?

2         A     I've seen more now.  At the time, I didn't.

3    I had no idea who they were.

4         Q     Who are they now that you've --

5         A     They are -- LG is Life is Good, a Korean

6    company.  And LG CNS is a subsidiary they have that's

7    working in the US, a Korean company working with a US

8    company working on health records.

9         Q     There's a reference here to a Diana in item

10   D.  Who is Diana?

11        A     Diana in item D is Diana Wilks.

12        Q     And what was her involvement?

13        A     Diana Wilks heads up the skilled nursing

14   operation.  She was the person responsible for skilled

15   nursing, including the facilities that were utilizing

16   the electronic health record being piloted by LG.

17        Q     Did she work under Mr. Waldrop?

18        A     Diana reported to Mark.

19        Q     All right.  Let's skip down to number two.

20   We've talked quite a bit about VEBA, but there are

21   some specific items listed there, A, B, C.  What was

22   the issue with these contracts?

23        A     Varying issues.  One, we had not received

24   them.

25        Q     Okay.

1      A      We did not have contracts for several

2   months.

3      Q      Contracts from who?

4      A      From a number of vendors regarding payments

5   on the VEBA and management of the VEBA.

6      Q      It appears that -- maybe it's not listed

7   here, but I do recall hearing in one of the recordings

8   a discussion of a three-year commitment for some of

9   these providers.

10     A      Again, there were multiple contract dates

11  and expirations.  There may have been three years.

12     Q      Why would multiple contract dates and

13  expirations be of concern to you?

14     A      Multiple contract dates means it's difficult

15  to change.  If you have a one-year contract, we've

16  just unbundled a single payer that's managing things

17  with a single fee and suddenly we're paying seven

18  vendors with contracts ranging from one to three

19  years.

20            If this doesn't work -- if this, being the

21  program that we're in, doesn't work out as planned, we

22  don't have a way to change easily if a component is

23  not working out well.  If the pharmacy component is

24  not working out well and it has a one-year contract,

25  well, it's easy to terminate it.  If the administrator

78

1    has a one-year contract but pharmacy has a three and

2    we love what pharmacy's doing but we don't like the

3    administrator, we potentially -- and they have a -- in

4    the contracts, they don't marry up, you can't

5    terminate them.

6         Q    You can't make a clean break?

7         A    You can't make a clean break and turn to

8    anything else.

9         Q    Would these VEBA contracts that you're

10   describing with the providers, would that have been

11   something that would have fallen under the purview of

12   Tracie Clark under your prior memo, exhibit three?

13        A    No.

14        Q    Okay.  So in your view, that would have been

15   something that the VEBA trustee should have been

16   dealing with?

17        A    The VEBA trustees would have -- that's one

18   of the few things they would actually have to approve.

19        Q    Okay.  But having the -- the varying

20   termination provisions and things was something that

21   you did not see as acceptable.  Is that fair?

22        A    I didn't see it as acceptable.  I wanted to

23   understand how it was going to work.  What were our

24   options is what I was trying to understand.

25        Q    And you ultimately, according to item C,

1    indicated that y'all just wanted to execute any

2    contracts and see what happened basically?

3        A    Mark and I discussed it and I think we

4    agreed we were just going to just let them rock along

5    for a few months and see how it worked.

6        Q    Okay.  Number three, Workday contract.  I

7    have seen multiple references to Workday.  What is

8    Workday?

9        A    Workday is an enterprise software system.

10       Q    Meaning?

11       A    It provides software in our case

12   specifically to CHS, our financial reporting,

13   including financial statements and financial reporting

14   along with accounts payable, human capital management,

15   including payroll, W-2s, 1099s, on-boarding.  It's our

16   single-source solution for multiple business

17   processes.

18       Q    Are there varying levels of access to

19   Workday information?

20       A    Yes, absolute security.  There are security

21   settings within Workday by the very nature of the

22   software.

23       Q    So, again, I'm not trying to be to

24   elementary here, but if you have an associate who

25   deals in one particular area that uses Workday that's

80

1   not financial, they wouldn't necessarily have access

2   to financial information in Workday?  It's more

3   targeted to what they do?

4         A    Work within Workday or the allowable

5   structure is within their area of responsibility.

6         Q    Now, you're the president and CEO.

7         A    Yes.

8         Q    Do you have any kind of restrictions on your

9   access to Workday --

10        A    Yes.

11        Q    -- information?  You do?  What are those

12  restrictions?

13        A    I'm the most limited person in the system.

14        Q    So you can't access as much information as

15  others?

16        A    I cannot.

17        Q    That just sounds a little counterintuitive

18  to me.  Why would that be?

19        A    It's really quite simple.  It's check and

20  balance.

21        Q    Okay.

22        A    With my position of authority and

23  responsibility and accountability, I shouldn't be able

24  to change things.  I can only audit is all I can do in

25  some instances.  I can't initiate anything other than

81

1   run an expense report.

2         Q    Okay.  So -- that's helpful.  So in the

3   Workday system, you can alter information?

4         A    No.

5         Q    Well, I mean, in general.

6         A    No, you can't do that.

7         Q    Can you view the information?

8         A    Can who view the information?

9         Q    You specifically, Mr. Rollins.

10        A    I can view certain information.

11        Q    Okay.  Is your ability to view information

12  most limited?

13        A    I believe so.

14        Q    Okay.  I mean, I understand what you're

15  saying about checks and balances on changing the

16  information.  But I'm talking about viewing the

17  information.

18        A    I don't know what my rights are under the

19  system with regard to viewing.

20        Q    How often do you use Workday?

21        A    I look at it or open it up daily.

22        Q    Okay.  How many of your duties are --

23  involve you accessing Workday?

24        A    Approving expense reports for my reports,

25  approving invoices for entities that I supervise --

82

1      Q      Okay.

2      A      -- and initiating pay rate changes for

3  persons that directly report to me.

4      Q      Such as Mr. Waldrop --

5      A      Yes.

6      Q      -- when he was there of course?  I believe

7  the first item you listed was approving expense

8  reports.  Is that something you use Workday for?

9      A      I use Workday to approve expense reports.

10     Q      Okay.  Do you have access to everybody's

11 expense reports on Workday?

12     A      No.

13     Q      Okay.  Whose expense reports do you have

14 access to on Workday?

15     A      I have access to my direct reports in

16 Workday.

17     Q      Okay.  So when you say your direct reports,

18 do you mean the reports that you generate or the

19 reports generated by the people who report to you?

20     A      I mean the people that report to me, those

21 that report directly to me.

22     Q      Okay.  That's -- we're talking about reports

23 as in paper and we're talking about reports as in

24 people.  I just wanted to be sure I knew.  So you

25 would have had access to all of Mr. Waldrop's expense

1    reports on Workday?

2        A    I would have had access to all reports that

3    Mr. Waldrop submitted to me, yes.

4        Q    Okay.  Who else would you have had access to

5    the expense reports?

6        A    Lorraine Taylor, Stelling Nelson.

7        Q    Did you say Stelling?

8        A    Stelling, S-T-E-L-L-I-N-G.

9        Q    Okay.

10       A    Dean Shuford, Angie Griffin, Hunter Hearst.

11       Q    Anybody who directly reports to you?

12       A    That's it.  I think those are the persons.

13   It's changed recently, so I'm --

14       Q    Okay.  How is expense reporting done at

15   Community Health Systems generally?

16       A    How is it done?  What does that mean?

17       Q    Like, what's the process?

18       A    Generally associates who incurs business

19   expenses on behalf of the company prepare a written

20   report in Workday and attach electronic digital copies

21   of the supporting documentation each month within 30

22   days of expending the amount on behalf of the

23   organization, and they're reimbursed.

24       Q    And does somebody have to approve those

25   expense reimbursement requests?

84

1      A      Expense reports are approved by each

2   individual's supervisor.

3      Q      Hence the reason you have access to these

4   individuals you've named?

5      A      Yes.  They submit invoices to me -- excuse

6   me -- submit expense reports to me for approval.

7      Q      Does the board of directors for Community

8   Health Systems approve a budget every year?

9      A      The board of directors of Community Health

10  Services approves an operating budget on an annual

11  basis.

12     Q      Okay.  For items that are included in that

13  operating budget, does an associate have to go through

14  the expense reimbursement reporting process?

15     A      I believe you're confusing two different

16  issues.

17     Q      Okay.  Please -- please clarify.

18     A      Maybe I didn't understand your question.

19  Maybe you can ask that question again.  Maybe I just

20  misunderstood it.

21     Q      That's fine.  And that's exactly what I said

22  at the beginning.  It's my understanding based on what

23  you said that there is an expense reimbursement policy

24  where an associate will upload an expense

25  reimbursement report on Workday for approval by their

85

1    supervisor.

2        A    And an expense report is prepared each month

3    and submitted to their supervisor for approval.

4        Q    Okay.  How, if at all, is that expense

5    report tied to the operating budget?

6        A    It's not.

7        Q    Okay.  So how does the operating budget

8    work?  The board approves it.  It's put out there.

9    How are funds spent under that budget?

10       A    Hopefully according to the budget.

11       Q    Okay.  Are there ever any instances where

12   there's money spent that has not been approved by the

13   budget, that falls outside the budget?

14       A    We have budget variances, so I would say

15   yes.

16       Q    What is a capital expense?

17       A    A capital expense is a nonoperating expense.

18       Q    Okay.  Would that be something that falls

19   outside the budget?

20       A    Absolutely, yes.

21       Q    Okay.

22       A    Outside the budget approved by the board of

23   directors.

24       Q    Right.  So how are capital expenses

25   approved?

1     A     Capital expenses are approved by a person

2  initiating an expenditure requesting it with approval

3  through the person responsible for the area of

4  responsibility for the budget it's being charged to

5  and submitted to ultimately me for approval.

6     Q     Okay.  Do you approve all capital expenses?

7     A     Yes.  With approval of the board on those

8  required by board approval, but I approve them all.

9     Q     Is there a limit that's applied to determine

10  whether it has to go to the full board or whether you

11  have discretion to approve it or disapprove it?

12     A     Yes.

13     Q     Okay.  What is that limit?

14     A     That limit is $100,000.

15     Q     Was that the same limit that was in effect

16  when Mr. Waldrop was the COO?

17     A     Yes, it is.

18     Q     Did you ever have any issues or discussions

19  with Mr. Waldrop about capital expenses?

20     A     Issues, no.  Discussions, yes.

21     Q     How about discussions between January 1st,

22  2016, and June 28th, 2016?

23     A     Yes.

24     Q     All right.  What were those discussions?

25     A     Those discussions centered on making sure

87

1     that Mr. Waldrop was clear on our process -- our

2     business process surrounding capital expenditures.

3          Q     Did you have reason to believe that

4     Mr. Waldrop wasn't clear on those procedures?

5          A     Yes.

6          Q     And why -- what reasons were there to make

7     you think that?

8          A     He -- in conversations with him during this

9     period, he told me that he didn't know about certain

10    expenditures and he appeared to me, based on

11    conversations, not to --

12         Q     Okay.

13         A     -- understand.

14         Q     Is there a written capital expense policy?

15         A     Yes.

16         Q     Okay.  Who would have that policy?

17         A     Lorraine Taylor.

18         Q     When is the last time that policy was

19    changed?

20         A     I'm not sure.  Years ago.

21         Q     Okay.  So it hasn't been changed since

22    Mr. Waldrop's termination?

23         A     Oh, no.

24               MR. HENRY:  We can go off for just a second.

25               (Whereupon, a recess was taken from 12:21

88

1        p.m. until 12:57 p.m.)

2   BY MR. HENRY:

3        Q    I think we're getting closer to being done.

4   There are a few other things that I want to talk

5   about, but a couple of things I wanted to go back to

6   just to be sure.  You had testified earlier that Diana

7   Wilks heads up skilled nursing; is that correct?

8        A    That's correct.

9        Q    What is her actual title or was her actual

10  title at the time?

11       A    She changed titles in April.  I don't know

12  the exact title she was on that exact date.

13       Q    Okay.  Well, let's do it this way.  What did

14  she change titles from and to during that timeframe?

15       A    Senior vice president of skilled nursing

16  services I believe.

17       Q    Okay.  And that title changed at some point

18  to something else?

19       A    From.

20       Q    Did it change from senior vice president of

21  skilled nursing services to something else or did it

22  change from something else to senior vice president of

23  skilled nursing services?

24       A    Both.

25       Q    Both.  Okay.

89

1     A     That's why -- both things occurred.

2     Q     Okay.

3     A     She's been with our organization more than a

4 little while.

5     Q     All right.  Heads up skilled nursing I think

6 is probably the best way to put that, that that's her

7 title.  Okay.  Let's go back through on some other

8 things.  Well, let's go back to exhibit five.  Yes,

9 exhibit five.

10    A     Okay.

11    Q     We had talked about the Workday program.

12 Are you familiar with a program called Selectica?

13    A     Yes.

14    Q     What is Selectica?

15    A     Selectica is a contract management software.

16    Q     Okay.  And how is it different from Workday?

17    A     It specifically addresses contracts and

18 actually provides for recording contracts in digital

19 form and tracks the dates, times, everything that's

20 touched on that contract --

21    Q     Okay.

22    A     -- and then provides an opportunity for

23 renewals, gives notifications for renewals, et cetera.

24 So it's a different kind of software than Workday.

25    Q     All right.  Are there varying levels of

90

1    access to Selectica?

2         A    I don't know.

3         Q    Do you have any limitations on your access

4    to contracts under Selectica?

5         A    I don't have any access to Selectica.

6         Q    Okay.  Is there a policy at Community Health

7    Systems as to what contracts are supposed to be

8    entered into the Selectica program or is it every

9    contract or --

10        A    As far as I know, every contract.  Again, I

11   don't manage Selectica or the contracting process.

12   I'm not dealing with that level of detail.  I'm sorry.

13        Q    Oh, no, that's fine.  That's fine.  Okay.

14   And you had indicated earlier that the board meetings

15   are recorded by Lorraine Taylor?

16        A    The minutes are reported by Lorraine Taylor.

17        Q    Is there anybody -- is there a stenographer

18   that attends the meetings?

19        A    On some board meetings, we contract with

20   Hazel.  I know -- I know Hazel.  I've known her -- I'm

21   under pressure and I can't remember her last name at

22   this second.  I know her as well as I know my mother.

23   I know the lady.  I can't remember.  But she does

24   record -- she does attend some meetings.

25        Q    Do you know if she attended the

1    November 2015 meeting?

2          A     I don't recall.

3          Q     Is she a court reporter?

4          A     She has done that in the past.  I'm not sure

5    if she's doing that today.

6          Q     Okay.  When we took a break, we were going

7    through exhibit five, the specific items.  And I think

8    we had covered Workday.  Let's flip to page two.  HHA

9    and hospice market information.  What is that exactly?

10         A     Home health agency and hospice market

11   information.  That stands for home health agency.

12         Q     Okay.  What was the issue there?

13         A     After budget -- conversations were had after

14   budget presentations were made.  Our home health and

15   hospice folks were going to prepare certain market

16   information and provide it for review.  And Mark let

17   me know in the meeting that he didn't give it to me

18   because we didn't -- we weren't in meeting and he was

19   just going to wait and bring it to me.  And I asked

20   him if he was going to send it by e-mail.  I mean,

21   it's a report.  It's data.

22         Q     All right.  Academic relations grants,

23   number five.  What's the issue there?

24         A     We're looking at -- our board's looking at

25   our investment in -- investments in general in our

92

1    foundation and we're looking to make investments in

2    key academic institutions to recruit nurses,

3    therapists, doctors, nurse practitioners, any number

4    of positions.  And it was just an item that had been

5    discussed on the phone call with Mark right before.

6    We were just confirming that -- this was me confirming

7    that we both know where we are.

8         Q    Is that a common practice, for Community

9    Health Systems to recruit from colleges?

10        A    Sure.

11        Q    Have you ever recruited from Southern

12   Adventist University?

13        A    I'm sure we have, yes, for 20 or 30 years.

14        Q    You're aware, aren't you, that one of the

15   things that was cited as a reason for Mr. Waldrop's

16   termination was that he was on the faculty at Southern

17   Adventist University?  Are you aware of that?

18        A    I'm aware of that.

19        Q    Were you aware at any time prior to

20   June 28th, 2016, that Mr. Waldrop was serving as a

21   professor at Southern Adventist University?

22        A    I was.

23        Q    When did you first become aware of that?

24        A    I helped him become the interim instructor

25   up there probably in the '90s.

93

1      Q      Okay.

2      A      Clay, Ralph -- he succeeded a series of

3  people from the '80s when we began providing a staff

4  member on our organization as a staff member to

5  provide a program -- a summer intern program where

6  they would come in, our associate employee would

7  teach, lead a two-week class usually in June from what

8  I recall.  It was in the morning from 9:00 to 12:00,

9  has been for about 30 years.

10             And we provided the instruction and then the

11  students would do internships in our buildings, our

12  being Community Health Service buildings, in

13  anticipation of trying to identify recruits and hire

14  them.

15     Q      Okay.  Well -- and we're jumping ahead a

16  little bit, but I want to stay on this topic.  Is it

17  your testimony that you've known for quite some time

18  that Mr. Waldrop was serving in a professor role at

19  Southern Adventist University?

20     A      No.  That's not what I'm testifying to.

21     Q      Okay.  So your testimony is there was a more

22  limited kind of summer program that Mark was involved

23  in that you were aware of?

24     A      That our organization was involved in, that

25  we supported --

94

1      Q    Okay.

2      A    -- where we provided the leadership at no

3  cost to the university.

4      Q    Okay.  Well, we'll come back to that a

5  little later.  All right.  Let's look at Brogdon

6  homes.  A lot of this stuff I know is probably sort of

7  standard.  But what was the issue that you discussed

8  with Mark with regard to Brogdon homes?

9      A    I basically updated him on our phone call of

10 where we were with them in the process.  I had met

11 with them like a week before when he was on leave.

12     Q    Okay.  Is that something that you were

13 primarily handling, the issues with Brogdon?

14     A    Is what something?

15     Q    The Brogdon homes issue.

16     A    Yes.  That's a project that -- that I was

17 leading.

18     Q    All right.  Navicent.  You mentioned

19 Navicent before today.  What is Navicent?

20     A    Navicent is a health system located in

21 Macon, Georgia.

22     Q    Okay.  And what kind of dealings was

23 Community Health Systems having with Navicent at the

24 time you had your call with Mr. Waldrop?

25     A    At that time, it was just part of an ongoing

1   discussion that we've had with them for years about

2   how we might work together.  We actually have a joint

3   venture with them on EMS and had expanded the

4   discussion as we were looking at skilled nursing.

5   They have a skilled nursing post-acute liaison that we

6   work with and we're discussing how we might work

7   together.

8        Q    Okay.  Was that something that was primarily

9   your responsibility or Mr. Waldrop's responsibility?

10       A    It was my responsibility.

11       Q    Okay.

12       A    I was just informing him of what we were

13   doing.

14       Q    Item C under number seven indicates that MW,

15   which is Mark Waldrop, had no additional guidance on

16   how to proceed.  Is it your recollection that

17   Mr. Waldrop had a particular issue with the way you

18   characterized item C?

19       A    On the phone conversation?

20       Q    No, no, no.  In the days to follow.

21       A    In the days to follow, yes.  At the time of

22   the call, no.

23       Q    Okay.  What were Mr. Waldrop's concerns

24   regarding item C in the days to follow?

25       A    In the days to follow -- this was on

96

1    Thursday.  On Friday in the phone call he had with me,

2    it is that someone looking at this comment four months

3    down the road or some period of time would feel

4    like -- might feel like that he was not doing -- that

5    he had not done his job.

6         Q    Is that how you intended that?

7         A    No, that is not how I intended that.

8         Q    How did you intend it?

9         A    Exactly as I told him, that I was updating

10   him and were we having -- were we creating problems

11   for anyone with what he was doing, did he offer us any

12   guidance so as not to interfere with the things that

13   he was doing.

14        Q    Okay.  What was -- what were his

15   responsibilities with regard to Navicent?  Let me

16   rephrase that so the record's clear.  What were

17   Mr. Waldrop's responsibilities with regard to

18   Navicent?

19        A    Mr. Waldrop had responsibility for

20   supporting Diana Wilks who was one of the persons --

21   we operate skilled nursing facilities in central

22   Georgia and so they are having -- they, Diana Wilks,

23   is having conversations with Navicent regarding

24   operations.

25             I, along with Hunter Hearst, am having

97

1    conversations with Navicent regarding EMS, post-acute

2    care, rehab hospital, a number of business issues.

3        Q    Okay.

4        A    So we're both working with similar -- some

5    of the same people on different subjects.

6        Q    FSLA which may should be FLSA?

7        A    It probably could be typed better FLSA, Fair

8    Labor Standards Act.  And that was just a quick ask.

9    I'm meeting with the board on the Tuesday following

10   this conversation.  Is there anything that I need to

11   know?  What's the impact on our organization?  Really

12   just give me a number.  Tell me have we looked at it.

13           We know right then there had just been a

14   recent announcement on FLSA that was changing.  The

15   rules were changing.  I'm meeting with the board on

16   Tuesday; is there anything I need to know before I

17   walk into the board meeting.

18       Q    All right.  So you've testified earlier that

19   you view the change in your relationship with

20   Mr. Waldrop as having come about the day after you

21   sent this e-mail.  Is that fair?

22       A    I believe Mark's relationship with me

23   changed -- his relationship with me changed on Friday

24   morning following me sending this e-mail.

25       Q    Okay.  Tell me why you believe that.

1    A    He -- he said the e-mail was full of lies
2    and I was targeting him to be terminated.
3    Q    Okay.
4    A    That's a pretty clear -- I mean, this is a
5    normal followup on a phone call to make sure I'm
6    squared away before I walk into a board meeting and I
7    go from there to being accused of lying and trying to
8    terminate him and that's a change in relationship.
9    Q    Going back to exhibit five, the first page,
10   the very first sentence:  I had a phone message from
11   Tracie Clark regarding the VEBA meeting and I returned
12   her call after 4:00 p.m. today.  She was very
13   confused.  After speaking with her, I felt it best to
14   provide you followup notes from our call today to help
15   us stay on the same page.
16        What was it about your call with Ms. Clark
17   that made you feel you had to send this e-mail?
18   A    To do exactly what I stated, to make sure we
19   stay on the same page.  Mark and I had had a long
20   phone conversation in the middle of the afternoon and
21   right before I was getting ready to leave work, I got
22   a phone call from Tracie who was distraught, if I can
23   describe it any other way, that she was having to lead
24   the VEBA trustees meeting and she didn't know how to
25   do it and she was upset, which is exactly what I --

99

1   and she was confused in my opinion.  I tried to say

2   she was upset.  She was confused.  She thought she was

3   supposed to lead it and obviously I had a different

4   opinion.

5        Q    Well, I guess, what I'm wondering about is

6   it appears from this e-mail that the only issue of

7   these eight that she had any involvement with at all

8   would have been the VEBA contracts, number two; is

9   that correct?

10       A    That's true.

11       Q    So why would you need to send an e-mail

12  addressing seven other topics because of her call?

13       A    Because it was apparent from her call, as

14  upset as she was, that -- and I had just finished a

15  conversation with Mark that I was using as a

16  foundation with my presentation to the board.  I'm

17  saying let's confirm what I just said.  Let me know if

18  where we are is where we are.  Because I'm about to

19  walk into a board meeting a couple days later with

20  this.  This is what I'm armed with.  This is what I

21  know.

22       Q    Okay.

23       A    Let's confirm it.

24       Q    Was it your intent to share this e-mail with

25  the board?

1      A     No.

2      Q     Okay.

3      A     Heavens, no.

4      Q     Were you surprised that Mr. Waldrop reacted

5  the way did he to exhibit five?

6      A     Yes, I was.

7      Q     Was there a break-in at Mr. Waldrop's office

8  in Dalton around this time period?

9      A     He reported there was a break-in the

10  Saturday after this.  This was Thursday e-mail, Friday

11  conversation, Saturday he reported a break-in at his

12  office.

13      Q     Okay.  How did you first learn of the

14  break-in?

15      A     Voicemail, e-mail, text message, something.

16  Something that was sent that said there had been a

17  break-in.

18      Q     Was that from Mr. Waldrop?

19      A     You know, I don't recall.  I haven't looked

20  at it, so I didn't -- it's not something I looked at.

21      Q     All right.

22            (Plaintiff's Exhibit 6 was marked for

23        identification.)

24  BY MR. HENRY:

25      Q     Before we get to exhibit six, did you have

1   any involvement in the investigation of the break-in

2   or any followup on the break-in?

3        A    Of the Dalton office?

4        Q    Yes.  I'm sorry.

5        A    No.  I had no involvement in it at all.

6        Q    Okay.  So you just -- well, did you discuss

7   it with Mr. Waldrop?

8        A    Yes.  I spoke with him via phone.

9        Q    And that was the extent of your involvement?

10       A    That's all, yes.

11       Q    Do you know if they ever -- they being law

12  enforcement -- ever discovered or found out who broke

13  in?

14       A    No, I do not.

15       Q    All right.  Let's look at exhibit six.

16  Mr. Rollins, you're looking at exhibit six.  It

17  appears to be a letter from you to Mr. Waldrop.  Do

18  you recall exhibit six?

19       A    Yes, I do.

20       Q    And that's your signature on the last page?

21       A    Yes, it is.

22       Q    Okay.  What are you attempting to do here in

23  exhibit six?

24       A    A couple of things.  One, let Mark know that

25  his behavior on the phone in calling an associate a

102

1    liar and telling them that they're targeting them for
2    firing is just inappropriate conduct.  I tried to
3    explain my actions and I was looking to have some type
4    of personal conversation.  I was seeking to have a
5    personal conversation where we could discuss what was
6    obviously going on with him, why he felt the way he
7    felt.  I was seeking for the two of us to have a
8    conversation.

9        Q    Well, at one point in here, you mention
10   something about an apology.

11       A    Oh, I probably asked for an apology from him
12   as well, I think, for calling -- for saying
13   essentially I'm a liar.  That's inappropriate for
14   anyone.  You just shouldn't do that, certainly not
15   someone that you've worked with for 25 years.  That's
16   just inappropriate behavior.  I'm sorry.

17       Q    Did he ever apologize?

18       A    No, sir.

19       Q    Did Mr. Waldrop ever respond to exhibit six?

20       A    No, sir.  I don't have any record of him
21   responding to this exhibit.

22       Q    Okay.  Is it your testimony that at no time
23   were you targeting Mr. Waldrop?

24       A    Yes, it's my testimony that at no time was I
25   targeting Mr. Waldrop.

1      Q    Okay.  Even after the events on May 13th,
2  that call and your letter, even after that?
3      A    Even after the events, all that had gone on
4  up to and including this letter, I was not targeting
5  Mr. Waldrop.
6      Q    Did you share this letter with anyone other
7  than Mr. Waldrop at the time?
8      A    No.  I did not share this letter with
9  anyone.
10     Q    Did you share this letter with Mr. Lange or
11 Mr. Wall when they interviewed you about Mr. Waldrop's
12 complaints?
13     A    Yes.  I did.  I shared the letter with
14 Mr. Wall after he called me, after he had spoken with
15 Mr. Waldrop.
16     Q    When did Mr. Waldrop -- strike that.  When
17 did you learn that Mr. Waldrop had contacted Mr. Wall
18 about you?
19     A    A couple of days after his contact.
20     Q    A couple of days after --
21     A    Mr. Waldrop contacted Mr. Wall.
22     Q    Okay.  In the context of exhibit six, which
23 is dated May 15th, how long after that?  And I
24 understand it's not going to be precise, but --
25     A    This was on a Sunday.  I wrote the letter on

1    Sunday.  I sent it first thing Monday morning.  The

2    board met on Tuesday.  So within a couple of days

3    after that, Joe called me.

4        Q    Okay.

5        A    So later in the week of May the 16th, within

6    Thursday or Friday of that week.  I don't know.

7        Q    And what did Mr. Wall tell you when he

8    called you?

9        A    He told me that -- Mr. Wall told me that he

10   needed for me to come to his office.  He needed to

11   speak with me.

12       Q    Okay.  And I'm assuming you did that.

13       A    Yes, I did.  I went to his office.

14       Q    How long after his call did you go?

15       A    I got the phone call.  I was out in west

16   Macon.  Within 30 minutes or an hour.  I was headed

17   back after a meeting.

18       Q    Okay.  So immediately?

19       A    Soon after, yeah.

20       Q    Practically immediately?

21       A    As soon after as I could, I went to his

22   office.

23       Q    And what did you discuss?

24       A    I discussed Joe Wall's conversation with

25   Mark Waldrop.

1      Q     And what did he tell you about that

2   conversation?

3      A     He told me that he'd had a conversation with

4   Mr. Waldrop and during the course of it, he had

5   accused me of lying in e-mails and targeting him, that

6   I was going to terminate him, to fire him.

7      Q     Do you believe Mr. Wall took Mr. Waldrop's

8   accusation seriously?

9      A     I do believe Mr. Wall took it very

10  seriously.  Yes, I'm confident he did.

11     Q     So other than Mr. Wall relating to you what

12  Mr. Waldrop had told him, what else did you discuss?

13  How did the conversation go?

14     A     That's what we -- our entire conversation

15  surrounded this matter.  That was it.

16     Q     Did he ask you to make a response of any

17  kind?

18     A     To make a response?

19     Q     To what Mr. Waldrop had told him, get your

20  view of it, an explanation?  Did he just tell you --

21     A     Not at that -- he told me at that moment --

22  he informed me what was going on.  I'm trying to

23  remember did he ask me or ask me to come back when he

24  did his second interview with me.

25     Q     And that's exactly what I'm asking.  I

1   didn't know if it happened in the first one.  I knew

2   there were two.  I didn't know if it happened in the

3   first or second.

4        A    Mainly I was -- I was kind of -- well, I was

5   very surprised to hear what I heard.

6        Q    Well, you knew that Mr. Waldrop had accused

7   you of lying and of targeting him already; right?

8        A    Yes.  But it was -- it was more than that.

9        Q    He accused you of more than that?

10       A    We discussed more than that.

11       Q    You and Mr. Wall did?

12       A    Mr. Wall and I did.  We discussed other

13  issues that Mr. Waldrop had brought up beyond that to

14  me, regarding me.

15       Q    And what were those additional issues?

16       A    I was angry.  I was irrational.  I was

17  essentially unfit to be a leader of the organization

18  and that I was -- you can -- I don't know how I would

19  characterize it.  I hadn't thought about it in

20  context, but along that line.  I'll just leave it at

21  that.  That will give you a good enough flavor I

22  think.

23       Q    And these are things that Mr. Wall said that

24  Mr. Waldrop told him?

25       A    Yes, he shared with him regarding my

1    conduct, regarding my personal conduct as an officer

2    of the organization, that, in effect, my conduct as an

3    officer was inappropriate in addition to -- including

4    lying in e-mails and targeting him for termination.

5         Q    Did Mr. Wall tell you whether Mr. Waldrop

6    had given any specific instances of you being

7    irrational or unfit to be a leader?

8         A    He indicated that, but he didn't -- he did

9    not share those with me.

10        Q    Okay.

11        A    Not at that time.

12        Q    And what did he ask you to do after that

13   first meeting?

14        A    He asked me to go -- well, I asked if I was

15   being suspended or in any way my employment -- was I

16   under any type -- was my employment under any type of

17   conditional limits.

18        Q    Okay.

19        A    Effectively, am I acting as president of the

20   company or not.

21        Q    Okay.  And what did he say?

22        A    He told me at this time that I would be

23   still -- that Mark was still working in his capacity

24   and I was still working in my capacity and that that's

25   where I stood.

1      Q    Okay.  Did you discuss anything else?

2      A    That we would try to get together.  He was

3  going to try to facilitate a mediation conference,

4  that that's what he felt like we ought to do.

5      Q    Did he tell you who would be attending the

6  mediation conference?

7      A    He didn't tell me, but I assumed Mark and

8  Joe and myself.

9      Q    Okay.

10      A    He was going to be the mediator I assumed to

11  try to have a discussion is what I assumed.  Rightly

12  or wrongly, I assumed that.  He didn't state that

13  explicitly.

14      Q    Did you ever have any mediation conference

15  after this initial meeting?

16      A    Yes.

17      Q    With whom?

18      A    With Mark Waldrop, Joe Wall and myself.

19      Q    Oh.  So the three of y'all met?

20      A    Yes.

21      Q    When was that?

22      A    About a week later.

23      Q    Okay.

24      A    I don't know the exact date.

25      Q    Within a relatively short period of time?

1     A     Yeah.

2     Q     And what happened at that meeting?

3     A     We had a conversation and we discussed this

4  matter, my relationship with Mark, at length,

5  including the e-mail that I had written.  Mostly the

6  e-mail that I had written as a matter of fact as I

7  think back on it.

8              (Plaintiff's Exhibit 7 was marked for

9         identification.)

10 BY MR. HENRY:

11    Q     Okay.  Let me show you another document,

12 exhibit seven.

13            MR. HENRY:  I know I've got copies.  I just

14       don't know if I've got them here or -- oh,

15       they're in here.

16            MR. DANIEL:  Thank you.

17            MR. HENRY:  Uh-huh.

18 BY MR. HENRY:

19    Q     Exhibit seven which you're holding, have you

20 seen exhibit seven before?

21    A     Yes, I have.

22    Q     Okay.  It appears to be an e-mail from

23 Mr. Waldrop responding to your e-mail of May 12th;

24 correct?

25    A     I believe so.

1     Q    All right.  Was exhibit seven discussed in

2  your -- I'll just call it a mediation conference.  Was

3  exhibit seven discussed in your mediation conference

4  with Mr. Waldrop and Mr. Wall?

5     A    This is exactly what I was referring to was

6  discussed in our mediation conference.

7     Q    Okay.  Well, if you would, just walk me

8  through that discussion, the mediation conference.

9     A    We discussed most of the items here, at

10  least the first -- most of it surrounded EHR.

11     Q    Okay.

12     A    And there was -- Mark presented and read to

13  Joe what he had responded.

14     Q    And how did Mr. Wall react to --

15     A    He listened intently.

16     Q    Do you believe he took it seriously?

17     A    Absolutely he took it seriously.  I know

18  that for a fact.

19     Q    So you went through each of the items in

20  exhibit seven?

21     A    Most of them.

22     Q    Most of them?

23     A    Yeah.

24     Q    Did you discuss item two, do you recall,

25  which is the VEBA contracts?

1     A    Yes.

2     Q    Okay.

3     A    Yes.

4     Q    And did you discuss item seven, Navicent?

5     A    Yes.  Well, I don't recall if Navicent was

6  discussed or not.  I know the -- I don't recall the

7  last part, if Navicent was or not.

8     Q    Okay.  So after you discussed what you

9  discussed under exhibit seven, what was the

10  resolution?  What was the final result of those

11  discussions?

12     A    Mark and I were both dismissed.  Actually,

13  Mark left first I believe and then I asked again am I

14  suspended or do I need to respond to this.  Because I

15  learned of this at the time.  What do I need -- what

16  do you want me to do now.

17     Q    Okay.

18     A    And Joe told me he wanted to think about it.

19     Q    All right.  You said something there.  I

20  just want to be sure I understand.  This e-mail,

21  exhibit seven, appears to have been sent on May 20th

22  at 11:46 p.m.  When was your mediation conference with

23  Mr. Wall in relation to sending this e-mail?

24     A    I don't know.  I saw this e-mail at the

25  conference with Joe Wall.

1     Q    Okay.  Did you see it before that?

2     A    I don't recall seeing it.  That was the

3   first time that I recall seeing it.

4     Q    Okay.  So you have your mediation

5   conference.  What happened next with regard to these

6   issues?

7     A    A couple of days later, Joe -- I don't know

8   if he called me or came to see me.

9     Q    Okay.

10    A    But he -- he essentially said it doesn't

11  appear to be resolved; what do you think.  And I told

12  him at the time I just want my name cleared.  If y'all

13  need -- I don't see any other way other than doing an

14  investigation.  Y'all can investigate and do whatever

15  you want to do and I'll live with the results, but I

16  need my name cleared.

17    Q    Did Mr. Wall indicate that he had spoken to

18  Mr. Waldrop about it?

19    A    He didn't and I didn't ask.

20    Q    So you told Mr. Wall you wanted your name

21  cleared and that the board needed to do an

22  investigation?

23    A    Well, I didn't say the board.  I told

24  Mr. Wall that I wanted my name cleared and there

25  needed to be an investigation I believed.

1    Q    Okay.  So when's the next time you had any

2    communications about these issues after that?

3    A    I was notified -- I don't recall the

4    specifics -- that Mark Lange would be interviewing me.

5    Q    Okay.  Mark Lange is an attorney with

6    Holland and Knight; right?

7    A    Mark Lange is an attorney, yes.

8    Q    Okay.  But at that time, I believe he may

9    have been with a different firm.  Maybe I'm wrong

10   about that.

11   A    No.  No, he's been here.

12   Q    Where did that meeting take place?

13   A    He interviewed me -- we talked about doing

14   it here, but I actually interviewed -- he came to see

15   me in Macon because I was busy on stuff.  So he

16   actually came to see me and interviewed me in Macon.

17   Q    Okay.  Had there ever been any other

18   investigations by Community Health Systems with regard

19   to issues similar to this in the past?

20   A    Sure.  I think that's routine.

21   Q    Okay.  How often was Mr. Lange or an

22   attorney involved in those investigations?

23   A    I don't know.  I didn't coordinate them.

24   But I know that our labor attorney, Jonathan --

25   whatever his name is -- is in frequently.  He works

**114**

1    all the time.  I know him by name.  I don't ever see

2    it, but I know he worked primarily with Mark and the

3    operations folks handling investigations because

4    that's just the way we handle it.

5          Q    Was it surprising to you that Mr. Lange was

6    going to be interviewing you as opposed to Mr. Wall or

7    someone else from the board?

8          A    No.  Actually, I wasn't surprised by that at

9    all.

10          Q    And please go through that investigation --

11    that interview and describe what was discussed there.

12          A    It was a facts-and-circumstances

13    interrogation.

14          Q    Okay.

15          A    He asked me a lot of questions about my

16    e-mail and my -- me personally, my conduct, all the

17    issues that had been apparently brought up to

18    Mr. Wall.  He asked me about my relationship with Mark

19    Waldrop.  He asked me about everything that was going

20    on at the company, what was going on.  He asked me --

21    it was a lengthy process of -- it felt very much

22    like -- like this deposition.

23          Q    Hopefully he did a better job asking

24    questions.  Strike that.  Did you look at the same

25    documents that you looked at with Mr. Wall, exhibit

1  seven?

2      A    Yeah.  There were -- I mean, yeah, the

3  e-mails, the response and my letter.  Those -- that's

4  what we looked at.

5      Q    Did -- do you know if Mr. Lange ever spoke

6  to Mr. Waldrop about these issues?

7      A    I am aware after the fact that he did.  I

8  assumed that's what he was doing.  I don't know if

9  they looked at these documents or not.  I don't know

10 what they talked about.

11     Q    Okay.  I know we've -- I know the dates are

12 not exact, but we're getting into a time period where

13 at least a general idea of the timing is important.

14 How long after exhibit seven would you say you were

15 interviewed by Mr. Lange?

16     A    After exhibit seven?

17     Q    May 20th.

18     A    Oh.  It would have been probably sometime

19 late that following week, sometime the week -- it

20 would have been late -- it was probably the 25th, 6th,

21 7th, 8th.

22     Q    Okay.

23     A    Somewhere out there.  Late in the month.

24     Q    In either Mr. Lange's interview with you or

25 the mediation conference with Mr. Wall and

1   Mr. Waldrop, was there ever any indication made that

2   the board was investigating Mr. Waldrop's actions?

3        A    No.

4        Q    Okay.  So did Mr. Lange request that you do

5   anything after his interview?

6        A    No, he didn't.

7        Q    Was anybody taking notes during the

8   interview?

9        A    He took notes.

10       Q    Have you seen those notes?

11       A    No, I have not.

12       Q    After the interview with Mr. Lange, when was

13  the next time you had any discussions regarding these

14  issues?

15       A    I'm trying to think.  I had a followup -- he

16  asked me additional questions.

17       Q    He being Mr. Lange?

18       A    He being Mr. Lange asked me -- I had a

19  second conversation with him and he asked me some

20  specific questions.  I don't recall what they were.

21  But it was a brief conversation.

22       Q    How long after the initial interview did

23  that take place?

24       A    It was within a week after his initial

25  interview probably.

1     Q    Okay.  Did Mr. Lange take notes in that

2 second interview?

3     A    I don't recall.

4     Q    All right.  So you've had two interviews

5 with Mr. Lange.  You testified earlier that you had

6 two interviews or two discussions with Mr. Wall.

7     A    Yes.

8     Q    Was there another discussion with Mr. Wall

9 or are you counting the mediation conference as one?

10     A    That's -- that's the conference call.  The

11 mediation conversation is the second.

12     Q    Okay.  So no further conversation about this

13 with Mr. Wall?

14     A    No.

15     Q    Okay.  Earlier in the deposition you

16 testified about attending a board meeting where the

17 results of this investigation were told to you.

18     A    Yes.

19     Q    Was that the first time you learned that the

20 board was conducting an investigation of Mr. Waldrop

21 as well?

22     A    No.  I had heard -- I had heard an inkling.

23 I'm not sure how I became aware.  But I know when the

24 meeting was called, it became -- I'm not sure if they

25 sent me -- if Joe sent an e-mail, but at that point in

1  time, I was aware they were -- the meeting was going

2  to be a discussion of me and Mark Waldrop, that it

3  wasn't just me.

4       Q    Okay.

5       A    I don't know what that meant, but I knew

6  that both of us were being discussed, that it wasn't

7  just me.

8       Q    At that meeting, was Ms. Taylor, Lorraine

9  Taylor, present?

10      A    You know, I was so focused on me and the

11 fact of what I had been accused of and not knowing if

12 I'm about to be fired, I --

13      Q    I understand.  If you don't remember --

14      A    I don't recall exactly who was in there.

15      Q    I'm sure your answer will be the same, but

16 one last question.  And I understand what you're

17 saying.  Was the stenographer/court reporter, Hazel,

18 was she there at this meeting?

19      A    She was at the meeting and she was excused

20 because Mark Lange was there.

21      Q    Okay.

22      A    That's -- that's -- and I'm not sure who all

23 left.  There were more people in the room.  The

24 stenographer left and I was kind of left with an

25 attorney and a board.

1    Q    So what did they tell you about their

2  investigation into the issues, exhibit seven, at that

3  meeting?

4    A    They actually didn't -- Joe Wall gave a

5  report to the board of his work and asked Mark Lange

6  to add anything in addition he wanted to say regarding

7  his work.

8         But, essentially, Joe reported on a -- on an

9  investigation that he had worked on in conjunction

10  with or supported by Mark Lange or something and that

11  he needed -- there were serious issues that he needed

12  to share with the board and that -- something along

13  the line of he was -- it was difficult to have the

14  conversation.  He didn't want to have this

15  conversation.  He didn't want to do the investigation.

16  It was a somber meeting.

17    Q    Okay.

18    A    And then he shared with them that Mark had

19  made accusations against me and described the May 12th

20  e-mail and the conversations he'd had with us.

21  Essentially, he said everything that he had done

22  through the meetings with me and with Mark and his

23  work, his discussions with Mark Lange and -- and he

24  described what they had uncovered.

25    Q    With regard to Mr. Waldrop?

1      A      Yes.  In addition while investigating me,

2  they had learned the information about Mr. Waldrop,

3  that he had stolen money and violated the trust with

4  them and the organization and that our organization

5  was facing the most serious event in its history and

6  it was -- it was -- it was sad.

7              And I -- I asked what about the charges on

8  me.  Because that's what I was most concerned with and

9  I had to ask.  And I asked for a vote.  I wanted to

10  see a vote on me and my conduct and my career.

11      Q      And was a vote taken?

12      A      A vote was taken and I was -- the charges

13  were deemed to be unfounded.

14      Q      Was it a unanimous vote?

15      A      Yes, it was a unanimous vote.

16      Q      Okay.  Was there any kind of vote taken with

17  regard to Mr. Waldrop and the investigation into his

18  activities?

19      A      I'm a little fuzzy on that part, but I know

20  they had to.  I was somewhere between breathing a sigh

21  of relief and crying.  But they felt like the

22  actions -- and I didn't -- I don't remember all the

23  specifics of what was said.  It was stealing money

24  and -- and that made me sick.

25              And they determined -- they said, well, this

1    is -- this is something we can't tolerate.  This is

2    going to be -- we've got to figure out essentially how

3    to have Mr. Waldrop exit the -- he couldn't stay there

4    any longer.  There's no way to -- Mark Lange brought

5    up the contract issue, that he had a contract.  I

6    think it was Mark that brought that up.  And he said

7    the acts were so egregious, it couldn't be cured.

8              And the board decided, well, we need to try

9    to resolve it.  Everybody's hurt and someone who's

10   been -- that I've supported to the board for years as

11   my successor is essentially stealing money and

12   everything -- all the trust the board put into him, it

13   was left up to Joe -- what I recall in the end was Joe

14   was to work with Mark to come up with a separation

15   arrangement for Mark Waldrop so that he could quietly

16   exit the organization.

17        Q    So it's your -- it's your recollection that

18   the contract was discussed during that meeting?

19        A    No.  It wasn't discussed.

20        Q    It was brought up?

21        A    It was brought up.  Mark mentioned it.  And

22   what happened, they were aware there was one, but it

23   was -- my recollection is the conduct was so bad, the

24   stealing, I think everybody was so hurt -- I was; I

25   was personally hurt -- that I think the issue was

**122**

1    we've been harmed in a way that this can't be fixed.

2    We can't mediate.  We can't come together.  We

3    can't -- he's got to go.

4              And from that standpoint, I think the board

5    just turned it over to Joe as chairman -- he had done

6    the investigation -- to work with legal counsel and

7    work it out.

8         Q    Okay.  Did you have any conversations with

9    Mr. Waldrop after that board meeting?

10        A    I don't believe so.  I don't believe I had

11   any conversations after that, no.

12        Q    Are you aware that on June 28th, Mr. Lange

13   and Mr. Wall met with Mr. Waldrop and terminated his

14   employment?

15        A    I am aware that Mr. Wall and Mr. Lange met

16   with Mark on the 28th here in these offices in

17   Atlanta, Holland and Knight.

18        Q    Okay.  Do you know what was discussed during

19   that meeting?

20        A    I do not.

21        Q    Okay.

22        A    I was not there.

23        Q    How did you find out about the meeting?

24        A    Joe Wall.  I learned that it was being

25   scheduled.  They notified me that they were

1    scheduling -- they notified, I guess, all of us board

2    members, Joe did, to keep us apprized of it, that they

3    were having a meeting, that they had scheduled it and

4    they were going to have a meeting.

5         Q    How -- that brings me to a point I meant to

6    ask about earlier.  How were meeting agendas -- well,

7    strike that.  Are you provided regular agendas for the

8    board meetings beforehand?

9         A    Actually, on regular board meetings, me,

10   along with -- I along with Lorraine Taylor prepare the

11   agendas, run them by, get them approved by Joe Wall,

12   and then they're distributed to the board.

13        Q    Okay.  How are they distributed?

14        A    Typically by e-mail or we just send a

15   notice.  Usually the agenda may not even be sent

16   there.  Or regular meetings via director's desk.

17             I can tell you that this instance was not

18   regular.  This was totally different for this

19   organization.  So I'm not sure what all they used.

20   This is an unprecedented event in our organization.

21        Q    Well, and I had asked typically.  I mean,

22   you told me typically.  Did Mr. Wall inform you by

23   e-mail that the meeting with Mr. Waldrop had been set

24   up or some other way?

25        A    I actually think he dropped by the office.

1   He periodically started checking to -- I didn't know

2   if he was checking on me or if I was being checked up

3   on, but I had been checked on periodically just to see

4   if I was there I think --

5       Q    Okay.

6       A    -- to see what I was doing.  So I don't -- I

7   don't know.  He may have just come by the office and

8   they let me know that Joe had come by and I wasn't

9   there.  Because that periodically happened.

10      Q    When he dropped by the office and told you

11  about the meeting, did he tell you what they were

12  going to do at the meeting?

13      A    I was aware they were going to work out a --

14  they were trying to have a -- work out a deal.  A

15  separation offer is what they were going to try to do.

16      Q    All right.  I'm going to show you a document

17  that you've probably seen before, number eight.

18          (Plaintiff's Exhibit 8 was marked for

19          identification.)

20  BY MR. HENRY:

21      Q    Mr. Rollins, you've got exhibit eight in

22  your hand.  I will represent to you that this document

23  has been filed in this litigation, that it is dated

24  July 1st, 2016.

25          MR. DANIEL:  Now, just to clarify the

1        question, you say it was filed in the litigation.

2        You mean it was attached to some pleading?

3              MR. HENRY:  Attached, yeah, I believe to our

4        complaint.

5              MR. DANIEL:  Okay.  It's not filed on its

6        own?

7              MR. HENRY:  Correct.  Correct.  Thank you.

8        Yes.  You're exactly right.

9   BY MR. HENRY:

10       Q    And I say that only to say you may have seen

11  it in that context.

12       A    Okay.

13       Q    Other than as an attachment to a lawsuit

14  paper, had you seen this document, exhibit eight,

15  previously?

16       A    Yes.

17       Q    Okay.  When did you first see this document?

18       A    Sometime after the 1st of July.  I guess it

19  was after the 4th of July holiday.

20       Q    Okay.  How did you come to receive this

21  document?

22       A    Joe Wall showed it to me.

23       Q    And what did he tell you about it?

24       A    He -- I'm not sure that he told me a lot

25  about it.  He actually just let me read it.

126

1      Q     Okay.

2      A     I'm not sure he told me a lot.

3      Q     And you did read it?

4      A     Yes, I did.

5      Q     And what was your reaction to it?

6      A     It was something along the line it looks

7    like he didn't take your offer.  It looks like your

8    deal you're working on didn't work so well or

9    something to that effect.

10      Q     Was there any indication in your

11    conversation with Mr. Wall when he showed this to you

12    about any other written communications from the

13    company to Mr. Waldrop?

14      A     No.

15      Q     Okay.

16      A     We didn't discuss that.

17      Q     Do you know if the company responded to

18    exhibit eight?

19      A     Yes.  I believe -- I believe we did.  I

20    think -- I'm pretty sure we did.  I've seen a lot of

21    stuff in here.  I think there is.  I'm at the point if

22    you want to pull out the next letter --

23      Q     That's right.  You read my mind.  Did you

24    play a role in the company's response to exhibit

25    eight?

1      A    I did not play a role in the --

2      Q    Response --

3      A    -- response to exhibit eight.

4           (Plaintiff's Exhibit 9 was marked for

5      identification.)

6  BY MR. HENRY:

7      Q    I show you exhibit nine which, actually,

8  this version has not been filed or attached to any

9  document in the litigation.

10          MR. DANIEL:  Just a matter of clarification.

11     I think it's possible the first page of exhibit

12     nine was attached to something.

13          MR. HENRY:  Yes.  It was.  The first page

14     was an exhibit to the complaint.  But the actual

15     separation agreement that's behind it was not

16     attached.

17          MR. DANIEL:  That's my understanding.

18  BY MR. HENRY:

19     Q    Have you seen exhibit nine in its entirety?

20     A    No, I've not.  I saw the letter.  I saw the

21  first page and I didn't read any more.

22     Q    Okay.  Let me see this one.  I may have

23  given you a highlighted version, which is fine.  Yes,

24  I did, but that's fine.  Let me show you page nine of

25  exhibit nine.  There's an entity name that's

1    highlighted there.

2              MR. HENRY:  It's not on your version, Hal.

3         I'm sorry.  I only highlighted one of them, but

4         it's there.

5    BY MR. HENRY:

6         Q    What is that entity, United Health Services,

7    Inc.?

8         A    What is it?

9         Q    Yes.

10        A    United Health?  I guess it's --

11        Q    Are you familiar?

12        A    No, sir.  I'm not familiar with it.

13        Q    You're not familiar with United Health

14   Services, Inc.?

15        A    No.

16        Q    Is it a competitor?

17        A    I'm not sure.  I don't know.

18        Q    Okay.

19        A    I mean, I haven't read this.  I don't know

20   who they are.  I'm just looking at it cold.

21        Q    I'm not asking you to identify them in the

22   context of the agreement.  I'm just wondering about

23   the name itself.

24        A    There's a lot of United stuff out there.  So

25   I don't recognize that.  I'm not sure why it would be

1   here.  So I'm not aware of it.

2        Q    All right.

3            MR. HENRY:  Let's take another break.  This

4        may be the last one.

5            MR. DANIEL:  Okay.

6            (Whereupon, a recess was taken from 2:02

7        p.m. until 2:19 p.m.)

8   BY MR. HENRY:

9        Q    I had asked you about that entity that's

10  highlighted.  Pruitt Corporation, are you familiar

11  with that?

12       A    I am familiar with Pruitt Corporation.

13       Q    Okay.  What is Pruitt Corporation?

14       A    Pruitt Corporation is a skilled nursing -- a

15  company about like Community Health Services.

16       Q    Okay.  A competitor?

17       A    I don't look at it that way.  I look at it

18  as another large entity that provides post-acute

19  services in the state of Georgia.

20       Q    Okay.  Integrated post-acute services?

21       A    There you go.  You were taking notes.

22       Q    I got it.

23       A    I'm not sure that's their name, though.

24       Q    I'm not sure either.  My understanding is

25  there may be a connection there and that's why I was

1   asking, but I could be totally wrong.  Okay.  Moving

2   on.  I won't say it's the last exhibit, but it could

3   very well be the last exhibit.

4           (Plaintiff's Exhibit 10 was marked for

5       identification.)

6   BY MR. HENRY:

7       Q    Mr. Rollins, you're looking at exhibit 10.

8   And I'll represent to you that exhibit 10 has been

9   attached to Community's counterclaim in this case and

10  you may have seen it in that context.  But other than

11  as a part of this lawsuit and something attached to

12  this lawsuit, had you seen exhibit 10 in another

13  context?

14      A    No.

15      Q    Okay.  Have you seen exhibit 10 before at

16  all?

17      A    I have seen it in the context of the

18  lawsuit.

19      Q    Did you play a role in the preparation of

20  exhibit 10?

21      A    No, I did not.

22      Q    Well, I want to -- even though you haven't

23  seen it, it's instructive for us to look at it because

24  it lists the -- well, I'll say that it's my

25  understanding the intent of exhibit 10 is to list the

1    reasons Mr. Waldrop was terminated.

2              I just want to ask you a few questions.

3    Number one on page two, if you'll just read that to

4    yourself and let me know when you're finished.

5              MR. DANIEL:  You're talking about the

6         subparagraph designated one?

7              MR. HENRY:  Yeah.  The one that starts you

8         submitted hundreds of thousands of dollars.

9              THE WITNESS:  Okay.

10   BY MR. HENRY:

11       Q    Was number one there a topic that was

12   discussed in the board meeting where you learned that

13   no further action was going to be taken against you

14   but that there was an investigation into Mr. Waldrop's

15   activities?

16       A    Yes.

17       Q    Okay.  And what was discussed about that at

18   the board meeting?

19       A    About as much as in that sentence, that

20   there was -- that the expense reports -- that Mark had

21   submitted the reimbursement under Stephanie Dotson's

22   name rather than his own to conceal from his

23   supervisor various expenditures.

24       Q    Do you have an assistant at Community Health

25   Services?

132

1      A      What kind of -- what are you talking about?

2      Q      A secretary.

3      A      A secretary?  No, I do not.

4      Q      Anybody who arranges for your travel

5   accommodations or travel arrangements?

6      A      No, I do not.

7      Q      Have you ever used Ms. Dotson for those

8   types of services?

9      A      I haven't used her, but I've had Mark offer

10  to have her make reservations, yes.

11     Q      Has she done that for you?

12     A      For me?  I don't think so for me.  I

13  think -- no, I don't think so.

14     Q      Okay.

15     A      I think I've paid for all of -- everything

16  I've done.  I'm not aware of it.

17     Q      All right.  Let's go to number two.  Go

18  ahead and read that one for me please.

19     A      Okay.

20     Q      Was the DeBrock Poodles mentioned in that

21  board meeting?

22     A      I don't know the name DeBrock Poodles.  I

23  don't know if it was mentioned or not.  Poodles --

24  poodles were -- poodles were mentioned.

25     Q      Okay.

1       A      I'm just not familiar with DeBrock Poodles.

2       Q      With the name DeBrock Poodles, but the breed

3   of dog, poodles, was mentioned?

4       A      (No verbal response.)

5       Q      Was that a yes?

6       A      Yes.  Poodles were mentioned in the meeting

7   that I attended.

8       Q      We've gotten this far and that's the first

9   time you've messed up.  So you've done great.  Well,

10  you didn't really mess up, but -- number three we

11  talked about briefly before, but if you would just

12  read that one and let me know if that was discussed in

13  the meeting.

14      A      Again, I don't know that serving as a

15  faculty member was discussed specifically.  Southern

16  College -- or, Southern Adventist University was

17  mentioned.

18      Q      Okay.  Number four, the same question, was

19  it mentioned in the board meeting, after you've had an

20  opportunity to read it?

21      A      I'm not sure if that was mentioned.

22      Q      Okay.  Was there a flood at the Dalton

23  office in 2014?

24      A      I believe there was.  I've been told there

25  was one, yes.

1     Q     Do you recall any conversations you had with
2  Mr. Waldrop about that?
3     A     He told me there was one, so that's how I
4  know.  I wouldn't know other than that.
5     Q     Okay.  Did Community Health Systems -- well,
6  let me back up.  You testified earlier that Community
7  Health Systems has grown substantially I think was
8  your word while you've been there.  How does Community
9  Health Systems grow?  Does it acquire new facilities?
10  Build new facilities?  Both?
11     A     We acquire, lease, build, in terms of
12  skilled nursing facilities.  And we just purchase
13  businesses in terms of -- and some we start just as a
14  new business venture, new idea.
15     Q     Did Community Health Systems build any new
16  facilities in 2014?
17     A     I'm sure we had construction going on then.
18  We've had construction going on regularly.
19     Q     Okay.  What about 2015?  The same answer?
20     A     Yes, sir.  We have -- we've had construction
21  going on -- we've had construction, development,
22  renovation projects going on for six, eight, 10 years.
23  A long time.  That's a routine part of our business.
24     Q     Has Community Health Systems ever suffered
25  damage, flood, fire, some other casualty, at any of

135

1   its other offices besides the Dalton office?

2       A    Its other offices?  I don't believe so.

3       Q    Okay.

4       A    I'm just trying to think.  I'm trying to

5   think back.  Not -- give me -- we've been around a

6   while, so just give me a moment to think about it.

7       Q    No, no, no.  Take all the time you need even

8   though the traffic is starting to -- no, take your

9   time.

10      A    We've had periodic things over the years.

11  But a catastrophic flood, I'm not aware that we've

12  ever had that before.

13      Q    Okay.  When there have been issues like

14  that, damage to offices or renovations or things of

15  that nature, how are those normally approved from an

16  expense perspective, a contract perspective?

17      A    How are they approved?

18      Q    Yeah.  Are they -- is it a

19  capital-expense-type procedure or is it something

20  else?

21      A    Oh, no, it was not a -- it would be a

22  capital expenditure.

23      Q    Okay.  When you discussed the flood with

24  Mr. Waldrop, do you recall telling him that he should

25  take care of it by using whomever he believed could

1   get it done quickly?

2       A    I believe I indicated something to that

3   equivalent after he described to me the nature of the

4   flood that had occurred.

5       Q    Did he tell you that Ms. Dotson's father was

6   a contractor and could do some of the work quickly?

7       A    No.  He did tell me Ms. Dotson's father was

8   a retired contractor --

9       Q    Okay.

10      A    -- and could help him, could advise him.

11      Q    What did you take that to mean?

12      A    He was retired and would drop by and chat

13  with Mark periodically.

14      Q    Okay.  We may have covered this previously

15  and forgive me if I'm repeating myself, but are

16  capital expenditures something that would be dealt

17  with within the Workday system?

18      A    I'm not sure what you mean, dealt with.

19      Q    Well, that's -- that's fair.  Submitted to

20  the Workday system for approval or for record keeping

21  purposes.

22      A    Invoices for the company's business would be

23  paid -- processed and paid through the Workday system.

24      Q    Okay.  So taking the flood damage for

25  example, would that be something that typically would

1   have been processed through Workday in the manner you

2   just described?

3       A    The bills would have been paid through

4   Workday.

5       Q    Okay.  Contracts for that type of work, the

6   flood damage, fixing it, would that have been

7   something that would typically be uploaded to the

8   Selectica system?

9       A    Yes, typically it would be.

10      Q    Does Community Health Systems have an IT

11  department or associate who monitors, updates and

12  handles these electronic systems, Workday and

13  Selectica?

14      A    No.  There's a team of folks that we

15  actually contract.  The vendors update.  So we don't

16  actually update things.  We don't do any updating, no.

17      Q    Okay.  So where is the Selectica and Workday

18  information stored physically?

19      A    It's physically in the cloud.

20      Q    It's out in the cloud?

21      A    It's out in the cloud as far as I know.

22      Q    Y'all don't have a private server or

23  anything?

24      A    No, it's not privately maintained.  No, we

25  don't have private servers.  It's in the cloud.

1  That's the beauty of having it.

2      Q    I need you to come talk to some of my

3  partners about the beauty of the cloud.  All right.

4  Who does your cloud hosting?

5      A    I don't know.

6      Q    All right.  Number five on exhibit 10, the

7  same series of questions.  So just take your time

8  reviewing it.

9      A    Okay.

10      Q    Okay.  The charter authorization process --

11  project charter authorization process, was that

12  discussed during the board meeting?

13      A    No.

14      Q    What is the project charter authorization

15  process?

16      A    It's a process management tool and function

17  that allows us to accumulate all the information

18  needed to make decisions by engaging the right people

19  at the right time to be involved in the decision,

20  moving forward through determination of the process to

21  be developed and subsequently receiving the approvals

22  of all those stakeholders in the final project.

23      Q    Are there written guidelines on when a

24  project charter authorization process is supposed to

25  be used?

1      A      Yes.

2      Q      When were those guidelines adopted?

3      A      2005, '6, '7.  Somewhere -- it's been a long

4  time ago, a decade ago.

5      Q      Who would have those guidelines at the

6  company?

7      A      Who would have them?

8      Q      Who maintains them?

9      A      They are electronic in format and Lorraine

10  Taylor has the repository for them.  So I would assume

11  she would be the best person to ask about them.

12      Q      Okay.

13      A      I don't know where they -- in the end, I

14  know where they land.  I don't know where they begin.

15  It's in the cloud.  That may be in the cloud.

16      Q      They go in the cloud and land in Lorraine

17  Taylor's purview.  Okay.  Have you ever used the

18  project charter authorization process?

19      A      Yes.

20      Q      Do you use it regularly?

21      A      No, because I don't -- I don't do things

22  that need project charters.

23      Q      Well, what kind of projects require project

24  charter authorizations?

25      A      Something that's not approved by the board

1    in advance.  The projects that I do are actually

2    usually approved in advance by the board.

3          Q    Are you aware of any projects that

4    Mr. Waldrop has been involved in that were not

5    approved by the board in advance?

6          A    Yes, I am.

7          Q    Okay.  Is it too many to list?  Is it a lot?

8          A    It's a few.

9          Q    Okay.  Can you list them?

10         A    I can list a couple of them that come to

11   mind.

12         Q    Okay.  Please do.

13         A    The acquisition of TCGRX machines in our

14   pharmacy.

15         Q    You're going to have to say that a little

16   slower.  What was that machine?

17         A    TCGRX.

18         Q    Is that an acronym for something?

19         A    Yes.  It's a -- you can look it up.  It is

20   an acronym.

21         Q    Is it the machine where you can -- it's

22   almost like a pharmaceutical vending machine?

23         A    Similar.

24         Q    Kind of?

25         A    Kind of.

1      Q     Okay.  So the TCGRX project.  Anything else?

2      A     LG -- LG ERH, electronic health record.

3      Q     Right.  That's one of the items we discussed

4  earlier.  Okay.

5      A     Those are two that come quickly to mind.

6      Q     Okay.  Did Mr. Waldrop obtain a project

7  charter authorization for those two projects?

8      A     No.

9      Q     Okay.  When did you become aware that those

10  two projects were occurring?

11      A     July of this year, 2016.

12      Q     Okay.  So after Mr. Waldrop's termination?

13      A     Yes.

14      Q     Have there been any changes since

15  Mr. Waldrop's termination as to expense

16  reimbursements?

17      A     No.

18      Q     Maybe the change -- a change that had been

19  adopted before his termination but did not take effect

20  until after his termination?

21      A     There's been an update.

22      Q     Okay.

23      A     But with regard to Mr. Waldrop, his haven't

24  changed at all.  His were approved by the board of

25  directors on the corporate guidelines and on his

1    employment agreement.

2         Q    What's the nature of the update as you --

3         A    The nature of the update is a general update

4    to how it processes, particularly within Workday.

5         Q    Okay.

6         A    How to utilize the system.

7         Q    Okay.

8         A    So it's a clarification.

9         Q    But what specifically was the change, the

10   update?

11        A    There are a number of changes and I'm not

12   the right person to ask about that.  I'm aware that

13   they're working on those.  But I actually didn't work

14   on them myself, so I don't know the specifics.

15        Q    Who did work on them?

16        A    Lorraine Taylor.

17        Q    Okay.

18        A    And Mark Waldrop.

19        Q    I'm sorry?

20        A    And Mark Waldrop.

21        Q    While he was employed there?

22        A    Yes.

23        Q    Mark Waldrop was the COO; right?

24        A    Mark Waldrop was the COO of CHS.

25        Q    Who is performing Mark Waldrop's job duties

143

1   right now?

2       A    No one is performing his job duties right

3   now.  They've been -- we had to rework our whole

4   organization chart we worked on for a year as a result

5   of this.  So there are a number of people performing

6   those duties.

7       Q    Performing the same duties that Mr. Waldrop

8   was performing?

9       A    Performing the duties that are required to

10  be performed in our health system.

11      Q    Okay.  Can you tell me some of those folks?

12      A    Sure.

13      Q    Okay.

14      A    Diana Wilks, Michelle Andrews, Charles

15  Briscoe, Robin Leake, Lorraine Taylor, Ronnie Rollins.

16      Q    Okay.

17      A    Is that enough or --

18      Q    Well, I don't know.  You tell me.  I mean,

19  is it more than that?

20      A    We actually had to rework our entire org

21  chart as a result of Mr. Waldrop's actions.  We took a

22  year's worth of work that had to be undone and redone.

23      Q    Do you actually have a physical organization

24  chart, a document?

25      A    Yes.  Absolutely.  Absolutely we have an org

144

1    chart.

2         MR. HENRY:  I'll tell you what.  Why don't

3    we -- I know we just took a break, but why don't

4    we take a brief one?  I'll talk with Mr. Waldrop

5    and see if there's anything we need to follow up

6    on.

7         MR. DANIEL:  Sure.  We'll leave the room and

8    let you do that.

9         (Whereupon, a recess was taken from 2:42

10   p.m. until 2:53 p.m.)

11   BY MR. HENRY:

12   Q    Mr. Rollins, that will be the last break.  I

13   just have a few more questions.  All right.  Are you

14   familiar with a construction company called Appling

15   Brothers?

16   A    Yes, I am.

17   Q    What is Appling Brothers?

18   A    Appling Brothers is a grading contractor

19   located in Jones County, Georgia.

20   Q    Are you related to anybody -- any owners of

21   Appling Brothers?

22   A    No.

23   Q    By marriage?

24   A    Yes.  My wife is the daughter of the owner

25   of Appling Brothers.

1    Q    Has Appling Brothers ever done any work for
2  Community Health Systems?
3    A    Yes.
4    Q    What work has Appling Brothers done?
5    A    They served as grading contractor on the
6  Zebulon Park project.
7    Q    Okay.  Would that project be a project that
8  would require a project authorization charter process?
9    A    No, sir.
10   Q    Why not?
11   A    Because that project was approved by the
12  board in advance of any project charter being used.
13   Q    Okay.  Would the invoices and items relating
14  to that project be processed through Workday?
15   A    I'm trying to think if Workday was in place
16  when that project was done.  It's been several years
17  ago.
18   Q    Okay.
19   A    The answer is if Workday was in place at
20  that time, if we were using it, they would have been
21  processed through Workday.
22   Q    Okay.  When was that project?
23   A    It was approved in I believe -- well, it was
24  first approved in 2006 maybe.
25   Q    Okay.

1      A    And then it was subsequently tabled and

2  reapproved around 2010.

3      Q    And when you say approved, you mean by the

4  board?

5      A    By the board of directors.

6      Q    Going back to these UPL payments briefly, I

7  know you said that Community does not expect to have

8  to refund any of those payments.  But if CMS and the

9  State of Georgia determine that CHS must pay back --

10  I'm sorry -- if CMS and the State of Georgia determine

11  that Community must pay back the UPL funds, what would

12  that number be?

13      A    I have heard a number of numbers, so I'm

14  uncertain the exact number that would be.

15      Q    Okay.  The reason I ask, I had seen in an

16  article or some reference that it could be as high as

17  250 million.

18      A    I've heard that number as well.

19      Q    All righty.  How was the fact that

20  Mr. Waldrop had been terminated communicated to the

21  company?

22      A    We had a meeting.

23      Q    Okay.  When you say we --

24      A    Community Health Services of Georgia had a

25  meeting at which time it shared that information with

1    its leadership.

2        Q    Okay.  How was it -- well, I guess I'm

3    assuming something with that question.  Was it

4    communicated to the organization as a whole?

5        A    No, it was not communicated to the

6    organization as a whole.

7        Q    So just to the leadership of the

8    organization?

9        A    His departure was communicated to a group of

10   people in leadership positions as determined by the

11   board of directors of CHS.

12       Q    You know what I'm about to ask you.  Who was

13   in that group of leaders?

14       A    I can't tell you all of the people on that

15   list.

16       Q    Okay.

17       A    There were a lot of people.

18       Q    Is there an actual list somewhere?

19       A    There is a list of attendees or persons that

20   were invited to that.  Joe Wall -- I'm assuming there

21   is a list there and it can be produced.

22       Q    Okay.

23       A    But I don't have it.

24            MR. HENRY:  I believe that's it.  Thank you.

25       Your attorney may have some questions.

148

1          MR. DANIEL:  I have no questions and the

2    witness will read and sign the deposition.

3          (Whereupon, the deposition was concluded at

4    3:00 p.m.)

149

1                          DISCLOSURE

2      STATE OF GEORGIA            Deposition of Ronnie Rollins

3      COUNTY OF COBB              Date: December 8th, 2016

4               Pursuant to Article 10.B of the Rules and
       Regulations of the Board of Court Reporting of the
5      Judicial Council of Georgia, I make the following
       disclosure:
6
                I am a Georgia Certified Court Reporter.  I
7      am here as a representative of American Court
       Reporting Company, Inc.
8
                I am not disqualified for a relationship of
9      interest under provisions of O.C.G.A. 9-11-28(c).

10              American Court Reporting Company, Inc., was
       contacted by the offices of Gary L. Henry, Esq., to
11     provide court reporting services for this deposition.

12              American Court Reporting Company, Inc., will
       not be taking this deposition under any contract that
13     is prohibited by O.C.G.A. 15-14-37(a) and (b).

14              American Court Reporting Company, Inc., has
       no exclusive contract to provide reporting services
15     with any party to the case, any counsel in the case,
       or any reporter or reporting agency from whom a
16     referral might have been made to cover this
       deposition.
17
                American Court Reporting Company, Inc., will
18     charge its usual and customary rates to all parties in
       the case, and a financial discount will not be given
19     to any party to this litigation.

20              This the 8th day of December, 2016.

21

22

23     _____
                                    BONNIE L. SMITH, RPR, CCR
24                                       CCR-B-2432

25

150

1                    C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF COBB)

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    proceedings were reduced to typewriting under my

7    direction and control.

8         I further certify that the transcript is a true

9    and correct record of the evidence given at the said

10   proceedings.

11        I further certify that I am neither a relative or

12   employee or attorney or counsel to any of the parties,

13   nor financially or otherwise interested in this

14   matter.

15        This the 8th day of December, 2016.

16

17

18

19

20

21   _____

22        BONNIE L. SMITH, RPR, CCR B-2432

23

24

25

151

1                    E R R A T A   S H E E T

2    In Re:  Mark A. Waldrop v. Community Health Systems,
              Inc.
3             United States District Court
              File No. 4:16-CV-235-HLM
4
     Deposition of RONNIE ROLLINS, taken on December 8th,
5    2016.

6    I have read the transcript of my deposition and find

7    that no changes are necessary _____.
                                        RONNIE ROLLINS
8    or

9    Having read the transcript of my deposition, I wish to

10   make the following changes:  (Please state reason.)

11
     Page _____,  Line _____:
12
     Page _____,  Line _____:
13
     Page _____,  Line _____:
14
     Page _____,  Line _____:
15

16

17

18

19

20

21

22        _____

23             RONNIE ROLLINS

24

25

**$**

**$1 (1)**
62:9
**$10 (1)**
57:1
**$100,000 (1)**
86:14
**$250,000 (2)**
57:5;58:20
**$5 (2)**
56:2,22
**$8 (2)**
56:3,22

**A**

**ability (2)**
72:22;81:11
**able (1)**
80:23
**absolute (1)**
79:20
**Absolutely (7)**
26:20;43:8;65:3;
85:20;110:17;
143:25,25
**ACA (3)**
59:10;67:9,15
**Academic (2)**
91:22;92:2
**acceptable (2)**
78:21,22
**access (14)**
79:18;80:1,9,14;
82:10,14,15,25;83:2,
4;84:3;90:1,3,5
**accessing (1)**
81:23
**accommodate (1)**
7:10
**accommodations (1)**
132:5
**accomplished (1)**
62:12
**according (12)**
36:7;51:3,8,11,12;
52:12;65:22,24;68:2,
5;78:25;85:10
**account (4)**
22:1,1,4;60:2
**accountability (1)**
80:23
**accountable (1)**
43:6
**accountant (1)**
20:3
**accounting (2)**
9:1;20:2
**accounts (1)**
79:14
**accumulate (1)**

**138:17**
**accusation (1)**
105:8
**accusations (1)**
119:19
**accused (6)**
29:24;98:7;105:5;
106:6,9;118:11
**acquire (2)**
134:9,11
**acquisition (1)**
140:13
**acronym (5)**
35:12;38:14;74:18;
140:18,20
**across (2)**
64:16;65:6
**Act (2)**
59:11;97:8
**acting (1)**
107:19
**action (4)**
29:8;52:3,5;131:13
**actions (5)**
71:11;102:3;116:2;
120:22;143:21
**active (1)**
9:8
**activities (3)**
11:22;120:18;
131:15
**acts (1)**
121:7
**actual (4)**
88:9,9;127:14;
147:18
**actually (33)**
26:9;34:25;40:8,
16;42:11;45:16;
46:20;60:3;62:3,7;
63:13;64:2;66:17;
69:22;75:12;78:18;
89:18;95:2;111:12;
113:14,16;114:8;
119:4;123:9,25;
125:25;127:7;
137:15,16;140:1;
142:13;143:20,23
**actuarially (1)**
69:25
**acute-care (3)**
11:23,23;63:16
**add (3)**
56:14;69:2;119:6
**addition (5)**
60:21;67:13;107:3;
119:6;120:1
**additional (7)**
11:1;40:21,22;
64:24;95:15;106:15;
116:16
**address (1)**
29:16

**addressed (1)**
73:19
**addresses (1)**
89:17
**addressing (1)**
99:12
**administration (2)**
41:25;45:15
**Administrative (1)**
36:5
**administrator (3)**
71:14;77:25;78:3
**adopted (2)**
139:2;141:19
**advance (4)**
140:1,2,5;145:12
**Adventist (5)**
92:12,17,21;93:19;
133:16
**advice (7)**
23:1;69:23;70:2,3,
23;71:7,10
**advise (1)**
136:10
**advised (2)**
26:10;52:9
**adviser (1)**
51:4
**affiliate (8)**
16:19,20,21,24,25;
17:5,6;37:14
**affiliated (1)**
16:3
**affiliates (9)**
16:8,10,12,14;
17:23,25;18:2;36:7,
18
**Affordable (1)**
59:10
**afternoon (4)**
37:12;74:1,5;98:20
**again (13)**
11:17;12:18;17:7;
34:23;42:22;47:23;
68:9;77:10;79:23;
84:19;90:10;111:13;
133:14
**against (10)**
4:13;21:4;29:5,8,
10,19,22;64:8;
119:19;131:13
**agency (2)**
91:10,11
**agenda (5)**
43:24,25;44:14;
45:9;123:15
**agendas (3)**
123:6,7,11
**ago (8)**
14:5;21:23,24;
61:21;87:20;139:4,4;
145:17
**agreed (1)**

**79:4**
**agreement (26)**
5:6;23:15,17,20;
24:9,10,14,15,18,24;
25:1,3,10,11,14,15,
20,24;26:25;27:20,
23;28:1,5;127:15;
128:22;142:1
**agreements (4)**
26:4,8,11,21
**ahead (5)**
4:18;7:16;23:25;
93:15;132:18
**AIH (3)**
58:14,15;60:2
**alleged (1)**
21:9
**allow (1)**
14:13
**allowable (1)**
80:4
**allows (2)**
46:7;138:17
**almost (3)**
54:4;59:17;140:22
**along (10)**
27:14,16;79:4,14;
96:25;106:20;
119:12;123:10,10;
126:6
**Alta (1)**
58:2
**Altahama (1)**
58:3
**Altamaha (7)**
58:4,5,6,9,12,16;
60:4
**alter (1)**
81:3
**Although (1)**
51:13
**always (1)**
54:20
**ambivalent (1)**
30:12
**amend (2)**
26:7,10
**amended (8)**
24:22;25:7,21,22,
24;26:3,4,22
**amendment (1)**
25:18
**America (2)**
59:15,18
**amount (4)**
58:19;61:14,23;
83:22
**amounts (1)**
57:9
**Ancillary (1)**
16:23
**Andrews (1)**
143:14

**Angie (1)**
83:10
**angry (2)**
52:23;106:16
**announcement (1)**
97:14
**annual (1)**
84:10
**answered (1)**
53:25
**anticipate (2)**
6:24;7:9
**anticipated (2)**
48:19;52:12
**anticipation (1)**
93:13
**apart (1)**
46:16
**apologize (1)**
102:17
**apology (2)**
102:10,11
**apparent (2)**
72:19;99:13
**apparently (1)**
114:17
**appear (1)**
112:11
**appeared (2)**
66:12;87:10
**appearing (1)**
44:24
**appears (9)**
24:12;25:23;38:4;
59:2;77:6;99:6;
101:17;109:22;
111:21
**applied (1)**
86:9
**Appling (7)**
144:14,17,18,21,
25;145:1,4
**appointed (1)**
42:13
**appreciate (1)**
46:21
**apprized (1)**
123:2
**approach (1)**
51:17
**appropriately (1)**
69:10
**approval (8)**
84:6,25;85:3;86:2,
5,7,8;136:20
**approvals (1)**
138:21
**approve (8)**
50:9;78:18;82:9;
83:24;84:8;86:6,8,11
**approved (16)**
84:1;85:12,22,25;
86:1;123:11;135:15,

Mark A. Waldrop v.
Community Health Systems, Inc.

Ronnie Rollins
December 8, 2016

17;139:25;140:2,5;
141:24;145:11,23,24;
146:3
**approves (3)**
50:10;84:10;85:8
**Approving (3)**
81:24,25;82:7
**approximate (2)**
12:22;16:15
**approximately (10)**
10:4,18;11:7;13:2;
14:4;17:16;48:20;
57:5;59:10;68:16
**April (2)**
72:25;88:11
**area (5)**
20:5;75:22;79:25;
80:5;86:3
**areas (1)**
13:11
**armed (1)**
99:20
**around (3)**
44:15;59:5;100:8;
135:5;146:2
**arrangement (2)**
55:12;121:15
**arrangements (1)**
132:5
**arranges (1)**
132:4
**arrest (1)**
30:13
**article (3)**
65:6;66:12;146:16
**assistance (1)**
39:9
**assistant (1)**
131:24
**associate (7)**
59:23;79:24;84:13,
24;93:6;101:25;
137:11
**associates (13)**
39:18;40:3,6,13;
41:19,22,23;47:4,4,
10;61:11;63:6;83:18
**associates/employees (1)**
47:8
**Association (2)**
35:9;46:5
**assume (2)**
6:5;139:10
**assumed (7)**
25:7;75:20;108:7,
10,11,12;115:8
**assuming (5)**
30:19;34:21;
104:12;147:3,20
**assure (1)**
43:3
**Athens (1)**
63:18

**Atlanta (3)**
7:20;65:14;122:17
**attach (1)**
83:20
**attached (10)**
27:13,17;38:5;
125:2,3;127:8,12,16;
130:9,11
**attachment (1)**
125:13
**attempting (1)**
101:22
**attend (2)**
49:12;90:24
**attended (3)**
28:15;90:25;133:7
**attendees (1)**
147:19
**attending (4)**
29:2;41:17;108:5;
117:16
**attends (1)**
90:18
**attention (1)**
38:12
**attorney (6)**
113:5,7,22,24;
118:25;147:25
**audio (2)**
22:17;23:9
**audit (1)**
80:24
**authority (5)**
66:1,2,5,5;80:22
**authorization (7)**
138:10,11,14,24;
139:18;141:7;145:8
**authorizations (1)**
139:24
**available (3)**
48:3,19,24
**aware (23)**
28:9;33:19;44:13;
59:15;92:14,17,18,
19,23;93:23;115:7;
117:23;118:1;
121:22;122:12,15;
124:13;129:1;
132:16;135:11;
140:3;141:9;142:12
**away (2)**
64:11;98:6

**B**

**bachelor's (5)**
8:23,24;9:1,6,15
**back (26)**
11:16;13:23;19:13;
20:7;40:9;51:4,15;
54:17;56:5;62:6,10;
63:9;69:6;88:5;89:7,
8;94:4;98:9;104:17;

105:23;109:7;134:6;
135:5;146:6,9,11
**bad (3)**
70:2,3;121:23
**balance (1)**
80:20
**balances (1)**
81:15
**based (4)**
55:16;72:16;84:22;
87:10
**basically (4)**
5:22;20:10;79:2;
94:9
**basis (1)**
84:11
**beauty (2)**
138:1,3
**became (8)**
10:16;11:4;13:8,
19;25:10;72:18;
117:23,24
**become (4)**
59:15;92:23,24;
141:9
**beds (1)**
12:25
**beforehand (2)**
41:16;123:8
**began (3)**
10:10;18:5;93:3
**begin (2)**
10:8;139:14
**beginning (1)**
84:22
**behalf (5)**
47:5;52:3;75:18;
83:19,22
**behavior (2)**
101:25;102:16
**behind (2)**
74:20;127:15
**Benefit (4)**
35:9;45:15,16;71:4
**benefited (1)**
65:1
**benefits (2)**
46:9,10
**besides (1)**
135:1
**best (7)**
5:25;20:18;24:8;
61:8;89:6;98:13;
139:11
**betray (1)**
30:17
**betrayed (2)**
30:8,9
**better (4)**
30:14;67:5;97:7;
114:23
**beyond (1)**
106:13

**big (2)**
62:21;67:14
**bills (1)**
137:3
**bit (3)**
46:20;76:20;93:16
**Blair (8)**
35:7,20,21,23,24;
36:1,4;38:6
**blame (2)**
69:18,20
**board (94)**
28:15,18,19,23;
29:16,18;30:6,9,20,
21,23;31:15;34:20;
35:8;37:1,4,4;42:12,
17,23,24;43:4,7,10,
12,13;47:14,16,21,
24;48:4,20;49:12,14,
16;50:3,5,8,10;51:1;
52:21;55:9,13;57:4;
70:16;72:24;84:7,9;
85:8,22;86:7,8,10;
90:14,19;97:9,15,17;
98:6;99:16,19,25;
104:2;112:21,23;
114:7;116:2;117:16,
20;118:25;119:5,12;
121:8,10,12;122:4,9;
123:1,8,9,12;131:12,
18;132:21;133:19;
138:12;139:25;
140:2,5;141:24;
145:12;146:4,5;
147:11
**board's (1)**
91:24
**bonds (1)**
62:9
**booked (1)**
69:3
**both (15)**
6:21;29:15;31:19;
32:16;35:3;53:5;
64:9;88:24,25;89:1;
92:7;97:4;111:12;
118:6;134:10
**bottom (1)**
53:7
**bought (2)**
61:21;62:2
**boy (1)**
8:8
**boys (2)**
8:7,9
**break (10)**
7:7,13;43:16,21;
78:6,7;91:6;129:3;
144:3,12
**breakfast (1)**
55:7
**break-in (7)**
100:7,9,11,14,17;

101:1,2
**breaking (1)**
51:22
**breaks (1)**
7:9
**breathing (1)**
120:20
**breed (1)**
133:2
**Bridges (1)**
7:25
**brief (2)**
116:21;144:4
**briefly (4)**
4:9;13:23;133:11;
146:6
**bring (1)**
6:22;91:19
**brings (1)**
123:5
**Briscoe (1)**
143:15
**Brogdon (4)**
94:5,8,13,15
**broke (3)**
52:21;53:1;101:12
**Brooks (1)**
8:15
**Brothers (7)**
144:15,17,18,21,
25;145:1,4
**brought (6)**
106:13;114:17;
121:4,6,20,21
**budget (15)**
84:8,10,13;85:5,7,
9,10,13,13,14,19,22;
86:4;91:13,14
**Build (3)**
134:10,11,15
**buildings (2)**
93:11,12
**bullet (2)**
38:13;40:25
**buried (1)**
44:7
**business (13)**
11:12,13;15:15;
41:24;58:14;63:21;
79:16;83:18;87:2;
97:2;134:14,23;
136:22
**businesses (1)**
134:13
**busy (2)**
45:10;113:15
**buy (1)**
61:22
**bylaws (1)**
10:24

**C**

American Court Reporting Company, Inc.    (2) approves - bylaws

Mark A. Waldrop v.
Community Health Systems, Inc.

Ronnie Rollins
December 8, 2016

**call (33)**
34:22;35:5,6,22,
25;37:5,13;43:23;
45:5,6;73:8,10;74:3,
4,5,6;92:5;94:9,24;
95:22;96:1;98:5,12,
14,16,22;99:12,13;
103:2;104:14,15;
110:2;117:10
**called (10)**
4:4;36:5;63:14;
89:12;103:14;104:3,
8;112:8;117:24;
144:14
**calling (2)**
101:25;102:12
**calls (7)**
35:1,3;39:6;41:12;
42:3;44:11;74:9
**came (11)**
10:13,20;13:7;
27:14;59:10;60:2;
65:6;72:24;112:8;
113:14,16
**can (39)**
11:16;14:2;16:13,
14;17:11;18:22;
20:18;21:19,19;
22:11;23:5;24:1;
35:13,14;43:3,3;
46:9;51:13;56:5,7,
16;80:24,24;81:3,7,8,
10;84:19;87:24;
98:22;106:18;
112:14;123:17;
140:9,10,19,21;
143:11;147:21
**capacity (2)**
107:23,24
**capital (11)**
79:14;85:16,17,24;
86:1,6,19;87:2,14;
135:22;136:16
**capital-expense-type (1)**
135:19
**car (1)**
60:15
**care (40)**
12:1,7;18:11,13,15,
16,20,23,24;19:4,6,8,
11;20:24;21:1,4,8,14;
30:12;38:17,18,19,
20,20;39:7,9,11,14,
14,16;40:10;41:1,9,
22;42:4;59:10,15,18;
97:2;135:25
**C-A-R-E (1)**
18:14
**career (1)**
120:10
**case (13)**
5:1;14:24;15:1,3;
20:14,15;21:1;46:24;

47:3,6;64:16;79:11;
130:9
**casualty (1)**
134:25
**catastrophic (1)**
135:11
**cause (1)**
71:8
**caused (1)**
48:14
**center (1)**
75:14
**centered (1)**
86:25
**Centers (5)**
59:15,18;65:14;
68:7;74:24
**central (1)**
96:21
**CEO (9)**
10:16;11:2,3;13:8,
19;36:25;42:23;
43:14;80:6
**certain (8)**
46:12,13;64:21;
65:16;67:24;81:10;
87:9;91:15
**certainly (1)**
102:14
**certification (6)**
9:7,11,16;19:14;
20:8,12
**certified (1)**
9:14
**cetera (1)**
89:23
**chairing (2)**
37:8,15
**chairman (2)**
40:19;122:5
**Chandler (4)**
8:15,16,17,20
**change (16)**
10:25;13:18;25:18;
26:9;70:9;77:15,22;
80:24;88:14,20,22;
97:19;98:8;141:18,
18;142:9
**changed (13)**
11:6,8;25:4;44:21;
51:19;83:13;87:19,
21;88:11,17;97:23,
23;141:24
**changes (10)**
60:18;70:5,12,14;
71:6,7;72:20;82:2;
141:14;142:11
**changing (3)**
81:15;97:14,15
**characterize (1)**
106:19
**characterized (1)**
95:18

**charged (2)**
10:22;86:4
**charges (13)**
29:4,6,9,11,14,15,
17,18,22;30:20;
32:21;120:7,12
**Charles (1)**
143:14
**chart (6)**
75:8,8;143:4,21,
24;144:1
**charter (9)**
138:10,11,14,24;
139:18,24;141:7;
145:8,12
**charters (1)**
139:22
**charts (1)**
75:7
**chat (1)**
136:12
**chatted (1)**
22:22
**check (10)**
57:21,23,25;58:18,
19,21,25;60:7;66:24;
80:19
**checked (2)**
124:2,3
**checking (3)**
60:2;124:1,2
**checklist (1)**
74:10
**checks (2)**
61:10;81:15
**chief (6)**
9:25;10:4,12;
19:11;33:23;36:19
**children (2)**
8:1;60:14
**choose (1)**
63:18
**chosen (2)**
34:19;60:22
**CHS (4)**
79:12;142:24;
146:9;147:11
**CHSI (1)**
10:7
**circuit (1)**
35:14
**cited (1)**
92:15
**claim (2)**
21:3,6
**claims (1)**
46:13
**clarification (2)**
127:10;142:8
**clarify (3)**
35:7;84:17;124:25
**Clark (9)**
37:19,20;38:24;

39:21;40:1,15;78:12;
98:11,16
**Clark's (1)**
39:11
**class (1)**
93:7
**Clay (1)**
93:2
**clean (2)**
78:6,7
**clear (6)**
6:16;28:2;87:1,4;
96:16;98:4
**cleared (4)**
112:12,16,21,24
**clients (1)**
20:3
**Clinical (1)**
16:18
**close (2)**
14:12;19:13
**closer (1)**
88:3
**cloud (9)**
137:19,20,21,25;
138:3,4;139:15,15,16
**CMS (10)**
65:14,23,24;66:8,
10;68:1,5;69:1;
146:8,10
**CMS's (2)**
66:3;68:11
**CNS (3)**
76:1,1,6
**cold (1)**
128:20
**college (2)**
60:14;133:16
**colleges (1)**
92:9
**combination (1)**
12:6
**coming (1)**
15:9
**comment (1)**
96:2
**commitment (1)**
77:8
**common (3)**
50:8;55:20;92:8
**communicated (4)**
146:20;147:4,5,9
**communications (2)**
113:2;126:12
**Community (95)**
4:13;9:22;10:8,9;
11:1,11,13;12:8;14:6,
10,16,19,22;15:9;
16:3,6,7,9,23;17:4,5,
8;23:16,18;25:4,11,
15,21;27:12;28:7,16,
18,19;33:24,25;34:1,
2,4,6,6,11,12;35:24;

36:2,5,9,17,20,24,25;
42:17,24;43:7;47:6,
14,16;53:16,19;54:2;
57:11;59:1,12,24;
61:11;65:1,4,7;
66:13;67:8,22;68:9,
17,22,25;75:9;83:15;
84:7,9;90:6;92:8;
93:12;94:23;113:18;
129:15;131:24;
134:5,6,8,15,24;
137:10;145:2;146:7,
11,24
**Community's (1)**
130:9
**companies (1)**
60:18
**Company (39)**
18:12,17,21;26:7;
30:5,8;33:22;36:18;
47:6;48:2;55:3,5,25;
56:20,25;57:4,9,10,
11;58:17;59:11;63:3,
25;69:4;71:5;74:10;
75:19;76:6,7,8;
83:19;107:20;
114:20;126:13,17;
129:15;139:6;
144:14;146:21
**company's (2)**
126:24;136:22
**competitor (1)**
128:16;129:16
**complaint (2)**
125:4;127:14
**complaints (1)**
103:12
**completely (1)**
14:20
**completion (1)**
62:9
**component (2)**
77:22,23
**conceal (1)**
131:22
**concern (1)**
77:13
**concerned (4)**
29:23;60:17;67:7;
120:8
**concerns (3)**
67:2,18;95:23
**concluded (1)**
148:3
**conditional (1)**
107:17
**conduct (10)**
30:17;37:18;58:15;
102:2;107:1,1,2;
114:16;120:10;
121:23
**conducted (2)**
30:21,23

American Court Reporting Company, Inc.

**conducting (1)**
117:20
**conduit (5)**
37:1;42:16;43:3,
11,13
**conference (13)**
108:3,6,14;110:2,3,
6,8;111:22,25;112:5;
115:25;117:9,10
**confident (3)**
51:25;63:7;105:10
**confirm (2)**
99:17,23
**confirmed (1)**
69:25
**confirming (1)**
92:6,6
**confused (4)**
37:16;98:13;99:1,2
**confusing (2)**
5:24;84:15
**conjunction (2)**
40:11;119:9
**connection (1)**
129:25
**construction (5)**
134:17,18,20,21;
144:14
**consultant (7)**
45:14;52:9;69:24;
70:17,22;71:1,4
**contact (2)**
40:8;103:19
**contacted (2)**
103:17,21
**contacts (2)**
40:3,8
**context (8)**
67:17;103:22;
106:20;125:11;
128:22;130:10,13,17
**contextualize (1)**
73:10
**continue (4)**
13:9;62:15;68:3,14
**continued (2)**
13:12,15
**continuous (1)**
13:22
**continuously (1)**
59:17
**contract (17)**
77:10,12,14,15,24;
78:1;79:6;89:15,20;
90:9,10,19;121:5,5,
18;135:16;137:15
**contracting (1)**
90:11
**contractor (4)**
136:6,8;144:18;
145:5
**contracts (14)**
76:22;77:1,3,18;

78:4,9;79:2;89:17,
18;90:4,7;99:8;
110:25;137:5
**contribute (1)**
47:8
**contributions (1)**
47:4
**conversation (32)**
6:25;33:14,17;
55:14;56:4,15,17,18;
72:16;73:24,25;
95:19;97:10;98:20;
99:15;100:11;102:4,
5,8;104:24;105:2,3,
13,14;109:3;116:19,
21;117:11,12;119:14,
15;126:11
**conversational (1)**
6:24
**conversations (14)**
22:20;54:15,21,25;
67:21;87:8,11;91:13;
96:23;97:1;119:20;
122:8,11;134:1
**convince (1)**
59:20
**COO (4)**
34:16;86:16;
142:23,24
**coordinate (1)**
113:23
**copies (3)**
50:5;83:20;109:13
**copy (1)**
27:13
**corollary (1)**
6:4
**corporate (1)**
141:25
**corporation (7)**
17:10;46:16;58:7;
129:10,12,13,14
**correctly (1)**
40:15
**correspondence (1)**
29:12
**cost (4)**
46:9;70:20,20;94:3
**counsel (4)**
5:7;22:18;26:10;
122:6
**counterclaim (1)**
130:9
**counterintuitive (1)**
80:17
**counting (1)**
117:9
**County (1)**
144:19
**couple (8)**
88:5;99:19;101:24;
103:19,20;104:2;
112:7;140:10

**course (5)**
28:6;43:9;64:15;
82:6;105:4
**Court (7)**
4:12;6:10,13;7:4;
20:16;57:20;91:3
**covered (2)**
91:8;136:14
**CPA (8)**
9:7,10,16;19:14,
20;20:1,8,12
**CPAs (2)**
19:17,19
**created (1)**
48:17
**creating (1)**
96:10
**criteria (1)**
13:6
**CROSS-EXAMINATION (1)**
4:7
**crying (1)**
120:21
**cured (1)**
121:7
**curious (1)**
48:23
**current (2)**
9:19;48:4
**custodian (1)**
48:17

## D

**d/b/a (3)**
34:5,6,11
**daily (1)**
81:21
**Dale (1)**
7:18
**Dalton (5)**
20:19;100:8;101:3;
133:22;135:1
**damage (4)**
134:25;135:14;
136:24;137:6
**DANIEL (16)**
5:12;23:4,10;
43:17;56:5,8,12;
109:16;124:25;
125:5;127:10,17;
129:5;131:5;144:7;
148:1
**data (1)**
91:21
**date (12)**
24:12,19;34:22,25,
25;50:14;54:16;59:2;
62:7;72:17;88:12;
108:24
**dated (2)**
103:23;124:23
**dates (5)**

77:10,12,14;89:19;
115:11
**daughter (1)**
144:24
**day (11)**
5:3;24:16;35:1;
51:21,24;55:8,13,24;
56:16,17;97:20
**days (12)**
28:13;74:7;83:22;
95:20,21,24,25;
99:19;103:19,20;
104:2;112:7
**day-to-day (1)**
39:2,4
**deal (4)**
66:14,14;124:14;
126:8
**dealing (3)**
66:17;78:16;90:12
**dealings (1)**
94:22
**deals (1)**
79:25
**dealt (2)**
136:16,18
**Dean (2)**
62:8;83:10
**DeBrock (4)**
132:20,22;133:1,2
**decade (1)**
139:4
**decided (1)**
121:8
**decision (1)**
138:19
**decisions (1)**
138:18
**deemed (1)**
120:13
**deeply (3)**
30:15,15,16
**degree (6)**
8:23,24,25;9:1,6,15
**deliver (2)**
12:6;60:6
**delivered (3)**
60:8;63:2;66:21
**delivery (2)**
11:15,20
**demonstration (2)**
75:10,16
**department (1)**
137:11
**departure (1)**
147:9
**dependent (1)**
47:5
**depending (1)**
6:1
**deposited (1)**
49:3
**deposition (16)**

77:10,12,14;89:19;
115:11
**depositions (1)**
13:24
**describe (5)**
34:15;38:15;51:10;
98:23;114:11
**described (4)**
119:19,24;136:3;
137:2
**describes (2)**
41:6,7
**describing (1)**
78:10
**description (1)**
10:24
**design (1)**
71:15
**designated (1)**
131:6
**desk (1)**
123:16
**detail (1)**
90:12
**determination (2)**
68:11;138:20
**determine (5)**
29:21;72:22;86:9;
146:9,10
**determined (7)**
29:20;48:3;49:4;
65:15;68:1;120:25;
147:10
**developed (1)**
138:21
**development (3)**
66:1,5;134:21
**Diana (11)**
74:24;76:9,10,11,
11,13,18;88:6;96:20,
22;143:14
**difference (3)**
34:1;64:22;66:4
**different (8)**
46:1;84:15;89:16,
24;97:5;99:3;113:9;
123:18
**differently (1)**
51:16
**difficult (3)**
60:13;77:14;
119:13
**difficulties (1)**
59:16
**digital (3)**
75:4;83:20;89:18
**dinner (5)**
60:8,11,12;63:1,9
**direct (3)**
39:7;82:15,17

directed (3)
42:23;50:19,22
directing (1)
50:17
direction (3)
41:18;42:8,15
directions (2)
46:2;64:9
directly (4)
36:1;82:3,21;83:11
directors (13)
30:7;42:13,17,24;
43:14;47:14,16;84:7,
9;85:23;141:25;
146:5;147:11
director's (1)
123:16
disappointed (2)
51:12,15
disappointing (2)
51:7,9
disapprove (1)
86:11
discovered (1)
101:12
discretion (1)
86:11
discuss (12)
52:19;53:23;63:2;
66:20;101:6;102:5;
104:23;105:12;
108:1;110:24;111:4;
126:16
discussed (39)
23:6;37:11;39:19;
45:10;47:18,20,22;
52:14,15;53:10;
63:17;65:6;73:20;
79:3;92:5;94:7;
104:24;106:10,12;
109:3;110:1,3,6,9;
111:6,8,9;114:11;
118:6;121:18,19;
122:18;131:12,17;
133:12,15;135:23;
138:12;141:3
discussing (5)
37:7;55:11;63:5,7;
95:6
discussion (12)
33:4,5;63:20;
72:19;74:21;77:8;
95:1,4;108:11;110:8;
117:8;118:2
discussions (14)
53:16;63:11,24;
73:1,21;86:18,20,21,
24,25;111:11;
116:13;117:6;119:23
dismissed (1)
111:12
dispute's (1)
66:6

disregarded (1)
30:10
disrupted (1)
60:19
distant (1)
52:1
distraught (1)
98:22
distributed (2)
123:12,13
District (2)
4:12,13
doctors (1)
92:3
doctor's (1)
75:6
document (13)
4:18,23;37:24;
57:15;75:5;109:11;
124:16,22;125:14,17,
21;127:9;143:24
documentation (1)
83:21
documents (5)
23:13;27:17;75:6;
114:25;115:9
dog (1)
133:3
dollars (1)
131:8
done (18)
22:14;40:1;55:15;
75:1;83:14,16;88:3;
91:4;96:5;119:21;
122:5;132:11,16;
133:9;136:1;145:1,4,
16
Dotson (1)
132:7
Dotson's (3)
131:21;136:5,7
doubled (1)
12:21
down (3)
6:14;76:19;96:3
dream (2)
62:2,2
driving (1)
60:15
drop (1)
136:12
dropped (2)
123:25;124:10
drowned (1)
21:11
drowning (1)
21:7
duly (1)
4:5
during (13)
31:7;32:9;47:18,
20;63:8;66:21;87:8;
88:14;105:4;116:7;

121:18;122:18;
138:12
duties (10)
10:19;11:1,3;
15:18;81:22;142:25;
143:2,6,7,9

E

earlier (10)
40:2;74:1;88:6;
90:14;97:18;117:5,
15;123:6;134:6;
141:4
early (3)
31:11;32:6;72:18
easily (1)
77:22
easy (3)
6:23,25;77:25
education (2)
8:18,22
educational (1)
9:17
effect (9)
25:15;63:24;64:1;
71:24;72:3;86:15;
107:2;126:9;141:19
Effectively (1)
107:19
efforts (1)
53:16
egregious (1)
121:7
EHR (3)
74:17,18;110:10
eight (8)
99:7;124:17,21;
125:14;126:18,25;
127:3;134:22
either (10)
22:7;25:18;29:14;
50:16;70:2,2,3,21;
115:24;129:24
elaborate (1)
46:22
Electronic (14)
74:19,21;75:1,3,4,
8,11,13,21;76:16;
83:20;137:12;139:9;
141:2
elementary (2)
45:22;79:24
else (14)
22:14;23:11;31:7;
63:3;78:8;83:4;
88:18,21,22;105:12;
108:1;114:7;135:20;
141:1
e-mail (28)
33:11;38:4,7;
73:22;74:12,17;
91:20;97:21,24;98:1,

17;99:6,11,24;
100:10,15;109:5,6,
22,23;111:20,23,24;
114:16;117:25;
119:20;123:14,23
e-mails (7)
29:12;32:22;33:6,
9;105:5;107:4;115:3
employed (17)
9:22;14:16;15:11;
18:1,8,10,11,20;19:4,
7,10;36:1,3,4,19;
48:11;142:21
employee (4)
28:8;35:9;71:19;
93:6
employees (2)
47:11;61:11
employment (20)
10:7,9;23:15,17;
24:9,10,14,15,18,24;
25:1,4,11,20;26:21,
25;107:15,16;
122:14;142:1
EMS (2)
95:3;97:1
encourage (5)
58:25;61:8;62:10,
11,25
encouragement (1)
61:9
end (2)
121:13;139:13
enforcement (1)
101:12
engage (2)
39:6;41:8
engaged (1)
45:14
engaging (4)
41:13;42:4;44:12;
138:18
enhance (2)
39:17,18
enjoy (1)
62:1
enough (3)
70:19;106:21;
143:17
entered (1)
90:8
enterprise (1)
79:9
entire (3)
11:5;105:14;
143:20
entirety (1)
127:19
entities (1)
81:25
entity (8)
34:10,13;41:12;
46:6;127:25;128:6;

129:9,18
environment (1)
63:16
envision (1)
39:11
equivalent (1)
136:3
ERH (1)
141:2
ERISA (1)
26:15
essentially (8)
25:10;102:13;
106:17;112:10;
119:8,21;121:2,11
estimates (2)
57:13;70:20
et (1)
89:23
even (10)
6:8;44:13;60:1;
74:2;103:1,2,3;
123:15;130:22;135:7
event (2)
120:5;123:20
events (2)
103:1,3
everybody (3)
46:25;47:1;121:24
everybody's (2)
82:10;121:9
exact (11)
16:13;50:14,25;
53:2;61:23;72:17;
88:12,12;108:24;
115:12;146:14
Exactly (14)
34:14;39:13;41:7;
51:1;62:12;84:21;
91:9;96:9;98:18,25;
105:25;110:5;
118:14;125:8
examined (1)
4:5
example (1)
136:25
exceed (1)
46:13
exception (1)
7:11
excess (1)
57:1
Excuse (2)
19:19;84:5
excused (1)
118:19
execute (1)
79:1
executed (1)
24:14
executing (1)
49:2
executive (5)

9:20,25;10:4,12,22
**exempt (1)**
46:6
**Exhibit (83)**
4:15,19,20;24:1,2,
5,9,11,12;25:23;
26:25;28:2;37:21,25;
38:4;40:17;57:16,20,
22;58:19;59:2;63:2;
66:22,23;72:4,10,13;
73:10,12,15,17,18,
20;78:12;89:8,9;
91:7;98:9;100:5,22,
25;101:15,16,18,23;
102:19,21;103:22;
109:8,12,19,20;
110:1,3,20;111:9,21;
114:25;115:14,16;
119:2;124:18,21;
125:14;126:18,24;
127:3,4,7,11,14,19,
25;130:2,3,4,7,8,12,
15,20,25;138:6
**existence (2)**
15:22,23
**exit (2)**
121:3,16
**exonerated (1)**
29:6
**expanded (1)**
95:3
**expect (4)**
39:21;49:3;69:2;
146:7
**expending (1)**
83:22
**expenditure (2)**
86:2;135:22
**expenditures (4)**
87:2,10;131:23;
136:16
**expense (24)**
81:1,24;82:7,9,11,
13,25;83:5,14,25;
84:1,6,14,23,24;85:2,
4,16,17,17;87:14;
131:20;135:16;
141:15
**expenses (6)**
60:14;83:19;85:24;
86:1,6,19
**experience (1)**
60:17
**expert (1)**
15:2
**expirations (2)**
77:11,13
**explain (1)**
102:3
**explained (1)**
72:23
**explanation (2)**
46:21;105:20

**explicitly (1)**
108:13
**exposure (1)**
46:14
**express (1)**
67:2
**expressing (1)**
67:17
**extent (2)**
29:21;101:9

---

## F

**Facebook (3)**
22:4,7,12
**faced (1)**
65:7
**facilitate (1)**
108:3
**Facilities (18)**
16:19;19:1;20:4,5;
64:25;65:16;67:24;
68:2,4,10,13,18;
76:15;96:21;134:9,
10,12,16
**facility (1)**
21:8
**facing (2)**
74:10;120:5
**fact (7)**
23:4;28:6;109:6;
110:18;115:7;
118:11;146:19
**facts (1)**
70:3
**facts-and-circumstances (1)**
114:12
**faculty (2)**
92:16;133:15
**fair (16)**
6:6;30:1;40:24;
41:3;4;48:25;49:1;
54:5;60:1;67:10,11,
13;78:21;97:7,21;
136:19
**fall (3)**
6:23,25;39:1
**fallen (1)**
78:11
**falling (1)**
39:10
**falls (2)**
85:13,18
**familiar (12)**
5:17;23:19;28:6;
38:3;89:12;128:11,
12,13;129:10,12;
133:1;144:14
**family (2)**
21:9;47:5
**far (6)**
54:17;62:6;71:16;
90:10;133:8;137:21

**fate (1)**
29:6
**father (2)**
136:5,7
**fearful (1)**
59:6
**February (1)**
50:16
**federal (3)**
66:7,16;68:23
**fee (1)**
77:17
**feel (5)**
5:24;70:12;96:3,4;
98:17
**felt (9)**
33:10;53:9;70:14;
98:13;102:6,7;108:4;
114:21;120:21
**few (10)**
5:19;7:9;22:22;
74:6;78:18;79:5;
88:4;131:2;140:8;
144:13
**figure (1)**
121:2
**figures (1)**
57:7
**filed (6)**
27:17;29:4;124:23;
125:1,5;127:8
**final (2)**
111:10;138:22
**financial (8)**
19:11;36:20;67:8;
79:12,13,13;80:1,2
**financially (1)**
46:14
**find (2)**
22:25;122:23
**fine (8)**
6:22;16:16;34:9;
84:21;90:13,13;
127:23,24
**finished (2)**
99:14;131:4
**fire (2)**
105:6;134:25
**fired (1)**
118:12
**firing (1)**
102:2
**firm (8)**
19:20;20:1;48:10,
12,16;69:25;72:11;
113:9
**first (28)**
4:4;10:12;35:5,6;
38:12;40:25;69:21,
23;74:17;82:7;92:23;
98:9,10;100:13;
104:1;106:1,3;
107:13;110:10;

111:13;112:3;
117:19;125:17;
127:11,13,21;133:8;
145:24
**five (14)**
59:9;62:13;73:11,
15,17,18,20;89:8,9;
91:7,23;98:9;100:5;
138:6
**fixed (1)**
122:1
**fixing (1)**
137:6
**flavor (1)**
106:21
**flip (1)**
91:8
**flipping (1)**
75:7
**flood (7)**
133:22;134:25;
135:11,23;136:4,24;
137:6
**FLSA (3)**
97:6,7,14
**focused (2)**
70:7;118:10
**folks (4)**
91:15;114:3;
137:14;143:11
**follow (5)**
95:20,21,24,25;
144:5
**followed (3)**
51:24;71:17,18
**following (4)**
62:9;97:9,24;
115:19
**follows (1)**
4:6
**followup (6)**
41:6;74:12;98:5,
14;101:2;116:15
**follow-up (1)**
31:17
**foot (1)**
7:7
**forgive (3)**
45:17;62:6;136:15
**form (2)**
20:11;89:19
**formal (5)**
8:18,20,22;9:17,18
**format (1)**
139:9
**formation (1)**
37:3
**formed (2)**
42:25;61:5
**for-profit (2)**
17:6,10
**forward (2)**
30:6;138:20

**found (1)**
101:12
**foundation (2)**
92:1;99:16
**four (15)**
31:22,23,25;32:5;
57:15,20,22;58:19;
59:2,9;63:2;66:22,
23;96:2;133:18
**frankly (1)**
29:22
**Freddie (1)**
62:8
**free (1)**
5:25
**frequently (1)**
113:25
**Friday (1)**
96:1;97:23;100:10;
104:6
**friend (1)**
60:21
**frustrating (1)**
54:4
**FSLA (1)**
97:6
**full (8)**
7:17;28:21,23;
33:6,9,11;86:10;98:1
**function (1)**
138:16
**functioning (1)**
43:4
**functions (1)**
10:23
**fund (2)**
46:9;48:17
**funded (5)**
46:22;47:25;48:1;
65:25;66:1
**funding (5)**
41:20;46:23;47:3;
51:5;70:19;71:14
**funds (12)**
48:2,18,24;49:3;
52:12;60:3;61:23;
62:4;65:17,21;85:9;
146:11
**further (2)**
117:12;131:13
**future (1)**
52:1
**fuzzy (1)**
120:19

---

## G

**Gary (1)**
4:10
**gathered (1)**
66:11
**gave (6)**
14:4;20:15;26:7;

Mark A. Waldrop v.
Community Health Systems, Inc.

Ronnie Rollins
December 8, 2016

58:25;62:7;119:4
**gears (1)**
    53:15
**general (8)**
    42:15;53:5,19;
    67:16;81:5;91:25;
    115:13;142:3
**generally (9)**
    23:20,21;45:20;
    48:25;50:15,16;
    54:15;83:15,18
**generate (1)**
    82:18
**generated (1)**
    82:19
**Georgia (28)**
    4:13;7:20;8:17;9:3,
    12,23;11:14;16:2;
    20:19;33:25;34:3,5,7,
    11;59:1,12;66:7,10,
    15;68:23;69:1;94:21;
    96:22;129:19;
    144:19;146:9,10,24
**girl (1)**
    8:7
**Girls (1)**
    8:7
**given (7)**
    5:15;13:24,25;
    14:1,25;107:6;
    127:23
**gives (1)**
    89:23
**giving (3)**
    41:18;54:8;58:21
**glasses (1)**
    4:21
**golden (7)**
    55:11,19;56:2,21;
    57:1,5,8
**good (4)**
    23:1;35:13;76:5;
    106:21
**government (3)**
    66:7,16;68:23
**grading (2)**
    144:18;145:5
**graduated (1)**
    9:5
**grants (1)**
    91:22
**Gray (2)**
    7:20;8:17
**great (5)**
    34:18;62:15,24;
    72:24;133:9
**greatest (1)**
    65:3
**greatly (1)**
    64:1
**Griffin (1)**
    83:10
**groomed (1)**

59:23
**group (3)**
    40:9;147:9,13
**grow (2)**
    13:15;134:9
**grown (4)**
    11:10;12:11;13:4;
    134:7
**growth (6)**
    12:16,17;13:9,12,
    18,22
**guess (11)**
    12:14;18:22;29:25;
    48:12;54:14;70:11;
    99:5;123:1;125:18;
    128:10;147:2
**guidance (3)**
    37:18;95:15;96:12
**guidelines (5)**
    5:19;138:23;139:2,
    5;141:25
**guys (1)**
    62:20

## H

**Hal (2)**
    22:23;128:2
**hand (1)**
    124:22
**handed (1)**
    57:19
**handle (2)**
    39:5;114:4
**handles (1)**
    137:12
**handling (6)**
    41:12;42:3;44:11;
    45:8;94:13;114:3
**happen (1)**
    55:17
**happened (9)**
    25:22;65:4;79:2;
    106:1,2;109:2;112:5;
    121:22;124:9
**happening (1)**
    59:5
**happy (1)**
    7:10
**hard (2)**
    45:22;58:18
**harmed (1)**
    122:1
**Hazel (3)**
    90:20,20;118:17
**head (3)**
    6:15,20;17:14
**headed (1)**
    104:16
**heads (3)**
    76:13;88:7;89:5
**Health (140)**
    4:13;9:22;10:8,9;

11:11,13;12:8;14:6,
10,17,19,22;15:10,
11,13,15,18,21,23;
16:1,4,5,6,7,9,19,20,
24;17:5,8,23;18:3,5,
8;23:16,18;24:25;
25:2,5,12,14,16,21;
27:12;28:7,16,20;
33:24,25;34:2,2,4,6,
7,11,12;35:25;36:2,5,
9,17,20,24,25;37:14;
38:21;39:8;40:12,21;
41:18,19,21,23;
42:17,24;43:7;46:9,
10;47:6,16;53:16,19;
54:2;57:11;59:1,12,
24;60:19;61:11;
63:15,16,19;64:8;
65:4,7,17;67:9,14,16,
22;68:9,25;74:19,21;
75:1,3,4,11,13,21,24;
76:8,16;83:15;84:8,
9;90:6;91:10,11,14;
92:9;93:12;94:20,23;
113:18;128:6,10,13;
129:15;131:24;
134:5,7,9,15,24;
137:10;141:2;
143:10;145:2;146:24
**healthcare (4)**
    9:20;11:15,20;
    60:18
**hear (2)**
    53:8;106:5
**heard (6)**
    56:9;106:5;117:22,
    22;146:13,18
**hearing (1)**
    77:7
**Hearn (11)**
    45:8,13,14;52:18;
    70:24,25;71:4;72:11,
    14,16;73:2
**Hearst (2)**
    83:10;96:25
**Heavens (1)**
    100:3
**help (7)**
    37:17;40:6;45:15;
    61:24;73:9;98:14;
    136:10
**helped (1)**
    92:24
**helpful (1)**
    81:2
**helps (1)**
    46:20
**Hence (1)**
    84:3
**HENRY (40)**
    4:8,11,17;5:13,14;
    23:8;24:4;37:23;
    43:16,20;44:6,9;56:7,

13;57:18;73:14;
87:24;88:2;100:24;
109:10,13,17,18;
124:20;125:3,7,9;
127:6,13,18;128:2,5;
129:3,8;130:6;131:7,
10;144:2,11;147:24
**hey (1)**
    26:18
**HHA (1)**
    91:8
**high (2)**
    70:21;146:16
**highlighted (4)**
    127:23;128:1,3;
    129:10
**hire (1)**
    93:13
**hired (2)**
    10:11,14
**history (2)**
    74:20;120:5
**hold (1)**
    47:14
**holding (2)**
    58:17;109:19
**Holdings (6)**
    58:5,6,10,13,16;
    60:4
**holiday (1)**
    125:19
**Holland (2)**
    113:6;122:17
**home (11)**
    8:5,6,10,11,14;
    17:4;19:23;20:1;
    91:10,11,14
**homes (3)**
    94:6,8,15
**hope (1)**
    72:6
**Hopefully (2)**
    85:10;114:23
**horrible (1)**
    68:8
**hospice (3)**
    91:9,10,15
**hospital (6)**
    11:24;12:2;66:2,5;
    75:7;97:2
**hospitals (1)**
    64:25
**hosting (1)**
    138:4
**hour (1)**
    104:16
**huh-uh (2)**
    6:16;7:1
**human (1)**
    79:14
**hundreds (1)**
    131:8
**Hunter (2)**

83:10;96:25
**hurt (1)**
    30:15,16,16;121:9,
    24,25

## I

**idea (4)**
    70:11;76:3;115:13;
    134:14
**identical (1)**
    66:9
**identification (10)**
    4:16;24:3;37:22;
    57:17;73:13;100:23;
    109:9;124:19;127:5;
    130:5
**identified (2)**
    10:23;48:3
**identify (2)**
    93:13;128:21
**immediately (5)**
    52:21,25;62:17;
    104:18,20
**impact (1)**
    97:11
**implemented (1)**
    71:23
**implies (2)**
    46:5,12
**imply (1)**
    62:22
**important (1)**
    115:13
**importantly (1)**
    70:5
**improve (4)**
    40:12;41:23;52:10;
    53:6
**inappropriate (4)**
    102:2,13,16;107:3
**Inc (57)**
    15:12,13,16,19,21,
    23;16:1,5,6,7,18,19,
    20,23,24;17:4,5,8,24;
    18:4,6,8,12,17,21,23;
    19:5,6,8,12;20:24;
    21:1,4,8,15;24:25;
    25:2,12,14,21;27:12;
    28:16,20;33:24;34:2,
    6,12;36:2,12;60:4;58:5,
    6,10,13;60:4;128:7,
    14
**include (1)**
    52:16
**included (3)**
    20:4;27:18;84:12
**including (10)**
    10:23;39:2;43:14;
    70:16;76:15;79:13,
    15;103:4;107:3;
    109:5
**Incorporated (2)**

4:14;11:12
**incurs (1)**
  83:18
**indicate (1)**
  112:17
**indicated (7)**
  33:5;39:4;67:6;
  79:1;90:14;107:8;
  136:2
**indicates (2)**
  12:4;95:14
**indicating (4)**
  55:25;56:19,24;
  57:3
**indication (2)**
  116:1;126:10
**individual (1)**
  47:4
**individually (1)**
  58:8
**individuals (1)**
  84:4
**individual's (1)**
  84:2
**industry (2)**
  19:23;20:1
**inform (2)**
  51:1;123:22
**information (19)**
  5:23;79:19;80:2,
  11,14;81:3,7,8,10,11,
  16,17;91:9,11,16;
  120:2;137:18;
  138:17;146:25
**informed (3)**
  29:18;37:15;
  105:22
**informing (2)**
  30:20;95:12
**initial (4)**
  31:17;108:15;
  116:22,24
**initiate (3)**
  54:21,25;80:25
**initiating (2)**
  82:2;86:2
**inkling (1)**
  117:22
**inside (1)**
  46:8
**instance (3)**
  27:19;32:24;
  123:17
**instances (6)**
  33:2;54:11;62:16;
  80:25;85:11;107:6
**instead (3)**
  5:9;6:15;75:8
**institutions (2)**
  64:22;92:2
**instruction (1)**
  93:10
**instructive (1)**

130:23
**instructor (1)**
  92:24
**insurance (1)**
  46:8
**integrated (6)**
  11:14,18,21;12:3,
  4;129:20
**integration (1)**
  12:6
**intend (1)**
  96:8
**intended (5)**
  40:14,15;48:4;
  96:6,7
**intent (3)**
  5:21;99:24;130:25
**intently (1)**
  110:15
**interact (1)**
  74:8
**interacting (1)**
  40:10
**interaction (1)**
  37:4
**interested (1)**
  51:13
**interfere (1)**
  96:12
**interim (1)**
  92:24
**intermittently (1)**
  34:8
**intern (1)**
  93:5
**internships (1)**
  93:11
**interpretation (1)**
  40:25
**interrogation (1)**
  114:13
**interview (15)**
  31:8,10,13,17,17;
  32:2;105:24;114:11;
  115:24;116:5,8,12,
  22,25;117:2
**interviewed (10)**
  31:2,4,5,20;32:4;
  103:11;113:13,14,16;
  115:15
**interviewing (3)**
  32:19;113:4;114:6
**interviews (9)**
  31:14,16,19,23,25;
  32:5,10;117:4,6
**into (15)**
  6:23,25;14:11;
  71:24;72:3;75:6;
  90:8;97:17;98:6;
  99:19;115:12;119:2;
  120:17;121:12;
  131:14
**invested (1)**

48:19
**investigate (1)**
  112:14
**investigating (3)**
  53:20;116:2;120:1
**investigation (18)**
  29:19;30:22,24;
  31:1,14;101:1;
  112:14,22,25;114:10;
  117:17,20;119:2,9,
  15;120:17;122:6;
  131:14
**investigations (3)**
  113:18,22;114:3
**investment (13)**
  48:4,10,24;51:6;
  52:11;58:5,6,9,13,16,
  17;60:4;91:25
**investments (2)**
  91:25;92:1
**investor (1)**
  48:8
**invited (1)**
  147:20
**invoices (4)**
  81:25;84:5;136:22;
  145:13
**involve (3)**
  14:23;64:3;81:23
**involved (15)**
  15:16;19:25;20:11;
  22:21,22;30:25;
  31:18;35:3;38:24;
  73:3;93:22,24;
  113:22;138:19;140:4
**involvement (11)**
  19:22;31:3;39:12,
  22;75:15,17;76:12;
  99:7;101:1,5,9
**irrational (2)**
  106:16;107:7
**issue (18)**
  26:15;37:6,9;
  52:20;65:11,12;66:9,
  13,18;76:22;91:12,
  23;94:7,15;95:17;
  99:6;121:5,25
**issued (1)**
  5:1
**issues (23)**
  65:6,10;67:9;
  73:19;74:6,9;76:23;
  84:16;86:18,20;
  94:13;97:2;106:13,
  15;112:6;113:2,19;
  114:17;115:6;
  116:14;119:2,11;
  135:13
**item (12)**
  74:16,17;76:9,11;
  78:25;82:7;92:4;
  95:14,18,24;110:24;
  111:4

**items (7)**
  76:21;84:12;91:7;
  110:9,19;141:3;
  145:13

**J**

**January (5)**
  27:24;71:24;72:1,
  2;86:21
**Jenkins (2)**
  19:17,19
**Jimmy (4)**
  48:7,11,14,16
**job (8)**
  9:19;10:24;15:10;
  43:5;96:5;114:23;
  142:25;143:2
**Joe (21)**
  31:5;104:3,24;
  108:8,18;110:13;
  111:18,25;112:7;
  117:25;119:4,8;
  121:13,13;122:5,24;
  123:2,11;124:8;
  125:22;147:20
**John (4)**
  45:8,13,14;52:18
**joint (1)**
  95:2
**Jonathan (1)**
  113:24
**Jones (1)**
  144:19
**judge (1)**
  6:9
**July (4)**
  124:24;125:18,19;
  141:11
**jumping (1)**
  93:15
**June (11)**
  24:13,16;27:24;
  28:8,13;31:11;32:6;
  86:22;92:20;93:7;
  122:12
**jury (1)**
  6:9

**K**

**keep (2)**
  66:25;123:2
**keeping (1)**
  136:20
**key (1)**
  92:2
**kids (1)**
  62:1
**kind (14)**
  14:23;44:23;80:8;
  89:24;93:22;94:22;
  105:17;106:4;

118:24;120:16;
132:1;139:23;
140:24,25
**knew (5)**
  60:12;82:24;106:1,
  6;118:5
**Knight (2)**
  113:6;122:17
**knowing (1)**
  118:11
**known (3)**
  74:13;90:20;93:17
**knows (1)**
  7:4
**Korean (2)**
  76:5,7

**L**

**Labor (2)**
  97:8;113:24
**lady (1)**
  90:23
**Lake (11)**
  35:7,20,21,23,24;
  36:1,4;38:6;45:7;
  49:9,10
**land (2)**
  139:14,16
**Lange (24)**
  31:6,18;32:14;
  103:10;113:4,5,7,21;
  114:5;115:5,15;
  116:4,12,17,18;
  117:1,5;118:20;
  119:5,10,23;121:4;
  122:12,15
**Lange's (1)**
  115:24
**large (3)**
  63:18;67:16;
  129:18
**larger (4)**
  12:8,10;61:15,16
**last (16)**
  7:8;26:23;27:2,3;
  48:20;65:8,9;87:18;
  90:21;101:20;111:7;
  118:16;129:4;130:2,
  3;144:12
**Late (4)**
  37:12;115:19,20,
  23
**later (5)**
  94:5;99:19;104:5;
  108:22;112:7
**law (3)**
  26:9,21;101:11
**lawsuit (6)**
  27:14,21;125:13;
  130:11,12,18
**lawyer (1)**
  44:6

Mark A. Waldrop v.
Community Health Systems, Inc.

Ronnie Rollins
December 8, 2016

**lead (7)**
40:16,20;41:1;
75:18;93:7;98:23;
99:3
**leader (3)**
59:24;106:17;
107:7
**leaders (1)**
147:13
**leadership (8)**
10:22;35:7;37:6,8;
94:2;147:1,7,10
**leading (1)**
94:17
**Leake (1)**
143:15
**learn (5)**
28:10,14;29:5;
100:13;103:17
**learned (8)**
28:12,16;30:4;
111:15;117:19;
120:2;122:24;131:12
**lease (1)**
134:11
**least (2)**
110:10;115:13
**leave (7)**
59:13,20,25;94:11;
98:21;106:20;144:7
**left (5)**
111:13;118:23,24,
24;121:13
**legal (7)**
16:14;26:10,15,18;
34:5;66:9;122:6
**length (1)**
109:4
**lengthy (1)**
114:21
**letter (11)**
101:17;103:2,4,6,8,
10,13,25;115:3;
126:22;127:20
**level (1)**
90:12
**levels (2)**
79:18;89:25
**LG (9)**
75:2,10;76:1,1,5,6,
16;141:2,2
**liability (1)**
69:3
**liaison (3)**
43:11,13;95:5
**liar (2)**
102:1,13
**lied (2)**
29:11;32:22
**lies (4)**
33:7,9,11;98:1
**Life (3)**
59:15,17;76:5

**likewise (1)**
25:24
**limit (6)**
64:17,20;86:9,13,
14,15
**limitations (1)**
90:3
**limited (3)**
80:13;81:12;93:22
**limits (2)**
46:13;107:17
**line (3)**
53:7;106:20;
119:13;126:6
**lingo/vernacular (1)**
47:10
**LinkedIn (4)**
21:25;22:2,7,12
**list (9)**
36:8;130:25;140:7,
9,10;147:15,18,19,21
**listed (4)**
5:9;76:21;77:6;
82:7
**listen (2)**
33:13,20
**listened (5)**
22:17;33:16,17;
60:20;110:15
**lists (1)**
130:24
**litigation (7)**
4:11;21:15,18;
27:13;124:23;125:1;
127:9
**little (8)**
58:18;64:2;80:17;
89:4;93:16;94:5;
120:19;140:15
**live (4)**
7:19,20;8:16;
112:15
**lives (4)**
8:10,11,13,17
**living (2)**
8:5,6
**LLC (1)**
36:10
**located (4)**
15:25;16:1;94:20;
144:19
**long (12)**
7:8;10:2;18:18;
21:23,24;98:19;
103:23;104:14;
115:14;116:22;
134:23;139:3
**longer (3)**
8:13;65:18;121:4
**look (12)**
28:4;38:1;69:23;
71:14;81:21;94:5;
101:15;114:24;

129:17,17;130:23;
140:19
**looked (6)**
97:12;100:19,20;
114:25;115:4,9
**looking (23)**
27:4;29:21;37:17,
18;44:15;46:19;
48:18;49:2;51:15;
62:2,10;68:9;70:23;
72:22;91:24,24;92:1;
95:4;96:2;101:16;
102:3;128:20;130:7
**looks (3)**
4:23;126:6,7
**Lorraine (20)**
35:20;36:12,15,19;
38:6;49:8,21;52:18,
20;74:25;83:6;87:17;
90:15,16;118:8;
123:10;139:9,16;
142:16;143:15
**lot (13)**
45:10;46:1;55:17;
64:1;69:25;94:6;
114:15;125:24;
126:2,20;128:24;
140:7;147:17
**love (1)**
78:2
**lying (5)**
29:25;98:7;105:5;
106:7;107:4

**M**

**machine (3)**
140:16,21,22
**machines (1)**
140:13
**Macon (5)**
16:2;94:21;104:16;
113:15,16
**Mainly (1)**
106:4
**maintained (1)**
137:24
**maintains (1)**
139:8
**making (2)**
44:23;86:25
**malpractice (2)**
15:1;20:14
**manage (2)**
41:22;90:11
**Management (19)**
18:12,17,20,24;
38:20;39:3,4,7,14,14,
16;40:10;41:9;42:14;
48:12;77:5;79:14;
89:15;138:16
**managing (2)**
41:21;69:10;77:16

**manner (1)**
137:1
**manual (1)**
75:5
**many (8)**
8:3;14:1;19:15;
30:18;61:19;68:4;
81:22;140:7
**March (2)**
41:11;50:16
**Mark (58)**
4:11;24:1;31:5;
33:3;35:7,19;38:5;
44:6;52:16,20;59:22;
73:25;74:25;75:20;
76:18;79:3;91:16;
92:5;93:22;94:8;
95:15;98:19;99:15;
101:24;104:25;
107:23;108:7,18;
109:4;110:12;
111:12,13;113:4,5,7;
114:2,18;118:2,20;
119:5,10,18,22,23;
121:4,6,14,15,21;
122:16;131:20;
132:9;136:13;
142:18,20,23,24,25
**marked (13)**
4:15,19;24:2;
37:21,25;57:16,20;
73:12;100:22;109:8;
124:18;127:4;130:4
**market (3)**
91:9,10,15
**Mark's (2)**
59:22;97:22
**marriage (1)**
144:23
**married (2)**
7:22,23
**marry (1)**
78:4
**match (2)**
63:15;64:7
**math (1)**
68:13
**matter (4)**
105:15;109:4,6;
127:10
**matters (1)**
45:10
**Mauldin (3)**
19:17,19,22
**may (39)**
6:20;13:1;17:13;
22:1;24:22;31:11;
32:6;33:4;34:7,17,
24;37:5;39:20;43:23;
45:5,6;51:23;73:9;
74:25;77:11;97:6;
103:1,23;104:5;
109:23;111:21;

113:8;115:17;
119:19;123:15;
124:7;125:10;
127:22;129:4,25;
130:10;136:14;
139:15;147:25
**maybe (13)**
19:14;64:11,12;
66:8;67:5;74:10;
77:6;84:18,19,19;
113:9;141:18;145:24
**mean (22)**
11:9;21:23;2:39:3,
25;42:19;65:11;81:5,
14;82:18,20;83:16;
91:20;98:4;115:2;
123:21;125:2;
128:19;136:11,18;
143:18;146:3
**Meaning (1)**
79:10
**means (2)**
41:7;77:14
**meant (2)**
118:5;123:5
**measure (2)**
12:15;13:1
**media (1)**
21:25
**mediate (1)**
122:2
**mediation (12)**
108:3,6,14;110:2,3,
6,8;111:22;112:4;
115:25;117:9,11
**mediator (1)**
108:10
**Medicaid (2)**
64:23;65:15
**medical (2)**
14:25;20:14
**Medicare (4)**
64:20,23;65:15;
67:16
**meet (1)**
46:15
**meeting (93)**
23:4;28:15,17;
35:8;37:8,16,18;
39:19,22,23;40:16,
20;41:2;43:22,24,24;
44:1,24;45:9;47:14,
19,21;49:5,8,10,24;
50:9,11,11,13;51:18,
20,22,24;52:1,8,13,
19,21;53:1,10;65:3,1;
13;60:9,11;63:1;
66:21;69:8;72:18;
74:23;91:1,7,18;
97:9,15,17;98:6,11,
24;99:19;104:17;
107:13;108:15;
109:2;113:12;

**Min-U-Script®**

American Court Reporting Company, Inc.

**(9) lead - meeting**

117:16,24;118:1,8,
18,19;119:3,16;
121:18;122:9,19,23;
123:3,4,6,23;124:11,
12;131:12,18;
132:21;133:6,13,19;
138:12;146:22,25
**meetings (15)**
40:2;41:17;49:12,
15,16,22;50:4;90:14,
18,19,24;119:22;
123:8,9,16
**member (12)**
28:18,19,21,23;
36:9;38:21;43:9;
47:24;57:4;93:4,4;
133:15
**members (10)**
39:6,8;41:8,13;
42:4;44:12;47:5;
48:2;50:5;123:2
**memo (3)**
38:5,7;78:12
**memory (1)**
12:18
**mention (2)**
67:18;102:9
**mentioned (13)**
32:25;63:8,10;
94:18;121:21;
132:20,23,24;133:3,
6,17,19,21
**merger (1)**
62:10
**mess (1)**
133:10
**message (5)**
44:25;45:3;72:9;
98:10;100:15
**messed (1)**
133:9
**met (8)**
4:9;33:4;47:17;
94:10;104:2;108:19;
122:13,15
**Michelle (1)**
143:14
**mid (1)**
33:4
**middle (3)**
31:11;32:6;98:20
**might (7)**
44:10;52:15;56:1;
69:2;95:2,6;96:4
**million (7)**
56:2,3,22,22;57:1;
62:9;146:17
**mind (5)**
13:7;58:3;126:23;
140:11;141:5
**mine (1)**
60:21
**minutes (12)**

22:22;49:14,20,21,
23;50:1,3,6,9,10;
90:16;104:16
**mischaracterize (1)**
54:12
**misconduct (2)**
29:4,10
**mismanaging (3)**
69:9,11,13
**mission (1)**
62:12
**misunderstood (1)**
84:20
**moment (6)**
17:17,19,21;21:12;
22:10;121:135:6
**Monday (2)**
74:22;104:1
**money (9)**
30:5;60:2;68:22;
69:1;70:1;85:12;
120:3,23;121:11
**monitors (1)**
137:11
**Montana (1)**
61:21
**month (3)**
83:21;85:2;115:23
**months (4)**
63:8;77:2;79:5;
96:2
**more (35)**
12:7,21;18:11,13,
15,16,20,23,24;19:4,
6,8,11,15;20:24;21:1,
4,8,14;51:13,14;
67:15;68:20;70:4;
76:2;80:2;89:3;
93:21;106:8,9,10;
118:23;127:21;
143:19;144:13
**M-O-R-E (1)**
18:14
**morning (3)**
93:8;97:24;104:1
**Most (10)**
71:24;72:2;80:13;
81:12;110:9,10,21,
22;120:5,8
**mostly (2)**
74:12;109:5
**mother (1)**
90:22
**mouthpiece (1)**
43:11
**moved (2)**
64:6,6
**moving (6)**
64:3,11,12;75:10;
130:1;138:20
**much (6)**
12:8;59:21;70:20;
80:14;114:21;131:19

**multiple (6)**
12:4;77:10,12,14;
79:7,16
**must (2)**
146:9,11
**MW (1)**
95:14
**myself (4)**
108:8,18;136:15;
142:14

# N

**name (34)**
4:10;7:17,18,24,
25;8:14,15;16:14,15;
17:7;21:10,19,20;
22:10;25:19;34:5,5;
46:4,12;62:4;66:8;
90:21;112:12,16,20,
24;113:25;114:1;
127:25;128:23;
129:23;131:22;
132:22;133:2
**named (2)**
43:2;84:4
**names (2)**
16:11;20:22
**nation (1)**
63:19
**nature (7)**
12:5;21:6;79:21;
135:15;136:3;142:2,
3
**Navicent (13)**
63:17;94:18,19,19,
20,23;96:15,18,23;
97:1;111:4,5,7
**necessarily (1)**
80:1
**need (19)**
7:7,9;26:7,18;
43:16;51:15;56:7;
97:10,16;99:11;
111:14,15;112:13,16;
121:8;135:7;138:2;
139:22;144:5
**needed (26)**
26:10,21;37:10;
39:7,8;41:13,14;
42:4;44:12;52:10,11;
70:6,12,15,16,22;
72:19,21,23;104:10,
10;112:21,25;119:11,
11;138:18
**neighborhood (1)**
10:6
**Nelson (1)**
83:6
**new (8)**
44:16,22;60:15;
134:9,10,14,14,15
**new-fangled (1)**

22:11
**next (16)**
18:22;24:1;38:17,
18,18,20;39:5,11;
41:1,22;42:4;50:13;
112:5;113:1;116:13;
126:22
**nine (5)**
127:7,12,19,24,25
**nodding (1)**
6:15
**nonoperating (1)**
85:17
**Nor (2)**
49:12;69:2
**normal (2)**
74:5;98:5
**normally (1)**
135:15
**Northern (1)**
4:13
**notes (11)**
32:9,12,15,16,17;
98:14;116:7,9,10;
117:1;129:21
**notice (2)**
32:14;123:15
**notifications (1)**
89:23
**notified (3)**
113:3;122:25;
123:1
**November (10)**
5:2;47:15,17;
49:23;50:13;51:18;
55:9;69:8;72:18;91:1
**nowadays (1)**
22:11
**NSC (4)**
38:16;39:2,5,21
**number (27)**
12:25;13:3;54:8,
10,55:15;76:19;77:4;
79:6;91:23;92:3;
95:14;97:2,12;99:8;
124:17;131:3,11;
132:17;133:10,18;
138:6;142:11;143:5;
146:12,13,14,18
**numbers (4)**
12:19;62:21;70:17;
146:13
**numerous (2)**
53:25;59:16
**nurse (1)**
92:3
**nurses (1)**
92:2
**nursing (23)**
15:17;19:1,23;
20:1,4,5,12;21:8;
64:24;65:16;74:24;
76:13,15;88:7,15,21,

23;89:5;95:4,5;
96:21;129:14;134:12

# O

**oath (3)**
6:8,10,11
**obligation (1)**
46:15
**obtain (1)**
141:6
**obviously (2)**
99:3;102:6
**occur (3)**
5:8;11:22;32:6
**occurred (4)**
22:20;27:16;89:1;
136:4
**occurring (2)**
26:6;141:10
**o'clock (10)**
5:7,8,8;34:17,22;
35:1,6;37:5;39:20;
43:23
**off (3)**
7:6;17:14;87:24
**offer (5)**
61:9;96:11;124:15;
126:7;132:9
**offered (1)**
13:4
**office (15)**
5:9,9;65:14;75:7;
100:7,12;101:3;
104:10,13,22;123:25;
124:7,10;133:23;
135:1
**officer (8)**
10:1,4,12;19:11;
33:24;36:20;107:1,3
**offices (3)**
122:16;135:1,2,14
**often (2)**
81:20;113:21
**old (3)**
8:10,12;60:15
**on-boarding (1)**
79:15
**one (51)**
4:19,20;8:6,7,7,10,
11,13;12:7;13:1;
14:2;17:7,23;27:16;
33:13,15;35:1,1;
36:7;38:14;57:22;
60:15;70:18;74:23;
76:23;77:7,18;78:17;
79:25;92:14;96:20;
101:24;102:9;106:1;
117:9;118:16;
121:22;127:22;
128:3;129:4;131:3,6,
7,11;132:18;133:12,
25;134:3;141:3;

143:2;144:4
**ones (2)**
  68:1,6
**one-year (3)**
  77:15,24;78:1
**ongoing (1)**
  94:25
**only (7)**
  7:11;31:2;62:20;
  80:24;99:6;125:10;
  128:3
**open (1)**
  81:21
**operate (3)**
  11:14,17;96:21
**operated (2)**
  19:1;21:8
**operating (3)**
  33:23;84:10,13;
  85:5,7
**operation (1)**
  76:14
**operationally (1)**
  72:21
**operations (4)**
  39:16;41:24;96:24;
  114:3
**opinion (5)**
  57:8;65:16,20;
  99:1,4
**opportunity (3)**
  14:13;89:22;
  133:20
**opposed (1)**
  114:6
**options (1)**
  78:24
**order (1)**
  70:12
**org (2)**
  143:20,25
**organization (37)**
  10:21,23;11:5;
  13:12,15,18;38:21,
  23;39:15;41:10;
  43:14;45:15;46:6,7;
  52:4;60:25;61:5;
  63:21;67:8,14;83:23;
  89:3;93:4,24;97:11;
  106:17;107:2;120:4,
  4;121:16;123:19,20;
  143:4,23;147:4,6,8
**organizational (1)**
  63:13
**others (6)**
  9:13;17:11;62:18;
  68:20;74:25;80:15
**ought (1)**
  108:4
**out (22)**
  22:25;59:10;62:1;
  64:3;66:10;70:4;
  77:21,23,24;85:8;

101:12;104:15;
115:23;121:2;122:7,
23;124:13,14;
126:22;128:24;
137:20,21
**outcomes (1)**
  41:23
**outside (1)**
  85:13,19,22
**over (4)**
  5:18;35:24;122:5;
  135:10
**oversight (1)**
  11:5;42:12,15
**own (6)**
  58:7,8,9;60:4;
  125:6;131:22
**owner (1)**
  144:24
**owners (3)**
  58:11,12;144:20

**P**

**page (12)**
  38:13;57:22;91:8;
  98:9,15,19;101:20;
  127:11,13,21,24;
  131:3
**paid (6)**
  48:1;69:25;132:15;
  136:23,23;137:3
**paper (4)**
  75:5,8;82:23;
  125:14
**papers (1)**
  27:21
**paperwork (1)**
  44:7
**parachute (6)**
  55:12;56:2,21;
  57:1,5,9
**parachutes (1)**
  55:19
**Park (1)**
  145:6
**part (7)**
  31:14;63:20;94:25;
  111:7;120:19;
  130:11;134:23
**partially (1)**
  46:9
**participant (2)**
  39:23,24
**participating (3)**
  29:2,3;73:6
**particular (4)**
  56:16;66:13;79:25;
  95:17
**particularly (2)**
  40:4;142:4
**parties (1)**
  20:23

**partner (2)**
  19:16;20:6
**partners (1)**
  138:3
**party (3)**
  15:7,8;25:19
**past (7)**
  9:6;17:25;65:1;
  68:23;70:9;91:4;
  113:19
**patient (1)**
  21:10
**Patton (6)**
  48:7,11,15;50:17,
  19;69:6
**Patton's (1)**
  48:16
**pay (4)**
  62:4;82:2;146:9,11
**payable (1)**
  79:14
**payer (1)**
  77:16
**paying (1)**
  77:17
**payment (4)**
  64:16,20,21,22
**payments (12)**
  65:2,25;67:23,25;
  68:3,5,17,24;69:2;
  77:4;146:6,8
**payroll (1)**
  79:15
**pending (4)**
  4:12;7:12;20:15;
  21:3
**people (15)**
  30:18;64:3,11,12;
  82:19,20,24;93:3;
  97:5;118:23;138:18;
  143:5;147:10,14,17
**percentage (3)**
  68:10,11,13
**perfectly (1)**
  61:2
**perform (3)**
  51:12;70:13;71:8
**performance (2)**
  52:10;53:6
**performed (6)**
  13:21;51:2,8,10;
  69:16;143:10
**performing (7)**
  69:14;142:25;
  143:2,5,7,8,9
**period (6)**
  44:15;87:9;96:3;
  100:8;108:25;115:12
**periodic (1)**
  135:10
**periodically (5)**
  54:19;124:1,3,9;
  136:13

**person (10)**
  21:20;37:3;55:4;
  60:22;76:14;80:13;
  86:1,3;139:11;
  142:12
**personal (7)**
  58:16;59:24;60:3,
  21;102:4,5;107:1
**personally (5)**
  58:9;60:8,16;
  114:16;121:25
**persons (6)**
  43:2;52:15;82:3;
  83:12;96:20;147:19
**perspective (2)**
  135:16,16
**pharmaceutical (1)**
  140:22
**pharmaceuticals (1)**
  40:4
**pharmacy (3)**
  77:23;78:1;140:14
**pharmacy's (1)**
  78:2
**phone (14)**
  35:1;37:13;74:1;
  92:5;94:9;95:19;
  96:1;98:5,10,20,22;
  101:8,25;104:15
**phrase (1)**
  64:16
**physical (1)**
  143:23
**physically (2)**
  137:18,19
**physician (1)**
  40:5
**pick (1)**
  63:18
**piece (2)**
  61:21,22
**Piedmont (2)**
  16:20;63:17
**pilot (2)**
  75:14,16
**piloted (1)**
  76:16
**place (5)**
  61:25;113:12;
  116:23;145:15,19
**plaintiff (1)**
  21:17
**Plaintiff's (10)**
  4:15;24:2;37:21;
  57:16;73:12;100:22;
  109:8;124:18;127:4;
  130:4
**plan (11)**
  48:5;49:2;51:3,8,
  11,12;52:11,12;
  71:15;75:21,23
**planned (3)**
  69:16;71:8;77:21

**planning (1)**
  45:16
**play (3)**
  126:24;127:1;
  130:19
**pleading (1)**
  125:2
**please (10)**
  7:17;14:15;45:25;
  46:3;60:10;84:17,17;
  114:10;132:18;
  140:12
**pm (9)**
  88:1,1;98:12;
  111:22;129:7,7;
  144:10,10;148:4
**point (14)**
  12:17;18:2;30:11;
  38:12,13;40:7;41:1;
  44:14;61:25;88:17;
  102:9;117:25;123:5;
  126:21
**pointing (1)**
  13:19
**police (1)**
  30:13
**policy (5)**
  84:23;87:14,16,18;
  90:6
**Poodles (9)**
  132:20,22,23,24,
  24;133:1,2,3,6
**position (11)**
  10:2,3;18:19;19:6;
  33:21;35:21,22,24;
  36:14;61:7;80:22
**positioned (1)**
  61:3
**positioning (4)**
  63:14,15,21;64:7
**positions (4)**
  64:4,6;92:4;147:10
**positive (1)**
  72:5
**possible (1)**
  127:11
**post-acute (8)**
  11:14,18,21,22;
  95:5;97:1;129:18,20
**posted (1)**
  22:5
**potential (6)**
  53:20,23;54:1;
  55:11;63:5;69:3
**potentially (3)**
  66:14;75:12;78:3
**Practically (1)**
  104:20
**practice (4)**
  20:5;50:8;55:20;
  92:8
**practitioners (1)**
  92:3

**preceding (1)**
37:12
**precise (1)**
103:24
**premiums (1)**
48:1
**preparation (2)**
33:14;130:19
**prepare (5)**
22:15;23:11;83:19;
91:15;123:10
**prepared (1)**
85:2
**present (7)**
13:13,14,22;31:7;
32:9;49:5;118:9
**presentation (3)**
44:23;72:25;99:16
**presentations (1)**
91:14
**presented (1)**
110:12
**presently (1)**
17:25
**president (19)**
9:25;10:3,12,15,16,
19,21;11:4;13:16;
15:20;18:16;19:8;
37:13,20;80:6;88:15,
20,22;107:19
**pressure (1)**
90:21
**pretty (6)**
29:25;62:20;71:15,
15;98:4;126:20
**previous (1)**
50:11
**previously (7)**
13:24,25;14:1;
64:13;67:6;125:15;
136:14
**primarily (5)**
15:17;19:2;94:13;
95:8;114:2
**primary (1)**
20:4
**Prior (19)**
14:10,16;15:11;
17:22;18:10,11;19:3,
4,9,10,15,16;41:11;
42:4;69:1;73:21;
75:16;78:12;92:19
**private (2)**
137:22,25
**privately (1)**
137:24
**privileges (1)**
28:21
**probably (18)**
5:17;18:22;45:18,
22;51:12,13;54:16;
55:14;63:17;89:6;
92:25;94:6;97:7;

102:11;115:18,20;
116:25;124:17
**problems (1)**
96:10
**procedure (1)**
135:19
**procedures (1)**
87:4
**proceed (1)**
95:16
**process (16)**
5:18;83:17;84:14;
87:1,2;90:11;94:10;
114:21;138:10,11,15,
16,20,24;139:18;
145:8
**processed (4)**
136:23;137:1;
145:14,21
**processes (2)**
79:17;142:4
**produced (1)**
147:21
**professor (2)**
92:21;93:18
**profit (3)**
17:9;62:14,14
**program (12)**
45:16;46:8;64:20;
75:14,16;77:21;
89:11,12;90:8;93:5,5,
22
**project (20)**
63:14;94:16;
138:11,14,22,24;
139:18,22,23;141:1,
6;145:6,7,7,8,11,12,
14,16,22
**projects (10)**
134:22;139:23;
140:1,3;141:7,10
**promoted (1)**
34:19
**prompted (1)**
74:2
**pronounce (1)**
58:2
**property (4)**
61:21,22;62:3,3
**proportionally (1)**
68:4
**proposals (1)**
63:23
**prospect (1)**
53:20
**prospects (1)**
51:5
**protege (1)**
30:6
**provide (6)**
39:16;41:21;43:3;
91:16;93:5;98:14
**provided (7)**

10:24;12:1,5;
22:18;93:10;94:2;
123:7
**providers (14)**
39:6;40:4,11;41:8,
12;42:3;44:12,16,19,
20,22;64:23;77:9;
78:10
**provides (5)**
64:21;79:11;89:18,
22;129:18
**providing (6)**
39:7,14;40:21,22;
42:8;93:3
**provision (1)**
26:11
**provisions (1)**
78:20
**Pruitt (4)**
129:10,12,13,14
**public (1)**
20:2
**pull (1)**
126:22
**purchase (2)**
46:10;134:12
**purposes (1)**
136:21
**pursuant (1)**
5:6
**purview (4)**
39:2,10;78:11;
139:17
**put (4)**
30:6;85:8;89:6;
121:12

**Q**

**qualified (1)**
65:18
**qualify (8)**
65:19,20,22,24;
68:1,5,10,14
**qualifying (3)**
64:21,23;68:2
**quasi (1)**
46:8
**quick (1)**
97:8
**quickly (4)**
13:6;136:1,6;141:5
**quietly (1)**
121:15
**quit (3)**
59:1,7;60:23
**Quite (5)**
29:22;46:20;76:20;
80:19;93:17
**quoting (1)**
70:18

**R**

**raised (1)**
69:7
**Ralph (1)**
93:2
**range (2)**
56:3,22
**ranging (1)**
77:18
**rate (1)**
82:2
**rather (3)**
5:8;66:1;131:22
**react (1)**
110:14
**reacted (1)**
100:4
**reaction (2)**
54:14;126:5
**read (14)**
56:5,10;58:18;
110:12;125:25;
126:3,23;127:21;
128:19;131:3;
132:18;133:12,20;
148:2
**reading (1)**
66:12
**ready (1)**
98:21
**really (11)**
7:8;22:6;30:12;
45:11,19;66:6;67:15;
75:17;80:19;97:11;
133:10
**reapproved (1)**
146:2
**reason (12)**
6:22;26:17,19,20,
21;29:3;44:10;65:5;
84:3;87:3;92:15;
146:15
**reasonable (4)**
55:4;57:8,12,12
**reasons (3)**
61:6;87:6;131:1
**recall (71)**
5:2;12:18;13:2;
14:2;16:13;17:14,21;
20:22;21:12,13,14,
16,17,19,20;22:5,11;
24:19,23;25:6;26:13,
14;27:4,9,19;38:6;
44:4;45:8;48:22;
50:7,25;51:1,2;52:5;
53:3;54:16;55:7,11,
18,25;56:4,15,24;
57:3;58:21;61:23;
62:16,19;63:4,5;67:1,
21;71:22;72:17;77:7;
91:2;93:8;100:19;

101:18;110:24;
111:5,6;112:2,3;
113:3;116:20;117:3;
118:14;121:13;
134:11;135:24
**receive (10)**
8:23;9:4;29:7;56:2,
21,25;57:5;67:24;
68:3;125:20
**received (6)**
8:24;9:16,18;
37:13;75:10;76:23
**receiving (5)**
27:20;65:17;67:23;
68:17;138:21
**recent (1)**
97:14
**recently (5)**
23:23;65:7,8;
74:22;83:13
**recess (1)**
43:18;87:25;129:6;
144:9
**recognize (2)**
57:22;128:25
**recollection (5)**
24:8;74:4;95:16;
121:17,23
**recommendations (6)**
71:16,18,23;72:4,
11,14
**recommended (3)**
37:3;42:23;71:11
**record (17)**
4:10;5:11;6:16;
7:17;56:10;66:25;
74:19;75:2,3,4,13,21;
76:16;90:24;102:20;
136:20;141:2
**recorded (2)**
33:19;90:15
**recorder (1)**
49:13
**recording (1)**
89:18
**recordings (3)**
22:17;23:10;77:7
**records (3)**
74:21;75:11;76:8
**record's (2)**
28:1;96:16
**recoupment (1)**
65:20
**recruit (2)**
92:2,9
**recruited (2)**
59:17;92:11
**recruits (1)**
93:13
**redone (1)**
143:22
**reduce (1)**
46:13

**refer (1)**
55:21
**reference (3)**
76:1,9;146:16
**references (1)**
79:7
**referred (1)**
12:16
**referring (3)**
28:2;48:13;110:5
**refers (2)**
11:22;74:1
**reflect (1)**
25:4
**reflection (1)**
11:4
**refund (2)**
68:22;146:8
**refunded (1)**
68:25
**regard (16)**
10:25;12:10;36:21,
23;37:6;51:19;68:7;
81:19;94:8;96:15,17;
112:5;113:18;
119:25;120:17;
141:23
**regarding (12)**
39:20;54:1;77:4;
95:24;96:23;97:1;
98:11;106:14,25;
107:1;116:13;119:6
**regards (1)**
63:3
**Regional (2)**
16:20;65:14
**regular (5)**
74:5;123:7,9,16,18
**regularly (3)**
67:20;134:18;
139:20
**rehab (1)**
97:2
**reimbursed (1)**
83:23
**reimbursement (5)**
83:25;84:14,23,25;
131:21
**reimbursements (1)**
141:16
**reinsurance (1)**
46:10
**reiterated (1)**
61:4
**related (1)**
144:20
**relating (2)**
105:11;145:13
**relation (2)**
68:5;111:23
**relations (1)**
91:22
**relationship (8)**

34:16,18;97:19,22,
23;98:8;109:4;
114:18
**relative (1)**
67:14
**relatively (1)**
108:25
**relaxed (1)**
22:23
**relief (1)**
120:21
**remember (11)**
51:23;56:17,18,19;
62:7;63:10;90:21,23;
105:23;118:13;
120:22
**renewals (2)**
89:23,23
**renovation (1)**
134:22
**renovations (1)**
135:14
**repeated (1)**
59:8
**repeating (1)**
136:15
**rephrase (3)**
5:25;56:7;96:16
**replace (1)**
75:5
**report (13)**
40:2,9;81:1;82:3,
19,20,21;83:20;
84:25;85:2,5;91:21;
119:5
**reported (7)**
42:16,18;76:18;
90:16;100:9,11;
119:8
**reporter (6)**
6:13;7:4;56:11;
57:20;91:3;118:17
**reporting (4)**
79:12,13;83:14;
84:14
**reports (19)**
81:24,24;82:8,9,11,
13,15,17,18,19,22,23;
83:1,2,5,11;84:1,6;
131:20
**repositioning (3)**
63:6,12,24
**repository (1)**
139:10
**represent (4)**
4:11,25;124:22;
130:8
**representative (2)**
21:1;70:16
**represented (2)**
21:14,17
**request (1)**
116:4

**requested (1)**
56:11
**requesting (1)**
86:2
**requests (1)**
83:25
**require (2)**
139:23;145:8
**required (2)**
86:8;143:9
**reservations (1)**
132:10
**reserve (3)**
48:17,24;51:5
**reserves (3)**
47:25;48:15;69:7
**resident (2)**
21:7,9
**resolution (1)**
111:10
**resolve (1)**
121:9
**resolved (1)**
112:11
**resources (1)**
40:22
**respond (3)**
50:24;102:19;
111:14
**responded (2)**
110:13;126:17
**responding (2)**
102:21;109:23
**response (9)**
6:12;72:14;105:16,
18;115:3;126:24;
127:2,3;133:4
**Rightly (1)**
108:11
**rights (1)**
81:18
**righty (1)**
146:19
**rise (1)**
26:7
**risk (1)**
46:14
**Road (2)**
7:20;96:3
**Robin (1)**
143:15
**rock (1)**
79:4
**role (10)**
11:4;36:21,23;
42:9;43:10;63:25;
93:18;126:24;127:1;
130:19
**ROLLINS (16)**
4:3,9,20;7:18,19,
25;8:19,21;24:5;
57:19;81:9;101:16;
124:21;130:7;
143:15;144:12
**RONNIE (3)**

**revenue (1)**
64:24
**revenues (1)**
12:17
**review (6)**
23:13;27:23;38:2,
2;50:4;91:16
**reviewed (4)**
23:23;26:24;27:3,
20
**reviewing (3)**
23:9;64:15;138:8
**rework (2)**
143:3,20
**right (69)**
6:4;7:6,15,15;
10:11;12:3;13:24;
14:3,18;15:25;16:11,
22;17:3,11;18:18;
20:10,18;21:3,24;
22:15;36:17;47:2,12;
56:9;58:2;61:6,7,7;
62:8;66:20;69:15;
70:10;71:3;73:17;
74:16;76:19;85:24;
86:24;89:5,25;91:22;
92:5;94:5,18;97:13,
18;98:21;100:21;
101:15;106:7;110:1;
111:19;113:6;117:4;
124:16;125:8;
126:23;129:2;
132:17;138:3,6,18,
19;141:3;142:12,23;
143:1,2;144:13
**Rightly (1)**
108:11
**rights (1)**
81:18
**righty (1)**
146:19
**rise (1)**
26:7
**risk (1)**
46:14
**Road (2)**
7:20;96:3
**Robin (1)**
143:15
**rock (1)**
79:4
**role (10)**
11:4;36:21,23;
42:9;43:10;63:25;
93:18;126:24;127:1;
130:19
**ROLLINS (16)**
4:3,9,20;7:18,19,
25;8:19,21;24:5;
57:19;81:9;101:16;
124:21;130:7;
143:15;144:12
**RONNIE (3)**

4:3;7:18;143:15
**room (2)**
118:23;144:7
**routine (2)**
113:20;134:23
**rude (1)**
7:2
**rules (1)**
97:15
**run (3)**
46:8;81:1;123:11

**S**

**sad (1)**
120:6
**sale (2)**
53:21,23
**sales (1)**
54:1
**same (19)**
6:9;13:2;26:2,5;
28:3,4;34:13;41:24,
25;86:15;97:5;98:15,
19;114:24;118:15;
133:18;134:19;
138:7;143:7
**Saturday (2)**
100:10,11
**saw (6)**
27:11;45:11,12;
111:24;127:20,20
**saying (11)**
6:15;7:3,4;41:20;
47:13;54:3,13;81:15;
99:17;102:12;118:17
**scared (1)**
37:16
**scenario (1)**
57:10
**scenarios (1)**
55:17
**scheduled (2)**
122:25;123:3
**scheduling (1)**
123:1
**Scholarships (15)**
15:12,13,15,19,21,
23;16:1,5;17:24;
18:4,5,8;24:25;25:2,
14
**scope (1)**
11:6
**second (8)**
37:25;87:24;90:22;
105:24;106:3;
116:19;117:2,11
**secretary (3)**
49:14;132:2,3
**security (2)**
79:20,20
**seeing (2)**
112:2,3

seeking (2)
102:4,7
selected (1)
48:16
Selectica (11)
89:12,14,15;90:1,4,
5,8,11;137:8,13,17
selling (1)
53:16
send (4)
91:20;98:17;99:11;
123:14
sending (4)
38:6;73:21;97:24;
111:23
Senior (3)
88:15,20,22
sent (12)
40:17,18;72:3;
73:17,18;97:21;
100:16;104:1;
111:21;117:25,25;
123:15
sentence (4)
39:5;41:7;98:10;
131:19
separate (2)
34:10;46:15
separately (1)
31:20
separating (1)
71:12
separation (3)
121:14;124:15;
127:15
series (3)
71:11;93:2;138:7
serious (2)
119:11;120:5
seriously (4)
105:8,10;110:16,
17
serve (1)
43:3
served (9)
5:2,3;18:16;19:16;
20:6;27:12;33:23;
36:15;145:5
server (1)
137:22
servers (1)
137:25
service (13)
39:6;40:3,10;41:8,
12,14;42:3;44:11,16,
19,20,22;93:12
Services (43)
9:22;11:13;12:5,6;
13:1,3;15:17;16:18,
23,24;17:4;18:23,24;
33:24,25;34:5;36:6;
39:17,18;40:5;42:17,
24;47:7,17;57:11;

59:1,12,25;65:15;
68:25;71:12;84:10;
88:16,21,23;128:6,
14;129:15,19,20;
131:25;132:8;146:24
serving (4)
40:13;92:20;93:18;
133:14
set (2)
75:5;123:23
setting (3)
11:23,24;12:7
settings (1)
79:21
seven (16)
77:17;95:14;99:12;
109:12,19,20;110:1,
3,20;111:4,9,21;
115:1,14,16;119:2
several (4)
45:9;61:20;77:1;
145:16
shake (1)
6:20
shape (1)
20:11
share (6)
99:24;103:6,8,10;
107:9;119:12
shared (7)
33:3;59:16;60:16;
103:13;106:25;
119:18;146:25
sharing (1)
60:13
Sherry (1)
7:25
shocked (1)
53:11
short (2)
35:14;108:25
shortly (2)
35:2;74:22
show (9)
4:18;23:25;37:24;
57:14;73:10;109:11;
124:16;127:7,24
showed (3)
74:24;125:22;
126:11
Shuford (2)
62:8;83:10
sick (1)
120:24
sigh (1)
120:20
sign (1)
148:2
signature (2)
57:25;101:20
signed (5)
24:13,16,17,18,19
significance (1)

66:4
significantly (4)
11:6,8,10;12:12
similar (10)
11:3;13:21;24:9,
10;25:10;42:12;
61:10;97:4;113:19;
140:23
simple (1)
80:19
single (4)
65:3,11;77:16,17
single-source (2)
71:13;79:16
sitting (1)
22:12
six (9)
62:13;100:25;
101:15,16,18,23;
102:19;103:22;
134:22
size (4)
11:6;12:22;57:11;
67:14
Skilled (21)
15:17;19:1,23;
20:1,4,5,11;21:7;
64:24;76:13,14;88:7,
15,21,23;89:5;95:4,5;
96:21;129:14;134:12
skip (1)
76:19
slightly (1)
53:15
slower (1)
140:16
social (1)
21:25
software (5)
79:9,11,22;89:15,
24
sold (10)
55:5;56:1,20,25;
57:4,9,11;59:12,13;
60:19
solution (2)
30:14;79:16
somber (1)
119:16
somebody (1)
83:24
someone (4)
96:2;102:15;114:7;
121:9
sometime (3)
115:18,19;125:18
sometimes (5)
14:11;70:4;73:4,5;
74:12
Somewhere (5)
10:6;115:23;
120:20;139:3;147:18
soon (4)

51:24;60:24;
104:19,21
sorry (10)
8:21;18:25;45:6;
66:24;90:12;101:4;
102:16;128:3;
142:19;146:10
sort (1)
94:6
sound (2)
57:8;61:1
sounds (2)
54:3;80:17
Southern (6)
92:11,16,21;93:19;
133:15,16
space (1)
18:14
speak (3)
70:15,17;104:11
speaking (3)
23:10;48:25;98:13
specific (12)
12:18;24:19;27:9;
32:24;33:2;47:23;
54:16;62:7;76:21;
91:7;107:6;116:20
specifically (20)
25:9;27:11;32:20,
21;48:21,22;50:7;
52:14;55:10,22,23;
63:12;67:21;72:13;
74:17;79:12;81:9;
89:17;133:15;142:9
specifics (6)
13:2;26:13,14;
113:4;120:23;142:14
speculating (1)
59:11
spent (2)
85:9,12
spoke (2)
101:8;115:5
spoken (3)
74:6;103:14;
112:17
sponsored (2)
36:24;46:5
sponsoring (1)
47:6
sponsors (1)
46:16
sponsorship (1)
46:7
squared (1)
98:6
stability (1)
67:8
staff (5)
20:3;40:1,11;93:3,
4
stakeholders (1)
138:22

standard (1)
94:7
Standards (1)
97:8
standpoint (1)
122:4
stands (1)
91:11
start (7)
5:7;18:3;35:23;
45:2;54:15;74:2;
134:13
started (5)
4:10;7:16;12:9;
63:9;124:1
starting (1)
135:8
starts (1)
131:7
state (14)
5:10;7:17;9:14;
33:10;63:19;66:7,9,
15;68:23;69:1;
108:12;129:19;
146:9,10
stated (1)
98:18
statement (2)
30:1;40:25
statements (1)
79:13
States (2)
4:12;9:10
statute's (1)
66:9
stay (7)
12:1;62:11,15;
93:16;98:15,19;
121:3
steal (1)
30:17
stealing (3)
120:23;121:11,24
Stelling (3)
83:6,7,8
S-T-E-L-L-I-N-G (1)
83:8
stenographer (2)
90:17;118:24
stenographer/court (1)
118:17
Step (8)
38:17,18,19,20;
39:11;41:1,22;42:4
Stephanie (1)
131:21
Steward (4)
16:24;17:1,2,3
still (16)
8:5,6,10,11;9:8;
15:21;25:15;67:23,
24;68:3,14,17;71:19;
107:23,23,24

Mark A. Waldrop v.
Community Health Systems, Inc.

Ronnie Rollins
December 8, 2016

**stipulate (1)**
5:12
**stolen (4)**
30:4,5,7;120:3
**stood (1)**
107:25
**stored (1)**
137:18
**straight (1)**
66:25
**straightforward (1)**
71:15
**strategic (3)**
63:13;75:21,23
**strategically (2)**
64:5;75:23
**stream (1)**
64:24
**strike (6)**
26:24;35:22;72:2;
103:16;114:24;123:7
**strong (1)**
60:25
**structure (1)**
80:5
**students (1)**
93:11
**stuff (4)**
94:6;113:15;
126:21;128:24
**subject (3)**
5:6;43:22;73:20
**subjects (1)**
97:5
**submit (2)**
84:5,6
**submitted (6)**
83:3;85:3;86:5;
131:8,21;136:19
**subparagraph (1)**
131:6
**subpoena (4)**
5:1,3,6,10
**subsequent (2)**
50:9,11
**subsequently (2)**
138:21;146:1
**subsidiary (6)**
16:6;17:6;36:4,10;
46:18;76:6
**substantially (1)**
134:7
**succeed (1)**
61:7
**succeeded (1)**
93:2
**successful (2)**
62:13;70:6
**successor (5)**
30:7;34:19;59:24;
60:23;121:11
**suddenly (1)**
77:17

**suffered (1)**
134:24
**summarize (1)**
46:2
**summer (2)**
93:5,22
**Sunday (2)**
103:25;104:1
**supervise (1)**
81:25
**supervisor (4)**
84:2;85:1,3;131:23
**support (2)**
41:19,21
**supported (3)**
93:25;119:10;
121:10
**supporting (2)**
83:21;96:20
**supposed (6)**
44:1,2;69:15;90:7;
99:3;138:24
**Sure (62)**
4:22,22;6:14;7:3,8;
11:17;12:20;16:16;
17:15,18;25:9;29:1;
31:21;32:2;34:10;
38:1;40:5;41:15;
42:2;47:12;49:25;
50:2,6,14;51:9,24;
55:20;56:6,8;63:8,
10;70:17,21;74:14;
82:24;86:25;87:20;
88:6;91:4;92:10,13;
98:5,18;111:20;
113:20;117:23,24;
118:15,22;123:19;
125:24;126:2,20;
128:17,25;129:23,24;
133:21;134:17;
136:18;143:12;144:7
**surprise (2)**
44:8;53:8
**surprised (5)**
53:13,14;100:4;
106:5;114:8
**surprising (1)**
114:5
**surrounded (2)**
105:15;110:10
**surrounding (1)**
87:2
**survivor (1)**
61:2
**suspended (2)**
107:15;111:14
**Switching (1)**
53:15
**sworn (1)**
4:5
**system (27)**
11:15,20;20:16;
36:5;37:14;38:22;

39:8;40:12,22;41:18,
19,22;63:15,19;
65:17;75:24;79:9;
80:13;81:3,19;94:20;
136:17,20,23;137:8;
142:6;143:10
**Systems (66)**
4:14;10:8,9;11:11;
12:8;14:7,17,19,22;
16:6,7,9,19,23;16,18;
25:5,12,16,21;27:12;
28:8,16,20;34:2,2,6,
7,11,12;35:25;36:2,5,
10,18,20,24,25;43:7;
53:17,20;54:2;60:19;
61:12;63:16;64:8;
65:4,7;67:9,15,16,22;
68:10;83:15;84:8;
90:7;92:9;94:23;
113:18;134:5,7,9,15,
24;137:10,12;145:2

---

**T**

**tabled (1)**
146:1
**talk (8)**
23:5,6;44:2,3;73:8;
88:4;138:2;144:4
**talked (9)**
38:15;67:20;74:13,
14;76:20;89:11;
113:13;115:10;
133:11
**talking (10)**
34:12;43:21;45:1;
53:18;74:6;81:16;
82:22,23;131:5;
132:1
**tape-recordings (1)**
33:14
**targeted (1)**
80:3
**targeting (14)**
29:13,24;32:23,25;
33:6,12;98:2;102:1,
23,25;103:4;105:5;
106:7;107:4
**tax (2)**
45:24;46:6
**Taylor (25)**
35:20;36:12,15,19;
38:6;49:8,21;52:18,
20;53:9,24;55:8,12;
56:1,21;83:6;87:17;
90:15,16;118:8,9;
123:10;139:10;
142:16;143:15
**Taylor's (1)**
139:17
**TCGRX (3)**
140:13,17;141:1
**teach (1)**

93:7
**team (2)**
74:24;137:14
**telephone (1)**
34:22
**telling (2)**
102:1;135:24
**tenure (1)**
19:22
**terminate (5)**
28:24;77:25;78:5;
98:8;105:6
**terminated (8)**
28:7,9,13;33:22;
98:2;122:13;131:1;
146:20
**termination (12)**
28:11;29:13,25;
32:23;78:20;87:22;
92:16;107:4;141:12,
15,19,20
**terms (3)**
23:20;134:11,13
**testified (7)**
4:5;43:10;88:6;
97:18;117:5,16;
134:6
**testify (1)**
15:2
**testifying (1)**
93:20
**testimony (5)**
20:25;93:17,21;
102:22,24
**thanked (1)**
60:12
**thankfully (2)**
35:14,15
**therapists (1)**
92:3
**thirdly (1)**
13:3
**third-party (1)**
71:13
**though (5)**
6:8;60:1;129:23;
130:22;135:8
**thought (5)**
32:1;34:18;62:24;
99:2;106:19
**thousands (1)**
131:8
**threatened (2)**
53:9;59:13
**three (21)**
13:6,11;37:25;
38:4,9;40:17;59:9;
65:8,9;69:21;70:19;
72:4,10,13;77:11,18;
78:1,12;79:6;108:19;
133:10
**three-year (1)**
77:8

**Thursday (1)**
96:1;100:10;104:6
**tied (1)**
85:5
**timeframe (5)**
10:17,18;12:23;
13:20;88:14
**times (5)**
27:9;55:15;59:17;
61:19;89:19
**timing (1)**
115:13
**title (8)**
9:24,25;11:2;88:9,
10,12,17;89:7
**titled (1)**
62:4
**titles (2)**
88:11,14
**today (13)**
5:20;7:8;12:9;
15:24;22:16;25:15;
27:5;30:16;33:15;
91:5;94:19;98:12,14
**together (7)**
32:3,4;74:15;95:2,
7;108:2;122:2
**told (27)**
22:23;23:1;53:5;
55:18,23;59:14;87:9;
96:9;104:9,9;105:3,
12,19,21;106:24;
107:22;111:18;
112:11,20,23;117:17;
123:22;124:10;
125:24;126:2;
133:24;134:3
**tolerate (1)**
121:1
**took (13)**
11:1;32:14,16;
43:21;52:5;91:6;
105:7,9;110:16,17;
116:9;143:21;144:3
**tool (1)**
138:16
**top (1)**
17:14
**topic (3)**
74:21;93:16;
131:11
**topics (1)**
99:12
**total (2)**
31:22,25
**totally (3)**
30:9;123:18;130:1
**touched (1)**
89:20
**toward (2)**
30:12;75:10
**TPA (1)**
71:12

**Tracie (9)**
37:19,20;38:23;
39:11;40:1,15;78:12;
98:11,22
**tracks (1)**
89:19
**traffic (1)**
135:8
**trained (1)**
59:23
**training (2)**
9:17,18
**transactions (1)**
54:1
**transfer (1)**
25:9
**transition (1)**
62:13
**transitioned (2)**
44:19,20
**travel (2)**
132:4,5
**trick (2)**
5:21;42:1
**tried (2)**
99:1;102:2
**true (4)**
5:22;29:14;73:7;
99:10
**trust (5)**
30:8,9,18;120:3;
121:12
**trustee (10)**
35:16,17;36:11,16;
37:16;41:2;43:2;
44:24;71:19;78:15
**trustees (27)**
35:8,18,19;37:9;
38:9;40:16,19,19,20;
42:10,11,13,14,22;
43:4,5,6;44:2;49:7;
51:18;69:9,17;70:15;
73:3,6;78:17;98:24
**truth (2)**
6:11;22:24
**try (8)**
5:25;46:2;68:8;
108:2,3,11;121:8;
124:15
**trying (30)**
7:2,2;13:17;17:13;
22:10,25;42:1,2;
46:21;54:9,12,13;
59:20;61:8,8,22,24;
62:22;66:25;70:10;
78:24;79:23;93:13;
98:7;105:22;116:15;
124:14;135:4,4;
145:15
**Tuesday (3)**
97:9,16;104:2
**turn (1)**
78:7

**turned (1)**
122:5
**twice (1)**
31:20
**Twitter (1)**
22:8
**Two (37)**
8:4,9;18:14;24:6,9,
11,12;25:23;26:25;
28:2;31:16;35:1;
38:13;48:20;59:9;
63:8;65:8,9;68:13,
18;69:21;70:18;
76:19;84:15;91:8;
99:8;102:7;106:2;
110:24;117:4,6,6;
131:3;132:17;141:5,
7,10
**two-week (1)**
93:7
**type (3)**
29:8;30:17,21;
102:3;107:16,16;
137:5
**typed (1)**
97:7
**types (2)**
46:12;132:8
**typical (1)**
49:13
**typically (11)**
49:12;50:3,10,22;
74:8;123:14,21,22;
136:25;137:7,9

## U

**ultimately (4)**
42:16;43:6;78:25;
86:5
**unable (1)**
46:15
**unanimous (2)**
120:14,15
**unbundled (1)**
77:16
**uncertain (1)**
146:14
**uncovered (1)**
119:24
**under (21)**
6:8;39:2,10;57:10;
64:4,6,12,13;68:10;
76:17;78:11,12;
81:18;85:9;90:4,21;
95:14;107:16,16;
111:9;131:21
**underneath (1)**
75:22
**understood (2)**
6:6;56:6
**undone (1)**
143:22

**unfit (2)**
106:17;107:7
**unfounded (3)**
29:20;30:21;
120:13
**United (5)**
4:12;128:6,10,13,
24
**University (7)**
9:3;92:12,17,21;
93:19;94:3;133:16
**unprecedented (1)**
123:20
**unrelated (1)**
14:20
**unsure (1)**
41:14
**untrue (1)**
29:15
**up (27)**
6:22;51:25;63:15;
64:7;70:15;76:13;
78:4;81:21;88:7;
89:5;92:25;103:4;
106:13;114:17;
121:5,6,13,14,20,21;
123:24;124:2;133:9,
10;134:6;140:19;
144:5
**update (7)**
137:15,16;141:21;
142:2,3,3,10
**updated (1)**
94:9
**updates (1)**
137:11
**updating (2)**
96:9;137:16
**UPL (18)**
64:17,18;65:1,3,7,
12,25;66:20;67:3,19,
20,23,25;68:3,5,17;
146:6,11
**upload (1)**
84:24
**uploaded (1)**
137:7
**upon (1)**
25:11
**upper (2)**
64:16,20
**upset (5)**
30:1,2;98:25;99:2,
14
**use (8)**
22:6;30:3;34:7;
71:13;81:20;82:8,9;
139:20
**used (7)**
22:2;123:19;132:7,
9;138:25;139:17;
145:12
**uses (1)**

79:25
**using (6)**
41:21;75:12,13;
99:15;135:25;145:20
**usually (3)**
93:7;123:15;140:2
**utilize (1)**
142:6
**utilizing (1)**
76:15

## V

**valued (2)**
59:21;60:22
**variances (1)**
85:14
**various (1)**
131:23
**Varying (4)**
76:23;78:19;79:18;
89:25
**VEBA (89)**
35:10,11,16,17,18,
19;36:15,22,23,23;
37:1,4,6,9,15;38:10,
15;39:1,12,16,17,20;
40:16,18,21,22;
41:20;42:10,11,12,
20,21,22,25;43:4,15,
22;44:1,2,15,24;
45:11,20;46:4,8,14,
22,23;47:3,18,20,22,
25;48:5,15,18;49:7;
50:18;51:2,5,7,10,18,
19;52:9;53:6;69:6,7,
9,10,11,13,16;70:1,
15;71:8,20;73:2,6;
76:20;77:5,5;78:9,15,
17;98:11,24;99:8;
110:25
**vending (1)**
140:22
**vendors (3)**
77:4,18;137:15
**venture (2)**
95:3;134:14
**Ventures (2)**
17:5,8
**verbal (4)**
6:12,14,21;133:4
**version (3)**
127:8,23;128:2
**via (2)**
101:8;123:16
**vice (5)**
37:13,20;88:15,20,
22
**view (8)**
66:3;78:14;81:7,8,
10,11;97:19;105:20
**viewing (2)**
81:16,19

**violated (1)**
120:3
**Voicemail (1)**
100:15
**volume (1)**
54:8
**Voluntary (1)**
35:8
**vote (8)**
28:24;120:9,10,11,
12,14,15,16
**voted (1)**
29:1
**voting (1)**
28:21

## W

**W-2s (1)**
79:15
**wait (1)**
91:19
**Waldrop (122)**
4:11;28:7,9,25;
29:5,23;30:4,12;
32:22,25;33:3,5,8,10,
23;34:16,18;35:3,7,
19;38:5;45:6;49:5;
51:17;52:16,20;53:9,
24;54:1,20;55:8,12,
16;56:1,20;58:22,25;
59:6,8;60:6;61:17,
20;62:8;63:2;64:4,
12;66:21;67:2,7,17;
69:8;71:19;73:2,9,
21;74:9;76:17;82:4;
83:3;86:16,19;87:1,
4;92:20;93:18;94:24;
95:15,17;96:19;
97:20;100:4,18;
101:7,17;102:19,23,
25;103:5,7,15,16,17,
21;104:25;105:4,12,
19;106:6,13,24;
107:5;108:18;
109:23;110:4;
112:18;114:19;
115:6;116:1;117:20;
118:2;119:25;120:2,
17;121:3,15;122:9,
13;123:23;126:13;
131:1;134:2;135:24;
140:4;141:6,23;
142:18,20,23,24;
143:7;144:4;146:20
**Waldrop's (20)**
25:24;26:24;29:9;
33:21;63:24;82:25;
87:22;92:15;95:9,23;
96:17;100:7;103:11;
105:7;116:2;131:14;
141:12,15;142:25;
143:21

Mark A. Waldrop v.
Community Health Systems, Inc.

Ronnie Rollins
December 8, 2016

**walk (5)**
60:10;97:17;98:6;
99:19;110:7
**Wall (41)**
31:5,18;32:14;
33:3;103:11,14,17,
21;104:7,9;105:7,9,
11;106:11,12,23;
107:5;108:18;110:4,
14;111:23,25;112:17,
20,24;114:6,18,25;
115:25;117:6,8,13;
119:4;122:13,15,24;
123:11,22;125:22;
126:11;147:20
**Wall's (1)**
104:24
**Walter (1)**
62:8
**way (27)**
6:16,20;16:3;
20:11;27:16;41:24,
25;53:9;54:3;67:5;
69:18;70:11,21;
77:22;88:13;89:6;
95:17;98:23;100:5;
102:6;107:15;
112:13;114:4;121:4;
122:1;123:24;129:17
**wealth (1)**
48:12
**week (7)**
94:11;104:5,6;
108:22;115:19,19;
116:24
**wellness (2)**
40:12;41:24
**WellStar (1)**
63:18
**weren't (4)**
29:3;62:23;64:13;
91:18
**west (2)**
62:1;104:15
**what-if (1)**
55:17
**What's (9)**
11:12;58:19;66:4,
23;69:23;83:17;
91:23;97:11;142:2
**when's (1)**
113:1
**Whereupon (7)**
4:2;43:18;56:10;
87:25;129:6;144:9;
148:3
**whole (3)**
143:3;147:4,6
**whomever (1)**
135:25
**who's (1)**
121:9
**Whose (1)**

82:13
**wife (2)**
60:14;144:24
**wife's (2)**
7:24,25
**Wilks (7)**
74:24;76:11,13;
88:7;96:20,22;
143:14
**wired (2)**
61:22;62:4
**wish (1)**
66:18
**within (17)**
37:14;51:21,23;
65:8,16;67:20;79:21;
80:4,5;83:21;104:2,5,
16;108:25;116:24;
136:17;142:4
**witness (6)**
4:4;15:5,6;23:7;
131:9;148:2
**wondering (2)**
99:5;128:22
**word (6)**
30:2,3;43:11;51:9;
56:14;134:8
**words (3)**
18:14;50:25;53:2
**work (33)**
41:8;45:20;48:10;
62:16;66:10;70:4;
75:1;76:17;77:20,21;
78:23;80:4;85:8;
95:2,6,6;98:21;119:5,
7,23;121:14;122:6,7;
124:13,14;126:8;
136:6;137:5;142:13,
15;143:22;145:1,4
**Workday (37)**
79:6,7,8,9,19,21,
25;80:2,4,9;81:3,20,
23;82:8,9,11,14,16;
83:1,20;84:25;89:11,
16,24;91:8;136:17,
20,23;137:1,4,12,17;
142:4;145:14,15,19,
21
**worked (8)**
17:23,24;20:3;
79:5;102:15;114:2;
119:9;143:4
**working (17)**
18:3,5;34:15;
40:11;51:3;75:2,9;
76:7,7,8;77:23,24;
97:4;107:23,24;
126:8;142:13
**works (2)**
5:18;113:25
**worried (1)**
51:14
**worth (2)**

62:9;143:22
**wow (1)**
45:19
**writing (2)**
33:6,9
**written (8)**
33:11;61:10;83:19;
87:14;109:5,6;
126:12;138:23
**wrong (6)**
30:2;19;67:7;
69:23;113:9;130:1
**wrongly (1)**
108:12
**wrote (4)**
44:25;45:3;72:8;
103:25

**Y**

**y'all (6)**
44:1;79:1;108:19;
112:12,14;137:22
**year (6)**
9:4;18:7,9;84:8;
141:11;143:4
**years (20)**
8:12;14:4;48:20;
59:9;61:20;62:13;
65:8,9;74:13;77:11,
19;87:20;92:13;93:9;
95:1;102:15;121:10;
134:22;135:10;
145:16
**year's (1)**
143:22
**yielded (1)**
72:4
**yielding (1)**
72:1

**Z**

**Zebulon (1)**
145:6

**1**

**1 (1)**
4:15
**10 (9)**
130:4,7,8,12,15,20,
25;134:22;138:6
**10:00 (8)**
5:8;34:17,22;35:1,
6;37:5;39:20;43:23
**100 (1)**
40:6
**1099s (1)**
79:15
**10th (1)**
45:5
**11 (1)**

12:22
**11:00 (1)**
43:18
**11:13 (1)**
43:19
**11:46 (1)**
111:22
**12/14/2015 (1)**
59:3
**12:00 (1)**
93:8
**12:21 (1)**
87:25
**12:57 (1)**
88:1
**12th (3)**
73:9;109:23;
119:19
**13th (8)**
34:17,24;37:5,12;
39:20;43:23;45:6;
103:1
**15th (1)**
103:23
**16th (2)**
41:11;104:5
**17 (1)**
8:12
**1980 (2)**
9:5;20:2
**1982 (1)**
9:7
**1985 (2)**
19:17;20:5
**1986 (6)**
19:10,15,16,17;
20:3,6
**199 (1)**
7:20
**1993 (1)**
19:11
**1994 (3)**
19:7,9,10
**1996 (1)**
19:7
**1997 (3)**
18:21;19:3,4
**1st (6)**
27:24;71:24;72:2;
86:21;124:24;125:18

**2**

**2 (1)**
24:2
**2:02 (1)**
129:6
**2:19 (1)**
129:7
**2:42 (1)**
144:9
**2:53 (1)**
144:10

**20 (2)**
14:4;92:13
**2000 (1)**
62:6
**2002 (4)**
18:6,11,21;24:20
**2003 (12)**
10:10,15,20;11:6;
12:9,22;13:13,22;
15:10,11;17:22;
62:10
**2005 (1)**
139:3
**2006 (3)**
24:13,16;145:24
**2009 (6)**
25:21,25;26:8;
27:3,5,20
**2010 (6)**
10:4,17;11:7;
12:22;54:17;146:2
**2010-2011 (1)**
13:19
**2011 (4)**
10:6,17;13:14,16
**2014 (2)**
133:23;134:16
**2015 (7)**
47:15,17;49:24;
50:13;55:9;91:1;
134:19
**2016 (14)**
27:24,24;28:8;
31:12;32:7;41:11;
71:25;72:18;73:9;
86:22,22;92:20;
124:24;141:11
**2017 (1)**
14:11
**20th (4)**
24:13,16;111:21;
115:17
**24th (1)**
5:2
**25 (3)**
68:16;74:13;
102:15
**250 (1)**
146:17
**25th (1)**
115:20
**25-year (2)**
59:22;60:22
**28th (6)**
27:24;28:13;86:22;
92:20;122:12,16

**3**

**3 (1)**
37:21
**3:00 (1)**
148:4

American Court Reporting Company, Inc.

**30 (5)**
   68:16;83:21;92:13;
   93:9;104:16
**31032 (1)**
   7:21

---

### 4

**4 (1)**
   57:16
**4:00 (1)**
   98:12
**4th (1)**
   125:19

---

### 5

**5 (1)**
   73:12
**500 (1)**
   40:7
**501c3 (10)**
   16:5,8,10,14,18,20,
   21,24,25;36:9

---

### 6

**6 (2)**
   100:22;139:3
**6th (1)**
   115:20

---

### 7

**7 (2)**
   109:8;139:3
**7th (1)**
   115:21

---

### 8

**8 (1)**
   124:18
**80s (1)**
   93:3
**8th (1)**
   115:21

---

### 9

**9 (1)**
   127:4
**9:00 (3)**
   5:7,8;93:8
**90s (1)**
   92:25

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
#### Northern District of Georgia

| | | |
|---|---|---|
| MARK A. WALROP | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   4:16-cv-235-HLM |
| COMMUNITY HEALTH SYSTEMS, INC. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                        Ronnie Rollins, 213 Third Street, Macon, Georgia 31201

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Cruser, Mitchell, Novitz, Sanchez, Gatson & Zimet, LLP Meridian II, Suite 2000, 275 Scientific Drive Norcross, Georgia 30092 | Date and Time: 12/08/2016 9:00 am |
|---|---|---|

The deposition will be recorded by this method:   Stenographic

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/18/2016

*CLERK OF COURT*

                                                                        OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Mark A. Waldrop
_____ , who issues or requests this subpoena, are:

Gary L. Henry, 320 McCallie Avenue, Chattanooga, Tennessee 37402, ghenry@gearhiserpeters.com, (423) 756-5171

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Rollins
Ex. 1

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  4:16-cv-235-HLM

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Ronnie Rollin

on *(date)* 11-21-16 .

☑ I served the subpoena by delivering a copy to the named individual as follows: Personally

Served with subpoena + fees.

on *(date)* 11-24-16 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.

Date: 11-24-16

_____
*Server's signature*

JIM GOSWICK / Process Server
*Printed name and title*

P.O. Box 66, Macon, GA. 31202
*Server's address*

Additional information regarding attempted service, etc.:

*Execution Version*

# EMPLOYMENT AGREEMENT
# OF MARK A. WALDROP

THIS EMPLOYMENT AGREEMENT (as amended and restated herein, this "Agreement") is made and entered into as of the 26 day of _June_, 2006, and is now amended and restated as of January 1, 2009, by and between Community Health Systems, Inc.. a Georgia nonprofit corporation (the "Company"), and the undersigned employee, Mark A. Waldrop, a resident of the State of Tennessee ("Employee").

## WITNESSETH:

WHEREAS, the Company desires to continue to employ Employee and Employee desires to accept such continued employment on the terms and conditions hereinafter stated; and

WHEREAS, Company and Employee now wish to update the Agreement in order to establish its compliance with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), with the understanding that this Agreement supersedes all prior versions and hereinafter shall solely establish the terms of Employee's employment with the Company;

NOW, THEREFORE. in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1.    Employment.  Employee shall serve as the Executive Vice President, Integration Services and shall perform the duties set forth on Exhibit 1 attached hereto, in addition to those duties reasonably assigned to Employee from time to time by the President of the Company or the Board of Directors of the Company.  Employee shall be employed on a full-time basis and shall report directly to the President of the Company.  Employee shall be subject to the Company's policies and procedures in effect from time to time.  Employee shall perform the duties assigned to him faithfully, diligently and to the best of his ability, and Employee shall not engage in any outside employment without the express written consent of the Board of Directors of the Company.

2.    Term of Employment.

2.1    Term.  Unless earlier terminated pursuant to Sections 2.2-2.6 below, the initial term of Employee's employment under this Agreement began on January 1, 2006 and shall continue until December 31, 2006 (the "Initial Term"); provided that such Initial Term shall be automatically extended for additional periods of one (1) year commencing on January 1, 2007 and each anniversary thereof (such period or periods, the "Renewal Term"), unless either party shall have given notice to the other party at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term (as the case may be) that such party does not desire to extend the term of this Agreement, in which event, the employment would terminate on December 31 of the Initial Term or the applicable Renewal Term (as the case may be) (the Initial Term and the Renewal Term or Terms, if applicable, collectively, the "Term").

2.2    Termination upon Death.  Employee's employment hereunder shall automatically terminate upon the death of Employee.  In the event of termination of employment upon death,

Rollins

Ex. 2

Case 4:16-cv-00235-HLM Document 77 Filed 07/18/17 Page 174 of 222
Case 4:16-cv-00235-HLM Document 1 Filed 07/26/16 Page 15 of 36
*Execution Version*

the Company shall pay to Employee's estate an amount equal to six (6) months' Salary (as defined below) payable in a lump sum within 60 days of the Employee's death.

2.3 <u>Termination upon Disability</u>. The Company may terminate Employee's employment hereunder immediately upon Employee's Disability, which has lasted (or can reasonably be expected to last) for a period of six (6) consecutive months (except as prohibited by law). For purposes of this Agreement, "Disability" shall mean the inability of Employee, as determined by the Company's Board of Directors, to perform the essential functions of his regular duties and responsibilities, with or without reasonable accommodation, due to a medically determinable physical or mental illness.

2.4 <u>Termination by the Company for Cause</u>. The Company may immediately terminate Employee's employment hereunder for Cause upon prior written notice of termination to Employee with such Cause being specified in such notice. As used herein, "Cause" shall mean (i) Employee's act or acts or omission or omissions amounting to gross negligence or willful misconduct which are detrimental to the Company or its reputation; (ii) Employee's conviction of, pleading guilty to, or confessing to any felony; or (iii) Employee's failure to observe or perform any material covenant, condition, or provision of this Agreement or of the Company's written policies, and when such failure is capable of remedy, such failure is not remedied within 30 days after notice of such failure is given to Employee by the Company.

2.5 <u>Termination by the Company without Cause</u>.

(a) The Company may terminate Employee's employment hereunder without Cause by giving Employee 30 days' prior written notice thereof.

(b) In the event of the Company's termination of employment without Cause, as severance pay the Company shall, subject to Section 2.8 below, continue to pay the Salary to Employee for (1) year. Such severance pay shall be payable in equal installments and in accordance with the regularly recurring pay periods established by the Company but in no event less frequently than monthly.

2.6 <u>Termination by Employee</u>. Employee may terminate Employee's employment hereunder by giving the Company not less than 30 days' prior written notice thereof.

2.7 <u>Effect of Termination of Employment</u>. Upon termination of employment, all obligations of the Company under this Agreement shall terminate except with respect to (i) payment of compensation earned to the date of termination, (ii) any severance payments required to be paid under Section 2 of this Agreement, (iii) reimbursement of expenses incurred prior to the date of termination of employment to which Employee would have been entitled under this Agreement, and (iv) any unpaid vested amounts or benefits to which Employee would have been entitled as of the date of Employee's date of termination pursuant to any benefit plan. In addition to the foregoing, (a) upon termination of employment pursuant to Section 2.5 and for the duration of the severance period set forth in Section 2.5(b), Employee shall be provided benefits, at no cost to Employee, substantially similar to the employee benefits being provided to Employee at the time of such termination; and (b) upon termination of employment for any other reason, or immediately following the severance period set forth in Section 2.5(b), as applicable,

ATLANTA:5093463.1

*Execution Version*

Employee shall have the option to purchase continuation coverage as to any Company-provided medical, dental or vision plan in which he participates, such option being in addition to any legally-mandated rights Employee may have to COBRA continuation coverage as to any Company-provided medical, dental or vision plan in which he participates.

2.8     Code Section 409A Compliance.  Notwithstanding anything in this Agreement to the contrary, if any benefit or amount payable to the Employee under Section 2 on account of Employee's termination of employment constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended or successor provision ("409A"), payment of such benefit or amount shall commence only when Employee incurs a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h).  Such payments or benefits shall be provided in accordance with the timing provisions of Section 2 by substituting the references to "termination of employment" or "termination" with "separation from service".  If at the time Employee incurs a separation from service Employee is a "specified employee" within the meaning of 409A, any benefit or amount payable to the Employee under Section 2 that constitutes nonqualified deferred compensation subject to 409A shall be delayed until the first day of the seventh month following the Employee's separation from service (the "409A Suspension Period").  Within 14 calendar days after the end of the 409A Suspension Period, the Company shall pay to the Employee (or his estate or beneficiary, as applicable) a lump sum payment in cash equal to any payments (without interest) that the Company would otherwise have been required to provide under this Agreement but for the imposition of the 409A Suspension Period.  Thereafter, Employee shall receive any remaining payments due under Section 2 in accordance with the terms of Section 2 (as if there had not been any suspension period beforehand).   For purposes of this Agreement, each payment that is part of a series of installment payments shall be treated as a separate payment for purposes of 409A.

3.     Compensation.  For all services which Employee renders to the Company during the Term, Employee shall receive from the Company an annual Salary as of January 1, 2009 (the "Salary") of $562,680, less normal withholdings.  The Salary shall be paid to Employee on the regularly recurring pay periods established by the Company, but in no event less frequently than monthly.  The amount of the Salary shall be reviewed annually by the Board of Directors of the Company for, at the discretion of the Board of Directors of the Company, possible increases in such amount.

4.     Reimbursement of Business Expenses.  The Company shall pay all reasonable and necessary travel and business expenses incurred by Employee directly related to Employee's performance of Employee's responsibilities and duties for the Company under this Agreement. Employee shall submit to the Company statements that justify in reasonable detail all expenses so incurred.  Employee shall submit all reimbursements hereunder for a particular calendar year no later than forty-five (45) days after it ends, and payment shall occur not later than March 15 immediately following the end of the calendar year to which the reimbursement relates.

5.     Benefits.

5.1     Executive Benefits Program.  The Company shall pay insurance premiums on behalf of Employee for health insurance for Employee and his dependents and for disability and life insurance, in such amounts as the Company from time to time may determine.

3

*Execution Version*

5.2     <u>Standard Benefits</u>.  Employee shall be eligible to participate in any 401(k) plan in which the employees of the Company participate.  Employee shall also be entitled to participate in any other employee benefit plans and programs, to the same extent generally available to other similarly situated Company executives, in accordance with the terms of those plans and programs.

5.3     <u>Short Term Disability Payments</u>.

(a)     Irrespective of whether the Company purchases or maintains any disability insurance for Employee, should Employee become Disabled, then the Company shall provide to Employee short-term disability payments, as set forth in this Section 5.3.  During the first 180 days of a Disability, the Company will continue to pay to Employee his Salary commencing on the 6th day of such Disability.  During the first 5 days of such Disability, Employee must take sick days, vacation days or paid leave time to which he is entitled.  If Employee is not entitled to any more sick days, vacation days or paid leave time, then during the first 5 days of such Disability, Employee must take unpaid leave.  During the time period where Employee receives short-term disability benefit payments pursuant to this Section 5.3, Employee shall continue to be covered by all of the benefits and other provisions of the executive benefits program, if applicable, generally described above.

(b)     All such short-term disability benefit payments shall be made monthly on the appropriate regularly recurring pay periods established by the Company.  The short-term disability benefit payable from the Company shall be reduced by short-term disability benefit payments to Employee by insurance companies for which the premium is payable by the Company.

5.4     <u>Executive Leave Policy</u>.  During the Term, Employee shall be entitled to certain paid time off, as more fully described in the Company's Executive Leave Policy, a copy of which is attached hereto as <u>Exhibit 5.4</u>.

6.     <u>Restrictive Covenants</u>.

6.1     <u>Definitions</u>.

(a)     "Business" shall mean:  (a) the provision of rehabilitative therapy, medical and personal support services, home care, medical or pharmaceutical supplies or case management services; (b) the leasing, ownership, management or operation of nursing facilities or assisted living facilities ("assisted living facilities" being known under Section 31-712 of the Official Code of Georgia Annotated as "personal care homes"); (c) the operation and management of a health care cooperative; (d) the operation and management of one or more captive insurance companies; and (e) other activities or provision of products or services being conducted or provided, as applicable, or which the Company has active plans to pursue, at the time of termination of Employee's employment.

(b)     "Competing Business" shall mean any person or entity which engages in a business substantially the same as the Business or any portion thereof.

4                                    ATLANTA:5093463.1

*Execution Version*

(c) "Confidential Information" shall mean any data or information, other than Trade Secrets, that is valuable to the Company, any other member of the System or their respective affiliates and is not generally known by the public. To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, lists (whether or not in writing) of the Company's, any other member of the System's or their respective affiliates' current or potential customers, lists of and other information about the Company's, any other member of the System's or their respective affiliates' officers and employees, financial information (whether or not in writing) that has not been released to the public by the Company, any other member of the System or their respective affiliates, marketing techniques, price lists, pricing policies, and the Company's, any other member of the System's or their respective affiliates' business methods, contracts and contractual relations with the Company's, any other member of the System's or their respective affiliates' customers and suppliers and future business plans. Confidential Information also includes any information or data described above which the Company, any other member of the System or their respective affiliates obtain from another party and which the Company, any other member of the System or their respective affiliates treat as proprietary or designate as confidential information whether or not owned or developed by the Company, any other member of the System or their respective affiliates. "Confidential Information" shall not include any materials or information of the types specified above to the extent that such materials or information (i) are or become publicly known or generally utilized by others engaged in the same business or activities in which the Company, any other member of the System or their respective affiliates utilized, developed, or otherwise acquired such information; or (ii) are known to Employee prior to employment, having been lawfully received from parties other than the Company, any other member of the System or their respective affiliates; or (iii) are furnished to others by the Company, any other member of the System or their respective affiliates with no restriction on disclosure. Failure to mark any Confidential Information as confidential shall not affect its status as "Confidential Information" under this Agreement.

(d) "Restricted Customer" shall mean any customer or client of the Company or its affiliates with whom Employee has had business contact during his employment with the Company.

(e) "Trade Secrets" shall mean any information of the Company, any other member of the System or their respective affiliates, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product or service plans, or a list of actual or potential patients or suppliers, which is not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secrets also include any information described in this Section 6.1(e) which the Company or other members of the System or their affiliates obtain from another party which the Company or other members of the System or their affiliates treat as proprietary or designate as trade secrets, whether or not owned or developed by the Company, any other member of the System or their respective affiliates. Failure to mark any Trade Secrets as confidential shall not affect its status as a Trade Secret under this Agreement.

ATLANTA:5093463.1

*Execution Version*

(f)     "Territory" shall mean the State of Georgia.

6.2     <u>Nondisclosure of Trade Secrets and Confidential Information</u>.  In the course of Employee's employment by the Company, Employee will have access to the Company's, other members of the System's or their respective affiliates' most sensitive and most valuable Trade Secrets and Confidential Information, the use, application or disclosure of any of which would cause substantial and possibly irreparable damage to the business and asset value of the Company, other members of the System or their respective affiliates.  Accordingly, Employee accepts and agrees to be bound by the following provisions:

(a)     During the Term and following the termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose, or permit any unauthorized person or entity access to, any Trade Secrets or any portion thereof so long as they remain Trade Secrets.

(b)     During the Term and for a period of two (2) years following termination of this Agreement, Employee shall hold in confidence and shall not, except as expressly authorized or directed by the Company and except in the performance of services for the Company hereunder, use, copy, duplicate, reproduce, distribute, reverse engineer, decompile, disassemble, transfer, transmit, disclose or permit any unauthorized person or entity access to, any Confidential Information or any portion thereof.

(c)     Without limiting the foregoing, Employee shall abide by the Company's policies and regulations, as established from time to time, for the protection of its Trade Secrets and Confidential Information.  Notwithstanding anything herein to the contrary, Employee shall be permitted to disclose Trade Secrets or Confidential Information if required by applicable law, provided that, in such case, Employee shall (i) furnish only that portion of the Confidential Information or Trade Secrets that he is advised by counsel is legally required to be disclosed, and (ii) provide the Company with prompt written notice of such request or requirement so that the Company may seek a protective order or other appropriate remedy.

(d)     Upon the request of the Company and in any event upon the termination of employment with the Company, Employee shall deliver to the Company all memoranda, notes, records, tapes, documentation, disks, manuals, files or other documents, and all copies thereof in any form, concerning or containing Confidential Information, Trade Secrets or Works (as defined below) that are in Employee's possession, whether made or compiled by Employee, furnished to Employee or otherwise obtained by Employee.

6.3     <u>Nonsolicitation of Customers and Employees</u>. Employee covenants and agrees that during the Term and for a period of eighteen (18) months thereafter, Employee shall not, directly or indirectly (whether on his own behalf or on behalf of any other person, as owner, partner, stockholder, investor, employee, officer, director, agent, independent contractor, associate, executive, consultant or licensor):

ATLANTA:5093463.1

Case 4:16-cv-00235-HLM   Document 77   Filed 07/18/17   Page 179 of 222
Case 4:16-cv-00235-HLM   Document 1   Filed 07/26/16   Page 20 of 36
*Execution Version*

(a)     (A) solicit, recruit, divert or take away or attempt to solicit, recruit, divert or take away any person that is an employee of the Company, any other member of the System or their respective affiliates and with whom Employee had personal contact during his employment under this Agreement, (B) encourage any person or entity (other than the Company, any other member of the System or their respective affiliates) to solicit, recruit, divert or take away any such employee or (C) otherwise encourage any such employee to discontinue his or her employment with the Company, any other member of the System or their respective affiliates; or

(b)     solicit, recruit, divert or take away a Restricted Customer for the purpose of directly or indirectly providing, distributing or selling products or services similar to those provided, distributed or sold in the operation of the Business.

Nothing herein shall prohibit Employee (following the termination of this Agreement) from conducting solicitations of the general public for employment or for business not targeted specifically at Restricted Customers or employees of the Company or its affiliates.

6.4     Noncompetition Covenant.  Except as set forth on Exhibit 6.4 attached hereto, Employee further covenants and agrees that, during the Term and for a period of twenty four (24) months thereafter, he shall not, without the Company's prior written consent, serve as an operations manager, an executive vice president of integration services or in any other position requiring Employee to perform some or all of the duties that Employee was performing for the Company at the time this Agreement is terminated in the Territory for any Competing Business.

6.5     Ownership of Common Stock.  Notwithstanding anything in this Section 6 to the contrary, nothing contained herein shall prohibit Employee from owning not more than three percent (3%) of the common stock of any company whose common stock is publicly traded on a national securities exchange or in the over-the-counter market.

7.     Company Ownership of Works.

7.1     Definition of Works.  "Works" shall mean any and all works of authorship, code, inventions, improvements, discoveries, trademarks, technologies, and work product, whether or not patentable or eligible for copyright, trade secret or trademark protection, and in whatever form or medium and all derivative works thereof, and any and all rights, applications or registrations with respect thereto which are, have been or will be created, made, or developed by Employee:  (a) in the course of employment with the Company, (b) during Employee's regular business hours with the Company, (c) on the Company's premises, or (d) using the Company's resources or equipment.  Employee agrees to fully and promptly disclose in writing to the Company any such Works as such Works from time to time may arise.

7.2     Company Ownership of Works.  All Works are the property of the Company. Employee shall execute and deliver such confirmatory assignments, instruments, or documents as the Company deems necessary or desirable without requiring the Company to provide any further consideration therefor.  Employee agrees to and hereby does assign to the Company all right, title, and interest in and to any and all Works, including all worldwide copyrights, patent rights, trademark rights, and all trade secrets embodied therein.  Employee waives any and all rights Employee may have in any Works, including but not limited to the right to

ATLANTA:5093463.1

*Execution Version*

acknowledgement as author. Employee agrees not to use or include in Works any copyrighted, restricted or protected code, specifications, concepts, trademarks, or trade secrets of any third party or any other information that Employee would be prohibited from using by any law or any confidentiality, non-disclosure or other agreement with any third party.

   7.3 <u>Further Assurances</u>.  Employee shall, without charge to the Company other than reimbursement of Employee's reasonable out-of-pocket expenses, execute and deliver all such further documents, including applications for patents, trademarks and copyrights, and perform such acts, at any time during or after the Term as may be necessary, to obtain patents, trademarks, or copyrights, or any other legal protection in respect of the Works and to vest title such Works in the Company, its successors, assigns, or designees.  Without limiting the generality of the foregoing, Employee further agrees to give all lawful testimony, during or after the Term, which may be required in connection with any proceedings involving any Works so assigned by Employee.

   8. <u>No Conflicting Obligations to Third Parties</u>.

   Employee represents and warrants to the Company that Employee is not subject to any employment, non-disclosure, confidentiality, non-compete, or other agreement with any third party which would prevent or prohibit Employee from fulfilling Employee's duties for the Company.  If Employee is the subject of any such agreement, and has any doubt as to its applicability to Employee's position with the Company, Employee will provide a copy of such agreement to the Company so that the Company can make a determination as to its effect on Employee's ability to work for the Company.

   9. <u>Remedies</u>.

   The restrictions contained in this Agreement are considered by the parties hereto to be fair and reasonable and necessary for the protection of the legitimate business interests of the Company.  It is recognized that damages in the event of breach of the provisions of this Agreement by Employee would be difficult, if not impossible, to ascertain, and it is therefore agreed that the Company, in addition to and without limiting any other remedy or right it may have, shall have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach.  The existence of this right shall not preclude any other rights and remedies at law or in equity which the Company may have.

   10. <u>Notices</u>.

   Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally (including by facsimile, overnight courier or express mail service) or sent by registered or certified mail, postage or fees prepaid,

Company:
    Community Health Systems, Inc.
    213 Third Street
    Macon, Georgia 31201

ATLANTA:5093463.1

*Execution Version*

> Attention: Joseph A. Wall
> Fax: (478) 743-4501

With a copy (which shall not constitute notice) to:

> Paul, Hastings, Janofsky & Walker LLP
> 600 Peachtree Street, Suite 2400
> Atlanta, Georgia 30308
> Attention: Mark S. Lange
> Fax: (404) 815-2433

Employee:   Mark A. Waldrop
> 9686 Bowen Trail
> Ooltewah, TN 37363
> Fax: _____

or at such other address for a party as shall be specified by like notice. Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or the office of such party. Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth business day after the day it is so placed in the mail or, if earlier, the time of actual receipt.

11.   Binding Agreement.

The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. This Agreement is a personal service agreement and may not be assigned in whole or in part by Employee without the prior written consent of the Company. The covenants of Employee contained in Section 7 shall be binding upon the heirs, beneficiaries, administrators, and executors of Employee.

12.   Modifications and Amendments. This Agreement shall not be modified or amended except by an instrument signed by both parties, which makes specific reference to this Agreement.

13.   Waiver. The failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or of any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver.

14.   Severability. If any provision or covenant, or any part thereof, of this Agreement should be held by any court to be invalid, illegal or unenforceable, either in whole or in part, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remaining provisions or covenants, or any part thereof, of this Agreement, all of which shall remain in full force and effect.

ATLANTA:5093463.1

*Execution Version*

15. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all which together shall constitute one and the same instrument.

16. <u>Governing Law: Jurisdiction</u>.

This Agreement and the rights and obligations of the parties to the Agreement will be determined in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law. The Company and Employee irrevocably consent to the exclusive jurisdiction and venue of the courts of any county in the State of Georgia and the district courts of Georgia, in any judicial proceeding brought to enforce this Agreement. The parties agree that any forum other than the State of Georgia is an inconvenient forum and that a lawsuit (or non-compulsory counterclaim) brought by one party against another party in a court of any jurisdiction other than the State of Georgia should be forthwith dismissed or transferred to a court located in the State of Georgia.

17. <u>Attorney's Fees</u>.

If either party to this Agreement breaches any terms hereof, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

18. <u>Interpretation</u>.

This Agreement (including the Exhibits attached hereto) constitutes the complete understanding between the parties concerning the subject matter hereof, and all prior negotiations, representations and agreements having been merged into this Agreement.

*(Signatures on following page)*

ATLANTA:5093463.1

*Execution Version*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first set forth hereinabove.

"Company"

COMMUNITY HEALTH SYSTEMS, INC.

By: _____

Name: Ronnie D. Rollins
Title:   President

"Employee":

_____
Mark A. Waldrop

11                                                    ATLANTA 5093463 1

## **EXHIBIT 1**

Duties of Employee

**Overall Responsibility/Primary Objective/Summary**:  Manage the overall operations of each individual operating company to ensure the consistent application of Company policies (financial, business practices and people), operating philosophies, values and principles.  Work with the Business Unit Presidents to develop and implement plans for the successful integration of services to customers, systems, processes and people to accomplish the goals of the Company.

### **Summary of Major Responsibilities**

#### **Board of Directors**
- Serve as Ex-Officio member of the Board of Directors' Systems Integration and Support Committee
- Coordinate documentation and presentations necessary for the Board of Directors

#### **Executive Committee and Steering Committee**
- Serve on Executive Committee and Steering Committee
- Assist all Steering Committee members in the coordination of all operating matters

#### **Financial Management**
- Work with the Executive Committee to review budgets and business goals and manage the business units to meet these goals
- Approve all contracts between business units and its clients

#### **Integration**
- Collaborate with Business Unit Presidents to launch cross Business Unit Initiatives that improve service to customers, revenue, compliance with regulation, efficiency/effectiveness, etc.
- Develop initiatives that encourage collaboration across business unit senior management and staff lines
- Bridge cultural and communications gaps across Business Units and work with Executive staff to mobilize joint teams as necessary

#### **Patient Centered Care**
- Establish partnerships among practitioners, aging/disabled customers and their families to ensure that decisions respect a customer's wants, needs and preferences
- Ensure that customers have the education and support needed to make decisions and participate in their own healthcare
- Enable transition to preventative healthcare, chronic care and care management in home and community based settings

#### **Human Resources Management**

ATLANTA:5093463.1

Case 4:16-cv-00235-HLM   Document 77   Filed 07/18/17   Page 185 of 222
Case 4:16-cv-00235-HLM   Document 1   Filed 07/26/16   Page 26 of 36
*Execution Version*

- Directly and indirectly manage direct reports including the President, Ethica Health & Retirement Community; President, Health Distribution; President, Pharmacy Services; President, Integra Rehabilitation; President, Home & Community Services; Vice President, Human Resources; Director, Information Services; and Director of Project Management
- Establish goals for direct reports and ensure direct reports have goals established for their employees that correspond.  Manage performance toward achieving these goals
- Constantly evaluate the skill sets versus requirements of direct reports and make adjustments accordingly
- Provide leadership direction to the organization to ensure direct reports are optimally utilized
- Work with the VP, Human Resources, to review Human Resources initiatives and financial models to meet the needs of the organization

**Essential Job Functions:**

- Provide day-to-day leadership to the System that mirrors the mission, vision, and values of the organization
- Orchestrate transfer of best practice between Business Units
- Help identify and implement critical business and clinical synergies across the day-to-day operations of the System
- Monitor progress against the goals of the System and individual Business Units
- Analyze industry trends and look for business and revenue enhancement opportunities
- Monitor the operating and capital budget for each business unit in ways that direct effective forecasting and control of costs
- Work with Business Unit Presidents and Corporate leadership to redesign key processes and standardize policies and procedures
- Work with Business Unit Presidents to assure timely provision of skilled nursing, home and community based services in the most appropriate setting
- Participate in multiple state and national professional associations
- Perform other tasks as assigned by the President

*Execution Version*

**EXHIBIT 5.4**

Executive Leave Policy

*See attached.*

ATLANTA:5093463.1

*Execution Version*

# EXECUTIVE
# LEAVE
# POLICY

**May 2006**

## Executive Leave

The organization provides its eligible executives with an Executive Leave Policy that is designed to allow executives greater flexibility in planning their lives.  Under the Executive Leave Policy, executives may use their leave days for vacation, sick leave, medical appointments, family illness or any leave of absence.

Executives are eligible immediately upon employment and leave may be taken any time during employment, with supervisory approval.  Executives will receive their leave days at the beginning of each anniversary year and will be based on the number of continuous years of service on the executive's previous anniversary year.  Leave days do not carry over to future years, and cannot be borrowed from future unearned leave.

The organization recognizes the importance of an executive taking time off from work to rest and relax and accordingly provides leave days as follows:

## Leave Days Available:

- Year One (1) thru Year Five (5)          20 days
- Year Six (6) thru Year Ten (10)          25 days
- After Tenth (10) Year and Beyond         30 days

All requests for Executive Leave must be in writing and approved by the President.  In order to balance and meet organization needs, executives should provide appropriate notice when anticipating taking time off.  Requested leave will be approved taking into account organization needs and other associates' leave requests.

## **EXHIBIT 6.4**

1.      Section 6.4 of this Agreement shall not prohibit Employee from the continued ownership, operation or use of any real or personal property owned by Employee at the time of termination of Employee's employment hereunder.

2.      In the event that Employee's employment is terminated by the Company without Cause under Section 2.5 of this Agreement, then Section 6.4 of this Agreement shall automatically terminate.

**Mark Waldrop**

| | |
|---|---|
| **From:** | Ronnie Rollins |
| **Sent:** | Wednesday, March 16, 2016 3:20 PM |
| **To:** | Mark Waldrop; Lorraine Taylor; Blair Lake |
| **Subject:** | CHSGA VEBA |
| **Attachments:** | MEMO VEBA Trustees_Management_3.16.16.docx |

VEBA Trustees,

Please see attached memo regarding the CHSGA VEBA.

Thank you for your attention to this matter.

*Ronnie Rollins*
*President*

*Community Health Services of Georgia*
**P.O. Box 1037**
**Macon, GA 31202**

1

Rollins
Ex.3

MEMO

March 16, 2016

To:     VEBA Trustees

From: Ronnie Rollins

Re:     VEBA Management

Thank you for the time and energy each of you have put into transitioning from a fully-insured health program to a partially self-funded program over the past couple of years. There have been many challenges that have been met and overcome and, of course, there are many challenges lying before us.

It appears that our organization will pursue the current model for the foreseeable future and accordingly, it is time to move from start-up of VEBA operations to recognizing the VEBA as a part of our on-going operations.  To facilitate this transition, we will be making the following adjustments effective April 1, 2016.

Assign work tasks and activities in the VEBA consistent with other operations within CHSGA as follows:

- Operations: The VEBA will fall under the purview of NSC including day-to-day management.  NSC will handle calls with service providers and engage the members as needed.

- Business Operations:  The VEBA will be assigned to corporate financial services for all accounting and business operations including finance-related engagement with services providers.

- Benefits Administration:  Benefit planning and follow-up will be assigned to the Human Resources Department in SAS along with other human resource-related activities.

Please review and let me know your availability for a call on Monday, March 21st, at 10 AM to discuss transition matters.

Thank you again for your assistance providing health benefits to our associates through the CHSGA VEBA.

CheckWorks ImageExplorer Enterprise Print                                                    Page 1 of 1

**Check Image Print**

User ID: UTKS108                                                                    Date: 12/06/2016
Report ID: Check Image Print                                                        Time: 12:38:16

| Capture Date | Sequence Number | Check Number | Amount | Posting Date | Posting Account |
|---|---|---|---|---|---|
| REDACTED | | 725 | 250000.00 | | REDACTED |

ALTAMAHA INVESTMENT HOLDINGS INC                                              725
P.O BOX 648
MACON, GA, 31202                                                        64-2261

DATE  12/14/15

PAY TO THE ORDER OF  Mark A. Waldrop                              $ 250,000 ⁰⁰/₁₀₀

Two hundred fifty thousand & ⁰⁰/₁₀₀                              DOLLARS

STATE BANK
& Trust Company

FOR                                                    REDACTED

REDACTED

REDACTED

ROLLINS
EX 4

## Check Image Print

User ID: UTKS108
Report ID: Check Image Print

Date: 12/06/2016
Time: 12:38:53

| Capture Date | Sequence Number | Check Number | Amount | Posting Date | Posting Account |
|---|---|---|---|---|---|
| REDACTED | | 0 | 250000.00 | | REDACTED |

**SunTrust**

**Deposit Ticket**

Date 12-16-15

Account Name (print) MARK Waldrop

250,000.00

Signature (only if receiving cash from deposit)

Account No.

REDACTED

$ 250,000.00

REDACTED

REDACTED

REDACTED

**Stephanie Dotson**

| | |
|---|---|
| **From:** | Ronnie Rollins |
| **Sent:** | Thursday, May 12, 2016 5:59 PM |
| **To:** | Mark Waldrop |
| **Subject:** | Follow-up from today's call |

Mark,

I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.

After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".

1. EHR
   a. You have not really been involved in LG pilot
   b. Diligence on LG CNS (who are they)
   c. Monday was the first time you had seen the product demonstrated
   d. You have a number of questions and will be following up with Diana
   e. LG is not your recommendation for a system-wide EHR solution at this time
   f. No system solution identified
   g. RR does not need to respond to Diana or her team

2. VEBA Contracts
   a. Lack of understanding of my concern regarding the negotiation of multiple contracts with different expiration dates
   b. Varying opinions on payment of early termination fees ($55,000/yr.)
   c. Agreement on not executing contracts at present and watch a few more months and reconsider

3. Workday Contract
   a. Identified work projects over the next 6 – 18 months are all included in the current contract fees
   b. Should there be a reduction in cost? Paid in advance?
   c. RR noted Business Process (PBJ) meeting identified several weaknesses in current time and attendance system
   d. RR, MW and LT previously identified need for new time and attendance system within next 2 years (Imp 2016-2017)
   e. T&A not included in HCM/PAY strategy or FIN strategy with Workday
   f. RR to speak with LT regarding FIN and T&A
   g. RR to speak with Workday regarding T&A during contract discussions

1

*Rollins*
*Ex 5*

4. HHA and Hospice market information
   a. MW has information and did not provide because prior meeting was telephonic and not in person
   b. MW to send market information to RR by email

5. Academic Relations Grants
   a. RR informed Board looking to make change in investment managers
   b. Now is opportune time to discuss ARG strategy
   c. MW to speak with team and prioritize recommendations and provide to RR

6. Brogdon homes
   a. RR met with owners of centers to discuss lease extensions
   b. Learned centers owned by Global REIT and introduction of discussion of Goodwill in Macon
   c. MW is unaware of what Diana is doing
   d. DW informed Mark she is working with RR
   e. RR informed that decision expected by Global by end of week – 50/50 chance deal will go

7. Navicent
   a. RR informed of recent meetings between CHS and Navicent
   b. RR and HH having meetings some of which included Diana and discussion of beds
   c. MW had no additional guidance on how to proceed

8. FSLA
   a. RR requested impact analysis for system (assumed HR had prepared) proposed rule on exempt status
   b. Blair Lake attending seminar on FSLA today
   c. MW to forward report on impact of proposed rule

Please let me know if you have any additions to the follow-up/action items from today's call.

Thanks.

**Ronnie Rollins**
**President**

**Community Health Services of Georgia**
**P.O. Box 1037**
**Macon, GA 31202**



May 15, 2016

Mr. Mark Waldrop
1013 Riverburch Parkway
Suite 1
Dalton, GA 30721

Dear Mark,

This letter is to follow-up your phone call to me on Friday, March 13, 2016 regarding my email dated 5/12/15, subject matter "Follow-up from today's call". In our conversation on Friday you indicated there were "lies" in my email message to you – that is a very strong statement. I will speak more on that later in this letter.

During our call, I asked you to follow-up in writing regarding the instances you were referring to as lies and I have not received it to date. However, please do not consider that statement to be criticism, rather merely the rationale for my sending this letter to you in advance of receipt of your comments. The purpose of this letter is to address the "lie" that you discussed in our call on Friday.

First, I ask that you read the first three sentences of the May 12th email for context of the email (see excerpt below).

**[I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.**

**After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".]**

Context – I had provided what I thought were clear directions and support to the VEBA Trustees in a memo dated March 16, 2016 and in a subsequent follow-up conference call on March 21, 2016 with the VEBA Trustees. At no point was it discussed that Tracie would be running the VEBA Trustee meetings. As a practical matter, I do not recall any discussions or questions regarding the VEBA Trustees or the VEBA Trustee meetings in the previous two months since the March memo and conference call.

In reaching out to me, Tracie was very concerned that she did not know what she needed to do and that she was unprepared to run the VEBA meeting; however, she was very willing to try. I assured her that I believed that she and her team were very capable of managing and reporting on the claims and pharmacy operations of the VEBA and looked forward to her report. In addition, I assured her that I had not intended for her to chair the VEBA meeting. It was after 5 pm on Thursday and it was clear to me that I needed to speak with you and Blair.

*Raines*
*Ex 6*

Mark Waldrop
May 15, 2016
Page 2

My rationale was simple; I had sent an email and had conversations with you, Blair and Lorraine, as VEBA Trustees. It seemed clear that I needed to speak with you as Michelle's supervisor (and Michelle as Tracie's supervisor) and Blair as VEBA chair and as a subordinate to you to clarify that I had not made any changes to the VEBA Trustees or their meetings. The sole purpose of the March email was to assign additional focus (personnel) to the VEBA given its poor performance over the preceding two years in anticipation that VEBA performance might improve and we could avoid another year with multi-million dollar expenditures in excess of planned results.

At that time I made the decision to request a call on Friday morning to clear-up the confusion regarding Tracie's call to me. Also, as you and I had just completed a lengthy call a few hours earlier regarding several matters, I decided to send a quick email with bullet notes to summarize the results of our call which I completed and sent just before 6 PM.

On Friday morning I sent an email to you and Blair requesting a call (see excerpt below)

**[Tracie Clark called me with questions on the VEBA meeting next week. There appears to be some confusion based on her conversations with with you.**

**I believe it would be helpful for us to talk today. Are you available at 10 or 10:30 this morning?]**

On the call I shared with you and Blair my conversation with Tracie and learned that she had been instructed she would be leading the VEBA Trustee Meeting on Thursday. When I questioned why she was given those instructions, I was stunned when you and Blair indicated "I thought that's what you wanted me to do" or words to that effect. I was not taking notes and was too stunned by the response to write down the exact words, as I could not think of any rational reason either he or you would think those directions had been provided to the VEBA Trustees. The example that quickly came to my mind and that I shared with you and Blair would be a request from me to have Blair, Diana, or Charles serve as chair of the CHS Board meeting. It just seems too irrational to understand from my perspective. Nonetheless, Blair quickly "got it" as I believe he stated and set about to handle VEBA Committee meeting information as VEBA Chairman as he has for the past couple of years.

Shortly after the call with Blair, you called me indicating a number of issues with our relationship and specifically that my email on May 12th contained "lies". My impression was that you were very upset and you made several strong statements in addition to the "lies" comment including your belief that I was "targeting" you and the May 12th email was part of creating a file and that months down the road someone could look at the email and infer/conclude that you were not doing your job. In identifying the "lies" in the email, you specifically pointed out Item 7 of the memo as misrepresenting our conversation. You told your perspective of the conversation. You did not ask for my perspective.

Mark Waldrop
May 15, 2016
Page 3

Mark, let me first state that I am disappointed that you would begin a conversation regarding another associate's email by indicating the other associate has written lies.  I believe that approach is unprofessional and name-calling is counter-productive to resolving issues. I expect an apology and I would expect you to apologize to any other associate for a similar action. Below is Item 7 from the May 12th email.

> Navicent
> a. RR informed of recent meetings between CHS and Navicent
> b. RR and HH having meetings some of which included Diana and discussion of beds
> c. MW had no additional guidance on how to proceed

The topic of this item is "Navicent". I have been handling conversations with Navicent for many, many months and you have not been engaged in the negotiations involving EMS, MIH, the call center, skilled nursing beds, case management or any other aspect of the Navicent relationship. All the comments that you indicated on Friday that I had said to you in our Thursday conversation had probably been said by me, as I lead the conversation and recall the comments. From my perspective, I updated and informed you of the actions taken and conversations had by me and the group I am leading to make you aware of our actions – not to ask your opinion or your advice.  7a and 7b provided you information regarding our conversations with Navicent and 7c confirmed that you did not offer comments, suggestions or any other information which is the desired response from your role within our organization. The only change I might make, given your subsequent comments, would be to add the words "as expected" to item 7c.  I believe any CEO in this context would expect no comments being made unless there was a problem. Given the CEO, CFO and two SVP's are working on the Navicent matter, I believe it is expected that there will be few, if any, issues arising that affect the COO or daily operations.

In this context, your comments about someone looking at this email months down the road and concluding that you did not do your job because you did not offer guidance appears somewhat implausible. I suggest you reconsider your statement regarding the truthfulness and accuracy of item 7. I also suggest in the future if you have questions regarding communications that you ask questions and discuss matters before reaching conclusions. I believe this process to be a much more professional and productive way to handle communication.

Again, I welcome your comments on my email and look forward to discussing and resolving whatever issues you may have.

Sincerely,

Ronnie D. Rollins
President and CEO

**Mark Waldrop**

| | |
|---|---|
| **From:** | Mark Waldrop |
| **Sent:** | Friday, May 20, 2016 11:46 PM |
| **To:** | Ronnie Rollins (RRollins@chs-ga.org) |
| **Subject:** | Fw: Follow-up from today's call |

Since our goal is to stay on the same page, I hope these notes (please see below in blue font) regarding the follow-up/action items help to provide additional insight. Thanks!

-Mark

**From:** Ronnie Rollins
**Sent:** Thursday, May 12, 2016 5:59 PM
**To:** Mark Waldrop
**Subject:** Follow-up from today's call

Mark,

I had a phone message from Tracie Clark regarding the VEBA meetings and I returned her call after 4 pm today. She was very confused.

After speaking with her, I felt it best to provide you follow-up notes from our call today to help us "stay on the same page".

1. EHR
   a. You have not really been involved in LG pilot
   b. Diligence on LG CNS (who are they)
   c. Monday was the first time you had seen the product demonstrated
   d. You have a number of questions and will be following up with Diana
   e. LG is not your recommendation for a system-wide EHR solution at this time
   f. No system solution identified
   g. RR does not need to respond to Diana or her team

**Response:**
**1. EHR**
   a. I was aware, as were you and Lorraine, that Diana was conducting the LG pilot in two of our nursing centers. During one of our strategic planning meetings with Diana and Michelle, you asked Diana when we were going to be able to see the software. Diana asked that we wait to see the software until the pilot was complete. Why? Diana

1

*Rollins Ex7*

wanted to make certain that the software met her needs before recommending it to us. Diana gave me regular updates that the pilot was progressing well. A couple of weeks ago, you asked to see the software so I worked with Diana to schedule the meeting. Diana felt it was a good idea to see the software in a live Ethica environment and I agreed.

b.c.d.g. You asked if I was recommending LG and I indicated that I had follow-up questions for Diana after seeing the software in a live environment. I do want to review the LG CNS corporate structure. I have asked Diana to send me the diligence work that has been completed thus far for the pilot.

e.f. I am encouraged by LG CNS. I think that, strategically, an electronic health record (EHR) is something that will propel us into the future. You and I have discussed EHR in the past, but we were not aware of a good system platform. In addition, we have discussed on numerous occasions that we did not want to be too early of an adopter. Furthermore, we did not want to pay too much or purchase the wrong system that would not "talk" to hospitals, physicians, etc. LG CNS appears to have the platform we have been searching for. We also discussed finding the money for the additional expense of the software. I shared that LG CNS may also solve our need of an integrated software because they indicated that they now have hospice, home health and transitions of care as well. Further, we discussed that I would visit Scott and see the software in a smaller traditional SNF. You stated that you believe the expectation for an approval of a couple of million dollars based on a demonstration needs to first have a set of parameters. I expressed that I did not think Ethica leadership expected us to make a decision on Monday. Jill was opening it up for any questions after the live demonstration. I also expressed that I wanted to follow-up on the Therapute integration. As LG has progressed, it appears at this point that they may provide a system-wide solution.

2. VEBA Contracts
   a. Lack of understanding of my concern regarding the negotiation of multiple contracts with different expiration dates
   b. Varying opinions on payment of early termination fees ($55,000/yr.)
   c. Agreement on not executing contracts at present and watch a few more months and reconsider

Response:
2. VEBA Contracts
   a.b. **BAS (TPA)** is an annually renewable agreement with a three year price escalation limit of 3% per year. Termination with a 30-day notice prior to renewal. No penalty.

2

**Anthem (Network)** is an annually renewable agreement with a four year price escalation limit of 3% per year on network access fees. Termination with a 30-day notice. No penalty.

**Magellan (PBM)** is a three year agreement with a negotiated 90-day termination/out clause. Penalties of approximately $55,000 (based on approximately 5,500+ members) per year after year one should we terminate early.

**Rx Results (Formulary Management)** is a three year agreement with a 90-day termination/out clause. No penalty.

**Sun Life (Stop Loss)** is a one year term.

**Inetico (Pre-certification/Case Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty.

**Data Smart (Reporting/Care Management)** is an agreement that may be terminated at any time with a 90-day notice. No penalty. Paid for by Sun Life.

**Truveris (RFP Procurement Tool)** is a three year agreement with a 90-day termination/out clause. No penalty. Paid for by Magellan.

With all due respect, we did not discuss "varying opinions" on payment of early termination fees ($55,000/yr.). We may terminate any combination of the contracts listed above and still have access to our data through Data Smart, according to John Hearn, The Benefit Company. Vendor data (medical and pharmacy claims) is housed in Data Smart. As we have discussed over the last couple of years, our strategy is to move from a bundled single carrier solution to an unbundled approach. This allows us to improve transparency of claims and financial details. It also gives NextStep Care access to acute claims information more quickly, in an effort to intervene in care coordination for our associates. It further provides us additional flexibility to changing market conditions.

c. I concurred with your idea of not signing the agreements until we see more performance data and after you seek legal counsel to determine if we can legally delay.

3. Workday Contract
   a. Identified work projects over the next 6 – 18 months are all included in the current contract fees
   b. Should there be a reduction in cost? Paid in advance?
   c. RR noted Business Process (PBJ) meeting identified several weaknesses in current time and attendance system

   d. RR, MW and LT previously identified need for new time and attendance
      system within next 2 years (Imp 2016-2017)
   e. T&A not included in HCM/PAY strategy or FIN strategy with Workday
   f. RR to speak with LT regarding FIN and T&A
   g. RR to speak with Workday regarding T&A during contract discussions

**Response:**
**3. Workday Contract**
   b. With all due respect, we did not discuss if there should be a reduction in cost or if it
   should be paid in advance.

   c.d.e. You indicated you had the HCM stuff and the finance stuff. At the business process
   meeting, one of the things you noticed was that we needed a new time and attendance
   system. You said that neither Lorraine nor I raised the need for a time and attendance
   system, so it's not on the Workday list. You said that you thought it was a strategic issue
   for us. I indicated that I appreciated you raising the issue and that Lorraine and I had
   already shared with you, in a previous meeting, that we would need a time and attendance
   system in the future.

4. HHA and Hospice market information
   a. MW has information and did not provide because prior meeting was
      telephonic and not in person
   b. MW to send market information to RR by email

**Response:**
**4. HHA and Hospice Market Information**
   a. You cancelled our regular two week in-person communication meeting on Friday,
   where I was planning to bring the information for our review together.

   b. I emailed the information earlier this week, as requested.

   With all due respect, the statement, "MW has information and did not provide because
   prior meeting was telephonic and not in person" is not what I discussed during our call.

5. Academic Relations Grants
   a. RR informed Board looking to make change in investment managers
   b. Now is opportune time to discuss ARG strategy
   c. MW to speak with team and prioritize recommendations and provide to RR

**Response:**
**5. Academic Relations Grant**
   b.c. During the presentation several weeks ago, we reviewed the strategy to assist the
   LPN schools in the geographic areas where we have the greatest need for additional

nurses. An email was sent this week with academic donation ranking, as requested, from academic relations.

6. Brogdon homes
   a. RR met with owners of centers to discuss lease extensions
   b. Learned centers owned by Global REIT and introduction of discussion of Goodwill in Macon
   c. MW is unaware of what Diana is doing
   d. DW informed Mark she is working with RR
   e. RR informed that decision expected by Global by end of week – 50/50 chance deal will go

**Response:**
**6. Brogdon Homes**

c.d. Our conversation last Thursday was the first time you had mentioned anything to me regarding Global. Diana had shared with me that she was working on Global REIT with you at your request. She also informed me that Ken was running some numbers and that she had been on several conference calls with you. You said, I guess Diana is talking to you. She and Ken seem to be working, which is fine, are you supportive of what they are doing? I discussed with you that even while I was in Macon attending the Business Process Meeting which you attended as well, that you, Lorraine, Ken and Diana had already planned to tour the Macon center. However, you did not ask me to attend nor have you included me in any of the Global conversations. Further, you indicated that you assumed she had pulled me back in, but maybe she didn't need me and that was okay.

7. Navicent
   a. RR informed of recent meetings between CHS and Navicent
   b. RR and HH having meetings some of which included Diana and discussion of beds
   c. MW had no additional guidance on how to proceed

**Response:**
**7. Navicent**

c. You asked me to let you know if any issues had bubbled up regarding Navicent. I discussed Elbert's tour of our centers and that our staff felt the visits went well. We further discussed that some of the physical plants were older, but clean. You indicated that Elbert was not a decision maker, but rather a practical day-to-day guy. I said, "Okay, I'm just updating you on his visit, since you asked for updates on Navicent." You indicated that you had spoken with Elbert and he told you the visits went great and it was all positive. Elbert was impressed with what we do.

With all due respect, you did not ask for my guidance or input on how to proceed. You did ask that I make you aware if I heard anything and I assured you I would.

5

8. FSLA
   a. RR requested impact analysis for system (assumed HR had prepared) proposed rule on exempt status
   b. Blair Lake attending seminar on FSLA today
   c. MW to forward report on impact of proposed rule

**Response:**
8. **FSLA**
   c. FSLA email sent this week with estimated impacts to our organization.


Please let me know if you have any additions to the follow-up/action items from today's call.

Thanks.


Thank you for allowing me the opportunity to provide clarification from our call on Thursday, May 12th.  I believe the recent opportunity for increased communication on these important matters is a step in the right direction.

*Ronnie Rollins*
*President*

*Community Health Services of Georgia*
**P.O. Box 1037**
**Macon, GA 31202**

Mark Waldrop
9686 Bowen Trail
Ooltewah, TN  37363


July 1, 2016

Community Health Systems, Inc.
213 Third Street
Macon, Georgia 31201
Attention: Joseph A. Wall

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia 30308
Attention: Mark S. Lange


**VIA CERTIFIED MAIL**

In Re:   **Employment Agreement of Mark A Waldrop**
          **Amended and restated as of January 1, 2009**

Gentlemen:

I'm writing to follow up on our meeting in the offices of attorney Mark S. Lange on Tuesday, June 28, 2016.

During that meeting you advised me that my employment was immediately terminated, and requested that I not return to my office in Dalton, Georgia.  You also informed me that the Dalton, Georgia office was being closed.

As of this date I have not been provided information regarding the reason for my termination.

This letter is to advise you that I stand ready, willing and able to perform my services under and in accordance with my Employment Agreement.  Additionally, I am not aware of any reason which gives the right to the Company to terminate my employment for cause.  If you believe that there is such cause, then I request that you advise me of the same, and that I be given the opportunity to remedy the same in accordance with Paragraph 2.4 of my Employment Agreement.  I stand willing, able and ready to continue to provide services in accordance with my Employment Agreement, and to make all reasonable efforts to address and remedy any issues relating to my employment, including but not limited to the remedy as provided under Paragraph 2.4.

*Rollins*
*Ex. 8*

Mark Waldrop
July 1, 2016
Page 2


Since there is no cause for the termination of my employment, or if you believe there is cause and do not give me the opportunity to remedy the same in accordance with the terms of my Employment Agreement, then I will expect to be paid severance pay by the continuance of my annual salary of $1,045,665.17 for a period of one year in accordance with paragraph 2.5 (b) of my Employment Agreement.

In the event the Company does not meet its obligations to me under the Employment Agreement, I will also expect the Company to pay any attorney's fees, costs and expenses incurred by me in enforcing my rights under the Agreement and in responding to the Company's defaults under the Agreement.


Sincerely Yours,


Mark A. Waldrop

cc:     Mark S. Lange
        Holland and Knight
        1180 West Peachtree Street
        Suite 1800 Northwest
        Atlanta, GA  30309
        (via e-mail)

# Holland & Knight

1180 West Peachtree Street, Suite 1800  |  Atlanta, GA 30309  |  T 404 817 8500  |  F 404 881 0470
Holland & Knight LLP  |  www hklaw com

Joshua I Bosin
404 817 8558
joshua bosin@hklaw com

July 6, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mark A  Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

> *Re:   Community Health Systems, Inc. and Mark A. Waldrop*

Dear Mr  Waldrop·

The law firm of Holland & Knight LLP and the undersigned in particular represent Community Health Systems, Inc. ("CHSI") in connection with the above-referenced matter.

We are in receipt of your July 1, 2016 correspondence addressed to Joseph A. Wall, the Chair of CHSI's Board of Directors, and my law partner, Mark S. Lange, Esq.

Although CHSI terminated your employment effective immediately on June 28, 2016, the company would like to provide you with certain separation benefits in recognition of your many years of service to CHSI.  Accordingly, please find enclosed a Separation Agreement, General Release, Waiver & Confidentiality Agreement memorializing the terms of CHSI's separation offer to you as discussed during your recent meeting with Messrs. Wall and Lange.  I look forward to hearing from you upon your receipt and review of the same.

Should you have any additional questions in the interim, please contact me at your convenience.

Very truly yours,

**HOLLAND & KNIGHT** LLP

Joshua I. Bosin

Enclosure

cc:     Joseph A. Wall
        Mark S. Lange, Esq.

Anchorage | Atlanta | Austin | Bogotá | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville
Lakeland | London | Los Angeles | Mexico City | Miami | New York | Northern Virginia | Orlando | Portland | San Francisco | Stamford
Tallahassee | Tampa | Washington, D C | West Palm Beach

#47175963_v1

Rollins Ex. 9

**SEPARATION AGREEMENT, GENERAL RELEASE,
WAIVER & CONFIDENTIALITY AGREEMENT**

This **SEPARATION AGREEMENT, GENERAL RELEASE, WAIVER & CONFIDENTIALITY AGREEMENT** (this "**Agreement**") is entered into by and between **COMMUNITY HEALTH SYSTEMS, INC.**, a non-profit corporation duly organized under the laws of the State of Georgia ("**CHSI**"), on the one hand, and **MARK A. WALDROP**, a resident of the State of Tennessee ("**Employee**"), on the other.  CHSI and Employee may each be referred to herein individually as a "**Party**" or collectively as the "**Parties**."

In conjunction with this Agreement, the applicable policies and procedures of CHSI, and in exchange for the good and valuable consideration consisting of the mutual promises and covenants as set forth herein, the receipt, adequacy, and sufficiency of which is hereby acknowledged by both Parties, it is agreed as follows:

1.      **Termination of Relationship and Employment Agreement**.

      (a)      The Parties' relationship shall end effective as of the close of business on Tuesday, June 28, 2016 (the "**Separation Date**").

      (b)      This Agreement shall become effective on the Effective Date (as defined below).

      (c)      CHSI and Employee entered into that certain Employment Agreement of Mark A. Waldrop dated as of June 20, 2006 and as amended and restated as of January 1, 2009 (the "**Employment Agreement**").  Employee and CHSI agree that as of the Separation Date, the Employment Agreement automatically terminated and is of no further force and effect, and all rights of Employee under the Employment Agreement were terminated as of such Separation Date.

2.      **Payments and Benefits**.      In connection with Employee's separation from Employee's employment with CHSI:

      (a)      Employee acknowledges and agrees that, except as set forth in Section 2(b) below with respect to the payment of any amounts due and owing to Employee for accrued but unused paid time off, as of the Separation Date, Employee already will have received from CHSI the payment of all wages, compensation, and/or other benefits otherwise due and owing to Employee and earned through and including the Separation Date.  For the avoidance of doubt, CHSI and Employee agree that Employee may retain his full salary payment for the month of June 2016, which such payment was made to Employee on June 8, 2016.

      (b)      Employee and CHSI agree that as of the Separation Date, Employee only will have used twelve (12) of his thirty (30) day paid time off allotment for 2016.  Accordingly, CHSI agrees that not later than the Effective Date (as

defined below), CHSI will pay to employee through its regular payroll system the amount of Seventy-Two Thousand Three Hundred Ninety-Two and 20/100 Dollars ($72,392.20), less all applicable payroll-related tax and income tax withholdings, such sum representing the eighteen (18) days of accrued but unused paid time off due and owing to Employee.

(c)     If, and only if, Employee complies with this Agreement and the terms and conditions set forth herein, and if, and only if, Employee does not revoke this Agreement in the manner set forth in Section 5 hereof, CHSI agrees to pay Employee the amount of One Hundred Seventy-Four Thousand Two Hundred Seventy-Seven and 52/100 Dollars ($174,277.52), such sum representing two (2) months of Employee's current base salary equal (the "**Separation Payment**").   The Separation Payment shall be paid to Employee through CHSI's regular payroll system in five (5) equal and consecutive monthly installments of Thirty-Four Thousand Eight Hundred Fifty-Five and 50/100 Dollars ($34,855.50) each, less all applicable payroll-related tax and income tax withholdings, commencing in July 2016 and ending in November 2016 on the last day of each such month (starting with July 31, 2016) (the "**Separation Pay Period**").   Employee understands and agrees that during the Separation Pay Period, he will not be deemed an employee of CHSI for any reason whatsoever.

(d)     Employee's and Employee's dependents' health insurance coverage under CHSI's health insurance plan(s) ended on the Separation Date.  From and after the Separation Date, Employee and Employee's dependents' will be eligible for continuing health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) as required by applicable law at Employee's own expense.   CHSI shall provide to Employee information regarding the COBRA election under separate cover.

(e)     Employee shall not be entitled to receive any reimbursements for business expenses incurred in connection with Employee's employment with CHSI following the Separation Date, regardless of whether such reimbursement requests were submitted prior to the Separation Date.

3.     **No Admission**.  The Parties acknowledge and agree that this Agreement is not intended by either Party to be construed and will not be construed as an admission by them of any liability or violation of any federal, state, and/or local law, statute, ordinance, regulation, or legal or moral duty of any nature whatsoever.  The Parties have entered into this Agreement for the purpose of maintaining an amicable and cooperative relationship and also to settle any and all existing claims now or heretofore in existence between them.  The Parties agree that this Agreement shall not constitute or be asserted by any Party to this Agreement to constitute evidence of the existence or non-existence of or validity or invalidity of any right, claim, or obligation or any liability or wrongdoing, except as expressly provided for herein and then only

for purposes of the enforcement of (or defense against) claims made under or pursuant to the terms of this Agreement.

4. **General Release and Covenant Not to Sue**. In exchange for the mutual promises and covenants described herein, Employee, on behalf of himself, his representatives, agents, estate, heirs, executors, administrators, successors, and assigns, hereby unconditionally releases, acquits, discharges, and agrees to release CHSI, its Affiliates (as defined below), and its and their past, present, and/or future directors, administrators, officers, trustees, employees, agents, attorneys, insurers, representatives, and assigns (hereinafter collectively referred to as the "**Released Parties**"), or any one or more of them, from any and all charges, complaints, claims, liens, contracts, covenants, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, attorneys' fees, costs, losses, and/or debts of any kind or nature that arose or accrued on or prior to Employee's execution of this Agreement, including, but not limited to, any or all claims that may have arisen or begun to arise or accrue out of any federal, state, and/or local law, constitution, regulation, or common law theory, whether statutory in nature, in tort, contract, equity, or otherwise (each such action, claim, suit, right, liability, or demand being hereinafter individually referred to as a "**Claim**" and hereinafter collectively referred to as the "**Claims**") that Employee may now or hereafter have against the Released Parties, or any one or more of them, including, but not limited to, any and all Claim(s) in connection with: (a) Employee's employment relationship with CHSI; (b) the terms and conditions of Employee's employment relationship with CHSI, including, without limitation, those set forth in the Employment Agreement (and including, but not limited to, compensation and benefits); (c) Employee's service as an employee of CHSI; (d) the end of Employee's employment relationship with CHSI and the circumstances surrounding the end of such employment relationship; and/or (e) any one or more of the following Claim(s) sounding in or with specific regard to, without limitation: pay, commissions, sick pay, vacation pay, wages, incentives, or bonuses of any type or character; all claims based on any oral, written, or implied contract or breach of contract (including, without limitation, the Employment Agreement); breach of the duty of loyalty; breach of covenants; breach of the covenant of good faith and fair dealing; infliction of emotional distress; tortious interference with contractual relations; tortious interference with business relations; wrongful discharge; violation of public policy; libel; slander; defamation; invasion of privacy; misappropriation of trade secrets; misappropriation of property; conversion of property; unjust enrichment; negligence; assault; battery; negligent retention; negligent hiring; negligent supervision; promissory estoppel; retaliation; bad faith refusal to pay; or any other tort.

Without limiting the generality of the foregoing, Employee specifically releases, acquits, discharges, waives, and agrees to indemnify and hold the Released Parties, or any one or more of them, harmless from and against any and all Claim(s) arising under: (a) the Civil Rights Acts of 1866, 1871, 1964, and 1991; the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the ADA Amendments Act of 2008; the Lilly Ledbetter Fair Pay Act of 2009; the Genetic Information Nondiscrimination Act of 2008; the Older Workers Benefit Protection Act of 1990; the Family and Medical Leave Act of 1993; the Fair Labor Standards Act of 1938; the Age Discrimination in Employment Act of 1967; the Equal Pay Act of 1963; Executive Order Nos. 11246 and 11478; the Occupational Safety and Health Act of 1970; the Immigration Reform and Control Act of 1984; the Sarbanes-Oxley Act of 2002; the False Claims Act; the

National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; each such law as amended; and/or any other federal employment practices-related law; (b) the laws of the State of Georgia with regard to CHSI concerning fair employment practices (which acts and laws prohibit discrimination based upon race, religion, sex, national origin, color, age, disability, and, in some local jurisdictions, sexual orientation), including, but not limited to, the Georgia Sex Discrimination in Employment Act; the Georgia Equal Employment for Persons with Disabilities Code; the Georgia Age Discrimination Act; and/or the Georgia Security and Immigration Compliance Act; (c) the Employee Retirement Income Security Act of 1974 (other than such rights as are mandated or vested by law or by operation of any applicable ERISA-qualifying or other retirement-related plan under which Employee may have such rights); any right to health care continuation pursuant to any applicable plan documents, COBRA, or any similar state law; and/or all health care policy or plan conversion rights; and/or (d) any other federal, state, and/or local constitutions, laws, and/or regulations, and/or any common law theories of recovery.

Except as otherwise provided for in this Agreement or to the extent prohibited by applicable law, Employee agrees that Employee has not and will not file, promote, instigate, or participate in any complaint, charge, claim, action, proceeding, suit, or litigation in any court or before any federal, state, or local government agency or department with respect to any Claim(s) released by Employee herein. If Employee does file, promote, instigate, or participate in any complaint, charge, claim, action, proceeding, suit, or litigation in any court or before any federal, state, or local government agency or department with respect to any Claim(s) released by Employee herein, Employee covenants and agrees to hold the Released Parties, or any one or more of them, harmless from and to indemnify the Released Parties, or any one or more of them, from and against any damages, losses, costs, expenses, and/or attorneys' fees paid, suffered, sustained, incurred by, and/or asserted against any of the Released Parties, or any one or more of them, in addition to any judgments arising therefrom.

Except as otherwise prohibited by applicable law, Employee waives any right to become and promises not to become a member of any class in any proceeding in any court or before any federal, state, or local government agency or department in which claims are asserted against CHSI or its Affiliates that are related in any way to Employee's employment with CHSI or that relate to or are otherwise connected to matters or events that arose or accrued on or prior to Employee's execution of this Agreement. If, without Employee's prior knowledge and consent, Employee is made a member of a class in any such proceeding in any court or before any federal, state, or local government agency or department, Employee immediately shall opt-out of the class at the first opportunity afforded to Employee after Employee learns about Employee's inclusion in the class.

Employee understands, acknowledges, and agrees that nothing contained in this Section 4 or any other portion of this Agreement is intended to or shall interfere with Employee's rights under any federal, state, or local laws to file, institute, or otherwise initiate a complaint, charge, claim, action, proceeding, suit, or litigation with the Equal Employment Opportunity Commission (EEOC) or any other federal, state, or local government agency or department; to participate in any federal, state, or local government agency or department proceeding; or to provide truthful testimony if under compulsion of subpoena or otherwise cooperate in any

federal, state, or local government agency or department investigation. In addition, nothing contained in this Section 4 or any other portion of this Agreement is intended to or shall interfere with Employee's rights to report possible violations of any federal law or regulation to any governmental agency or entity, including, but not limited to, the Department of Justice, the Securities and Exchange Commission, the United States Congress, and any agency Inspector General, or to make other disclosures that are protected under the whistleblower provisions of any such federal law or regulation. Provided, however, that Employee hereby waives all of Employee's individual rights to any benefits and relief, including, but not limited to, monetary recovery and reinstatement, derived from any complaint, charge, claim, action, proceeding, suit, or litigation brought on Employee's behalf related in any way to Employee's employment with CHSI, including, but not limited to, any complaint, charge, claim, action, proceeding, suit, or litigation brought by the EEOC, any other federal, state, or local governmental agency or department, or any other person or third party.

Notwithstanding the foregoing, Employee hereby represents that, although Employee is not legally barred from doing so, Employee does not presently have on file and has not made or filed in any forum any complaint(s), charge(s), claim(s), action(s), proceeding(s), suit(s), or litigation (whether civil, administrative, criminal, or otherwise) against CHSI or the Released Parties, or any one or more of them, and Employee acknowledges that CHSI has relied on Employee's representation as to such in agreeing to perform its obligations and provide the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement.

Employee understands and agrees that the foregoing is not a complete list of Claim(s) released. Employee further understands and warrants that this Agreement shall operate as a fully binding and complete resolution of all Claim(s) by and between the Parties to this Agreement and all Parties represented by or claiming through such Parties and that Employee shall not be able to seek any monies for any Claim(s), whether known or unknown, against any of the persons or entities released hereunder, unless otherwise expressly provided for herein. Nothing contained in this Section 4 shall preclude either Party from asserting a claim for breach of this Agreement and/or a claim that may arise from events occurring after this Agreement is executed.

5. **<u>Revocation of Release</u>**. Employee agrees that Employee has been advised to consult with an attorney and/or other advisor of Employee's choosing concerning Employee's rights and obligations under this Agreement and that Employee has been advised to consider this Agreement fully before executing it. Employee further agrees that Employee has been offered twenty-one (21) days within which to review this Agreement. After Employee signs and delivers this Agreement, Employee has the right to revoke this Agreement within seven (7) days from the date on which Employee signs and delivers this Agreement. This Agreement shall not become effective until the expiration of that seven-day revocation period, and, therefore, the Parties agree that the effective date of this Agreement shall be the eighth (8th) day following such seven-day revocation period (the "**Effective Date**"). If Employee wants to revoke this Agreement, Employee must deliver a written revocation to: CHSI c/o Mark S. Lange, Esq., Holland & Knight LLP, Regions Plaza, Suite 1800, 1180 West Peachtree Street, Atlanta, Georgia 30309, within that seven-day period. If Employee does not revoke this Agreement, Employee will

receive the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement.

6.  **Confidentiality and Non-Disclosure of This Agreement**.

    (a)    Except as otherwise authorized by this Agreement, Employee hereby warrants and agrees that Employee has not and will not and that none of Employee's attorneys, agents, or representatives or anyone acting on Employee's behalf has or will, under any circumstances, whether directly or indirectly, disclose or cause to be disclosed to any person any of the terms and conditions of this Agreement, including, without limitation, the Separation Payment described in Section 2 of this Agreement to which Employee would not otherwise be entitled absent Employee's execution of this Agreement or any facts or other information relating to the negotiation and execution of this Agreement, all such information being deemed strictly confidential.

    (b)    Nothing contained in this Section 6 shall prohibit the disclosure of any term of this Agreement:

        (i)    To the extent necessary to comply with any law, rule, regulation, court or administrative order, and/or directive or to enforce or defend against claims arising in connection with this Agreement; provided, however, that if Employee receives a subpoena or other formal legal process seeking the disclosure of any information about this Agreement, Employee must give the Released Parties, or any one or more of them, sufficient advance notice in writing (as set forth in Section 15) prior to any such disclosure to allow the Released Parties, or any one or more of them, to take steps to object to and/or seek other protection from any such disclosure;

        (ii)    To a government agency or department in connection with any charge or investigation it is conducting or may conduct; or

        (iii)    To the extent necessary, to members of Employee's immediate family and Employee's attorneys, accountants, and tax advisors; provided, however, that Employee shall inform each such person about the confidentiality provisions of this Agreement and that such disclosure is made on the condition that such information be treated as strictly confidential.

7.  **Employee's Continuing Obligations to CHSI**.

    (a)    **Confidentiality of CHSI's Information**.  Employee recognizes that by virtue of Employee's employment with CHSI, Employee has been granted otherwise prohibited access to trade secrets and other confidential and proprietary information that is not known to

CHSI's competitors or within the industry generally, that has been developed by CHSI and its Affiliates over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to CHSI and its Affiliates. This information (in whatever form or medium) relating to CHSI and its Affiliates includes, but is not limited to, CHSI's and its Affiliates' trade secrets, including the information defined by the Georgia Trade Secrets Act, O.C.G.A. §§ 10-1-761 *et seq.*, or any other applicable trade secrets statute or act; information relating to CHSI's and its Affiliates' tax-exempt charitable healthcare activities and services, earnings, assets, liabilities, revenues, or any other financial data for any time periods; marketing and service strategies, programs, and procedures with respect to the provision of healthcare services and products; contract expiration dates; any and all types of patient or resident or customer data, including, without limitation, any information protected by HIPPA; information concerning the third party payor programs, including Medicaid, Medicare, managed care plans, and other private insurance company programs; business plans; marketing plans; computer programs and databases; research projects; new healthcare products and service developments; and any other information of CHSI and its Affiliates or any of their patients, residents, or customers that CHSI informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential (the "**Confidential and Proprietary Information**"). Confidential and Proprietary Information does not include information that is: (i) in the public domain (except as a result of a breach of this Agreement or Employee's obligations under statutory or common law); or (ii) obtained by Employee from a third party subsequent to the termination of Employee's employment with CHSI (except where the third party obtains the information in violation of a contractual obligation or a statutory or common law obligation). Employee agrees that: (a) Employee will never disclose, access, or use or permit others to access or use or attempt to disclose, access, or use or permit others to access or use, whether directly or indirectly, any of CHSI's Confidential or Proprietary Information or make use of any of CHSI's Confidential or Proprietary Information for Employee's own purposes or the purposes of another, except as required for the benefit of CHSI or as required by law; and (b) Employee will take all reasonable measures, in accordance with CHSI's policies, procedures, and instructions, to protect CHSI's Confidential and Proprietary Information from any accidental or unauthorized disclosure or use. To the extent that any of CHSI's information loses its status as a "trade secret" (as so designated and protected by state statutory or common law), such information will immediately fall within the foregoing definition of Confidential and Proprietary Information.

        (b)   **Non-Solicitation of Customers**.  For a period of twenty-four (24) months following the Separation Date (the "**Restricted Period**"), Employee shall not, directly or indirectly:  (i) for any Competing Business (as defined below) solicit or accept or attempt to solicit or accept business from any of CHSI's or its Affiliates' residents, patients, or customers or any of CHSI's and its Affiliates' specifically identified and/or prospective residents, patients, or customers with whom or which Employee had Material Contact (as defined below) on behalf of CHSI and its Affiliates in the twelve (12) months preceding the Separation Date; and/or (ii) cause any of CHSI's and its Affiliates' residents, patients, customers or any of CHSI and its Affiliates specifically identified and/or prospective residents, patients, or customers with whom or which Employee had Material Contact on behalf of CHSI and its Affiliates in the twelve (12) months preceding the Separation Date to terminate or otherwise diminish its or their business relationship with CHSI and its Affiliates.

(c)      **Non-Solicitation of CHSI's Personnel**.   During the Restricted Period, Employee shall not, directly or indirectly, solicit, induce, recruit, or otherwise encourage any of CHSI's or its Affiliates' employees, officers, directors, contractors, consultants, agents, or anyone else providing services to CHSI and its Affiliates that Employee had Material Contact with or that Employee obtained Confidential Information about in the twelve (12) months preceding the Separation Date to end or leave their employment, engagement, or business relationship with CHSI and its Affiliates for any reason, to cease doing business with CHSI and its Affiliates, or to engage in any Competing Business.

(d)      **Non-Competition with CHSI**.   During the Restricted Period, Employee shall not, directly or indirectly, whether in an individual or representative capacity (and whether or not for compensation) as an employee, agent, consultant, independent contractor, officer, or otherwise, render services in a like or similar capacity to that in which he was functioning prior to the Separation Date for or to any Person engaged in a Competing Business in the Restricted Territory (as such terms are defined in this Section 7).   Provided, however, that the provisions of this Section 7(d) shall not be construed to prohibit Employee from owning up to two percent (2%) of the issued shares of any company whose common stock is listed for trading on any national securities exchange or the NASDAQ National Market System.

It is acknowledged and agreed by the parties hereto that the non-competition provisions contained in this Section 7(d) have been narrowly tailored to prohibit Employee from working in competition with CHSI within the limited geographic area described herein and that they are reasonable and necessary to protect CHSI's legitimate business interests and goodwill and are not burdensome to Employee or merely punitive or arbitrary in nature and that Employee shall be able to earn a living while complying with such restrictive covenants.   Employee acknowledges that the foregoing definitions provide fair notice of the maximum reasonable scope of this Section 7(d).

(e)      **Certain Definitions**.   For purposes of this Agreement, the term "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.   As used in this definition of "Affiliate" the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by control or otherwise.   For purposes of this Agreement, the term "**Business**" shall mean:   (i) providing nursing home care, assisted living care, senior housing, home health care, adult day care, hospice care, medical transportation services of any type, rehabilitative therapy services, medical and pharmaceutical supplies, equipment and related supplies to such providers of healthcare services, disease management or case management services, in-patient or out-patient diagnostic medical services; (ii) providing acute care medical and/or emergency room services in an in-patient hospital facility (or portion of such facility) or in an out-patient surgery setting; (iii) the acquisition, establishment, financing, construction, leasing, management, or operation of licensed nursing facilities or assisted living facilities; (iv) the acquisition, development, operation and management of one or more captive insurance companies; and (v) the provision of other healthcare services being offered to the public by CHSI and its Affiliates as of the Separation Date.   For purposes of this Agreement, the term "**Competing Business**" shall mean any Person that engages in a business substantially the same

as the Business or any portion thereof, including, without limitation, United Health Services, Inc., a Georgia corporation and its Affiliates.  For purposes of this Agreement, the term "**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-5, 42 U.S.C. §§ 1320d-1329d-8, and the Regulations promulgated thereunder.  For purposes of this Agreement, "**Material Contact**" is defined as any contact between Employee and a person or entity that:  (a) Employee solicited directly for CHSI or its Affiliates; (b) Employee dealt with directly for CHSI's or its Affiliates' business purposes and maintained a business relationship; and/or (c) Employee obtained Confidential and Proprietary Information about as a result of Employee's employment with CHSI.  For purposes of this Agreement, the term "**Person**" means any individual, corporation, partnership, joint venture, limited liability company, trust, association, or other entity or organization.  For purposes of this Agreement the term "**Restricted Territory**" shall mean the State of Georgia.

(f)    **Reasonable Restrictions**.  Employee acknowledges and agrees that the time and geographic restrictions and other obligations placed on Employee by this Section 7 (the "**Restrictions**") are reasonable and necessary to protect and preserve the legitimate interests, properties, goodwill, and business of CHSI and its Affiliates.

(g)    **Court or Agency Order**.  If Employee receives a subpoena, court order, agency order, or any other form of compulsory process requesting any information related to CHSI and its Affiliates, including, but not limited to CHSI's Confidential and Proprietary Information, Employee will, to the extent permitted by law:  (i) provide to CHSI and its Affiliates reasonable and timely notice of the subpoena or order so that CHSI or its Affiliates, as applicable, may object, obtain a protective order, or seek other appropriate relief on behalf of CHSI or its Affiliates, as applicable, in a timely manner; (ii) provide reasonable cooperation and assistance, in conjunction with CHSI and at CHSI's expense, in any efforts to obtain relief from the subpoena or order; and/or (iii) take all appropriate steps, in conjunction with CHSI and at CHSI's expense, to limit the amount and scope of the information to be disclosed.  If Employee is called to testify in response to a subpoena, court order, agency order, or any other form of compulsory process concerning any of the matters referenced in this Subsection, nothing contained in this Agreement shall serve to limit the substance of Employee's testimony in any way.

(h)    **Scope of Restrictions**.  Employee carefully has read and considered the provisions of this Section 7, and, having done so, agrees that the Restrictions set forth in this Section 7 (including the time period and geographic scope of the Restrictions) are fair and reasonable and are reasonably required for the protection of the interests of CHSI and its Affiliates.  Without limiting other possible remedies available to CHSI, Employee agrees that immediate injunctive or any other equitable relief from a court of competent jurisdiction shall be available to enforce the covenants set forth in this Section 7, such relief to be available to CHSI without the necessity of posting a bond.  In the event that any part of the covenants set forth in this Section 7 shall be held to be invalid, overbroad, or unenforceable by a court of competent jurisdiction, the Parties hereto agree that such invalid, overbroad, or unenforceable provision(s) may be modified or severed from this Agreement without in any manner affecting the remaining

portions hereof (all of which shall remain in full force and effect).   In the event that any Restriction set forth in this Section 7 related to time period, geographic scope, or restricted activities shall be declared by a court of competent jurisdiction to exceed the maximum time period or activities such court deems reasonable and enforceable, said time period or restricted activities shall be deemed modified to the minimum extent necessary to make the temporal restrictions, geographic scope, or activities reasonable and enforceable.

(i)   **Common Law and Statutory Obligations Remain**.   This Agreement shall not supersede, replace, or diminish Employee's common law and statutory obligations to CHSI, as those obligations are in addition to the Restrictions (and other obligations) set forth in this Agreement.

(j)   **Tolling**.   The Restricted Period shall be tolled and extended for any period during which the enforcement of the Restrictions is being litigated or arbitrated, including any appeal or confirmation proceedings, provided that the outcome of such litigation or arbitration is initiated to enforce, in whole or in part, the Restrictions set forth in this Section 7.

8.   **Return of Materials**.   Employee agrees that not later than seven (7) days following the Separation Date, Employee will return all of CHSI's Confidential and Proprietary Information and any other documents, materials, and other things in Employee's possession, custody, or control relating to CHSI, or that have been or were in Employee's possession, custody, or control as of the Separation Date, regardless of the form thereof (including, but not limited to, all of CHSI's technology devices of any kind, programs, manuals, and equipment), without retaining any copies or replicas thereof.   To the extent that Employee has use and/or possession of any of CHSI's Confidential and Proprietary Information that is not capable of being physically returned to CHSI, Employee agrees to destroy and/or delete and such information as contained in its non-physical form and, upon request, execute an affidavit affirming the same, which such affidavit shall become a part of this Agreement and incorporated herein.

9.   **Employee Cooperation**.   Employee agrees that Employee will cooperate with and assist CHSI by providing information relevant to matters about which Employee gained knowledge while employed by CHSI and that, upon reasonable notice from CHSI, Employee will meet with CHSI's attorneys and other representatives, appear at hearings, depositions, trials, and other proceedings relating to any such matters. CHSI will reimburse Employee for all reasonable and necessary out-of-pocket expenses necessitated by Employee's cooperation as described in this Section 9.

10.   **Non-Disparagement**.   Employee agrees not to disclose any information, or make or publish any statement, or make to or solicit for the media or others, or say or do anything to or in relation to any of the Released Parties that is adverse or prejudicial to any of the Released Parties or that may be considered to be negative, harmful, false, disparaging, derogatory, defamatory, slanderous, or libelous as to any of the Released Parties.   Employee further agrees not to disclose any information, or make or publish any statement, or make to or solicit for the media or others, or say or do anything to or in relation to any of the Released Parties that may tend to harm or prejudice the reputation or good name or goodwill of any of the Released Parties.

11.     **Employee Reference Request**.     Confirmation of Employee's dates of employment, position(s) held by Employee, Employee's rate(s) of pay, and/or other administrative matters shall be provided by request through CHSI's Human Resources Department.

12.     **No Reemployment**.     In further consideration of the undertakings described herein, Employee agrees that following the Separation Date, Employee is not eligible for and will not apply for or otherwise seek employment, reemployment, or reinstatement with or otherwise provide services for CHSI or any of its Affiliates, including, but not limited to, engagement or retention on a freelance, independent contractor, consultant, or other contract basis.  In the event that Employee applies for any position or engagement with CHSI or any of its Affiliates, Employee acknowledges that CHSI nor any of its Affiliates has no obligation to rehire, reemploy, or reinstate Employee, and Employee agrees that any denial of Employee's application is not and will not be deemed retaliatory or form the basis for any retaliation claim against CHSI or any of its Affiliates.  Employee agrees that Employee may be denied employment or any other remunerative relationship with CHSI or any of its Affiliates without CHSI or any of its Affiliates incurring any liability whatsoever.  Employee acknowledges that the provisions of this Section are fair and just under the relevant facts and circumstances, and Employee acknowledges and agrees that Employee's forbearance from seeking future employment is purely contractual and is in no way involuntary, discriminatory, or retaliatory.

13.     **No Assignment of Claims and Warranty**.  Employee, on behalf of himself and his representatives, agents, estate, heirs, executors, administrators, successors, and assigns, hereby expressly warrants and represents that Employee is the owner of all Claim(s) released by Employee herein, that Employee has not assigned or transferred or purported to have assigned or transferred (whether expressly, impliedly, voluntarily, or by operation of law or otherwise) any of the Claim(s) released by Employee herein or any portion thereof.  Employee further agrees that Employee will hold harmless and indemnify CHSI and the Released Parties, or any one or more of them, from and against any and all Claim(s) so assigned or transferred.

14.     **Attorneys' Fees and Costs**.  In any dispute involving the interpretation or enforcement of this Agreement, whether by way of a legal proceeding or otherwise, the prevailing party shall be entitled to recover its/his reasonable attorneys' fees and costs (including such fees and costs of any enforcement or appeal proceedings), which fees may be set by a court in the trial or appeal of any such action or awarded in a separate action brought for that purpose and which fees shall be in addition to any other relief (whether at law or in equity).  For purposes of this Section 14, the prevailing party means the party obtaining substantially the relief sought, whether by compromise, settlement, or judgment.

15.     **Notice.**  Any notices required to be provided under this Agreement by Employee to CHSI and/or the Released Parties, or any one or more of them, shall be made to CHSI c/o Mark S. Lange, Esq., Holland & Knight LLP, Regions Plaza, Suite 1800, 1180 West Peachtree Street, Atlanta, Georgia 30309.

16.     **Governing Law**.  This Agreement will be construed, interpreted, and enforced, both as to substance and remedies, in accordance the laws of the State of Georgia.  Employee

irrevocably consents to the personal jurisdiction of the courts of the State of Georgia and to the personal jurisdiction of the United States District Court for the Middle District of Georgia for all purposes related to this Agreement. Further, Employee irrevocably consents to venue in the state and/or federal courts having jurisdiction over Macon-Bibb County, State of Georgia. Employee hereby waives any objections to jurisdiction and venue as set forth herein, including, but not limited to, any forum non conveniens objections.

17. **Waiver of Jury Trial**. The Parties hereby knowingly, voluntarily, and intentionally waive any right to a jury trial with respect to any claims arising in connection with the Parties' employment relationship and/or this Agreement.

18. **General Provisions**. This Agreement may be executed in any number of counterparts each of which, taken together, shall constitute one Agreement. If any provision of this Agreement should be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions will not be affected, and the illegal or invalid parts, terms, or provisions will be deemed not to be a part of this Agreement. The provisions of this Agreement may be amended, modified, or waived in a writing made to effectuate the same and only with the prior written consent of each Party hereto. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their successors, legal representatives, and assigns.

19. **Entire Agreement**. This Agreement constitutes the sole and entire agreement between Employee and CHSI and supersedes all other agreements, representations, promises, understandings, undertakings, and inducements, whether written or oral, made prior to or contemporaneously with the execution and delivery of this Agreement.

20. **Consultation with Legal Counsel**. Employee expressly acknowledges that before signing this Agreement, Employee was advised of Employee's right to consult with legal counsel and/or other advisors selected by Employee regarding the terms and conditions of this Agreement as well as the federal and state income tax consequences of this Agreement, that Employee knows and understands the contents of this Agreement, and that Employee enters into this Agreement of Employee's own free will without any inducement not described in this Agreement and not under duress or coercion of any nature.

21. **Tax Matters**. All amounts paid to Employee under this Agreement shall be net of amounts withheld for federal and state income taxes and applicable payroll-related taxes. Employee and CHSI agree that CHSI shall _not_ under any circumstances be responsible to Employee for any of the tax consequences of the Employee's receipt of payments under this Agreement, including, without limitation, as a result of the application of Section 409A of the Internal Revenue Code of 1986, as amended.

**IN WITNESS WHEREOF**, and intending to be legally bound, the parties hereto have executed the foregoing Separation Agreement, General Release, Waiver & Confidentiality Agreement as of the dates accompanying the Parties' respective signatures below.

**ACCEPTED AND AGREED:**

**MARK A. WALDROP**                        **COMMUNITY HEALTH SYSTEMS, INC.**, a Georgia nonprofit corporation

_____          _____

Date:_____          By: _____

                                          Its:_____

                                          Date:_____



# COMMUNITY
## HEALTH SERVICES *of Georgia*

August 16, 2016

**VIA ELECTRONIC MAIL:  waldropmc@centurytel.net**
**VIA FEDERAL EXPRESS**

Mr. Mark Waldrop
9686 Bowen Trail
Ooltewah, Tennessee  37363

> *Re:    Community Health Systems, Inc. and Mark A. Waldrop*
> *Termination of Employment with "Cause"*

Dear Mr. Waldrop:

As you are aware, Community Health Systems, Inc. ("CHSI") terminated your employment effective June 28, 2016.

At the time of your employment termination, the CHSI Board of Directors (the "Board") was in the preliminary phases of an investigation into certain acts undertaken and omissions made by you in violation of that certain January 1, 2009 amended and restated Employment Agreement of Mark A. Waldrop by and between you and CHSI (the "Employment Agreement") and CHSI's practices, policies, and procedures.  Based on the initial investigative results, under no circumstances could CHSI continue your employment; your conduct prior to June 28, 2016 was of such an egregious nature that the emergency removal of you from the organization was mandatory.

In an effort to minimize any embarrassment or further harm to you or the organization, the CHSI Board decided to offer to you a separation package in recognition of your years of service to CHSI as discussed during a meeting between you, Mark Lange, and me in the offices of Holland & Knight LLP on June 28, 2016.  Subsequently, that offer was extended to you in writing in a draft Separation Agreement, General Release, Waiver & Confidentiality Agreement sent to you by attorney Joshua I. Bosin, Esq. on July 6, 2016.

On July 26, 2016, rather than accept CHSI's separation package (or even inquire as to whether the terms thereof were negotiable), you filed a lawsuit against CHSI in federal court seeking in excess of one million dollars from the organization and alleging that CHSI breached its obligations to you pursuant to the Employment Agreement.  That was an unfortunate decision.

Rollins EX 10

Mark A. Waldrop
August 16, 2016
Page 2

I write now to confirm and provide the formal notice to you as required by Section 2.4 of the Employment Agreement that your employment with CHSI was, in fact, terminated immediately on June 28, 2016 with "Cause." Not only did you engage in acts and omissions amounting to gross negligence and willful misconduct that were and are detrimental to CHSI and its reputation, but you also failed to observe or perform material covenants, conditions, and provisions of the Employment Agreement and abide by CHSI's written policies and procedures, all of which such failures are incapable of remedy. By way of example only and without limitation:

1) You submitted hundreds of thousands of dollars in business expenses for reimbursement under your assistant's name rather than under your name so as to conceal from your direct supervisor the nature and magnitude of the unauthorized gifts, awards, consumables, travel, office supplies, cleaning supplies, and other questionable items for which you obtained reimbursement from CHSI.

2) You operated the DeBrock Poodles business owned by you and your wife out of CHSI's Dalton, Georgia office. Indeed, at least one online website for DeBrock Poodles lists the contact telephone number for that business as the telephone number for the mobile telephone for which you submitted requests for 100% expense reimbursement to CHSI for many years – and received 100% expense reimbursement for many years – and also provided to internal and external persons as your CHSI cell phone number.

3) You served on the faculty of Southern Adventist University teaching multiple courses and participating in campus-related activities, for which you received compensation, that never were disclosed to the CHSI Board in violation of the terms of your Employment Agreement.

4) After the flooding of CHSI's Dalton, Georgia office in 2014, you authorized renovations and refurbishments of the office space that cost in excess of one hundred thousand dollars more than the insurance proceeds received in connection with CHSI's property claim. In connection with that project, you also authorized the engagement of your then-assistant's father pursuant to an Independent Construction Superintendent Agreement when a general contractor already had been retained to oversee and complete the renovations and refurbishments. You did not provide to the Board any information regarding that transaction, one effect of which was to deprive the Board of an opportunity to address issues of independence, private inurement, or the possibility of an excess benefit transaction.

5) On numerous occasions, you failed to engage in and/or complete CHSI's project charter authorization process, resulting in the commencement of numerous projects and the engagement of third-parties to perform work on behalf of CHSI without the standard approval of the Chief Executive Officer and/or the Chief Financial Officer and the Board. CHSI is aware of several instances in which you provided false information to CHSI employees and third-parties regarding project charter authorization by CHSI's Chief Executive Officer and the Board as

Mark A. Waldrop
August 16, 2016
Page 3

required when, in fact, such authorization was never provided on behalf of the organization in any way.

Lastly, it is my understanding that our attorneys have communicated with your attorneys regarding the return of your personal effects from the Dalton office and CHSI's property still in your possession.  Please arrange for the exchange of those items as soon as possible as directed by counsel.

Should you have any additional questions in connection with these matters, please direct them to our attorneys.

Very truly yours,

Joseph A. Wall
Chairman of the Board

cc:     Joshua I. Bosin, Esq.
        Mark S. Lange, Esq.